UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith

       Plaintiff,

vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

       Defendants.

Case No.

**COMPLAINT**

Jury Trial Demanded
Under Fed. R. Civ. P. 38(b)

---

For his Complaint, Larry E. Smith as trustee for the heirs and next of kin of David Cornelius Smith states and alleges as follows:

1. Larry E. Smith ("Plaintiff") was appointed as the Trustee for the Next of Kin of David Cornelius Smith ("Smith") on February 11, 2011 by Hennepin County District Court Judge Thomas W. Wexler.

2. This is an action for money damages for the wrongful death of Smith resulting from a violation of his constitutional rights by on-duty Minneapolis police officers Timothy Gorman ("Gorman") and Timothy Callahan ("Callahan"). Gorman and Callahan violated Smith's well-settled federal civil rights while acting under color of state law.

3. Plaintiff also asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978) and *Canton v. Harris*, 489 U.S. 378 (1989).

4. Smith was, at all times material herein, a citizen of the United States and a resident of Minneapolis, Minnesota.

5. Upon information and belief, Defendants Gorman and Callahan were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting officers of the Minneapolis Police Department.

6. Defendant City of Minneapolis is a municipality duly incorporated under the laws of the State of Minnesota.

7. Smith brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth Amendment to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3). The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

### The Prone Restraint Maneuver

8. The term "prone position" refers to a person lying face down on the ground.

9. Some police officers utilize techniques referred to as "prone restraint maneuvers."

10. Generally, prone restraint maneuvers consist of one or more officers placing an arrestee face down on any surface, and the officer then physically applying pressure with his hands, knees or other body parts to the individual's shoulders, posterior torso (i.e, back), hips, and/or upper legs. The pressure applied prevents the individual from moving out of the prone position, so the officer can, for example, place the arrestee in handcuffs.

11. An example of officers executing a prone restraint maneuver is set forth in the image below:



12.     The use of prone restraint maneuvers poses well-established dangers.

13.     When the chest is forcefully compressed down while a person is held in a prone position, a person's ability to inhale oxygen is severely compromised because the compression of the ribs limits the person's ability to expand the chest cavity and breathe.

14.     The use of the prone restraint maneuver therefore creates the risk of subjecting an arrestee to mechanical asphyxiation.

15.     "Asphyxia" is generally a condition resulting from deficient or absent supply of oxygen to the body.

16.     "Mechanical asphyxia" describes a condition where asphyxiation is caused by pressure applied on the outside of the body.

17.     The heart, like all of the body's muscles, needs oxygen to function.

18.     If a person's asphyxiated state persists and the heart does not receive oxygen, a person will likely experience cardiac arrhythmia.

19.     "Cardiac arrhythmia" generally refers to a group of conditions where there is abnormal electrical activity in the heart (i.e., an uncoordinated pattern of heartbeats).

20.     The persistence of cardiac arrhythmia may lead to "asystolic arrest," which is a state where there is no cardiac electrical activity (i.e., the heart does not beat).

21. When an individual suffers from asystolic arrest, there is no blood flow to the brain.

22. The absence of blood flow to the brain creates a condition called "anoxic encephalopathy," which is generally damage to the brain due to a lack of oxygen.

23. Scholarly research suggests that complicating factors may increase the potential for harm stemming from use of prone restraint maneuvers, including: (1) mental illness; (2) neuromuscular disruption stemming from Taser usage; and (3) physical exertion.

24. Because of the well-established danger associated with use of prone restraint maneuvers, law enforcement officers are taught to avoid restraining arrestees in the prone position or to do so only for a very short period of time.

25. Federal Courts that have specifically addressed the issue have found that officers are not entitled to qualified immunity for improper use of prone restraint maneuvers, finding that both prongs of the *Saucier v. Katz* test are easily met. *See, e.g., Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008); *see also Champion v. Outlook Nashville, Inc. et al*, 380 F.3d 893 (6th Cir. 2004).

