# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

Case No. 11-CV-03071 (SRN/JJK)

               Plaintiff,

vs.

**PLACEHOLDER FOR
EXHIBIT 1 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

               Defendants.

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

       Exhibit 1 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

___ Voluminous Document* (Document number of order granting leave to file conventionally: ___ )

___ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

___ Physical Object (description):

___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal* Pursuant to Protective Order, Document #10.

___ Conformance with the Judicial Conference Privacy Policy (General Order 53)
       (Document number of redacted version: ___)

___ Other (description):

* Filing of these items requires Judicial Approval.

       This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 2

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MINNESOTA
 2

 3     LARRY E. SMITH as trustee      )
       for the Heirs and Next of Kin)
 4     of DAVID CORNELIUS SMITH,      )
                                      )
 5                      Plaintiff,    )
                                      )
 6             VS.                    ) No. 11-CV-03071
                                      )
 7     TIMOTHY GORMAN and TIMOTHY     )
       CALLAHAN, acting in their      )
 8     individual capacities as       )
       Minneapolis police officers,  )
 9     and the City of Minneapolis,  )
                                      )
10                      Defendants.  )

11

12              The deposition of DIANE SMITH, called for

13     examination pursuant to the provisions of the

14     Federal Rules of Civil Procedure of the United

15     States District Courts as they apply to the taking

16     of depositions, taken before Paula A. Morsch, C.S.R.

17     License No. 84-002965, a Certified Shorthand

18     Reporter in the State of Illinois, on the 29th day

19     of August, 2012, at the hour of 10:00 a.m., at 500

20     Hamilton Boulevard, in the City of Peoria, County of

21     Peoria, State of Illinois.

22

23
```

COPY

2

```
 1    PRESENT:

 2              GASKINS, BENNETT, BIRRELL, SCHUPP,
              LLP
 3              BY:  Robert Bennett, Esq.
              and Jeffrey S. Storms, Esq.
 4              333 South Seventh Street, St. 2900
              Minneapolis, MN  55402
 5              612.333.9500
              for Plaintiffs Larry E. Smith, as
 6              trustee for the Heirs and Next of Kin
              of David Cornelius Smith;

 7
              MR. BURT T. OSBORNE, ESQ.
 8              and MS. TRACEY FUSSY, ESQ.
              Assistant City Attorneys
 9              City Hall, 350 South Fifth St., Rm 210
              Minneapolis, MN  55415
10              612.673.3847
              for Defendants Timothy Gorman,
11              Timothy Callahan, and City of
              Minneapolis.

12

13    ALSO PRESENT:  Leroy Smith

14

15    _____

16                    I N D E X

17    WITNESS                          PAGE

18    DIANE SMITH
          Direct By Ms. Fussy ............    3
19

20

21

22

23
```

3

1
2          DIANE SMITH
3      called by the Defendant,
4      being first duly sworn,
5      was examined and testified
6      as follows:
7
8          DIRECT EXAMINATION
9   BY MS. FUSSY:
10      Q   Ms. Smith, can you state and spell your
11  full name for the record, please?
12      A   Diane Smith, D-I-A-N-E, S-M-I-T-H.
13      Q   Okay. Ms. Smith, my name is Tracey Fussy
14  and I represent the City of Minneapolis and the
15  defendant officers in the lawsuit for which your
16  brother, Larry, has brought against the city. Have
17  you ever had your deposition taken before? And by
18  that I mean, you know, formal testimony sworn with a
19  court reporter present?
20      A   No, ma'am.
21      Q   So the point of this is to get a clean
22  record and so we need you to -- she's taking
23  everything down and that's called the record. So I

4

1   need you to, if you don't understand a question,
2   please let me know. I'll rephrase it. Otherwise
3   I'm going to assume that you understood my question.
4   I need you to make verbal responses and not head
5   nodding or shaking.
6       A   Uh-huh.
7       Q   And I need you to refrain from saying
8   uh-huh and huh-uh because that's difficult for us
9   later to discern what you meant. Finally, I will do
10  my very best not to speak over you and if you can do
11  the same courtesy, I'd appreciate it just to make a
12  clean record, okay?
13      A   Yes.
14      Q   Okay. This question is not designed to
15  embarrass or make you uncomfortable or anything but
16  as we sit here today, are you under the influence of
17  anything, any chemicals, drugs, or prescription
18  medications, anything or otherwise that might affect
19  your ability to recall or testify about the events
20  that bring us here today?
21      A   No.
22      Q   Did you review any documents in
23  preparation for your testimony today?

5

1       A   No.
2       Q   Did you talk with anyone other than your
3   attorneys, I don't want to know anything about that,
4   about your deposition today?
5       A   I mentioned it to my brother and my other
6   brother, Larry, and my sister.
7       Q   Who's your sister?
8       A   Lilly Smith. I just mentioned I had to
9   come here today.
10      Q   Okay. Ms. Smith, where do you currently
11  live?
12      A   2617 West Starr Street, Peoria, Illinois,
13  61605.
14      Q   How long have you lived there?
15      A   I think it will be a year and a half
16  maybe. I think I moved in February of last year.
17      Q   Who lives there with you?
18      A   My son, Adam, was here but now he's in Job
19  Corps. My son, Louis, and my son, Desmond.
20      Q   Anybody else?
21      A   No.
22      Q   Okay. Where did you live prior to this
23  address?

6

1       A   On Howett Street. I don't remember the
2   address.
3       Q   I'm sorry. I didn't hear what you said.
4       A   Howett Street.
5       Q   Can you spell that?
6       A   H-O-W-E-T-T.
7       Q   Oh, okay. And how long did you live
8   there?
9       A   For about six months. It was just a
10  transition state.
11      Q   Who did you live there with?
12      A   I lived with the same people.
13      Q   Okay. And then prior to that, where did
14  you live?
15      A   Excuse me?
16      Q   Prior to the Howett.
17      A   1805 South Stanley Street. I was there
18  for like ten years.
19      Q   Okay. Who did you live there with?
20      A   I lived there with Desmond, Tiffany, Adam,
21  Louis, Derrick, and myself, and David was not in
22  Peoria when we moved on Stanley Street.
23      Q   Okay.

7

1    MR. BENNETT:  Was Angie?
2    A    Neither was Angela.  I'm sorry.
3    Q    What is your date of birth?
4    A    ███████
5    Q    Okay.  And are you currently employed?
6    A    No.
7    Q    When was the last time that you were
8    employed?
9    A    That I was employed?
10    Q    Yeah.
11    A    About seven months ago I worked for
12    Lutheran Social Service.
13    Q    Okay.  And what did you do for them?
14    A    Home care for the elderly.
15    Q    What kind of job duties did that entail?
16    A    My duties was if they needed to go to the
17    stores or anything like that, most of the time their
18    relatives usually had to take them around, but I'd
19    go in, take care of them, keep them company, fix
20    meals, just home care, do things around the house
21    for them.
22    Q    How long did you do that for?
23    A    It would have been nine years.

8

1    Q    Nine years, okay.
2    A    Yeah.
3    Q    And then how is it that you're no longer
4    employed with them?
5    A    After all the stress that I was under, I
6    don't know, they wanted me -- and I'm not familiar
7    with computers and so they wanted me to come and get
8    a map quiz or something.
9    Q    Oh, and just so you know, while you're
10    under oath and we're deposing, you can't really ask
11    your attorneys any questions.
12    MR. BENNETT:  She didn't.
13    A    I wasn't asking him.
14    Q    No, I know.  You were looking over at him
15    for advice.  They can't provide you any advice.
16    A    No, because he wouldn't know anything
17    about that.
18    Q    Right, right, okay.  So continue.  They
19    wanted you to get a map?
20    A    See, I don't even know the terminology of
21    it.  Anyway, I found one place and I couldn't find
22    the other place, and I called the client to tell the
23    client that I couldn't find her house and I was

9

1    going to call back to work.  So I called back to
2    work and it was like 100 some degrees and I'm
3    already stressed, and so I was telling him I can't
4    find it and so she got upset and said, well, you
5    come back to the job and I'll print this out for you
6    and get it.  I said I don't know how to read that.
7    MR. BENNETT:  Are you talking about
8    Mapquest?
9    A    Maybe that's what it is, something to show
10    you how to get around in town.
11    Q    Yeah.
12    A    And I was like, I'm not familiar with
13    those things and so she was like, either you come
14    back to your job or you're going to be fired, and I
15    didn't go back to work.
16    Q    Okay.  Why didn't you go back?
17    A    I couldn't find the place.
18    Q    Oh, you couldn't find how to get back to
19    your work?
20    A    No, I couldn't find the place and I
21    couldn't read the Mapquest.  There was no reason for
22    me to get a Mapquest that I couldn't read because
23    she had it in my face.

10

1    Q    Okay.  And you worked -- I'm sorry.  Can
2    you tell me again, how long did you work there?
3    Nine years, is it?
4    A    Almost nine years.
5    Q    And prior to that, where did you work?
6    A    I don't recall.
7    Q    What high school did you -- did you attend
8    high school?
9    A    Yeah, I went to Central High School.
10    Q    Did you graduate?
11    A    No, I did not graduate.
12    Q    Did you get a GED?
13    A    No, I did not.
14    Q    What was the highest level of a grade that
15    you completed?
16    A    Tenth.
17    Q    Why did you not complete high school?
18    A    I had a baby.
19    Q    Okay.  Would that have been Angela?
20    A    Yes.
21    Q    Okay.  And then did you stay home with
22    Angela?
23    A    I stayed home with Angela, and then after

11

1  she got a certain age I got a baby-sitter and I got
2  a job at Burger King on Knoxville.
3      Q   Okay.  Did your mother live with you?
4      A   Did I live with my mom?
5      Q   During the course of your children's
6  lives, did your mother live with you?
7      A   No.
8      Q   Okay.  Sometimes grandmothers live with --
9      A   Right after I had Angela I lived with my
10  mother.  She didn't live with me.
11      Q   But later she didn't come live with you
12  guys at any point?
13      A   Never.
14      Q   Okay.  Ms. Smith, are you married?
15      A   No.
16      Q   Have you ever been married?
17      A   No.
18      Q   Okay.  Why don't we go through for the
19  record the names of all of your children.
20      A   My oldest is Angela Lynette Smith.  My
21  second eldest which was and still is my eldest son,
22  David Cornelius Smith.  My next eldest is Louis
23  Terrance Brown.  The next one is Derrick Jerome

13

1      Q   Nine grandchildren.
2      A   Uh-huh.
3      Q   How old and what are the age ranges of
4  them?
5      A   I can't tell you all that.  I can tell you
6  their names and that's about it.
7      Q   Okay.  What are their names?
8      A   I have Tavyeair, Sha-Sha, Deshawn,
9  Dariana, Braden, and I'll call him Derrick for
10  today.  Louis got Riley.  I already said Deshawn.
11  Louis got Riley, Deshawn, and Malachi.
12          MR. BENNETT:  It's eight or nine.
13  Close enough for government work.
14      Q   Ouch.
15      A   Yeah.
16      Q   Ms. Smith, have you ever been treated or
17  counseled for any emotional or mental health issues?
18          MR. BENNETT:  Objection, relevance,
19  beyond the scope of Rule 26, but you can go ahead
20  and answer.
21      A   Okay.  After my son was murdered, and I
22  say that word because that's what happened to him, I
23  went in the hospital for overnight but they said it

12

1  Brown.  The next one is --
2      Q   I'm sorry, she's got to take this all
3  down.
4      A   I'm sorry, ma'am.  How many was that?
5          MR. BENNETT:  You were on a roll.  I
6  wasn't going to stop you.
7      A   We've got Adam, Louis.
8          MR. BENNETT:  I don't think you said
9  Adam yet.
10      A   No, I haven't said Adam.
11          MR. BENNETT:  And Tiffany.
12      A   Tiffany is after Derrick, Tiffany Chantera
13  Monique Brown, Adam Larry Earl Smith, Desmond
14  Harrell Redden, Jr., and Louis Terrance Brown.
15          MR. STORMS:  You got Louis.
16      A   Oh, okay.
17          MR. BENNETT:  You double counted.
18      A   There's seven of them.  That should be all
19  of them.
20      Q   Do you have any grandchildren?
21      A   Yes, I do.
22      Q   And how many?
23      A   I have nine.

14

1  was just -- what do you call it -- I guess what you
2  go through when you're grieving.  It was a grieving
3  process.  They let me go the next morning.
4      Q   Okay.
5      A   No medications, no anything.
6      Q   How many days or weeks or months after his
7  death did you go to the hospital?  Was it that
8  night?
9      A   I don't recall.
10      Q   Was it shortly after he died?
11      A   I don't recall.
12      Q   So you went for one night?
13      A   Yes.
14      Q   And what symptoms -- did you voluntarily
15  go to the hospital?
16      A   Yeah, I called.
17      Q   What symptoms, what were you feeling?
18  What made you think you should go to the hospital?
19      A   I was hurt.  My son had just -- something
20  horrible happened to him at the mercy hands of
21  someone else.  I was upset.  I was going through --
22  I can't diagnose myself what I was going through, I
23  didn't have any idea, but I knew I was hurt and my

15

1  heart was broken and I've never been hurt like that
2  before, and I still hurt.
3      Q   And again any time you need to take a
4  break, just let me know.
5      A   I don't mean to yell at you.
6      Q   I didn't feel like you were. So just any
7  time you feel like you need to take a break, should
8  we take a break or should we keep going? I'm just
9  going to keep going then unless you tell me to stop.
10         MR. BENNETT:   We'll try to judge that
11 and we'll let you know.
12         MS. FUSSY:   Or if your attorneys
13 think maybe you should take a break --
14         THE DEPONENT:   I'm fine.
15         MR. BENNETT:   She'll probably tell me
16 she doesn't want to take a break either but just
17 keep asking.
18         MS. FUSSY:   Yeah, I get the feeling
19 she will be telling you. She doesn't need to tell
20 anybody to tell her what to do, a firecracker over
21 here.
22         MR. BENNETT:   Just keep going ahead
23 and we'll figure it out if we need a break.

16

1          THE DEPONENT:   Okay.
2          MS. FUSSY:   And I want to be as
3  respectful as possible so that's why I say these
4  things.
5          THE DEPONENT:   Yes, ma'am.
6  BY MS. FUSSY:
7      Q   So what kind of treatment or anything did
8  you receive?
9      A   I don't receive any treatment. I was just
10 in and they explained to me it was a grieving
11 process that I was going through and turned me
12 loose.
13     Q   Was that in Peoria or is that a hospital
14 in Minnesota?
15     A   Peoria.
16     Q   Okay. Other than that, have you ever
17 treated or counseled for any emotional or mental
18 health issues?
19     A   No. Well, not emotional or mental, but I
20 did go talk to a therapist because I was still going
21 through some things and I went to the doctor to get
22 checked out and --
23         MR. BENNETT:   Your regular medical

17

1  doctor?
2      A   Yes.
3          MR. BENNETT:   Okay.
4      A   Yes, sir, so they suggested, well, maybe
5  you ought to talk to the counselor, we'll provide it
6  for you, and it was going to help me get some
7  medical benefits too. So I went one time only and
8  spoke to a lady. I don't recall her name or
9  anything, but I went and she didn't tell me any more
10 than I already knew.
11     Q   Do you have any time frame when that was
12 that you went to talk with the therapist, a year?
13     A   Last year.
14     Q   Last year, okay.
15         MR. BENNETT:   So sometime in 2011?
16     A   Yes, sir, uh-huh.
17     Q   Any other time?
18     A   No.
19     Q   Any time before his death?
20     A   No.
21     Q   Okay. Have you ever been treated for any
22 chemical dependency issues?
23     A   Huh-uh.

18

1          MR. BENNETT:   That's a no. All I'm
2  trying to do is get it for her.
3          THE DEPONENT:   Oh, I'm sorry.
4          MR. BENNETT:   That's all right.
5  We'll help you with this.
6          MR. OSBORNE:   We understand what
7  you said. That works for us, but it doesn't for
8  her.
9          THE DEPONENT:   Okay.
10         MR. BENNETT:   I just want the
11 transcript to read correctly.
12         THE DEPONENT:   Yes, sir.
13 BY MS. FUSSY:
14     Q   I'd like to ask you a few questions about
15 David, his background, just because obviously we
16 don't know him at all.
17     A   Okay.
18     Q   Where did David go to high school?
19     A   David went to Woodruff, I believe.
20     Q   Woodruff, okay.
21     A   David went to Woodruff.
22     Q   Did he graduate?
23     A   No, but he went back and got his diploma.

19

1   Q   He got a GED?

2   A   Yes.

3   Q   Do you know when that was?

4   A   No, I don't recall.

5   Q   Growing up where did David -- did he have

6   a doctor he saw for any check-ups or physicals or

7   anything?

8   A   Well, of course they had to have a doctor.

9   It was Glen Oak, St. Francis. It used to be there.

10  It's not there anyway. Just say St. Francis

11  Hospital. I'll put it like that.

12  Q   And that was his, kind of like a primary

13  family physician?

14  A   Yeah, the kids' physician.

15          MR. BENNETT:   It doesn't exist

16  anymore?

17  A   I mean the clinics, I'm sure they exist

18  but I don't know where most of them are at because

19  when we moved, David was not here. He was already

20  in Minnesota. As a child, as she asked me, I took

21  the kids to St. Francis Community Clinic just for

22  shots and things of that nature.

23  Q   And that's in Peoria?

20

1   A   Yeah.

2   Q   Have you lived in Peoria your whole life?

3   A   Yeah. Ever since I was about six, I

4   believe.

5   Q   Okay. Do you know the names of any of the

6   friends David had in Minnesota?

7   A   Yeah. One name is Kirk. I don't know his

8   last name. One name is Crystal, and pretty much

9   they're family and I don't know all their names.

10  Q   Anybody else?

11  A   Not as far as I know. I was not in -- I

12  don't travel like that so I don't know that. I know

13  them because they came. They brought my son home

14  when my mom passed, and they all stayed with me for

15  two or three weeks.

16  Q   When did your mother die?

17  A   I think it was 2009.

18  Q   Do you know if David ever had any

19  girlfriends?

20  A   Oh, I'm sure he had quite a few I didn't

21  know about probably, but one name was Josephine.

22  No, I don't know her last name, and I don't know any

23  others.

21

1   Q   Did you ever meet Josephine?

2   A   I met her at the hospital.

3   Q   Are you talking about at the hospital in

4   September of 2010, at HCMC?

5   A   Yeah.

6   Q   Do you know where David got the money he

7   needed to, you know, live on like pay his rent,

8   groceries, prescription co-pays, anything like that,

9   cell phone bill?

10  A   I believe he was on disability. I'm not

11  positive.

12  Q   Do you know what he was on disability for?

13  A   No, I don't.

14  Q   Did you ever give him any money?

15  A   Did I ever give him money?

16  Q   Yeah, since he moved to Minneapolis.

17  A   No.

18  Q   Okay. Do you know what David's phone

19  number was, the phone he had when he died?

20  A   I don't remember that, honey. I know I

21  had it, but I don't remember it.

22  Q   Do you know the last time that you saw

23  David alive?

22

1   A   When he came home for a visit.

2   Q   When was that?

3   A   I don't remember. When my mom passed

4   probably.

5   Q   And you think that was in 2009?

6   A   I think so.

7   Q   And that's when he came with Kirk and

8   Crystal. Did they ever bring him down any other

9   times?

10  A   I think they came once before that but

11  that was years ago, if I'm making a mistake.

12  Q   Like three years prior, five years prior?

13  A   Maybe three.

14  Q   Okay. Did they stay with you when they

15  came to visit?

16  A   Yes.

17  Q   Where were you living when they came to

18  visit?

19  A   Stanley Street, 1805 South Stanley.

20  Q   Prior to your grandmother's funeral?

21  A   My mother.

22  Q   I'm sorry, your mother's funeral.

23  A   Yes, ma'am.

23

1   Q   When was the last time you saw him?
2   A   I said I think they was here for her
3   funeral was the last time I saw him.
4   Q   And then before that, I'm wondering when
5   did you see him before that?
6   A   I believe it was like three years prior.
7   Q   Okay.
8   A   No, that wasn't the last time I saw
9   Pumpkin. David come home -- I thought you meant
10   with Crystal and Kirk.
11   Q   No.
12   A   I'm sorry. David came home -- they came
13   periodically. If he may be home, either he or Angie
14   both would make it at the same time for holidays and
15   things and if they didn't, then one or the other
16   would come, but I always talked to them pretty much
17   maybe once a month on the phone because they called
18   for birthdays and they'd just call to check and let
19   me know they were doing OK.
20   Q   Okay. So just to be clear, the last time
21   that you saw David alive, would that have been when
22   he came for your grandmother's funeral?
23   A   You keep saying my grandmother.

24

1   Q   I'm sorry. Your mother.
2   A   And that wasn't the last time that I saw
3   him.
4   Q   Okay. Then what was the last time?
5   A   The last time I saw him was like probably
6   about nine months before that. I don't recall the
7   exact date, year, and all of that.
8   Q   When you say nine months before that, do
9   you mean nine months before he died or nine months
10   before your -- do you mean nine months before he
11   died you saw him?
12   A   Yes.
13   MR. BENNETT:   So you're talking one
14   of the holidays of 2009, like Christmas or
15   Thanksgiving?
16   A   Yes, sir.
17   Q   So working back then, you would have seen
18   him about nine months before he died at a Christmas
19   or Thanksgiving, some major holiday, correct?
20   A   Yes.
21   Q   And then prior to that, you would have
22   seen him at your mother's funeral, correct?
23   A   At my house because that's where he came

25

1   first. My mother had already passed and then we all
2   went to the funeral.
3   Q   Do you remember what month?
4   A   No, ma'am. I don't recall.
5   Q   And how did he get to your house for your
6   mother's funeral?
7   A   Crystal and Kirk brought him for that.
8   Q   Okay. When you saw him about nine months
9   before he died at that holiday in around late 2009,
10   how did he get to your house then?
11   A   I don't remember all that. I've been
12   through so much. I'm not going to lie to you. I
13   don't remember how he got there that particular
14   time. I know when my mom passed, Crystal and Kirk
15   brought him because they all stayed at my house for
16   two or three weeks.
17   Q   When he came down for the funeral, he was
18   there for two to three weeks?
19   A   They were there, yes.
20   Q   Was David Smith there for two to
21   three weeks as well?
22   A   Yes, ma'am.
23   Q   Okay. I know that you don't recall the

26

1   month that your mother's funeral was in, but do you
2   recall whether it was cold or warm out weather wise?
3   A   It was warm.
4   Q   It was warm, like shorts weather warm?
5   A   It was warm enough that I had a T strap
6   dress on.
7   Q   Okay. What was your mother's name?
8   A   Rosalie Smith.
9   Q   Did she live in Peoria?
10   A   Yes, ma'am.
11   Q   Do you recall where her funeral was held?
12   A   At a church over on -- I don't know the
13   street.
14   Q   Do you know the name of the church?
15   A   No.
16   Q   Who handled the funeral arrangements?
17   A   I don't know.
18   Q   When was the last time that you lived with
19   David?
20   A   David left Peoria. I had to sign for him
21   to go to Job Corps. He asked me could he go. I
22   told him I didn't want him to go, but he went. He
23   left here. They sent him to Minnesota. He passed

27

1  all his courses and he decided he wanted to stay and
2  do something good and positive and so he did that.
3  So he was 17 to answer your question.
4      Q     Did he live with you up until the time he
5  was 17?
6      A     From birth.
7      Q     Did you ever visit David in Minnesota?
8      A     No, I don't travel like that.
9      Q     Who would you say in the family was David
10 closest to?
11     A     They all were close, so I couldn't tell
12 you which one he picked to be the closest with
13 because they all were close.  Seven kids.  I
14 understand what you're saying, but they all were
15 close.
16     Q     After David moved to Minnesota -- well,
17 first of all, you didn't want him to go into Job
18 Corps.  Why not?
19     A     He was my oldest son.
20     Q     You wanted him to stay home with you?
21     A     And I wanted all my kids home with me.  I
22 didn't want them to go anywhere, but I had no
23 choice.  I had to let him become a man.  So that's

28

1  what I did.
2      Q     I suspected that was something like that.
3  Do you know, does the Job Corps decide where they're
4  going to send them?
5      A     I guess so because he wouldn't have known
6  about it to go there on his own.
7      Q     Okay.  In the five years preceding his
8  death, how often would you say you communicated with
9  him?
10     A     I told you.  Either every month they would
11 call, during holidays, birthdays.  They would call
12 on everybody's birthday and since most of the kids
13 were still at home, that means I spoke with him as
14 well.
15     Q     What phone did he call you on?
16     A     My phone, whichever phone I had, house
17 phone.  It was just about four years ago, three or
18 four years when the kids bought me a cell phone for
19 my birthday, so I've always had a house phone.
20     Q     What's your house phone number?  What was
21 it or is it?
22     A     Are you serious?  No, I don't know it.  I
23 don't recall the number to the house phone all them

29

1  years ago.
2      Q     Do you have a house phone now?
3      A     No, I don't.
4      Q     Okay.  What is your cell phone number?
5      A     309-232-2664.
6      Q     Is that a number that David would have
7  called you on?
8      A     Yeah.
9      Q     Did you ever communicate with David
10 electronically, E-mail, Facebook, Myspace?
11     A     I don't know anything about none of the
12 stuff.
13     Q     You're aware that David was diagnosed with
14 schizophrenia?
15     A     I am now.
16     Q     When did you become aware of that?
17     A     When you guys -- when I was told, when I
18 heard someone was talking about it over the news I
19 think.  I don't know.  I don't remember.  I'm lying
20 now because I don't remember.  I heard something
21 about a disorder, but I don't remember when that was
22 or how I found it out.  He never had that problem
23 before he left here.  I know that.

30

1      Q     So he never, prior to -- as far as you
2  know, he never treated for any mental health?
3      A     No doctor here ever treated David for
4  anything but childhood diseases, scrapes, cuts, or
5  something like that, no mental disease, no mental
6  illness.  So whatever happened to him happened to
7  him in the state of Minnesota.  I don't know.
8      Q     Did David ever talk to you about hearing
9  voices in his head?
10     A     No.
11     Q     Do you know when David started drinking
12 alcohol?
13     A     No.
14     Q     Were you aware of any chemical dependency,
15 and by that I mean drug or alcohol issues that David
16 had?
17     A     Well, he drank beer.  I drink beer.  I
18 didn't know about any drugs or a dependency on it.
19 No.
20     Q     So he never talked to you about that?
21 That was never an issue when he was growing up in
22 your home?
23     A     My kids were raised where they don't sit

31

1  and ever discuss with me if they're drinking,
2  especially if they're too young to do so, and no, he
3  did not.
4      Q    And why don't they talk to you about that?
5      A    About drinking?
6      Q    Yeah, especially if they're too young.
7  Just finish the thought.
8      A    Because they know they don't have any
9  business drinking if they're too young, first of
10 all. Regular teenager things, no, they wouldn't
11 have shared that part with me.
12     Q    Okay. Did you ever speak with -- do you
13 know any of the places that David lived when he
14 lived in Minneapolis?
15     A    I don't recall them. He's wrote me
16 letters and things. I had the addresses. No, I
17 don't have it sitting in my memory.
18     Q    Did he ever tell you about Vinland?
19     A    I don't recall.
20     Q    Did he ever tell you about Mosaic?
21     A    I don't remember.
22     Q    I'm just going to go through the ones and
23 I'm going to ask you.

32

1      A    Okay. I don't recall.
2           MR. BENNETT:  She's going to give you
3  some names, if you recognize any of them.
4      Q    If you do, you do. If you don't, you
5  don't. Oak Grove?
6      A    I don't recall.
7      Q    Okay. Did David ever talk to you about
8  any issues he was having with his housing?
9           MR. BENNETT:  Objection, vague.
10     Q    You can go ahead and answer.
11     A    Excuse me?
12     Q    Did he ever talk to you about any issues
13 he had with any of his housing?
14     A    He didn't talk about the issues of the
15 housing. He talked about a couple of tenants
16 before. He said someone has stolen his computer or
17 something and he was upset about that and he was
18 going to move. Outside of that, not a whole lot.
19     Q    Do you know if David ever lived in any
20 group homes?
21     A    He stayed in one. I don't remember the
22 name of it.
23     Q    Did you ever ask him why he was in a group

33

1  home?
2      A    Yeah. Well, I knew why. He didn't have
3  any money at that point.
4      Q    Did you ever know that David was homeless
5  at any point?
6      A    Yeah.
7      Q    How did you know that?
8      A    Because he told me so.
9      Q    When was he homeless?
10     A    I don't remember that now. I really
11 don't. I can't give you a year, a date. I don't
12 know.
13     Q    Okay. Did you ever send him any money
14 when he told me I'm homeless, I need a place to
15 stay?
16     A    If I had a few dollars that he needed, he
17 can get it. I didn't have a lot of money to share,
18 but he was my son so whatever I had, he was welcome
19 to it.
20     Q    Did you ever suggest to him that he should
21 come back home to Peoria?
22     A    Yes, I did, quite a few times.
23     Q    What did he say to that?

34

1      A    He said no. He liked Minnesota. He
2  wanted to live there and that's where he stayed.
3  Unfortunately that's where he died. And now I need
4  a break.
5      Q    Okay.
6           MR. OSBORNE:  Got it.

8      (Whereupon a five-minute break was taken.)

10 BY MS. FUSSY:
11     Q    Have you ever spoken with any of David's
12 case workers or counselors, roommates, medical
13 providers? And I can go through it again.
14          MR. BENNETT:  Hold it.
15     Q    One at a time?
16          MR. BENNETT:  I think so.
17     Q    Have you ever talken with any -- talken?
18 Have you ever spoken with any of David's case
19 workers?
20     A    No.
21     Q    Have you ever spoken with any of his
22 counselors?
23     A    No.

35

1    Q    Have you ever spoken with any of his
2  roommates?
3    A    No, outside of Kirk.
4        MR. BENNETT:   Yeah, I know the answer
5  was yes to Kirk, right?
6    A    Yes.
7    Q    Have you ever spoken with any of David's
8  medical providers?
9    A    No.
10   Q    Other than obviously with HCMC staff?
11   A    Who is that?
12       MR. BENNETT:   Well, in the hospital
13  from the time until he was -- when he was hurt until
14  he died, did you talk with any of the people there,
15  any of the nurses or doctors?
16   A    Yes.
17       MR. BENNETT:   Okay.
18   Q    Other than those people, did you ever
19  speak with any of his medical providers?
20   A    No.
21       MR. STORMS:   When he was a kid?
22   Q    Obviously you would have spoken with the
23  doctor when he was a child though?

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

36

1    A    I spoke to doctors. You mean those
2  medical people when he was a kid?
3    Q    No, I was thinking --
4        MR. BENNETT:   After he left.
5    Q    In 2000 until the time of his death but
6  for the medical staff at the hospital after the
7  incident.
8    A    I talked to the doctors at the hospital
9  and the nurses.
10   Q    Other than that, from 2000 until 2010 did
11  you ever speak with any medical providers of his?
12   A    I can't give you the year on it because I
13  don't remember all that.
14   Q    Do you remember speaking with any other
15  medical providers of his?
16   A    Not that I recall.
17   Q    Okay. Did you know Maureen Glover?
18   A    I don't remember.
19   Q    Did David ever mention her?
20   A    I don't remember. I can't say if he did
21  or didn't. I don't remember.
22       MR. BENNETT:   Is it a name you
23  recognize though?

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

37

1    A    It sounds slightly familiar but I don't
2  remember.
3    Q    Did David ever talk about Cheryl Sprat?
4    A    Yes, Cheryl was at the hospital. They
5  were like trying to do some kind of business
6  together or something.
7    Q    She was at the hospital?
8    A    I think that's the same Cheryl.
9    Q    When you say at the hospital, are you
10  referring to the time he was in the hospital right
11  before his death?
12   A    Yes.
13   Q    Okay. What kind of business were they
14  talking about?
15   A    I don't know, some kind of banking or
16  something I think. I think.
17   Q    Okay. Do you know how he knew Cheryl?
18   A    No.
19   Q    Okay.
20   A    From Minnesota.
21   Q    Do you know, did you ever speak with
22  Phillip or Theresa Warner?
23   A    I don't think so.

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

38

1    Q    Did David ever mention them?
2    A    I don't remember.
3    Q    Okay. Who is Frankie Brown?
4    A    His uncle. Well, he's not really his
5  uncle. It's the other kids' dad. He's the other
6  kids' dad's brother.
7    Q    Okay. Like Adam and Derrick?
8    A    Adam, Derrick, Louis, and Tiffany.
9    Q    Okay.
10   A    Adam, Derrick, Louis, and Tiffany.
11   Q    Do you know if David ever lived with
12  Frankie Brown?
13   A    I've never heard anything about it.
14   Q    Okay. Have you ever heard David talk
15  about Cheryl Smith?
16   A    Another Cheryl?
17   Q    Yeah.
18   A    No, I don't know.
19   Q    Had he ever talked about a Charlene?
20   A    I have no idea.
21   Q    Did he ever mention Dale Peterson to you?
22   A    I don't recall.
23   Q    I'd like to go through chronologically --

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

39

1      A      Excuse me.  What is chronologically?
2      Q      Oh, let's go back to after David was born;
3  not the time he was born.  Obviously he was born.
4  Was he born in a hospital?
5      A      Yeah.
6      Q      Okay.  Other than the time he was in the
7  hospital at birth, are you aware of him ever being
8  hospitalized?
9      A      Am I aware?
10     Q      Yes.
11     A      Yes.
12          MR. BENNETT:  While he's in Peoria?
13  You want to just stop there for one part of the
14  question?
15     Q      Sure.  Was he ever hospitalized while he
16  was in Peoria?
17     A      He wasn't hospitalized, no.
18     Q      Are you aware of him being hospitalized
19  any time after he moved away from Peoria?
20     A      I think someone had told me that he was in
21  the hospital once.
22     Q      Who told you he was in the hospital once?
23     A      I'm not sure which one of the kids.  I

40

1  told you they're back and forth on their little
2  computers.
3      Q      So it looks like what you're doing here,
4  you're making the motions of typing.  You're talking
5  about Facebook and E-mail kind of thing?
6      A      Yeah, but I'm not sure if they even told
7  me over that.  Well, they didn't tell me on that
8  because I don't do those.  So one might have told
9  the other and the other probably told me, something
10  like that.
11     Q      Okay.  Did they tell you where he was in
12  the hospital?
13     A      No.
14     Q      Did they tell you why he was in the
15  hospital?
16     A      No, not as far as I recall.
17     Q      Did you ask them why he was in the
18  hospital?
19     A      I'm not even sure they told me, first of
20  all, but I don't remember.  I mean my mind, I've
21  been through so much here lately, there's a lot of
22  stuff.  He may have told me and I don't remember it.
23  And I'm not trying to be funny.  I'm very serious.

41

1  I just don't.
2      Q      Okay.  Why don't we talk about briefly
3  what kinds of things you've been going through that
4  has affected your memory.
5      A      Murder for one.
6      Q      Anything else?
7      A      Yeah, I mean it took a toll on my whole
8  life.
9      Q      Understandably so.
10     A      It's taken my family through hoops because
11  everyone is trying to channel their own self in
12  their own way.  David was a very well loved, humble
13  person.  He was a very nice guy.
14     Q      Other than David's death, is there
15  anything else that has occurred to you that happened
16  to you that affects your ability to remember these
17  things?
18     A      To remember?
19     Q      Correct.
20     A      No, that right there alone is enough.
21     Q      I'm just asking.
22     A      I know.  Once again, I apologize.  I don't
23  mean to be rude.  This is just kind of really --

42

1      Q      Did you ever ask David why he was in the
2  hospital?
3      A      What do you mean?
4      Q      Well, you stated that you were aware he
5  was in the hospital one time.  I'm wondering if you
6  ever asked David.
7          MR. BENNETT:  She's talking about the
8  time prior to him being in the hospital in
9  Minnesota.
10     A      He was in the hospital that time.  I think
11  one of the kids told me he was there so, no, I
12  didn't ask him himself because I didn't talk to him
13  at that time.  I may have talked to him maybe a
14  month, maybe weeks later, but no, I did not because
15  sometimes as adults, we have a tendency to not want
16  our parents to pry.  Not that I'm not concerned.
17  He'll make sure that he gets to me if he needed to.
18     Q      Okay.  So is it -- just to be clear, is it
19  your testimony that you don't know why he was in
20  that hospital this other time prior to his death?
21     A      No, I don't know.
22     Q      And you didn't ask him either?
23     A      No, I did not.

43

1    Q    And you didn't ask your children either?
2    A    No, I did not.
3    Q    Okay.  Did you know that David went to
4    Florida in 2010?
5    A    Yes, I did.
6    Q    Do you know why he went there?
7    A    No.  He told me he wanted to live off the
8    land of the earth, and that's what he did.  He went
9    there.  He wasn't crazy either, trust me.  How he
10   got there I don't know.  He went to Florida and I
11   told him to come home.  He went to Florida.  He left
12   Florida.  He went back to Minnesota.  That's where
13   he was at.
14   Q    Okay.  Do you have any family in Florida?
15   A    Not as far as I know.
16        MR. BENNETT:  At that time?
17   A    Not as far as I know.
18   Q    Did you know that he was hospitalized when
19   he was in Florida in 2010?
20   A    No, I did not.
21   Q    Did David ever talk to you about any legal
22   problems he was having?
23   A    No, he didn't.  Being the oldest son,

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

44

1    David, I keep saying he's a humble guy.  He was the
2    type of fellow where he always found his way and
3    made his way and whatever he endured, he endured it
4    without sharing most of it with me because he didn't
5    want me to worry about him or to keep telling him to
6    come home.
7    Q    Did you notice any behavioral changes of
8    David Smith after he moved to Minnesota?
9    A    Not immediately.  I did some years later.
10   I'd start questioning him, asking him what was
11   wrong, was anything wrong.  Like I said a few
12   minutes ago, he didn't want to put that on me.
13   Whatever was going on with him, he kept it to
14   himself pretty much.  He didn't share with me.  What
15   types of things was he doing?  Nothing really.  Just
16   I knew my son, how he was at first and how he became
17   years later.
18   Q    What kind of changes did you --
19   A    Well --
20   Q    Can you just wait for me to finish the
21   question?
22   A    I'm sorry.
23   Q    Because otherwise it's difficult, and you

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

45

1    may not know what I'm going to ask.
2    A    Okay.
3    Q    What kinds of things did you notice in his
4    behavior that changed after he moved to Minnesota?
5    A    It wasn't after he moved to Minnesota.  It
6    was years later in more or less in his middle
7    adulthood.  It wasn't so much when he'd come home,
8    but he always made his way home.  He was always
9    polite and courteous.  I mean he -- I don't know.  I
10   don't know.  I guess call it mother's intuition.  It
11   was something.  I don't know.  It wasn't so much as
12   what he was doing, excuse me, because he was at my
13   house and there's rules at my house so he wasn't
14   doing so much at the house.  I don't know what he
15   was doing outside of the house, you know.  But he
16   was grown so if he went and had a few drinks or
17   something, that was fine with me because he was a
18   grown man.
19   Q    Did David ever have any problems with his
20   temper or anger management issues?
21   A    No, he was a humble guy as far as I saw.
22   He never showed me that side of him.
23   Q    Did David provide you with any counseling,

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

46

1    provide you any advice or counseling?
2    A    Did who?
3    Q    David.
4    A    How is David going to provide me with
5    counseling?  No, I'm sorry.  No.  You said did he
6    provide me with --
7    Q    Yeah.  Did he give you any advice or
8    anything like that?
9    A    Yeah, we talked all the time.
10   Q    What did you guys talk about?
11   A    That's personal.
12   Q    Well, I get to ask.
13   A    Oh, okay.
14   Q    I'm not trying to ask this --
15   A    Mother and son things like, momma, how do
16   you cook chitlins; momma, how do you cook that,
17   things of that nature, or momma, what's going on
18   with the kids, meaning the grandkids, or he may ask
19   the question about his siblings, things of that
20   nature.  We don't talk about his love life outside
21   of if he was having problems with his girlfriend,
22   Josephine.  That was it.
23   Q    Do you know if he was ever having any

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

47

1  problems with his girlfriend?
2       A    I don't know nothing about that. I don't
3  know.
4       Q    What kind of problems did you have that
5  you talked to him about? Did you seek his advice on
6  anything?
7       A    Not particularly because I mean advice is
8  always welcome, but there wasn't a need given for me
9  to. I may have asked him a question about how he's
10 doing or something, if that's what you mean.
11      Q    But did you ever tell him about any
12 problems you were having or anything you didn't know
13 how to handle and ask him how he would handle it?
14      A    No, because I usually took care of it.
15      Q    Did David ever provide you with any
16 guidance?
17      A    Huh?
18      Q    Did he ever provide you with any guidance?
19 We've kind of already covered this. It sounds like
20 you handled it on your own. Did you tell him about
21 any problems or issues you were having?
22      A    Didn't you just asked me? I'm sorry. I'm
23 just making sure you just asked me the same thing.

48

1       Q    I did just ask you.
2       A    Oh, okay. Not really because normally I
3  took care of it. If there's was a problem, I took
4  care of it. Like I said, David was a humble guy.
5  He was the type of fellow that with his problems he
6  normally kept them, the burden off of me as much as
7  he could and because he was the oldest son.
8       Q    And then did you similarly keep your
9  burdens off of him?
10      A    Yes. If I could help him with something,
11 I would.
12      Q    Of course you would help him.
13      A    Excuse me. Can I have some more hot
14 water?
15      Q    Here, I'll get it for you.
16      A    That's okay. I can get up.
17      Q    Sorry, I used to be a waitress.
18      A    Me too.
19           MS. FUSSY:  Off the record.
20      (Whereupon a short break was taken.)
21
22 BY MS. FUSSY:
23      Q    Have you ever had to pay from 2000 forward

49

1  any of David Smith's medical bills?
2       A    No.
3       Q    Have you been asked to pay any of his
4  medical bills?
5       A    You said 2004?
6       Q    2000 going forward to the time of his
7  death.
8       A    No.
9       Q    You've never been asked to pay
10 approximately $102,000 in any medical expenses?
11      A    No.
12      Q    Did you pay any of his burial expenses?
13      A    Yes, my family and myself.
14      Q    Okay. How much did you -- do you know how
15 much you paid? Was it about four or five thousand
16 dollars?
17      A    We all had to come up with quite a bit of
18 money. Four to five thousand I'm sure is about
19 right.
20      Q    Did David ever tell you that he was
21 evicted from any treatment centers?
22      A    No, not that I recall.
23      Q    Do you have any knowledge of any traumatic

50

1  brain injury that David might have sustained ever?
2       A    No.
3       Q    Do you recall if a TV ever fell on his
4  head?
5       A    No.
6       Q    Do you recall if he ever fell out of a
7  third story window, something like that? Just
8  asking.
9       A    He never fell out of a third story window.
10 He would have been pretty broke up where I would
11 have found out about it, or a TV didn't drop on his
12 head. That never happened either.
13      Q    Was David ever incarcerated, and by that I
14 mean was he ever in jail or prison?
15           MR. BENNETT:  What you mean is do
16 you know if he was, right?
17      Q    Yeah, do you know. Do you know if he ever
18 was in jail or in prison?
19      A    None of them have ever been in prison.
20 I'm sure he might have went to jail a couple times,
21 and what for I don't know. He called me and he said
22 I'm in here and that was it, and he got out. So it
23 must have not been too bad.

51

1    Q    Do you know if he was ever in jail in
2  Chicago?
3    A    No, I've never heard of that.
4    Q    Do you know if he was ever in jail in the
5  beginning of like six months in 2007?
6    A    I don't know.
7    Q    You don't know?
8    A    I do not know.
9    Q    Where was David's funeral held?
10   A    What's the name of that --
11   Q    I'm sorry.  You have to answer it on your
12  own.  You can't seek advice from anyone else.
13   A    It's Parkview, Parkview Cemetery.
14   Q    Parkview, okay.  Was there a church
15  service held prior to the burial?
16   A    Yes.
17   Q    Where was it at?
18   A    The church was on Knoxville, I mean off of
19  Knoxville, off Nebraska.  I don't remember the name
20  of the church.  I have the envelopes and things with
21  the church's names on it at home.
22   Q    Was that a church you had been to before?
23   A    No, I had never went in there before.

52

1    Q    Okay.  Who made the funeral arrangements?
2    A    Myself, my brother, my daughter, and my
3  other brother.
4    Q    By your daughter, you're referring to
5  Angela?
6    A    Yes.
7    Q    Okay.  Who decided to have it at the
8  church that it was held at?
9    A    I don't remember that.  I was totally
10  deranged.  I wasn't crazy, but a lot of it they kept
11  off of me as much as they could.  I remember I had
12  lots of things to sign and things and some questions
13  to answer.  Outside of that, they did pretty good
14  with me with that.
15   Q    Desmond testified that there was an
16  eviction action in 2010.
17   A    Okay.  What happened was in 2000, I think
18  it was 2000, I put in an application where you can
19  buy a house.  It was a nice house.  It was a big
20  house.  So years had passed and my money got lower
21  and lower and lower so then they have to mail you a
22  five-day notice.  Normally I paid all of it off
23  because I worked so I paid it with my taxes, and it

53

1  was one eviction.  They have it down as four.  There
2  was one that actually went through.  And they didn't
3  set my things out.  I actually moved.
4    Q    Okay.  So did you buy this house?
5    A    I was hoping to buy it.  I thought I had
6  enough.  You know the money that you apply towards
7  it, the money you pay for rent is supposed to go to
8  it.  It was something like a government thing.
9    Q    Was it like a rent to own kind of thing?
10   A    Kind of, yes.
11   Q    So you were living in this home you were
12  renting with the hopes of buying it, is that
13  correct?
14   A    Uh-huh, yes.
15   Q    And then at some point --
16   A    I had been there for ten years.
17   Q    You had been there for ten years and at
18  some point could you no longer afford the payment?
19   A    Exactly.
20   Q    So you stopped making the payments?
21   A    No.  Well, I guess if I couldn't afford to
22  pay it, yeah, same thing.
23   Q    So what did you do then?

54

1    A    I moved.
2    Q    Okay.  How long did it take you to find a
3  new place?
4    A    I didn't go directly into a new place
5  because my son was murdered the next day.  I moved
6  into my sister's house.  I put my furniture into a
7  friend's house, or garage rather, and then I got a
8  phone call saying that my son had been hurt.  He was
9  not dead I don't think at that point.  I left, went
10  to Minnesota, came back home, moved straight into
11  another house the day after and that was Howett.
12  Then we moved into another house, which is where I'm
13  currently at.
14   Q    Okay.  Who informed you, who called you to
15  tell you about David?
16   A    Nobody called me.  They either text or
17  something.  Somebody, I don't recall who it was, got
18  and did Brittany, my niece, Brittany.  They did
19  whatever with her.
20   Q    Are you referring to Brittany Jackson?
21   A    Yes.
22   Q    She's your niece?
23   A    Yes.

55

1   Q   Okay.  So you text?

2   A   I don't text at all.  I do not text.  I

3   don't text anybody, nobody text me.  What it was, I

4   was sitting on the couch.  Brittany was in the

5   chair.  She said, Auntie, something happened to

6   Pumpkin, which is his nickname from birth, and

7   that's how I found out.

8   Q   Okay.  Now I understand.  So who came up

9   to Minnesota after you found out that something had

10  happened to David?

11  A   Angie made it first because she flew.

12  Myself and Adam and we went up there with my nephew

13  Lovell, and my daughter, Tiffany.

14  Q   Adam, you, and Tiffany?

15  A   And Lovell.

16  Q   Who's that?

17  A   My nephew took us there.

18  Q   How old is Lovell?

19  A   He's almost 40.

20  Q   Oh, he's your nephew, okay.  I'm sorry.

21  So Adam, Tiffany --

22  A   And my brother, Larry, came.  Leroy didn't

23  come up there right then.  He did come, but that was

56

1   after he passed.

2   Q   Okay.  Do you know how long David had been

3   in the hospital in terms of days before you got

4   there?

5   A   Before I got there?

6   Q   Yeah.

7   A   No, I don't know.  I think the night

8   before because whatever she got over her phone, then

9   we headed out the next morning.

10  Q   Okay.  Where did you stay when you came up

11  here?

12  A   Excuse me?

13  Q   When you came up when David was in the

14  hospital the last time, where did you stay?

15  A   Where did I stay?

16  Q   Yeah.  Did you rent a hotel?

17  A   Myself and Adam stayed with Crystal and

18  Kirk in their one bedroom apartment.

19  Q   Where do they live?

20  A   I don't know.

21  Q   Do they live in Minneapolis?

22  A   Yeah.

23  Q   Do you still speak with them?

57

1   A   Not since last year.  They was here for

2   his first year memorial but not since then.

3   Q   This is going to be a very tough question

4   and I apologize, but how has David's death affected

5   your life?

6   A   You say how has his death affected my

7   life?

8   Q   Yeah.

9   A   It affected me like this here.  I will

10  never see my son again.  I cry a lot.  I'm depressed

11  sometimes, but I try to stay away from that by my

12  faith being what it is.  I pray a lot, which is a

13  good thing.  It has affected my whole world, yes, it

14  has, because they took somebody from me and my whole

15  family and we've never had anyone to be killed,

16  period, ever in such a brutal way with nothing.  So

17  when you ask me how has it affected my whole life, I

18  can't sleep a lot of nights.  I wake up thinking

19  about my baby.  I need a break.

20  Q   Okay.

21  (Whereupon a five-minute break was taken.)

22  THE DEPONENT:   Okay.  You can start,

23  please.

58

BY MS. FUSSY:

1   Q   Is there anything else that you would like

2   to add to that?

3   A   Nobody never gave me his personal

4   property.  Nobody never said they were sorry.

5   Nobody never sent a flower.  Nobody never did

6   anything, and I think that's horrible and sad.  It

7   is so wrong.  Even though the police officers killed

8   my son, I still found it in my heart not to hate

9   them, and I can't believe so much inconsideration

10  has been shown towards us and his life and his name

11  discriminated against and him put down when he did

12  nothing wrong.  It was done to him.

13  Q   How has his name been put down?

14  A   I heard about what was on the news.  I

15  can't quote them word for word.  It wasn't that

16  nice.

17  Q   Who said something?

18  A   I don't know who said it.  Media,

19  somebody, whoever puts stuff on the news.

20  Q   What were they saying?

21  A   Bad things.

22  Q   Like what?

59

1   A    I don't know.  I don't remember.
2   Q    Did David ever talk to you about the Cedar
3 Ridge Treatment Center?
4   A    No, not that I know.
5   Q    Did David ever talk to you about the MICA
6 house?
7   A    Who?
8   Q    MICA house.  I think it's a residential --
9   A    Huh-uh.
10   Q    Did David ever talk to you about St.
11 Barnabas, living at St. Barnabas?
12   A    I'm not sure.  Like I said, sometimes
13 David would talk to me about a lot of things.  Again
14 I don't remember after all this time.
15   Q    Do you know whether David was ever
16 committed?
17   A    Committed to an asylum?
18   Q    Yeah, in a facility for his protection?
19   A    No.
20   Q    No, you don't know or no, he wasn't?
21   A    No, I don't know.  Nobody told me anything
22 about it.
23   Q    Did David ever talk to you or have you

60

1 ever heard of Maureen Glover?
2         MR. BENNETT:  Asked and answered I
3 think.
4   Q    That was Charlene.
5         MR. BENNETT:  Maureen Glover, you
6 said you thought you heard the name.
7   A    Yeah, I was going to say it again.
8   Q    Maureen Glover sounds familiar?
9         MR. BENNETT:  Slightly familiar I
10 think.
11   Q    Well, just let her --
12         MR. BENNETT:  She already answered
13 the question.
14   Q    Okay.  Well, she can answer it again.
15 It's no big deal.
16   A    Slightly.  I don't remember if I remember
17 or not.  I said it sounds familiar.
18   Q    What was David's home life like when he
19 was growing up?
20   A    David had a well rounded and stable home
21 because I like stability and so we didn't move
22 constantly.  They may have not had all the things
23 because I had seven kids, but they had the things

61

that they needed more so than everything that they
wanted.  They had food, they had shelter, and they
had their health and strength, and he enjoyed life.
  Q    Tell me about that.
  A    About what?
  Q    Why do you say he enjoyed life?
  A    Because he did.  He was a kid.  Most kids
enjoy life.  He was young and vibrant.
  Q    What kinds of things did he like to do?
  A    Basketball, baseball, run with his buddies
sometimes, you know, listen to music, rap.  He was
an artist.  He did many things.  David was a very,
very smart young man.
  Q    Did he have a lot of friends growing up?
  A    Yes, he did.
  Q    Do you remember his best friends' names?
  A    He had a lot of them.  They were boys.  He
had a lot of them.  There's one whole particular
family, there's five boys in their family as well as
there was mine and so they all grew up together and
right today the brothers still come and check on me
and cry.
        MR. BENNETT:  What's their name?

62

  A    Joey, Jaime, Javi.  Those are the three
oldest brothers.  Those are the ones that David and
Louis grew up with and Derrick.
  Q    Joey, Jaime, Javi?
  A    Javi and Jaime.
  Q    Javi.
  A    There's Justin, and I forget the last one.
        MR. BENNETT:  They're all J's though,
right?
  A    Jaime, is that with a J?
        MR. BENNETT:  Yeah.
  A    Oh, they're part Mexican.
        MR. BENNETT:  J-A-I-M-E.
  A    Jaime, Joey, and Javi and Justin, and
there's another baby boy.  I can't think of his
name.
  Q    Jean Claude?  I'm just kidding.  Was David
ever expelled in school?
  A    I don't know.  I really don't.  He's my
son and, yes, out of five boys, he might have.  Not
expelled, no.  He wasn't ever expelled.
  Q    Was he suspended?
  A    Yeah, I'm sure he did once or twice.  Not

63

1 many times because I didn't like that.
2     Q   Do you know why he was suspended?
3     A   No.
4     Q   What were his grades like?
5     A   A student, A/B student. He was a very --
6 I told you he was a very smart young man. Many
7 awards and many academic things.
8     Q   What was the last year of high school that
9 he completed?
10     A   Probably 12th. He didn't complete the
11 12th. He went to the 12th.
12     Q   He stopped in the 12th year?
13     A   Yes.
14     Q   Why did he stop?
15     A   I don't know.
16     Q   Did you ever ask him?
17     A   Doing what young folks do.
18     Q   Which is what?
19     A   He went back and got his diploma. I mean
20 all these years later, I mean if I did ask him, I
21 ain't going to remember it.
22     Q   Well, I'm just wondering if he was an A/B
23 student --

64

1     A   He was a very good student but as you
2 become a teenager, a lot of times young men --
3     Q   A lot of times what? I'm sorry.
4     A   Young men, as young men, maybe he was
5 being rebellious for some reason. I don't know why
6 people do what they do. All I know is that he went
7 until he felt like he didn't want to go or whatever
8 and then he went back to school and he took up
9 school and he kept going to school. He might have
10 been enrolled in a school up there.
11     Q   Did you ever ask him why he stopped going
12 to school in high school?
13     A   No, I didn't ask him why he stopped going
14 to school. What I told him was he needed to take
15 his butt back to school is what I told him.
16     Q   And did he?
17     A   No, because he didn't have to if he didn't
18 want to.
19     Q   It's my understanding that Louis can't be
20 here today for his deposition because he's in jail.
21 Do you know why he's in jail?
22     A   No, but I don't know exactly why he's in
23 jail. I'll put it like that. I really don't. I

65

1 have an inkling of something. I know he went to
2 court and then his girlfriend called me and told me
3 he was in jail.
4     Q   He went to court. You know that?
5     A   Yeah.
6     Q   Why did he go to court, do you know?
7     A   I'm not sure for what reason it was, but
8 he did go to court because he told me he was going
9 to court and he said he'll be back. Then his
10 girlfriend called me later that evening and said
11 they took Louis to jail.
12     Q   Do you know if it was a prescheduled court
13 date? Do you know, did he plan on going to court?
14     A   Yes, he planned it. He got up and left
15 the house, yeah. That morning he left and told me
16 he'll be back, and I ain't talked to him since.
17 Well, I'm lying. I did talk to him once.
18     Q   When did you talk to him?
19     A   When he called me and told me he was in
20 jail.
21     Q   Did you ask him why he was in jail?
22     A   After his girlfriend called. He get two
23 free calls.

66

1     Q   Did you ask him why he was in jail?
2     A   Huh?
3     Q   Did you ask him why he was in jail?
4     A   He said because they took him. I didn't
5 ask him anything. He told me that they locked him
6 up. He said on some B.S. is what he said.
7     Q   Did you inquire?
8     A   What B.S. was?
9     Q   Yeah.
10     A   Bullshit.
11     Q   Did you ask him what the bullshit was?
12     A   No. I told him he a grown man and he had
13 to figure it out for himself.
14     Q   Do you have any idea of why he could
15 possibly have been in jail?
16     A   No. Obviously he must have went to jail
17 before and had a court date. So when he went to the
18 court date, I do know that much, if he didn't do
19 whatever they told him to do, well --
20     Q   Why was he originally in court?
21     A   I just told you I don't know. I'm
22 serious. I don't know. He went to court about
23 something.

67

1   Q   What did his girlfriend tell you when she
2   called you to tell you he was in jail?
3       A   She said Louie asked me to call you and
4   tell you that they took him to jail from court and
5   he wanted me to call you and let you know so you
6   wouldn't be worried.  That was it.
7       Q   Did David ever tell you about any fights
8   he got into with anyone up in Minnesota?
9       A   Huh-uh.
10          MR. OSBORNE:  Is that a no?
11      A   I'm sorry.
12          MR. OSBORNE:  That's all right.
13      A   No.
14          MR. OSBORNE:  We know what you were
15  saying.
16      A   No.
17      Q   I know you testified that David never gave
18  you any money.  Did you anticipate that he would
19  give you any money in the future?
20      A   I didn't say David never gave me any
21  money.
22      Q   Oh, I'm sorry.  I thought you did.  Did
23  David ever give you any money?

68

1       A   He gave me, if he got a little extra
2   money, he might have sent me something a few times.
3   He didn't take care of me, if that's what you're
4   asking.
5       Q   I'm not asking that.  When did he send you
6   money?
7       A   Right before he died he sent me $200 right
8   before my birthday.
9       Q   That was a birthday present?
10      A   Yes, so that was the December before he
11  passed away.
12      Q   Were there any other times that you can
13  remember him sending you money?
14      A   Over the years I'm sure he sent me
15  probably -- like I said, he wasn't rich either so
16  when he was making it on his own, when he got ahold
17  of something, sometimes he'd send me things.  He
18  always was mailing me birthday cards and Mother's
19  Day cards and writing me letters and things like
20  that.  If he had to go without a cell phone for a
21  month or so, then he would do it in a letter, in the
22  form of a letter rather.
23      Q   Have you ever been convicted of any

69

1   crimes?
2       A   No, ma'am.  I have two parking tickets.
3           MR. OSBORNE:  I got that beat by a
4   mile.
5           MS. FUSSY:  Why don't we just take a
6   couple minute break and then we'll see if we have
7   anything else.
8           THE DEPONENT:  Okay.  I hope I wasn't
9   mean.
10          MS. FUSSY:  You were not mean at all.
11  (Whereupon a five-minute break was taken.)
12  BY MS. FUSSY:
13      Q   I just have one follow-up question.  I
14  know you talked before about you sensed some sort of
15  behavioral changes in David after he moved to, not
16  right after but at some point after he lived in
17  Minnesota.  Can you state at all, anything at all
18  that you can think of as to why you thought he's
19  acting differently?  Did he call differently?  Did
20  he say different things to you?
21      A   He seemed more like he wanted -- not that
22  he didn't love me already, but I don't know.  I
23  don't know.  I don't know what it was.  He had a Mormon

70

1   book and that's not our faith, and I was talking to
2   him about that but he was telling me about the
3   religion that was in the book and I was telling him
4   to get rid of it.  Outside of that, like I said, he
5   was pretty humble.  It wasn't so much of what he did
6   or said around me.  So I don't know.  It wasn't
7   nothing bad that he did.  I didn't like the Mormon
8   book though because I don't believe in that, but
9   he's a grown man.
10      Q   Did David ever seem depressed?
11      A   No, not when he came home.  When he came
12  home, he was glad to be home.
13      Q   What about when you spoke with him on the
14  phone?
15      A   No.
16          MS. FUSSY:  Okay.  I don't have any
17  further questions.
18          MR. BENNETT:  We will read and sign.
19
20      WITNESS FURTHER SAYETH NOT;
21      BY AGREEMENT, SIGNATURE NOT WAIVED.
22
23

# EXHIBIT 3

1

## Page 1

