# EXHIBIT 15

Condensed Transcript

# In the Matter Of:

## SMITH vs. GORMAN

11-CV-03071

## ANGELA SMITH

*October 10, 2012*



800.211.DEPO (3376)
*EsquireSolutions.com*

ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
1–4

---

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MINNESOTA
 2

 3   Larry E. Smith as trustee
     for the Heirs and Next of
 4   Kin of David Cornelius
     Smith,              CIVIL ACTION FILE
 5
           Plaintiff,     NO. 11-CV-03071
 6
     vs.
 7
     Timothy Gorman and Timothy
 8   Callahan, acting in their
     individual capacities as
 9   Minneapolis police
     officers, and the City of
10   Minneapolis,

11        Defendants.
     _____
12

13          DEPOSITION OF

14          ANGELA SMITH

15

16         October 10, 2012

17           9:35 a.m.

18

19        4700 Southport Road
          College Park, Georgia
20

21
       Kara Barger, CCR No. B-1496
22

23

24

25
```

Page 2

```
 1            APPEARANCES

 2
     On behalf of the Plaintiff:
 3
       ROBERT BENNETT, Esq.
 4     JEFFREY S. STORMS, Esq.
       Gaskins, Bennett, Birrell & Schupp
 5     333 South Seventh Street
       Suite 2900
 6     Minneapolis, Minnesota 55402
       612-333-9500
 7     rbennett@gaskinsbennett.com

 8
     On behalf of the Defendants:
 9
       TRACEY N. FUSSY, Esq.
10     BURT T. OSBORNE, Esq.
       City of Minneapolis, Office of City Attorney
11      350 South Fifth Street
        Room 210
12     Minneapolis, Minnesota  55415
       burt.osborne@ci.minneapolis.mn.us

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
 1             ANGELA SMITH,
 2   having been first duly sworn, was examined and
 3   testified as follows:
 4             CROSS-EXAMINATION
 5   BY MS. FUSSY:
 6       Q.   Do you mind if I call you Angie or do you
 7   prefer Ms. Smith or Angela?
 8       A.   Angela is fine, either one.
 9       Q.   Okay.  My name is Tracey Fussy, and I'm an
10   assistant city attorney for the City of Minneapolis;
11   and I represent the defendant officers who have been
12   sued related to the reason that you're here today.
13          Have you ever had your deposition taken
14   before?
15       A.   I don't think so.  Did we do a deposition?
16   I don't think so.
17       Q.   Okay.  And, just while you're sitting here
18   and I'm asking you questions, you can't really ask
19   anyone else for help.  You have to just -- if you
20   don't know the answer, you don't know the answer.
21       A.   Sorry.  Okay.
22       Q.   If you don't understand a question that I
23   ask, please let me know.
24       A.   Okay.
25       Q.   And I'll try to rephrase it.  It may be
```

Page 4

