# EXHIBIT 18

Lawson Bernstein, MD, PC

P.O. Box 81977

Pittsburgh, PA  15217

Telephone:  412-422-9240

Fax:  412-422-5203

12/7/12

My name is Lawson Bernstein, MD. I have practiced clinical and forensic psychiatry since 1991 and 1994 respectively. I was Director of psychiatric residency training at the University of Pittsburgh School of Medicine/Department of Psychiatry from 1991-1994. I worked as a clinical psychiatrist on Pennsylvania's Capital Offender Unit/"Death Row" from 1992 -1994. I held various academic titles at the University of Pittsburgh School of Medicine from 1991 – 2008, first as full time faculty and after 1994 as volunteer teaching faculty. I am currently a lecturer at Duquesne Law School and the Cyril Wecht Institute of Forensic Science and the Law on topics related to Forensic Psychiatry and Neuroscience. I have acted as a forensic consultant to multiple local, state and federal agencies since 1994. I have evaluated hundreds of individuals, both clinically and forensically, with histories similar to Mr. David Smith. My CV, forensic fee schedule and Rule 26 testimony disclosure are attached to this report. I have reviewed the records you forwarded which are also listed as an attachment to this report.

Briefly, this was a then 28 year-old man with a psychiatric history of Schizoaffective Disorder, Substance Abuse, Antisocial personality disorder and longstanding treatment non-compliance. Mr. Smith was a regular abuser of over-the-counter cough medicine containing Dextromethorphan, a substance with known "PCP"/Phencyclidine-like intoxicant and psychotomimetic properties. Mr. Smith's regular abuse of a psychotomimetic agent like Dextromethorphan more likely than not made his underlying psychotic disorder worse and more difficult to treat. Further, Dextromethorphan intoxication and other forms of

1

substance abuse and dependence were a regular feature of Mr. Smith's day-to-day. This fact coupled with his Schizoaffective disorder, resulted in a chronically chaotic and progressively marginalized existence and exceedingly poor clinical prognosis.

As the results of his Schizoaffective Disorder, Antisocial Personality Disorder, Substance Abuse and treatment non-compliance Mr. Smith was frequently homeless and/or intoxicated. Mr. Smith had regular contact with police due to public intoxication and symptoms from his untreated psychiatric and substance abuse problems. Mr. Smith had been psychiatrically hospitalized multiple times and was a frequent patient at local emergency rooms. The week prior to 9/9/10 Mr. Smith had been emergently treated for Dextromethorphan intoxication. On the night before 9/9/10 he had been emergently treated for intoxication.

On 9/9/10 Mr. Smith engaged in an extended altercation with police and then lost consciousness. At the time of subsequent emergent hospitalization he had a documented blood Dextromethorphan level of 2000ng/l (therapeutic 0.5 – 5.9ng/ml) due to acute OTC cough medicine abuse. Concurrent drug screen for one of his psychiatric drugs (lamotrigine) produced a negative result. He subsequently died from cerebral anoxia and it's sequelae on 9/17/10.

You have posed a number of questions to me regarding the decedent.

   1. What was the expected life span of Mr. Smith?

Mr. Smith suffered from a number of longstanding psychiatric diseases plus severe substance abuse. A recent study published by the Ontario Ministry of Health[1] examined the burden of mental illness compared to cancer and infectious disease in regards to excess mortality and lost productive years. This study estimated the adverse effect of mental illness plus substance abuse as 1.5 times that of cancer and 7 times that of infectious disease. This study replicates

---

[1] Opening Eyes, Openings Minds – The Ontario Burden of mental illness and addictions report, Ratnasingham S, Cairney J, Rehm J, Manson H, Kurdyak PA. October 2012

others in the literature which have concluded that chronic mental illness plus substance abuse predicts substantial excess mortality in the sufferers.

Mr. Smith had a history of regularly engaging in dangerous behaviors or exposing himself to dangerous situations. These include passing out on railroad tracks while intoxicated, experiencing incapacitating intoxication/"overdosing" requiring medical treatment (including the week and the night before the 9/9/10 event), contracting sexually transmitted diseases (and thereby placing himself at risk for Hepatitis B and/or HIV), episodic homelessness (exposing him to the dangers of street life) and committing petty crimes. I believe that Mr. Smith's mix of severe mental disorder(s), regular substance abuse, medical history (including treatment for sexually transmitted diseases), legal history, frequent homelessness and treatment non-compliance predicted at best a life expectancy of 50 years.

2. What factors were extant on the date of the altercation that predicted Mr. Smith's level of violence?

At the time of the altercation Mr. Smith was apparently non-compliant with psychotropic medication (as was his habit), severely intoxicated on Dextromethorphan and other constituents of cough syrup, and more likely than not acutely psychotic from both of these factors both singly and in the aggregate. In particular the combination of high dose Dextromethorphan (which as noted above is an intoxicant with PCP-like properties) plus un-medicated psychosis is a potent recipe for bizarre violent acting out behaviors such as those evinced by Mr. Smith. It is also important to note that individuals intoxicated with Mr. Smith's blood level of Dextromethorphan but *without* an underlying autonomous psychotic disorder can present identically to his presentation at the YMCA on 9/9/10.

3. What was Mr. Smith's strength potential given the factors in item #2?

Predicated on the factors extant in item #2, Mr. Smith's capacity for extended periods of high physical exertion related violence would have been substantial. In fact, the type of prolonged struggle captured by an officer's pen-camera is emblematic of an excited

3

delirium-like state in individuals with Mr. Smith's acute and chronic psychiatric history and/or Dextromethorphan intoxication.

4. What was Mr. Smith's employability and prospect for further educational achievement?

Mr. Smith was chronically mentally ill with a psychotic disorder, a long-term substance abuser whose apparent drug of choice predictably worsened underlying psychosis, was frequently treatment non-compliant and effectively homeless. This had been his condition for quite some time per record review. As such, his prospects for gainful employment and/or educational achievement were negligible.

5. What was Mr. Smith's emotional capacity to provide a stable, loving and supportive influence to other family members.

Referencing the above, individuals such as Mr. Smith lead chaotic and frequently dangerous lives in which their capacity for daily subsistence (let alone supportive family interactions or a productive life) is severely impaired. The records do not reflect an individual with a strong family life, and indeed his capacity for this would have been minimal for obvious reasons. In addition, psychotic spectrum disorders such as Schizoaffective Disorder produce delusions and/or hallucinations that interfere with the formation and maintenance of close interpersonal relationships. In individuals such as Mr. Smith, a comorbid substance abuse disorder (particularly with a psychotomimetic agent like Dextromethorphan) routinely makes these psychotic symptoms worse. Substance abuse also exerts its own deleterious effects on the capacity to form stable and loving relationships. Even in non-psychotic individuals chronic or intermittent intoxication, possible physical dependence, disinhibited mood state due to abuse and/or withdrawal, prevarication and other associated phenomena related to addiction are all inimical to the development and maintenance of close interpersonal relations and/or an intact family life.

Given the diagnoses extant in Mr. Smith and treatment non-compliance it is highly unlikely that his family would have been ignorant of his psychosis and associated aberrant behaviors and their adverse effect on interpersonal relationships. Schizoaffective disorder

4

is chronic and even when treated does not fully remit. Thus his psychotic symptoms would have been extant, albeit in a muted state, even with pharmacological treatment and extended sobriety.

Plaintiff's psychiatric expert has opined that with different treatment(s) Mr. Smith's conditions might have improved as pertains to family life, work and/or educational achievements. Given the facts of this case, the presence of both a serious chronic psychotic disorder and severe substance abuse with a psychotomimetic agent, the likelihood of future treatment compliance and associated symptom remission allowing these potential positive outcomes was low.

In summary, on 9/9/10 Mr. Smith presented as acutely psychotic and violent more likely than not due to an unmedicated psychotic disorder coupled with acute severe dextromethorphan intoxication. Both these factors, particularly together, are associated with a propensity for extended periods of bizarre violent behavior. Mr. Smith's capacity for gainful employment, educational success and/or a stable loving family life was minimal given the fact pattern of this case. His clinical prognosis was poor and it was unlikely he would have achieved a life span anywhere near his actuarial one for the multitude of reasons noted above.

I reserve the right to amend, expend or change my opinions based on new information disclosed to me. All opinions are expressed within a reasonable degree of medical certainty.

Sincerely,

Lawson Bernstein, MD

5

David C Smith – records reviewed

United States District Court – District of Minnesota
    Larry E Smith, as trustee for the Heirs and Next of Kin of David Cornelius Smith vs. Timothy
    Gotman and Timothy Callahan, acting in their individual capacities as Minneapolis police
    officers, and the City of Minneapolis
        Plaintiff's Second Supplemental Answers to Defendants' Interrogatories
        First Amended Complaint
        Answer of Defendants Gorman, Callahan and the City of Minneapolis to Plaintiff's
            First Amended Complaint
        Plaintiff's Responses to Defendants' Request for Production of Documents
        Plaintiff's Answers to Defendants' Interrogatories
        Plaintiff's First Supplemental Answers to Defendants' Interrogatories
        Plaintiff's Responses to Defendants' Request for Production of Documents (Second
            Set)
        Plaintiff's Second Supplemental Answers to Defendants' Interrogatories
        Videotaped deposition transcript of Timothy Callahan – 01/30/2012
        Videotaped deposition transcript of Timothy Gorman – 01/30/2012
        Videotaped deposition transcript of Andrew M Baker, MD – 01/25/2012
        Videotaped deposition transcript of Andrew M Baker, MD – Volume II – 02/08/2012
        Videotaped deposition transcript of Sigrid Finke – 07/11/2012
        Deposition transcript of Natalie K Harris – 05/18/2012
        Videotaped deposition transcript of Martin J Stachnik – 05/17/2012
        Videotaped deposition transcript of William Christopher Taylor – 07/26/2012
        Videotaped deposition transcript of Courtney Troyer – 05/18/2012
        Videotaped deposition transcript of Angela Weber – 07/26/2012
        Videotaped deposition transcript of Jo Ann Zillhardt – 07/11/2012
        Expert Report of John J Ryan

Correspondence between David Smith & Angela Smith
Myspace  posts of "King David"
Hennepin County Medical Examiner reports
American Indian Community Development Corporation
Cedar Ridge Treatment Center
Fairview University Riverside Campus
Hennepin County Mental Health Center
Karol Neuropsychological Services & Consulting
MN Department of Human Services
Park Nicollet Methodist Hospital
Vinland Center
State of Minnesota Office of the Ombudsman for Mental Health and Developmental Disabilities
Oak Grove Residential Treatment Center
Hennepin County Medical Center
Hennepin County Human Services & Public Health Department
Mosaic Apartment Services, Inc
REM Hennepin – Brooklyn Center
Mill City Clinic
Report of Michael M Baden, MD – 02/28/2012
Report from The Tox Group – 11/13/2012
Expert Report of Dr. S Charles Schulz, II
Report titled: *Opening Eyes, Opening Minds: The Ontario Burden of Mental Illness and*
    *Addictions Report*

## LAWSON F. BERNSTEIN, MD, PC
## CASE LISTING  -  JANUARY 2007 - NOVEMBER 2012

| Case Name | Law Firm | Time Period | Testimony or Deposition | | |
|---|---|---|---|---|---|
| Keidering, Eric | Lenahan & Dempsey | Jan-07 | Testimony | w/c | defense |
| Benning, Lillie | Malone, Middleman | Jan-07 | Deposition | PI | defense |
| Smith, Robert v Young Touchtone | Pietragallo, Bosick & Gordon | Feb-07 | Testimony | PI | defense |
| McDowell, Mark | Cheerhardy, Sherman, Ellis, Murray | Feb-07 | Deposition | w/c | defense |
| Felix, Armen | Robb, Leonard & Mulvihill | Feb-07 | Deposition | w/c | defense |
| Cooke, James, State v | Delaware Public Defender's Office | Feb-07 | Testimony | criminal | criminal |
| Rios, Miguel | Federal Defender's Assoc | Feb-07 | Testimony | criminal | defense |
| Fennell, Scott | Pribanic & Pribanic | Feb-07 | Deposition | w/c | defense |
| Baysinger, William | Malone, Middleman | Mar-07 | Deposition | w/c | defense |
| Paul Schulz v Pittsburgh Board of Education | Pietragallo, Bosick & Gordon | Mar-07 | Deposition | w/c | defense |
| Brooks, Dustin | Lenahan & Dempsey | Mar-07 | Deposition | w/c | defense |
| Painter, Donald v New Image Press | Dickie, McCamey & Chilcote | Apr-07 | Deposition | PI | plaintiff |
| Curran, Saundra v National City Corporation | Cipriani & Werner | Apr-07 | Deposition | w/c | defense |
| Innocenti, Kendra vs. Cook's Pharmacy | Lenahan & Dempsey | Apr-07 | Testimony | w/c | defense |
| Fundis, Tammy | Dapper, Baldasare, Benson, Behlir | Apr-07 | Deposition | w/c | defense |
| Wright v Wright | Wilder & Mahood | Apr-07 | Testimony | divorce | plaintiff |
| State of Ohio v Janae C Ray | Stephanie Greenberg | May-07 | Testimony | criminal | prosecuting |
| Walkiewicz, Stanley | Burns, White & Hickton | May-07 | Deposition | w/c | defense |
| Leuschen, Robert | Mamen, Mioduszewski, Bordonaro | May-07 | Deposition | w/c | defense |
| Davis, Richard | Dickie, McCamey & Chilcote | Jun-07 | Deposition | w/c | defense |
| Greeco, Mark | PA Dept of State, Board of Nursing | Jun-07 | Deposition | criminal | prosecuting |
| Cummings, Keith v Horsehead Corp. | Pietragallo, Bosick & Gordon | Jun-07 | Deposition | w/c | defense |
| Wilson, James | Knox, McLaughlin, Gornall & Stenn | Jul-07 | Deposition | w/c | defense |
| Watson, Kim M | PA Dept of State, Board of Nursing | Jul-07 | Testimony | criminal | prosecuting |
| Pritchet, Leonard | Timothy Dawson | Aug-07 | Testimony | PI | defense |
| McNeill, Daniel and Dawn McNeill v. US Airways, Inc., Philip C | Pietragallo, Bosick & Gordon | Aug-07 | Disc Depo | PI | defense |
| Doe, Jane v David Gillispie, as agent of Kanawha Co Board o | Eisenberg & Torisky | Aug-07 | Disc Depo | medmal | defense |
| Rebecca B Caldwell, as Personal Representative of the Estat Searcy Denney Scarola Barnhart | Dickie, McCamey & Chilcote | Sep-07 | Disc Depo | PI | defense |
| Algeo, William | Eisenberg & Torisky | Oct-07 | Deposition | PI | defense |
| Caldwell, Doug v Senex Explosives, Inc | Dickie, McCamey & Chilcote | Oct-07 | Deposition | w/c | defense |
| Baumann, Tyler, State of WV v | Wilson, Frame, Benninger & Methe | Oct-07 | Testimony | criminal | prosecuting |
| Bielic, Cheryl | PA Dept of State, Board of Nursing | Nov-07 | Deposition | w/c | defense |
| Davis, Gregory, v Nelson Tree Service | Pietragallo Bosick & Gordon | Nov-07 | Testimony | w/c | defense |
| Flaherty, Lynn A & James Flaherty v St Clair Memorial Hospit | DelSole Cavanaugh | Nov-07 | Testimony | medmal | defense |
| McGough, Mark v Aspen Valley Contracting | Robb, Leonard & Mulvihill | Dec-07 | Deposition | w/c | defense |
| Strothmore, Estate of Timothy v United Summit Center | Steptoe & Johnson | Dec-07 | Disc Depo | PI | defense |
| Strothmore, Estate of Timothy v United Summit Center | Steptoe & Johnson | Dec-07 | Testimony | PI | defense |
| Carnes, Robert v Christopher L Stewart, Edwin R Roup, Jr | Dapper, Baldasare, Benson, Behlir | Dec-07 | Deposition | w/c | defense |
| Cawthen, Joyce | Abes, Baumann | Dec-07 | Deposition | w/c | plaintiff |
| Smith v Akhtar | Williams, Hall & Latherow | Dec-07 | Testimony | medmal | defense |

# LAWSON F. BERNSTEIN, MD, PC
## CASE LISTING  -  JANUARY 2007 - NOVEMBER 2012

| Case Name | Law Firm | Time Period | Testimony or Deposition | | |
|---|---|---|---|---|---|
| Strother, Estate of Timothy v United Summit Center | Steptoe & Johnson | Dec-07 | Testimony | PI | defense |
| Trevena, Edwin vs. Primehealth, et al. | Paul M. Kaufman | Jan-08 | Testimony | PI | defense |
| Andreen, Kelly | Evaluation Specialists | Jan-08 | Deposition | w/c | defense |
| Callender, Gail v Allegheny Ludlum Corporation | Dapper, Baldasare, Benson, Behlir | Jan-08 | Deposition | w/c | defense |
| Lundquist, Nicholas | Litter Mendelson | Feb-08 | Deposition | PI | defense |
| Buynovsky, Paul v Jacob A Vachal | Willman & Arnold | Mar-08 | Deposition | PI | defense |
| Rasey, John K Jr and Diane Rasey vs Transflo Corporation, | Yates, McLamb & Weyher | Mar-08 | Deposition | PI | defense |
| Corley, Robert | Thomas Kostolonsky | Mar-08 | Disc Depo | w/c | defense |
| Jennings, John | Sugarman and Sugarman, PC | Apr-08 | Testimony | PI | defense |
| Pulford, Daniel | Dickie, McCamey & Chilcote | Apr-08 | Deposition | PI | defense |
| Clark, Richard | Cipriani & Werner | May-08 | Deposition | w/c | defense |
| Dayton, Margaret v Gayle R. Yunk | Malone Middleman | May-08 | Testimony | PI | defense |
| Martello-Adams, Terry | Dapper, Baldasare, Benson, Behlir | May-08 | Deposition | w/c | defense |
| Brannaka, Pamela v Family Festivals Assoc, Inc | Zimmer, Kunz | Jun-08 | Deposition | w/c | defense |
| Russell, Renee v UPMC Presbyterian Shadyside | Abes, Baumann | Jun-08 | Deposition | w/c | defense |
| Estel, et al. v John Bushovisky, d/b/a Traveler's Paradise, et al | Meyer Darragh Buckler Bebenek & | Jul-08 | Deposition | PI | plaintiff |
| Hager, Christine | Swartz, Campbell | Jul-08 | Deposition | w/c | defense |
| Brown, Martin | Burns, White & Hickton | Aug-08 | Deposition | w/c | defense |
| Laurianno v. Arbour-Fuller Hospital, et al. | Crowe & Mulvey | Oct-08 | Testimony | medmal | defense |
| Carvelli, Amanda | | Nov-08 | Deposition | PI | defense |
| Quinn, Mary Lee v Presbyterian Senior Care | Gerald Yanity | Nov-08 | Deposition | w/c | defense |
| Perrone, Amy v Highmark | Farrell & Fraticelli, PC | Jan-09 | Deposition | w/c | defense |
| McCullough, et al., v Veterans Memorial Amvets Post 0821, e | Mitchell, Baldwin, Northrup, LLP | Jan-09 | Deposition | PI | defense |
| Chieza, Paul v Chadderton Trucking | Dapper, Baldasare, Benson, Behlir | Jan-09 | Deposition | PI | defense |
| Lufkins, Michelle | Department of State | Jan-09 | Testimony | criminal | prosecuting |
| Alexander, Deanna v Penn State University, et al. | Marnen, Mioduszewski, Bordonaro | Feb-09 | Testimony | w/c | defense |
| Ferlanti, Joseph v Liggett Group | Kasowitz, Benson, Torres & Friedn | Feb-09 | Deposition | PI | defense |
| Moore, Kimberly | Department of State | Feb-09 | Testimony | criminal | prosecuting |
| Cox, Michael, State of West Virginia v | Department of State | Mar-09 | Testimony | criminal | prosecuting |
| Adams, Robert, Commonwealth v | Kratovil & Amore | Mar-09 | Testimony | criminal | prosecuting |
| Landrum, Randy | Erie County District Attorney | Apr-09 | Testimony | criminal | prosecuting |
| Gibson, Ronald , Commonwealth v | Evaluation Specialists | May-09 | Deposition | w/c | defense |
| Lufkins, Michelle | Federal Defender's Assoc | May-09 | Deposition | criminal | defense |
| Banks, Peggy Sue | Department of State | May-09 | Testimony | criminal | prosecuting |
| Sexton, Catherine v Virginia Phillips | Yates, McLamb & Weyher | Jun-09 | Deposition | PI | defense |
| Cozza, Theodore | Department of State | Jul-09 | Testimony | criminal | prosecuting |
| Johnston, David R v Plum Contracting, Inc | Dell, Moser, Lane & Loughney, LLC | Aug-09 | Deposition | PI | defense |
| Salopek, Linda & David Gianessi v Eat 'n Park Hospitality Gro | Dickie, McCamey & Chilcote | Aug-09 | Deposition | w/c | defense |
| Kisak, Dennis v US Steel | U.S. Steel Corporation | Oct-09 | Disc Depo | PI | defense |
| McGee, Beth | Post & Schell | Dec-09 | Deposition | w/c | defense |

# LAWSON F. BERNSTEIN, MD, PC
## CASE LISTING  -  JANUARY 2007 - NOVEMBER 2012

| Case Name | Law Firm | Time Period | Testimony or Deposition | | |
|---|---|---|---|---|---|
| Cole, Anne, Thomas J Duggan, Joseph T Duggan, Jr., Barbar Hardine, Dacus, Barger, Dreyer & I | | Dec-09 | Disc Depo | PI | defense |
| Hampton, Stacie, et al. v. Russell & Illinois Armored Car, et al | Norris, Choplin & Schroeder, LLP | Dec-09 | Disc Depo | PI | defense |
| Saewitz v Saewitz | Broad & Cassell | Dec-09 | Deposition | | |
| Maro, Cynthia | PA Dept of State, Board of Medicin | Dec-09 | Testimony | criminal | prosecuting |
| Sempkowski, Curtis | Eisenberg & Torisky | Jan-10 | Deposition | w/c | defense |
| Ames, Lawrence | Cipriani & Werner | Jan-10 | Deposition | w/c | defense |
| McGinn, Patricia, Personal Representative the Estate of Mich Jeffrey P Paul | | Jan-10 | Disc Depo | PI | plaintiff |
| Jontony, Henry, et al. v Lee J Coliegrove, et al. | Sutter, O'Connell & Farchione | Jan-10 | Disc Depo | PI | defense |
| Hall, Arthur v RJ Reynolds, et al. | Womble, Carlyle | Jan-10 | Disc Depo | PI | defense |
| Townsend, Estate of Frank v RJ Reynolds, et al. | Womble, Carlyle | Jan-10 | Disc Depo | PI | defense |
| Stanley, Andrew v Aline Gilibert Johnson, MD, et al. | Bill T Walker, JD, LLM | Jan-10 | Disc Depo | | |
| Lauriano, Joanne Admx., et al. v. Arbour-Fuller Hospital, et ε Crowe & Mulvey | | Feb-10 | Testimony | medmal | defense |
| Green, Eva Dunlap v Housing Authority of the City of Chariott Kennedy, Kennedy, Kennedy & Ke | | Feb-10 | Testimony | | plaintiff |
| Oliva, Allen C v RJ Reynolds, et al. | Womble, Carlyle | Feb-10 | Disc Depo | PI | defense |
| Lopez, Kimberly v Metropolitan Government of Nashville and Blackburn & McCune, PLLC | | Feb-10 | Testimony | PI | defense |
| Trieschock, Timothy | Moyles Law Firm | Mar-10 | Testimony | medmal | plaintiff |
| Hall, Arthur v RJ Reynolds, et al. | Womble, Carlyle | Mar-10 | Testimony | PI | defense |
| Collins, Cynthia vs Cara L Zieler & State Farm Mutual Automc Robb Leonard Mulvihill | | Mar-10 | Testimony | PI | defense |
| Townsend, Estate of Frank v RJ Reynolds, et al. | Womble, Carlyle | Apr-10 | Testimony | PI | defense |
| McClelland, William | del Sole, Cavanaugh | Apr-10 | Testimony | | plaintiff |
| Juliano, Dominica, a minor, by & thru her parent & natural gua MacDonald, Illig, Jones & Britton | | Apr-10 | Testimony | PI | plaintiff |
| Ritchey, Dennis L v Wal-Mart | Post & Schell | Apr-10 | Deposition | w/c | defense |
| Conrad, Eric v Veeder Root/Danaher Corp | Cipriani & Werner | May-10 | Deposition | w/c | defense |
| Demchak, George | Ogg Cordes Murphy & Ignelzi | May-10 | Deposition | w/c | defense |
| Urban, Eric | Stofko Law Offices | May-10 | Deposition | | plaintiff |
| Young, Kimberly | Chartwell Law Offices | May-10 | Deposition | | plaintiff |
| Rea, Mary | Frankovitch Antiekis Colantino Sim | May-10 | Deposition | w/c | defense |
| Buczek, James | Pietragallo Gordon Alfano Bosick & | Jun-10 | Disc Depo | | |
| Talenfeld, Mitchell David Personal Representative of the Esta Womble, Carlyle | | Jun-10 | Disc Depo | w/c | defense |
| Massie, Debra V Dr. Anthony T Dinh, et al. | Curry & Tolliver, PLLC | Jun-10 | Disc Depo | PI | defense |
| Riemann, Duane E | Early Ludwick Sweeney & Strauss | Jun-10 | Disc Depo | medmal | defense |
| Allen, Patricia L and Andy R Allen, Sr, her husband, Francois Womble, Carlyle | | Jul-10 | Disc Depo | PI | defense |
| Czajkowski, Frank v YMCA | Koskoff, Koskoff & Bieder | Aug-10 | Disc Depo | PI | plaintiff |
| Wingrove, Gregory S | Abes, Baumann | Aug-10 | Disc Depo | PI | plaintiff |
| Rezak, Joseph | Dapper, Baldasare, Benson, Behlr | Sep-10 | Deposition | w/c | defense |
| Robinson, Johnna | Malone, Middleman | Sep-10 | Deposition | | defense |
| Nida, David | Department of State | Sep-10 | Deposition | | defense |
| Rose, Stevenson, Commonwealth v. | Difenderfer, Rothman & Haber | Oct-10 | Testimony | criminal | prosecuting |
| Kowalyk, Vanessa | Woomer & Hall | Dec-10 | Deposition | | defense |
| Igoe, Tracie | Dickie, McCamey & Chilcote | Dec-10 | Deposition | w/c | defense |

