UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Larry E. Smith as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

    Plaintiff,

vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

    Defendants.

Case No. 11-CV-03071 (SRN/JJK)

**PLAINTIFF'S ANSWERS TO DEFENDANTS' INTERROGATORIES (SECOND SET)**

TO: The above-named Defendants and their attorneys, C. Lynne Fundingsland, Burt T. Osborne, and Tracey Fussy, Minneapolis City Attorney's Office, 350 South 5th Street, Room 210, Minneapolis, MN 55415.

For his Answers to Defendants' Interrogatories (Second Set), Plaintiff Larry E. Smith, as trustee for the Heirs and Next of Kin of David Cornelius Smith, states as follows:

### ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 26**: Set forth in detail and not in a summary fashion all contacts Diane Smith had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections that he believes to the best of his information and belief after inquiry that Diane Smith would speak to David on the telephone an average of once or twice a month during that time period; however, he and Ms. Smith recognize that from time-to-time longer periods of time may have passed without such communications taking place. David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year. David returned to Peoria for his Grandmother's funeral in 2009. Defendants should depose Diane Smith should they wish to further explore her contacts with David Smith.

**INTERROGATORY NO. 27**: Set forth in detail and not in a summary fashion all contacts Angela Smith had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by

EXHIBIT 2

correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, that he believes to the best of his information and belief after inquiry that Angela Smith would speak to David on the telephone an average of once every two weeks during that time period; however, he and Ms. Smith recognize that from time-to-time longer periods of time may have passed without such communications taking place. David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year – David and Angela would sometimes make it home for holidays at the same time. David returned to Peoria for his Grandmother's funeral in 2009. David visited Angela in Georgia at least once over that time period, and Angela visited David in Minneapolis at least three times over that time period. They would sometimes communicate via Facebook and email. Defendants should depose Angela Smith should they wish to further explore her contacts with David Smith.

**INTERROGATORY NO. 28**: Set forth in detail and not in a summary fashion all contacts Louis Brown had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, that he believes to the best of his information and belief after inquiry that Louis Brown would speak to David on the telephone an average of once a month during that time period; however, he and Mr. Brown recognizes that from time-to-time longer periods of time may have passed without such communications taking place. David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year. David returned to Peoria for his Grandmother's funeral in 2009. Defendants should depose Louis Brown should they wish to further explore his contacts with David Smith.

**INTERROGATORY NO. 29**: Set forth in detail and not in a summary fashion all contacts Derrick Brown had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, that he believes to the best of his information and belief after inquiry that Derrick Brown would be in touch an average of once a month between phone calls and Myspace messages; however, he and Mr. Brown recognize that from time-to-time longer periods of time may have passed without such communications taking place. David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year. David returned to Peoria for his Grandmother's funeral in 2009. Defendants should depose Derrick Brown should they wish to further explore his contacts with David Smith.

**INTERROGATORY NO. 30**: Set forth in detail and not in a summary fashion all contacts Tiffany Brown had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, that he believes to the best of his information and belief after inquiry that Tiffany Brown would speak to David on the telephone sporadically (i.e., sometimes they would speak on the telephone several times a week and other times a month or so would pass without them talking). David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year. David returned to Peoria for his Grandmother's funeral in 2009. Defendants should depose Tiffany Brown should they wish to further explore her contacts with David Smith.

**INTERROGATORY NO. 31**: Set forth in detail and not in a summary fashion all contacts Adam Brown had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, that he believes to the best of his information and belief after inquiry that Adam Brown would talk on the telephone with David on an average of once a month; however, he and Mr. Brown recognize that from time-to-time longer periods of time may have passed without such communications taking place. They would sometimes exchange emails. David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year. David returned to Peoria for his Grandmother's funeral in 2009. Defendants should depose Adam Brown should they wish to further explore his contacts with David Smith.

**INTERROGATORY NO. 32**: Set forth in detail and not in a summary fashion all contacts Desmond Redmond had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, that he believes to the best of his information and belief after inquiry that Desmond Redden would talk on the telephone with David on an average of once a month; however, he and Mr. Redden recognize that from time-to-time longer periods of time may have passed without such communications taking place. They would also sometimes exchange emails or messages over Facebook. David would sometimes make it home for Thanksgiving and/or Christmas, and his return home for those holidays likely varied from year-to-year. David returned to Peoria for his Grandmother's funeral in 2009. Defendants should depose Desmond Redden should they wish to

further explore his contacts with David Smith.