26. The Minneapolis Police Department has had a policy addressing this issue in place since May 29, 2002:

> When **ANY** restraint technique is used on a subject, the subject shall not be left in a prone position and shall be placed on their side as soon as they are secured. Once the subject is secured, an officer shall watch for any of the following signs:
> 
> - Significant change in behavior or level consciousness;
> - Shortness of breather or irregular breathing;
> - Seizures or convulsions;
> - Complaints of serious pain or injury; and/or

- Any other serious medical problem.

MPD Policy & Procedure Manual § 9-111.01 (emphasis in original).

27. Indeed, the risks associated with the use of the prone restraint position are so great and so well-understood that the Governor of Ohio issued an Executive Order in 2009 barring the use of that position for anything longer than a brief, transitional period of time (i.e., long enough to handcuff a suspect).

28. Recent scholarly studies reveal that in-custody, restraint/asphyxia related deaths are often improperly attributed to substance toxicity or excited delirium.[1]

29. The National Association of Medical Examiners ("NAME") has recognized that deaths resulting from the execution of a prone restraint maneuver should properly be characterized as "homicides":

> **Deaths due to positional restraint induced by law enforcement personnel or to choke holds or other measures to subdue** may be classified as **Homicide.** In such cases, there may not be intent to kill, but the death results from one or more intentional, volitional, potentially harmful acts directed at the decedent (without consent, of course). Further, there is some value to the homicide classification toward reducing the public perception that a "cover up" is being perpetrated by the death investigation agency.

National Association of Medical Examiners, *A Guide for Manner of Death Classification* (1st ed. 2002) (emphasis in original).

### Factual Background

30. Smith was, at all times material herein, a 28-year-old man, who suffered from schizoaffective disorder.

---

[1] "Excited delirium" is a general medical term referring to a state of extreme mental and motor excitement with confused and unconnected thoughts, and has been linked to mental illness and prolonged drug use, among other things.

5

31.     At approximately 3:30 p.m. on September 9, 2010, Smith was attempting to play basketball on the basketball courts located on the 6th floor of the downtown Minneapolis YMCA, where Smith was member.

32.     Upon information and belief, Smith was suffering from the effects of his schizoaffective disorder at that time.

33.     A juvenile member of the YMCA went up to the 6th floor, and observed Smith without any shoes on, "throwing the ball everywhere and just hitting the backboard really hard and stuff."

34.     Smith eventually walked over to the juvenile and began speaking to him in such a manner that the juvenile became frightened.

35.     The juvenile left the basketball playing area soon thereafter, and informed YMCA employees Natalie Harris ("Harris") and Arion Jackson that Smith's behavior was making him uncomfortable.

36.     Harris then made contact with YMCA employee Courtney Campbell ("Campbell"), and informed her about the situation.

37.     Campbell, and a man identified as "Chad," went to the 6th floor to assess the situation.

38.     Once on the 6th floor, Campbell approached Smith, who she described as stumbling or "teeter-totter[ing]" about.

39.     Campbell attempted to speak with Smith, but she said that Smith basically just mumbled in response, managing to mumble only his name at one point.

40.     Campbell determined that she was not equipped to handle the situation, so

she left the 6th floor to call the police.

41. The MPD Incident Detail Report reflects that Campbell called the MPD 911 dispatch at 3:47 p.m.

42. The Incident Detail Report further reflects that MPD officers Gorman and Callahan were dispatched to the scene at 3:49 p.m. and that the defendant-officers arrived on the scene at approximately 4:00 p.m.