```
 1              UNITED STATES DISTRICT COURT
                    DISTRICT OF MINNESOTA
 2
 3   Larry E. Smith as Trustee for
     the Heirs and Next of Kin of
     David Cornelius Smith,
 4
                    Plaintiffs,
 5
                         Court File No.: 11-CV-03071 (SRN/JJK)
 6   VS.
 7   Timothy Gorman and Timothy Callahan,
     acting in their individual capacities as
 8   Minneapolis police officers, and the City
     of Minneapolis,
 9
                    Defendants.
10

11   _____

12                 DEPOSITION OF

13               JOSHUA O. ZIMMERMAN

14                TAKEN 10-26-12

15   _____

16

17        Whereupon the deposition of JOSHUA ZIMMERMAN in the
18   above-entitled matter was taken pursuant to Notice of
19   Deposition on the 26th day of October, 2012, commencing at
20   approximately 9:30 a.m., in the City of Minneapolis, State of
21   Minnesota, before Lisa M. Tiedeman, a Notary Public in and
22   for the County of Goodhue, State of Minnesota.
23
24
25
```

## Page 2

```
 1              A P P E A R A N C E S
 2
 3   ROBERT BENNETT, ESQUIRE, and KATHRYN H. BENNETT, ESQUIRE,
 4   Gaskins, Bennett, Birrell & Schupp, 333 South Seventh Street,
 5   Suite 2900, Minneapolis, MN 55402, appeared as Counsel on
 6   behalf of the Plaintiffs,
 7
 8   TRACEY N. FUSSY, ESQUIRE, Assistant City Attorney, City
 9   Hall-Room 210, 350 South 5th Street, Minneapolis, MN 55415,
10   appeared as Counsel on behalf of the Defendants.
11
12   KELLY A. PUTNEY, ESQUIRE, Bassford Remele, 33 South Sixth
13   Street, Suite 3800, Minneapolis, Minnesota 55402-3707,
14   appeared as Counsel on behalf of the witness.
15
16                    *  *  *
17
18
19
20
21
23
24
25
```

## Page 3

```
 1                    I N D E X
 2
 3   EXAMINATION BY:
 4   Ms. Fussy.............................  4, 66
 5   Mr. Bennett...........................    53
 6
 7
 8   EXHIBITS
 9   DD...Curriculum Vitae, 4
10   EE...Records of David Smith, 18
11
12
13
14
15   OBJECTIONS
16   By Mr. Bennett, 16
17   By Ms. Putney, 65
18
19
20
21   CERTIFICATE...........................    70
22
23
24
25
```

**COPY**

## Page 4