```
 1   just a terrible question.  Otherwise, I'm going to
 2   assume that you understood.
 3          And then the goal here is to try to get a
 4   clear record.  So head shakes and head nods won't
 5   come across.  So I need you to give verbal responses.
 6       A.   Okay.
 7       Q.   And, similarly, try to say yes and no
 8   rather than uh-huh and huh-uh, because that can be
 9   difficult to discern later too.
10          And, finally, I will do my very best to
11   try not to speak over you; and if you can do the same
12   that will also produce a nice, clean record.
13       A.   Absolutely.
14       Q.   Okay.  As we sit here today, are you under
15   the influence of any drugs or alcohol that might
16   affect your ability to testify today?
17       A.   No.
18       Q.   Okay.  Did you review any documents in
19   anticipation of your testimony today?
20       A.   I did review the file report.
21       Q.   The file report?
22       A.   Yes.
23       Q.   Can you tell me what was in that, what
24   you're referring to?
25       A.   I don't know what it is.  We filed -- I
```



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
5–8

Page 5

1 didn't even read it, but I did see that it says -- it
2 said something like plaintiff and something at the
3 top.
4          MR. STORMS:  To help out, it was the
5 answers to interrogatories.
6          MS. FUSSY:  Okay.
7          THE WITNESS:  Sorry.  I didn't know the
8 name of it.
9     Q.  (By Ms. Fussy)  Okay.  Anything else?
10    A.  No.
11    Q.  Did you speak with anyone else other than
12 your attorneys regarding being here today?
13    A.  No.
14    Q.  Okay.  Ms. Smith, where do you currently
15 live?
16    A.  At 71 Thayer Avenue.
17    Q.  Can you spell Thayer?
18    A.  It's T, as in Tom, h-a-y-e-r, Avenue,
19 Atlanta, 30315.
20    Q.  How long have you lived there?
21    A.  Six, maybe seven years.
22    Q.  Okay.  And where did you live prior to
23 that?
24    A.  What's the address?  In Stone Mountain,
25 1110 Tree Hills Parkway.

Page 6

1    Q.  And how long did you live there?
2    A.  Maybe three years.
3    Q.  Okay.  71 Thayer, is that an apartment, is
4 that a home?
5    A.  It's my home.
6    Q.  Okay.  You own the house?
7    A.  Yes.
8    Q.  Okay.  And who do you live there with?
9    A.  I live there with myself.
10    Q.  Okay.  Prior to moving to Atlanta where
11 did you live?
12    A.  I lived in Peoria.
13    Q.  Okay.  And when did you move from Peoria
14 to Atlanta?
15    A.  In '99.
16    Q.  Okay.  Where did you live in Peoria?  Do
17 you recall?
18    A.  Oh, boy.
19    Q.  Street name would be good enough.
20    A.  I think LaSalle Street maybe.
21    Q.  Okay.  Who did you live there with?
22    A.  Myself.
23    Q.  Just yourself?
24    A.  Uh-huh.
25    Q.  Okay.  And when did you move into LaSalle

Page 7

1 Street, what year?
2    A.  I came back from -- it was '90 -- maybe
3 '98, just like a couple of months before I moved to
4 Atlanta.  So like '98, and then I moved here in '99.
5 Like eight months or so.  '98.
6    Q.  Do you remember what year or what month
7 you moved to Atlanta?  It was in '99 but what month?
8    A.  Boy.  I don't remember exactly but I
9 think --
10          MR. BENNETT:  If you don't know, don't
11 guess.
12          THE WITNESS:  Okay.
13    Q.  (By Ms. Fussy)  Was it summertime?
14    A.  May not be summer yet.
15    Q.  Okay.  Prior to LaSalle Street do you
16 recall where you lived?
17    A.  I lived with my mom.
18    Q.  Do you know the name of the street that
19 you lived on?
20    A.  We lived on California Street and Monroe.
21    Q.  California and Monroe?
22    A.  Uh-huh.
23    Q.  Okay.  So just to double back, you lived
24 on LaSalle Street for, you thought, three months
25 maybe?

Page 8

1    A.  I don't know exactly how many, but it was
2 a couple of months.
3    Q.  Okay.  And then you moved down to?
4    A.  Georgia.
5    Q.  Okay.  And who did you live with on
6 California Street?
7    A.  My mom.
8    Q.  Just your mom?
9    A.  Oh, my family:  my mom, my brothers and
10 sister.
11    Q.  Which brothers and sisters?
12    A.  All of us.  Oh, the names, okay.  You have
13 David.  You have Louis, Derrick, Adam, Desmond,
14 Tiffany and myself.
15    Q.  Okay.
16    A.  That's all of us, right?  It's a lot to
17 remember.
18    Q.  Same with Monroe Street?
19    A.  Yes.  Monroe Street and then California,
20 yes.
21    Q.  Okay.  So Monroe was first and then
22 California?
23    A.  Uh-huh.
24    Q.  Okay.  And you lived with your entire
25 family --



ANGELA SMITH
SMITH vs. GORMAN

Page 9

1    A.   Yes.
2    Q.   -- at both of those places?
3    A.   (Witness nods head affirmatively.)
4    Q.   Okay.  What's your date of birth?
5    A.   ████████
6    Q.   Are you currently employed?
7    A.   I am.
8    Q.   What do you do?
9    A.   I work at Missions and I also work with
10   Fulton County.  Missions, I don't know.  When you say
11   employed, Missions does not pay.  You can raise
12   support for Missions.  But Fulton County pays me.
13   Q.   Fulton?
14   A.   County.
15   Q.   Okay.
16   A.   I'm a youth and children -- I work in
17   youth and children advocacy.
18   Q.   What do you do for Missions?
19   A.   Well, I work with youth, young girls, who
20   are at risk in a neighborhood transitioning.  So we
21   do personal development, counseling, mentorship.  And
22   then also I provide housing assistance.  I've been a
23   housing counselor for DCA, State of Georgia.
24   Q.   Did you say DCA?
25   A.   Uh-huh.

Page 10

1    Q.   What does that stand for?
2    A.   The Department of Community Affairs.
3    Q.   Okay.
4    A.   DCA is a program here in Georgia that I'm
5    certified through for housing counseling to help our
6    families become first-time homeowners, families that
7    are at risk, that don't know how to pay or don't know
8    how to communicate with their community.  We teach
9    them how to do all of those things.
10   Q.   Okay.  How long have you worked for
11   Missions?
12   A.   Since I moved here in '99.
13   Q.   Okay.  And how long have you worked for
14   Fulton -- tell me what you do for Fulton County.
15   A.   Fulton County, it's a poverty program
16   called Successful Families.  And we work with
17   families who are living below the poverty line,
18   helping them to gain sustainability so that they can
19   possibly get their kids back if they've been taken or
20   they can get in a rehabilitation center or they can
21   get mental health help or they can get housing
22   assistance if they're homeless.  My job is to help
23   secure those resources and help work with the
24   families so that we can help change their life.
25        MR. BENNETT:  Just as a matter -- you

Page 11

1    worked for Missions as a paid person for 10
2    years or 11 years, right?
3         THE WITNESS:  From '99 -- the pay is
4    different.  Sometimes you get a stipend.  So it
5    depends on the fundraising.  But, yes, for six
6    years it was full employee, from 2006 through
7    2012.
8         MR. BENNETT:  And you've gone back to
9    school and Fulton --
10        THE WITNESS:  I went back to school and I
11   got a full-time job -- part-time job at Fulton
12   so I can go back to school.
13   Q.   (By Ms. Fussy)  Okay.  How long have you
14   been at Fulton?
15   A.   Since maybe May.
16   Q.   May of 2012?
17   A.   Yes.
18   Q.   Okay.  Are you still working for Missions?
19   A.   Yes, yes, yes.
20   Q.   Is it a volunteer position or is it still
21   paid?
22   A.   No.  It's volunteer.
23   Q.   And you've been a volunteer there for how
24   long now?
25   A.   I've always done this.

Page 12

1    Q.   You've always been a volunteer there?
2    A.   Well, the capacity I'm doing now, I've
3    always been a part of this Missions, yes.
4    Q.   But I'm just wondering how long you've
5    been a volunteer versus paid.
6    A.   Since January of -- February of this year.
7    Q.   Okay.
8    A.   And it's volunteer in regards to we raise
9    support for the program that we're working with.
10   Q.   You've indicated that in your capacity at
11   Fulton County you work with people with mental health
12   issues; is that correct?
13   A.   Yes.
14   Q.   And what do you do for persons with mental
15   health issues?
16   A.   We pair them up with counseling agencies
17   so that they can get the mental health assistance
18   that they need.
19   Q.   Do you assess them for any mental health
20   or do they suffer from a mental health concern?  How
21   do you know?
22   A.   It's a part of our overall assessment.  We
23   do wraparound services.  So we look for the whole
24   well-being which is housing, employment, health --
25   and mental health is included in health -- and



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
13—16

Page 13

1  education.
2      Q.    How do you know if they have a mental
3  health issue?
4      A.    The mental health agency assesses them.
5      Q.    There's a mental health agency component
6  with specialists at Fulton County; is that correct?
7      A.    I'm not sure. You know, we have a
8  partnership with a mental health agency, yes.
9      Q.    Okay.
10     A.    I don't know about their credentials.
11     Q.    Okay. So what exactly do you do? Can you
12  explain that again?
13     A.    I help to secure resources for the family
14  so that they can -- if they're homeless, I meet with
15  partners that can potentially help this family to no
16  longer be homeless.
17     Q.    Okay.
18     A.    And I work with the families to hear what
19  it is that is going on, what do you need, review
20  their files to see how we can better help them.
21     Q.    Okay. So you would have contacts in the
22  community you would call and say, hey, do you have
23  any availability for housing for --
24     A.    Oh, yes. I would meet like with the
25  principal at the school to see if we can do GED

Page 14

1  programs or meet with a childcare facility. Just
2  different resources. We would meet with them so that
3  they can know us as a person and know the families
4  we're trying to work with and partner with us to help
5  this family.
6      Q.    Okay. Now, you began working at Missions
7  probably shortly after you moved to Atlanta; is that
8  correct?
9      A.    Uh-huh.
10     Q.    Where did you work prior to Missions?
11     A.    Before I moved to Atlanta?
12     Q.    Yeah.
13     A.    At St. Francis Hospital.
14     Q.    Okay. And is that in Peoria?
15     A.    Uh-huh.
16     Q.    Illinois?
17         MR. STORMS:  Angela, just for the record,
18  it's important that you say yes as opposed to
19  uh-huh or huh-uh.
20         THE WITNESS:  I apologize. Yes.
21     Q.    (By Ms. Fussy)  I didn't even notice it
22  because this is how people normally speak.
23     A.    Yes.
24     Q.    But it's true.
25         Okay. What did you do for St. Francis

Page 15

1  Hospital?
2      A.    I worked in their physician call center.
3  It's where you will call if you need a doctor paged
4  or if you need to find a patient.
5      Q.    And what did you do specifically there?
6      A.    They would call me and then I would
7  dispatch, whether it be to the ambulance or to
8  another doctor that he needs to reach or, you know,
9  we would page. So, yes, I contacted whoever they
10  needed.
11     Q.    Okay. How long did you do that for? When
12  did you start, when did you end?
13     A.    I'm not exactly sure of dates. I don't
14  know to put anything out exactly.
15     Q.    Okay. Do you have any idea how long you
16  worked there?
17     A.    I know I left just before I came to
18  Atlanta.
19     Q.    Okay. Let's talk about your education.
20         Did you graduate from high school?
21     A.    Yes.
22     Q.    And what high school did you graduate
23  from?
24     A.    Manual High School.
25     Q.    Can you spell that, please?

Page 16

1      A.    M-a-n-u-a-l.
2      Q.    And what year did you graduate?
3      A.    '97.
4      Q.    And did you go to college right after you
5  graduated from high school?
6      A.    Yes.
7      Q.    Okay. Where did you go to college?
8      A.    Triton. I think it's Triton University
9  now.
10     Q.    Okay. What was it when you were there?
11     A.    Triton College maybe.
12     Q.    What did you study?
13     A.    I was a biology major with a premed
14  program, biology and possibly -- if I'm remembering
15  because it's been a long time ago -- but I think a
16  minor in early childhood. I don't know.
17     Q.    Early childhood development, education?
18     A.    I can't remember exactly.
19     Q.    No problem. And did you graduate from
20  Triton?
21     A.    I did not.
22     Q.    Okay. How many years did you complete?
23     A.    I'm not sure. I think it was -- I'm not
24  sure. I left probably before --
25     Q.    How many years were you there?



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
17–20

Page 17

1    A.   -- my first year.  I may have been there
2  one year.
3    Q.   Okay.
4    A.   May have.  I'm not sure.
5    Q.   So that would have been sometime in
6  probably the summer or fall of '98 you would have
7  left Triton?
8    A.   That would sound about right, but I'm not
9  exactly sure of the date.
10   Q.   Okay.
11   A.   I'm trying to remember.  I just can't.
12   Q.   And then what did you do after you
13  graduated or after that year?
14   A.   After that year I came back home to
15  Peoria.
16   Q.   What city is Triton located in?
17   A.   Maywood, Illinois.
18   Q.   How far is that away from Peoria?
19   A.   That's like two and a half hours maybe.
20   Q.   Okay.  Why did you leave Triton?
21   A.   I went back home to be with my family.  I
22  was staying with my aunt and uncle and it was my
23  first time away from my family.
24   Q.   So did you leave Triton and move back home
25  because you missed your family?

Page 18

1    A.   Well, I went back home -- that was part of
2  the reason was my family.  But it was just an easier
3  situation to be back home where I had resources I
4  knew to get back and forth.  And then, of course, I
5  missed my family as well.
6    Q.   Okay.  How were your grades at Triton?
7    A.   I've always been a generally good student.
8    Q.   What does that mean?
9    A.   I don't have my report card, but I know
10  that I was generally a good student.
11   Q.   Like A/B, B/C?
12   A.   I would like to remember it's A/B.
13   Q.   Okay.  Did you pass all the classes that
14  you took at Triton?
15   A.   I think so.  I don't remember ever
16  failing.  But, like I said, I don't have my report
17  card and can't really remember.
18   Q.   Okay.  So you moved back home to Peoria
19  after about a year, give or take?
20   A.   Uh-huh.
21   Q.   And then what did you do?
22   A.   I went to ICC.
23   Q.   And what is ICC?
24   A.   A community college.
25   Q.   Okay.  Can you tell me what ICC stands

Page 19

1  for?
2    A.   Illinois Central College.
3    Q.   Okay.  And what did you study there?
4    A.   The same.  I just took up the same program
5  back home because the high school I went to had a
6  relationship with this community college.  They told
7  us a lot about it.
8    Q.   And that would have been -- you would have
9  started that in '98, do you think?
10   A.   Possibly, yes.
11   Q.   Did you start in the fall or summer?
12   A.   I don't know.
13   Q.   Okay.  And then did you graduate from ICC?
14   A.   I did not.
15   Q.   Okay.
16   A.   I moved to Atlanta to hopefully go to
17  school.  I wanted to go to school.  But when I got
18  here I learned about Missions and decided to take a
19  year off and do Missions.
20   Q.   Okay.  How did you hear about Missions?
21   A.   Well, I was working with -- I got a job
22  with a temp service; and one of the coworkers told me
23  about getting connected with a church and nonprofit
24  organizations that were doing Missions, and I went
25  over and learned about it and signed up.

Page 20

1    Q.   Okay.  And what made you decide to move to
2  Atlanta?
3    A.   There was a counselor from my high school
4  who I used to be really close with, and she told me
5  that she could possibly help me get back in school in
6  Atlanta with a scholarship that she received during
7  her retirement; but she didn't have resources back in
8  Peoria anymore because she was here in Atlanta.
9    Q.   Okay.  Was there a reason why you didn't
10  finish -- you didn't graduate from Illinois Central?
11   A.   Oh, you know, I was in a car accident.  I
12  was in a car accident and had to take off.  And so
13  during that time I connected with her.  It just
14  seemed -- like I wanted to finish my education; and I
15  was excited to explore the world, see what Atlanta
16  had to offer.
17   Q.   Okay.  Did you have any family down here?
18   A.   I did not.
19   Q.   Okay.  How old were you when you moved
20  down here then?
21   A.   I was maybe 20.
22   Q.   Wow.
23   A.   In school I was always told that you're
24  going to go to college in another state, and so I was
25  thinking that is what I was supposed to do.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
21–24

1    Q.    Okay. So you moved down here in '99, and
2  then your goal is to go to school but then you hear
3  about Missions and then you start working at
4  Missions?
5    A.    Uh-huh.
6    Q.    And then did you ever enroll in any sort
7  of college again?
8    A.    No.
9    Q.    Okay.
10    A.    I did now.
11    Q.    Well, when?
12    A.    This is my first semester.
13    Q.    Where are you at?
14    A.    Carver College.
15    Q.    So you're in your first semester and
16  you're working part time at Fulton and still
17  volunteering at Missions?
18    A.    Yes.
19    Q.    Okay. What are you studying at Carver
20  College?
21    A.    Well, I want to do Christian counseling.
22    Q.    Okay. What is that?
23    Christian counseling?
24    Q.    Yeah.
25    A.    It's where you counsel families. So I'll

1  probably do -- I don't think I'll specialize in just
2  youth. It's going to be family.
3    Q.    Okay. Where is Carver College located?
4    A.    In Atlanta.
5    Q.    And this is your first semester, you said?
6    A.    Yes.
7    Q.    Okay. Is Carver College like a
8  traditional four-year, you know, college?
9    A.    It's a Christian school.
10    Q.    Okay.
11    A.    So my mentor, the chaplain in the Missions
12  that I've been working with, knew the president and,
13  you know, knew what happened with my brother and that
14  I have been wanting to go back to school, you know,
15  with everything happening. And so he connected the
16  two of us.
17    Q.    Okay. What faith, if any, would you
18  identify yourself?
19    A.    I'm a Christian.
20    Q.    Any like more specific denomination or
21  just Christian?
22    A.    Yes. I'm a Christian. I'm a Baptist.
23  Our church is Baptist.
24    Q.    Okay. Ms. Smith, are you currently
25  married?

1    A.    I am not.
2    Q.    Have you ever been married?
3    A.    No.
4    Q.    Okay. Do you have any children?
5    A.    No.
6    Q.    Do you have any nieces or nephews?
7    A.    Yes.
8    Q.    Okay. Tell me about them. How many do
9  you have, boys, girls?
10    A.    Gosh. Okay. Let me think.
11    Q.    And I'll represent your mom indicated
12  there are a lot of them so it's not like there are
13  three.
14    A.    No, no. I'm just trying to count each of
15  the siblings.
16        So Tiffany has two, Tavier and Ni.
17    Q.    If I recall, one is a boy, one is a girl,
18  right?
19    A.    Yes. Tavier is a boy. Ni, Tanija, is a
20  girl.
21    Q.    Oh, okay. But you refer to her as Ni?
22    A.    Yes. Her name is Tanija.
23    Q.    Okay.
24    A.    We don't call her that often.
25    Q.    And then who else?

1    A.    Adam has a son named Chance.
2    Q.    How old is Chance?
3    A.    Wow. Chance is turning four soon. So
4  he's three.
5    Q.    Okay.
6    A.    Wait. August the 28th. So he's four.
7    Q.    Okay. And then who else?
8    A.    Derrick has three kids.
9    Q.    Okay.
10    A.    Do you need their names?
11    Q.    If you want to.
12    A.    Daveon, Darianna, and Bralyn.
13        (Discussion ensued off the record.)
14    Q.    (By Ms. Fussy) So Derrick has three. And
15  then anyone else?
16    A.    Derrick is three? No. Oh, Derrick has
17  three kids, yes. I'm sorry. Derrick is not three
18  anymore. So yes, Derrick has three kids.
19    Q.    Okay. And then who else?
20    A.    Derrick has three kids. Louis has three
21  too.
22    Q.    Okay. Any of your other siblings?
23    A.    No. Me and Desmond are the last two,
24  right? Did I get everybody? Desmond and I don't
25  have children.

ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
25–28

Page 25

1    Q.    Okay.  And David never had children?
2    A.    And David.
3    Q.    Okay.  Have you ever treated or counseled
4    for any emotional or mental health issues?
5    A.    Have I ever been treated?
6    Q.    Yes.
7    A.    I've been getting counseling since my
8    brother passed.
9    Q.    Okay.  Where do you receive counseling?
10   A.    Hope Counseling Center.
11   Q.    And when did you start receiving
12   treatment?
13   A.    Wow.  Maybe May.  I'm not sure exactly
14   when.
15   Q.    May of this year?
16   A.    Yes.
17   Q.    Okay.  How about any other times prior to
18   David's death?
19   A.    No.
20   Q.    Okay.
21   A.    I mean I don't know if you'd count -- I
22   work -- I serve in the counseling ministry, but
23   that's not me getting counseling.
24   Q.    Right, yeah.
25   A.    Okay.

Page 26

1    Q.    And you've been receiving counseling
2    presumably for emotional health issues, correct?
3    A.    Yes.
4    Q.    Not mental health issues?
5    A.    No.  I'm sorry.  I thought you meant --
6    Q.    I did ask both, but I just wanted to be
7    clear.
8    A.    Okay.  Yes.  Not mental health.
9    Q.    Okay.  How often have you been going to...
10   A.    Once a week.
11   Q.    Okay.
12   A.    You know, give or take.  I may have missed
13   a couple of weeks.  But I generally try to go every
14   week.
15   Q.    And why is it that you started in May?
16   A.    Well, I guess everyone was saying, you
17   know, you probably should talk to somebody, you know,
18   you've been taking on a lot lately and I just go, go,
19   go and always looking out for everybody.  And I
20   figured I was fine but it couldn't hurt anything.  I
21   knew I wanted to go back to school.  I knew, you
22   know, I wanted to become a mother one day and a wife.
23   And so I just figured it wouldn't hurt to be able to
24   have a place where I could flesh that out and not be
25   the big sister but really talk to somebody else.

Page 27

1    Q.    You were saying that you've been taking on
2    a lot lately.  What kind of things are being -- I
3    mean obviously you're working and you're going to
4    school.
5          Anything else in addition to that?
6    A.    I've been working and going to school and
7    working, you know, with the girls in the community.
8    So that's, you know, a lot.  School was big in
9    homework and everything.
10   Q.    And I'm not trying to minimize, yeah.  I
11   just wondered if there's anything else.
12          What's the age difference between you and
13   David?
14   A.    It should be three years.
15   Q.    And you're older, correct?
16   A.    Yes.
17   Q.    Okay.  Do you know where David went to
18   high school?
19   A.    Manual.
20   Q.    Manual?  He did too?  Okay.  Do you know
21   the highest year he completed?
22   A.    I'm sorry?
23   Q.    Do you know the highest year -- the
24   highest school year of education he completed?
25   A.    I'm not sure because I moved to Atlanta.

Page 28

1    Q.    You moved to Atlanta prior to him
2    completing or ending his school career in high
3    school?
4    A.    Yes.
5    Q.    Okay.  Did you ever meet any of David's
6    friends in Minnesota?
7    A.    Yes.
8    Q.    Okay.  Who did you meet?
9    A.    I met Josephine.  I met Sheryl.
10   Q.    Who?
11   A.    Sheryl.
12   Q.    Can you spell that?
13   A.    S-h-e-r-y-l.
14   Q.    And do you know a last name?
15   A.    Spray.
16   Q.    Spray?
17   A.    Yes.  S-p-r-a-y, I believe.
18   Q.    Okay.  Do you know how --
19   A.    I don't call her by her last name a lot.
20   Q.    All right.  Do you know how David knew
21   Sheryl?
22   A.    Yes.  David worked with Sheryl in a
23   networking business that they did and helped him to
24   speak in public, helped him get to know people.  She
25   would take him -- he would spend holidays and stuff.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
29–32

Page 29

1 They were friends.
2     Q.   They worked together at this place or they
3 both worked at this networking place?
4     A.   Well, she's a school teacher; but
5 networking is a -- networking opportunities like a
6 business.
7     Q.   Okay.  And did David work there or did he
8 kind of take classes and receive services from that?
9     A.   No.  He worked -- from what I know, they
10 worked together in the networking business.
11     Q.   Okay.  Who else?  Anyone else that you can
12 recall?
13     A.   Yeah.  Kirk, Crystal.
14     Q.   And, to be clear, that's Kirk Foster,
15 correct?
16     A.   I'm sorry.  Yes.
17     Q.   And Crystal is Kirk's -- is or was his
18 girlfriend?
19     A.   Yes.
20     Q.   Okay.  Anyone else that you can remember?
21     A.   Teresa.
22     Q.   And how did David know Teresa?
23        MR. BENNETT:  If you know.
24        THE WITNESS:  I can't remember how they
25 know exactly.

Page 30

1     Q.   (By Ms. Fussy)  Okay.  And you met all of
2 these people in person?
3     A.   Yes.
4     Q.   And did you meet them in Minnesota?  Where
5 did you meet them?
6     A.   In Minnesota.
7     Q.   Okay.  Do you know how David paid for any
8 housing, clothing, food, any of his bills?
9        MR. BENNETT:  Objection, foundation as to
10     time.
11     Q.   (By Ms. Fussy)  During David's time in
12 Minnesota, do you know how he paid for any of his
13 bills relating --
14        MR. BENNETT:  Same objection and vague.
15     Q.   (By Ms. Fussy)  You can answer.
16     A.   I'm not sure.
17     Q.   Okay.  In the five years preceding David's
18 death, how often would you have phone contact with
19 David?
20     A.   Gosh.  I would say we talked at least once
21 every couple of weeks, every other week, something
22 like that.  We kept in touch pretty good.
23     Q.   Did you guys communicate electronically,
24 like e-mail, Facebook?
25     A.   Uh-huh.

Page 31

1     Q.   Yes?
2     A.   Yes.
3     Q.   E-mail?
4     A.   Both.
5     Q.   And Facebook?
6     A.   Uh-huh, yes.
7     Q.   Okay.  Do you still have an active
8 Facebook account?
9     A.   Yes.
10     Q.   How often would you say that you messaged
11 each other on e-mail or Facebook?
12     A.   I'm sorry.  You know, let's see.  How
13 often did we talk on Facebook?  If we didn't talk by
14 phone, we would talk by Facebook or e-mail.  I'm not
15 sure exactly how often.
16     Q.   Would you say every week, you know, every
17 month?
18     A.   If I had to guess, it was at least every
19 month.  But since it wasn't our only form of
20 communication, you know, I don't know how frequent it
21 was.
22     Q.   Okay.
23     A.   Yeah.
24     Q.   When was the last time that you saw David
25 alive?

Page 32

1     A.   In August of 2010.
2     Q.   Okay.  Where did you see him, what state?
3     A.   Here in Atlanta.  He came here.
4     Q.   Okay.  How long did he stay here?  Do you
5 recall?
6     A.   He only stayed a day.
7     Q.   A day?
8     A.   Uh-huh.  He was heading back to Minnesota
9 and wanted to stop and catch up and see how I was
10 doing.
11     Q.   Was he coming back up from Florida?
12     A.   Yes.
13     Q.   Okay.  Do you know why he went to Florida?
14     A.   I do not.  I would imagine vacation, but
15 I'm not sure.
16     Q.   Do you have any family in Florida?
17     A.   Yes.  We have family in Florida, cousins
18 his age; but I'm not sure where they live.
19     Q.   Okay.
20     A.   He would probably have kept up with them
21 more because they were his age.
22     Q.   Did he tell you anything about his visit
23 when he was in Florida?
24     A.   Yes.  He told me things like when he went
25 to the ocean and, you know -- yes.  He told me -- he



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
33–36

Page 33

1  would call and check in, let me know how he's doing,
2  he's at the beach.  Yes.
3      Q.   Did he tell you about being in the
4  hospital in Florida?
5      A.   He told me vaguely about being in the
6  hospital.  He said that he was down there and he
7  didn't have his medicine, was going to check in the
8  hospital to make sure he got that and then they would
9  help him find a place to stay.
10     Q.   Do you know why he was taking medication?
11     A.   I don't know exactly.  I would imagine
12  maybe depression, but I don't know.
13     Q.   Okay.  Prior to the August 2010 visit in
14  Atlanta, what was the last time you had seen him?
15     A.   I went to Minnesota maybe for Valentine's
16  Day, February of 2009.
17     MR. BENNETT:  '9 or '10?  The year he died
18     or the year before he died?
19     THE WITNESS:  I don't know.  Maybe the
20     year.  Maybe 2009.
21     Q.   (By Ms. Fussy)  How long did you --
22     A.   I'm not sure about that.  Maybe it was
23  2010.
24     Q.   Well, do you remember if it had been --
25  when you saw him in August of 2010, had it been over

Page 34

1  a year or had it been just a few months since you had
2  seen him?
3      A.   I was in Minnesota again in May.
4      Q.   May of what year?
5      A.   Maybe 2009.  I'm not sure.  I think it
6  was -- I can't believe my dates are kind of bunching
7  up.  I guess maybe 2009.
8      Q.   February 2009?
9      A.   Huh?
10     Q.   February 2009, was that the last time you
11  had -- prior to August 2010?
12     A.   No.  May.  I was in Minnesota again in
13  May.
14     Q.   Of 2009 or 2010?
15     A.   I think '9.
16     Q.   Was it the year after your grandmother had
17  died or two years after?
18     A.   Actually lost a couple of grandparents.
19  Things kind of seemed like hazy around that time.
20  But I think it was -- I know it was after my
21  grandmother passed.  So it was 2009, I guess.  I'm
22  not sure.
23     Q.   Okay.  Do you think you saw him twice, in
24  May and in February of 2009?
25     A.   Oh.  So it must have been 2010, 2009.  To

Page 35

1  be honest with you, I can't remember.
2      Q.   Okay.
3      A.   I know Valentine's Day I spent with him.
4      Q.   Okay.  You spent time with him on
5  Valentine's Day and in May, you're not exactly sure
6  if it was 2009 or 2010 as we sit here today; is that
7  correct?
8      A.   Yes.
9      Q.   Okay.  Do you think that you would have
10  seen him twice in one year or do you think they would
11  have been...
12     A.   (Witness nods head affirmatively.)
13     Q.   Okay.  That's a possibility?
14     A.   Yes, uh-huh.
15     Q.   Okay.  And then prior to the 2009 or 2010
16  visit?
17     A.   I would have saw him in Peoria at my
18  Grandmother Rosie Leigh Smith's funeral.
19     Q.   And that would have been in August
20  of 2008?  Was that your mother's mother?
21     A.   Yes.
22     Q.   Okay.  Do you recall if you saw him at all
23  in 2007?
24          Do you need to take a break?
25     A.   I'm sorry.  I just haven't thought about

Page 36

1  my grandmother dying and my brother.
2          It's okay.
3      Q.   Are you sure?  You've got to tell me if
4  you need to take a break because otherwise I'm not
5  going to know.  It's perfectly acceptable to stop and
6  take a break.
7      MR. BENNETT:  Do you want to take five?
8      MS. FUSSY:  Maybe, yeah.  Let's go off the
9      record.
10          (Recess from 10:27 a.m. to 10:32 a.m.)
11     Q.   (By Ms. Fussy)  Do you remember what
12  David's phone number was?
13     A.   No.  I just dial his name.
14     Q.   Yeah.  Do you still have that phone number
15  saved on your phone?
16     A.   (Witness nods head affirmatively.)
17     Q.   Do you have your phone with you today?
18     A.   I do, yes.
19     Q.   So if you could access your phone it would
20  pull up that phone number?
21     A.   Yes.  It should, yeah.  I recently lost
22  all my contacts -- well, Sprint lost my contacts; but
23  they said they were able to restore them.  Most of
24  them are there, yes.  I'm doing well since I've
25  stopped calling his number.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
37—40

Page 37

1    Q.   How long have you had your phone number?
2    A.   Wow. Years. I know it has to be over
3  eight years. I've had it a long time. I can't
4  remember the exact date but many years. I kept the
5  same number for my siblings so they always remember
6  my number.
7    Q.   When you went up to visit David in August
8  2010 --
9    A.   No. He came here.
10   Q.   That's right. I'm sorry.
11        When you went to visit him for Valentine's
12 Day, where did you stay?
13   A.   I stayed with a friend of mine. I worked
14 with a ministry there. And so my boyfriend's
15 Godmother at the church that David attended, I stayed
16 with her.
17   Q.   What church was that?
18   A.   Progressive Baptist Church.
19   Q.   Where was David living when you went to
20 visit him?
21   A.   He was living -- I want to say it was
22 Bloomington.
23   Q.   He lived in Bloomington?
24   A.   Yes. I think that's the name.
25   Q.   Name of the city?

Page 38

1    A.   Yes.
2    Q.   Did he have his own apartment or was he
3  staying at a group home?
4    A.   It was more like a -- I guess you would
5  call it a group home. It wasn't necessarily
6  classified as a group home; but there were several
7  people living there, yes.
8    Q.   It wasn't a traditional apartment
9  building?
10   A.   Right.
11   Q.   Okay. How often do you think that you
12 came up here to visit David in the five years
13 preceding his death?
14   A.   Actually I never visited -- preceding his
15 death?
16   Q.   Before.
17   A.   I'm sorry. I thought you meant before the
18 time I told you already.
19        How many times before?
20   Q.   Yeah, in the five years or so.
21   A.   Just the number of times I probably told
22 you.
23   Q.   Okay. So you think probably you were up
24 here twice?
25   A.   Yes.

Page 39

1    Q.   Did you stay with your boyfriend's
2  Godmother both times?
3    A.   Yes.
4    Q.   Was David living in Bloomington both
5  times?
6    A.   Did he move out by then? I'm not sure. I
7  guess I'll say --
8        MR. BENNETT: If you don't know, you don't
9    know.
10       THE WITNESS: He moved, but I'm not
11   exactly sure when. So I don't know.
12   Q.   (By Ms. Fussy) Okay. Did you ever live
13 with your mother's mother?
14   A.   My grandmother?
15   Q.   Yeah.
16   A.   Did I ever live with my grandmother? Not
17 that I can recall, unless when I was young.
18   Q.   Who would you say in the family David was
19 closest to?
20   A.   He was close with everyone in a different
21 way. I would say that. And I'm learning that even
22 more now that he's gone. Everyone has a relationship
23 where they feel they're closest with him, but I would
24 have thought I was the closest. But we all felt like
25 we had a very close relationship with him.

Page 40

1    Q.   So David came down to visit you in
2  August 2010.
3        Did he ever come down to visit you in
4  Atlanta any other time?
5    A.   I will say yes. As far as the date, maybe
6  it was 2000. Because I was on the chaplain team at
7  that time. So it was maybe 2001. I'm not sure of
8  the date. But yes. The answer is, yes, he did come.
9    Q.   Okay. He probably came down to visit you
10 twice then in Atlanta. Would that be correct?
11   A.   Yes, I guess.
12   Q.   How did David arrive in Atlanta, what mode
13 of transportation?
14   A.   Bus.
15   Q.   Are you aware that David did not graduate
16 from high school?
17   A.   Oh, because he went to Job Corps. Well, I
18 don't think I knew the details. I just know he went
19 to Job Corps. So I guess I was aware. Yes. I think
20 he got his GED through Job Corps. So yes.
21   Q.   But he didn't get his high school diploma?
22 You're aware of that?
23   A.   Yes.
24   Q.   Do you know why?
25   A.   My understanding, he went to Job Corps.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
41–44

---

**Page 41**

1    Q.   Do you know why he left high school to go
2  to Job Corps?
3    A.   They had a trade that they train you in
4  and they promise you a job and they promise you that
5  you'll get your GED and further your education.
6        You know, our family, that was pretty
7  hopeful. We didn't have much money, and so the idea
8  of us going away to college and becoming somebody is
9  pretty attractive.
10    Q.   Do you know what trade he was training
11  for?
12    A.   At that time when he first left, no,
13  because I was in Atlanta.
14    Q.   Okay. Do you know whether he completed
15  the Job Corps program?
16    A.   Yes.
17    Q.   He did?
18    A.   I believe he did, yes.
19    Q.   And then do you know what David did after
20  he completed the Job Corps program?
21    A.   He enrolled -- to the best of my
22  knowledge, he enrolled in school.
23    Q.   Do you know where he enrolled in school?
24    A.   Was it Minnesota Tech maybe?
25    Q.   Do you know if he got a job subsequent to

---

**Page 42**

1  completing the Job Corps program?
2    A.   Did they find him a job? I think so. He
3  worked at a call center maybe. I don't know if Job
4  Corps got the job for him. So I guess I would say
5  I'm not sure.
6    Q.   Okay. Do you know if he received a degree
7  from the community --
8    A.   No. He hadn't graduated.
9    Q.   Are you aware that David was diagnosed
10  with schizophrenia?
11    A.   I was not aware of the diagnosis.
12    Q.   When did you --
13        MR. BENNETT: Prior to his death?
14        THE WITNESS: Right, yes, prior to his
15  death.
16    Q.   (By Ms. Fussy) When did you become aware?
17    A.   The official diagnosis, after he passed.
18    Q.   How did you come about that information?
19    A.   I don't remember.
20    Q.   Did you read it somewhere? Did someone
21  tell you?
22    A.   Maybe I read it. I'm not sure. I mean I
23  knew that maybe he was depressed; but I didn't know
24  the official name, whatever, the schizophrenic
25  disorder. I didn't know that was the name of it.

---

**Page 43**

1    Q.   Okay. Did David ever talk to you about
2  hearing voices?
3    A.   Yes. He would talk about that and not
4  being able to sleep, yeah.
5    Q.   So what did he say about hearing voices?
6    A.   He would just say I can't sleep, I keep
7  hearing these voices in my head. You know, he would
8  ask me to pray with him, stay up with him, talk to
9  me, does this make sense.
10    Q.   What did you tell him?
11    A.   I would listen to him and I would pray --
12  if he asked for prayer, I would pray for him. If he
13  asked me if it made sense, if he told me about a
14  dream, I would help to make as much sense -- you
15  know, I wasn't a professional; but I loved him. So,
16  you know, whatever I thought it was I would try to
17  help him until he is at peace.
18    Q.   Did it raise any concerns for you that he
19  was hearing voices?
20    A.   It did because, you know, he's just as
21  normal as you and I. I'm like he must be tired or
22  stressed. Or, you know, he would work out. Like if
23  he needed to release some energy, go work out, go to
24  church. I connected him with the church. Talked to
25  the pastor, you know, try to connect him with youth

---

**Page 44**

1  group so he would become a youth leader. He loved
2  sports.
3        So yes.
4    Q.   Did you ever suggest to him that he should
5  seek medical help for hearing voices?
6    A.   Well, I told him talk to counseling, the
7  counselor.
8    Q.   What counselor?
9    A.   Well, I didn't have a particular
10  counselor. I just told him he should talk to
11  someone, talk to the pastor.
12    Q.   Did he ever tell you what the voices were
13  saying to him?
14    A.   He didn't. I wish maybe I could help
15  more.
16    Q.   When he was talking about, you know, the
17  depression, what you believed to be depression,
18  hearing voices, inability to sleep, was that at a
19  time when you were working at Missions or Fulton?
20    A.   I'm sorry? What did you say? I'm sorry.
21  Thank you. I'm sorry. What did you say?
22    Q.   When he was talking about hearing voices,
23  would that have been at a time when you were working
24  at Missions?
25    A.   Yes.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
45–48

Page 45

1    Q.   Okay.
2    A.   Yes, it was.  I worked in the counseling
3  ministry.  And so, you know, we would often talk.  We
4  would go through some of the strategies from our
5  counseling at the church.
6         MR. BENNETT:  Why don't we take a break?
7         MR. OSBORNE:  That's fine.
8         (Recess from 10:46 a.m. to 10:57 a.m.)
9    Q.   (By Ms. Fussy)  When was the first time
10  that David talked to you about hearing voices or
11  having trouble sleeping?
12    A.   Wow.  Maybe it was in 2001 when he came,
13  but it was very light.  Just kind of progressively he
14  spoke of it more to where I didn't brush it off, like
15  you're not tired, because it's something he talked
16  about as he got older.
17    Q.   Okay.  When you were living with him, did
18  he ever discuss hearing voices?
19    A.   In 2001 he was living with me here in
20  Atlanta.
21    Q.   Oh, he lived here in Atlanta in 2001?
22    A.   Well, not officially lived; but he stayed
23  for a couple of weeks.  He was here for a little
24  while with me, yes, in 2001.