## LAWSON F. BERNSTEIN, MD, PC
## CASE LISTING  -  JANUARY 2007 - NOVEMBER 2012

| Case Name | Law Firm | Time Period | Testimony or Deposition | | |
|---|---|---|---|---|---|
| Katz, David v Liggett Group, LLC, et al. | Kasowitz, Benson, Torres & Friedn | Jan-11 | Disc Depo | Pl | defense |
| Comly, Dannie | Pietragallo Gordon Alfano Bosick & | Jan-11 | Deposition | w/c | defense |
| Roy-Vesley, Cali v Richard Edwards | Weinheimer, Schadel & Haber | Jan-11 | Deposition | Pl | defense |
| Jurcevich, Donna | Tucker Arensberg | Feb-11 | Deposition | w/c | defense |
| Blitch, Josephine | Kasowitz, Benson, Torres & Friedn | Feb-11 | Deposition | Pl | defense |
| Ohls, Christine | Department of State | Feb-11 | Testimony | criminal | prosecuting |
| Palmer v Nassan | Ogg, Murphy & Perkosky | Feb-11 | Testimony | | |
| Roxberry, Melissa vs. Voices for Independence | Steffish & Lafferty, PC | Mar-11 | Deposition | w/c | defense |
| Oliva, Allen C v RJ Reynolds, et al. | Womble, Carlyle | Mar-11 | Testimony | Pl | defense |
| Allen, Patricia L. and Andy R Allen, Sr., her husband, Francois | Womble, Carlyle | Mar-11 | Disc Depo | Pl | defense |
| Allen, Patricia L. and Andy R Allen, Sr., her husband, Francois | Womble, Carlyle | Apr-11 | Testimony | Pl | defense |
| Miller, Allison v Johnstown Housing Authority | Buchanan Ingersoll Rooney | Apr-11 | Deposition | w/c | defense |
| Kenny, Carol v UPMC Passavant Cranberry | Dell, Moser, Lane & Loughney, LLC | May-11 | Deposition | w/c | defense |
| Jontony, Henry, et al. v Lee J Colegrove, et al. | Sutter, O'Connell & Falchione | Jun-11 | Testimony | | |
| Richter, Theresa R, Personal Representative of the Estate of | Womble, Carlyle, Sandridge & Ri | Jul-11 | Deposition | Pl | defense |
| McAnulty, Richard Commonwealth vs. | Timothy C Andrews, Esquire | Jul-11 | Testimony | criminal | defense |
| Irdi, Nigel | Carpenter, McCadden & Lane | Aug-11 | Deposition | w/c | defense |
| Ertman, David F & Jane F Ertman v RJ Reynolds Tobacco Co | Womble Carlyle | Aug-11 | Disc Depo | Pl | defense |
| Nzambi, Emanuel | Gover, Perry & Shore | Aug-11 | Testimony | criminal | defense |
| Ojeda, Reinaldo as Personal Representative for the Estate of | Womble, Carlyle, Sandridge & Ri | Sep-11 | Testimony | Pl | defense |
| McKeel, David v Joseph Rezk t/a Punxsutawney Medical Sup | Margolis Edelstein | Sep-11 | Deposition | w/c | defense |
| Cileo, Rita | Yates, McLamb & Weyher | Sep-11 | Disc Depo | | |
| Pollock, Phyllis L v Hugh P Pollock | Pollock Begg Komar Glasser LLC | Oct-11 | Testimony | divorce | |
| Todd, Nancy | Monge & Associates | Nov-11 | Disc Depo | | plaintiff |
| United States v Justin Smith and Brandon Piper | US Department of Justice | Nov-11 | Testimony | criminal | prosecuting |
| Czajkowski, Frank v YMCA | Koskoff, Koskoff & Bieder | Dec-11 | Testimony | Pl | plaintiff |
| Cileo, Rita | Yates, McLamb & Weyher | Jan-12 | Deposition | | |

<div align="center">

Lawson F. Bernstein, M.D., P.C.
P O Box 81977
Pittsburgh, Pennsylvania 15217

</div>

Administrative Assistant Mary Quinlisk      412 600-7996
Office Fax                                                    412 422-5203
**Fee Schedule, Notification and Cancellation Policy**

Case Name:                                                                      LFB #
Revised 2/2012   **PLEASE READ THIS CAREFULLY**:

1. Hourly rate for file review, trial preparation, other: $500/hr ($550/hr for < 96 hr/4 business days turn around)

2. Standard IME report fee: minimum $3000, general range $3000-$5000 depending on the records to review, fee greater for voluminous records.

3. Deposition/testimony :

    A. Flat fee for workers' compensation deposition = $1900

    B. Flat fee for all other depositions < 4 hours = $3000, then $500/h thereafter including any travel time.

    C. Flat fee for local live court testimony (less than 90 highway miles Pittsburgh), one calendar day or part thereof = $6000 / day.

    D. Flat fee for out-of-town live testimony (greater than 90 highway miles from Pittsburgh or requiring air-travel), one calendar day or part thereof = $8500 / day.

    E. Minimum video deposition fee = $4500

    F. Deposition/testimony prepayment due no less than 2 weeks prior to date of appearance.

4. Proposed dates for IMEs and/or depositions requested by you and subsequently provided by my office will be held unconfirmed for no more than 2 weeks from the calendar date they are provided to you.

5. Formal **written** notice for trial and/or deposition dates must be given no less than **4 calendar weeks in advance** of proposed appearance, or my appearance cannot necessarily be guaranteed.

6. <u>Trial and deposition prep fees</u> are billed separately from appearance fee. Testimony prep begins at least 4 weeks pre-appearance. These fees are non-refundable.

7. <u>Prepayment & Cancelled Deposition fees</u> - Prepayment by certified check no later than 2 weeks prior to deposition. Cancellation less than 7 calendar days notice = $2000, less than 96 hr notice (4 calendar days) = fee in full. Notice is determined from 8am on original date of scheduled testimony.

8. <u>Cancelled workers' compensation deposition (</u>notice is determined from @ 8am on date of exam) < 4 calendar days notice = $1000

9. <u>Prepayment & Cancelled Court testimony</u> - Prepayment by certified check no later than 2 weeks prior to deposition, cancellation less than 7 calendar days notice = $3500 (out of town = $5000),  < 96 hr notice (4 calendar days) = fee in full. (Notice is determined from 8 am on <u>original</u> 1st day of trial);

10. <u>Cancelled IME</u> (notice is determined from @ 8am on date of exam) < 5 calendar days notice = $1500; < 24 hr/ one calendar day notice  = $3000: <u>No-show for IME</u> = $3000

11. <u>MMPI-2</u> personality/malingering psych testing & report = $500

12. <u>All</u> travel expenses (car rental or mileage, air travel, hotel, etc) are to be paid at least 2 weeks in advance by the client.

13. Retainer of **<u>$3000.00</u>** due at onset of this matter, prior to beginning of any work.

14. **<u>A formal written notice at least 8 weeks prior to any proposed trial or deposition date is required or an appearance date *cannot be guaranteed*</u>**.

15. Failure to adhere to any aspect of items #1-11 will result in my immediate withdrawal from the case. <u>ALL FEES PAYABLE IN ADVANCE</u> Bills unpaid > 60 days from date posted may incur additional penalties or may be submitted for collection. <u>Please read, sign and fax back.</u>

16. <u>ELECTRONIC DOCUMENT TRANSFER</u> – **No more than 100 pages of documents per forensic case can be sent to this office via electronic document transfer.** All other case records must be sent as <u>printed documents</u> to my office. By request, this office will prepare an estimate for document printing. This estimate must be prepaid prior to document printing. <u>Document printing costs are not covered by the initial case retainer.</u>

ADDITIONAL SIGNATURE PAGE→

"I understand this fee schedule is a written contract between myself and/or the organization I represent and Lawson F. Bernstein, MD, PC. I have reviewed this fee schedule in its' entirety. My signature denotes formal receipt and acceptance of this fee schedule".

Signature: _____ Date: _____

- o PLEASE REFER TO INVOICE/ESTIMATE NUMBER IN ALL BILLING CORRESPONDENCE
- o CASE ESTIMATE PROVIDED ON REQUEST.

## LAWSON F. BERNSTEIN, JR., M.D.

*Correspondence Address*:
**Post Office Box #81977**
**Pittsburgh, Pennsylvania 15217**

*Office Telephone Number:* **412-422-9240**
*Administrative Assistant, Mary Quinlisk* – **412-600-7996**
*Fax Number:* **412-422-5203**
*Federal Tax ID:* **# 25-176-2150** *(Lawson F. Bernstein, M.D., P.C.)*
*Website:* www.lfbmdpc.com
*Email:* **lawsonbernstein@hotmail.com**

### PROFESSIONAL EXPERIENCE

1994-Present    **Lawson F. Bernstein M.D., P.C.**

Forensic & Neuropsychiatric consulting practice with expertise in the assessment and treatment of Brain Injury, Seizure disorders, stroke, toxic environmental exposure, chronic pain conditions, addiction and other neurological/neuropsychiatric conditions.

2005-Present    **Consultant, Department of State, PA Bureau of Professional and Occupational Affairs**

Case reviewer & consultant for above office as pertains to neuropsychiatrically impaired PA. Professionals (physicians, nurses, pharmacists, etc.)

1996-Present    **Physician Volunteer, Allegheny County Shelter for the Homeless**

1994-Present    **Forensic Psychiatric Consultant, Office of the Public Defender of Allegheny County, Court of Common Pleas -Juvenile Division & Family Division, Orphan's Court - Allegheny County, Attorneys general Offices of PA, OH & VW, various other State & Federal Agencies.**

Forensic Psychiatric Evaluation of Criminal Defendants, Juveniles, Parents and Adoptees, and testimony in various litigation procedings.

1997-2010   **St. Margarets Memorial Hospital, UPMC, Pittsburgh, Pa.**

Psychiatric Consultant to medically complicated patients, including Critical Care Units.

**2004-2009**   **Neurotoxicology & Neuropsychiatry Consultant to Allegheny County Office of the Coroner.**

Forensic case reviewer for above office as pertains to neurotoxicological issues and the manner of death of a decedent under investigation by the Coroner.

**1991-2009**   **Harmarville Rehabilitation Center, Brain Injury Unit, Pittsburgh, PA, Staff Psychiatrist**

Consulting neuropsychiatrist to brain injury, stroke & chronic pain programs.

**2000-2002**   **Advisor; State Senate Subcommittee on Youth & Aging – Initiative on Violence & Mental Illness, Harrisburg, PA**

Invited to present proposal to reform Mental Health Act and Uniform Firearms act in wake of two shooting rampages in Pittsburgh.

**1998-2005**   **Consulting & Teaching Staff, Greater Pittsburgh Rehabilitation Hospital**

Consulting neuropsychiatrist to brain injury & stroke programs.

**1998-1999**   **Consulting Staff, UPMC/Passavant Hospital**

Psychiatric Consultant to medically complicated patients, including Critical Care Units.

**1993 -1995**   **Member; Governor's Task Force for State Mental Health Planning Council, Harrisburg, PA**

Non-Voting member of committee delegated to assign 80 million dollars in community block grants for mental health services

**1992-1995**   **Western Psychiatric Institute and Clinic, Director, General Psychiatry Training Program; Co-Director, Office of Residency Training**

Responsible for monitoring education of 65 residents/fellows, and academic teaching activities of 255 faculty, overseeing office staff of 6, monitoring budget of 2.8 million dollars, setting educational goals and initiatives for one of largest training programs in the U.S.. Position involved major presentations, recruitment activities and liaison with other medical specialty leadership at university, and senior administration at WPIC.

1992-1994       **Chairperson, AADPRT Committee on Managed care and Residency Education**

National Committee to evolve strategy to modify training and advocate for continued government funding of psychiatric residency education. Involved liaison with other American Psychiatric Association Committee chairpersons and various managed care executives.

1992-1994       **UPMC Brain Injury Program, Attending Psychiatrist**

1992-1993       **Allegheny County Jail, Allegheny County MH/MR, Pittsburgh, PA, Psychiatric Consultant**

Performed psychiatric service assessment utilized by jail administration to obtain psychiatric nurse clinician from current health care vendor at this institution

1991-1993       **State Correctional Institute at Pittsburgh (SCIP) Department of Corrections, Pittsburgh, PA, Psychiatric Consultant**

Responsible for creating "team" concept of care delivery to inmates, utilizing multidisciplinary approach. Developed psychiatric formulary of drugs to decrease utilization and set practice guidelines.

1991-1995       **University of Pittsburgh Medical Center, Psychiatric Consultation-Liaison Program/Service, Attending Psychiatrist – Trauma & Toxicology Programs**

1989-1991       **New York Hospital Burn Center, New York, NY, Research Associate**

1983-1987       **Marketing Representative, Continental Wingate Capital Corporation**

1978-1979       **Union Organizer, District 65, New York, NY**

1975-1978       **Principal, Lone Star Trucking and Freight Co.**

## ACADEMIC APPOINTMENTS

2004 – 2009       Clinical Instructor in Psychiatry, University of Pittsburgh School of Medicine

2004 – 2008       Assistant Professor of Psychiatry, Department of Family Practice, University of Pittsburgh School of Medicine

1991-2004       Assistant Professor of Psychiatry, University of Pittsburgh School of Medicine Western Psychiatric Institute and Clinic Pittsburgh, Pennsylvania

## EDUCATION AND TRAINING

### UNDERGRADUATE:

| 1979 –<br>1983 | Hunter College, CUNY<br>New York, NY | BA 1983<br>English/Classi<br>cs Major |
|---|---|---|

### GRADUATE:

| 1983 –<br>1987 | Cornell University<br>New York, NY | MD 1987<br>Medicine |
|---|---|---|

### POST GRADUATE:

| 1987 –<br>1988 | New York Hospital<br>New York, NY | Rotating<br>Internship |
|---|---|---|
| 1988 –<br>1991 | New York Hospital<br>Payne Whitney Clinic<br>New York, NY | Residency in<br>Psychiatry |

## CERTIFICATION AND LICENSURE

SPECIALTY CERTIFICATION:

1992        American Board of Psychiatry & Neurology #36050

1996        American Board of Forensic Medicine #1164

1996        Diplomate, American Board of Forensic Examiners #3505

MEDICAL LICENSURE:

1988        New York State Board of Medicine  #176951

CV - L. Bernstein, M.D.                                             Page 4
Revised 10/11

1991          Pennsylvania State Board of Medicine #MD-044058-L

## MEMBERSHIPS IN PROFESSIONAL AND SCIENTIFIC SOCIETIES

1996-         American Society of Addiction Medicine

1996-         American College of Forensic Examiners

1995-         American Medical Association & Allegheny County Medical Society

1992-1994     American Association of Directors of Psychiatric Residency Training

1991-         American Academy of Psychosomatic Medicine

1986-         American Psychiatric Association

## HONORS and AWARDS

1983          Salk Award; Outstanding Undergraduate Research in the Biological Sciences

              "Hyper Hydroxylation of Estradiols in Systemic Lupus Erythematosus"; Hunter

              College, CUNY

1987          Diethelm Award; Outstanding Medical Student/Psychiatry; Cornell University

              Medical College

1991          Llahmon Prize; Outstanding Psychiatric Resident Research; New York

              Hospital/Payne Whitney Clinic

1991          Outstanding Psychiatric Resident Research, 2nd Prize; American Psychiatric

              Association, Area 2 Council

1991          Granet Prize; Best Resident Consultation Psychiatry; New York Hospital/Payne

              Whitney Clinic

# PUBLICATIONS

REFEREED ARTICLE/CMES:

1. Bernstein, L., Jacobsberg, L., Ashman, T., Musagni, G., Goodwin, C., Perry, S.: Detection of alcoholism in burn patients. Hospital & Community Psychiatry 43(3):255-256; 1992.

2. Bernstein, L. & Daviss, S.: Organic anxiety disorder with symptoms of akathisia in a patient treated with the immunosuppressant FK506. General Hospital Psychiatry. 14:210-211; 1992.

3. Bernstein, L.: Trazodone treatment of targeted aggression in a mentally retarded man. ,The Journal of Neuropsychiatry and Clinical Neurosciences, 4(3):348; Summer 1992.

4. Bernstein, L.: Abrupt cessation of rapid-cycling bipolar disorder with the addition of low-dose L-Tetraiodothyronine (T4) to Lithium.. Journal of Clinical Psychopharmacology. 12(6):443-444; December 1992

5. Bernstein, L. & Levin, R.: Catatonia responsive to intravenous Lorazepam in a patient with cyclosporine neurotoxicity and hypomagnesemia. Psychosomatics 34(1); Jan/Feb 1993.

6. Bernstein, L: Pain Perception and Serum Beta Endorphin in Trauma. Psychosomatics 36 (3), May-June 1995

REVIEW ARTICLE/CMES & BOOK CHAPTERS

A. Bernstein, L.: Mental Disorders, Tests & Drugs  In Psychological and Scientific Evidence in Criminal Trials, 3d edition, JC Moriarity, Ed.., West Group, St. Paul, MN-2000

B. Bernstein, L.: Burn Trauma. In Principles of Medical Psychiatry, 3d edition, Stoudemire & Fogel Eds., Oxford University Press, New York, NY; 1999

C. Bernstein, L.: Mentally disordered prisoners. Book review.  J. Gunn, T. Maden, & M. Swinton, Eds., The Home Office. Journal Criminal Behavior & Mental Health; 1992.

D. Bernstein, L.: Residency Training and Health Care Reform. AADPRT Newsletter, Drell, Ed., School of Medicine, New Orleans, LA

E. Bernstein, L.: Burn Trauma In <u>Acute Pain Managemment</u>., 1998

F. Bernstein L.,: Textbook of Forensic Psychiatry Book Review, Gold & Simon Editors, <u>American Journal of Psychiatry</u>; 2011 *in press*

<u>PEER REVIEWER, ACADEMIC JOURNALS</u>

- American Journal of Psychiatry – 1994 to present

- Forensic Examiner – 1996 to present

<u>CONFERENCE PROCEEDINGS</u>

1. Co-author, Length of Antidepressant Therapy : Consensus Conference, University of Minnesota, 1995

**PROFESSIONAL ACTIVITIES**

<u>Visiting Professorships</u>

| | |
|---|---|
| 3/94 | Visiting Professor, Cambria County Medical Society |
| 6/94 | Visiting Professor, Department of Psychiatry, Medical Center of Brazil at Sao Paolo |

<u>Individual Lectures/Presentations/Media Appearances</u>

| | |
|---|---|
| 4/12 | Mock Neuroscience Civil Trial 2nd &3rd year law students Scientific Evidence Course, Duquesne University Law school, Pittsburgh, PA |
| 3/12 | "Neuroscience in Criminal & Civil Litigation" lecture to 2nd &3rd year law students Legal Medicine Course, Duquesne University Law school, Pittsburgh, PA |
| 9/11 | Interview WPXI TV,. Pittsburgh PA regarding mass shooting at UPMC Medical Center by Richard Shick. |

| | |
|---|---|
| 3/12 | "Diagnosis and Treatment of Depression in the injured worker" presented at Current Trends in Workers Compensation management Conference, Allegheny General Hospital, Pittsburgh, PA |
| 3/12 | "Neuroscience and the Law" lecture to 2nd & 3rd year law students Experts & Scientific Evidence Course , Duquesne University Law school, Pittsburgh, PA |
| 2/12 | "Neuroscience On Trial" presented at "Forensic Fridays" Conference, Wecht Institute of Forensic Sciences, Duquesne University, Pittsburgh, PA |
| 10/11 | "Towards a Neurobiology of Predation" presented at "Predators and their Prey" Conference, Wecht Institute of Forensic Sciences, Duquesne University, Pittsburgh, PA |
| 9/11 | "Psychiatric Disease in the Injured Worker", Pennsylvania Bar Institute, Harrisburg, PA. |
| 9/11 | Interview WPXI TV,. Pittsburgh PA regarding appeal of Death Sentence in Richard Baumhammers case. |
| 1/11 | Interview WPXI TV,. Pittsburgh PA regarding shooting of Rep. Giffords in Tucson, AZ |
| 11/10 | "PTSD", lecture given at first graduation ceremony for Allegheny County Veteran's Court |
| 4/10 | Interview WPXI TV,. Pittsburgh PA regarding 11 year olds murder of stepmother, certification to try as an adult. |
| 8/09 | Interview WPXI TV,. Pittsburgh PA regarding shooting at LA Fitness Center in Pittsburgh, PA. |
| 5/09 | Interview WTAE TV,. Pittsburgh PA regarding shooting of 3 local police officers by Richard Poplowski |
| 5/09 | Interview WPXI TV,. Pittsburgh PA regarding shooting of 3 police officers by Richard Poplowski |
| 4/09 | Interview TV-14,. Pittsburgh PA regarding treatment of Depression |
| 2/09 | Interview WPXI TV,. Pittsburgh PA regarding 11 year olds murder of stepmother |
| 2/09 | Interview KDKA TV and radio, Pittsburgh PA regarding 11 year olds murder of stepmother |

| 1/09 | Interviewed by Northwest Herald, McHenry County Illinois regarding "red flags" signs of violence in children |
| 11/07 | Psychiatric Disease in the Injured Worker – "mental/mental" claims, CLE lecture , Pittsburgh PA |
| 11/07 | Interviewed WGN radio, Chicago Ill. regarding baseball steroid abuse scandal |
| 3/07 | Interviewed by Geraldo Rivera/ NEWS regarding Virginia Tech mass murder case. |
| 3/07 | Interviewed by Kimberly Guilfoyle/ "Line Up" program FOX NEWS regarding multiple unsolved murder cases. |
| 1/07 | Interviewed by Kimberly Guilfoyle/ "Line Up" program FOX NEWS regarding Missouri Child Abduction cases. |
| 1/07 | Interviewed by Katrina Owens/ "Night Talk" PCNC regarding Missouri Child Abduction cases |
| 10/06 | Interviewed by ABC News/Good Morning America regarding Dissociative Amnesia |
| 10/06 | Interviewed by Pittsburgh Tribune Review regarding Amish Schoolhouse Murders. |
| 10/06 | Interviewed by Ann Devlin/ "Night Talk" PCNC regarding Amish Schoolhouse Murders. |
| 8/06 | "Evaluating Change in Mental Status, Practice & Pitfalls", CME/Grand rounds, UPMC St. Margaret's Hospital, Pittsburgh, PA. |
| 1/06 | "Psychiatric Assessment of the Potentially Abusive Parent", CME Seminar, Pittsburgh, PA. |
| 10/05 | "Management of drug/alcohol withdrawal in the acute med/surg patient", CME Seminar, Pittsburgh, PA. |
| 9/05 | "Work Related Psychiatric Injuries- Practices & Pitfalls", CME/CLE Seminar, Harrisburgh, PA. |
| 8/05 | "2nd generation antipsychotics, medical morbidity and mortality", CME/Grand rounds Harmarville Rehabilitation Center, Pittsburgh, PA. |
| 3/05 | "Work Related Psychiatric Injuries- Practices & Pitfalls", CME/CLE Seminar, Pittsburgh, PA. |