**INTERROGATORY NO. 33**:   Set forth in detail and not in a summary fashion all contacts Larry Smith had with David Cornelius Smith in the five year period preceding his death. For each contact, specify the date of the contact and the type of contact: whether in person, by correspondence, by telephone, or via any electronic device, e.g. Facebook, Skype, etc.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the detail it seeks pertaining to contacts made long ago and which normally would not be the subject of any note or specific recollection. Subject to and without waiving said objections, Plaintiff and David would talk on the telephone one every couple of months. Occasionally, they would communicate via email. Plaintiff's contacts with David can be explored during a deposition.

**INTERROGATORY NO. 34**:   Set forth in detail and not in a summary all facts upon which you rely to support your allegation that, "[b]efore September 9, 2010, the City of Minneapolis with deliberate indifferent to the rights of citizens failed to properly train MPD officers or failed to require adherence to appropriate policies to avoid the improper use of prone restraint maneuvers when arresting citizens" as set forth in Paragraph 117 of the First Amended Complaint.

**ANSWER**: Plaintiff objects to this improper contention interrogatory as overly broad and unduly burdensome. *See Shqeirat v. U.S. Airways Group, Inc.*, No. , (D. Minn. Sept. 9, 2008) ("a contention interrogatory will be considered overly broad and unduly burdensome 'if it seeks 'all facts' supporting a claim or defense, such that the answering party is required to provide a narrative account of its case.'" (quoting *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006)); *see also Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 273 F.R.D. 367, 369 (S.D.N.Y. 2010). Plaintiff further objects to this interrogatory as premature because discovery is ongoing. Subject to and without waiving said objections, the following facts have been established thus far in this litigation:

   1. Defendants Gorman and Callahan restrained David Smith in a prone restraint position for approximately four-minutes-and-thirty-seconds. *See* depositions transcripts of Gorman and Callahan and the video evidence of the subject incident.

   2. Defendants Gorman and Callahan continued to restrain David Smith even though, by Callahan's own admission, David Smith had ceased resisting. *See* deposition transcript of Callahan and Callahan's statement to the homicide investigators.

   3. Indeed, Gorman and Callahan continued to restrain David Smith in the prone position after David Smith was physically incapable of resisting because he had ceased voluntarily breathing and cardio pulmonary arrest and anoxic encephalopathy had already set in. *See* deposition transcripts of Dr. Baker and the video evidence of the subject incident.

   4. Both police and medical experts, and even homicide investigators and patrol officers from the Minneapolis Police Department, agree that it has long been known that restraining a subject in prone position can impair a subject's breathing, which can cause severe medical problems including death. *See, e.g.,* Kingdon Dep. at 52:12 – 53:3.

   5. The pertinent MPD Policy No. 9-111.01, which has been effective since at least May

4

29, 2002, states, in relevant part:

> When ANY restraint technique is used on a subject, the subject shall not be left in a prone position and shall be placed on their side as soon as they are secured. Once the subject is secured, an officer shall watch for any of the following signs:
>
> - Significant change in behavior or level consciousness;
> - Shortness of breath or irregular breathing;
> - Seizures or convulsions;
> - Complaints of serious pain or injury; and/or
> - Any other serious medical problem.

6. Defendants Gorman and Callahan, among others, agree that handcuffing and sitting or kneeling on a subject constitutes a restraint technique.

7. Despite the seemingly clear language of MPD Policy No. 9-111.01 regarding the use of "ANY restraint technique," Defendants Gorman and Callahan maintained in their depositions that they were not required to take the common sense precautions (i.e., observe for shortness of breath or irregular breathing) set forth in Policy No. 9-111.01 because they were not, per their definition, using a maximal restraint.

8. Dr. Andrew Baker, the Hennepin County Medical Examiner, concluded that David Smith's death was a homicide caused by the Defendant's prone restraint of David Smith, which resulted in mechanical asphyxiation. Dr. Baker testified during his deposition that he does not believe David Smith would have died from mechanical asphyxiation had the Defendants turned David Smith on his side by following the common sense procedures set forth in Policy No. 9-111.01 cited above.