43. Campbell escorted the defendant-officers to the 6th floor after they arrived on the scene.

44. Campbell stated that Smith panicked immediately upon seeing the officers, and that he attempted to run from them.

45. Callahan was wearing a video camera on his uniform, which captured pertinent portions of the following events.

46. The video reflects the following time period: September 9, 2010 from 5:02:51 – 5:28:38.

47. Upon information and belief, the time-zone setting on the camera was improperly set, and the events captured on Callahan's video actually occurred from 4:02:51 until 4:28:38, or thereabout.[2]

48. After initially attempting to evade the defendant-officers, Smith continued to resist their efforts to arrest him.

49. The captured video evidence shows portions of the struggle that occurred

---

[2] In order to avoid confusion in relation to the other time-marking evidence in this case, the events related to the video will be referred to as occurring in the fourth rather than fifth hour.

7

from approximately 4:02:51 until 4:04:09 (i.e., one-minute-and-eighteen seconds).

50. At the time the video commences, Callahan and Gorman appear to both be on top of Smith attempting to secure him.

51. Smith breaks free and tries to run away from Callahan and Gorman, so Callahan effectively deployed his Taser device at 4:03:14, causing Smith to fall to the ground.

52. Smith then rose to his feet again approximately ten seconds later.

53. Smith then struck Callahan in the face.

54. Callahan again effectively deployed his Taser at 4:03:30, and Gorman threw Smith to the ground.

55. Gorman and Callahan then moved Smith into a prone position in order to place him in handcuffs.

56. Callahan deployed his Taser two more times in the course of attempting to handcuff Smith.

57. The defendant-officers completed their handcuffing of Smith at 4:04:10, at which time Smith was face-down in prone position with his hands handcuffed behind his back.

58. At this point, Gorman and Callahan had knowledge that Smith was subject to all the complicating factors listed in Paragraph 23 above.

59. At the time the handcuffing was complete, Callahan was sitting on Smith's thighs preventing him from moving.

60. At the same time, Gorman had his right knee placed on Smith's upper-back between Smith's scapulae, driving the weight of his body down onto Smith; thus,

compressing Smith's torso in such a manner that Smith could not obtain oxygen: to wit; a prone restraint maneuver.

61. Witness Martin Stachnik ("Stachnik") observed that Smith ceased fighting with the officers once he was placed in handcuffs.

62. At 4:04:26, Gorman then also placed his left knee on Smith's back; thus, Gorman was kneeling on Smith's back with both knees.

63. Gorman then began to forcefully rub his knees into and bounce up and down on Smith's back thereby compressing Smith's torso even more intensely into the ground and further preventing Smith from obtaining oxygen.

64. Despite the fact that Smith was handcuffed in the prone restraint position, Gorman began striking Smith in the head at 4:04:42.

65. Per the videotaped evidence, Callahan called for an ambulance at 4:04:52.

66. The last audible sounds that can be heard from Smith appear to be the sound of air escaping from his lungs at approximately 4:05:54.

67. Also beginning at or around 4:05:54, Gorman attempts to question Smith but Smith does not respond.

68. While continuing to question Smith, Gorman continued to apply pressure to Smith's upper back with one or more of his knees.

69. At some point after attempting to question Smith, Gorman removed his right knee from Smith's back but continued to apply pressure to Smith's upper back with his left knee.

70. The officers continued to try and question Smith, but Smith continued to be

unresponsive.

71. Gorman continued to restrain Smith in prone position while exerting pressure on Smith's upper-torso with his left knee until at least 4:08:00.

72. Upon information and belief, at no point did Callahan ever intervene and instruct Gorman to cease applying pressure to Smith's back through the prone restraint maneuver.

73. At 4:09:42, rather than checking Smith's breathing or pulse, Callahan berated Smith, stating "Mother fucker, you better not have broke my fucking jaw. . ."

74. The video evidence plainly demonstrates at 4:09:42 that Smith's eye is no longer blinking.

75. Finally, at 4:10:09, Callahan instructs the ambulance to be stepped up to a "Code 3" (i.e., an emergency response is needed).

76. As Smith remained unresponsive, Callahan checks his pulse for the first time at 4:10:42 and found none, and finally recognizes shortly thereafter that Smith was no longer breathing.