```
 1                  JOSHUA O. ZIMMERMAN,
 2   a witness in the above matter, after having been first
 3   duly sworn, testified under oath as follows:
 4                    EXAMINATION
 5   BY MS. FUSSY:
 6   Q    Dr. Zimmerman, can you state and spell your name for
 7        the record, please?
 8   A    Joshua, J-O-S-H-U-A, middle name Orr, O-R-R, Zimmerman,
 9        Z-I-M-M-E-R-M-A-N.
10   Q    Okay.  And prior to going on the record, your attorney
11        gave me your curriculum vitae.  Can you review that and
12        let me know if that appears to be accurate?
13                MS. FUSSY:  Let's mark this as
14        Exhibit A -- or no, no, no DD.
15                    (Whereupon Deposition Exhibit No.
16        DD was marked for identification.)
17   Q    (By Ms. Fussy)  Okay.  Thank you.  So it appears that
18        you graduated from college in 1997 with a BA in biology
19        at Swarthmore College; is that correct?
20   A    Yes.
21   Q    And you went to medical school at Case Western Reserve
22        and received your degree in 2001; is that correct?
23   A    Yes.
24   Q    Okay.  And your area of concentration is in biomedical
25        ethics.  What is that?
```

1  A   Biomedical ethics would be the study of complicated
2      decisions in health care that may put the benefit of
3      two parties against each other, and then you have to
4      make a complicated decision about what's best for the
5      patient. For example, you may need to make a decision
6      that goes against a patient's wishes but is in their
7      best interest because they lack the capacity to make a
8      decision on their own behalf. That would be a
9      complicated ethical decision.
10  Q   Okay. And after you graduated with your degree in
11     medicine, where did you go then?
12  A   I attended residency at Harvard University in one of
13     their psychiatry programs.
14  Q   Okay. And then it looks like -- and then what did you
15     do after that?
16  A   I performed a fellowship in advanced psychotherapy for
17     one year. I had a private practice and teaching
18     position at Harvard University, and then moved to the
19     Twin Cities and back working for Park Nicollet.
20  Q   What brought you to the Twin Cities?
21  A   My wife received a tenure track position offered at
22     Macalester College.
23  Q   Okay. So you've been at Park Nicollet since?
24  A   Yes.
25  Q   2006 it would appear?

5

1  A   Yes.
2  Q   And what is your area of practice?
3  A   I'm primarily a pharmacologist. Meaning that I
4     evaluate patients, diagnose them with mental illness,
5     and prescribe and manage medications as appropriate. I
6     also work as an administrator, but did not -- I was not
7     working in that role at the time I was treating
8     Mr. Smith.
9  Q   Okay. When did you -- do you recall when you began
10     seeing David Smith?
11  A   November of 2006.
12  Q   Okay. And how did you come to see him?
13  A   Mr. Smith was referred to me from his primary care
14     physician, Dr. Jack Levitt, who worked in the clinic
15     where I was officed. He was referred to me for
16     evaluation and continued management of what I was told
17     was schizophrenia.
18  Q   And did you make any diagnosis with respect to
19     Mr. Smith?
20  A   After speaking to his psychologist, I diagnosed
21     Mr. Smith with schizoaffective disorder, depressive
22     type.
23  Q   What does that mean to be depressive type?
24  A   Schizoaffective disorder can be either bipolar or
25     depressive. People who are bipolar will have very high

6

1     swings where they are grandiose. They could think they
2     are Jesus, they could think they have powers, they stop
3     sleeping for days. People who are only depressive type
4     don't have those high swings, they will have psychotic
5     symptoms and then depression, but not the really
6     dramatic high spells.
7  Q   Okay. Now, you said you spoke with Mr. Smith's
8     psychologist?
9  A   Yes.
10  Q   Do you recall his name?
11  A   Dale Peterson.
12  Q   Okay. Do you recall your conversation?
13  A   Yes.
14  Q   How many conversations did you have with him?
15  A   I had one in-depth conversation that I remember and
16     documented clearly. It lasted approximately
17     half-hour.
18  Q   Can you tell me about what you remember from that
19     conversation, or what you have documented?
20  A   I asked Mr. Peterson about the patient's past history
21     because he had treated him for a significant period of
22     time, I believe, approximately one year. I asked about
23     comorbid medical conditions and his substance abuse
24     history.
25  Q   What are comorbid medical conditions?

7

1  A   That would mean any additional diagnosis that would
2     affect his treatment and planning. The most
3     significant one that Dr. Peterson told me about was a
4     fall from a second floor window where he suffered a
5     head trauma. So I learned from Dr. Peterson about his
6     history of head trauma, a history of very serious
7     problems with alcohol and marijuana, and the fact that
8     even when the patient was sober from those substances,
9     he continued to have ongoing problems with psychotic
10     thinking and mood swings. I also learned --
11  Q   Hold on one second.
12  A   Sorry.
13  Q   Okay. What else did you learn?
14  A   I also learned that the patient had been challenging to
15     treat because of noncompliance with follow up, frequent
16     relapses on marijuana and alcohol, and that he had
17     required significant stays in residential treatment
18     programs.
19  Q   Do you remember anything else?
20  A   That's the majority of our conversation that was
21     relevant to me.
22  Q   Okay. Let's first talk about what you remember
23     Mr. Peterson said regarding Mr. Smith's fall from the
24     second floor window. Do you remember what
25     specifically -- anything more about that?

8

1 A   No. I remember he had told me he fell. He was
2     concerned he had had a history of brain injury, but
3     details were tough to get. From what I had documented,
4     I did not document a date of the injury or incident.
5     The history, we knew it happened, but getting specifics
6     was quite challenging.
7 Q   How did you know that it had happened?
8 A   Dr. Peterson told me about it. The patient himself did
9     not.
10 Q  Okay.
11 A  I have never reviewed medical records of said incident,
12    nor do I know at what point it happened, whether it was
13    in Illinois where he was living, or after he relocated
14    to the Twin Cities.
15 Q  Okay. And how long did you see Mr. Smith?
16 A  I saw Mr. Smith for a total of 12 visits between 2006
17    and 2008.
18 Q  And in your time with Mr. Smith, did you have any
19    reason to doubt that he did fall from a second floor
20    window or sustain any sort of head trauma? Was there
21    any other indicia of it?
22 A  I had no reason to doubt that as fact, no. He had
23    significant cognitive problems, impulsivity, memory
24    issues, all of which could be consistent with a head
25    trauma, they also could be consistent with

9

1     schizophrenia. So it's very difficult to determine
2     which of those two would be the case. There would be
3     times, for example, he would leave my office having
4     asked me to send his prescriptions to one place, then
5     he would return to my office 10 minutes later and tell
6     me that he wanted them sent somewhere else. He had
7     pretty profound problems with keeping organized and
8     keeping on track. So the head trauma diagnosis always
9     seemed reasonable to me.
10 Q  Okay.
11 A  Referring him for more specific testing would be a
12    challenge because the neuropsychologists we use are
13    largely in the suburbs, and getting a homeless guy to
14    go to a set appointment in Edina to have
15    neuropsychological testing is usually not going to
16    happen.
17 Q  Okay. Can you give me any other examples of the memory
18    issues he was having?
19 A  He struggled in school. His care manager sent me
20    several notes that he was doing very poorly in school.
21 Q  Who was that care manager?
22 A  Maureen Glover.
23 Q  Okay.
24 A  G-L-O-V-E-R.
25 Q  Okay.

10

1 A   He also reported to me that he wanted to be evaluated
2     for ADD because he could not pay attention, complete
3     tasks. He would lose track in class. He gave me
4     incorrect information at our initial evaluation. He
5     told me his care manager was located in the same clinic
6     as his psychologist, when in reality she was located in
7     the county -- in the county building. So he seemed to
8     struggle with details and dates.
9 Q   Okay. So if someone is having memory issues and they
10    are struggling with, you know, organizational issues
11    and such, how do you reach your conclusion as to
12    whether they have, you know, schizoaffective disorder
13    or whether they have, you know, head trauma and things
14    like that? How do you reach those conclusions?
15 A   That's why talking to his psychologist who had known
16    him for a year was quite valuable. He knew him over an
17    extended period of time, had seen what happened to
18    Mr. Smith, knew of the psychotic relapses, knew of the
19    chemical health problems. And really it was that
20    outside information that was extremely valuable from a
21    reliable source, which was a Ph.D. psychologist. Just
22    going on the patient's word and the evaluation would
23    not have been sufficient evaluation information.
24 Q   But your interactions kind of shored up what you -- the
25    information that you received from the psychologist;

11

1     would that be correct?
2 A   Yes. At subsequent visits he was clearly paranoid.
3 Q   Can you give me an example of how he was paranoid?
4 A   He refused to allow me to have him complete a release
5     of information to speak to his care managers. He said
6     he believed this would be evidence he was doing badly,
7     and did not want me to speak to his care manager. He
8     shut down in the session and started looking at me
9     suspiciously when I told him it was very important to
10    have him sign that. He would also frankly complain
11    about hearing voices. He would hear screaming
12    children. He told me he would hear demons. These
13    voices would be louder at times than others. So he
14    seemed to exhibit very consistent symptoms with a
15    psychotic disorder.
16 Q   Okay. And the fact that he was hearing screaming
17    voices, I think you already alluded, or might maybe
18    have said, that that's a symptom of schizophrenia, not
19    necessarily a symptom of anything -- any experience he
20    had, or could it be?
21 A   What do you mean "experience"? You mean the head
22    trauma?
23 Q   Well, I mean the fact that he's hearing screaming
24    voices doesn't necessarily indicate he has a history of
25    any sort of trauma or abuse necessarily, or could it

12

1  have been?

2  A  I don't understand that question.

3  Q  Okay.  Never mind.

4      MR. BENNETT:  I was going to object

5  to it but I thought that would be the answer.

6      MS. FUSSY:  Were you going to object

7  on unintelligible?

8      MR. BENNETT:  That's the one I was

9  thinking about.  But I figured the doctor could sort it

10  out.

11  Q  (By Ms. Fussy)  All right.  Mr. Peterson, he told you

12  about some ongoing psychotic symptoms and mood swings

13  that Mr. Smith was experiencing?

14  A  Correct.

15  Q  Can you tell me about that?

16  A  He told me that Mr. Smith had experienced psychotic

17  symptoms since the age of 11.  He said that he knew him

18  to have trouble with paranoia and voices regardless of

19  his level of sobriety.  But when he drank or used

20  marijuana, the psychosis was far, far worse.  He said

21  that he could have very significant spells of

22  depression with hopelessness.  The patient himself told

23  me he had never been suicidal.  Outside records from

24  his psychologist suggested that he had had suicidal

25  symptoms in the past, so that he had very quite severe

13

1  symptoms of depression as well.  He also told me once

2  psychotic, he was prone to leaving his housing and

3  becoming homeless, drinking up to, I believe it was a

4  quart of hard liquor daily.  And that when sober and

5  compliant with meds and in supportive housing, he could

6  do much better and was capable of engaging in

7  vocational rehabilitation.  Nice guy.  There was a

8  really big difference, Dr. Peterson said, between when

9  he was doing well and when he had relapsed and was

10  really struggling.

11  Q  Did Dr. Peterson say what the time span was of how long

12  he would do well and how long he would do bad, anything

13  like that?

14  A  I do not recall.  My direct factual experience of that

15  was that he would usually have about four good months

16  and then often start missing appointments and be

17  relapsing, and then there would usually be probably

18  another four bad months.  He would frequently end up in

19  a residential treatment program during the bad months.

20  So it was probably, I would say, a quarterly cycle

21  between doing well and doing poorly.  But that's a

22  ballpark estimate.

23  Q  Did Dr. Peterson say -- do you recall any conversations

24  with Dr. Peterson regarding any reason why he believed

25  he had suicidal symptoms or attempts?

14

1  A  I do not remember asking why he had suicidal symptoms

2  or suicide attempts, no.

3  Q  Okay.  Do you recall having discussions with him

4  regarding mood swings?

5  A  I remember primarily having conversations being with

6  depression, the difference between when he was very

7  depressed or not depressed.  I also remember -- so

8  that's primarily what we talked about in terms of mood

9  swings.  I also remember asking about dangerousness

10  specifically, and he informed me that, to his

11  knowledge, he did not have a history of dangerous or

12  violent behavior.

13  Q  Did Mr. Peterson give you -- or Dr. Peterson give you

14  any of his record to review?

15  A  I did not ask for formal records from Dr. Peterson, no.

16  I requested records from the residential treatment

17  facility where he had been taken care of.

18  Q  Okay.  So did you see any of the records from -- that

19  Dr. Peterson -- have you ever seen any of his records?

20  A  I have seen record from Dr. Peterson, yes.  They

21  arrived to me in a packet of medical records after I

22  received the subpoena that Park Nicollet's attorney

23  Vickie Wagner helped arrange.

24  Q  And I'll represent to you that there's a notation in

25  one of his records that David was capable of immediate

15

1  and sudden violence?

2  A  I did see that, yes.

3  Q  Okay.

4  A  That was -- that was confusing to me when I saw that.

5  Q  Okay.  Why was that confusing?

6  A  Because in my experience with David, he had been a

7  quiet, calm, fairly pleasant individual to see in the

8  office.  He did not seem labile.  He had never been

9  threatening in our clinic even when he was frustrated

10  because he would arrive very late for some appointments

11  and he would have to wait for some time.  He was never

12  threatening.  At the same time, I do remember from

13  records from his residential facility he was described

14  as posturing, he was described as engaging in

15  aggressive sort of behavior to get what he wanted.  So

16  it seemed like in certain situations he could act like

17  that, but I had never personally found him frightening

18  or dangerous.  The description of being suddenly

19  capable -- what was that quote again?

20  Q  I believe the quote was he was capable of immediate and

21  sudden violence?

22  A  Yeah.

23      MR. BENNETT:  I'm going to object to

24  that characterization and any characterization of

25  Peterson as a doctor, because he isn't.  But just put

16

1    that in there for the record.

2 Q   (By Ms. Fussy)  You can answer?

3 A   He's a doctor of psychology.

          MR. BENNETT:  No.

5 A   He's not?  What is he?

          MR. BENNETT:  He has a masters.

7 A   I apologize, I thought was a doctor.

8 Q   (By Ms. Fussy)  Well, you can answer the question.

9 A   When I read that, I found it surprising because that

10    was not what my experience with Mr. Smith had been.

11 Q   Did Mr. Smith ever -- did you ever see Mr. Smith when

12    he was intoxicated?

13 A   No.

14 Q   Now, you indicated that you saw Mr. Smith approximately

15    12 times.  What did you do when you saw him?  What were

16    your visits like?

17 A   There was a one-hour initial visit, which was

18    comprehensive and involved a significant amount of

19    history taking and gathering collateral information, as

20    I've already described.  Follow-up visits were then 20

21    to 30 minutes in duration and would involve talking

22    about his symptoms, his medications, side effects,

23    where he was in school, where he was in looking for a

24    job, where he was in sobriety.

25 Q   Okay.

17

1 A   Those were our main focuses of conversation.

2 Q   Okay.  What information did you gather from Mr. Smith

3    in that one-hour initial visit?

4 A   I would have gathered the information shown in my

5    initial evaluation here in the court documents.

6 Q   Okay.

7          MS. FUSSY:  Why don't we mark that.

8    I noticed you are looking at -- why don't we mark that

9    as Exhibit EE.

10 A   I'll need to find it.

11          MS. FUSSY:  Okay.  If you could give

12    it to the court reporter?

13          MS. PUTNEY:  They are going to mark

14    the whole pack.

15 A   Sounds good.

16          MR. BENNETT:  6415 is the number I

17    have on there.

18 A   Okay.

19          (Whereupon Deposition Exhibit No. EE

20    was marked for identification.)

21 A   I'm now looking at that evaluation.

22 Q   (By Ms. Fussy)  Okay.  Take your time.

23 A   Do you want me to go through the whole evaluation?

24 Q   If you would like to review it prior to answering.

25 A   I've already looked at it.

18

1          MS. PUTNEY:  I think he's asking if

2    do you want him to basically just tell you what's in

3    his note or do you have specific questions?

4 Q   (By Ms. Fussy)  I want you to tell me what you

5    remember, either based on your own personal

6    recollection, or what's in the medical record?

7 A   Okay.  Mr. Smith had been referred to me by his primary

8    care physician because of schizophrenia.  He informed

9    me he was doing well.  He agreed he had schizophrenia

10    and that his medications continued.  He was living in a

11    supported housing program and location and

12    rehabilitation.  He indicated he had worked with

13    psychologists for the past two years.  He had recently

14    been discharged from a dual diagnosis treatment

15    facility.  That is defined as a treatment program for

16    people with serious mental health and chemical health

17    problems, and that he had stayed in Stillwater for two

18    months.

19          He had been stabilized on

20    medication, which he found helpful.  Since discharge he

21    indicated he had attained sobriety and had been free of

22    psychosis and depression.  He felt he was doing well

23    and wanted to continue sobriety and medications.  He

24    told me that he had psychotic symptoms beginning at the

25    age of 14.

19

1 Q   Okay.  Let's stop.

2          MR. BENNETT:  That's rather than 11

3    as you said before?

4 A   Correct.

5          MR. BENNETT:  Saves me

6    cross-examination.

7 Q   (By Ms. Fussy)  Why don't you tell me what you remember

8    about him telling you about having symptoms since the

9    age of 14?

10 A   I have written down that he told me he had symptoms

11    beginning at the age of 14.

12 Q   Okay.

13 A   I don't remember that specific point in our

14    conversation.

15 Q   Okay.  Did you have reason to doubt that?

16 A   Yes.

17 Q   Why?

18 A   Because he seemed guarded and unreliable, and it was

19    often very difficult to get him to tell me a lot of

20    detail.

21 Q   Okay.

22 A   Which is why I talked to his therapist for collateral

23    information.

24 Q   Okay.

25 A   I would say that most aspects of the evaluation had to

20

**Page 21**

1  be taken with a grain of salt. Because anytime you are
2  speaking to someone with a psychotic disorder, you do
3  not know how reliable they are.
4  Q  Okay. And when you spoke with his psychologist, did
5  you feel like you got a better idea of when the
6  psychotic symptoms began?
7  A  His psychologist said they began around the age of 11.
8  So reasonably close to what Mr. Smith estimated.
9  Q  Okay. And did you have reasons to doubt that?
10  A  No.
11  Q  Okay. In your experience, do psychotic symptoms
12  related to schizophrenia generally start at an age that
13  early or --
14  A  They can in more severe cases.
15  Q  Okay.
16  A  The typical age of onset in a man is typically between
17  the ages of 18 and 25.
18  Q  Okay.
19  A  Earlier onset symptoms usually are harboring of a much
20  more severe illness.
21  Q  Even if it's not diagnosed, are there symptoms that can
22  occur at even earlier ages than 11?
23  A  Yes.
24  Q  What kind of symptoms?
25  A  I have spoken to my colleagues in child psychology who

**Page 22**

1  have treated kids as young as six or seven with
2  psychotic symptoms. In residency training, we had a
3  five year old who was profoundly psychotic and
4  paranoid, similar symptoms to what he's having
5  essentially happening earlier.
6  Q  Like hearing voices and things like that?
7  A  Correct.
8  Q  Okay. Now, according to the notes on page 6416 it says
9  that he -- and I assume that's David -- began drinking
10  alcohol heavily at the age of 13. Did he tell you
11  that?
12  A  Yes.
13  Q  Did you have any reason to doubt that?
14  A  No.
15  Q  Why not?
16  A  He seemed pretty honest and forthcoming about it.
17  Again, there's always a grain of salt. But usually
18  when people are saying they started using drugs at an
19  early age, they are being pretty honest about it.
20  Q  Okay. And it also says that he first heard mumbled
21  distorted voices speak to him when he was about 14
22  years old. He informed you of that as well?
23  A  Yes.
24  Q  Okay. Did you have any reason to doubt that?
25  A  No.

**Page 23**

1  Q  Okay. Did he tell you what the voices were saying to
2  him?
3  A  I believe he indicated they were mumbled.
4  Q  I mean -- I'm sorry. At any time did he ever tell you
5  what the voices were telling him, the kinds of things
6  voices were telling him? What he was hearing?
7  A  I do not recall. I remember he said they were mumbled,
8  they were screaming. Usually he was focused on them as
9  being frightening, but not receiving specific commands.
10  So I do not recall his telling me he had specific
11  discernible hallucinations as opposed to more loud
12  frightening noises and jumbled conversations.
13  Q  Did he ever tell you about any visual hallucination he
14  was having?
15  A  Yeah. He said he saw cartoon characters in the past as
16  a visual hallucination.
17  Q  Did he tell you about seeing robots?
18  A  I would have to review the chart. I do not remember
19  that off the top of my head. I may have documented
20  that in another note, but I can't remember right now.
21  Q  Did he ever tell you about seeing ghosts?
22  A  I do recall his talking about seeing ghosts, yes.
23  Q  Okay. Your notation there it says, "There are also
24  classic symptoms of significant psychosis, including
25  ideas of reference from the radio." What do you mean

**Page 24**

1  by that? What is that?
2  A  That means that he felt that things that were being
3  broadcasted on the radio specifically had to do with
4  him, were created intentionally for him, or were
5  special messages that were communicated directly to
6  him.
7  Q  Okay. If you look at the next paragraph, there's also
8  a history of significant depressive symptoms, and it
9  notes an occasional fantasy of death. What does that
10  mean?
11  A  When I type "fantasy of death," what it refers to is
12  that people wish they would die. They are frustrated
13  with their life, they wish they could die as an escape
14  from it. But it is different than specifically
15  planning "I'm going to go get a gun and shoot myself or
16  overdose on a pills." It's more of a fantasy of
17  escaping life through death.
18  Q  Okay. Now, the last page it states that "past
19  medication trials have included Trileptal. What is
20  that?
21  A  That is an antiepileptic medication, which is not FDA
22  approved for bipolar disorder but can be used for
23  bipolar disorder.
24  Q  And Risperdal?
25  A  That's an antipsychotic.

25

1  Q    Okay.  Why would he be prescribed an epilepsy
2       medication?
3  A    He could have been prescribed an epilepsy medication
4       for epilepsy or mood swings, but I have never seen the
5       records of the individual who prescribed it, so I'm
6       guessing.
7  Q    Okay.  If you turn to page 6417 at the top of the page
8       "He denies prostituting himself while homeless or using
9       IV drugs."  Why was that discussed?
10  A   Anytime I have a patient who has been homeless and has
11      a chemical health problem, I ask about prostitution as
12      it's an easy way to get money to buy drugs if you are
13      homeless.
14  Q   Okay.
15  A   And it is an HIV risk factor.
16  Q   Okay.
17  A   And if people have a history of prostitution, they need
18      to be screened for HIV if it hasn't been done.
19  Q   Okay.  Now, if you look further down the page, social
20      history, do you recall, where did you get this
21      information that he was born and raised in Peoria?
22  A   The patient.
23  Q   Okay.  What do you remember about him telling you about
24      his youth or former history?
25  A   He indicated that he had a troubled childhood.  He was

25

1  Q    Okay.  If you look at page 6419, there's a notation
2       that he consented for you to speak with psychologist,
3       Dale Peterson, which you thought would be helpful in
4       clarifying the differentiating between bipolar or
5       psychotic disorder?
6  A    Correct.
7  Q    Now, it looks like at that point it would make sense,
8       this is approximately your first meeting with him, you
9       are trying to determine whether or not he has a -- what
10      did you call it, whether he has a depressive or bipolar
11      component to the schizophrenia; is that correct?
12  A   Yes.
13  Q   Is there any other?
14  A   At that point in time, there were multiple diagnoses
15      the patient could have.
16  Q   Okay.
17  A   He could have straightforward schizophrenia.  He could
18      have schizoaffective disorder.
19  Q   What's the difference between schizophrenia and
20      schizoaffective disorder?
21  A   People with schizoaffective disorder have prominent
22      depression or mania along with psychosis.  People with
23      schizophrenia do not.
24  Q   Okay.
25  A   It also was impossible to tell what effect the drug use

27

1       uncomfortable because of gang activity in his
2       neighborhood.  He said that he was raised by his mother
3       and did not have a relationship with his father.  He
4       said he enjoyed music.  He did his best to try hard in
5       school and try to stay away from trouble.  He said he
6       left his hometown at the age of 17 on his own to come
7       to the Twin Cities, but soon became homeless, drug
8       addicted and alcoholic.  He eventually got into a
9       stable housing complex downtown at Saint Barnibus,
10      which is my understanding of why he sort of entered
11      mental health treatment here in the Twin Cities.
12  Q   Okay.  And it says -- skip a paragraph -- "most of his
13      prior friends were drug contacts, but he states that he
14      is slowly assembling a new group of supportive and
15      sober friends."  That information came from him?
16  A   Yes.
17  Q   Classified his prior friends as drug contacts?
18  A   Yes, that's typical of homeless individuals who have a
19      significant drug history, they don't know anyone who's
20      sober.
21  Q   Okay.  Page 6418, second paragraph, "there's some
22      intermittent history of cocaine smoking."  Did that
23      come from him?
24  A   Yes.  He said it was not his drug of choice, but he had
25      smoked crack off and on in the past.

26

1       and abuse had upon his mood or psychotic symptoms.  So
2       Mr. Smith covered what's called a substance-induced
3       mood disorder or a substance-induced psychotic
4       disorder.
5  Q    Do you think he had a substance-induced psychotic
6       disorder?
7  A    I thought based on his history, that was unlikely.  But
8       I needed to rule it out by speaking to his
9       psychologist.
10  Q   Okay.  Once you spoke with his psychologist, were
11      you -- did you have enough information at the time to
12      make a diagnosis?
13  A   I felt I did.  His psychologist indicated that the
14      patient still had psychotic symptoms even when he was
15      able to achieve sobriety, which effectively rules out a
16      substance-induced psychotic disorder.
17  Q   Okay.
18  A   And that he had prominent spells of depression, which
19      also occurred when he was sober.
20  Q   Okay.
21  A   So that suggested that he had a depressive type
22      schizoaffective disorder.  His psychologist had no
23      knowledge of him being manic, not sleeping for days at
24      a time, thinking he had special powers.  Therefore, I
25      felt that a depressive type schizoaffective disorder

28

**Page 29**

1 was the most accurate diagnosis.
2 Q Once you reached that diagnosis, what did you do?
3 A I continued his medications that he said were helpful
4 to him. I encouraged him to continue in his vocational
5 rehabilitation program and maintain sobriety. The
6 medications he was taking were appropriate for that
7 condition, so I did not see a reason to change them.
8 Q And did it seem to help him?
9 A He did fairly well as long as he was taking his
10 medications and sober.
11 Q Did he have trouble taking his medications and/or
12 staying sober?
13 A Yes.
14 Q Did he have trouble taking his medications?
15 A Yes.
16 Q How do you know that?
17 A Because he would tell me he had stopped the medications
18 for one reason or other, and then would come back in
19 and see me, feeling much worse.
20 Q Okay. How did you know that he was having trouble
21 maintaining his sobriety?
22 A Because he would be readmitted to a residential
23 treatment facility for people with alcohol and drug
24 problems. And I would receive specific reports that he
25 had relapsed again and was doing quite poorly, usually
29

**Page 30**

1 from his care manager.
2 Q Do you know if David was still hearing voices even when
3 he was taking his medication?
4 A He would usually report that they were muffled and very
5 quiet. There was one point in time where he told me
6 they were completely gone, and they had stopped. But I
7 would say when he was on meds, like many of my patients
8 with schizophrenia, he said that they were quiet, he
9 could barely hear them, and they didn't bother him
10 much.
11 Q Okay. Do you know why David would stop taking his
12 medication?
13 A I know on one occasion he said he ran into problems
14 with insurance and getting it paid for. That was the
15 only specific reason he cited to me why he had stopped
16 them. I don't know what other reasons may -- actually,
17 I take that back. That's not correct. He also told me
18 he had side effects to his medications, that they made
19 him feel tired and slow at times, and that that also
20 resulted in his stopping his medications.
21 Q Okay. What did you say? What did you respond to him
22 then?
23 A I tried to adjust the doses of his medicine so he would
24 tolerate them more easily. And then I tried to add on
25 some medications to help him with focus and energy so
30

**Page 31**

1 that he might be more willing to stick with the
2 antipsychotic.
3 Q Did that help?
4 A He reported that it did help.
5 Q Did he continue to take his medicine?
6 A This was near the end of our treatment course. Over
7 our last few visits he reported he was taking his meds,
8 but then he stopped coming in for appointments. So I
9 don't know for sure.
10 Q Okay. If you look at page 6395, it says the increase
11 in Prozac and Zyprexa was helpful. What is Zyprexa?
12 A Zyprexa is an antipsychotic, FDA approved for
13 schizophrenia or psychotic symptoms.
14 Q And it says, "Still believes that he's receiving
15 thoughts from other people when they walk by him."
16 That's something he reported to you?
17 A Yes.
18 Q Okay. And that he believed his mind may be
19 progressively being erased by someone -- by someone
20 similar to how a computer can be erased. What did he
21 say about that?
22 A He said that he believed his memories and mind were
23 slowly being taken away.
24 Q Okay. Did that indicate to you that he was still
25 suffering from some psychotic symptoms?
31

**Page 32**

1 A Yes.
2 Q Okay.
3 A In general, it's much easier to get the hallucinations
4 from schizophrenia to respond than the disorganization
5 or the delusional thinking.
6 Q Okay.
7 A And patients are often more distressed by the
8 hallucinations than by the delusional thinking.
9 Q What is the disorganized and delusional thinking? Can
10 you give me examples of disorganized and delusional
11 thinking?
12 A Disorganized thinking would be having a hard time
13 staying on track. For example, someone who is having
14 trouble with getting here for a deposition on time
15 because they would be late for the bus, they wouldn't
16 remember which way to come in the skyway, they would
17 get turned around or confused quickly.
18 Q Okay.
19 A Delusional thinking would be the belief that people are
20 after me, my mind is being taken away, I'm receiving
21 special messages from the government. Because people
22 accept that as true, they are often not as distressed
23 by it. The hallucinations, people usually see there's
24 something going on that's not good.
25 Q Okay. And did David have disorganized and delusional
32

1    thinking?

2  A    He did.

3  Q    Can you tell me about his disorganized thinking?

4  A    His disorganized thinking I thought was most reflective

5    in his struggles in school and the vocational

6    rehabilitation.  He reported he couldn't stay on track.

7    He couldn't stay on focus.  But it's interesting

8    because at times he could do quite well and received

9    good grades in his training.

10  Q    Did you receive his MCTC transcripts?

11  A    I did not.  I received just a report from the patient

12    that he got an A and a B --

13  Q    Okay.

14  A    -- when he was at school, but I did not receive his

15    transcript.

16  Q    You don't know that that's true?

17  A    I don't.

18  Q    Okay.  Can you give me an example of his delusional

19    thinking?

20  A    The beliefs about his mind being erased would be an

21    example of delusional thinking.

22  Q    Okay.

23  A    I felt when I first met with him he was clearly -- when

24    I asked him to let me speak to his care manager, and

25    then he refused to talk to me and would look at me with

33

1    a suspicious glance, he seemed very paranoid that I was

2    up to something or that I was trying to dismantle his

3    care in some way.  That's how he felt.  That would also

4    be indicative to the delusional processes.

5  Q    What did you do when he did that?

6  A    I stopped pushing him on it.

7  Q    Okay.

8  A    So generally it's not going to get you anywhere by

9    pushing him on it, but if you let the patient get to

10    know you, that you are a good guy, you are trying to

11    help him out, usually they come around.

12  Q    Okay.  And he did come around eventually on that issue,

13    right?

14  A    He did.

15  Q    You did speak with Maureen Glover?

16  A    Again, I can't remember if we spoke or if it was more

17    notes sent back and forth.  I did receive -- usually

18    the way Maureen works, she's a care manager with some

19    of my other patients, so she would send you updates.

20  Q    Okay.

21  A    So I'm guessing I received updates in a more formal

22    fashion.

23  Q    Do you remember any information you received in these

24    communications?

25  A    Maureen would usually let me know how he was doing in

34

1    school.  Maureen would also let me know if he had been

2    readmitted to a chemical health program.  Those --

3    usually it would be life updates about what else was

4    happening for him in his daily living.

5  Q    Okay.  Now, if you look at page 6397, it says this

6    appears -- if you look at the top it says,

7    "Authenticated by" you, Joshua Zimmerman, "on 2-1-08."

8    What does this mean, authenticated by you?

9  A    I believe that that is how our electronic medical

10    record refers to my signing and completing the note.

11    Let's see, the shorthand note was completed on February

12    1st, 2008.  Authenticated.  So yes, that would have

13    been the date I formally signed the note

14    electronically.

15  Q    Okay.

16  A    The date at the bottom of the note, shorthand note

17    completed, that's the date that our algorithm helped me

18    with writing the note.

19  Q    Okay.

20  A    But I formally signed it then at 15:31 on February 1st.

21  Q    Okay.  And it says "David is not doing well.  Reports

22    increased depression, sadness, and worthlessness.

23    Feels very down.  Psychosis also increased.  Hears more

24    loud mumbling voices at bedtime.  Also hears children

25    screaming and has started seeing ghosts."  Does this

35

1    information came from David?

2  A    Yes.

3  Q    Do you remember that meeting?

4  A    Do I remember the meeting specifically?

5  Q    Yeah.

6  A    No, not beyond my medical record.

7  Q    Okay.  What -- do you know what you would have done

8    with that information?

9  A    We would have discussed triggers.  We would have

10    discussed sobriety.  We would have discussed medication

11    options.  We would have discussed suicidality or safety

12    issues.

13  Q    Okay.

14  A    We would have worked out a plan to try to address the

15    psychotic symptoms and depression.  And I believe we

16    increased his medications for depression and psychosis

17    both.

18  Q    Okay.  And then mental status exam, it's at the bottom

19    of the page.  "During the interview the patient was

20    easily engaged, withdrawn."  That seems confusing to

21    me, what does that mean?

22  A    It means that although he seemed quiet, that it was not

23    hard for me to get him talking.

24  Q    Okay.

25  A    Someone, in my mind, can be withdrawn and disengaged,

36

1 which is usually refusing eye contact, refusing to
2 answer questions. Someone who's easily engaged and
3 withdrawn, maybe they are shrinking in the chair and
4 withdrawn, but they are responding to everything I'm
5 saying and they are polite and clearly want to be
6 speaking to me.
7 Q And that's what you noticed on that day?
8 A Yes.
9 Q It also said "psychotic appearing today"?
10 A Yes.
11 Q What do you think he meant by that?
12 A What I believe I meant was that -- what I remember with
13 David was that he could be very bright and connected
14 and looking at you and talking with you. Or when he
15 was not doing well, he could avoid eye contact, look a
16 little suspicious, paranoid. He may have also -- let's
17 see -- his thoughts appeared circumstantial, distracted
18 and derailed easily. That's also a sign that he looks
19 more psychotic. Derailing is when someone is talking
20 about one topic, and then they completely go off in
21 another direction on an unrelated topic and just lose
22 what they are talking about. So that also can make
23 them look more psychotic. I did not write down he was
24 actively speaking to voices in the room, so I'm
25 guessing it was more the withdrawn appearance and the
37

1 disorganized demeanor.
2 Q What does that mean, his thought process appeared
3 circumstantial? What does that mean?
4 A It means he ultimately answered my question, but
5 wandered around a lot of unnecessary information first.
6 Q Okay. Can you give me an example?
7 A A circumstantial person would typically be exemplified
8 by your pleasant grandmother who you ask what happened
9 today, and they tell you about ten acres of unrelated
10 stuff that's all pleasant, and it answers the question,
11 but the question could have been answered in about 30
12 seconds.
13 Q Okay. Now, if you turn to page 6399, Mr. Smith comes
14 in with his case worker, Rachelle, and I'm assuming
15 that's Rachelle Schwab?
16 A Don't know.
17 Q Okay.
18 A Not my note.
19 Q Oh, not your note. Okay. About -- it does note here
20 that he needs a new prescription for sildenafil?
21 A Yes.
22 Q What is that?
23 A Viagra.
24 Q Okay. 6400, David has had several changes since our
25 last visit. And then it says, "Had repeated noise
38

1 complaints in his apartment, also got into a fight with
2 people trying to barge into his apartment." Are those
3 the changes that you are referring to, or were there
4 other changes?
5 A Well, there would have been those changes also. He was
6 transferred to another residential treatment facility
7 as opposed to doing an independent apartment. So that
8 plus the other changes.
9 Q Were you given any documents to review, you know, as
10 you were seeing him as a patient from any of the
11 residential treatment plans like RFM house?
12 A I do not remember getting those.
13 Q Vinland?
14 A I do not remember getting those, no.
15 Q Okay.
16 A The most significant records outside I got were from
17 Oak Grove, but I do not remember that he would come to
18 appointments with outside records, because I would
19 document -- when that happens, I document "Patient
20 brings collateral information" from wherever they are
21 coming from, and I did not document that with
22 Mr. Smith.
23 Q Would you have had access to those documents in any
24 other way other than if he brought them in?
25 A I don't know. It's so variable with the local
39

1 residential treatment centers and group homes, what
2 documentation they have, that I really don't know what
3 they would have had and whether I could have had access
4 to it or not.
5 Q Now, there's a notation, "Went out partying with
6 friends, drank very heavily, got into a fight and broke
7 his nose." Was that reported to you by him?
8 A I can't rule out whether there was also a collateral
9 report with that, because those records have not been
10 included, my collateral notes from outside people.
11 It's possible it was an outside provider, but I believe
12 in the way the note is written, it came from David.
13 Q Okay. Do you remember anything else about that
14 incident that he told you?
15 A Was this -- this was the noise complaint that's already
16 been mentioned. No, I do not.
17 Q Okay. It says, "Quite poor insight into his drinking."
18 What did you mean by that?
19 A I mean that he would have shrugged off the drinks as
20 not really a big deal. "It was just a one-time thing.
21 I'm not going to really do that again." Instead of
22 sort of appreciating the legal problems, the mental
23 health problems, the way it dismantles the things he
24 was working for about employment. He kind of shrugged
25 it off.
40

1  Q    Okay.  If you look at page 6409.

2  A    Yep.

3  Q    Bottom of the page is "prescribed olanzapine"?

4  A    Yes.

5  Q    What is that?

6  A    That's just the generic name for Zyprexa, the same

7       medication you asked about earlier.

8  Q    Okay.  If you look at page 6410, David is wearing the

9       same clothes as the last time I saw him.  Why did you

10      make a notation about that?

11  A   It implies that he might not be changing his clothes or

12      laundering them.  People with psychotic disorders can

13      have problems with hygiene, activities of daily living,

14      or cleanliness.  And when -- and I'm not sure how much

15      time elapsed between my two appointments there.  That's

16      September 27th, so I'm going the wrong way.

17  Q   Oh --

18  A   So it looks like I had seen him one week prior.

19  Q   Okay.

20  A   So what I was worried about was that he had basically

21      been wearing the same thing for a week.  It also could

22      be an indicator that somebody had become homeless again

23      because they don't have a change of clothing with them.

24      When I documented his hygiene, it appeared fair, which

25      meant I didn't really think his hygiene was really as

41

1       disheveled as someone who had become homeless or purely

2       living on the streets would be.

3  Q    Okay.  It says his mood is, quote, "kind of worried

4       about this," end quote.  What does that mean?

5  A    David was worried because at that visit I had received

6       forms asking whether or not he could work --

7  Q    Okay.

8  A    -- in the prior, in the interim, he had been actively

9       attending a vocational program and had been looking for

10      work and had been doing well.  And I said I thought it

11      would reasonable that he could work no more than 20

12      hours a week if he could find a job.  An unintended

13      consequences by saying that was that his care manager

14      let me know he could be denied Medicaid if I thought he

15      could work that much.

16  Q   Okay.

17  A   So David was worried that he was going to lose

18      insurance and the ability to pay for medications.  It's

19      unfortunately, I would say, a built-in problem with the

20      disability system.  Because if someone is stable and

21      they are trying to find a job and I say they can't find

22      a job, well, if they can find a job, then they don't

23      need the indigent insurance plan.  So that's what he

24      was worried about.

25  Q   Okay.  It says his thoughts are disorganized and

42

1       scattered.  What do you remember about that?

2  A    It would have meant he had trouble staying on topic.

3       It would have meant that he would again be

4       circumstantial.  That when asked questions, he would

5       not answer them quickly or succinctly.  I think at that

6       time I felt it was also likely due to a lot of anxiety

7       he had about what was going to happen to him with his

8       insurance and housing.

9  Q    Okay.  He reports hearing some unusual sounds lately.

10      Do you remember what he reported hearing?

11  A   I don't remember specifically.  That's common when

12      people have hallucinations, they say they start to hear

13      bumps or thumps, weird noises they go to look at and

14      there's no one there.  I heard someone mumbling in a

15      room two doors down, but there wasn't anyone in the

16      room.

17  Q   Is that kind of it starts at that level, and then it

18      progresses up to actual words?

19  A   Correct, correct.

20  Q   Okay.

21  A   So I can say typically my documentation, when I write

22      unusual sounds, that's what I'm referring to.

23  Q   Okay.  And then again, "He does seem more restricted

24      and odd than when I saw him last time."  That would

25      have been a week prior, correct?

43

1  A    Correct.

2  Q    Do you remember what you meant by he seemed odd?

3  A    Again, speaking loosely, there was kind of good David

4       and bad David.  Good David, pleasant, engaged,

5       optimistic, although not very insightful.  Bad David,

6       more suspicious, withdrawn, disorganized, not

7       responding well to questions, not maintaining much eye

8       contact.  It meant he looked more in that realm.

9  Q    Okay.  When David was in quote/unquote bad David, would

10      he have been able to hide that from other people?

11  A   I do not believe so, no.

12  Q   Okay.  Did David talk to you about his family at all?

13  A   Not very much.  The most we spoke about his family

14      would have been at the initial evaluation regarding

15      when he moved to the area, being raised only by his

16      mom, trying to stay out of trouble.  The information we

17      already reviewed.

18  Q   Okay.

19  A   Other than that, his family was not a focus of

20      conversation.

21  Q   Okay.

22  A   He also did not bring up his family as -- how do I put

23      it?  When people are more connected with their family,

24      usually they bring it up as a, you know, "I wish I

25      could see my mom.  I have this support person with me."

44

1   It did not come up with David in our treatment and our
2   conversations.
3 Q  And what did that mean to you?
4 A  It didn't mean a whole lot.  People with psychotic
5   disorders become estranged from their families because
6   of their paranoia, because they relocate.
7 Q  Okay.
8 A  He also did have other supportive people with his care
9   manager and housing, so I knew there were people
10  involved in trying to help him out.  So it never seemed
11  productive to have him lean on me and speak of his
12  family, because it seemed to me they hadn't seen him
13  for quite some time.
14 Q Did David ever talk to you about concerns with sexually
15  transmitted diseases?
16 A  I do not recall that, no.  He may have taken those
17  issues more directly to his primary care physician.
18 Q  Okay.  Did you speak to his primary care physician
19  about David?  Did you compare notes or talk about
20  anything?
21 A  I read Dr. Levit's notes when I would see David.  I
22  believe I sent Dr. Levit an initial copy of my note
23  when I first saw David, but I don't recall directly
24  speaking to him because there weren't any issues that
25  came up that would have -- I would have needed a
45

1   primary care opinion about.  For example, he didn't
2   have bad medical side effects to his medication.  I
3   didn't need help managing blood pressure, cholesterol,
4   or things like that.
5 Q  You had mentioned that -- I think you had mentioned
6   that you were a pharmacologist, correct?
7 A  (Whereupon the witness nods their head.)
8 Q  What does that mean?
9 A  That means I specialize in the prescription and
10  management of medications for people with mental health
11  problems.
12 Q  I'm sorry?
13 A  I also have advanced training in psychotherapy, but at
14  this point it's not a prominent part of my practice.
15 Q  Did you engage in any psychotherapy with Mr. Smith?
16 A  Psychotherapy is a kind of vague term that could mean a
17  lot of different things.
18 Q  Okay.
19 A  I would say that I engaged in what I would probably
20  call some supportive psychotherapy with Mr. Smith.
21  That would be things like, "You really got to stay
22  sober.  Let's look at what this has done to you."
23  Trying to bring out the positive coping skills that he
24  had and minimize the negative ones and have more
25  insights about what his goals were.  In an independent,
46

1   steady, employable, and completing school, and how he
2   could achieve that, I did not do psychotherapy with
3   him, which would have been discussion of family of
4   origin issues, really pushing him on the knowing
5   himself or understanding why he does things.  It was
6   really just trying to encourage positive behavior,
7   discourage negative behavior.
8 Q  Are you familiar with the dextromethorphan?
9 A  Dextromethorphan, yes, I am familiar with
10  dextromethorphan.
11 Q  What affect does dextromethorphan have on the body?
12 A  Dextromethorphan is an opiate-derived cough
13  suppressant.  It's a cheap drug of abuse which if taken
14  in large quantities could have a disassociated affect.
15 Q  What is a disassociated affect?
16 A  A disassociated affect means you no longer feel that
17  things happening around you are real.  People can
18  perceive being cut off from reality or floating.
19  People can also hallucinate with enough of it or
20  experience euphoria.
21 Q  What if someone had like hundreds of times the
22  recommended dosage of dextromethorphan in their system?
23 A  You mean what would it do to them?
24 Q  Yeah.
25 A  They could experience the things I mentioned.  So they
47

1   could feel confused.  They could feel like things
2   weren't real.  They could have trouble differentiating
3   reality from nonreality.  They could get agitated.
4   There's a variety of things it could do.
5 Q  What affect could that have had if David had been
6   intoxicated with dextromethorphan?
7 A  An individual with a psychotic disorder, and an extra
8   large amount of dextromethorphan would be more likely
9   to be prominently paranoid, hallucinating, or agitated.
10 Q  Did you want to add something?
11 A  No, I was just breathing.
12 Q  Oh.
13      (Whereupon a short recess was
14  taken.)
15 Q  (By Ms. Fussy)  Given what you knew about David, your
16  experience working with him, do you think that college
17  was an appropriate goal for him?
18 A  College was an inappropriate goal for him?  I did not
19  feel that college was an inappropriate goal for him.
20 Q  I'm sorry, was college an appropriate goal for him?
21 A  Yes.
22 Q  Okay.
23 A  I thought college was a reasonable thing for David to
24  work towards.
25 Q  Okay.
48

49

**Page 49**

1 A   I would not have felt that a four-year degree was
2     reasonable, but I thought working towards a vocational
3     degree to help him get job training and independent was
4     reasonable.
5 Q   By vocational, you mean like a two-year degree?
6 A   Correct.
7 Q   Did you ever have any knowledge of whether or not
8     Maureen Glover wanted David to seek anger management
9     therapy?
10 A  I do not recall that, no.
11 Q  Okay.  Did David ever talk to you about any of his
12    friends or girlfriend?
13 A  We talked about people he identified as friends when he
14    let a large group of homeless people start living with
15    him, and it resulted with him being evicted.  So we
16    talked about what the difference was between someone
17    you knew and a friend.  It seemed to me that he had
18    trouble with that concept.  I do not recall any other
19    in-depth conversations about a girlfriend beyond "I'm
20    having trouble with sexual potency.  I think the meds
21    are messing with that."  And we had some safe sex
22    conversations, and he asked for Viagra.  But not a lot
23    of personal dialogue about his friends or girlfriend.
24 Q  Okay.  You mentioned that David had some impulsivity
25    problems or issues, what do you remember about that?

**Page 50**

1 A   These would be sort of short-sighted decisions, like
2     letting a large group of homeless men move in with you.
3     You know, things that just aren't really well thought
4     out and are decisions in the moment.  His decision to
5     drink that night and then get into a fight at the same
6     time as he's trying to succeed in school.  You know,
7     it's also impulsive, it's in the moment to lose track
8     of his larger goals he's working towards.
9 Q   Do you remember having any discussions with Dale
10    Peterson about David's family?
11 A  I don't.  I would have -- I would need access to the
12    note that I wrote summarizing the longest conversation
13    I had with Dale to fully answer that.  Off the top of
14    my head, I do not remember speaking to Dale about
15    David's family.
16        MR. BENNETT:  Is that note in the
17    original visit?  Is it incorporated in that?
18 A  No, it's a separate note that I would have written
19    about two days after the original visit.  Because then
20    I got ahold of him on the phone, and that's the only
21    thing in that note.  And I did not see it in this.
22        MR. BENNETT:  It didn't say very
23    much in that note, I don't think, did it?
24 A  That separate note, it was pretty to the point.  I know
25    it summarized the head trauma, it summarized the

**Page 51**

1     chemical health history.  I just can't -- if I would
2     have gotten history about family, it would have been in
3     there.  But I do not remember anything about family off
4     the top of my head.  Usually I do try to keep those
5     collateral notes kind of brief and to the point for
6     privacy reasons.
7        MR. BENNETT:  Sure.  Is it in here
8     though?  In the --
9 Q   (By Ms. Fussy)  Well, let me ask you --
10        MS. PUTNEY:  You didn't see it in
11    Exhibit EE, did you?
12 A  No.
13 Q  (By Ms. Fussy)  Are there additional medical records
14    from you that you prepared, notes of anything that we
15    don't have in these documents?
16 A  The only things that I think -- the only things I note
17    that aren't included are the documentation of when
18    David did not show up for appointments, documentation
19    of notes that I may have received from his care
20    manager, and documentation of a phone conversation with
21    his therapist, Dale Peterson.
22 Q  And by "documentation," what do you mean?  Like just
23    noting that it happened?
24 A  Correct.
25 Q  Or like actual substantive?

**Page 52**

1 A   Noting that it happened, and a brief substantive
2     description of what took place.
3 Q   I assume that we can give you the appropriate release.
4     Can we get those documents as well?
5        MS. PUTNEY:  Well --
6        MR. BENNETT:  I mean, we've already
7     given them --
8        MS. FUSSY:  I thought we had.  I
9     don't know why we don't have the documents.
10        MS. PUTNEY:  Well, I'm not speaking
11    to this situation, but other than his note of his call
12    with Dr. Peterson --
13 A  That's really it.
14        MS. PUTNEY:  Right.  The others
15    might not --
16        MS. FUSSY:  Well, Maureen Glover --
17        MS. PUTNEY:  Yeah, but they might
18    not give you other provider's records, just from my
19    experience trying to get records.  They won't give you
20    outside provider's records, they'll only give you -- I
21    don't know what your authorization said.
22        MR. BENNETT:  But his note with
23    Peterson would be a Park Nicollet --
24        MS. PUTNEY:  I would think it would
25    be.  And if you made a notation about the --

1  (Whereupon the discussion continued
2  off the record.)
3  MS. FUSSY: Okay. I don't have any
4  further questions at this point.
5  MR. BENNETT: Okay. I do have some.
6  EXAMINATION
7  BY MR. BENNETT:
8  Q  You are about, I don't know, the 80th deposition that
9     we've taken. We've taken probably 25 people who have
10    known, related to, or dealt with David professionally,
11    and most of them said that, you know, they had good
12    David and bad David, kind of like you. But good David
13    by all accounts was a really good guy?
14 A  I found him easily likeable. I never dreaded when I
15    saw him on my schedule. I always felt bad that he
16    continued to struggle. He was a likeable young man,
17    yes.
18 Q  I'm going to tell you a little bit about his family --
19    MR. BENNETT: And if I say
20    anything wrong, you can correct me, Tracey.
21 Q  (By Mr. Bennett) But your one note on 6417 kind of
22    says some things, and I just want to clarify. It says,
23    "Patient grew up with seven siblings, and the oldest
24    child." He also talked about the mother raising and
25    family basically on welfare in Peoria. That's what
53

1  how they were doing, what their problems were. Is that
2  believable to you based on -- and maybe he only went
3  when he was in the good cycle, I don't know. But
4  that's what the siblings have said uniformly?
5 A  If they saw him when he was doing well and sober and
6    taking medications, then yes, I would find that
7    believable. It's a little hard to believe if someone
8    does have pubertal onset psychosis, that no one else in
9    the family would have noticed something, or he wouldn't
10   have said something.
11 Q  Well, he left at 17.
12 A  So, and I don't know if he got treatment at those young
13   ages. But parents or a guardian would have had to
14   consent to treatment at that young age.
15 Q  She did not.
16 A  So he did not receive treatment.
17 Q  He went for immunizations, and if he, you know, got
18   hurt somehow or you know got sick.
19 A  Okay.
20 Q  I mean they were -- that's the history that they have
21   all said. And people -- actually people do remember
22   that he fell off a roof one time, and I think that's
23   the window incident?
24 A  Right.
25 Q  And that a TV fell on him, which is I think in another
55

1  your recollection is generally?
2 A  That's what he told me, yeah.
3 Q  And by all accounts, that's true. He fit into the
4    family system by he was the oldest boy, and the second
5    oldest child. And there were brothers and sisters
6    under him, and one sister older than him. By "under,"
7    I mean younger. I think the record is clear that the
8    only one who even knew he had heard voices and
9    interpreted that to be mentally -- some mental illness
10   problem was his sister. And he would talk to her about
11   it, and she would -- there was record that he talked to
12   her about it on the phone, and often when he did, it
13   was late at night and he would -- you know, she would
14   try to comfort him. But he never told you that, did
15   he?
16 A  No.
17 Q  Other than that, the other siblings don't really have
18   any recollection of him saying anything about being
19   mentally ill or that -- mentioning the people up here
20   who basically treated him for that. Is that uncommon
21   that people will compartmentalize that?
22 A  No.
23 Q  In fact, they said that when they talked to David and
24   he came back for the holiday, he was -- they didn't
25   notice anything wrong. And he was always talking about
54

1  medical record. And I don't think -- even think he
2  went to the doctor for that one, at least I think
3  that's the record as it stands. But it isn't unusual
4  for people to move away -- if they are mentally ill, to
5  separate from the family, correct?
6 A  Yeah. We call it a geographic cure. So it's the idea
7    if you have a start over in a new area with a fresh
8    start, that you leave your problems behind. It's
9    extremely common in people with chemical health
10   problems. That that is a common way people try to
11   solve mental health problems.
12 Q  And he did reasonably -- at least the record reflects
13   he did reasonably well in school until he up and left
14   basically. He came up here, and then went in the job
15   corp. Did he mention that job corp to you?
16 A  There was always some kind of job training program he
17   was involved in. I think it changed a couple of times.
18   But he always -- he seemed to take very seriously being
19   involved in some job rehab.
20 Q  And he got his GED up here. Was that part of your
21   frame of reference? Was that something that Dale
22   Peterson might have said to you?
23 A  Maybe. I think his schooling was more post GED stuff
24   that he was working on.
25 Q  That too. But he -- the GED is kind of the jumping off
56

1  spot for anything post-high school, right?
2 A  Sure, sure.
3 Q  The other thing that his siblings, especially the older
4  one, remembers, is that he was always making notes to
5  himself and was always calling himself and leaving
6  himself messages.  Is that symptomatic of that
7  disorganization piece?
8 A  It's idiosyncratic.  It's an unusual way to try to
9  organize information.  You know, most people would
10  choose to keep a notebook or a log or write things
11  down, calling your own phone and leaving yourself
12  messages is a little more odd.  That being said, I've
13  done it on occasion.
14      MS. PUTNEY:  I was going to say --
15      MS. FUSSY:  Yeah.
16      MR. BENNETT:  I've e-mailed myself,
17  "remember to go do this."
18 A  I wouldn't do it more as just reflecting that he was
19  struggling with organizational issues.
20 Q  (By Mr. Bennett)  You did come to the judgment at least
21  in his good cycle that he was employable?
22 A  Yes.
23 Q  And you did come to the judgment at least when he was
24  in his good cycle, that he was educatable?
25 A  Yes.
                                                    57

1 Q  And I take it you have undertaken this profession with
2  the idea that people who have mental illness still have
3  value and are worthy of care and societal concern
4  generally, correct?
5 A  Yes.
6 Q  Okay.  You don't value someone less than human because
7  they have a mental illness?
8 A  No.
9 Q  Are there -- can you ever write a happy ending on this
10  book?  I mean, about David's life?  Are there happy
11  periods?  I mean, is there -- it sounds like there's
12  always going to be some troubles, but if you could
13  get -- is there some -- do patients ever realize that
14  medication is good for them and it is a way for them to
15  stay societally important or --
16 A  Yes.
17 Q  -- meaningful, or even to themselves?
18 A  Yes.  The best possible outcome for a patient similar
19  to David is usually residence in a group home, a job,
20  staying on medications.  And then they have -- they
21  have permanent housing.  They have a job.  They have a
22  check.  They often are on disability, but they continue
23  to work.  And I have two dozen patients where they are
24  actually very happy with that routine, and they are
25  pretty content.
                                                    58

1 Q  Well, that was -- that's the same information I've got
2  from others who deal with paranoid schizophrenia.  I
3  mean, it's not easy, but it's not undoable in terms of
4  their long-term care, correct?
5 A  Right.
6 Q  The time that he got his nose broken in a fight or an
7  assault, it's a little undetermined on how it happened.
8  Can you get -- would you get those record sent to you
9  typically, or they are just -- if he came in and had
10  been diagnosed and sometime after that, would that --
11  that pass without you knowing it?
12 A  Typically I'm not -- typically I would not be hunting
13  for the records of like the ER and the broken nose
14  unless it resulted in a psych admission.  If it
15  resulted in a psych admission, I'm going to go after
16  those records, otherwise I do not typically go after
17  those.
18 Q  And it's not sent to you just in the normal course of
19  business?
20 A  No.
21 Q  Okay.  And he would -- you know, we know he went to --
22  back to Peoria when his grandmother died and
23  participated in the family event there.  That was never
24  mentioned to you?  That was during the course of the
25  time you treated him, I think.
                                                    59

1 A  Correct.  He would fall away from treatment with me
2  sometimes for significant periods.  I think up to four
3  to six months, so.
4 Q  Would that be in good cycles or bad cycles or both?
5 A  I'm not sure.  Let me check.  I want to say if he fell
6  out of treatment for that long, usually something bad
7  would happen in the interim.
8 Q  Okay.
9 A  Usually I would want to see him more often than when he
10  would actually come in for.
11 Q  Or would it be a surplus of confidence he had in a good
12  cycle, and he would think he could get away without
13  seeing you?
14 A  That is common.
15 Q  And then the falling off the wagon, medical or
16  substance abuse?
17 A  So for example, he went two months without seeing me,
18  from March until April, but had been readmitted back to
19  a residential treatment program.  So I think to answer
20  your question, usually if he had not seen me for quite
21  some time, something bad would have happened in the
22  interim.
23 Q  At least by the end of that?
24 A  Yes.
25 Q  Your first note says, "There's no history of any
                                                    60

1    suicide attempts, purposeful or accidental violence
2    towards others or inpatient psychiatric treatment other
3    than his residential treatment at Cedar Ridge." And
4    you were comfortable with that observation?
5 A  I wasn't until I talked to his psychologist --
6 Q  Okay.
7 A  -- to get confimation of that, because I didn't view
8    him as terribly reliable.
9 Q  Okay. And it's not uncommon for you -- for example,
10    not to talk to his siblings or parents if they are in
11    other states, and if they are really in either the
12    profoundly or working poor, there's not a lot of travel
13    opportunities I wouldn't think you could get to see
14    them either?
15 A  Correct. I'm more likely to talk to someone's family
16    if they are identified as a support, if they are local,
17    and I don't think it's going to worsen the treatment
18    relationship.
19 Q  Okay.
20 A  When a guy seemed paranoid and is not describing that
21    his family plays a role in his life and I think there
22    are other people who can substitute in that role, I'm
23    not usually going to push him on talking to family.
24 Q  And I might have asked you this, but would it be
25    unusual for someone like David to not mention you or to

61

1    not mention Maureen Glover or, you know, not mention
2    that he's getting the quantity and depth of services
3    that he's getting to his family?
4 A  No, that would not be unusual, especially if someone
5    has a history of keeping their psychotic symptoms
6    secret from their family.
7 Q  I take it vis-a-vis, their family, even psychotic
8    people have some view of how their placement is in the
9    family structure?
10 A  Sure.
11 Q  And if they can maintain that without disclosing their
12    mental illness to their siblings or their parent, they
13    would do that oftentimes?
14 A  Yes, they will. I think some people will quickly cry
15    out for help and say that something is wrong, but a lot
16    of my patients have very, very mixed feelings about
17    talking to their family about those kind of symptoms.
18    They are much more likely to talk about depression or
19    anxiety, but they'll usually come to a doctor or
20    therapist before they may come to a family member if
21    they are hearing voices.
22 Q  Many of his brothers are a fair amount, and some a lot
23    younger than David, and there wasn't any father around
24    really. And David, they portrayed David as trying to
25    be the adult or oldest male figure in their lives.

62

1    That wouldn't surprise you?
2 A  No, I wouldn't say it would surprise me.
3 Q  And you could certainly see good David trying to occupy
4    that role and feel good about occupying that role?
5 A  Yeah. He always took education, bettering himself,
6    making an income, very, very seriously. So that would
7    fit in with the concept of trying to take care of his
8    family.
9 Q  And most of the time had he was in a good cycle, he
10    would look good, wouldn't he?
11 A  Yes. Like I said, there was a clear difference between
12    that and when he would look more disheveled and not
13    make eye contact and seemed as more odd. But yeah,
14    when he was doing well, he would look good.
15         MR. BENNETT: I think that's all I
16    have. Thank you, Doctor. I appreciate it.
17         MS. FUSSY: I just have a few
18    follow-up questions.
19         MR. BENNETT: I did forget one.
20         MS. FUSSY: Oh, please.
21 Q  (By Mr. Bennett) We talked a little bit about
22    dextromethorphan, and that's one of the active
23    ingredients in Coricidin. Did you get to know him as a
24    user of Coricidin?
25 A  I did not. That could be a hard thing to show. It

63

1    will not show up on a standard tox screen, and if we
2    had done a toxicology screen, it would not show up on
3    that, so it's hard to pick up. But I did not know
4    about that prior to you mentioning it.
5 Q  And do you know of anybody who's ever fatally overdosed
6    on Coricidin? Is that in any report that you know of?
7 A  I have had several patients abuse it in very large
8    amounts, and they have never needed intubation or
9    stopped breathing or died from it. I can't say I am an
10    expert on toxicology of Coricidin, but it's not one
11    like heroin or alcohol where people can commonly die
12    from taking too much of it.
13 Q  The other drug that's in coricidin is dextromethorphan
14    is Chlorphenamine?
15 A  Okay.
16 Q  And that's not -- dextromethorphan, that's the more
17    active ingredient causing an altered mental state which
18    is really what I heard you describe?
19 A  Chlorphenamine can cause some psychoactive effects.
20    It's basically an antihistamine. If you take enough of
21    it, you can get very confused and what we would call
22    delirious. But that's not usually a fun experience.
23    For the fun part of it, people usually are taking the
24    dextromethorphan.
25 Q  All right. And this is a medical record -- and I don't

64

1 have the exhibit with me -- but I think it's Exhibit
2 12, which is -- I think it was September 1, 2010, which
3 is -- I think it's either the first or the second, and
4 the September 9th, 2010, was the event that caused his
5 death. But he went to the HCMC, he admitted having 30
6 plus Coricidin, and they watched him for a bit, and I
7 think they gave him fluid, which would be in the ER.
8 And then I think they did a screen for Chlorphenamine,
9 but they didn't even do a tox screen for dex. And then
10 they just let him go once it cleared.
11 A Okay.
12 Q Is that -- that would be how you would think that an ER
13 would deal with a dextromethorphan overdose?
14                 MS. PUTNEY: I'm just going to --
15 Q (By Mr. Bennett) Do you understand.
16                 MS. PUTNEY: Object on foundation
17 grounds.
18 Q (By Mr. Bennett) Yeah, if you would know?
19 A I don't. It would depend on so many other
20 circumstances.
21 Q Well, you wouldn't -- if somebody took 30 plus
22 Coricidin or the dex, wouldn't you expect -- I mean,
23 you wouldn't expect them to -- strike that. I'll leave
24 it alone.
25 A All right.
65

1 but you can't know for sure.
2 Q What are risk factors that put a patient at high risk
3 for noncompliance?
4 A Substance abuse, psychosis, delusions, a lack of
5 insight, impulsivity, bad side effects from
6 medications, extremely costly medications would be the
7 main ones I can think of right now.
8 Q Why did you stop seeing David?
9 A I forget -- and I forget the exact number of
10 appointments he missed with me. I'm going to ballpark
11 it around six. Because the clinic where I was working
12 at that time in Minneapolis only got paid for people
13 who showed up, we had a policy if you missed three
14 appointments, we could eventually ask you to go
15 elsewhere. So after David had missed six, we enacted
16 that policy and asked him to get a psychologist through
17 a county or through another agency.
18 Q Okay. And you used the expression sort of good David
19 and bad David, could bad David have served as a father
20 figure while he was on the bad David cycle?
21 A What do you mean by father figure?
22 Q So he could have provided advice, guidance, counseling?
23 A While he was psychotic and delusional and abusing the
24 drugs and alcohol, I would say the counseling and
25 advice he would have given would have -- I mean,
67

1                 MR. BENNETT: Go ahead. I'm done.
2                 MS. FUSSY: Okay. Just a couple of
3 questions.
4                 EXAMINATION
5 BY MS. FUSSY:
6 Q Did you ever know of David holding down a job for any
7 significant period of time?
8 A When I reviewed the chart prior to today, I saw that
9 his primary care doctor noted he had gotten a job as a
10 laborer. It looked like he was working for a
11 sanitation department. I don't know how long he worked
12 for that job, and that was after he had fallen away
13 from care with me.
14 Q Okay.
15 A Over the course of my treatment with him, he never had
16 reached a point of being ready for a job search. It
17 was always the job training.
18 Q Okay.
19 A So no, I did not know him to work regularly while I
20 treated him.
21 Q How do you know if a patient is going to stay on
22 medication like for the rest of their life
23 consistently?
24 A You can take an educated guess and look at risk factors
25 that would put them at greater risk for noncompliance,
66

1 everyone is capable of advice and counseling, you are
2 asking whether he would have been a good father figure
3 or not?
4 Q Capable of providing, yeah, good advice, counseling,
5 guidance?
6 A Not while he was abusing substances and not taking his
7 medications.
8 Q What does delirious mean?
9 A Delirious means confused, disoriented, not aware of
10 your surroundings, what day or date or year it is.
11 Q Okay.
12                 MS. FUSSY: I have no further
13 questions.
14                 MR. BENNETT: Nor do I.
15                 MS. FUSSY: Thank you so much.
16                 MS. PUTNEY: Would you like to read
17 and sign your transcript or would you like to waive
18 that right?
19 A I'll read and sign it.
20                 (Whereupon the deposition ended at
21 approximately 11:30 p.m.)
22                 *  *  *  *
23
24
25
68

1  (UPON COMPLETION, forward this original Reading and Signing
   Certificate to ATTORNEY FUSSY, who already has the Sealed
2  Original.)

4          I, JOSHUA ZUMMERMAN, do hereby certify that I have

5  read the foregoing transcript of my Deposition and believe

6  the same to be true and correct, (or except as follows,

7  noting the page and the line number of the change or addition

8  desired and the reason why):

9

10 Page     Line       Change or Addition       Reason

11

12

13

14

15

16

17

18

19

20

21

22

23  _____

24 Dated this _____ day of _____, 2012

25 LMT

69

1  STATE OF MINNESOTA)

2              ) SS.

3  COUNTY OF GOODHUE )

4

5          Be it known that I took the deposition of JOSHUA

6  ZIMMERMAN on the 26th day of October, 2012;

7          That I was then and there a notary public in and

8  for the County of Goodhue, State of Minnesota, and that by

9  virtue thereof; I was duly authorized to administer an oath;

10         That the witness before testifying was by me first

11 duly sworn to testify to the truth and nothing but the truth

12 relative to said cause;

13         That the testimony of said witness was recorded in

14 computerized stenotype and thereafter transcribed by myself,

15 and that the testimony is a true record of the testimony

16 given by the witness to the best of my ability;

17         That I am not related to any of the parties hereto

18 nor interested in the outcome of the matter.

19

20 WITNESSED MY HAND AND SEAL THIS 1ST DAY OF NOVEMBER, 2012.

21

23

24  _____

25              Lisa M. Tiedeman

70

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

               Plaintiff,

     vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

               Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 4 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

     Exhibit 4 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

___  Voluminous Document* (Document number of order granting leave to file conventionally: __ )

___  Unable to Scan Documents (PDF file size larger than the e-filing system allows)

___  Physical Object (description):

___  Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_  Item Under Seal* Pursuant to Protective Order, Document #10.

___  Conformance with the Judicial Conference Privacy Policy (General Order 53)
       (Document number of redacted version: ____)

___  Other (description):

* Filing of these items requires Judicial Approval.

     This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

                              Plaintiff,

        vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

                              Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 5 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

        Exhibit 5 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

\_\_\_ Voluminous Document* (Document number of order granting leave to file conventionally: \_\_ )

\_\_\_ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

\_\_\_ Physical Object (description):

\_\_ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal* Pursuant to Protective Order, Document #10.

\_\_\_ Conformance with the Judicial Conference Privacy Policy (General Order 53)
        (Document number of redacted version: \_\_\_)

\_\_\_ Other (description):

* Filing of these items requires Judicial Approval.

        This Notice is e-filed as a place holder in ECF for the documents filed conventionally.  A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 6

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

                  Plaintiff,

      vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

                  Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 6 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

      Exhibit 6 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

___ Voluminous Document* (Document number of order granting leave to file conventionally: __ )

___ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

___ Physical Object (description):

___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal* Pursuant to Protective Order, Document #10.

___ Conformance with the Judicial Conference Privacy Policy (General Order 53)
      (Document number of redacted version: ___)

___ Other (description):

* Filing of these items requires Judicial Approval.

      This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 7

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

                Plaintiff,

     vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

                Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 7 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

      Exhibit 7 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

___ Voluminous Document* (Document number of order granting leave to file conventionally: ___ )

___ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

___ Physical Object (description):

___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal* Pursuant to Protective Order, Document #10.

___ Conformance with the Judicial Conference Privacy Policy (General Order 53)
      (Document number of redacted version: ___ )

___ Other (description):

* Filing of these items requires Judicial Approval.

     This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 8

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

               Plaintiff,

   vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

               Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 8 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

     Exhibit 8 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

___ Voluminous Document* (Document number of order granting leave to file conventionally: ___ )

___ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

___ Physical Object (description):

___ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal* Pursuant to Protective Order, Document #10.

___ Conformance with the Judicial Conference Privacy Policy (General Order 53)
       (Document number of redacted version: ___)

___ Other (description):

* Filing of these items requires Judicial Approval.

     This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 9

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

               Plaintiff,

    vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

               Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 9 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

    Exhibit 9 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

\_\_\_ Voluminous Document* (Document number of order granting leave to file conventionally: \_\_ )

\_\_\_ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

\_\_\_ Physical Object (description):

\_\_ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

_X_ Item Under Seal* Pursuant to Protective Order, Document #10.

\_\_\_ Conformance with the Judicial Conference Privacy Policy (General Order 53)
       (Document number of redacted version: \_\_\_)

\_\_\_ Other (description):

* Filing of these items requires Judicial Approval.

    This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 10

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

               Plaintiff,

     vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

               Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLACEHOLDER FOR
EXHIBIT 10 TO THE
AFFIDAVIT OF
ROBERT BENNETT**

This document is a place holder for the following item, which is filed in conventional or physical form with the Clerk's Office:

     Exhibit 10 to the Affidavit of Robert Bennett

If you are a participant in this case, this filing will be served upon you in conventional format.

This filing was not e-filed for the following reason(s):

\_\_\_ Voluminous Document* (Document number of order granting leave to file conventionally: \_\_ )

\_\_\_ Unable to Scan Documents (PDF file size larger than the e-filing system allows)

\_\_\_ Physical Object (description):

\_\_ Non Graphical/Textual Computer File (audio, video, etc.) on CD or other media

 X  Item Under Seal* Pursuant to Protective Order, Document #10.

\_\_\_ Conformance with the Judicial Conference Privacy Policy (General Order 53)
       (Document number of redacted version: \_\_\_)

\_\_\_ Other (description):

* Filing of these items requires Judicial Approval.

     This Notice is e-filed as a place holder in ECF for the documents filed conventionally. A copy of this Notice and a copy of the NEF are filed with the Clerk's Office along with the conventionally filed item(s).

# EXHIBIT 11

DEC-09-2011  10:31        GASKINS BENNETT BIRRELL              66412 333 9579    P.72/77
6126596310
10:20:12 a.m.    12-09-2011      72/77