25    Q.   How about prior to that when you were

Page 46

1  living in Peoria?  Did you --
2    A.   No, no.
3    Q.   Okay.  You've indicated that you thought
4  maybe he was suffering from depression.
5         What made you think that?  What behaviors
6  made you think he was suffering from depression?
7    A.   Because he couldn't sleep.  He couldn't
8  sleep and he said he was hearing voices.  All I know,
9  he must be depressed or stressed.
10    Q.   Okay.
11    A.   It made me think that.  And then he would
12  ask me to pray with him.  I didn't have much history
13  with mental health.  All I knew is I knew of
14  depression, maybe it's depression.
15    Q.   Do you know if anyone else in your family
16  suffers from any mental health issues like depression
17  or anything?
18    A.   My mom or me or any -- none of us.
19    Q.   Okay.
20    A.   Not my mom or my brothers and -- well, not
21  that I know of.
22    Q.   Okay.
23    A.   I mean since my brother passed all of us
24  could probably use -- sit down and talk.  I don't
25  know if it would be considered mental health as much

Page 47

1  as sad or depressed.
2    Q.   Were you ever aware of David's chemical
3  dependency issues?
4    A.   No.  Is this outside of -- what do they
5  call it?  Over the counter, is that chemical
6  dependency?
7    Q.   It could be.
8    A.   Yeah.  I didn't know of it.  He told me
9  the counselors and his counselor at the home -- I
10  would keep an e-mail.  He said that they thought he
11  had a dependency on it but he was just using it to
12  sleep.
13    Q.   Are you referring to cold medicines?
14    A.   Uh-huh.
15         MR. BENNETT:  Is that a yes?
16         THE WITNESS:  Sorry.  Yes.
17    Q.   (By Ms. Fussy)  And did you ever have any
18  contact with any of his caseworkers or counselors?
19    A.   Daryl is -- yes.  When I went there I was
20  able to sit and meet with them and spend the day with
21  them.
22    Q.   When you went there what time?
23    A.   In 2009 or '10, whichever that was.
24    Q.   Okay.
25    A.   And so we just kept in touch and would

Page 48

1  text.  I think text or e-mail.
2    Q.   Do you remember Daryl's last name?
3    A.   I do not.  What is Daryl's last name?  I
4  just call him by first name.  I don't.
5    Q.   Okay.  And where was David living?  Or do
6  you know who Daryl worked for?
7    A.   I can't remember.  I'm sorry.
8         MR. BENNETT:  You don't know what agency?
9         THE WITNESS:  The agency?  I'm not sure.
10    I guess we could research it.
11    Q.   (By Ms. Fussy)  If you don't know, you
12  don't know.  I'm just asking.
13    A.   Okay.  I don't remember the name.
14    Q.   And was Daryl like a caseworker of his or
15  worked at the group home, something like that?
16    A.   He did, yes.  He spent time with my
17  brother, would take him -- you know, if he needed to
18  run errands.  He would talk to him.  He would keep me
19  abreast of how he was doing.
20    Q.   What did Daryl tell you about how David
21  was doing?
22    A.   Well, he said he would do really well and
23  then he would have moments where he would not do
24  well.  He would be agitated.  He's not sleeping.  He
25  wants to know who was in his room.  Things of that



**Page 49**

1  sort.
2      Q.    Did you wonder why David was living in
3  sort of a group home and had caseworkers?
4      A.    Yes.  Because I imagined it was because of
5  depression.  It prevented him from being able to go
6  to school all the way through.  He would have to take
7  breaks.  But they worked with him.  He would just
8  have to write a letter explaining what's happening
9  and the case managers would agree to it.  So I
10 figured that was the same thing.
11     Q.    So is your understanding of why he would
12 live in these sort of group home facilities was
13 because it was depression?
14     A.    Yes.  And I know like -- I didn't see him
15 drink myself, but I know that they also said he was
16 drinking.  So I would imagine it was -- you know
17 what?  We did talk about that.  In the home they have
18 like a 12-step program.  Like we would talk about
19 some of the things that he was going through in the
20 12 steps for drinking.
21     Q.    You would talk with Daryl about this?
22     A.    No.  I'm sorry.  David.
23     Q.    You would talk to David about it?
24     A.    (Witness nods head affirmatively.)
25     Q.    So David talked about issues he may have

**Page 50**

1  had with alcohol with you?
2      A.    Well, he didn't talk about the alcohol
3  issue.  He talked about the steps that he was going
4  through, the 12 steps.  Like while he's a part of the
5  meetings, he talked about the things that they talk
6  about, forgiveness and why, you know, I respond this
7  way, why do I want -- you know, we talked about those
8  things.  He didn't actually talk about the drinking
9  part; but he did say it was part of the AA, you know,
10 a drinking program.
11     Q.    So you knew he was in an AA 12 step
12 program but you didn't know if he was drinking?
13     A.    No.  I never seen him drink myself.
14     Q.    Okay.
15         MR. BENNETT:  You asked, to be fair,
16     whether he talked to her about the actual
17     drinking.
18     Q.    (By Ms. Fussy)  Okay.  Did you ever become
19 aware of any chemical dependency issues he had with
20 alcohol?
21     A.    Yes, from what he told me about being in
22 the program.
23     Q.    Okay.  What did David --
24         MR. BENNETT:  Program, you mean the AA
25     program?

**Page 51**

1          THE WITNESS:  Yes.
2      Q.    (By Ms. Fussy)  What did David tell you?
3      A.    He said it was a part of his housing.  It
4  was part of his housing situation.  They offered
5  this, and so he took advantage of it.  I can't
6  remember everything.  You're talking about years of
7  life.  But whatever their topic was they were talking
8  about.  He would come and talk to me about it.  And,
9  you know, I would give my input; and I would learn,
10 you know, from some of the stuff he was talking -- he
11 was very smart.  He had a lot to offer.
12     Q.    And we'll get to that.
13         Did you ever talk with any of your family
14 members about any issues David was having with mental
15 health issues or with chemical dependency issues?
16     A.    I never classified it as -- well, I guess
17 we've talked about it since he's passed.
18     Q.    Prior to his death did you talk about it
19 with anybody?
20     A.    Yes.  But I didn't diagnose -- I thought
21 it was depression.  So we talked about it as if it
22 was depression.
23     Q.    Who did you talk to about it with?
24     A.    I think I would tell my mom vaguely.  He
25 didn't ever really want to go into detail.  So I

**Page 52**

1  would just say have you talked to him, he sounded
2  kind of down or depressed.  Or she would call and ask
3  me the same thing:  Did you talk to David, you might
4  want to give him a call.  She called him Punkin.  His
5  nickname is Punkin.
6      Q.    Other than Daryl, did you ever talk with
7  any other of David's caseworkers, counselors,
8  roommates?
9          Prior to his death I'm referring now.
10     A.    Other counselors?  No.  Well, no.  Kirk is
11 a friend.  So I don't know.
12     Q.    Did you ever talk to Kirk about any
13 concerns that you had with David?
14     A.    He wouldn't have any mental health issues
15 when I was around him and Kirk.  He wasn't depressed.
16 He was happy and excited.  So we wouldn't talk about
17 that.  It's only since he's passed that we talk about
18 that.
19     Q.    And what do you guys talk about now, now
20 that he --
21     A.    Now we don't talk about anything, but
22 during the funeral it was like he was -- maybe it was
23 more than depression, wish we could have known more,
24 you know.
25     Q.    Do you know how David knew Kirk?



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
53—56

Page 53

1    A.   I don't know how they met.  It's just like
2  Kirk has always been a part of his conversation, but
3  I don't think I've ever asked where did you
4  officially meet Kirk.
5    Q.   Do you think that he met Kirk in
6  Minnesota?  You know that right?
7    A.   Oh, I'm sorry.  Yes, in Minnesota.  I just
8  thought you meant what place.
9    Q.   I did.  Yeah, I did.  But I mean did he
10  know him for a better part of the time that he was in
11  Minnesota?  Do you know?
12      MR. BENNETT:  Objection to foundation.
13    Q.   (By Ms. Fussy)  I'm asking if you know.
14    A.   I don't know.
15    Q.   When did David start talking about Kirk?
16  Do you remember?
17    A.   Kirk was -- didn't have a name.  He was
18  just a friend.  He would talk about his friend.  So I
19  don't know for sure if Kirk is the same friend that
20  he referred to as my friend, my friend, my friend.
21    Q.   Okay.
22    A.   But around my grandmother's funeral is
23  when I think I met Kirk.
24    Q.   Kirk took David down to the funeral,
25  correct?

Page 54

1    A.   Uh-huh.
2    Q.   And did he bring his girlfriend Crystal?
3    A.   Yes.
4    Q.   When did you meet Josephine?
5    A.   I met Josephine when I went to Minnesota
6  in 2009.
7       You mean in person though, right?
8    Q.   That's what I mean.
9    A.   Okay.  In person.
10    Q.   Did you speak with her on the phone?
11    A.   Yes.
12    Q.   Okay.  Prior to meeting her in 2009?
13    A.   Yes.
14    Q.   What did you guys talk about?
15    A.   Tell me about your brother and, you know,
16  he said we're going to get -- it's not important.
17  You know, just girl stuff.  Or he'll call:  Talk to
18  J, you know, she's being unreasonable.  And I'm like
19  what's going on now.  Yeah.  It was nice, like she
20  was a little sister.
21    Q.   Do you know why they broke up?
22    A.   I don't know officially.  I know she was
23  in college.  I guess I better say I don't know
24  officially.  Because they broke up but they were kind
25  of still together, if that makes any sense.  You

Page 55

1  couldn't tell that they broke up because they were
2  still talking on the phone, still going out to eat
3  and all that stuff.  So I'm not sure exactly.  But I
4  know she was going to school and wanted to move away
5  to get a job and start a new life or whatever.
6    Q.   Do you know how David met Josephine?
7    A.   I don't.  And she's one of those people
8  that he talked about for a while, my girlfriend, my
9  girlfriend.  And then finally my girlfriend became
10  Josephine.
11    Q.   Do you know when he started dating
12  Josephine?
13    A.   After he broke up with Eden.  So I would
14  say after Job Corps -- he had a girlfriend in Job
15  Corps and they broke up and he met Josephine.
16    Q.   Do you know who Maureen Glover is?
17    A.   I do not.
18    Q.   Okay.  Do you know Phillip or Teresa
19  Warner?
20    A.   Yes, I do.
21    Q.   Who are they?
22    A.   Those are his friends.  And Sheryl and Al
23  Spray, those are friends that, if he couldn't come
24  home for Thanksgiving, he spent the holiday with them
25  or he helped them move.  They were friends.

Page 56

1    Q.   Okay.
2    A.   And they also had the business, the
3  networking business, that they kind of worked.  They
4  had cleaning products that you could buy online,
5  stuff like that.
6    Q.   Do you know the last time David went down
7  to Peoria?  Do you know when that was?  Was it for
8  his grandmother's funeral?
9    A.   Grandma Josephine, I think the last time
10  he went was for Grandma Josephine.  I couldn't afford
11  to go.
12    Q.   Was that your mother's mother?
13    A.   No.  That was my stepfather's mother.
14    Q.   When did she die?
15    A.   I'm not sure.  I can look it up.
16    Q.   Was that before or after your mother's
17  mother died?
18    A.   After.
19    Q.   Okay.  Prior to your stepfather's mother's
20  death, do you know when he went to Peoria?
21    A.   Well, my Grandmother Rosie's funeral, he
22  was there.  That's when I was there with him.  I
23  can't remember all the times.  I don't know.
24    Q.   Do you remember -- your stepfather's
25  mother, did she die the same year that David died?



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
57–60

Page 57

1    A.   I wouldn't put those two together.  I
2  don't know.
3    Q.   Okay.  Other than Grandma Rosie's funeral,
4  do you know the time that he went home prior to that?
5    A.   I don't know.  I don't know.
6    Q.   Do you know when the last holiday you saw
7  David was?
8    A.   I thought that -- when was the last time I
9  saw David?  I can't remember.
10    MR. BENNETT:  I don't want to break every
11  time.
12    THE WITNESS:  I'm fine.
13    MR. BENNETT:  We need to know if you can't
14  focus on the question.
15    THE WITNESS:  I can't think.  Let me
16  think.
17    Okay.  I'm sorry.
18    Dates I just -- my mind can't remember the
19  dates and such.  I'm sorry.
20    But what did you ask me again?
21    MR. BENNETT:  It was the holidays.
22    Q.   (By Ms. Fussy)  I asked you when was the
23  last holiday that you saw him, that you spent time
24  with him, you know.  When did you last spend a
25  holiday together?

Page 58

1    A.   I think it was a Thanksgiving.  I can't
2  remember.
3    MR. BENNETT:  Was it after the Valentine's
4  Day when you came up?
5    THE WITNESS:  No.  That would have been
6  Thanksgiving.
7    Q.   (By Ms. Fussy)  The last holiday you spent
8  was on Thanksgiving with him?
9    A.   I think so.
10    Q.   That would be consistent with what other
11  family members have said.
12    A.   I think so, because I usually go home for
13  Thanksgiving.
14    Q.   Was that in Peoria?
15    A.   Uh-huh.  I would try to go home for
16  Thanksgiving and stay in Atlanta for Christmas.
17    Q.   Okay.  Have you ever seen any of the
18  deposition transcripts from any of your family
19  members related to this?  Have you ever reviewed any
20  of these?
21    A.   I don't know.  Let me see.
22    Q.   This is, for instance, the deposition of
23  Brittany Jackson.  I'm just wondering if you --
24    A.   Oh, no, no.
25    Q.   Okay.

Page 59

1    A.   I haven't been to Peoria since they've
2  done this.  I don't know.
3    Q.   So you haven't reviewed any of your family
4  members' deposition transcripts?
5    A.   No.
6    Q.   Okay.
7    A.   Do they have that?  They never even
8  mentioned that they have a copy.
9    Q.   I don't know if they have a copy.  I'm
10  just wondering if you ever saw it.
11    A.   No.  I have not seen it.
12    Q.   Okay.  Did David provide any counseling to
13  you?
14    A.   He says he would tell me stuff.  He
15  would -- I mean it's not official counseling.
16    Q.   No.  I know.
17    A.   But yes.  When I'm dating he talked to me.
18  You don't know -- he'd talk to me from the
19  perspective of what a guy needs and how I need not to
20  be the big sister with the guy I'm dating but be the
21  girlfriend of the guy I'm dating, things of that
22  sort.  And he would also be helpful as far as he was
23  younger.  Although we were not far in age, it seemed
24  that we were for me and my siblings.  And so he would
25  help me, you know, know what they were saying, that

Page 60

1  they didn't want to hurt my feelings or something
2  like that.
3    Q.   I don't understand.
4    A.   Like he would maybe tell me you should
5  talk to Desmond, he doesn't really want to go to that
6  school but he doesn't want to hurt your feelings but
7  he's going to go.
8    Q.   Are you talking about Triton University?
9    A.   No.  Desmond went to Grambling University.
10    Q.   Oh, Grambling, okay.
11    A.   Yes.  So he would tell me stuff like I
12  talked to Desmond, I know you think this is the best
13  school but you should probably let him make this
14  decision for himself.  You know, he would counsel me;
15  and it would give me another perspective that they
16  would probably speak to him about.
17    So, yeah, it was good, yeah.  He would
18  keep me abreast of our family.  You know, I worked at
19  Missions quite deeply and so he had more time to be
20  able to call cousins and aunts and uncles and stuff
21  like that.  He would also let me know who you should
22  probably call and pray for and take more time for
23  yourself.
24    Yeah.
25    Q.   Anything else that you can think of?  Any



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
61–64

Page 61

1  other ways he counseled you that you can think of?
2    A.   His main thing was always telling me to
3  take some time for myself because I always do for all
4  of them.  But I think I already said that.
5    Q.   Okay.  Did David ever provide you with any
6  guidance?
7    A.   I think that's what I just -- that was
8  part of what I was -- maybe I combined two things,
9  but yes.
10    Q.   Did David provide you with any aid?
11    A.   Aid as in money?
12    Q.   Yeah.  Any money or... no?
13    A.   No.
14    Q.   Okay.
15    A.   He wouldn't have given me money.
16    Q.   Did David provide you with any comfort?
17  Have you suffered any loss of comfort since his
18  death?
19    A.   Yes.  He gave me great comfort.  He was
20  the oldest boy and I was the oldest girl.  Gosh.  My
21  brother was very helpful.  I was engaged to be
22  married in 2003, and it was very hard.  And
23  surprisingly he stepped up.  He would call and check
24  on me and tell me, you know, you're going to meet
25  somebody special.

Page 62

1        So I mean I know you began with the health
2  issues, but he was actually a really insightful guy.
3        Comfort, it was comforting knowing that he
4  was staying in touch with our family as well.  Like
5  he had relationships.  He would tell me things,
6  things that they may not have told me.  So that was
7  of great comfort.
8    Q.   Anything else?
9    A.   It was comforting with our relationship to
10  be able to talk to him and bounce ideas off of him of
11  what I'm trying to do, trying to plan a family
12  reunion.  As my little brother, I didn't have to do
13  it alone because we both were away.  We both were
14  trying to better ourselves.  So we knew each one of
15  us couldn't do it all by ourselves.  And so we could
16  kind of tag team, I think.  I think that's been a
17  great loss since he's been gone.  I just feel like
18  for the boys not -- not really having that.  So very
19  comforting.  It was comforting knowing if I got
20  married he would walk me down the aisle, and that's
21  not going to happen.
22    Q.   Are you close with Louis?
23    A.   I am.  I don't get to see Louis that
24  often, but I would say yes.
25    Q.   Did you know that Louis went to jail this

Page 63

1  summer?
2    A.   Yes.  I don't know exactly what he went to
3  jail for, but I heard about it.
4    Q.   Did you ever talk to Louis about why he
5  went to jail?
6    A.   Yes.  I talked to him that he was in jail
7  and we talked about him being out of jail and him
8  being glad he's out and what he's going to do.  We
9  talked about next steps:  Okay, that happened, now
10  what do we do from here.
11        But I can't remember.  I'm sure it was
12  something like a traffic ticket.  Or I don't know
13  exactly.  But I don't remember it being anything
14  major.
15    Q.   Do you know that he was held without bail?
16    A.   No, I didn't know that.
17    Q.   Okay.  Do you know if Louis has had any
18  trouble with the law prior to this jailing incident
19  this summer?
20    A.   Since my brother has passed, he has had a
21  few things; but, from what I understand, it's been
22  stuff like him not wanting the police to tell him
23  what to do and so they took him in for arrest or had
24  a ticket.  But I don't know for sure.  I haven't seen
25  any records or anything.  It's not a big deal; I took

Page 64

1  care of it; I'm going to do this, that and the other.
2    Q.   Did you ever talk with any of your family
3  members about why he was in jail?
4    A.   Yes.  I talked to them:  You know, I don't
5  know what Louis was in jail for, you never know, you
6  can call down there and check.  I wasn't concerned,
7  you know.  Unless he told me it was something really
8  serious, I didn't call the jailhouse to figure it
9  out.
10        But the few things that I mentioned were
11  things that I heard from family members.  He was
12  mouthing off or he -- some traffic violation or
13  something.  I don't have the details of why he's been
14  arrested, but I was aware of it.  I just figured he's
15  hurting.
16        And I wouldn't express myself -- I don't
17  want to ever go to jail.  I never had detention in
18  school.
19        But he -- I don't know.  He feels like he
20  doesn't have a place where he can express his anger.
21  And so I'm guessing that's why he's in jail.  I don't
22  know.
23    Q.   Have you suffered any loss of protection
24  since David's death from David?
25    A.   A loss from David?



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
65–68

Page 65

1    Q.   Do you feel a loss of protection?  Did
2  David provide you any protection during his lifetime?
3    A.   Yeah.  David would -- ever since he was a
4  little boy, he's been very protective of me.  Like I
5  said, it was the two of us.  I like to feel like I
6  was a big girl, I didn't really need protection; but
7  it was always good to know that he was there to do it
8  if I needed him.
9        So yeah.  He knew me a little more
10  intimately because he was older than the younger ones
11  being little kids.  And so he could see some areas
12  that I was maybe walking into emotionally that he'd
13  bring up be careful, this is probably not the best
14  thing for you.
15    Q.   Can you give me an example?
16    A.   I would say mostly over-committing myself.
17  If he saw something to that nature, he's like you're
18  going to stress out, you're not going to be able to
19  do this ministry much longer at this rate and then
20  you want to help but maybe you should go home, you
21  know, something like that.
22        Or something in a relationship.  He's
23  like, no, I'm telling you I'm a man, I know what that
24  means, if he's doing that I'm going to talk to him.
25  Like he's going to talk to the guy I'm dating.  He's

Page 66

1  going to figure out what's your intentions.  I think
2  that was a sense of protection because they knew as a
3  woman that I had a brother who cared and who knew guy
4  language and was setting the pace for the
5  relationship, what's your intentions for her.
6    Q.   Have you ever been asked to pay any of
7  David's medical bills?
8    A.   No.
9    Q.   Did you pay any of David's funeral bills?
10    A.   Yes.
11    Q.   How much did you pay?
12    A.   Gosh.  I don't know.  Probably maybe about
13  2200.  I don't have the total number.  Probably a
14  little over 2,000.
15    Q.   Do you know who else paid for any of his
16  funeral bills?
17    A.   My Uncle Leroy denoted the plot.  My Uncle
18  Larry like everybody -- the funeral needed the money
19  before we could start.  So everybody just kind of
20  gave me money in hand so we can give them the money
21  to start.  But I don't have a list of everyone's
22  names.  But that's three that sat down with me to do
23  it.  Like my Uncle Leroy, he did the plot.  My Uncle
24  Larry gave me several hundred dollars.  Everyone else
25  gave me what they could.

Page 67

1    Q.   Who else?  Did your mother give you any
2  money?
3    A.   Oh, yeah, my mom gave me money.  At this
4  point people are just putting money in my hand and
5  her hand.  So I don't know exactly how much it was.
6  We just needed to come up with all the money.
7    Q.   Do you know how much it cost in total?
8    A.   Gosh, it's probably -- we looked at --
9  I've got so many numbers in my head.  I know it had
10  to total more than 7,000.  I was like budget queen.
11  I was trying to do everything I could to get it down.
12  First it was like 9,000 and we got it down to 8,000.
13  I can't remember exactly.  Maybe about 7-.
14    Q.   Where was the funeral held?
15    A.   Park -- what was the name of it?  Gosh.
16  We do all our funerals there.  Off University.
17  Parkside I think it's called.
18    Q.   Parkside Funeral Home?
19    A.   Yeah.  I think, you know.  I've been gone
20  for a long time.
21    Q.   It's off of University?
22    A.   Uh-huh.  That's where we had the --
23        MR. BENNETT:  That uh-huh was a yes,
24  right?
25        THE WITNESS:  I'm sorry.  Yes.  That's

Page 68

1  where we had the burial.  McArthur Highway.  No,
2  no.  Nebraska.  What's the name of that church?
3  I had to find a church that would let me do it
4  affordably.  So we didn't use my home church
5  when I was there.  We used another church of my
6  cheerleading coach when I was in high school.
7  Her husband had a church on Nebraska Avenue.  So
8  I can't remember the name exactly.  But they let
9  me use their church for the funeral ceremony.
10    Q.   (By Ms. Fussy)  Parkside Funeral Home, is
11  that where your mother's mother was -- where her
12  services were?
13    A.   Yes.
14    Q.   Okay.  Did you know that David was
15  homeless for portions of the time he lived in
16  Minnesota?
17    A.   I did know that.  I guess I thought that
18  the group home was considered homeless because he
19  didn't have his own place.
20        Is that not the case?
21    Q.   I'll ask you the questions.
22    A.   Yes, I did know he was homeless.  I
23  thought that's what the group home was classified as,
24  homeless or a shelter.
25    Q.   Okay.  So you knew that he lived in

ESQUIRE

Page 69

1  shelters like Salvation Army shelters and so forth?
2      A.   Yeah.  In my head I thought that there
3  was -- like our church has a home.  I thought that's
4  what the Salvation Army was like, a house type.
5      Q.   Okay.  Do you know why he was living in
6  group homes and shelters?
7      A.   I would imagine if he didn't have a job to
8  pay the rent he probably needed somewhere to stay.
9      Q.   Do you know why he didn't have jobs during
10  given periods of his time in Minnesota?
11      A.   For the most part he was in school; and I
12  think that's what he was focusing on, school.  And if
13  he had to take a break because of the depression you
14  don't have the school stipend anymore.  And so I
15  would imagine that would make it difficult to pay for
16  rent.
17      Q.   Do you know how he paid for school?  Do
18  you know if he had student loans?
19      A.   I would think financial aid.  He should
20  have qualified for financial aid.  But he may have
21  had to take out some student loans.
22      Q.   Do you recall whether David was evicted
23  from any homes or treatment centers?
24      A.   I don't know.
25      Q.   You never talked about that?

Page 70

1      A.   I know he moved a lot.
2      Q.   Are you aware of any traumatic brain
3  injuries that David had?
4      A.   I wasn't aware until since he's been
5  passed just reading stuff and seeing that they said
6  he had a disorder and maybe a brain injury from
7  falling or something like that.
8      Q.   Okay.
9      A.   But, no, I was not aware until he passed.
10      Q.   Okay.  Did you know that David was
11  incarcerated in Chicago from December 2006 until
12  June 2007?  Do you know anything about that?
13      A.   No.  In Chicago?
14      Q.   Yeah.
15      A.   I remember -- I didn't know he was
16  incarcerated for a long period of time, no.  I know
17  he had a car accident and he went to jail for the car
18  accident.
19      Q.   Do you know if that was related to a DWI?
20      A.   I'm not sure what it was related to, but I
21  do remember there was a car accident and he had to go
22  to jail.
23      Q.   Do you know why he had to go to jail as a
24  result of the car accident?
25      A.   I don't remember why he had to go to jail,

Page 71

1  but I do know it was a car accident and he went to
2  jail.  But from my knowledge he got out.
3      Q.   Do you know who made the decision to take
4  David off of life support?
5      A.   The hospital.
6      Q.   The hospital made that decision?
7      A.   Yeah.  They told me we're so sorry for
8  your loss.  The neurologist came in with her team.
9  They said they would do one final check.  Because up
10  until this point they said he had 1 percent chance to
11  live.  There was some activity in the brainstem.
12          And I was hopeful on that 1 percent
13  because I had seen God do things in our ministry.
14          But the team of doctors told me, you know,
15  we want to be honest with you, there's no activity
16  going on, we'll do one more test but depending on
17  what the neurologists say we'll come back.  She said
18  I'm so sorry for your loss, he's no longer with us.
19  And the nursing staff, I guess it was, said we'll
20  give you and your family some time to say good-bye.
21      Q.   Did they make you sign anything?
22      A.   We didn't sign anything until afterwards.
23  They went in and asked if we wanted to donate his
24  organs or anything like that.  My mom said no.  So I
25  signed no.  That's all I remember after that.

Page 72

1      Q.   So there was no discussion about whether
2  or not he should be taken off of life support?  They
3  just told you we're doing it?
4      A.   No.  They told us he was no longer there.
5  They said he's only here by machine, there's no brain
6  activity, we're sorry for your loss, we'll give you
7  time to say good-bye.  So I called everybody and told
8  them that they needed to come say good-bye.  And they
9  were nice.  They let us stay.
10          Afterwards they asked me if I wanted to
11  donate his organs.  I didn't know what to do.  So I
12  asked my mom.  She didn't want to do it.  I thought
13  it would be a good idea if we could help some other
14  families.
15          But, yeah, I didn't know.  That was it.
16      Q.   Who was at the hospital at Hennepin
17  Medical Center in September of 2010 when he was there
18  the last time?
19      A.   What day?
20      Q.   Any of the days.
21      A.   Well, I think the first day until I got up
22  there Sheryl was there, I believe.  Because she was
23  the last person in his cell phone.  So I guess they
24  called her.
25      Q.   Who called her?



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
73–76

Page 73

1    A.   I don't know.  So Sheryl was there.  Al
2  was there.
3    Q.   Is Al Sheryl's husband?
4    A.   Yes.
5    Q.   Okay.
6    A.   Pastor Miller -- Reverend Miller but I
7  call him Pastor Miller -- went with me.  Pastor
8  Miller and Reverend -- Reverend Miller went to the
9  hospital with me to see him.  So they were there.
10  Some of the church members brought food and, you
11  know, clothing and stuff for the family to give to
12  the family because we couldn't get any assistance
13  through the social worker as far as housing or food
14  or anything.  So they brought all of that.
15       Josephine was there.  Kirk was there.
16  Kirk's mother was there.  Teresa was there.
17    Q.   Who is Teresa?
18    A.   What was her last name?  You mentioned her
19  earlier, her and her husband.  Teresa is his friend
20  that they did the network business with.
21    Q.   Okay.
22    A.   Her and her husband.  Gosh.  Who else was
23  there?  My mom, of course; Tiffany.  My brother Adam
24  was there.  My cousin Lavelle was there.  Tiffany was
25  there.  My boyfriend's parents came to give me

Page 74

1  support.  That's Mr. and Mrs. Clark.  Otis was there,
2  Clark.  Gosh.  Latoya was there.  Ashley was there.
3    Q.   Who is Latoya?
4    A.   Latoya is a friend of Josephine's and
5  David's.  She just came for support.  They weren't
6  allowed in the room.  They were just allowed to be
7  there to support the family and to grieve and pray
8  and all of that.
9       Gosh.  Who else was there?
10       Jeff was there from the church.  He came,
11  Jeff Martin.  These are people who worked with my
12  brother.  He got baptized at the church.
13       Who else came?
14       Ashley's mother came.
15    Q.   Who is Ashley?
16    A.   Ashley is a friend of David's.
17       They heard about -- you know, eventually
18  they start putting stuff on the news.  They came up
19  to the hospital and just wanted to talk to me:  We've
20  heard so much about you and we're so sorry.  I let
21  them say good-bye to him.
22       Who else?  I hope I didn't forget anybody.
23  It was kind of hazy during this time, but I was
24  trying to remember as much as I can.
25    Q.   How did you find out that David was in the

Page 75

1  hospital?
2    A.   Kirk -- maybe it was Crystal's Facebook
3  page, but they both Facebooked me and told me to call
4  right away.
5    Q.   Do you know how they found out?
6    A.   They didn't know that first day, which was
7  the 9th, because he was under a John Doe.  I think
8  maybe Friday when they said his name they knew.  I
9  don't know how they found out.
10    Q.   Do you know where David was living?
11    A.   I think he was staying with them.
12    Q.   He was staying with --
13    A.   With Kirk.
14    Q.   -- Kirk and Crystal?  He was living with
15  them at or around the time of his death?
16    A.   I believe so, yeah.  I'm like where are
17  you staying and he said I'm with Kirk for now,
18  staying with Kirk, yes.
19    Q.   Have you ever been a party to a lawsuit as
20  a plaintiff or defendant other than -- well, you're
21  not really a party to this one; but have you ever
22  been party to a lawsuit?
23    A.   I don't know if this is a lawsuit.  I'm
24  thinking maybe it is.  I was in a car accident during
25  my cousin Jermaine's funeral.  And the lady ran into

Page 76

1  the funeral procession.  So I had people in my car
2  that sued me and I had to sue her.  So I don't know
3  if that's an official lawsuit.
4    Q.   Do you know who Dale Peterson is?
5    A.   I don't.
6    Q.   Are you familiar with a housing agency
7  called REM?
8    A.   REM?  Not off the top of my head.  It
9  sounds familiar, but I can't really tell you anything
10  about it.  So I'll say no.
11    Q.   Did you ever have a conversation with a
12  caseworker of David's regarding whether David had a
13  poor relationship with his mother because he used to
14  take money from her for his addictions?
15    A.   No.  The counselor I know of is Daryl that
16  I spoke with.
17    Q.   When David was growing up and living in
18  Peoria with the whole family, were there, would you
19  say, fights and so forth, any acts of violence or
20  aggression?
21    A.   No.
22    Q.   That doesn't sound familiar to you at all?
23    A.   No.  I mean I will say that this was not a
24  fight but, the boys, they wrestled.  They loved
25  wrestling, all of that.  So they wrestled a lot.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
77–80

**Page 77**

1  Which Adam and Desmond went on to high school and
2  started wrestling for high school. But that was
3  their thing. I don't know if you're talking about
4  that kind of fight.
5        But was he aggressive as far as punching
6  holes? No. No, he was not like that at all.
7      Q.   What about arguments? Were there frequent
8  arguments?
9      A.   No, huh-uh. I mean I'm the oldest. They
10  don't argue with me.
11     Q.   Did David ever talk to you about thoughts
12  about committing suicide?
13     A.   No.
14     Q.   Was that a no?
15     A.   That was a no. Committing suicide?
16     Q.   Yes.
17     A.   No, not that I remember.
18     Q.   Did David have a temper?
19     A.   He would. Like if he was talking to me:
20  Are you listening, just listen, I just need someone
21  to talk to. Yeah, he would try to talk. Or he would
22  overtalk me. If I was trying to tell him to listen,
23  he's like I'm old enough, you know.
24        Yeah. But it was never to a point of, oh,
25  my gosh, I'm going to hang up, he's scaring me.

**Page 78**

1      Q.   Do you and David have the same father?
2      A.   No, we do not.
3      Q.   Okay. You said that you had a stepfather?
4      A.   Uh-huh.
5      Q.   Is he still your mother's husband?
6      A.   No.
7      Q.   Okay. When was he married to your mother?
8      A.   Well, I don't think they were officially
9  married; but he's who I grew up in the house with.
10     Q.   Okay. And when did he live in the house
11  with you?
12     A.   Gosh. From as early as I can remember,
13  being a little girl all the way until -- gosh. When
14  did he move out? I can't remember exactly, but I can
15  say when I started high school he wasn't there. I
16  can't remember exactly when he moved out. But when I
17  became a freshman in high school I know he wasn't
18  there.
19     Q.   Did David --
20     A.   That's the kids' father. That's Louis and
21  Derrick and Tiffany. That's all their dad.
22     Q.   What was his name?
23     A.   Louis; Big Louis; Louis, Sr.
24     Q.   Did David get along with Big Louis?
25     A.   Yes. It was our step, yeah, stepdad.

**Page 79**

1      Q.   Okay. And he lived in the home with you?
2      A.   Uh-huh.
3      Q.   Okay.
4      A.   I mean yes. I'm sorry. I didn't realize
5  I used uh-huh so much.
6        MR. OSBORNE: It totally works in everyday
7  conversation. We're all good with what you're
8  saying, but it's hard to transcribe.
9        MS. FUSSY: I don't even notice it.
10       MR. OSBORNE: No.
11       MS. FUSSY: Mr. Bennett over here does.
12       MR. BENNETT: I don't like murky
13  testimony.
14     Q.   (By Ms. Fussy) Did David ever tell you
15  about failing classes at MCTC, the community college
16  he attended?
17     A.   Did he ever tell me that or did I learn
18  that since he's passed?
19        To be honest, just thinking about it now,
20  things are starting to -- like I'm thinking -- I
21  don't know that he told me he wasn't passing. More
22  so he took a break. I learned now that he may not
23  have been passing, that's why he took the break, so
24  he didn't fail the class.
25     Q.   What was David's relationship with your

**Page 80**

1  mom like?
2      A.   He loved my mom. He talked about buying
3  her a house all the time and taking care of her. He
4  loved her.
5      Q.   Your mother was, I think, evicted from an
6  apartment right before David's death?
7      A.   Her house.
8      Q.   Her house. Do you know the circumstances
9  surrounding that?
10     A.   I don't know exactly. I was out of the
11  loop until I found out. But there was so much other
12  stuff happening. I think she probably thought she
13  could take care of it on her own.
14       Which I'm a housing counselor. If she
15  would have told me about it...
16       (Whereupon, Mr. Bennett exits the room.)
17     Q.   (By Ms. Fussy) Do you know who Ralph
18  Pruitt is?
19     A.   No.
20     Q.   Okay. When I reviewed the medical records
21  and the housing history and the chemical dependency
22  records, it makes repeated reference to the fact that
23  David didn't have any family resources, that they
24  weren't supportive of his chemical dependency issue
25  that he was estranged.



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
81–84

Page 81

1    I'm just wondering where would they have
2 gotten that information.
3    A.   I have no idea. I wasn't there. I don't
4 know if they meant that he had -- had had no family
5 living there, just like I didn't living in Atlanta.
6 I mean I could imagine. I don't know for sure that
7 they were saying he had no family support there.
8    Q.   Do you know why they would say that he was
9 estranged from his family?
10    A.   Yeah. I can't imagine. Well, I mean I
11 wasn't there. So I don't know why they would say
12 that. He has lots of connections. Like I don't know
13 why they would say that. I honestly don't know.
14    Q.   Again reviewing medical history from
15 caseworkers and hospital reports, it indicates that
16 he had some conflicts with his family growing up,
17 that there was trauma and/or abuse.
18        Do you know anything about that?
19    A.   No, no. I mean there was stuff like,
20 okay, you're on punishment. I don't know that to be
21 traumatic. As a kid you might -- like I thought my
22 mom was mean because she didn't buy me name brand and
23 all the other cheerleaders had name brand shoes. And
24 for a long time I was like she's the worst mother
25 ever. But now I'm an adult. She wasn't the worst

Page 82

1 mother ever ever, you know.
2        As a young person, that may -- like being
3 on punishment or not being able to play on the
4 baseball team, those things may have been traumatic,
5 or being disciplined. But there was no like -- oh,
6 my gosh -- like us fighting or being -- yeah. No.
7    Q.   There's also references to your mother
8 having alcohol dependency issues.
9        Do you know anything about that?
10    A.   I know my mom has -- I would say -- I'm
11 not there to see it, but I would say that she's been
12 drinking since my brother passed away. And then even
13 so since my grandmother got sick and passed away.
14    Q.   Are you talking about your Grandmother
15 Rosie?
16    A.   Yes.
17    Q.   Did she have sort of like a sudden illness
18 and die sort of quickly or -- what did she die from?
19    A.   I want to say she was in the nursing --
20 I'm in Atlanta. So I was only hearing hearsay. But
21 I want to say she was in the nursing home. But she
22 had Alzheimer's. I don't know if you can die from
23 Alzheimer's, but I remember her being really sick
24 with the Alzheimer's. She started forgetting blocks
25 of years and stuff like that and then she started

Page 83

1 losing weight and wouldn't eat. You know, she
2 gradually got sicker. And when I went to visit
3 sometimes she would remember me, sometimes she
4 wouldn't.
5    Q.   Did David ever talk to you about any
6 fights he got in with, you know, other people when he
7 lived in Minnesota?
8    A.   Fights?
9    Q.   Physical fights.
10    A.   Not that I can remember, a physical fight.
11 Like I can remember arguments saying they think -- I