| | |
|---|---|
| 3/05 | "The BTK killer", Interview regarding serial killer arrest, CJOB radio station, Winnipeg Canada. |
| 3/05 | "The BTK killer", Interview regarding serial killer arrest, WPXI radio station/Night Talk Show, Pittsburgh, PA. |
| 2/05 | "School Noted Adoptees size", Interview regarding abuse of adopted children by adoptive parents, Tamp Tribune, Tampa, FL. |
| 10/04 | "Creutzfeld Jacob Disease", Interview regarding unusual epidemiological outbreak of this disorder in the local area, WAMC, Albany, N |
| 8/04 | "Little League can't escape online bets", Interview regarding compulsive gambling, Ventura County Star, Ventura, CA |
| 7/04 | "Psychopharmacology, Practice & Pitfalls in the General Hospital & ICU patient", Grand Rounds, UPMC-St. Margaret's Hospital, Aspinwall, PA |
| 6/04 | Interview regarding serial killer, Eugene McWatters, Port St. Lucie News, Pt. St. Lucie, FL |
| 4/04 | Testimony regarding urine drug testing and confounding physiological fluid balance abnormalities in professional football players, NFL League Headquarters, New York, NY |
| 3/04 | Interview regarding Asperger's Syndrome and the Robert Durst Murder Trial, "48 hours" show, ABC TV, New York, NY |
| 2/04 | "The role of the Forensic Neuropsychiatrist in Civil & Criminal court proceedings", Duquesne Law School/Forensic Science program, Pittsburgh, PA |
| 1/04 | "Gambling Addiction & Gambling TV", interview, FoxNews.com, New York, NY |
| 11/03 | "Is there a common set of characteristics among serial killers", interview regarding the apprehension of Green River serial killer Gary Ridgeway, Agence France Presse Wire Service, Los Angeles, CA |
| 11/03 | "Gambling Addiction", interview regarding this disorder, The Newark review, Newark, Delaware |
| 10/03 | Radio interview regarding Rush Limbaugh and opiate addiction in professionals, KABC radio station, Los Angeles, California |

| | |
|---|---|
| 9/03 | "Drug and Alcohol Detoxification in the medical inpatient", Family Practice Residency Teaching lecture, UPMC-St. Margaret's Hospital, Aspinwall, PA |
| 9/03 | "The use of anxiolytics, antipsychotic agents and antidepressants in the ICU", Grand Rounds, UPMC-St. Margaret's Hospital, Aspinwall, PA |
| 8/03 | Radio interview regarding serial sniper in Charleston WV, and the psychiatric profile of serial killers, KMSO radio station, Kansas City, Kansas |
| 7/03 | "Mother of Townsend Boy: 'there's no need for arrest'", interview regarding Asperger's Syndrome, The Middletown Transcript, Middletown, Delaware |
| 5/03 | "Breakthroughs in Burn treatment saves Lives", interview regarding current Burn Trauma treatment in US, Buenos Aires Herald, Buenos Aires, Argentina |
| 5/03 | "Amnesia", interview regarding US soldier Pfc. Jessica Lynch and her reported amnesia after Iraqi War capture, Chicago Tribune, Chicago Illinois |
| 4/03 | "Gulf War Syndrome", radio interview regarding Gulf War Syndrome and its' clinical effects, National Radio Chain, Colombia, South America |
| 4/03 | "The Mystery of Nigel Smith", interviewed regarding homeless man with psychogenic  amnesia, Post & Courier Newspaper, Charleston, SC |
| 3/03 | "After Kuwait grenade incident, 101st Airborne Soldiers fight new fear", interviewed regarding grenade attack by US soldier on comrades in Kuwait during 2nd Gulf War, Stars & Stripes Magazine, Washington, DC |
| 2/03 | "New Techniques Proving Vital for Burn Patient's", interviewed regarding Rhode Island Night-Club Fire, Boston Globe Newspaper, Boston, MA |
| 1/03 | "The Death Penalty in America, aftermath of the Illinois Governor's Decision", interview, WLIE Radio, Long Island, NY |
| 11/02 | "Rational Use of Chemical Restraints in the Agitated ICU patient'", Saint Margaret's Memorial Hospital, Department of Critical Care Medicine, Pittsburgh, Pa. |
| 10/02 | "Gulf War Syndrome & Violent Behavior" – interview, Canadian Public Broadcasting Channel, Toronto , Canada |
| 9/02 | "Desperate Mom kills son to save self", interview regarding addiction and codependency in genesis of crime, Salt Lake City Tribune, Salt Lake, UT |
| 3/02 | "Psychiatric Assessment of the 'Sexually Violent Predator', Practice &Pitfalls'", Pennsylvania Association of Criminal Defense Lawyers, Pittsburgh, Pa. |

| | |
|---|---|
| 1/02 | "Psychiatric Issues in Federal Sentencing Downward Departure", |
| | Pennsylvania Association of Criminal Defense Lawyers, Valley Forge, Pa. |
| 7/01 | "Fibromyalgia", Pennsylvania Bar Institute - Pittsburgh, Pa. |
| 6/01 | "Fibromyalgia", Pennsylvania Bar Institute - Philadelphia, Pa. |
| 8/00 | CLE Lecture - Lawyers Concerned for Lawyers - PA Chapter "Modern Rx" |
| | Pittsburgh, PA |
| 6/00 | Invited Presentation to Pa. Senate Subcommittee on Youth & Aging – |
| | "The Legal Rights of the Mentally Ill as pertains to Involuntary Commitment |
| | and gun ownership"; Public Hearing on Violence & Mental Illness, |
| | Sponsor : State Senator Murphy, Allegheny County Courthouse, Pittsburgh, Pa |
| 10/99 | CME Lecture – Medicolegal Seminar |
| | "Dymanic Neuroimageing, the state of the art",  Pittsburgh, Pa |
| 8/99 | CLE Lecture – Lawyers Concerned for Lawyers –PA Chapter |
| | "Stress, Burnout, Addiction and Depression in Professionals", |
| | Pittsburgh, PA |
| 5/99 | CME Lecture -Allegheny County Workers  Compensation Information |
| | Exchange "Demographic & Behavioral Predictors in the Acutely Injured |
| | Worker" Pittsburgh, Pa |
| 4/99 | CLE Lecture – Lawyers Concerned for Lawyers –PA Chapter |
| | "Addiction Issues and Downward Departure under Federal |
| | Sentencing Guidelines",  Pittsburgh, Pa |
| 3/99 | CLE Lecture – Allegheny County Bar Association – |
| | "Closed Head Injury, New Developments",  Pittsburgh, Pa |
| 11/ 98 | Grand Rounds – UPMC/Passavant Hospital – |
| | "Psychopharmacology in the Critically Ill Patient",  Pittsburgh, Pa. |
| 11/ 98 | Teaching Grand Rounds – St. Margaret's Mem. Hospital – |
| | "Emergency Psychiatry, Principles & Practice",  Pittsburgh, Pa. |
| 10/ 98 | Grand Rounds – St. Margaret's Mem. Hospital – |
| | "Invasive Psychiatry – management  of the ICU patient with agitation", |
| | Pittsburgh, Pa. |
| 10/ 98 | Seminar – Morgantown, WV. – "Daubert Issues in Neuropsychiatry", |

CV - L. Bernstein, M.D.                                                                    Page 12
Revised 10/11

| | |
|---|---|
| | presented at CLE Seminar for Northern West Virginia. |
| 5/98 | "Psychiatric Implications of Impairment", presented at *Worker's Compensation Impairment Evaluation: Using the 4th Edition of the AMA Guidelines*, Pennsylvania Orthopedic Society, Philadelphia, Pa. |
| | 9/97 Teaching Grand Rounds: "Management of Agitation in The ICU" - St. Margaret's Memorial Hospital. Pittsburgh, Pa. |
| 6/97 | Grand Rounds - Shadyside Hospital, "Depression in the Medically Ill"; Pittsburgh, PA |
| 6/97 | Presenter, CLE/CME Seminar, Duquesne University School of Law , "McN'aughton meets Buck Rogers, Forensically proving cognitive impairment into the 21st century ", Pittsburgh., PA. |
| 3/97 | Presenter, CLE/CME Seminar - , "Depression, Brain Injury and Reflex Sympathetic Dystrophy", Erie, PA. |
| 1/97 | Presenter, CLE/CME Seminar - "Tort Aspects of Neurotoxicolgy", Pittsburgh, PA. |
| 11/96 | Presenter, Pennsylvania Defense Institute CLE/CME course, "Depression, Brain Injury and Reflex Sympathetic Dystrophy", Pittsburgh, PA. |
| 9/96 | Grand Rounds-Harmarville Rehabilitation Center, "Pharmacology of the Newer Antidepressants", Pittsburgh, PA. |
| 4/96 | Presenter, Pennsylvania Association of Criminal Defense Lawyers 1996 Spring Meeting & CLE/CME Seminar, "The Effective Use of Psychiatric Evidence" Pittsburgh, PA |
| 4/94 | Presenter, Annual American Trauma Society Conference, Pennsylvania Division, "Neuropsychiatric Determinants of Repetitive Injury", Pittsburgh, PA |
| 7/93 | Grand Rounds-Harmarville Rehabilitation Center, "Treatment of Geriatric Depression"; Pittsburgh, PA. |
| 4/93 | Presenter - Annual American Trauma Society Conference, Pennsylvania Division, "Neuropsychiatric Determinants of Repetitive Injury", Pittsburgh, PA |
| 4/93 | Grand Rounds - St. Francis Hospital, "Depression in the Medically Ill"; Pittsburgh, PA |
| 10/92 | Grand Rounds - University of Pittsburgh Medical Center Department of Critical Care Medicine, "Acute Drug Withdrawal"; Pittsburgh, PA. |

| | |
|---|---|
| 9/92 | Medical Grand Rounds - University of Pittsburgh Medical Center, "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 9/92 | Grand Rounds - Center for Emergency Medicine, "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 5/92 | Grand Rounds - Montefiore University Hospital Department of Toxicology/ Emergency Medicine "Acute Drug Withdrawal"; Pittsburgh, PA. |
| 4/92 | Grand Rounds - University of Pittsburgh Medical Center, Department of Critical Care Medicine, "Stress Management in the Critical Care Setting"; Pittsburgh, PA. |
| 3/92 | Eastern Emergency and Trauma Forum - University of Pittsburgh Medical Center, Departments of Trauma and Emergency Medicine "Neuropsychiatric Determinants of Repetitive Traumatic Injuries"; Pittsburgh, PA |
| 1992 | Lecturer, Psychiatry Rotation, to third year Medical Students; University of Pittsburgh Medical Center, Pittsburgh, PA |
| 10/91 | Grand Rounds - University of Pittsburgh Medical Center, Department of Critical Care Medicine, "Differential Diagnosis and Management of Agitation in the Critical Care Setting"; Pittsburgh, PA. |
| 10/91 | Teleconference - University of Pittsburgh Medical Center, Department of Toxicology/Emergency Medicine, "Assessment and Management of the Violent Patient"; Pittsburgh, PA. |
| 9/91 | Trauma Conference - University of Pittsburgh Medical Center, Department of Surgery, Trauma Service "Neurobiological Antecedents of Repetitive Traumatic Injury"; Pittsburgh, PA. |
| 12/90 | Grand Rounds - New York Hospital, Department of Psychiatry, "Psychiatric Management of the Severely Burned Patient"; New York, NY. |

## TEACHING:

2003 -2009  Co-developer/lecturer Neuropsychiatry/Neurotoxicology curriculum for ICU rotation @ St. Margaret's Memorial Hospital-- Family Practice Residency Curriculum

1997 -2003  Clinical Preceptor, Western Psychiatric Institute & Clinic & St. Margaret's Memorial Hospital - Emergency Psychiatry Curriculum

1994-2003   Volunteer faculty, University of Pittsburgh Medical Center - Psychiatry Residency

   Curriculum

1997 -2002  Guest Lecturer, Shadyside Hospital - Family Practice Curriculum

1992-95     Curriculum Director, WPIC Office of Residency Training didactic curriculum;

   University of Pittsburgh Medical Center, Pittsburgh, PA

1992-1995   Program Development Consultant, Various Regional Health Care Organizations

1991-95     Supervisor, Psychiatric Residents and Medical Students on the Psychiatric

   Consultation-Liaison Service/Program; University of Pittsburgh Medical Center,

   Pittsburgh, PA

1991-95     Examiner, Mock Board Examination as a component of the Residency Training
   Program at Western Psychiatric Institute and Clinic; University of Pittsburgh
   Medical Center, Pittsburgh, PA.

RESEARCH: Past Grants

| Grant Number (Funded) | Grant Title | Role in Project and % Effort | Years Inclusive | Source |
|---|---|---|---|---|
| *[Internal Seed Funds]* | Undetected Alcoholism in the Acute Burn Trauma Patient | Principal Investigator; 50% FTE, 0% salary support | 1990-1991 $8,000 | NY Hospital/ Payne Whitney Clinic Training Grant |
| *[Internal Seed Funds]* [2-90871] | Beta Endorphin Levels in Acutely Traumatized Patients, Presbyterian | Principal Investigator; 20% effort, 0% salary support | 12/91-11/92 $9,000 | Univ. Pittsburgh Medical Center - Seed Grant |

| | University Hospital | | | |
|---|---|---|---|---|
| 1-T15-MH19883-01 | HIV Infection and AIDS | Co-Principal Investigator; 10% effort, 10% salary support *[L Frank PhD, P.I.]* | 8/92-7/95 $157,211 (yrs 01 & 02) | NIMH Mental Health Care Provider Training Grant [University of Pittsburgh Dept Epidemiology] |

## RESEARCH:  Presentations

3/91 — Young Investigators Poster Session - American Psychiatric Association Annual Meeting, "Undetected Alcohol Related Burn Trauma";  Washington, DC.

6/91 — Grand Rounds - New York Hospital, Department of Psychiatry, "Undetected Alcohol Related Burn Trauma";  New York, NY.

5/93 — Scientific Program Poster Session - American Psychiatric Association Annual Meeting, "Pain Perception and Beta Endorphin Level in Trauma"; San Francisco, CA

# EXHIBIT 19

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

- - - - -

Larry E. Smith as          )
trustee for the Heirs      )
and Next of Kin of         )
David Cornelius Smith,     )
                           )
          Plaintiff,       )
                           )
     vs.                   ) Case No.
                           ) 11-cv-03071 (SRN/JJK)
Timothy Gorman and         )
Timothy Callahan,          )
acting in their            )
individual capacities      )
as Minneapolis police      )
officers, and the City     )
of Minneapolis,            )
                           )
          Defendants.      )

- - - - -

VIDEOTAPE DEPOSITION OF
LAWSON F. BERNSTEIN, JR., M.D.

- - - - -

February 5, 2013

- - - - -

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
WITHOUT AUTHORIZATION FROM THE CERTIFYING
AGENCY

- - - - -

Page 2

1
2  VIDEOTAPE DEPOSITION OF LAWSON F. BERNSTEIN,
3  JR., M.D., a witness herein, called by the
4  Plaintiff for examination, taken pursuant to
5  the Federal Rules of Civil Procedure, by and
6  before Ronda J. Weinell, a Registered
7  Professional Reporter and Notary Public in and
8  for the Commonwealth of Pennsylvania, at the
9  law offices of Meyer, Unkovic & Scott,
10  1300 Oliver Building, 536 Smithfield Street,
11  Pittsburgh, Pennsylvania, on Tuesday,
12  February 5, 2013, at 8:31 a.m.
13        - - - - -
14  COUNSEL PRESENT:
15  For the Plaintiff:
16      Robert Bennett, Esq.
        and Jeffrey S. Storms, Esq.
17      Gaskins Bennett Birrell Schupp LLP
        333 South Seventh Street, #2900
18      Minneapolis, MN 55402
19  For the Defendants:
20      Burt T. Osborne, Assistant City Attorney
        City of Minneapolis
21      Office of City Attorney
        350 South Fifth Street - Room 210
22      Minneapolis, MN 55415
23
24
25

Page 3

1
2              I N D E X
3           - - - - -
4  WITNESS:  LAWSON F. BERNSTEIN, JR., M.D.
5
6  E X A M I N A T I O N:        PAGE
7
8  BY MR. BENNETT              5
9
10
11  E X H I B I T S:
12
13  EXHIBIT NO. 1              6
14  EXHIBIT NO. 2              6
15  EXHIBIT NO. 3              6
16  EXHIBIT NO. 4              6
17  EXHIBIT NO. 5              6
18  EXHIBIT NO. 6             69
19  EXHIBIT NO. 7             77
20  EXHIBIT NO. 8             80
21  EXHIBIT NO. 9            132
22  EXHIBIT NO. 10           132
23  EXHIBIT NO. 11           132
24
25

Page 4

1
2            P R O C E E D I N G S
3            - - - - -
4        THE VIDEOGRAPHER:  Today's
5  date is February 5th, 2013.  My name is James
6  Rumbaugh.  I am employed by Pittsburgh
7  Reporting Service, which is located at
8  1900 Lawyers Building, 428 Forbes Avenue,
9  Pittsburgh, Pennsylvania 15219.
10        The name of the witness to be
11  deposed is Lawson Bernstein, M.D.  We are
12  located at the office of Meyer, Unkovic &
13  Scott, 1300 Oliver Building, 535 Smithfield
14  Street, Pittsburgh, Pennsylvania 15222.
15        The case caption is as follows:
16  Larry L. Smith as trustee for the Heirs and
17  Next of Kin of David Cornelius Smith versus
18  Timothy Gorman and Timothy Callahan acting in
19  their individual capacities as Minneapolis
20  police officers and the City of Minneapolis,
21  Case No. 11-CV-03071 in the United States
22  District Court, District of Minnesota.
23        This deposition is commencing at
24  8:31 a.m., and the court reporter shall now
25  administer the oath.

Page 5

1
2        THE COURT REPORTER:  Would you
3  raise your right hand.
4        - - - - -
5      LAWSON F. BERNSTEIN, JR., M.D.
6  a witness herein, having been first duly sworn,
7  was examined and testified as follows:
8        - - - - -
9            EXAMINATION
10  BY MR. BENNETT:
11     Q.   Would you state your full name for
12  the record, please.
13     A.   Lawson Frederick Bernstein, Jr.
14     Q.   And we just met today.  My name is
15  Robert Bennett.  I represent the plaintiff in
16  the action that we're here for.  This is
17  Jeffrey Storms, who you again met today; is
18  that correct?
19     A.   Yes, sir.
20     Q.   Burt Osborne is the counsel for the
21  defense.  Have you ever met him before?
22     A.   No.  We've spoken on the phone, I
23  think, but I've never met him.
24        MR. BENNETT:  Okay.  Let's go
25  off the record for just a second.

2 (Pages 2 to 5)

Page 6

Dr. Bernstein - by Mr. Bennett

1
2       THE VIDEOGRAPHER:  Going off
3  the record at 8:32 a.m.
4       (Off the record.)
5       (Deposition Exhibit Nos. 1
6  through 5 were marked for identification.)
7       THE VIDEOGRAPHER:  We're back
8  on the record at 8:34 a.m.
9       Q.  Dr. Bernstein, you've had your
10 deposition taken many, many times before;
11 correct?
12      A.  Correct.
13      Q.  And I've marked five exhibits, and
14 I'd just like to identify them for the record,
15 please.  What is Exhibit 1?
16      A.  Exhibit 1 is an advertisement I have
17 on a website called HGExperts.com, which is a
18 forensic search engine for medical experts.
19      No. 2 --
20      Q.  That's a three-page document?
21      A.  Yes.  I believe it is.  No. 2 is a
22 copy of my current forensic fee agreement.
23 That's three pages.
24      No. 3 is my current CV, which I
25 believe is 15 pages in length.  16.

Page 7

Dr. Bernstein - by Mr. Bennett

1
2       No. 4 is a case list, which is four
3  pages in length, and No. 5 is a xerographic
4  copy of my report and the list of records that
5  I reviewed as part of the preparation of that
6  report.
7       Q.  The report is for your opinions in
8  this case?
9       A.  Yes, sir.
10      Q.  Starting with Exhibit 1, the
11 information on this exhibit was provided by
12 you?
13      A.  Correct.  The areas of expertise is
14 from a list that's provided by the website
15 folks, but I did check the boxes that were
16 applicable.
17      Q.  So, for example, you checked the
18 box, when it says sexual addiction, you checked
19 that?
20      A.  Yes, sir.
21      Q.  Serial killers?
22      A.  Well, I've worked on death row and
23 treated more than a few serial killers, that's
24 correct.
25      Q.  I assumed you checked it because you

Page 8

Dr. Bernstein - by Mr. Bennett

1
2  had some experience in these areas.
3       A.  Right.  That is correct.
4       Q.  Syphilis?
5       A.  Neurosyphilis, specifically, but
6  that's correct.
7       Q.  Tobacco?
8       A.  As an addictive disorder.
9       Q.  There are about 105 of these, aren't
10 there?
11      A.  I believe so, 105 five search terms,
12 correct.
13      Q.  And the rest of it --
14      A.  Actually, are there 105?
15      Q.  I think so.
16      A.  Well, we can add it up during the
17 break, but thank you.
18      Q.  I think you did it in another
19 deposition, as well.
20      A.  Okay.
21      Q.  I counted them.  Did you take any
22 off after the --
23      A.  I don't think so.
24      Q.  And the Exhibit 2 is your fee
25 schedule notification and cancelation policy;

Page 9

Dr. Bernstein - by Mr. Bennett

1
2  correct?
3       A.  Yes, sir.
4       Q.  And you stated your hourly fees for
5  file review, trial preparation at $500 or
6  $550 per hour; is that correct?
7       A.  Right.  Depending on how quickly the
8  turnaround is.
9       Q.  The more emergent it is, the more
10 you up the rate?
11      A.  Correct.
12      Q.  The IME report fee, does that
13 include the file review, or is that a second
14 charge for the report?
15      A.  No.  That's -- no.  That would be
16 subsumed within that total fee.
17      THE COURT REPORTER:  Could we
18 go off the record for a second.
19      THE VIDEOGRAPHER:  Going off
20 the record at 8:38 a.m.
21      (Off the record.)
22      THE VIDEOGRAPHER:  We're back
23 on the record at 8:51 a.m.
24 BY MR. BENNETT:
25      Q.  We've been dealing with some

3 (Pages 6 to 9)

Page 10

```
 1        Dr. Bernstein - by Mr. Bennett
 2   technical issues, but I think I remember where
 3   I am. We were talking about your manner of
 4   charging for this case, generally and for this
 5   case. Exhibit 2 defines what it is in cases
 6   generally; correct?
 7        A.  Yes, sir.
 8        Q.  And it is the fee agreement that is
 9   part of your agreement with the defendants in
10   this case?
11        A.  Yes.
12        Q.  Essentially, though, what you're
13   charging is $500 an hour for every hour you
14   work on this case, plus the fee for the
15   deposition?
16        A.  Correct.
17        Q.  Do you know how much time you've
18   spent on this case to date?
19        A.  Including the preparation for today,
20   I would say it's in the neighborhood of 30 to
21   40 hours.
22        Q.  And that $500 fee includes the
23   preparation of a report?
24        A.  Yes, sir.
25        Q.  Exhibit 3 is your current CV?
```

Page 11

```
 1        Dr. Bernstein - by Mr. Bennett
 2        A.  Yes.
 3        Q.  And I'd like to go over some things
 4   in that, if you will, that I found interesting.
 5        A.  Okay.
 6        Q.  What year were you born, sir?
 7        A.  '57, 1957.
 8        Q.  Where was that?
 9        A.  In New York City.
10        Q.  And you graduated from high school
11   in?
12        A.  '75.
13        Q.  And then I note that then you were
14   the principal in Loan Star Trucking and Freight
15   Company.
16        A.  Which means I owned a truck, that's
17   correct.
18        Q.  And you did that for three years?
19        A.  As well as some other things, yes.
20   I had other blue collar jobs, for lack of a
21   better term.
22        Q.  You were a union organizer for what
23   union?
24        A.  District 65, Textile Workers.
25        Q.  And a marketing representative for
```

Page 12

```
 1        Dr. Bernstein - by Mr. Bennett
 2   Continental Wingate Capital Organization, '83
 3   to '87?
 4        A.  On a part-time basis.
 5        Q.  Yeah, I notice you were going to
 6   medical school then.
 7        A.  Correct.
 8        Q.  Correct? What is Continental
 9   Wingate Capital Corporation?
10        A.  It was an entity that bought
11   historically significant properties, turned
12   them into Section 8 housing, and then
13   syndicated that, i.e., sold shares in that for
14   the purposes of investment and for the tax
15   benefits that accrued from that type of
16   investment at that time.
17        And I wrote some of their marketing
18   material.
19        Q.  If you look back at Exhibit 1, you
20   say there in the first page that you are a
21   Board certified forensic neuropsychiatrist.
22        A.  Correct.
23        Q.  I looked at your CV, and I see you
24   were Board certified, at least in your CV, you
25   were certified by the American Board of
```