9. The MPD homicide detectives assigned to this case, Eric Fors and Darcy Klund, failed to diligently investigate David Smith's homicide/critical incident in accordance with generally accepted police policy and practice. The detectives willfully turned a blind eye, not only to the real facts, but to obvious deliberate violations by Callahan and Gorman of not only MPD policy but also state and federal criminal law. Indeed, Fors and Klund did not even question Defendants Gorman and Callahan on the video evidence even though the evidence directly contradicted certain of Defendants' statements made to homicide. The MPD homicide detectives investigating this case did not find any wrongdoing on behalf of Defendants Gorman and Callahan, even though the plain video evidence demonstrated that Gorman and Callahan restrained David Smith in prone position with weight on his back for four-and-one-half-minutes after David Smith had ceased resisting and had even stopped breathing.

10. The Minneapolis Internal Affairs Unit similarly did not find any wrongdoing on behalf of Defendants Gorman and Callahan, even though the plain video evidence demonstrated that Gorman and Callahan restrained David Smith in prone position with weight on his back for four-and-one-half-minutes, well after David Smith had ceased resisting and had even stopped breathing.

11. Defendants Gorman and Callahan were not disciplined in any way for causing David

Smiths' death even though the plain video evidence demonstrated that Gorman and Callahan restrained David Smith in prone position with weight on his back for four-and-one-half-minutes after David Smith had ceased resisting and had even stopped breathing in violation of training, policy and the Fourth Amendment. As such, such conduct has been and continues to be approved and ratified by the department.

12. Upon information and belief and upon the limited discovery provided thus far, it appears that David Smith's death is not the first death caused by MPD officers, where improper prone restraint was involved. *See, e.g.,* the deaths of Raymond Siegler (D.O.D. 2/6/04), Quincy Smith (D.O.D. 12/9/08), and Anthony Williams (D.O.D. 8/28/03).

13. In this case, the MPD continued its larger pattern and practice of not disciplining its officers for the improper use of excessive and deadly force and other violations of policy and law which would, in all likelihood, have both criminal and civil liability implications.

14. The MPD's failure to discipline its officers when discipline is necessary is highlighted in this case by the MPD's failure to discipline Callahan for intentionally removing video evidence of the homicide from the crime scene and failing to turn it in to investigating authorities, in violation of MPD policy, Minnesota state law, and federal law. MPD homicide, internal affairs, and command and control ignored a number of obvious and deliberate acts committed by Callahan and Gorman with regarding to the handling of material evidence in a homicide/critical incident investigation that would properly subject an officer to discipline, including possible termination, and criminal charges. No civilian, citizen would have been granted such treatment. The effect of ratifying these serious breaches of law and policy is to ratify and approve such conduct as a matter of custom, practice and policy in order to escape criminal or civil liability on the part of the officers, their supervisors, the department and the City.

15. The MPD never even made an effort to secure all potential evidence related to David Smith's homicide. Callahan's attorney, Fred Bruno, turned over a flash drive containing the video from Callahan's pen camera to homicide investigators on September 15, 2010, six days after the events causing Smith's homicide. Despite gaining knowledge of Callahan's pen camera by at least that date, neither the homicide investigators nor any member of the MPD sought to obtain and forensically search the pen camera itself or the computer(s) that Callahan used to create the flash drive containing the video of Smith's homicide. *See* Hanson Dep. at 49:8-19 (recognizing that conducting a forensic analysis of the pen camera and computer would have been part of the normal protocol). This would not have occurred if Callahan was a citizen or if a neutral agency was conducting the investigation according to Hanson.

16. The impropriety of Callahan and Gorman failing to disclose the existence of critical evidence of the homicide (i.e., the pen camera and its contents) was obvious to the rank and file MPD employees even though these obvious transgressions were ignored by MPD's command and control. *See, e.g.,* Berget Dep. at 32:9-12, 48:11-15 (recognizing that such improper handling of evidence likely violates policy regarding the handling of evidence and potentially amounts to obstruction of justice); *see also* Jacobson Dep. at 47:13 – 48:3 (stating that an officer's removal of video evidence from a critical incident should subject that officer to discipline).

Discovery continues.

**INTERROGATORY NO. 35**: Set forth in detail and not in a summary all facts upon which you rely to support your allegation that "…there has been an approval of a deficient policy, custom, or practice of using the prone restraint maneuver without sanction or consequence" as stated in Paragraph 118 of the First Amended Complaint.