77. Callahan finally rolled Smith onto his side at 4:11:06; thus, Smith was kept on his stomach for almost seven minutes after he was secured.

78. Callahan started CPR at 04:11:35, more than seven minutes after the defendant-officers executed the prone restraint maneuver.

79. The paramedics ultimately arrived on the scene and continued resuscitation techniques.

80. Smith's heart was eventually restarted, and he was rushed to the Hennepin

County Medical Center (HCMC), where he was placed on life support.

81. At HCMC, Smith suffered and was treated for the known injuries resulting from the improper use of the prone restraint maneuver (i.e., mechanical asphyxia, asystolic cardiac arrest and anoxic encephalopathy).

82. Smith never regained consciousness while at HCMC.

83. Smith was ultimately taken off of life support and died at HCMC on September 17, 2010, as a result of the injuries he sustained at the hands of Gorman and Callahan on September 10, 2011.

84. Despite clear videotaped evidence of the Defendant-officers' improper use of the prone restraint maneuver, in a manner that plainly contravenes MPD policy, MPD Chief Timothy Dolan stated that: "Based upon our initial review it appears that the officers followed proper protocol and policies. . ."

85. The MPD treated this incident as a "critical incident," meaning that officers Callahan and Gorman were not required to immediately report or otherwise speak about their version of events.

86. Callahan and Gorman did not give statements regarding their version of events until September 15, 2010 (i.e., five days after the incident).

87. Callahan and Gorman did not give their statement until after they had retained legal counsel, and presumably had an opportunity to review all evidence available to the MPD, including the videotaped evidence.

88. Callahan's and Gorman's statements were taken by Sergeants Klund and Fors.

89. The interviews conducted by Klund and Fors amounted to no more than a

sham investigation.

90. Klund and Fors asked no pointed or direct questions regarding the execution of the prone restraint maneuver.

91. The only statement made by Callahan related to the prone restraint maneuver was that "SMITH was laying on his stomach and [he] was sitting on his upper thighs/back of his knees area."

92. The only statement made by Gorman related to the prone restraint maneuver was that he "maintained [his] left knee in contact with SMITH's right shoulder."

93. The videotaped evidence plainly demonstrates that Gorman used his right knee and **both knees** at various points throughout his execution of the prone restraint maneuver; however, neither Klund nor Fors questioned Gorman regarding his false statement.

94. Instead, Klund and Fors were content not to make any legitimate inquiry into the unlawful and deadly technique executed by the defendant-officers.

95. Any legitimate inquiry would necessarily include basic questions, such as: (1) whether Smith offered any continued resistance after being placed in prone restraint; (2) the length of the prone restraint maneuver; (3) the length of application of pressure to Smith's back; (4) the amount of pressure applied to Smith's back; (5) the length of restraint of Smith's legs; (6) whether any complicating factors making the prone restraint maneuver more dangerous were present; (7) why Smith was not turned to his side per MPD policy; and (8) what attempts were made (and when) to ascertain whether Smith was breathing while in the prone restraint maneuver.

96. Any legitimate inquiry would also include questioning specific to the evidence on the videotape.

97. The Hennepin County Medical Examiner (the "Medical Examiner") classified the manner of Smith's death as a "homicide."

98. The Medical Examiner concluded that the immediate cause of death was anoxic encephalopathy resulting from cardiopulmonary arrest, which was in turn caused by mechanical asphyxia.

99. The Medical Examiner further provided in its report: "How Injury Occurred: Cardiopulmonary arrest while being restrained by another person(s)."

100. The Medical Examiner found that other significant conditions included: "Prone restraint position; Mixed chlorpheniramine and dextromethorphan intoxication;[3] Schizoaffective disorder; Recent conducted energy device use; [and] Physical exertion during struggle."