```
Report-ID  : AR039CGA
Version/Mode : 04.11 / PROD
Institution : Minneapolis Community & Technical Coll
```

**MN State Colleges and Universities**
**Accounts Receivable System**
**Student Account Summary**

Date : 11/17/11
Time : 09:15:17
Page : 1

Name: Smith David   ID Number: 00166682

| Charges | Fall 2000 | Spring 2001 | Summer 2001 | Fall 2001 | Fall 2005 | Summer 2006 | Spring 2007 | Fall 2007 | Spring 2008 | Summer 2008 |
|---|---|---|---|---|---|---|---|---|---|---|
| Application Fee | 20.00 | | 20.00- | | | | | | | |
| Non-Resident Tuition | 1,622.50 | 1,770.00 | | | 2,932.80 | 122.20 | | 680.00 | | 702.32 |
| Technology Fee | 55.00 | 60.00 | | | 96.00 | 4.00 | | 40.00 | | 40.00 |
| Student Life Activity Fee | 41.25 | 45.00 | | | 45.00 | 1.88 | | 18.75 | | 18.75 |
| State Wide Student Association | 2.75 | 3.00 | | | 3.60 | .15 | | 1.55 | | 1.55 |
| Bus Pass | | | | | | 30.00 | | | | |
| Text Books | | | | | | | | | | |
| Electronics | | 385.25 | | | | | | | | |
| Art Supplies | | 23.99 | | | | | | | | 22.99 |
| Undergraduate Non-Resident/Non | | 27.48 | | | 267.22 | | | | | |
| Other Income | | | | 5.00 | | | | | | |
| Liability Insurance | | | | | | | | | | |
| Sale of New Books | | | | | | | | | | |
| Sale of Used Books | | | | | | | | | | |
| Sale of Notebooks/Paper/Binder | | | | | | | | 81.05 | | 89.05 |
| Sale Tax - Minnesota | | | | | | | | 43.20 | | 1.49 |
| Non-Resident Film & Video Tuit | | | | | | | | 5.88 | | .11 |
| Textbooks (New price) | | | | | | | | .42 | | .03 |
| State Sales Tax | | | | | | | | | | |
| City Sales Tax | | | | | | | | | | |
| County Sales Tax | | | | | | | | | | |
| Continuing Education & Trainin | | | | | | | | | | |
| Student Center Fee | | | | | | | | | | |
| Health Services Fee | | | | | | | | | | |
| Miscellaneous-Other | | | | | | | | | | |
| Sale of Backpacks | | | | | | | | | | |
| Late Fee | | | | | | | | | | |
| Student Late Fees | | | | | | | | | | |
| **Waivers** | | | | | | | | | | |
| Crse Cond | | | | | 488.80 | | | | | |
| **Write Off** | | | | | | | | | | |
| Receivable Written Off | | | | | | | | | | |
| **Financial Aid** | | | | | | | | | | |
| Pell Grant | 1,238.00 | 1,650.00 | | | 2,025.00 | | | 539.00 | | 539.00 |
| Subsid - SSL | | | | | 1,272.64 | | | 390.00 | | 390.00 |
| MN Grant | | | | | | | | | | |
| Unsub - SSL | | | | | | | | | | |
| **Third Party** | | | | | | | | | | |
| HHH Job Corp | 483.50 | 228.00 | | | | | | | | |
| T.P. Books | | | | | | | | | | |
| *TP Books AG | | 412.73 | | | | | | | | |
| **Payments received** | | | | | | | | | | |
| 11/13/2001 | 5.00 | | | | | | | | | |
| 01/17/2007 | | | | | | 158.23 | | | | |

SMITH 001655

Report-ID   : AR03956CB
Version/Mode : 04.11 / PROD
Institution : Minneapolis Community & Technical Coll

Name:   Smith David                            ID Number:   00166682

MN State Colleges and Universities
Accounts Receivable System
Student Account Summary

Date : 11/17/11
Time : 09:15:17
Page : 2

Checks / Direct deposit

| Date | | | | |
|---|---|---|---|---|
| 07/25/2001 | 00073783 | 30.00 | | |
| 10/05/2005 | 00167781 | | | |
| 09/13/2007 | 00210129 | | | 52.71 |
| 06/19/2008 | 00223346 | | | |

Totals

| | Spring 2009 | Fall 2009 | Spring 2010 | Total | | |
|---|---|---|---|---|---|---|
| Charges | 1,741.50 | 2,314.72 | 20.00- | 5.00 | 158.23 | 875.85 | 876.29 |
| Waivers | | | | | | |
| Financial Aid | 1,238.00 | 1,650.00 | | | | 929.00 | 929.00 |
| Third Party Aid | 483.50 | 640.73 | | | | | |
| Payments received | 5.00 | | | | | | |
| Check / Direct deposit | 30.00 | | | | | | |

387.83   158.23   53.15

Account Balance   45.00   23.99   20.00-   5.00   53.99-   53.15   52.71

| | Spring 2009 | Fall 2009 | Spring 2010 | Total |
|---|---|---|---|---|
| Charges | | | | |
| Non-Resident Tuition | | 422.25 | | 8,252.07 |
| Technology Fee | | 60.00 | | 355.00 |
| Student Life Activity Fee | | 24.00 | | 194.63 |
| State Wide Student Association | | 1.86 | | 14.46 |
| Bus Pass | | | | 30.00 |
| Text Books | | | | 652.47 |
| Electronics | | | | 46.98 |
| Art Supplies | | | | 27.48 |
| Other Income | | | | 6.50 |
| Sale of New Books | | | 18.95 | 100.00 |
| Sale of Used Books | | | 25.65 | 73.85 |
| Sale of Notebooks/Paper/Binder | | | | 5.88 |
| Sales Tax - Minnesota | | | 4.27 | 4.69 |
| Non-Resident Film & Video Tuit | | 645.00 | | 645.00 |
| Textbooks (New price) | | | | 89.05 |
| State Sales Tax | | | | 1.49 |
| City Sales Tax | | | | .11 |
| County Sales Tax | | | | .03 |
| Continuing Education & Trainin | | 159.00 | | 159.00 |
| Student Center Fee | | 42.00 | | 42.00 |
| Health Services Fee | | 4.50 | | 4.50 |
| Miscellaneous-Other | | | 84.00 | 84.00 |
| Sale of Backpacks | | | 54.99 | 54.99 |
| Late Fee | | | 30.00 | 30.00 |

Waivers

| Case Cond | | 488.80 |

Write Off

Financial Aid

| Pell Grant | 1,338.00 | 7,329.00 |

SMITH 001656