12 don't know. Somebody used my DVDs or -- I don't
13 know. Something like somebody went in his room, used
14 his DVDs. So he's going back and forth trying to
15 prove his case, like I had this many. But I can't
16 remember any fistfights.
17    Q.   Did you ever hear about a fight that David
18 got into in which his nose was broken?
19    A.   He went to a hospital for it?
20    Q.   Yeah.
21    A.   No, no.
22    Q.   Other than the time in Atlanta when he was
23 in the hospital, are you aware of any other times
24 that David was in the hospital in his lifetime?
25    A.   Well, he went to the hospital in Florida.

Page 84

1    Q.   Right. Other than that time?
2    A.   No. I don't think so. I don't know. I
3 really don't -- I don't know of any like hospital
4 stay. Like I've gone to the hospital if I got a
5 severe headache but not stay in the hospital. So I
6 know that he may have gone to the hospital to get
7 medicine or something like that, but I don't know of
8 any times where he actually had to stay in the
9 hospital.
10    Q.   Okay.
11        (Whereupon, Mr. Bennett enters the room.)
12    Q.   (By Ms. Fussy) We're almost done.
13    A.   Okay. I can do this.
14    Q.   Did David ever tell you about a time he
15 was found passed out on a light rail track?
16    A.   No. Are these alleged things or are these
17 real things that you're asking me?
18    Q.   I'm just asking you if you know anything
19 about it.
20    A.   Oh, okay.
21        MR. BENNETT: We call it hearsay things.
22        THE WITNESS: How could I not hear about
23    that?
24    Q.   (By Ms. Fussy) When was the last time you
25 communicated in any fashion with Kirk or Crystal?



ANGELA SMITH
SMITH vs. GORMAN

October 10, 2012
85–88

Page 85

1    A.    I tried to reach out just to check with
2  Kirk I think maybe my birthday last year.  Kirk sent
3  me a -- I want to say sent me a Facebook message
4  wishing me happy birthday and how he missed Punkin.
5  Then he and Crystal broke up.  I reached out to him a
6  couple of times on Facebook, but I haven't heard
7  anything; and then I heard he went in a rehab center
8  but.
9    Q.    Kirk?
10   A.    Uh-huh.
11   Q.    Do you know where he lives?
12   A.    He lived in Minnesota.  I don't know if he
13  still lives there because I haven't heard from him.
14   Q.    Okay.  You said he was in a rehab center.
15  Do you know what for?
16   A.    No.  I don't know if that's true.  That's
17  what -- you know.
18   Q.    That's what you heard?
19   A.    Yeah.
20   Q.    Did you hear anything about why he was in
21  a rehab --
22   A.    No.
23   Q.    -- center?  Okay.
24        MR. BENNETT:  Other than for rehab?
25        MS. FUSSY:  Lots of reasons you can be in

Page 86

1  rehab.
2        I don't have any further questions.
3        MR. BENNETT:  We will read and sign.
4        (Whereupon, the deposition was concluded
5  at 12:00 p.m.)
6        (Pursuant to Rule 30(e) of the Federal
7  Rules of Civil Procedure and/or O.C.G.A.
8  9-11-30(e), signature of the witness has been
9  reserved.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 87

1
2                C E R T I F I C A T E
3
4  STATE OF GEORGIA:
5  COUNTY OF FULTON:
6
7        I hereby certify that the foregoing
8  transcript was taken down, as stated in the
9  caption, and the questions and answers thereto
10  were reduced to typewriting under my direction;
11  that the foregoing pages 1 through 86 represent
12  a true, complete, and correct transcript of the
13  evidence given upon said hearing, and I further
14  certify that I am not of kin or counsel to the
15  parties in the case; am not in the regular
16  employ of counsel for any of said parties; nor
17  am I in anywise interested in the result of said
18  case.
19        This, the 22nd day of October, 2012.
20
21
22        KARA BARGER, GA CCR-B-1496
23
24
25

Page 88

1
2          COURT REPORTER DISCLOSURE
3
4      Pursuant to Article 10.B. of the Rules and
5  Regulations of the Board of Court Reporting of the
   Judicial Council of Georgia which states: "Each court
   reporter shall tender a disclosure form at the time
6  of the taking of the deposition stating the
   arrangements made for the reporting services of the
   certified court reporter, by the certified court
7  reporter, the court reporter's employer, or the
   referral source for the deposition, with any party to
8  the litigation, counsel to the parties or other
   entity.  Such form shall be attached to the
9  deposition transcript," I make the following
   disclosure:
10
       I am a Georgia Certified Court Reporter.  I am
11  here as a representative of Esquire Deposition
   Solutions.  Esquire Deposition Solutions was
12  contacted to provide court reporting services for the
   deposition.  Esquire Deposition Solutions will not be
13  taking this deposition under any contract that is
   prohibited by O.C.G.A. 9-11-28 (c).
14
       Esquire Deposition Solutions has no
15  contract/agreement to provide reporting services with
   any party to the case, any counsel in the case, or
16  any reporter or reporting agency from whom a referral
   might have been made to cover this deposition.
17  Esquire Deposition Solutions will charge its usual
   and customary rates to all parties in the case, and a
18  financial discount will not be given to any party to
   this litigation.
19
20
21        KARA BARGER, GA CCR-B-1496
22
23
24
25



# EXHIBIT 16

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MINNESOTA

2

3    LARRY E. SMITH, as Trustee    )
     for the Heirs and Next of Kin)
4    of DAVID CORNELIUS SMITH,     )
                                   )
5                    Plaintiff,    )
                                   )
6            VS.                   )  No. 11-CV-03071
                                   )
7    TIMOTHY GORMAN AND TIMOTHY    )
     CALLAHAN, acting in their     )
8    individual capacities as      )
     Minneapolis police officers,  )
9    and the CITY OF MINNEAPOLIS,  )
                                   )
10                   Defendants.   )

11

12        The deposition of TIFFANY BROWN, called

13   for examination pursuant to the provisions of the

14   Federal Rules of Civil Procedure of the United

15   States District Courts as they apply to the taking

16   of depositions, taken before Paula A. Morsch, C.S.R.

17   License No. 84-002965, a Certified Shorthand

18   Reporter in the State of Illinois, on the 29th day

19   of August, 2012, at the hour of 3:00 p.m., at 500

20   Hamilton Boulevard, in the City of Peoria, County of

21   Peoria, State of Illinois.

22

23

2

1    PRESENT:

2            GASKINS, BENNETT, BIRRELL, SCHUPP,
             LLP
3            BY:   Robert Bennett, Esq.
             and Jeffrey S. Storms, Esq.
4            333 South Seventh Street, St. 2900
             Minneapolis, MN  55402
5            612.333.9500
             for Plaintiff Larry E. Smith, Trustee
6            for the Heirs and Next of Kin of
             David Cornelius Smith;
7
             MS. TRACEY N. FUSSY, ESQ.
8            and MR. BURT T. OSBORNE,ESQ.
             Assistant City Attorney
9            350 S. Fifth Street-Room 210
             Minneapolis, MN  55415
10           612.673.3847
             for Defendants Timothy Gorman,
11           Timothy Callahan, City of
             Minneapolis.

12

13

14

15

16

17

18

19

20

21

22

23

3

I N D E X

| WITNESS | PAGE |
|---|---|
| TIFFANY BROWN | |
| Direct By Ms. Fussy | 4 |
| Cross By Mr. Bennett | 44 |

*No Exhibits Marked.

---

4

TIFFANY BROWN

called by the Defendants,

being first duly sworn,

was examined and testified

as follows:

DIRECT EXAMINATION

BY MS. FUSSY:

Q    Ms. Brown, can you state and spell your
name for the record, please?

A    Tiffany, T-I-F-F-A-N-Y, Brown, B-R-O-W-N.

Q    And how old are you, Ms. Brown?

A    24.

Q    My name is Tracey Fussy and I represent
the City of Minneapolis and defendant officers in
the litigation matter brought by I believe your
Uncle Larry Smith.  As we sit here today, are you
under any, under the influence of any drugs or
alcohol, prescription or otherwise, that might
impair your ability to testify today?

A    No, ma'am.

Q    Okay.  Did you review any documents in

---

5

anticipation of your testimony today?

A    No, ma'am.

Q    Did you talk with anyone other than your
attorneys about this deposition today?

A    No, ma'am.

Q    Have you ever been deposed before?

A    Explain.

Q    Have you ever sat in a situation similar
to this with a court reporter taking your testimony
where you're sworn under oath?

A    I think so.

Q    I'm sorry?

A    Yeah.

Q    You think you have?

A    Yeah, I think I have.

Q    Okay.

A    It wasn't in relation of anything like
this though I don't think.  No, it wasn't.

Q    What was it in relation to?

A    A friend with her kids.  It wasn't a thing
in relation to this.

Q    The reason I ask is because I wanted to
give you a couple of what we often refer to as

---

6

ground rules.  The goal here is to make a nice,
clean record so we know exactly what people said.

A    Oh, okay.

Q    So later we'll know what people have said.
So in order to do that, first I need you, and you're
doing a fantastic job already, but I need you to
give verbal responses to my answers.  Head shakes
don't show up on the record.

A    Okay.

Q    Saying things like uh-huh and huh-uh also
don't show up on the record.  If you don't
understand a question that I ask, please let me know
and I'll try to rephrase it.  And then finally, I
will do my very best to not speak over you and if
you would do the same for me, that will help
maintain a clean record.  In the course of normal
conversations, that kind of thing happens all the
time so we'll probably have to stop and correct
ourselves.

A    Okay.

Q    Ms. Brown, where do you currently live?

A    706 East Republic in Peoria, Illinois.

Q    Who do you live there with?

7

1    A     Myself and my two kids.
2    Q     And who are your -- what are your
3    children's names?
4    A     Tayveair, T-A-Y-V-E-A-I-R, Brown,
5    B-R-O-W-N; Tanisjiah, T-A-N-I-S-J-I-A-H.
6    Q     And how old are they?
7    A     Tayveair is four. Tanisjiah is three.
8          MR. OSBORNE:   Makes me tired just
9    thinking about it.
10   A     Keep you on your toes.
11   Q     Is Tanisjiah a girl?
12   A     Yes.
13   Q     I have a three-year-old too. How long
14   have you lived at this address?
15   A     A little over a year.
16   Q     Okay. Are your children the only people
17   who live there with you?
18   A     Yes, ma'am.
19   Q     Where did you live prior to that?
20   A     On Arago Street.
21   Q     Can you spell that?
22   A     1527, A-R-A-G-O.
23   Q     Okay. And how long did you live there?

8

1    A     I think like three years.
2    Q     Who did you live there with?
3    A     Myself and my two kids.
4    Q     And then prior to that, where did you
5    live?
6    A     With my mother. No, I'm sorry. I lived
7    in the Woodlands Apartments with myself and my son
8    at the time.
9    Q     Okay. Are you currently employed?
10   A     Yes.
11   Q     Where are you employed?
12   A     PCCEO. It's an organization that helps
13   people in the community, currently working as a
14   support service clerk at a primary school. I'm
15   sorry, at an Early Head Start.
16   Q     What does the acronym stand for?
17   A     The who?
18   Q     You said PT --
19   A     PCCEO?
20   Q     Yeah.
21   A     I think it's People Community -- I'm
22   sorry, I can't remember it.
23   Q     Okay. How long have you worked there?

9

1    A     For a year.
2    Q     One year?
3    A     Yes.
4    Q     What are your job duties?
5    A     Bus monitoring, helping out in the
6    kitchen, wherever help is needed pretty much.
7    Q     Okay. Where did you work prior to that?
8    A     At a -- not the hotel. I worked at a
9    factory. Hotel is after the factory.
10   Q     What factory did you work at?
11   A     Sc2, Superior.
12   Q     What did you do there?
13   A     Allocation.
14   Q     What does that mean?
15   A     Allocation is rechecking the packages that
16   are shipped out for Caterpillar.
17   Q     When did you work there?
18   A     January of 2011.
19   Q     Okay. And that's when you left that job?
20   A     Yeah.
21   Q     When did you start that job?
22   A     Which one?
23   Q     The allocation job.

10

1    A     No, I started in January. I left there in
2    May.
3    Q     And then did you go immediately to your
4    current position?
5    A     No, ma'am.
6    Q     Where did you go?
7    A     Unemployment.
8    Q     Okay. Where did you work prior to the
9    factory job? I think you mentioned a hotel.
10   A     A hotel, at Wingate Hotel.
11   Q     Where is that located?
12   A     I think 74, Route 91.
13   Q     And what did you do for them?
14   A     I was a housekeeper.
15   Q     And when did you work there?
16   A     From September of '09 to October 2010.
17   Q     Why did you leave that job?
18   A     Stress due to my brother's death, needed
19   time off.
20   Q     Would they not give you time off?
21   A     Yeah, they did. They were pretty good
22   with it, but after all that happened, I just
23   figured, you know, it was time to make a change,

11

1   time to move forward in life.  Housekeeping is not
2   what I wanted to do for the rest of my life so I
3   continued on with school.  Life is too short as I
4   seen it.
5       Q    Okay.  So you left there in October 2010,
6   and then you went back to school?
7       A    Yeah.
8       Q    Where did you go to school?
9       A    I was going to school during that time.  I
10  had just started school at Kaplan University online.
11      Q    Okay.  So, and correct me if I'm wrong,
12  I'm just trying to get this straight, were you
13  taking courses at Kaplan University while working at
14  the hotel?
15      A    I was supposed to start the school while
16  being at the hotel but I figured with school, work,
17  the death of my brother, two kids, it all was too
18  much so on my time off I just figured, you know, I'm
19  just going to leave.  I put in my two weeks notice
20  and I left.
21      Q    So you quit in October 2010?
22      A    Uh-huh.
23           MR. BENNETT:  That's a yes?

12

1       A    Yes, I'm sorry.  Yeah, you did say that.
2   I'm sorry.
3       Q    And did you focus on your school work?
4       A    I was trying to, but unfortunately things
5   didn't happen that way.
6       Q    Well, first what were you studying?  What
7   classes were you taking?
8       A    Medical assistant.
9       Q    Okay.  And how did you do?
10      A    I had a B.
11      Q    A B average?
12      A    Yes.
13      Q    Okay.  And then did you get a degree or
14  complete your program?
15      A    No, ma'am.  I'm actually in school now for
16  the same thing and I have a 4.0 and I'll be done in
17  December.
18      Q    Nice.  So what was going on the first time
19  then?  Can you just spell that out for me?
20      A    Well, due to my brother's death, I didn't
21  think that it affected me that much but I was wrong.
22  It affected me a lot more than what I thought it
23  did.  So I pretty much just fell back with

13

1   everything.  I wasn't working anymore, wasn't going
2   to school anymore.  I could barely concentrate,
3   barely focus with trying to hold up my duties of
4   being a single parent.
5       Q    When was the -- so when was the next time
6   that you were employed then?
7       A    After figuring how hard it is to pay bills
8   with no job, I went back in January of 2011.
9       Q    And is that when you started with PCCEO?
10      A    No, that's when I started with Superior.
11      Q    Oh, with the factory?
12      A    Sc2.
13      Q    And why did you leave the factory job?
14      A    Actually I had a very important meeting,
15  and they wasn't accepting it so they let me go.
16      Q    So you asked for time off and they said
17  no?
18      A    For a meeting.
19      Q    What was the important meeting?
20      A    It was with housing.
21      Q    Had they had some issues with you in the
22  past that you knew of?
23      A    Housing?

14

1       Q    No, the factory.
2       A    No.
3       Q    Okay.  What was the problem you were
4   having with housing?
5       A    No problem.  We just have regular
6   meetings.
7       Q    Who has regular meetings?
8       A    Housing have routine meetings each year.
9   I'm with housing.
10      Q    What do you mean you're with housing?
11      A    Section 8.
12           MR. BENNETT:  Section 8.
13      Q    Oh, okay.  I apologize.
14           MR. BENNETT:  It's assistance in
15  paying rent and you have to meet their criteria.
16      A    Yes, and come to the meeting and all that
17  in order to obtain it.
18      Q    And they wouldn't let you do it.  What
19  high school did you attend?
20      A    Manual.
21      Q    Manual?
22      A    Yes.
23      Q    Is that in Peoria?

15

1    A    Yes, Manual High.

2    Q    What was the -- did you graduate?

3    A    Yes.

4    Q    What year did you graduate?

5    A    2007.

6    Q    What did you do after you graduated?  Did

7 you go on to college?

8    A    I tried moving to Georgia for college but

9 it didn't work out so I came back, the birth of my

10 son.  A couple months after I had him I went to

11 Illinois Central College in East Peoria where I got

12 credit hours.

13    Q    Okay.  How were your grades in high

14 school?

15    A    It was fair.

16    Q    C's?

17    A    Yeah.  I would say C's, B's/C's.

18    Q    Okay.

19    A    A couple of A's.

20    Q    What college were you going to go to in

21 Georgia?

22    A    Georgia Tech.

23    Q    Okay.  Had you been accepted to Georgia

16

1 Tech?

2    A    I didn't wait around to see.  I just left.

3    Q    Why did you leave?

4    A    I didn't like it.

5    Q    What didn't you like?

6    A    Georgia is too fast.

7    Q    Were you living -- did you go and live

8 with your sister, Angela?

9    A    Yes.

10    Q    And then you started taking, you came back

11 and you started taking classes at Illinois --

12    A    Central College.

13    Q    Central College.  Do you know what year

14 that was?

15    A    2008.

16    Q    Okay.  And did you obtain any degree from

17 them?

18    A    No, just credit hours.

19    Q    Okay.  How long were you there?

20    A    For ICC, two years.

21    Q    When you say you get credit hours, what

22 does that mean?

23    A    I was studying to become a nurse, but you

17

1 have to do the basic courses before you can even

2 enter through the nursing program.  So I have credit

3 hours in English, credit hours in math.  I have

4 credit hours in child development and reading.

5    Q    Okay.

6    A    So I don't have to go back and take those.

7    Q    Have you ever in your life treated or

8 counseled for any emotional or mental health issues?

9    A    Did I need it, yes.  Have I done it, no.

10    Q    What did you need it for and when?

11    A    Emotional issues.  I had emotional issues

12 when my brother died.  I needed it because I didn't

13 believe it was real.  I'm like really, how can you

14 tell me that this person who was once here just the

15 other day who called me a week before this happened

16 ain't here anymore?  How can you tell me that he'd

17 been here all my life and he's not here anymore?  I

18 haven't been with him for 24 years, but I've known

19 him for 24 years.  We didn't have really too much of

20 a father figure in our life but him.  How is he not

21 there?  So sometimes I still question it but, you

22 know, I guess it just comes.

23    Q    Did Larry Smith serve as any type of

18

1 father figure to you?

2    A    No.

3    Q    Is he your uncle?

4    A    Yes.  He's just an uncle.

5    Q    How often do you see him?

6    A    He stays in Chicago.  Not that often.

7         MR. BENNETT:  How far is Chicago?

8 It's about two hours, isn't it?

9    A    Two hours away.  Well, he'd do a lot of

10 traveling with him being a lawyer.

11    Q    Are you close with him at all?

12    A    No, I'm not too much close with anyone

13 except for my immediate family, my siblings and my

14 mother.  I'm sorry.  I'm not a people's person.  I

15 mean I'm a people's person but I don't like to hang

16 in crowds.

17    Q    Would you describe yourself as an

18 introvert a little bit?

19    A    No.

20    Q    What about -- is Louis older than you?

21    A    Yes, that's the second to the oldest boy.

22    Q    Did Louis serve as any type of father

23 figure?

19

1   A   Yes.  I look at it that all my brothers
2  have in some kind of way, even the youngest one.
3   Q   You look at even Desmond as a father?
4   A   Desmond and Adam, yes.  Desmond helps
5  tremendously.  Even Adam when he was here with my
6  kids, yes.  They're a good support system.
7   Q   Did you say Marquis?
8   A   Who?
9   Q   I thought you said Marquis.
10   A   Support system.
11   Q   Okay, I misheard.
12       MR. STORMS:   My kids.
13   Q   Oh, I'm sorry.
14   A   My kids.
15   Q   Thank you.  I mentioned the bad hearing.
16  Desmond is the youngest, right?
17   A   Yes.
18   Q   And then you are the next?
19   A   Adam.
20   Q   Adam and then you?
21   A   Yes.
22   Q   And then Louis and then David and then
23  Angela?

21

A   Woodruff.
Q   Do you know the names of any of David's
friends in Minnesota?
A   Curt and Crystal.
Q   Anyone else?
A   His girlfriend, ex-girlfriend, Josephine.
Q   Do you know when they broke up?
A   They was off and on.
Q   Do you know how he met Josephine?
A   Working.
Q   Do you know where, at what work he met
her?
A   In a mall.  I don't know what job it was
in the mall, but I know he said it was in the mall.
Q   They worked together or they both worked
in the mall?
A   No, she was in the mall and he worked at
the mall.
Q   Okay.  Had you ever met Josephine?
A   Yes.
Q   When was the first time you met her?
A   When he died, or when he was in the
hospital.

20

1   A   No.  It's Desmond, Adam, me, Derrick,
2  Louis, David, Angela.
3   Q   Okay.  When you were growing up, did you
4  live with -- did everyone live under one roof?
5   A   Yes.
6   Q   Okay.  Prior to David's death, had you
7  ever treated or counseled for any emotional or
8  mental health issues?
9   A   No.
10   Q   Did you ever have any chemical dependency
11  issues?
12   A   Explain.
13   Q   Did you ever have any problems with
14  alcohol or drugs?
15   A   No.
16   Q   Prior to, before David's death, had there
17  been any other close relatives in your family who
18  had died?
19   A   My grandmother.
20   Q   Anyone else that you can think of?
21   A   My grandmother.  Both of them.
22   Q   Oh, both of them.  Where did David go to
23  high school?

22

Q   Did David ever bring any of his friends
from Minnesota or his girlfriend to Peoria?
A   Curt and Crystal.
Q   When did he do that?
A   I can't remember a year.  They came a lot
of times.
Q   Can you tell me when?
A   No.  Christmas and Thanksgivings.
Q   I'm sorry.  Can you speak up?
A   It would have been Chrismases and
Thanksgivings.  Curt and Crystal came with him
often.  They brung him here.
Q   Did they come every Christmas and
Thanksgiving?
A   No, periodically.
Q   Okay.  When was the last time you saw
David alive?  I didn't say this to you before but if
you need to take a break at any time for any reason,
you just tell us.  Would now be a good time to take
a break?  Do you want some water?
A   No, I'm okay.
       MR. BENNETT:   I have these handy if
you need them.

23

1    Q    I'm just going to wait and you tell me
2  when you're ready.  I don't want to -- you just take
3  your time.  Can we just go off the record?
4         MR. BENNETT:  Sure.
5
6         (Whereupon an off the record
7          discussion was held.)
8
9  BY MS. FUSSY:
10   Q    We'll go back on, okay.  The last time you
11 saw David alive.
12   A    2008.
13   Q    Was that for your grandmother's funeral?
14   A    Yes.
15   Q    Was that in August of 2008?
16        MR. BENNETT:  Do you want to take a
17 break?
18   A    Yes.  No, I'm okay.
19        MR. BENNETT:  Okay.
20   Q    When David came down for the funeral in
21 August of 2008 -- and I'm just going to count on you
22 to tell me then when you need a break.
23        MR. BENNETT:  Yeah, she'll do that.

24

1    Q    Okay.  Did Curt and Crystal come with him
2  in 2008, do you remember, for the funeral?
3    A    I think they did.
4    Q    Prior to the 2008 funeral, when was the
5  last time you'd seen him before then?
6    A    Thanksgiving the year before that.
7    Q    Thanksgiving 2007?
8    A    No.  Yes, I remember being pregnant.
9    Q    With your daughter?
10   A    Son.
11   Q    With your son.  You were pregnant with
12 your son.  When was your son born?
13   A    December 2007.
14   Q    Okay.  You saw him -- well, it probably
15 would have been Thanksgiving then?
16   A    No, I think it was before, 4th of July.
17 Yes, it was before because I wasn't that big.
18   Q    Do you think you saw him in the summer of
19 2007?
20   A    Uh-huh, yes.
21   Q    Do you know how David -- did Curt and
22 Crystal come with him or did he come by bus?
23   A    He came by train.

25

1    Q    Train, okay.  And prior to the summer of
2  2007, when was the last time you'd seen him before
3  then?
4    A    Maybe three years.  Two, three years.
5    Q    If David had come to Peoria, you would
6  have seen him do you think?
7         MR. BENNETT:  Objection, foundation.
8    Q    How often did you speak with David?
9    A    Just periodically.  Sometimes we'd talk
10 two, three, four times a week.  Sometimes I don't
11 hear from him for months and months, two months.
12   Q    If David had come to town, I mean he would
13 have seen someone in your family don't you think?
14   A    Yes.
15        MR. BENNETT:  Can you ask her when
16 she was in Georgia though, because that's sort of --
17   Q    Sure, sure.  Do you recall when you were
18 in Georgia?
19        MR. BENNETT:  After high school.
20   A    After graduation.
21   Q    You graduated --
22   A    In May.  I left right after graduation so
23 May 24, 2007.

26

1    Q    And when did you come back to Peoria?
2    A    August 2007.
3    Q    August 2007.  Do you know where David got
4  the income he needed to pay for his living expenses,
5  phone bills, groceries, things of that nature?
6    A    (Witness shaking head)
7         MR. OSBORNE:  Is that a no?
8    A    No.
9    Q    Do you know whether he was on disability,
10 had disability insurance or whatever payments?
11   A    No, he kept his business private.  He
12 didn't want us to see him hurt or to let us know if
13 anything was going wrong with him.
14   Q    When you talked, when you spoke with --
15 well, what was your primary type of communication
16 with David?  Did you speak with him on the
17 telephone, Facebook, Myspace, E-mail?
18   A    Over the phone the majority of the time.
19 I'm not a big internet person.
20   Q    Okay.  Do you have a computer?
21   A    Yes.
22   Q    How long have you had the computer?
23   A    Since school started now.  I had it off

27

1    and on.
2        Q    So primarily you spoke with him on the
3    phone?
4        A    Yes.
5        Q    Did you call him?  Did he call you?
6        A    Both.
7        Q    Did you ever have trouble getting ahold of
8    David?
9        A    No.
10       Q    Do you know where David's funeral was?
11       A    St. Paul on Nebraska.
12       Q    St. Paul Church?
13       A    Yes, Baptist church on Nebraska in Peoria,
14   Illinois.
15       Q    Did you ever go to visit David in
16   Minnesota?
17       A    No.
18       Q    Was that a no?
19       A    No.
20       Q    When was the last time that you lived with
21   David?
22       A    When he was 16, 17.
23           MR. BENNETT:   When he was 17?

28

1        Q    And is that when he moved out and moved to
2    Minnesota?
3        A    Yes.
4        Q    Who do you think in the family David was
5    closest to?
6        A    Everyone.
7        Q    Were you aware at any time that David was
8    diagnosed with schizophrenia?
9        A    No.
10       Q    As we sit here today, you have never been
11   informed that David was diagnosed with
12   schizophrenia?
13       A    No.
14       Q    Did you ever speak with any of David's
15   case workers?
16       A    No.
17       Q    Did you ever speak with any of David's
18   counselors?
19       A    No.
20       Q    Did you ever speak with any of David's
21   roommates?
22       A    No.
23       Q    Did you ever speak with any of David's

29

1    medical providers?
2        A    No.
3        Q    Did David ever mention Maureen Glover?
4        A    No.
5        Q    Did he ever mention Cheryl Sprat?
6        A    No.
7        Q    Did he ever mention Phillip or Theresa
8    Warner?
9        A    No.
10       Q    Did he ever mention Cheryl Smith?
11       A    No.
12       Q    Did he ever mention anyone named Charlene?
13       A    No.
14       Q    Do you know who Daryl Tate is?
15       A    No.
16       Q    Never spoken with Daryl Tate?
17       A    No.
18       Q    Okay.  Do you know any of the places that
19   David lived in Minnesota?
20       A    No.
21       Q    Did you have any knowledge of any chemical
22   dependency issues that David had?
23       A    No.

30

1        Q    You went up to see David in the hospital
2    following the September 2010 incident, correct?
3        A    Yes.
4        Q    Other than that time, do you know of any
5    other time he's been hospitalized?
6        A    No.
7        Q    Did David ever talk to you about any
8    problems he was having with alcohol or drugs?
9        A    No.
10       Q    Did David ever talk to you about hearing
11   voices?
12       A    No.
13       Q    Were you aware that David went to Florida
14   in 2010?
15       A    Yes.
16       Q    Do you know why he went there?
17       A    Vacation.
18       Q    He went on a vacation.  Do you know if he
19   had any friends or family that lived there at the
20   time?
21       A    I think my cousin was there.
22       Q    What cousin?
23       A    One of them was there.

31

1    Q    I'm sorry, who?
2    A    Shawn.
3    Q    Shawn.  Do you know if he went -- if David
4    saw Shawn when he was there?
5    A    No.
6    Q    No, he didn't or no, you don't know?
7    A    No, I don't know.
8    Q    Okay.  Do you remember David's phone
9    number?
10   A    No.
11   Q    Did David ever tell you about any housing
12   problems he had?
13   A    No.
14   Q    Did David ever tell you about being
15   evicted from any residences?
16   A    No.
17   Q    Were you aware that David was homeless for
18   some times during his life?
19   A    No.
20   Q    No.  Had you ever heard your mother or any
21   of your siblings talk about David taking money from
22   them for his alcohol and drug addictions?
23   A    No, he wasn't a thief.

32

1         MR. BENNETT:  I don't know that
2    she -- by taking it, taking money, stealing money,
3    is that what you're implying?
4    Q    I don't know.  All I know is the word
5    taking.  I'm not inferring anything from it one way
6    or the other.
7         MR. BENNETT:  Okay, but you weren't
8    aware of any of it anyway?
9    A    No.
10   Q    I'm not implying.  Sorry.  Can you
11   describe your relationship with David, what it was
12   like, you know, during the last five years of his
13   life?  Would you say you had a close relationship
14   with David or not?
15   A    Yes, it was close.
16   Q    Okay.  What kinds of things did you guys
17   talk about?
18   A    Everything.
19   Q    Can you give me some for instances?
20   A    Good times, bad times, relationships.  He
21   gave me advice on what I should do.
22   Q    Give me -- when did he give you advice?
23   Tell me when he gave you advice.

33

1    A    On everything.  Every moment of my life.
2    Q    Okay.  Well, then it should be easy for
3    you to come up with some examples.
4    A    Oh, I'm sorry.  He gave me advice on what
5    I should do about school, whether I should move out
6    of town or not.  He figured I should have moved out
7    of town to better myself and go venture off.  I was
8    always too scared to do that, to leave my mom.
9    Q    What other advice would you say he gave
10   you?
11   A    He gave me advice on who I should hang out
12   with and who I shouldn't, good people and bad
13   people.
14   Q    And what specific advice?  What did he
15   say?
16   A    Telling me some of my friends I should let
17   go because I'm not that type of person.
18   Q    What else?  Anything else?
19   A    That's a lot of it.
20   Q    I'm sorry, I couldn't hear.
21   A    It was a lot of advice he gave me.  A lot
22   that I gave him.
23   Q    A lot of advice you gave him too?  What

34

1    advice did you give him?
2    A    On kids.  When he thought that he had a
3    baby, he asked me advice on how to go about the
4    test, pregnancy test and doctor's appointments,
5    paternity test.
6    Q    When did he think he might have had a
7    baby?
8    A    2008, 2009.
9    Q    He didn't though, correct?
10   A    No.
11   Q    Did David ever give you any money?
12   A    Yes.
13   Q    When did he give you money?
14   A    I can't remember.  He always gave me money
15   when he seen me if he had it.
16   Q    How much money would he give you?
17   A    Whatever he had in his pocket, his pants.
18   Q    What was the most amount of money he ever
19   gave you?
20   A    $20.
21   Q    Do you remember when he gave you that
22   $200?
23        MR. BENNETT:  I think she said 20.

35

1    A    20.
2    Q    Oh, 20. I'm sorry. Did David provide you
3  with any guidance in life?
4    A    Yes, he told me I should graduate.
5    Q    From high school?
6    A    Yes.
7    Q    Anything else?
8    A    Yes, it's a lot. I just don't want --
9  right now I can't remember everything.
10    Q    Did he give you any advice on employment?
11    A    I guess.
12    Q    Did you say you guess?
13    A    Yes, he told us to keep a job. When we
14  get older, we can help momma because she took care
15  of us so when she get older, take care of her.
16    Q    Do you -- was your mother sick in 2009 and
17  needing help from family or friends to pay for
18  medical bills?
19    A    No.
20    Q    How about did David provide you any
21  guidance or advice with respect to raising your
22  children?
23    A    At the time that I was having kids he

36

1  wasn't around. He couldn't make it to Peoria. When
2  I had my son, he always told me to just let them
3  help guide him as being a man, becoming a man
4  growing from a boy. A female can't teach him the
5  kind of perspective that a man needs or guidance
6  that a little boy needs to be guided, that his dad
7  is not there. So I did like he said. I let my
8  brothers take over on that part.
9    Q    How about relationships, any advice with
10  relationships?
11    A    Just told me to do as I seen my mother do.
12    Q    And what does that mean?
13    A    She raised seven of us by herself.
14    Q    So was his advice not to get into
15  relationships?
16    A    Oh, you mean as to being in a
17  relationship?
18    Q    Yeah, any relationship advice?
19    A    He hoped that I find a good man that know
20  how to treat me.
21    Q    Anything else?
22    A    It's a lot, but right now my head is like
23  everywhere.

37

1    Q    Is there any particular reason why your
2  head is kind of everywhere right now?
3    A    Yeah. One, we're talking about my brother
4  in past tense. I shouldn't be talking about him in
5  past tense.
6    Q    Did David provide you with any type of
7  protection?
8    A    Can you explain it?
9    Q    You mentioned that he would serve as sort
10  of a father figure role. In what way did he do
11  that?
12    A    He always protected me from bullies,
13  people who always try to run over me. Mostly boys
14  in general. He always, like if I had a boyfriend,
15  he'd come and chastise them like brothers do.
16    Q    Anything else?
17    A    He protected all of us.
18    Q    How did he do that?
19    A    By looking over us. If anything was
20  happening to us, he was always there when he was
21  here. Even when he wasn't, he would call and if
22  he'd hear about it, he'd call and make sure we was
23  okay.

38

1    Q    Were you ever asked to pay any of David's
2  medical bills?
3    A    No.
4    Q    No?
5    A    No.
6    Q    Did you ever have any knowledge of any
7  legal problems David was having?
8    A    No.
9    Q    Do you have any knowledge of whether or
10  not he was ever in jail?
11    A    No.
12    Q    You graduated from high school in 2007, is
13  that correct?
14    A    Yes.
15    Q    Did David come to your graduation?
16    A    No, he couldn't make it.
17    Q    Do you know why he couldn't make it?
18    A    Didn't have funds.
19    Q    Did you say funds?
20    A    Yes.
21    Q    It's my understanding that your brother,
22  Louis, is in jail currently. Do you know why? Did
23  you know that he was in jail?



39

1    A    No.
2    Q    How often do you speak with your mother?
3    A    Every day.
4    Q    She didn't tell you that he was in jail?
5    A    No, I thought he was with his girlfriend.
6    Q    How often do you speak with Louis?
7    A    Just about every day except for when he's
8    with his girlfriend.  She's staying in Pekin.
9    Q    Your mother stated that Louis was in court
10   and they took him from court to jail.  Do you know
11   why he was in court yesterday?
12   A    No.
13   Q    You and Louis have the same father,
14   correct?
15   A    Yes, and Derrick and Adam.
16   Q    And Derrick and Adam.  Did David ever tell
17   you about any fights he got in with anybody?
18   A    No.
19   Q    Did you hear from any other family members
20   about any fights he ever got into?
21   A    No.
22   Q    How did you find out that David was in the
23   hospital in September of 2010?

40

1    A    Someone called my mom.
2    Q    Someone called your mom?
3    A    And she called us.
4    Q    She called you.  And what did you do after
5    you found out that he was in the hospital?
6    A    Began searching for a plane ticket.
7    Q    Did you fly up here?
8    A    No.
9    Q    Or Minnesota.
10   A    We rented a car.  I picked up my check.
11   We rented a car and we went there.
12   Q    Who went?
13   A    Me and my mom, my brother, Adam, and my
14   cousin, Lovell.
15   Q    Did your children go with you?
16   A    No.
17   Q    Who watched them?
18   A    Louis.
19   Q    Louis.  Hennepin County medical reports
20   indicate someone told Hennepin County medical staff
21   that David had been estranged from his family for a
22   number of years.
23   A    No.

41

1    Q    Not true?
2    A    No.
3    Q    Do you have any idea why someone would
4    have said that?
5    A    No.
6    Q    How old were you when David was in high
7    school?
8    A    I'm not sure.
9         MR. BENNETT:  There's seven years
10   difference.
11   Q    Seven years difference.  So you would have
12   been in elementary school when he was in high
13   school?
14   A    Yes.
15   Q    Okay.  Did you ever have any knowledge of
16   David being committed to, you know, any kind of
17   facility for his safety?
18   A    No.
19   Q    Do you recall ever speaking with David on
20   the phone when he was like obviously intoxicated,
21   slurring his words?  Do you have any memory of that?
22   A    No.
23   Q    Do you remember or do you know what kind

42

1    of student David was?  Do you know what kind of
2    grades he got?
3         MR. BENNETT:  Just so I have -- do
4    you know where you're referring, in high school?
5    Q    Yeah, in high school.  Do you have any
6    knowledge of his grades at all?
7    A    What I remember he was an A student, A/B
8    student.
9    Q    And it's my understanding that David
10   dropped out of high school in his last year of high
11   school, is that correct?
12   A    Yes.
13   Q    Do you know why he dropped out of high
14   school?
15   A    No.
16   Q    No?
17   A    No.
18   Q    Did you ever ask him why?
19   A    No.
20   Q    He never told you why?
21   A    No.
22   Q    No other family members ever indicated
23   that they knew why?

43

1          MR. BENNETT:   To her?

2     Q    To you.

3     A    No.

4     Q    Did you think it was strange that he

5 dropped out?

6     A    Yes.

7     Q    But you never asked him about it?

8     A    No.

9     Q    Why not?

10     A    At the time I was young.  I wasn't really

11 thinking about that stuff then.

12          MS. FUSSY:   Why don't we take a break

13 for a minute.

14    (Whereupon a five-minute break was taken.)

15

16 BY MS. FUSSY:

17     Q    Have you ever been convicted of any crime?

18     A    No, ma'am.

19          MR. BENNETT:   She thought that was

20 the answer.

21          MS. FUSSY:   I have to ask of

22 everybody I depose.  I have no further questions.

23

44

1          CROSS EXAMINATION

2 BY MR. BENNETT:

3     Q    I've got a couple.  Did you love your

4 brother?

5     A    Yes.

6     Q    Do you think he loved you?

7     A    Yes.

8     Q    Did he do things in your life to show you

9 that?

10     A    Yes.

11     Q    What do you miss the most about him?

12     A    Our conversations.  He always made me

13 smile.

14          MR. BENNETT:   That's all I have.

15          MS. FUSSY:   I have nothing further.

16          MR. BENNETT:   We'll read and sign.

17

18     WITNESS FURTHER SAYETH NOT;

19     BY AGREEMENT, SIGNATURE NOT WAIVED.

20

21

22

23

# EXHIBIT 17

**MAUREEN GLOVER**                                                                  **CONDENSED**

---

**Page 1**