Page 13

```
 1        Dr. Bernstein - by Mr. Bennett
 2   Psychiatry and Neurology.
 3        A.  Correct.
 4        Q.  In both?
 5        A.  No, no, no. It's a joint board, and
 6   there are two certifications. It's psychiatry
 7   or neurology, and I was Board certified in
 8   psychiatry.
 9        Q.  That's what I thought. Okay. And
10   you're also certified by the American Board of
11   Forensic Medicine?
12        A.  Correct.
13        Q.  And a diplomat of the American Board
14   of Forensic Examiners?
15        A.  Yes, sir.
16        Q.  You are not Board certified in
17   neuropsychiatry, are you?
18        A.  I've not done a fellowship and sat
19   for the exam, that's correct.
20        Q.  The neuropsychiatry has -- actually,
21   the Board that deals with that is entitled
22   Behavioral Neurology and Neuropsychiatry;
23   correct?
24        A.  I believe so.
25        Q.  And that is jointly accredited
```

4 (Pages 10 to 13)

Page 14

Dr. Bernstein - by Mr. Bennett
1 through the United Council for Neurologic
2 Subspecialties and the American Board of
3 Psychiatry and Neurology; correct?
4
5    A.   Yes.
6    Q.   And you do not have that Board
7 certification?
8    A.   No.
9    Q.   Nor do you have the American
10 Neuropsychiatric Association Membership;
11 correct?
12    A.   No, sir.
13    Q.   You went to undergraduate, got your
14 baccalaureate at Hunter College in the City
15 University of New York?
16    A.   Correct.
17    Q.   In '83?
18    A.   Correct.
19    Q.   And you, like I, was an English
20 major?
21    A.   And classics, Latin.
22    Q.   Then you went to Cornell University
23 for medical school?
24    A.   Correct.
25    Q.   And it says Cornell University in

Page 15

Dr. Bernstein - by Mr. Bennett
1 New York, New York.  Is that -- the Cornell I'm
2 thinking of is in Ithaca, New York.
3    A.   Right.  People always say what do
4 you think of Ithaca, and I say I've never been
5 there.  The medical school is actually in New
6 York City.
7    Q.   You did your internship at New York
8 Hospital?
9    A.   Correct.
10    Q.   And your residency in psychiatry at
11 New York Hospital, as well; correct?
12    A.   Yes.
13    Q.   You became Board certified in
14 psychiatry in 1992?
15    A.   Correct.
16    Q.   Are you a member of the American
17 College of Psychiatrists?
18    A.   I'm not sure I've ever heard of that
19 organization.
20    Q.   How about the International Society
21 for the Study of Personality Disorders?
22    A.   No.  Most assuredly I am not a
23 member of that organization.
24    Q.   How about the American Society of

Page 16

Dr. Bernstein - by Mr. Bennett
1 Clinical Psychopharmacology?
2    A.   No.
3    Q.   How about the American
4 Psychopathologic Association?
5    A.   No.
6    Q.   How about the American College of
7 Psychosocial Research?
8    A.   No.  That would be very far afield
9 from what I do.
10    Q.   Have you ever been the board member
11 or had any position of leadership in the
12 American Psychiatric Association?
13    A.   I ran a committee for the American
14 Academy of Directors of Psychiatric Group
15 Residency Training regarding managed care and
16 education, but I don't think that was also an
17 APA affiliated committee, so I would have to
18 say no.
19    Q.   Do you have any postdoctoral
20 training?
21    A.   As in fellowship training after
22 residency?
23    Q.   Yes.
24    A.   No.

Page 17

Dr. Bernstein - by Mr. Bennett
1    Q.   You've been a clinical instructor in
2 psychiatry at the University of Pittsburgh
3 School of Medicine?
4    A.   Correct.
5    Q.   And you've also taught at the
6 Department of Family Practice at the University
7 of Pittsburgh School of Medicine; correct?
8    A.   Correct.
9    Q.   At this time how is it that you --
10 what professions or businesses do you work in
11 presently?
12    A.   I have my own professional
13 corporation, Lawson F. Bernstein, M.D., PC.
14    Q.   And that is a forensic and you say
15 neuropsychiatric consulting practice?
16    A.   Correct.
17    Q.   And in your CV you say you have an
18 expertise in the assessment and treatment of
19 brain injury, seizure disorders, stroke, toxic
20 environmental exposure, chronic pain condition,
21 addiction, and other neurological and
22 neuropsychiatric conditions; is that correct?
23    A.   Correct.
24    Q.   Do you still perform work as a

Page 18

1    Dr. Bernstein - by Mr. Bennett
2  consultant for the Department of State,
3  Pennsylvania Bureau of Professional and
4  Occupational Affairs?
5          THE COURT REPORTER:
6  Occupational --
7          MR. BENNETT: Affairs.
8      A.  Yes.  I have a matter that I will be
9  appearing before them Thursday of this week.
10     Q.  How much of your time is taken up in
11 this position?
12     A.  It varies.  I probably do one to two
13 independent assessments for them a month, and
14 then occasionally there will be an
15 administrative law hearing regarding somebody's
16 license that I might have to testify at.
17         I assess healthcare professionals
18 for which there are allegations that they're
19 unfit to practice regarding neurological,
20 psychiatric, or substance abuse issues.  That
21 would be my answer.
22     Q.  Okay.  On an average how many hours
23 a month do you spend doing that?
24     A.  Three.
25     Q.  And then it also says you're a

Page 19

1    Dr. Bernstein - by Mr. Bennett
2  forensic psychiatric consultant for the Office
3  of Public Defender of Allegheny County, Court
4  of Common Pleas, Juvenile Division, and Family
5  Division, Orphans' Court, Allegheny County?
6      A.  Correct.
7      Q.  How much time do you spend on a
8  monthly basis doing that?
9      A.  There are months at a time where I
10 might not do anything with them, and then if
11 I'm involved in a case, it might be a few hours
12 in a given month.
13     Q.  So your predominant work activity is
14 within and for Lawson F. Bernstein, PC, or
15 professional corporation?
16     A.  Yes.  I'm not anybody's employee,
17 that's correct.
18     Q.  Are you on staff at any hospitals
19 right now?
20     A.  At this time, no.
21     Q.  Are you teaching anywhere right now?
22     A.  I teach at the Duquesne University
23 Law School in their neuroscience in the law
24 curriculum and at the Cyril Wecht Forensic
25 Institute.

Page 20

1    Dr. Bernstein - by Mr. Bennett
2      Q.  How much time do you devote to that
3  on a monthly basis?
4      A.  It really varies.  The next couple
5  of months will be quite a bit, because I have
6  to give a couple of lectures and participate in
7  a mock trial experience.  So that's probably
8  going to be for March, April, and May, maybe
9  ten hours a month, maybe more.
10         The Cyril Wecht thing is sort of hit
11 and miss.  Depends what programs they're
12 putting on.  If they're putting on something
13 that they want me to lecture in, it may be ten
14 hours in a month, as I get ready to do that,
15 and then maybe nothing for eight or nine
16 months.
17     Q.  So on average or during the course
18 of a year, it's not very much time for either
19 one of them?
20     A.  Well, I mean, it seems like a fair
21 amount of time at the time it's going on.  I
22 suppose if you averaged it out, yes, it would
23 be a low amount of time.
24     Q.  I mean, in total, would it be a
25 week's worth of bills, 40 hours?

Page 21

1    Dr. Bernstein - by Mr. Bennett
2      A.  I don't bill.  That's all --
3      Q.  A week's worth of time?  Excuse me.
4      A.  Yeah.  Maybe a week, week and a
5  half.
6      Q.  Okay.  So your predominant
7  occupational activity is forensic and
8  neuropsychiatric consulting?
9      A.  Right.  I treat patients, and I do
10 forensic consulting.
11     Q.  And how many patients do you
12 currently treat?
13     A.  With the understanding that some of
14 these people are folks I see maybe four times a
15 year, I don't know, a couple hundred patients.
16     Q.  Okay.  Exhibit 4 is your list of
17 testimony?
18     A.  Yes.
19     Q.  And WC I would take to mean workers'
20 comp?
21     A.  Yes.
22     Q.  PI is personal injury?
23     A.  Yes.
24     Q.  Criminal is criminal defense?
25     A.  Well, sometimes plaintiffs or

6 (Pages 18 to 21)

Page 22

1      Dr. Bernstein - by Mr. Bennett
2  prosecution, I should say.
3      Q.   Divorce speaks for itself. Med mal
4  speaks for itself, I take it. But it's a
5  variety of criminal and civil testimony. How
6  much as a percentage of your time do you spend
7  getting ready to and testify? And that would
8  include your file review.
9      A.   Right. I would say it can be
10 anywhere from 25 to 35 percent of my time.
11     Q.   Have you ever published any papers
12 specifically related to schizophrenia?
13     A.   No. Well, let me be encyclopedic in
14 my answer. I wrote a book chapter on burn
15 trauma and psychiatric disease which contained
16 a section on psychotic disorders as a risk
17 factor for self-immolation, but other than
18 that, no.
19     Q.   How about schizoaffective disorders?
20     A.   No. Same answer.
21     Q.   Why would it be the same answer?
22     A.   People with psychotic spectrum --
23 when you look at those people who purposely set
24 themselves on fire, which is a unique clinical
25 group, you see an overrepresentation of

Page 23

1      Dr. Bernstein - by Mr. Bennett
2  individuals with psychotic spectrum disorders.
3      Q.   And a fair amount of your writing
4  has been devoted, at least in some part, to the
5  intersection of burns and psychiatry?
6      A.   And traumatic injury and psychiatry
7  and substance abuse as a sort of fellow
8  traveler of that clinical group.
9      Q.   All right. When you testify for the
10 government, that is, a federal or state agency,
11 is it usually related to prosecution of
12 criminal matters?
13     A.   Let me think. Did you say federal
14 government?
15     Q.   Federal or state.
16     A.   Okay.
17     Q.   If you want to break it up into
18 federal and then give that answer and state,
19 however --
20     A.   Sure. Well, state would include the
21 Bureau of Professional Occupational Affairs
22 thing, which I guess when we consider
23 prosecution, and in that venue it's always for
24 them. Well, no. I've done one or two cases
25 that weren't for them that ended up in that

Page 24

1      Dr. Bernstein - by Mr. Bennett
2  venue. But 95 percent of the time that's what
3  that is.
4      Other state entities, I would say
5  it's generally for the defense, I'd say 75
6  percent of the time. For the federal entities,
7  of late, it's been primarily prosecution, I
8  would say 75 percent of the time.
9      Q.   So you would know, if I said the
10 term to you record evidence, you would know
11 what I was talking about?
12     A.   I think I would know what you're
13 talking about, but I would ask you to define
14 the term.
15     Q.   Well, I'd look at record evidence as
16 the things that generally would become exhibits
17 or potential exhibits in any civil action,
18 things you would look at forensically to make
19 determinations, come to judgments and
20 professional opinions.
21     A.   Correct. I might term it as
22 documents or other information that might be
23 produced as part of the discovery process but,
24 yes, I understand the term as you've defined
25 it.

Page 25

1      Dr. Bernstein - by Mr. Bennett
2      Q.   Okay. When were you first contacted
3  about this case?
4      A.   That's a good question. I apologize
5  for this. I should know this. Sometime in
6  2011.
7      Q.   Your report is dated December 7th,
8  2012, and it would have been more than a year
9  prior to your --
10     A.   No. I'm sorry. It would have been
11 sometime in 2012. My mistake.
12     Q.   Do you have any idea, with reference
13 to your report dated 12/7/12, how much before
14 it would be --
15     A.   Months.
16     Q.   Who contacted you?
17     A.   I don't recall.
18     Q.   And who decided what it was that you
19 would be paid to review and to come to your
20 professional judgments? Is that based on the
21 contract that you commonly used as Exhibit 2?
22     A.   Yes. Whether that was read and
23 signed by an individual within the professional
24 entity that is defending the matter or whether
25 they generated some sort of contract through

7 (Pages 22 to 25)

Page 26

Dr. Bernstein - by Mr. Bennett

1  their office that replicated or substantially
2  replicated my fee agreement, I don't recall.
3  But, yes, my fee --
4      Q.   Do you have a signed contract?
5      A.   I'd have to go back to the office
6  and look.  I imagine I have something, because
7  I won't get involved unless there is some
8  written agreement.  But many times when I deal
9  with a local, state, or federal entity, they'll
10  have to put it within a document that they
11  would use for the purposes like a purchase
12  order, sort of, and that may be the case here,
13  as opposed to somebody in the defendant's
14  practice, law practice that's defending the
15  matter actually signing the fee agreement.  I'm
16  not sure which it is.
17      Q.   What was the assignment, as you
18  understood it?
19      A.   To review the universe of
20  information available regarding the matter and
21  to respond to certain questions that were posed
22  of me by the attorneys defending the matter.
23      Q.   So that was -- the questions that
24  were answered in your report are questions that

Page 27

Dr. Bernstein - by Mr. Bennett

1  they came up with?
2      A.   Correct.
3      Q.   And not questions that you came up
4  with?
5      A.   No.
6      Q.   Were there any questions that you
7  chose not to answer that are posed?
8      A.   No.  Let me think for a second.  Was
9  there anything posed of me that I thought was
10  outside my area of expertise?
11      Q.   That's not what I asked.
12      A.   I know, but it would sort of be on
13  point.  That's why I'm thinking out loud.  And
14  the answer to that is no.
15      Q.   Okay.  Do you believe that the
16  mentally ill, particularly people who have
17  schizophrenia or schizoaffective disorder, are
18  worthless?
19      A.   No.  Hardly.
20      Q.   Do you think their lives have value?
21      A.   All life has value.
22      Q.   Did your assignment change at all
23  after you were hired?  Did it morph into
24  something different?

Page 28

Dr. Bernstein - by Mr. Bennett

1      A.   No.
2      Q.   Who chose what to give to you to
3  review?  You or the defense counsel?
4      A.   What I communicated to defense
5  counsel was that it would be my preference to
6  have as much of the discovery that they would
7  care to give me with the understanding that
8  more is generally better than less.
9          What was sent to me was voluminous.
10  Upon reviewing it, I did not feel there was
11  anything that appeared to be lacking, so I did
12  not ask for anything further.
13      Q.   Did you know the universe of
14  discovery that was available?
15      A.   No, I did not.
16      Q.   So how would you know what to ask
17  for within the universe?
18      A.   Generally speaking, what I'm looking
19  for are clinical records, if there are expert
20  reports, that sort of thing, other information
21  that's generated by the discovery process, any
22  video material that might be relevant to the
23  matter at hand.  Those would all be -- that
24  would all be information I would want to see

Page 29

Dr. Bernstein - by Mr. Bennett

1  and that was present.
2      Q.   Well, there's some things, if we go
3  to your report, it said David C. Smith, records
4  review; correct?
5      A.   Yes, sir.
6      Q.   I don't see -- is this the list,
7  complete list of what you did review?
8      A.   I don't believe I've received
9  anything else subsequent to this list being
10  generated.
11      Q.   And you meant it to be complete when
12  you drafted it?
13      A.   Yes, sir.
14      Q.   Because you knew that there would be
15  fellows like me that would cross-examine you.
16      A.   That is one reason to be complete.
17      Q.   And you figured I'd do my homework?
18      A.   Yes, in fact, I did.
19      Q.   I don't see any record here that you
20  looked at either the pen camera video, the YMCA
21  video, or the taser video.
22      A.   I'm so sorry if that's not in here,
23  and I truly apologize for that.  I have the pen
24  camera video.

8 (Pages 26 to 29)

Page 30

Dr. Bernstein - by Mr. Bennett
1
2      Q.   Do you have the YMCA video?
3      A.   I don't think I've seen that.
4      Q.   How about the taser video?
5      A.   I didn't know that such a thing
6  existed.
7      Q.   So we're one for three on the video
8  evidence?
9      A.   And I apologize for the fact that is
10 not listed here.  That is my error.
11     Q.   There are some other things that
12 aren't in there that I want to talk to you
13 about, too.
14     A.   All right.
15     Q.   So you would have been in charge of
16 talking to the city attorney, and the city
17 attorney would be the person who transmitted
18 that pile of materials over to your -- which is
19 stage left, I guess, in the video.  I don't see
20 that you reviewed any deposition transcript,
21 for example, of David's mother's deposition.
22     A.   I did not see that.
23     Q.   Nor any of his siblings who were
24 also deposed by Mr. Osborne?
25     A.   Those are not documents that I've

Page 31

Dr. Bernstein - by Mr. Bennett
1
2  seen.
3      Q.   Did you interview his longtime girl
4  friend Josephine -- how do you say that name?
5          MR. STORMS:  I think it's
6  Oluuch.
7      Q.   Oluuch?
8      A.   No.
9      Q.   O-L-U-U-C-H.  Did you even know that
10 David had a longtime girl friend?
11     A.   Yes.
12     Q.   I also note that there is the
13 deposition transcript of Dr. Joshua Zimmerman,
14 his treating psychiatrist.  It was not on your
15 list, either.
16     A.   I have not seen that.
17     Q.   Nor Maureen Glover, his veteran case
18 manager at Behavioral Health Care?
19     A.   I have not seen that.
20     Q.   Did you consult with or interview
21 anyone who personally knew David Smith?
22     A.   Did I personally speak to any of the
23 authors of the multiple documents that I
24 reviewed?  No.
25          Did I ask to speak to any third

Page 32

Dr. Bernstein - by Mr. Bennett
1
2  party not reflected in the documents?  No.
3      Q.   Do you think it would have been
4  important for your analysis and in coming to
5  your professional opinions and judgments to
6  look at the deposition of his treating
7  psychiatrist?
8      A.   You know, the records are so
9  voluminous in this matter and the documentation
10 is so thorough going, if such a document
11 exists, if such deposition exists, I would like
12 to see it.  But I don't think it would
13 substantively change my opinion, unless the
14 gentleman's opinions are different than what is
15 reflected in the records that I reviewed.
16     Q.   But without looking at it, you
17 wouldn't know?
18     A.   That is correct.
19     Q.   For example, if Dr. Zimmerman or
20 Maureen Glover touched on areas that were
21 pertinent to the answers to your questions,
22 would that be one of the things you would want
23 to know?
24     A.   Would that be one of the things I
25 would want to know.

Page 33

Dr. Bernstein - by Mr. Bennett
1
2      Q.   Sure.
3      A.   Certainly, I would be happy to
4  review their testimony, if it is substantively
5  different than what they reported in the record
6  would be my answer.
7      Q.   Well, for example, if Dr. Zimmerman
8  testified under oath that they thought college
9  was an appropriate goal for him, would you want
10 to know that?
11     A.   He's certainly entitled to whatever
12 opinion he might have.  I must say the record
13 does not appear to be consistent with that.
14 But, sure, if that's an opinion that he holds,
15 I'd be happy to take a look at it.
16     Q.   Have you ever heard the term
17 geographic cure?
18     A.   Yes, I have heard that term.
19     Q.   What does that mean to you?
20     A.   It's generally a term of art that
21 refers to individuals with drug or alcohol
22 problems who move to a different locale,
23 distant from where they live with the idea that
24 this move will somehow magically cure the drug
25 and/or alcohol problem.

9  (Pages 30 to 33)

Page 34

Dr. Bernstein - by Mr. Bennett

1    Q.   Well, I've read your report in great
2    detail, and I want to explore exactly what your
3    opinions are, and I want to focus on what
4    you're actually opining on to a reasonable
5    degree of medical certainty and things you're
6    merely mentioning in passing without having an
7    opinion to that level of certainty.  Are we
8    communicating?  Do you know what I'm looking
9    at?
10       A.   We are -- I do understand what you
11   just said.
12       Q.   Okay.  And forensic psychiatry,
13   let's just talk about that for a moment before
14   we go into the opinions versus the nonopinions
15   section.  But forensic psychiatry is -- how is
16   it different from ordinary psychiatry?
17       A.   Well, in clinical psychiatry one is
18   treating a patient and has a professional
19   relationship with that individual that has
20   certain -- one's alliances with the patient.
21   Forensic psychiatry is the application of
22   psychiatric diagnosis to issues in the law.
23       By definition, the relationship is
24   not with the patient.  And there may be, in

Page 35

Dr. Bernstein - by Mr. Bennett

1    certain instances, may involve reviewing
2    voluminous records, but without the benefit of
3    actually evaluating the individual,
4    particularly if that individual is deceased.
5        Q.   It's pretty hard to evaluate the
6    deceased, isn't it?
7        A.   It is exceedingly difficult.
8        Q.   But if you're going to be rigorous
9    in your forensic opinions, you have to apply
10   the same rules and strictures that govern, for
11   example, the diagnosis of mental disorders that
12   you would employ on the living, people you see;
13   correct?
14       A.   The diagnostic criteria are the
15   same, whether they're applied in a clinical or
16   forensic setting.
17       Q.   So the answer to my question is
18   really, yes, you have to be just as rigorous in
19   applying the diagnostic criteria to come to an
20   opinion about diagnosing someone forensically
21   as you do if you're treating them?
22       A.   Referencing my prior answer without
23   repeating it, yes.
24       Q.   Okay.  And I understood your answer.

Page 36

Dr. Bernstein - by Mr. Bennett

1        A.   Okay.
2        Q.   But I thought it was just a long way
3    of saying yes.
4        A.   I've been known to do that.
5        Q.   And you're good at it.
6        A.   Well, that's very kind of you.
7        Q.   So if you look at Exhibit -- you've
8    got your report in front of you?
9        A.   I do.
10       Q.   And we'll euphemistically refer to
11   it as Exhibit 5, and you can look at your
12   version, and I'll look at my version.
13       A.   Yes, sir.
14       Q.   You say at the beginning of the
15   second paragraph, "Briefly, this was a then
16   28-year-old man with a psychiatric history of
17   schizoaffective disorder, substance abuse,
18   antisocial personality disorder, and
19   longstanding treatment noncompliance."  Is that
20   correct?
21       A.   Yes.
22       Q.   So what I wanted to know is that as
23   you sit here today and at the time you wrote
24   the report, are you forensically enforcing

Page 37

Dr. Bernstein - by Mr. Bennett

1    these historical diagnoses, each of them?
2        A.   In reviewing the records, I believe
3    that the diagnosis of schizoaffective disorder
4    is well documented, and I concur with it.  The
5    diagnosis of substance abuse is well
6    documented, and I concur with it.
7        The statement long-term treatment --
8    longstanding treatment noncompliance I believe
9    is well documented.
10       Q.   That's not actually a disorder
11   but --
12       A.   It's a term of art.
13       Q.   But you think that that is --
14   there's record evidence that would amply
15   support that?
16       A.   Right.  The antisocial personality
17   disorder is open to debate.  Frankly, even if
18   he doesn't have antisocial personality
19   disorder, it doesn't particularly change my
20   opinions, but I think that is more open to
21   debate than the others, which are not.
22       Q.   What I'm getting at, it's only --
23   I'm looking for your professional opinions and
24   judgments, and obviously it's only fair that

10 (Pages 34 to 37)

Dr. Bernstein - by Mr. Bennett

1  you state the diagnosis is that you
2  forensically endorsed to a reasonable degree of
3  medical certainty; correct?
4      A.    In this colloquy, this was a
5  reflection of the record I reviewed, but it
6  wasn't proffered for the purposes of endorsing
7  it or not endorsing it. It was a way of
8  describing the individual and the events
9  surrounding that individual in that bullet
10 point kind of way.
11     Q.    Well, let's -- so what I heard you
12 say was that you believe that there's record
13 evidence that fully meets the criteria set
14 forth in DSM-IV-TR for schizoaffective
15 disorder?
16     A.    Yes, sir.
17     Q.    The same would be true for substance
18 abuse?
19     A.    Yes.
20     Q.    And is it your professional opinion
21 to a reasonable degree of medical certainty
22 that the diagnostic criteria for antisocial
23 personality disorder is met in this case?
24     A.    No. The conduct disorder with onset

Dr. Bernstein - by Mr. Bennett

1  before age 15 is not well documented, so that's
2  an open issue.
3      I don't believe you can say that the
4  antisocial behavior occurred outside the
5  spectrum of the psychotic disorder, so I don't
6  think that can be stated within a reasonable
7  degree of medical certainty.
8      Q.    In fact, it would be fair to state
9  that the antisocial personality disorder
10 mentioned is really from one -- spins out of
11 one source. It was not a physician; correct?
12     A.    The term antisocial personality
13 disorder is rendered by a nonphysician and
14 present to my review in the record only a
15 single time. There are aspects of antisocial
16 personality disorder which are in the record
17 separate and apart from that, but I think the
18 overall criteria cannot be met for the reasons
19 I just discussed.
20     Q.    We'll go on to that in a little bit.
21 Antisocial personality disorder has this huge
22 negative connotation these days, doesn't it?
23     A.    And probably always has. But yes.
24     Q.    Well, you know, you only have to

Dr. Bernstein - by Mr. Bennett

1  watch one of half a dozen television shows like
2  Criminal Minds and The Following and -- well,
3  there's -- you know, and movies by the dozen
4  that portray serial killers in our midst with
5  antisocial personality disorders; correct?
6      A.    The term is used in that context.
7      Q.    Okay. And if I remember your CV
8  correctly, you have been more than occasionally
9  called on by the media to talk about serial
10 killers like the BTK killer?
11     A.    Right.
12     Q.    And so you're quite aware of the
13 connotation of antisocial personality disorder
14 on people in common parlance here in the United
15 States; correct?
16     A.    It's probably used in common
17 parlance, but it has, I think, within the
18 general population, a negative or pejorative
19 connotation.
20     Q.    And, actually, it's actually misused
21 in this report in terms of to the extent it
22 implied that you forensically didn't endorse
23 the diagnosis; correct?
24     A.    It is misused in my report. This

Dr. Bernstein - by Mr. Bennett

1  was a reflection of records that I reviewed and
2  was also based on information in the report
3  that could be consistent with antisocial
4  personality disorder.
5      So I don't think the term misused is
6  appropriate. I think it is reasonable to say
7  that this would be the sole diagnostic
8  condition mentioned on this page which could be
9  reasonably disputed.
10     Q.    Well, there isn't enough record
11 evidence to support a forensic diagnosis under
12 DSM-IV-TR for antisocial personality behavior
13 on the part of David Cornelius Smith; correct?
14     A.    There is not enough information
15 regarding his adjustment and life prior to age
16 15, and there is not enough information to
17 state that the antisocial behavior did not
18 occur exclusively during the course of a
19 psychotic disorder. So with that said, yes,
20 you're correct.
21     Q.    Schizoaffective disorder, is that an
22 Axis I diagnosis?
23     A.    Yes, sir.
24     Q.    Antisocial personality disorder is

Page 42

1        Dr. Bernstein - by Mr. Bennett
2    an Axis II diagnosis; correct?
3        A.   Correct.
4        Q.   And the essential feature of
5    antisocial personality disorder is a pervasive
6    pattern of disregard for and violation of the
7    rights of others that begins in childhood or
8    early adolescence and continues into adulthood;
9    correct?
10       A.   Correct.
11       Q.   This pattern is also referred to as
12   psychopathy, sociopathy, dyssocial personality
13   disorder, as well?
14       A.   Yes.
15       Q.   Were you aware that depositions had
16   been taken by the defense counsel of his mother
17   and siblings, the people who lived with him in
18   Peoria?
19       A.   I think I was aware that that was
20   going to be done, but I didn't know it had been
21   done.
22       Q.   And, certainly, questions about that
23   and evidence about his early -- his adolescence
24   and childhood could have been asked at that
25   time?