**ANSWER**: See Objections and preliminary Answer to Interrogatory No. 34.

**INTERROGATORY NO. 36**: Set forth in detail and not in a summary all facts upon which you rely to support your allegation that, "Before September 9, 2010, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its officers, including the defendants herein, of improperly using prone restraint maneuvers" as stated in Paragraph 124 of the First Amended Complaint.

**ANSWER**: See Objections and preliminary Answer to Interrogatory No. 34.

**INTERROGATORY NO. 37**: Set forth in detail and not in a summary all facts upon which you rely to support your allegation that, "…there has been an approval of a deficient policy, custom, or practice of using the prone restraint maneuver without sanction or consequence" as stated in Paragraph 125 of the First Amended Complaint.

**ANSWER**: See Objections and preliminary Answer to Interrogatory No. 34.

**INTERROGATORY NO. 38**: Identify all of David Cornelius Smith's family members who were with David Cornelius Smith at Hennepin County Medical Center between the dates of September 9, 2010, and September 17, 2010, and, for each person identified, state the dates they were present with David Cornelius Smith.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome because of the type and manner of event that was encountered. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, and control. Subject to and without waiving said objection, plaintiff believes that Diane Smith, Angela Smith, and Adam Brown were with David from September 11, 2010 until September 17, 2010. Tiffany Brown was with David on September 11, 2010.

**INTERROGATORY NO. 39**: Identify the family member(s) or "next of kin" of David Cornelius Smith who opted to withdraw life support from David Cornelius Smith on September 17, 2010.

**ANSWER**: To the best of the family's recollection, no one gave HCMC permission to remove David from life support; rather, the hospital informed the family that it was going to do so.

**INTERROGATORY NO. 40**: Identify the family member or "next of kin" of David Cornelius Smith who advised staff of the Hennepin County Medical Center that David Cornelius Smith "had been estranged from his family for a decade" as set forth in the Main Narrative Report of the Hennepin County Medical Examiner.

**ANSWER**: No next of kin or family member said this.

**INTERROGATORY NO. 41**: From whom and on what date did each of David Cornelius Smith's family members learn that David Cornelius Smith was in the hospital following the incident which is the subject of the Complaint?

**ANSWER**: Plaintiff objects to this interrogatory as overbroad and unduly burdensome. It is wholly unreasonable to expect such detail pertaining to this disturbing event. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, and control. Subject to and without waiving said objections, plaintiff, upon information and belief, believes that Diane Smith learned of David's hospitalization on September 10, 2010 from Brittany Jackson. He believes that Angela Smith learned of David's hospitalization on September 10, 2010 from Krystle Webb. He believes that Tiffany Brown learned of David's hospitalization from Diane Smith on September 10, 2010. He believes that Desmond Redden learned of David's hospitalization from a nurse at HCMC on September 10, 2010.

**INTERROGATORY NO. 42**: Did any family member have contact with any of David Cornelius Smith's caseworkers, landlords, or medical providers in the last ten years? If yes, please detail which family member talked with whom, when, the type of contact(s), the substance of the conversation(s), and the frequency of the contacts.

**ANSWER**: Plaintiff objects to this interrogatory as overbroad and unduly burdensome. It is wholly unreasonable to expect such detail pertaining to events occurring so long ago and which did not become a matter of noted recollection. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, he believes that Angela Smith may have some limited contact with a case worker.

**INTERROGATORY NO. 43**: Provide all of David Cornelius Smith's telephone numbers from the five year preceding his death, and the names of all telephone service providers he used within five years preceding his death.

**ANSWER**: Plaintiff objects to this interrogatory as unduly burdensome. It is unreasonable to expect such details pertaining to information existing so long ago. Plaintiff further objects to this Interrogatory as seeking information out of his possession, custody, or control. Subject to and without waiving said objections, 612.366.2743, 612.600.7351, 612.408.3640, and 651.523.9005.

Dated: July 23, 2012

GASKINS BENNETT BIRRELL SCHUPP LLP

Robert Bennett, #6713
Jeffrey S. Storms, #387240
Kathryn H. Bennett, #392087
333 South Seventh Street, #2900
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
jstorms@gaskinsbennett.com
kbennett@gaskinsbennett.com
Attorneys for Plaintiff