101. Upon information and belief, the City of Minneapolis never disciplined (or even further interviewed) Gorman or Callahan despite the Medical Examiner's finding that Smith's death resulted from the defendant-officers' use of the prone restraint maneuver.

102. Gorman's and Callahan's conduct, including that captured on videotape, was done willfully, callously, and with either reckless indifference or actual malice to the life, rights, and safety of Smith and has no place in a civilized society.

103. Plaintiff demands a jury trial to all issues of fact herein.

---

[3] These are drugs found in over-the-counter cough and cold mediations.

## COUNT I

42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATIONS
*Plaintiff v. Gorman and Callahan*

104.  Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

105.  By the actions described above, Gorman and Callahan, under color of state law, violated and deprived Smith of his clearly established and well-settled civil rights to be free from unreasonable searches and seizures and the use of excessive, unreasonable, and deadly force in violation of the Fourth Amendment.

106.  Smith died as a direct and proximate result of Gorman's and Callahan's acts and omissions, and Plaintiff was thereby damaged in an amount as yet to be determined.

107.  Gorman and Callahan subjected Smith to these deprivations of his rights in such a manner so as to render Gorman and Callahan liable for punitive damages.

108.  Punitive damages are available against Defendants Gorman and Callahan and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. Ann. § 549.20.

109.  Plaintiff is entitled to punitive damages in an amount exceeding Ten Million ($10,000,000) Dollars.

110.  Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT II

### FAILURE TO TRAIN UNDER CANTON V. HARRIS
*Plaintiff v. City of Minneapolis*

111.  Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

112.  Before September 9, 2010, the City of Minneapolis with deliberate indifference to the rights of citizens failed to properly train MPD officers or failed to require adherence to appropriate policies to avoid the improper use of prone restraint maneuvers when arresting citizens.

113.  Through Chief Dolan's ratification and approval of the defendant-officers' actions (captured on videotape for all officers to see), and by failing to discipline the defendant-officers, there has been an approval of a deficient policy, custom, or practice of using the prone restraint maneuver without sanction or consequence.

114.  Smith's wrongful death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by the City's failure to train, and the City of Minneapolis is thereby liable in an amount as yet to be determined.

115.  Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## COUNT III

### CIVIL RIGHTS VIOLATIONS - MONELL V. DEP'T OF SOCIAL SERVICES
*Plaintiff v. City of Minneapolis*

116.  Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

117.    Before September 9, 2010, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its officers, including the defendants herein, of improperly using prone restraint maneuvers.

118.    Through Chief Dolan's ratification and approval of the defendant-officers' actions (captured on videotape for all officers to see), and by failing to discipline the defendant-officers, there has been an approval of a deficient policy, custom, or practice of using the prone restraint maneuver without sanction or consequence.

119.    Smith's wrongful death and the violation of his civil rights was directly and proximately caused by the aforementioned acts and omissions and by the City's customs, patterns, and/or practices, and the City of Minneapolis is thereby liable in an amount as yet to be determined.

120.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### Prayer for Relief

WHEREFORE, Plaintiff Larry E. Smith as trustee for the heirs and next of kin of David Cornelius Smith prays for judgment against Defendants as follows:

1.    As to Count I, a money judgment against Defendants Gorman and Callahan for compensatory damages in an amount to be determined and punitive damages in an amount in excess of Ten Million ($10,000,000) Dollars together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

2.    As to Counts II & III, a money judgment against the City of Minneapolis for

compensatory damages in an amount to be determined together with costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest;

3. For an Order requiring the imposition of appropriate discipline for Gorman and Callahan; and

4. For such other and further relief as this Court deems just and equitable.

GASKINS BENNETT BIRRELL SCHUPP LLP

Dated: 10/17/11

Robert Bennett, #6713
Andrew J. Noel, #322118
Jeffrey S. Storms, #387420
333 South Seventh Street, #2900
Minneapolis, MN  55402
Telephone: 612-333-9500
*Attorneys for Plaintiff*