```
Report-ID    : AR059SCB                          MN State Colleges and Universities        Date : 11/17/11
Version/Mode : 04.11 / PROD                           Accounts Receivable System           Time : 09:15:17
Institution  : Minneapolis Community & Technical Coll   Student Account Summary             Page : 3

Name:  Smith David                     ID Number: 00166682

Subsid - SSL              1,723.75                2,996.59
MN Grant                                            780.00
Unsub - SSL               2,955.00                2,955.00

Third Party
HHH Job Corp                                        711.50
*TP Books AG                                        412.73

Payments received
11/13/2001                                            5.00
01/17/2007                                          158.23
03/26/2009      159.00                              159.00
08/18/2009                                          157.00

Checks / Direct deposit
07/25/2001  00737785                                 30.00
10/06/2005  00167781                                387.43
09/13/2007  00210129                                 53.15
06/19/2008  00223346                                 52.71
09/29/2009  00245714          295.39                295.39
11/05/2009  00240261        4,678.75              4,678.75

Totals
Charges                     159.00    1,199.61    217.86    10,872.68
Waivers                                                        488.80
Financial Aid                         6,016.75              14,060.39
Third Party Aid                                             1,124.23
Payments received           159.00      157.00                479.23
Checks / Direct deposit               4,974.14              5,497.83