```
1                UNITED STATES DISTRICT COURT
2                   DISTRICT OF MINNESOTA
3     -------------------------------------------------
4     Larry E. Smith as trustee for
      The Heirs and Next of Kin of
5     David Cornelius Smith,

6          Plaintiff,          Court File No.
                               11-CV-03071(SRN/JJK)
7     VS.

8     Timothy Gorman and Timothy
      Callahan, acting in their
9     individual capacities as
      Minneapolis police officers,
10    and the City of Minneapolis,

11         Defendants.

12
13
14         The Deposition of MAUREEN GLOVER taken
15    pursuant to Notice of Taking Deposition, taken before
16    Michelle R. Clifton, a Notary Public in and for the
17    County of Hennepin, State of Minnesota, on Thursday, the
18    25th day of October, 2012, commencing at approximately
19    10:00 a.m., at 350 South Fifth Street, Suite 210, in the
20    city of Minneapolis, Minnesota.
21
22
23
24
25
```

COPY

---

**Page 2**

```
1     APPEARANCES:

2
3          C. LYNNE FUNDINGSLAND, ESQUIRE; TRACEY
4     FUSSY, ESQUIRE, of the MINNEAPOLIS CITY ATTORNEY'S OFFICE,
5     350 South Fifth Street, Suite 210, Minneapolis, Minnesota,
6     55415, appeared for and on behalf of the Defendants.

7
8          ROBERT BENNET, ESQUIRE, KATHRYN H. BENNETT,
9     ESQUIRE, of the Law Firm of GASKINS, BENNETT, BIRRELL,
10    SCHUPP, LLP, 333 South Seventh Street, Suite 2900,
11    Minneapolis, Minnesota, 55402, appeared for and on behalf
12    of the Plaintiff.

13
14         ARTHUR W. KATZMAN, ESQUIRE, SENIOR ASSISTANT
15    HENNEPIN COUNTY ATTORNEY, of the HENNEPIN COUNTY ATTORNEY'S
16    OFFICE, C-2000, Hennepin County Government Center, 300
17    South Sixth Street, Minneapolis, Minnesota, 55487, appeared
18    for and on behalf Maureen Glover

19
20         ALEX HALVERSON, LAW CLERK

21
22    **The Original is in the possession of Attorney
23      Tracey Fussy**
24
25
```

---

**Page 3**

```
1     INDEX:
2                                    Page
3     MAUREEN GLOVER:
4     Examination by Ms. Fundingsland......................5
5     Examination by Mr. Fussy.........................53
6     Examination by Ms. Fundingsland.................70
7     Examination by Mr. Bennett......................115
8
9     OBJECTIONS: By Mr. Bennett...................24
10         By Mr. Bennett.........................25
11    EXHIBITS:
12
13    Exhibit L  Case Summary Notes (Pages 1-63)...........27
14    Exhibit M  Release of Information Consent Form.......82
15    Exhibit N  Document assigning case with redaction....84
16    Exhibit O  Park Nicollet Clinic Progress Note, Service
17               Date December 28, 2007.................89
18    Exhibit P  Referral by Maureen Glover for waivered
19               services...........................91
20    Exhibit Q  Letter from Maureen Glover to
21               Dr. Zimmerman.....................91
22    Exhibit R  Individual Community Service Plan pages 1-4
23               (June 21, 2007).....................93
24    Exhibit S  Individual Community Service Plan page
25               3 of 4 (December 10, 2007)..............94
      Exhibit T  Park Nicollet Clinic Progress Note, Service
                 Date February 1, 2008.....................95
      Exhibit U  Fax cover sheet from Jenny Lindholm at Oak
                 Grove and Crisis/Relapse Prevention Plan...97
```

---

**Page 4**