Page 43

1        Dr. Bernstein - by Mr. Bennett
2        A.   Anything could have been asked of
3    them. Well, not anything, but many things
4    could have been asked of them which might have
5    included that.
6        Q.   Sure. They were people around him
7    when he was a child.
8        A.   Yes.
9        Q.   You also, in this report, say things
10   like Mr. Smith was a regular abuser of
11   over-the-counter cough medicine containing
12   dextromethorphan, and I want to focus on some
13   of the word choices. Regular means what in a
14   forensic psychiatric setting? Once a year?
15   Once a month? Once a week?
16       A.   In an ongoing fashion. I think once
17   a year would be stretching it. In an ongoing
18   fashion, which might be anywhere from monthly
19   to daily, hourly. Well, daily. Let's leave it
20   at that.
21       Q.   Well, for example, we know that he
22   used dextromethorphan on the 9th of September.
23       A.   Correct.
24            MR. OSBORNE: I think that's
25   right.

Page 44

1        Dr. Bernstein - by Mr. Bennett
2        Q.   And we know he used dextromethorphan
3    the 1st of September; correct?
4        A.   Correct.
5        Q.   And we don't know if he used it any
6    time in between?
7        A.   That would be correct.
8        Q.   Okay. And, again, then you say that
9    in describing dextromethorphan that it has
10   known, quote, "PCP/phencyclidine-like," and
11   there's no end to the -- where is the end of
12   the quote supposed to be?
13       A.   Well, PCP is the acronym, and slash
14   phencyclidine is the chemical name.
15       Q.   Sure.
16       A.   And so the dextromethorphan, since
17   it's not PCP, would have phencyclidine-like
18   intoxicants and psychotomimetic properties.
19       Q.   Well, it's a different body of
20   chemicals -- right -- a different kind of
21   chemicals?
22       A.   They have different chemical
23   structures, but they are both dissociative
24   amnestics with psychotomimetic properties.
25       Q.   Again, PCP is one of those words

Page 45

1        Dr. Bernstein - by Mr. Bennett
2    like antisocial personality disorder that has a
3    negative, pejorative connotation; correct?
4        A.   But in this particular instance the
5    characterization of dextromethorphan as having
6    similar clinical properties when used as an
7    intoxicant to PCP is legitimate. So while I
8    guess there could be pejorative qualities, the
9    characterization is legitimate.
10       Q.   Then you go on to say
11   dextromethorphan intoxication and other forms
12   of substance abuse and dependence were a
13   regular feature of Mr. Smith's day-to-day. I
14   don't know, again, what regular feature means.
15       A.   Can you just point me to where you
16   are, sir.
17       Q.   It's the sentence that starts on the
18   bottom of Page 1.
19       A.   Okay, thank you.
20       Q.   And goes over.
21       A.   Okay. What is your question?
22       Q.   Well, what is regular feature? You
23   used this regular -- or do you mean to express
24   a medical -- does it have a medical meaning,
25   regular, like you would -- a bowel movement

12 (Pages 42 to 45)

Page 46

Dr. Bernstein - by Mr. Bennett

1 would be regular every day? What are you --
2 you know.
3 
4     A.   In this particular instance the use
5 of the word regular reflects the fact that
6 Mr. Smith had multiple references in the record
7 to substance abuse as a defining feature of his
8 clinical situation and that he had been in
9 multiple venues specifically for treatment of
10 substance abuse-related problems.
11     So the term regular as I used it in
12 this sentence would refer to the fact that this
13 was not an episodic problem but was an ongoing
14 and clinically significant problem.
15     Q.   Schizoaffective disorder is, as I
16 understand it, and according to Dr. Zimmerman,
17 schizoaffective disorder is people that have a
18 prominent depression or mania along with the
19 psychosis, and people with straight
20 schizophrenia do not; correct?
21     A.   Right. There is an affective or
22 mood component with the psychotic disorder.
23     Q.   And Dr. Zimmerman describes David's
24 existence as having periods of sobriety, what
25 you call -- and high functioning, good David,

Page 47

Dr. Bernstein - by Mr. Bennett

1 and then periods when he was depressed, and
2 depending or not whether he could get
3 regular -- or whether prescription medicine or
4 this self-medication, it would be the band-aid,
5 it would be a different cycle. That's often
6 the case with people with schizoaffective
7 disorder; correct?
8     A.   Can I ask you to read the question
9 back to me, please?
10     Q.   I can maybe try to make it better.
11     A.   If you could.
12     Q.   I get it. It wasn't a great
13 question.
14     A.   Well --
15     Q.   People with schizoaffective disorder
16 are not necessarily depressed all of the time;
17 correct?
18     A.   They would have discrete affective
19 episodes, correct.
20     Q.   David's history, according to his
21 treating psychiatrist, was evidenced by periods
22 of sobriety and good functioning, higher
23 functioning, and then periods of nonsobriety
24 with lower functioning, what he called good

Page 48

Dr. Bernstein - by Mr. Bennett

1 David and bad David. And sometimes David would
2 be able to get prescription medications that
3 would deal with the lower functioning end and
4 bring it back into sobriety, and sometimes he
5 would take -- he would self-medicate.
6     And that whole pattern is
7 reasonably typical for people with
8 schizoaffective disorder who have prominent
9 depression as their defining schizoaffective
10 nature.
11     A.   That's a broad summation of the
12 record. The record is voluminous, spans a
13 great deal of time. And I believe the tenor of
14 Mr. Smith's disorders changed such that over
15 time he appeared to have been less functional,
16 and the substance abuse disorders appeared to
17 have had an autonomous nature.
18     So with that caveat that I don't
19 necessarily endorse the characterization of the
20 record as you've related the testimony of
21 Dr. Zimmerman, it is true that individuals with
22 any number of psychiatric disorders may, in
23 part or in whole, use substance abuse as a form
24 of self-medication as a general precept, that's

Page 49

Dr. Bernstein - by Mr. Bennett

1 correct.
2     Q.   Well, Dr. Zimmerman testified,
3 quote, "He did fairly well as long as he was
4 taking his medications and sober."
5     A.   That's a tautology, but okay. I'm
6 sorry to interrupt you.
7     Q.   I'm just telling you what he said.
8     A.   Yes, sir.
9     Q.   In fact, I can show it to you, if
10 you'd like. He did have trouble maintaining,
11 sobriety over a long period of time; correct?
12     A.   Yes, sir.
13     Q.   And you are not a pharmacologist,
14 are you?
15     A.   Sure. I treat patients with
16 medication every day.
17     Q.   You've not taken any -- you're not
18 Board certified in pharmacology?
19     A.   No. But every psychiatrist in this
20 country who is a graduate of an American
21 training program has extensive training in
22 pharmacology. That's the backbone of
23 psychiatric treatment circa 2013.
24     Q.   Going back to the things you

13 (Pages 46 to 49)

Page 50

Dr. Bernstein - by Mr. Bennett

1  reviewed, did you get any of the deposition
2  exhibits?  I don't see that on your --
3      A.   May have, if they were attached to
4  the deposition transcript.  I'd have to look.
5      Q.   Okay.  You don't know?
6      A.   I have not committed the record to
7  memory in the sense of knowing and seeing in my
8  mind's eye every page, so it's possible that
9  there are exhibits appended to various
10 depositions.
11     Q.   Who is kind of the person, the guy,
12 the man, as it were, in dextromethorphan
13 research these days?
14     A.   That I don't know.
15     Q.   Barry Logan?
16     A.   Not a name familiar to me.
17     Q.   Do you ever use a laboratory called
18 NMS?
19     A.   Yes.
20     Q.   They're in Willow Grove,
21 Pennsylvania?
22     A.   I didn't know that, but I have used
23 NMS.  They're a common national chain of
24 laboratories.

Page 51

Dr. Bernstein - by Mr. Bennett

1      Q.   Well, did you read Deposition
2  Exhibit No. 19?
3      A.   And that would be which one?
4          MR. OSBORNE:  Which deposition
5  is that, Bob?
6          MR. BENNETT:  Let's go off the
7  record for a bit.  I need to use the men's
8  room, anyway.
9          THE VIDEOGRAPHER:  Going off
10 the record at 9:46 a.m.
11         (Off the record.)
12         THE VIDEOGRAPHER:  We're back
13 on the record at 9:50 a.m.
14 BY MR. BENNETT:
15     Q.   Going back to your statement that
16 dextromethorphan is a substance with a known
17 PCP/phencyclidine-like intoxicant and psycho --
18 how do you say that?
19     A.   Psychotomimetic.
20     Q.   Psychotomimetic properties, on what
21 do you rely for that statement?  What
22 research --
23     A.   I believe that's reflected in a
24 number of different research and clinical

Page 52

Dr. Bernstein - by Mr. Bennett

1  publications, and it's certainly my experience
2  as somebody who regularly treats substance
3  abusers.
4      Q.   What research are you specifically
5  relying on?
6      A.   I think the PDR or any other such
7  similar research.
8      Q.   The PDR doesn't say it has
9  phencyclidine-like --
10     A.   Give me one second.  I brought some
11 articles which are on point, but there are
12 many, many such articles in the literature.
13     Q.   Well, which ones?
14     A.   I brought a Drug and Human
15 Performance Fact Sheet from the NHTSA.gov
16 website.  I'm going to forget what that acronym
17 means, and I apologize for that.  I brought an
18 article entitled Massive Dextromethorphan
19 Ingestion and Abuse.
20     Q.   Who is that by?
21     A.   Well, let's see here.  That is by
22 Timothy Wolfe, M.D. and a Dr. Caravati,
23 C-A-R-A-V-A-T-I, M.D., from the Division of
24 Emergency Medicine, University of Utah School

Page 53

Dr. Bernstein - by Mr. Bennett

1  of Medicine.
2      Q.   Is that a peer-reviewed article?
3      A.   I believe it is.  And I have brought
4  an article entitled Severe Manifestations of
5  Coricidin Intoxication, authored by a Thomas
6  K-I-R-A-G-E-S and others from Cook County
7  Hospital.  I believe this is a peer-reviewed.
8      Q.   May I see that?
9      A.   Sure.  Do you want them all?
10     Q.   Sure.
11     A.   But there are others out there.
12         MR. BENNETT:  Let's go off the
13 record for a second.  I want to take a quick
14 look at this.
15         THE VIDEOGRAPHER:  Going off
16 the record at 9:54 a.m.
17         (Off the record.)
18         THE VIDEOGRAPHER:  We're back
19 on the record at 9:58 a.m.
20 BY MR. BENNETT:
21     Q.   I've had a chance to review, and I
22 thank you for that chance, Doctor, the three
23 articles that you mentioned.  The first is a
24 Drug and Human Performance Fact Sheet at

14  (Pages 50 to 53)

Page 54

Dr. Bernstein - by Mr. Bennett

1   www.NHTSA.gov on dextromethorphan; correct?
2        A.   Yes, sir.
3        Q.   And I've reviewed that article.  I
4   can't find any mention of phencyclidine or PCP.
5   Can you?
6        A.   Those terms may not be in the
7   article, but I think the description of the
8   effects of the agent would be consistent with
9   phencyclidine and/or PCP.  And I believe there
10  are, in the literature, references to PCP-like
11  properties of dextromethorphan, but that term
12  in and of itself may not be contained within
13  this document.
14       Q.   So the simple answer to my question
15  about whether or not PCP was mentioned or
16  phencyclidine was mentioned is no; correct?
17       A.   Referencing my prior answer without
18  repeating it, that's correct.
19       Q.   The other article, Massive
20  Dextromethorphan Injection --
21       A.   Ingestion.
22       Q.   -- Ingestion and Abuse from the
23  American Journal of Emergency Medicine,
24  actually the words phencyclidine and PCP

Page 55

Dr. Bernstein - by Mr. Bennett

1   appear, but it says they were not evaluated on
2   Page 2.  And on Page 3 they say that, I quote,
3   "Experimental evidence in animal models
4   suggests that the physical effects of DM and
5   its abuse potential are caused by the active
6   metabolite dextro" -- say that for me, please.
7        A.   Where is it?  Dextrophan.
8   Dextrophan.  I'm sorry.
9        Q.   -- "dextrorphan.  And this
10  metabolite binds the same CNS receptors as PCP,
11  and animals exhibit similar activity if given
12  either drug.  The level of Dextrophan
13  metabolite is highly variable," and it says,
14  "Five to ten Caucasians lack the enzyme to make
15  it."  Correct?  That's what it says?
16       A.   Excuse me one second, please.
17  Quote, "This metabolite binds the same CNS
18  receptors as PCP, and animals exhibit similar
19  activity if given either drug.  The level of
20  dextrorphan metabolite is highly variable; five
21  to ten Caucasians lack the enzyme to make it,
22  whereas in others there is extensive
23  metabolism," close quote.
24       Q.   Nowhere in this article does it say

Page 56

Dr. Bernstein - by Mr. Bennett

1   that in human beings that dextromethorphan
2   causes -- has PCP or phencyclidine-like
3   intoxicants and psychotomimetic properties;
4   correct?
5        A.   That sentence is not contained
6   within this article.
7        Q.   And it doesn't really stand for that
8   scientific proposition, does it?
9        A.   The article?
10       Q.   Yes.
11       A.   I think the article speaks to an
12  individual who was abusing Robitussin and
13  presented with a number of symptoms, including
14  psychotic symptoms.  So I would say that it
15  does stand for that.
16       Q.   All right.  It doesn't say it,
17  though, does it?
18       A.   I think a reading of the article
19  would be consistent with that conclusion.  The
20  exact sentence as you've promulgated it in your
21  prior question is not contained within the
22  article.
23       Q.   And the other, the third article,
24  Severe Manifestations of Coricidin

Page 57

Dr. Bernstein - by Mr. Bennett

1   Intoxication, doesn't mention PCP or
2   phencyclidine at all; correct?
3        A.   I believe you are correct.
4        Q.   Let me see that again.  And that
5   case involves two cases, both 16-year-old
6   girls; correct?
7        A.   I believe that's correct.
8        Q.   And one ingested 20 tablets of
9   Coricidin HBP Cough & Cold and some other
10  drugs.  The other one ingested 50 tablets of a
11  different Coricidin preparation and Coricidin
12  HBP Maximum Strength Flu; is that correct?
13       A.   Yes.
14       Q.   Both girls lived?
15       A.   I believe that's correct.
16       Q.   And both -- one was discharged to
17  within a few hours, and one was discharged
18  within a week -- correct -- from the hospital?
19       A.   Case in point, No. 1, quote, "The
20  patient required 72 hours of inpatient
21  monitoring until her vital signs and mental
22  status returned to normal."
23       Q.   72?
24       A.   72.  I'm sorry.  She was discharged

15  (Pages 54 to 57)

Page 58

1      Dr. Bernstein - by Mr. Bennett
2    to home. The second individual after a
3    seven-day hospital stay, the patient was
4    discharged.
5      Q.   But that would be consistent with
6    Dr. Baker's testimony that he never heard of
7    anybody dying from a Coricidin overdose?
8      A.   I think that would be a broad
9    extrapolation of those two case series. I'm
10   not here to opine whether or not
11   dextromethorphan was the cause or contributing
12   factor to this gentleman's death. But to take
13   any one of those articles and then use it to
14   make the statement that you made I believe is
15   overreading of the article.
16     Q.   That's a regular feature of mine.
17     A.   Well, I appreciate that.
18     Q.   You talk about Mr. Smith having
19   taken cough syrup on your report; is that
20   right?
21     A.   Excuse me one second. Cough
22   medicine containing dextromethorphan.
23     Q.   And then cough syrup appears on the
24   next page?
25     A.   Need to find that. Where are you on

Page 59

1      Dr. Bernstein - by Mr. Bennett
2    the page?
3      Q.   Answer to Question 2.
4      A.   Okay. Give me one second. You are
5    correct, the term cough syrup is there.
6    Actually, the sentence reads "Severely" -- in
7    part, "Severely intoxicated on dextromethorphan
8    and other constituents of cough syrup, as
9    opposed to" --
10     Q.   Do you have any evidence that he
11   took cough syrup at all?
12     A.   No. And the sentence wasn't
13   proffered as such. I believe the chemicals,
14   the substances in both preparations would be
15   similar, if not identical.
16     Q.   Okay. Your report goes on, Page 2,
17   says, "As a result of his schizoaffective
18   disorder, antisocial personality disorder,
19   substance abuse, and treatment noncompliance,
20   Mr. Smith was frequently homeless and/or
21   intoxicated." Do you see that?
22     A.   Yes, sir.
23     Q.   And now you don't really want to say
24   antisocial personality disorder there, do you?
25     A.   Referencing my prior testimony

Page 60

1      Dr. Bernstein - by Mr. Bennett
2    without repeating it, I think it is the
3    condition most open to debate, and even
4    deleting it does not substantively change my
5    opinion.
6      Q.   Okay. And then you say, "He had
7    regular contact with police, due to his public
8    intoxication" --
9      A.   Right.
10     Q.   -- "and symptoms from his untreated
11   psychiatric and substance abuse problem."
12   Again, what's regular contact? Once a month?
13   Once a week? Once a year?
14     A.   I did not go through the record and
15   codify or add that up, but it appears that in
16   many instances the police were involved in
17   situations that involved him.
18     Q.   How many?
19     A.   I didn't add it up. If you'd like,
20   we can take a break, and I can do that.
21     Q.   Well, are you aware of any arrests
22   or convictions?
23     A.   According to the discovery materials
24   that I received, I believe there was a
25   disorderly conduct arrest and I'm assuming

Page 61

1      Dr. Bernstein - by Mr. Bennett
2    conviction and an intoxication-related arrest,
3    I believe, although I'd have to look, and that
4    was in the discovery materials that I saw.
5      Q.   You say the week prior to 9/9/2010,
6    Mr. Smith had been emergently treated for
7    dextromethorphan intoxication, and that was at
8    HCMC?
9      A.   Hennepin County?
10     Q.   Hennepin County Medical Center.
11     A.   Yes, sir.
12     Q.   And he was released the same night;
13   correct?
14     A.   I believe that's correct.
15     Q.   Alive?
16     A.   Yes, alive.
17     Q.   And you have read the -- did you
18   read the Exhibit 9? Have you seen that?
19     A.   I've seen this before.
20     Q.   All right. So this is from the NMS
21   lab in Willow Grove, Pennsylvania; correct?
22     A.   Yes.
23     Q.   And that's a well known and regarded
24   lab; is that correct?
25     A.   It's a very common national

16  (Pages 58 to 61)

Page 62

Dr. Bernstein - by Mr. Bennett

1 laboratory. If I received results from them, I
2 would not have cause to question the results.
3 What their reputation might be beyond that, I
4 don't know.
5     Q.    They found two substances that were
6 abnormal; correct?
7     A.    Yes, sir.
8     Q.    One was chlorpheniramine, and the
9 other was dextro or levomethorphan?
10    A.    Yes.
11    Q.    And on Page 2 they describe what
12 they call reference comments. Do you see that?
13    A.    I do.
14    Q.    Reference comments describe the drug
15 and its effects -- correct -- of
16 chlorpheniramine or dextro or levomethorphan?
17    A.    I'm sorry. Could you read the
18 question back to me, please.
19    Q.    The reference comments there, you
20 see chlorpheniramine and dextro and
21 levomethorphan are on Page 2; correct?
22    A.    I see that.
23    Q.    And they describe the drug and its
24 effects?
25

Page 63

Dr. Bernstein - by Mr. Bennett

1     A.    Amongst other things is a brief
2 rendition of the effects the drug may have at a
3 toxic level.
4     Q.    And there's no indication there that
5 there is any PCP or phencyclidine-like
6 properties or effects in the NMS laboratory
7 reference comments -- correct -- for dextro or
8 levomethorphan?
9     A.    Hallucinations would be a PCP-like
10 effect, but the term PCP or phencyclidine or
11 PCP-like is not contained within the document.
12    Q.    And they also -- it goes on to state
13 that "Overdose of DM is rare. Overtoxicity,
14 which may include death, is usually manifested
15 when doses exceed 100 times the normal adult
16 dose." They say that; correct?
17    A.    You read that correctly.
18    Q.    They also say that "The observed
19 symptoms include central nervous system
20 depression, hallucination, dizziness, and
21 ataxia"; correct?
22    A.    You read that correctly.
23    Q.    And the fatalities have been
24 reported to dextromethorphan concentrations as
25

Page 64

Dr. Bernstein - by Mr. Bennett

1 low as 3300 NG over ML in blood. How would you
2 say that?
3     A.    Nanograms per milliliter.
4     Q.    In blood; is that right?
5     A.    You read that correctly.
6     Q.    And they measured the dextro or
7 levomethorphan at 2,000; correct?
8     A.    Yes, sir.
9     Q.    Is central nervous system depression
10 consistent with increased or elevated strength?
11    A.    Generically speaking, when somebody
12 is undergoing central nervous system
13 depression, then they would be lethargic as
14 opposed to agitated, as a generic precept.
15    Q.    How about dizziness? Would that be
16 consistent with elevated or increased strength?
17    A.    It might or might not.
18    Q.    How about ataxia?
19    A.    Same answer.
20    Q.    Have you found people who are ataxic
21 to have elevated strength, ever?
22    A.    Sure. If you ever worked in an
23 emergency room, I mean, somebody who is
24 substantially intoxicated can hurt you and can
25

Page 65

Dr. Bernstein - by Mr. Bennett

1 engage gauge in feats of strength which would
2 be startling, given their body habitus or age
3 or level of debilitation.
4     Q.    They also tested for a number of
5 other drugs in Exhibit 15; correct?
6     A.    Excuse me one second. Yes, sir.
7     Q.    They tested for amphetamines?
8     A.    Correct.
9     Q.    That was negative?
10    A.    Yes.
11    Q.    Barbiturates was negative?
12    A.    Yes, sir.
13    Q.    Benzodiazapine was negative?
14    A.    Yes.
15    Q.    Cocaine metabolites was negative?
16    A.    Correct.
17    Q.    LSD negative?
18    A.    Yes, sir.
19    Q.    Methadone negative?
20    A.    Correct.
21    Q.    The opiate urine --
22 dextromethorphan, would that test for that?
23 That's an opiate-like substance, they say?
24    A.    You can get a false positive at the
25

Page 66

Dr. Bernstein - by Mr. Bennett

1    radioimmunoassay level, but it would not
2    confirm it at the mass spectroscopy level.
3        Q.    They did test for phencyclidine and
4    PCP; correct?
5        A.    Yes, sir.
6        Q.    And that was negative?
7        A.    Correct.
8        Q.    The other two drugs there were
9    negative, as well; correct?
10       A.    One was aspirin, and the other is a
11   weak sedative called propoxyphene, but they
12   were both negative.
13       Q.    Okay.
14       A.    Just to amend my answer, it says
15   underneath there chromatography urine, which
16   would be a confirmatory test, and it says
17   specimen quantity not sufficient for
18   chromatography.  So it is possible the
19   individual had opiates in his urine, but it is
20   also possible that's a false positive from the
21   dextromethorphan.
22       We'll never know, because there
23   simply wasn't enough specimen to do the
24   confirmatory test.