Account Balance                                   217.86      217.86    217.86
```

SMITH 001657

# EXHIBIT 12

Condensed Transcript

## In the Matter Of:

## SMITH vs. GORMAN

11-CV-03071

## ADAM BROWN

*October 10, 2012*



ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
1–4

---

Page 1

1   IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF MINNESOTA
2

3   Larry E. Smith as trustee
    for the Heirs and Next of
4   Kin of David Cornelius
    Smith,                    CIVIL ACTION FILE
5
        Plaintiff,      NO. 11-CV-03071
6
    vs.
7
    Timothy Gorman and Timothy
8   Callahan, acting in their
    individual capacities as
9   Minneapolis police
    officers, and the City of
10  Minneapolis,
11      Defendants.
    --------------------------------
12
13      DEPOSITION OF
14         ADAM BROWN
15
16      October 10, 2012
17         2:15 p.m.
18
19      4700 Southport Road
        College Park, Georgia
20
21   Kara Barger, CCR No. B-1496
22
23
24
25

---

Page 2

1        APPEARANCES
2
3   On behalf of the Plaintiff:
4      ROBERT BENNETT, Esq.
       JEFFREY S. STORMS, Esq.
       Gaskins, Bennett, Birrell & Schupp
5      333 South Seventh Street
       Suite 2900
6      Minneapolis, Minnesota 55402
       612-333-9500
7      rbennett@gaskinsbennett.com
8
    On behalf of the Defendants:
9
10     TRACEY N. FUSSY, Esq.
       BURT T. OSBORNE, Esq.
       City of Minneapolis, Office of City Attorney
11     350 South Fifth Street
       Room 210
12     Minneapolis, Minnesota 55415
       burt.osborne@ci.minneapolis.mn.us
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1            ADAM BROWN,
2   having been first duly sworn, was examined and
3   testified as follows:
4            CROSS-EXAMINATION
5   BY MR. OSBORNE:
6      Q.   Could you give the court reporter your
7   full name and spell your first name and middle name
8   and last name?
9      A.   Say it first and then spell it?
10     Q.   Yes.
11     A.   Adam Larry Earl Brown, A-d-a-m, L-a-r-r-y,
12  E-a-r-l, B-r-o-w-n.
13     Q.   Mr. Brown, my name is Burt Osborne.  I'm
14  an assistant city attorney, and I represent the
15  defendant police officers in this case and the City
16  of Minneapolis.  I'm going to be taking your
17  deposition today.
18         Have you ever had your deposition taken
19  before?
20     A.   No, sir.
21     Q.   So a few ground rules so today goes as
22  quickly and as smoothly as possible.
23         The court reporter is transcribing
24  everything we say to make a permanent and, hopefully,
25  accurate record of what you and I talk about today.

---

Page 4

1   And it helps her if, No. 1, you and I talk one at a
2   time.  I'm going to let you finish your answers
3   before I hop in with another question, and you need
4   to try to let me finish my question before you begin
5   your answer.
6         Is that fair enough?
7      A.   Yes.
8      Q.   And then the second rule is that it's
9   difficult for the court reporter to transcribe
10  nonverbal answers like uh-huh and huh-uh and nods of
11  the head and shakes of the head like that.  Between
12  normal conversation with you and I, I know exactly
13  what you're talking about; but it's difficult for her
14  to transcribe and accurately reflect what your answer
15  is.
16         Does that make sense?
17     A.   Yes.
18     Q.   Okay.
19     A.   Yes and no pretty much, right?
20     Q.   Yes and no and just use the King's English
21  for all your answers.
22         Now, is there any reason why you can't
23  concentrate today or testify in your deposition?  Are
24  you under the influence of any drugs or alcohol of
25  any kind?



ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
9–12

Page 9

1   Q.   Okay.
2   A.   But I want to get in solar power
3   engineering.
4   Q.   Pardon?
5   A.   Solar power engineering.
6   Q.   Solar-powered engineering, okay.
7   A.   Yeah.
8   Q.   Have you taken any education or training
9   on that?
10  A.   It's coming up in the future.
11  Q.   Okay.
12  A.   I'm going to advance from Job Corps.  They
13  offer programs where you can advance in your
14  trade/field, and they'll send you somewhere to
15  advance more training.  And they offer solar-powered
16  training.
17  Q.   Do you know where you're going to take
18  that at?
19  A.   Yeah.  I've got a couple of locations that
20  I'm interested in.
21  Q.   In Atlanta or elsewhere?
22  A.   Elsewhere.
23  Q.   Where do you want to go?
24  A.   Between Florida or California.  I'm
25  looking at D.C. too.

Page 10

1   Q.   Okay.  Before you lived in the dorms at
2   Brunswick, where did you live before that?
3   A.   Atlanta, Georgia.
4   Q.   And how long did you live in Atlanta?  How
5   long have you lived in Atlanta?
6   A.   For a year.  So it's going on two years
7   after this.
8   Q.   Okay.  So you lived in Atlanta for about a
9   year and a few months before you joined the Job
10  Corps?
11  A.   Yes.
12  Q.   Where did you live then?
13  A.   71 Thayer Avenue.  You're talking about
14  who did I stay with?
15  Q.   No.  What was your address?
16  A.   71 Thayer Avenue.
17  Q.   And was that an apartment or a house?
18  A.   That was a house.
19  Q.   Who did you live with there?
20  A.   I lived with my sister Angela.
21  Q.   For a year and a few months?
22  A.   Right.
23  Q.   Before that did you live anywhere else in
24  Atlanta?
25  A.   No, sir.

Page 11

1   Q.   Did you live in Peoria before that?
2   A.   Before I came to Atlanta?
3   Q.   Yes.
4   A.   Yes, sir.
5   Q.   Who did you live with when you lived in
6   Peoria?
7   A.   My mother.
8   Q.   Did you live with your mother exclusively
9   while you were in Peoria or did you live other
10  places?
11  A.   Exclusively.
12  Q.   Okay.  How old are you?
13  A.   I'm 22.
14  Q.   What's your date of birth?
15  A.   ████████
16  Q.   As part of your current Job Corps duties,
17  are you performing any work for pay?  Do you get paid
18  by any employer?
19  A.   No, sir.  But they do offer certain
20  programs.  Like you can work in the cafeteria and get
21  paid.  I haven't had a chance to do that because I
22  got elected president of SGA, Student Government
23  Association.  So that kind of keeps me tied up with
24  extra stuff.
25  Q.   What's the SGA?  What does that stand for?

Page 12

1   A.   Student Government Association.
2   Q.   Oh, okay.  Of Brunswick?
3   A.   Yes.
4   Q.   And then do you get paid for performing
5   those duties?
6   A.   No.  You just take on extra work.
7   Q.   Okay.
8   A.   They've got phases on your productivity.
9   Like they've got bronze, silver and gold phase.  Gold
10  phase, you can get paid earlier than the rest of the
11  student body.  Like we get paid on Monday normally.
12  If you make the gold phase you can get paid on
13  Friday.
14  Q.   How much do you get paid each week?
15  A.   About 40 to 50 bucks every two weeks.
16  Q.   Okay.
17  A.   Dollars.
18  Q.   What high school did you attend?
19  A.   Manual High School.
20  Q.   In Peoria?
21  A.   In Peoria.
22  Q.   Did you graduate?
23  A.   No, sir.
24  Q.   What year were you supposed to graduate?
25  A.   2009.

ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
17–20

Page 17

1  forgot to bring my doctor note to work and they let
2  me go.
3      Q.   Was there a confrontation at work?
4      A.   No, sir.
5          This is the situation.  I was coming home
6  from work.  I was coming from work, trying to go
7  home; and the bus almost hit me.  So I had caught
8  whiplash.  And after like the next day and stuff I
9  was like feeling pain.  So I decided to go to the
10 hospital to get it checked out or whatever.  And I
11 left work early.  And they told me if I leave work
12 early to make sure I bring a doctor note back.  I
13 forgot to bring a doctor note back.
14         It was my fault.  But I was trying to
15 explain to them and see would they reason with me,
16 but they wasn't hearing that.
17     Q.   Okay.  After SC2, where did you work after
18 that?
19     A.   Wal-Mart.
20     Q.   What did you do at Wal-Mart?
21     A.   I did third shift stocking.
22     Q.   How long did you work at Wal-Mart?
23     A.   About six months.
24     Q.   And why did you leave Wal-Mart?  Were you
25 terminated or did you quit?

Page 18

1      A.   Yeah, they terminated me.  It was down
2  here in Georgia.  And they said they didn't need no
3  real reason to fire me or terminate me.
4      Q.   Did they give you a reason?
5      A.   No.  She just said we don't need your
6  services here no more.  She feels like that job
7  wasn't suitable for me.
8      Q.   Were you late to work?
9      A.   No.
10     Q.   Okay.  Then after Wal-Mart where did you
11 work?
12     A.   At Job Corps.
13     Q.   Then you started at Brunswick?
14     A.   Yeah.
15     Q.   Okay.
16     A.   I did a couple of temp services between
17 there.
18     Q.   Okay.
19     A.   But it wasn't no like --
20     Q.   Nothing long term?
21     A.   No.
22     Q.   Okay.  Other than the training you're
23 receiving at Job Corps now in the electrical field,
24 have you received any other professional training or
25 vocational training or skills training of any kind

Page 19

1  after you quit high school?
2      A.   Yes.
3      Q.   Tell me about that.
4      A.   I did habitat with Workforce Center.  Have
5  you heard of that?
6      Q.   I have not.
7      A.   Well, we go into communities and we help
8  build houses.  The tools, how to use stuff, just get
9  the basic principles of construction to understand
10 and be familiar with a worksite or a construction
11 site.
12     Q.   Was that in Peoria or here in Atlanta?
13     A.   That was here in Atlanta.
14     Q.   Anything else as far as vocational
15 training or skills training after high school?
16     A.   No.  That pretty much covers it.
17     Q.   Now I'm going to ask you a series of
18 questions.  I'm not meaning to pry.
19         MR. BENNETT:  What he means is it's his
20 job to pry.  He's got to do a professional job.
21     Q.   (By Mr. Osborne)  That's correct.  I mean
22 to pry, but I apologize in advance for asking
23 questions of such a personal nature.
24         I'm going to ask you about generally
25 before David's death and after David's death.

Page 20

1  Because, you know, I understand that your family and
2  your family members' claim in this case is that
3  David's death has adversely affected your life.  And
4  I understand that.  And so I'm just trying to explore
5  how that is.
6          So I apologize in advance.
7          Before David's death had you ever been
8  treated for any sort of alcohol or chemical
9  addiction?
10     A.   No.
11     Q.   What about after David's death?
12     A.   No.
13     Q.   Before David's death were you ever treated
14 or counseled for any emotional or mental health
15 issues?
16     A.   You said before?
17     Q.   Correct.
18     A.   I was receiving Social disability, if that
19 counts.
20     Q.   What's a Social disability?
21     A.   SSI.
22     Q.   Why were you receiving that?
23     A.   I ain't really sure what my paperwork
24 said, but the most problem my teachers informed me on
25 was I've got attention disorder.  I get fidgety



ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
25–28

Page 25

1    A.    No. I actually had a chance to talk to
2  David personally. Like me and David, we had a
3  nice -- we had a strong bond pretty much.
4    Q.    No. I understand that.
5         I just wanted to know if your mom or
6  Angela ever talked to you about why David moved to
7  Minnesota.
8    A.    No.
9    Q.    Did they ever tell you that David was
10 having problems in Peoria and that that might be one
11 reason he moved to Minnesota?
12   A.    No. He would have told me that personally
13 on account of I'm his brother. You know, he's going
14 to talk to the women in the family different than the
15 mens in the family.
16   Q.    Did you ever come visit David while he
17 lived in Minnesota?
18   A.    No.
19   Q.    You were probably a little young for that
20 most of the years.
21   A.    My first time coming to Minnesota was
22 while he was on his deathbed.
23   Q.    Did you come to Minnesota when David was
24 in the hospital --
25   A.    Yes, sir.

Page 26

1    Q.    -- for the last time? How long were you
2  here?
3    A.    I was here for a whole week. Or I was
4  there for a whole week.
5    Q.    You never visited Minnesota before that?
6    A.    No.
7    Q.    Okay. Did David ever talk to you about
8  how he made money or obtained funds while he lived in
9  Minnesota?
10   A.    Yeah.
11   Q.    What did he tell you about that?
12   A.    Did odd jobs. He told me he was like --
13 he liked the Avon program and stuff like that,
14 telemarketing. David was a good communicator, first
15 of all. So it wasn't that hard for him to get out
16 there in the mix as far as networking, talking to
17 different jobs and stuff.
18        So he'd let he know. He'd keep like odd
19 jobs and stuff to do, stuff like that.
20   Q.    Did you know any of David's friends that
21 he had when he lived in Minnesota?
22   A.    None except for Kirk and Christy.
23   Q.    Did you ever meet them in person?
24   A.    Yes.
25   Q.    When?

Page 27

1    A.    They actually brought him down -- up
2  there -- well, to Illinois for my grandma's funeral.
3  That's the first time I've met them personally. They
4  stayed. It was bad timing but everything still
5  worked out.
6    Q.    How many other times did you meet them?
7    A.    When we went to Minnesota.
8    Q.    When David died?
9    A.    Yeah.
10   Q.    Any other times?
11   A.    No. We just kept in contact after that.
12   Q.    And you've been in contact with Kirk and
13 Crystal a few times since David's death?
14   A.    Yes.
15   Q.    How many times?
16   A.    Couple of them, couple of times.
17   Q.    Okay.
18   A.    You know, I'm in the mix of doing my own
19 life, living my own life. But when I'm thinking
20 about them I send them a message on Facebook or
21 something like that.
22   Q.    I understand.
23   A.    Check up with them.
24   Q.    Did David ever talk to you about having
25 trouble with housing in Minnesota?

Page 28

1    A.    Not really as far as that. He wouldn't
2  just tell me he was homeless or nothing like that.
3    Q.    He didn't tell you that?
4    A.    No. He wouldn't like -- probably a pride
5  thing. I'm his little brother. I look up to him.
6  He's aware of it.
7    Q.    But did you suspect maybe he had some
8  issues going on with housing, being homeless?
9    A.    Yeah.
10   Q.    Why did you suspect that?
11   A.    There were indications. He constantly was
12 moving around.
13   Q.    Did your mom and Angela also talk to you
14 about David having some problems with being homeless
15 sometimes and moving around?
16   A.    My mom probably told me something, yes;
17 give me some indications, yeah.
18   Q.    Okay. Telling you David is having some
19 problems?
20   A.    Yeah, as far as housing and stuff like
21 that. They probably said something like David's at
22 the mission.
23   Q.    Did Angela or your mom ever talk to you
24 about David having problems with law enforcement or
25 legal problems or being in jail while he was in



ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
33–36

Page 33

1   A.   He could have.
2   Q.   Okay.  In late 2009?
3   A.   Yes.
4   Q.   Okay.  When David was alive, did you talk
5   to him on the telephone?
6   A.   Yes.
7   Q.   How often?
8   A.   I'd say about a three to six-month period
9   time frame.
10   Q.   Every three or six months?
11   A.   Yeah.
12   Q.   Like two or three or four, five times a
13   year?
14   A.   Yeah, that's it, rough estimate.
15   Q.   Did you call him usually?
16   A.   No.  He usually called to check up and let
17   us know that he's alive, he's all right, let us know
18   that he's still trying to hold on.
19   Q.   Hold on from what?
20   A.   Hold on for survival, for his life,
21   livelihood.
22   Q.   You understood that he was having somewhat
23   of a rough time in Minnesota?
24   A.   I understand.  When you're out of state
25   and you ain't got no family and friends really or

Page 34

1   you've got to start your life over again, things can
2   get hard, like that transition, to put yourself out
3   there and build up a foundation and start growing
4   like that.
5   Q.   And so he would call you every three or
6   four months and say I'm still here, I'm still alive?
7   A.   He would keep it transparent.  He'd let me
8   know like, hey, bro, what you up to, you got a
9   girlfriend.  Brotherly stuff.  How is everything
10   going with your school?
11        He was big on education.  He always wanted
12   us to do the best we could in school and he wanted us
13   to stay up and up and don't let the environment get
14   us down.
15   Q.   Did David talk to you about quitting high
16   school?
17   A.   David graduated from high school.
18   Q.   Did he talk to you about you quitting high
19   school?
20   A.   Yeah.  He didn't like that.  That didn't
21   settle good with him.
22        But, at the same time, he had to come to
23   that funeral too.  So he kind of got to see what I
24   was going through and what discouraged me from that.
25   But he also tried to motivate me at the same time,

Page 35

1   like you've got your own life to live, bro, she lived
2   a full life, you know, that type of stuff.
3   Q.   Did you ever call David when he lived in
4   Minnesota?
5   A.   Yeah.
6   Q.   Did you ever call a number that had been
7   disconnected?
8   A.   I'm pretty sure I hit that road.
9   Q.   What did you say?
10   A.   I'm pretty sure I hit that rock in the
11   road.
12        Like I probably got used to using a
13   certain number.  One time I called that number and it
14   had been disconnected or something until he called
15   again, like I've got a new phone and such and such,
16   that's why I ain't been calling.
17   Q.   Okay.  Now, in some of the medical records
18   and other records we've received as part of preparing
19   for this case, it's mentioned in some places in the
20   medical records and the other records that David was
21   estranged from his family.
22   A.   What does estranged mean?
23   Q.   Estranged means kind of a strained
24   relationship, rarely sees them because of that
25   estranged relationship, rarely talks to them.

Page 36

1        Do you know why that would have appeared
2   in the medical records?
3        MR. BENNETT:  Objection, foundation.
4        THE WITNESS:  No; no, sir.
5   Q.   (By Mr. Osborne)  Okay.  Do you know how
6   often David talked to your mother while he was alive?
7   A.   I know he talked to her more than he
8   talked to all of us.
9   Q.   Did your mother ever tell you about a time
10   in which David stole money from her?
11   A.   No, sir.
12   Q.   And when David -- I think I asked you
13   about this, but I'll do it again just so I remember.
14        When David lived with you, was David ever
15   violent when he lived in Peoria with you and your
16   family?
17   A.   No, sir.
18   Q.   Was there any violence in the house when
19   David lived with you and your family in Peoria?
20   A.   Violence, no.  But David loved wrestling.
21   He's the reason why we --
22   Q.   Yeah.  There's been very common testimony
23   about that, and that's good between brothers.
24        I'm talking about violence from other
25   adults in the house.



ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
41–44

Page 41

1  about how David's death has affected you. Judges and
2  juries and lawyers have talked -- they talk in terms
3  of loss of counsel, loss of guidance, loss of aid
4  from David's death. And a lot of these concepts are
5  very much overlapping. So I don't expect distinct
6  answers for every category or every topic I'm going
7  to ask you about. But, you know, just answer as best
8  and fully as you can when we cover each topic about
9  how David's death has affected you.
10      Okay?
11     A.   Right.
12     Q.   How has David's death affected you? How
13  has the loss of his counsel and guidance affected
14  you?
15     A.   It's man to man, that wisdom that he
16  gained before I was even born and knowledge he could
17  share with me from his experience from life.
18     Q.   Like what knowledge would he share with
19  you to make sure you took a different road?
20     A.   Puberty, just finding out and
21  understanding myself, to the fact of social
22  acceptance, just being comfortable within my own
23  body.
24     Q.   Did David talk to you about mistakes he
25  had made along the way and wanting you to do

Page 42

1  differently?
2      A.   Yeah. He let me know that he made
3  mistakes.
4      Q.   Like what mistakes would he talk to you
5  about, wanting you to learn from that?
6      A.   Like trying to -- in a sense, being too
7  outspoken. He always told me to listen more than I
8  talk.
9      Q.   What else?
10     A.   Just how to carry myself and keep that
11  pride, that sense of self-being.
12         David was -- he had the confidence. He
13  had the look. This is what I observed from him as
14  being his little brother. Because I wanted to be
15  like him in a sense but not be him. Because he set
16  the standard for our family, how -- my mama's child,
17  the boys, the mens, is going to walk in this world.
18         You know what I'm saying?
19     Q.   Yes.
20     A.   So I kind of wanted some of that. You
21  know what I'm saying? He's smart. He's always on
22  the honor roll.
23     Q.   David was always on the honor roll?
24     A.   Yeah. He was real good in academics in
25  school and stuff. He stayed with a book. Even at

Page 43

1  home he stayed reading. I might catch him writing
2  notes in a journal or something. What you doing,
3  bro? I'm just taking notes on something I'm
4  studying, dah, dah, dah. He would say what are you
5  studying or whatever. He believed in self-teaching
6  hisself, you know.
7          And that's it for that.
8      Q.   What about loss of aid?
9          We talked about David maybe not having the
10  resources to give you or your family much, if any,
11  money.
12     A.   No, sir. That would be like from support,
13  just encouragement and embracing me when I feel like
14  I was dying, you know, fell out prior with my
15  girlfriend or something. He was like, bro, it's all
16  right, you're going to live, you're young, there's
17  more out there for you, you know.
18     Q.   Sure.
19     A.   Stuff like that.
20         David, now, when he was in town, he would
21  do what he could. I won't say that he wouldn't like
22  help me out. If I asked him for a couple of bucks
23  and he's got it, he'll give it to me with no
24  questions.
25         He bought me my first jewelry set ever in

Page 44

1  my life, you know. He bought me -- I'll never
2  forget. He bought me a gold chain and a ring for
3  like my birthday one year, and it surprised me
4  because that's probably like one of the few gifts I
5  actually got that year.
6          You know what I'm saying?
7          But he managed to do that for me so.
8      Q.   What about loss of advice? What advice
9  would David give you when he was alive?
10     A.   Just that advice of understanding that I
11  come from a single-parent household. And there's
12  only so much a woman can teach you about being a man.
13  So, until he started that journey, he's going to tell
14  us what he's been through already and how to manage
15  to act and conduct theirself. A man should stand up
16  to use the restroom instead of sitting on the toilet
17  seat, stuff like that. Something that a woman
18  probably won't be too keen on, you know.
19     Q.   That's for sure.
20         Tell me about the loss of comfort and loss
21  of companionship that you've experienced from David's
22  death.
23     A.   I was like -- I always wanted to like do
24  business with David. That was my lifetime goal, to
25  like make a family business. You know, he was

Page 49

1 call from Kirk or Christy or something saying it's
2 important, something is seriously wrong with David,
3 he's in the hospital.
4      And that's when everything went haywire.
5    Q.   What year was that?
6    A.   It was the same year he died.  That was
7 like -- like we got evicted or whatever you want to
8 call it.  We had to move from the house that we was
9 living at.  And after we got done getting everything
10 out of the house and stuff, getting ready to turn in
11 the house key the next week, we got that call that
12 David was in real serious trouble.  I'm thinking he's
13 probably in jail or something, and then I heard the
14 fact that he's in the hospital.  I'm like --
15    Q.   Is that the hospital -- the last time he
16 was in the hospital?
17    A.   Yeah.  That was the last time.
18    Q.   So you remember your mom's eviction and
19 moving out of that house taking place in September
20 of 2010?
21    A.   Something like that.
22      MR. OSBORNE:  All right.  Let's go off the
23 record for about five minutes.
24      (Recess from 3:12 p.m. to 3:15 p.m.)
25    Q.   (By Mr. Osborne)  Mr. Brown, you mentioned

Page 50

1 after your family had moved out of the house that
2 within a day or two you got a call from Minnesota
3 saying David was in trouble?
4    A.   Yes.  If I can remember correctly, it was
5 that same night when we just finished up.
6      MR. BENNETT:  Yeah.  Not a day or so
7 later.
8      MR. OSBORNE:  Pardon?
9      MR. BENNETT:  You misstated.
10      MR. OSBORNE:  Okay.  Whenever it was.  One
11 minute after.
12      MS. FUSSY:  Let the witness testify.
13    Q.   (By Mr. Osborne)  One minute after you
14 finished moving out.  I don't care when it was.
15      But you had mentioned that you thought
16 maybe David was in jail but then you found out it was
17 something where he was hospitalized?
18    A.   Right.
19    Q.   Why did you think that maybe David was in
20 jail again?
21    A.   As long as he's been out of state, we
22 never got a call like that.  So I'm thinking
23 emergency, bond money, something, something big
24 happened.  And being in jail is big too.  You know
25 what I'm saying?  I didn't know he was in a coma at

Page 51

1 the time with a 1 percent chance of waking up.
2    Q.   Did your mom or Angela ever talk to you
3 about why David needed to go to Florida to get
4 medication?
5    A.   No.  He didn't really go to Florida to get
6 medication.
7    Q.   Well, you had testified earlier I
8 thought -- maybe I misunderstood -- that --
9    A.   No.  I said he went down to Florida and
10 probably the reason why he ended up in whatever you
11 say he ended up in is to get the help that he needed.
12    Q.   No.  You said something about his
13 medication in Florida before I even used those words.
14 So I need to know what you remember about...
15    A.   I know this.  David went to Florida to see
16 the ocean because he never seen the ocean before and
17 it was his summer break from college.
18    Q.   Why did you mention him going there to get
19 medication that he needed?
20    A.   Because you said something about him being
21 up in -- something about crazy.
22    Q.   He was hospitalized when he was in
23 Florida.
24    A.   Yeah, hospitalized.
25    Q.   He was suicidal.  You weren't aware of

Page 52

1 that, right?
2    A.   No, sir.
3    Q.   How did you know that he needed medication
4 when he was in Florida?
5    A.   I'm assuming like you not being a
6 recipient from Florida, if you want to get some help,
7 you probably need to go to the hospital to get the
8 help that you need.  That's what I would do.
9      MR. BENNETT:  For the record, he also said
10 that he didn't hear about that until after he
11 died.
12      MR. OSBORNE:  I realize that, Bob; but he
13 brought it up, not me.
14      THE WITNESS:  You said something about him
15 getting like -- I don't know exactly what you
16 said, but it triggered something that made me
17 think that it was something else to it.
18    Q.   (By Mr. Osborne)  Why do you think David
19 needed help in Florida?  Do you know?
20    A.   Because he was out of his region.  He
21 wasn't in Minnesota.  He wasn't in Illinois.  He
22 wasn't in Georgia.  He don't know nobody in Florida.
23    Q.   Tell me why your mom went through a
24 foreclosure proceeding and was evicted.
25      Do you know what happened there?



ADAM BROWN
SMITH vs. GORMAN

October 10, 2012
53–56

Page 53

1    A.    Money got slow and couldn't make the
2  payments.
3    Q.    And did you talk to David about that
4  situation before he died, in the months leading up to
5  that?
6          Because that's, I assume, not a -- that's
7  a process that takes several months, right?
8    A.    Yeah. I'm pretty sure he was aware of it.
9  I haven't personally talked to him. That doesn't
10  mean that he wasn't aware of what was going on,
11  dealing with my mama and my other siblings.
12    Q.    Okay.
13    A.    But I was like kind of on my own life at
14  that time. I was trying to make some adjustments to
15  my living conditions at that point.
16          MR. OSBORNE:  We don't have anything else,
17  Bob.
18          MR. BENNETT:  We'll read and sign.
19          MR. OSBORNE:  All right. Thank you, sir.
20          THE WITNESS:  Thank you.
21          (Whereupon, the deposition was concluded
22  at 3:20 p.m.)
23  ///
24  ///
25  ///

Page 54

1          (Pursuant to Rule 30(e) of the Federal
2  Rules of Civil Procedure and/or O.C.G.A.
3  9-11-30(e), signature of the witness has been
4  reserved.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 55

1
2              C E R T I F I C A T E
3
4  STATE OF GEORGIA:
5  COUNTY OF FULTON:
6
7          I hereby certify that the foregoing
8  transcript was taken down, as stated in the
9  caption, and the questions and answers thereto
10  were reduced to typewriting under my direction;
11  that the foregoing pages 1 through 54 represent
12  a true, complete, and correct transcript of the
13  evidence given upon said hearing, and I further
14  certify that I am not of kin or counsel to the
15  parties in the case; am not in the regular
16  employ of counsel for any of said parties; nor
17  am I in anywise interested in the result of said
18  case.
19          This, the 22nd day of October, 2012.
20
21
22              KARA BARGER, GA CCR-B-1496
23
24
25

Page 56

1
2              COURT REPORTER DISCLOSURE
3
4          Pursuant to Article 10.B. of the Rules and
   Regulations of the Board of Court Reporting of the
5  Judicial Council of Georgia which states: "Each court
   reporter shall tender a disclosure form at the time
   of the taking of the deposition stating the
6  arrangements made for the reporting services of the
   certified court reporter, by the certified court
7  reporter, the court reporter's employer, or the
   referral source for the deposition, with any party to
8  the litigation, counsel to the parties or other
   entity. Such form shall be attached to the
9  deposition transcript," I make the following
   disclosure:
10
          I am a Georgia Certified Court Reporter. I am
11  here as a representative of Esquire Deposition
   Solutions. Esquire Deposition Solutions was
12  contacted to provide court reporting services for the
   deposition. Esquire Deposition Solutions will not be
13  taking this deposition under any contract that is
   prohibited by O.C.G.A. 9-11-28 (c).
14
          Esquire Deposition Solutions has no
15  contract/agreement to provide reporting services with
   any party to the case, any counsel in the case, or
16  any reporter or reporting agency from whom a referral
   might have been made to cover this deposition.
17  Esquire Deposition Solutions will charge its usual
   and customary rates to all parties in the case, and a
18  financial discount will not be given to any party to
   this litigation.
19
20
21
22              KARA BARGER, GA CCR-B-1496
23
24
25



800.211.DEPO (3376)
EsquireSolutions.com

# EXHIBIT 13

Condensed Transcript

# In the Matter Of:

# SMITH vs. GORMAN

11-CV-03071

# DERRICK BROWN

*October 10, 2012*



800.211.DEPO (3376)
*EsquireSolutions.com*

DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
1—4

Page 1

1      IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF MINNESOTA
2

3   Larry E. Smith as trustee
    for the Heirs and Next of
4   Kin of David Cornelius
    Smith,              CIVIL ACTION FILE
5
           Plaintiff,    NO. 11-CV-03071
6
    vs.
7
    Timothy Gorman and Timothy
8   Callahan, acting in their
    individual capacities as
9   Minneapolis police
    officers, and the City of
10  Minneapolis,
11         Defendants.
    ------------------------------
12

13          DEPOSITION OF

14          DERRICK BROWN

15

16          October 10, 2012

17          12:10 p.m.

18

19          4700 Southport Road
            College Park, Georgia
20

21          Kara Barger, CCR No. B-1496

22

23

24

25

Page 2

1              APPEARANCES
2
    On behalf of the Plaintiff:
3
       ROBERT BENNETT, Esq.
4      JEFFREY S. STORMS, Esq.
       Gaskins, Bennett, Birrell & Schupp
5      333 South Seventh Street
       Suite 2900
6      Minneapolis, Minnesota 55402
       612-333-9500
7      rbennett@gaskinsbennett.com
8
    On behalf of the Defendants:
9
       TRACEY N. FUSSY, Esq.
10     BURT T. OSBORNE, Esq.
       City of Minneapolis, Office of City Attorney
11     350 South Fifth Street
       Room 210
12     Minneapolis, Minnesota 55415
       burt.osborne@ci.minneapolis.mn.us
13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1              DERRICK BROWN,
2   having been first duly sworn, was examined and
3   testified as follows:
4              CROSS-EXAMINATION
5   BY MR. OSBORNE:
6      Q.   Could you state your full name for the
7   record and spell your first and last name.
8      A.   Derrick J. Brown. I'm supposed to say
9   Jerome. Derrick Jerome Brown. D-e-r-r-i-c-k,
10  B-r-o-w-n.
11     Q.   I'm an assistant city attorney for the
12  City of Minneapolis. My name is Burt Osborne. And
13  I'm going to be taking your deposition today.
14         A couple of ground rules.
15         Have you ever had your deposition taken
16  before?
17     A.   Well, when I talked once before, I thought
18  that was a deposition; but other than that, no.
19     Q.   You were probably interviewed by your
20  attorneys --
21     A.   Yes, sir.
22     Q.   -- for your participation in this case?
23     A.   Yes, sir.
24     Q.   Okay. But this is the first time that
25  you've been in a room with a court reporter?

Page 4

1      A.   Yes, sir.
2      Q.   Okay. What she's doing is taking down
3   everything we're saying so we have a permanent record
4   of what we talk about today.
5      A.   Uh-huh.
6      Q.   And so the first rule is you and I have to
7   try as best as we can to let each other talk one at a
8   time.
9      A.   Yes, sir.
10     Q.   Let me finish my question before you start
11  to answer, and I'm going to let you finish your
12  answer before I hop in with my next question.
13         The second rule is, even though commonly
14  we converse with uh-huhs and huh-uhs and shakes of
15  the head -- and I understand
16  exactly what you're saying. But when a court
17  reporter is present you have to try as best you can
18  to answer with yes, no, verbal responses, because
19  she's taking down everything we're saying.
20         Does that make sense?
21     A.   Yes, sir.
22     Q.   Okay. Now, are you under the influence of
23  any alcohol or drug or any medications that would
24  make it hard for you to focus today?
25     A.   No, sir.



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
5–8

Page 5

1    Q.   Okay. Did you review any documents for
2 your deposition today?
3    A.   Not that I know of, no.
4    Q.   Okay. I don't want to hear about what you
5 talked with your attorneys about because that's your
6 business, but did you review any deposition
7 transcripts or --
8    A.   No.
9    Q.   -- transcripts of any of your relatives'
10 testimony?
11    A.   No, sir.
12    Q.   Okay. Any other documents? Does the word
13 answers to interrogatories -- does that ring a bell?
14    A.   No, sir.
15    Q.   Okay. You didn't review any documents in
16 preparation for today?
17    A.   No, sir.
18    Q.   Okay.
19    A.   No.
20    Q.   Again, other than your attorneys, have you
21 talked with anybody before today about the fact that
22 you're going to come give a deposition today?
23    A.   Yeah, my mother and my sister. Well,
24 family.
25    Q.   Tell me about the conversations you had

Page 6

1 with your mother and your sister about today's
2 deposition.
3    A.   She just let me know that we was going to
4 be here today. I don't know if that's what you mean.
5    Q.   What else did you talk about? Did you
6 talk about how your mom's deposition went?
7    A.   No, sir.
8    Q.   Did your mom tell you it was difficult?
9    A.   No. She told me to speak the truth.
10    Q.   What else did you talk with your mother
11 about with regards to today's deposition?
12    A.   Nothing other than speak the truth, you've
13 got to be there. So that was it.
14    Q.   Very short conversation?
15    A.   Yeah; yes, sir.
16    Q.   What about your conversation with Angela?
17 Tell me about that.
18    A.   We all was coming in blindsided.
19    Q.   Pardon?
20    A.   We was all coming in blindsided. We were
21 just sharing our comments, like what David meant to
22 me, just reminiscing. Other than that, nothing.
23    Q.   Okay. Tell me where you currently reside,
24 where you live.
25    A.   Atlanta, Georgia, now.

Page 7

1    Q.   What's your address?
2    A.   1658 Burden Street.
3    Q.   Is that an apartment?
4    A.   No. House.
5    Q.   Who do you live with?
6    A.   Brenda Strong and my kids, mother of my
7 kids.
8    Q.   How many kids do you have?
9    A.   I have three.
10    Q.   How old are they?
11    A.   Eight, six and three.
12    Q.   And how long have you lived there?
13    A.   Not even two months.
14    Q.   Where did you live before that?
15    A.   Peoria, Illinois.
16    Q.   So you just recently moved to Atlanta?
17    A.   Yes, sir.
18    Q.   Did you live with Ms. Strong and your kids
19 in Peoria?
20    A.   Yeah, and my mother.
21    Q.   You all lived with your mother?
22    A.   No. Like I lived there, you know, because
23 sometimes they get mad, get out. So if I wasn't at
24 my mother's house I was over there.
25    Q.   Okay. Sometimes did Ms. Strong want you

Page 8

1 to go stay with your mom and sometimes your mom
2 wanted you to go stay with Ms. Strong?
3    A.   No. My mother never put me out.
4    Q.   Okay.
5    A.   It was like, hey, that's my family.
6    Q.   But Ms. Strong sometimes said go stay with
7 your mom?
8    A.   Not in those words. When you're around
9 each other all day and night, you tend to like --
10 hey, I'm going over here for a little while to go
11 visit my mother. And plus her dealing with what was
12 going on, the death of my brother, you know. I'd go
13 over there. She'd call me crying and I'd go over
14 there, you know, and spend nights. It's been a
15 battle with staying over there and over here.
16    Q.   What was your last address in Peoria?
17    A.   109 North Merriman Court.
18    Q.   And you lived there with Ms. Strong and
19 your kids?
20    A.   Yes, sir.
21    Q.   How long did you live at that address?
22    A.   We were there for about nine years.
23    Q.   Have you been with Ms. Strong for nine
24 years?
25    A.   Nine years.

DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
9—12

Page 9

1    Q.    What is your date of birth?
2    A.    ███████
3    Q.    And what's your current occupation?
4    A.    Well, I got laid off from Caterpillar,
5    yeah.  Shipping I guess you'd call that, material
6    handler.
7    Q.    Shipping?
8    A.    Yeah, material handler.
9         MR. BENNETT:  And material handler?
10        THE WITNESS:  Yes, sir.
11    Q.    (By Mr. Osborne)  Okay.  Was that here in
12   Atlanta?
13    A.    No.  That was Peoria.
14    Q.    When did you get laid off from that job?
15    A.    That was like three months ago.  I
16   couldn't give you a --
17    Q.    Was it right around the time you moved?
18    A.    Yes, sir.  That's why I moved, because I
19   was laid off.
20    Q.    And so you and Ms. Strong and the kids
21   moved down to Atlanta at that point?
22    A.    Yes, sir.
23    Q.    Have you worked since you've been down
24   here?
25    A.    No.  I'm looking.  I mean I did community

Page 10

1    work, but I've been looking.
2    Q.    In today's new economy it's no fun looking
3    for a job, is it?
4    A.    No, sir.
5    Q.    It's different than it used to be.  Is
6    your wife working?
7    A.    No, sir.
8    Q.    Okay.  How long did you work for
9    Caterpillar?
10    A.    Wow.  I was there for about five months.
11   Now, before that I worked VSI.
12    Q.    What was that?
13    A.    They are a cleaning company, but I was on
14   the side of the Caterpillar fence.
15        Let me see how I can word this.
16        I was on the side of the Caterpillar fence
17   where I was changing batteries and battery acid spilt
18   on me.  So I had battery acid all over me and it
19   was eating through my skin.
20        So that's what happened with that.
21    Q.    That's when you worked for VSI?
22    A.    Uh-huh.
23    Q.    What does VSI stand for?
24    A.    Vonachen Services, Inc.
25    Q.    How do you spell Vonachen?

Page 11

1    A.    V-o-n -- I used to Google it because it's
2    almost like an Italian word.
3    Q.    It's okay if you don't know.
4    A.    Yeah.
5    Q.    Did they have some sort of relationship
6    with Caterpillar?
7    A.    Yes, sir.  They had a contract through
8    them.
9    Q.    Cleaning services?
10    A.    Yes, sir.
11    Q.    And then after that you went to work for
12   Caterpillar?
13    A.    Yes, sir.
14    Q.    Okay.  Are you healed up from your battery
15   acid injury?
16    A.    Yeah; yes, sir.
17    Q.    Okay.
18    A.    I've still got scars; but yes, sir.
19    Q.    It must have hurt.
20    A.    I'm a trooper.
21    Q.    What high school did you attend?
22    A.    I went to Manual and Woodruff.
23    Q.    Where is that?
24    A.    Manual?
25    Q.    Yes.

Page 12

1    A.    Peoria, Illinois.
2    Q.    And where is Woodruff?
3    A.    Peoria, Illinois.
4    Q.    Did you graduate high school?
5    A.    No.
6    Q.    What year were you scheduled to graduate?
7    A.    2006.
8    Q.    Have you since received a GED?
9    A.    I'm in the process of that now, yeah.
10   Down here Angie is getting me connected to that.
11    Q.    How old were you when you quit high
12   school?
13    A.    18.
14    Q.    Were you a senior?
15    A.    Yes, sir.
16    Q.    Why did you quit high school so close to
17   the end?
18    A.    It started getting hard.  Like people --
19   bullies, bullies.  They drove me to quit pretty much.
20   Like people just -- I don't know.  They was picking
21   on people and I didn't like it.  So I started getting
22   in the middle of it like, hey, why are you picking on
23   these innocent people.  And that's when I became the
24   target you could say.
25    Q.    Was that at Woodruff or Manual?



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
13–16

Page 13

1    A.   That was Woodruff.
2    Q.   Was Woodruff the last high school you
3 attended?
4    A.   Yes, sir.
5    Q.   What course are you taking to get your
6 GED?
7    A.   Well, right now we're through this
8 independent living organization Angie got us through;
9 and like my schooling starts, I think, in two weeks.
10 So, yeah, I already did the paperwork and everything.
11 We're just waiting to hear back or whatever. But we
12 go to this place every Thursday and like they help
13 us, like schooling and, you know, independent living
14 pretty much.
15    Q.   Does Ms. Strong attend those classes with
16 you?
17    A.   Yes, sir. The kids do too.
18    Q.   So it's some kind of a family --
19    A.   A family, yeah, transitional.
20    Q.   Okay. Since leaving Woodruff, have you
21 taken any other vocational classes or trade classes
22 or educational classes of any kind?
23    A.   I build computers. So like when I got out
24 of school it was like money, you know. I really
25 didn't have no need to go back to school, which I

Page 14

1 should have. But me building computers, there's a
2 lot of computers that needed fixed.
3    Q.   So after you were done at Woodruff did you
4 work for --
5    A.   Myself, yeah.
6    Q.   Did you have a shop?
7    A.   My mother's backyard.
8    Q.   You're not the first son to start his
9 business in his mom's backyard. That's for sure.
10       Did you make a lot of money doing that?
11    A.   I made enough to get by, yeah.
12    Q.   Did you file yearly income tax returns
13 after you started working, after you were done at
14 Woodruff?
15    A.   Yeah. When I started working, yes, sir.
16    Q.   So all the income you received, you
17 reported it and paid your taxes?
18    A.   Yes, sir.
19    Q.   Did you work for any other employers up to
20 the time you worked for VSI?
21    A.   Temp service.
22    Q.   The business was called Temp Service?
23    A.   It's a lot of them.
24    Q.   Oh, okay.
25    A.   Kelly Services. Let me think.

Page 15

1    Q.   Only if you remember.
2    A.   It's a lot of services.
3    Q.   So you worked for various temp services?
4    A.   Yes, sir.
5    Q.   And I assume you were just performing
6 whatever they assigned you?
7    A.   Yes, sir.
8    Q.   Did they assign any duties involving
9 fixing computers or anything like that, the temporary
10 services; or did you just do that on your own?
11    A.   Yeah, for a little while.
12    Q.   Okay.
13    A.   Yes, sir.
14    Q.   I'm just assuming you're sort of
15 self-taught in your computer skills from 2006?
16    A.   I started early. I've been fixing
17 computers since I was about six years old.
18    Q.   So after you left Woodruff did you take
19 any formal classes or vocational training?
20    A.   No, sir.
21    Q.   Okay.
22    A.   No, sir.
23    Q.   And no higher education of any kind?
24    A.   No, sir.
25    Q.   Okay. Now, I'm just trying to understand.

Page 16

1 The reason Ms. Fussy and I are talking to you and
2 your family members is because we need to understand
3 your relationship with your brother David. And you
4 know why we're here. So I'm going to ask you some
5 questions. I'm not meaning to be disrespectful or
6 pry, but we're just trying to understand what your
7 life was like before David passed and what your life
8 has been like since then.
9       Is that fair enough?
10    A.   Yes, sir.