```
1     Exhibit V  Exhibit V was added to Exhibit U after being
2                marked......................................99
3     Exhibit W  Copy of e-mail from Jenny Lindholm to
4                Maureen Glover...................102
5     Exhibit X  Client Assessment completed by Suzanne
6                Burke..................................104
7     Exhibit Y  Closing Summary........................104
8     Exhibit Z  Hennepin County Functional Summary.......106
9     Exhibit AA  Letter from Maureen Glover to Judge Marilyn
10                Kaman...................... ....107
11    Exhibit BB  Minnesota Long Term Care Consultation Services
12                Assessment Form.....................110
13    Exhibit CC  Front Door Adult Screening and Needs
14                Assessment..................... .....112
15
16
17
18
19
20
21
22
23
24
25
```

**MAUREEN GLOVER**

5

1   MAUREEN GLOVER,
2   A Witness in the above-entitled action,
3   After having been duly sworn
4   Testified as follows:
5   EXAMINATION BY MS. FUNDINGSLAND
6   BY MS. FUNDINGSLAND:
7   Q.   Could you state your full name, please, and
8   spell the last name?
9   A.   It's Maureen Glover, G-L-O-V-E-R.
10   Q.   Good morning, Ms. Glover.
11   A.   Hi.
12   Q.   I'm Lynn Fundingsland, and I'm representing
13   the City and Officers Gorman and Callahan in this lawsuit.
14   And Mr. Katzman, I see, is here with you today.  And has
15   he talked to you at all about the rules of depositions?
16   Or have you had your deposition taken before?
17   A.   I don't think I have had a deposition.  But
18   we did talk about this procedure today, and I reviewed my
19   notes.
20   Q.   Okay.  Great.  So we'll try not to talk over
21   each other.  And if you need a break, just let us know.
22   And I'll try not to make my questions too confusing.  And
23   when I'm done, I'm sure Mr. Bennett or Ms. Bennett may
24   have some questions for you.  But, for now, I'm just going
25   to ask you some stuff hopefully relevant to this case.

6

1   MS. FUNDINGSLAND:  And I am going to
2   apologize to everybody in the room before we get going for
3   the exhibits that I've got, because some of them are --
4   the way we got the exhibits from Hennepin County, some of
5   them aren't even -- the pages aren't even together.  So I
6   tried to get the pages in order and pull out the stuff
7   that I wasn't going to use.  But we might hit a few bumps
8   in this road as we go along, but we'll --
9   MR. BENNETT:  Just so I --
10   MS. FUNDINGSLAND:  Yep.
11   MR. BENNETT:  They're not the -- the
12   records as we got them in, kind of, Bates-stamped,
13   numerical order?  They are kind of catch as catch can?
14   MS. FUNDINGSLAND:  Yep.
15   MR. BENNETT:  Do you have copies for us
16   so that we can try to follow the same --
17   MS. FUNDINGSLAND:  Oh, I do.  I'll get
18   there.  Yeah, I got a stack for you.
19   MR. BENNETT:  As long as you do that, I
20   might be --
21   MS. FUNDINGSLAND:  Yeah, it's very --
22   off the record.
23   (At this time a brief discussion was
24   held off the record.)
25   MS. FUNDINGSLAND:  Again, back on the

7

1   record.
2   BY MS. FUNDINGSLAND:
3   Q.   Tell us a little bit about yourself, would
4   you, please?
5   A.   Well, I'm a case manager in Hennepin County
6   Behavioral Health Case Management.  I've worked there
7   since 1996.  I've had other jobs at the County before
8   that.  I've worked for the County for 38 years, and this
9   last 16 years in mental health.  We work with people that
10   have psychiatric disorders and chemical dependency.  We
11   work in a multiple disciplinary team; so I'm the case
12   manager of record for the clients that are assigned to me,
13   and then I have consulting staff.  Do you want to know
14   more about that?
15   Q.   Yeah, I would like to.
16   A.   On our team, we have a psychiatric nurse and
17   we have a vocational counselor; we have a chemical health
18   counselor and a case management assistant.  Our supervisor
19   is a psychologist, and we all work together.  I would be
20   the lead worker on a case, and other staff are pulled in
21   as appropriate.  And sometimes, then, they might take the
22   lead with one part of a case plan.
23   Q.   Does that team stay the same all the time or
24   -- in other words, like, could you consult with a
25   different psychologist on a particular case?

8

1   A.   We consult with providers in the community a
2   lot.
3   Q.   Okay.  Does your psychiatric nurse stay the
4   same?
5   A.   I think during the time that we had this case
6   it did.
7   Q.   Maybe it would be probably helpful to me,
8   anyway, because in going through records, I run into names
9   and I don't know exactly who these people are.
10   A.   Sure.
11   Q.   So tell me first, if you would, during --
12   what was the span of years that you worked with David
13   Smith?
14   A.   I got his case in January of '07.  And I
15   tried to make contact with him but did not really meet
16   with him for the first time until June of '07.
17   Q.   Okay.
18   A.   And normally we would just close out; but
19   because the way the referral came in, that he was aging
20   out of a homeless youth program and needed housing and
21   psychiatric supports and everything, my supervisor said
22   just keep it open until we can reach him, because he had
23   not moved out of St. Barnabas, where he was living.  So we
24   probably met in June.
25   Q.   So when was the last contact you had with

**9**

1  him?

2      A.  I just have a little timeline here that I

3  made from the case notes.

4      Q.  Okay.

5      A.  I don't know the exact last contact, but we

6  closed our case in -- let's see here -- in July of 2009.

7  So we had contact with him in June and July of 2009.

8      Q.  Okay.  Can I back you up just a little bit?

9      A.  Um-hmm.

10     Q.  During that time period, January of -- well,

11  January or June of '07 to July of '09, who was the team?

12  Who were the people who were on your team?

13     A.  Our psychiatric nurse was Patrick Ellis,

14  E-L-L-I-S, and he had quite a bit of involvement with

15  David.  Our chemical health counselor was Cindy Fleming,

16  and Sheila Lipsco was our case management assistant.

17     Q.  I'm sorry?

18     A.  Sheila Lipsco, L-I-P-S-C-O.  And she's

19  somebody that David worked closely with.

20          MR. BENNETT:  The title on that was?

21          THE WITNESS:  Case management assistant

22  to the team.  And then Tom Davis was our vocational

23  specialist who worked with David.

24  BY MS. FUNDINGSLAND:

25     Q.  Anybody else?

**10**

1      A.  Just the team supervisor.

2      Q.  And that is?

3      A.  Dick Dahlquist, a licensed psychologist.

4      Q.  And you mentioned that he was -- that David

5  Smith was aging out of a home?

6      A.  Um-hmm.

7      Q.  Where was that?

8      A.  It was St. Barnabas, right downtown, near

9  HCMC.

10     Q.  Okay.

11     A.  I think he was 25 then, and he had to find

12  other housing.

13     Q.  What is St. Barnabas?

14     A.  It is -- that was the only contact I ever had

15  with that program was with David.  So as I understand it,

16  it's a housing program for homeless youth.  And he lived

17  there -- I'm not sure how long he lived there, but for a

18  while.  And they have case managers and support staff

19  there.  So we met him as he was getting out of that

20  program.

21     Q.  All right.  And how was he referred to you?

22     A.  I got his case from Charleen Svingen, from

23  our front door.  And I know she got the referral from

24  Cedar Ridge Treatment Center.

25     Q.  Okay.  So would he have been seen there being

**11**

1  that the referral came from there?

2      A.  From Cedar Ridge?

3      Q.  Yes.

4      A.  Yes.

5      Q.  And is the cutoff date 25?

6      A.  I think so.

7      Q.  Now, you said that you closed his case in

8  July of 2009?

9      A.  Right.

10     Q.  Why was it closed?

11     A.  We had gone through two and a half years of

12  working with David in various settings.  He was in very,

13  very good quality settings.  He had a lot of really good

14  quality support.  And he had periods where he did okay,

15  but he had increasing periods of not following

16  recommendations, having difficulty in the programs,

17  especially in the housing programs.

18          And between his psychiatric symptoms and

19  medication compliance issues and becoming less able or

20  willing to follow our recommendations, we closed,

21  partially, because he wasn't benefitting from case

22  management.  But he had also signed up for Cornerstone

23  Solutions, which is -- it was a partnership between

24  Hennepin County and Metropolitan Health Plan for case

25  management.  So he was open with them.

**12**

1          And we closed our part of the case with an

2  understanding that if they needed behavioral health case

3  management, they could refer him back.

4      Q.  Okay.  Let me back you up a little bit here.

5  You said that he had lived in some good quality places?

6      A.  Um-hmm.

7      Q.  Okay.  Why don't you tell us about those, if

8  you would?

9      A.  Sure.  The first place that we moved him was

10  to the Mosaic -- it was Oak Grove Mosaic, a partner

11  program, and it's related to the Oak Grove Assisted

12  Living, where he also lived, all under the same director.

13          And the Mosaic apartment program is one that gives

14  our clients a housing subsidy so that whatever their

15  income is, they only pay 30 percent of the income for

16  rent.  So even when they are on GA -- I think he was on GA

17  when we first got him -- they only pay like $60 for rent.

18  So they can make it in the community.  And then that

19  program includes a mental health support worker that meets

20  with them as needed, usually on a weekly basis.

21          So he moved into that program in August of '07.

22  And it was close to the Oak Grove Assisted Living, so the

23  staff were in and out quite a bit.  And he had difficulty

24  there and ended up losing that apartment.

25     Q.  Okay.  Let me stop you there.  When you say

**13**

1   "he had difficulty there," can you be a little bit more
2   explicit?
3        A.  He had noise complaints in the building.  And
4   the rules were pretty strict as far as if there was a
5   third complaint, a person's housing would end; and he was
6   well aware of that.  And he had kind of poor judgment
7   sometimes about who he would invite into his apartment.
8   He -- the way he described it is that he felt really good
9   about all the help that he had gotten, and he felt bad
10  about people that he knew that didn't have housing, didn't
11  have food, and he'd let people move in.  And they would
12  spend time in the apartment, and there would be fights,
13  there would be loud music, and other residents were
14  complaining.  So there was a series of complaints pretty
15  close together, and we tried to -- we tried to address
16  that with him.  We met with David and all his support
17  staff and the landlord, who was actually really
18  supportive, too.
19       Q.  What was his or her name?
20       A.  I know his first name was Danny; that's all I
21  know.
22       Q.  Okay.
23       A.  And that was at 1822 LaSalle.  And he --
24  David actually advocated for himself pretty well during
25  that meeting, and we had a plan.  He was willing to work

**14**

1   with everyone to make this apartment work.  And the
2   landlord, you know, gave him another chance.  But it was
3   just shortly after that there were further noise
4   complaints, and his lease was ended.
5        Q.  So he was basically evicted from there?
6        A.  He didn't have a legal eviction, but he
7   signed something that he was willing to leave to avoid
8   having an eviction.  And then we moved him to -- another
9   part of Oak Grove was their Rule 36 at the time.
10       Q.  Okay.  Let me just stop you.  Were there any
11  -- as far as you remember, were there any complaints at
12  Oak Grove Mosaic, was it, where he was before?
13       A.  (Witness indicating.)
14       Q.  Were there any complaints about him fighting
15  there?
16       A.  Um-hmm.
17       Q.  When you talked to him, what did he say about
18  that?
19       A.  Well, on one occasion, I was there to -- I
20  was trying to pick him up for a medical appointment, and
21  he wasn't answering.  And I called Oak Grove staff to meet
22  me over there.  And he wasn't answering for quite a while,
23  and we finally let ourselves in as far as opening the door
24  and calling to him.  And the apartment was in real
25  disarray, and he was a very clean, neat, tidy person.  And

**15**

1   there was furniture overturned, CDs all over the floor.
2   And he came out of the bedroom and sat and talked to us,
3   and he said he had been in a fight the night before.  And
4   he was rubbing his ankle and saying that he had injuries
5   from this fight, and he had let people come in, and he
6   couldn't make them leave.
7        Q.  Okay.  So then you moved him into Oak Grove
8   Rule 36?
9        A.  Rule 36.  Yeah.
10       Q.  Why is it called that?
11       A.  Well, that was probably a funding stream.  It
12  was a --
13       Q.  Oh, I see.
14       A.  It was a program that -- they used to be
15  year-long programs where people could live in these
16  treatment facilities, residential mental health treatment
17  facilities.  And now they are shortened up to three
18  months.  But at that time, Sara Williams was transitioning
19  her Rule 36 to what she now has, the assisted living.  So
20  it was kind of in progress.  So we moved him into the Rule
21  36, because he needed that level of support at the time.
22  And then we were already talking about maybe the assisted
23  living program, where he'd have more supervision and his
24  own apartment.
25       Q.  You know, I probably should have asked you

**16**

1   this in the beginning, because I really don't know -- I
2   mean, I see it mentioned on TV all the time, but I really
3   have never really known, what is your role as a case
4   worker?
5        A.  Well, my role is to initially assess with the
6   client what their needs are, what their strengths are,
7   what their goals are, and then make a service plan with
8   them to address those.  And it's usually pretty complex.
9        With David, he was extremely focused on his
10  vocational goals.  He wanted to get a college degree; he
11  wanted to have a good paying job.  So he started out being
12  referred to our vocational person right away, because he
13  had already enrolled in college.  And he needed disability
14  services through the college, so Tom would then help him
15  access the services of the disability office so that he
16  could have accommodations that he needed.
17       He had a lot of difficulty with school, a lot of
18  cognitive deficits and learning disabilities.  So even
19  though it wasn't really recommended by assessments that he
20  go to college, he just kept signing up.  And we tried to
21  work with it, and it was a way for us -- our vocational
22  counselor felt like he was so motivated in that direction
23  that we could do better with his mental health if we kind
24  of stayed on board with his goal.
25       So then, you know, any other needs, like, I

MAUREEN GLOVER                                    **CONDENSED**

17

1   referred him to our nurse for assessment of his symptoms
2   and medications and to kind of interact with the doctor.
3   And our roles are a little bit interchangeable there. I
4   interacted with his doctor and his therapist.
5            MS. FUSSY: I'm sorry, could you slow
6   down just a hair?
7            THE WITNESS: Yeah.
8            MR. BENNETT: Usually the court reporter
9   says that.
10           MS. FUSSY: I need more coffee.
11           THE WITNESS: So -- and all of our roles
12  can be a little bit interchangeable. You know, we help
13  each other out.
14  BY MS. FUNDINGSLAND:
15       Q. Sure. It's a team?
16       A. Pardon me?
17       Q. It's a team?
18       A. Right. And Cindy, her basic role -- you
19  know, I referred him to her because she has to do the Rule
20  25 Assessment, which gets funding for chemical health
21  treatment. And then Sheila, our case aide, she just kind
22  of does a little bit of everything; she can do a lot of
23  the economic assistance stuff, a lot of transportation.
24  She's very skilled, and she's somebody that he really
25  related very well to.

18

1        Q. Okay. You mentioned -- and I can certainly
2   understand this -- that he was highly motivated to go to
3   school and get a degree?
4        A. Um-hmm.
5        Q. And even though somebody wasn't thinking that
6   was the best thing for him, it's easier to work with
7   somebody than against them, right?
8        A. Yeah.
9        Q. So you folks were supportive of that goal,
10  right?
11       A. Right. Well, we tried to -- you know, we
12  tried to look at some other options too.
13       Q. Like what?
14       A. He took a banking class through
15  Goodwill/Easter Seals, and I don't know very much about
16  that. He kind of did a lot of things on his own, without
17  us referring him.
18       Q. Um-hmm.
19       A. He was always finding resources in the
20  community even though, you know, he had a whole team of
21  people. He also tried to sign up for a real estate course
22  that he wanted to take, and I think his rep payee blocked
23  that effort. He didn't think that was a good way --
24       Q. His what?
25       A. His representative payee.

19

1        Q. What does that mean?
2        A. Because of his chemical dependency, Social
3   Security decided that his benefits should be sent to a
4   payee to manage his funds each month. So he had an agency
5   that was working with him.
6        Q. Do you know who that was?
7        A. It was Alliance of the Streets, Tom Logeland.
8        Q. Okay. Now, you mentioned earlier that part
9   of the difficulty for Mr. Smith in pursuing a degree or,
10  you know, going through courses and pursuing a degree was
11  that he had some cognitive and learning disabilities?
12       A. Um-hmm.
13       Q. What were they?
14       A. Is it all right if I look at my notes?
15       Q. Absolutely.
16       A. Okay.
17       Q. I don't expect you to remember this off the
18  top of your head.
19       A. Yeah. He had a lot of labels. His major
20  psychiatric diagnosis was schizoaffective disorder, which
21  is a thought and mood disorder.
22       Q. Schizoaffective disorder?
23       A. S-C-H-I-Z-O-A-F-F-E-C-T-I-V-E. I wonder if
24  I'll be able to find this. He also had alcohol
25  dependence. He had some auditory processing disorder.

20

1        Q. What does that mean?
2        A. That -- it was a learning disability. Some
3   kind of brain functions that didn't work properly for him
4   so that he had a real hard time taking information in and
5   really grasping it. He often had to hear things multiple
6   times, and he had to do things like write things out and,
7   you know, kind of learn in every possible modality so that
8   -- if he's just hearing something, it's just not going to
9   stick. And he had a lot of trouble with comprehension; he
10  had a low IQ. I don't know what the score was, but he had
11  low intellectual functioning. He had numerous traumatic
12  brain injuries, not documented, as far as we know. I
13  mean, he reported them to us, and he did receive TBI
14  funding for the placements that he had.
15       Q. What were these head injuries?
16           MR. BENNETT: Objection; foundation.
17  BY MS. FUNDINGSLAND:
18       Q. If you know.
19       A. I only know what David said. He had a period
20  of unconsciousness. He didn't really -- he did not tell
21  us much about his past. We really had very little
22  history. He talked about a time that he fell out of a
23  window when he was small; I don't know what age. He
24  talked about a time when a TV was dropped on him and he
25  got a head injury. But that's all he would say.

21

1       Q.  And did he -- you said he stated that he fell
2  out of a window when he was small?  Did he say to you when
3  the incident happened with the TV?
4       A.  No.
5       Q.  Okay.  Was there anything else?
6       A.  Not that I can -- well, I mean, he had some
7  fights in the community that possibly contributed.  He had
8  one fight where his nose was broken, so.
9       Q.  Okay.  I got you off track.  So you were
10 looking at your notes to --
11      A.  I was hoping to find them here.
12          MR. BENNETT:  I think you were looking
13 for learning disabilities.  I think that's where the
14 actual question started.
15          MS. FUNDINGSLAND:  Yep.
16          MR. BENNETT:  And I'd like to -- are
17 these -- again, I'd like to figure out if they are
18 self-reported or if there is actual testing.
19          THE WITNESS:  Those are all
20 self-reported.
21          MR. BENNETT:  So there is no testing
22 that confirmed ADHD or --
23      A.  Well, let me just look at this note from the
24 doctor.  And these are, like, not in order.  They are --
25 different parts of our agencies are all interspersed in

22

1  here.
2          MR. BENNETT:  For the uninitiated, they
3  are even worse to read.
4          THE WITNESS:  The what?
5          MR. BENNETT:  For the uninitiated, it's
6  even harder to read.
7          THE WITNESS:  Oh, I know.  I mean, I
8  kind of remember most of this, but --
9          MR. BENNETT:  Part of them remind me of
10 the continuous loop of the -- it was Charleen's,
11 particularly.  I'd find it in like 11 places.  I thought I
12 was watching CNN and CNN Headline News.
13          MS. FUSSY:  At least you weren't
14 watching Fox News.
15          MR. BENNETT:  No.  Never.
16          THE WITNESS:  All right.  Here.  Well,
17 this is on November 26th of '07; I talked to Dale
18 Peterson, who was a therapist that David mentioned a lot.
19          MR. BENNETT:  Can you tell us the date,
20 please?
21          THE WITNESS:  Dale Peterson, and it was
22 11/26/07.
23          MR. BENNETT:  Okay.
24          THE WITNESS:  And that was the first
25 time I finally reached him directly; he was hard to reach.

23

1  BY MS. FUNDINGSLAND:
2       Q.  Are you talking about Dale Peterson?
3       A.  Um-hmm.  I asked him -- because David wanted
4  to still work with him as a therapist, I asked if he was
5  available.  He said he was not; that he was retiring and
6  closing his clinic that week.  He stated that he had
7  referred David multiple times to the Connections Group at
8  the Hennepin County Mental Health Center, which meets
9  weekly.  He stated that a physician --
10      Q.  Can I stop you there?
11      A.  Um-hmm.
12      Q.  What's the Connections Group?
13      A.  It's a group to assist people with
14 maintaining sobriety.
15      Q.  Okay.
16      A.  He stated that David has always been and
17 continues to be very confused, paranoid, has delusions and
18 cognitive deficits related to schizoaffective disorder,
19 but that he can often present as if he has it all
20 together, and he really did.  He was a pretty sharp
21 person, and we see lots of clients like that.
22          Let's see, he said he first met David at the 4th
23 floor Beacon program at Harbor Lights, which is a CD
24 treatment program.
25      Q.  Chemical dependency?

24

1       A.  Um-hmm.
2          MR. BENNETT:  What's the date on this
3  note?  What page is it on?
4          MS. FUNDINGSLAND:  Well, on my printout,
5  it's on page 35 of 63.
6          MR. KATZMAN:  What's the date?
7          THE WITNESS:  It's 11/26/07.  I think
8  this is a really important note, because it really
9  describes --
10          MR. BENNETT:  Does it answer the
11 question, though, what learning disabilities he has,
12 without reading -- you know, I mean, that was the
13 question.
14          THE WITNESS:  Yeah.  I think I had that
15 in Dr. Zimmerman's note, which I'm having trouble finding
16 here.
17          MS. FUNDINGSLAND:  Take your time.
18          MR. BENNETT:  I do just want to
19 interpose a general objection, though.  I mean, if we're
20 just going to read from what other people say, there
21 really isn't foundation for the answer.  And I think we're
22 -- you know, I'd like to, so I can at least make proper
23 objections, know that you're answering the question about
24 -- I think we're on learning disabilities, right, still?)
25          THE WITNESS:  Right.  Okay.  I found the

**MAUREEN GLOVER**

25

1   note from the psychiatrist, Dr. Zimmerman, which is

2   9/7/07. In this, he actually listed the diagnoses for me

3   and explained to me how that affects David. And we

4   probably have a -- we probably had a written diagnostic

5   assessment from him in the file, which I don't have access

6   to.

7        Okay. He said that "David is unemployable, has

8   diagnosis of alcohol and Cannabis dependence, both

9   sustained, in full remission at this time.

10  Schizoaffective disorder, depressive type, mixed social

11  phobia, history of head trauma, performance indicative of

12  cerebral dysfunction, semantic aphasia related to parietal

13  lobe lesions of the brain, severe deficits in

14  comprehension, attention and memory, difficulty following

15  directions, and becomes confused and has attentional

16  deficits." Let's see, "Dr. Zimmerman was aware of the

17  head trauma."

18        MR. BENNETT: Of the report of head

19  trauma.

20        THE WITNESS: Right. And then he just

21  made some recommendations for education and employment.

22        MR. BENNETT: I'll object to the answer

23  as hearsay.

24        MS. FUNDINGSLAND: I thought you were

25  supposed to object to the question?

26

1        MR. BENNETT: Well, the question wasn't

2   answered, and -- I don't think. And if it was, it was

3   hearsay.

4   BY MS. FUNDINGSLAND:

5        Q. I take it that, in your profession, you must

6   rely on other people's diagnosis of folks that you're

7   working with, right?

8        A. Yes. Our services depend on a diagnostic

9   assessment.

10       Q. All right. And so you got a diagnostic

11  assessment from both Dr. Peterson and Dr. Zimmerman

12  regarding David Smith?

13       A. Yes.

14       Q. And that's what you were referring to?

15       A. Yes.

16       MR. BENNETT: Is Peterson a doctor?

17       THE WITNESS: Yes.

18  BY MS. FUNDINGSLAND:

19       Q. You don't make --

20       MS. FUNDINGSLAND: Excuse me. Bob.

21       MR. BENNETT: I just want to know.

22       THE WITNESS: He's a clinical

23  psychologist.

24       MS. FUNDINGSLAND: Doctor --

25       MR. BENNETT: That's not a doctor.

27

1        MS. FUNDINGSLAND: Off the record. Off

2   the record.

3        (At this time a brief discussion was

4   held off the record.)

5        (At this time Glover Deposition Exhibit

6   L marked for identification by the court reporter.)

7   BY MS. FUNDINGSLAND:

8        Q. Ms. Glover, Exhibit -- explain to us what

9   Exhibit L is?

10       A. These are the "Case Notes Summary" for all of

11  our time working with David in case management.

12       Q. Okay.

13       MR. BENNETT: It does begin with

14  "Episode: 5," though, right?

15       MS. FUNDINGSLAND: Bob, can I just

16  continue? You'll have your chance, okay?

17       MR. BENNETT: I'm just trying to explain

18  the anomaly. Because the other one we marked with

19  Charleen has "Episode: 4," and it's the same top.

20       MS. FUNDINGSLAND: Let me ask.

21       MR. BENNETT: Okay. You weren't there.

22       MS. FUNDINGSLAND: Well, it doesn't

23  matter. I'm trying -- Bob, can I just do this? And you

24  can jump in when you need to, okay?

25       MR. BENNETT: That's what I was doing.

28

1        MS. FUNDINGSLAND: When you need to, not

2   when you feel like it.

3   BY MS. FUNDINGSLAND:

4        Q. This shows for the period January 19, 2007,

5   to October 24, 2012. First off, where does that come

6   from?

7        A. It just comes from -- I put to today's date

8   so I get everything from the time it was opened until now.

9        Q. All right. Now, to make Mr. Bennett happy,

10  Exhibit L, on the first page, starts out with saying

11  "Episode: 5," parentheses "(Discharged)," close

12  parentheses; please explain what that means?

13       A. The Episode: 5 (Discharged) -- this first

14  page on here, is -- it's page 1 -- my discharge summary

15  that I wrote when I closed his case. And I think that

16  case management was Episode: 5; and front door services,

17  where Charleen worked, was Episode: 4. And then there is

18  other episodes we have, depending on other parts of the

19  agency that get involved in.

20       Q. What does that mean?

21       A. It just means how it's divided up on the

22  computerized case notes.

23       Q. Well, do I understand, then, that every

24  person on your team would have a document like Exhibit L

25  that said episode something different?

MAUREEN GLOVER                                    CONDENSED

29

1      A.  No.  My whole team would be in Episode: 5.
2  And then I noticed that the CADI workers, the waivered
3  service people that do the funding, theirs are included in
4  here, too; and they are a different part of our agency.
5      Q.  Their what are?
6      A.  Their notes.  They run parallel to ours, but
7  they are all on pages together.
8      Q.  All right.  Is it fair, then, for me to
9  assume that Exhibit L contains your entire case note
10  summary?
11      A.  Yes.
12      Q.  Okay.  All right.  Let's go back to where we
13  were a long time ago, which was when you moved Mr. Smith
14  into Oak Grove Rule 36.  I think we -- that's kind of
15  where we got off course.
16      A.  Right.  November 27th of '07.
17      Q.  November 27th of '07?
18      A.  Um-hmm.
19      Q.  And, again, what kind of a place is that?
20      A.  That was a residential mental health
21  treatment facility; it was called a Rule 36.
22      Q.  Okay.  And, again, you thought that had
23  something to do with the funding stream?
24      A.  I think the name of it does.
25      Q.  The name, yes.  Okay.  And you mentioned that

30

1  Mr. Smith had wanted to take some real estate classes but
2  that Alliance of the Streets refused to pay for those?
3      A.  Right.
4      Q.  Do you know why?
5      A.  What I read in the note, it said that Tom,
6  the payee, told him that it was an expensive school and
7  that it was 2008 when the housing was not, in his opinion,
8  something good to get into.  So that was his --
9      Q.  In Tom Logeland's opinion?
10      A.  In his opinion; that's what he said.  Sorry,
11  I should have said that.
12      Q.  All right.  So when Mr. Smith went to Oak
13  Grove Rule 36, what happened then?
14      A.  Well, he started having -- he started having
15  periods where they noticed that he was intoxicated, and so
16  we had another assessment done by Cindy Fleming, for
17  treatment; and that was in January of '08.  And she
18  assessed him for outpatient treatment, which he went to
19  for a while.
20      Q.  Did he complete the outpatient treatment?
21      A.  No.
22      Q.  Do you know where that was?
23      A.  It was called Create.
24      Q.  Do you know how long he lasted in the
25  outpatient treatment?

31

1      A.  Let's see.  Not very long, because he ended
2  up going to inpatient treatment January 29th.  So he
3  wasn't in Create very long.
4      Q.  January 29th of '08?
5      A.  Um-hmm.
6      Q.  And how, if you know, did he end up in
7  inpatient?
8      A.  The outpatient program was not meeting his
9  needs.  He had problems with attendance and paying
10  attention; he was constantly distracted by his cell phone
11  and his headset and wasn't participating.
12      Q.  So did -- I guess what I'm asking is, did he
13  check himself into inpatient?
14      A.  We had another meeting and another
15  assessment.
16      Q.  When was that?
17      A.  It was some time just before 1/27/08.
18      Q.  Okay.  And who was present at that
19  assessment, if you recall?
20      A.  Mike Evans, who is the psychiatric nurse at
21  Oak Grove, and Cindy Fleming and I, David.  I think that
22  might be all.
23      Q.  Okay.  And what happened at that meeting?
24      A.  We talked to David about what wasn't working
25  at Create and how Vinland might be able to meet his needs.

32

1  And we talked to him about this being a really important
2  thing for him to do, even though he wanted to stay
3  outpatient and go to school.  We talked about really
4  building a foundation of stability and sobriety.  It has
5  to come first.  And so we told him we knew that, you know,
6  we were asking him to do something difficult, and he said
7  he was up for it.
8      Q.  What is Vinland?
9      A.  It is -- it's an inpatient CD program, they
10  also address mental health needs, out in Loretto.
11      Q.  And so how did he get out there?
12      A.  I think our nurse drove him out there.
13      Q.  Okay.  Do you know when he was admitted?
14      A.  1/27/08 or 1/29/08.  I can't read my writing.
15      Q.  Yeah, and I think you said 1/29, and then you
16  said 1/27, so I thought I would check.  It's in through
17  there, right?
18      A.  Yep.  Do you want me to find --
19      Q.  No.  Sorry.  How long did he stay there?
20      A.  He was there -- it was supposed to be for
21  21 days, and then there was an extension on it.  He was
22  there until March 3rd of '08.
23      Q.  So did he complete that program?
24      A.  Yes.
25      Q.  And then what happened?

**MAUREEN GLOVER**

33

1    A.   Then he was placed at Micah House, M-I-C-A-H;
2  it's a halfway house.
3    Q.   Okay.  The chemical dependency halfway house?
4    A.   Right.
5    Q.   Do you know where it's located?
6    A.   Oh, it's, like, on 29th and 4th Avenue, I
7  think.
8    Q.   Okay.  Is it --
9    A.   Or 31st and 4th Avenue.
10    Q.   Yeah.  Is it a large building?
11    A.   No.  It's like a big, old three-story house.
12    Q.   Okay.  And is it -- well, how much
13  supervision is there?
14    A.   Well, they had a pretty structured schedule
15  for the guys.  They had groups during the day that were
16  required.  We did request that they do -- that they
17  monitor his sobriety with urine analysis; so they did some
18  of that.  And we met with their staff once or twice while
19  David was there, just to assess his progress.
20    Q.   Now, earlier, when you were first talking
21  about where Mr. Smith had resided, you said that he had
22  been with -- has been in a number of good quality places?
23    A.   Um-hmm.
24    Q.   Are all these places that you've mentioned,
25  in your opinion, good quality places?

34

1    A.   Yes.  I think all of the Oak Grove programs
2  are superb; they are very, very good.  We were already
3  planning for him to go into the Assisted Living at Oak
4  Grove in May, but they required that we place David at
5  either another Rule 36, which are now called IRTS,
6  I-R-T-S.  One of them is Bill Kelly House, which is more
7  of a specialty for dual diagnosis, or a halfway house, so
8  that we could monitor whether he was able to stay stable
9  and sober in the community, to a pretty good extent,
10  before they would admit him to the assisted living.
11    Q.   At Oak Grove?
12    A.   Right.
13    Q.   Okay.  So he's at Micah House.  And he must
14  have gotten there in --
15    A.   March 3rd.
16    Q.   March 3rd.  Okay.  And how long did he stay
17  there?
18    A.   He stayed there until May 27th of '08.
19    Q.   How did he do while he was at Micah House?
20    A.   He was somewhat participatory at first, and
21  then kind of started falling off in attendance at groups,
22  was really focused on -- well, he told us he was really
23  focused on school, although school was not really in
24  session at the time he told us that.  But he was always
25  gearing up and checking out programs and getting himself

35

1  registered in the services he needed.  So that's where his
2  focus always was.
3    Q.   And when you talk about school, what school
4  was he going to?
5    A.   MCTC.
6    Q.   Okay.  Do you know what his focus was?
7    A.   He was working a little bit in sound arts and
8  then he was taking some political science classes.
9    Q.   Did he finish any of these classes?
10    A.   He did finish some; I'm not sure which.
11  There was one semester where he passed both classes, and I
12  think he got good grades, like B's.
13    Q.   And when was that?
14    A.   I'm not really sure.  Let's see.  That would
15  have been -- that would have been at the time he was at
16  Oak Grove Assisted Living, so some time the summer or fall
17  -- probably the fall of '08; summer or fall.
18    Q.   Okay.  So May 27th he left, correct?
19    A.   May 27th -- no, wait.  May 27th he moved into
20  the Oak Grove Assisted Living.
21    Q.   Okay.
22    A.   And he was there until October 9th of '08.
23    Q.   Was that the Oak Grove Assisted Living -- is
24  that different than the Oak Grove Mosaic?
25    A.   Yes.

36

1    Q.   What's the difference?
2    A.   Oak Grove Assisted Living is an apartment
3  building.  And the Oak Grove staff have all their offices
4  in the basement of the building, and they are there 24/7.
5  The residents all have their own apartment, but they have
6  a lot of supportive services; and they're all funded by
7  waivered services.
8    Q.   Okay.  Is it more supervised than Mosaic?
9    A.   Much.
10    Q.   Okay.  And how did Mr. Smith do while he was
11  at Oak Grove Assisted Living?
12    A.   He did, off and on.  He did well.  At first,
13  he did well.  He was always excited when he got into a new
14  placement, and that was a very, very nice placement.  He
15  got a beautiful furnished apartment, he had good staff, he
16  had a lot of support.  They provide the meals there; they
17  administer medications.
18    Q.   Okay.
19    A.   So he was, you know, med compliant.  And
20  then, eventually, in October of '08, his alcohol use
21  interfered, and there was -- on October 9th of '08, he was
22  intoxicated, and they couldn't wake him up.  And they
23  ended up having him transported to HCMC.  And then the
24  next day they transferred him to detox.
25    Q.   I'm guessing that drinking at Oak Grove

**MAUREEN GLOVER**

**37**

1   Assisted Living is a no-no?
2       A.   Yeah.  I don't know if they exactly have a
3   zero tolerance; I'm not sure.  But they -- you know, they
4   knew that David had chemical dependency, and that's the
5   expectation, that he not use.  I mean, they do work in a
6   harm reduction kind of way, that if people have a relapse,
7   that, you know, we reassess and see what kind of services
8   can be put in place.  So they would work with someone.
9   But he was using a lot of alcohol and denying it at the
10  same time, even though there was evidence of it.
11      Q.   What's a lot?
12          MR. BENNETT:  Objection; foundation.
13          MS. FUNDINGSLAND:  To my last question?
14          MR. BENNETT:  Yeah.
15  BY MS. FUNDINGSLAND:
16      Q.   Well, what does she mean by "a lot?"
17      A.   That he was impaired.  They couldn't get his
18  attention.  They couldn't -- he was unconscious.
19      Q.   Okay.  So do you know how long he was in
20  detox?
21      A.   I don't.  Let's see here.  Well, he went
22  there on October 10th.  And then my next placement for
23  him, again, on October 30th, was at Vinland again,
24  inpatient.  I'm not sure if he was there that whole time;
25  he might have been.

**38**

1       Q.   Why didn't he go back to Oak Grove Assisted
2   Living?
3       A.   They felt that he was putting himself and
4   others in danger.
5       Q.   So did they refuse to take him?
6       A.   Yes.
7       Q.   Who made that decision; do you know?
8       A.   Sara Williams, the director of the program,
9   and, I'm sure, in conjunction with her director of
10  nursing.
11      Q.   So you don't know that he was actually in
12  detox that whole 20 days, you just know that October 30th
13  he went to Vinland, correct?
14      A.   Yeah.  I can look through the notes, if you
15  want, so I can see if there's any entries.
16      Q.   Yeah, that would be helpful.
17      A.   I can see that I was in court on 10/20, but I
18  didn't say where I picked him up from, just that he was on
19  the waiting list for Vinland.  I think he must have been
20  -- oh, he was still at detox.  Brian stated, "David is
21  anxious to get out of detox."
22      Q.   Where are you?
23      A.   I am on page 15.
24      Q.   Of Exhibit L?
25      A.   Right.  October 20th.

**39**

1           MS. FUSSY:  And then, again, if you're
2   going to be reading -- I know it's easy to read fast, but
3   it can be difficult for the court reporter to type as
4   fast.
5           THE WITNESS:  Sure.
6   BY MS. FUNDINGSLAND:
7       Q.   Okay.  October 20, you say?
8       A.   Right.  There was some discussion about him
9   wanting to get out of detox then.  10/28 our nurse saw him
10  in detox.  So he was there until he went back out to
11  Vinland.
12      Q.   All right.  I'm looking at page 15 of Exhibit
13  L.  And the notes at the top, under October 20th,
14  indicated that -- is this you speaking in the course of
15  the interview, "I asked David -- "?
16      A.   Um-hmm.
17          MR. BENNETT:  Which one?  At the top
18  one?
19          MS. FUNDINGSLAND:  Yeah, at the very
20  top.  Well, about halfway down, that paragraph.
21  BY MS. FUNDINGSLAND:
22      Q.   "If he wasn't feeling pretty sad and angry
23  about losing his apartment."  And you state, "David became
24  somewhat agitated and talked at length about feeling
25  violated by OG staff."  What is OG?

**40**

1       A.   Oak Grove.
2       Q.   Oh, I see.  "And stated numerous times that
3   their reports were not accurate"?
4       A.   I asked him this during his psychiatric
5   appointment with Dr. Benson, because I knew that they had
6   documented, you know, that he was drinking and sent him to
7   the hospital.  And I knew that he was still denying it,
8   and he had pretty paranoid thinking about their staff.
9   And so I brought it up on the doctor's appointment, and
10  that's a good way for the doctor to see, kind of, how he
11  -- how he's doing, how he's reacting; and he increased
12  most of his medications at that visit.
13      Q.   It said he increased his Zyprexa, Prozac, and
14  Strattera?
15      A.   Right.
16      Q.   I'm not a doctor or a pharmacist, and I'm
17  just going to ask you if you know what those were
18  prescribed for?
19      A.   Zyprexa is an antipsychotic; Prozac is
20  antidepressant; and Strattera is for attention deficit.
21      Q.   Do you know who originally prescribed that
22  medication for him?
23      A.   Dr. Zimmerman.
24      Q.   Thank you.  Now, you stated earlier that Oak
25  Grove -- Sara Williams and her staff at Oak Grove refused

MAUREEN GLOVER

41

1  to take Mr. Smith back and that he was putting others in
2  danger?
3       A.  Um-hmm.
4       Q.  Do you know how they came to that conclusion?
5       A.  Okay.  On page 17, October 6th --
6       Q.  Of Exhibit L?
7       A.  Yes.  October 6th of '08, I received a
8  voicemail from Sara stating that David was found on the
9  evening -- well, this date is definitely wrong, because it
10 says '05, but it was the night before.  So they found him
11 passed out in his apartment.  It was difficult to wake
12 him.  He appeared to be intoxicated, smelled of alcohol,
13 but continues to deny this.  Let's see here.  I think it
14 was after this.  I tried to see -- I tried to see if Sara
15 would keep him on a behavioral contract.  I think I read
16 that.  Yeah, the one above that; discussed his recent
17 drinking and behavior that Sara sees as being a danger to
18 himself and others in the program, she discussed in these
19 recommendations that David be Rule 25 assessed.
20      Q.  And what does that mean?
21      A.  For more treatment.  I asked if we could --
22      Q.  I'm sorry.  More -- like inpatient treatment?
23      A.  Um-hmm.  More chemical dependency treatment.
24      Q.  I see.  Thank you.
25      A.  I asked if we could have David follow a month

42

1  of CD treatment by a 90-day placement in IRTS, which is
2  the old Rule 36.  If she would consider taking him back
3  with a behavioral contract.  She said she could not
4  consider this any longer.  He's putting not only himself
5  but other residents in the program at risk.  I think he
6  was -- let's see if I read it in here.  Oh, okay.  There
7  was raw chicken in the sink, the water was running, and
8  the sink had overflowed.  There was also a pot on the
9  stove that had boiled over.  So there was flooding; and
10 then she was worried about, you know, a possible fire.
11      Q.  But my specific question had to do with how
12 he was putting others in danger.
13      A.  That's what she thought was dangerous, was --
14 I mean, he was doing damage to the building, and he had a
15 pot boiling on the stove, and they weren't able to wake
16 him.
17      Q.  Okay.  All right.  So on October 30th, he
18 went to Vinland?
19      A.  Yes.
20      Q.  And that's the inpatient, right?
21      A.  Right.  Out in Loretto.
22      Q.  In Loretto?
23      A.  Um-hmm.
24      Q.  And how long was he there?
25      A.  He was there until we found a placement for

43

1  him January 8th of '09.
2       Q.  And where was that placement?
3       A.  It was with REM Bloomington; R-E-M.  It's an
4  adult foster care facility.
5       Q.  And where is that located?
6       A.  The address is 9643 Grand Avenue South,
7  Bloomington.
8       Q.  And it's -- again, it's a what type of
9  facility?
10      A.  Adult foster care.
11      Q.  What does that mean?
12      A.  These are homes that have usually four
13 adults.  They each have their own room, and then they
14 share common space.  And they have staff there 24/7; and
15 they administer their medications; and they provide their
16 meals; and they provide transportation to appointments.
17      Q.  Why was that place selected?
18      A.  Well, the recommendation, after him being at
19 Oak Grove -- between Oak Grove and our team and the team
20 at Vinland, everybody said he needed more structure, more
21 supervision.  And Tim Grathwol was the counselor out at
22 Vinland; and he recommended REM, and he helped to
23 facilitate that referral.
24      Q.  Okay.  I'm wondering if you can tell me the
25 difference between -- because earlier you said that at Oak

44

1  Grove Assisted Living the staff lived there --
2       A.  They're there.
3       Q.  They're there?
4       A.  On shifts.
5       Q.  But they're there?
6       A.  Um-hmm.
7       Q.  That was a poor choice of words on my part.
8  But their staff is there 24/7?
9       A.  Right.
10      Q.  And he -- they have this -- meals, his
11 apartment was nice, they administer medication?
12      A.  Um-hmm.  Um-hmm.
13      Q.  And REM sounds like it does the same thing.
14      A.  Sounds like they do.
15      Q.  Okay.  But is there more structure and
16 supervision at REM?  And if so, how?
17      A.  It's a level of care that is designed to
18 provide more structure and supervision.  The team there at
19 REM Bloomington was a very strong, good team that worked
20 to really supervise David and provide services to meet his
21 needs, I felt.  There's a big variety in adult foster care
22 homes.  I thought that was a particularly good one.
23 Theoretically, the assisted livings are not as intensive
24 supervision, but I'm -- with the Oak Grove company, they
25 just do a fabulous job no matter what their funding is.

**MAUREEN GLOVER**

45

1    Q.  Are there fewer people at REM Bloomington
2  than at --
3    A.  Yes.  Four residents.
4    Q.  Than at Oak Grove?
5    A.  Right.
6         (Court reporter asks them to speak one
7  at a time.)
8         MR. BENNETT:  I'd kind of blend them.
9  That'd be good.
10        MS. FUNDINGSLAND:  I'm sorry?  I missed
11  a good one, didn't I?  Let's try that again.
12  BY MS. FUNDINGSLAND:
13   Q.  Are there fewer people at REM Bloomington?
14   A.  Yes.
15   Q.  Than at Oak Grove Assisted Living?
16   A.  Yes.
17   Q.  All right.  And by how many?
18   A.  Well, there's four residents at the adult
19  foster care, REM, and there were 18 at Oak Grove Assisted
20  Living.
21   Q.  Okay.  And how did Mr. Smith do at REM?
22   A.  Initially, again, he did well.  He was really
23  excited to be there.  He talked them into letting him make
24  the downstairs, which was all finished, his space.  He was
25  very excited about it.  The staff were very supportive,

46

1  and he felt supported.  And said he felt respected and
2  supported.  And then kind of the same, as in most