Page 67

Dr. Bernstein - by Mr. Bennett

1        Q.    What specific PCP-like properties or
2    effects are you talking about?
3        A.    Agitation, hallucinations, violence.
4    I think that covers it.
5        Q.    Well, those things could be
6    associated with other things, including his
7    psychosis; correct?
8        A.    Yes, that's a possibility, or it
9    could be a product of the two, synergistic
10   effect.
11       Q.    Now, you were asked the first
12   question, what was the expected lifespan, so
13   even if you look at all 105 of the areas of
14   your expertise, lifespan wasn't listed, was it?
15       A.    I don't believe the term lifespan is
16   in that list.
17       Q.    Or anything that would lead us to
18   believe that that is an area of your expertise?
19       A.    Well, if one treats patients with
20   any degree of regularity as a physician, you're
21   certainly aware of factors which would decrease
22   or truncate an individual's lifespan, but I'm
23   not an actuarial expert.
24       Q.    Well, you did predict a life

Page 68

Dr. Bernstein - by Mr. Bennett

1    expectancy of 50 years for Mr. Smith?
2        A.    Right.  I think for an individual
3    who passes out on train tracks, that's not an
4    unreasonable estimate and may, in fact, be
5    generous.
6        Q.    Well, I know, but really, and the
7    only article you cite is this Opening Eyes,
8    Opening Minds:  The Ontario Burden of Mental
9    Illness and Addictions Report; correct?
10       A.    Correct, that is the only one that I
11   cite.  There are other articles available.
12       Q.    What are they?
13       A.    Let's think.  MMWR, the morbidity
14   and mortality weekly report published by the
15   CDC I believe has articles on point in that
16   regard.
17       Q.    Well, none of them allow you to pick
18   specific days, do they?
19       A.    No.  I mean, at a certain point you
20   have to apply your own acumen.  The gentleman
21   had a long list of risk factors associated with
22   a less than actuary predicted lifespan.
23       MR. BENNETT:  Can you mark
24   this exhibit, please.

Page 69

Dr. Bernstein - by Mr. Bennett

1        (Deposition Exhibit No. 6 was
2    marked for identification.)
3        Q.    This article that you said is not a
4    peer-reviewed article; is it?
5        A.    It's the product of the public
6    health entity for Ontario.
7        Q.    I know that.  But --
8        A.    I wasn't complete with my answer.
9        Q.    Okay.
10       A.    So, as such, I'm sure there's some
11   type of internal peer review process, but it
12   was not published in a peer-reviewed journal.
13       Q.    We are not in Canada, are we?
14       A.    We're not far from it.  And the
15   issues addressed here are generic for western
16   countries with individuals with psychiatric
17   disease and substance abuse.
18       In fact, their numbers may be a
19   little bit better, because they do a better job
20   of taking care of their mentally ill through
21   their public health system.  Let me amend that
22   answer.  They have more readily accessible
23   services than we do in this country because of
24   the nature of their public health system.

18 (Pages 66 to 69)

Dr. Bernstein - by Mr. Bennett

1  Q.  Well, are you telling me that you
2  hold the opinion to a reasonable degree of
3  medical certainty that the most he would ever
4  live to was 50 years?
5  A.  That would require clairvoyance.  I
6  think the likelihood of his living to 50 years
7  was extremely low, given the factors that I've
8  described.  But I can't say that he wouldn't
9  have.  I can't say that he wouldn't have lived
10 to 150 years.  I just don't know.
11 Q.  So that opinion you're not
12 expressing to a reasonable degree of medical
13 certainty?
14 A.  Which opinion?
15 Q.  "I believe that Mr. Smith's mix of
16 severe mental disorders, regular substance
17 abuse, medical history, legal history, frequent
18 homelessness, and treatment noncompliance
19 predict, at best, a life expectancy of 50
20 years."
21 A.  Utilizing the definition of
22 reasonable degree of medical certainty as more
23 likely than not, I stand by that statement.
24 Q.  The foundation for that is what you

Dr. Bernstein - by Mr. Bennett

1  say?
2  A.  The multiplicity of risk factors
3  that would be discussed and my own clinical
4  acumen.
5  Q.  Let's go back to the PCP-like
6  intoxicants.  Are the properties that you're
7  talking about, the similarities between
8  dextromethorphan and PCP-like properties, are
9  they shared by other types of substances?
10 A.  Other agents that have similar
11 properties.  One that comes to mind would be
12 ketamine, K-E-T-A-M-I-N-E.  Are there other
13 substances with similar clinical properties.
14 There are more likely than not or anesthetic
15 agents, but I can't think of them off the top
16 of my head.  What about medications one might
17 have as an outpatient or over-the-counter?
18 Q.  Your understanding of Mr. Smith's
19 documented level of dextromethorphan was 200
20 nanograms per milliliter?
21 A.  2,000.
22 Q.  2,000?
23 A.  Yes, sir.
24 Q.  Are you aware of any literature

Dr. Bernstein - by Mr. Bennett

1  indicating the usage at that level promotes
2  psychotomimetic effects?
3  A.  Not per se, but individuals'
4  reaction to this type of substance can be
5  idiosyncratic.  Therefore, I don't think you
6  can reliably state that there is a
7  dose-response effect at which any given level
8  will -- a majority of individuals produce a
9  given set of findings.
10 So I'm not aware of any such
11 literature, and for the reasons I've just
12 stated, I don't believe that such literature is
13 a foundation for my opinion.
14 Q.  Do you know what kind of metabolizer
15 David Smith was?
16 A.  In terms of dextromethorphan?
17 Q.  Yes.
18 A.  No, I do not.  Obviously, he's --
19 well, they measured the parent compound and not
20 the metabolite.  No.  I cannot say if he is a
21 fast or slow metabolizer or an individual who
22 lacks the enzyme.
23 Q.  In terms of the lifespan, what facts
24 are you relying on to provide that opinion?

Dr. Bernstein - by Mr. Bennett

1  A.  Engaging in dangerous behaviors such
2  as passing out on railroad tracks; substance
3  abuse to include intoxication and overdose; the
4  contracting of sexually transmitted diseases
5  and, therefore, being at risk for other such
6  diseases which could decrease his lifespan.
7  Q.  Can I interrupt you there for just a
8  moment?
9  A.  Sure.
10 Q.  What sexually transmitted diseases
11 do you think he had?
12 A.  I believe he was treated for
13 chlamydia, and I don't remember the other
14 agent, the other organism.
15 Q.  What besides this Ontario article,
16 Exhibit 6, are you relying on to provide this
17 opinion?
18 A.  Well, there are other articles in
19 the literature which I can get, if you want me
20 to, and my own --
21 Q.  I'm talking about ones you've read
22 or relied upon for this opinion.
23 A.  There are various MMWR articles
24 which I did not bring with me, and my own

Page 74

Dr. Bernstein - by Mr. Bennett

1  experience and training.
2
3      Q.   You didn't reference any in the
4  MMWR?
5      A.   I did not.
6      Q.   Did you have any specific data
7  comparing or contrasting the treatment the
8  mentally ill receive in Ontario compared to
9  Minnesota or elsewhere in the United States?
10     A.   No, I did not.
11     Q.   What tools are you using to get to a
12 life expectancy of 50 years?
13     A.   My clinical acumen in treating
14 patients similar to this.
15     Q.   What are you using as a baseline for
16 average black male life expectancy?
17     A.   For his age cohort it would be in
18 the seventies.
19     Q.   Did Mr. Smith have any systemic
20 disease that you know of?
21     A.   I am not aware of his having any
22 systemic disease.
23     Q.   And how many people do you treat
24 with schizophrenia or schizoaffective disorder?
25     A.   At this juncture I'd say more than

Page 75

Dr. Bernstein - by Mr. Bennett

1
2  50, less than a hundred.
3      Q.   And are you aware of the medications
4  that Dr. Schulz talks about in terms of
5  promoting a better outcome and longer term
6  sobriety and longer term good days?
7      A.   I'm aware, I believe he discusses
8  Clozaril, and I believe he mentions depot or
9  long-acting antipsychotics. I'm aware of
10 those.
11     Q.   Haloperidol decanoate?
12     A.   Yes, sir. Decanoate. I thought you
13 said is haloperidol a candidate. I'm sorry.
14 Yes, decanoate.
15     Q.   And Risperdal?
16     A.   Correct.
17     Q.   Would those have been appropriate
18 choices to assist David in staying on
19 antipsychotic medication?
20     A.   Yes.
21     Q.   And then he also recommended
22 clozapine?
23     A.   Clozaril, yes. That's the brand
24 name. Clozapine is the generic.
25     Q.   And he also recommended for the

Page 76

Dr. Bernstein - by Mr. Bennett

1
2  issue of his impulsive aggressive behavior a
3  medication in the class of the anti-convulsant
4  medication Trileptal?
5      A.   Trileptal, right.
6      Q.   Would have been -- may have been
7  helpful in dealing with that?
8      A.   Well, it gets dicey, because
9  Mr. Smith, amongst other agents, was an abuser
10 of alcohol, and there may be some synergy in
11 terms of liver damage with Trileptal. But,
12 yes, that is something you could have used.
13     Q.   There wasn't any liver damage noted
14 in the autopsy; correct?
15     A.   I'll have to look, which I think I
16 have here. The liver was not sectioned, so to
17 the external inspection, it was noted to be
18 congested. Well, no, I guess it was -- it did
19 undergo microscopic. My mistake. So that is
20 correct, there is no evidence at autopsy of
21 extant liver disease.
22     Q.   He didn't have any of a number of
23 the health problems that would specifically
24 impact mortality like hypertension or diabetes;
25 correct?

Page 77

Dr. Bernstein - by Mr. Bennett

1
2      A.   Not yet. He's still a relatively
3  young man.
4          THE WITNESS:  Would anyone
5  mind if I adjusted the thermostat? I find it a
6  bit cold in here. Is it troubling anyone else?
7          MR. OSBORNE:  None at all.
8          MR. BENNETT:  Let's go off the
9  record.
10         THE VIDEOGRAPHER:  Going off
11 the record at 10:32 a.m.
12         (Off the record.)
13         THE VIDEOGRAPHER:  We're now
14 at the beginning of Tape No. 2 of the
15 deposition of Lawson Bernstein, M.D. The time
16 is 10:49 a.m.
17         MR. BENNETT:  Would you want
18 to mark this?
19         (Deposition Exhibit No. 7 was
20 marked for identification.)
21     Q.   Have you ever seen that one?
22     A.   I have, and then when it was cited
23 in --
24     Q.   By Dr. Schulz?
25     A.   Then I read it again, but I had read

20 (Pages 74 to 77)

Page 78

Dr. Bernstein - by Mr. Bennett
1   it previously.
2       Q.   And this actually is a refereed
3   peer-reviewed article; correct?
4       A.   That is correct.
5       Q.   And it does concede the medical
6   morbidity and mortality rates remain elevated
7   in schizophrenia patients compared with the
8   general population; correct?
9       A.   Correct.
10      Q.   It says that's in part due to
11  potentially reversible medical risk factors; is
12  that correct?
13      A.   Excuse me one second.  Yes.
14      Q.   And the risk factors they talked
15  about were, for example, cigarette smoking,
16  obesity, diabetes, hypertriglyceridemia, that
17  sort of thing; correct?
18      A.   Right.
19      Q.   And then HIV and infectious
20  hepatitis were the two others that were
21  mentioned?
22      A.   Correct.
23      Q.   As far as we know, David didn't have
24  any of those, did he?

Page 79

Dr. Bernstein - by Mr. Bennett
1       A.   I was advised, actually, given some
2   of the data in the records about the question
3   of his prostituting himself -- and I by no mean
4   am passing judgment on that.  It's simply a
5   reflection of the record.
6       Q.   There is no actual evidence that he
7   did, either, was there?
8       A.   But knowing what they knew and that
9   he had had some sexually transmitted diseases,
10  I was surprised that he wasn't offered HIV and
11  hepatitis screening.  But you are correct.  You
12  read this correctly.
13      Q.   This article would not support --
14  given his history, they talk about the medical
15  guidelines.  You didn't use this article in
16  coming to your judgment, though; correct?
17      A.   No.  I mean, I think this sort of
18  states what is now the obvious, which is that
19  patients with schizophrenic disorders are high
20  risk for a variety of adverse disease outcomes
21  and that what can be done prophylactically to
22  decrease those risks.  It does not speak to
23  some of the other factors that were unique to
24  Mr. Smith, but it does speak to some.

Page 80

Dr. Bernstein - by Mr. Bennett
1       Q.   Well, there are -- let's look at
2   Exhibit 8 here.
3           (Deposition Exhibit No. 8 was
4   marked for identification.)
5       Q.   Are you familiar with this article?
6       A.   I'm just trying to find the journal.
7   This is from an entity entitled Medical Care.
8   That's the name of the journal?
9       Q.   Yes.
10      A.   I must say this is not something
11  that I read on a regular basis.
12      Q.   It does say it's -- the article is
13  Understanding Excess Mortality in Persons With
14  Mental Illness; correct?
15      A.   That's the title.
16      Q.   It says 17-year Follow-Up of a
17  Nationally Representative Study, and it's dated
18  June of 2011.
19      A.   Correct.
20      Q.   And the study used data from the
21  1989 National Health Interview Survey?
22      A.   I'll need to read this.
23      Q.   Okay.
24      A.   Shall we take a break?

Page 81

Dr. Bernstein - by Mr. Bennett
1       Q.   Sure.
2       A.   Thank you.
3           THE VIDEOGRAPHER:  Going off
4   the record at 10:54 a.m.
5           (Off the record.)
6           THE VIDEOGRAPHER:  We're back
7   on the record at 10:58 a.m.
8   BY MR. BENNETT:
9       Q.   This article is by three people from
10  the Rollins School of Public Health at Emory
11  University; a person from the University of
12  Colorado, Denver School of Public Health; and
13  an individual from the School of Social Work at
14  the University of Pennsylvania School of Social
15  Policy and Practice; correct?
16      A.   Yes, sir.
17      Q.   Supported by a grant from the
18  National Institute of Mental Health?
19      A.   Yes.
20      Q.   In terms of the results, they say
21  that persons with mental disorders died an
22  average of 8.2 years younger than the rest of
23  the population; correct?
24      A.   Without commenting on the

21  (Pages 78 to 81)

Page 82

```
 1          Dr. Bernstein - by Mr. Bennett
 2   statistical methodology or the particular
 3   shortcomings of the study, yes, that's correct.
 4   I believe that estimate, by the author's own
 5   conclusion in the paper, understates the
 6   diminution in lifespan.
 7          Q.   Where does it say it says that?
 8   What page?
 9          A.   I'm finding that for you.
10          Q.   I didn't think they were too
11   self-deprecating, to be perfectly honest with
12   you.
13          A.   And I'm at a pretty fair
14   disadvantage having just scanned this, but if
15   you'll give me a moment. (Pause.)  All right.
16   We can go back on record.
17          Q.   Okay.  I think we're still on the
18   record.
19          A.   Thank you.  This is quoting from
20   Page 603 of the article on the left side of the
21   page, second full paragraph.  "Nonetheless,
22   there was still a trend toward a residual
23   effect of mental disorders on mortality even in
24   this adjusted model, suggesting that mental
25   disorders continue to have an impact on
```

Page 83

```
 1          Dr. Bernstein - by Mr. Bennett
 2   mortality over and above the variables measured
 3   in the study," close quote.
 4          I think there is also another
 5   reference in here somewhere, and again I've
 6   just reviewed this, which speaks to that issue,
 7   as well, but that's how I read it.  It's an
 8   underestimation.  There are other
 9   methodological issues, as well, but we can --
10          Q.   They did find that trajectories of
11   mortality varied across the mental disorder,
12   depending on what kind you had; right?
13          A.   Correct.
14          Q.   They said persons with psychotic
15   disorder, not surprising to you, I guess, had
16   the earliest and highest rates of mortality?
17          A.   Agreed.
18          Q.   And the mean age of death was 73.4
19   versus 74.4 in the normal.  That's what they
20   had the normal --
21          A.   Where are you deriving that, sir?
22          Q.   601.
23          A.   Okay.
24          Q.   And that's because of the severity
25   of the psychosis in terms of mental disorder;
```

Page 84

```
 1          Dr. Bernstein - by Mr. Bennett
 2   right?
 3          A.   You referred to a number.  I asked
 4   you where that was.  And I haven't had a chance
 5   to look at it.
 6          Q.   I'm sorry.  "Persons with psychotic
 7   disorders had the earliest and highest rates of
 8   mortality.  The mean age at death was 63.4
 9   years for persons with psychotic disorders,
10   66.0 for individuals with affective disorders,
11   64.0 years for persons with substance abuse
12   disorders, and 71.0 years for persons with
13   other disorders, as compared with 74.4 years
14   for individuals without reported mental
15   disorders."  Do you see that?
16          A.   Yes.
17          Q.   So the average is 8.2 people with
18   all mental disorders, and for psychotic it's 11
19   years -- correct -- according to this study?
20          A.   You read the section correctly.
21   There are problems with the way the study is
22   done.  But without commenting on those, that is
23   what the authors state.
24          Q.   Okay.  They also stated that of the
25   study group only 5.4 percent of the deaths
```

Page 85

```
 1          Dr. Bernstein - by Mr. Bennett
 2   among persons with mental illness were caused
 3   by unnatural causes such as suicide, homicide,
 4   or accidents, which did not differ
 5   statistically from the rate of unnatural
 6   deaths, 4.7 among those without mental
 7   disorders.
 8          A.   One second.
 9          Q.   That's above the trajectory right
10   there.
11          A.   Yes, sir.  And where is the 5.4
12   reference?
13          Q.   It's on 601.
14          A.   Oh, I see it.
15          Q.   Right the second -- the first full
16   paragraph in the column.
17          A.   I see that.  There is an internal
18   inconsistency in the document regarding the
19   methodologies used and the reporting of that
20   statistic.  Without commenting on that, you
21   read the sentence correctly.
22          Q.   Well, do you think these folks did a
23   bad job?  Is that what you're trying to tell
24   me?
25          A.   No.  What I'm saying is that the
```

Page 86

Dr. Bernstein - by Mr. Bennett

1  paper, like many papers, has its strengths and
2  weaknesses.  And we're talking about statistics
3  which I'm assuming will be proffered at a later
4  date and time, and I think it's necessary to
5  point out what the authors point out, that the
6  article likely underestimates the overall
7  morbidity and mortality of this patient
8  population.
9          There is no statistical attempt to
10  meld categories such as substance abuse and
11  psychotic disorders, which is the way things
12  present clinically quite often.
13          There is a particular statement
14  under mortality measures regarding sensitivity
15  analyses that were calculated excluding
16  suicide, homicide, and accidents, which is --
17  I'd have to really drill down into the paper to
18  understand how they're deriving this statistic.
19          So while you read the sentence
20  correctly, I don't want -- I think it's
21  necessary to point out that there are severe
22  limitations with the study.  And that if it is
23  proffered as some sort of holy grail or
24  absolute statement of fact, which it might be

Page 87

Dr. Bernstein - by Mr. Bennett

1  at some point, that that would be problematic.
2      Q.  Well, it appears to use what I would
3  consider to be the scientific and statistical
4  methodology that's typically used for studies
5  of this type; correct?
6      A.  There are no studies of this type.
7  This was the first attempt to do this.  It was
8  done retrospectively using a questionnaire with
9  yes or no answers, which the authors rightly
10  discuss as being problematic and prone to
11  error.
12          So to say that this is
13  representative of the literature of this type
14  is incorrect, because by the author's own
15  admission, this is the first time this type of
16  study has been done, in this particular
17  methodology.
18      Q.  I notice they didn't pick any
19  particular number for David Cornelius Smith.
20      A.  I'm not sure they know the
21  gentleman.
22      Q.  And did you employ anything nearly
23  this scientific for coming up with 50 years,
24  Doctor?

Page 88

Dr. Bernstein - by Mr. Bennett

1      A.  I did not use this article.  This
2  article, frankly, would await replication, and
3  so it would be improper to use it for that
4  purpose.
5      Q.  So it's improper to use this
6  article; is that what you're saying?
7      A.  As a stand-alone, peer-reviewed,
8  without question document, which is accurate
9  and doesn't contain any type of statistical
10  problems which might make the data relatively
11  or absolutely unreliable, yes, I think it would
12  be premature to use this as some sort of
13  template for calculating life expectancies in
14  patients such as David Smith.
15      Q.  Would it be petter than
16  clairvoyance?
17      A.  Well, I'm not attempting
18  clairvoyance.  What I said was -- I'll find the
19  sentence.  "I believe that Mr. Smith's mix of
20  severe mental disorders, regular substance
21  abuse, medical history, including treatment for
22  sexually transmitted diseases, legal history,
23  frequent homelessness, and treatment
24  noncompliance predicted, at best, a life

Page 89

Dr. Bernstein - by Mr. Bennett

1  expectancy of 50 years."  That's not
2  clairvoyance.  These are factors that are
3  extant in the individual's life.
4      Q.  How does it compare to the Ontario
5  study in terms of methodology?
6      A.  Those are epidemiological studies,
7  which one then would extrapolate from to the
8  extent that one can.
9      Q.  Okay.  Do you claim to be expert in
10  the prediction of the level of violence of
11  human beings?
12      A.  Well, the field of psychiatry,
13  through its own resources, has determined that
14  our ability to predict violence is no better
15  than chance.  I probably have more than the
16  average level of psychiatric experience with
17  violent individuals and the prediction of
18  violence.  So perhaps I'm somewhat better than
19  the average psychiatrist would be.  That would
20  be my answer.
21      Q.  Before the police laid hands on him,
22  what violent act, if any, did David Cornelius
23  Smith do on September 9 of 2010?
24      A.  On that day?