11    Q.   Okay. Can you tell me before David's
12 death had you received any mental or emotional or
13 psychiatric care of any kind before David's death?
14    A.   No.
15    Q.   Did you have any physical problems that
16 you needed medical care for other than the occasional
17 cold?
18       MR. BENNETT: The battery acid deal.
19       THE WITNESS: Yeah.
20    Q.   (By Mr. Osborne) That happened before
21 David's death right, the getting burned?
22    A.   No. That happened after.
23    Q.   After?
24    A.   Uh-huh.
25    Q.   Okay. Before David's death did you



Page 17

1   receive any significant injuries that you can
2   remember?
3       A.   No, sir.
4       Q.   And, even though you dropped out of high
5   school, I take it when you dropped out of high school
6   you lived with your mother?
7       A.   Yes, sir.
8       Q.   Okay.  Did you ever do any family
9   counseling before David's death?
10      A.   We always did family counseling.  Our
11  family counseling was different.  It was mother
12  sitting there and we all sat down and we had like a
13  group meeting.
14      Q.   But not with any formal counselors?
15      A.   Can't afford it, no, sir.
16      Q.   Okay.  No psychiatric care or anything
17  like that?
18      A.   No, sir.
19      Q.   Okay.  After David's death have you
20  received any formal mental health counseling or
21  psychiatric care?
22      A.   No, sir.  Like I said, ours is different.
23  We can't afford it.  So we all come to like a table
24  and we all sit down and we talk.
25      Q.   Okay.  You just talk amongst your family?

Page 18

1       A.   Yeah, family meeting.
2       Q.   Okay.  And, again, I apologize for the
3   personal nature of the questions; but before David's
4   death or after David's death do you have any chemical
5   dependency issues or alcohol issues or anything like
6   that?
7       A.   I mean I don't know.  I've got Social
8   Security.  I mean so I've been having an issue before
9   all of this, but that's learning.
10      Q.   Tell me about that.
11      A.   I've got a learning disability.  I've also
12  got hearing impaired.  Like I can barely hear you
13  sometimes.  But other than that -- like I said, we
14  all come to a table.  So if there is an issue we all
15  address the table.
16      MR. BENNETT:  Did you hear the question
17      though?
18      He asked you if you had any chemical
19      dependency problems before?
20      THE WITNESS:  No, sir, no.
21      Q.   (By Mr. Osborne)  No alcohol problems?
22      A.   No, sir.
23      Q.   Have you ever sought treatment for any
24  sort of addiction?
25      A.   No, sir.

Page 19

1       Q.   Okay.
2       MR. BENNETT:  But if you can't hear him
3       you have to tell him because he won't know you
4       can't.
5       Okay?
6       THE WITNESS:  Okay.
7       Q.   (By Mr. Osborne)  Yeah.  I'm sorry.  I'll
8   speak louder if I have to.
9       A.   That's okay.
10      Q.   We're pretty far away from each other for
11  a deposition.  So I apologize.
12      A.   That's all right.
13      MR. BENNETT:  Just let him know.  I mean,
14      if you don't hear something, I don't want you
15      answering some question you don't hear.
16      Which is your -- you've got a bad ear?  Is
17      one worse than the other?
18      THE WITNESS:  I had tubes in my ears.  I
19      mean it goes in and out.  Like sometimes you're
20      loud; sometimes you're not.
21      Q.   (By Mr. Osborne)  So you have hearing
22  problems in both ears?
23      A.   Yes, sir.
24      Q.   I have kids with tubes in their ears.  So
25  I know what that's like.  So it does affect your

Page 20

1   hearing.
2       Okay.  Have you understood all of the
3   questions I've been asking you?
4       A.   Yes, sir.
5       Q.   And you've heard me?
6       A.   Yes, sir.
7       Q.   Okay.  How much older was David than you?
8       A.   Five.
9       Q.   Five years older?
10      A.   Yes, sir.
11      Q.   Where did David go to high school?
12      A.   David went to Manual.
13      Q.   Do you know if David graduated?
14      A.   Yeah, he graduated.
15      Q.   You think he graduated there?
16      A.   Yes, sir.
17      Q.   Okay.  Do you remember when David moved to
18  Minnesota?
19      A.   I was young.  I think he was 16.  I think
20  he was 16, yeah.
21      Q.   You were 16 years old?
22      A.   He was 16.
23      Q.   He was 16?
24      A.   First time he left.
25      Q.   So that would have made you about 11 years



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
21–24

Page 21

1  old?
2      A.   Yes, sir.
3      Q.   Did you ever go to Minnesota to visit
4  David after he moved?
5      A.   Couldn't afford it.
6      Q.   That's a no?
7      A.   No.
8          MR. BENNETT:  Try again, because I think
9  you've got a double-negative.
10         THE WITNESS:  No.
11         MR. BENNETT:  Did you go to Minnesota
12  before he died?
13         THE WITNESS:  No.
14         MR. OSBORNE:  Okay.  I understood the
15  answer, but you're worried about the record?
16         MR. BENNETT:  I was.
17     Q.   (By Mr. Osborne)  Okay.  Do you know who
18  David's friends were at any point he lived in
19  Minnesota?
20     A.   Yes, sir.
21     Q.   Tell me what you know about his friends,
22  their names and if you've ever met them.
23     A.   Kirk.
24     Q.   Do you know Kirk's last name?
25     A.   No.  I know Christy Webb's.  That's Kirk's

Page 22

1  girlfriend, was.
2      Q.   How many times have you met them or seen
3  them in your life?
4      A.   About four or five times.
5      Q.   And I assume from your earlier answers you
6  saw them when they would come to Peoria?
7      A.   And on Facebook.
8      Q.   Okay.  What I want to talk about is
9  in-person meetings.
10     A.   Oh, okay.
11     Q.   How many times did you meet them in
12  person?
13     A.   About four times.
14     Q.   When they would come to Peoria?
15     A.   Yes, sir.
16     Q.   Okay.  Do you remember what years those
17  visits took place?
18     A.   The anniversary that David died, that was
19  one.  They came like Thanksgiving and they came again
20  for the anniversary.  And I think it was, yeah,
21  Thanksgiving again.
22     Q.   So you're talking -- I assume from just
23  the testimony of your relatives you're talking about
24  Thanksgiving the year before David died?
25     A.   No.  This was after.

Page 23

1      Q.   Oh.  Kirk and Crystal --
2      A.   Crystal.
3      Q.   -- they've been to Peoria twice since
4  David died?
5      A.   I thought it was four times, but it could
6  have been -- it was four times.  I'm sorry.  It could
7  have been twice.
8          MR. BENNETT:  They were at the funeral,
9  weren't they?
10         THE WITNESS:  Yes, sir.
11     Q.   (By Mr. Osborne)  So before David died had
12  you ever met Kirk or Crystal?
13     A.   Yes.  Come to think of it, yes.  They
14  drove him down here in a beat-up car, raggedy car.
15  They drove all the way from Minnesota.
16     Q.   Okay.  Did David ever bring any girlfriend
17  to Peoria?
18     A.   No.
19     Q.   Okay.  So you never met any of David's
20  girlfriends?
21     A.   I have online, telephone.  But he had one
22  next door.
23     Q.   What was her name?
24     A.   I can't remember it.  I didn't like her
25  for the world.  Sorry.

Page 24

1      Q.   But you never met any of his girlfriends
2  in person?
3      A.   No, sir.
4      Q.   Okay.  Did you talk to any of David's
5  girlfriends on the phone or online before David died?
6      A.   Yes, sir.
7      Q.   How many times?
8      A.   A lot, a lot.
9      Q.   But you don't know names?
10     A.   Josephine.
11     Q.   Josephine?
12     A.   Uh-huh.
13     Q.   How many times did you talk to Josephine?
14     A.   A lot.  Every time you talked to David you
15  talked to Josephine.  They stayed with each other.
16     Q.   Josephine is the one you didn't like too
17  much?
18     A.   No, no.  I like Josephine.
19     Q.   Okay.
20     A.   The one I don't remember that lived next
21  door to me, I don't know her name.
22         MR. BENNETT:  When he was in high school,
23  you mean?
24         THE WITNESS:  No.  This is when he came
25  back to visit.



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
25–28

Page 25

1    Q.    (By Mr. Osborne)  So somebody he lived
2    next to in Minnesota?
3    A.    No.  Next door to my mother on Stanley
4    Street.
5    Q.    Oh, okay.  I understand.
6    MR. BENNETT:  A crime of opportunity
7    apparently.
8    Q.    (By Mr. Osborne)  But you never met
9    Josephine in person before David's death?
10    A.    No, sir.
11    Q.    Okay.  Who were David's two best -- do you
12    know who his two best friends were in high school?
13    A.    Himee and Joey.
14    Q.    Pardon?
15    A.    Himee and Joey.
16    Q.    Do you know their last name?
17    A.    Sanchez, I think.  I'm not sure on that.
18    Q.    Do you keep in touch with Himee and Joey?
19    A.    Yeah.  Well, Himee, he's in the Army,
20    yeah.  But, Joey, he come around.
21    Q.    Still lives in Peoria?
22    A.    He lives in Peoria.
23    Q.    Have you been back to Peoria since you
24    moved to Atlanta?
25    A.    No, sir.

Page 26

1    Q.    When David lived in Minnesota, do you know
2    where David made his money, who he got money from or
3    how he paid his bills?
4    A.    No, sir.
5    Q.    Did David ever talk to you about not
6    having much money?
7    A.    He made hisself seem like he was Superman.
8    He made it seem like he had money, like he was good.
9    Whenever I talked to him:  Everything is good, how
10    are you doing.
11    Q.    Did David ever tell you about having any
12    problems with housing, finding housing?
13    A.    No, sir.
14    Q.    Did he ever talk to you about living in
15    any sort of group homes?
16    A.    No, sir.
17    Q.    Did you talk to David on the phone
18    routinely --
19    A.    Yes, sir.
20    Q.    -- before his death?
21    A.    Yes, sir.
22    Q.    Do you remember his phone number?
23    A.    He had a lot of numbers.
24    Q.    So he would probably get cell phones with
25    a number of minutes on them and then that cell phone

Page 27

1    is done?
2    A.    I don't know.  I just know he had a lot of
3    numbers.
4    Q.    Do you know why he had a lot of numbers?
5    A.    I thought they was other people's phones
6    he was using, like when he got the chance he would
7    call, like how are you doing.
8    Q.    Just borrow somebody's phone?
9    A.    Yeah.  Like, hey, can I use your phone, I
10    want to call home.
11    Q.    Did he ever talk to you about not being
12    able to afford a phone?
13    A.    No, sir.
14    Q.    Now, this big stack of papers is some of
15    the records we've received about your brother's life
16    and medical records and social work records, things
17    like that.
18    In some places in the records it mentions
19    David having very little contact with his family
20    during his time in Minnesota.
21    Do you know why that would be in the
22    medical records?
23    A.    He'd always call home.
24    Q.    Did you ever talk to any of David's
25    caseworkers or anybody in Minnesota about David?

Page 28

1    A.    No, sir.
2    Q.    Did you ever talk to -- none of his
3    counselors or people he lived with?
4    A.    No, sir.
5    MR. BENNETT:  Other than Josephine.
6    Q.    (By Mr. Osborne)  Other than Josephine,
7    did you talk to anybody else routinely on the phone
8    up here in Minnesota?
9    A.    No, sir.  Just Josephine.
10    MR. STORMS:  For the record, we're down
11    here in Atlanta, not up here in Minnesota.
12    MR. OSBORNE:  Thank you, Jeff.
13    MR. STORMS:  Just thought I would be
14    helpful.
15    MR. OSBORNE:  When you're in an airport,
16    then a cab, then a conference room, you forget
17    where you are.
18    MR. STORMS:  It doesn't make any
19    difference.
20    Q.    (By Mr. Osborne)  When David lived at home
21    in Peoria with you, was David ever violent?
22    A.    No, sir.  He was Superman.
23    Q.    Did he ever fight with your mom?
24    A.    I mean we all -- seven kids in one house,
25    we all butt heads.  But I mean --



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
29—32

Page 29

1    Q.    I understand that. That's for sure.
2    A.    You respect Mama. She's short but she'll
3 knock you down. You respect Mama.
4    Q.    I talked to your mother, and I believe
5 that.
6          Did your mom ask David to leave the house
7 when he moved?
8    A.    Don't know. I was young.
9    Q.    I understand. But do you remember why
10 David left the house?
11   A.    He used to -- see, we was close. He told
12 me he was going to make a better life. He hated that
13 we lived in this three-bedroom house and all the boys
14 was in one room. That's what he told me. Like he
15 would never let me see that side of him. It was
16 always, you know --
17   Q.    What side of him are you talking about?
18   A.    That's what I'm saying. Whatever you're
19 saying, he never did show me that. He was always I'm
20 going to be your dad since we ain't got no dad.
21   Q.    Your mom or Angela, even though you were
22 young, did they ever talk to you about David's real
23 problems?
24   A.    No, no.
25   Q.    Okay. After David left, did your mom or

Page 30

1 Angela explain to you -- I mean you must have been
2 curious, right?
3    A.    Uh-huh, yes.
4    Q.    I mean David was one of the primary young
5 adult males in your life; is that correct?
6    A.    Yes, sir.
7    Q.    Did Angela or your mom ever explain to you
8 the real problems David was having?
9    A.    No, sir.
10   Q.    Okay.
11         MR. BENNETT: I object to the form of the
12   question.
13   Q.    (By Mr. Osborne) I'll ask it again. I
14 think I know the answer.
15         Did they ever describe to you any problems
16 David was having after he left for Minnesota?
17   A.    No, sir.
18   Q.    When was the last time you saw David
19 alive?
20   A.    He came home -- if I'm not mistaken, it
21 was a holiday. I think it was Christmas, I think.
22 Think. 2011.
23   Q.    David died in September of 2010.
24   A.    Uh-huh. It was two years before that.
25   Q.    So would it have been --

Page 31

1    A.    About '09.
2    Q.    -- the holidays around 2008?
3    A.    Yes, sir.
4    Q.    So you hadn't seen him -- I think your mom
5 testified it had been a couple of years since she had
6 seen him before he died.
7    A.    Yes, sir.
8    Q.    Is that about the same time frame?
9    A.    Yes, sir.
10   Q.    Okay. Do you have any photographs or
11 videos or anything else? In the five years before
12 David died, did you take any photographs with David?
13   A.    Yeah, yes, yes.
14   Q.    Do you have those photographs?
15   A.    Well, at the house, yes.
16   Q.    But none on your phone?
17   A.    I've got My Space where I added them, but
18 that is just of him.
19   Q.    Yeah. I'm talking about photographs
20 together.
21   A.    No, sir.
22   Q.    Okay.
23   A.    This is a new phone. I change phones a
24 lot too.
25   Q.    But at home, at your home here in Atlanta,

Page 32

1 you have photographs of you and David together?
2    A.    Oh, yeah, yes, sir.
3    Q.    How many?
4    A.    A lot, a lot.
5    Q.    Taken in the last five years of his life
6 or from when you were kids?
7    A.    No. When he came the last time, we took a
8 lot of photos.
9    Q.    Okay. Who would you say David was closest
10 to in your family?
11   A.    I thought me. I don't know what they
12 think. I thought me.
13   Q.    Why do you think you were closest to
14 David?
15   A.    I used to want to go with him, and he used
16 to stop me. But then when he got older he was like,
17 oh, little brother, it's okay, all that. But growing
18 up he was closer to Louis, but me and him just had a
19 bond. Like he got me sucking my thumb and rubbing my
20 ear. I wanted to be just like him.
21   Q.    When David lived in Minnesota in the five
22 years before his death, how often did you talk to him
23 on the phone?
24   A.    Because he changed numbers so much, it was
25 kind of, you know, scarce. But we kept communication



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
33—36

Page 33

1  through Facebook -- I mean My Space. But it was when
2  he would call you. Because you'd call the number.
3  It's disconnected.
4    Q.   Did you ever call him on the phone?
5    A.   Oh, yes.
6    Q.   Okay. And oftentimes you would reach a
7  disconnected number?
8    A.   Yes, sir.
9    Q.   And then I take it you would just wait for
10 David to call you?
11   A.   Yes, sir.
12   Q.   How many times do you remember calling
13 David and reaching a disconnected number? Was it
14 more than five?
15   A.   It wasn't long. I mean, yeah, it was
16 like -- because after I did that like three times, I
17 said forget it, I'll just wait on him to call me.
18 When he started calling me then, I asked him is your
19 phone going to be on long. Yeah, it will be on, call
20 me tomorrow. Okay.
21   Q.   Did David ever talk to you about having
22 problems with people he was living with?
23   A.   No, sir.
24   Q.   Have any of your other relatives talked
25 with you about David having problems with people he

Page 34

1  lived with in Minnesota?
2    A.   No, sir.
3    Q.   When David was alive, were you aware of
4  any diagnosis of schizoaffective disorder or
5  schizophrenia on David's part?
6    A.   No.
7    Q.   Your relatives, since David's death have
8  your relatives talked to you about David having
9  schizophrenia?
10   A.   No. But like I read it on the newspaper.
11   Q.   So after David's death when news reports
12 started coming up --
13   A.   Yes, sir.
14   Q.   -- that's the first time you had learned
15 anything about that?
16   A.   Yes, sir.
17   Q.   Did David ever talk to you when he lived
18 in Peoria about hearing voices?
19   A.   No, sir.
20   Q.   And what about when he lived in Minnesota?
21 Would he ever tell you, hey, I'm having some
22 problems, I'm hearing voices, I'm scared or anything
23 like that?
24   A.   No, sir.
25   Q.   Has Angela or your mother ever talked to

Page 35

1  you about David's schizophrenia or problems -- any
2  problems it may have been causing him?
3    A.   No, sir.
4    Q.   Do you know who Maureen Glover is?
5    A.   No, sir.
6    Q.   What about Sheryl Sprat?
7    A.   No, sir.
8    Q.   Do you know who Phillip or Teresa Warner
9  is?
10   A.   No, sir.
11   Q.   You mentioned Louis a few minutes ago.
12 Who is Louis?
13   A.   My brother.
14   Q.   How old is Louis?
15   A.   Louis is 26.
16   Q.   So you're just a year younger than him
17 maybe?
18   A.   Yes, sir.
19   Q.   Do you know why is Louis in -- is he
20 currently in jail?
21   A.   No, sir.
22   Q.   Was he in jail a few months ago?
23   A.   Yes, sir.
24   Q.   What for?
25   A.   I don't know.

Page 36

1    Q.   Have you talked to Louis about that?
2    A.   He's just like David. I mean we don't put
3  our problems on each other. Because he knows I'll go
4  down there. No, sir.
5    Q.   Okay. Has Angela or your mother told you
6  what kind of trouble Louis got into?
7    A.   No, sir; no, sir. I asked him. He
8  wouldn't tell me. Like I just got a phone call:
9  Louis is in jail. What for? She wouldn't tell me.
10   Q.   Who called you?
11   A.   My mother, my mom.
12   Q.   And she wouldn't tell you?
13   A.   No.
14   Q.   Do you think she knew?
15   A.   She knows I would spend my last little bit
16 of money going down there. Same thing with David.
17 If there's a problem, I'm going. We'll face it
18 together. She will not tell me.
19   Q.   Okay. Did your mom ever tell you David
20 was having a rough time when he lived in Minnesota
21 but just protected you from the details?
22   A.   No. I would have went. We would have
23 faced it together. No.
24   Q.   Okay. Do you know of any dates or
25 times -- you don't even have to remember dates. Do



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
37–40

Page 37

1  you know of any times your brother was hospitalized
2  for any reason?
3      A.  No.
4      Q.  So I take it you weren't aware he was
5  hospitalized in Florida the year he died?
6      A.  I heard he went to Florida.
7      Q.  Tell me what you remember about that and
8  who told you.
9      A.  You know what? He called me from Florida.
10  Hey, bro, I'm on the beach, I'm on the beach. Or he
11  kept saying I'm on the ocean, man, I'm on the ocean.
12  I was like yeah. I was like you're liking it. He's
13  like, yeah, it's beautiful, it's beautiful. And then
14  the phone died. I called my mom. I was like what is
15  David doing there. I don't know.
16      Q.  So he didn't tell you he was in the
17  hospital in Florida?
18      A.  No.
19      MR. BENNETT: Unless he was on the beach,
20  right?
21      THE WITNESS: Yeah. He was on the beach.
22      Q.  (By Mr. Osborne) And you don't know of
23  any other hospitalizations when David lived in
24  Minnesota?
25      A.  No.

Page 38

1      MR. BENNETT: Other than the last one.
2      MR. OSBORNE: Well, yeah, I assumed --
3      THE WITNESS: Yeah, that.
4      MR. OSBORNE: Thanks for clarifying.
5      MR. STORMS: We endeavor to be helpful on
6  this side of the table.
7      MS. FUSSY: Why don't you just ask Bob all
8  the questions?
9      MR. OSBORNE: You guys are givers. Can we
10  go off the record for a minute?
11      (Discussion ensued off the record.)
12      Q.  (By Mr. Osborne) Now I'm going to talk to
13  you a little bit about some of the ways David's death
14  affected your life, if at all.
15      A.  Yes, sir.
16      Q.  I'm sure it has. And these are questions
17  that us lawyers need to ask you and your family
18  members to figure out what we're going to talk to the
19  jury about if we ever go to trial in the case. So,
20  again, I'm not meaning to pry.
21      I want to ask you about a series of
22  topics, and they overlap. So I'm not expecting
23  distinct answers to every topic I ask you about.
24  It's the loss of guidance, loss of counsel, loss of
25  aid. And so I understand, you know, a lot of these

Page 39

1  concepts are overlapping; but they're the words the
2  judges use in their decisions in court, and so we're
3  just going to stick to what they talk about.
4      Tell me about how David's death affected
5  you with regards to any like counsel he gave you,
6  which I interpreter to mean, you know, how to live
7  your life, how to address problems, things like that.
8      How did David's death affect you in that
9  way?
10      A.  Good and bad, because I stay as far away
11  from the police as possible. That's the good. Now,
12  the bad, God. It's hard to put into words. Like he
13  loved my music. He was my everything. Since then I
14  quit music. I don't touch -- like I play keyboard
15  and all that. I don't do it. I dropped out of the
16  church band. I don't know. Everything. Like he was
17  the motivator in school real big. He was big in
18  school. Hey, go to school, go to school, go to
19  school.
20      I wasn't even going to go back to school
21  until Angie started pushing me. I still don't want
22  to go back now.
23      Q.  Did David counsel you to stay in school in
24  2006?
25      A.  He was like my dad.

Page 40

1      Q.  Why didn't you listen to him and stay in
2  school?
3      A.  Because I mean, see, where I'm from, it's
4  bad. This is around the time they start shooting. I
5  almost got shot.
6      Q.  Did you tell David that?
7      A.  No, no, no. I ain't even told my mom.
8  She saw it on the news. The guy was running down the
9  hallway with the gun, shooting in the crowd.
10      Q.  Did David ever tell you he was angry with
11  you quitting school?
12      A.  I knew he was.
13      Q.  Did he ever tell you he was?
14      A.  No.
15      Q.  Okay. What other ways has David's death
16  affected you with regard to loss of counsel?
17      A.  I don't talk to nobody about my problems.
18  I used to talk to him because I can trust him.
19      Q.  So at your family meetings where you get
20  together and talk about problems --
21      A.  I don't say anything.
22      Q.  Why not?
23      A.  I shut down. To be honest with you, I
24  shut down.
25      Q.  But your other family members get together



Page 41

1 and talk about problems and how they're feeling and
2 things like that?
3    A.   Now I ain't there. So I'm assuming they
4 do because before I left we had a sit-down.
5    Q.   But you didn't participate?
6    A.   I did, but I didn't say nothing.
7    Q.   Okay. So you participated in the meeting
8 as you were present but you didn't say anything?
9    A.   I didn't say nothing.
10    Q.   I understand.
11         Tell me about any loss of guidance that
12 you've felt since David's death.
13         What kind of guidance did David provide to
14 you when he was alive?
15    A.   Lots.
16    Q.   He told you to stay in school?
17    A.   Yeah. He helped me. Like he's the one
18 that taught me how to tie my shoes, how to count,
19 left from right. A lot. I mean I hear mom; but
20 you're a woman, whatever. This is a dude right here,
21 this is a guy, the man of the house. He taught me a
22 lot.
23         So I lost a part of me with him, I want to
24 say.
25    Q.   Tell me about the guidance David gave you

Page 42

1 when he lived in Minnesota.
2    A.   It was always guidance. I mean he always
3 pushed you. He was a pusher, like, hey, do right, do
4 this, you know. Like he was going to school for
5 music. It's in my My Space. He was pushing me to
6 pursue my music. When everybody else starts arguing,
7 yeah, you're a piece of garbage, your rap is trash,
8 he was the one like do it.
9    Q.   Why haven't you listened to David's
10 guidance in that respect and kept on with your music?
11    A.   I did. I stopped when he died.
12    Q.   Why though? David wouldn't want you to
13 stop, right?
14    A.   (Witness shakes head negatively.)
15    Q.   Is that a no?
16    A.   He wouldn't want me to stop.
17    Q.   Do you need to take a break, sir? I know
18 this is really difficult.
19         MR. OSBORNE: Let's take five minutes.
20         (Recess from 1:01 p.m. to 1:08 p.m.)
21    Q.   (By Mr. Osborne) Sir, I'm almost done
22 asking you questions.
23         Are you doing all right?
24    A.   Yes, sir.
25    Q.   When David was alive did David ever send

Page 43

1 you any money?
2    A.   No. But he sent my son Bralyn a wrestling
3 belt.
4    Q.   A wrestling belt?
5    A.   Yeah.
6    Q.   Like a WWF replica belt?
7    A.   Yeah.
8    Q.   Did he ever send your mom any money that
9 you know of?
10    A.   Not that I know, no. I don't know.
11    Q.   And he never sent you any money?
12    A.   No.
13    Q.   Do you know if he ever sent any of your
14 brothers or sisters any money?
15    A.   Don't know.
16    Q.   Nobody has asked you about being
17 responsible for any of David's medical bills; is that
18 right?
19    A.   No.
20    Q.   Okay.
21         MR. BENNETT: That is right?
22    Q.   (By Mr. Osborne) Nobody has ever asked
23 you about being responsible for --
24    A.   Yeah, that's right.
25    Q.   Okay.

Page 44

1    A.   I'm sorry.
2    Q.   That's all right. I'm asking somewhat bad
3 questions sometimes. So your answers are
4 understandable to me. But Bob is just trying to make
5 sure the record is clear.
6         Did David ever talk to you about any
7 problems he was having with drug addiction or alcohol
8 addiction?
9    A.   No, sir. I knew he drink. I didn't know
10 he had an alcoholic problem.
11    Q.   You didn't know that?
12    A.   I didn't know. I knew he drink.
13         MR. BENNETT: But did not know he had an
14 alcohol problem?
15         THE WITNESS: Did not know.
16    Q.   (By Mr. Osborne) Okay. When David lived
17 with you in Peoria, was there any violence in the
18 home at any time from anybody?
19    A.   Like I said, house full of seven people,
20 five boys in one room, you're going to bump heads.
21    Q.   The typical brother --
22    A.   Yeah.
23    Q.   -- sorting things out with each other.
24 But I'm talking about any abuse from any adults.
25    A.   No, sir.



DERRICK BROWN
SMITH vs. GORMAN

October 10, 2012
45–48

Page 45
1    Q.    Okay.  Did David ever talk to you about
2  being evicted from anywhere he was living while he
3  lived in Minnesota?
4    A.    No, sir.
5    Q.    Did David ever talk to you about being
6  incarcerated or in jail while he was in Minnesota?
7    A.    No, sir.
8       MR. OSBORNE:  Okay.  We don't have
9  anything else.
10      MR. BENNETT:  We'll read and sign.
11      MR. OSBORNE:  Thank you, sir.
12      (Whereupon, the deposition was concluded
13  at 1:10 p.m.)
14      (Pursuant to Rule 30(e) of the Federal
15  Rules of Civil Procedure and/or O.C.G.A.
16  9-11-30(e), signature of the witness has been
17  reserved.)
18
19
20
21
22
23
24
25

Page 47
1
2        COURT REPORTER DISCLOSURE
3
4     Pursuant to Article 10.B. of the Rules and
  Regulations of the Board of Court Reporting of the
  Judicial Council of Georgia which states: "Each court
5  reporter shall tender a disclosure form at the time
  of the taking of the deposition stating the
6  arrangements made for the reporting services of the
  certified court reporter, by the certified court
7  reporter, the court reporter's employer, or the
  referral source for the deposition, with any party to
8  the litigation, counsel to the parties or other
  entity.  Such form shall be attached to the
9  deposition transcript," I make the following
  disclosure:
10
     I am a Georgia Certified Court Reporter.  I am
11  here as a representative of Esquire Deposition
  Solutions.  Esquire Deposition Solutions was
12  contacted to provide court reporting services for the
  deposition.  Esquire Deposition Solutions will not be
13  taking this deposition under any contract that is
  prohibited by O.C.G.A. 9-11-28 (c).
14
     Esquire Deposition Solutions has no
15  contract/agreement to provide reporting services with
  any party to the case, any counsel in the case, or
16  any reporter or reporting agency from whom a referral
  might have been made to cover this deposition.
17  Esquire Deposition Solutions will charge its usual
  and customary rates to all parties in the case, and a
18  financial discount will not be given to any party to
  this litigation.
19
20
21
22        KARA BARGER, GA CCR-B-1496
23
24
25

Page 46
1
2        C E R T I F I C A T E
3
4  STATE OF GEORGIA:
5  COUNTY OF FULTON:
6
7        I hereby certify that the foregoing
8  transcript was taken down, as stated in the
9  caption, and the questions and answers thereto
10  were reduced to typewriting under my direction;
11  that the foregoing pages 1 through 45 represent
12  a true, complete, and correct transcript of the
13  evidence given upon said hearing, and I further
14  certify that I am not of kin or counsel to the
15  parties in the case; am not in the regular
16  employ of counsel for any of said parties; nor
17  am I in anywise interested in the result of said
18  case.
19      This, the 22nd day of October, 2012.
20
21
22        KARA BARGER, GA CCR-B-1496
23
24
25

Page 48
1        DEPOSITION ERRATA SHEET
2
3  Our Assignment No. 322484
4  Case Caption: Larry E. Smith, et. al vs. Timothy
5  Gorman, et. al
6
7        DECLARATION UNDER PENALTY OF PERJURY
8
9     I declare under penalty of perjury that I have
10  read the entire transcript of my deposition taken in
11  the above-captioned matter or the same has been read
12  to me and the same is true and accurate, save and
13  except for changes and/or corrections, if any, as
14  indicated by me on the DEPOSITION ERRATA SHEET
15  hereof, with the understanding that I offer these
16  changes as if still under oath.  Signed on the _____
17  day of _____, 20___.
18
19  _____
20  Derrick Brown
21
22
23
24
25



# EXHIBIT 14

1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MINNESOTA
2

3    LARRY E. SMITH, as trustee    )
     for the Heirs and Next of Kin)
4    of DAVID CORNELIUS SMITH,     )
                                   )
5                     Plaintiff,   )
                                   )
6               VS.                )  No. 11-CV-03071
                                   )
7    TIMOTHY GORMAN and TIMOTHY    )
     CALLAHAN, acting in their     )
8    capacities as Minneapolis     )
     police officers, and the CITY)
9    OF MINNEAPOLIS,               )
                                   )
10                    Defendants.  )

11

12          The deposition of DESMOND REDDEN, called

13   for examination pursuant to the provisions of the

14   Federal Rules of Civil Procedure of the United

15   States District Courts as they apply to the taking

16   of depositions, taken before Paula A. Morsch, C.S.R.

17   License No. 84-002965, a Certified Shorthand

18   Reporter in the State of Illinois, on the 29th day

19   of August, 2012, at the hour of 8:00 a.m., at 500

20   Hamilton Boulevard, in the City of Peoria, County of

21   Peoria, State of Illinois.

22

23

2

1    PRESENT:

2            GASKINS, BENNETT, BIRRELL, SCHUPP,
         LLP
3         BY:  Robert Bennett, Esq.
         and Jeffrey S. Storms, Esq.
4         333 South Seventh Street, St. 2900
         Minneapolis, MN  55402
5         612.333.9500
         for Plaintiff Larry E. Smith, as
6         Trustee for the Heirs and Next of Kin
         of David Cornelius Smith;

7
         MR. BURT T. OSBORNE, ESQ.
8         and MS. TRACEY N. FUSSY, ESQ.
         Assistant City Attorneys
9         City Hall-Room 210
         350 South 5th Street, 612.673.2180
10        Minneapolis, MN  55415
         for Defendants Timothy Gorman,
11        timothy Callahan, City of
         Minneapolis.

12

13    _____

14                    I N D E X

15    WITNESS                           PAGE

16    DESMOND REDDEN

17        Examination By Mr. Osborne ......    3

18    *No Exhibits Marked.

19

20

21

22

23



3

1     DESMOND REDDEN
2     called by the Defendant,
3     being first duly sworn,
4     was examined and testified
5     as follows:
6
7          DIRECT EXAMINATION
8  BY MR. OSBORNE:
9     Q    Mr. Redden, could you state your full name
10 for the record and spell your first and last name?
11    A    Desmond, D-E-S-M-O-N-D, Harrell,
12 H-A-R-R-E-L-L, Redden, R-E-D-D-E-N, Jr., J-R.
13    Q    Mr. Redden, my name is Burt Osborne. I
14 represent the City of Minneapolis and the defendants
15 in this matter, the defendant police officers, and
16 have you ever had your deposition taken before?
17    A    Yes.
18    Q    Okay. So you're probably familiar with a
19 few of the ground rules, like the main ones being
20 today and I have to talk one at a time. I need
21 to let you finish your answers before I ask another
22 question and you need to let me finish my question
23 before you start to answer. In normal conversation

4

1  we tend to kind of talk over each other, and that
2  works for me but the court reporter will have a hard
3  time transcribing it properly unless we speak one at
4  a time. And then you just nodded your assent, which
5  is another issue during a deposition. All your
6  answers have to be verbal.
7     A    Okay.
8     Q    Yes, no, and again a nod works for me. I
9  know exactly what you're talking about, and things
10 like uh-huh and huh-uh, that works for me too, but
11 the court reporter will have a hard time accurately
12 getting down our conversation today. Fair enough?
13    A    Fair enough.
14    Q    And if you need to take a break at any
15 time, you just let me know and we can do that. If
16 you don't understand one of my questions, it's
17 really important that you seek clarification from me
18 because today is sworn testimony and so it's real
19 important that you understand the question I'm
20 asking. If you don't, just stop me and we'll get it
21 clarified.
22    A    Okay.
23    Q    Give me your current address.

5

1     A    2617 West Starr Street, two R's,
2  S-T-A-R-R, Street, Peoria, Illinois, 61605.
3     Q    Is that a single family home or an
4  apartment?
5     A    Single family home.
6     Q    Do you own that home?
7     A    No, my mother do.
8     Q    Do you live with your mother?
9     A    Yes.
10    Q    Okay. Is there any reason why you can't
11 participate today in this deposition? Were you up
12 all night last night or are you under the influence
13 of any drugs or alcohol or prescription medications
14 that might impair your ability to participate today?
15    A    No, sir.
16    Q    Okay. I understand you're going into the
17 military soon?
18    A    Yes.
19    Q    When is that?
20    A    On September 5th.
21    Q    And what branch?
22    A    United States Navy.
23    Q    Do you know where you're going to report

6

1  to?
2     A    MEPS, which is a process center in
3  St. Louis.
4     Q    St. Louis, okay.
5     A    Yes.
6     Q    How old are you?
7     A    21.
8     Q    What's your date of birth?
9     A    
10    Q    How long have you lived at your current
11 address?
12    A    For maybe a year and a half.
13    Q    And you said that's your mother's house?
14    A    Well, it's actually my uncle's house.
15 He's buying it and we stay there.
16    Q    What is your uncle's name?
17    A    Leroy Smith, Sr.
18    Q    Leroy Smith, Sr.?
19    A    Yes.
20    Q    And so in addition to your mother and you,
21 who else lives at the address?
22    A    Me and my mother and my brother, Louis
23 Brown.

7

1    Q    How old is Louis?

2    A    26.

3    Q    I understand Louis won't be joining us

4    today for his deposition today, is that correct?

5    A    Correct.

6    Q    Tell me why not.

7    A    Well, Louis had a problem at his father's

8    house. He went to see someone to talk to him about

9    a problem he was having dealing with David, and he

10   went to talk to his dad but his dad, I believe he

11   says he was busy that night and he didn't have time

12   to talk to him, and Louis had a problem with that

13   and acted out.

14   Q    So Louis was having a problem with David,

15   your brother?

16   A    Yeah, sometimes he have --

17        MR. BENNETT:  His death I think is

18   what he said.

19   A    Yeah, with the death.

20   Q    I don't believe that's what he said, but

21   that's fine. Go ahead.

22   A    Yeah, that's what I meant.

23   Q    David's death?

8

1    A    Yeah, dealing with his death, and

2    sometimes it becomes very hard to deal with.

3    Q    And so he went to talk to -- do you know

4    his father's name?

5    A    Louis Brown, Sr.

6    Q    Tell me in as much detail as you know what

7    happened that landed him in jail.

8    A    Well, actually I have no knowledge but

9    that he may have went over there.

10        MR. BENNETT:  If you don't know,

11   don't guess.

12   Q    Yeah, I don't want you guessing. Just

13   what you know.

14   A    Well, I don't know. I know he went over

15   there. They got into an altercation, and that was

16   all.

17   Q    Who told you that?

18   A    The police officer.

19   Q    What did the police officer tell you

20   happened?

21   A    That's all I was told. He talked to my

22   mother.

23   Q    Okay. Who's your current employer?

9

1    A    I'm currently not employed.

2    Q    When was the last time you were employed?

3    A    I was employed I would say April, April or

4    May. I was employed in May by Bass Pro Shops in

5    East Peoria.

6    Q    Bass Pro Shops?

7    A    Yes, sir.

8    Q    And how long did you work there?

9    A    For about nine months.

10   Q    Then before that who did you work for?

11   A    PARC, Peoria Association for Retarded

12   Citizens.

13   Q    And how long did you work for them?

14   A    For about five months.

15   Q    Okay. And so since April or May you

16   haven't worked?

17   A    Correct.

18   Q    Okay. And it sounds like you're going to

19   be working hard in about a week?

20   A    Yes, sir.

21   Q    What high school did you attend?

22   A    Peoria Manual.

23   Q    Did you graduate?

10

1    A    Yes, sir.

2    Q    In what year?

3    A    2010.

4    Q    Do you have any other vocational training

5    or college training of any kind, college courses?

6    A    Yes, I went to Grambling State University

7    for summer semester and I attended ICC directly

8    after that coming home.

9    Q    What did you say? I didn't hear the

10   college name.

11   A    Grambling State.

12   Q    Grambling State, okay. And how long were

13   you there?

14   A    For one summer semester.

15   Q    And then what is ICC?

16   A    Illinois Central College.

17   Q    What courses did you take at Grambling and

18   ICC?

19   A    At Grambling I was taking architectural

20   engineering and business, business management.

21   Q    How many courses did you take that summer?

22   A    One.

23   Q    Did you pass?

11

1    A   No.

2    Q   Okay.  And then at ICC what courses did

3  you take?

4    A   I took business management alone.

5    Q   And how did you do in that course?

6    A   I was doing fairly well until coming home.

7  Coming home I was dealing with an eviction and also

8  David being killed directly once I got home, and I

9  dropped out of school directly after that.

10    Q   That was around 2010?

11    A   Yes.  Well, 2011.  No, 2010, you're right.

12  2010.

13    Q   Tell me about the eviction.

14    A   I have no knowledge of that.  I never went

15  to court about it.  I was busy with school.

16          MR. BENNETT:  It was your mother that

17  was evicted?

18    A   Yes.

19          MR. BENNETT:  Okay.

20    Q   Oh, okay.  And then is that when you and

21  your mother and Louis moved into the house that

22  Leroy Smith, Sr., bought?

23    A   No.  When the eviction happened, we ended

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

12

1  up moving onto Howett Street into a house that I was

2  able to purchase through a school financial aid

3  check because we had no place to stay, and so I

4  purchased --

5          MR. BENNETT:  When you say purchased,

6  you mean leased?

7    A   Yeah, leased for rent.

8    Q   And you used your school financial aid

9  check for that?

10    A   Yes.

11    Q   Okay.  Why don't you go back to -- tell me

12  when your mother was evicted from the premises you

13  mentioned, and then give me where you lived after

14  that until now.

15    A   Okay.  Well, I was at Grambling State in

16  maybe June of 2010.  Then I came home after a

17  semester which was probably a month later so maybe

18  July.  Then I went to ICC and then directly after

19  coming home, we were evicted while I was going to

20  ICC.

21    Q   So about July of 2010?

22    A   I have no idea.  I know it was directly

23  afterward, maybe in the middle of July.

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

13

1    Q   So that's when the eviction took place,

2  and what was that address?

3    A   1805 South Stanley Street.

4    Q   Okay.  And then where did your mother and

5  you move when she was evicted?

6    A   1310 West Howett Street.

7    Q   Was that a single family home or

8  apartment?

9    A   Single family home.

10    Q   Was that a rental property?

11    A   Yes.

12    Q   That's the one you rented with your

13  student loan check?

14    A   Yes.

15    Q   Do you know if that's an appropriate use

16  of student loans?  Was that allowed?

17          MR. BENNETT:  Objection, calls for a

18  legal conclusion.

19    Q   Go ahead and answer.

20          MR. BENNETT:  You can answer.

21    A   Okay.  Well, we had noplace to go and so

22  actually my mom was busy in Minnesota at the

23  hospital, and so I did it on my own and she had no

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

14

1  knowledge of it.

2    Q   Okay.  How long did you live at 1310

3  West -- give me the address.

4    A   Howett, Howett Street.  We stayed there

5  for the winter.

6    Q   2010 into 2011?

7    A   Yes.

8    Q   How come you moved away from there?

9    A   Well, the house had problems and it was

10  actually just temporary.

11    Q   Okay.  And so I take it you moved from the

12  1310 address to your current address?

13    A   Yes.

14    Q   Did you ever talk to your mother about the

15  eviction?

16    A   No.

17    Q   You never got any details from her about

18  why she was being evicted?

19    A   No.

20    Q   Do you have any -- do you know why she was

21  evicted?

22    A   No.

23    Q   All right.  I want to talk to you about

PAULA A. MORSCH, C.S.R.
ADVANTAGE REPORTING SERVICE, 309-673-1881

15

1 your brother, David. When is the last time you saw
2 David?
3     A    Do you mean dead or alive?
4     Q    Alive.
5     A    Okay. The last time I seen David alive, I
6 can't give you an exact. I remember it was a
7 holiday. I'm not sure what holiday but it was a
8 holiday, and he had came and everyone was happy to
9 see him because we were wondering how he was doing.
10    Q    Do you remember what holiday that was?
11    A    No.
12    Q    Do you remember what year it was?
13    A    Must have been -- no, I take that back.
14 I'm trying to remember if he attended for my
15 graduation, but I can't vividly remember that. I
16 don't think he was there. No, he wasn't there. So
17 it was a holiday. I don't know what holiday, but --
18    Q    Do you remember the year?
19    A    2010.
20    Q    Which holiday was that?
21    A    I can't remember.
22    Q    Was it either Thanksgiving or Christmas?
23    A    It was one or the other.

16

1     Q    Okay.
2         MR. BENNETT:   The year before he
3 died?
4     Q    What month did your brother die, do you
5 know?
6     A    September.
7     Q    What year?
8     A    2010.
9     Q    So the holiday I think you're probably
10 referring to is late in 2009 or 2008 perhaps?
11    A    Late 2009, early 2010.
12    Q    Okay. Tell me about that visit. David
13 came here?
14    A    Yes. He arrived in a car with his best
15 friends, Crystal and Curt. They showed up.
16 Everyone was happy to see them or whatnot, and I was
17 busy, I was busy with school and sports so I wasn't
18 home often.
19    Q    Tell me his friends' names again. Curt,
20 and what was the other one?
21    A    Crystal. Curt's wife, Crystal.
22    Q    Crystal. Do you remember their last
23 names?

17

1     A    No.
2     Q    Who did David and Curt and Crystal stay
3 with?
4     A    They stayed with us.
5     Q    With your mom and you?
6     A    Yes.
7     Q    What address was that? Was that 1310?
8     A    That was 1805 Stanley.
9     Q    Now, before that holiday time frame 2009
10 visit from David, when did you see him before that?