3  placements, as time went on, there was some concern about
4  his use, and noncompliance, not following recommendations,
5  getting into trouble.
6    Q.  Use of alcohol?
7    A.  Yes.  Well, he was using cold medications
8  then.  They were finding wrappers from cold medications in
9  his trash all the time.
10   Q.  Alcohol, too, or no?
11   A.  I think there was alcohol use when he was
12  there as well.
13   Q.  And what about his prescribed medications?
14   A.  They administer meds, so I think that he was
15  pretty compliant with his medications.  But the concern
16  was always if he's using other things, it's hard to know
17  how things are working.
18   Q.  Sure.  So do you know when the folks at REM
19  started to have issues with Mr. Smith's use of cold
20  medicine or alcohol?
21   A.  Do I know when that happened?
22   Q.  Yeah.
23   A.  I know that we had several -- at least two --
24  team meetings to discuss it.  Let's see, on January 13th
25  we had his initial assessment there.  So things were going

47

1  well.
2    Q.  Can you point me to where you are?
3    A.  Page 9 of 63.
4    Q.  Again, this is Exhibit L?
5    A.  There was some discussion of him going to AA
6  meetings from there.
7    Q.  Are you on 09/1/13?
8    A.  Yes.
9    Q.  Thank you.
10   A.  Okay.  It was on page 8, under February 5th.
11  Patrick Ellis has a note in here that I had forwarded him
12  a message from the REM staff that the client had three
13  empty packets of Coricidin in his trash in his room, which
14  he denied he had used.  He said a friend left it there.
15        There's reference on that same page, on
16  February 19th, to psychological testing that was done that
17  our nurse is referring to, and he's got a lot of the
18  diagnostic information in there.  And then on page 7,
19  February 24th meeting with REM staff; we talked about
20  David's plan for unsupervised time at length.  That was
21  always a concern of his, that he be independent and have
22  unsupervised time in the community or the house.
23        MR. BENNETT:  What page is that?
24        THE WITNESS:  Page 7, February 24th.  At
25  that meeting -- after we had the meeting, one of the staff

48

1  pulled me aside to express his concern about David, you
2  know, having contacts in the community that he felt were
3  dangerous; and he was worried about him.  So I did tell
4  him that he needed to report all of this to their team, to
5  their staff.  February 26th one of their staff called me
6  to report having concerns about David having unsupervised
7  time and that they found more cold medication packets in
8  David's room and would be addressing that with him.
9  BY MS. FUNDINGSLAND:
10   Q.  Can I ask you a little bit more about that
11  February 24th entry?
12   A.  Um-hmm.
13   Q.  You were speaking with someone, staff at --
14   A.  REM.
15   Q.  -- REM, identified here as Alvin, saying that
16  he had grave concerns about David, that he's untruthful,
17  and has contacts -- or, I'm sorry, contact with members of
18  the Bloods and Crips gangs; did you know anything about
19  that?
20   A.  No, I didn't, except that he told me that.
21        MR. BENNETT:  Is Alvin a resident or
22  a --
23        THE WITNESS:  He was a staff person
24  there.
25        MR. BENNETT:  Okay.  Because he's not

**MAUREEN GLOVER**

49

1  mentioned in the meeting, is he?

2         THE WITNESS: He didn't attend the

3  meeting, he was just there listening. And that's why I

4  asked him, you know, why he didn't report it while we were

5  talking about it. And I said that he needed to share that

6  with his whole team and that I would share it with mine.

7  BY MS. FUNDINGSLAND:

8         Q. And this Alvin, who is identified here, also

9  states that -- or stated to you that David "makes negative

10  contacts at the Y downtown"?

11         A. That's what he said.

12         Q. Did you know anything about that?

13         A. I didn't know anything about that.

14         Q. And then he went on to say that he was

15  "afraid for David's safety"; what did you understand that

16  to mean?

17         A. Just that we didn't always know where David

18  was when he was in the community. And he -- I don't know

19  what he was basing it on, but he felt that there were

20  concerns about David making contacts with people that were

21  not good and wanted me to know that. And we did talk to

22  David after that at other meetings, not specifically about

23  those details, but that he's not forthcoming, that he

24  doesn't share much information with us. We would talk

25  about what the staff concerns were. And to do case

50

1  management with him, we need to be able to know what's

2  really happening and that he's following our

3  recommendations. Because, kind of, at that time, he

4  started really not following our recommendations.

5         Q. All right. Do you know Alvin's last name?

6         A. I don't. I don't think so. Nope.

7         Q. Okay. So what happened after you were there

8  meeting with him on the 24th of February, 2009?

9         A. He -- Alvin had said he would call me. He

10  took my card and said he would call me; he never did. I

11  had contact with other people in the program and -- one of

12  the staff people there was Anne, who was pretty involved,

13  and Kirsten. And so we talked in general about how

14  difficult it was getting to keep track of what David was

15  doing with chemicals. He was leaving in the middle of the

16  night, going out a window, going out the back door, and

17  out in the community.

18         And we talked to David at meetings we had there,

19  you know, about wanting to continue to work with him on

20  his goals, but he -- he was really slipping away from us

21  as far as following recommendations or being very

22  forthcoming; and that kind of happened in most of the

23  settings after he got comfortable and started using again,

24  and then he wasn't really on board with us.

25         Q. So how long did he stay at REM?

51

1         A. You know, that's the last address I have for

2  him. And then we were in the process of discussing

3  closing out his services because he signed up with MHP,

4  Cornerstone.

5         MR. BENNETT: MHP, what's that for?

6         THE WITNESS: Metropolitan Health Plan,

7  Cornerstone Case Management. So we started having

8  conversations with them. And at some point David was

9  hospitalized in there; it's probably in the narratives,

10  but I didn't keep track anymore because I was closing his

11  case. We were still having contact with him in April,

12  May. We had discussions with Cornerstone in June. Okay.

13  He was hospitalized on June 19th at HCMC, and I had

14  contact with --

15  BY MS. FUNDINGSLAND:

16         Q. This is 2009?

17         A. Right. With the social worker at that point.

18         Q. What was he hospitalized for?

19         A. I'm not sure how that happened. But they

20  were looking at a possible commitment, but it wasn't

21  supported.

22         Q. What does that mean?

23         A. They were looking at his psychiatric

24  stability. And I don't know if there was any drug use

25  they were looking at specifically then, but that was why

52

1  -- that was why, even though I had sent him a notice and I

2  was closing his case, we agreed to stay open because there

3  was a commitment process possibly happening. And the

4  Cornerstone Solutions staff had not been trained in

5  commitments yet, so I kept the case open so that we could

6  follow him through the commitment process. And then it

7  wasn't supported.

8         Q. And this was a civil commitment?

9         A. Right.

10         Q. Okay. So when was the last contact that you

11  actually had with him?

12         A. I talked to him on June 12th, on the phone.

13  And then I explained to him that we were closing and that

14  he would be continuing to receive case management services

15  through Cornerstone Solutions and that they could refer

16  him back on our program in the future if that was

17  appropriate. So that was June 12th of '09.

18         Q. And after that did you have any more contact

19  with his case at all?

20         A. I did not. I know that he had some contact

21  with Sheila Lipsco, just because she had helped him to

22  order a birth certificate, and he called a few times

23  checking on that. But that was all.

24         Q. And then you didn't have any more contact

25  with him after that period?

MAUREEN GLOVER                                                    CONDENSED

53

1       A.  No.
2       Q.  Okay.
3            MS. FUNDINGSLAND:  All right.  I wonder
4  if we should take a few minutes?
5            MR. BENNETT:  Sure.  I'll have some
6  questions, so if you want to come back, you can come back.
7            MS. FUNDINGSLAND:  I just want to go
8  through these exhibits with her.  But I don't think, based
9  on what I've heard, it'll take long.  And then that will
10  be it, unless Tracey's got a bunch for me.
11           MS. FUSSY:  I have a bunch for you.
12           (At this time a brief recess was taken.)
13           EXAMINATION BY MS. FUSSY
14  BY MS. FUSSY:
15      Q.  Hi, Ms. Glover.  May name is Tracey Fussy,
16  and I also represent the defendants in this action.
17           You know what, I'm sorry; you probably
18  already said, but what are your job duties as a case
19  manager?
20      A.  My job is to assess the clients that are
21  assigned to me, assess their needs and the services that
22  would meet their needs, and to coordinate all of their
23  needed services in the community and with our team
24  consults, our team members.
25      Q.  Who -- and you work closely with the team.

54

1  You guys -- would you -- you have -- you know, can you
2  kind of go over the information they have with respect to
3  the nurses and the psychiatrists; is that correct?
4       A.  Right.  We have team meetings every week, and
5  then we consult, informally, during the week; e-mail each
6  other, call.
7       Q.  What is your educational background?
8       A.  I have a bachelor's degree in psychology, and
9  then I have --
10      Q.  Where is that from?
11      A.  University of Minnesota.
12      Q.  What year did you obtain that?
13      A.  '72.  And then I have graduate work in family
14  social science that I did; I think it was 1987.
15      Q.  Did -- you obtained a degree?
16      A.  No, I didn't.  I didn't obtain another
17  degree.  I took graduate credits to be able to promote at
18  the county from social worker to senior social worker, and
19  that was kind of what we had in place at the time.
20      Q.  Where did you take those classes?
21      A.  University of Minnesota.
22      Q.  And when did you begin -- once you graduated
23  from college, tell me about your work history.  Where did
24  you work?
25      A.  I started working at Hennepin County in 1974

55

1  and --
2       Q.  A very good year?
3       A.  Yeah.  I was a financial worker, initially,
4  in economic assistance, and then worked there for five
5  years.  Then I worked as a case aide; I was the liaison
6  person between our agency and other government agencies.
7       Q.  What other government --
8       A.  Social Security.  Mostly Social Security.
9       Q.  Okay.
10      A.  And then I took a different case aide job, as
11  a -- it was basically a social worker job called a case
12  aide job, and I did that for 10 years.  And I worked with
13  a couple different populations; one was services to
14  seniors, and one was services to persons with
15  disabilities.
16      Q.  What type of disabilities?
17      A.  They were mostly quadriplegic.
18      Q.  And then what did you do?
19      A.  And then I moved into mental health in '96.
20      Q.  And in what capacity?
21      A.  As a senior social worker.
22      Q.  Okay.  If I could direct your attention to
23  Exhibit L.  If you look at the first page, I just have a
24  couple questions.  You'll note about a quarter of the way
25  down the page it states, "Both Dr. Peterson and David's

56

1  psychiatrist, Dr. Joshua Zimmerman, stated that plans for
2  him to attend college would not be appropriate."  Do you
3  know why they stated that?
4       A.  Because of his psychiatric disorder and
5  cognitive disabilities.
6       Q.  Kind of scroll down a little bit more, I
7  would say, about an inch.  "Because of ongoing alcohol
8  abuse and disregard for program rules, David began to have
9  difficulty in this program also."  Are you referring to
10  the program that you work for?
11      A.  I must be referring to -- he was admitted to
12  Oak Grove Rule 36 on November of '07.  Because of ongoing
13  alcohol abuse and disregard for program rules, he began to
14  have difficulty there, too.
15      Q.  Okay.  And I guess you kind of discussed
16  those.  Is there anything else you'd like to add, any
17  other disregard for program rules you're aware of?
18      A.  No.  He was using alcohol, and he brought
19  someone in to his room overnight one night, which they
20  don't do there.
21      Q.  Okay.
22      A.  And they were in the process of changing to
23  the assisted living, so we already were planning for him
24  to move on to the next --
25      Q.  Okay.

**MAUREEN GLOVER**

57

1   A. -- program.

2   Q. Now, at the bottom of page 1 it states, "He
3   was charged on 5/8/09 with disorderly conduct and is now
4   on probation for that offense." What do you know about
5   that 5/8/09 incident?

6   A. Whereabouts is it? In May 2009?

7   Q. May 8, '09.

8   A. Okay. In May 2009 at --

9   MR. BENNETT: Where is that?

10  MS. FUSSY: It's at the bottom of the

11  page. Sorry.

12  MR. BENNETT: So the urinating in

13  public?

14  THE WITNESS: So that was when he was at

15  REM. So that is something that was just mentioned to me

16  by their staff. I didn't know anything more about it.

17  BY MS. FUSSY:

18  Q. Okay. And it states, "David also became

19  involved in physical fights with a housemate, which

20  necessitated police involvement." Do you know -- as you

21  sit here today, do you have any recollection of that?

22  A. No. Just that they informed me of it.

23  Q. Okay. Going on to page 2. Top of the page,

24  "Staff tried to intervene when they were aware that he was

25  frequenting places in the community where they felt he was

58

1   having contact with gang members or other criminal types."

2   Do you know -- do you recall, as we sit here today, why

3   staff members were concerned that he was having contact

4   with gang members and other criminal types?

5   A. I think just everything kind of combined with

6   his -- with them not knowing for sure what kind of

7   chemicals he was using and then leaving in the middle of

8   the night and then just having time in the community. The

9   one staff had mentioned that earlier, that he felt --

10  MR. BENNETT: Is that Alvin?

11  THE WITNESS: Yeah. So I think just all

12  of that together, they were trying to keep track of him.

13  They transported him out in the community quite a bit; and

14  so they were, for a while, trying to keep a better eye on

15  him and keep him very supervised.

16  BY MS. FUSSY:

17  Q. Now, it states that "David agreed to

18  participate in anger management therapy groups." Why was

19  David asked to participate in that?

20  A. I think just because of the level of

21  agitation he sometimes had and involvement in some fights.

22  And it was an African American provider that, you know, we

23  thought we'd try that. And just some recommendations that

24  I've heard along the way about that program.

25  Q. What recommendations -- what can you tell me

59

1   about that program?

2   A. I don't know a lot about that program, just

3   that Wayne Hunter is the therapist at Phyllis Wheatley,

4   and it's anger management. I think it's groups, and then

5   he works individually with people. So it was just --

6   there's not a lot of services out there like that. So

7   that was one that I heard about; I can't remember exactly

8   how. But we gave it a try.

9   Q. So you were concerned with the fights that he

10  was getting into; is that correct?

11  A. Right.

12  Q. And did David complete the anger management

13  therapy?

14  A. No.

15  Q. He did not?

16  A. No.

17  Q. Did he ever have any discussions with you

18  regarding no longer -- was not completing the therapy as

19  he agreed to?

20  A. No. He was just pretty passively avoidant a

21  lot of times with the plans that we had with him.

22  Q. And here it notes on the same top of page 2

23  that you had discussed closing case management services

24  with David if he was unwilling to follow your

25  recommendations or to follow your rules. Which

60

1   recommendations can you remember that he was unwilling to

2   follow?

3   A. Just various recommendations we made along

4   the way for therapy.

5   Q. Including anger management?

6   A. Anger management, following the rules of the

7   residential programs that he was in. We reviewed these

8   pretty constantly with David. And he did seem to really

9   appreciate the team support and sometimes, you know, was

10  just more cooperative and engaged than others.

11  Q. Is it fair to say that he appreciated and

12  wanted to be able to follow through, but he was not able

13  to for whatever reason?

14  A. Right.

15  Q. And it says, "David was hospitalized on

16  June 19, 2009 --" well, it says, "David was hospitalized

17  on June 19, 2009, for increased psychiatric symptoms." Do

18  you recall, as we sit here today, what those increased

19  psychiatric symptoms were?

20  A. I don't know specifically what it was at that

21  time; but in general, his symptoms had always been

22  psychosis and confusion and hearing voices.

23  Q. Okay. Did he ever mention to you about

24  seeing robots?

25  A. I don't recall that.

**MAUREEN GLOVER**

61

1     Q.  At the same notation it said that REM Grand
2  staff had concerns about the plan for David to move in
3  with Curt; do you know who Curt is?
4     A.  I just remember that was a friend of David's
5  that REM staff always had concerns about.  And I don't
6  remember where he met him or any -- I never met Curt.
7     Q.  Okay.  Do you remember what concerns REM
8  staff had about Curt?
9     A.  Nope.  Just that he was a negative contact.
10  I really can't say what it was.
11     Q.  Okay.
12     A.  I mean, I probably knew at the time; but I
13  don't remember.
14     Q.  Is Curt's last name Foster?
15     A.  Could be.  I'm not sure though.
16     Q.  You don't know one way or the other?
17     A.  No.
18     Q.  Now, on the same page, in the middle
19  notation, you noted that "David has had a great deal of
20  treatment, but has been not --" "not able to make it in
21  numerous settings including Oak Grove Rule 36, Oak Grove
22  Mosaic Apartment Program, Oak Grove Assisted Living, and
23  now REM"; true statement?
24     A.  Um-hmm.
25     Q.  And would you say those were good quality

62

1  care facilities?
2     A.  Yes.
3     Q.  What is -- if you turn to page 3, there's a
4  notation in the third note, on June 5, 2009, to a Bethesda
5  Clinic, B-E-T-H-E-S-D-A.  What is Bethesda Clinic?
6     A.  I'm not very familiar with Bethesda, except
7  that they are a -- they're a clinic that works with people
8  with traumatic brain injuries.  And I think we had been to
9  some training and this person's name came up as somebody
10  who works well with a presentation similar to David's, so
11  I called them just to kind of look into that for him.
12     Q.  Okay.  If you look at page 4, the middle
13  notation, it makes a notation "that he was no longer
14  court-ordered to work with us."  What was the court order
15  that required him to work with you?
16     A.  Let's see here --
17     Q.  It's under a notation on -- oh, do you see
18  it?
19     A.  Yeah.  Let's see.  This was in May --
20     MR. BENNETT:  I'm not sure that's her
21  saying that.
22     THE WITNESS:  Oh, this is Sheila.
23  BY MS. FUSSY:
24     Q.  Right.  If you know.  Do you know what court
25  ordered he was required to work with you?

63

1     MR. BENNETT:  To her or with REM?
2  Because --
3     THE WITNESS:  I think maybe just that
4  there was some discussion of a commitment, but it just
5  never -- well, I can't say for sure.  I know at one point
6  it wasn't supported.  But there was some reference in the
7  notes to a stayed order, and I don't recall about it.
8  BY MS. FUSSY:
9     Q.  Okay.  Let's just clean this up.  He was not
10  court-ordered to work with Hennepin County Behavior --
11     A.  No, he was not.
12     Q.  He was court-ordered, it would appear, to
13  work with -- work at REM; is that correct?
14     A.  No.  He didn't have a court order there
15  either.  I think it was just -- I think there was possibly
16  a stayed order for a while, but I don't have anything else
17  in these notes about it.
18     Q.  And do you know who he would have been
19  court-ordered to work with?
20     A.  Well, then it would be Hennepin County Case
21  Management if it was a stayed order of commitment.
22     Q.  Okay.
23     MR. BENNETT:  But you don't know that
24  from your own personal knowledge, do you?
25     THE WITNESS:  No, I don't.  I mean, he

64

1  was basically a voluntary client the whole time.
2  BY MS. FUSSY:
3     Q.  If you look at the top of page 5, there's a
4  notation that David was involved in a physical alteration
5  (sic).  I'm assuming that is in June 2009, but that date
6  is cut off on my page.
7     A.  What page is it again?
8     Q.  On the top of 5.
9     MS. FUNDINGSLAND:  Altercation.
10     MS. FUSSY:  What did I say?
11     MS. FUNDINGSLAND:  Alteration.
12     THE WITNESS:  Yeah.  Just that they did
13  have a physical altercation and they -- the staff called
14  the police.
15  BY MS. FUSSY:
16     Q.  Okay.  You don't know anything else as you
17  sit here today?
18     A.  No.
19     Q.  Okay.  If you look at the bottom of page 5,
20  there's a notation you had discussed -- you had
21  "discussions with Derrell and Al."  Is Al Alvin; do you
22  believe?
23     A.  Yes.
24     Q.  They are REM staff, "about their concerns of
25  David's safety with his recent AWOL behaviors"; do you

MAUREEN GLOVER

65

1  know what concerns they had regarding him being AWOL?  Why
2  would that have been an issue?
3      A.  Just because --
4          MR. BENNETT:  Objection; hearsay.
5          MS. FUSSY:  I asked if you know.
6          THE WITNESS:  Just because the placement
7  was to supervise him, and he was just taking off.
8  BY MS. FUSSY:
9      Q.  And then it looks like, again, you apparently
10  had discussions with them regarding a court-ordered stay
11  and agreed that I "would not revoke, because having David
12  on court order for treatment was not effective."  What
13  does that mean?
14      A.  Basically, for a lot of people, and someone
15  like David, a court order isn't that meaningful to him.
16  And so that does tell me that we had a stay that we were
17  operating under.  But he's basically on a stay, and he's
18  volunteering to follow our recommendations to avoid a full
19  commitment.
20      Q.  Okay.  What does that mean, he's on a "stay"?
21      A.  It just means that a person is committed, but
22  it's stayed, providing they follow the recommendations
23  that are being made at the time.
24      Q.  Okay.
25      A.  And --

66

1      Q.  Is it kind of like probation, then?
2          MR. BENNETT:  Objection; foundation.
3          MS. FUSSY:  Well, anyway, just continue
4  with your thoughts.
5          THE WITNESS:  It just gives us a little
6  more authority sometimes, if we think we can use it to
7  their benefit.
8  BY MS. FUSSY:
9      Q.  Okay.  If you continue on the bottom of page
10  5, it states, "This is the 4th supportive living situation
11  that we have placed David in.  His relationships with
12  staff have deteriorated.  His oppositional behavior
13  continues to increase."  In what way were his, if you know
14  -- his relationships with staff deteriorated, and in what
15  way?
16      A.  He would just become evasive and passive
17  avoidant.
18      Q.  What does that mean, "passive avoidant"?
19      A.  He just would -- he would just slip out at
20  night, or just do his own thing.  He wouldn't necessarily
21  be confrontive about it, he would just -- I mean, he tried
22  to get along always; but when he wanted to do what he
23  wanted, he just did it.
24      Q.  When you say "he tried to get along always,"
25  who would he try to get along always with?

67

1      A.  Well, he was great with our team.  You know,
2  he was very pleasant to work with.  The REM staffed liked
3  him a real lot; the Oak Grove staff did, too.  He was
4  very, very motivated.  And, you know, it's pretty
5  rewarding to work with somebody like him.
6      Q.  Did he stay in REM?  How long did he stay?
7      A.  Let's see.  He was at REM from January 8th of
8  '09, until that hospitalization.  I forget when it was.  I
9  think it was July -- June or July.
10      Q.  Did Sara Williams -- did you ever have any
11  discussions with Sara Williams in which David allegedly
12  took a defiant stance towards her with a fork?
13      A.  Oh, I think that was during that time that
14  they had him taken to the hospital, when he was
15  intoxicated.
16      Q.  And you're aware that he was having physical
17  altercations with people, correct?
18      A.  I would hear about them; I never witnessed
19  any.
20      Q.  So there are some people he wasn't getting
21  along with?
22      A.  Right.
23      Q.  That would be a fair statement, right?
24      A.  Yeah.
25      Q.  If we can go to page 7 of Exhibit L.  And I

68

1  know you've already discussed this, but there is a
2  notation in which Alvin stated to you that David was
3  making negative contacts at the Y downtown.  What -- as we
4  sit here today, can you remember anything about what David
5  said about -- or, excuse me, what Alvin said about that?
6      A.  Just basically that when he's unsupervised,
7  we don't really know where he is.  And he talked about
8  possibly the Y and MCTC when he says that's where he is.
9  We don't know if he's there, or if he's there, if he's
10  doing something productive or if he's getting in trouble,
11  was the jist of it.
12      Q.  Okay.  But the statement isn't that you just
13  don't know, it's that you're concerned he's making
14  negative contacts at the Y, right?
15          MR. BENNETT:  Not that she's concerned;
16  that's not what statement says.
17  BY MS. FUSSY:
18      Q.  And the statement that Alvin made to you
19  wasn't that -- it was that he actually was concerned that
20  making negative contacts at the Y downtown, correct?
21      A.  He was concerned about his safety, just the
22  kind of people he hung out with, just said he's up to no
23  good.
24          MR. BENNETT:  How did he know?
25          THE WITNESS:  He didn't give me any

**MAUREEN GLOVER**                                    **CONDENSED**

69

1    details that -- you know, I don't know really any more
2    than that.
3    BY MS. FUSSY:
4         Q.   Okay.  But you do know that Alvin told you
5    that he makes negative contacts at the Y downtown because
6    that's what you wrote here?
7         A.   Um-hmm.
8         Q.   If you turn to page 9, on the bottom notation
9    it says, "Areas highlighted as potential areas of risk for
10   client are," and that includes, "client may not --" let's
11   see.  "May not take reasonable caution with strangers";
12   what does that mean?
13        A.   This is our nurse documenting this.  He
14   attended a care conference at REM.  Okay.  Yeah, he
15   doesn't -- you know, he didn't always follow up with
16   needed appointments and so forth.  I mean, sometimes he
17   lost providers because he missed appointments.  He didn't
18   stay on top of that, even with a lot of reminding.
19        Q.   And I'm concerned primarily with -- I'm just
20   wondering what does that mean?  He may not take reasonable
21   caution with strangers; what does that mean?
22        A.   I don't know what he meant by that.  I think
23   that, you know, David was --
24        MR. BENNETT:  Objection; foundation for
25   further answer of that question.  She's basically

70

1    disqualified because she doesn't know.
2         MS. FUSSY:  You can go ahead and answer.
3         THE WITNESS:  Just the fact that David
4    was a vulnerable person and didn't always use the best
5    judgment.  He was often confused; he was often not
6    psychiatrically stable.  We were always concerned about
7    him making poor choices.
8         MS. FUNDINGSLAND:  I'm going to take
9    over.
10        MR. BENNETT:  It's a team deposition?
11        MS. FUNDINGSLAND:  It's a team.
12        MR. BENNETT:  Okay.  Well -- all right.
13        MS. FUNDINGSLAND:  I just got a couple
14   more minutes.  I'm going to go through these exhibits and
15   then I'm done.
16        EXAMINATION BY MS. FUNDINGSLAND
17   BY MS. FUNDINGSLAND:
18        Q.   I just found a couple other things in Exhibit
19   L that I'd like to talk about.  On page 19 --
20        A.   Um-hmm.
21        Q.   The entry for 8/26, you apparently met -- or
22   this is an entry by Patrick Ellis; would that be correct?
23        A.   Is it the 7/31?
24        Q.   Yeah.  I'm sorry.  7/31.  I'm having trouble
25   going from the bottom to the top here on this.

71

1         A.   I know.
2         Q.   This is regarding a relapse that Mr. Smith
3    had; it says, "this past Monday, after he reports being
4    treated rudely by his --"
5         A.   Payee.
6         Q.   -- "payee"?
7         A.   Right.
8         Q.   Was that about the real estate thing?
9         A.   Him and his payee did not get along.  I
10   thought it would be a good payee for him because the guy
11   actually has an office in the community, right off of
12   Franklin; and it's kind of nice for people to be able to
13   drop in.  They didn't get along.  Tom's got a very gruff
14   manner.  He's got a heart of gold, but David did -- that
15   was a trigger for him to have somebody tell him what to do
16   with his money; he wanted to make his own decisions.  So,
17   in general, they had difficulty.
18        Q.   Okay.  And the next entry up on that page for
19   8/26 says, "He advised that he saw property
20   ownership/management as a way to insure that he would not
21   be homeless in the future"?
22        MR. BENNETT:  Where is this?
23        MS. FUNDINGSLAND:  I'm sorry.  It's on
24   the second -- page 19.
25        MR. BENNETT:  All right.

72

1         MS. FUNDINGSLAND:  Second entry from the
2    bottom.
3         MR. BENNETT:  All right.
4    BY MS. FUNDINGSLAND:
5         Q.   Is that referring to Mr. Smith's outlook?
6         A.   Yes.  That was David's outlook.
7         Q.   Okay.  And then the next entry up from there,
8    which is 8/01/08, this is you discussing with Mr. Smith
9    staff reports at Oak Grove about his recent alcohol and
10   marijuana use?
11        A.   Now, which one are we on?  It was my note on
12   8/1?  I see one by Tom Davis.
13        Q.   Sorry, it's Tom Davis.  Sorry.  Do you know
14   anything about that conversation other than what's listed
15   here?
16        A.   Let me just look.  It looks to me like Tom
17   was trying to direct David to the disabilities office and
18   to kind of get him focused on the steps he needed to do to
19   get back into school.
20        Q.   This -- actually, this is the third entry
21   from the bottom.
22        A.   Okay.
23        Q.   Which talks about additional AA meetings.
24        A.   Okay.  Oh, okay.  Let's see, this was 9/5/08,
25   so he was -- he was at Oak Grove still.  Yeah, he --

73

1    instead of doing additional AA meetings, David said that
2    it was really helpful to him when he works out regularly,
3    which is true of a lot of people in recovery; and he asked
4    if he could just participate in rec activities and work
5    out rather than adding an AA meeting.
6         Q.   All right.
7         A.   That's what we would agree with if that's
8    what he thinks would help him.
9         Q.   Okay.  So you agreed to that?
10        A.   Um-hmm.
11        Q.   Okay.  On page 20 of Exhibit L, the first
12   entry at the top appears to be your entry from 7/31.  And
13   this had to do with Mr. Smith stating that if he couldn't
14   have his girlfriend over, he was going to sleep in the
15   park?
16        A.   Right.
17        Q.   And then he also stated that he had learned
18   that he had failed his final exam in his literacy class,
19   and this was disappointing to him.  Where was he living at
20   that time?
21        A.   This was when he was at Oak Grove Assisted
22   Living.
23        Q.   And are people allowed to have guests stay
24   over?
25        A.   They can now.  But at that time, they had not

74

1    figured that policy out yet; and they were making --
2    developing their policy, and that's what she meant when
3    she said no one is allowed to have visitors right now.
4         Q.   Okay.  On page 28 of Exhibit L, the top entry
5    by you, dated 2008 -- sorry, February 6th, it says that
6    you were speaking with David and he "appeared to be
7    distracted or responding to an internal stimuli"?
8         A.   Okay.
9         Q.   Are you with me there?
10        A.   Um-hmm.
11        Q.   Okay.  And he stated that he heard voices.
12   And the voices are a lot about torture, and there is
13   screaming from a little girl being tortured in the
14   basement?
15        A.   That's the only time he ever said anything
16   like that to me.
17        Q.   Did you do anything about that?
18        A.   I mean, we had been trying to assess him for
19   effects of trauma the whole time we worked with him, but
20   he just was not ever forthcoming about any history at all.
21        Q.   Did you say effects of trauma?
22        A.   Right.
23        Q.   Okay.
24        A.   We just talked to him about importance of
25   letting the staff and his psychiatrist know, you know, how

75

1    his meds were working as far as symptoms, those types of
2    symptoms.  And then it's the fine line of not sedating him
3    to the extent that he can't benefit from the program he's
4    in.
5         Let me just see here.  I can remember being at
6    this meeting.  And I just put in my note here that his
7    symptoms may be largely related to the thought disorder.
8    But I have wondered about a history of trauma and that he
9    has never shared much detail of his history.  And then
10   some examples of things he said he learned from family
11   members, things that had happened to him.  He mentioned
12   several head traumas.  And then, you know, talking about
13   working with a therapist, you know, that specializes in
14   trauma.  I remember in this meeting he started out being
15   distracted and doing poorly, but he ended up being able to
16   really participate.
17        Q.   Okay.  You state here that, "I have wondered
18   --" and this is a quote.  "I have wondered about a history
19   of trauma."  What -- I don't -- I guess I don't quite
20   understand that statement.
21        A.   Let me see here.  You know, we always
22   wondered about his presentation.  I mean, we discussed it
23   in our team because it's really hard to -- and sometimes
24   it takes years with various professionals.  It's hard to
25   sort out sometimes the symptoms of a thought disorder or

76

1    PTSD from trauma.  And, you know, we had discussions about
2    trauma with him, but he never gave us anything to go on.
3    That was the first time he had ever made a statement, so I
4    guess I was just putting my thoughts in his record.
5         And then, you know, that we talked about it a
6    little bit in the meeting; and you know, you have to
7    really proceed very slowly when it's something like that.
8    And so I let him know that I have wondered about it, but
9    he hasn't shared a lot.  And a lot of times, when you do
10   that, three meetings down the road they'll tell you a lot
11   more.
12        Q.   That comes out?
13        A.   Yeah.  That never did happen with him,
14   though.
15        Q.   And you state in the same entry that "he,"
16   meaning Mr. Smith, "has mentioned learning from a family
17   member that someone got him intoxicated at age 2"?
18        A.   Right.
19        Q.   Did he ever say who that family member was?
20        A.   No.
21        Q.   In the time that you worked with David, did
22   you have any contact with his family?
23        A.   You know, I didn't find anything in the notes
24   here, but I have a very vague recollection of his sister
25   coming into the metro area at one point to visit him.  And

MAUREEN GLOVER                                          CONDENSED

---

77

1  she either came with a boyfriend or fiance, or he was
2  here. And I think I met them in passing when I was
3  leaving a meeting out at Bloomington REM. But it was
4  just, like, less than a minute or two.
5      Q. Was that the only time that you remember
6  seeing a -- one of his family members?
7      A. Right. We never had any contact with family.
8  We always heard about the girlfriend, Josephine, who had
9  been in the picture for years; never met her either.
10     Q. What was Josephine's last name?
11     A. I don't know. He wouldn't tell us.
12     Q. Okay. In all the time you worked with
13 Mr. Smith, did he talk much about his family?
14     A. Not much. He talked about visiting them when
15 we first were open with him, when he was in jail in
16 Chicago, that he saw him before. And then he got
17 arrested, and then he saw them after he got out of jail.
18     Q. And when was this?
19     A. That was in 2007, before we ever met him, and
20 he told us about it. And then there was one Thanksgiving
21 that he traveled, and that was when he lived at Mosaic,
22 because he traveled home to see his family, he reported to
23 us anyway's, at Thanksgiving. But he left his apartment
24 with other people in it that were homeless, and that was a
25 problem in keeping that housing.

---

78

1      Q. That was 2007 that he was in jail in Chicago?
2      A. He was in jail in Chicago from December of
3  '06 to June of '07.
4      Q. From December '06 to June of '07?
5      A. Um-hmm.
6      Q. Do you know what he was in jail for?
7      A. What he told us was that he was in jail for a
8  traffic violation which also included a probation
9  violation, because he had left the state. So then they
10 ended his probation and made him serve out the sentence,
11 and that's all he ever told us.
12     Q. Okay. There was one entry in here that
13 talked about his girlfriend being pregnant -- Josephine
14 being pregnant.
15     A. I don't even remember reading that.
16     Q. I'll see if I can find it. But I was just
17 wondering if -- here, on page 36 of Exhibit L.
18     A. Page what, again?
19     Q. 36.
20     A. I'm all out of order now. Okay.
21     Q. Second entry from the top. Well, maybe I
22 jumped to conclusions. But the second sentence says,
23 "When David got in the car, he stated he was angry and
24 upset about another possible noise violation that happened
25 last evening."

---

79

1      A. It was his friend and his friend's pregnant
2  girlfriend.
3      Q. So his friend and his pregnant -- gotcha. I
4  misread it. Could have been not Josephine anyway, right?
5  Was he with her for a long time?
6      A. Yeah. I think it was at least six years. It
7  might have been longer than that even.
8      Q. Okay. On page -- again, for the record,
9  Exhibit L, on page 33, the very bottom entry.
10     A. Okay.
11     Q. It says UCMPC?
12     A. Oh, that's just -- we have to put universal
13 case management notes in there for certain kinds of
14 entries.
15     Q. From Sara Williams and Rachel Schwab to
16 report that David Smith was involved in a fight that he
17 instigated; and this was 2007, December 6th, correct?
18     A. Yeah. He was living in their Rule 36 at that
19 time.
20     Q. And he was hospitalized with -- at Methodist
21 with a broken nose?
22     A. Um-hmm.
23     Q. A .39 blood alcohol level, and a positive tox
24 screen for THC, correct?
25     A. Um-hmm.

---

80

1      Q. Did this trouble you in any way?
2      A. Well, yes. I mean, this was kind of an
3  ongoing concern with just his alcohol and drug use. And
4  so that's when we did a reassessment for more treatment to
5  try to address that.
6      Q. And if you look at page 30, on the top entry,
7  that looks to be -- that's from 2008, August 15th -- looks
8  to be where you discussed possible civil commitment for
9  him?
10     A. Is this the first entry, did you say, on 30?
11     Q. Yeah. On 30. Because it says, "In light of
12 his recent hospitalization as a result of fighting while
13 intoxicated, suffering a broken nose"?
14     A. Oh, okay. Okay. Let me just get the context
15 of this. Oh, yeah. He was in a treatment program, and he
16 was just kind of in and out and on his phone and not
17 participating. They weren't able to get any social
18 history from him either. And we were planning to transfer
19 him to inpatient at that point, at Vinland, because of his
20 TBI; that's kind of their specialty there at Vinland. And
21 then I don't know what this William Albert is, I guess. I
22 don't know who that is. I don't know who that was.
23         MR. BENNETT: You're on page 30?
24         THE WITNESS: Yeah. It starts out on
25 the bottom of 29.

81

1    MR. BENNETT: Where is William Albert?

2    THE WITNESS: It says -- we were talking

3    about the assisted living program. And then it says W.M.

4    on the bottom of page 29, and then it says Albert.

5    William Albert stated they would welcome David's

6    attendance while he was waiting for placement at Vinland.

7    He must have been somebody in the Create program, that

8    they would let him keep coming. I don't recall. And that

9    they would contact the Oak Grove staff if he showed up in

10   their program intoxicated. Okay. And he thought the

11   Vinland referral was appropriate.

12       We did discuss commitment and evidence that David

13   is a danger to himself in light of his recent

14   hospitalization as a result of fighting while intoxicated,

15   suffering a broken nose.

16       Okay. Sara and Rachel indicated they did not

17   believe we are at a point of pursuing commitment, but we

18   should continue to discuss it. And we do discuss

19   commitments ongoing; but you know, we just don't do that

20   unless we have a case for it, you know. If there's a

21   clear demonstration of danger to self or others. Did I

22   answer your question.

23   BY MS. FUNDINGSLAND:

24       Q. I think so. I just have a question: The

25   little timeline that you made for yourself, does that

82

1    include anything that we haven't talked about here today?

2        A. No, it doesn't. Everything is on here that

3    we talked about.

4        Q. I'm going to try to go through with you now

5    this -- these exhibits that I got.

6        MR. BENNETT: M? This is M?

7        MS. FUNDINGSLAND: This is them.

8        MR. BENNETT: Is that Exhibit M then?

9        MS. FUNDINGSLAND: This is M.

10       MR. BENNETT: So you got his records?

11       MS. FUNDINGSLAND: I'm sorry?

12       MR. BENNETT: You got Peterson's

13   records?

14       MS. FUNDINGSLAND: No. This was in the

15   Hennepin County stuff.

16       MR. BENNETT: Okay.

17       (At this time Glover Deposition Exhibit

18   M was marked for identification by the court reporter.)

19   BY MS. FUNDINGSLAND:

20       Q. Okay. Just as a backdrop, Ms. Glover, to

21   these exhibits, I'm not going to go -- I'm not going to go

22   into any kind of detail, really, on these with you. I

23   just want to find out if you're aware of them or if you

24   had any input into them or if you used them when you were

25   working with David, okay?

83

1        A. All right.

2        Q. So starting with Exhibit M, this was one of

3    the few notations from the file that we got from Hennepin

4    County that related to Dale B. Peterson, M.A. And he

5    is --

6        MR. BENNETT: Not to be confused with

7    M.D. or Ph.D.

8        MS. FUNDINGSLAND: Right. But I -- I

9    never said he was a psychiatrist, Bob.

10       MR. BENNETT: Or a doctor.

11       MS. FUNDINGSLAND: He says.

12       THE WITNESS: I said that. I guess he's

13   an M.A. level.

14       MS. FUNDINGSLAND: Yeah, he's an M.A.

15   BY MS. FUNDINGSLAND:

16       Q. Anyway. Looking at Exhibit M, which consists

17   of two pages; on the second page, Dale Peterson, who, I

18   believe by your earlier testimony, had worked with David

19   quite a bit?

20       A. Um-hmm.

21       Q. And his opinion was that Mr. Smith had a

22   serious and persistent mental illness?

23       A. Right.

24       Q. And then up above, he has a diagnosis with

25   the corresponding axis under that, correct?

84

1        A. Right.

2        Q. Was this something that you looked at before

3    you met with Mr. Smith?

4        A. No, not beforehand. When I first started

5    working with him, we had to get him through the SMRT

6    process, State Medical Review Team.

7        Q. Okay.

8        A. So our case aides had access to the economic

9    assistance records that are filed for the SMRT process,

10   and she was able to pull up the -- eventually, she was

11   able to pull up the diagnostic assessment that was

12   submitted by Dale Peterson. And we looked at that, but I

13   don't remember exactly when that happened. But I didn't

14   have it before I started working with him.

15       Q. All right.

16       MS. FUNDINGSLAND: And if you'd mark

17   this, please.

18       (At this time Glover Deposition Exhibit

19   N was marked for identification by the court reporter.)

20   BY MS. FUNDINGSLAND:

21       Q. Showing you what's been marked as Glover

22   Exhibit N. And this is -- again, this is something that I

23   found in the Hennepin County Medical Center files

24   regarding Mr. Smith. And it starts out, "Employment:,

25   Living Skills:, Court Involvement/Legal Issues:". And I

85

1   have no idea who authored this or where it came from, and
2   it's not dated. And I was wondering if you could help me
3   understand this?
4        A.   This was a Hennepin County Medical Center
5   record.
6        Q.   All of the -- Ms. Glover, all of these
7   exhibits that I'm showing you came out of the Hennepin
8   County Medical Center records.
9        A.   Because it says -- on the second page, it
10  says, "Service planner disposition case opened." And
11  that's usually -- the people that are just before Charleen
12  are the ones that decide if it's going to be open; and
13  they are called screeners, or they used to be called
14  screeners, at Hennepin County Front Door for social
15  services.
16       Q.   Okay. Here --
17       A.   This looks like their type of documentation,
18  rather than the hospital's.
19            MR. BENNETT: I think this is -- this
20  looks like another continuous loop of Charleen's.
21            MR. KATZMAN: Looks like it.
22            MR. BENNETT: I think it was marked --
23  it's the front page of her Episode: 4 --
24            THE WITNESS: That's what it looked
25  like.

86

1            MR. BENNETT: -- it's just in another
2   format.
3            MS. FUNDINGSLAND: Yeah, it's very
4   difficult to figure out what this is because there is no
5   date and there really doesn't purport to be an author.
6            MR. BENNETT: If you look at Exhibit E,
7   I think, under the heading "Episode: 4," this is the front
8   page of it.
9            MS. FUNDINGSLAND: Okay. I have one
10  question about this. This summary --
11           MR. BENNETT: It's the same thing as the
12  next page. It's another format of -- if you go down, skip
13  to the 2007 -- if you start --
14           MS. FUNDINGSLAND: Okay. All right.
15  Well, then for --
16           MR. BENNETT: That's Charleen's closing
17  summary.
18           MS. FUNDINGSLAND: For ease of the
19  record, let's take the next two pages and put those with
20  Exhibit M, right?
21           MR. BENNETT: What?
22           MS. FUNDINGSLAND: It would just be a
23  continuation.
24           MR. BENNETT: It's already there, isn't
25  it?

87

1            MS. FUNDINGSLAND: No. Four pages.
2   Your next four pages, Bob.
3            MR. FUSSY: That whole thing is not
4   Exhibit M. There are going to be pages she's going to be
5   taking out.
6            MS. FUNDINGSLAND: The stack there --
7            MR. BENNETT: Is that Exhibit M?