23  (Pages 86 to 89)

Page 90

Dr. Bernstein - by Mr. Bennett

2  Q.  Yes.
3  A.  I am not aware -- I believe he was
4  acting strangely and in a fashion that
5  individuals found frightening and aggressive,
6  so in that context one would consider this a
7  type of violence, although not physical
8  violence.
9  Q.  Did you read the testimony of the
10  boy who complained?
11  A.  What is his name, sir?
12  Q.  William Taylor.
13  A.  No.
14  Q.  So if David asked him his name,
15  would that be violent?
16  A.  Depends on the way he asked it.  If
17  he asked it in a fashion that was threatening
18  or aggressive, yes.
19  Q.  If he asked him how old he was,
20  would that be violent?
21  A.  Same answer.
22  Q.  So if he didn't ask him in a
23  threatening way, it wouldn't be violent?
24  A.  It depends on his body habitus, the
25  way he's standing.  I mean, we've all had the

Page 91

Dr. Bernstein - by Mr. Bennett

2  experience of walking in a subway car or bus
3  terminal and someone is sitting across the way,
4  and this person isn't necessarily doing
5  anything but presents a threatening persona.
6  So I can't say.
7  Q.  Did you watch the YMCA video?
8  A.  I saw the officer's pen cam video.
9  Q.  But that's after they laid hands on
10  him and deciding whether to taser him or not?
11  A.  I believe that's correct.
12  Q.  Mentally ill people, people
13  particularly with schizophrenia or psychosis,
14  schizoaffective disorder don't like to have
15  people lay hands on them, do they?
16  A.  I don't think anybody likes hands
17  laid on them.
18  Q.  They like it less then other people,
19  though?
20  A.  Certain of those patients, yes, if
21  there is a paranoid spectrum to their thinking.
22  Q.  And there was with David; right?
23  A.  Yes.
24  Q.  Have you been part of training any
25  police force about how to deal with such

Page 92

Dr. Bernstein - by Mr. Bennett

2  people?
3  A.  I've done -- I've participated in
4  trainings, but not with police officers, no.
5  Q.  Never with police officers?
6  A.  No, sir.
7  Q.  Have you done it with hospital
8  personnel?
9  A.  Yes, although it's been a while.
10  Q.  I mean about that topic.
11  A.  About dealing with violent patients?
12  Q.  Yes.
13  A.  Yes.
14  Q.  And you train them to deescalate and
15  not to immediately lay hands on them; correct?
16  A.  Right.  They're not law enforcement
17  officers, so there may be different standards
18  applicable there, but for hospital personnel
19  working in a mental health facility, that is
20  preferentially, if possible, the first step.
21  Q.  To your knowledge, nobody has
22  reported to you that prior to the police laying
23  hands on David, that David had committed any
24  crime; is that true?
25  A.  Right.  And I haven't come prepared

Page 93

Dr. Bernstein - by Mr. Bennett

2  to proffer any testimony about what Mr. Smith
3  did or didn't do or what the police should or
4  shouldn't have done.
5  Q.  It's just you were asked to -- I
6  mean, are you giving some opinion to a
7  reasonable degree of medical certainty when you
8  answer the question, too?  If so, I'd like to
9  know what it is.
10  A.  Sure.  Let's take it one sentence at
11  a time.  "At the time of the altercation,
12  Mr. Smith was apparently noncompliant with
13  psychotropic medication (as was his habit)."
14  He was on lamotrigine, was supposed to be on
15  lamotrigine.  Confirmatory tests for
16  lamotrigine performed at the receiving hospital
17  did not reveal the presence of that agent.
18  Mr. Smith had a history of being noncompliant.
19  So that's expressed within a reasonable degree
20  of medical certainty.
21  "Severely intoxicated on
22  dextromethorphan and other constituents of
23  cough syrup," I believe the toxicology report
24  would support that.
25  "And more likely than not acutely

24  (Pages 90 to 93)

Page 94

1    Dr. Bernstein - by Mr. Bennett
2  psychotic from both of these factors both
3  singly and in the aggregate." This gentleman
4  has a history of a psychotic disorder.
5  Psychotic disorders, when unmedicated, can and
6  will get worse. I think those factors are
7  extant here, and that sentence is expressed
8  within a reasonable degree of medical
9  certainty.
10      The next sentence is, "In particular
11  the combination of high dose dextromethorphan,"
12  parentheses, "(which as noted above is an
13  intoxicant with PCP-like properties)," close
14  parenthesis, "plus unmedicated psychosis is a
15  potent recipe for bizarre, violent, acting-out
16  behaviors such as those evinced by Mr. Smith."
17  That's a general statement which I believe is
18  reflected in the medical literature regarding
19  both conditions, both singly and together.
20      "It is also important to note that
21  individuals intoxicated with Mr. Smith's blood
22  level of dextromethorphan but without an
23  underlying autonomous psychotic disorder can
24  present identically to his presentation at the
25  YMCA on September 9, 2010." That's a general

Page 95

1    Dr. Bernstein - by Mr. Bennett
2  statement which I believe is correct.
3    Q.  Based on what?
4    A.  I'm sorry. I don't follow you.
5    Q.  Based on those articles you showed
6  me?
7    A.  And others. Let's go back. "It is
8  important to note that individuals intoxicated
9  with Mr. Smith's blood level of
10  dextromethorphan but without an underlying
11  autonomous psychotic disorder can present
12  identically." That would be predicated on the
13  case reports that I showed you, and there may
14  be others in the literature, as well. And I
15  believe it's also contained within the fact
16  sheet from the National Highway Transportation
17  and Safety Board, which speaks to
18  hallucinations as a side effect of toxicity, as
19  an effect of toxicity, and people who
20  hallucinate can become violent.
21    Q.  So you haven't seen the video of his
22  conduct before the police arrived; correct?
23    A.  Excuse me one second. Take this
24  off.
25    Q.  Why don't we go off the record while

Page 96

1    Dr. Bernstein - by Mr. Bennett
2  you look.
3    A.  Thank you.
4      THE VIDEOGRAPHER:  Going off
5  the record at 11:20 a.m.
6      (Off the record.)
7      THE VIDEOGRAPHER:  We're back
8  on the record at 11:20 a.m.
9    A.  I have seen that.
10    Q.  What?
11    A.  The YMCA video.
12    Q.  How do you know?
13    A.  Because I have it here.
14    Q.  You didn't list it in your report,
15  did you?
16    A.  My shortcoming for not listing those
17  videos, you are correct, and you have my
18  apologies for that.
19    Q.  What do you recall seeing in the
20  video?
21    A.  I don't recall much about the YMCA
22  video. The pen cam video I recall.
23    Q.  Do you recall anything about the
24  YMCA video?
25    A.  Not off the top of my head, no.

Page 97

1    Dr. Bernstein - by Mr. Bennett
2    Q.  We have a video of his conduct
3  before the police arrived and of his initial
4  conduct with the defendant officers. We've
5  established that; right?
6    A.  Yes, sir.
7    Q.  So why is it necessary to engage in
8  speculation about whether he was likely or
9  unlikely to be violent or anything else that
10  occurred?
11    A.  The question was posed to me.
12    Q.  You don't make any mention in the
13  report about -- in the text of your report
14  about the YMCA video or the taser video, do
15  you?
16    A.  Let's see if there is reference
17  to --
18    Q.  Or even the pen camera video?
19    A.  I know I don't have the taser video.
20  Correct.
21    Q.  The taser shows him making one
22  offensive strike. He swung and hit Callahan
23  one time; right? It doesn't show any of the
24  blows that he struck; is that true?
25    A.  I have not seen the taser video.

                        25 (Pages 94 to 97)

Page 98

Dr. Bernstein - by Mr. Bennett

1
2    Q.   Well, I mean, on the pen camera
3    video, it only shows one strike; correct?
4    A.   Correct.  Well, I did not view the
5    video with the notion of adding up the number
6    of strikes.  I'd have to look at it again.  I
7    don't know that.
8    Q.   The taser had an effect each time it
9    was deployed that you could observe; correct?
10   A.   I'd have to look at the video again
11   to answer the question.
12   Q.   You have no memory?
13   A.   I have no independent recollection
14   of that.
15   Q.   When you say that it's important to
16   note that individuals are intoxicated, why is
17   it important to note, when you say that at the
18   bottom of --
19   A.   It's important to note that
20   dextromethorphan intoxication, in and of
21   itself, can cause violent behavior.  Why is it
22   important to note that?  It's important to note
23   that, because there are three possibilities in
24   this matter.  One is that the gentleman was
25   agitated and became violent in the setting of

Page 99

Dr. Bernstein - by Mr. Bennett

1
2    unmedicated or undermedicated psychosis.
3         The second would be that the
4    gentleman became violent because of
5    dextromethorphan intoxication.  And the third
6    possibility is that he became violent from
7    both.
8         If one were to posit that his
9    psychotic disorder were somehow under good
10   control, a supposition which I believe is
11   incorrect, one could still explain the violent
12   behavior based on the presence of the
13   dextromethorphan.
14   Q.   The only violent behavior that you
15   noticed was in response to and after,
16   temporally, the police laid hands on him?
17   A.   The only overt act of violence
18   occurred around that time, and I would have to
19   look at the video again to obtain whether it
20   preceded any police intervention or was
21   subsequent to any police intervention.
22   Q.   You just don't remember?
23   A.   I do not -- I have no independent
24   recollection of that.  I'd have to look.
25   Q.   Now, I looked at -- and then you're

Page 100

Dr. Bernstein - by Mr. Bennett

1
2    asked, Question No. 3 is what was Mr. Smith's
3    strength potential.  Again, that isn't in the
4    105 things that you list here, is it?
5    A.   No.  But with all due respect, if
6    someone routinely treats violent patients, I
7    believe there is clinical experience and
8    literature to support the contention that
9    individuals who are acutely psychotic from any
10   etiology can achieve levels of strength due to
11   agitation which would not have been predicated
12   simply by looking at their body habitus.  I
13   don't think that's a far-flown concept.
14        I think any psychiatrist who has
15   ever worked in an emergency room setting with
16   chronic psychotic patients would have some
17   knowledge of that.
18   Q.   So that's what you're relying on to
19   give that answer?
20   A.   I have no doubt there is literature
21   about relatively benign looking patients who
22   are psychotic achieving rather substantial
23   feats of strength, and I can certainly obtain
24   those for you if you need them.
25   Q.   I'm just wondering if you looked at

Page 101

Dr. Bernstein - by Mr. Bennett

1
2    any before you looked at the report.
3    A.   No.  That would be something that is
4    part of my background and training and
5    experience.
6    Q.   So what -- I mean, what
7    extraordinary strength did David Smith evidence
8    in what you saw?
9    A.   From the pen cam it was an extended
10   struggle.
11   Q.   How long?
12   A.   I didn't time it.  There may be
13   times stamps on the pen cam.  I don't recall
14   what they are.  Multiple minutes.
15   Q.   Well, more than two?
16   A.   I believe so.  But I'd have to look.
17   Q.   And he fell down when the taser --
18   the first two applications of the taser;
19   correct?
20   A.   I was aware that he fell down during
21   the course of the altercation.
22   Q.   So the taser had that effect on him,
23   the neuromuscular disruption?
24   A.   I don't know that.
25   Q.   You don't know that?

26 (Pages 98 to 101)

Page 102

Dr. Bernstein - by Mr. Bennett
1
2    A.   That would be a reasonable
3    supposition, but I don't know that, per se.
4    Q.   Do you know any other reason he fell
5    down?
6    A.   He could have tripped.
7    Q.   Did you see him get tripped?
8    A.   I did not examine the video with the
9    purpose of codifying and explaining each and
10   every physical act present on it.
11   Q.   Well, you say his capacity for
12   extended periods of high physical exertion
13   related to violence would have been
14   substantial.
15   A.   Yes, sir.
16   Q.   And you claim to have the foundation
17   to say that; correct?
18   A.   Based on my clinical experience and
19   training, yes.
20   Q.   All right.  And, you know, was this
21   struggle any longer than, for example, a round
22   in amateur boxing of a minute and a half or --
23   A.   Let me go back for a second.  You
24   had asked me if I had referenced the pen camera
25   video in my report and, in fact, the next

Page 103

Dr. Bernstein - by Mr. Bennett
1
2    sentence references the pen camera video, just
3    to amend my prior answer.
4    Q.   And then he jumped into an excited,
5    delirium-like state.  When you say like, what
6    does that mean?  Because I used to ask my kids
7    that.
8    A.   We don't know if he was delirious,
9    but the types of behaviors he was evincing
10   coupled with the dextromethorphan intoxication
11   would indicate that delirium is in the
12   differential diagnosis for the behavior.
13   Q.   Not according to Dr. Andrew Baker;
14   right?  He said that there was no -- that
15   excited delirium played no part in David
16   Smith's case.  There wasn't any.
17   A.   I'm not here to comment on his
18   testimony.
19   Q.   Did you read it?
20   A.   Yes.
21   Q.   You opine that Mr. Smith's prospects
22   for gainful employment or educational
23   achievement were negligible?
24   A.   Excuse me one second.  There is a
25   preceding sentence which explains that

Page 104

Dr. Bernstein - by Mr. Bennett
1
2    sentence, but you're correct, that's part of a
3    sentence.
4    Q.   You don't hold the opinion to a
5    reasonable degree of medical certainty that
6    David Smith was suffering from excited
7    delirium, do you?
8    A.   I don't have enough information to
9    render that diagnosis, that's correct.
10   Q.   So then no would be the answer?
11   A.   Certainly, the behavior could have
12   been indicative of that, but there is not
13   enough information to render that diagnosis, so
14   the answer would be no.
15           There are other explanations extant
16   at the time of the event that would also
17   explain the behavior, which we know are
18   factual, i.e. the psychotic disorder and the
19   dextromethorphan intoxication.
20   Q.   Okay.  When you describe this
21   prolonged struggle, going back to your
22   statement there, are you saying that an
23   ordinary human being does not have the capacity
24   to struggle for that period of time to a
25   reasonable degree of medical certainty?

Page 105

Dr. Bernstein - by Mr. Bennett
1
2    A.   When you say ordinary, could I ask
3    you to -- I mean --
4    Q.   Well, me.  How about that?  I am
5    only 61, but I figure I could still fight for
6    three minutes if I had to, even two.
7    A.   There could be many so-called normal
8    individuals that could engage in an extended
9    altercation of the type captured by the pen
10   cam.
11   Q.   Do you know how long, for example,
12   the armed forces trains individuals to be able
13   to engage in hand-to-hand combat?
14   A.   No.
15   Q.   Excited delirium is not recognized
16   in the diagnostic and statistical manual for --
17   A.   Delirium is, but the term excited
18   delirium is not.
19   Q.   Or by the American Medical
20   Association; correct?
21   A.   What about the American Medical
22   Association?  What was the question again?
23   Q.   Excited delirium is not recognized
24   by the American Medical Association.  Let's
25   leave it at that first.

27 (Pages 102 to 105)

Page 106

Dr. Bernstein - by Mr. Bennett

1
2    A.   Not recognized, I'm not sure what
3  you're referencing.  It's a very broad
4  statement.  There may be literature the
5  American Medical Association's published which
6  could contain the term excited delirium.  I
7  don't know that.
8    Q.   Well, it's not -- excited delirium
9  is not described in -- what's the -- IC --
10    A.   ICD-9 or ICD-10?
11    Q.   Yes.
12    A.   I don't know if you can code excited
13  delirium in ICD-10.  But, certainly, it's well
14  described that delirium can have different
15  manifestations, a lethargic delirium, an
16  excited delirium, a delirium that waxes and
17  wanes between lethargic and excited.  There can
18  be so-called lucid intervals.  All of those are
19  possible.
20    Q.   Let's just be clear.  You're not
21  opining that David Smith had excited delirium
22  or died from it; right?
23    A.   I'm not opining at all about what he
24  died from.
25    Q.   I assume whether he had it, you

Page 107

Dr. Bernstein - by Mr. Bennett

1
2  cannot come to that judgment?
3    A.   I cannot.  And there are other
4  extant conditions which could also explain the
5  behavior which are diagnosable.
6    Q.   What facts are you relying upon to
7  provide the opinions that his prospects for
8  gainful employment or educational achievement
9  were negligible?
10    A.   The universe of factors that we have
11  been discussing for the past few hours and per
12  the discovery material he had not held a job
13  since 2006 and, I believe, was unable to
14  navigate his single attempt at college, not a
15  full college load, but simply a course or two.
16  So I think that plus other factors plus the
17  fact that -- his overall clinical course, to my
18  reading of the record, was worsening with time,
19  would all inform that statement.
20    Q.   You're not opining to a reasonable
21  degree of medical certainty that David Smith
22  exhibited superhuman or even elevated levels of
23  strength, are you?
24    A.   Within a reasonable degree of
25  medical certainty, he certainly exhibited a

Page 108

Dr. Bernstein - by Mr. Bennett

1
2  substantial degree of strength to the extent
3  that two police officers were having a hard
4  time subduing him.  I wouldn't use the word
5  superhuman.  What was the other term?
6    Q.   Or even an elevated level of human
7  strength.
8    A.   Elevated level.  Elevated above a
9  normal baseline.  Can I say that within a
10  reasonable degree of medical certainty?  I
11  would say given the factors extant, unmedicated
12  psychosis and the dextromethorphan intoxication
13  coupled with what appears to me to be an
14  extended altercation with two trained police
15  officers, I believe I would state within a
16  reasonable degree of medical certainty that his
17  strength level was elevated above his normal
18  baseline as a result of those conditions.
19    Q.   And you claim to have observed that
20  visually in the pen camera video?
21    A.   Yes.  The pen cam appears, to my
22  looking at it -- I'm not a police officer --
23  but to be quite a fight.
24         THE COURT REPORTER:  Quite
25  what?

Page 109

Dr. Bernstein - by Mr. Bennett

1
2         THE WITNESS:  Quite a fight.
3    Q.   Do you have any police use of force
4  training?  Were you ever involved with that?
5    A.   No.
6    Q.   You have no idea if the police were
7  employing proper police force techniques?
8    A.   No, I do not.
9    Q.   Are you relying on any scientific
10  articles or studies to help you with the
11  opinion that his chance for gainful employment
12  or educational achievement were negligible?
13    A.   No.  That's predicated on the record
14  and the factors that I described as contained
15  within the record.
16    Q.   Do you think you have a better idea
17  of whether people with schizophrenia or
18  schizoaffective disorder are able to be
19  gainfully employed or educated if you treat
20  them for it rather than if you look at it on a
21  paper record, since you treat between 50 and a
22  hundred --
23    A.   Right.
24    Q.   -- psychotic disorder patients?
25    A.   I think you can write it both ways.

28  (Pages 106 to 109)

Page 110

Dr. Bernstein - by Mr. Bennett

1      There may be clinicians who would be more
2 astute than the record. The record is really
3 meant to reflect what the clinician sees. And
4 so the record that I read, I think, is
5 reflective of the statements that I've made.
6      But I think to answer your question,
7 I think you could write that story both ways.
8 They might be better than the record, they
9 might not. They could be worse than the
10 record.
11      MR. BENNETT: Let's go off the
12 record for a second.
13      THE VIDEOGRAPHER: Going off
14 the record at 11:41 a.m.
15      (Off the record.)
16      THE VIDEOGRAPHER: We're back
17 on the record at 11:46 a.m.
18   Q.   You don't have any idea of David
19 Smith's strength baseline, do you?
20   A.   No. I haven't seen him tested on a
21 strength dynamometer or something like that.
22   Q.   You don't have any scientific
23 measurements reflecting the force that Smith
24 was exerting during the struggle, do you?

Page 111

Dr. Bernstein - by Mr. Bennett

1   A.   As in foot-pounds, no.
2   Q.   By any measuring capability?
3   A.   No. I mean, it looks like he was
4 putting up a pretty good fight, but I can't say
5 for more than that.
6   Q.   Your observation that it appeared to
7 be quite a fight or a good fight is the same
8 observation any lay person could make, though,
9 isn't it?
10   A.   Well, I've seen probably more than
11 my share of fights because of the work I've
12 done in prisons and in the emergency room. So
13 I think it would be somewhat different than the
14 average lay person, hanging out in a bad area.
15   Q.   When you look at the record, in the
16 record did you see opinions from people that he
17 was employable, that he was educable?
18   A.   I saw documents that stated that
19 appeared to lack life skills regarding
20 independent living and/or educational work
21 achievement. I believe I also saw -- did I see
22 records in time point regarding those issues,
23 where people expressed opinions as to his
24 employability or capacity to pursue school? I

Page 112

Dr. Bernstein - by Mr. Bennett

1 think I did.
2   Q.   But did you have a chance when you
3 were looking through your stuff to see if
4 you've got Dr. Zimmerman or Maureen Glover's
5 deposition?
6   A.   If it's not listed here, I don't
7 have it.
8   Q.   Okay. Have you ever personally
9 treated a patient who suffered from psychosis
10 and substance abuse that was able to ultimately
11 gain employment and further their education?
12   A.   Yes. It's usually predicated on
13 prolonged abstinence from alcohol or drug abuse
14 and compliance with treatment, but, yes, I've
15 seen those types of patients.
16   Q.   And there are drugs that you now
17 have available that we talked about, the
18 clozapine and the long-acting inhibitors that
19 Dr. Schulz talked about that would help in that
20 process; correct?
21   A.   Could help, yes.
22   Q.   Correct. My word was wrong there.
23 They're designed to help?
24   A.   Yes, sir.

Page 113

Dr. Bernstein - by Mr. Bennett

1   Q.   Are there any studies that you're
2 relying on, specific studies, to provide this
3 opinion?
4   A.   The employability and prospects of
5 further educational achievement?
6   Q.   Yes.
7   A.   No. That's predicated upon my
8 reading of the record.
9   Q.   And your experience and education
10 and general --
11   A.   Yes, sir.
12   Q.   Do you agree that David Smith
13 expressing desire to go to college and work are
14 motivational factors that would be part of --
15 take any part in increasing the good outcome in
16 a schizoaffective disorder?
17   A.   Good clinical outcome?
18   Q.   Yes.
19   A.   As in would his symptoms get better
20 because he wanted to go to college or work?
21   Q.   If he actually had the desire to do
22 something like that.
23   A.   Not necessarily. Sometimes patient
24 have to walk before they run. And if their

29 (Pages 110 to 113)

Page 114

Dr. Bernstein - by Mr. Bennett
1 goals are too inflated, they're not willing to
2 go through the steps necessary to get to that
3 point, that can be deleterious.
4        Having said that, it is possible
5 that his or a patient with schizoaffective
6 disorders' wish to have those achievements
7 could have a decided effect on his overall
8 prognosis.
9    Q.    You're unaware of any of his
10 family's knowledge at any point in time of his
11 psychosis?
12    A.    Actually, let me go back and amend
13 my answer. The gentleman that also had a brain
14 injury and had neuropsychological testing that
15 was not normal and appeared to show cognitive
16 deficits from brain injury.
17    Q.    Where did he get this
18 neuropsychological testing?
19    A.    Let me find that for you.
20    Q.    Yes. Because I don't remember that
21 he had a full neuropsych workup.
22    A.    Yes, he did. I can't see without my
23 glasses.
24         THE VIDEOGRAPHER: Do you want

Page 115

Dr. Bernstein - by Mr. Bennett
1 to go off?
2         MR. OSBORNE: Yes, let's go
3 off the record.
4         MR. BENNETT: Sure.
5         THE VIDEOGRAPHER: Going off
6 the record at 11:52 a.m.
7         (Off the record.)
8         THE VIDEOGRAPHER: We're back
9 on the record at 11:55 a.m.
10    A.    I have found the document that you
11 asked me about.
12 BY MR. BENNETT:
13    Q.    Who is the provider?
14    A.    Carroll Neuropsych Services and
15 C-O-U-N-S-E. I'm assuming that's counseling,
16 but --
17    Q.    I don't know what that is.
18    A.    That's got to be counseling, and it
19 was cut off.
20    Q.    Okay. They didn't find any
21 neuropsychological evidence that would
22 corroborate the head injury; correct?
23    A.    Hold on just one second. No.
24 That's not the way I read this report.