11    A    Summer, the summer before. I remember him
12 coming. He came and we were listening to music and
13 he was telling me about how big I had grown and I
14 was telling him how well I was doing in wrestling,
15 and I remember showing him some of my medals and he
16 was telling me how I was going to be the biggest kid
17 my mom had because of the size of my hand, and
18 that's pretty much the most I remember.
19    Q    Did you ever visit David in Minnesota?
20    A    No.
21    Q    What about in Florida?
22    A    No.
23    Q    How much younger are you than David?

18

1     A    I'm the youngest brother and -- well, I'm
2 the youngest, period. He would have been probably
3 31 or 32.
4     Q    What was your brother's birthday?
5     A    March 2nd, 1982, so maybe nine years, ten.
6     Q    On the two visits you mentioned in the
7 summer of 2009, how long did -- let's take them one
8 at a time. In the summer of 2009 when David came to
9 visit, how long did he stay?
10    A    Well, he was initially to stay for a week
11 but then he ended up missing a flight and our bus,
12 our bus, and he stayed for another week, I believe.
13    Q    Did he come by himself in the summer of
14 2009?
15    A    Yes.
16    Q    And then so he was here for roughly
17 two weeks?
18    A    Yes.
19    Q    What about the holiday visit in late 2009?
20 How long did he stay then?
21    A    Two days.
22    Q    With Crystal and Curt?
23    A    Yes.

19

1     Q    Did they all stay with you?

2     A    Yes.

3     Q    Now, since David's death, have you sought

4 any sort of medical treatment for depression or

5 mental health counseling or anything like that?

6     A    No, sir.

7     Q    What about before David's death? Did you

8 have any emotional problems as a kid?

9     MR. BENNETT: I'm going to object to

10 that. First of all, what does that have to do with

11 anything? His medical condition is not an issue.

12     MR. OSBORNE: It could be.

13     MR. BENNETT: No, it can't be.

14     MR. OSBORNE: Well, he answered my

15 first question so it probably isn't, but if I hear

16 at trial the emotional effects --

17     MR. BENNETT: You can get into

18 emotional stuff with him, but he's not putting his

19 medical condition at issue in this case.

20     MR. OSBORNE: Are you instructing him

21 not to answer?

22     MR. BENNETT: No, I'm instructing --

23 well, yeah, I guess I'm going to instruct him not to

21

    MR. OSBORNE: Then there's not going to

to be any testimony down the road?

    MR. BENNETT: That's for somebody

else to say. I don't intend to ask them about their

medical conditions at trial.

    MR. OSBORNE: Let's go off the record

for a second.

    (Whereupon an off the record

      discussion was held.)

    MR. OSBORNE: Bob, we're not going to

call the judge right away. We might call him at the

end of the deposition, but I just want to

understand.

    MR. BENNETT: Call him whenever you

think you need to.

    MR. OSBORNE: No, no. I don't want

to call him at all. I just want to understand the

basis of your instructing your witness not to

answer.

    MR. BENNETT: Well, what I will

instruct him not to answer is about his mental

health history and any treatment he's had for any

mental health problems. It isn't relevant.

20

1 answer that question.

2     MR. OSBORNE: Well, I guess we're

3 going to probably have to call the judge then.

4     MR. BENNETT: Then call the judge.

5 Go ahead.

6     MR. OSBORNE: If folks --

7     MR. BENNETT: They're not going to

8 answer about their medical conditions.

9     MR. OSBORNE: As long as then they're

10 not going to testify about their medical conditions

11 and having sought treatment or anything like that.

12     MR. BENNETT: They're not allowed to

13 get -- the state wrongful death statute and the

14 JIG's that relate to that don't allow them to get

15 compensated for grief. They get loss of aid,

16 comfort, society, companionship, guidance, counsel,

17 but they're not putting their medical condition at

18 issue and you're not going to ask them about their

19 medical condition in front of me.

20     MR. OSBORNE: Well, I am going to ask

21 them.

22     MR. BENNETT: You're not going to get

23 any answers.

22

    MR. OSBORNE: But relevance isn't a

reason to instruct him not to answer.

    MR. BENNETT: It isn't an issue in

this case. That's different than irrelevance. It's

completely off limits. That's like asking him --

    MR. OSBORNE: So what do you think

the judge will say? The way I see this, and I'm not

trying to be difficult and I'm not trying to pry,

but if somebody says, you know, I lived a pristine

life -- and none of us do, I realize that. I'm just

being argumentative and giving you a hypothetical; I

lived a pristine life until this incident and after

that I'm devastated.

    MR. BENNETT: He can say I'm

devastated.

    MR. OSBORNE: Maybe they didn't live

a pristine life and maybe the devastation was

already starting or in process based on what was

going on in their lives before something happened,

and so that's the only thing I'm trying to get at,

Bob. I'm not trying to pry into people's --

    MR. BENNETT: Well, you're asking a

question about his medical history. That's what you

23

1  want to know.
2       MR. OSBORNE:  Medical or emotional
3  history.  These things overlap.  You know that.
4       MR. BENNETT:  Well, I know they --
5  well, but his medical, he has not put any medical
6  condition of his at issue in this case.
7       MR. OSBORNE:  I guess that's the
8  notion I disagree with.  I'm devastated and I am
9  damaged permanently and this has affected my life in
10  these ways, loss of companionship, loss of advice
11  and counsel.  That's going to affect my life.  I
12  want to know what happened before then.
13       MR. BENNETT:  This can be on the
14  record or off the record.  In Minnesota, for
15  instance, I tried the -- getting ready to try the
16  Taylor case, you couldn't put in that every one of
17  them suffered grief so bad that they had to undergo
18  counseling, psychological counseling, even the kids,
19  you know, except for the littlest one.
20       MR. OSBORNE:  I understand, and so
21  the lawyers for the country club and the other
22  defendants didn't inquire into anything?  They just
23  let them testify I was devastated?

24

1       MR. BENNETT:  They did not inquire as
2  to any medical history.  They let -- yeah, they did.
3  In the Minnesota wrongful death, it's a pecuniary
4  loss merit.
5       MR. OSBORNE:  I understand your
6  position.  I hope you understand mine.
7       MR. BENNETT:  Well, I do, and I
8  think --
9       MR. OSBORNE:  I've never had to call
10  a judge in a case in my whole career.
11       MR. BENNETT:  Well, I have, but I
12  think the question I objected to and wouldn't let
13  him answer was you started with his mental health
14  history.  Now, it seems to me you craft other
15  questions depending on what the answers are.
16       MR. OSBORNE:  No, I'm going to come
17  at it in different ways.
18       MR. BENNETT:  Then those questions
19  will be dealt with when those questions are asked.
20  You have to do your craft.  I have to do mine.
21       MR. OSBORNE:  Okay.  I don't think
22  it's plain fair for you to instruct him not to
23  answer questions forcing us to call the judge when

25

1  you know that's not an appropriate basis to instruct
2  your witness not to answer.
3       MR. BENNETT:  To the question you
4  asked him, it is an appropriate basis.
5       MR. OSBORNE:  It is?
6       MR. BENNETT:  I believe it's
7  harassing.  I mean that's the --
8       MR. OSBORNE:  Harassing?
9       MR. BENNETT:  Because you can't put
10  his mental health condition at issue.
11       MR. OSBORNE:  Well, I think you know
12  me better than that, Bob.
13       MR. BENNETT:  It's just what the --
14  ask another question.  You can get, I think, the
15  information you need another way, okay?
16       MR. OSBORNE:  All right.
17       MR. BENNETT:  And if you can't, we'll
18  talk about it later.
19       MR. OSBORNE:  We'll table the issue.
20       MR. BENNETT:  No, you should ask the
21  questions you think -- he hasn't answered anything
22  so far that would let you ask that question, okay?
23       MR. OSBORNE:  He has talked about his

26

1  brother having so much trouble that now he's
2  incarcerated.
3       MR. BENNETT:  You can ask Louis about
4  that.
5       MS. FUSSY:  Not today.
6       MR. BENNETT:  But not today.
7       MR. OSBORNE:  But Bob --
8       MR. BENNETT:  He's also told you he
9  wasn't there, but he hasn't put his --
10       MR. OSBORNE:  He said he failed out
11  of college and had trouble in some part due to
12  David's death.
13       MR. BENNETT:  Okay.  So ask him about
14  his college.  You asked him if he passed the course.
15  He said no.
16       MR. OSBORNE:  We're not going to call
17  the judge right now because we don't know if you're
18  going to continue to instruct him not to answer on
19  other topics and so we can just call the judge all
20  at once.
21       MR. BENNETT:  Okay.  Well, what I
22  instructed him not to answer on, I believe, was the
23  question about his mental health history and I'm

27

1  going to continue that, persist in that objection,
2  and you can ask other questions. We'll see what the
3  answers are and we'll make a decision about those at
4  that time.
5          MR. OSBORNE:  All right.
6          MR. BENNETT:  I'm not sure he said
7  exactly what -- I mean if you want to ask him why he
8  left college, ask him specifically why he left
9  college and how it relates to David. Some of it was
10  before the death. Some of it involved the eviction
11  which he's talked to you about. I think he said
12  that too, right?
13          THE DEPONENT:  Right.
14          MR. BENNETT:  I don't know that
15  you're hearing -- I'm not sure I agree with you.
16  BY MR. OSBORNE:
17      Q    Mr. Redden, how did David's death affect
18  you?
19      A    Well, of course there was grief, but that
20  happens with everyone and it affected me negatively
21  and positively; positive because he always strived
22  for me to do the best for all of his brothers and
23  sisters. He wanted me to go to school, attend

28

1  school, gain a degree of some sort and start off on
2  a good foot in life, and the negative is that
3  because he was like the main push for me to attend
4  school and go to school and graduate, while watching
5  videos and film from what was going on in Minnesota
6  and going to school, having trouble focusing, I
7  dropped out of school. But the other positive on
8  that side is that I never quit. I never stopped
9  because that's what he wanted and that's what I
10  wanted for myself.
11      Q    Okay. So based partially on what you saw
12  on the video of your brother at the YMCA with the
13  police officers, is that what you're talking about,
14  the videos from Minnesota?
15      A    No.
16      Q    What are you talking about?
17      A    I'm talking about news conferences and
18  press conferences.
19          MR. BENNETT:  Essentially at the time
20  of the death or just after it?
21      A    Right directly after.
22          MR. BENNETT:  That your uncle was in,
23  the ones that your uncle was in?

29

1      A    Yes.
2          MR. BENNETT:  They had some news
3  coverage at the time.
4      A    I think some of them he was in.
5      Q    And so part of that led to you dropping
6  out of school because of the affect that your
7  brother's death had on you. Is that what you're
8  saying?
9      A    No, it was actually the focus level that I
10  was able to retain after -- I was focused on what
11  was going on and my family situation while I was
12  having trouble focusing with school, which is the
13  ultimate reason why I ended up dropping out.
14      Q    So the family situation caused a lot of
15  stress?
16      A    Also.
17      Q    Tell me about that. In addition to the
18  situation with David, what family stress are you
19  talking about?
20      A    Well, the eviction actually. I had no
21  knowledge of it until I came home on break and then
22  it happened, and so that was a bear on everyone, but
23  directly after then David was killed and that took

30

1  most of our energy and focus.
2      Q    All right. Before the summer 2009 visit
3  with David, when was the time immediately prior to
4  that that you saw David?
5      A    I can't remember vividly, but he did visit
6  periodically, holidays and birthdays. I believe
7  actually -- no, I believe he was here for my
8  grandmother's funeral.
9      Q    When was that?
10      A    In 2009.
11      Q    When was the last time you lived with
12  David?
13      A    So long ago. He was maybe 16.
14      Q    That would have made you six or seven?
15      A    Yes, seven, six. Six, seven, and eight.
16      Q    David -- or not David necessarily but in
17  some of the records, the medical records we received
18  about your brother, he mentions or it is mentioned
19  by somebody that David had a troubled family life
20  when he lived at home.
21      A    I have no knowledge of it.
22      Q    So when David lived with you and I assume
23  your mother, who else lived in the house at that

31

1   time?
2       A    Everyone but my oldest sister.
3       Q    And what's your oldest sister's name;
4   Angela?
5       A    Angela.
6       Q    So were there any issues of -- did your
7   mom have a hard time paying rent or anything like
8   that that you can recall?  You were pretty young.
9       A    No, I can't recall any of that.
10      Q    Other than Curt and Crystal that you
11  mentioned, did you know the names of any of David's
12  other friends that he had while he lived in
13  Minnesota?
14      A    He had a girlfriend.
15      Q    What was her name?
16      A    Josephine.
17      Q    Did you ever meet Josephine?
18      A    Not in person but via Facebook, yes.
19      Q    How long was she David's girlfriend, do
20  you know?
21      A    I have no idea.
22      Q    Let's talk about the last, let's just talk
23  about the last five years of David's life, so

33

1       Q    Do you know, do you remember his phone
2   number?
3       A    No.
4       Q    Did you ever call him on the phone?
5       A    He always called me.  We talked random, at
6   random when he calls, and he was always busy because
7   he did attend school, and so whenever he got time I
8   assume he would call me or Facebook me or something
9   like that.
10      Q    So during the five-year time period we're
11  talking about, David attended school?
12      A    Yes.
13      Q    What school did he attend?
14      A    I'm not sure.
15      Q    Do you know what kind of school it was?
16      A    No.
17      Q    In David's bag that was recovered at the
18  YMCA, there was over $400 in cash in a duffle bag.
19  Do you know where David got that?
20      A    No.
21      Q    I'll represent to you that throughout some
22  of the records that we have in this case it's
23  mentioned that David had very little contact with

32

1   September of 2005 to September of 2010, okay?
2       A    Okay.
3       Q    Do you know where David got his resources,
4   his money, his phone, things like that?
5       A    No.
6       Q    Did you ever give him any money?
7       A    No.
8       Q    Do you know if your mother ever sent him
9   any money?
10      A    No.
11      Q    Do you not know or the answer is no, she
12  didn't?
13      A    I don't know.
14      Q    Okay.  That's what I thought.  Do you know
15  of anybody who ever gave David any money in that
16  five-year time period?
17      A    I don't know.  I don't know at all.
18      Q    Okay.  Do you know if David had a job
19  during that time period?
20      A    No.
21      Q    Do you know what his address was in
22  Minnesota?
23      A    I do not know.

34

1   his family in Peoria and his other family members.
2   Do you know why David or somebody else would have
3   characterized his contact with his family that way?
4       A    I have no idea why they did that, but I
5   can tell you personally from my own standpoint that
6   we had contact with him, and with my mom being who
7   she is, she makes sure that she keep in contact with
8   every last one of us and she has to know where we
9   are, especially if you live out of state.  She wants
10  to make sure you're doing fine.  She made sure that
11  I contact him on Facebook if his phone was off or
12  that he called her or if not, she will call him
13  whenever she got an available number.
14      Q    Again in the five-year time period,
15  September 2005 to September 2010, how often did your
16  mom talk with David?
17      A    I'm not sure.
18      Q    Was it more than once a year?
19           MR. BENNETT:  Objection.
20      A    I don't know.
21           MR. BENNETT:  Foundation.
22      Q    You can answer if you know.
23           MR. BENNETT:  He said he didn't.

35

1    A    I don't.
2         MR. BENNETT:   He said he wasn't sure
3    before so that pretty much --
4         MR. OSBORNE:   Well, no, Bob. A
5    second ago he said his mother talked to all the kids
6    all the time.  That was just the kind of person she
7    is.  So I'm just trying to inquire a little bit.
8         MR. BENNETT:   But you asked
9    specifically about the number of times, right?
10        MR. OSBORNE:   Yeah.
11        MR. BENNETT:   Okay.
12        MR. OSBORNE:   I'm just trying to find
13   out what he knows.
14        MS. FUSSY:   It's a fair question to
15   ask.
16        MR. BENNETT:   He asked twice.
17        MS. FUSSY:   It's a fair question to
18   ask every six months, every year, to get a parameter
19   on it.
20        MR. BENNETT:   Fine.  The problem is
21   that there's foundation lacking, but go ahead.
22   BY MR. OSBORNE:
23        Q    Go ahead and answer.

36

1    A    I don't know.
2    Q    Did she call him more than once a month on
3    the phone?
4    A    I don't know.  I wasn't there all the
5    time.  I was busy with school and sports and
6    activities.  I don't know.
7    Q    So what were you talking about a few
8    moments ago when you testified about your mother
9    keeping in contact with all of the kids as often as
10   she does?
11   A    Because I know my mother from growing up
12   with her, and plus she would have me contact him on
13   Facebook to make sure he was all right when she
14   could.  I don't know the exact times or the exact
15   number of times she would talk to him because I
16   wasn't home as much.  I was busy.
17   Q    So sometimes your mother would request
18   that you contact David to make sure he was okay?
19   A    Yes.
20   Q    In that five-year time period, how often
21   did you talk to David?
22   A    He would call at least sometimes -- well,
23   it was actually very like random.  Sometimes I'll

37

1    talk to him more than once a month.  Sometimes I
2    don't talk to him for months and that's because our
3    schedules did not come together.  I don't know what
4    he was doing, he don't know what I was doing, but I
5    was in sports and in school and homework and whatnot
6    so I was always on the go.
7    Q    Okay.  Commonly would you all talk on the
8    phone, you and David, or would it be on Facebook?
9    A    It was random.
10   Q    When David would make telephone calls to
11   you, what number would he call?
12   A    What number would he call?
13   Q    Yes.  Did your mom --
14   A    My cell phone.
15   Q    Oh, your cell phone?
16   A    Yeah.
17   Q    What number is that?
18   A    I can't remember.
19   Q    You don't have the cell phone anymore?
20   A    No, not the same number or the same phone.
21   Q    Mr. Redden, I'm going to represent to you
22   that in the records we have in this case it's
23   mentioned that your mother did not see David in the

38

1    two years prior his death.  Is that accurate?
2    A    No.
3    Q    Do you know the last time your mother saw
4    David prior to his death?
5    A    The last time he visited.
6    Q    Which was the holiday visit in 2009?
7    A    Yeah.
8    Q    So roughly nine months before his death,
9    roughly eight months?
10   A    Somewhere between there.
11   Q    Do you have any pictures of you and David
12   together?  Again just in the five-year time period
13   we're talking about, do you have any pictures of you
14   and David together during that time period?
15   A    I have no idea where they are.
16   Q    But do you know they exist?
17   A    Yeah.
18   Q    How many pictures?
19   A    I have no idea.
20   Q    Are they pictures on your phone?
21   A    No.
22   Q    What about videos?  Do you have any videos
23   of you and your brother together?

39

1    A    No.

2    Q    Roughly how many pictures can you recall

3  today of you and your brother together in the last

4  five years?

5    A    I can't recall a certain number. It was

6  random pictures.

7    Q    Who in your family do you think David was

8  closest to before he died?

9    A    My sister, Angela.

10   Q    How often did he talk to Angela?

11   A    I have no idea, but I do know that she

12  would go visit him.

13   Q    I think you answered this question

14  already, Mr. Redden, but prior to the summer 2009

15  visit that you specifically recall David making to

16  Peoria, I believe you testified you don't really

17  have a specific recollection as to time in prior

18  visits, is that correct?

19   A    Correct.

20   Q    Okay.

21        MR. BENNETT:    Except for didn't you

22  mention your grandmother's funeral?

23   Q    Yeah, your grandmother's funeral in 2008.

40

1  He came out for that, right?

2    A    Yeah.

3    Q    Do you recall any other specific visits as

4  to months or years prior to either the 2009 summer

5  visit or your grandmother's funeral?

6    A    No.

7    Q    And I think I understood you said he was

8  here at kind of random times, not random but like

9  for birthdays and things like that?

10   A    Yeah.

11   Q    Do you recall the year that your

12  grandmother died?

13   A    No.

14   Q    Would you dispute that some of the records

15  we have indicate was 2008? Does that sound right?

16        MR. BENNETT:    He can't dispute what

17  records you have. I mean are you going to show him

18  the record?

19        MR. OSBORNE:    Not necessarily.

20        MR. BENNETT:    I've got a little bit

21  of a problem with -- I'd like some reference to the

22  record you're referring to by document if you're

23  going to ask him a question.

41

1        MR. OSBORNE:    Well, when it's your

2  turn to ask questions, you can get your documents

3  out and show him anything you want.

4        MR. BENNETT:    But in terms of

5  documents, you're referring to him about the record

6  reflects. Well, there's no record.

7        MR. OSBORNE:    Well, Bob, I've been in

8  depositions with you recently where you said I'm

9  going to represent to you thus and so; without

10  showing it to you, do you disagree with that. I

11  think it's a very effective way to get to the point

12  without having to dig through a bunch of records.

13       MR. BENNETT:    Well, if there's a

14  hospital record at HCMC that says this or if you've

15  got something, just so we know what the heck you're

16  talking about.

17       MR. OSBORNE:    Well, if we need to do

18  it, we will.

19       MR. BENNETT:    I'm just asking you to

20  do it. If you don't want to do it, don't do it I

21  guess and I'll craft an objection. I'm not doubting

22  you. I'd just like to know which reference it is.

42

1  BY MR. OSBORNE:

2    Q    You mentioned David's friends, Kirk

3  and Crystal. Is it Curt or Kirk?

4    A    Curt.

5    Q    Curt and Crystal?

6    A    Yeah.

7    Q    Did you see them any other time other than

8  the one time you mentioned?

9    A    Yes.

10   Q    When was that?

11   A    They came to visit after the funeral to

12  check up on everyone to make sure everything was

13  okay.

14   Q    Curt And crystal came here after David's

15  funeral?

16   A    Yes.

17   Q    Okay. What about other than the one time

18  you mentioned before David's death, were they ever

19  here another time, any other time?

20       MR. BENNETT:    While he was alive?

21   Q    While he was alive, yeah.

22   A    No, they came once with him.

23   Q    When did you get rid of the phone number

43

1  that David used to call you on?  Do you recall
2  approximately when?
3      A   No, I just had different numbers at
4  different times.
5      Q   Okay.  Now, Mr. Redden, I take it you're
6  aware that your brother had been diagnosed at some
7  point with schizophrenia or schizo affective
8  disorder?
9      A   I wasn't aware until maybe I watched the
10  video on the computer which someone brought it up,
11  and so other than that, I saw no problem with him.
12      Q   You didn't know about any medical
13  diagnosis like that about your brother?
14      A   No.
15          MR. BENNETT:   While he was alive.
16      Q   While he was alive.
17      A   No.
18      Q   Your mother and your siblings never talked
19  with you about David's medical condition while he
20  was alive?
21      A   No.
22      Q   Do you know of any times prior to David's
23  death, let's say prior to the day he was arrested at

44

1  the YMCA and he was hospitalized from that day and
2  died, what, eight or nine days later, I'm talking
3  about before that, do you know if David was ever
4  hospitalized for any other reason?
5      A   No.
6      Q   And I take it by your answer, you don't
7  know?
8      A   I do not know.
9      Q   Did you ever hear -- did any of your
10  siblings or your mother while David was alive
11  mention to you that David was having any health
12  problems?
13      A   It was never mentioned to me.
14      Q   Did they ever talk to you about David
15  being hospitalized at any other time?
16      A   No.
17      Q   Okay.  Mr. Redden, do you know that David
18  went to Florida in 2010?
19      A   I don't know that he did.  I don't know
20  what year it was.
21      Q   But you recall he did go to Florida at
22  some point?
23      A   I was told he went to Florida.

45

1      Q   Tell me about what you know about that
2  trip.
3      A   I know nothing about it.  I was just told
4  that he went.
5      Q   By who?
6      A   By my sister.
7      Q   Okay.  Do you know when that was?
8          MR. BENNETT:   When you were told.
9      A   I don't remember exactly when I was told
10  but I remember being told.
11      Q   And which sister told you that?
12      A   Angela.
13      Q   Do you recall when Angela told you that?
14      A   No.
15          MR. OSBORNE:   Let's go off the record
16  for about five minutes.
17      (Whereupon a five-minute break was taken.)
18  BY MR. OSBORNE:
19      Q   Mr. Redden, have you ever had, besides
20  David, a close friend or relative die in the last
21  five years?
22      A   My grandmother.
23      Q   Other than your grandmother?

46

1      A   No.  I'm thinking.  No, not that I can
2  remember as of right now.
3      Q   When I was in high school, I had a couple
4  friends die.  It just happens in bigger high
5  schools.  Did any of your friends die when you were
6  in high school?
7      A   No.
8      Q   Okay.  What about -- tell me about your
9  grandmother.  Were you close with her?
10      A   Yeah, I would say so.
11      Q   How was she -- your grandmother, was she
12  your mom's mom or your dad's mom?
13      A   Mother's mom.
14      Q   Did she live with you?
15      A   No.
16      Q   Did she live here in Peoria?
17      A   Yes.
18      Q   Were your siblings close with your
19  grandmother?
20      A   I really don't know as far as their
21  personal relationships.
22      Q   How old was she when she died, do you
23  know?

47

1    A    Not exact age.

2         MR. BENNETT:   Was she in her 80's

3    or --

4    A    Late 70's.

5    Q    Okay.  Now, remind me again in the

6    five-year time frame that you and I have been

7    talking about, September of 2005 until David's

8    death, tell me again how many times per month you

9    would talk on the phone with David during that time

10   period.

11        MR. BENNETT:   Just the phone?

12   Q    Just the phone.

13   A    I have no idea.  Like I say, he will call

14   randomly and so I can't really say the number,

15   especially just the phone.

16   Q    Other than the phone and Facebook, what

17   other ways did you communicate with David other than

18   in person?

19   A    Well, before Facebook it was Myspace, but

20   other than that, I believe those are the only other

21   ways.

22   Q    Did David in that five-year time period

23   that I keep mentioning, did David talk to you about

48

1    any of his legal issues or legal problems he was

2    having?

3    A    No.

4    Q    Did David ever talk to you about any

5    chemical dependency issues that he was having?

6    A    No.

7    Q    Did he ever talk to you about any housing

8    problems that he was having?

9    A    No.

10   Q    Did David ever talk to you about not

11   having a home at any point in that five-year period?

12   A    No, he didn't.

13   Q    Did he talk to you about having problems

14   keeping any of his jobs?

15   A    No.

16   Q    Did he talk to you about any problems in

17   any academic programs he was in?

18   A    No.

19   Q    Did you know that David was homeless at

20   certain points in that five-year time period?

21   A    No.

22   Q    None of your siblings or your mother ever

23   spoke with you about that?

49

1    A    No.

2    Q    And David didn't?

3    A    No.

4    Q    On Myspace and Facebook, how often did you

5    communicate with David using those kinds of tools?

6    A    Randomly.  Some days he'd just come up in

7    my mind.  I'll think about him.  I'll message him.

8    Some days my mom tells me to message him.  Some days

9    he messaged me.  Some days he called me.  It was

10   random.

11   Q    Okay.  Tell me about -- one of the things

12   we're going to talk about in this case is how

13   David's death has affected you and we talk about

14   things, us lawyers talk about things like loss of

15   counsel, loss of advice, loss of companionship.  So

16   I'm just going to go through a few of these with

17   you.  We can just start with loss of counsel.  Did

18   David provide counsel to you when he was alive?

19   A    Yes.

20   Q    On what topics?

21   A    Leaving school, going to school.

22   Q    Did you ever drop out of school before

23   David died?

50

1    A    No.

2    Q    Why did David talk to you about leaving

3    school?

4    A    Well, because when I went to Grambling

5    State University, school was on break, we was on

6    break and everyone was going home, and I was talking

7    to him about how hard it was getting home because we

8    didn't have the money and so he was telling me that

9    it was a great school and he was proud of me, but

10   maybe I should look for a school that's closer to

11   home like ISU I remember him saying.  And I was

12   saying, well, that could be an option I said, but I

13   like this school.  He said, well, if you like it,

14   then stay he said, but he said if you don't like it

15   and you're having trouble getting home, then don't

16   force yourself to be there.

17   Q    Okay.  What other topics would he speak

18   with you about and provide you counsel with?

19   A    Well, all through high school when I was

20   little, when I was little I remember him telling me

21   something about, because I had got in trouble in

22   school and he saw a D on my report card and he asked

23   me why, and I said because the teacher didn't show

51

1   me anything, and he says it's not about the teacher,
2   it's about you, and he was telling me how I have to
3   work for what I want in life and he was also telling
4   me how I really need to do my homework and I was
5   asking him why, because I didn't know how to do it.
6   He said the paper that you write on to do your
7   homework is the paper that's going to make you
8   money, and he was telling me about to just visualize
9   each paper that I write for English as a $20 bill,
10  and he asked me if that's what I want for life for
11  myself and I said yeah. He would just give me like
12  that kind of guidance and stuff like that.
13       Q    Okay. Anything else that jumps out in
14  your memory?
15       A    Well, as far as other than guidance, if I
16  had a problem, like sometimes I'd disagree with my
17  mom, he would tell me another way around it for me
18  to get what she needed done but in a way that it
19  wouldn't make me feel like I was fully wrong.
20       Q    You're not the first young man to disagree
21  with his mom. I hope you know that.
22       A    Yeah.
23       Q    What else? You've given me some good

52

1   examples. Anything else that you want to tell me
2   about today, loss of counsel or guidance from David?
3       A    Other than him and my sister when we were
4   little, my mom had seven so she was working a whole
5   lot, and so he and my sister would basically raise
6   us until they left at around 16 or 17. So up until
7   we were about seven and eight, they would take care
8   of us.
9       Q    When your sister and David left, was that
10  a hard time in your life?
11      A    Well, actually I was busy running outside
12  and playing and having fun.
13      Q    Okay. Did your mom continue to work very
14  hard to support the family?
15      A    Yes.
16      Q    Did David ever give you any money?
17      A    Yeah.
18      Q    When was that?
19      A    I don't remember for sure but all I do
20  remember is one time I was talking to him on the
21  phone, on my mom's phone and he was telling me
22  asking me how I was doing and I was telling him fine
23  and everything. He was saying he's been trying to

53

1   call me and I said, well, my phone is off, and he
2   said how much is your bill and I said it was $50,
3   and he sent me like $53 to pay my phone bill so he
4   can call me and see how I was doing.
5       Q    When was that?
6       A    I was still in high school, so maybe 2009.
7       Q    Okay. In that five-year time period we're
8   talking about?
9       A    Uh-huh.
10      Q    Other than that time, did David ever send
11  you any money?
12      A    No.
13      Q    You mentioned a few moments ago that your
14  mom worked really hard to support her family. Where
15  did she work?
16      A    I'm not sure.
17      Q    Where does she work now?
18      A    As of right now she doesn't have a job,
19  but the last job I remember her having was Lutheran
20  Social Services.
21      Q    How long ago was that?
22      A    The last time I remember her actively
23  working there was probably 2010 right before the

54

1   eviction.
2       Q    Okay. What did she do at Lutheran Social
3   Services?
4       A    She was a home care provider.
5       Q    So she worked in somebody's home?
6       A    Yeah.
7       Q    Mr. Redden, do you know if any of your
8   siblings or any other member of your family has paid
9   any of David's medical bills?
10      A    No, I do not know.
11      Q    Now, you've told me a little bit about
12  kind of the loss of counsel and guidance from after
13  David died, how it affected your life, and we talked
14  about whether or not David provided you with any
15  money and I think you've answered me fully on that.
16  What about advice? Did David provide you with
17  advice when he was alive?
18      A    Tons.
19      Q    Tell me about that.
20      A    Basically every time I talked to him it
21  was a different piece of advice he was giving me,
22  like sometimes it was just on life in general.
23  Sometimes it was on how important school was.

55

1   Sometimes it was on how proud he was of me.
2       Q     Did you ever talk to him about joining the
3   military?
4       A     No.
5       Q     What other kind of advice did David
6   provide you?
7       A     Pretty much that was all.
8       Q     Okay.  What about, sometimes in these
9   cases us lawyers again talk about a loss of comfort.
10  After David's death, tell me about how that loss
11  affected my life.
12      A     I mean other than having to deal with
13  looking at the pictures of him smiling and seeing us
14  together and not being able to see him on holidays
15  and visits and he don't call, I mean I have that
16  loss, and then I mean other than that, I mean just
17  like the regular loss that a family would have, I
18  think that's pretty basic.
19      Q     Okay.  We kind of touched on the loss of
20  aid and you've told me about some guidance and
21  comfort that David has given you.  What about a loss
22  of assistance?  Did David assist you in any other
23  way that you haven't mentioned already when he was

57

1   did together that I probably would have never did if
2   he wasn't there.
3       Q     Like what?
4       A     Like just stuff boys do.  He taught me how
5   to do a back flip when I was young, my first
6   PlayStation.
7       Q     That's when David still lived with you?
8       A     Yeah, and he even brought me like games
9   and stuff even when he didn't live with us.  Like
10  when he'd come home on visits, he'll bring games and
11  sometimes he'll bring his laptop so we can make some
12  songs or something like that.
13      Q     Anything else?
14      A     When he died, my mom brought back some of
15  his video games from his game system and gave them
16  to me because she knew that me and him played video
17  games a lot.
18      Q     After David moved out of your house when
19  he was around age 16, did you and he ever play video
20  games together after that point?
21      A     Yeah.
22      Q     I assume that happened when he would
23  visit?

56

1   alive?
2       A     Well, I kind of look at it like he
3   assisted me with joining the military.  Even though
4   we never had any voice to voice conversation about
5   it, I just remember him telling me that whatever you
6   do, stay on the right track and don't let anything
7   get you off.  So I dropped out of school and I was
8   working for Bass Pro Shops and then I thought that
9   this is not all I wanted was to be a fryer cook, and
10  I thought about him and I figured I got to make
11  another big step if school isn't working for me so I
12  decided I'm going to join the military.  I thought
13  he'd be proud of that and so I joined the military
14  looking for a better future.
15      Q     And what other ways did David comfort or
16  assist you when he was alive?
17      A     That's all.
18      Q     Now, I take it that you understand what
19  the word companionship means?
20      A     Yeah.
21      Q     Tell me about any loss of companionship
22  you felt since David's death.
23      A     Well, it's a lot of stuff like we may have

58

1       A     Yeah.
2       Q     What about any loss of protection that
3   you've experienced since David's death?
4       A     I always feel some sense of protection
5   with my oldest brother but as far as protection, I'm
6   fine.  He hasn't been living with us for as long as
7   I can remember, but I always felt like this is my
8   oldest brother, my big brother.  He got my back
9   through whatever.
10      Q     Do you know the dates that David lived
11  with his girlfriend you mentioned, Josephine?
12      A     No.
13      Q     Do you know her last name?
14      A     Olouch.
15      Q     I have it as O-L-U-O-C-H.
16      A     Yeah, I believe it's O-L-O-U-C-H.
17      Q     I pronounce it much like you just did.
18  I've never seen that one before.
19      A     Yeah, Olouch.
20      Q     And you said you never met her in person,
21  is that right?
22      A     That's correct.
23      Q     I think I know the answer to this

59

1   question, but I'm just going to make sure. David
2   never talked to you about being evicted from Oak
3   Grove Residential Treatment Center or Mosaic
4   Apartment Services?
5       A   No.
6       Q   Did your brother -- did you have any
7   knowledge of any traumatic brain injury that David
8   ever experienced?
9       A   No.
10      Q   When David was at Hennepin County Medical
11  Center in September 2010 or upon his death or
12  thereafter, did you ever come to Minnesota?
13      A   No.
14      Q   Okay. Do you know which of your family
15  members or siblings or anybody else communicated
16  with Hennepin County Medical Center about David?
17      A   Well, that night it was maybe two or three
18  in the morning and I received a phone call. They
19  said that Curt or Crystal may have gave them a
20  family contact number and is this the family of -- I
21  don't remember the name they used, but it was like a
22  different name or whatnot. I think they may have
23  said his first name or something, but when they said

60

1   Minnesota, I knew exactly who it was about because
2   we only have like one family member that's there.
3       Q   Who called you that night?
4       A   The nurse.
5       Q   Do you remember her name?
6       A   No.
7           MR. BENNETT:   So it came into your
8   phone?
9       A   Yeah, and from there I was sleepy so I
10  gave the phone to my sister because I didn't
11  understand. So I gave her the phone and whatnot and
12  she started crying, and then I asked her what was
13  wrong and she said it was David. And then I
14  immediately tried to call my sister who was out of
15  town at the time.
16      Q   Which sister did you give your phone to?
17      A   Tiffany.
18      Q   Tiffany. And then I assume the other
19  sister you tried to call was Angela?
20      A   Yeah.
21      Q   Who came to Minnesota after you learned of
22  David's death?
23      A   My mom, my sister.

61

1       Q   Which sister?
2       A   Angela. Tiffany went also. I believe my
3   Uncle Larry, my brother Adam, and I'm not sure who
4   all else went. I know that they went though.
5       Q   Do you know who told Hennepin County
6   medical staff that David had been estranged from his
7   family for the previous ten years?
8       A   No.
9       Q   Where was David's funeral held?
10      A   I don't know the cemetery name, but I know
11  it was the same cemetery they buried my auntie and
12  my grandmother in.
13      Q   Here in Peoria?
14      A   Yeah.
15      Q   So who made arrangements for David's body
16  to be brought back to Peoria for burial?
17      A   I'm not sure, but I know that my mom said
18  that my uncle had gave him a tombstone or something.
19  I'm not sure.
20      Q   Did you attend David's funeral?
21      A   Yes.
22      Q   How many people were there?
23      A   A lot. It was all of my mom's kids.

62

1   Basically most of the family in Peoria.
2       Q   Was it more than 50 people?
3       A   Yes.
4       Q   More than 100?
5       A   I don't think, no. I don't think it was
6   more than 100.
7       Q   Was there a funeral service held in a
8   church?
9       A   Yes.
10      Q   What church was that?
11      A   I can't remember exactly.
12      Q   Did anybody speak at the service?
13      A   Yeah.
14      Q   Who did?
15      A   It was a pastor of the church and some
16  other people and then the family spoke and stuff
17  like that. I'm not sure exactly what pastor or what
18  church because I know a family member had set up the
19  church because they were a member of the church.
20      Q   One of your siblings?
21      A   No, one of an outside family member.
22      Q   I see. Do you have any specific
23  recollection, other than the minister, who spoke at



63

1  the funeral?
2      A   I think my sister might have spoke.
3      Q   You don't remember though?
4      A   No.
5      Q   Mr. Redden, I'm almost done here, but
6  right when we got started you'd mentioned having
7  participated in another deposition on another
8  occasion than today.
9      A   Well, is this -- are you speaking about
10  meeting with other people?
11      Q   In this case?
12      A   No.
13      Q   Yeah, I don't want to know anything else
14  about this case, but have you participated in any
15  sort of lawsuit or deposition or legal proceeding of
16  any kind before your deposition today?
17      A   No.
18      Q   So have you given another deposition in
19  another case?
20      A   No. Well, at first when you said
21  deposition, I was thinking like just meeting our
22  lawyers.
23      Q   Oh, okay. I'm sorry.

64

1              MR. BENNETT:   The chief
2  characteristic of a deposition is seated at the end
3  of the table.
4      Q   Yeah, I should have explained myself
5  further. I apologize.
6              MR. STORMS:   I may run my client
7  meetings a little differently than you do.
8      Q   Other than this case involving your
9  brother's death and your meetings with your lawyers,
10  which I don't want to hear anything about --
11      A   Okay.
12      Q   -- have you been involved in any other
13  lawsuits as either a plaintiff or a defendant?
14      A   No.
15      Q   Have you ever been charged with a crime?
16      A   No.
17              MR. BENNETT:   And you heard my --
18  I've reconsidered my objection so ask your question
19  if you want.
20              MR. OSBORNE:   Yeah, I don't know if I
21  actually --
22              MS. FUSSY:   Yes.
23              MR. BENNETT:   You wanted to complain

65

1  about it. You'd better ask about it. I can see why
2  you wouldn't, but I'm just trying to help you out of
3  the weeds here.
4              MR. OSBORNE:   I think that, you know,
5  it can lead to relevant information.
6              MS. FUSSY:   Just ask the questions.
7              MR. OSBORNE:   Easy does it, Tracey.
8              MS. FUSSY:   Okay, sorry.
9  BY MR. OSBORNE:
10      Q   Mr. Redden, have you ever been treated or
11  counseled for any emotional issues or mental health
12  issues?
13      A   No.
14      Q   And I asked you about other deaths or
15  illnesses of other relatives or siblings. I assume
16  you've never experienced any of that?
17      A   Never.
18      Q   What about chemical dependency? Have you
19  ever struggled with any chemical dependency?
20      A   No.
21              MR. OSBORNE:   We'll just go off the
22  record for a couple minutes. I think we might be
23  done.

66

1  (Whereupon a five-minute break was taken.)
2              MR. OSBORNE:   Desmond, I think we're
3  done.
4              MR. BENNETT:   We'll read and sign.
5
6              WITNESS FURTHER SAYETH NOT;
7        BY AGREEMENT, SIGNATURE NOT WAIVED.