8            MS. FUNDINGSLAND: No. I'm trying to
9   describe for you on the record the -- Dale Peterson's
10  thing is the first two pages; that's Exhibit M, okay?
11           MR. BENNETT: Okay.
12           MS. FUNDINGSLAND: Exhibit N is the next
13  four pages.
14           MR. BENNETT: That's already been marked
15  Exhibit D. It's part of Exhibit D. We're making a
16  cluster of something on this.
17           MS. FUNDINGSLAND: Okay. But I want to
18  ask her questions, and I don't have Exhibit D here.
19           MR. BENNETT: That's not my fault.
20           THE WITNESS: This first one is the
21  screener, Sue Sullivan. There is a name on here, Sue
22  Sullivan, front door screener; and she assigned the case
23  to Charleen Svingen. And this one that Charleen wrote,
24  she was passing the case along to me.
25  BY MS. FUNDINGSLAND:

88

1        Q.   And that -- and you're referring to pages 3
2   and 4 of Exhibit N?
3        A.   Yeah.
4        Q.   Okay. Just put those together.
5            MR. BENNETT: We taking this out?
6            MS. FUNDINGSLAND: Yeah. That's junk.
7   BY MS. FUNDINGSLAND:
8        Q.   This says Julie at Cedar Ridge Treatment
9   Center called to request an MHCD?
10       A.   Case manager.
11       Q.   Case manager, right?
12       A.   Yes.
13       Q.   And then it talks about that Mr. Smith had
14  gotten into St. Barnabas?
15       A.   Barnabas. Yeah.
16       Q.   When "blank" evicted him for his chemical
17  use. Do you know anything about that?
18       A.   No. That was before my time.
19       Q.   Okay. So as far as you knew, he aged out of
20  the program and that was it?
21       A.   Right.
22       Q.   Okay.
23            MS. FUNDINGSLAND: All right. This is
24  would be O.
25            (At this time Glover Deposition Exhibit

**MAUREEN GLOVER**                                                    **CONDENSED**

89

1  O was marked for identification by the court reporter.)
2           MR. BENNETT:  So the four pages are
3  Exhibit N?
4           MS. FUNDINGSLAND:  Yep.
5           MR. BENNETT:  And what's going to be O?
6           MS. FUNDINGSLAND:  O is the next --
7  that's the two pages from Park Nicollet Clinic.
8           MR. BENNETT:  How are we going to mark
9  that through her since she has no foundation for it?
10          MS. FUNDINGSLAND:  I'm going to ask her
11  about it.  This isn't a trial, Bob; this is a deposition.
12          MR. BENNETT:  No, really?
13  BY MS. FUNDINGSLAND:
14      Q.  I'm showing you what's been marked as Exhibit
15  O.  And this is from Park Nicollet Clinic, from -- the
16  dictating physician is a Joshua Zimmerman.  Is that the
17  Dr. Zimmerman that you had been talking about?
18      A.  Right.  Right.
19      Q.  Okay.  Is this something that you looked at
20  when you were dealing with Mr. Smith?
21      A.  I'm just trying to figure out if it looks
22  like I was at this point with him.  I mean, I communicated
23  with this doctor, and I went with David to appointments.
24  Let's see, December 28th?  I could look in the notes and
25  see if I was there; do you need to know that?

90

1       Q.  I'm just wondering if you looked at this
2  document before?
3       A.  Yeah.  This is information that the doctor
4  and I exchanged.
5       Q.  Okay.  All right.  That's all.
6           MS. FUNDINGSLAND:  This next one is
7  Exhibit P.
8           MR. BENNETT:  It's already been marked.
9           MS. FUNDINGSLAND:  And this is from --
10          MR. BENNETT:  That's F, I think.
11          MS. FUNDINGSLAND:  Okay.  Well, F from a
12  prior deposition.  I don't care what we call it.
13  BY MS. FUNDINGSLAND:
14      Q.  And showing you that document, have you seen
15  that document before?
16          MR. BENNETT:  So what are you going to
17  call it?
18          MS. FUNDINGSLAND:  I'm calling it F,
19  because that's what you want.
20          MR. BENNETT:  Well, it is F.
21          MS. FUNDINGSLAND:  Well, that's fine.
22          THE WITNESS:  It looks like the routine
23  transfer that I would look at when I get a new case
24  assigned to me.  So I'm sure that I saw this at the time I
25  got the case.

91

1           MS. FUNDINGSLAND:  Okay.  If you mark
2  that one, please, as P.
3           (At this time Glover Deposition Exhibit
4  P was marked for identification by the court reporter.)
5  BY MS. FUNDINGSLAND:
6       Q.  Showing you what's been marked as Exhibit P.
7           MR. BENNETT:  What is that?  Which page
8  is it, this one?
9           MS. FUNDINGSLAND:  Yep.  It's just right
10  in order.
11  BY MS. FUNDINGSLAND:
12      Q.  Do you recall this?
13      A.  Yes.  This is when I referred -- when he lost
14  his Mosaic apartment, and I had to refer him to our
15  waivered services so that we could get funding for him in
16  a more structured program, the assisted living, that we
17  were planning on putting him in.
18      Q.  All right.
19          MS. FUNDINGSLAND:  That will be Q.
20          (At this time Glover Deposition Exhibit
21  Q was marked for identification by the court reporter.)
22  BY MS. FUNDINGSLAND:
23      Q.  Showing you Glover Exhibit Q.  This is a
24  letter from you to Dr. Joshua Zimmerman, dated
25  December 20, 2007, correct?

92

1       A.  Um-hmm.
2       Q.  What was the purpose of this letter?
3       A.  It was to explain to the doctor that he was
4  due for renewal on his certification as a disabled person
5  by the State Medical Review Team.  And so we have some
6  questions for the doctor to write about, and then we
7  submit it to the State.  And then this gives him a level
8  of medical assistance that we can apply for waivered
9  services from placements.
10      Q.  What does that mean?
11      A.  Well, he would be on a higher level of MA
12  than --
13      Q.  Medical assistance?
14      A.  Right.  Than if he was just general
15  assistance eligible.  It's a more -- it's a certification
16  of disability, much the same as social security criteria;
17  same doctors, same criteria.  And we have to do this
18  periodically.  Sometimes they approve someone for a year;
19  sometimes they approve them for three or four years.  And
20  it's just submitting ongoing documentation of their
21  disability.  So we have to have a psychiatrist document,
22  you know, what he's been -- how he's been treating the
23  patient, what his symptoms are, how it affects his
24  functioning.
25      Q.  And how does it -- how do you pick who that

MAUREEN GLOVER                                                    CONDENSED

93

1   is going to be?
2         A.   For the provider that we contact?
3         Q.   Yeah.
4         A.   We always ask their treating psychiatrist.
5   And for some clients, it will be their primary care
6   physician, too, depending on if they have other medical
7   issues. And sometimes we contact their therapist as well.
8         Q.   Okay.
9               MS. FUNDINGSLAND:   This will be R.
10              (At this time Glover Deposition Exhibit
11  R was marked for identification by the court reporter.)
12              (At this time a brief discussion was
13  held off the record.)
14  BY MS. FUNDINGSLAND:
15        Q.   Okay. Can we talk about Exhibit R?
16        A.   Um-hmm.
17        Q.   What is this?
18        A.   This is our program's service plan that we do
19  every six months for our clients. And it's kind of a --
20  it's a computerized service plan, so we have limited
21  choices of goals and objectives to meet those goals. So,
22  like, for instance, this is the mental health goal -- and
23  it's not my words or anything, it's just the choice that I
24  picked from the program -- to maintain stable mental
25  health. And then the objectives to reach that goal would

94

1   be attending your psychiatrist appointments, your therapy
2   appointments, take your medications as prescribed, and
3   then use our work with you effectively. That's one
4   example; that's one goal. The next goal is his sobriety
5   goal.
6         Q.   Okay. And is this something that you discuss
7   with the client?
8         A.   Yes.
9         Q.   Okay.
10        A.   It's based on a functional assessment, which
11  is I don't know how many pages. We do the functional
12  assessment with the client, and then we do our service
13  plan; and then we bring it out the next time and have them
14  sign it.
15        Q.   Okay.
16              MS. FUNDINGSLAND:   S.
17              (At this time Glover Deposition Exhibit
18  S was marked for identification by the court reporter.)
19  BY MS. FUNDINGSLAND:
20        Q.   Showing you Exhibit S. Is this --
21              MR. BENNETT:   Is that two pages off
22  Zimmerman again?
23              MS. FUNDINGSLAND:   No. It's one page;
24  the 6/10/08 one.
25              THE WITNESS:   Yeah, this is just one

95

1   page of a service plan. I don't know if you have the rest
2   of it or not.
3               MS. FUNDINGSLAND:   I couldn't find it.
4               THE WITNESS:   Similar goals throughout
5   the time we worked with him.
6   BY MS. FUNDINGSLAND:
7         Q.   And this was six months later, correct?
8   Approximately?
9         A.   I think it was actually more. This was
10  December of '07, and this was June of '08. Yeah, so about
11  six months.
12        Q.   Right. And, basically, the goals are pretty
13  much the same, right?
14        A.   Um-hmm.
15              MS. FUNDINGSLAND:   T.
16              (At this time Glover Deposition Exhibit
17  T was marked for identification by the court reporter.)
18  BY MS. FUNDINGSLAND:
19        Q.   Showing you Exhibit T. This is a two-page
20  exhibit, St. Louis Park, from Dr. Zimmerman, correct?
21        A.   Um-hmm.
22        Q.   And was this something that he sent to you?
23  Or you got this record how?
24        A.   I probably requested it from him.
25        Q.   Okay. Now, in this -- in Exhibit T, he

96

1   relates that he hears more loud mumbling voices at
2   bedtime?
3         A.   Um-hmm.
4         Q.   Also hears children screaming; do you see
5   that?
6         A.   Yes. And started seeing ghosts. Yep.
7         Q.   And when we were looking at Exhibit L, there
8   was a reference, at one time, to Mr. Smith believing that
9   he heard a girl being tortured in the basement, or the
10  screams of a girl?
11        A.   Right.
12        Q.   Was that -- and you said that was the only
13  time you heard him say that?
14        A.   That's the only time he ever said anything to
15  me, directly to me.
16        Q.   Okay. Did anyone -- well -- did you discuss
17  with him -- he -- so the first time he said -- or the only
18  time he said anything to you. But did you ask him when
19  this happened whether this was a recurring thing with him
20  or a one-time thing?
21        A.   Not really, specifically, that way. We would
22  talk to him about his -- related to this, it would be
23  about his doctor's recommendations for medications to
24  treat his symptoms. And like I said before, with trauma,
25  we're very careful. And especially with a person like

MAUREEN GLOVER

97

1  David, who was pretty guarded and paranoid. And we had --
2  he was not very forthcoming about history. We just don't
3  dive in there. What I usually try to do is get them on
4  board with working with a therapist, and then those people
5  are trained to do that effectively.
6      Q.  Okay.
7          MS. FUNDINGSLAND: For the record, the
8  next two pages are garbage and don't belong there.
9          MR. BENNETT: Which ones?
10         MS. FUNDINGSLAND: Just throw the next
11 two pages.
12         MR. BENNETT: What were they?
13         MS. FUNDINGSLAND: Show Bob.
14         (Ms. Fussy shows documents to
15 Mr. Bennett.)
16         MS. FUNDINGSLAND: V.
17         COURT REPORTER: U?
18         MS. FUNDINGSLAND: I'm sorry. Never
19 could get that alphabet stuff down right.
20         (At this time Glover Deposition Exhibit
21 U was marked for identification by the court reporter.)
22         MR. BENNETT: Is that the next page?
23         MS. FUNDINGSLAND: This is U; it starts
24 Hennepin County Human Services.
25         THE WITNESS: Okay. Yep. This is part

98

1  of a document. We have, I think, a two-page -- we used to
2  have a two-page crisis relapse prevention plan, and this
3  is page one of it, that we complete with the client.
4      Q.  And who would have completed this?
5      A.  This doesn't look like my writing, so --
6  let's see. It could have been any team member. It could
7  have been Sheila or -- it would not have been Tom. It
8  could have been Sheila or Patrick. Or it could have been
9  Cindy. I think, probably, I asked Cindy to do relapse
10 prevention, because she's a chemical health counselor.
11         MR. BENNETT: Do you know?
12         THE WITNESS: I'm pretty sure it was
13 Cindy.
14 BY MS. FUNDINGSLAND:
15     Q.  Would you have been there when this was done?
16     A.  No. No. I'm just recalling it now that I
17 asked her to do that.
18     Q.  On Exhibit U, it talks about a "history of
19 the following, due to use: Involved in fights, arrested
20 for drunk and disorderly conduct, and arguing with
21 friends/relatives."
22     A.  Um-hmm.
23     Q.  Do you know anything about that?
24     A.  I don't know anything about -- well, I mean,
25 I knew that he had people in his life that he had

99

1  conflicts with; I don't know if they were friends or not.
2  And then relatives, I didn't have any information about
3  conflicts with relatives.
4      Q.  Okay.
5      A.  So he might have shared that with her.
6          MS. FUNDINGSLAND: Okay. Exhibit V.
7          (At this time Glover Deposition Exhibit
8  V was marked for identification by the court reporter.)
9  BY MS. FUNDINGSLAND:
10     Q.  Showing you Exhibit V. This looks like a fax
11 transmittal to you from Jenny Lindholm.
12     A.  Okay.
13     Q.  From Oak Grove Care Center.
14     A.  Okay.
15     Q.  Dated 7/08/08.
16     A.  Right.
17     Q.  And she indicates on here that "I worked on
18 the crisis/relapse prevention plan with David."
19     A.  Um-hmm.
20     Q.  And then, "If you would want to review and
21 let me know your thoughts or if you have any additional
22 comments"?
23     A.  Right.
24     Q.  And then she has a star; it says "difficult
25 to pull things out of David"?

100

1          MR. BENNETT: Here's the second page of
2  that; do you want to look -- see if that's the whole plan.
3  I think it goes with this (indicating), the fax
4  transmittal.
5          THE WITNESS: Yep, this is it.
6          MR. BENNETT: So I think you ought to
7  mark that U, I mean -- and the fax transmittal shows whose
8  handwriting it was, too.
9          THE WITNESS: Right. That's Jenny, the
10 Oak Grove staff. So I had asked Cindy to do the relapse
11 prevention plan, and she evidently talked to Jenny. A lot
12 of times these programs have their own relapse prevention
13 plans; so we will consult with them or do it in
14 combination with them. It looks like Jenny did it with
15 David.
16         MR. BENNETT: And he signed the second
17 page, right, that I gave you?
18         THE WITNESS: I don't remember.
19         MS. FUNDINGSLAND: Yes. All right.
20 Thank you, Mr. Bennett.
21         MR. BENNETT: So are we going to make U
22 conform to the --
23         MS. FUNDINGSLAND: This is V, is that
24 what you're talking about, Bob?
25         MS. FUSSY: It would all be U.

MAUREEN GLOVER

101

1     MS. FUNDINGSLAND: Oh, I'm sorry.

2     MR. BENNETT: I thought that's what we

3   were going to do. Let's make U the corrected one.

4     MS. FUSSY: Just add the fax cover to U.

5     MR. BENNETT: And the second page.

6     MS. FUSSY: Right.

7     MS. FUNDINGSLAND: Yes. I'll just put

8   all that in here. All right. So that's really U.

9     MR. BENNETT: You have my copy of that,

10  but I'll get it through you, I guess, madam court

11  reporter.

12    MS. FUNDINGSLAND: Thank you,

13  Mr. Bennett.

14    MR. BENNETT: What are we on, V?

15    COURT REPORTER: We're on W.

16    MS. FUNDINGSLAND: So we need -- yeah,

17  W. Next page doesn't belong there; you can throw out the

18  one that starts out "client information."

19    MR. BENNETT: Throw that away?

20    MS. FUNDINGSLAND: Yep. Get rid of it.

21  So if you'd mark this as Exhibit W. And this will start,

22  Bob, with the -- I think she put them in the wrong order.

23  It should be the Petition for Judicial Commitment and the

24  stay of it.

25    MR. BENNETT: You know, I don't -- I

102

1   only have like two and a half pages of that. I mean,

2   there's no sign -- do you --

3     MS. FUNDINGSLAND: You should have it.

4     MR. BENNETT: Well, how many pages -- I

5   got page one.

6     MS. FUNDINGSLAND: Two; there's three

7   pages on the petition, and then two pages on the stay.

8     MR. BENNETT: Yeah, but --

9     MS. FUNDINGSLAND: Even though -- what

10  is this?

11    MR. BENNETT: I mean, we're missing --

12    MS. FUNDINGSLAND: Let's go off the

13  record.

14    (At this time a brief discussion was

15  held off the record.)

16    (At this time Deposition Exhibit W was

17  marked for identification by the court reporter.)

18  BY MS. FUNDINGSLAND:

19    Q.  All right. Showing you what's been marked

20  as, I believe, Exhibit W. Can you tell me if -- it looks

21  like you got CC'd -- or this is sent to you, I'm sorry,

22  CC'd to Sara Williams. I don't quite understand what this

23  is.

24    A.  It's a copy of an e-mail from Jenny Lindholm

25  to me.

103

1     Q.  And Jenny Lindholm, again, is?

2     A.  She was the staff at Oak Grove.

3     Q.  Okay.

4     A.  Regarding David.

5     MS. FUSSY: I think you're looking at a

6   different -- Oh, no. You have the right thing. I'm

7   sorry.

8     THE WITNESS: Just notifying us that he

9   can't be seen at the mental health clinic anymore because

10  he's missed too many appointments.

11    MR. BENNETT: I always thought that was

12  a catch 22; if you needed to be seen at the mental health

13  appointment and you miss appointments.

14    THE WITNESS: Yeah. It happens. Oh,

15  wait a second, though. Yeah, I'm not sure if they're

16  talking about Dr. Zimmerman's clinic, their mental health

17  clinic, or if it's the Hennepin County Mental Health

18  Center. It must be Dr. Zimmerman's, because he did lose

19  Dr. Zimmerman due to failed appointments, unfortunately.

20  BY MS. FUNDINGSLAND:

21    Q.  You mean he wouldn't see him anymore?

22    A.  They couldn't get him up. He lived like two

23  blocks from the office, and they couldn't get him up and

24  going to his appointments.

25    Q.  But, I mean, you said he lost Dr. Zimmerman

104

1   because of missed appointments; does that mean

2   Dr. Zimmerman wouldn't see him anymore?

3     A.  His clinic wouldn't allow him to come back.

4     Q.  Okay.

5     MS. FUNDINGSLAND: Exhibit X is the next

6   one, and that's a two-page one that has assessment date

7   12/9/08 at the top.

8     (At this time Glover Deposition Exhibit

9   X was marked for identification by the court reporter.)

10    THE WITNESS: Oh, this is -- Suzanne

11  Burke was the assessor for the TBI services. So this is

12  that part of our agency that does the assessments for

13  funding for placements; so this is her summary.

14  BY MS. FUNDINGSLAND:

15    Q.  And, again, that assessment was made

16  December 9, 2008, correct?

17    A.  Yes.

18    Q.  Okay.

19    MS. FUNDINGSLAND: Next one will be

20  Exhibit Y.

21    (At this time Glover Deposition Exhibit

22  Y was marked for identification by the court reporter.)

23  BY MS. FUNDINGSLAND:

24    Q.  Showing you Exhibit Y.

25    A.  Yep.

**MAUREEN GLOVER**

105

1    Q.   That's copied in your case notes in Exhibit
2    L?
3    A.   Right; on page 1.
4    Q.   Okay.  Is there a reason that you keep this
5    separate?
6    A.   When we -- well, we don't have files anymore;
7    we're all electronic.  But when we had case files, we
8    would have to give our supervisor the file with this in a
9    certain place and a functional assessment discharge in a
10   certain place.  And I always scanned it into the notes,
11   because a lot of times people come back through; and then
12   the front door can decide -- it can help them decide if
13   they should open a case again.
14   Q.   Okay.  All right.
15          MR. BENNETT:  When you copy it through,
16   it removes all the paragraphs?
17          THE WITNESS:  Oh, yes.
18          MR. BENNETT:  It makes it look like one
19   James Joyce thing.
20          THE WITNESS:  That's really hard when
21   you want to write a nice document.
22          MR. BENNETT:  So we're throwing this
23   away?
24          MS. FUNDINGSLAND:  Well, it's got a --
25   you know what, rather than confuse the record any more

106

1    with this lady, let's just leave it as it is.
2          MR. BENNETT:  So what is it, exhibit --
3          MS. FUNDINGSLAND:  That was Exhibit Y.
4          MR. BENNETT:  So Exhibit Y is a
5    redundant exhibit?
6          MS. FUNDINGSLAND:  It is redundant of
7    Exhibit L, okay?  How does that sound?
8          MR. BENNETT:  As silly as it sounds.
9          MS. FUNDINGSLAND:  I know.  Okay.
10   Exhibit Z.
11          (At this time Glover Deposition Exhibit
12   Z was marked for identification by the court reporter.)
13          THE WITNESS:  This is --
14          MR. BENNETT:  Is this Z?
15          MS. FUNDINGSLAND:  This is Z.
16          THE WITNESS:  This is one page of four
17   of a functional assessment, and this is what we do when
18   we're with a client.  And then that other service plan
19   that we already filed is based on this.
20          MS. FUNDINGSLAND:  All right.  So --
21   yeah.  All right, so that's -- that was kind of what I was
22   wondering, but because I never did find the other three
23   pages -- but that, somehow, right now doesn't surprise me.
24   Okay.
25          This -- the next one, Bob, that says REM

107

1    Minnesota A, does not belong there.
2          MR. BENNETT:  So two pages there are
3    going to be thrown away?
4          MS. FUNDINGSLAND:  Right.  The next will
5    be Exhibit AA.
6          (At this time Glover Deposition Exhibit
7    AA was marked for identification by the court reporter.)
8    BY MS. FUNDINGSLAND:
9    Q.   Showing you Exhibit AA.  This is a letter
10   from you to Judge Kaman.
11   A.   Okay.
12   Q.   Do you want to explain how it was that you
13   ended up writing this letter?
14   A.   We're just required to write a progress
15   report at a certain point after a commitment happens.  So
16   this is just a progress report on his stayed order of
17   commitment.  And it's just talking about, you know, what
18   we've recommended and what he's doing.  We are
19   recommending that his commitment continue until it is due
20   to expire on April 20th.
21   Q.   Do you know what happens after the expiration
22   date of this?
23   A.   We just didn't continue the commitment.
24   Q.   All right.  What was the reason?
25   A.   I think -- let's see.  October to April of 09

108

1    -- I think probably, in a case like this, a commitment
2    didn't make a big difference to David.
3    Q.   Why not?
4    A.   I mean, he was such a voluntary client; he
5    wanted to work with us.  And, you know, most of the time
6    we were pretty successful in working with him on a
7    voluntary basis; but because of his illness and
8    everything, he wasn't able to stay on task all the time.
9    Q.   Whereas, that would be the purpose for a
10   civil commitment, is to keep him?
11   A.   Well, if you can't necessarily do any
12   better --
13   Q.   Right, but --
14   A.   But, unless -- yeah.
15   Q.   For involuntary?
16   A.   Right.
17   Q.   Okay.
18          MR. BENNETT:  So it expired on April?
19          THE WITNESS:  Right.
20          MS. FUNDINGSLAND:  Yep.  All right.
21   We're off the record.
22          (At this time a brief discussion was
23   held off the record.)
24          MS. FUNDINGSLAND:  And this is Exhibit
25   BB, and it consists of 25 pages.

MAUREEN GLOVER

109

1    MR. BENNETT:  Even the bottom one?

2    MS. FUNDINGSLAND:  There is just one
3  more exhibit after that.

4    MR. BENNETT:  Okay.

5    (At this time Glover Deposition Exhibit
6  BB was marked for identification by the court reporter.)

7  BY MS. FUNDINGSLAND:

8    Q.  I've just got a couple questions about
9  Exhibit BB.  This is a Minnesota Long Term Care
10  Consultation Services Assessment, and the date of referral
11  is 8/9/2010.

12    A.  And I don't think this is my assessment.

13    Q.  Okay.

14    A.  Because we don't have all these other forms
15  that go with it.  So I don't know.  Oh, no, I did this
16  assessment, because my name is on it.  So the first page
17  is mine, and it's one of four pages.  But the pages that
18  follow are not part of that document.

19    MS. FUNDINGSLAND:  What?

20    MR. BENNETT:  You filled out the first
21  four pages?

22    THE WITNESS:  No.  I just filled out the
23  first page.  It's actually one of four, but the other
24  three I don't see here so far.

25    MR. BENNETT:  This is your handwriting?

110

1    THE WITNESS:  It's just my staff
2  signature is on page 1.

3    MR. BENNETT:  Is that -- am I looking at
4  the right thing?

5    MS. FUNDINGSLAND:  Yeah.

6    MS. FUSSY:  She's on a different
7  exhibit.

8    THE WITNESS:  The rest of the pages, I
9  don't recognize.

10    MS. FUNDINGSLAND:  Oh.  Oh.  Here.  Wait
11  a minute, I screwed up.  Give me the whole thing.

12    THE WITNESS:  Okay.

13    MS. FUNDINGSLAND:  That was my mistake.
14  Sorry.  No wonder I had you confused.  Okay.  So this will
15  be BB.  I'll need another one.  We'll just forget that.
16  Just put it on the front page.

17    (At this time a new document entitled
18  Glover Deposition Exhibit BB was marked for identification
19  by the court reporter.)

20  BY MS. FUNDINGSLAND:

21    Q.  Okay.  Now we got it.  Take a look at that
22  (indicating).

23    A.  Long Term Care -- this would be, you know,
24  somebody in our waivered services doing their assessment.

25    Q.  Okay.  The very last page, page 25, is signed

111

1  by Michelle Anderson.

2    A.  Right.

3    Q.  Okay.  Do you know who that is?

4    A.  I don't know her.

5    Q.  Okay.  Then my question, then, is:  Why would
6  this be in the Hennepin County medical files for Mr.
7  Smith?

8    A.  Their records are also included in all my
9  case notes.  We operate in the same Episode.  They are
10  part of our agency; they are just a different program.

11    MR. BENNETT:  But this Episode doesn't
12  appear -- it's in a different Episode?

13    THE WITNESS:  That's not in there, but
14  some of the other people that documented assessments are
15  in our same case notes.  I don't recall seeing her name in
16  the case notes.

17    MR. BENNETT:  There was an Episode: 6 in
18  Exhibit D; and that would be after you, right?

19    THE WITNESS:  Maybe that's it.  When is
20  the date on this?  8/9/10.  Yep that was after --

21    MR. BENNETT:  It was about a month
22  before he was killed.

23    THE WITNESS:  Um-hmm.

24    MS. FUNDINGSLAND:  One last exhibit.

25    (At this time Glover Deposition Exhibit

112

1  CC was marked for identification by the court reporter.)

2    MR. BENNETT:  That's the last two pages?

3    MS. FUNDINGSLAND:  It's just -- it's
4  actually not the last page.  It's the second to the last.
5  I don't know what the last page is, to tell you the truth.

6  BY MS. FUNDINGSLAND:

7    Q.  Looking at Exhibit CC --

8    A.  This is also August 9th of 2010.  It's a
9  Front Door Adult Screening and Needs Assessment.  Maybe
10  they were referring him back to Hennepin County for case
11  management again; that might be possible.  Because it's
12  Front Door; that's our intake.

13    Q.  It says --

14    MR. BENNETT:  Show her the second page,
15  too.  I think that is --

16    THE WITNESS:  Referred by Sigrid, who
17  was the -- she was a Cornerstone case manager.

18    MS. FUNDINGSLAND:  It has nothing --
19  well, I'll show it to her, but there is nothing on there.

20    MR. BENNETT:  Well, except that the case
21  was assigned to service planning's Anne Semenak's
22  supervisor there.

23    THE WITNESS:  Oh, yeah.  She's the
24  supervisor there.

25  BY MS. FUNDINGSLAND:

    Q.  Do you think that page goes with that page?

113

1      A.  It looks like it.
2      Q.  Okay.
3           MR. BENNETT:  It's the second page of
4    the form, right?
5           THE WITNESS:  Um-hmm.
6    BY MS. FUNDINGSLAND:
7      Q.  Well, do you know why there is no information
8    on the second page?
9      A.  Um --
10          MR. BENNETT:  There's not much on the
11   first, after disposition.
12          THE WITNESS:  They just do file
13   clearances to see where he's open in the county in all
14   different places.
15   BY MS. FUNDINGSLAND:
16     Q.  On this -- on Exhibit CC, it says, "Situation
17   that prompted call"?
18     A.  Um-hmm.
19     Q.  "CADI referral called in by Sigrid Finke, who
20   is client's MHP Cornerstone Solutions Care Guide"?
21     A.  Yep.  They wanted -- what they wanted was
22   long-term-care services, and that would be the waivered
23   service funding.  And they were looking for structured
24   housing, like a foster care assisted living again,
25   following his treatment at Vinland.

114

1           MR. BENNETT:  She wanted to send him
2    back to Vinland, if you remember, Sigrid Finke.  And isn't
3    she a Hennepin County person on loan to Cornerstone?
4           THE WITNESS:  She was.  Yes.
5           MR. BENNETT:  At that point?
6           THE WITNESS:  Um-hmm.
7    BY MS. FUNDINGSLAND:
8      Q.  All right.  So I'm confused.  I -- he left --
9    you had your last contact with him in June of '09?
10     A.  Um-hmm.
11     Q.  Because he was going to Cornerstone?
12     A.  Right.  He was already with Cornerstone.
13     Q.  Was with Cornerstone.
14     A.  Um-hmm.
15     Q.  So why are they now referring him back?
16     A.  Well, at that time, he was living with a
17   friend.  And then, apparently, they were looking at
18   treatment again at Vinland.  And knowing that he'd need a
19   placement after that, they were referring him to be
20   assessed so that there could be funding for him in a
21   structured placement again.
22     Q.  Okay.
23     A.  So, apparently, maybe things weren't going
24   very well in the community or --
25          MR. BENNETT:  Don't guess about that,

115

1    though.
2           THE WITNESS:  Yeah.  I just never heard
3    anything.
4           MS. FUNDINGSLAND:  I don't have any
5    further questions.
6           MR. BENNETT:  I'll try to make it a few,
7    and I'll try to make them relevant.
8           EXAMINATION BY MR. BENNETT:
9    BY MR. BENNETT:
10     Q.  How often does the downtown Y come into your
11   -- I mean, do you have any experience with that or?
12     A.  I don't.  I've had a couple of other clients
13   that say they go there, and not with any problems or
14   anything.
15     Q.  And going there -- do you know David was a
16   member?
17     A.  I knew that he was a member.  I didn't know
18   for sure if that was through Cornerstone or what; he just
19   went to the Y.
20     Q.  And did he express to you, personally, so you
21   heard him, that he liked to work out.  He liked to go to
22   places where he could work out, and the Y would certainly
23   facilitate that?
24     A.  Um-hmm.
25     Q.  Is that a yes?

116

1      A.  Yes.
2      Q.  I'm understanding you, it's just for the
3    record.
4      A.  Yes.
5      Q.  I have never heard of the Y as a haven for
6    the Crips or the Bloods, have you?
7      A.  No.
8      Q.  So Alvin's concerns are just Alvin's
9    concerns; they are nothing that you know of, of your own
10   personal knowledge?
11     A.  Right.
12     Q.  And it didn't appear that Alvin had much
13   association out of Bloomington with the downtown Y, did
14   it?
15     A.  I don't think so.  He might have provided
16   transportation.
17     Q.  Your sense of -- your discussion with Alvin
18   was that he was generally concerned because he was AWOL,
19   generally?
20     A.  Right.
21     Q.  All right.  And he never told you that David
22   said he was meeting the Crips or the Bloods at the Y, did
23   he?
24     A.  No.  No.
25     Q.  And a danger to himself or others, at least

MAUREEN GLOVER

**117**

1  in having deposed Sara Williams and having had your
2  understanding of it told to us, really, that was, if I
3  understand the Oak Grove model that he was in at that
4  time, they could be -- the Oak Grove people, placements
5  could be in various apartment buildings, not all would be
6  members of the Oak Grove -- I mean, there would be other
7  people, not Oak Grove participants, in the same buildings,
8  correct?
9       A.  The Oak Grove Assisted Living has only their
10  clients in the apartments.
11      Q.  But the one in which he flooded --
12      A.  That was the assisted living apartment.
13      Q.  Oh, it was?
14      A.  It was. Yeah.
15      Q.  Okay. All right. Well, you don't want
16  apartments flooded, I suppose.
17      A.  Yeah. They are all vulnerable adults there,
18  too. And there with a fire risk, possibly.
19      Q.  So it wasn't that he was physically
20  threatening, it was that he was negligent and with -- when
21  he was intoxicated about fire and water?
22      A.  Right.
23      Q.  You sort of touched on, tangentially, your
24  personal contact with David. And at least I got out of
25  that that a lot of that was positive?

**118**

1       A.  Yes.
2       Q.  I mean, would it be fair to say that you
3  liked David?
4       A.  Yes.
5       Q.  And you used some words that I thought were
6  actually, you know -- he seemed very motivated, rewarding
7  to work with?
8       A.  Um-hmm.
9       Q.  That's a yes?
10      A.  Yes. He appreciated getting support and
11  services.
12      Q.  And he -- despite being severely and
13  persistently mentally ill, you had that overall
14  impression?
15      A.  Yes.
16      Q.  Now, we've taken the depositions of his
17  family who -- his mom, and his -- all but one of his
18  siblings, including Angela, who was here with her fiance
19  at --
20      A.  Okay.
21      Q.  -- I think, at REM. I think she described
22  the place that wasn't in downtown Minneapolis; I think
23  that's about as close as she got. But she testified that
24  he would call her at night and talk about the voices, and
25  she'd pray with him on the phone and things like that.

**119**

1  But that would be a humane way of dealing with her brother
2  and her brother's troubles, wouldn't it?
3       A.  Yes.
4       Q.  And none of the siblings or the mom appear to
5  have any knowledge of you or what you and Charleen and
6  Sara and Dr. Zimmerman and Dr. Peterson did with or for
7  David.
8       A.  Right.
9       Q.  That's not that unusual is it?
10      A.  No.
11      Q.  I mean, people with David's problems, and
12  many of the other severe and persistently mentally ill
13  people, can compartmentalize their lives?
14      A.  Exactly.
15      Q.  And they like not to project their mental
16  illness to people, family members, if they can keep it
17  separate; is that fair to say?
18      A.  That's sometimes true. Yes.
19      Q.  And it's -- I think if I showed you the
20  deposition transcripts -- I mean, when he called his
21  brothers -- he was an older brother -- they testified that
22  he'd -- he would talk to them about their problems and
23  never about his.
24      A.  Oh.
25      Q.  And ask them how they were doing and what --

**120**

1  how they were doing in school and that sort of thing.
2  That wouldn't surprise you with David, would it?
3       A.  No.
4       Q.  David was capable of having caring, human
5  relationships; do you believe?
6       A.  Yes.
7       Q.  He certainly did with his girlfriend?
8       A.  Yes.
9       Q.  And he did with other people, like Curt, and
10  -- and that was described as negative. Did you ever meet
11  Curt?
12      A.  I never met Curt. No.
13      Q.  The -- but if I understand it, it would be
14  your professional opinion that David Smith was capable of
15  enjoying material parts of his life?
16      A.  Yes.
17      Q.  He -- the relationships that you saw he had,
18  like with his girlfriend, he enjoyed that. Did he express
19  that to you?
20      A.  He talked about her quite a bit.
21      Q.  Did he talk about music and drawing?
22      A.  Yes.
23      Q.  Did you ever see any of his drawings?
24      A.  I don't think I did see his drawings.
25      Q.  Did you ever talk to Charleen about that?

MAUREEN GLOVER                                                    CONDENSED

---

**121**

1    A.  You know, we might have; but I just don't
2  recall.  Music is more what he talked about.
3    Q.  He talked a lot about music?
4    A.  Um-hmm.
5    Q.  That's a yes?
6    A.  Yes.
7    Q.  And it would be fair to say that even in his
8  severely and persistently mentally ill state, that he
9  strove to expand his knowledge of various things, correct?
10    A.  Yes.
11    Q.  And, you know, he enjoyed working out; he
12  told you that, right?
13    A.  Right.
14    Q.  And if I remember right -- if I remember my
15  classes in college -- working out is sort of nature's
16  antidepressant; isn't that true?
17    A.  True.
18    Q.  And when David was all together -- I think
19  that's another word you used -- and he was part of the
20  time, wasn't he?
21    A.  Yes.
22    Q.  He was a pretty nice fellow, wasn't he?
23    A.  Yes, he was.
24    Q.  He basically kept his family out of his
25  mental illness problems as far as you were involved?

---

**122**

1    A.  As far as I knew, yes; we did not cross
2  paths.
3    Q.  And because of HIPAA and because of privacy
4  rules, data practice and stuff, you can't call people up
5  and have a conversation to vet any of the things he was --
6    A.  Right.
7    Q.  -- saying or to explore how he was doing in
8  other phases of his life; is that fair to say?
9    A.  That's fair.
10    Q.  All right.  But it wouldn't surprise you,
11  would it, that he had positive relationships with people
12  you didn't know about?
13    A.  No, that wouldn't surprise me.
14    Q.  And if I -- at least my reading of this is
15  that a person figured out if they had a history of TBI,
16  even if it wasn't documented, medically, they could end up
17  with funding, correct?
18    A.  I'm sorry, I don't --
19    Q.  I think some of David's -- David got some
20  money and some of the things funded because of reports of
21  traumatic brain injury, didn't he?
22    A.  Well --
23    Q.  It's actually in the exhibits.
24    A.  Okay.  I mean, he would have had funding.  We
25  kind of pushed, just because he had shared the TBI

---

**123**

1  stories, because we know it's more funding; he didn't
2  really know that, I don't think.
3    Q.  But once you tell him that -- well, you don't
4  know what he knew and when he knew it, that's part of the
5  problem, right?
6    A.  I remember we would talk about he has some
7  undocumented TBI's, and we'd have a discussion about it.
8  And with the CADI program, they don't necessarily need it
9  to be documented if we have history.  And so we would say,
10  oh, well, this could be for more funding, even though we
11  probably didn't need it.
12    Q.  Now, adult males tend to get -- if they are
13  going to hear voices and have those sort of thought
14  disorder things, they often begin in the 17- to
15  22-year-old; isn't that the historical --
16    A.  Um-hmm.  Yes.
17    Q.  So a person might have a life through high
18  school that was without the voices, that was relatively
19  normal-appearing, correct?
20    A.  Yes.
21    Q.  And if you then started to -- David didn't
22  give you a history about moving up here for the Job Corps?
23  I don't see much about Job Corps in here.
24    A.  Not in our records.  I was aware that he had
25  come here for job training.  And I know at one point he

---

**124**

1  did say he had voices and hallucinations back a long time;
2  I think it was to age 15.
3    Q.  Yeah.  David was not always a reliable
4  historian, though, was he?
5    A.  No.
6    Q.  So you couldn't really take at face-value
7  certain things he said, specifically, as they related to
8  his chemical usage and that sort of thing, correct?
9    A.  Right.
10    Q.  But you were never able to verify the TBI?
11    A.  No.
12    Q.  Although, if you'd have asked, I suppose he
13  has lived in a family with five boys, and they roughhoused
14  and did things that -- and Tracey did ask, so she does
15  know those things.  But the -- and you didn't -- you have
16  no understanding about how or where or what setting he
17  grew up in Peoria, correct?
18    A.  No.  I really don't.
19    Q.  Okay.  Would it be fair to say that David's
20  life had some value from your perspective?
21    A.  Definitely.
22    Q.  He had things that he was able to give
23  positively to people?
24    A.  Yes.
25    Q.  And there were areas of his life that you

---

**MAUREEN GLOVER**

125

1  observed him enjoy, correct?
2      A.  Yes.
3      Q.  And part of the problem at Oak Grove, I
4  think, was that he wanted to have his girlfriend come over
5  so they might have relations, correct?
6      A.  Right.
7      Q.  I'm getting old, but that still would be part
8  of the enjoyment of life, wouldn't it?
9      A.  Yes.
10     Q.  Did you ever talk to Josephine?
11     A.  No.  I don't think I ever talked to her.
12     Q.  But he described that relationship
13  positively, didn't he?
14     A.  Yes.
15     Q.  If a person has a thought disorder and has
16  been hearing voices, it isn't uncommon at all for them to
17  use self-medication, whether it be through
18  over-the-counter drugs, illegal drugs, or alcohol --
19     A.  That's right.
20     Q.  -- to suppress or try to suppress those
21  voices?
22     A.  Yes.  That's true.
23     Q.  Voices don't appear in, at least in your --
24  the people you deal with, to be benign.  There appears to
25  be a struggle and a cause for mental problems, correct?

126

1      A.  Some of them are fairly benign, but a lot of
2  times they are persecutory.
3      Q.  And that can have absolutely nothing do with
4  a person's family history?
5      A.  Right.
6      Q.  It's just a disease.  And you can't associate
7  the voices that they hear or the prosecutorial things that
8  are said, or that they report --
9      A.  Right.
10     Q.  -- you can't juxtapose those to his family or
11  his friends, necessarily, can you?
12     A.  No, you can't.
13     Q.  I mean -- and you don't as a matter as a
14  professional; is that true?
15     A.  I don't.  I think just when you take the
16  whole situation into account, when he's describing head
17  injuries and so forth, I wondered; but he was never
18  forthcoming, so we really couldn't pursue it.
19     A.  All I can tell you is that I wish you had a
20  chance to talk to his mom and his siblings, that's all.
21  Your picture of him, your positive picture of him, would
22  be confirmed.  And you don't get to see that.  And I don't
23  have any privacy concerns, so I can tell you.
24     A.  Yeah.  I know that he had a positive
25  relationship with his sister.

127

1          MR. BENNETT:  Well, that's all the
2  questions I have for you.  Thank you very much.
3          THE WITNESS:  Yeah.  Thank you.
4          MS. FUNDINGSLAND:  One moment.  I just
5  have a couple of follow-up questions.
6          EXAMINATION BY MS. FUNDINGSLAND
7  BY MS. FUNDINGSLAND:
8      Q.  Do you know why Mr. Smith wouldn't tell you
9  Josephine's last name?  I'm just curious about that.
10     A.  You know, I just think he kept everybody
11  separate.  I think --
12         MR. BENNETT:  He couldn't spell it, is
13  it.  It was terrible to spell.
14         THE WITNESS:  He did really
15  compartmentalize.  And he was a very guarded person, and
16  he guarded his privacy.
17  BY MS. FUNDINGSLAND:
18     Q.  Now, Mr. Bennett asked you if you knew if he
19  had a positive relationship with his sister?
20     A.  Um-hmm.
21     Q.  How did you know that?
22     A.  Just from a few remarks that David had made.
23  And I know that the one time that I'm vaguely recalling
24  that she was in town, it was a very happy time for him,
25  that she came in and just had a vibe of her being a caring

128

1  sister.
2      Q.  And did he ever talk about any other member
3  of his family?
4      A.  No, he never did.
5      Q.  Now, it's possible when people have mental
6  issues or emotional issues to compartmentalize, as
7  Mr. Bennett put, and keep part of your life separate,
8  right?
9      A.  Yes.
10     Q.  Would that necessarily, however, stop
11  somebody from talking about their family?
12     A.  It might.  I mean, I don't know why he never
13  told us about his family.  I mean, I can only guess.  I've
14  worked with a lot of people like David.  He wanted to be
15  successful.  He -- I mean, that was a constant theme of
16  his.  He wanted to have vocational success; he came here
17  to do that.  He probably wanted to go back a success, is
18  what I would imagine.
19     Q.  And it wasn't working out?
20     A.  He tried really hard.  He had a lot of
21  successes along the way, but -- you know, I was really
22  impressed when I read the -- reviewed the notes from the
23  doctor and the psychologist.  Because sometimes, you know,
24  you're working on so many different things with people,
25  you forget, really, how challenged they are.  I mean, just

**MAUREEN GLOVER**

129

1  with the thought disorder and the confusion and the
2  intellectual functioning level, that's a lot to deal with.
3      Q.  Well, let me ask you this:  In your opinion,
4  having worked with David, did you think that he was
5  capable of living independently?
6      A.  Not independent -- well, not from what we
7  saw; not from what we experienced.  He so much wanted to
8  be able to do it, and he had a lot of good skills and
9  drive; but other stuff always got in the way.  Making poor
10  choices about who to help and who to let in; wanting to
11  help other people because he was helped is the way he put
12  it.  He just didn't have good judgment.
13      Q.  Do you think that, in your opinion, that he
14  would have been able to get a degree?
15      A.  Well, I don't think so.  I don't think he
16  would have been able to get a degree according to the
17  recommendations of the doctor and the therapist.  And a
18  lot of times, our clients -- they want that and they
19  demand it.  And down the road, we take different turns and
20  they might eventually get into maybe a more technical
21  program or something.  So we try to -- I mean, he just
22  insisted.  He just signed up every single semester, even
23  though we said let's focus on this or that.  I don't see
24  him completing a degree; although, I'm not a vocational
25  specialist.  Maybe there's some degree programs out there

130

1  that he could have gotten through under ideal
2  circumstances, if he hadn't had all these other things
3  going wrong.
4      Q.  Other issues?
5      A.  Right.
6      Q.  And my last question is:  You talked about
7  with Mr. Bennett about him having hallucinations and
8  hearing voices, and he said that that went back to about
9  age 15?
10      A.  I think that's what he said to me.
11      Q.  And then Mr. Bennett said, well, wasn't he a
12  poor historian?  And you agreed with that.
13      A.  When I --
14      Q.  Let me just ask you a question.
15      A.  Okay.
16      Q.  Did you believe him when he said that?
17      A.  Yes, I did believe him.  As a poor historian
18  -- what I would say makes David a poor historian, to me,
19  is he omits things.  He was not forthcoming.  I don't
20  think he lied, I just think he was guarded and paranoid.
21      Q.  Okay.
22          MS. FUNDINGSLAND:  I don't have anything
23  further.
24          MR. BENNETT:  I don't either.  Thank you
25  very much.

131

1          MS. FUNDINGSLAND:  Thank you so much for
2  coming down.  Art, you too.
3          MR. KATZMAN:  My pleasure, as always.
4
5              *  *  *  *
6
7          (Deposition concluded at approximately
8  1:30 p.m.)
9              *  *  *  *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

132

1  (UPON COMPLETION, forward this original Reading and Signing
   Certificate to ATTORNEY TRACEY FUSSY, who already has the
2  Sealed Original.)
3
4      I, Maureen Glover, do hereby certify that I have
   read the foregoing transcript of my deposition, taken
   October 25, 2012, and believe the same to be true and
5  correct, except as follows:
6
7  PAGE LINE     DESIRED CHANGE
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  Dated this _____ day of _____, 2012.
25  MRC