Page 116

Dr. Bernstein - by Mr. Bennett
1    Q.    That's what it says in the English
2 language in the conclusion; right?
3    A.    Point to me where you're referring
4 to.
5    Q.    I'll just have to see it for a
6 minute.
7    A.    Yeah, sure.
8    Q.    "He has had some significant head
9 injuries, although there is no medical
10 documentation to substantiate any long-lasting
11 effect."
12    A.    Right. Your question to me was they
13 didn't document any cognitive effects of the
14 traumatic brain injury. The report states,
15 quote, "Mr. Smith has cognitive difficulty with
16 attention to nonverbal material, vocabulary,
17 and visual and graphic skill. He shows
18 variability for mental control, nonverbal
19 reasoning, and planning.
20        "He shows relative strength for
21 verbal fluency. The etiology of the above
22 listed difficulties is likely multifactorial.
23 He has had some significant head injuries,
24 although there is no medical documentation to

Page 117

Dr. Bernstein - by Mr. Bennett
1 substantiate any long-lasting effect."
2        The way that I read this is there
3 are, in fact, cognitive abnormalities. With
4 all due respect to the author, I don't think
5 it's possible to say they are or are not due to
6 the head injury. You have to consider that.
7        What I was speaking to in
8 referencing the document is the individual's
9 capacity to pursue gainful employment or
10 school. So whether he has a head
11 injury-related cognitive problem or not, he
12 clearly has cognitive problems.
13    Q.    You didn't mention a head injury or
14 TBI in your report at all.
15    A.    I didn't. But in being responsive
16 to the question, it struck me as relevant.
17    Q.    Well, in fairness to you,
18 Mr. Osborne did ask about whether a TV fell and
19 hit him on the head, and one of his siblings,
20 one of his brothers or two of his brothers
21 mentioned that, and he did fall out of a second
22 story window. They remembered that. Or was it
23 off a roof?
24         MR. OSBORNE: It was off a



Page 118

Dr. Bernstein - by Mr. Bennett

1    balcony.
2
3            MR. STORM:  Or, no, it was
4    out of a window.
5            MR. BENNETT:  But he didn't
6    even go to a doctor, as I recall.
7            MR. OSBORNE:  There was no
8    record of doctors, no.
9            MR. BENNETT:  They said they
10   just woke him up.
11       A.   That's a bad sign.  I mean, wakening
12   up sounds like he had a loss of consciousness,
13   which is problematic.  Okay.  Enough.  I'll
14   stop.
15   BY MR. BENNETT:
16       Q.   In any event, you didn't read any of
17   the available body of evidence from the family
18   about his relationship with them; correct?
19       A.   Their relationship with him?
20       Q.   Yes.
21       A.   That is correct, I have not seen any
22   of their deposition testimony.
23       Q.   And it is not unusual at all for
24   people who are being treated for mental health
25   disorders not to divulge or disclose their

Page 119

Dr. Bernstein - by Mr. Bennett

1    relationships with their family to mental
2    health providers; correct?
3        A.   I don't think that's true.  I think
4    there are certain mentally ill patients who
5    would be reticent to disclose personal
6    information, including that sort of
7    information.  I didn't get that sense from
8    Mr. Smith's records, but that is possible.
9        And I don't think the majority of
10   psychiatrically ill patients or even the
11   majority of patients with a psychotic disorder
12   invariably are reticent or frequently are
13   reticent to divulge family information.
14       Q.   Well, again, you didn't read the
15   depositions of Maureen Glover or Joshua
16   Zimmerman who say, at least in their
17   experience, David's not sharing was consistent
18   with a lot of other people not sharing their
19   family histories?
20       A.   They're certainly free to say
21   whatever they wish.  The record that I reviewed
22   showed he was quite forthcoming on a number of
23   issues, including those types of things.
24       Q.   What evidence did you consider in

Page 120

Dr. Bernstein - by Mr. Bennett

1
2    rendering your opinions that -- well, tell me
3    what your opinions are with regard to his
4    emotional capacity to provide a stable, loving,
5    and supportive influence to other family
6    members.  I guess that was the question.
7        A.   Well, stable, given his clinical
8    situation through 2010, his life was anything
9    but stable.  And I don't think -- I think the
10   instability would apply also to that factor as
11   pertains to interaction with family members.
12       The issue of a loving and supportive
13   dovetails with stable.  By all means he may
14   have loved his family, but the idea that given
15   the chaotic nature of his life in 2010, that he
16   was going to be able to be a loving and
17   supportive influence to his family, I just
18   think that the way he was living and the
19   clinical situation was inimical,
20   I-N-I-M-I-C-A-L, to that.  It is just a very
21   chaotic life.
22       He was in Minneapolis, then he left.
23   He was psychiatrically hospitalized, and then
24   he came back.  He was in and out of homeless
25   shelters, short-term placements for homeless

Page 121

Dr. Bernstein - by Mr. Bennett

1
2    individuals.  It just doesn't strike me as a
3    situation consistent with a stable family life.
4        Q.   Okay.  Did you read any depositions
5    in which he was called charming?
6        A.   I've seen records that describe him
7    as a charming person or a person capable of
8    that.
9        Q.   Did you read the notation or were
10   you aware that many of his providers indicated
11   they liked him very much?
12       A.   I think he was a likable but
13   difficult patient, but I didn't get the
14   sense -- I mean, there are certain patients who
15   are very difficult to interact with, and you
16   can't get information, or they're always angry.
17   And I didn't get any sense of that.
18       I got the sense that those who
19   treated him didn't have those types of problems
20   to contend with.  So therefore, I guess by
21   default, he would have been a reasonably
22   likeable individual.
23       Q.   And if a 38-year veteran of
24   behavioral services and social work says that
25   he was very motivated and rewarding to work

31  (Pages 118 to 121)

Page 122

Dr. Bernstein - by Mr. Bennett

1    with and appreciated getting support and
2    services, despite his mental illness, would
3    that tend to color your view?
4        A.   Could you repeat the question back
5    to me.
6            (The Reporter read back part
7    of the question, as requested.)
8        A.   Let me stop you there.  I didn't see
9    motivation.  You know, motivation also implies
10   activity, and I just didn't see that, the
11   compliance with treatment and things of that
12   nature.  Could you read the rest of the
13   sentence, please.
14           (The Reporter read back the
15   rest of the question, as requested.)
16       A.   I do agree that he appreciated the
17   support that he got, although at times he was
18   not accepting of it and would be removed from
19   certain places because of noncompliance with
20   the treatment rules.
21           So your question is those factors,
22   would they color my opinion that he was not
23   capable or had limited capacity to provide to other
24   stable, loving, supportive influence to other

Page 123

Dr. Bernstein - by Mr. Bennett

1    family members?  No, it would not.
2        Q.   Do you have an opinion, to a
3    reasonable degree of medical certainty, whether
4    David Smith was capable of having caring human
5    relationships?
6        A.   I think he was capable of that,
7    particularly if he was sober and medicated.
8        Q.   And he had a six-year relationship
9    described as positive with his girl friend;
10   right?
11       A.   Correct.
12       Q.   Did you ever see his drawings?
13       A.   I don't think I've seen that.
14       Q.   Did you see references describing
15   him as a, quote, pretty nice fellow?
16       A.   I don't know if I saw that exactly,
17   but he seemed like a nice guy.  There were
18   times that he could be a handful and difficult,
19   but I think, on balance, he was a likable
20   individual, particularly when not substance
21   abusing and/or in the throws of unmedicated
22   psychotic disorder.
23       Q.   So your opinions expressed in the
24   answer to Question No. 5 did not include any

Page 124

Dr. Bernstein - by Mr. Bennett

1    information from the family or those with whom
2    he had the closest personal relationships like
3    his girl friend?
4        A.   I did not see their deposition
5    testimony.  I relied upon the records to reach
6    that opinion, the records that were in my
7    possession, the clinical records to reach that
8    opinion.
9        Q.   You had read Dr. Schulz's report
10   before you rendered yours; correct?
11       A.   Yes, sir.
12       Q.   You did not discuss, in your report,
13   the long-acting drugs and the clozapine;
14   correct?
15       A.   Correct.
16       Q.   And you made no attempt to discern
17   or opine on his mother and siblings'
18   relationship with him, from their perspective?
19       A.   Given that I haven't seen their
20   deposition testimony, I wouldn't have the basis
21   to do that.
22       Q.   When you say he had a propensity for
23   extended periods of bizarre, violent behavior,
24   what are the propensity instances you're

Page 125

Dr. Bernstein - by Mr. Bennett

1    thinking of?
2        A.   What are the instances I'm thinking
3    of?
4        Q.   Yes.  What is the foundation for
5    that, and do you hold it to a reasonable degree
6    of medical certainty?
7        A.   I'm just looking for the sentence.
8        Q.   Second to last paragraph?
9        A.   On Page?
10       Q.   5.
11       A.   Thank you.  So what I wrote was,
12   quote, "In summary, on September 9, 2010,
13   Mr. Smith presented as acutely psychotic and
14   violent, more likely than not due to an
15   unmedicated psychotic disorder coupled with
16   acute, severe dextromethorphan intoxication.
17   Both of these factors, particularly together,
18   are associated with a propensity for extended
19   periods of bizarre, violent behavior."
20           I think that's a statement of fact.
21   Patients with unmedicated psychotic disorders
22   can engage in extend periods of bizarre,
23   violent behavior.  And patients who are acutely
24   intoxicated with high levels of

32 (Pages 122 to 125)

Page 126

Dr. Bernstein - by Mr. Bennett

dextromethorphan can have a propensity for extended periods of bizarre, violent behavior. And those two conditions together would be synergistic, thus increasing the risk for that type of outcome.

Q. Are we off?

A. No. That's okay.

Q. Are you looking for something?

A. I thought I was, but I think I have it here.

Q. Who picked what depositions you would get?

A. I don't know.

Q. It wasn't you, though?

A. No.

Q. Did you read the one of William Christopher Taylor? It says that you got it.

A. Yes.

Q. And he didn't describe any act of violence on the part of Mr. Smith, did he?

A. Hold on just one second. I'd have to look at his deposition. I don't recall.

Q. But none comes to your mind as you sit here today?

Page 127

Dr. Bernstein - by Mr. Bennett

A. I have no spontaneous recollection of that. I'd have to look at the record.

Q. Were you aware of the fact that his sister visited him in Minneapolis?

A. I was not aware of that.

Q. Were you aware that she spoke on the phone with him on a regular basis, even discussing his disease?

A. No.

Q. Were you aware that she would pray with him about his disease and often fall asleep with him on the phone?

A. No.

Q. Are you opining that the individuals afflicted with the illnesses and problems that Mr. Smith had are incapable of providing love and support and other value to the family members?

A. No.

Q. Have you been asked to provide any additional opinions that we haven't discussed today?

A. Not at this time, no.

Q. Would you recognize Dr. Schulz as an

Page 128

Dr. Bernstein - by Mr. Bennett

expert in the treatment of schizophrenia and schizoaffective disorder?

A. Yes. I might not agree with everything he had to say, but I would recognize him as an expert.

Q. Well, would it be fair to say he has a great deal more experience with schizophrenia and schizoaffective disorder than you?

A. You know, it depends on what you mean by experience. He's certainly done a lot of research, and it appears he's done a fair amount of clinical work. I'm not sure how much of that he does currently.

I've seen an awful lot of psychiatric spectrum patients, particularly in the criminal justice system. I don't have a basis to say one way or the other. That's a reasonable supposition, but I'm not sure I can say more than that.

Q. Have you ever been chair or chief of the department of psychiatry in any university?

A. No.

Q. The National Institute of Mental Health, is that a well recognized organization?

Page 129

Dr. Bernstein - by Mr. Bennett

A. Yes.

Q. The University of Pittsburgh has a schizophrenia program; correct?

A. It does.

Q. And before you came there, he was chair of that department; correct?

A. I believe that's correct.

Q. And he's written six books on schizophrenia. Have you written any?

A. I have not written any.

Q. Are you a member of the International Congress of Schizophrenia Research?

A. No.

MR. OSBORNE: Bob, I don't know how long you're going to go on that line of questioning, but I'm going to just put a standing objection into relevance.

MR. BENNETT: Sure. Well --

Q. Hearing voices is a prominent feature of schizophrenia and schizoaffective disorders?

A. Yes.

Q. Even if you're medicated, I think at

## Page 130

Dr. Bernstein - by Mr. Bennett

1  least Dr. Zimmerman testified that the voices
2  are lower and muted?
4  A.  That would be the hopeful outcome.
5  Q.  That's what you want?
6  A.  Frequently, the voices will
7  continue.  In fact, that's the hallmark of a
8  chronic psychotic disorder is that you can turn
9  the volume down, but you can't shut it off.
10  Q.  So that's not a surprising finding
11  in David's case?
12  A.  No.
13  Q.  Do you have patients that use
14  long-acting, injectable medications, the LAIs,
15  yes?
16  A.  Yes.
17  Q.  In what situation do you prescribe
18  those?
19  A.  Generally, it's to try to enhance
20  compliance in patients who have limited insight
21  into their disorder and have a history of
22  noncompliance.
23  Q.  So enhancing compliance would be the
24  same as enhancing adherence?
25  A.  Yes.

## Page 131

Dr. Bernstein - by Mr. Bennett

2  Q.  All right.  And it's true that
3  anticonvulsant medications are used to enhance
4  treatment of schizophrenia; correct?
5  A.  Primarily as mood stabilizers, more
6  so in schizoaffective disorders than
7  schizophrenia, but yes.
8  Q.  Schizophrenia and schizoaffective
9  patients often compartmentalize their lives?
10  A.  I'm going to have to ask you what
11  you mean.
12  Q.  Well, they don't wish to share their
13  suffering from a stigmatizing mental disorder
14  with certain family or friends, that sort of
15  thing?
16  A.  That can happen, yes.  Not
17  invariably true, but it can happen.
18  Q.  Did you read any of the studies
19  cited by Dr. Schulz, the Robinson study, the
20  Harding study?
21  A.  Some of those are known to me.  I
22  did not pull them and reread them.  Some of the
23  studies he cited, I have not read.
24  MR. BENNETT:  Let's go off the
25  record for a few minutes.

## Page 132

Dr. Bernstein - by Mr. Bennett

2  THE VIDEOGRAPHER:  Going off
3  the record at 12:20 p.m.
4  (Off the record.)
5  (Deposition Exhibit Nos. 9
6  through 11 were marked for identification.)
7  THE VIDEOGRAPHER:  We're back
8  on record at 12:45 p.m.
9  BY MR. BENNETT:
10  Q.  So we talked about these three
11  articles before, and we've had them marked for
12  purposes of making the record complete.
13  Exhibit 9 is the dextromethorphan fact sheet
14  from National Highway Transportation Safety --
15  A.  Administration.
16  Q.  -- Administration?
17  A.  Yes, sir.
18  Q.  Exhibit 10 is the Massive
19  Dextromethorphan Injection and Abuse from the
20  American Journal of Emergency Medicine,
21  Volume 13, Issue 2, March 1995.
22  A.  Yes, sir.
23  Q.  And Exhibit 11 is a brief report
24  entitled Severe Manifestation of Coricidin
25  Intoxication.  That's Exhibit 11.  Correct?

## Page 133

Dr. Bernstein - by Mr. Bennett

2  A.  Yes.
3  Q.  Have you ever read any of
4  Dr Schulz's books?
5  A.  I know I've read articles of him.  I
6  don't think I ever read any of his books in its
7  entirety.
8  Q.  The people that you treat with
9  schizophrenia or schizoaffective disorder, how
10  many of them are employed?
11  A.  That's a good question.  In some
12  form of gainful employment, including part-time
13  or funded or shelter employment?
14  Q.  Sure.
15  A.  I would say about a third.
16  Q.  Have you done any -- is that
17  basically anecdotal on your part?
18  A.  Yes.  Trying to think back on the
19  folks I have and what they do and --
20  Q.  Do you have any criticism of
21  Dr. Schulz's expert report that you would want
22  to tell me about that I haven't addressed in
23  your report?
24  A.  Let me call them observations.  The
25  second report contains an anecdote regarding a

Page 134

1      Dr. Bernstein - by Mr. Bennett
2 patient who received an antipsychotic
3 medication and had a substantial reversal of
4 their clinical situation, an improvement. And
5 it appears to be offered -- well, I am not sure
6 why it's offered, because -- you know what, I
7 don't have any criticisms. That's my answer.
8     Q.  Okay. Any other experts that you
9 have any knowledge of or opinions related to
10 that you haven't expressed? I mean, I notice
11 you got other reports.
12     A.  Yes.
13     Q.  Dr. Glenn Hardin's, the
14 toxicologist, and Dr. Baden's report. I don't
15 know if you got Dr. Jack Ryan's report. I
16 think you got that, too.
17     A.  There may be points in each report
18 that I disagree with, but I'm not prepared to
19 sit and render -- to tell you that chapter and
20 verse.
21     Q.  And you don't have any opinion, as
22 you sit here today? That wasn't part of your
23 task, I guess?
24     A.  No, that is correct.
25     Q.  Have you received any additional

Page 135

1      Dr. Bernstein - by Mr. Bennett
2 tasks other than as expressed in your original
3 report?
4     A.  No, sir.
5     Q.  Did you have to do a budget for this
6 case?
7     A.  No.
8     Q.  Do you ever do a budget?
9     A.  Sometimes when I'm asked to, yes.
10     Q.  But you weren't asked in this case;
11 correct?
12     A.  No.
13     MR. BENNETT: That's all of
14 the questions I have.
15     MR. OSBORNE: I don't have
16 anything, Bob. And Dr. Bernstein has already
17 said he wants to read and sign, so that's what
18 we'll do.
19     MR. BENNETT: Thank you,
20 Doctor.
21     THE WITNESS: Thank you, sir.
22     THE VIDEOGRAPHER: Being that
23 there are no further questions, this deposition
24 is now concluded. The time is 12:51 p.m.
25     (Signature not waived.)

Page 136

1      Dr. Bernstein - by Mr. Bennett
2     (Whereupon, the above-entitled
3 matter was concluded at 12:51 p.m.)
4     - - - - -

Page 137

1
2 COMMONWEALTH OF PENNSYLVANIA ) E R R A T A
   COUNTY OF ALLEGHENY      ) S H E E T
3
4 Larry E. Smith
   vs.
5 Timothy Gorman and Timothy Callahan
6
   I, LAWSON F. BERNSTEIN, JR., M.D., have
7 read the foregoing pages of my deposition given
   on February 5, 2013, and wish to make the
8 following, if any, amendments, additions,
   deletions or corrections:
9
   Pg. No. Line No. Change and reason for change:
10
11
12
13
14
15
16
17
18
19
   In all other respects the transcript is true
20 and correct.
21
       _____
22        LAWSON F. BERNSTEIN, JR.,
        M.D.
23 Subscribed and sworn to before me this
   _____ day of _____, 2013.
24
25    Notary Public     (RW)

35 (Pages 134 to 137)

# EXHIBIT 20



An
ICES/
PHO
Report

# OPENING EYES, OPENING MINDS:
The Ontario Burden of Mental Illness and Addictions Report

Summary

OCTOBER 2012



ICES  Institute for Clinical Evaluative Sciences
Twenty Years • 1992-2012

Public Health Ontario
PARTNERS FOR HEALTH

Santé publique Ontario
PARTENAIRES POUR LA SANTÉ



Institute for Clinical Evaluative Sciences
Public Health Ontario

## OPENING EYES, OPENING MINDS: THE ONTARIO BURDEN OF MENTAL ILLNESS AND ADDICTIONS REPORT

*You are invited to view the full report which is available for download at www.ices.on.ca or at www.oahpp.ca.*



The opinions, results and conclusions reported in this paper are those of the authors and are independent from the funding sources. No endorsement by the Institute for Clinical Evaluative Sciences (ICES), Public Health Ontario (PHO) or the Ontario Ministry of Health and Long-Term Care (MOHLTC) is intended or should be inferred.

Authors:

Sujitha Ratnasingham, MSc

John Cairney, PhD

Jürgen Rehm, PhD

Heather Manson, MD, FRCPC, MHSc

Paul A. Kurdyak, MD, PhD, FRCPC





Opening Eyes, Opening Minds: The Ontario Burden of Mental Illness and Addictions Report



Institute for Clinical Evaluative Sciences
Public Health Ontario

# Findings

Most Ontarians are affected, either directly or
indirectly, by mental illness and addiction issues.
According to the Mental Health Commission of
Canada, one in five Canadians is affected by a
mental illness or addiction issue every year. Onset
often occurs at a young age and can persist throughout
life, with a significant impact on social connections,
educational goals and workforce participation.
The impact of mental illness and addiction on
life expectancy, quality of life and health care
utilization is significant—in many cases, more so
than with other medical conditions—yet is often
under-recognized.

The World Health Organization (WHO) defines
health as a state of complete physical, mental
and social well-being, and not merely the absence
of disease or infirmity. Mental health is a critical
component of overall health. Measuring the burden
of mental illness and addiction is an important
step in ensuring that the needs of people who
suffer from these conditions are understood and
can be addressed. This study quantifies the burden
and allows for comparison with other diseases
and conditions.

The methods used in this study are conservative; they
are based on a group of selected conditions and
addictions that are highly prevalent and readily
measured. Therefore, the findings do not reflect the total
burden of mental illness and addiction in Ontario.





Burden of mental illness and addictions (MI&A) compared to cancers and infectious diseases in
Ontario, by years of life lost due to premature mortality (YLL) and year-equivalents of reduced
functioning (YERF)



Institute for Clinical Evaluative Sciences
Public Health Ontario

## 2 | The Impact of Mental Illness and Addictions

- The burden of mental illness and addictions in Ontario is more than 1.5 times that of all cancers and more than seven times that of all infectious diseases.

- The nine conditions identified in this report contributed to the loss of over 600,000 health-adjusted life years (HALYs), a combination of years lived with less than full function and years lost to early death in Ontario.

- Five conditions have the highest impact on the life and health of Ontarians: depression, bipolar disorder, alcohol use disorders, social phobia and schizophrenia.

- Depression is the most burdensome condition with twice the impact of bipolar disorder, the next highest condition. The burden of depression alone is more than the combined burden of lung, colorectal, breast and prostate cancers.

- In terms of deaths, alcohol use disorders contributed to 88% of the total number of deaths attributed to these conditions and 91% of the years of life lost to dying early.

# Conclusions and Recommendations

Ontarians experience a high burden of illness related to mental illness and addictions. Individuals may be encumbered by these illnesses at a young age, experiencing the disruption of important life transitions, and challenged by their ongoing burden over a long period of time.

The findings of this study underscore the need for effective collaboration between health care providers, practitioners, policy-makers and researchers to identify effective mental health promotion and mental illness and addiction prevention interventions and improve access to treatment for those suffering from mental illness and addiction. Early detection and timely intervention are critical in reducing the lifelong burden of these conditions.

While effective treatments exist for mental illness and addiction, only a small proportion of affected individuals receive them. Given the significant burden, there is a need to consider population-based prevention, promotion and treatment strategies aimed at reducing the burden of mental illness and addiction in Ontario.

> There is a need to consider population-based prevention, promotion and treatment strategies aimed at reducing the burden of mental illness and addiction in Ontario.



Institute for Clinical Evaluative Sciences
Public Health Ontario

## ABOUT OPENING EYES, OPENING MINDS: THE ONTARIO BURDEN OF MENTAL ILLNESS AND ADDICTIONS REPORT

The Ontario Burden of Mental Illness and Addictions Report is the most thorough evaluation of the impact of mental illness and addictions undertaken to date in Ontario. A joint project of the Institute for Clinical Evaluative Sciences (ICES) and Public Health Ontario (PHO), the study sought to estimate the relative impact of a wide range of mental illnesses and addictions.

### The objectives of this study were to:

1) Determine the burden of disease related to mental illness and addictions in Ontario;

2) Inform priority setting, planning and decision-making;

3) Establish a baseline for future evaluation of interventions that have an impact on the burden of mental illness and addictions;

4) Engage those working in public health in Ontario in a discussion on how to promote positive mental health and prevent mental illness and substance misuse and their associated health and social harms; and

5) Foster a dialogue between those working in mental health and public health on the mutual goal of promoting health and wellness for individuals with mental illness and addictions.

## Methodology

The study used health-adjusted life years (HALYs), a composite health gap measure that incorporates both premature death (mortality) and reduced functioning or suboptimal states of health (morbidity) associated with disease or injury. HALYs quantify the amount of "healthy" life lost by estimating the difference between the health experienced within a defined population and some specified norm or goal. HALYs incorporate aspects of quality-adjusted life years (QALYs) and disability-adjusted life years (DALYs). HALYs are calculated by combining years of life lost due to premature death (YLLs) and year-equivalents of reduced functioning from living with the disease (YERFs).

Disease burden was estimated for nine mental illnesses and addictions for which reliable and valid Ontario data were available. Data on the nine conditions were acquired from a variety of different sources, including population health surveys and health administrative data. Deaths were estimated from vital statistics data.





Institute for Clinical Evaluative Sciences
Public Health Ontario

4 | **ABOUT ICES**

The Institute for Clinical Evaluative Sciences (ICES) is an independent, non-profit organization that produces knowledge to enhance the effectiveness of health care for Ontarians. Internationally recognized for its innovative use of population-based health information, ICES evidence supports health policy development and guides changes to the organization and delivery of health care services.

Key to our work is our ability to link population based health information, at the patient level, in a way that ensures the privacy and confidentiality of personal health information. Linked databases reflecting 13 million of 33 million Canadians allow us to follow patient populations through diagnosis and treatment and to evaluate outcomes. ICES brings together the best and the brightest talent across Ontario. Many of our scientists are not only internationally recognized leaders in their fields but are also practicing clinicians who understand the grassroots of health care delivery, making the knowledge produced at ICES clinically focused and useful in changing practice. Other team members have statistical training, epidemiological backgrounds, project management or communications expertise. The variety of skill sets and educational backgrounds ensures a multi-disciplinary approach to issues and creates a real-world mosaic of perspectives that is vital to shaping Ontario's future health care system.

ICES receives core funding from the Ontario Ministry of Health and Long-Term Care. In addition, our faculty and staff compete for peer-reviewed grants from federal funding agencies, such as the Canadian Institutes of Health Research, and receive project-specific funds from provincial and national organizations. These combined sources enable ICES to have a large number of projects underway, covering a broad range of topics. The knowledge that arises from these efforts is always produced independent of our funding bodies, which is critical to our success as Ontario's objective, credible source of evidence guiding health care.

**ABOUT PHO**

Public Health Ontario (PHO) is a Crown corporation dedicated to protecting and promoting the health of all Ontarians and reducing inequities in health. As a hub organization, PHO links public health practitioners, frontline health workers and researchers to the best scientific intelligence and knowledge from around the world.

PHO provides expert scientific and technical support relating to communicable and infectious diseases; health promotion, chronic disease and injury prevention; environmental and occupational health; emergency preparedness; and public health laboratory services to support health providers, the public health system and partner ministries in making informed decisions to improve the health and security of Ontarians. PHO's work also includes surveillance and epidemiology, research, professional development and knowledge services.



