Timothy Callahan
1/30/2012

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
--------------------------------------------------------
                        Case No. 11-CV-03071(SRN/JJK)

Larry E. Smith, as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

          Plaintiff,

     vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers,
and the City of Minneapolis,

          Defendants.
--------------------------------------------------------

          VIDEOTAPED DEPOSITION TRANSCRIPT OF

                  TIMOTHY CALLAHAN

                 January 30, 2012

                    8:57 A.M.

                       at

          Gaskins, Bennett, Birrell, Schupp, LLP
                 333 South 7th Street
                     Suite 2900
               Minneapolis, MN  55402

Court Reporter:  Janet D. Winberg, RPR

Doby Professional Reporting, Inc.
952-943-1587



EXHIBIT
11

Timothy Callahan
1/30/2012

**2**

1  APPEARANCES:
2      On Behalf of the Plaintiff:
3          ROBERT BENNETT, Attorney at Law
            rbennett@gaskinsbennett.com
4          JEFFREY S. STORMS, Attorney at Law
            jstorms@gaskinsbennett.com
5          KATHERINE BENNETT, Attorney at Law
            kbennett@gaskinsbennett.com
6          GASKINS, BENNETT, BIRRELL, SCHUPP, LLP
            333 South 7th Street
7          Suite 2900
            Minneapolis, Minnesota 55402
8
9      On Behalf of the Defendants:
10         C. LYNNE FUNDINGSLAND, Assistant City
            Attorney
11          lynnefundingsland@ci.minneapolis.mn.us
            BURT T. OSBORNE, Assistant City Attorney
12          burt.osborne@ci.minneapolis.mn.us
            TRACEY FUSSY, Assistant City Attorney
13          tracey.fussy@ci.minneapolis.mn.us
            CITY OF MINNEAPOLIS-OFFICE OF CITY ATTORNEY
14          350 South Fifth Street
            City Hall, Room 210
15          Minneapolis, Minnesota  55415
16     VIDEOGRAPHERS:
17         Chris Grey
            John Heinen
18         Nick Nichols
19
20
21
22     NOTE:
        The original transcript will be delivered to the
23     noticing party, Gaskins, Bennett, Birrell & Schupp.
24     NOTE:
        Exhibits 15, 21 - 26, 28, 30, 31, 33, 34, 35, 37, 38,
25     40 and 48 were marked/introduced/reviewed.

**3**

1                    P R O C E E D I N G S
2
3          MR. BENNETT: So the video record can
4      reflect that we are here to take the videotape
5      deposition of Defendant Timothy Callahan
6      pursuant to agreement of the parties and the
7      Court's order and for this truncated deposition
8      in the matter of Larry E. Smith, as trustee for
9      the heirs and next-of-kin of David Cornelius
10     Smith versus Timothy Gorman and Timothy
11     Callahan, acting in their individual capacities
12     as Minneapolis police officers and the City of
13     Minneapolis.
14         It is United States District Court, District
15     of Minnesota, Case File Number 11 CV 03 071
16     SRN/JJK.
17         We'll do appearances.
18         Robert Bennett, Jeffrey Storms and Katherine
19     Bennett on behalf of the plaintiff.
20         MS. FUNDINGSLAND: On behalf of the
21     defendants, Lynne Fundingsland, Tracey Fussy and
22     Burt Osborne.
23         MR. BENNETT: Madam Court Reporter,
24     would you swear the witness?
25                    *   *   *

**4**

1          (Witness sworn.)
2              TIMOTHY CALLAHAN,
3          called as a witness, being first duly sworn,
4          was examined and testified as follows:
5                    *   *   *
6                    EXAMINATION
7      BY MR. BENNETT:
8   Q.  Would you state your full name for the record,
9          please?
10  A.  Timothy Donald Callahan.
11  Q.  What is your date of birth, sir?
12  A.  5/29/68.
13  Q.  Tell us your educational background.
14  A.  A 2-year associate in arts degree in law
15          enforcement.
16  Q.  Where?
17  A.  It was Lakewood Community College. I'm not sure
18          what it's called now.
19  Q.  When did you get that?
20  A.  I went there in the very early '90s. '91, '92.
21  Q.  When did you graduate from high school?
22  A.  1986.
23  Q.  What high school?
24  A.  Stillwater High School.
25  Q.  What did you do between 1986 and attending

**5**

1          Lakewood?
2   A.  Various jobs. Landscaping. Um...
3   Q.  Were you in the military service at all?
4   A.  No, I wasn't.
5   Q.  So was it mostly landscaping, is that what you
6          did for those few years?
7   A.  Mostly, yes. Oh, I worked for a security
8          company for about a year.
9   Q.  What one?
10  A.  American Security.
11  Q.  They still exist, don't they?
12  A.  I believe so.
13  Q.  Yeah. And what's your date of hire at the
14          Minneapolis Police Department?
15  A.  September of '93.
16  Q.  And what has... What have been your duties
17          since '93?
18  A.  911 responding. Working the street in a patrol
19          car for the most part.
20  Q.  And you are a patrol officer?
21  A.  Yes.
22  Q.  Ever take the sergeant's exam?
23  A.  Ah, yeah.
24  Q.  Did you pass?
25  A.  I've passed the written before.

2 (Pages 2 to 5)

Timothy Callahan
1/30/2012

**6**

1    Q.   Do you know where you are on the sergeant's
2         list?
3    A.   I'm not on the sergeant's list currently.
4    Q.   All right.  When was the last time you were on
5         the sergeant's list?
6    A.   I don't know.  A long time ago.
7    Q.   Not --
8    A.   10 years ago.
9    Q.   Okay.  In the '90s?
10   A.   Well, I was never on the list.
11   Q.   Okay.  Have you been on...  What sort of duty
12        assignments have you had?
13   A.   I've worked in the 2nd Precinct and I've worked
14        in the 1st Precinct.
15   Q.   How long in each one?
16   A.   I was assigned to the 2nd Precinct until '99.
17        And in '99 I came to the 1st Precinct.
18   Q.   Have you ever been deposed before, as opposed to
19        giving trial testimony?
20   A.   No.
21   Q.   What documents did you -- or videos did you
22        review in preparation for your deposition today?
23   A.   The same videos that would have been shown at
24        the grand jury.
25   Q.   Okay.  How do you know the videos were shown at

**7**

1         the grand jury?
2    A.   I believe we looked at least one of them.
3    Q.   In front of the grand jury?
4    A.   I think.
5    Q.   Which one?  The pen camera, or --
6    A.   Yeah.
7    Q.   -- the Taser or the YMCA photo?
8    A.   The pen one.
9    Q.   All right.  When did you get the pen camera?
10   A.   When did I purchase it?
11   Q.   Yeah.
12   A.   Maybe a few months -- 6 months before September
13        of 2010.
14   Q.   Where did you get it?
15   A.   I have no idea.  I got it...  I saw it online
16        and I purchased it online.
17   Q.   Okay.  So you looked at the videos.  Anything
18        else?
19   A.   I don't...  As in...  I don't understand.
20   Q.   Well, did you look at any other documents?  Did
21        you read your answers to interrogatories?
22   A.   I've seen my own statement.
23   Q.   Okay.  Did you read your answers to
24        interrogatories before -- in preparation for the
25        deposition today?

**8**

1    A.   The -- the interrogatories?  I'm not sure what
2         you mean.
3    Q.   Showing you Exhibit 21.  Those are the answers
4         that you signed to your interrogatories.
5    A.   Yes, I'm familiar with them.
6    Q.   Did you read those?
7    A.   Yes.
8    Q.   You know, I noticed in answer to Interrogatory
9         Number 2 you list a bunch of people that you
10        spoke to about the incident; correct?
11   A.   Yes.
12   Q.   You made a call that's recorded on your
13        pen camera, correct, at the scene?
14   A.   Yes.
15   Q.   Who was that call to?
16   A.   My wife.
17   Q.   And what's her name?
18   A.   Susan.
19   Q.   So you would have talked to her about that, as
20        well: correct?  Including on the -- on that date
21        and time where you made the call?
22   A.   Yes.
23   Q.   All right.  Is there anybody else that you spoke
24        to about this incident that's not on this list
25        -- on your answer to Interrogatory Number 2?

**9**

1    A.   I don't believe so.
2    Q.   Did you ever talk to Judy Johnson?
3    A.   I don't know who that is.
4    Q.   Another Assistant Hennepin County Attorney whose
5         name has come up in this.  Do you remember?
6    A.   I -- like I said, I don't know who that is so
7         I --
8    Q.   That doesn't refresh your recollection?
9    A.   No.
10   Q.   Okay.  When did you first speak with Marlene
11        Senechal?
12   A.   I don't know.
13   Q.   Well, was it before the grand jury?
14   A.   Yes.
15   Q.   Did she...  How much before you actually
16        testified before the grand jury was it?
17   A.   I -- I don't know.  Maybe a month.
18   Q.   Okay.  Were you aware they waited for several
19        grand juries to bring it before the one they
20        did?
21   A.   No.
22   Q.   She didn't tell you that?
23   A.   No.
24   Q.   When did you go in front of the grand jury?
25        What -- what --

3 (Pages 6 to 9)

Timothy Callahan
1/30/2012

10

1  A.  September... This past September.
2  Q.  September of 2011?
3  A.  I believe so.
4  Q.  So a full year after the event?
5  A.  I -- yes.
6  Q.  Okay.  Give or take a few days?
7  A.  Yeah.
8  Q.  Do you know Chief Dolan?
9  A.  He's my chief.  I don't know him personally.
10  Q.  You've never worked with him?
11  A.  No.
12  Q.  Ever trained with him?
13  A.  We may have been in the same in-service training
14      class, but I've -- no, I've never trained with
15      him.
16  Q.  Are you friends with him?
17  A.  No.
18  Q.  Do you ever play -- ever on the hockey team?
19  A.  No.
20  Q.  You know he does that, don't you?
21  A.  I know he does -- or did play hockey.
22  Q.  Do you play sports in Stillwater?
23  A.  Do I?  No.
24  Q.  Did you play sports in high school in
25      Stillwater?  Were you a football player, for

11

1      example?
2  A.  No.
3  Q.  Okay.  Showing you Exhibit 22.  This is a
4      document that was given to us.
5      The... Do you know what... Do you know
6      that the Civilian Review Authority sustained a
7      complaint against you as to discretion or
8      judgment as to a gentleman called "Ruben Flood"?
9  A.  (No response.)
10  Q.  Are you aware of that?
11  A.  Yes.
12  Q.  Do you remember... That case involved a
13      situation where a black man came to the precinct
14      to ask for information on how to file a
15      complaint against a MPD officer and it was
16      alleged you failed to provide him with that
17      information.  Do you remember that?
18  A.  I remember that that is what was alleged.
19  Q.  Did the deputy chief actually conclude that a
20      violation had occurred, but the -- that the
21      incident occurred past the reckoning period for
22      discipline to be imposed?
23  A.  I'm not sure.
24  Q.  Okay.  You wouldn't deny that if the record
25      reflects that?

12

1  A.  No.
2  Q.  You've received, as a Minneapolis
3      police officer, various training throughout your
4      career; correct?
5  A.  Yes.
6  Q.  You received use-of-force training?
7  A.  Yes.
8  Q.  You've -- you understand that the use-of-force
9      training is to mirror the protections of the --
10      that are afforded under the 4th Amendment to the
11      United States Constitution?
12  A.  Yes.
13  Q.  And the case law that surrounds that -- that
14      amendment; for instance, Graham versus Connor?
15      You're familiar with that case?
16  A.  No.
17  Q.  Okay.  They teach you the case names, but -- and
18      the principles in the cases in the use-of-force
19      training, don't they?
20  A.  Yes.
21  Q.  But you don't always pick up on the case names?
22      That's not important to you necessarily?
23  A.  Yes.
24  Q.  Is it fair to say that you're supposed to use
25      the least amount of force necessary to

13

1      accomplish the legitimate police purpose you're
2      engaged in?
3  A.  Yes.
4  Q.  And is it ever constitutionally acceptable to
5      use force to punish a subject?
6  A.  I would say no.
7  Q.  Is it ever constitutionally acceptable to exact
8      -- to use force to exact retribution from a
9      subject?
10  A.  No.
11  Q.  Okay.  And as a Minneapolis police officer
12      you've had training where there have been a
13      number of different kinds of trainers.  There
14      have been Minneapolis police officers, there
15      have been Minneapolis city attorneys and there
16      have been outside people; correct?
17  A.  Yes.
18  Q.  And they go over the case law governing a
19      particular topic, whether it's use of force, or
20      use of deadly force, qualified immunity, Taser
21      use, that sort of thing, don't they?
22  A.  Sometimes, I would say yes.
23  Q.  Okay.  And you've been given training on certain
24      tools or weapons that you can use when they're
25      appropriate; correct?

4 (Pages 10 to 13)

Timothy Callahan
1/30/2012

**14**

1  A.  Yes.
2  Q.  And they would include like chemical weapons
3      such as the pepper spray?
4  A.  Yes.
5  Q.  Your Taser?
6  A.  Yes.
7  Q.  Your firearm?
8  A.  Yes.
9  Q.  And that's -- what do you carry, a 40 caliber?
10  A.  What do I carry as a firearm?
11  Q.  Yeah.
12  A.  9 millimeter.
13  Q.  Beretta?
14  A.  Beretta.
15  Q.  And you've also taken courses to be -- to
16      experience and to be trained in M16 I thought I
17      saw; is that right?
18  A.  Patrol rifle, yes.
19  Q.  Are you... How about a shotgun, too?
20  A.  Yes.
21  Q.  Have you ever been on SWAT?
22  A.  No.
23  Q.  And you've been given training on the other
24      tools that you have that you use to restrain
25      somebody, like your handcuffs; correct?

**15**

1  A.  Yes.
2  Q.  Would you characterize your handcuff as your
3      primary tool of restraint?
4  A.  Yes.
5  Q.  And in the -- in my experience, I guess that
6      doesn't matter so much, but let me ask you this:
7      In your experience the -- when you're taking
8      control of a subject and make a decision to
9      restrain the subject or to take them into
10      custody, him or her, your handcuffs are
11      essentially your primary tool, aren't they?
12  A.  I would say yes.
13  Q.  Okay.  And you do that because the handcuffs --
14      once you get a person handcuffed you can control
15      their movements more easily?
16  A.  I would -- more easily, yes.
17  Q.  Yeah, that doesn't say you can control all of
18      their movements, but you have the ability to
19      restrict the use of their arms; correct?
20  A.  Yes.
21  Q.  And if you pin the subject against a flat
22      surface, whether it's a wall standing, whether
23      it's the floor, whether it's a car, you can gain
24      some control over their torso, as well; correct?
25  A.  Some control, yes.

**16**

1  Q.  Yeah.  And the -- you've -- you understand...
2      Now maybe you don't remember it as a
3      Graham-versus-Connor analysis, but in using the
4      use of force there's a 3-prong test; correct?
5  A.  (No response.)
6  Q.  One is the severity of the -- the offense
7      involved.  You've been taught that?
8  A.  Ah... Can you start over again?
9  Q.  Okay.  We're talking use-of-force analysis.
10  A.  Okay.
11  Q.  And usually it's the severity of the offense,
12      that's the first thing; correct?
13  A.  Okay.
14  Q.  Well, is that -- that what you've been taught?
15  A.  I'm not sure that I received it in the way that
16      you're phrasing it.
17  Q.  Okay.  Well, how -- just tell me how you were
18      taught.
19  A.  Well, okay.  You're going to have to start
20      over --
21  Q.  Tell --
22  A.  -- with your question.
23  Q.  -- me how you're supposed to analyze how and in
24      what degree you can use force.
25  A.  Um... Hmm.  I -- first -- one of the first

**17**

1      things might be officer safety.  You need to
2      handcuff someone who might be a suspect if you
3      think -- you have reasonable suspicion that they
4      might be carrying a weapon.
5      Or the type of crime.  If it was an assault
6      or something, might be an indicator as to when
7      you might handcuff someone.
8  Q.  Well, I'm not necessarily talking about
9      handcuff.  I'm talking about the use of force
10      generally.
11  A.  Okay.  Go ahead with your analysis.
12  Q.  I mean -- well, how do you -- how do you -- what
13      are the steps you're supposed to do in analyzing
14      what use of force is appropriate?
15  A.  Well, I don't -- I mean I think you're looking
16      for a -- certain specific steps and I don't know
17      that I can answer it that way.
18  Q.  Have you been taught that way?
19  A.  I -- I'm not sure.  You're -- you're referencing
20      this Graham versus Connor, but I'm not familiar.
21  Q.  Okay.  You've never been taught Graham versus
22      Connor or the Supreme Court's ruling on how
23      force is to be analyzed?
24  A.  I --
25  Q.  Is that what you're saying?

5 (Pages 14 to 17)

Timothy Callahan
1/30/2012

18

1    A.    -- may have.
2          I'm not able to recall it right now.
3    Q.    Okay.  Have you ever used plastic handcuffs?
4    A.    On occasion, yes.
5    Q.    How often?
6    A.    Not very.
7    Q.    In relationship to use of your regular metal
8          handcuffs would be --
9    A.    Very few times.
10   Q.    Okay.  How about hobbling, have you ever done
11         that?
12   A.    Yes, I have.
13   Q.    How many times?
14   A.    Very few.
15   Q.    Less than plastic handcuffs?
16   A.    Yes.
17   Q.    Okay.  So that would be -- that would be even
18         further down the list in comparison to your use
19         of your metal handcuffs?
20   A.    Yes.
21   Q.    I'm showing you what's been marked as
22         Exhibit 23.  That's your training records that
23         have been given to me in the course of the
24         truncated discovery that we've engaged in so
25         far.

19

1          Would this be true and correct to the best
2          of your knowledge and belief?
3    A.    If you got it from the department, I would say
4          it's probably true and correct.
5    Q.    Okay.  So I can rely on it for purposes of
6          trying to understand what training you've
7          received?
8    A.    I think you probably can.
9    Q.    Okay.  Now Exhibit 23 shows you've been --
10         you've had training in CPR; correct?
11   A.    Yes.
12   Q.    And it shows you have EMS, which I would...
13         You tell me what "EMS" means.
14   A.    Um, where...  Are you referring to a specific --
15   Q.    Well, yeah.  You had it in '94, '96, '98 and
16         '99.  I would think that's Emergency Medical
17         Services.
18   A.    That's very...  If that's what you're referring
19         to, it's very basic.
20   Q.    Okay.  Is it First Responder training?
21   A.    It's -- I think it's even less than that because
22         I don't think we're First Responders.
23   Q.    Have you ever been an EMT?
24   A.    No.
25   Q.    Have you taken any medical courses on your own?

20

1    A.    No.
2    Q.    Okay.  But whatever the EMS training was
3          provided in those 4 years you took it?
4    A.    Yes.
5    Q.    Do they give it as part of regular in-service
6          training, as well, on an annual basis?
7    A.    Not on an annual basis.
8    Q.    Okay.  Were you taught in that training or any
9          training that you've had how to evaluate
10         distressed breathing?
11   A.    I don't recall.
12   Q.    And by "distressed breathing," by -- have you
13         been trained to determine what you're to do if
14         someone isn't breathing?
15   A.    That would be CPR.
16   Q.    How about somebody who's not breathing properly,
17         not obtaining sufficient oxygen?
18   A.    Are you referring to like rescue breathing?
19   Q.    Well, I suppose you could refer to a number of
20         different possibilities.  Someone having a
21         severe asthma attack.  Someone whose breathing
22         is compromised by something in their throat.  It
23         could be a number of things.
24         I mean have you been trained how to deal
25         with or how to recognize that?  Let's deal with

21

1          the first thing, recognition.
2          Have you been taught how to recognize those
3          things if someone is not breathing correctly?
4    A.    We've been taught how to recognize if somebody
5          is not breathing, period.  But I don't know
6          about the --
7    Q.    Okay.
8    A.    -- breathing distress.
9    Q.    Have you ever heard the term "death rattle"?
10   A.    Yes.
11   Q.    Have you ever observed a death rattle
12         personally?
13   A.    Um... I don't know.
14   Q.    How many people have you seen die or in a
15         condition you thought was dead?
16         MS. FUNDINGSLAND:  Can we get some
17         foundation on that as to place?
18         MR. BENNETT:  Well, I don't know.
19         We'll -- it could be a number -- I've seen them
20         in a number of places.  I imagine you've seen
21         them in a number of places, too.  I'd like to
22         cover the whole waterfront.
23         THE WITNESS:  I have seen people die.
24         MR. BENNETT:  Okay.
25   BY MR. BENNETT:

6 (Pages 18 to 21)

Timothy Callahan
1/30/2012

**22**

1  Q.  In car accidents?
2  A.  Ah... I don't -- I don't know --
3  Q.  Okay.
4  A.  -- about a car accident.
5  Q.  You don't?  Okay.  In your personal life have
6     you seen people die?
7  A.  No.
8  Q.  Okay.  Now have you seen people die in your
9     professional life?
10  A.  Yes.
11  Q.  Is that what you're referring to?
12  A.  Yes.
13  Q.  Is it solely in your professional life?
14  A.  To the best of my recollection, yes.
15  Q.  Okay.  And -- how many people have you seen
16     die, --
17  A.  I don't know.
18  Q.  -- or what you thought was dead?
19  A.  People when I arrived at the scene that were
20     already dead?
21  Q.  Already.  Or who died at the scene while you
22     were there.
23  A.  Less than 10.
24  Q.  What kinds of death were these that you recall?
25  A.  Trauma deaths for the most part, I would say.

**23**

1  Q.  Okay.  And what kind of trauma?  Gunshot wounds?
2  A.  Yes.
3  Q.  How many gunshot wounds of the number of people
4     that you've seen?
5  A.  Um...  Less than five.
6  Q.  What other kinds of trauma?
7  A.  Blunt force trauma.
8  Q.  And what can you tell me about those?
9  A.  Just some sort of assault with an object I would
10     say probably.
11  Q.  Okay.  How many of those have you seen?
12  A.  A few.  I don't know.
13  Q.  Okay.  Any others?
14  A.  I mean I haven't -- I think what you -- are you
15     asking me if I saw them actually expire or if
16     they were expired?
17  Q.  Well, how many did you see actually expire?
18  A.  Very few.  A handful.  Two or three maybe.
19  Q.  Did you ever see the breathing at the end?
20  A.  I -- I don't know.  I wasn't the only one there.
21     I was probably in the background while medical
22     personnel worked.
23  Q.  Okay.  Have you ever seen -- heard a death
24     rattle before?
25  A.  I... I don't know.  I don't...

**24**

1  Q.  Okay.  How many arrests do you figure you make
2     on an annual basis?
3  A.  Over a hundred probably.
4  Q.  Okay.  And on those a hundred arrests how many
5     would you actually handcuff?  All of them?
6  A.  Depends on if they went to jail.
7  Q.  Okay.  So you could do -- make an arrest and
8     give someone a citation and let them go?
9  A.  Yes.
10  Q.  How many times do you think you take someone to
11     jail on an annual basis?
12  A.  Thirty.
13  Q.  Okay.
14  A.  Maybe.
15  Q.  Is it important to you that the person that you
16     arrest and restrain continue to breathe?
17  A.  Yes.
18  Q.  Is it basic police training to ensure that the
19     person that you arrest, restrain, or take
20     control of continues to breathe?
21  A.  I'm sorry?
22  Q.  Is it basic police training to ensure that the
23     person you arrest, restrain, or take control of
24     continues to breathe?
25  A.  Yes.

**25**

1  Q.  Is it basic EMS training to ensure that the
2     person that you're dealing with, in whatever
3     capacity you come upon them, continues to
4     breathe?
5  A.  I would assume that that would be basic EMS
6     training.
7  Q.  Would you agree that once you have seized a
8     person within the meaning of the
9     4th Amendment...
10     Do you know what that means?
11  A.  Uh-huh.
12  Q.  That you continue to be responsible for that
13     seizure and the person you've seized?
14  A.  Yes.
15  Q.  I mean you -- you -- and you understand that
16     you're responsible for the reasonability of the
17     seizure throughout the course of the seizure?
18  A.  Yes.
19  Q.  Okay.  And you'd agree with me that breathing is
20     needed to sustain life; correct?
21  A.  Yes.
22  Q.  Have you been taught in your EMS training, or do
23     you know otherwise, that if the brain is
24     deprived of oxygen for something like 4 minutes
25     it may never come back?

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

26

1  A.  Yes.
2  Q.  Okay.  So the first 4 minutes that you're
3      dealing with a person not breathing are the most
4      important to continued brain activity?
5  A.  Not being a doctor, I would say yes.
6  Q.  I mean what I'm asking is, is that your lay
7      understanding as a person who may come across...
8      I mean as a police officer you come across
9      people who are hurt?
10 A.  Uh-huh.
11 Q.  You have to hurt people sometimes yourselves?
12 A.  Well...
13 Q.  You --
14 A.  Okay.
15 Q.  You have to use force on them?
16 A.  Okay.  Yes.
17 Q.  And that may hurt them?
18 A.  Yes.
19 Q.  I'm not saying -- I'm not implying any intent.
20     As part of your job you may have to do
21     things that injure people?
22 A.  Yes.
23 Q.  And to prevent them from injuring others, to
24     prevent them from injuring you, but -- and --
25     and to take them into custody?

27

1  A.  That's correct.
2  Q.  Okay.  But even the persons that you use force
3      on and -- and you understand that you're
4      responsible for their well-being once that force
5      is implemented and the person taken into
6      custody?
7  A.  I'm sorry.  What?
8  Q.  Okay.  You understand that once you decide to
9      use force, --
10 A.  Yes.
11 Q.  -- to implement the force, that you're
12     responsible for that person that you've taken
13     into custody?
14 A.  Yes.
15 Q.  Okay.  And usually you're mainly responsible for
16     them until you turn them over to someone else,
17     whether it be the Hennepin County Sheriff's
18     Department at the sally port.  Whether it be
19     HCMC if they've been hurt, but usually you have
20     to stay with them then, I think.  Or in the case
21     of this, where you turn them over to emergency
22     medical people; correct?
23 A.  Yes.
24 Q.  All right.  But until you turn them over they're
25     yours to deal with and your responsibility, the

28

1      persons you take control of?
2  A.  Yes.
3  Q.  Okay.  And that's part of basic use-of-force
4      training and basic police training?
5  A.  Yes.
6  Q.  And you've been an officer -- is this your 19th
7      year?
8  A.  Yes.
9  Q.  When you started you didn't think -- there
10     weren't pen cameras necessarily, were there?
11 A.  Not that I'm aware of.
12 Q.  And there were a lot less cameras that covered
13     the city streets --
14 A.  Yes.
15 Q.  -- and buildings?
16 A.  Yes.
17 Q.  And -- and when you first got a Taser did it
18     have a camera?
19 A.  Yes.
20 Q.  Okay.  You're aware that the earlier editions of
21     the Taser had no cameras?
22 A.  Yes.
23 Q.  All right.  So this videoing conduct is sort of
24     a new phenomenon or recent phenomenon?
25 A.  Yes.

29

1  Q.  Okay.  Now do you have your pen camera with you
2      today?
3  A.  No.
4  Q.  That's just a regular pen?
5  A.  That's just a regular pen.
6  Q.  I just wanted to know if I was on camera.
7  A.  No, no.
8          MR. OSBORNE:  You are on many cameras.
9          MR. BENNETT:  I am on many cameras, but
10     not that one.
11         THE WITNESS:  No.
12 BY MR. BENNETT:
13 Q.  Did you happen to bring that today, the pen
14     camera?
15 A.  No.
16 Q.  What does it look like?
17 A.  It looks like this, but it's a little thicker.
18 Q.  Okay.
19 A.  A little bit wider.
20 Q.  That's why I asked.
21     How does your pen camera work?
22 A.  It has a button on the top and you just press it
23     and it turns on.
24 Q.  Did the -- did you activate the pen camera in
25     the -- in your interaction with Mr. Smith?

8 (Pages 26 to 29)

Timothy Callahan
1/30/2012

30

1    A.   Yes.
2    Q.   Why did you decide to do that?
3    A.   Because it was turning into a -- a situation
4         that I thought it might be helpful.
5    Q.   And how many times had you done that before?
6    A.   Have I ever used it?
7    Q.   Yeah.
8    A.   I don't know.
9    Q.   I mean was this the first time?
10   A.   No.
11   Q.   Was it the first time that you had to turn your
12        pen camera into the -- into the department, the
13        video of it?
14   A.   Yes.
15   Q.   Okay. Had you ever... How did you download
16        this particular pen camera?
17   A.   Just -- it comes apart in two. And there's a
18        USB port and you just plug it in and it
19        downloads.
20   Q.   So with regard to the video we all now have
21        seen, how did it come about that that came to
22        exist? You hit the camera? Then did someone
23        take control of the pen camera from you at the
24        scene?
25   A.   No.

31

1    Q.   Did you tell anybody at the scene that you had a
2         pen camera?
3    A.   I don't recall. I don't think so.
4    Q.   Well, so then you took -- did you go home with
5         the pen camera?
6    A.   Yes.
7    Q.   Did... What did you do with it?
8    A.   I downloaded it.
9    Q.   So you went to your personal computer. Is that
10        right?
11   A.   (Pausing.)
12   Q.   I mean how would you download? Explain what you
13        did.
14   A.   Well, the only way to view it is to put it on --
15        plug it into something and then you can view it
16        and then you can transfer it to a more portable
17        device.
18   Q.   Okay. So you... So what did you do when you...
19        Did you download it onto your personal
20        computer at home?
21   A.   My laptop, I think.
22   Q.   Okay. And is that your personal computer?
23   A.   Yes.
24   Q.   Okay. Did you watch it?
25   A.   Yes.

32

1    Q.   When did you first watch it?
2    A.   After I got home.
3    Q.   So it was -- what time did you get home?
4    A.   I don't remember.
5    Q.   What were you supposed to work that day? What
6         was your normal shift?
7    A.   6:30 A.M. to 4:30 P.M.
8    Q.   Did you watch it with anybody?
9    A.   No.
10   Q.   Now you had this discussion with your wife.
11   A.   Uh-huh.
12   Q.   How long have you been married?
13   A.   We've been together for quite a while. We've
14        been married since 2002.
15   Q.   Okay. That conversation that you had with her
16        was probably a memorable conversation for her, I
17        would guess.
18   A.   Probably.
19   Q.   Did she ever tell you it was?
20   A.   Um... No.
21   Q.   Did -- it seemed -- at least seems to me to be
22        the kind of conversation that engenders a
23        discussion when you get through the door. Did
24        it?
25   A.   Yes.

33

1    Q.   Did -- did you tell her about the pen camera?
2    A.   Yes.
3    Q.   Did she ask to see it?
4    A.   She may have been there standing behind me when
5         I watched it. I don't -- I -- I'm not sure.
6    Q.   What does your wife do? Is she a
7         police officer, --
8    A.   No.
9    Q.   -- by any chance?
10        Is she employed outside the home?
11   A.   A part-time job.
12   Q.   Is she in health care at all?
13   A.   No.
14   Q.   Okay. Would she have been the first person you
15        showed it to other than yourself?
16   A.   She -- yes.
17   Q.   Okay. Did she ask you any questions about it?
18   A.   I'm sure she did.
19   Q.   Did anyone ever tell you that you ought to throw
20        your pen camera away?
21   A.   No.
22   Q.   Okay. You talked with the -- is it Sergeant
23        Mercil at the -- at the scene?
24   A.   Yes. He was the sergeant that responded.
25   Q.   Did you tell Mercil about the pen camera?

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

34

1   A.   I don't think so.
2   Q.   Going back to your interrogatories.  Did you
3        talk -- it says you talked to Lieutenant Matthew
4        Clark briefly at the scene.
5            MR. BENNETT:  And his is Supplement 1,
6        Jeff.  Maybe we should look at that.
7   BY MR. BENNETT:
8   Q.   Did you tell Lieutenant Clark about the
9        pen camera?
10  A.   I don't believe so.
11  Q.   Why didn't you tell Sergeant Mercil or
12       Lieutenant Clark about the pen camera?
13  A.   I don't know.  I wasn't really thinking about
14       it.
15  Q.   Well, you had the presence of mind to start it?
16  A.   Uh-huh.
17  Q.   Is that a -- you have to --
18  A.   Yes.
19  Q.   I understood you to say "Yes."
20  A.   Yes.
21  Q.   Did you talk to Officer Kingdon at the scene, as
22       well?
23  A.   Yes.
24  Q.   Is he a friend of yours?
25  A.   He -- he works in the same precinct.  He works a

35

1        different shift right now.
2   Q.   I mean you're...  Did you tell him about the
3        pen camera?
4   A.   No.
5   Q.   Now you did tell your partner, Officer Gorman,
6        about the pen camera during the event, didn't
7        you?
8   A.   Yes.
9   Q.   And in fact you on the tape point to your
10       pen camera at one point on the -- on the video;
11       correct?
12  A.   I think so.
13  Q.   So you -- you had an awareness, even as the --
14       as you were interacting with Mr. Smith, that
15       were recording the video evidence of it;
16       correct?
17  A.   Yes.
18  Q.   All right.  You also had an awareness that the
19       Taser was videoing it, didn't you?
20  A.   Yes.
21  Q.   At some point in the video you knocked the Taser
22       away; correct?
23  A.   I don't know.
24  Q.   Do you remember doing that?
25  A.   I don't know what you mean by "knocked it away."

36

1   Q.   Well, it was focused right on your leg and --
2        and on -- and Officer Gorman and on part of the
3        torso of Mr. Smith.  Do you remember seeing that
4        Taser video?
5   A.   Yes.
6   Q.   At some point the video -- the Taser is -- it
7        appears to be several feet away from you.  And
8        that's correct, wasn't it?
9   A.   I don't know how far away it was, but it wasn't
10       in my hand.
11  Q.   Well, do you remember the -- going -- spinning
12       off at some point?
13  A.   It -- it may have.  I don't know.
14  Q.   Did you knock it away?
15  A.   I don't recall doing it -- you know, on purpose,
16       if that's what you're asking.
17  Q.   Okay.  Did you...  Did you say anything to your
18       wife about the video when you were watching it?
19  A.   Which video?
20  Q.   The pen camera.
21  A.   What do you mean did I say anything to her?
22  Q.   Did you say anything to her while you were
23       watching the video that you downloaded on your
24       computer?
25  A.   I -- I'm sure.

37

1   Q.   Well, do you remember --
2   A.   But I don't know --
3   Q.   -- saying anything?
4   A.   -- what.
5        (Shaking head.)
6   Q.   Do you remember her saying anything back to you?
7   A.   She was concerned for me.
8   Q.   And what did she say?
9   A.   I -- I don't know.
10  Q.   Okay.  Based on your training and understanding
11       of department policies, your EMS training, did
12       the video give you any understanding of why it
13       was that David Smith died after your and
14       Gorman's interaction with him?
15  A.   No.
16  Q.   Okay.  I show you what's...
17       Showing you what's been marked as
18       Exhibit 24.
19           MR. BENNETT:  Give a copy to...
20           MS. BENNETT: (Distributing copies of
21       Exhibit 24.)
22  BY MR. BENNETT:
23  Q.   Do you recognize this?
24  A.   It appears to be a photocopy of our department
25       manual.

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

38

1  Q.  And it's section -- it's just part of the
2      manual; correct?  The manual is much more
3      voluminous, it covers much more ground than this
4      does; correct?
5  A.  Yes.
6  Q.  This covers "9-100 Adult Arrests"; correct?
7  A.  Yes.
8  Q.  And in the -- um... In the...
9  A.  Excuse me.
10 Q.  The policy at one point talks about -- in
11     9-111.01 that deals with Maximal Restraint of
12     Prisoners?
13 A.  What page are you on, please?
14 Q.  I am on page 5 of 9, Officer.
15 A.  Okay.
16 Q.  And that deals with securing prisoners; correct?
17 A.  It does.
18 Q.  And it deals with securing subjects who are not
19     adequately controlled by handcuffing alone?
20 A.  Yes.
21 Q.  And that would cover David Cornelius Smith at
22     least for the beginning of his time after he was
23     handcuffed; correct?
24 A.  (No response.)
25 Q.  Is that -- at least that's what -- is that what

39

1      you're asserting?
2  A.  Can you -- I'm sorry.  Can you say that again?
3  Q.  Well, was David Smith a subject who was not
4      adequately controlled by handcuffing?
5  A.  No.  I would say that once we had him handcuffed
6      we had him --
7  Q.  Adequately controlled?
8  A.  I -- I -- I think so.
9  Q.  Okay.  The handcuffing itself is certainly a
10     restraint?
11 A.  Is what now?
12 Q.  Handcuffing itself is a restraint?  You're
13     taught that; correct?
14 A.  Yes.
15 Q.  And it's even more of a restraint when you have
16     a person in a position where they are against an
17     object, whether it be a floor, a wall or a car?
18     Correct?
19 A.  You have to say it again.  I'm sorry.
20 Q.  Have you heard of the -- do you know what
21     "decentralization" is?
22 A.  No.
23 Q.  Never heard of that term?
24 A.  I don't think so.
25 Q.  Okay.  Well, when you have someone handcuffed,

40

1      if you're just walking along with them they are
2      -- they have an ability to do certain things;
3      right?
4  A.  Sure.
5  Q.  They have less of an ability when you have them
6      positioned against a surface, whether it's a
7      floor, a wall, or a car; correct?
8  A.  Okay.
9  Q.  Do you agree with that?
10 A.  I would -- yes.
11 Q.  All right.  And they have -- the most
12     restraining of that would be a prone restraint,
13     where they're lying prone on their chest on a
14     hard surface, like the hardwood basketball court
15     of the YMCA; correct?
16 A.  Yes.
17 Q.  Okay.  And that's called a prone restraint
18     position?  Do you understand what that position
19     is?
20 A.  Yes.
21 Q.  Okay.  And this policy says that, "When ANY..."
22     And "ANY" is in bold and in caps; correct?
23 A.  It is.
24 Q.  When it says, "...ANY restraint technique is
25     used on a subject..."

41

1      That includes handcuffing; correct?
2  A.  Well, I think it's -- I think it's in addition
3      to handcuffing, is the way that it reads.
4  Q.  Well, it says, "When ANY..."  And "ANY" is in
5      bold?
6  A.  But at the top it says, "To secure subjects who
7      are not adequately controlled by handcuffing."
8  Q.  Okay.  Well, let's read the whole sentence.  It
9      says, "When ANY restraint technique is used on a
10     subject, the subject shall not be left in a
11     prone position and shall be placed on their side
12     as soon as they are secured."  Correct?
13 A.  Well, but prior to that it says, "Techniques
14     that secure the subject's feet to their
15     handcuffed hands behind the back shall be a last
16     resort technique."
17 Q.  Well, --
18 A.  "A supervisor shall be called to the scene where
19     a subject has been restrained in this manner to
20     evaluate the method of transportation.  When ANY
21     restraint technique is used on a subject, the
22     subject shall not be left in a prone
23     position..."
24     I read it as max -- the -- the -- what
25     you're referring to is titled, "Maximal

11 (Pages 38 to 41)

Timothy Callahan
1/30/2012

**42**

1    Restraint of Prisoners" and it's referring to
2    hobbling.  That's what -- that's what we call
3    maximal --
4    Q.   Well, --
5    A.   -- restraint.
6    Q.   -- I'm not the one who decided to bold and put
7         "ANY" in caps; right?
8              MS. FUNDINGSLAND:  Objection,
9         argumentative.
10   BY MR. BENNETT:
11   Q.   It says, "When ANY restraint technique is
12        used..."  Correct?
13   A.   It does say that.
14   Q.   Can we agree that handcuffing is a restraint
15        technique?
16   A.   We can agree that handcuffing is a restraint
17        technique.
18   Q.   All right.  That was used on David Smith?
19   A.   Yes, it was.
20   Q.   And David Smith was left in a prone position for
21        a prolonged period of time, wasn't he?
22   A.   He was.  And again you're taking it -- that is
23        not what -- where you're reading from is not
24        referring to --
25   Q.   Well, --

**43**

1    A.   -- handcuffing.
2    Q.   -- I guess others will decide that.
3              The... It doesn't say, "When a person is
4         restrained and hobbled"; correct?
5    A.   It does say that.  It's "Maximal" --
6    Q.   No, no.
7    A.   -- "Restraint of Prisoners" is what you're
8         reading from.
9    Q.   I know.  I understand that.  But the clause says
10        -- it doesn't say when...
11             And we can -- we'll have this discussion, I
12        suppose, with the judge.  But it doesn't say,
13        "When the person is hobbled the subject shall
14        not be left in a prone position" --
15   A.   It --
16   Q.   -- "and shall be placed on their side" --
17   A.   The middle paragraph says, the "Maximal
18        Restraint Technique," which is what we're
19        referring to, 9-11.01 [sic], "is accomplished by
20        placing a cord cuff or hobble restraint around
21        the waist of the subject and securing the bound
22        feet to the subject -- of the subject to the
23        cord cuff in front of the subject.  Officers may
24        also secure the bound feet of the subjects
25        [sic] -- to the subject's belt if they are

**44**

1    wearing one or use other variations that do not
2    tie the feet of the subject directly to their
3    hands behind their back."
4    Q.   Well, let me ask you this:  Whenever you take a
5         person into custody, correct, and you handcuff
6         them, --
7    A.   Yes.
8    Q.   -- should you watch for the following signs:
9         Significant change in behavior or level of
10        consciousness?
11   A.   Do we have to consciously...
12   Q.   Well, you know, we went through this before.  I
13        talked about it in any arrest, any 4th Amendment
14        situation.  And -- and I'm saying here the...
15             Are you saying that only if you hobble
16        somebody do you pay attention to those following
17        signs?  Is that what you're saying?
18   A.   I'm -- if using maximal restraint then it says
19        here that you -- you need to watch for
20        significant change in behavior or level [of]
21        consciousness, shortness of breath or irregular
22        breathing, seizures or convulsions, complaints
23        of serious pain or injury and any other serious
24        medical problems.
25   Q.   Well... But you have to do that with regard to

**45**

1    everybody you take into custody, don't you?
2    A.   I wouldn't consciously monitor that.  If
3         somebody collapsed over in my backseat just from
4         being handcuffed, then I would be aware that
5         they've collapsed over in my backseat and I
6         would want to make sure that they're okay.
7    Q.   Well... But just take this sentence.  "Once [a]
8         subject is secure, an officer shall watch for
9         any of the following signs:  Significant change
10        in behavior or level of consciousness.
11        Shortness of breath or irregular breathing.
12        Seizure or convulsions.  Complaints of serious
13        pain or injury.  And/or any other serious
14        medical problem."
15             Do you disagree with that?
16   A.   No.  If I was using a maximal restraint I would
17        definitely --
18   Q.   How about just a regular handcuffing?  Would you
19        pay attention to that?
20   A.   I'm not sure what -- what you mean.  I mean most
21        -- most of the time people are talking to you
22        and there's no -- you're not consciously
23        monitoring their breathing.
24   Q.   How big are you?
25   A.   How tall am I?

12 (Pages 42 to 45)

Timothy Callahan
1/30/2012

46

1    Q.    Yeah.
2    A.    I'm 6 foot 5.
3    Q.    What do you weigh?
4    A.    I weigh approximately 215 pounds.
5    Q.    And did you weigh 215 on September 9th of 2010?
6    A.    Give or take two or three pounds, yes.
7    Q.    Okay.  You were sitting straddling Mr. Smith
8          after he was handcuffed; correct?
9    A.    That's correct.
10   Q.    And you were -- you were sitting on him at least
11         for more than -- I would think 5-1/2 minutes;
12         correct?
13   A.    I don't know.
14   Q.    Well, have you read the timeline of events
15         prepared by the MPD from your pen camera video?
16   A.    I have not.  Is that what you're looking at?
17   Q.    Yeah.
18   A.    I have not seen that.
19   Q.    Okay.  Well, you watched the tape how many
20         times?
21   A.    I don't know.
22   Q.    Do you know if you were sitting straddling him?
23   A.    I was sitting on his --
24   Q.    For a period of more than 5-1/2 minutes?
25   A.    I don't know exactly how many minutes.

47

1    Q.    Would you disagree with that?
2    A.    No.
3    Q.    All right.  And Gorman, Officer Gorman was
4          also...  At the time you were on Mr. Smith he
5          was on the upper back of Mr. Smith, correct,
6          with one or both knees?
7    A.    He may have been.
8    Q.    Well, doesn't the videotape depict that?
9    A.    I don't know if it was -- what -- can you
10         clarify your question?
11   Q.    Well, he was -- from the time immediately prior
12         to the handcuffing completion, through at
13         least...  Um...  The...  For a period of at least
14         4 minutes, Gorman's right knee, left knee or
15         both knees was on -- between the scapulas of
16         David Cornelius Smith?
17   A.    I don't know.
18   Q.    Okay.  During that period of time did -- did
19         Gorman ever take all of his weight off of Smith?
20   A.    Again, I can't -- I don't know if he -- I don't
21         know.
22   Q.    He was right in front of you, wasn't he?
23   A.    Yes.
24   Q.    He was in your line of sight?
25   A.    Yes.

48

1    Q.    And your line of sight is much broader than the
2          pen camera video we see; correct?
3    A.    Probably.
4    Q.    Well, you were straddling -- you had your left
5          knee over the upper thigh/buttock area of Smith;
6          correct?
7    A.    Yes.
8    Q.    Or left -- left leg.
9          And right leg over his right buttock, right
10         side; correct?
11   A.    (No response.)
12   Q.    You were straddling him?
13   A.    Yes.
14   Q.    And in front of you was Gorman and Smith?
15   A.    Yes.
16   Q.    Okay.  Both of them were in your field of
17         vision?
18   A.    Probably.
19   Q.    You were talking --
20   A.    Yes, --
21   Q.    -- to him.
22   A.    -- I know, but I can't tell you if I was looking
23         at him the entire time.
24   Q.    Okay.  What were you looking at?
25   A.    Well, I don't know.  I may have -- I may have

49

1          been looking around me.  I may have looked to
2          the left, to the right.  I can't tell you that
3          I -- I wasn't locked eyes with Officer Gorman
4          the whole time the incident was...
5    Q.    You saw -- you would have applied weight to the
6          lower torso and upper leg of Mr. Smith; correct?
7    A.    Yes.
8    Q.    And Officer Gorman applied weight between his
9          shoulder blades; correct?
10   A.    Officer Gorman was on the upper part -- portion
11         of his body.  He was in that area.
12         I was in the lower body area.
13   Q.    Okay.  Well, anybody that you arrest and are
14         taking into custody, you have to be concerned
15         about any significant change in behavior or
16         level of consciousness; correct?
17   A.    People's behaviors change all the time.
18   Q.    Level of consciousness, you have to pay
19         attention to that?
20   A.    Yes.
21   Q.    You don't want to have one of the people who you
22         arrest while they were conscious become
23         unconscious, do you?
24   A.    Would I want that?
25   Q.    Correct.  And you certainly wouldn't want it to

13 (Pages 46 to 49)

Timothy Callahan
1/30/2012

50

1    be a product of activities that you conducted;
2    correct?
3    A.   (No response.)
4    Q.   You don't want to render somebody unconscious,
5    do you?
6    A.   No.
7    Q.   Okay.  And you would want -- you would want to
8    be vigilant and mindful of any shortness of
9    breath or irregular breathing or stoppage of
10   breathing of a person you're arresting; correct?
11   A.   Say it again, please.
12   Q.   You'd want to be aware of the shortness of
13   breath of a person you're arresting; correct?
14   A.   Yes.
15   Q.   If they were breathing irregularly; correct?
16   A.   If they had been breathing irregularly, yes.
17   Q.   And if -- or if they stopped breathing that
18   would be very important to know and to notice;
19   correct?
20   A.   Yes.
21   Q.   All right.  If a person had a seizure or a
22   convulsion you'd want to note that and deal with
23   it; correct?
24   A.   Yes.
25   Q.   If a person had complaints of a serious pain or

51

1    injury...  For example, if their -- if their arm
2    was broken at the humerus, while you were -- in
3    the handcuffing, you might do something
4    different about that other than leave it in that
5    handcuff position; correct?
6    A.   I -- I would -- I would call for medical
7    assistance for a person who had a broken bone.
8    Q.   Uh-huh.
9    A.   I wouldn't be able to treat them myself.
10   Q.   Okay.  And you'd want to deal with any serious
11   medical problem of a person you've taken control
12   of?
13   A.   Yes.
14   Q.   All right.  And you don't need the
15   Maximal-Restraint-of-Prisoners policy to deal
16   with that, do you?
17   A.   Pardon?
18   Q.   You don't need this policy to tell you that?
19   You've been trained that already; correct?
20        MS. FUNDINGSLAND:  Objection, compound
21   question.
22        (Pause.)
23   BY MR. BENNETT:
24   Q.   You can go ahead and answer it.
25   A.   Oh, I -- I'm sorry.  Can you say it again?

52

1    Q.   You didn't -- you didn't need to be trained to
2    look out for those health issues?  You don't
3    need this maximal restraint policy to understand
4    that you need to do that, do you?
5    A.   No.
6    Q.   It's what a reasonable officer would do in the
7    circumstances, isn't it?
8    A.   Yes.
9    Q.   Okay.  So what did you...  Did you put...
10        You downloaded the pen camera onto your
11   computer; correct?
12        MS. FUNDINGSLAND:  Objection, asked and
13   answered.
14   BY MR. BENNETT:
15   Q.   Well, you did --
16   A.   I -- yes.
17   Q.   Well, did you do anything to take it off your
18   computer and put it on some other device?
19   A.   I put it onto a flash drive to give to
20   investigators.
21   Q.   Okay.  In fact, did you give it to the
22   investigators or did you give it to your
23   attorney?
24   A.   I gave it to my attorney.
25   Q.   Okay.  When did you give it to your attorney?

53

1    A.   The day that we were giving our statements.
2    Q.   Did you show it to your attorney before that?
3    A.   I don't recall.
4    Q.   Did you show it to anybody other than your wife
5    before that?
6    A.   I don't believe so.
7    Q.   Did you show it to Officer Gorman before his
8    statement?
9    A.   I... I don't remember if --
10   Q.   You gave your statement on the 15th of
11   September, 2010; correct?
12   A.   Yes.
13   Q.   And that's Exhibit 37; correct?
14   A.   Yes.
15   Q.   And Gorman didn't give his -- I'm showing you
16   Exhibit 38 -- until the next day.
17   A.   (Reviewing exhibit.)
18   Q.   September 16th; correct?
19   A.   As I recall, we both went there on the 15th to
20   do it and it ran too long and I had to come back
21   on the 16th, as well, I believe.  Or -- I'm not
22   sure.
23   Q.   What time did you go there?
24   A.   It was in the afternoon.
25   Q.   It says 2:30 is when you give it.  2:31.  14:31

14 (Pages 50 to 53)

Timothy Callahan
1/30/2012

54

1      is 2:31, isn't it?
2  A.  I think the investigators watched the pen cam
3      footage before we --
4  Q.  Oh.  You only gave a 6-page statement.  That
5      wouldn't take very long, would it?
6  A.  I don't know.
7  Q.  Well... And Gorman only gave a 4-page statement;
8      correct?  If you look at that.
9  A.  (Reviewing exhibit.)
10      It looks like there's 4 pages here.
11  Q.  And it looked like he came back and gave his
12      on -- 16:09 or 4:09 P.M. on the 16th.
13  A.  That's what it says at the top of the statement.
14  Q.  All right.  Did you and Officer Gorman talk to
15      Sergeant Klund and Sergeant Fors together on the
16      15th?
17  A.  Did -- what now?
18  Q.  Did you and Officer Gorman talk to Sergeant
19      Klund and Sergeant Fors together on the 15th
20      when you came?
21  A.  No.
22      MS. FUNDINGSLAND:  Objection, vague.
23  BY MR. BENNETT:
24  Q.  Well, you say you showed them the video.
25  A.  I didn't show them the video.

55

1  Q.  Oh, I thought you said you did.
2  A.  My attorney gave it to them.
3  Q.  All right.  Did you watch it with them?
4  A.  No.
5  Q.  Did they watch the video before they took the
6      statement?
7      MS. FUNDINGSLAND:  Objection,
8      foundation.
9  BY MR. BENNETT:
10  Q.  Before they asked you these questions and took
11      your statement --
12  A.  I --
13  Q.  -- on the --
14  A.  -- think they did.
15  Q.  How do you know?
16  A.  Because I think they did.
17  Q.  Based on what information?
18  A.  Based on my attorney gave it to them and then
19      they didn't -- we didn't give -- I didn't give
20      my statement for another half an hour probably.
21      I don't know.  I am under the impression that
22      they watched it.
23  Q.  All right.  Did they ask you about the -- what
24      they saw on the tape in your statement?
25  A.  Um... I don't -- I don't know.  I don't think

56

1      they asked anything specific from it, given the
2      questions that I'm seeing in my statement.
3  Q.  In other words, the only reference to the video
4      camera appears on the last -- second-to-the-last
5      question and answer, correct, on page 6?
6  A.  Yes.  I think so.
7  Q.  And that's the only question and answer?
8  A.  If you say so.  I think so.
9  Q.  Did they ask you who had reviewed it?
10  A.  Pardon?
11  Q.  Well, was there -- did they talk to you outside
12      of this recorded statement?
13  A.  No.
14  Q.  Did they ask you questions that weren't
15      recorded?
16  A.  I don't believe so.
17  Q.  Is there anything about their questioning that
18      would let you know that they'd actually seen the
19      video?
20  A.  Ah... I don't remember other than what was --
21      other than what's in my statement, the
22      questions.
23  Q.  When did you get to the station...
24      Or you met them downtown, in Homicide?
25  A.  Yes.

57

1  Q.  When did you get to Homicide on the 15th?  Or do
2      you think you were there on the 14th?
3  A.  I don't -- I think I was there on the 15th.  And
4      I think --
5  Q.  Do you recall --
6  A.  I don't recall what time the original
7      appointment was for.  I -- I don't recall when
8      we were scheduled to be there, what time.
9  Q.  You've read this statement prior to today and
10      for purposes of preparing yourself; correct?
11  A.  Yes.
12  Q.  Now if you go to page 5...
13  A.  (Complying.)
14  Q.  You understand that you had to tell the truth in
15      this statement; correct?
16  A.  Yes.
17  Q.  And you were asked if you activated your Taser
18      any additional times.
19  A.  Ah --
20  Q.  It's that answer; correct?
21  A.  Yes.
22  Q.  And you gave an answer -- you answered the
23      question "Yes."  And then you elaborated;
24      correct?
25  A.  Yes.

15 (Pages 54 to 57)

Timothy Callahan
1/30/2012

58

1  Q.  And you said, "I know I activated it at least
2      one more time."  And that would have been the
3      final time?  You had 5 cycles of your Taser;
4      correct?
5  A.  I believe I was told that there were 5 cycles.
6  Q.  I can show you the Taser record and you wouldn't
7      deny --
8  A.  I don't disagree.
9  Q.  Okay.  And you say, "It was at this point that
10     we were able to get the arms fully behind his
11     back and handcuffed together"; correct?  That's
12     what you said?
13 A.  I know that the last time I activated the Taser
14     was the time prior to we -- us handcuffing him.
15 Q.  All right.  So once the...
16         The last Taser cycle immediately precedes
17     the final handcuffing; --
18 A.  Yes.
19 Q.  -- correct?
20         And one -- you said, "It was also at this
21     time..."
22         And I assume you're meaning in this answer
23     at the time you got him handcuffed "that Smith
24     seemed to calm down a bit."  You said that;
25     right?

59

1  A.  I did say that.
2  Q.  And he was not resisting as hard?
3  A.  Yes.
4  Q.  And you believed that Smith was giving up at
5      this time and complying; correct?
6  A.  Yes.
7  Q.  And when a person does that the excuse for force
8      abates?  Ends?  Correct?
9  A.  Yes.
10 Q.  Okay.  And you say that what -- when you were
11     asked what position he was in upon being
12     handcuffed you say that, "Smith was laying on
13     his stomach and I was sitting on his upper
14     thigh, back of his knees area.  I did this
15     because I was worried that he might resume
16     fighting"; correct?
17 A.  Yes.
18 Q.  He never resumed fighting, did he?
19 A.  No.
20 Q.  Okay.  You make no mention of -- in this answer
21     of Gorman; correct?
22 A.  No.
23 Q.  You make no mention of Gorman's application of
24     force after the handcuffing; correct?
25 A.  I wasn't asked to.

60

1  Q.  Well, you were -- you actually answered some
2      stuff you weren't asked in the prior answer.
3      "Did you activate your Taser at any additional
4      time?"  If you just stuck to your answer you
5      could have said "Yes" to the question before
6      that; right?
7         So you elaborated when you felt like you
8      wanted to elaborate; correct?
9  A.  I wasn't asked about Officer Gorman.
10 Q.  Okay.  Did you find that odd?
11 A.  As he was giving a statement, no, I didn't.
12 Q.  Well, you were a witness to Officer Gorman's
13     application of force; correct?
14 A.  Yes.
15 Q.  Okay.  Don't you think it was odd that you
16     weren't asked about it?
17         MS. FUNDINGSLAND:  Objection, asked and
18     answered.
19         THE WITNESS:  No.
20 BY MR. BENNETT:
21 Q.  Don't you usually -- don't investigators usually
22     ask witnesses what they saw?
23 A.  Yes.
24 Q.  Okay.  You've asked plenty of witnesses what
25     they saw if you thought they were eyewitnesses

61

1  to something, didn't you?
2  A.  Yes.
3  Q.  And you were told at the beginning of this, on
4      the very first page, that this is a -- a
5      criminal investigation into a recent incident
6      you were involved in and it was being done by
7      the Minneapolis Police Department Homicide Unit;
8      correct?
9  A.  Yes.
10 Q.  Involved the death of a party in custody on
11     which you two were -- were using force on;
12     correct?
13 A.  Yes.
14 Q.  Okay.  So you were seated in a position to see
15     Officer Gorman's conduct; correct?
16 A.  Yes.
17 Q.  And you were not asked about it?
18 A.  I was not.
19 Q.  Isn't asking witnesses what they saw sort of
20     Investigation 101?
21 A.  I'm not an investigator.
22 Q.  But you know enough to -- I mean when you go to
23     a scene and there's a witness do you ask them
24     what they saw and put that in your supplements?
25 A.  I don't want to speculate on how Sergeant Fors

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

62

1    or Sergeant Klund run their investigations.
2  Q.   I'm not asking that. I'm just asking you.
3        When you identify a witness at the scene do
4    you ask them what they saw and put it in your
5    statement?
6  A.   Yes.
7  Q.   Because that's what they tell you to do in your
8    manual?
9  A.   Yes.
10 Q.   All right.
11 A.   I guess. I don't know -- I don't know where it
12   says that in the manual, --
13 Q.   Well, --
14 A.   -- but I'll take your word for it.
15 Q.   Well, you know you're supposed to put the
16   material things you observe in your statement,
17   your supplement; correct?
18 A.   Yes.
19 Q.   And if you talk to a witness you put that -- you
20   put what the witness tells you in your
21   supplement so that the prosecutor can know what
22   to do with it?
23 A.   Yes.
24 Q.   And whether that witness is worthy of
25   discussing as a potential witness in a later

63

1    prosecution; correct?
2  A.   Yes.
3  Q.   At this time did you know that the medical
4    examiner was going to rule this as a homicide?
5  A.   No.
6  Q.   Did you -- did you know that he was going to
7    rule that Mr. Smith died of mechanical asphyxia?
8  A.   No.
9  Q.   Do you know that today?
10 A.   Yes.
11 Q.   Do you know... Mechanical asphyxia implies the
12   use of mechanical force; do you understand that?
13 A.   Yes.
14 Q.   Do you know who Dr. Baker said the agent or the
15   person that used the mechanical force was?
16 A.   No.
17 Q.   Who do you think he said?
18 A.   Both of us?
19 Q.   In any event, you saw Officer Gorman apply
20   mechanical force to the back of -- downward
21   pressure to the back of Mr. Smith; correct?
22 A.   Officer Gorman was restraining his upper body.
23 Q.   Let me just ask you the question again and I'd
24   like an answer.
25        Did you -- did you see Officer Gorman apply

64

1    mechanical force downward on Mr. Smith while he
2    was in the prone restraint position?
3  A.   Yes.
4  Q.   Okay. And he did so for a period of several
5    minutes; correct?
6  A.   I don't know how long.
7  Q.   Okay. You filmed it occasionally? And we'll go
8    through parts of it; correct?
9  A.   Correct.
10 Q.   You saw his knees -- Knee or knees... Actually
11   you see the left knee, the right knee and both
12   knees on David Cornelius Smith's back in your
13   pen camera video; correct?
14 A.   Yes.
15 Q.   All right. And in the Taser video you can see
16   his right knee, both knees and left knee on his
17   back; correct?
18 A.   From the Taser video?
19 Q.   Yes.
20 A.   I don't think so.
21 Q.   We'll go through it.
22        Um...
23        THE WITNESS: Can I go to the bathroom?
24        MR. BENNETT: Sure. That's -- like I
25   say, tell me when you need to...

65

1        THE WITNESS: Sure.
2        (Discussion held off the record.)
3        MR. BENNETT: Go off the record at
4    10:05.
5        (Recess taken.)
6        MR. BENNETT: Back on the record at
7    10:12.
8        Pull that -- pull page 5 back up, please.
9        MS. BENNETT: Exhibit 37?
10       MR. BENNETT: Exhibit 37, page 5.
11   And go to, "What position was Smith?"
12       (Exhibit displayed.)
13 BY MR. BENNETT:
14 Q.   You indicate you were sitting on his upper
15   thighs, back-of-knees area; correct?
16 A.   Yes.
17 Q.   That was a restraint that was in addition to the
18   restraint imposed by the handcuffs and the prone
19   position itself; correct?
20 A.   I -- I don't know that I'd refer to it as a
21   restraint.
22 Q.   Well, I'm just... What would you call it?
23 A.   We were trying to prevent him from getting up --
24 Q.   Okay.
25 A.   -- or kicking, or fighting, or spitting, or

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

66

1    anything else.
2  Q.  He didn't bite, did he?  He didn't try to bite
3      you?
4  A.  I was on his legs.
5  Q.  Oh.
6  A.  He didn't try to bite me.
7  Q.  There's no evidence that he tried to bite you or
8      bite Gorman; correct?
9  A.  I -- I don't think so.
10  Q.  There's no evidence he spit at anybody, in
11      either statement, or in anybody's supplement, or
12      on the video; correct?
13  A.  No.  But I didn't say that he did.  I said we
14      were concerned that he would.
15  Q.  Well, I know.  But you can't shoot him because
16      you're concerned that he might bite or spit on
17      you, can you?
18  A.  No.
19      MS. FUNDINGSLAND:  Objection,
20      argumentative.
21  BY MR. BENNETT:
22  Q.  I mean you do things in response to things that
23      the subject does; correct?
24  A.  (Pausing.)
25  Q.  You use force as a response to force, correct,

67

1      and his actions?  That's what I've heard
2      testifying for years and years; is that -- is
3      that true?
4      MS. FUNDINGSLAND:  Objection, compound
5      question and testimony.
6  BY MR. BENNETT:
7  Q.  Go ahead and answer the question.
8  A.  You have to ask it again.
9  Q.  You do things in response to -- you -- you make
10      force decisions based on the subject's response
11      to commands and that sort of thing; correct?
12  A.  Yes.
13  Q.  All right.  Well, you -- in addition to
14      handcuffing him and placing him in a prone
15      position you sat on his upper knees and thighs?
16      MS. FUNDINGSLAND:  Objection,
17      mischaracterizes the deponent's testimony.
18  BY MR. BENNETT:
19  Q.  Upper thighs and back of knees; is that right?
20  A.  After handcuffing him?
21  Q.  Yes.
22  A.  Yeah.
23  Q.  And you did that to restrain his movements?
24  A.  Yes.
25  Q.  And in part to restrain the movement of his

68

1      lower torso and legs?
2  A.  Yes.
3  Q.  Okay.  So that would have been a restraint in
4      addition to the handcuffing; correct?
5  A.  I guess it would.  I'm just having trouble with
6      a lot -- some of the terminology you're using,
7      that's all.
8  Q.  Okay.  Well, I'm trying to use the language you
9      used.  I just understand that to be a restraint.
10      And I think you do, too, don't you?
11  A.  I -- yes.
12  Q.  And the idea is to restrict movement?
13  A.  Yes.
14  Q.  Okay.  And this is after the time in which you
15      said he'd calmed down a bit and was not
16      resisting as hard; correct?
17  A.  Well, it was a continuation.  I was in that
18      position for the handcuffing.
19  Q.  Well, yeah.  And you stayed there after he
20      calmed down and was not resisting as hard;
21      correct?
22  A.  Yes.
23  Q.  And you stayed there after you believed he was
24      giving up and complying?
25  A.  Well, I said he -- "I believe that Smith was

69

1      giving up this time and complying."
2  Q.  And you stayed there after that?
3  A.  Right.  Because I was concerned that given his
4      prior behavior that at any time he may resume
5      fighting or trying to get away.
6  Q.  Well, you stayed there until he was brain dead,
7      didn't you?
8      MS. FUNDINGSLAND:  Objection,
9      argumentative.
10      THE WITNESS:  I don't know when he would
11      have...
12  BY MR. BENNETT:
13  Q.  Well, when you got off him he was completely and
14      wholly unresponsive; correct?  He was not
15      breathing?  He did not have a pulse; correct?
16  A.  I don't think so.
17  Q.  You don't think he had a pulse?  Or you don't
18      think I'm correct?
19  A.  I don't think he had a pulse.
20  Q.  When you got up off of him he was not breathing,
21      he did not have a pulse; correct?
22  A.  It was -- that is what I believe, yes.
23  Q.  All right.  Do you know when he ceased
24      breathing?
25  A.  I do not.

18 (Pages 66 to 69)

Timothy Callahan
1/30/2012

70

1  Q.  The chief medical examiner testified that the
2      last evidence of breath he has is about
3      2 minutes and 45 minutes [sic] after the first
4      Taser cycle.  That would be several minutes
5      before you got off him; correct?
6  A.  I don't know what he said.
7  Q.  All right.  Well, assume that to be correct,
8      that it -- let's see if I can...
9          Well, let me...
10         Have you received training that once you
11     have the individual handcuffed that you're
12     supposed to get off the subject?
13 A.  I don't think so.
14 Q.  Have you been taught that they should be turned
15     on their side or in an upright position?
16 A.  If you've used a maximal restraint.
17 Q.  Only in that -- and only in that circumstance?
18 A.  I mean there may be other circumstances when you
19     would use it, I'm not aware of it.
20 Q.  Well, do you -- do you know -- well, the -- the
21     medical examiner said, "If once he had been
22     handcuffed, had the officers not remained on top
23     of the subject and had the subject been turned
24     on his side or in an upward position of comfort,
25     would he have died of mechanical asphyxia?"

71

1          Dr. Baker said, "No, he would not have died of
2      mechanical asphyxia."
3          Do you have any belief to the contrary?
4  A.  I don't know.
5  Q.  Okay.  Do you have any evidence that that isn't
6      true?
7  A.  Again, I'm not -- I mean I'm not a doctor.  I
8      don't know what would have happened to him.
9  Q.  Were you able to determine any breath or
10     breathing after 2 minutes and 45 seconds after
11     you started the Taser, the first cycle?
12 A.  Yeah, he was breathing.
13         After when?
14 Q.  After 2 minutes and 45 seconds of when you
15     started the first cycle of the Taser.
16 A.  I don't know what you mean.  Are you talking
17     about when the medical examiner thinks that he
18     was no longer breathing?
19 Q.  Yeah.
20 A.  I didn't notice that he wasn't breathing.
21 Q.  All right.  You're supposed to continually
22     check; correct?
23 A.  If you're referring to the "Maximal Restraint of
24     Prisoners," it says monitor a change in behavior
25     or level of consciousness.

72

1  Q.  So you don't think you have to do that for
2      regular prisoners --
3          MS. FUNDINGSLAND:  Objection, asked --
4  BY MR. BENNETT:
5  Q.  -- if you're applying force to --
6          MS. FUNDINGSLAND:  -- and --
7      Excuse me.  I'm sorry.
8  BY MR. BENNETT:
9  Q.  Is that your question -- is that your statement?
10         MS. FUNDINGSLAND:  Objection, asked and
11     answered.
12         THE WITNESS:  I don't -- no more so than
13     you would for anybody.
14         MR. BENNETT:  Okay.
15 BY MR. BENNETT:
16 Q.  Have you been trained in the use of the prone
17     restraint maneuver?
18 A.  It's not a term that we use to my knowledge.
19 Q.  You indicated knowledge of it before.
20 A.  I understand what you're referring to, but it's
21     not a term that is -- that I'm familiar with
22     being used by the department.
23 Q.  Are you familiar with it being used in case law?
24 A.  I don't know.
25 Q.  So you've never been trained on the dangers of a

73

1      prone restraint maneuver; is that what you're
2      saying?
3  A.  I guess not.  I'm not aware of it.
4  Q.  Okay.
5          MR. BENNETT:  Do you have Exhibit 25?
6      The color one?
7          MR. STORMS:  (Distributing Exhibit 25.)
8          MR. BENNETT:  Do you have one for me?
9          MR. STORMS:  (Distributing Exhibit 25.)
10 BY MR. BENNETT:
11 Q.  This is training materials that were given to us
12     by the City of Minneapolis on hobbles, maximum
13     restraint...
14 A.  Excuse me.
15 Q.  Is -- did you get -- have you seen this
16     PowerPoint in your training?
17 A.  Probably.
18 Q.  Okay.  You had the use-of-force training that
19     includes this?
20 A.  I'm sure that I have.
21 Q.  All right.  And the...  You see these...  It
22     says, "Any individual who chooses to restrain
23     someone may be charged and found to be
24     responsible for the intended or unintended
25     impact."  Correct?

19 (Pages 70 to 73)

Timothy Callahan
1/30/2012

74

1   A.   What -- where are you reading from?
2   Q.   (Pointing to exhibit.)
3   A.   Oh.  Is this the correct page?
4   Q.   (Nodding.)
5        You've been told that?
6   A.   I am not familiar with what this is coming from.
7   Q.   Well, this is what's been given to us by the
8        Minneapolis Police Department as part of your
9        training.  Are you --
10  A.   Is this for police officers?
11  Q.   Yeah.
12  A.   Or for citizens?
13  Q.   Police officers.
14  A.   So this isn't -- this isn't part of a citizen's
15       arrest part?
16  Q.   No.
17  A.   I'm not familiar with it.
18  Q.   Well, is it -- is it true that in 4th Amendment
19       work and use-of-force training that any use of
20       force or restraint should be necessary,
21       reasonable and valid?  You've been trained that
22       a hundred times, haven't you?
23  A.   Yes.
24  Q.   Okay.  And the next -- the next PowerPoint slide
25       says, "When there is a restraint-related death

75

1        the responsibility of those who restrain the
2        individual will depend on the cause of death."
3        Do you see that?
4   A.   I don't -- where did you get -- I'm not sure
5        where you got -- I don't know where you got this
6        from.
7   Q.   Have you seen that before?  Were you told that?
8   A.   I don't know if I've seen it before.
9   Q.   All right.
10  A.   It doesn't --
11  Q.   Well, --
12  A.   It doesn't look like something that came from --
13       it looks like something that would be out of the
14       citizen's arrest portion of the...
15       I'm not familiar with it.
16  Q.   Okay.  Have you been taught not to remain on top
17       of any subject after the subject has been
18       restrained?
19  A.   I'm sorry.  Say again.
20  Q.   Have you been taught not to remain on top of a
21       subject after the subject has been restrained?
22  A.   No.
23  Q.   Have you been taught that any subject you
24       restrain should be put on the side or in an
25       upright position?

76

1   A.   I'm sorry.  Say again.
2   Q.   Okay.  Have you been taught that any subject you
3        restrain should be put on his or her side or in
4        an upright position?
5   A.   No.
6   Q.   Have you been taught that you must remain --
7        must maintain constant observation of someone
8        who is being restrained?
9   A.   I'm not sure what context you're...  No.
10  Q.   Okay.  Now your shift ended at 4:30; correct?
11  A.   Yes.
12  Q.   What time did you get this call?
13  A.   Sometime around 4:00 P.M. or a little before.
14  Q.   Okay.
15  A.   I think.
16  Q.   Timothy Gorman was your partner for that shift?
17  A.   Yes.
18  Q.   How often had you worked with Gorman in the
19       past?
20  A.   We had been partners for approximately I think
21       9 months at that point.
22  Q.   Are you still partners today?
23  A.   We still work on the same shift, yes.
24  Q.   Are you still partners today?
25  A.   No.

77

1   Q.   In September of 2010 were you friends?
2   A.   We were friendly.  We didn't hang out outside of
3        work together.
4   Q.   Never?
5   A.   No.
6   Q.   Never went to have a beer with him or go
7        shoot --
8   A.   I --
9   Q.   -- with him?
10  A.   -- think he was at a retirement get-together,
11       the same retirement get-together that I was one
12       time.
13  Q.   And that's --
14  A.   But I don't even know if that was before.
15  Q.   That's all, though?
16  A.   Yeah.
17  Q.   You didn't socialize with him?
18  A.   No.
19  Q.   And how did it come about that you're no longer
20       partners?
21  A.   It was just a shuffling of squads.
22  Q.   Okay.  Who is your partner now?
23  A.   Do you want their names?
24  Q.   Yeah.
25  A.   Officer Reimer and Officer Gingrich.

20 (Pages 74 to 77)

Timothy Callahan
1/30/2012

78

1  Q.   Do your families know each other, yours and
2       Gorman?
3           MS. FUNDINGSLAND:  I'm sorry, I didn't
4       hear that one.
5  BY MR. BENNETT:
6  Q.   Do your families know each other's families?
7  A.   My wife knows who he is.  I mean she doesn't
8       know him.
9  Q.   Okay.  Showing you Exhibit 26.  Have you seen
10      this before?
11 A.   I don't recall if I've seen it before or not.
12 Q.   You know what they are...  You know what an
13      Incident Detail Report is, don't you?
14 A.   I believe so, yes.
15 Q.   And this is the Incident Detail Report for
16      the --
17 A.   Call.
18 Q.   -- the matter we're here?
19 A.   Yes.
20 Q.   It shows that Unit 110, that was you and Gorman,
21      was assigned at 3:49:44, almost 3:50; correct?
22 A.   Okay.
23 Q.   And it -- it shows...  You don't have any reason
24      to disagree with that; correct?
25 A.   No.

79

1  Q.   Where were you at the time you received the
2       dispatch?
3  A.   I think we were -- I think we were at the
4       1st Precinct station.
5  Q.   How far away is that?
6  A.   (Pausing.)
7  Q.   That's the downtown command precinct; correct?
8  A.   Yeah.  Seven, eight blocks.  I don't know.
9  Q.   Kind of difficult --
10 A.   Not far.
11 Q.   Was it difficult to get to at that time of day?
12 A.   It did take a little time to get there because
13      of traffic.
14 Q.   And it shows you arrived at -- that you were
15      en route at 15:52:51 or about 3:53; correct?
16      P.M.?
17 A.   Yes.
18 Q.   And it shows you arrived at a little after
19      4:00 o'clock or 16:00 and 25 seconds.
20 A.   Okay.  Yep.
21 Q.   Any reason to disagree with that?
22 A.   No.
23 Q.   My understanding of Exhibit 27 [sic], based on
24      other depositions we've done in other cases, is
25      that you did not mark your arrival manually or

80

1       through Dispatch, but your arrival was
2       automatically marked through your GPS system; do
3       you agree with that?
4  A.   I don't recall how we arrived.
5  Q.   Or how they got that time?
6  A.   I don't recall.
7  Q.   Okay.  Between the time you received the initial
8       information from Dispatch and when you arrived
9       at the YMCA you did not receive any additional
10      information related to David Smith or what was
11      ongoing at the YMCA; correct?
12 A.   Other than what was in the "Comments" of the
13      call are you saying?
14 Q.   Yeah.
15 A.   I don't know.  I don't think so.
16 Q.   The "Comments" is what's put out on the
17      dispatch?
18 A.   The "Comments" are what the -- the caller to 911
19      tells the call-taker.  And then that gets put --
20      whatever they say is going on gets put in the
21      "Comments."
22 Q.   Well, that's not entirely true.  You don't get
23      the actual 911 call.  You get the distillation
24      from Dispatch about what the 911 call is about;
25      correct?

81

1  A.   Yeah.
2  Q.   All right.  So you didn't hear the actual 911
3       call?
4  A.   No.
5  Q.   But you get...  Obviously the information comes
6       from --
7  A.   Somewhere.
8  Q.   -- from the call, --
9  A.   Dispatcher, yeah.
10 Q.   -- but you get it from the dispatcher?
11 A.   Yes.
12 Q.   Did you enter the YMCA from the first floor or
13      the skyway level?
14 A.   First floor.
15 Q.   Were you met by anyone from the YMCA staff?
16 A.   Yes.
17 Q.   Do you know that person's name?
18 A.   I believe it was -- her -- I don't know her last
19      name, but I believe her first name is Courtney.
20 Q.   Okay.  How long did you talk to Courtney?
21 A.   A short time.
22 Q.   What additional information did you receive from
23      Courtney?
24 A.   She stated that -- to the best of my
25      recollection she stated that there was a member

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

82

1      on the 6th floor that was causing some problems
2      for a juvenile.
3   Q.   Did she -- did you have any understanding if
4      this is most likely a mental health call at that
5      time?
6   A.   I don't -- I have no idea.
7   Q.   Okay.  So by the time you and Officer Gorman
8      were traveling upstairs you don't have any
9      information that David Smith has actually
10     committed any crime at all, do you?
11  A.   No.
12  Q.   Okay.  And you have no information that he
13     physically assaulted anyone in any fashion?
14  A.   No.
15  Q.   Did you have some belief based on what they told
16     you, you were dealing with a mental health
17     issue?
18  A.   I don't know.  I don't think so.  I don't know.
19  Q.   You don't remember?
20  A.   (Pausing.)
21  Q.   You have to deal with mentally ill people in the
22     city of Minneapolis and downtown a fair amount,
23     don't you?
24  A.   Yes.
25  Q.   In fact, it's something that's done on a

83

1      reasonably regular basis?
2   A.   Yes.
3   Q.   Minneapolis actually has officers who are
4      trained specifically to deal with individuals
5      who are suffering from mental illness?  That's
6      the Crisis Intervention Team or CIT; correct?
7   A.   Yes.
8   Q.   Are you a member of CIT?
9   A.   I am not.
10  Q.   Is Gorman?
11  A.   I don't think so.
12  Q.   Did you call for a member of CIT before making
13     contact with David Smith?
14  A.   No.
15  Q.   Do you know what if any plans you had later that
16     evening?
17  A.   Ah...  I was going to watch the football game I
18     think.  I think that's all I can...  That's it.
19  Q.   Kids' football game?  NFL football game?
20  A.   NFL.
21  Q.   Okay.  I mean you...  As far as you knew, or at
22     least...  And I got from the call that perhaps
23     your wife was expecting you home in your normal
24     time after your shift stopped; correct?
25  A.   Well, she was going -- she had -- she had an

84

1      appointment, so I was letting her know that I
2      wasn't going to be home for her to make her
3      appointment.
4   Q.   Okay.  An appointment you were going to be at?
5   A.   No.  I was going to be babysitting.
6   Q.   Okay.  How -- you had kids you would have had to
7      take care of?
8   A.   Yes.
9   Q.   Okay.  Did someone from the YMCA escort you to
10     David Smith?
11  A.   I -- I believe Courtney accompanied us up to the
12     6th floor.
13  Q.   The stairs or the elevators?
14  A.   Elevator.
15  Q.   Okay.  And where was David Smith when you saw
16     him?
17  A.   He was just -- get off the elevator, he was just
18     to our left.
19  Q.   My understanding is that on the 6th floor
20     basketball court area there are three
21     essentially full-size basketball courts with
22     kind of fabric-y or plastic-y curtains that
23     separate them.
24  A.   I don't know how many basketball courts there
25     are.  There was a curtain hanging.

85

1   Q.   Okay.  So there's more than one basketball court
2      and there was a curtain that separated at least
3      the two of them?
4   A.   It would appear that way.
5   Q.   Okay.  Did you take the staff elevator then?
6   A.   I don't think so.  I think it was a regular
7      elevator.
8   Q.   Were there children playing on the courts on the
9      other side of the curtain?
10  A.   (Pausing.)
11  Q.   On both sides of the curtain?
12  A.   No.  They were on one side of the curtain.
13  Q.   What was David Smith doing when you first laid
14     eyes on him?
15  A.   Digging through a backpack or a bag or
16     something.
17  Q.   So he wasn't doing anything criminal?
18  A.   No.
19  Q.   He wasn't threatening anybody?
20  A.   Nope.
21  Q.   And at that point there's no reason to use force
22     on him at all?
23  A.   No.
24  Q.   Did you and Gorman approach him?
25  A.   We did.

22 (Pages 82 to 85)

Timothy Callahan
1/30/2012

86

1   Q.   Did you say anything to him?
2   A.   We asked him if we could speak to him.
3   Q.   What did he say?
4   A.   He didn't say anything.
5   Q.   Okay.  And that -- was that odd?
6   A.   It's -- it's a little odd.
7   Q.   It didn't appear that he was with anybody else,
8        did it?
9   A.   Not to me.
10  Q.   And you didn't receive any information or
11       observe anything that led you to believe he had
12       a weapon?
13  A.   We were not given any information.
14  Q.   And you didn't see any weapon?
15  A.   He had some small silver object in his hand.  I
16       didn't know what it was initially.
17  Q.   What was it?
18  A.   It turned out to be packets of medicine of some
19       sort.
20  Q.   Okay.  But it wasn't a gun or a knife?
21  A.   No.
22  Q.   Or anything -- any traditional weaponry of which
23       you're aware?
24  A.   No.
25  Q.   Okay.  What events occurred that led you to

87

1        eventually make physical contact with him?
2   A.   He was unresponsive to our requests to speak
3        with him.  He continued to walk away from us,
4        back away from us as we walked towards him.
5   Q.   Had you ever been trained that mentally ill
6        individuals experiencing episodes, whether
7        psychotic or, you know, schizophrenic, related
8        to their illness, don't like to be touched?
9   A.   I may have.  I don't know.
10  Q.   Okay.  Before you made contact with him had you
11       personally observed Mr. Smith do anything
12       aggressive to you?
13  A.   No.
14  Q.   In fact, he didn't do anything aggressive to you
15       before you laid hands on him; correct?
16  A.   Not that I recall.
17  Q.   All right.  And he attempted to walk away from
18       you at some point; correct?
19  A.   Initially.
20  Q.   Which basketball court was he on when he walked
21       away from you?
22  A.   If you're facing -- if you're at the elevator
23       and you're facing, he was on the right-hand
24       side.  I don't know what number it is or...
25  Q.   Was he walking in the direction of the

88

1        stairwell?
2   A.   No, he was walking in the direction -- I --
3        there may have been a stairwell over there, I
4        don't know.
5   Q.   He was walking away from you?
6   A.   Yes.  Towards the people who were on the court.
7   Q.   I think there is a -- that is how people get up
8        and down?  The people use the stairway, don't
9        they?
10  A.   I don't know.
11  Q.   Okay.  Any reason you couldn't just let him
12       leave at that point?
13  A.   He would have left without his bags.
14  Q.   Okay.  That's not illegal?
15  A.   No.  But there was no indication to me that he
16       was leaving.
17  Q.   And he was a member and not some interloper?  I
18       mean he was there --
19  A.   He was a member, yes.
20  Q.   -- according to the terms of his membership?
21  A.   Yes.
22  Q.   When he was walking away from you did you or
23       Gorman give an order for him to stop or turn
24       around?
25  A.   We asked him to stop, yes.

89

1   Q.   Did he eventually turn around and face you?
2   A.   He did.
3   Q.   You've seen the YMCA footage in that regard?
4   A.   It's a long time ago.  I haven't seen it -- I
5        just saw it once.
6   Q.   Well, did he comply with your order to turn
7        around?
8   A.   He did turn around and look at us, yes.
9   Q.   That would be compliance?
10  A.   I guess, yes.
11  Q.   What did you do after he turned around?
12  A.   As I recall, we walked up and gently laid hands
13       on him in order to escort him over towards the
14       elevators and then eventually out the door.
15  Q.   Why was it so important to put hands on him at
16       that point?
17  A.   He wasn't following -- he wasn't complying with
18       our requests to come over towards us, speak with
19       us.  We wanted to ask him what the problem was.
20  Q.   But he had turned around and faced you with
21       nothing in his hands at that point; correct?
22  A.   He wasn't responding verbally.
23  Q.   So if I don't talk...
24       I mean did you know if he was mute?
25  A.   The staff did not give us any indication that

23 (Pages 86 to 89)

Timothy Callahan
1/30/2012

90

1    would indicate he has trouble communicating.
2  Q.   Okay.
3         MR. BENNETT:  Can you get that -- cue up
4    the tape, please?
5         MS. BENNETT:  (Complying.)
6         MR. BENNETT:  This is a little harder.
7    This takes a little longer, to do the Taser...
8    So indulge me a bit here, Officer.
9         (Viewing video.)
10        MR. BENNETT:  Will you stop it there?
11        (Viewing of video ends.)
12 BY MR. BENNETT:
13 Q.   So in the sequence we saw it -- it goes -- it
14    isn't a continuous loop.  It's a choppy --
15 A.   Uh-huh.  Yes.
16 Q.   Have you seen this before?
17 A.   No.  Actually I don't recall seeing this.
18 Q.   He does turn around and face you two; correct?
19 A.   Yes.
20 Q.   And Gorman lays hands on him right there?
21 A.   Yeah.
22 Q.   All right.
23        MR. BENNETT:  Go ahead.
24        (Viewing video.)
25 BY MR. BENNETT:

91

1  Q.   Then you both -- it's when you both touch him
2    that he gets excited; correct?
3  A.   It looks like it.
4  Q.   And then you walk him out of that court into
5    this next court; correct?
6  A.   Yes.
7         MR. BENNETT:  Can you show the next
8    court?
9         MS. BENNETT:  (Retrieving video.)
10        MR. BENNETT:  What exhibit number is
11    this?
12        MR. STORMS:  28.
13        MR. BENNETT:  This thing goes so fast.
14        MS. FUNDINGSLAND:  Did you...
15    Excuse me, Bob.
16    Did you identify for the record that exhibit
17    number?  I wonder when we were --
18        MR. BENNETT:  Which one?
19        MS. FUNDINGSLAND:  Just the -- the one
20    before.
21        MR. STORMS:  The Incident Detail Report?
22        MS. FUNDINGSLAND:  No.  The tape, by
23    number.
24        MS. BENNETT:  The --
25        MR. BENNETT:  By --

92

1         MS. FUNDINGSLAND:  By exhibit number, is
2    what I'm saying.
3         MR. BENNETT:  The tape is Exhibit Number
4    -- the Y video...
5         MS. FUNDINGSLAND:  Just so we have it on
6    the record.
7         MR. STORMS:  The Y video is Exhibit 28.
8         MS. FUNDINGSLAND:  Okay.
9         MR. BENNETT:  Yeah.
10        (Viewing video.)
11        MR. BENNETT:  Can you go back a little
12    bit?
13        MS. BENNETT:  Yeah, I think --
14        MR. STORMS:  And to be clear, I made
15    both clips part of the same exhibit.
16        MS. FUNDINGSLAND:  Okay.  That's what I
17    was wondering.  All right.
18        (Playing of videotape continues.)
19        MR. BENNETT:  So this is -- this is --
20    this is prior to -- he's playing basketball in
21    this court.  And I'll just set the scene for
22    that.
23      Can you make it go as slow as you can, --
24        MS. BENNETT:  Yeah.
25        MR. BENNETT:  -- Kate?

93

1         (Viewing of video continues.)
2         MS. BENNETT:  Do you want it faster?
3         MR. BENNETT:  Yeah, a little faster
4    maybe.
5         (Viewing of video continues.)
6  BY MR. BENNETT:
7  Q.   All right.  There you're bringing him -- this is
8    where you brought him, this sequence right here;
9    correct?
10        MR. BENNETT:  Stop it, Kate, please.
11        (Viewing of video ends.)
12        (Viewing video.)
13 BY MR. BENNETT:
14 Q.   And this is before...  Is your pen camera
15    operating now?
16 A.   I -- shortly -- very soon it will be, if it's
17    not already.
18 Q.   Okay.  So it's -- I figured it was about at this
19    time.
20        MR. BENNETT:  And then they go off
21    camera; right?
22        MR. STORMS:  There's a gap in --
23        MR. BENNETT:  Yeah.
24        MR. STORMS:  -- the security footage.
25 BY MR. BENNETT:

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

94

1  Q.   And that's at the end when you see... Is that
2       Officer Gorman with his left knee on the back of
3       Mr. Smith?
4  A.   Yes.
5  Q.   Okay.  And his right knee is extended out?
6  A.   Yes.
7  Q.   And that knee would be placed putting mechanical
8       force downward on Mr. Smith?
9            MR. BENNETT:  Play a little bit...
10           (Viewing video.)
11 BY MR. BENNETT:
12 Q.   Is that correct?  The left knee?
13 A.   On his shoulder, yeah.
14 Q.   And that's where you turn him over, right there?
15 A.   Yes.
16 Q.   All right.  Did you have to get up off of him to
17      turn him over?
18 A.   Yes.
19 Q.   All right.
20           MR. BENNETT:  That's all I want with
21      that tape.
22           (Viewing of video ends.)
23           MR. BENNETT:  We need to get that
24      other -- or back into...
25 BY MR. BENNETT:

95

1  Q.   At the time he -- that -- that Gorman took --
2       touched -- first touched him, he wasn't taking
3       an aggressive stance or posture against either
4       of you, was he?
5  A.   Well, he was acting agitated.
6  Q.   He wasn't in the fighting stance?  He didn't
7       have closed fists, did he?
8  A.   No.
9  Q.   Okay.
10 A.   Not that I recall.
11 Q.   So after you puts hands on David Smith you ran
12      him around to the other side of the court -- the
13      other court; correct?
14 A.   Ran him around?
15 Q.   Walked him around?  Brought him around?  Took
16      him around?
17 A.   Okay.  Yes.
18 Q.   It looked like...  It looked to me like it
19      was -- you wanted him there with some speed; is
20      that true?
21 A.   We -- I was just trying to get him over there.
22      It was difficult.
23 Q.   At the time you took him to the other side of
24      the curtain had you made up your mind to
25      handcuff him at that point?

96

1  A.   Based on his behavior, yes.
2  Q.   And you make decisions about what you're going
3       to do based on the behavior of the person you're
4       dealing with?
5  A.   Yeah.
6  Q.   So after you brought him into the second court
7       you became involved in the struggle, both you
8       and Gorman were involved in the struggle with
9       Smith; correct?
10 A.   Yes.
11 Q.   And you recall tasering him five times?
12 A.   I don't recall tasering him five times.
13 Q.   Showing you Exhibit 34, which is the Taser
14      record...
15      You might have 34...  Well, that's 34...
16      That shows that there was --
17           (Sotto voce discussion between Katie
18      Bennett and Robert Bennett.)
19 BY MR. BENNETT:
20 Q.   -- that there were five cycles.  30, 31, 32, 33
21      and 34 in a short period of time there?
22 A.   Oh, yes.
23 Q.   The Taser...  Have you ever looked at these
24      before?
25 A.   I think so.

97

1  Q.   They never match up with the times of anything,
2       do they?
3  A.   Oh, you mean prior to this?
4  Q.   They give you the date, but they're -- they
5       always give it to you in Greenwich Meridian time
6       or --
7  A.   Yeah, something like that.  Yes.
8  Q.   So you're not surprised to see the time doesn't
9       necessarily match with either the video or what
10      you think the time was; correct?
11 A.   No.
12 Q.   Okay.  You made a decision to employ the Taser;
13      correct?
14 A.   Yes.
15 Q.   You made a comment about the Taser on the -- on
16      the pen camera video; is that right?
17 A.   Yeah.
18 Q.   What did you say?
19 A.   I have never -- I had never -- I had never
20      deployed it before.
21 Q.   Okay.  And did Gorman indicate...
22      I mean it appeared that Gorman didn't have
23      very much experience with it either, did he?
24 A.   He doesn't carry one, no.
25 Q.   And he wouldn't...  Do you now know that if

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

98

1    you're -- if you tased Katie and I held onto
2    Katie I wouldn't get tased, would I?
3  A.  Yes, I know that.
4  Q.  All right.  Gorman got away from him rather --
5    when the tasing was occurring; correct?
6  A.  (Pausing.)
7  Q.  In the video?
8  A.  Well, more so from him actually getting a probe
9    in him than anything, probably.
10  Q.  Well, didn't he say that... All right.  We can
11    go into that later.
12    Each...  Firing the probes into him was a
13    volitional act on your part?
14  A.  Yes.
15  Q.  And cycling it five times were five volitional
16    acts on your part?
17  A.  Um...  I don't know that I meant to do it five
18    times, but every time I pulled the trigger I
19    meant to pull it.
20  Q.  Okay.  And the effect was to cycle the Taser and
21    it went through the full five seconds each time?
22  A.  Yes.
23  Q.  Now you were struck in the face after the first
24    tasering; is that correct?
25  A.  Yes.

99

1  Q.  Tell me how he hit you.
2  A.  With his left hand, I believe.
3  Q.  All right.  Was it open or closed?
4  A.  It was a fist.
5  Q.  So, you know, I box some.  Was it a right cross?
6    A left hook?  A left uppercut?  Or a jab?
7  A.  A left roundhouse I would describe it as.
8  Q.  And you say he had a closed fist?
9  A.  Yes.
10  Q.  Does it look closed on the video?
11  A.  I don't know.
12  Q.  Were his feet planted?
13  A.  I don't know.
14  Q.  Was he stumbling after he got up, after being
15    tased?
16  A.  I don't think so.
17  Q.  Did he look like he was robo walking or
18    shuffling?
19  A.  I don't know what that means.
20  Q.  Do you know what a "robo walk" is?
21  A.  No.
22  Q.  Okay.  Well, did he plant his feet like
23    Joe Frazier planted his feet and hit Ali in the
24    15th round of the fight in 1970 or...
25  A.  I don't know.

100

1  Q.  Okay.  Did he look like he was on -- that he was
2    in a position of balance to hit you when he hit
3    you?
4  A.  I don't know how he was balanced.
5  Q.  Okay.  You've been hit in the face prior to
6    that, haven't you?
7  A.  Rarely.
8  Q.  Well, how many times have you been hit?
9  A.  Five.
10  Q.  Did you ever box or wrestle?
11  A.  No.
12  Q.  Did it look like he just flailed at you with his
13    hand from his hip, all the way around to hit
14    you?
15  A.  No.
16  Q.  Okay.  You eventually got him into a prone
17    position; correct?
18  A.  Excuse me.
19    Yes.
20  Q.  You swung your right leg over his body,
21    straddling his buttocks and legs?
22  A.  Yes.
23  Q.  And that was something you chose to do?
24  A.  Yes.
25  Q.  That was a volitional act?

101

1  A.  Yes.
2  Q.  And it was equally true that you chose to remain
3    straddling or sitting on his legs for the period
4    of time that you did?
5  A.  Yes.
6  Q.  Okay.  I'd like to show you Exhibits 30 and 33.
7    These are the MPD documentations of the
8    pen camera video.
9    Have you ever seen these before?
10  A.  No.
11  Q.  If you want to take a few minutes to look at
12    those.  And I might as well have you -- and you
13    can look at Exhibit 31 if you need to, as well.
14    So Exhibits 30, 31 and 33.
15    MR. BENNETT:  Why don't we go off the
16    record for 5 minutes and let him take a look at
17    those things.
18    Because I'm going to be asking you some
19    questions about them.
20    Off the record at 10:52.
21    (Recess taken.)
22    MR. BENNETT:  Go to Exhibit 15, please.
23    (Exhibit displayed.)
24  BY MR. BENNETT:
25  Q.  Just for...  You don't...  This is...

26 (Pages 98 to 101)

Timothy Callahan
1/30/2012

---

**102**

1    Dr. Baker prepared this for Ms. Fundingsland
2   and myself, among others.
3    And his video recap is:
4    "Start of [the] first TASER cycle.
5    "End of [the] last TASER cycle.
6    "Handcuffed with knee on back.
7    "Last voluntary sound.
8    "Sonorous breathing starts.
9    "Sonorous breathing ends."
10   He also testified that's the same, agonal
11  breathing is the death rattle.
12   "Knee still on back.
13   "Rolled onto back.
14   "CPR starts."
15    MR. BENNETT:  Why don't we -- why don't
16  we play Dr. Baker's tape first.
17  BY MR. BENNETT:
18  Q.   And then I want you to -- and then I'll ask you
19  questions about Exhibit 31, 33 and that tape.
20    MR. BENNETT:  This is Dr. Baker's tape.
21    (Viewing video.)
22    MR. BENNETT:  Stop it.
23    MS. FUNDINGSLAND:  This is almost
24  painful.  It's too loud.
25    (Viewing of video ends.)

---

**103**

1    MR. BENNETT:  Can you back it up just a
2   little bit?  I want to make sure that's him.
3    MS. FUNDINGSLAND:  Did you get it fixed?
4    MR. STORMS:  I think so.
5    MS. FUNDINGSLAND:  Good.  Because it's
6   so loud it distorts things.
7    MR. BENNETT:  Go now, but when I tell
8   you to stop it, stop it.
9    (Viewing video.)
10    MR. BENNETT:  Stop right now.
11    (Viewing of video ends.)
12  BY MR. BENNETT:
13  Q.   He has not hit you yet, has he?
14  A.   I don't think so.
15  Q.   This is him just prior to hitting you?
16  A.   Yes.
17  Q.   All right.
18    MR. BENNETT:  Go ahead.
19    (Viewing video.)
20    MR. BENNETT:  No, it went through...
21    Go back further.
22    (Viewing of video ends.)
23    MR. BENNETT:  I want you to go back to
24  where he said he...
25    MR. STORMS:  Just --

---

**104**

1    MS. BENNETT:  Yeah, it gets --
2    MR. BENNETT:  It gets screwed up if you
3   don't play it from the beginning?
4    MR. STORMS:  Sometimes, yeah.
5    MR. BENNETT:  All right.
6    (Viewing video.)
7    MR. BENNETT:  Turn it down a little bit.
8    MR. STORMS:  (Adjusting audio volume.)
9    MR. BENNETT:  I'm going to ask a couple
10  questions.
11  BY MR. BENNETT:
12  Q.   That's him hitting you right there?
13  A.   Yeah.
14  Q.   Okay.  All right.
15    MR. BENNETT:  Run it through.
16    You can turn it back up a little bit.
17    MR. STORMS:  (Adjusting audio volume.)
18  BY MR. BENNETT:
19  Q.   That's Gorman's right knee; right?
20  A.   It looks like it.
21  Q.   Okay.
22    What was that?
23  A.   I don't know.
24  Q.   Is that both knees down?
25  A.   I don't know.

---

**105**

1  Q.   What was that?
2  A.   I don't know.
3  Q.   That's Gorman, right, saying that?
4  A.   Yes.
5  Q.   That's his left knee then, right, that's on his
6   back?
7  A.   It looks like it.
8  Q.   That's between his scapula, that knee, isn't it?
9  A.   It looks like it's on the shoulder to me.
10  Q.   It does, huh?
11  A.   Isn't that the scapula?
12    (Viewing of video continues.)
13    MR. BENNETT:  All right.  2 minutes
14  later.  Okay.
15    Finish that.
16    (Viewing of video continues.)
17  BY MR. BENNETT:
18  Q.   Here's...  You're still straddling him at this
19  point; correct?
20  A.   I think so.
21    (Viewing of video continues.)
22  BY MR. BENNETT:
23  Q.   Are you checking his wrist for a pulse there?
24  A.   Yes.
25  Q.   You didn't get any, did you?

---

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

106

1    A.   No.
2         (Viewing of video continues.)
3    BY MR. BENNETT:
4    Q.   And that's when you turn him over?
5    A.   Yes.
6    Q.   Okay.  That's Gorman?
7    A.   Yep.
8    Q.   You take a pulse from someplace else then?
9    A.   Neck, I think.
10   Q.   Carotid?
11   A.   I think so.
12        (Viewing of video continues.)
13   BY MR. BENNETT:
14   Q.   That's you actually starting chest compressions?
15   A.   Yes.
16        (Viewing of video ends.)
17        MR. BENNETT:  All right.  I think that's
18   the end of his tape.
19   BY MR. BENNETT:
20   Q.   You've had the chance to look at Exhibit 30 and
21        Exhibit 31 and Exhibit 33?
22   A.   Yes.
23   Q.   Do you -- do you have any quarrel with the --
24        let's start with Exhibit 30, about the -- about
25        the transcript -- or about what they say is

107

1         happening or what they say is said on
2         Exhibit 30?
3    A.   I don't -- I don't know that it's a hundred
4         percent word-for-word, but I don't have a
5         quarrel with it.
6    Q.   Are you -- do you -- can you think of something
7         you said that isn't on there or something they
8         say is on there that you didn't say?
9    A.   One second.
10        (Reviewing exhibit.)
11        On Page 4, this 10:18 and 10:20, I don't
12   recall that.
13   Q.   All right.
14   A.   At least not in that -- whatever...
15   Q.   You don't recall -- okay.  We can play that.
16        All right.  You don't recall Gorman saying
17   that?
18   A.   No.
19   Q.   Do you call Mr. -- Officer Gorman "Jimi"?
20   A.   It's a nickname.
21   Q.   Okay.  I mean I thought I heard "Jimi," not
22   "Timmy"?
23   A.   Yeah.  It's a nickname.
24   Q.   All right.  You were referring to Officer Gorman
25        by the word nickname -- by the word "Jimi," --

108

1    A.   Yes.
2    Q.   -- his nickname?
3         Other than that do you have any --
4    A.   No.
5    Q.   How about the Taser video?
6         MS. FUNDINGSLAND:  Are you talking about
7    Exhibit 31?
8         MR. BENNETT:  Exhibit 32 [sic], the
9    Taser video timeline of events prepared --
10        MR. OSBORNE:  33.
11        MS. FUNDINGSLAND:  Are you --
12        THE WITNESS:  I don't think so.
13        MS. FUNDINGSLAND:  Wait a minute.  Mine
14   says "33."
15        MR. BENNETT:  It is 33.
16        MS. FUNDINGSLAND:  Oh.  I thought you
17   said "32."
18        MR. BENNETT:  No.  I'm sorry.  If I did,
19   I misspoke.
20        MS. FUNDINGSLAND:  I'm going to
21   interpose an objection.
22        He hasn't had a chance to -- I know you gave
23   him some time to look through this, but there's
24   a lot of information on Exhibits 30, 31 and 33,
25   so I'm just going to interpose a standing

109

1    objection to asking him questions to make him
2    commit to whether this is correct or not.
3         MR. BENNETT:  All right.  I don't think
4    that's a legal grounds for objection, but you
5    can do whatever you want.
6         MS. FUNDINGSLAND:  Lack of foundation
7    then.
8    BY MR. BENNETT:
9    Q.   We took some time off for you to read this;
10   correct?
11   A.   The time just now?
12   Q.   Yeah.
13   A.   Yeah.
14   Q.   And you're, I would guess, most familiar with
15        the times and the words that are on the
16        pen camera video; correct?
17   A.   What now?
18   Q.   You're most familiar with the timeline of events
19        and the words that appear on the pen camera
20        video?
21   A.   Yes.
22   Q.   How many times have you looked at that?
23   A.   This (pointing to exhibit)?
24   Q.   No.  The pen camera video.
25   A.   I don't know.

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

110

1   Q.   More than 20?
2   A.   No.
3   Q.   How many times have you and your wife looked at
4        it?
5   A.   Once.
6   Q.   Okay.  When you went home that night on the 9th
7        did you think that Smith was dead?
8   A.   No.
9   Q.   Did you think that Smith was dead when you told
10       your wife that you and Jimi killed a guy?
11  A.   Based on the fact that I couldn't find a pulse.
12  Q.   So that's a "Yes"?
13  A.   Yes.
14  Q.   Had they resuscitated his heart by the time you
15       left?
16  A.   I don't know.  They were working on him.
17  Q.   Okay.  You knew he'd been without a pulse or
18       breath for a significant period of time;
19       correct?
20  A.   I did not know how long he had been without a
21       pulse or a breath.
22  Q.   I didn't -- well, you knew he'd been more than
23       4 minutes without a pulse or breath, didn't you?
24  A.   No, I did not know that.
25  Q.   You never got a pulse or breath while you were

111

1        administering CPR to him: correct?
2   A.   When I was checking?
3   Q.   Yeah.
4   A.   No.
5   Q.   And as far as you know the EMTs while they were
6        there didn't get a pulse or breath, did they?
7   A.   No, I think they did get a pulse at some point.
8   Q.   At some point while --
9   A.   After they worked on him.
10  Q.   Before you left?
11  A.   I... I think so.
12  Q.   Okay.  Well, you believed in your heart of
13       hearts when you told your wife that you and Jimi
14       killed a guy that he was dead, though; correct?
15  A.   No.  I said I -- I thought that could be the
16       case.
17  Q.   Well, you...
18  A.   And I didn't believe that at the time that we --
19       the way that you're using the word "killed him."
20  Q.   I'm just talking about the way you used it.
21  A.   I know.  That's not the way I meant it, the way
22       that you're implying it.
23  Q.   Well, you wouldn't kid about that, would you,
24       certainly not to your wife?
25  A.   No.  It's just -- it was just a word that I

112

1        used, but I didn't believe that we had caused
2        his death.
3   Q.   Okay.  What did you think he died from?
4   A.   I don't know.
5   Q.   Looking at Exhibit 30...  Let's focus on the --
6        after the Taser the things that you say.
7             After you get him handcuffed you're on --
8        you're straddling his buttock, upper thigh area;
9        correct?
10  A.   Yes.
11  Q.   And Gorman's knee -- right knee is on his -- on
12       Smith's back; correct?
13  A.   I think so.
14  Q.   And you say, "Stop."  What is that referring to?
15  A.   Where are you looking at?  First page?
16  Q.   The first thing you say after the tasing.
17  A.   I'm saying, "Stop" and -- to Mr. Smith.
18  Q.   Okay.
19  A.   To stop resisting.
20  Q.   All right.  And then you say, "Punched me in the
21       face" at 1:22; correct?
22  A.   I believe I said, "He punched me in the face."
23  Q.   All right.  You said, "He punched me in the
24       face"?
25  A.   Yeah, I believe so.

113

1             MR. BENNETT:  Give me Exhibit 31.
2             MR. STORMS: (Complying.)
3   BY MR. BENNETT:
4   Q.   "He punched me in the face."  That's what the
5        court reporter has, too.
6             All right.  And then, "Squad 110:  We need a
7        supervisor."
8             And you would call -- you're supposed to
9        call for a supervisor if you're using maximal
10       restraint; correct?
11  A.   No.  We notify a supervisor if we use force.
12  Q.   Well, Exhibit 24, paragraph 3, requires a
13       supervisor be called; correct?
14  A.   Are you referring to maximal restraint again?
15  Q.   Yep.
16  A.   Let's see.
17            (Reviewing exhibit.)
18            I'm sure it does.  It's -- maximal restraint
19       would be considered force.
20  Q.   Okay.  And then you said, "We need an ambulance
21       right now.  Start Ambulance Code 2."  Correct?
22  A.   (Reviewing exhibit.)
23            I -- are you saying that I said, "We need an
24       ambulance right now" to Dispatch?
25  Q.   Yeah.  Did -- didn't you say that?

Timothy Callahan
1/30/2012

114

1   A.   No.  I don't believe I did.
2   Q.   Did you say, "Do we need an ambulance for him"?
3   A.   I may have said that.
4   Q.   And Gorman says, "Yeah, probably"?
5   A.   Okay.
6   Q.   And an ambulance was started, Code 2; correct?
7   A.   Yes, I believe so.
8   Q.   Code 2 is "come when you can" basically?
9   A.   Code 2 is we need an ambulance to come, but they
10       don't have to come with their lights and sirens
11       on.
12  Q.   It's not an emergency?
13  A.   Yes.
14  Q.   Code 3 is an emergency; right?
15  A.   Yes.
16  Q.   So then the moaning and yelling starts.  You see
17       that -- at least that's -- and you heard him
18       moaning or yelling, didn't you?
19  A.   Yes.
20  Q.   Did you do anything to check his pulse then?
21  A.   No.
22  Q.   Did you do...  Did you talk about his moaning or
23       yelling with Gorman?
24  A.   Not that I recall.
25  Q.   Did Gorman talk about his moaning or yelling

115

1        with you?
2   A.   Not that I recall.
3   Q.   Did you voice...  As far as you know during that
4        period Gorman's knee or knees are still on his
5        back, Smith's back; correct?
6   A.   What now?
7   Q.   During the moaning and yelling, as described
8        here in Exhibit 30, Gorman's knee or knees are
9        still on his back: correct?
10  A.   I -- I wasn't paying attention.
11  Q.   Okay.  Well, you didn't tell Gorman at any time
12       to take his knee off his back, did you?
13  A.   Not that I -- no.
14  Q.   And as far as you were concerned him kneeling on
15       Smith's back was acceptable to you?
16  A.   Yes.
17  Q.   All right.  What police purpose was being
18       accomplished by his knee being on -- Gorman's
19       knee being on Smith's back?
20  A.   We were holding him down so that we didn't have
21       to fight with him any further.
22  Q.   Did you do anything to check his breathing
23       during the moaning or yelling period?
24  A.   No.
25  Q.   Did you talk about his health or welfare at all

116

1        during that period with Gorman?
2   A.   I don't think so.
3   Q.   Is there any manifestation in the audio or
4        visual evidence that you've seen that indicates
5        that you had any concern for Mr. Smith's welfare
6        at all?
7   A.   I think there's one point where I said, "Is he
8        breathing?"
9   Q.   All right.  That's the first manifestation?
10  A.   I think so.  It wasn't -- it wasn't a serious
11       question.
12  Q.   All right.  Why wasn't it a serious question?
13  A.   Because he just wasn't responding to us or
14       talking to us, so I just made a comment, "Is he
15       breathing?"  But I wasn't concerned whether he
16       was really breathing.
17  Q.   Well, if a person is nonresponsive that's a
18       problem, isn't it?
19  A.   People are nonresponsive all the time and they
20       don't talk to us when they don't want to.
21  Q.   And they don't talk to you if they're
22       unconscious?
23       MS. FUNDINGSLAND:  Objection, --
24  BY MR. BENNETT:
25  Q.   Correct?

117

1        MS. FUNDINGSLAND:  -- argumentative.
2   BY MR. BENNETT:
3   Q.   And only a few of them talk to you while they're
4        dead?
5        MS. FUNDINGSLAND:  Same objection.
6   BY MR. BENNETT:
7   Q.   I mean they don't talk to you if they're dead
8        either, do they?
9   A.   No.
10  Q.   Okay.  So during this moaning or yelling period
11       you did nothing to determine whether or not
12       Mr. Smith was breathing; correct?
13  A.   No.
14  Q.   That's not correct?  What did you do?
15  A.   No, I said I don't --
16  Q.   You --
17  A.   I mean no, I don't think we -- I don't think I
18       did.
19  Q.   And nor did Gorman, to the best of your
20       knowledge?
21  A.   I don't know.
22  Q.   When he was moaning or yelling did you think his
23       breathing was distressed?
24  A.   No.
25  Q.   Did you see Gorman do anything during the

30 (Pages 114 to 117)

Timothy Callahan
1/30/2012

118

1      moaning or yelling period, from the time it
2      started until the time it stops, did you see him
3      do anything to check Smith's breathing or pulse?
4   A.  I don't think so.
5   Q.  All right.  Did he appear to be fighting for
6      breath when he was moaning and yelling?
7   A.  Not to me.
8   Q.  He never responds to any verbal discussion or
9      any verbal talk of Gorman, does he?
10  A.  He only responded to us verbally one time.
11  Q.  When was that?
12  A.  Right before he punched me in the face.
13  Q.  What did he say?
14  A.  He smiled at me and said, "Do it."
15  Q.  All right.  And what did that mean to you?
16  A.  I had just told him if he didn't stop resisting
17     and get down on the ground I was going to tase
18     him again.
19  Q.  All right.  Then do you see the "GROANING" --
20     on page 2 do you see the "GROANING"?
21  A.  Yes.
22  Q.  And that's what Baker refers to as sonorous, or
23     agonal breathing, or the death rattle.  He's
24     called it all three things.  Do you see that?
25  A.  It doesn't say what you said, but I see where

119

1      you're referring to the arrow with the
2      "GROANING" on this exhibit.
3   Q.  And in Exhibit 15 it's "sonorous breathing";
4      correct?
5   A.  I accept that that's what you're saying, yeah.
6   Q.  And he also calls it "agonal" in the Ombudsman
7      Report and his testimony.
8      Do you know what "agonal breathing" is?
9   A.  I accept that those are the terms that you are
10     using, yes.
11  Q.  And that those are synonymous with "death
12     rattle"?
13  A.  Okay.
14  Q.  All right.  Well, while he's doing that,
15     groaning here, sonorous breathing, agonal or
16     death rattle, no matter what you call it, --
17  A.  Okay.
18  Q.  -- it lasts for a period of something like
19     24 seconds, 25 seconds.
20  A.  Okay.
21  Q.  Exhibit 15 shows a...
22     MR. BENNETT:  Can you go back and forth
23     very easily?
24     (Exhibit displayed.)
25     MR. BENNETT:  Okay.  Let me just see it

120

1      here.  Go to the first page.
2      (Exhibit displayed.)
3   BY MR. BENNETT:
4   Q.  He has it at 29 seconds, Dr. Baker.  And this
5      has it on something of the order of 24 seconds.
6      But you heard him making those lower sounds
7      on the videotape?
8   A.  Just now?
9   Q.  Yes.
10  A.  Yes.
11  Q.  And every time you've listened to it?
12  A.  Do I hear him making noises?
13  Q.  Yes.
14  A.  Yes.
15  Q.  Do you hear him making... Do you know what the
16     sonorous breathing noises were?  Do you remember
17     those?
18  A.  Yes.
19  Q.  Had you ever heard those in any human being
20     before?
21     MS. FUNDINGSLAND:  Objection, asked and
22     answered.
23     THE WITNESS:  I probably have.
24     MR. BENNETT:  All right.
25  BY MR. BENNETT:

121

1   Q.  In this time, though, you -- you're talking
2      about -- during the period -- at least on
3      exhibit -- you -- you -- instead of responding
4      to that breathe -- that sound, you are talking
5      about what kind of drugs he might have been on,
6      whether -- you can't believe he punched you in
7      the face.  And that he -- you know, you're
8      having a discussion about that and -- and such;
9      correct?
10  A.  Yes.
11  Q.  All right.  Again, is there any manifestation
12     of -- on your part for care for David Smith?
13  A.  I did not recognize through the noises that
14     you're indicating that there was reason to check
15     on him.
16  Q.  All right.  You did not check on his breathing
17     or pulse in that period, did you?
18  A.  No.
19  Q.  And... Nor did Gorman to the best of your
20     knowledge?
21  A.  I don't know.  I don't think so.
22  Q.  Well, he's right in front of you.  Did you see
23     him?
24  A.  I don't think so.
25  Q.  Okay.  And -- then the agonal breathing

31 (Pages 118 to 121)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

122

1 stops. And did you hear any other sounds from
2 him after that at all?
3 A. I don't know.
4 Q. You don't remember?
5 A. I don't.
6 Q. Dr. Baker said that he did not. I'm just trying
7 to find out: Did you hear any sounds? I didn't
8 hear any on the tape. Did you -- do you
9 remember any?
10 A. I don't recall at the time if... If...
11 Q. And again, after the groaning stops you're
12 thinking about what you can charge him for;
13 right? How many times you were tased?
14 MS. FUNDINGSLAND: Object to the form of
15 the question.
16 THE WITNESS: (Pausing.)
17 Can you repeat it?
18 BY MR. BENNETT:
19 Q. Well, during this time after the -- his -- the
20 -- what -- the involuntary breathing, or
21 sonorous breathing, or agonal breathing, or
22 death rattle stops, you talk about -- about how
23 many times you tased him? You and Gorman talk
24 about that; correct?
25 A. Yes.

123

1 Q. The knee is still on the back according to the
2 videotape?
3 A. Okay.
4 Q. And then you say, "Are you going to talk to us,
5 man? Hey, are you going to talk to us? What's
6 wrong with you?"
7 And he doesn't respond at all, does he?
8 A. No.
9 Q. And you don't even -- you don't hear him
10 breathing at this point? You don't hear any
11 sound from him at all?
12 A. He's not responding, no.
13 Q. Okay. And at that point you're still sitting on
14 him and Gorman is still on his back?
15 A. I'm still sitting on his lower, ah, extremities,
16 yes.
17 Q. And when Gorman -- Gorman says to you, "That was
18 a hell of a fight"; right?
19 A. Somewhere he does, yes.
20 Q. Yeah. You -- you two are talking to each other
21 while you're on David Smith; correct?
22 A. Yes.
23 Q. Did you do anything between 3:25 and 5:29,
24 according to Exhibit 30, to check on his
25 breathing or pulse?

124

1 A. Between when and when?
2 Q. 3:25 and 5:29. And I'm not vouching for the
3 times, but that -- that shows the amount of
4 elapsed time.
5 A. I don't believe I did.
6 Q. Okay. Did you observe Gorman do anything to
7 determine his breathing or pulse?
8 A. I don't believe so.
9 Q. What was your response to his
10 non-responsiveness?
11 A. When?
12 Q. What did you do? When -- when you say, "Are you
13 going to talk to us, man? Hey, are you going to
14 talk to us? What's wrong with you?" And he
15 doesn't say anything. Do you do anything other
16 than remain seated on him?
17 MS. FUNDINGSLAND: Object to the form of
18 the question.
19 THE WITNESS: I was under the impression
20 at that time that he was simply ignoring us.
21 BY MR. BENNETT:
22 Q. Well, he wasn't trying to get up, was he?
23 A. No, he wasn't.
24 Q. And this was long past when you say in your
25 statement to Sergeant Klund and Sergeant Fors

125

1 that he'd been handcuffed and had calmed down a
2 bit. Was not resisting as hard. It was a long
3 time after that; correct?
4 A. I don't know how -- exactly how long.
5 Q. Well, this was... If he's handcuffed at --
6 A. We're talking a matter of --
7 Q. 4 or 5 minutes.
8 A. -- minutes.
9 Not a long time, but a matter of minutes.
10 Q. Well, if you're not getting air it's a long time
11 I suppose. I guess it's all...
12 It's a matter of 5 or 6 minutes, though,
13 isn't it?
14 A. I don't know the exact number of minutes.
15 Q. What was the police purpose for staying on top
16 of him after he'd calmed down a bit and was not
17 resisting as hard?
18 MS. FUNDINGSLAND: Objection,
19 repetitious.
20 THE WITNESS: Because he had indicated
21 with his past behavior that he could pretend to
22 be done and then lash out.
23 BY MR. BENNETT:
24 Q. Well, how could... When did he pretend to be
25 done and lash out?

32 (Pages 122 to 125)

Timothy Callahan
1/30/2012

126

1  A.   After he was tased the first time.  When he
2       stood up.  And then he was -- he seemed to be
3       calmer at that point.
4  Q.   Okay.  So that was -- that was the police
5       purpose for -- for not letting him give up
6       basically and continuing to restrain him?
7            MS. FUNDINGSLAND:  Objection,
8       repetitious.
9  BY MR. BENNETT:
10  Q.   Well, you're supposed to stop using force if he
11       gives up; right?
12  A.   We did stop using force.
13  Q.   Okay.  You don't think your sitting on him
14       and -- and Gorman's kneeling on his back is
15       using force, is that what you're saying?
16  A.   In the same manner that his hands was
17       handcuffed behind his back is force.
18            If you're going to equate that with force,
19       then his handcuffs being behind his back were
20       force, as well.
21  Q.   Well, you understand that he was killed by
22       mechanical asphyxia and the force of the
23       mechanical asphyxia is that which is driving him
24       to the floor and stopping him from breathing; do
25       you understand that?

127

1            MS. FUNDINGSLAND:  Objection,
2       repetitious.
3            THE WITNESS:  We were restraining him to
4       prevent any further fighting.
5            MR. BENNETT:  And that you did.
6            MS. FUNDINGSLAND:  Objection, --
7  BY MR. BENNETT:
8  Q.   When was the last --
9            MS. FUNDINGSLAND:  -- argumentative.
10  BY MR. BENNETT:
11  Q.   When was the last time he actually did anything
12       that you could construe as fighting with you?
13  A.   I don't know.
14  Q.   Was it after he was handcuffed?
15  A.   No.
16  Q.   He didn't fight with you after he was
17       handcuffed, did he?
18  A.   He was moving around after he was handcuffed.
19  Q.   That's not fighting with you, is it?
20  A.   Well, it's...  When someone is sitting on your
21       legs and someone is on your upper torso, it's
22       hard to move around, but he was moving around.
23  Q.   Well, wouldn't he be moving around, trying to
24       get a breath?
25            MS. FUNDINGSLAND:  Objection,

128

1       foundation.
2  BY MR. BENNETT:
3  Q.   I mean wouldn't you expect that he would...
4            Well, you two were both huffing and puffing,
5       weren't you?  You can hear you.
6  A.   Yes.
7  Q.   Okay.  He had been in a confrontation with both
8       of you; correct?
9  A.   Yes.
10  Q.   He'd been tased five times?
11  A.   Yes.
12  Q.   You understood that he would probably be sucking
13       for air, too, wouldn't you?
14  A.   I would assume.
15  Q.   Okay.  Yeah.  I mean you're taught about factors
16       that can complicate arrest situations and
17       restraint: correct?
18  A.   For instance, in the maximal restraint, yes.
19  Q.   Well, you're taught -- and you're taught
20       generally that all -- that -- you're taught to
21       avoid certain things if a person is mentally
22       ill, if they've had neuromuscular disruption, if
23       they've been in a ground fight, that sort of
24       thing; correct?  All of those are factors that
25       complicate arrests and you have to be sure that

129

1       the person doesn't -- doesn't get hurt or expire
2       on your watch?
3  A.   No.
4  Q.   Okay.  All right.  When you first say, "Is he
5       breathing?"  Do you do anything to determine
6       whether he's breathing?
7  A.   No.  As I said before, I didn't -- that was not
8       a serious question.
9  Q.   It wasn't?
10  A.   (Pausing.)
11  Q.   Why?
12  A.   Because I thought he was breathing.
13  Q.   How did you...  Why did you think he was
14       breathing?
15  A.   I just assumed he was breathing.
16  Q.   Okay.
17  A.   I've never had a situation like this before
18       where somebody wasn't breathing.
19  Q.   And then you go on to talk about, "My jaw hurts
20       on this side."  Correct?
21  A.   Yes.
22  Q.   You're still straddling him when you say, "Is he
23       breathing"?
24  A.   Yes.
25  Q.   You're still straddling him when he [sic] says,

33 (Pages 126 to 129)

Timothy Callahan
1/30/2012

130

1      "My jaw hurts on this side"?
2   A.   Yes.
3   Q.   When you say, "Well, I hope we're not going to
4        wait for somebody to get done with roll call,"
5        what do you mean?
6   A.   Well, we weren't going anywhere until a
7        supervisor got to the scene.  I didn't want to
8        wait any longer than was necessary.
9   Q.   Wait to do what?
10  A.   Have a supervisor come to the scene.
11  Q.   So you didn't want them to wait until after the
12       supervisor was done with roll call?  That's what
13       you meant?
14  A.   Well, I know how long roll calls sometimes go.
15       I didn't want to have to wait 15 or 20 minutes.
16       I was hoping a supervisor would respond
17       immediately.
18  Q.   And the reason you didn't want to wait was
19       because you had to get home to take care of the
20       kids?
21  A.   No, not at that point.
22  Q.   Okay.  Well, why didn't -- then what difference
23       would it have made?
24  A.   I didn't see it necessary to wait for a
25       supervisor to finish roll call.  I was hoping

131

1        that they would come right away.
2   Q.   Then at 6:05 you say, "My jaw hurts on this
3        side," and Gorman responds seconds later with,
4        "The whole right side of your face is all red."
5        And then you say, "Oh, mother fucker."
6        What's that about?
7   A.   I was angry about getting punched in the face.
8   Q.   Okay.  And he asked --
9   A.   I was in pain.
10  Q.   And he says, "Is that fully charged?"  He's
11       talking about the Taser?
12  A.   I don't know.  I think... Possibly.  I'm
13       assuming that's probably what he meant.
14  Q.   And you said, "Oh, yeah"?
15  A.   Well... Okay.
16  Q.   And then you say, "Oh, fuck."  Do you know
17       what --
18  A.   That's --
19  Q.   -- you're talking about?
20  A.   That was in response to the pain in my jaw.
21  Q.   Okay.  And Gorman says, "You should get looked
22       at by an ambulance."  And you respond, "I did
23       not expect that."  And you're talking about
24       there the --
25  A.   Getting punched.

132

1   Q.   You're talking about this getting punched and
2        the fight you had; correct?
3   A.   Yes.
4   Q.   And he says, "Neither did I"?
5   A.   Yes.
6   Q.   And you say, "I can't bite down.  Mother fucker,
7        you better not have broke my fucking jaw."
8        You're referring to David Smith as the
9        "mother fucker" there?
10  A.   Yes.
11  Q.   During this interlude, when you're having this
12       discussion, did you do anything to check and see
13       if David Smith was breathing?
14  A.   No.
15  Q.   If he had a pulse?
16  A.   I don't -- I don't recall --
17  Q.   Did you care if he was breathing or had a pulse
18       at that time?
19  A.   I assumed that he was breathing and had a
20       pulse --
21  Q.   That --
22  A.   -- at that time.
23  Q.   -- isn't the question.
24  A.   Did I care?
25  Q.   Yeah.

133

1   A.   Yes, I cared.
2   Q.   Did you do anything physically to manifest that
3        care that shows that -- that's evidence of any
4        care about whether he had a pulse or he had a
5        breathing --
6   A.   I did not because I thought he was.
7   Q.   Okay.  Did you see... Could you see his eyes?
8   A.   I could not.
9   Q.   That's because Smith -- that's because Gorman
10       was in the way?
11  A.   I was too far away from his head.
12  Q.   Well, he was only 5-9 or so, wasn't he?
13  A.   Yes.  His head was turned away from me.  I was
14       too far away to see over the top of him.
15  Q.   And then at 7:09 you say, "Hey, talk to us man."
16       He doesn't; correct?
17  A.   He does not.
18  Q.   Do you do anything in response to that?
19  A.   Hmm.  I -- at -- that's -- at that point that
20       I'm concerned for his well-being.
21  Q.   At the 7 plus minute mark?
22  A.   Yes.
23  Q.   But you didn't take his pulse or -- determine
24       if he was breathing until about a minute later;
25       correct?  50 seconds later?

34 (Pages 130 to 133)

Timothy Callahan
1/30/2012

134

1   A.   No.  When I asked for an ambulance to go -- for
2        Ambulance Code 3 I was concerned that he was --
3        whether he was breathing.  I didn't -- I don't
4        think it took a minute.
5   Q.   7:44 it says, "Dude, talk to me."  And then
6        you -- then you -- we looked at that on the --
7        on -- on the video.  That's when you checked his
8        wrist?  That's the first time, isn't it, on the
9        video?
10  A.   Oh, I -- okay.
11  Q.   Well, is it?
12  A.   I don't know.  Without watching the video and
13       seeing it I don't...
14  Q.   Do you remember --
15  A.   I know --
16  Q.   Did you --
17  A.   I remember what you're referring to.
18  Q.   All right.  Is that the first time that the
19       video shows you checking his pulse?
20  A.   I think so.
21  Q.   Okay.  And then you yell at Gorman about
22       10 seconds later, "Gorman.  Gorman.  Dude, I
23       don't think he's breathing."  "Dude" I think is
24       referring to Gorman; right?
25  A.   I think so.

135

1   Q.   And then at 8:11 you flip Smith over onto his
2        back.
3   A.   Okay.
4   Q.   And is that when you check the carotid pulse?
5   A.   I think so.
6   Q.   All right.  So from...  It's about...  Let's say
7        you get it at close to the 1-minute mark.
8        There's 8 minutes that you're on his back, that
9        you're seated on him?
10  A.   Um... Yes.
11  Q.   And Gorman is on his back a little less time
12       than you're seated on him; correct?
13  A.   I don't know the exact amount of time.  Less
14       time than me.
15  Q.   Okay.  You never placed David Smith on his side
16       at all, did you?
17  A.   No.
18  Q.   You voluntarily chose to keep David Smith prone,
19       chest down on the floor with your weight on him
20       and with your acquiescence in Officer Gorman
21       keeping his weight on him; correct?
22  A.   Yes.
23  Q.   As far as you know Gorman made the volitional
24       and conscious choice to kneel on Smith's back?
25  A.   Yeah -- what now?

136

1   Q.   As far as you know Gorman knelt on Smith's back
2        and that was a voluntary and conscious decision
3        on his part?
4   A.   Yes.
5   Q.   And you observed it happening in front of you
6        and voiced no displeasure in it?
7   A.   Yes.
8   Q.   Never told him not to do it?
9   A.   Yes.
10  Q.   You didn't signal with your hand not to do it?
11  A.   No.
12  Q.   Your choice of language to direct at him was --
13       to refer to him as a "mother fucker," that was
14       volitional and conscious on your part?
15  A.   Yes.
16  Q.   And indicated you were angry with him, as you
17       indicated?
18  A.   Say that again.
19  Q.   You called him a "mother fucker" because you
20       were angry with him; correct?
21  A.   I was angry about being punched by --
22  Q.   Well, he was the person that punched you and it
23       was to him --
24  A.   Yeah, but it wasn't a personal thing for me.
25  Q.   Well, you were calling him the "mother fucker";

137

1        correct?
2   A.   I used the term "mother fucker," yes.
3   Q.   And Gorman called him "a fucking mope."
4   A.   I don't recall that.
5   Q.   Okay.  Do you know what "a fucking mope" is?
6   A.   No.
7   Q.   Do you know what...  You don't know what --
8   A.   It's on this Taser video transcript, but it's
9        not on this one, --
10  Q.   Yeah.
11  A.   -- from the pen camera.
12  Q.   You're right.
13  A.   So I don't recall him saying that.
14  Q.   Okay.  You'd agree that no one checked Smith's
15       breathing for a period of several minutes after
16       he was handcuffed; correct?
17  A.   Pardon?
18  Q.   No one checked Smith's breathing for a period of
19       several minutes after he was handcuffed;
20       correct?
21  A.   I didn't think it was necessary.  He was yelling
22       and screaming.  That indicated to me that he was
23       breathing.
24  Q.   Do you have any quarrel with how Dr. Baker
25       categorized his sounds?

35 (Pages 134 to 137)

Timothy Callahan
1/30/2012

138

1  A.  No.
2  Q.  Did he yell or scream any words?
3  A.  No.
4  Q.  He never -- and you talked to him after he made
5      the sounds that Dr. Baker talked about; correct?
6  A.  He -- say again.
7  Q.  After -- after Dr. Baker's characterization of
8      his sounds, --
9  A.  Uh-huh.
10 Q.  -- voluntary and involuntary and sonorous, you
11     tried to talk to him and so did Officer Gorman?
12 A.  Yes.
13 Q.  No response; correct?
14 A.  No.
15 Q.  The --
16 A.  No verbal response.
17 Q.  The not checking his breathing for several
18     minutes after he was handcuffed is something you
19     either chose -- you chose not to do that
20     voluntarily; correct?
21 A.  I did not think it was necessary.
22 Q.  Well, do you think it was now?
23 A.  Well, I -- I --
24 Q.  Do you think it was necessary?
25 A.  I can't answer it that way now because it was --

139

1      I can only answer the way it was happening at
2      the time.
3  Q.  Did you --
4  A.  I didn't think he was having trouble breathing.
5  Q.  Do you think you neglected to do that in
6      violation of your training and policy?
7  A.  No.
8  Q.  Did you see Gorman strike Smith in the head
9      several times after he'd been handcuffed?
10 A.  No.
11 Q.  Did you see him strike him in the head at all
12     after he was handcuffed?
13 A.  I wouldn't classify what you're referring to as
14     a strike.
15 Q.  What would you call it?
16 A.  A distracting tap on the head.  It certainly
17     wasn't a blow.
18 Q.  What was its police purpose?
19 A.  Sometimes we use distracting techniques.
20 Q.  To distract him from what?
21 A.  I don't know what Officer Gorman was concerned
22     about.  Perhaps Smith's mouth was getting close
23     to his leg in a bite.  I don't know.
24 Q.  Gorman never told you that, did he?
25 A.  I -- no.

140

1  Q.  So did you just make that up?
2  A.  I was giving you a --
3  Q.  Example?
4  A.  -- possibility, yes.
5      MR. BENNETT:  Now I want to play...
6  What exhibit is the embedded?
7      THE WITNESS:  Just before you...
8  Can I --
9      MR. BENNETT:  Sure.
10     THE WITNESS:  -- use the bathroom?
11     MR. BENNETT:  Absolutely.  I'm just
12 waiting for you to tell me.
13     THE WITNESS:  Okay.
14     MR. BENNETT:  And you need to do that.
15     (Discussion held off the record.)
16     MR. BENNETT:  Off the record at 11:42.
17     (Recess taken.)
18     MR. BENNETT:  On the record now at --
19 I've got 11:54.
20     And the record can reflect -- oh, cripe.
21 Am I still hooked up to audio?
22     VIDEOGRAPHER:  Yes.
23     MR. BENNETT:  That we're looking at an
24 embed of the Taser video onto the...
25     Come on up here if you want to, Lynne.

141

1      MS. FUNDINGSLAND:  Yeah, because the
2  glare back there is too tough.
3      MR. BENNETT:  Okay.
4      MS. FUNDINGSLAND:  Yeah.
5      MR. BENNETT:  You might even want to
6  come on this side with me.  And you -- it's just
7  a little -- I don't get that glare on the Taser
8  video.
9      MS. FUNDINGSLAND:  Oh, okay.
10     MR. STORMS:  And we're identifying
11 Exhibit 35.
12     MR. BENNETT:  35.
13     MS. FUNDINGSLAND:  Does he have enough
14 room, though?
15     VIDEOGRAPHER:  I'm fine.  Don't worry
16 about me.
17     MS. FUNDINGSLAND:  Okay.
18     MR. BENNETT:  The reason we did this
19 many cameras is to make sure we've got a shot.
20     MS. FUNDINGSLAND:  Okay.
21     MR. BENNETT:  All right.
22 Go ahead and play it, Kate.
23     (Viewing video.)
24 BY MR. BENNETT:
25 Q.  There's -- and there's the hit?  That you get

36 (Pages 138 to 141)

Timothy Callahan
1/30/2012

---

142

1      hit; right?
2  A.  Yes.
3  Q.  You don't see much on the Taser video right now,
4      do you?
5  A.  No.
6  Q.  The tape... And now you're in the process of
7      getting the handcuffs ready and on, the
8      handcuffing process?
9  A.  Yes.
10 Q.  Okay.
11         (Viewing of video continues.)
12 BY MR. BENNETT:
13 Q.  And you step over...
14         MR. BENNETT:  Stop it, if you can.
15         (Viewing of video ends.)
16 BY MR. BENNETT:
17 Q.  This is when you're on his left side and you
18     step over with your right knee and get into the
19     straddle position we've talked about.
20         Is that depicted in the Taser --
21 A.  Yes.
22 Q.  -- video?
23 A.  Yes.
24 Q.  And this is your boot?
25 A.  Yes.

---

143

1  Q.  And lower leg.
2      Your knees just a little off camera; right?
3  A.  Yes.
4  Q.  And then this is the upper leg coming back to
5      your buttocks here?
6  A.  Yes.
7  Q.  All right.  And then we're going to look through
8      on this area and I want -- tell me when you see
9      -- when you see Officer Gorman.
10         MR. STORMS:  And, Bob, just for a time
11     marker it might be helpful to state that the
12     pen camera time is reflecting 05:04:03 --
13         MR. BENNETT:  Correct.
14         MR. STORMS:  -- during this still.
15         MR. BENNETT:  Thank you.
16     Go ahead.
17         (Viewing video.)
18 BY MR. BENNETT:
19 Q.  Do you see that -- Gorman's knee on his back in
20     both views; correct?
21 A.  Yes.
22         (Viewing of video continues.)
23 BY MR. BENNETT:
24 Q.  At 5:04:10, something like that?
25 A.  (No response.)

---

144

1         (Viewing of video continues.)
2  BY MR. BENNETT:
3  Q.  And then you see both knees on him, don't you,
4      in the Taser --
5  A.  I don't know.
6  Q.  You don't know what that is?
7  A.  I don't know if both knees are on there.
8  Q.  Okay.
9  A.  I can clearly see that one knee is on there
10     right now.  Because there's a gap right now
11     (pointing to screen).
12         (Viewing of videotape continues.)
13 BY MR. BENNETT:
14 Q.  Okay.  Do you see him kneeling on him now, right
15     in the Taser video?
16 A.  With one.
17 Q.  Yeah.  Okay.
18         (Playing of videotape continues.)
19         MR. BENNETT:  Turn it up a little.
20         MR. STORMS:  (Adjusting audio.)
21 BY MR. BENNETT:
22 Q.  You hear the agonal breathing or the --
23 A.  Yes.
24 Q.  Okay.  And you're both on him then?
25 A.  Yes.  I don't know.  I don't know where --

---

145

1         (Viewing of video continues.)
2  BY MR. BENNETT:
3  Q.  Does he have both knees on him now?
4  A.  I don't think so.
5  Q.  All right.
6         (Viewing of video continues.)
7  BY MR. BENNETT:
8  Q.  Then you move the wires with your left hand?
9  A.  I guess so.
10 Q.  Why did you do that?
11 A.  I don't know.
12         (Viewing of video continues.)
13 BY MR. BENNETT:
14 Q.  That's you; right?
15 A.  That's me.
16 Q.  Yep.
17         (Viewing of video continues.)
18 BY MR. BENNETT:
19 Q.  You got no response to that; right?
20 A.  No.
21 Q.  His head doesn't move from that position, does
22     it?
23 A.  I don't think so.
24         MR. STORMS:  At 05:07:40.
25         MR. BENNETT:  40.

---

37 (Pages 142 to 145)

Timothy Callahan
1/30/2012

146

1           (Viewing of video continues.)
2   BY MR. BENNETT:
3   Q.   You see the knee between the scapulas: correct?
4   A.   I saw a knee on his shoulder, yeah.
5   Q.   Well, the shoulder is not -- not -- is not where
6        his spine is, is it?
7   A.   It's on -- one -- the -- let's see.  Right side
8        of his back.
9           (Viewing of video continues.)
10  BY MR. BENNETT:
11  Q.   Is he still on his back then?
12  A.   I don't know.
13  Q.   Okay.
14          (Viewing of video ends.)
15  BY MR. BENNETT:
16  Q.   Let's do the -- showing you Exhibit 48, that's a
17       posterior view of the scapula.  And Dr. Baker
18       indicates that his view of it is he's kneeling
19       between the scapula, the two scapulas.  Is yours
20       different than that?
21  A.   I don't -- are you indicating that he was --
22       that --
23  Q.   These scapula -- these are scapula bones; that
24       is, the two --
25  A.   Shoulder blades.

147

1   Q.   Yeah.
2   A.   Yep.
3   Q.   These are the shoulders blades, the big --
4   A.   Uh-huh.
5   Q.   -- bones that look like blades and his knee was
6        between there.  Do you have any -- do you have
7        any disagreement with that?
8   A.   Yes.
9   Q.   Okay.  So you disagree with -- you saw that, but
10       you didn't see him --
11  A.   I'm going from what we just watched.
12  Q.   You didn't see the -- between the scapula: is
13       that correct?
14  A.   I think he was on the right side of his back.
15  Q.   With which knee, the left knee or the right
16       knee?
17  A.   I don't recall.  Which one we were just
18       watching.  I don't know.
19  Q.   Well, he switched, didn't he?
20  A.   He may have.
21  Q.   He started out on his right knee.  And then you
22       saw the picture in the YMCA video of him with
23       his left knee on him; correct?
24  A.   That would indicate to me that he moved around.
25       Wasn't there constantly.

148

1   Q.   Okay.
2           MR. BENNETT:  Play the... Can we have
3        the clip that says, "Is he breathing?"  That
4        one.
5           MS. BENNETT: (Pointing to document.)
6           MR. BENNETT:  Yeah.
7        I'm going to play this clip for you.
8           (Viewing video.)
9   BY MR. BENNETT:
10  Q.   And you say that's just a joke?
11  A.   No, I'm not saying it was a joke.
12          (Viewing of video ends.)
13  BY MR. BENNETT:
14  Q.   It's something you should be concerned about,
15       isn't it?
16  A.   I was not concerned at that point that he was
17       breathing.  I was just making a statement and it
18       wasn't -- it wasn't a serious statement.
19  Q.   Well, it -- you should be concerned with every
20       person you arrest, about whether they're
21       breathing.  You've already said that that was
22       true; correct?
23          MS. FUNDINGSLAND:  Objection, asked and
24       answered.
25  BY MR. BENNETT:

149

1   Q.   Were you concerned that he was breathing?
2   A.   No.
3   Q.   Should you have been concerned that he was
4        breathing?
5   A.   It would not be normal for me to check on
6        somebody -- it's not a normal course of what I
7        would do after arresting someone or fighting
8        with them.
9   Q.   How many --
10  A.   I've never encountered that situation before.
11  Q.   Well, you tell me what's normal.  Would it be
12       normal for you to straddle somebody's back while
13       another officer sits on his -- or straddle his
14       buttocks, while another officer kneels on his
15       back?
16  A.   Yes, it would.
17  Q.   It would?  How long do you do that for usually?
18       How many minutes?
19  A.   I don't know.
20  Q.   That's normal?
21  A.   After fighting with someone and holding them
22       down, that's normal.
23  Q.   It is?  Did you tell Fors and Klund that that
24       was normal?
25  A.   Why would -- I don't think I was asked that.

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

150

1  Q.  Well, you didn't even tell Fors and Klund where
2      Gorman was in your statement, did you?
3  A.  I don't think I was asked.
4      In a statement like that I give -- I tell
5      what -- what I did.
6  Q.  On Exhibit 37 you say -- on page 5 you say that,
7      "I could see that Smith was breathing heavily."
8  A.  Which one is 37?  Is that my statement?
9  Q.  Your statement.
10 A.  Okay.
11 Q.  Page 5.
12 A.  Page 5.  All right.
13 Q.  You said, "I was also breathing heavily trying
14     to catch my breath after the fight."
15 A.  Yes.
16 Q.  So breathing was -- you were concerned about
17     yours and you made some observation of his;
18     correct?
19 A.  No.
20 Q.  Well, you said, "I could see that Smith was
21     breathing heavily."  Isn't that --
22 A.  Well, my answer is I wasn't concerned about my
23     own breathing.
24 Q.  Okay.
25 A.  I only know that I had exerted myself and I was

151

1      breathing heavily, but I wasn't concerned that I
2      was going to stop breathing.
3  Q.  All right.  Well, you thought he was resting; is
4      that right?
5  A.  That is the term that I used.
6  Q.  But why would you stay on top of him if he was
7      resting?
8  A.  Because, as I said before, he had already
9      exhibited behavior that would lead me to believe
10     that he -- he -- the way that he's acting is not
11     the way that he intends to act.
12 Q.  Well, how -- how long would it have been proper
13     to sit on his back like you did, the two of you,
14     under Minneapolis police policies and practices?
15     MS. FUNDINGSLAND:  I object to the form
16     of the question.
17     THE WITNESS:  There -- there is no time
18     limit.
19 BY MR. BENNETT:
20 Q.  Do you know what the purpose of Gorman striking
21     Smith in the head was at 5:04:42 on the tape?
22     MS. FUNDINGSLAND:  Objection,
23     repetitious.
24     THE WITNESS:  I do not.
25     MR. BENNETT:  Okay.

152

1  BY MR. BENNETT:
2  Q.  So when you asked...
3      MR. BENNETT:  Go back to that clip, the
4      are-you-breathing clip again.
5      (Viewing video.)
6  BY MR. BENNETT:
7  Q.  Did you want to --
8      MR. BENNETT:  Stop it.
9      (Viewing of video ended.)
10 BY MR. BENNETT:
11 Q.  Did you want an answer to that question?
12 A.  It was a rhetorical question, to be honest.
13 Q.  Rhetorical.
14 A.  If I'm using that term correctly.
15 Q.  Well, it wasn't...  I mean wouldn't...
16     And you had done nothing to check his
17     breathing up to that point, Smith's breathing?
18     That's right, isn't it?
19 A.  That's correct.
20 Q.  You're still on his back and Gorman is still on
21     his back?
22 A.  Yep.
23 Q.  Did you ever show Gorman the pen video?
24 A.  I don't recall -- he -- he saw it.  I don't
25     recall when.

153

1  Q.  Well, did you -- did you -- did you ever watch
2      it with him?
3  A.  I don't...
4  Q.  Before his statement?
5  A.  I don't know.  I think I just handed it over to
6      the investigators.
7  Q.  Did the investigators tell you why they didn't
8      ask you anything about the video?
9  A.  What do you mean?
10 Q.  Well, I mean they could have done what I did
11     with this video, right, the homicide
12     investigators?
13 A.  They didn't have -- I don't -- I don't know why
14     they didn't.
15 Q.  Okay.  Did they ever talk to you about what
16     questions they were or were not going to ask
17     you?
18 A.  No.
19 Q.  What is the police purpose in calling him "a
20     mother fucker"?
21 A.  There's no police purpose.
22 Q.  Okay.  Did you have any evidence available to
23     you at 5:10:47 on the pen video that made you
24     call the -- step the ambulance up to Code 3?
25 A.  Ah... Let me see.  Well, I -- I'm assuming I was

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

154

1    starting to get concerned that he was so
2    unresponsive to us.
3    Q.   Did you know your Taser had video capability for
4         5 minutes?
5    A.   Yes.
6    Q.   Okay.
7              MR. BENNETT:  Let's go back to
8         Exhibit 35 with the...
9              And turn up the volume.
10             MS. BENNETT:  The embedded?
11             MR. BENNETT:  It's the embedded.
12        Do you have the Taser video?  Just the plain
13        Taser?  That's not flipped over, though, is it?
14             MR. STORMS:  It's not flipped over.
15             MR. BENNETT:  Play the embedded one
16        again.
17             MS. BENNETT:  With the Taser audio.
18             MR. BENNETT:  With the Taser audio, but
19        I want it turned up so that he can hear the --
20             MR. STORMS:  Exhibit 35.
21   BY MR. BENNETT:
22   Q.   I want -- and I want you to look and see if you
23        can hear the "fucking mope" and if it
24        corresponds to the head strike.
25   A.   Okay.

155

1              MR. BENNETT:  5:04:42 is when it should
2         come up.
3              (Viewing video.)
4              MR. BENNETT:  Is that turned up enough?
5              MR. STORMS:  (Nodding.)
6              (Viewing of video continues.)
7    BY MR. BENNETT:
8    Q.   Did you hear him say that?
9    A.   I heard what he said.  It's not what you think
10        he said.
11   Q.   What do you think he said?
12   A.   He says, "Nope," as if you're not going to be
13        moving your head around.  That's what I heard.
14   Q.   Okay.
15             (Viewing of video ends.)
16   BY MR. BENNETT:
17   Q.   And that's when he strikes him?
18   A.   I guess so.
19   Q.   All right.
20   A.   And there was no "Fuck'n."  I didn't hear that
21        part.
22   Q.   Well, I didn't do the -- you realize that
23        Exhibit 33 was done by Minneapolis police
24        personnel?
25   A.   Oh, okay.

156

1              MR. BENNETT:  Can we get a both-knees
2         video?
3              (Sotto voce discussion between Katie
4         Bennett and Robert Bennett.)
5              MR. BENNETT:  Show exhibit...
6         Look at this tape.
7              (Viewing video.)
8    BY MR. BENNETT:
9    Q.   Do you see both knees on his back then?
10   A.   I see one.
11   Q.   Look at...  Look at...
12             MR. BENNETT:  I mean go back and play it
13        again.
14             (Viewing of video ends.)
15             (Viewing video.)
16   BY MR. BENNETT:
17   Q.   Do you see two now?
18   A.   It looks like that's in transition to me.
19   Q.   Okay.
20             (Viewing of video ends.)
21   BY MR. BENNETT:
22   Q.   Was it made clear when you were given your
23        statement by Fors and Klund that there were
24        topics that were going to be off limits--either
25        that they wouldn't talk about them or wouldn't

157

1         ask about them or you wouldn't answer them?
2    A.   No.  I don't think so.
3    Q.   If they asked where Gorman was what would have
4         been your response?
5    A.   He was on his upper body.
6    Q.   And they never -- the interviewers, Fors and
7         Klund, never asked how long you remained on the
8         upper body; correct?
9    A.   No.
10   Q.   Did you ever watch the video with the
11        interviewers, Fors and Klund?
12   A.   No.
13   Q.   Were you ever asked to make an additional
14        statement following this -- this one?
15   A.   What do you mean?
16   Q.   Were you ever asked to clarify things after
17        they'd had a chance to flyspeck the --
18   A.   I --
19   Q.   -- video?
20   A.   -- don't believe so.
21   Q.   Did anybody from Internal Affairs ever look at
22        the video with you?
23   A.   Not with me.
24   Q.   When you were with the grand jury did you see
25        the grand jury see the video?

40 (Pages 154 to 157)

Timothy Callahan
1/30/2012

158

1   A.   I believe they did show the video, --
2   Q.   While you --
3   A.   -- as I recall.
4   Q.   Well, while you were in the room?
5   A.   I'm trying to remember. I -- because there was
6        a big TV in front of me. I think we did. I'm
7        not sure, though.
8   Q.   At the time you had restrained Smith by
9        handcuffing you knew he had engaged in a ground
10       fight with you and your partner; correct?
11  A.   Yes.
12  Q.   You knew he'd been tased five times?
13  A.   At that time I wasn't sure how many.
14  Q.   Four or five? Multiple times?
15  A.   Yes, multiple times.
16  Q.   You knew he was likely to be as short on breath
17       as you and Gorman?
18       MS. FUNDINGSLAND: Objection,
19       repetitious.
20       THE WITNESS: I don't know.
21  BY MR. BENNETT:
22  Q.   You believed he was acting like someone who was
23       mentally ill or on a substance?
24  A.   He was acting very erratic and irrational I
25       thought.

159

1   Q.   What you call an altered mental state?
2   A.   Yes.
3   Q.   Okay. Were you aware that all of these facts
4        are risk factors that can present medical
5        complications when you arrest a subject?
6   A.   Are those risk factors?
7   Q.   Uh-huh.
8   A.   I wasn't thinking about that at the time.
9   Q.   Well, do you know -- have you been trained that
10       those are all risk factors that can present
11       medical complications when you arrest a subject?
12  A.   I arrest people all the time that exhibit
13       behavior like that.
14  Q.   Well, I'm just asking --
15  A.   It's commonplace.
16  Q.   -- are you aware that these items are risk
17       factors that can present medical
18       complications --
19  A.   I think -- I am aware that they are very
20       uncommon occurrences.
21  Q.   Well, but they --
22  A.   They -- they could be a factor I suppose.
23       They could present --
24  Q.   But very -- very rarely.
25  A.   That can present medical complications when

160

1        arresting a subject?
2   A.   Rarely.
3   Q.   Your sitting on Smith's legs prevented him from
4        moving his lower body?
5   A.   That was my intention.
6   Q.   Okay. And you personally observed Gorman exert
7        force and pressure on Smith's back with his knee
8        or knees during and after the handcuffing;
9        correct?
10  A.   I wouldn't say he was exerting force.
11  Q.   Well, his weight was on the knee; correct?
12  A.   Yes. Body -- some body weight, but not -- I
13       didn't see him pushing down in the way -- in the
14       manner that it appears that you're asking that
15       question.
16  Q.   Did you see him, in fact, bounce a few times on
17       him?
18  A.   Well, I saw him transition from one leg to
19       another.
20  Q.   Okay. Did you see him grind his knee into
21       Smith's back at some point?
22  A.   No.
23  Q.   Okay. You don't quarrel with the fact, though,
24       that Gorman exerted pressure on Callahan -- or
25       on Smith's back for approximately 4 minutes?

161

1   A.   I don't quarrel with the fact that he was
2        holding him down.
3   Q.   By use of his knees?
4   A.   By use of the knee, yes.
5   Q.   Well, do you know if it was his right knee or
6        his left knee? It was different --
7   A.   One or the other at different times.
8   Q.   Okay. Showing you...
9        MR. BENNETT: I need the Request for
10       Admissions.
11       MR. STORMS: (Retrieving exhibit.)
12       MR. BENNETT: Have I got the original of
13       that one? I do.
14       Hold on. I'll give you the original.
15  BY MR. BENNETT:
16  Q.   Exhibit 40, that's "Defendants' Answers to
17       Plaintiff's First Set of Requests for
18       Admissions." Do you see that?
19  A.   Yes.
20  Q.   Were you consulted about this?
21  A.   I don't know what it is.
22  Q.   Well, we asked -- formally as a matter of
23       pleadings ask that the defendants admit certain
24       things.
25  A.   Oh, okay.

41 (Pages 158 to 161)

Timothy Callahan
1/30/2012

162

1   Q.   For instance, we ask -- Number 1 was to "Admit
2        [that] the immediate cause of David Smith's
3        death was anoxic encephalopathy."
4             And that was admitted.  You don't have any
5        quarrel with that, do you?
6   A.   Well, I mean who admitted it?
7   Q.   Well, your...  Ms. Fundingsland, on behalf of
8        you.
9   A.   Okay.
10  Q.   These are now deemed admitted facts to the
11       extent they are admitted.
12  A.   Okay.
13  Q.   That Smith -- you don't have any -- do you
14       have any reason or evidence to contradict
15       admission --
16  A.   What's anoxic enceph- --
17  Q.   Brain death.  Lack of oxygen to the brain.
18  A.   Okay.
19  Q.   Do you have any reason to -- to not --
20  A.   I don't have any reason to dispute what the
21       medical examiner might rule.
22  Q.   All right.  To "Admit that Smith suffered a
23       cardiopulmonary arrest on September 9, 2010."
24            And that was admitted.
25            Do you have any evidence or reason to state

163

1        contrarily?
2   A.   No.
3   Q.   On 3, "Admit that Smith's anoxic encephalopathy
4        was due to or as a consequence of [the]
5        cardiopulmonary arrest suffered on September
6        9th..."
7   A.   No.
8   Q.   So you -- you're okay with that admission?
9   A.   I --
10  Q.   It says admit --
11  A.   Well, I mean it...  I didn't do the admitting,
12       but if this --
13  Q.   Well, actually --
14  A.   If this is part of the case --
15  Q.   Actually you did, but they did it for you.
16  A.   Okay.  Well, if this is a part of the procedure,
17       then I don't have a -- I'm not objecting.
18  Q.   All right.  And then it says -- 6 it says -- at
19       6 admit -- we ask them to "Admit that the
20       mechanical asphyxiation of Smith on September 9,
21       2010, was caused, in whole or in part, [by
22       pressure or] force exerted on Smith's body by
23       Defendant Callahan."
24            What evidence do you have to deny that?
25  A.   I don't know what the evidence is.

164

1   Q.   Admission 7 requested was, "Admit that the
2        mechanical asphyxiation of Smith on September 9,
3        2010, was caused in whole or in part by pressure
4        or force exerted on Smith's body by Defendant
5        Gorman."
6             And they denied that.  Do you -- do you have
7        any facts to support that?
8   A.   Same answer for 6.
9   Q.   You don't know?
10  A.   I don't know.
11  Q.   Okay.
12  A.   I don't know.
13  Q.   All right.  If you were following the training
14       you received as a law enforcement officer you
15       would have moved Smith to his side after he was
16       handcuffed; correct?
17  A.   No.
18  Q.   If you were following the training you received
19       as a law enforcement officer you would have
20       moved Smith to his side after you had noticed he
21       had calmed down?
22  A.   No.
23  Q.   If you were following the training you received
24       as a law enforcement officer you would have
25       moved Smith to his side after he was not

165

1        resisting?
2   A.   No.
3   Q.   If you were following the training you received
4        as a law enforcement officer you would have
5        moved Smith to his side after he'd given up?
6   A.   No.
7   Q.   If you were following the training you received
8        as a law enforcement officer you would have
9        moved Smith to his side after he was complying
10       with your commands?
11  A.   No.
12  Q.   If you had moved Smith to his side after he was
13       handcuffed, calmed down, not resisting, given
14       up, or complying, that would have been in
15       accordance with your training, policy and case
16       law that you're taught; correct?
17  A.   No.
18  Q.   Okay.  Would it have been reasonable?
19  A.   If we had thought he was in distress it might
20       have been reasonable.
21  Q.   Well, if you were following the training you
22       received as a law enforcement officer you would
23       have paid attention to Smith's breathing as soon
24       as he had calmed down a bit; correct?
25  A.   If we were using a maximal restraint that would

42 (Pages 162 to 165)

Timothy Callahan
1/30/2012

166

1    have been reasonable then.  That would have been
2    in accordance with training.
3  Q.   Well, I didn't incorporate that in the question,
4    so don't incorporate that into your --
5  A.   Well, that's what you're asking --
6  Q.   No, I'm not.
7  A.   You're asking that question.
8  Q.   No, I'm not.
9  A.   It doesn't say anywhere in our manual on
10    handcuffing that they need to be placed in a
11    recovery --
12  Q.   I'm --
13  A.   -- position.
14  Q.   -- not asking about policy.
15      If you were following the training you
16    received as a law enforcement officer you would
17    have paid attention to Smith's breathing as soon
18    as he'd calmed down a bit; correct?
19  A.   We never received training -- that training in
20    my law enforcement training.
21  Q.   If you were to -- if you were to follow in the
22    training you received as a law enforcement
23    officer you would have paid attention to Smith's
24    breathing as soon as he was not resisting;
25    correct?

167

1  A.   No.
2  Q.   Okay.  If you were following the training you
3    received as a law enforcement officer you would
4    have paid attention to Smith's breathing as soon
5    as he had given up; correct?
6  A.   No.  There's no specific training for that.
7  Q.   If you had done so, you would have been
8    complying with your training policy and case
9    law; correct?
10  A.   In regards to a maximal restraining technique.
11  Q.   Based on your training and years of experience
12    as a police officer do you believe that David
13    Smith died because pressure was exerted on his
14    back for an extended period of time while he was
15    in the prone restraint position causing him to
16    mechanically asphyxiate?
17  A.   No.
18  Q.   Well, why do you think he died then?
19  A.   I think there was a multitude of factors.
20  Q.   What are they?
21  A.   I think his mental state of mind.
22      I think the fact that he was taking a
23    copious amount of cold medicine.
24      The fact that he had exerted himself.
25      I think there's a lot of different...

168

1      And the fact that he was tased.
2    I think there's a lot of different factors.
3  Q.   Really?  Okay.
4      Should Gorman have taken his knee off David
5    Smith's back when David Smith had calmed down?
6  A.   I don't know.
7  Q.   Should Gor- --
8  A.   That's a judgment call.
9  Q.   Should Gorman have taken his -- gotten off David
10    Smith's back when he was not resisting as hard?
11  A.   He had already exhibited behavior that he could
12    calm down and then explode at any moment, so --
13  Q.   Well, --
14  A.   -- no.
15  Q.   -- you couldn't shoot him for that, could you?
16      MS. FUNDINGSLAND:  Objection,
17    repetitious.
18      THE WITNESS:  No.  That's why we were
19    holding him down, to make sure that he didn't
20    burst out in any further activity, for his
21    well-being and ours.
22  BY MR. BENNETT:
23  Q.   You realize that the mechanical asphyxia -- the
24    mechanical force that was applied to asphyxiate
25    him was in fact deadly force?

169

1  A.   No.
2  Q.   Okay.  Do you disagree with the medical examiner
3    about that then?
4      MS. FUNDINGSLAND:  Um --
5      THE WITNESS:  That the medical examiner
6    said that?
7  BY MR. BENNETT:
8  Q.   Well, that he said that the force -- the
9    mechanical force was deadly, killed him?
10  A.   I don't disagree -- I don't disagree that he
11    said that.
12  Q.   Do you disagree with the fact?
13  A.   I disagree that you're characterizing it as
14    deadly force.
15  Q.   Well, deadly force can be -- can be with your
16    car, your weapon, or your hands; right?
17  A.   Could.
18  Q.   Okay.  In this case a gun wasn't used.  The car
19    wasn't used.  And he was killed by the use of
20    mechanical force; correct?
21      MS. FUNDINGSLAND:  I'll object to the
22    form of the question.
23  BY MR. BENNETT:
24  Q.   Well, I mean do you believe that...
25      Do you have any reason to believe to be --

43 (Pages 166 to 169)

Timothy Callahan
1/30/2012

170

1    that to be untrue?
2  A.   I believe the medical examiner is using those
3        words. I don't think that we caused the death
4        in that manner.
5  Q.   And why is that?
6  A.   As I already told you. As I've stated, I think
7        there was a multitude of factors that
8        contributed to it. I don't think there's any
9        one factor.
10 Q.   And let's list those. What are they?
11         MS. FUNDINGSLAND: Objection, asked and
12       answered.
13 BY MR. BENNETT:
14 Q.   I just want to make sure I understand this
15       complete list.
16         The fact that he was mentally ill. That was
17       one; right?
18 A.   I believe so, yes.
19 Q.   The fact that he was tased?
20 A.   Yes.
21 Q.   Multiple times?
22 A.   Yes.
23 Q.   The fact that he'd ingested drugs?
24 A.   Yes.
25 Q.   Or something that altered his mental state?

171

1          And the fact that he had been involved in a
2        ground fight?
3  A.   Physical exertion, yes.
4  Q.   Yeah, physical exertion or ground fight.
5          And those are the things you knew at the
6        time you got the handcuffs on him?
7  A.   No.
8  Q.   Well, you knew he was -- you had reason to
9        believe he was mentally ill?
10 A.   I had reason to suspect.
11 Q.   All right. You knew he'd been tased?
12 A.   Yes.
13 Q.   You believed if he wasn't mentally ill, he was
14       under the influence of drugs. You talked about
15       it while you were sitting on him.
16 A.   Again, it was suspected.
17 Q.   Yeah. And you knew he had been involved in
18       physical exertion. So you had two --
19 A.   That I knew.
20 Q.   Yeah. You had two things you knew beyond a
21       reasonable doubt--that he was tased and that he
22       had physical exertion. And you had reasonable
23       suspicion to believe he was either mentally ill
24       or had ingested drugs; correct?
25 A.   Suspected it, yes.

172

1  Q.   And reasonably?
2  A.   Yeah.
3  Q.   Okay. I mean if you were asked...
4          You know, if you were to make a
5        probable-cause determination, those would have
6        been reasonable suspicions upon which you could
7        have made a probable-cause determination;
8        correct?
9  A.   Probable cause -- and for what? For arrest?
10 Q.   To take him in. To -- to -- you know, that he
11       was a danger to himself or others and needed to
12       be removed from the Y, for example.
13         One of the things that made you decide to
14       take him into custody was you weren't getting
15       any -- he was unresponsive?
16 A.   Well, we don't take people into custody for
17       people mentally ill or for having ingested
18       drugs, per se.
19 Q.   Well, then what was he taken into custody for?
20 A.   Assault on a police officer is why he would have
21       been taken into custody.
22 Q.   Well, but -- but what would he have been taken
23       into custody for before you laid hands on him?
24 A.   He wasn't going to be taken into custody. He
25       was going to be asked to leave the premises.

173

1  Q.   So the moment he struggles about leaving the
2        place where he is a member and not doing
3        anything wrong, at least, --
4  A.   He has a right to be there until the business
5        owner, the establishment, requests that he
6        leave.
7  Q.   Don't they have to tell him that, though?
8  A.   I don't know that they didn't.
9  Q.   You don't know that they did either, do you?
10 A.   No, I don't.
11 Q.   Did you look... I mean, for example, we know
12       that he went into the fitness class or -- it was
13       either that day or the day before and they just
14       told him to leave and he left.
15 A.   I -- I got the impression they were afraid of
16       him.
17 Q.   Okay. Did anybody tell you that, in those
18       words?
19 A.   Yeah.
20 Q.   Who?
21 A.   I think it was Courtney.
22 Q.   They were afraid of him?
23 A.   They were afraid of his behavior, yes. His
24       erraticness. He made them nervous.
25 Q.   Okay. Well, "nervous" and "afraid" are a little

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

**174**

1    different things, but did they tell you they
2    were afraid physically of him?
3    A.   They were concerned over the way that he was
4         acting.
5    Q.   Okay.  I'm going to take just a few minutes and
6         make sure that I'm done, but I'm probably done.
7    A.   Okay.
8         MR. BENNETT:  Let me go off the record
9    at 12:30.
10        Let's take 5.
11        (Recess taken.)
12        MR. BENNETT:  For purposes of this
13   truncated process that we're operating in, and
14   reserving all the rights I have should the case
15   not settle at the immediate settlement
16   conference, I am done with my questioning of
17   Officer Callahan today.
18        MS. FUNDINGSLAND:  Okay.
19   And we'll read and sign.
20        MR. BENNETT:  All right.
21   Thank you.
22        THE WITNESS:  Thank you.
23        (Concluded at 12:33 P.M.)
24              *   *   *
25

**175**

1    STATE OF MINNESOTA  )
                          : ss  CERTIFICATE
2    COUNTY OF WASHINGTON )
3         I, Janet D. Winberg, hereby certify
     that I reported the video deposition of TIMOTHY
4    CALLAHAN, on the 30th day of January, 2012, in
     Minneapolis, Minnesota, and that the witness
5    was, by me, first duly sworn to tell the truth:
     That the testimony was transcribed by me and is
6    a true record of the testimony of the witness:
7    That I am not a relative, or employee, or
8    attorney, or counsel of any of the parties: or a
     relative or employee of such attorney or
9    counsel:
     That I am not financially interested in the
10   action and have no contract with the parties,
11   attorneys or persons with an interest in the
     action that affects or has a substantial
12   tendency to affect my impartiality:
13   That the right to read and sign the transcript
     by the witness was reserved.
14
     WITNESS MY HAND AND SEAL THIS 3rd day of
15   February, 2012.
16
17
18
19
20   JANET D. WINBERG
     Registered Professional Reporter
21   Notary Public
     Washington County, Minnesota.
22
23
24
25

**176**

1    STATE OF MINNESOTA  )
                          : SS CERTIFICATE
2    COUNTY OF WASHINGTON)
3         I, TIMOTHY CALLAHAN, certify that I have
4    read and examined the typewritten transcript of
5    the deposition taken of me in the matter of
6    Larry E. Smith, et al., vs. Timothy Gorman,
7    et al., on January 30, 2012, consisting of the
8    preceding pages, and find the same to be true
9    and correct  (Except as follows):
10                     Reason
     Page  Line Correction          for Change
11   ____  ___ _____  _____
12   ____  ___ _____  _____
13   ____  ___ _____  _____
14   ____  ___ _____  _____
15   ____  ___ _____  _____
16   ____  ___ _____  _____
17   ____  ___ _____  _____
18   ____  ___ _____  _____
19   ____  ___ _____  _____
20   ____  ___ _____  _____
21   ____  ___ _____  _____
22   ____  ___ _____  _____
23   Dated this_____day of_____
24        _____
                TIMOTHY CALLAHAN
25

**177**

1              EXAMINATION INDEX
2    By Mr. Bennett:  4 - 174
3    ------------------------------------------------
                OBJECTION INDEX
4
     Ms. Fundingsland:  42, 51, 52, 54, 55, 60, 66, 67, 69,
5    72, 108, 109, 117, 120, 122, 124, 125, 126, 127, 148,
     151, 158, 168, 169
6    ------------------------------------------------
7                EXHIBIT INDEX
8    Exhibit 15:
     Printout of PowerPoint presentation
     marked/identified/reviewed..............101, 119, 120
9
     Exhibit 21:
10   Defendant Timothy Callahan's Answers To Plaintiff's
     First Set of Interrogatories
11   marked/identified/reviewed.........................8
12   Exhibit 22:
     Officer Timothy Callahan #1598 * CRA Incident Report
13   marked/identified/reviewed.........................11
14   Exhibit 23:
     Training Records for Timothy Callahan
15   marked/identified/reviewed....................18, 19
16   Exhibit 24:
     Minneapolis Police Department * Department Manual
17   9-100 Adult Arrests (Page 1 - 9)
     marked/identified/reviewed...................37, 113
18
     Exhibit 25:
19   3-213 Hobbles (Color Documents)
     marked/identified/reviewed........................73
20
     Exhibit 26:
21   Incident Detail Report
     marked/identified/reviewed........................78
22
     Exhibit 28: (Retained by Mr. Bennett)
23   YMCA Video
     marked/identified/reviewed........................92
24
25

Timothy Callahan
1/30/2012

178

| | |
|---|---|
| 1 | Exhibit 30: |
| | Timeline of Events - Pen Camera Video |
| 2 | marked/identified/reviewed.............101, 106, 107, |
| | 112, 115, 123 |
| 3 | |
| | Exhibit 31: |
| 4 | Transcript of Video Disc |
| | Re:  David Cornelius Smith |
| 5 | marked/identified/reviewed.....101, 102, 106, 108, 113 |
| 6 | Exhibit 33: |
| | Timeline of Events - Taser Video |
| 7 | marked/identified/reviewed..........101, 102, 106, 155 |
| 8 | Exhibit 34: |
| | Taser Weapon Summary |
| 9 | marked/identified/reviewed.......................96 |
| 10 | Exhibit 35: (Retained by Mr. Bennett) |
| | Taser Audio Video |
| 11 | marked/identified/reviewed...................141, 154 |
| 12 | Exhibit 37: |
| | Minneapolis Police Department Case Supplement |
| 13 | Statement of Officer Timothy Callahan |
| | marked/identified/reviewed................53, 65, 150 |
| 14 | |
| | Exhibit 38: |
| 15 | Minneapolis Police Department Case Supplement |
| | Statement of Officer Timothy Gorman |
| 16 | marked/identified/reviewed.......................53 |
| 17 | Exhibit 40: |
| | Defendants' Answers to Plaintiff's First Set of |
| 18 | Requests for Admissions |
| | marked/identified/reviewed.......................161 |
| 19 | |
| | Exhibit 48: |
| 20 | Scapula Diagram |
| | marked/identified/reviewed.......................146 |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

46 (Page 178)

Timothy Callahan
1/30/2012

**A**

abates 59:8
ability 15:18 40:2,5
able 18:2 51:9 58:10 71:9
Absolutely 140:11
accept 119:5,9
acceptable 13:4,7 115:15
accident 22:4
accidents 22:1
accompanied 84:11
accomplish 13:1
accomplished 43:19
115:18
acquiescence 135:20
act 98:13 100:25 151:11
acting 1:7 3:11 95:5
151:10 158:22,24 174:4
action 175:10,11
actions 67:1
activate 29:24 60:3
activated 57:17 58:1,13
activities 50:1
activity 26:4 168:20
acts 98:16
actual 80:23 81:2
addition 41:2 65:17 67:13
68:4
additional 57:18 60:3
80:9 81:22 157:13
adequately 38:19 39:4,7
41:7
Adjusting 104:8,17
144:20
administering 111:1
admission 162:15 163:8
164:1
Admissions 161:10,18
178:18
admit 161:23 162:1,22
163:3,10,19,19 164:1
admitted 162:4,6,10,11
162:24
admitting 163:11
Adult 38:6 177:17
Affairs 157:21
affect 175:12
afforded 12:10
afraid 173:15,22,23,25
174:2
afternoon 53:24
agent 63:14
aggressive 87:12,14 95:3
agitated 95:5
ago 6:6,8 89:4
agonal 102:10 118:23
119:6,8,15 121:25
122:21 144:22
agree 25:7,19 40:9 42:14
42:16 80:3 137:14
agreement 3:6
ah 5:23 16:8 22:2 56:20
57:19 83:17 123:15
153:25
ahead 17:11 51:24 67:7
90:23 103:18 141:22
143:16
air 125:10 128:13
al 176:6,7
Ali 99:23
alleged 11:16,18
altered 159:1 170:25
ambulance 113:20,21,24
114:2,6,9 131:22 134:1
134:2 153:24
amendment 12:10,14
25:9 44:13 74:18
American 5:10

amount 12:25 82:22
124:3 135:13 167:23
analysis 16:3,9 17:11
analyze 16:23
analyzed 17:23
analyzing 17:13
And/or 45:13
angry 131:7 136:16,20,21
annual 20:6,7 24:2,11
anoxic 162:3,16 163:3
answer 8:8,25 17:17
51:24 56:5,7 57:20,22
58:22 59:20 60:2,4
63:24 67:7 138:25
139:1 150:22 152:11
157:1 164:8
answered 52:13 57:22
60:1,18 72:11 120:22
148:24 170:12
answers 7:21,23 8:3
161:16 177:10 178:17
anybody 8:23 31:1 32:8
49:13 53:4 66:10 72:13
85:19 86:7 157:21
173:17
anybody's 66:11
apart 16:17
appear 85:4 86:7 109:19
118:5
appearances 2:1 3:17
appeared 97:22
appears 36:7 37:24 56:4
160:14
application 59:23 60:13
apply 63:19,25
applying 72:5
appointment 57:7 84:1,3
84:4
approach 85:24
appropriate 13:25 17:14
approximately 46:4 76:20
160:25
area 48:5 49:11,12 59:14
65:15 84:20 112:8
143:8
are-you-breathing 152:4
argumentative 42:9 66:20
69:9 117:1 127:9
arm 51:1
arms 15:19 58:10
arrest 24:7,16,19,23
44:13 49:13,22 74:15
75:14 128:16 148:20
159:5,11,12 162:23
163:5 172:9
arresting 50:10,13 149:7
160:1
arrests 24:1,4 38:6
128:25 177:17
arrival 79:25 80:1
arrived 22:19 79:14,18
80:4,8
arrow 119:1
arts 4:14
asked 29:20 52:12 55:10
56:1 57:17 59:11,25
60:2,9,16,17,24 61:17
72:3,10 86:2 88:25
120:21 131:8 134:1
148:23 149:25 150:3
152:2 157:3,7,13,16
161:22 170:11 172:3,25
asking 23:15 26:6 36:16
61:19 62:2,2 101:18
109:1 159:14 160:14
166:5,7,14
asphyxia 63:7,11 70:25

71:2 126:22,23 168:23
asphyxiate 167:16 168:24
asphyxiation 163:20
164:2
assault 17:5 23:9 172:20
assaulted 82:13
asserting 39:1
assigned 6:16 78:21
assignments 6:12
assistance 51:7
Assistant 2:10,11,12 9:4
associate 4:14
assume 25:5 58:22 70:7
128:14
assumed 129:15 132:19
assuming 131:13 153:25
asthma 20:21
attack 20:21
attempted 87:17
attending 4:25
attention 44:16 45:19
49:19 115:10 165:23
166:17,23 167:4
attorney 2:3,4,5,10,11,12
2:13 9:4 52:23,24,25
53:2 55:2,18 175:8,8
attorneys 13:15 175:11
audio 104:8,17 116:3
140:21 144:20 154:17
154:18 178:10
Authority 11:6
automatically 80:2
available 153:22
avoid 128:21
aware 9:18 11:10 28:11
28:20 45:4 50:12 70:19
73:3 86:23 159:3,16,19
awareness 35:13,18
A.M 1:14 32:7

**B**

babysitting 84:5
back 25:25 34:2 37:6
41:15 44:3 47:5 53:20
54:11 58:11 59:14
63:20,21 64:12,17 65:6
65:8 67:19 87:4 92:11
94:2,24 102:6,12,13
103:1,21,23 104:16
105:6 112:12 115:5,5,9
115:12,15,19 119:22
123:1,14 126:14,17,19
135:2,8,11,24 136:1
141:2 143:4,19 146:8
146:11 147:14 149:12
149:15 151:13 152:3,20
152:21 154:7 156:9,12
160:7,21,25 167:14
168:5,10
background 4:13 23:21
backpack 85:15
backseat 45:3,5
back-of-knees 65:15
bag 85:15
bags 88:13
Baker 63:14 71:1 102:1
118:22 120:4 122:6
137:24 138:5 146:11
Baker's 102:16,20 138:7
balance 100:2
balanced 100:4
based 37:10 55:17,18
67:10 79:23 82:15 96:1
96:3 110:11 167:11
basic 19:19 24:18,22 25:1
25:5 28:3,4
basically 114:8 126:6

basis 20:6,7 24:2,11 83:1
basketball 40:14 84:20,21
84:24 85:1 87:20 92:20
bathroom 64:23 140:10
beer 77:6
beginning 38:22 61:3
104:3
behalf 2:2,9 3:19,20 162:7
behavior 44:9,20 45:10
49:15 69:4 71:24 96:1,3
125:21 151:9 159:13
168:11 173:23
behaviors 49:17
belief 19:2 71:3 82:15
believe 5:12 7:2 9:1 10:3
34:10 53:6,21 56:16
58:5 68:25 69:22 78:14
81:18,19 84:11 86:11
99:2 111:18 112:1,22
112:25 114:1,7 121:6
124:5,8 151:9 157:20
158:1 167:12 169:24,25
170:2,18 171:9,23
believed 59:4 68:23
111:12 158:22 171:13
belt 43:25
Bennett 1:17 2:3,5,6,23
3:3,18,19,23 4:7 21:18
21:24,25 29:9,12 34:5,7
37:19,20,22 42:10
51:23 52:14 54:23 55:9
60:20 64:24 65:3,6,9,10
65:13 66:21 67:6,18
69:12 72:4,8,14,15 73:5
73:8,10 78:5 90:3,5,6
90:10,12,23,25 91:7,9
91:10,13,18,24,25 92:3
92:9,11,13,19,24,25
93:2,3,6,10,13,20,23,25
94:9,11,20,23,25 96:18
96:18,19 101:15,22,24
102:15,17,20,22 103:1
103:7,10,12,18,20,23
104:1,2,5,7,9,11,15,18
105:13,17,22 106:3,13
106:17,19 108:8,15,18
109:3,8 113:1,3 116:24
117:2,6 119:22,25
120:3,24,25 122:18
124:21 125:23 126:9
127:5,7,10 128:2 140:5
140:9,11,14,16,18,23
141:3,5,12,18,21,24
142:12,14,16 143:13,15
143:18,23 144:2,13,19
144:21 145:2,7,13,18
145:25 146:2,10,15
148:2,5,6,9,13,25
151:19,25 152:1,3,6,8
152:10 154:7,10,11,15
154:17,18,21 155:1,4,7
155:16 156:1,4,4,5,8,12
156:16,21 158:21 161:9
161:12,15 168:22 169:7
169:23 170:13 174:8,12
174:20 177:2,22 178:10
Beretta 14:13,14
best 19:1 22:14 81:24
117:19 121:19
better 132:7
birth 171:20
big 45:24 147:3 158:6
Birrell 1:17 2:6,23
birth 4:11
bit 29:19 58:24 68:15 90:8
92:12 94:9 103:2 104:7
104:16 125:2,16 165:24
166:18

bite 66:2,2,6,7,8,16 132:6
139:23
black 11:13
blades 49:9 146:25 147:3
147:5
blocks 79:8
blow 139:17
Blunt 23:7
Bob 91:15 143:10
body 49:11,12 63:22
100:20 157:5,8 160:4
160:12,12 163:22 164:4
bold 40:22 41:5 42:6
bone 51:7
bones 146:23 147:5
boot 142:24
both-knees 156:1
bounce 160:16
bound 43:21,24
box 99:5 100:10
brain 25:23 26:4 69:6
162:17,17
breath 44:21 45:11 50:9
50:13 70:2 71:9 110:18
110:21,23,25 111:16
118:6 127:24 150:14
158:16
breathe 24:16,20,24 25:4
121:4
breathing 20:10,12,14,16
20:18,21 21:3,5,8 23:19
25:19 26:3 44:22 45:11
45:23 50:9,10,15,16,17
69:15,20,24 71:10,12
71:18,20 102:8,9,11
115:22 116:8,15,16
117:12,23 118:3,23
119:3,8,15 120:16
121:16,25 122:20,21,21
123:10,25 124:7 126:24
129:5,6,12,14,16,18,23
132:13,17,19 133:5,24
134:3,23 137:15,18,23
138:17 139:4 144:22
148:3,17,21 149:1,4
150:7,13,16,21,23
151:1,2 152:17,17
165:23 166:17,24 167:4
briefly 34:4
bring 9:19 29:13
bringing 93:7
broader 48:1
broke 132:7
broken 51:2,7
brought 93:8 95:15 96:6
buildings 28:15
bunch 84:19
burst 168:20
Burt 2:11 3:22
burt.osborne@ci.minn...
2:12
business 173:4
buttock 48:9 112:8
buttocks 100:21 143:5
149:14
button 29:22

**C**

C 2:10 3:1
caliber 14:9
call 8:12,15,21 42:2 51:6
65:22 76:12 78:17
80:13,23,24 81:3,8 82:4
83:12,22 107:19 113:8
113:9 119:16 130:4,12
130:25 139:15 153:24
159:1 168:8

Timothy Callahan
1/30/2012

Callahan 1:7,12 3:5,11
  4:2,10 160:24 163:23
  174:17 175:4 176:3,24
  177:12,14 178:13
Callahan's 177:10
called 4:3,18 11:8 40:17
  41:18 113:13 118:24
  136:19 137:3
caller 80:18
calling 136:25 153:19
calls 119:6 130:14
call-taker 80:19
calm 58:24 168:12
calmed 68:15,20 125:1,16
  164:21 165:13,24
  166:18 168:5
calmer 126:3
cam 54:2
camera 7:5,9 8:13 28:18
  29:1,6,14,21,24 30:12
  30:16,22,23 31:2,5 33:1
  33:20,25 34:9,12 35:3,6
  35:10 36:20 46:15 48:2
  52:10 56:4 64:13 93:14
  93:21 97:16 101:8
  109:16,19,24 137:11
  143:2,12 178:1
cameras 28:10,12,21 29:8
  29:9 141:19
capability 154:3
capacities 1:7 3:11
capacity 25:3
caps 40:22 42:7
car 5:19 15:23 22:1,4
  39:17 40:7 169:16,18
cardiopulmonary 162:23
  163:5
care 33:12 84:7 121:12
  130:19 132:17,24 133:3
  133:4
cared 133:1
career 12:4
carotid 106:10 135:4
carry 14:9,10 97:24
carrying 17:4
case 1:2 3:15 11:12 12:13
  12:15,17,21 13:18
  27:20 72:23 111:16
  163:14 165:15 167:8
  169:18 174:14 178:12
  178:15
cases 12:18 79:24
catch 150:14
categorized 137:25
cause 75:2 162:2 172:9
caused 112:1 163:21
  164:3 170:3
causing 82:1 167:15
ceased 69:23
certain 13:23 17:16 40:2
  128:21 161:23
certainly 39:9 49:25
  111:24 139:16
CERTIFICATE 175:1
  176:1
certify 175:3 176:3
chance 33:9 106:20
  108:22 157:17
change 44:9,20 45:9
  49:15,17 71:24 176:10
characterization 138:7
characterize 15:2
characterizing 169:13
charge 122:12
charged 73:23 131:10
check 71:22 114:20
  115:22 118:3 121:14,16
  123:24 132:12 135:4

149:5 152:16
checked 134:7 137:14,18
checking 105:23 111:2
  134:19 138:17
chemical 14:2
chest 40:13 106:14
  135:19
chief 10:8,9 11:19 70:1
children 85:8
choice 135:24 136:12
chooses 73:22
choppy 90:11
chose 100:23 101:2
  135:18 138:19,19
Chris 2:17
circumstance 70:17
circumstances 52:7
  70:18
CIT 83:6,8,12
citation 24:8
citizens 74:12
citizen's 74:14 75:14
city 1:8 2:10,11,12,13,13
  2:14 3:12 13:15 28:13
  73:12 82:22
Civilian 11:6
clarify 47:10 157:16
Clark 34:4,8,12
class 10:14 173:12
classify 139:13
clause 43:9
clear 92:14 156:22
clearly 144:9
clip 148:3,7 152:3,4
clips 32:15
close 135:7 139:22
closed 99:5 99:3,8,10
Code 113:21 114:6,8,9,14
  134:2 153:24
cod 167:23
collapsed 45:3,5
College 4:17
color 73:6 177:19
come 9:5 25:3,25 26:7,8
  30:21 53:20 77:19
  89:18 114:8,9,10
  130:10 131:1 140:25
  141:6 155:2
comes 30:17 81:5
comfort 70:24
coming 74:6 143:4
command 79:7
commands 67:11 165:10
comment 97:15 116:14
Comments 80:12,16,18
  80:21
comm 109:2
committed 82:10
commonplace 159:15
communicating 90:1
Community 4:17
company 5:8
comparison 18:18
complaint 11:7,15
complaints 44:22 45:12
  50:25
complete 170:15
completely 69:13
completion 47:12
compliance 89:9
complicate 128:16,25
complications 159:5,11
  159:18,25
comply 89:6
complying 57:13 59:5
  68:24 69:1 89:17 90:5
  113:2 165:9,14 167:8
compound 51:20 67:4

compressions 106:14
compromised 20:22
computer 31:9,20,22
  36:24 52:11,18
concern 116:5
concerned 37:7 49:14
  66:14,16 69:3 115:14
  116:15 133:20 134:2
  139:21 148:14,16,19
  149:1,3 150:16,22
  151:1 154:1 174:3
conclude 11:19
Concluded 174:23
condition 21:15
conduct 28:23 61:15
conducted 50:1
conference 174:16
confrontation 128:7
Connor 12:14 17:20,22
conscious 49:22 135:24
  136:2,14
consciously 44:11 45:2
  45:22
consciousness 44:10,21
  45:10 49:16,18 71:25
consequence 163:4
considered 113:19
consisting 176:7
constant 76:7
constantly 147:25
Constitution 12:11
constitutionally 13:4,7
construe 127:12
consulted 161:20
contact 83:13 87:1,10
context 76:9
continually 71:21
continuation 68:17
continue 24:16 25:12
continued 26:4 87:3
continues 24:20,24 25:3
  92:18 93:1,5 105:12,16
  105:21 106:2,12 142:11
  143:22 144:1,12,18
  145:1,6,12,17 146:1,9
  155:6
continuing 126:6
continuous 90:14
contract 175:10
contradict 162:14
contrarily 163:1
contrary 71:3
contributed 170:8
control 15:8,14,17,24,25
  24:20,23 28:1 30:23
  51:11
controlled 38:19 39:4,7
  41:7
conversation 32:15,16,22
convulsion 50:22
convulsions 44:22 45:12
copies 37:20
copious 167:23
copy 37:19
cord 43:20,23
Cornelius 1:4 3:9 38:21
  47:16 64:12 178:4
correct 8:10,13,20 12:4
  13:16,25 14:25 15:19
  15:24 16:4,12 19:1,4,10
  25:20 27:11,22 35:11,16
  38:23 39:13,18 40:7,15
  40:22 41:1,12 42:12
  43:4 44:5 46:8,9,12
  47:5 48:2,6,10 49:6,9
  49:16,25 50:2,10,13,15
  50:19,23 51:5,19 52:11

53:11,13,18 54:8 56:5
  57:10,15,20,24 58:4,11
  58:19 59:5,8,16,21,24
  60:8,13 61:8,12,15
  62:17 63:1,21 64:5,8,9
  64:13,17 65:15,19 66:8
  66:12,23,25 67:11 68:4
  68:16,21 69:14,15,18
  69:21 70:5,7 71:22
  73:25 74:3 76:10 78:21
  78:24 79:7,15 80:11,25
  83:6,24 87:15,18 89:21
  90:18 91:2,5 93:9 94:12
  95:13 96:9 97:10,13
  98:5,24 100:17 105:19
  109:2,10,16 110:19
  111:1,14 112:9,12,21
  113:10,13,21 114:16
  115:5,9 116:25 117:12
  117:14 119:4 121:19
  122:24 123:21 125:3
  128:8,17,24 129:20
  132:2 133:16,25 135:12
  135:21 136:20 137:1,16
  137:20 138:5,13,20
  143:13,20 146:3 147:13
  147:23 148:22 150:18
  152:19 157:8 158:10
  160:9,11 164:16 165:16
  165:24 166:18,25 167:5
  167:9 169:20 171:24
  172:8 176:9
Correction 176:10
correctly 21:3 152:14
corresponds 154:24
counsel 175:8,9
County 9:4 27:17 175:2
  175:21 176:2
couple 104:9
course 18:23 25:17 149:6
courses 14:15 19:25
court 1:1,25 3:14,23
  40:14 84:20 85:1 87:20
  88:6 91:4,5,8 92:21
  95:12,13 96:6 113:5
Courtney 81:19,20,23
  84:11 173:21
courts 84:21,24 85:8
Court's 3:7 17:22
cover 21:22 38:21
covered 28:12
covers 38:3,6
CPR 19:10 20:15 102:14
  111:1
CRA 177:12
crime 17:5 82:10
criminal 61:5 85:17
cripe 140:20
Crisis 83:6
cross 99:5
cue 90:3
cuff 43:20,23
currently 6:3
curtain 84:25 85:2,9,11
  85:12 95:24
curtains 84:22
custody 15:10 26:25 27:6
  27:13 44:5 45:1 49:14
  61:10 172:14,16,19,21
  172:23,24
CV 3:15
cycle 58:16 70:4 71:11,15
  98:20 102:4,5
cycles 58:3,5 96:20
cycling 98:15

---
D
---

D 1:25 3:1 175:3,19
danger 172:11
dangers 72:25
date 4:11 5:13 8:20 97:4
Dated 176:23
David 1:4 3:9 37:13 38:21
  39:3 42:18,20 47:16
  64:12 80:10 82:9 83:13
  84:10,15 85:13 95:11
  121:12 123:21 132:8,13
  135:15,18 162:2 167:12
  168:4,5,9 178:4
day 32:5 53:1,16 79:11
  173:13,13 175:4,14
  176:23
days 10:6
dead 21:15 22:18,20 69:6
  110:7,9 111:14 117:4,7
deadly 13:20 168:25
  169:9,14,15
deal 20:24,25 27:25 50:22
  51:10,15 82:21 83:4
dealing 25:2 26:3 82:16
  84:4
deals 38:11,16,18
death 21:9,11 22:24 23:23
  61:10 74:25 75:2
  102:11 112:2 118:23
  119:11,16 122:22 162:3
  162:17 170:3
deaths 22:25
decentralization 39:21
decide 27:8 30:2 43:2
  172:13
decided 42:6
decision 15:8 97:12 136:2
decisions 67:10 96:2
deemed 162:10
Defendant 3:5 163:23
  164:4 177:10
defendants 1:9 2:9 3:21
  161:16,23 178:17
definitely 45:17
degree 4:14 16:24
delivered 2:22
denied 164:6
deny 11:24 58:7 163:24
department 5:14 19:3
  27:18 30:12 37:11,24
  61:7 72:22 74:8 177:16
  177:16 178:12,15
depend 75:2
Depends 24:6
depict 47:8
depicted 142:20
deployed 97:20
deponent's 67:17
deposed 6:18
deposition 1:11 3:5,7
  6:22 7:25 175:3 176:5
depositions 79:24
deprived 25:24
deputy 11:19
describe 99:7
described 115:7
Detail 78:13,15 91:21
  177:21
determination 172:5,7
determine 20:13 71:9
  117:11 124:7 129:5
  133:23
device 31:17 52:18
Diagram 178:20
die 21:14,23 22:6,8,16
  70:25 71:1 112:3
  167:13,18
difference 130:22

Timothy Callahan
1/30/2012

Page 181

different 13:13 20:20 35:1
51:4 146:20 161:6,7
167:25 168:2 174:1
difficult 79:9,11 95:22
Digging 85:15
direct 136:12
direction 87:25 88:2
directly 44:2
disagree 45:15 47:1 58:8
78:24 79:21 147:9
169:2,10,10,12,13
disagreement 147:7
Disc 178:4
discipline 11:22
discovery 18:24
discretion 11:7
discussing 62:25
discussion 32:10,23
43:11 65:2 96:17 118:8
121:8 132:12 140:15
156:3
dispatch 79:2 80:1,8,17
80:24 113:24
dispatcher 81:9,10
displayed 65:12 101:23
119:24 120:2
displeasure 136:6
dispute 162:20
disruption 128:22
distillation 80:23
distorts 103:6
distract 139:20
distracting 139:16,19
distress 21:8 165:19
distressed 20:10,12
117:23
Distributing 37:20 73:7,9
District 1:1,1 3:14,14
doctor 26:5 71:7
document 11:4 148:5
documentations 101:7
documents 6:21 7:20
177:19
doing 35:24 36:15 85:13
85:17 119:14 173:2
Dolan 10:8
Donald 4:10
door 32:23 89:14
doubt 171:21
download 30:15 31:12,19
downloaded 31:8 36:23
52:10
downloads 30:19
downtown 56:24 79:7
82:22
downward 63:20 64:1
94:8
Dr 63:14 71:1 102:1,16,20
120:4 122:6 137:24
138:5,7 146:17
drive 52:19
driving 126:23
drugs 121:5 170:23
171:14,24 172:18
Dude 134:5,22,23
due 163:4
duly 4:3 175:5
duties 5:16
duty 6:11

**E**

E 1:13 3:1,1,8 176:6
earlier 28:20
early 4:20
easily 15:15,16 119:23
editions 28:20
educational 4:13

effect 98:20
eight 79:8
either 66:11 95:3 97:9,23
117:8 138:19 156:24
171:23 173:9,13
elaborate 60:8
elaborated 57:23 60:7
elapsed 124:4
elevator 84:14,17 85:5,7
87:22
elevators 84:13 89:14
embed 140:24
embedded 140:6 154:10
154:11,15
emergency 19:16 27:21
114:12,14
employ 97:12
employed 33:10
employee 175:7,8
EMS 19:12,13 20:22 25:1,5
25:22 37:11
EMT 19:23
EMTs 111:5
en 79:15
enceph 162:16
encephalopathy 162:3
163:3
encountered 149:10
ended 76:10 152:9
ends 59:8 90:11 93:11
94:22 102:9,25 103:11
103:22 106:16 142:15
146:14 148:12 155:15
156:14,20
enforcement 4:15 164:14
164:19,24 165:4,8,22
166:16,20,22 167:3
engaged 13:2 18:24
158:9
engenders 32:22
ensure 24:18,22 25:1
enter 81:12
entire 48:23
entirely 80:22
episodes 87:6
equally 101:2
equate 126:18
erratic 158:24
erraticness 173:24
escort 84:9 89:13
essentially 15:11 84:21
establishment 173:5
et 176:6,7
evaluate 20:9 41:20
evening 83:16
event 10:4 35:6 63:19
events 46:14 86:25 108:9
109:18 178:1,6
eventually 87:1 89:1,14
100:16
everybody 45:1
evidence 35:15 66:7,10
70:2 71:5 116:4 133:3
153:22 162:14,25
163:24,25
exact 13:7,8 125:14
135:13
exactly 46:25 125:4
exam 5:22
EXAMINATION 4:6 177:1
examined 4:4 176:4
examiner 63:4 70:1,21
71:17 162:21 169:2,5
170:2
example 11:1 51:1 140:3
172:12 173:11
excited 91:2
excuse 38:9 59:7 72:7

73:14 91:15 100:18
exert 160:6
exerted 150:25 160:24
163:22 164:4 167:13,24
exerting 160:10
exertion 171:3,4,18,22
exhibit 8:3 11:3 18:22
19:9 37:18,21 53:13,16
53:17 54:9 65:9,10,12
73:5,7,9 74:2 78:9
79:23 91:10,16 92:1,3,7
92:15 96:11 103:13,22
101:23 102:19 106:20
106:21,21,24 107:2,10
108:7,8 109:23 112:5
113:1,12,17,22 115:8
119:2,3,21,24 120:2
121:3 123:24 140:6
141:11 146:16 150:6
154:8,20 155:23 156:5
159:12 161:11,16 177:6
177:7,9,12,14,16,18,20
177:22 178:1,3,6,8,10
178:12,14,17,19
exhibited 101:9 146:6
Exhibits 2:24 101:6,14
108:24
exist 5:11 30:22
expect 128:3 131:23
expecting 83:23
experience 14:16 15:5,7
97:23 167:11
experiencing 87:6
expire 23:15,17 129:1
expired 23:16
Explain 31:12
explode 168:12
extended 94:5 167:14
extent 162:11
extremities 123:15
eyes 49:3 85:14 133:7
eyewitnesses 60:25

**F**

fabric-y 84:22
face 89:1 90:18 98:23
100:5 112:21,22,24
113:4 118:12 121:7
131:4,7
faced 89:20
facing 87:22,23
fact 35:9 52:21 82:25
87:14 110:11 160:16,23
161:1 167:22,24 168:1
168:25 169:12 170:16
170:19,23 171:1
factor 159:22 170:9
factors 128:15,24 159:4,6
159:10,17 167:19 168:2
170:7
facts 159:3 162:10 164:7
failed 111:4
fair 12:24 82:22
familiar 8:5 12:15 17:20
72:21,23 74:6,17 75:15
109:14,18
families 78:1,6,6
far 18:25 36:9 79:5,10
83:21 111:5 115:3,14
133:11,14 135:23 136:1
fashion 82:13
fast 91:13
faster 93:2,3
February 175:15
feet 36:7 41:14 43:22,24
44:2 99:12,22,23
felt 60:7

field 48:16
Fifth 2:14
fight 99:24 115:21 123:18
127:16 128:23 132:2
150:14 158:10 171:2,4
fighting 59:16,18 65:25
69:5 95:6 118:5 127:4
127:12,19 149:7,21
figure 24:1
figured 93:18
file 3:15 11:14
filmed 64:7
final 58:3,17
financially 175:10
find 60:10 110:11 122:7
176:8
fine 141:15
finish 105:15 130:25
firearm 14:7,10
Firing 98:12
first 4:3 9:10 16:12,25,25
19:20,22 21:1 26:2
28:17 30:9,11 32:1
33:14 61:4 70:3 71:11
71:15 81:12,14,19
85:13 95:2 98:23 102:4
102:16 112:15,16 116:9
120:1 126:1 129:4
134:8,18 161:17 175:5
177:10 178:17
fist 99:4,8
fists 95:7
fitness 173:12
five 23:5 96:11,12,20
98:15,15,17,21 100:9
128:10 158:12,14
fixed 103:3
flailed 100:12
flash 52:19
flat 15:21
flip 135:1
flipped 154:13,14
Flood 11:8
floor 15:23 39:17 40:7
81:12,14 82:1 84:12,19
126:24 135:19
flyspeck 157:17
focus 166:21
focused 36:1
follow 166:21
following 44:8,16 45:9
89:17 157:14 164:13,18
164:23 165:3,7,21
166:15 167:2
follows 4:4 176:9
foot 46:2
footage 54:3 89:3 93:24
football 10:25 83:17,19
83:19
force 12:25 13:5,8,19,20
16:4,24 17:9,14,23 23:7
26:15 27:2,4,9,11 59:7
59:24 60:13 61:11
63:12,15,20 64:1 66:25
66:25 67:10 72:5 74:20
85:21 94:8 113:11,19
126:10,12,15,17,18,20
126:22 160:7,10 163:22
164:4 168:24,25 169:8
169:9,14,15,20
form 122:14 124:17
151:15 169:22
formally 161:22
Fors 54:15,19 61:25
124:25 149:23 150:1
156:23 157:6,11
forth 119:22
found 73:23

foundation 21:17 55:8
109:6 128:1
Four 158:14
Frazier 99:23
friend 34:24
friendly 77:2
friends 10:16 77:1
front 7:3 9:24 43:23 47:22
48:14 121:22 136:5
158:6
fuck 131:16
fucker 131:5 132:6,9
136:13,19,25 137:2
153:20
fucking 132:7 137:3,5
154:23
Fuck'n 155:20
full 4:8 10:4 98:21
fully 58:10 131:10
full-size 84:21
Fundingsland 2:10 3:20
3:21 21:16 42:8 51:20
52:12 54:22 55:7 60:17
66:19 67:4,16 69:8 72:3
72:6,10 78:3 91:14,19
91:22 92:1,5,8,16 102:1
102:23 103:3,5 108:6
108:11,13,16,20 109:6
116:23 117:1,5 120:21
122:14 124:17 125:18
126:7 127:1,6,9,25
141:1,4,9,13,17,20
148:23 151:15,22
158:18 162:7 168:16
169:4,21 170:11 174:18
177:4
further 18:18 103:21
115:21 127:4 168:20
Fussy 2:12 3:21

**G**

G 3:1
gain 15:23
game 83:17,19,19
gap 93:22 144:10
Gaskins 1:17 2:6,23
generally 17:10 128:20
gentleman 11:8
gently 89:12
getting 65:23 98:8 125:10
131:7,25 132:1 139:22
142:7 172:14
get-together 77:10,11
Gingrich 77:25
give 10:6 20:5 24:8 37:12
37:19 46:6 52:19,21,22
52:25 53:15,25 55:19
55:19 88:23 89:25 97:4
97:5 113:1 126:5 150:4
161:14
given 11:4 13:23 14:23
18:23 56:1 69:3 73:11
74:6 86:13 156:22
165:5,13 167:5
gives 126:11
giving 6:19 53:1 59:4
60:11 68:24 69:1 140:2
glare 141:2,7
go 9:24 13:18 17:11 24:8
31:4 51:24 53:23 57:12
61:22 64:7,21,23 65:3
65:11 67:7 77:6 90:23
92:11,23 93:20 98:11
101:15,22 103:7,18,21
103:23 119:22 120:1
129:19 130:14 134:1
141:22 143:16 152:3

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

Page 182

154:7 156:12 174:8
**goes** 90:13 91:13
**going** 16:19 34:2 36:11
63:4,6 80:20 83:17,25
84:2,4,5 96:2 101:18
104:9 108:20,25 118:17
123:4,5 124:13,13
126:18 130:3,6 143:7
147:11 148:7 151:2
153:16 155:12 156:24
172:24,25 174:5
**Good** 103:5
**Gor** 168:7
**Gorman** 1:7 3:10 35:5
36:2 47:3,3,19 48:14
49:3,8,10 53:7,15 54:7
54:14,18 59:21 60:9
63:19,22,25 66:8 76:16
76:18 78:2,20 82:7
83:10 85:24 88:23
90:20 94:2 95:1 96:8
97:21,22 98:4 105:3
106:6 107:16,19,24
114:4,23,25 115:11
116:1 117:19,25 118:9
121:19 122:23 123:14
123:17,17 124:6 131:3
131:21 133:9 134:21,22
134:22,24 135:11,20,23
136:1 137:3 138:11
139:8,21,24 143:9
150:2 151:20 152:20,23
157:3 158:17 160:6,24
164:5 168:4,9 176:6
178:15
**Gorman's** 37:14 47:14
59:23 60:12 61:15
104:19 112:11 115:4,8
115:18 126:14 143:19
**gotten** 168:9
**governing** 13:18
**GPS** 80:2
**graduate** 4:21
**Graham** 12:14 17:20,21
**Graham-versus-Connor**
16:3
**grand** 6:24 7:1,3 9:13,16
9:19,24 157:24,25
**Greenwich** 97:5
**Grey** 2:17
**grind** 160:20
**groaning** 118:19,20 119:2
119:15 122:11
**ground** 38:3 118:17
128:23 158:9 171:2,4
**grounds** 109:4
**guess** 15:5 32:17 43:2
62:11 68:5 73:3 89:10
109:14 125:11 145:9
155:18
**gun** 86:20 169:18
**gunshot** 23:1,3
**guy** 110:10 111:14

---
**H**
---

**half** 55:20
**Hall** 2:14
**hand** 36:10 86:15 99:2
100:13 136:10 145:8
175:14
**handcuff** 15:2 17:2,7,9
24:5 44:5 51:5 95:25
**handcuffed** 15:14 38:23
39:5,5,25 41:15 45:4 46:8
58:11,23 59:12 70:11
70:22 102:6 112:7
125:1,5 126:17 127:14

127:17,18 137:16,19
138:18 139:9,12 164:16
165:13
**handcuffing** 38:19 39:4,9
39:12 41:1,3,7 42:14,16
43:1 45:18 47:12 51:3
58:14,17 59:24 67:14
67:20 68:4,18 142:8
158:9 160:8 166:10
**handcuffs** 14:25 15:10,13
18:3,8,15,19 65:18
126:19 142:7 171:6
**handed** 153:5
**handful** 23:18
**hands** 41:15 44:3 87:15
89:12,15,21 90:20
95:11 126:16 169:16
172:23
**hang** 77:2
**hanging** 84:25
**happen** 29:13
**happened** 71:8
**happening** 107:1 136:5
139:1
**hard** 40:14 59:2 68:16,20
125:2,17 127:22 168:10
**harder** 90:6
**hardwood** 40:14
**HCMC** 27:19
**head** 37:5 133:11,13
139:8,11,16 145:21
151:21 154:24 155:13
**health** 33:12 52:2 82:4,16
115:25
**hear** 78:4 81:2 120:12,15
122:1,7,8 123:9,10
128:5 144:22 154:19,23
155:8,20
**heard** 21:9 23:23 39:20
39:23 67:1 107:21
114:17 120:6,19 155:9
155:13
**heart** 110:14 111:12
**hearts** 111:13
**heavily** 150:7,13,21 151:1
**Heinen** 2:17
**heirs** 1:4 3:9
**held** 65:2 98:1 140:15
**hell** 123:18
**helpful** 30:4 143:11
**Hennepin** 9:4 27:17
**Hey** 123:5 124:13 133:15
**high** 4:21,23,24 10:24
**hip** 100:13
**hire** 5:13
**hit** 30:22 99:1,23 100:2,2
100:5,8,13 103:13
141:25 142:1
**hitting** 103:15 104:12
**Hmm** 16:25 133:19
**hobble** 43:20 44:15
**hobbled** 43:4,13
**hobbles** 73:12 177:19
**hobbling** 18:10 42:2
**hockey** 10:18,21
**Hold** 161:14
**holding** 115:20 149:21
161:2 168:19
**home** 31:4,20 32:2,3
33:10 83:23 84:2 110:6
130:19
**homicide** 56:24 57:1 61:7
63:4 153:11
**honest** 152:12
**hook** 99:6
**hooked** 140:21
**hope** 130:3
**hoping** 130:16,25

**hour** 55:20
**huffing** 128:4
**huh** 105:10
**human** 120:19
**humerus** 51:2
**hundred** 24:3,4 74:22
107:3
**hurt** 26:9,11,17 27:19
129:1
**hurts** 129:19 130:1 131:2

---
**I**
---

**idea** 7:15 68:12 82:6
**identify** 62:3 91:16
**identifying** 141:10
**ignoring** 124:20
**ill** 82:21 87:5 128:22
158:23 170:16 171:9,13
171:23 172:17
**illegal** 88:14
**illness** 83:5 87:8
**imagine** 21:20
**immediate** 162:2 174:15
**immediately** 47:11 58:16
130:17
**immunity** 13:20
**impact** 73:25
**impartiality** 175:12
**implement** 27:11
**implemented** 27:5
**implies** 63:11
**implying** 26:19 111:22
**important** 12:22 24:15
26:4 50:18 89:15
**imposed** 11:22 65:18
**impression** 55:21 124:19
173:15
**incident** 8:10,24 11:21
49:4 61:5 78:13,15
91:21 177:12,21
**include** 14:2
**includes** 41:1 73:19
**Including** 8:20
**incorporate** 166:3,4
**INDEX** 177:1,3,6
**indicate** 65:14 90:1 97:21
147:24
**indicated** 72:19 125:20
136:16,17 137:22
**indicates** 116:4 146:18
**indicating** 121:14 146:21
**indication** 88:15 89:25
**indicator** 17:6
**individual** 1:7 3:11 70:11
73:22 75:2
**individuals** 83:4 87:6
**indulge** 90:8
**influence** 171:14
**information** 11:14,17
55:17 80:8,10 81:5,22
82:9,12 86:10,13
108:24
**ingested** 170:23 171:24
172:17
**initial** 80:7
**initially** 86:16 87:19
**injure** 26:21
**injuring** 26:23,24
**injury** 44:23 45:13 51:1
**instance** 12:14 128:18
162:1
**intended** 73:24
**intends** 151:11
**intent** 26:19
**intention** 160:5
**interacting** 35:14
**interaction** 29:25 37:14

**interest** 175:11
**interested** 175:10
**interloper** 88:17
**interlude** 132:11
**Internal** 157:21
**interpose** 108:21,25
**interrogatories** 7:21,24
8:1,4 34:2 177:10
**Interrogatory** 8:8,25
**Intervention** 83:6
**interviewers** 157:6,11
**investigation** 61:5,20
**investigations** 62:1
**investigator** 61:21
**investigators** 52:20,22
54:2 60:21 153:6,7,12
**involuntary** 122:20
138:10
**involved** 11:12 16:7 61:6
61:10 96:7,8 171:1,17
**in-service** 10:13 20:5
**irrational** 158:24
**irregular** 44:21 45:11 50:9
**irregularly** 50:15,16
**issue** 82:17
**issues** 52:2
**items** 159:16

---
**J**
---

**jab** 99:6
**jail** 24:6,11
**Janet** 1:25 175:3,19
**January** 1:13 175:4 176:7
**jaw** 129:19 130:1 131:2
131:20 132:7
**Jeff** 34:6
**Jeffrey** 2:4 3:18
**Jimi** 107:19,21,25 110:10
111:13
**job** 26:20 33:11
**jobs** 5:2
**Joe** 99:23
**John** 2:17
**Johnson** 9:2
**joke** 148:10,11
**jstorms@gaskinsbenn...**
2:4
**judge** 43:12
**judgment** 11:8 168:8
**Judy** 9:2
**juries** 9:19
**jury** 6:24 7:1,3 9:13,16,24
157:24,25
**juvenile** 82:2

---
**K**
---

**Kate** 92:25 93:10 141:22
**Katherine** 2:5 3:18
**Katie** 96:17 98:1,2 156:3
**kbennett@gaskinsbenn...**
2:5
**keep** 135:18
**keeping** 135:21
**kicking** 65:25
**kid** 111:23
**kids** 83:19 84:6 130:20
**killed** 110:10 111:14,19
126:21 169:9,19
**Kin** 1:4
**kind** 23:1 32:22 79:9
84:22 121:5
**kinds** 13:13 22:24 23:6
**Kingdon** 34:21
**Klund** 54:15,19 62:1
124:25 149:23 150:1
156:23 157:7,11
**knee** 47:14,14 48:5 64:10

64:11,11,16,16 94:2,5,7
94:12 102:6,12 104:19
105:5,8 112:11,11
115:4,8,12,18,19 123:1
142:18 143:19 144:9
146:3,4 147:5,15,15,16
147:21,23 160:7,11,20
161:4,5,6 168:4
**kneel** 135:24
**kneeling** 115:14 126:14
144:14 146:18
**kneels** 149:14
**knees** 47:6,15 59:14
64:10,10,12,16 67:15
67:19 104:24 115:4,8
143:2 144:3,7 145:3
156:9 160:8 161:3
**knelt** 136:1
**knew** 83:21 110:17,22
158:9,12,16 171:5,8,11
171:17,19,20
**knife** 86:20
**knock** 36:14
**knocked** 35:21,25
**know** 6:1,6,25 8:8 9:3,6
9:12,17 10:8,9,20,21
11:5,5 17:16 21:5,13,18
22:2,17 23:12,20,25
25:10,23 29:6 30:8
34:13 35:23,25 36:9,13
36:15 37:2,9 39:20 43:9
44:12 46:13,21,22,25
47:9,17,20,21 48:22,25
50:18 54:6 55:15,21,25
56:18 58:1,13 61:22
62:11,11,15,21 63:3,6,9
63:11,14 64:6 65:20
66:15 69:10,23 70:6,20
71:4,8,16 72:24 75:5,8
77:14 78:1,6,8,12,12
79:8 80:15 81:17,18
82:18,18 83:15 84:1,24
86:16 87:7,9,24 88:4,10
89:24 97:25 98:3,17
99:5,11,13,19,20,25
100:4 104:23,25 105:2
107:3 108:22 109:25
110:16,20,24 111:5,21
122:3 125:4,14 127:13
130:14 131:12,16
134:12,15 135:13,23
136:1 137:5,7,7 139:21
139:23 144:5,6,7,25,25
145:11 146:12 147:18
149:19 150:25 151:20
153:5,13 154:3 158:20
159:9 161:5,21 163:25
164:9,10,12 168:6
172:4,10 173:8,9,11
**knowledge** 19:2 72:18,19
117:20 121:20
**knows** 78:7

---
**L**
---

**Lack** 109:6 162:17
**laid** 85:13 87:15 89:12
172:23
**Lakewood** 4:17 5:1
**landscaping** 5:2,5
**language** 68:8 136:12
**laptop** 31:21
**Larry** 1:3 3:8 176:6
**lash** 125:22,25
**lasts** 119:18
**law** 2:3,4,5 4:14 12:13

13:18 72:23 164:14,19
164:24 165:4,8,16,22
166:16,20,22 167:3,9
lay 26:6
laying 59:12
lays 90:20
lead 151:9
leave 51:4 88:12 172:25
173:6,14
leaving 88:16 173:1
led 86:11,25
left 41:10,22 42:20 43:14
47:14 48:4,8,8 49:2
64:11,16 84:18 88:13
94:2,12 99:2,6,6,7
105:5 110:15 111:10
142:17 145:8 147:15,23
161:6 173:14
leg 36:1 48:8,9 49:6
100:20 139:23 143:1,4
160:18
legal 109:4
legitimate 13:1
legs 66:4 68:1 100:21
101:3 127:21 160:3
letting 84:1 126:5
let's 20:25 41:8 70:8
106:24 112:5 113:16
135:6 146:7,16 154:7
170:10 174:10
level 44:9,20 45:10 49:16
49:18 71:25 81:13
Lieutenant 34:3,8,12
life 22:5,9,13 25:20
lights 114:10
limit 151:18
limits 156:24
line 47:24 48:1 176:10
list 6:2,3,5,10 8:9,24
18:18 170:10,15
listened 120:11
little 29:17,19 76:13 79:12
79:18 86:6 90:6,7 92:11
93:3 94:9 103:2 104:7
104:16 135:11 141:7
143:2 144:19 173:25
LLP 1:17 2:6
locked 49:3
long 6:6,15 32:12 53:20
54:5 64:6 81:20 89:4
110:20 124:24 125:2,4
125:9,10 130:14 149:17
151:12 157:7
longer 71:18 77:19 90:7
130:8
look 7:20 29:16 34:6 52:2
54:8 75:12 89:8 99:10
99:17 100:1,12 101:11
101:13,16 106:20
108:23 143:7 147:5
154:22 156:6,11,11
157:21 173:11
looked 7:2,17 49:1 54:11
95:18,18 96:23 109:22
110:3 131:21 134:6
looking 17:15 46:16 48:22
48:24 49:1 112:5,15
140:23
looks 29:17 54:10 75:13
91:3 104:20 105:7,9
156:18
loop 90:14
lot 28:12 68:6 108:24
167:25 168:2
loud 102:24 103:6
lower 49:6,12 68:1 120:6
123:15 143:1 160:4
lying 40:13

Lynne 2:10 3:21 140:25
lynnefundingisland@ci...
2:11

**M**
Madam 3:23
maintain 76:7
making 83:12 120:6,12,15
148:17
man 11:13 123:5 124:13
133:15
maneuver 72:17 73:1
manifest 133:2
manifestation 116:3,9
121:11
manner 41:19 126:16
160:14 170:4
manual 37:25 38:2,2 62:8
62:12 166:9 177:16
manually 79:25
mark 79:25 133:21 135:7
marked 18:21 37:17 80:2
marked/identified/revie...
177:8,11,13,15,17,19
177:21,23 178:2,5,7,9
178:11,13,16,18,20
marked/introduced/revi...
2:25
marker 143:11
Marlene 9:10
married 32:12,14
match 97:1,9
material 62:16
materials 73:11
matter 3:8 15:6 78:18
119:16 125:6,9,12
161:22 176:5
Matthew 34:3
max 41:24
maximal 38:11 41:25 42:3
43:5,17 44:18 45:16
52:3 70:16 71:23 113:9
113:14,18 128:18
165:25 167:10
Maximal-Restraint-of-P...
51:15
maximum 73:12
mean 8:2 17:12,15 20:24
23:14 25:15 26:6,8 30:9
31:12 35:2,25 36:21
45:20,20 61:22 66:22
70:18 71:7,16 78:7
83:21 88:18 89:24 97:3
97:22 107:21 117:7,17
118:15 128:3,15 130:5
152:15 153:9,10 156:12
157:15 162:6 163:11
169:24 172:3 173:11
meaning 25:8 58:22
means 19:13 25:10 99:19
meant 98:17,19 111:21
130:13 131:13
mechanical 63:7,11,12,15
63:20 64:1 70:25 71:2
94:7 126:22,23 163:20
164:2 168:23,24 169:9
169:20
mechanically 167:16
medical 19:16,25 23:21
27:22 44:24 45:14 51:6
51:11 63:3 70:1,21
71:17 159:4,11,17,25
162:21 169:2,5 170:2
medicine 86:18 167:23
member 81:25 83:8,12
88:17,19 173:2
membership 88:20

memorable 32:16
mental 82:4,16 83:5 159:1
167:21 170:25
mentally 82:21 87:5
128:21 158:23 170:16
171:9,13,23 172:17
mention 59:20,23
Mercil 33:23,25 34:11
Meridian 97:5
met 56:24 81:15
metal 18:7,19
method 41:20
middle 43:17
military 5:3
millimeter 14:12
mind 34:15 95:24 167:21
mindful 50:8
Mine 108:13
Minneapolis 1:8,8,18 2:7
2:15 3:12,13 5:14 12:2
13:11,14,15 61:7 73:12
74:8 82:22 83:3 151:14
155:23 175:4 177:16
178:12,15
MINNEAPOLIS-OFFICE
2:13
Minnesota 1:1 2:7,15 3:15
175:1,4,21 176:1
minute 108:13 133:21,24
134:4
minutes 25:24 26:2 46:11
46:24,25 47:14 64:5
70:3,3,4 71:10,14
101:11,16 105:13
110:23 125:7,8,9,12,14
130:15 135:8 137:15,19
138:18 149:18 154:4
160:25 174:5
mirror 12:9
mischaracterizes 67:17
misspoke 109:18
MN 1:18
moaning 114:16,18,22,25
115:7,23 117:10,22
118:1,6
moment 168:12 173:1
monitor 45:2 71:24
monitoring 45:23
month 9:17
months 7:12,12 76:21
mope 137:3,5 154:23
mother 131:5 132:6,9
136:13,19,25 137:2
153:20
mouth 139:22
move 127:22 145:8,21
moved 147:24 164:20,20
164:25 165:5,9,12
movement 67:25 68:12
movements 15:15,18
67:23
moving 127:18,22,23
155:13 160:4
MPD 11:15 46:15 101:7
multiple 158:14,15 170:21
multitude 167:19 170:7
mute 89:24
M16 14:16

**N**
N 3:1
name 4:8 8:17 9:5 81:17
81:19,19
names 12:17,21 77:23
necessarily 12:22 17:8
28:10 97:9
necessary 12:25 74:20

130:8,24 137:21 138:21
138:24
Neck 106:9
need 17:1 44:19 51:14,18
52:1,3,4 64:25 94:23
101:13 113:6,20,23
114:2,9 140:14 161:9
166:10
needed 25:20 172:11
neglected 139:5
Neither 132:4
nervous 173:24,25
neuromuscular 128:22
never 6:10 10:10,14 17:21
25:25 39:23 59:18
72:25 77:4,6 97:1,19,19
97:19 110:25 118:8
129:17 135:15 136:8
138:4 139:24 149:10
157:6,7 166:19
new 28:24
next-of-kin 3:9
NFL 83:19,20
Nichols 2:18
Nick 2:18
nickname 107:20,23,25
108:2
night 110:6
Nodding 74:4 155:5
noises 120:12,16 121:13
nonresponsive 116:17,19
non-responsiveness
124:10
Nope 85:20 155:12
normal 32:6 83:23 149:5
149:6,11,12,20,22,24
Notary 175:21
note 2:22,24 50:22
notice 50:18 71:20
noticed 8:8 164:20
noticing 2:23
notify 113:11
number 3:15 8:9,25 13:13
20:19,23 21:19,20,21
23:3 87:24 91:10,17,23
92:1,3 125:14 162:1

**O**
O 3:1
object 23:9 39:17 86:15
122:14 124:17 151:15
169:21
objecting 163:17
objection 42:8 51:20
52:12 54:22 55:7 60:17
66:19 67:4,16 69:8 72:3
72:10 108:21 109:1,4
116:23 117:5 120:21
125:18 126:7 127:1,6
127:25 148:23 151:22
158:18 168:16 170:11
177:3
observation 76:7 150:17
observe 62:16 86:11
124:6
observed 21:11 87:11
136:5 160:6
observing 20:17
Obviously 81:5
occasion 18:4
occasionally 64:7
occurred 11:20,21 86:25
occurrences 159:20
occurring 98:5
odd 60:10,15 86:5,6
offense 16:6,11
officer 5:20 11:15 12:3

13:11 17:1 26:8 28:6
33:7 34:21 35:5 36:2
38:14 45:8 47:3 49:3,8
49:10 52:6 53:7 54:14
54:18 60:9,12 61:15
63:19,22,25 77:25,25
82:7 90:8 94:2 107:19
107:24 135:20 138:11
139:21 143:9 149:13,14
164:14,19,24 165:4,8
165:22 166:16,23 167:3
167:12 172:20 174:17
177:12 178:13,15
officers 1:8 3:12 13:14
43:23 70:22 74:10,13
83:3
oh 5:7 51:25 54:4 55:1
66:5 74:3 96:22 97:3
108:16 131:5,14,16
118:2 120:18 140:21
155:25 161:25
okay 6:9,11,25 7:17,23
9:10,18 10:6 11:3,24
12:17 13:11,23 15:13
16:9,10,13,17,19 17:11
17:21 18:3,10,17 19:5,9
19:20 20:2,8 21:7,24
22:3,5,8,15 23:1,11,13
23:23 24:1,4,7,13 25:19
26:2,14,16 27:2,8,15
28:3,20 29:1,18 30:15
31:18,22,24 32:15
33:14,17,22 36:17
37:10,16 38:15 39:9,25
40:8,17,21 41:8 45:6
46:7,19 47:18 48:16,24
49:13 50:7 51:10 52:9
52:21,25 58:9 59:10,20
60:10,15,24 61:14 64:4
64:7 65:24 68:3,8,14
71:5 72:14 73:4,18
74:24 75:16 76:2,10,14
77:22 78:9,22 79:20
80:7 81:20 82:7,12
83:21 84:4,6,9,15 85:1
85:5 86:5,20,25 87:10
88:11,14 90:2 92:8,16
93:18 94:5 95:9,17
97:12,21 98:20 99:22
100:1,5,16 101:6
104:14,21 105:14 106:6
107:15,21 110:6,17
111:12 112:3,18 113:20
114:5 115:11 117:10
119:13,17,20,25 121:25
123:3,13 124:6 126:4
126:13 128:7,15 129:4
129:16 130:22 131:8,15
131:21 133:7 134:10,21
135:3,15 137:5,14
140:13 141:3,9,17,20
142:10 144:8,14,17,24
146:13 147:9 148:1
150:10,24 151:25
153:15,22 154:6,25
155:14,25 156:19 159:3
160:6,20,23 161:8,25
162:9,12,18 163:8,16
164:11 165:18 167:2
168:3 169:2,18 172:3
173:17,25 174:5,7,18
Ombudsman 119:6
once 15:14 25:7 27:4,8
39:5 45:7 58:15 70:10
70:21 89:5 110:5
ongoing 80:11
online 7:15,16
open 99:3

Timothy Callahan
1/30/2012

operating 93:15 174:13
opposed 6:18
order 3:7 88:23 89:6,13
  120:5
original 2:22 57:6 161:12
  161:14
Osborne 2:11 3:22 29:8
  108:10
other's 78:6
ought 33:19
outside 13:16 33:10
  56:11 77:2
owner 173:5
oxygen 20:17 25:24
  162:17
o'clock 79:19

**P**

P 3:1
packets 86:18
page 38:13,14 56:5 57:12
  61:4 65:8,10 74:3
  107:11 112:15 118:20
  120:1 150:6,11,12
  176:10 177:17
pages 54:10 176:8
paid 165:23 166:17,23
  167:4
pain 44:23 45:13 50:25
  131:9,20
painful 102:24
paragraph 43:17 113:12
Pardon 51:17 56:10
  137:17
part 5:19 20:5 22:25
  26:20 28:3 36:2 38:1
  49:10 67:25 74:8,14,15
  92:15 98:13,16 121:12
  136:3,14 155:21 163:14
  163:16,21 164:3
particular 13:19 30:16
parties 3:6 175:8,10
partner 35:5 76:16 77:22
  158:10
partners 76:20,22,24
  77:20
parts 64:8
party 2:23 61:10
part-time 33:11
pass 5:24
passed 5:25
patrol 5:18,20 14:18
Pause 51:22
Pausing 31:11 66:24 79:6
  82:20 85:10 98:6
  122:16 129:10
pay 44:16 45:19 49:18
paying 115:10
pen 7:5,8,9 8:13 28:10
  29:1,4,5,13,21,24 30:12
  30:16,23 31:2,5 33:1,20
  33:25 34:9,12 35:3,6,10
  36:20 46:15 48:2 52:10
  54:2 64:13 93:14 97:16
  101:8 109:16,19,24
  137:11 143:12 152:23
  153:23 178:1
people 8:9 13:16 21:14,23
  22:6,8,15,19 23:3 26:9
  26:11,21 27:22 45:21
  49:21 82:21 88:6,7,8
  116:19 159:12 172:16
  172:17
People's 49:17
pepper 14:3
percent 107:4
period 11:21 21:5 42:21

46:24 47:13,18 64:4
  96:21 101:3 110:18
  115:4,23 116:1 117:10
  118:1 119:18 121:2,17
  137:15,18 167:14
person 15:14 24:15,19,23
  25:2,8,13 26:3,7 27:5
  27:12 33:14 39:16 43:3
  43:13 44:5 50:10,13,21
  50:25 51:7,11 59:7
  63:15 96:3 116:17
  128:21 129:1 136:22
  148:20
personal 22:5 31:9,19,22
  136:24
personally 10:9 21:12
  87:11 160:6
personnel 23:22 155:24
persons 27:2 28:1 175:11
person's 81:17
phenomenon 28:24,24
photo 7:7
photocopy 37:24
phrasing 16:16
physical 87:1 171:3,4,18
  171:22
physically 82:13 133:2
  174:2
pick 12:21
picture 147:22
pin 15:21
place 21:17 173:2
placed 41:11 43:16 94:7
  135:15 166:10
places 21:20,21
placing 43:20 67:14
plain 154:12
plaintiff 1:5 2:2 3:19
Plaintiff's 161:17 177:10
  178:17
plans 83:15
plant 99:22
planted 99:12,23
plastic 18:3,15
plastic-y 84:22
play 10:18,21,22,24 94:9
  102:16 104:3 107:15
  140:5 141:22 148:2,7
  154:15 156:12
player 10:25
playing 85:8 92:18,20
  144:18
pleadings 161:23
please 4:9 38:13 50:11
  65:8 90:4 93:10 101:22
plenty 60:24
plug 16:18 31:15
plus 133:21
point 35:9,10,21 36:6,12
  38:10 58:9 76:21 85:21
  87:18 88:12 89:16,21
  95:25 105:19 111:7,8
  116:7 123:10,13 126:3
  130:21 133:19 148:16
  152:17 160:21
pointing 74:2 109:23
  144:11 148:5
police 1:8 3:12 5:14 12:3
  13:1,11,14 24:18,22
  26:8 28:4 33:7 61:7
  74:8,10,13 115:17
  125:15 126:4 139:18
  151:14 153:19,21
  155:23 167:12 172:20
  177:16 178:12,15
policies 37:11 151:14
policy 38:10 40:21 51:15
  51:18 52:3 139:6

165:15 166:14 167:8
port 27:18 30:18
portable 31:16
portion 49:10 75:14
position 39:16 40:18,18
  41:11,23 42:20 43:14
  51:5 59:11 61:14 64:2
  65:11,19 67:15 68:18
  70:15,24 75:25 76:4
  100:2,17 142:19 145:21
  166:13 167:15
positioned 40:6
possibilities 20:20
possibility 140:4
Possibly 131:12
posterior 146:17
posture 95:3
potential 62:25
pounds 46:4,6
PowerPoint 73:16 74:24
  177:8
practices 151:14
precedes 58:16
preceding 176:8
precinct 6:13,14,16,17
  11:13 34:25 79:4,7
premises 172:25
preparation 6:22 7:24
prepared 46:15 102:1
  108:9
preparing 57:10
presence 34:15
present 159:4,10,17,23
  159:25
presentation 177:8
press 29:22
pressure 63:21 160:7,24
  163:22 164:3 167:13
pretend 125:21,24
prevent 26:23,24 65:23
  127:4
prevented 160:3
primary 15:3,11
principles 12:18
Printout 177:8
prior 41:13 47:11 57:9
  58:14 60:2 69:4 92:20
  97:3 100:5 103:15
prisoners 38:12,16 42:1
  43:7 71:24 72:2
Probable 172:9
probable-cause 172:5,7
probably 19:4,8 23:10,21
  24:3 32:16,18 48:3,18
  55:20 73:17 98:9 114:4
  120:23 128:12 131:13
  131:14
probe 98:8
probes 98:12
problem 45:14 51:11
  89:19 116:18
problems 44:24 82:1
procedure 163:16
process 142:6,8 174:13
  175:20
professional 22:9,13
  175:20
prolonged 42:21
prone 40:12,13,17 41:11
  41:22 42:20 43:14 64:2
  65:18 67:14 72:8 73:1
  100:16 135:18 167:15
proper 151:12
properly 20:16
prosecution 63:1
prosecutor 62:21
protections 12:9
provide 11:16

provided 20:3
psychotic 87:7
Public 175:20
puffing 128:4
pull 65:8,8 98:19
pulled 98:18
pulse 69:15,17,19,21
  105:23 106:8 110:11,17
  110:21,23,25 111:6,7
  114:20 118:3 121:17
  123:25 124:7 132:15,17
  132:20 133:4,23 134:19
  135:4
punched 112:20,22,23
  113:4 118:12 121:6
  131:7,25 132:1 136:21
  136:22
punish 13:5
purchase 7:10
purchased 7:16
purpose 13:1 36:15
  115:17 125:15 126:5
  139:18 151:20 153:19
  153:21
purposes 19:5 57:10
  174:12
pursuant 3:6
pushing 160:13
put 31:14 42:6 52:9,18,19
  61:24 62:4,15,19,20
  75:24 76:3 80:16,19,20
  89:15
puts 95:11
putting 94:7
P.M 32:7 54:12 76:13
  79:16 174:23

**Q**

qualified 13:20
quarrel 106:23 107:5
  137:24 160:23 161:1
  162:5
question 16:22 47:10
  51:21 56:5,7 57:23 60:5
  63:23 67:5,7 72:9
  116:11,12 122:15
  124:18 129:8 132:23
  151:16 152:11,12
  160:15 166:3,7 169:22
questioning 56:17 174:16
questions 33:17 55:10
  56:2,14,22 101:19
  102:19 104:10 109:1
  153:16
quite 32:13

**R**

R 3:1
ran 53:20 95:11,14
rarely 100:7 159:24 160:2
rattle 21:9,11 23:24
  102:11 118:23 119:12
  119:16 122:22
rbennett@gaskinsbenn...
  2:3
read 7:21,23 8:6 41:8,24
  46:14 57:9 109:9
  174:19 175:13 176:4
reading 42:23 43:8 74:1
reads 41:3
ready 142:7
realize 155:22 168:23
really 34:13 116:16 168:3
reason 78:23 79:21 85:21
  88:11 121:14 130:18
  141:18 162:14,19,20,25
  169:25 171:8,10 176:10

reasonability 25:16
reasonable 17:3 52:6
  74:21 165:18,20 166:1
  171:21,22 172:6
reasonably 83:1 172:1
recall 18:2 20:11 22:24
  31:3 36:15 53:3,19 57:5
  57:6,7 78:11 80:4,6
  87:16 89:12 90:17
  95:10 96:11,12 107:12
  107:15,16 114:24 115:2
  122:10 132:16 137:4,13
  147:17 152:24,25 158:3
recap 102:16
receive 80:9 81:22 86:10
received 12:2,6 16:15
  19:7 70:10 79:1 80:7
  164:14,18,23 165:3,7
  165:22 166:16,19,22
  167:3
Recess 65:5 101:21
  140:17 174:11
reckoning 121:16
recognition 21:1
recognize 20:25 21:2,4
  37:23 121:13
recollection 9:8 22:14
  81:25
record 3:3 4:8 11:24 58:6
  65:2,3,6 91:16 92:6
  96:14 101:16,20 140:15
  140:16,18,20 174:8
  175:6
recorded 8:12 56:12,15
recording 35:15
records 18:22 177:14
recovery 166:11
red 131:4
refer 20:19 65:20 136:13
reference 56:3
referencing 17:19
referring 19:14,18 20:18
  22:11 41:25 42:1,24
  43:19 71:23 72:20
  107:24 112:14 113:14
  119:1 132:8 134:17,24
  139:13
refers 118:22
reflect 3:4 140:20
reflecting 143:12
reflects 11:25
refresh 9:8
regard 30:20 44:25 89:3
regards 167:10
Registered 175:20
regular 18:7 20:5 29:4,5
  45:18 72:2 83:1 85:6
Reimer 77:25
related 80:10 87:7
relationship 18:7
relative 175:7,8
rely 19:5
remain 75:16,20 76:6
  101:2 124:16
remained 70:22 157:7
remember 9:5 11:12,17
  11:18 16:2 32:4 35:24
  36:3,11 37:1,6 53:9
  56:20 82:19 120:16
  122:4,9 134:14,17
  158:5
removed 172:12
render 50:4
repeat 122:17
repetitious 125:19 126:8
  127:2 151:23 158:19
  168:17
Report 78:13,15 91:21

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

119:7 177:12,21
**reported** 175:3
**reporter** 1:25 3:23 113:5
175:20
**Request** 161:9
**requested** 164:1
**requests** 87:2 89:18
161:17 173:5 178:18
**requires** 113:12
**rescue** 20:18
**reserved** 175:13
**reserving** 174:14
**resisting** 59:2 68:16,20
112:19 118:16 125:2,17
165:1,13 166:24 168:10
**resort** 41:16
**respond** 123:7 130:16
131:22
**responded** 33:24 118:10
**Responder** 19:20
**Responders** 19:22
**responding** 5:18 89:22
116:13 121:3 123:12
**responds** 118:8 131:3
**response** 11:9 16:5 38:24
48:11 50:3 66:22,25
67:9,10 124:9 131:20
133:18 138:13,16
143:25 145:19 157:4
**responsibility** 27:25 75:1
**responsible** 25:12,16
27:4,12,15 73:24
**resting** 151:3,7
**restrain** 14:24 15:9 24:16
24:19,23 67:23,25
73:22 75:1,24 76:3
126:6
**restrained** 41:19 43:4
75:18,21 76:8 158:8
**restraining** 40:12 63:22
127:3 167:10
**restraint** 15:3 38:11 39:10
39:12,15 40:12,17,24
41:9,21 42:1,5,11,14,16
43:7,18,20 44:18 45:16
52:3 64:2 65:17,18,21
68:3,9 70:16 71:23
72:17 73:1,13 74:20
113:10,14,18 128:17,18
165:25 167:15
**restraint-related** 74:25
**restrict** 15:19 68:12
**resume** 59:15 69:4
**resumed** 59:18
**resuscitated** 110:14
**Retained** 177:22 178:10
**retirement** 77:10,11
**retribution** 13:8
**Retrieving** 91:9 161:11
**review** 6:22 11:6
**reviewed** 56:9
**Reviewing** 53:17 54:9
107:10 113:17,22
**rhetorical** 152:12,13
**rifle** 14:18
**right** 6:4 7:9 8:23 14:17
18:2 27:24 28:23 31:10
35:1,18 36:1 40:3,11
42:7,18 47:3,14,22 48:9
48:9,9 49:2 50:21 51:14
54:14 55:3,23 58:1,25
60:6 62:10 64:11,15,16
67:13,19 69:3,23 70:7
71:21 73:21 75:9 81:2
87:17 90:20,22 92:17
93:7,8,21 94:5,14,16,19
97:16 98:4,10 99:3,5
100:20 103:10,17 104:5

104:12,14,19,19 105:3
105:5,13 106:17 107:13
107:16,24 109:3 112:11
112:20,23 113:6,21,24
114:14 115:17 116:9,12
118:5,12,15,19 119:14
120:24 121:11,16,22
122:13 123:18 126:11
129:4 131:1,4 134:18
134:24 135:6 137:12
141:21 142:1,3,18
143:2,7 144:10,10,14
145:5,14,19 146:7
147:14,15,21 150:12
151:3,4 152:18 153:11
155:19 161:5 162:22
163:18 164:13 169:16
170:17 171:11 173:4
174:20 175:13
**rights** 174:14
**right-hand** 87:23
**risk** 159:4,6,10,16
**Robert** 2:3 3:18 96:18
156:4
**robo** 99:17,20
**roll** 130:4,12,14,25
**Rolled** 102:13
**room** 2:14 141:14 158:4
**round** 99:24
**roundhouse** 99:7
**route** 79:15
**RPR** 1:25
**Ruben** 11:8
**rule** 63:4,7 162:21
**ruling** 17:22
**run** 62:1 104:15

---

**S**

**S** 2:4 3:1
**safety** 17:1
**sally** 27:18
**sat** 67:15
**saw** 7:15 14:17 23:15
49:5 55:24 60:22,25
61:19,24 62:4 63:19
64:10 84:15 89:5 90:13
146:4 147:9,22 152:24
160:18
**saying** 17:25 26:19 37:3,6
44:14,15,17 73:2 80:13
92:2 105:3 107:16
112:17 113:23 119:5
126:15 137:13 148:11
**says** 34:3 40:21,24 41:4,6
41:9,13 42:11 43:9,17
44:18 53:25 54:13
62:12 71:24 73:22
74:25 108:14 114:4
123:17 129:25 131:10
131:21 132:4 134:5
148:3 155:12 163:10,18
163:18
**scapula** 105:8,11 146:17
146:19,23,23 147:12
178:20
**scapulas** 47:15 146:3,19
**scene** 8:13 22:19,21
30:24 31:1 33:23 34:4
34:21 41:18 61:23 62:3
92:21 130:7,10
**scheduled** 10:8
**schizophrenic** 87:7
**school** 4:21,23,24 10:24
**Schupp** 1:17 2:6,23
**scream** 138:2
**screaming** 137:22
**screen** 144:11

**screwed** 104:2
**se** 172:18
**SEAL** 175:14
**seated** 61:14 124:16
135:9,12
**second** 96:6 107:9
**seconds** 71:10,14 79:19
98:21 119:19,19 120:4
120:5 131:3 133:25
134:22
**second-to-the-last** 56:4
**section** 38:1
**secure** 41:6,14 43:24 45:8
**secured** 41:12
**securing** 38:16,18 43:21
**security** 5:7,10 93:24
**see** 23:17,19 33:3 48:2
61:14 63:25 64:11,15
70:8 73:21 75:3 86:14
94:1 97:8 113:16
114:16 117:25 118:2,19
118:20,24,25 119:25
121:22 130:24 132:12
133:7,7,14 139:8,11
142:3 143:8,9,19 144:3
144:9,14 146:3,7
147:10,12 150:7 152:20
153:25 154:22 156:9,10
156:17 157:24,25
160:13,16,20 161:18
**seeing** 36:3 56:2 90:17
**seen** 7:22 21:14,19,20,23
22:6,8,15 23:4,11,23
30:21 46:18 56:18
73:15 75:7,8 78:9,11
89:3,4 90:16 101:9
116:4
**seized** 25:7,13
**seizure** 25:13,17,17 45:12
50:21
**seizures** 44:22
**Senechal** 9:11
**sentence** 41:8 45:7
**separate** 84:23
**separated** 85:2
**September** 5:15 7:12 10:1
10:1,2 46:5 53:11,18
77:1 162:23 163:5,20
164:2
**sequence** 90:13 93:8
**sergeant** 33:22,24 34:11
54:15,15,18,19 61:25
62:1 124:25,25
**sergeant's** 5:22 6:1,3,5
**serious** 44:23,23 45:12
45:13 50:25 51:10
116:10,12 129:8 148:18
**service** 5:3
**Services** 19:17
**set** 92:21 161:17 177:10
178:17
**settle** 174:15
**settlement** 174:15
**Seven** 79:8
**severe** 20:21
**severity** 16:6,11
**Shaking** 37:5
**Sheriff's** 27:17
**shift** 32:6 35:1 76:10,16
76:23 83:24
**shoot** 66:15 77:7 168:15
**short** 81:21 96:21 158:16
**shortly** 93:16
**shortness** 44:21 45:11
50:8,12
**shot** 141:19
**shotgun** 14:19

**shoulder** 49:9 94:13
105:9 146:4,5,25
**shoulders** 147:3
**show** 37:16 53:2,4,7
54:25 58:6 91:7 101:6
152:23 156:5 158:1
**showed** 33:15 54:24
**showing** 8:3 11:3 18:21
37:17 53:15 78:9 96:13
146:16 161:8
**shown** 6:23,25
**shows** 19:3,12 78:20,23
79:14,18 96:16 119:21
124:3 133:3 134:19
**shuffling** 77:21 99:18
**sic** 43:19,25 70:3 79:23
108:8 129:25
**side** 41:11 43:16 48:10
70:15,24 75:24 76:3
85:9,12 87:24 95:12,23
129:20 130:1 131:3,4
135:15 141:6 142:17
146:7 147:14 164:15,20
164:25 165:5,9,12
**sides** 85:11
**sight** 47:24 48:1
**sign** 174:19 175:13
**signal** 136:10
**signed** 8:4
**significant** 44:9,20 45:9
49:15 110:18
**signs** 44:8,17 45:9
**silver** 86:15
**simply** 124:20
**sir** 4:11
**sirens** 114:10
**sit** 151:13
**sits** 149:13
**sitting** 46:7,10,22,23
59:13 65:14 101:3
123:13,15 126:13
127:20 160:3 171:15
**situation** 11:13 30:3
44:14 129:17 149:10
**situations** 128:16
**skyway** 81:13
**slide** 74:24
**slow** 62:23
**small** 86:15
**smiled** 118:14
**Smith** 1:3,4 3:8,10 29:25
35:14 36:3 37:13 38:21
39:3 42:18,20 46:7 47:4
47:5,16,19 48:5,14 49:6
58:23 59:4,12 63:7,21
64:1 65:11 68:25 80:10
82:9 83:13 84:10,15
85:13 87:11 94:3,8
95:11 96:9 110:7,9
112:17 117:12 121:12
123:21 132:8,13 133:9
135:1,15,18 139:8
150:7,20 151:21 158:8
162:13,22 163:20 164:2
164:15,20,25 165:5,9
165:12 167:13 168:5
176:6 178:4
**Smith's** 64:12 112:12
115:5,15,19 116:5
118:3 135:24 136:1
137:14,18 139:22
152:17 160:3,7,21,25
162:2 163:3,22 164:4
165:23 166:17,23 167:4
168:5,10
**socialize** 77:17
**solely** 22:13
**somebody** 14:25 20:16

21:4 44:16 45:3 50:4
129:18 130:4 149:6
**somebody's** 149:12
**someplace** 106:8
**sonorous** 102:8,9 118:22
119:3,15 120:16 122:21
138:10
**soon** 41:12 93:16 165:23
166:17,24 167:4
**sorry** 24:21 27:7 39:2,19
51:25 72:7 75:19 76:1
78:3 108:18
**sort** 6:11 13:21 23:9
28:23 61:19 67:11
86:19 128:23
**Sotto** 96:17 156:3
**sound** 102:7 121:4
123:11
**sounds** 120:6 122:1,7
137:25 138:5,8
**South** 1:17 2:6,14
**speak** 9:10 86:2 87:2
89:18
**specific** 17:16 19:14 56:1
167:6
**specifically** 83:4
**speculate** 61:25
**speed** 95:19
**spine** 146:6
**spinning** 36:11
**spit** 66:10,16
**spitting** 65:25
**spoke** 8:10,23
**sports** 10:22,24
**spray** 14:13
**Squad** 113:6
**squads** 77:21
**SRN/JJK** 3:16
**ss** 175:1 176:1
**staff** 81:15 85:5 89:25
**stairs** 84:13
**stairway** 88:8
**stairwell** 88:1,3
**stance** 95:3,6
**standing** 15:22 33:4
108:25
**start** 16:8,19 34:15 102:4
106:24 113:21
**started** 28:9 71:11,15
114:6 118:2 147:21
**starting** 106:14 154:1
**starts** 102:8,14 114:16
**state** 4:8 143:11 159:1
162:25 167:21 170:25
175:1 176:1
**stated** 81:24,25 170:6
**statement** 7:22 53:8,10
54:4,7,13 55:6,11,20,24
56:2,12,21 57:9,15
60:11 62:5,16 66:11
72:9 124:25 148:17,18
150:2,4,8,9 153:4
156:23 157:14 178:13
178:15
**statements** 53:1
**States** 1:1 3:14 12:11
**station** 56:23 79:4
**stay** 27:20 151:6
**stayed** 68:19,23 69:2,6
**staying** 125:15
**step** 142:13,18 153:24
**steps** 17:13,16
**Stillwater** 4:24 10:22,25
**stomach** 59:13
**stood** 126:2
**stop** 88:23,25 90:10 93:10
102:22 103:8,8,10
112:14,17,19 118:16

Timothy Callahan
1/30/2012

126:10,12 142:14 151:2 152:8
**stoppage** 50:9
**stopped** 50:17 83:24
**stopping** 126:24
**stops** 118:2 122:1,11,22
**Storms** 2:4 3:18 73:7,9 91:12,21 92:7,14 93:22 93:24 103:4,25 104:4,8 104:17 113:2 141:10 143:10,14 144:20 145:24 154:14,20 155:5 161:11
**straddle** 142:19 149:12 149:13
**straddling** 46:7,22 48:4 48:12 100:21 101:3 105:18 112:8 129:22,25
**street** 1:17 2:6,14 5:18
**streets** 28:13
**strike** 139:8,11,14 154:24
**strikes** 155:17
**striking** 151:20
**struck** 98:23
**struggle** 96:7,8
**struggles** 173:1
**stuck** 60:4
**stuff** 60:2
**stumbling** 99:14
**subject** 13:5,9 15:8,9,21 39:3 40:25 41:10,10,19 41:21,22 43:13,21,22 43:22,23 44:2 45:8 66:23 70:12,23,23 75:17,17,21,21,23 76:2 159:5,11 160:1
**subjects** 38:18 41:6 43:24
**subject's** 41:14 43:25 67:10
**substance** 158:23
**substantial** 175:11
**sucking** 128:12
**suffered** 162:22 163:5
**suffering** 83:5
**sufficient** 20:17
**Suite** 1:18 2:7
**Summary** 178:8
**supervisor** 41:18 113:7,9 113:11,13 130:7,10,12 130:16,25
**supplement** 34:5 62:17 62:21 66:11 178:12,15
**supplements** 61:24
**support** 164:7
**suppose** 20:19 43:12 125:11 159:22
**supposed** 12:24 16:23 17:13 32:5 62:15 70:12 71:21 113:8 126:10
**Supreme** 17:22
**sure** 4:17 8:1 11:23 16:15 17:19 33:5,18 36:25 40:4 45:6,20 53:22 64:24 65:1 73:20 75:4 76:9 103:2 113:18 128:25 140:9 141:19 158:7,13 168:19 170:14 174:6
**surface** 15:22 40:6,14
**surprised** 97:8
**surrounds** 12:13
**Susan** 8:18
**suspect** 17:2 171:10
**suspected** 171:16,25
**suspicion** 17:3 171:23
**suspicions** 172:6
**sustain** 25:20
**sustained** 11:6

**T**

**SWAT** 14:21
**swear** 3:24
**switched** 147:19
**sworn** 4:1,3 175:5
**swung** 100:20
**synonymous** 119:11
**system** 80:2

---

**T**

**T** 2:11
**take** 3:4 5:22 10:6 15:9 24:10,19,23 26:25 28:1 30:23 44:4 45:1,7 46:6 47:19 52:17 54:5 62:14 79:12 84:7 85:5 101:11 101:16 106:8 115:12 130:19 133:23 172:10 172:14,16 174:5,10
**taken** 14:15 19:25 27:5,12 51:11 65:5 101:21 140:17 168:4,9 172:19 172:21,22,24 174:11 176:5
**takes** 90:7
**talk** 9:2 34:3,21 54:14,18 56:11 62:19 81:20 89:23 114:22,25 115:25 116:20,21 117:3,7 118:9 122:22,23 123:4 123:5 124:13,14 129:19 133:15 134:5 138:11 153:15 156:25
**talked** 8:19 33:22 34:3 44:13 138:4,5 142:19 171:14
**talking** 16:9 17:8,9 45:21 48:19 71:16 108:6 111:20 116:14 121:1,4 123:20 125:6 131:11,19 131:23 132:1
**talks** 38:10
**tall** 45:25
**tap** 139:16
**tape** 35:9 46:19 55:24 90:4 91:22 92:3 94:21 102:16,19,20 106:18 122:8 142:6 151:21 156:6
**tase** 118:17
**tased** 98:1,2 99:15 122:13 122:23 126:1 128:10 158:12 168:1 170:19 158:17 2:13
**Taser** 7:7 13:20 14:5 28:17,21 35:19,21 36:4 36:6 57:17 58:3,6,13,16 60:3 64:15,18 70:4 71:11,15 90:7 96:13,23 97:12,15 98:20 102:4,5 108:5,9 112:6 131:11 137:8 140:24 141:7 142:3,20 144:4,15 154:3,12,13,17,18 178:6,8,10
**tasering** 96:11,12 98:24
**tasing** 98:5 112:16
**taught** 16:7,14,18 17:18 17:21 20:8 21:2,4 22:22 39:13 70:14 75:16,20 75:23 76:2,6 128:15,19 128:19,20 165:16
**teach** 12:17
**team** 10:18 83:6
**technique** 40:24 41:9,16 41:21 42:11,15,17 43:18 167:10
**techniques** 41:13 139:19

---

**tell** 4:13 9:22 16:17,21 19:13 23:8 31:1 32:19 33:1,19,25 34:8,11 35:2 35:5 48:22 49:2 51:18 57:14 62:7 64:25 99:1 110:7 115:11 140:12 143:8 149:11,23 150:1 150:4 153:7 173:7,17 174:1 175:5
**tells** 62:20 80:19
**tendency** 175:12
**term** 21:9 39:23 72:18,21 137:2 151:5 152:14
**terminology** 68:6
**terms** 88:20 119:9
**test** 16:4
**testified** 4:4 9:16 70:1 102:10
**testifying** 67:2
**testimony** 6:19 67:5,17 119:7 175:6,6
**Thank** 143:15 174:21,22
**they'd** 56:18 157:17
**thicker** 29:17
**thigh** 59:14 112:8
**thighs** 65:15 67:15,19
**thigh/buttock** 48:5
**thing** 13:21 16:12 21:1 67:11 91:13 112:16 128:24 136:24
**things** 17:1 20:23 21:3 26:21 40:2 62:16 66:22 66:22 67:9 101:17 103:6 112:6 118:24 128:21 157:16 161:24 171:5,20 172:13 174:1
**think** 7:4 17:3,15 19:8,16 19:21,22 23:14 24:10 27:20 28:9 31:3,21 34:1 35:12 39:8,24 41:2,2 46:11 54:2 55:14,16,25 56:6,8 57:2,3,4 60:15 63:17 64:20 66:9 68:10 69:16,17,18,19 70:13 72:1 76:15,20 77:10 79:3,3 80:15 82:18 83:11,18,18 85:6,6 88:7 92:13 96:25 97:10 99:16 103:4,14 105:20 106:9,11,17 107:6 108:12 109:3 110:7,9 111:7,11 112:3,13 116:2,7,10 117:17,17 117:22 118:4 121:21,24 126:13 129:13 131:12 134:4,20,23,23,25 135:5 137:21 138:21,22 138:24 139:4,5 145:4 145:23 147:14 149:25 150:3 153:5 155:9,11 157:2 158:6 159:19 167:18,19,21,22,25 168:2 170:3,6,8 173:21
**thinking** 34:13 122:12 159:8
**thinks** 71:17
**Thirty** 24:12
**thought** 14:16 21:15 22:18 30:4 55:1 60:25 107:21 108:16 111:15 129:12 133:6 151:3 158:25 165:19
**threatening** 85:19
**three** 23:18 46:6 84:20 118:24
**throat** 20:22
**throw** 33:19
**tie** 44:2

---

**time** 6:4,6 8:21 30:9,11 32:3 38:22 42:21 45:21 47:4,11,18 48:23 49:4 49:17 53:23 57:6,8 58:2 58:3,13,14,21,23 59:5 60:4 63:3 68:14 69:1,4 76:12 77:12 79:1,11,12 80:5,7 81:21 82:5,7 83:24 89:4 93:19 95:1 95:23 96:21 97:5,8,10 98:18,21 101:4 108:23 109:9,11 110:14,18 111:18 115:11 116:19 118:1,2,10 120:11 121:1 122:10,19 124:4 124:20 125:3,9,10 126:1 127:11 132:18,22 134:8,18 135:11,13,14 139:2 143:10,12 151:17 158:8,13 159:8,12 167:14 171:6
**timeline** 46:14 108:9 109:18 178:1,6
**times** 18:9,13 24:10 30:5 46:20 57:18 74:22 96:11,12 97:1 98:15,18 100:8 109:15,22 110:3 122:13,23 124:3 128:10 139:9 158:12,14,15 160:16 161:7 170:21
**Timmy** 107:22
**Timothy** 1:7,7,12 3:5,10 3:10 4:2,10 76:16 175:3 176:3,6,24 177:10,12 177:14 178:13,15
**titled** 41:25
**today** 6:22 7:25 29:2,13 57:9 63:9 76:22,24 174:17
**told** 58:5 61:3 74:5 75:7 82:15 110:9 111:13 118:16 136:8 139:24 170:6 173:14
**tool** 15:3,11
**tools** 13:24 14:24
**top** 29:22 41:6 54:13 70:22 75:16,20 125:15 133:14 151:6
**topic** 13:19
**topics** 156:24
**torso** 15:24 36:3 49:6 68:1 127:21
**touch** 91:1
**touched** 87:8 95:2,2
**tough** 141:2
**Tracey** 2:12 3:21 tracey.fussy@ci.minne... 2:13
**traditional** 86:22
**traffic** 79:13
**trained** 10:12,14 14:16 20:13,24 51:19 52:1 72:16,25 74:21 83:4 87:5 159:9
**trainers** 13:13
**training** 10:13 12:3,6,9,19 13:12,23 14:23 18:22 19:6,10,20 20:2,6,8,9 24:18,22 25:1,6,22 28:4 28:4 37:10,11 70:10 73:11,16,18 74:9,19 139:6 164:13,18,23 165:3,7,15,21 166:2,15 166:19,19,20,22 167:2 167:6,8,11 177:14
**transcribed** 175:6
**transcript** 1:11 2:22 106:25 137:8 175:13

---

176:4 178:4
**transfer** 31:16
**transition** 156:18 160:18
**transportation** 41:20
**trauma** 22:25 23:1,6,7
**traveling** 82:8
**treat** 51:9
**trial** 6:19
**tried** 66:7 138:11
**trigger** 98:18
**trouble** 68:5 90:1 139:4
**true** 19:1,4 72:3 71:6 74:18 40:22 95:20 101:2 148:22 175:6 176:8
**truncated** 3:7 18:24 174:13
**trustee** 1:3 3:8
**truth** 57:14 175:5
**try** 66:2,6
**trying** 19:6 65:23 68:8 69:5 95:21 122:6 124:22 127:23 150:13 158:5
**turn** 27:16,21,24 30:11 88:23 89:1,6,8 90:18 94:14,17 104:7,16 106:4 144:19 154:9
**turned** 70:14,23 86:18 89:11,20 133:13 154:19 155:4
**turning** 30:3
**turns** 29:23
**TV** 158:6
**two** 23:8 30:17 46:6 61:11 85:3 90:18 123:20 128:4 146:19,24 151:13 156:17 171:18 171:20
**type** 17:5
**typewritten** 176:4

---

**U**

**Uh-huh** 25:11 26:10 32:11 34:16 51:8 90:15 138:9 147:4 159:7
**um** 5:2 16:25 19:14 21:13 23:5 32:20 38:8 47:13 55:25 64:22 98:17 135:10 169:4
**uncommon** 159:20
**unconscious** 49:23 50:4 116:22
**understand** 7:19 12:8 16:1 19:6 25:15 27:3,8 40:18 43:9 52:3 57:14 63:12 68:9 72:20 126:21,25 170:14
**understanding** 26:7 37:10,12 79:23 82:3 84:19
**understood** 34:19 128:12
**unintended** 73:24
**Unit** 61:7 78:20
**United** 1:1 3:14 12:11
**unresponsive** 69:14 87:2 154:2 172:15
**untrue** 170:1
**upper** 47:5 48:5 49:6,10 59:13 63:22 65:14 67:15,19 112:8 127:21 143:4 157:5,8
**uppercut** 99:6
**upright** 70:15 75:25 76:4
**upstairs** 82:8
**upward** 70:24
**USB** 30:18

Timothy Callahan
1/30/2012

Page 187

**U**

use 12:24 13:5,8,19,20,21
13:24 14:24 15:19 16:4
16:24 17:9,14 18:7,18
26:15 27:2,9 44:1 63:12
66:25 68:8 70:19 72:16
72:18 74:19 85:21 88:8
113:11 139:19 140:10
161:3,4 169:19
use-of-force 12:6,8,18
16:9 28:3 73:18 74:19
usually 16:11 27:15,19
60:21,21 149:17

**V**

vague 54:22
valid 74:21
variations 44:1
various 5:2 12:3
verbal 118:8,9 138:16
verbally 89:22 118:10
versus 3:10 12:14 17:20
17:21
video 3:3 30:13,20 35:10
35:15,21 36:4,6,18,19
36:23 37:12 46:15 48:2
54:24,25 55:5 56:3,19
64:13,15,18 66:2 90:9
90:11,24 91:9 92:4,7,10
93:1,5,11,12 94:10,22
97:9,16 98:7 99:10
101:8 102:3,21,25
103:9,11,19,22 104:6
105:12,16,21 106:2,12
106:16 108:5,9 109:16
109:20,24 134:7,9,12
134:19 137:8 140:24
141:8,23 142:3,11,15
142:22 143:17,22 144:1
144:15 145:1,6,12,17
146:1,9,14 147:22
148:8,12 152:5,9,23
153:8,11,23 154:3,12
155:3,6,15 156:2,7,14
156:15,20 157:10,19,22
157:25 158:1 175:3
177:23 178:1,4,6,10
VIDEOGRAPHER 140:22
141:15
VIDEOGRAPHERS 2:16
videoing 28:23 35:19
videos 6:21,23,25 7:17
videotape 3:4 47:8 92:18
120:7 123:2 144:12,18
VIDEOTAPED 1:11
view 31:14,15 146:17,18
Viewing 90:9,11,24 92:10
93:1,5,11,12 94:10,22
102:21,25 103:9,11,19
103:22 104:6 105:12,16
105:21 106:2,12,16
141:23 142:11,15
143:17,22 144:1,12
145:1,6,12,17 146:1,9
146:14 148:8,12 152:5
152:9 155:3,6,15 156:7
156:14,15,20
views 143:20
vigilant 50:8
violation 11:20 139:6
vision 48:17
visual 116:4
voce 96:17 156:3
voice 115:3
voiced 136:6
volitional 98:13,15 100:25
135:23 136:14
volume 104:8,17 154:9

voluminous 38:3
voluntarily 135:18 138:20
voluntary 102:7 136:2
138:10
vouching 124:2
vs 1:6 176:6

**W**

waist 43:21
wait 108:13 130:4,8,9,11
130:15,18,24
waited 9:18
waiting 140:12
walk 87:3,17 91:4 99:20
walked 87:4,20 89:12
95:15
walking 40:1 87:25 88:2,5
88:22 99:17
wall 15:22 39:17 40:7
want 45:6 49:21,24,25
50:4,7,7,12,22 51:10
61:25 77:23 93:2 94:20
101:11 102:18 103:2,23
109:5 116:20 130:7,11
130:15,18 140:5,25
141:5 143:8 152:7,11
154:19,22,22 170:14
wanted 29:6 60:8 89:19
95:19
Washington 175:2,21
176:2
wasn't 5:4 23:20 34:13
36:8,9 42:21 47:22 49:3
59:25 60:9 71:20 84:2
85:17,19 86:20 89:17
89:17,22 95:2,6 115:10
116:10,10,12,13,15
124:22,23 129:9,18
133:12 136:24 139:17
147:25 148:18,18
150:22 151:1 152:15
158:13 159:8 169:18,19
171:13 172:24
watch 31:24 32:1,8 44:8
44:19 45:8 55:3,5 83:17
129:2 153:1 157:10
watched 33:5 46:19 54:2
55:22 147:11
watching 36:18,23 134:12
147:18
waterfront 21:22
way 16:15 17:17,18 31:14
43:3,8,8 100:13
111:19,20,21,21 133:10
138:25 139:1 151:10,11
160:13 174:3
weapon 47:4 86:12,14
169:16 178:8
weaponry 86:22
weapons 13:24 14:2
wearing 44:1
weigh 46:3,4,5
weight 47:19 49:5,8
135:19,21 160:11,12
welfare 115:25 116:5
well-being 27:4 133:20
168:21
went 4:20 24:6 31:9 44:12
53:19 77:6 98:21
103:20 110:6 173:12
weren't 28:10 56:14 60:2
60:16 128:5 130:6
172:17
we'll 3:17 21:19 43:11
64:7,21 174:19
we're 16:9 19:22 43:18
78:18 125:6 130:3

140:23 141:10 143:7
174:13
we've 18:24 21:4 32:13,13
79:24 141:19 142:19
wholly 69:14
wider 29:19
wife 8:16 32:10 33:6
36:18 53:4 78:7 83:23
110:3,10 111:13,24
Winberg 1:25 175:3,19
wires 145:8
witness 3:24 4:1,3 21:23
29:11 60:12,19 61:23
62:3,19,20,24,25 64:23
65:1 69:10 72:12
108:12 120:23 122:16
124:19 125:20 127:3
140:7,10,13 151:17,24
158:20 168:18 169:5
174:22 175:4,6,13,14
witnesses 60:22,24 61:19
wonder 91:17
wondering 92:17
word 62:14 107:25,25
111:19,25
words 56:3 109:15,19
138:2 170:3 173:18
word-for-word 107:4
work 29:21 32:5 74:19
76:23 77:3
worked 5:7 6:13,13 10:10
23:22 76:18 111:9
working 5:18 110:16
works 34:25,25
worried 59:15
worry 141:15
worthy 62:24
wouldn't 11:24 45:2 49:25
51:9 54:5 58:6 97:25
98:2 111:23 127:23
128:3,13 139:13 152:15
156:25,25 157:1 160:10
wounds 23:1,3
wrestle 100:10
wrist 105:23 134:8
written 5:25
wrong 123:6 124:14
173:3

**Y**

Y 92:4,7 172:12
yeah 5:13,23 7:6,11 10:7
14:11 15:17 16:11 19:15
30:7 46:1,17 67:22
68:19 71:12,19 74:11
77:16,24 79:8 80:14
81:1,9 90:21 92:9,13,24
93:3,23 94:13 96:5 97:7
97:17 104:1,4,13
112:25 113:25 114:4
119:5 123:20 128:15
131:14 132:25 135:25
136:24 137:10 141:1,4
144:17 146:4 147:1
148:6 171:4,17,20
172:2 173:19
year 5:8 10:4 28:7
years 5:6 6:8 20:3 67:2,2
167:11
yell 134:21 138:2
yelling 114:16,18,23,25
115:7,23 117:10,22
118:1,6 137:21
Yep 79:20 106:7 113:15
145:16 147:2 152:22
YMCA 7:7 40:15 80:9,11

81:12,15 84:9 89:3
147:22 177:23

**#**

#1598 177:12

**0**

03 3:15
05:04:03 143:12
05:07:40 145:24
071 3:15

**1**

1 34:5 162:1 177:17
1st 6:14,17 79:4
1-minute 135:7
1:22 112:21
10 6:8 22:23 134:22
10:05 65:4
10:12 65:7
10:18 107:11
10:20 107:11
10:52 101:20
101 61:20 177:8 178:2,5,7
102 178:5,7
106 178:2,5,7
107 178:2
108 177:5 178:5
109 177:5
11 3:15 177:13
11-CV-03071(SRN/JJK)
1:2
11:42 140:16
11:54 140:19
110 78:20 113:6
112 78:2
113 177:17 178:5
115 178:2
117 177:5
119 177:8
12:30 174:9
12:33 174:23
120 177:5,8
122 177:5
123 178:2
124 177:5
125 177:5
126 177:5
127 177:5
14th 57:2
14:31 53:25
14:38 178:11
146 178:20
148 177:5
15 2:24 101:22 119:3,21
130:15 177:7
15th 53:10,19 54:16,19
57:1,3 99:24
15:52:51 79:15
150 178:13
151 177:5
154 178:11
155 178:7
158 177:5
16th 53:18,21 54:12
16:00 79:19
16:09 54:12
161 178:18
168 177:5
169 177:5
174 177:2
18 177:15
19 177:15
19th 28:6
1970 99:24
1986 4:22,25

**2**

2 8:9,25 70:3 71:10,14
105:13 113:21 114:6,8
114:9 118:20
2nd 6:13,16
2-year 4:14
2:30 53:25
2:31 53:25 54:1
20 11:0:1 130:15
2002 32:14
2010 7:13 46:5 53:11 77:1
162:23 163:21 164:3
2011 10:2
2012 1:13 175:4,15 176:7
21 2:24 8:3 177:9
210 2:14
215 46:4,5
22 11:3 177:12
23 18:22 19:9 177:14
24 37:18,21 113:12
119:19 120:5 177:16
25 73:5,7,9 79:19 119:19
177:18
26 2:24 78:9 177:20
27 79:23
28 2:24 91:12 92:7 177:22
29 120:4
2900 1:18 2:7

**3**

3 113:12 114:14 134:2
153:24 163:3
3rd 75:16,4
3-prong 16:4
3-213 177:19
3:25 123:23 124:2
3:49:44 78:21
3:50 78:21
3:53 79:15
30 1:13 2:24 96:20 101:6
101:14 106:20,24 107:2
108:24 112:5 115:8
123:24 176:7 178:1
30th 175:4
31 2:24 96:20 101:13,14
102:19 106:21 108:7,24
113:1 178:3
32 96:20 108:8,17
33 2:24 96:20 101:6,14
102:19 106:21 108:10
108:14,15,24 155:23
178:6
333 1:17 2:6
34 2:24 96:13,15,15,21
178:8
35 2:24 141:11,12 154:8
154:20 178:10
350 2:14
37 2:24 53:13 65:9,10
150:6,8 177:17 178:12
38 2:24 53:16 178:14

**4**

4 20:3 25:24 26:2 47:14
54:10 107:11 110:23
125:7 160:25 177:2
4th 12:10 25:9 44:13
74:18
4-page 54:7
4:00 76:13 79:19
4:09 54:12
4:30 32:7 76:10
40 2:25 14:9 145:25
161:16 178:17
42 177:4
45 70:3 71:10,14

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
1/30/2012

**48** 2:25 146:16 178:19

---

**5**

**5** 38:14 46:2 57:12 58:3,5
    65:8,10 101:16 125:7
    125:12 150:6,11,12
    154:4 174:10
**5-1/2** 46:11,24
**5-9** 133:12
**5/29/68** 4:12
**5:04:10** 143:24
**5:04:42** 151:21 155:1
**5:10:47** 153:23
**5:29** 123:23 124:2
**50** 133:25
**51** 177:4
**52** 177:4
**53** 178:13,16
**54** 177:4
**55** 177:4
**55402** 1:18 2:7
**55415** 2:15

---

**6**

**6** 7:12 46:2 56:5 125:12
    163:18,19 164:8
**6th** 82:1 84:12,19
**6-page** 54:4
**6:05** 131:2
**6:30** 32:7
**60** 177:4
**65** 178:13
**66** 177:4
**67** 177:4
**69** 177:4

---

**7**

**7** 133:21 164:1
**7th** 1:17 2:6
**7:09** 133:15
**7:44** 134:5
**72** 177:5
**73** 177:19
**78** 177:21

---

**8**

**8** 135:8 177:11
**8:11** 135:1
**8:57** 1:14

---

**9**

**9** 14:12 38:14 76:21
    162:23 163:20 164:2
    177:17
**9th** 46:5 110:6 163:6
**9-100** 38:6 177:17
**9-11.01** 43:19
**9-111.01** 38:11
**90s** 4:20 6:9
**91** 4:20
**911** 5:18 80:18,23,24 81:2
**92** 4:20 177:23
**93** 5:15,17
**94** 19:15
**96** 19:15 178:9
**98** 19:15
**99** 6:16,17 19:16

Doby Professional Reporting, Inc.
952-943-1587

210

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
--------------------------------------------------------
Case No. 11-CV-03071(SRN/JJK)

Larry E. Smith, as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

            Plaintiff,

      vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers,
and the City of Minneapolis,

            Defendants.
--------------------------------------------------------

CONTINUATION

VIDEOTAPED DEPOSITION TRANSCRIPT OF

TIMOTHY CALLAHAN

October 16, 2012

9:34 A.M.

at

Gaskins, Bennett, Birrell, Schupp, LLP
333 South 7th Street
Suite 2900
Minneapolis, MN  55402

Court Reporter:  Janet D. Winberg, RPR

Videographer:  Jayme Hogan, Envision Video

Timothy Callahan
10/16/2012

211

1    APPEARANCES:
2    On Behalf of the Plaintiff:
3        ROBERT BENNETT, Attorney at Law
         rbennett@gaskinsbennett.com
4        JEFFREY S. STORMS, Attorney at Law
         jstorms@gaskinsbennett.com
5        KATHRYN BENNETT, Attorney at Law
         kbennett@gaskinsbennett.com
6        GASKINS, BENNETT, BIRRELL, SCHUPP, LLP
         333 South 7th Street
7        Suite 2900
         Minneapolis, Minnesota  55402
8
9    On Behalf of the Defendants:
10       C. LYNNE FUNDINGSLAND, Assistant City
         Attorney
11       c.lynne.fundingsland@ci.minneapolis.mn.us
         CITY OF MINNEAPOLIS-OFFICE OF CITY ATTORNEY
12       350 South Fifth Street
         City Hall, Room 210
13       Minneapolis, Minnesota  55415
14   Also Present:  Chris Good
15
16
17
18
19
20
21
22
23   NOTE:
     The original transcript will be delivered to the
24   noticing party, Gaskins, Bennett, Birrell & Schupp.
25   NOTE: Exhibits 115 - 118 were marked.

212

P R O C E E D I N G S

2

3       VIDEOGRAPHER:  This is the continuation
4    of the deposition of Officer Timothy Callahan.
5       The date is October 16, 2012.  The time is
6    approximately 9:34 A.M.
7       Would each attorney please state his or her
8    name for the record?
9       MR. BENNETT:  Robert Bennett, appearing
10   on behalf of the plaintiff.
11      MR. STORMS:  Jeff Storms, on behalf of
12   the plaintiff.
13      MS. BENNETT:  Kathryn Bennett, for the
14   plaintiff.
15      MS. FUNDINGSLAND:  Lynne Fundingsland,
16   excuse me, on behalf of the defendants.
17      VIDEOGRAPHER:  Thank you.
18      Would the court reporter please administer
19   the oath?
20              *   *   *
21   (Witness sworn.)
22          TIMOTHY CALLAHAN,
23   called as a witness, being first duly sworn,
24   was examined and testified as follows:
25              *   *   *

213

1              EXAMINATION
2    BY MR. BENNETT:
3    Q.   We're going to cover this hopefully in some kind
4    of section so it makes sense.
5       And what I want to talk about first is the
6    training that -- that you received.
7       We have, for purposes of these questions,
8    both portions of the transcript and video
9    transcript of Officer...
10      MR. BENNETT:  Or is it Sergeant Brad
11   Anderson?
12      MR. STORMS:  Brian.
13      MR. BENNETT:  Brian Anderson.  Sorry.
14   BY MR. BENNETT:
15   Q.   And -- and some of the actual training officers
16   that you had.
17      MR. BENNETT:  Where's my...
18   Let's go off the record for one second.
19      VIDEOGRAPHER:  Off the video record at
20   9:35 A.M.
21      (Off the record.)
22      MR. BENNETT:  I can go back on.
23      VIDEOGRAPHER:  We are back on the video
24   record at 9:35 A.M.
25   BY MR. BENNETT:

214

1    Q.   Your training records indicate that you received
2    training in the fall of 2009 for -- regular
3    In-Service Training for Legal Updates, the
4    EIS systems and CIT.
5       Do you remember receiving that?
6    A.   What date was that?
7    Q.   It was October 19, 2009.
8    A.   I can't recall specifically --
9    Q.   All right.
10   A.   -- that.
11   Q.   Okay.
12   A.   This?
13   Q.   Yeah.  Do you agree that you...
14      That's a six-hour course?
15   A.   Do I agree that it's a six-hour course?
16   Q.   Yes.
17   A.   Yes.
18   Q.   Do you see that you were -- or at least it is
19   recorded that you passed?
20   A.   Yes.
21   Q.   Would you infer from that pass that you went and
22   attended?
23   A.   I would.
24   Q.   Okay.  Do you remember attending?
25   A.   I don't.

2 (Pages 211 to 214)

Timothy Callahan
10/16/2012

215

```
 1   Q.  Do you remember who taught it?
 2   A.  I don't.
 3   Q.  I'd like you to look at some testimony regarding
 4       certain aspects of this training.
 5           This is Brian Anderson's testimony.
 6           (Brian Anderson Embedded Video
 7           Page 80, Line 15 - Page 81, Line 20)
 8           "Q.  Prior to September 9, 2010 did the MPD
 9       provide its officers with training on how to
10       identify if a subject was suffering from the
11       effects of mental illness?
12           "A.  When you say 'provide' do you say it to
13       the department or to the specific individuals?
14           "Q.  Did it provide to its officers.  So not
15       the department, but all of its officers.  Let's
16       start there.
17           "A.  I want to...  Yes.
18           "Q.  So if you were an MPD officer on
19       September 9, 2010 you would have expected they
20       would have received at least some training on
21       how to identify individuals suffering from
22       mental illness?
23           "A.  They would have received...  I can't
24       testify -- until I look at the records to say
25       how much individuals -- certain individuals
```

216

```
 1       group that Officer Anderson, as the legal
 2       designee, official designee of the city on
 3       training, indicated would be the regular street
 4       officer; is that true?
 5   A.  Yes.
 6   Q.  All right.  And you didn't have the 40-hour
 7       course, but you had the CIT course that was
 8       embedded in the -- the regular in-service
 9       training?
10   A.  Can you say that again?
11   Q.  You didn't have the 40 hours?
12   A.  I did not have the 40-hour --
13   Q.  The --
14   A.  -- CIT course.
15   Q.  -- CIT training?
16   A.  No, I did not.
17   Q.  But you had the CIT training that the city
18       provides that Officer Anderson talked about that
19       it provides to the regular street officers in
20       the in-service training; correct?
21   A.  If we were -- if that was part of our in-service
22       for that time and that's what was being
23       discussed at that time and I attended it, then
24       yes.
25   Q.  Well, the records indicate that's all -- all
```

217

```
 1       those things are true; correct?  Your official
 2       training record --
 3   A.  Yes.  But --
 4   Q.  -- would verify --
 5   A.  -- what I'm saying to you is I don't recall that
 6       particular in-service.
 7           But I -- if we went to it and that was what
 8       was taught at in-service and I -- and it's
 9       indicated that I was there, then I was there.
10   Q.  And you understand --
11   A.  We go to in-service all the time and I can't --
12       I can't remember exactly every time that I have
13       -- I mean I've been...  For 20 years I've been
14       to in-service.
15   Q.  So how many times have you received CIT
16       training?
17   A.  I don't know.
18   Q.  More than once?
19   A.  I don't know.  We'd have to look at the record
20       to see how many times --
21   Q.  They're --
22   A.  -- it was.
23   Q.  -- in front of you.
24           Why don't you take a look?
25   A.  You want me to look through --
```

218

```
 1   Q.  Sure.
 2   A.  -- every one?
 3   Q.  Exhibit 23 is there for you to look.
 4   A.  (Coughing.)  Excuse me.
 5           Some of them just say "In-service Training,"
 6       so I don't know what was -- what -- what the
 7       topic was at those.
 8           I only see one that says -- specifically
 9       says "CIT."
10   Q.  And you're --
11   A.  Which is what I would interpret as what you're
12       talking about.
13   Q.  And what Brian Anderson was talking about?
14   A.  We're talking about the same thing; right?
15   Q.  Yes.
16   A.  Yes.
17   Q.  And -- and the CIT training provided to
18       Minneapolis police officers as a regular patrol
19       officer, that's what you got according to your
20       training records?
21   A.  The one -- there's only one that says
22       specifically "CIT."  There are many that just
23       say, "In-Service Training."
24   Q.  All right.
25   A.  I don't know what was -- those -- I don't know
```

3 (Pages 215 to 218)

Timothy Callahan
10/16/2012

219

1    what those training blocks were specifically.
2  Q.   So then it -- it may... But you got it at least
3    once less than a year preceding the incident
4    with David Smith?
5  A.   It would -- it would appear that way, yes.
6  Q.   And you may have had it more times in regular
7    Fall In-Service Training that aren't
8    specifically noted?
9  A.   Perhaps.
10  Q.   Okay.  Have you received training on
11    de-escalation of -- of situations with the
12    mentally ill?
13  A.   Again, I can't -- I don't know specifically.
14    And I -- and I don't recall what the particular
15    information was from the 2009 one.  Perhaps.
16  Q.   Do you remember the concept of de-escalation?
17  A.   I believe so, yes.
18  Q.   Do you know what I'm referring to as it relates
19    to Crisis Intervention Training?
20  A.   I -- I don't know that I could tell you --
21    recite the specifics of it, but I -- I
22    understand what the term is.
23  Q.   The general concept?
24  A.   Yes.
25  Q.   Tell me what you think it is.

220

1  A.   It -- I don't know that it's necessarily any
2    different than you would use for anybody that
3    you think needs to be calmed down or let them
4    know that they're not in any danger, that
5    there -- that, you know, we're there to help
6    them.
7  Q.   Have you had -- been taught any particular steps
8    to do that when you -- there's a recognition of
9    mental illness on the part of the individual
10    you're dealing with?
11  A.   I'm not -- can you say it again, please?
12    MR. BENNETT:  Can you read it back?
13    Because I think I -- I articulated the question
14    correctly, didn't I?
15    (The following was read back by the
    court reporter:
16
    "Q.  Have you had -- been taught any
17    particular steps to do that when you -- there's
    a recognition of mental illness on the part of
18    the individual you're dealing with?"
19    THE WITNESS:  I'm not sure.
20    MR. BENNETT:  Okay.
21    (Sotto voce comments.)
22    MR. BENNETT:  If you'd look back.
23    THE WITNESS:  Oh.  The bar code thing?
24
25

221

1    Brian Anderson Embedded Video
2    Page 174, 7 - Page 174, Line 12)
3
4    "Q.  And so this document would reflect that
5    all officers have received at least some sort of
6    training on how to de-escalate situations
7    involving individuals with mental illness?
8    "A.  Correct.  This would have been more of
9    the awareness training that was put out."
10  BY MR. BENNETT:
11  Q.   That's the...  Again, the awareness training is
12    for the regular street officers and the CIT
13    training -- the 40-hour CIT training is for
14    specific volunteers for that; correct?
15  A.   Yes.
16  Q.   Okay.  Did Gorman go with you to that training?
17    MS. FUNDINGSLAND:  Are you talking about
18    the one in 2009?
19    MR. BENNETT:  The Fall in-Service in
20    2009.
21    THE WITNESS:  I -- I don't -- to my
22    knowledge I can't -- I don't know that we've ever been to
23    in-service training together.
24    And I'm not sure that he was in the precinct
25    at that time.  He came down I think in 2009.

222

1    I'm not sure when.
2    MR. BENNETT:  Okay.
3    (Sotto voce comments.)
4  BY MR. BENNETT:
5  Q.   Do you know Adam Grobove?
6  A.   Yes, I do.
7    (Adam Grobove Embedded Video
    Page 18, Line 21 - Page 19, Line 6)
8
9    "Q.  Did you ever train either Officer
    Callahan or Officer Gorman?
10    "A.  Yes.
    "Q.  In CIT training?
11    "A.  Yes.
    "Q.  Which ones?
12    "A.  I would have to look exactly at the
    training records to make sure when they attended
    to be accurate for you.
13    "Q.  But you remember training both of them?
    "A.  Yes."
14
15  BY MR. BENNETT:
16  Q.   And the record reflects that you received your
17    training for CIT in 2009 on 9/14/2009; correct?
18  A.   Okay.  Yes.
19  Q.   And if you look at Exhibit 43, which is Timothy
20    Gorman's training records, you'll see that he
21    received it a week later, on 9/21/2009, the CIT,
22    the same training you -- that you got, the
23    six-hour class.
24  A.   Okay.
25  Q.   Do you agree?

4 (Pages 219 to 222)

Timothy Callahan
10/16/2012

223

1   A.   I see that that's what it says, yes.
2   Q.   Okay.  And it shows that he passed, as well?
3   A.   That's what it says.
4   Q.   Does -- does the Grobove's testimony refresh
5        your recollection as to who taught you?
6   A.   No.
7   Q.   You don't have any reason to --
8   A.   Well, when you -- you -- on the --
9            MS. FUNDINGSLAND:  Let -- let him
10       finish --
11           THE WITNESS:  Okay.
12           MS. FUNDINGSLAND:  -- the question,
13       please.
14  BY MR. BENNETT:
15  Q.   Do you have any reason to believe it wasn't
16       Grobove, as he testified?
17  A.   Officer Grobove specifically said CIT.  That...
18       Now I'm not sure if he's mistaken that I'm a
19       CIT officer or Officer Gorman is a CIT officer.
20  Q.   No, he was taught the regular in-service
21       training.
22  A.   Okay.  I don't recall it.
23  Q.   Okay.  So you would not deny that you received
24       training on how to de-escalate situations
25       involving individuals with mental illness?

224

1   A.   No.
2   Q.   And you wouldn't deny that you received training
3        in identifying people with mental illness?
4   A.   If that's what they say was taught on that date,
5        then -- then no.
6   Q.   Well, do you remember what was taught?
7   A.   I don't remember it.
8   Q.   Okay.  The idea of training is to provide you
9        with necessary information to help you operate
10       on the street; correct?
11  A.   Yes.
12  Q.   I mean as a regular street officer, patrol
13       officer, you from time to time have to deal with
14       people, especially in downtown Minneapolis, who
15       have problems with mental illness?
16  A.   Do we have to deal with people on --
17  Q.   Yes.
18  A.   -- a regular...
19       Yes.
20  Q.   You have to deal with people who are inebriated?
21  A.   Yes.
22  Q.   And... Did you recognize David Smith as one of
23       those people?
24           MS. FUNDINGSLAND:  Can you break that
25       down?

225

1   BY MR. BENNETT:
2   Q.   Did you recognize --
3            MS. FUNDINGSLAND:  Inebriated or
4        mentally ill?
5   BY MR. BENNETT:
6   Q.   Did you recognize him as -- as a person who
7        likely had mental illness problems?
8   A.   I don't think so initially, when we first saw
9        him.
10  Q.   When you first saw him he was digging in his bag
11       that contained his worldly goods; correct?
12  A.   Yes.
13  Q.   Isn't that what you basically said in your
14       statement?
15  A.   He was going through bags that I assumed were
16       his and I -- I believe we know now that they
17       were his.
18  Q.   Okay.  And you'd received information that would
19       be consistent with dealing with a person who had
20       mental illness; correct?
21  A.   I don't believe so.
22  Q.   Okay.
23  A.   Do you have a copy of the call?
24  Q.   Well, it was an un-want person call; right?
25  A.   Right.

226

1   Q.   The... Do you remember what was dispatched?
2   A.   That's why I asked if you have a copy of the
3        call.  I believe it was just a person that was
4        unwanted.  I don't -- I don't believe there was
5        information in there that would indicate he was
6        a -- what we would refer to as an EDP,
7        emotionally disturbed person.
8   Q.   Okay.  How did you get to the 6th floor?
9   A.   Elevator.
10  Q.   Did somebody have to take you up there?
11  A.   A YMCA employee --
12  Q.   And --
13  A.   -- brought us up there.
14  Q.   And who was that?
15  A.   I don't remember her name.
16  Q.   When that occurred did she give you additional
17       information about the subject?
18  A.   A -- a little bit.  Not a lot.
19  Q.   What information?
20  A.   I -- I'm not a hundred percent sure exactly what
21       she said, but she -- basically, as I recall,
22       that there was an individual up there that was
23       acting strangely and had intimidated a juvenile.
24  Q.   Okay.  And that didn't give you any indication
25       that he was EDP?

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

227

1   A.   That's -- that's not definitive evidence that
2        he's an EP [sic].  Some people are just jerks.
3   Q.   Sure.  Is it -- is it suggestive of an EDP?
4   A.   It could be.  It could be somebody...  It could
5        be a number of different things.
6   Q.   Well, he had -- you know -- you -- you -- we've
7        covered this before so I won't do it again.
8        You didn't go up there based on any criminal
9        allegations whatsoever; correct?
10  A.   No.
11  Q.   I was correct?
12  A.   You are correct.
13  Q.   All right.  And -- and so that you're going up
14       there in a situation that's -- that's
15       non-criminal about someone who's acting
16       strangely; correct?
17  A.   Based on the information that I had, I was not
18       -- I had no reason to believe that he had done
19       anything criminal.
20  Q.   But -- but my premise is correct?  It was a
21       non-criminal situation where the information you
22       received is that he has acted strangely towards
23       a young boy?
24  A.   Well, the Y wanted him ejected from the Y.
25  Q.   For acting strangely, as you indicated?

228

1   A.   That's their prerogative.
2   Q.   Sure.  But what I'm asking is did you have
3        the in...
4        My understanding is you had the information,
5        and it was non-criminal, about a person who was
6        acting strangely, that the Y wanted removed from
7        the premises; is that fair to say?
8   A.   Yes.
9   Q.   Okay.  You also received Taser training?
10  A.   Yes.
11  Q.   And is the first Taser training you received in
12       2009 in April?
13  A.   April...  I'm looking at the wrong thing here.
14       I think this is Officer Gorman's.
15  Q.   Yeah, you've got Gorman's.
16  A.   Ah...
17  Q.   We know he wasn't Taser certified.
18  A.   This is -- is this what you're referring to?
19  Q.   Yeah.  Well, I don't know.  Is it -- is it -- in
20       Caps it says, "2009 BASIC TASER OPERATOR"?
21  A.   Yes.
22  Q.   Yes.
23  A.   It would -- it looks that way, yes.
24  Q.   And so you're taught the...  Do you remember
25       what that class includes?

229

1        (Sotto voce comments.)
2        MS. FUNDINGSLAND:  There's a question
3   pending.
4        THE WITNESS:  Oh.  Well...
5   BY MR. BENNETT:
6   Q.   Do you remember what -- it's eight hours of
7        Taser training.  What is it comprised, as best
8        you can recollect?
9   A.   The basic functioning of -- of the CED.
10  Q.   That doesn't take eight hours, does it?
11  A.   I don't know.
12  Q.   Did they -- did they train you regarding the
13       warnings put out by Taser, the manufacturer's
14       warnings?
15  A.   I think those warnings were issued...  I'm not
16       sure if those warnings were in effect when I
17       went through that class.
18  Q.   Other -- Tasers had warnings since they put out
19       Tasers, their own...
20  A.   No, there was some different...  They came out
21       with some additional stuff --
22  Q.   In 2009 they did?
23  A.   I don't know.
24  Q.   But I mean there was -- there's ones that have
25       been general the -- the -- the whole time, the

230

1        regular operating one, that you don't shoot
2        somebody on an elevated surface.
3        You don't...  I think they actually had
4        pregnant women.  They removed pregnant women.
5        People in flammable substances.
6        You remember some of the major --
7   A.   Yes.
8   Q.   -- things --
9   A.   Yes.
10  Q.   -- that you're not supposed to use a Taser in;
11       correct?
12  A.   Yes.
13  Q.   Not while somebody is operating machinery or a
14       car?
15  A.   Yes.
16  Q.   Because they'll crash; right?
17  A.   Okay.
18  Q.   I mean you remember that; right?
19  A.   I know that there are -- yes.
20  Q.   And you get -- there's a -- there's a Taser
21       PowerPoint that's like -- it's like Microsoft?
22  A.   Yeah.
23  Q.   It's versions 10.0...  You know.  I think
24       they're up to 15 or 16 now.
25  A.   Okay.

6 (Pages 227 to 230)

Timothy Callahan
10/16/2012

231

1   Q.   But they show you that; right?
2   A.   I believe so, yes.
3   Q.   They go through the operating characteristics of
4        the weapon itself; right?
5   A.   Yes.
6   Q.   Okay.  You know, they show you where the safety
7        is.  Show you where the laser is.  And then you
8        do -- you get tased; right?
9   A.   No.
10  Q.   You didn't -- you didn't get tased?
11  A.   (Shaking head.)
12  Q.   They don't require that anymore?
13  A.   You can volunteer to do it.
14  Q.   And you did not?
15  A.   Not there, no.
16  Q.   Have you been tased?
17  A.   Once.
18  Q.   Before that?
19  A.   Many years before that.
20  Q.   Okay.  So you didn't feel the need to repeat the
21       experience?
22  A.   I did not.
23  Q.   All right.  I wouldn't -- I agree with you.
24       But they also train you with regard to the
25       specific policy of the Minneapolis Police

232

1        Department on Tasers; correct?
2   A.   Yes.
3   Q.   Okay.  That's Exhibit 91.
4            MR. STORMS:  90.
5            MR. BENNETT:  90.  Pardon me.
6   BY MR. BENNETT:
7   Q.   Showing you Exhibit 90, that is the Minneapolis
8        Police Department's Operation Section
9        Use-of-Force Policy.  And particularly draw your
10       attention to page 9 of that policy.
11           5.314 says, "USE OF CONDUCTED ENERGY DEVICES
12       (CED) 8/17/07."
13           Do you see that?
14  A.   Yes.
15  Q.   You're trained specifically on that policy in
16       the Taser operation course; correct?
17  A.   Yes.
18  Q.   And it trains that...
19           If you look at the last paragraph on the
20       page it says, "Sworn employees..."
21           That's you; right?  That's officers?
22  A.   Yes.
23  Q.   "...shall routinely monitor the medical
24       condition of a person that has been exposed to
25       electricity from a CED until they are released

233

1        to medical or other law enforcement personnel
2        [sic]."
3            That's part of the training specific to the
4        Taser -- the Taser usage; correct?
5   A.   Yes.
6   Q.   The -- if you go up into the prior paragraph it
7        says, "Post exposure treatment," that is
8        "(Medical Aid) for a person that has been
9        exposed to electricity from the CED shall
10       include the following..."  And the first
11       bullet point is:  "Determine if the subject is
12       injured and requires EMS [sic]."
13           Correct?
14  A.   Yes.
15  Q.   And you had EMS training?  The records reflect
16       that.
17  A.   Very basic EMS training.
18  Q.   Well, again, the department provides EMS
19       training that they believe is sufficient to
20       allow you to operate on the street; correct?
21           MS. FUNDINGSLAND:  I'm going to object
22       to the form of the question.
23           THE WITNESS:  To my knowledge the only
24       EMS training that we've had in many years is
25       CPR.

234

1            MR. BENNETT:  Okay.
2   BY MR. BENNETT:
3   Q.   Did you get EMS training as part of the Taser --
4   A.   Not --
5   Q.   -- operation?
6   A.   Not that I recall.
7   Q.   Did you get -- did they school you on what to
8        look for after the use of conducted energy
9        device in the Taser operation in terms of
10       following this policy?
11  A.   I don't -- I don't think any more than what is
12       right here.
13  Q.   But you see that the Taser -- any use of the
14       Taser would engender a required response of
15       monitoring routinely the medical condition of
16       the person who's been tased; correct?
17  A.   It says that at the -- at the very bottom
18       paragraph that you indicated earlier.
19  Q.   Uh-huh.  Did they tell you why?
20  A.   I -- I don't recall it specifically.
21  Q.   Are you required to call for medical personnel
22       once you have tased somebody?
23  A.   No.
24  Q.   What was your plan for the removal of David
25       Smith after you had tased him and secured him?

7 (Pages 231 to 234)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

### 235

```
1   A.   I -- I wanted him to leave on a stretcher
2        because I didn't -- in case he decided to fight
3        in the elevator, I didn't want to have to try to
4        fight him in an elevator in an enclosed place.
5             So I wanted the EMS to come and check him
6        out because of his behavior and hopefully remove
7        him on a stretcher.
8   Q.   So you -- you wanted the hospital people to
9        remove him, medical personnel?
10  A.   From the 6th floor, yes.  I believed -- after
11       the fact I believe that he needed to go to the
12       hospital based on his behavior.
13  Q.   Which part of the hospital?
14  A.   Well, that would be determined by the hospital.
15  Q.   Well, did you think he was going to the
16       emergency room or the psyche ward?
17  A.   Probably the APS.
18  Q.   Which is the Adult Psychiatric Services?
19  A.   Yes.
20  Q.   All right.  Why was a supervisor called?
21  A.   Because we used force.
22  Q.   Yeah.  If you'd look at...  This is the Taser
23       training.
24
25
```

### 236

```
1         (Brian Anderson Embedded Video
           Page 104, Line 1 - Page 105, Line 14)
2
3         "Q.  Well, first of all, when this policy
      was issued, my -- my understanding is the issue
      date would be 8/17/07: is that correct?
4         "A. Correct.
          "Q. Okay.  And as we discussed earlier, you
5     would have expected that this policy, upon
      issuance would have been circulated throughout
6     the MPD?
          "A. Correct.
7         "Q. And you had an opportunity to review
      the training records in this case and some of
8     those training records did relate to conducted
      energy devices; correct?
9         "A. Correct.
          "Q. Okay.  And from your review of the
10    training records were you able to tell whether
      or not officers had been trained with respect to
11    this policy by the MPD prior to September 2010?
          "A. Officer Callahan had, yes.
12        "Q. With respect to this policy?
          "A. Yes.
13        "Q. Do --
          "A. This specific policy, yes.
14        "Q. Do you know whether or not
      Officer Gorman had been trained with respect to
15    this specific policy?
          "A. I can't say what training that he
16    specifically had on this policy, but I know that
      this policy had been sent out to everybody in
17    the department so he would have had the
      opportunity to read it.
18        "Q. Now at the very bottom of the policy it
      states that, 'Sworn employees shall routinely
19    monitor the medical condition of a person that
      has been exposed to electricity from a CED until
20    they are released to medical or other law
      enforcement personnel.'  Do you see that?
21        "A. Yes.
          "Q. And 'sworn employees,' that would be
22    either Officer Gorman or Officer Callahan?
          "A. Correct."
23
24    BY MR. BENNETT:
25    Q.  So you agree you'd received that specific
```

### 237

```
1        training in accordance with departmental policy?
2   A.   Yes.
3   Q.   Okay.
4        (Brian Anderson Embedded Video
          Page 112, Line 19 - Page 113, Line 5)
5
          "Q.  And so the duty to monitor -- monitor
6     the medical condition of a subject, that's
      something that on September 9, 2010 was
7     specifically in place post-tasing?
          "A. Correct.
8         "Q. Okay.  And you would have expected that
      even non-certified -- non-certified or non-Taser
9     certified officers would have had an
      understanding that they had a duty to monitor
10    the medical condition of a subject after they
      were tased?
11        "A. Correct."
12  BY MR. BENNETT:
13  Q.   And that's something you agree to, as well?
14  A.   I don't know that officers that don't have the
15       CED, it would have been applicable to them.  I'm
16       not sure.
17  Q.   Well, everybody has to follow the use-of-force
18       policy, all MPD sworn employees?
19  A.   Yes.
20  Q.   So that would include Gorman with regard to the
21       Taser policy?  They're supposed to --
22  A.   Well, I mean you're asking me specifically if
23       he's aware of that or if he's -- I don't know.
24  Q.   I didn't ask you if you specific...
25        Well, you understood that obligation
```

### 238

```
1        yourself personally then; correct?
2   A.   Yes.
3   Q.   And if Gorman followed the policy it would
4        require that, as well; correct?
5   A.   The policy states that we routinely monitor the
6        medical condition.
7   Q.   And there's a policy that says you're supposed
8        to read the policies; right?
9   A.   Well, the policy is the policy.
10  Q.   And -- and you're required to know and
11       understand the policies --
12  A.   Yes.
13  Q.   -- as a sworn officer?
14  A.   Yes.
15  Q.   Whether you use the CED or not?
16  A.   Okay.
17  Q.   Well, you agree?
18  A.   Well, I'm -- I'm not -- I don't know what
19       Officer Gorman knows.
20  Q.   Well, I didn't ask...  Officer Gorman's name
21       didn't even appear in the...
22        You're expected to follow --
23  A.   Well, --
24  Q.   -- pol- --
25  A.   Well, that's what you're asking me, though, --
```

8 (Pages 235 to 238)

Timothy Callahan
10/16/2012

239

```
1    Q.   No.
2    A.   -- if we both are aware of this.
3    Q.   No.  I'm asking you are you both required to
4         follow the policy?  I don't even care if you're
5         aware of it.
6    A.   We are -- we have a policy and -- and we are
7         required to follow our policies.
8    Q.   Okay.
9              (Sotto voce comments.)
10             (Brian Anderson Embedded Video
11             Page 106, Line 20 - Page 107, Line 20)

11        "Q.  And aside from just the tasing, I guess
12    we can back up to Section 5-306.
13        "Now here it states that, 'Any sworn MPD
13    employee that uses force shall comply with the
14    following requirements.'
14        "And the first it lists is 'Medical
15    Assistance.'  And states, 'As soon as reasonably
15    practical, determine if anyone was injured and
16    render medical aid consistent with training and
16    request emergency medical service if necessary':
17    correct?
17        "A.  Correct.
18        "Q.  So this policy works similar to the
18    Taser policy we discussed, in that after you use
19    some level of force the first thing you want to
19    do, as soon as it's reasonably practical, is
20    monitor the medical condition of the subject you
20    used force on?
21        "A.  Correct.
21        "Q.  Okay.  And that's been standard
22    training since well before September 2010?
22        "A.  Correct.
23        "Q.  The need to monitor the medical
23    condition, as set forth in this policy, reflects
24    the officers' obligations under the
24    4th Amendment: correct?
25        "A.  Correct."
```

240

```
1    BY MR. BENNETT:
2    Q.   Would you agree with the answers to the
3         questions that Officer Anderson gave?
4              MS. FUNDINGSLAND:  Sergeant.
5              MR. BENNETT:  Sergeant Anderson.
6         Thank you, counsel.
7              THE WITNESS:  Yes.
8              MR. BENNETT:  All right.
9    BY MR. BENNETT:
10   Q.   So do you think we've established in your mind
11        that -- that monitoring the medical condition of
12        the person you used force on, used a Taser on,
13        or put in a prone restraint requires monitoring
14        their physical condition and health?
15   A.   If I had reason to believe that they were in
16        distress or injured, then yes.
17   Q.   Uh-huh.  And part of it, of course, is if you're
18        monitoring, you're paying attention.
19   A.   I'm not monitoring your condition right now, but
20        I can see that you're okay.
21   Q.   Well, and obviously we'll get to that.
22        There are indicia that normal human beings
23        in interaction give each other that their
24        physical condition is fine.  You and I can, by
25        looking and talking to each other, have
```

241

```
1         determined that we're both okay this morning;
2         correct?
3    A.   Yes.
4    Q.   But we haven't had a ground fight, been tased,
5         or put in the prone restraint position after
6         being handcuffed; correct?
7    A.   No.
8    Q.   And I've been responsive when you said something
9         to me and you've certainly been responsive when
10        I've said something to you; correct?
11   A.   Yes.
12   Q.   So you can -- you know that by making noise
13        we're breathing; correct?
14   A.   Yes.
15   Q.   And we can extrapolate from the fact that we're
16        both sitting here and moving and acting
17        appropriately that our pulse is probably okay
18        without the need to check it; correct?
19   A.   Yes.
20   Q.   But if I fell face forward on the -- on the --
21        on the table here and no longer asked questions
22        and no longer moved and you asked me questions
23        and I didn't respond, you might think something
24        was wrong, wouldn't you?
25   A.   I might.
```

242

```
1    Q.   Okay.  And you'd probably do something about it.
2         Maybe not want to, as much as the next guy, but
3         you probably would anyway, wouldn't you?
4              MS. FUNDINGSLAND:  Don't push it, Bob.
5              MR. BENNETT:  I understand.
6    BY MR. BENNETT:
7    Q.   But you get the point?
8    A.   Yes, I do.
9    Q.   All right.  And maybe it's more applicable than
10        not.  I mean you'd been in a situation where you
11        had reason to, in your own words, become angry
12        with David Smith; correct?
13   A.   I wasn't angry with him.
14   Q.   You said you were in your testimony before,
15        didn't you?
16   A.   I was -- I was angry that I had got punched, but
17        it wasn't personal.  I wasn't personally --
18   Q.   I can --
19   A.   -- angry with him.
20   Q.   Do you want me to read the answer to you?  Do --
21   A.   No, I --
22   Q.   Have you read your deposition?
23   A.   -- understand what I said.
24   Q.   Did you say that you were angry with him?
25   A.   Not on a personal level.  Or a professional.
```

9 (Pages 239 to 242)

Timothy Callahan
10/16/2012

243

1    I was -- I was mad that that happened.
2    Q.   Okay.  Well, I guess I'll...  Just so the record
3    is clear...
4           MR. BENNETT:  Let's go off the record
5    for just a second here.
6           VIDEOGRAPHER:  Off the video record at
7    10:11 A.M.
8           (Off the record.)
9           MR. BENNETT:  Let's go back on the
10   record.
11          VIDEOGRAPHER:  One moment, please.
12   We are back on the video record at
13   10:12 A.M.
14   BY MR. BENNETT:
15   Q.   I asked you when you said, quote,
16   "Oh, mother fucker," I asked, "What's that
17   about?"  And you gave the following answer,
18   page 131, line 7.
19          "I was angry about getting punched in the
20   face."
21          And then I say, "Okay."
22          And he [sic] added, "I was in pain."
23          Is that true?
24   A.   That's true.
25   Q.   Okay.  And you also said that you were angry

244

1    about being punched by him, correct, on
2    page 136?
3           MS. FUNDINGSLAND:  I'd ask that you show
4    him the depo.
5           MR. BENNETT:  Yeah.
6    BY MR. BENNETT:
7    Q.   And then you said, "...but it wasn't a personal
8    thing for me."
9           So you're telling us that when you leaned
10   down to him and said, "You mother fucker, you
11   better not have broke my jaw," that was not a
12   personal thing for you?  Is that what you're
13   telling us under oath?
14   A.   I -- I don't deny that I said those words.
15   I'm -- I'm saying it was not a personal thing
16   for me.
17   Q.   Well, --
18   A.   Something that -- sometimes that happens.
19   Q.   Was there -- yeah, I understand.
20          And sometimes you get angry about it.
21   A.   I -- I -- the reason I was probably angry is I
22   was concerned that it might actually be broken.
23   Q.   And it wasn't, was it?
24   A.   It was not.
25   Q.   Did you -- you didn't have any actual medical

245

1    treatment to it, did you?
2    A.   I went to the hospital.
3    Q.   I -- I understand.  They looked at it.  X-rayed
4    it?
5    A.   I think so.
6    Q.   Well, but they didn't -- your jaw was not --
7    A.   It was not broken.
8    Q.   -- broken?
9           There was nothing...
10          Have you had any medical treatment for it?
11   Any brace?  Was your jaw wired?
12   A.   No.
13   Q.   Anything like that?
14          Were you required to take any medication for
15   it?
16   A.   Just over-the-counter.
17   Q.   Okay.  So you took some Advil or something
18   to...
19   A.   Yes.
20   Q.   Or put ice on it or something like that;
21   correct?
22   A.   Yes.
23   Q.   But this is at the six -- you realize that your
24   "mother fucker" comments are from 6:05 to 6:41;
25   correct?

246

1    A.   I don't know.
2    Q.   Well, look at --
3    A.   I don't dispute it.
4    Q.   I know, but I don't want you to think I'm just
5    making this stuff up either.
6           Exhibit 30 is the IA pen camera video.
7    At 6:05 you start talking about, "The jaw hurts
8    on this side."  Do you see that?
9    A.   Uh-huh.  Yes, I do.
10   Q.   Okay.  You go on at 6:11 to say, "Oh, mother
11   fucker"; right?
12   A.   Yes.
13   Q.   And then you go -- you say, "Oh, fuck," at 6:22?
14   A.   I don't recall that, but okay.  Yes.
15   Q.   Well, I -- this is the IA --
16   A.   Well, they've been wrong on some other stuff.
17   Q.   Okay.  Do you remember saying, "Oh, fuck"?
18   A.   Not really.
19   Q.   Okay.  Do you remember saying, "I can't bite
20   down.  Mother fucker..."
21          "I can't bite down."  Period.  "Mother
22   fucker, you better not have broke my fucking
23   jaw," at 6:46?
24   A.   Okay.  I -- I -- I know I said that.  Now...
25   I thought that was this.  I don't know about

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

247

1    that one there. I don't remember saying --
2    Q.   We --
3    A.   -- that. I don't --
4    Q.   We can play it.
5    A.   Okay. I'm just saying I don't remember it.
6    Q.   Okay. But --
7    A.   This one I remember it.
8    Q.   But I asked you specifically at page 140 -- 131
9         about...
10        And we had looked at the... At the prior
11        deposition we looked at the pen camera, didn't
12        we?
13   A.   Yes.
14   Q.   A number of times?
15   A.   Yeah.
16   Q.   And I asked you -- and then we talk, "My jaw
17        hurts on this side."
18        "Yes."
19        "Not going to call -- wait for somebody to
20        get down with this call [sic]"?
21   A.   No. "...done with roll call."
22   Q.   "...done with roll call."
23   A.   That was -- that was in reference to a
24        supervisor.
25   Q.   Coming?

248

1    A.   Yes.
2    Q.   You were talking about waiting for somebody --
3    A.   That's right.
4    Q.   -- about whether...
5         And then you go at one thirty -- 6:05 you
6         say, "My jaw hurts on this side."
7         Gorman responds seconds later with, "The
8         whole right side of your face is all red."
9         And then you say, "Oh, mother fucker."
10   A.   Okay.
11   Q.   And then I ask you specifically at that
12        time--you were angry about being punched in the
13        face.
14        And -- and you remained angry about
15        something from 6:05 until 6:45; correct?
16   A.   45 minutes?
17   Q.   45 seconds.
18   A.   Oh.
19   Q.   It's -- well, it's about 35 seconds.
20   A.   Okay.
21   Q.   But I mean you're still angry about the jaw
22        thing from the time you say, "Oh, mother fucker"
23        until you say, "Mother fucker, you better not
24        have broke my fucking jaw"?
25   A.   Yeah, I don't dispute that I said that.

249

1    Q.   What was going to... I know. What was the
2         "or else"? What -- what -- what would have
3         happened if you'd have broke your jaw? What
4         were you going to do to him?
5    A.   I wasn't going to do anything to him. If I had
6         wanted...
7         I was angry because I didn't want my jaw to
8         be broken. That would keep me from work.
9    Q.   Uh-huh.
10   A.   I didn't want to be on a desk for however long
11        it takes for a broken jaw to heal.
12   Q.   Okay. But it wasn't for a minute and 10 seconds
13        until you did the first check of his pulse;
14        correct? After you say, "Oh, mother fucker, you
15        better not have broke my jaw"?
16   A.   That is what the document you're showing me
17        says, yes.
18   Q.   The IA Timeline of Events of the pen camera
19        video?
20   A.   Okay.
21   Q.   Exhibit 30.
22   A.   All right.
23   Q.   Okay.
24        (Sotto voce comments.)
25   BY MR. BENNETT:

250

1    Q.   Do you dispute that?
2         MS. FUNDINGSLAND: Can you be more
3    clear?
4    BY MR. BENNETT:
5    Q.   Well, do you dispute the transcript, any other
6         portion other than the quote that says,
7         "Fucking mope"? I understand you just -- that
8         you -- that's in the I think the exhibit --
9         that's in the Taser video, too.
10        But do you dispute anything on Exhibit 30?
11   A.   No.
12   Q.   Okay.
13        (Sotto voce comments.)
14        MR. BENNETT: Let's look at this one.
15        (Brian Anderson Embedded Video
         Page 113, Line 13 - Page 114, Line 5)
16
         "Q. And it's a little... In some sense
17   it's superfluous or redundant, I guess, that you
     need to monitor the medical condition of someone
18   post-tasing because the policy was already
     requiring officers to monitor the medical
19   condition of a subject after any force?
         "A. Correct.
20        "Q. Okay. And in terms of monitoring the
     medical condition of a subject, and I think we
21   touched on it briefly, things that officers were
     trained prior to 2010 to observe would be, 'Is
22   the subject breathing'?
         "A. Correct.
23        "Q. 'Are they conscious'?
         "A. Correct.
24        "Q. 'Do they have any other
     life-threatening injuries'?
25        "A. Correct."

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

251

1  BY MR. BENNETT:
2  Q.   Do you agree with the training designee,
3       official designee of the city in that regard,
4       with regard to those questions and answers?
5  A.   That's -- it -- was he reading from the manual?
6  Q.   No.  He was answering questions under oath as
7       the official designee of the city regarding
8       training, what they call a Rule 30(b)(6)
9       witness.
10 A.   Yes.
11 Q.   Okay.
12          (Sotto voce comments.)
13       (Brian Anderson Embedded Video
           Page 190, Line 3 - Page 190, Line 18)
14
          "Q.  And it goes on to say, 'Once [a]
15       subject is secured, an officer shall watch for
         any of the following signs:
16       "Significant change in behavior or level
         [of] consciousness:
17       "Shortness of breath or irregular breathing:
         "Seizures or convulsions:
18       "Complaints of serious pain or injury:
         "And/or any other serious medical problem
19       [sic].
          Do you see that?
20        "A.  Yes.
          "Q.  Now this -- at a certain level this
21       mirrors the use-of-force policy itself which
         says you need to monitor the medical condition
22       of the subject?
          "A.  Correct."
23
24 BY MR. BENNETT:
25 Q.   And do you agree with the -- Sergeant Anderson's

252

1       answers with regard to that?
2  A.   Where was the question that your colleague was
3       reading from?  He was reading from the manual I
4       believe.
5          MR. STORMS:  Maximal restraint.
6          MR. BENNETT:  Maximal restraint policy.
7          MS. FUNDINGSLAND:  You said, "It
8       says..." I think.
9          MR. BENNETT:  Yeah.
10 BY MR. BENNETT:
11 Q.   He's -- he was reading from where I -- the
12      "Where [sic] ANY restraint is used..." policy.
13 A.   I agree that if you use a maximal restraint that
14      that's correct.
15 Q.   And...  Okay.
16          (Sotto voce comments.)
17 BY MR. BENNETT:
18 Q.   How about post-tasing?
19 A.   You -- you would monitor a person's medical
20      condition.
21 Q.   Including his breathing?
22 A.   In the sense that you would monitor anybody's
23      breathing.
24 Q.   Level of consciousness?
25 A.   Yes.

253

1  Q.   Pulse?
2  A.   No.
3  Q.   Why wouldn't you monitor their pulse?
4  A.   I -- I have never monitored anybody's pulse.
5  Q.   You've never taken anybody's pulse before this
6       time?  Is that what you're telling me?
7  A.   I think people -- on people that were already
8       deceased, on some sort of a situation like that.
9          I've never been where I thought I needed to
10      check somebody's pulse to see if they were -- or
11      on a continuing basis.
12 Q.   To see if their heart was beating?
13 A.   No.
14 Q.   Okay.
15          (Sotto voce comments.)
16 BY MR. BENNETT:
17 Q.   Well, you think that -- you think you've been
18      trained that the need to monitor the
19      consciousness, breathing and...
20          So you'd agree post-tasing you're supposed
21      to monitor and look out for or assess any change
22      in behavior or level of consciousness; correct?
23 A.   In a broad sense I would say yes.
24 Q.   Shortness of breath or irregular breathing?
25 A.   Where are you reading from now?

254

1  Q.   Well, I'm reading from -- it says, "When ANY
2       restraint technique is used on the subject..."
3          Essentially, Officer, every other officer
4       we've asked except you and Callahan -- and
5       Gorman, excuse me, say that these -- these --
6       the medical monitoring, as delineated in
7       9111.01, apply generally.  You disagree with
8       that?
9  A.   Kind of in the way that you're putting it.  I am
10      not -- I'm not denying that we are responsible
11      for people once we take them into custody.
12 Q.   I know.  You did answer that -- my questions on
13      that.
14          But let's look at this.  This is not a
15      training officer, this is another officer.
16      (Erick Fors Embedded Video
           Page 96, Line 3 - Page 98, Line 6)
17
18       "Q.  Somebody you take -- you lay hands on
19      and you use force on them, you have to monitor
         their consciousness; correct?
         "A.  Correct.
20        "Q.  You have to monitor their -- their
21      breathing: in other words, they can't -- you
         don't want them to stop breathing or have a
         compromise in their breathing, do you?
22        "A.  Correct.
          "Q.  You're responsible for the people you
23      seize and lay hands on from the time you do so
24      until the time you turn them over to either the
         jail or the medical personnel: correct?
          "A.  Correct.
25

12 (Pages 251 to 254)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

255

1   "Q. You have been taught in your training
2   that if a person -- that -- well, there are a
3   number of situations you've been taught or
4   trained to turn an arrestee on their side or to
5   set them up -- sit them up: correct?
        "A. Correct.
6       "Q. One of them, oddly enough, is the
7   excited delirium situation? You actually have
8   training on that: right?
        "A. Correct.
9       "Q. And you're trained that if there's any
10  -- you're supposed to pay attention if there's
11  any of those myriad of things that they list for
12  potential excited delirium: that you're to watch
13  their breathing and if there's any compromise at
14  all you turn them on their side or sit them up
15  so you get them breathing: correct?
        "A. That sounds accurate.
16      "Q. That's also true with regard to really
17  any time that you have a person restrained in a
18  prone restraint and you notice any compromise of
19  breathing, that's what you're supposed to do?
20  That's the response?
        "A. I -- I would agree with you.
21      "Q. The other thing is you're supposed to
22  pay attention to the person you're continuing to
23  use force on to determine if they're losing
24  consciousness or having trouble breathing?
25      "A. Correct.
        "Q. So you can't really -- you know, you
    don't want to talk about the weather? You don't
    want to, you know, try to figure your golf score
    in reverse order from the holes you played? You
    don't want to -- you want to pay attention to
    the -- to the very serious business of -- of --
    of using force on people, which is something
    that we license police officers to do: correct?
        "A. Yes, you should --
        "Q. Okay.
        "A. -- be aware, yes."

    BY MR. BENNETT:
    Q.  You know who that is of course, don't you?
    A.  That was Sergeant Fors.
    Q.  Do you agree with his answers to those

256

1   questions?
2   A.  I -- I don't know what -- I don't know what you
3   mean.
4   Q.  Well, do you agree with the answers he gave to
5   those questions?  Or is there some particular
6   answer you'd like to take issue with?
7   A.  No.
8   Q.  Okay.  So do you agree with him?
9   A.  Yes.
10  Q.  Okay.
11      (Adam Grobove Embedded Video
        Page 23, Line 25 - Page 24, Line 17)
12
        "Q. And they'd be trained that once you
13  have a subject secured, that an officer shall
14  watch for any of the following signs, including
    significant change of behavior or level of
    consciousness?
15      "A. Yes, those are behaviors.
        "Q. Shortness of breath, irregular
16  breathing or not breathing?
        "A. Yes.
17      "Q. Seizures, convulsions?
        "A. Yes.
18      "Q. Complaints of any another serious pain
    or injury and any other serious medical problem,
19  right?
        "A. Yes.
20      "Q. I mean, you're basically --
        "A. It's medical monitoring.
21      "Q. -- supposed to medically monitor the
    person you're arresting?
22      "A. Yes."
23  BY MR. BENNETT:
24  Q.  Would you agree with anything...
25      You know who that officer is, I assume,

257

1   since we've already seen him, right, before?
2   A.  Yes.
3   Q.  Would you agree with Officer Grobove?
4   A.  Yes.
5       (Amelia Huffman Embedded Video
        Page 88, Line 7 - Page 88, Line 22)
6
7       "Q. And similarly officers have an
    obligation under the 4th Amendment when they --
8   when they arrest someone or otherwise maintain
    someone in custody, they have an obligation to
9   ensure that that person remains in good health?
        "A. Yes.
        "Q. Continues to breathe?
10      "A. Yes.
        "Q. And so officers have an obligation
11  under the 4th Amendment to, for example,
    continue to -- to continue monitoring the
12  breathing of a suspect that they've arrested?
        "A. Yes.
13      "Q. That didn't happen in this case?
        "A. No.  There was a significant gap of
14  time in which that did not happen."
15  BY MR. BENNETT:
16  Q.  Do you agree -- do you know who that was?
17  A.  That was Captain Huffman.
18  Q.  Do you have any disagreement with any of her
19  answers?
20  A.  In regards to this particular situation?
21  Q.  Yes.
22  A.  Yes.
23  Q.  What do you disagree with?
24  A.  I would contend that we were monitoring his
25  condition and we had no reason to believe that

258

1   he was in distress until I realized he was in
2   distress.
3       (Unidentified video started.)
4       MR. BENNETT:  Well, stop it.  Can you
5   stop it?
6       MR. STORMS:  (Complying.)
7   BY MR. BENNETT:
8   Q.  He was in distress within seconds of you -- of
9   you finishing the handcuffing of him; correct?
10  A.  I don't know.
11  Q.  What did you do to check before you checked his
12  pulse?
13  A.  He was breathing.  I knew he was breathing
14  because he was yelling and screaming and moving
15  around.
16  Q.  For how long?
17  A.  I don't know.
18  Q.  Before he -- he didn't yell or scream or move
19  after the agonal breathing was done, at all, did
20  he?
21  A.  I -- I don't think so.
22  Q.  Okay.  And for some period before the agonal
23  breathing, the death rattle, he didn't move, did
24  he?
25  A.  I don't know.

13 (Pages 255 to 258)

Timothy Callahan
10/16/2012

259

1    Q.   Do you remember?
2    A.   I -- I would have to see the tape again.
3    Q.   Okay.
4         (Richard Zimmerman Embedded Video
          Page 69, Line 9 - Page 70, Line 11)
5
6         *Q.  As a homicide investigator and then,
     you know, obviously now as a lieutenant, do you
     have the ability to point out any policy
7    violations that you observe to someone in
     internal affairs?
8         *A.  Yes.  I have a duty to report policy
     violations.  Yeah.
9         *Q.  Okay.  And is that something you've
     done before?
10        *A.  Yes.
          *Q.  Okay.  Did you observe any policy
11   violations in this case?
          *A.  Um... I may have, yes.
12        *Q.  And what policy violations do you
     believe you may have observed in this case?
13        *A.  The duty to render -- you know, to
     render aid right away.
14        *Q.  Did you express concern about that to
     anyone?
15        *A.  No.
          *Q.  And if you have a duty to do so, why is
16   it that you didn't express concern about that to
     anyone?
17        *A.  Because IA was down there, too, and
     investigated alongside of homicide.
18        *Q.  And so are you saying that you believe
     that any policy violation is something that
19   should have been observed by them?
          *A.  Yes.
20        *Q.  Okay.  And it was a policy violation
     that was obvious to you?
21        *A.  Yeah."
22   BY MR. BENNETT:
23   Q.   Do you recognize that individual?
24   A.   Is that Lieutenant Zimmerman?
25   Q.   Yeah.  Is he the head of Homicide?

260

1    A.   I think so.  I'm not sure.
2    Q.   At the time of this event?
3    A.   I -- I believe so.
4    Q.   All right.  Do you disagree with his answers?
5    A.   I do.
6    Q.   All right.  Which ones?
7    A.   The rendering aid.
8    Q.   Okay.  Do you think Lieutenant Zimmerman is a
9         reasonable police officer?
10   A.   I don't know him on a... I have had very little
11        contact with him.
12   Q.   How about Captain Huffman?
13   A.   I've had very little contact with her, as well.
14   Q.   So you don't have personal opinion as to --
15   A.   I don't.
16   Q.   -- either of them?
17        You just know that they've risen to the
18        ranks that they've risen and have the positions
19        that they've held?
20   A.   I know that, yes.
21   Q.   Do you have anything bad to say about
22        Lieutenant Zimmerman?
23   A.   I am not familiar with either one of them enough
24        to know anything about them.
25   Q.   Now you have had experience with Deputy Chief

261

1         Harteau; correct?
2    A.   Yes.
3    Q.   And as I understand it, it's quite significant
4         experience; correct?
5    A.   Can you define that for me?
6    Q.   Well, she -- has she been your supervisor?
7    A.   Yes.
8    Q.   How long?  How many years?  It's a matter of
9         years, isn't it?
10   A.   Yes.  I don't -- I couldn't tell you how many
11        years.
12   Q.   I mean you worked the shift that she supervised
13        at the 1st Precinct?
14   A.   From the time of 2000 I think 10.  No.  2000.
15        She has been in and out of the precinct several
16        times and have been -- she has been a
17        supervisor of mine, that's correct.
18   Q.   And -- and there have been times when you would
19        see her every day on the days that you worked?
20   A.   For the most part.
21   Q.   Yeah.  If you both worked the same day --
22   A.   That's correct.
23   Q.   -- you'd typically see her?
24   A.   If she was there.  A lot of times she was
25        working, but she wasn't there.

262

1    Q.   Sure.  But of the -- of the three deputy chiefs
2         that did the force review, Harteau, Allen and
3         Gerlicher, who by far do you have the most
4         personal experience with?
5    A.   I don't have any personal experience with any of
6         them.  I have professional experience with two
7         of them.
8    Q.   All right.  Personal professional experience.  I
9         meant -- I meant somebody you see every day, who
10        supervised your work.
11        I mean you -- you'd say you get along with
12        her, wouldn't you?
13   A.   We are not personally acquainted.  We are
14        professionally acquainted.  And I am cordial
15        with her in a professional manner.
16   Q.   Well, I know, but... All right.
17        You have a good professional working
18        relationship with her?
19   A.   Yes.
20   Q.   That's been established over a period of years?
21   A.   Yes.
22   Q.   Okay.  Going back to Huffman and Zimmerman's
23        testimony.  Has anyone from the department ever
24        explained to you that these people in those
25        positions had observed the failures in policy

14 (Pages 259 to 262)

Timothy Callahan
10/16/2012

263

1      and -- and conduct?
2 A.   What --
3 Q.   Anybody ever say anything to you about what
4      Huffman or Zimmerman said before?
5 A.   Are you asking if this is the first I've heard
6      this?
7 Q.   Well, all right. That's a good first question.
8      Can you answer that?
9 A.   This is the first I've heard this.
10 Q.   All right. So then I think the answer to my
11      question is that nobody -- it's true then that
12      nobody in -- in the Command & Control of the
13      Minneapolis Police Department has ever leveled
14      the criticism of the type you've heard Zimmerman
15      and Huffman utter today?
16 A.   That's true.
17 Q.   Okay. No one's --
18      MS. FUNDINGSLAND: Mr. --
19 BY MR. BENNETT:
20 Q.   -- said that you need any --
21      MR. BENNETT: I'm sorry?
22      MS. FUNDINGSLAND: Go ahead. I'm sorry.
23      I didn't want to interrupt.
24      I was just going to ask to take a break, but
25      go ahead.

264

1      MR. BENNETT: We can take a break.
2      MS. FUNDINGSLAND: Okay.
3      MR. BENNETT: This is a fine time.
4      MS. FUNDINGSLAND: Okay. Thank you.
5      MR. BENNETT: And, you know, I mean if
6      you want to take a break, any of you, at any
7      time, we'll do it.
8      MS. FUNDINGSLAND: I just didn't mean to
9      interrupt you.
10      VIDEOGRAPHER: Off the video record at
11      10:35 A.M.
12      (Recess taken.)
13      VIDEOGRAPHER: This is Disc Number 2.
14      We are on the record at 10:49 A.M.
15 BY MR. BENNETT:
16 Q.   Has anyone given you training specifically to
17      help you learn from this event, since the event?
18 A.   No.
19 Q.   Is there training you think you could have
20      gotten or the city should have given you to
21      prevent this event, the death of David Smith?
22 A.   I'm not aware of any.
23 Q.   Okay. I'd like to go back and talk about
24      medical monitoring a bit.
25      Here's how the city's official designee

265

1      indicates that you're trained.
2      (Brian Anderson Embedded Video
3      Page 110, Line 14 - Page 112, Line 5)
4      "Q. And in terms of medical monitoring, is
5      that a passive thing: meaning, you know, 'If I
6      happen to notice it, I pay attention to it'?
7      "Or were the officers -- or were MPD
8      officers trained prior to 2010 that they were
9      supposed to actively be making observations
10      related to the medical condition of the subject?
11      "A. I can't point to specific training as
12      far as, 'These are the steps that you have to
13      take in order to do it.' But more of a general
14      sense of your analysis of the situation that's
15      happening of the person that you're dealing
16      with.
17      "So if it's a person that's talking, making
18      sense, then it -- you go a different route:
19      where if it was a person that was not
20      responding, not doing anything, then you go
21      another... I mean it's more general than
22      specific.
23      "Q. And I think what I hear you saying is
24      that if someone is talking, at that point in
25      time you're not necessarily concerned that this

266

1      subject?
      "A. Yes."
2
3 BY MR. BENNETT:
4 Q.   Have you been in train-- have you been trained
5      in accordance with the principles set forth in
6      -- by Sergeant Anderson in the prior discussion
7      there?
8 A.   I don't know.
9 Q.   Well, really wasn't he -- didn't he just, in a
10      sense, give a -- an official answer for what you
11      and I just talked about before we went off the
12      record; in other words, you wouldn't have to
13      assess me because I'm talking, I'm responding,
14      you're -- you know, you're able to make physical
15      observations of me enough to know I'm okay:
16      correct?
17 A.   I don't recall specific training on specific
18      steps.
19 Q.   Okay. Well, do you remember it being sort of an
20      active inquiry, an active analysis, an active
21      assessment of things to make sure that it --
22      that someone doesn't die by mistake?
23 A.   I don't know that it was -- there was given any
24      training -- any training given at all
25      specifically on that other than what just the

15 (Pages 263 to 266)

Timothy Callahan
10/16/2012

---

267

1  manual says.
2  Q.  So you disagree with -- with what
3  Sergeant Anderson says about the need for active
4  analysis?
5  A.  I -- I'm not necessarily disagreeing. I'm
6  saying that I'm not aware of it.
7  Q.  I thought you were telling me that, at least
8  when we had the interlude where we talked about
9  you and me, remember, --
10 A.  Yes.
11 Q.  -- before we went off the record?
12     That -- and I thought you were basically
13 making the same point as Sergeant Anderson; that
14 is, you know, there's certain situations,
15 probably many situations where it's obvious--you
16 know, the person is okay because he's talking to
17 you and moving or responding appropriately to
18 questions that are being asked. You hear him,
19 you know, know by that fact that he's breathing
20 and likely that his heart is functioning. At
21 least he's not complaining about it; correct?
22 A.  Yes.
23 Q.  And when you've got somebody that's wholly
24 unresponsive you'd agree with me that you need
25 to be more active in your assessment of his

---

268

1  condition; correct?
2  A.  He was unresponsive in a number of ways through
3  that entire encounter with him.
4  Q.  All right. But you didn't answer my question.
5     If someone was --
6  A.  He was continuing to do what he had been doing
7  through much of the encounter.
8  Q.  All right. Let's go back. If someone is
9  unresponsive the need for active assessment and
10 analysis is greater; correct?
11 A.  It could be.
12 Q.  Well, how about it could be -- and -- well, all
13 right. It could be. Let's take that answer.
14 It could be and the need for active analysis and
15 assessment would increase if you use force on
16 someone; correct?
17 A.  It could.
18 Q.  It would -- the need for active analysis and
19 assessment would increase if you use a
20 conductive energy device on them multiple times;
21 correct?
22 A.  In -- in -- the conductive device is considered
23 a low level of force just like Mace. And I
24 would monitor in the same way that I would any
25 kind of force.

---

269

1  Q.  Well, there's specific requirement of it in your
2  policy for conductive energy -- conductive
3  energy device or a Taser; correct?
4  A.  The -- yes.
5  Q.  But -- so that need -- as -- as -- as these
6  things -- as force increases, as -- as you have
7  usage of conductive energy devices, as you have
8  use of the prone restraint, all of those things
9  would, combined with unresponsiveness, would
10 lead you to ratchet up the level of active
11 assessment and analysis that the officer has to
12 do; correct?
13 A.  I don't know. I -- not necessarily.
14 Q.  Why?
15 A.  He was unresponsive from the entire time we got
16 there other than the two words he said and the
17 physical actions that he took. Verbally he was
18 unresponsive the entire time.
19 Q.  Well, so then you're going to have to get
20 appropriate non-verbal... So if you're not
21 getting any information verbally, you're going
22 to have to get it non-verbally, by signs;
23 correct?
24 A.  I didn't have any reason to believe that he was
25 in distress until I did realize he was in

---

270

1  distress.
2  Q.  You know, others can judge whether... I mean
3  you've seen people that diagnosed with the
4  medical training you've done already, haven't
5  you, in this case? You've seen the evidence of
6  Zimmerman and Huffman?
7  A.  That's what they said, yes.
8  Q.  Yeah. And they looked at the evidence.
9  A.  I -- I don't know what they looked at.
10 Q.  Okay.
11 A.  I'm assuming they looked at what you --
12 Q.  All right.
13 A.  -- what you showed them.
14 Q.  Well, you'd agree that active assessment and
15 analysis is required dependent on the level of
16 force, type of force and -- and the activities
17 or responsiveness of the individual you use
18 force on? True or false?
19 A.  I feel we did that.
20 Q.  Well, is it -- is that true?
21 A.  Say it again.
22 Q.  Let's take it in the abstract before we talk
23 about David Smith.
24     I'm not... If you use force on someone --
25 somebody, the need for an active assessment is

16 (Pages 267 to 270)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

271

1    greater than if you don't use force on someone;
2    correct?
3    A.   I mean I think we're hung up on whether -- are
4         you asking me what I've done in the past?
5    Q.   Well, I'm asking you about the training. He's
6         talked about active analysis and assessment.
7    A.   I'm not familiar with -- with active analysis.
8    Q.   Well, if I'm not talking to you how are you
9         going to determine if I'm breathing if I'm --
10        especially if I'm face down and not moving?
11   A.   Well, you're looking at me.
12   Q.   I'm looking at you, but if I --
13   A.   You don't appear to be unconscious.
14   Q.   Well, now you -- when you went down to say,
15        "You better not have broke my jaw, mother
16        fucker..." Or "Mother fucker, you better not
17        have broke my jaw," his eyes were wide open,
18        weren't they?
19   A.   They were open.
20   Q.   They hadn't blinked?
21   A.   I wasn't -- I didn't look at him long --
22   Q.   Well, --
23   A.   -- enough to --
24   Q.   -- you're supposed to look, aren't you?
25   A.   -- to determine if he was blinking his eyes.

272

1    Q.   Okay.
2    A.   Eyes open would be an indicator that -- to me
3         that he was conscious.
4    Q.   Well, let's -- let's look at what you were
5         doing. Let's look at what you were doing.
6         If you look at Exhibit 30, that's the
7         transcript. And so we can just -- we can focus
8         on the transcript you agreed to.
9         If you look at Exhibit 30... At 1:15 you got
10        him handcuffed; correct?
11   A.   Yes.
12   Q.   And then you talk about what you're going to
13        charge him with, and you -- you and Gorman.
14        You say, "He punched me in the face."
15        He says, "Now we go to Assault 4"; correct?
16   A.   Officer Gorman said that, yes.
17   Q.   Well, in response to your saying --
18   A.   Well, I was making -- I was just making a
19        comment that he punched me in the face.
20   Q.   And all right. So you -- so Gorman then goes to
21        Assault 4, which is what?
22   A.   Assault on a police officer.
23   Q.   I mean you have to be struck; right?
24   A.   Yes.
25   Q.   It's a felony; right?

273

1    A.   Yes.
2    Q.   So you're discussing a felony charge.
3         And then you say -- then you say, "Squad 10,
4         we need a supervisor," because you've used
5         force; right?
6    A.   Yes.
7    Q.   Okay. And it's at this point that Gorman is
8         using his right hand to hold Smith's head down;
9         correct?
10   A.   Yes.
11   Q.   And you talk about Assault 4 right after you get
12        him handcuffed. And then at the -- at 2:32
13        there's more talk about assault in the
14        4th degree; correct?
15   A.   When I say, "I don't even think we can," I'm
16        referring to trying to take him in the elevator
17        with a -- standing up.
18   Q.   And what does Gorman say?
19   A.   Well, he doesn't -- he doesn't realize what I'm
20        talking about. He says, "We'll book him for
21        Assault 4 for sure."
22   Q.   Okay. So again there's -- there's continuous
23        talk... And this is after the -- after the
24        moaning stops; correct? The -- his -- the
25        initial moaning; correct? Do you remember him

274

1    kind of wiggling around a little bit? And
2    Gorman hits him in the head?
3    A.   You're asking me if this is correct. I'm going
4         by what this says here. The groaning starts, it
5         says, and then the groaning stops.
6    Q.   Okay. At 2:32, though, there's more talk about
7         what to book him for; correct?
8    A.   Yes.
9    Q.   So if you had the time and the opportunity to
10        discuss whether you could charge David for
11        assault in the 4th degree, would you agree that
12        you had the time and the opportunity to assess
13        his breathing?
14   A.   I didn't have reason to believe that that was
15        needed. I thought he was breathing.
16   Q.   Is that yes or no?
17   A.   I thought he was breathing.
18   Q.   Answer the question.
19   A.   I used that time that you're saying, "Didn't I
20        have time to assess..." I thought he was.
21   Q.   Did you do anything during that time period to
22        assess his breathing?
23   A.   No. Just like I'm not doing anything to see if
24        you are. He was making --
25   Q.   But --

17 (Pages 271 to 274)

Timothy Callahan
10/16/2012

275

1   A.   -- noises --
2   Q.   -- I'm talking to you; right?
3   A.   He was making noises, as well.
4   Q.   Okay. All right. Well, would you --
5   A.   He was not verbally responsive to me ever. It
6        was not unusual to me at that point that he was
7        not answering my questions.
8   Q.   If you had the time and opportunity to discuss
9        what you could charge him for, would you agree
10       that you had the time and opportunity to assess
11       his level of consciousness?
12  A.   I believe I was doing that.
13  Q.   Okay. You're... And how were you doing that?
14       What actively were you doing then?
15  A.   Just by being next to him. He was making
16       noises.
17  Q.   At -- and that's from -- when was he making
18       noises?
19  A.   I don't know.
20  Q.   Are the -- do you agree that the noises were, as
21       indicated in -- on the timeline in Exhibit 30?
22       I believe you have indicated that's...
23  A.   I -- it says that here.
24  Q.   Okay. And you remember hearing that on the
25       video; right?

276

1   A.   Yes.
2   Q.   You heard it the night you downloaded it and
3        watched it with your wife?
4   A.   Oh, I -- I don't know that I was watching it as
5        detailed as that, that I would pick up where and
6        when.
7   Q.   Well, did you hear the --
8   A.   I heard the -- I heard the audio of the video.
9   Q.   Okay. Well, you didn't do anything to determine
10       if he had a pulse at -- or what his pulse was
11       during the moaning period, correct, according to
12       Exhibit 30?
13  A.   No.
14  Q.   You didn't do anything to determine if he had a
15       pulse at the groaning or agonal breathing part,
16       which is what -- what the IA calls groaning;
17       correct?
18  A.   No.
19  Q.   And you didn't do anything to assess his
20       breathing at -- during the moaning and yelling
21       phase; correct?
22  A.   I didn't put a mirror down to make -- as they do
23       sometimes, to see if breath was coming out. I
24       thought that it was.
25  Q.   Well, based on what facts?

277

1   A.   Based on the fact that I was just there. That I
2        was -- that -- as I said, whatever sounds he was
3        making, he's making sounds.
4   Q.   All right. That's in the moaning and yelling
5        phase, you believed he was -- that was -- that
6        he was --
7   A.   I --
8   Q.   -- breathing air?
9   A.   -- believed that he was breathing.
10  Q.   Okay. Then did you do anything to assess his
11       breathing during the agonal breathing or
12       groaning stage?
13  A.   No.
14  Q.   Did you do anything to assess his pulse at that
15       time?
16  A.   Well, again, I -- I didn't specifically check
17       those things because I thought that he was
18       because of the fact that he was making noises.
19  Q.   Well, what, if anything, did you do to actively
20       medical monitor him during the groaning phase?
21       Just hear him groan?
22  A.   Just being there is -- is -- and seeing him is
23       monitoring him.
24  Q.   Well, except you guys were talking about every
25       other thing; right? You were talking about what

278

1        to charge him with; right?
2   A.   Yes.
3   Q.   You talk about the quality of the fight, "It was
4        a hell of a fight."
5        The number of times you tased him; right?
6   A.   Yep.
7   Q.   You talk about the blow you received and where
8        you received it?
9   A.   Yes.
10  Q.   And -- and what -- and what your health
11       condition is with regard to the blow; right?
12  A.   Yes.
13  Q.   You can't bite down. You've got, you know...
14       You do that; right?
15  A.   Yes.
16  Q.   So... And while you're doing all that and -- he
17       -- there's no sound after the groaning stops, is
18       there? There's nothing?
19  A.   I -- I -- that's what this says, yes.
20  Q.   Do you agree?
21  A.   I -- yes.
22  Q.   In fact, you -- you understand that Andrew Baker
23       says his last voluntary sound was the end of the
24       moaning period, as it's referred to on
25       Exhibit 30?

18 (Pages 275 to 278)

Timothy Callahan
10/16/2012

279

1          MR. OSBORNE: Object, foundation.
2    BY MR. BENNETT:
3    Q.   Are you aware of that? Have you read his
4         deposition?
5    A.   I have not read his deposition.
6    Q.   Okay. But you talk about the fight, your
7         injuries, your health. If you had time to do
8         that did you have time to stick your hand down
9         and see if he was breathing, see if you could
10        feel expiration?
11   A.   (Pausing.)
12   Q.   Yes or no?
13   A.   That's not -- is -- I mean if a person is
14   Q.   That's not -- did you have time to do it?
15   A.   I probably did.
16   Q.   Did you have time to check his pulse like you
17        did well after he was -- his heart had stopped?
18   A.   Probably.
19   Q.   Did you have time to monitor his level of
20        consciousness?
21   A.   I thought I was doing that.
22   Q.   Well, what about -- is -- I mean if a person is
23        nonresponsive how can you determine or assess
24        whether he's conscious? What would you do?
25   A.   That was not -- he was not responsive --

280

1    Q.   Just --
2    A.   -- period.
3    Q.   -- answer the question.
4    A.   I'm trying to answer it.
5    Q.   I didn't ask you --
6    A.   This is a specific situation for this specific
7         thing.
8    Q.   Well, what would you do to determine a level of
9         consciousness of someone who is nonresponsive?
10        Just answer that specific question.
11   A.   If I thought they were nonresponsive from a
12        medical condition I would check their breathing
13        and their pulse.
14             I thought he was being nonresponsive because
15        that's just the way he was the whole time we
16        were with him.
17   Q.   You didn't do anything to differentiate the two,
18        though, did you?
19   A.   I wasn't concerned that he wasn't breathing at
20        that time.
21   Q.   But what did you do to medically monitor him
22        before you put -- took his pulse at the 7:50
23        mark?
24   A.   I didn't do anything other than I was there.
25   Q.   Okay.

281

1    A.   I told you I thought he was.
2    Q.   Okay.
3    A.   There was no reason to check.
4    Q.   Well, doesn't policy tell you to check when you
5         Tase somebody and you use --
6    A.   I was -- I was being -- I was there with him and
7         I thought that he was just basically being
8         quiet.
9    Q.   What active steps did you do to check other
10        than --
11   A.   I --
12   Q.   -- before you took his pulse?
13   A.   Eventually I took his pulse.
14   Q.   That's the only active step you took?
15   A.   I was there with him.
16   Q.   So you think just being there, talking about
17        other things is medically monitoring, is that
18        what you say?
19   A.   Again, in the same sense that we're talking.
20        I can see that you're okay. I thought he was
21        okay.
22   Q.   What were the facts that you used to...
23             After -- after the groaning stopped what
24        facts did you -- what observable facts did you
25        have to --

282

1    A.   Again, I was going based on his prior behavior.
2    Q.   Well, but... His prior behavior isn't what
3         you...
4             You medically monitor someone after you take
5         them in custody, as their behavior is unfolding,
6         after you take them into custody; correct?
7    A.   But the policy also says changes in
8         consciousness -- or changes in status. And he
9         was the same status as he had been before, --
10   Q.   Well, --
11   A.   -- as far as verbally goes.
12             We had him restrained so he wasn't moving
13        anymore, but he wasn't -- he was also being
14        verbally nonresponsive, which is what he had
15        been prior.
16   Q.   Well, you asked him... He's asked six questions
17        by you and Gorman. At 1:46, 3:01, 3:47, 4:34,
18        5:55 and 7:09, if you look at Exhibit 30.
19             Do you want to look at those times?
20   A.   I -- I see the questions.
21   Q.   None were -- no answer was given to any
22        question; correct?
23   A.   And we asked him many questions when we first
24        got there and he was nonresponsive.
25   Q.   Well, yeah. But when you first got there you

19 (Pages 279 to 282)

Timothy Callahan
10/16/2012

283

1    hadn't used force on him; right?
2    A.   Correct.
3    Q.   You hadn't used the Taser five times?
4    A.   Correct.
5    Q.   You hadn't put him in the force -- a prone
6         restraint position and knelt on his back for
7         4-1/2 minutes?
8    A.   You keep using "prone restraint position."
9         That's not -- that's not in our manual.  I -- we
10        don't -- I don't know what you're --
11   Q.   Well, everybody else says it's a prone restraint
12        position.
13   A.   Well, everybody --
14   Q.   All your other officers.
15   A.   Well, everybody understands what "prone" and
16        "restraint" means, but it's not something that
17        we're trained on.  It's not a maneuver to my
18        knowledge.
19   Q.   Okay.  Well, the video and the IA transcript
20        indicate over a period of 5-1/2 minutes you or
21        Gorman asked David Smith these six different
22        questions without receiving a single verbal or
23        non-verbal response; correct?
24   A.   Yes.
25   Q.   Okay.  During that time you had the opportunity,

284

1         if you wanted to, to check on or assess David
2         Smith's breathing; would you agree?
3    A.   In the -- are -- is your question in -- to the
4         sense of taking a pulse?
5    Q.   I -- I'm saying whatever you would do to check
6         on or assess David Smith's breathing, you had
7         the opportunity during that 5-1/2 minutes to do
8         it; correct?
9    A.   Which I thought I was doing.
10   Q.   Okay.  But you -- but you agree you had the
11        opportunity?
12   A.   Yes.
13   Q.   You agree that you had the opportunity to take
14        David Smith's pulse, but did not?
15   A.   Again, I wouldn't take your pulse right now.
16        I thought that he was breathing --
17   Q.   I'm not asking if you'd take my pulse.
18        In the 5 minutes you asked him unanswered
19        questions you had the ability -- after you'd
20        used force on him, a Taser, and where he was
21        being knelt on by you and -- and -- and Gorman,
22        you had the opportunity to -- to assess his --
23        to take his pulse like you did later on?
24             MS. FUNDINGSLAND:  Object to the form of
25        the question and compound.

285

1             THE WITNESS:  I checked his pulse when I
2         -- when I became concerned that he was in
3         distress.
4    BY MR. BENNETT:
5    Q.   Why don't you answer the question I asked?
6    A.   I am answering the question.
7    Q.   No, you aren't.
8    A.   You want to know why I didn't do it sooner.  I
9         don't know why he -- I thought he was fine.  I
10        checked it when I became concerned.
11   Q.   The first time you checked it was -- was at the
12        7:50 mark, as indicated on there, though;
13        correct?
14             MS. FUNDINGSLAND:  Objection, asked and
15        answered.
16   BY MR. BENNETT:
17   Q.   And I'm talking about the 5-1/2 minutes between
18        1:46 and 7:09 when you're asking him these
19        questions.  Nobody ever took his pulse, did
20        they?
21   A.   I didn't have reason to check it at that time.
22   Q.   That's not the question.
23        Nobody took it, did they?
24   A.   I didn't do a lot of things between that period
25        of time.

286

1    Q.   You didn't get off him either, --
2    A.   It was --
3    Q.   -- did you?
4    A.   It was not taken between the time that you are
5         indicating.
6    Q.   Nothing was stopping you from taking his pulse?
7    A.   No.
8    Q.   Nothing was stopping you from turning him on his
9         side?
10   A.   We didn't turn him on his side for the reason
11        that has already been stated.  We were not -- we
12        didn't know if he was done --
13   Q.   You --
14   A.   -- resisting.
15   Q.   You never turned him on his side?
16   A.   No.
17   Q.   The -- you talked right -- you and Gorman talked
18        right over the -- his agonal breathing, didn't
19        you?
20   A.   I don't know.
21   Q.   Well, doesn't the transcript and the video
22        reflect that?  Groaning starts at 2:37 and ends
23        at 3:01, so there's 23 seconds of agonal
24        breathing if you -- if you credit this
25        transcript: okay?

20 (Pages 283 to 286)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

287

1    A.   Okay.
2    Q.   And during that time Gorman is recorded as
3         saying, "Never get the drugs out on time."
4         Do you remember that?
5    A.   That's the first I've ever read that.  I don't
6         recall ever hearing that.  I don't know what it
7         means.
8    Q.   You say at 2:50, "I can't believe he punched me
9         in the face."  You remember saying that, don't
10        you?
11   A.   I do remember saying that.
12   Q.   And then Gorman responds, "Yeah, he did."  And
13        then you say I got all that -- "I got that all
14        on here," and you tapped your pen camera, don't
15        you?
16   A.   It looks that way, yes.
17   Q.   And he says, "Good"; correct?
18   A.   Yep.
19   Q.   And then he says, "Dave, what are you on, man?
20        What are you on?  Dave, Dave, Dave, what are you
21        on?"  He gets no re- -- and that's while he's
22        making this agonal breathing sound, isn't it?
23   A.   That's what it says here.
24   Q.   What did you think that sound was?
25   A.   I -- I did not recognize it for what -- as what

288

1         a medical examiner is calling it.
2    Q.   Well, what did you do in response to that sound?
3    A.   I just thought it was him making noise.  I
4         didn't under -- I don't -- I'm not -- I'm not a
5         doctor.
6    Q.   I -- I asked you a simple question.  What did
7         you do in response to hearing --
8    A.   And --
9    Q.   -- that sound?
10   A.   And I said I didn't recognize it as distressed
11        breathing, so I didn't do --
12   Q.   Well, the answer is "Nothing"?
13   A.   That's right.
14            MS. FUNDINGSLAND:  Would you let him
15        finish his answer, please?
16            MR. BENNETT:  I'd like -- but --
17            MS. FUNDINGSLAND:  Well, let him finish
18        his answer.
19            MR. BENNETT:  Whether he recognizes it
20        or not...
21   BY MR. BENNETT:
22   Q.   I asked, "What did you do?"  Not, "What did you
23        think?"  Not where you were on the 4th of July.
24        I asked you what did you do in response to --
25   A.   Okay.

289

1    Q.   -- the --
2    A.   You're -- you're asking me a question that
3         can't -- I have to explain it.
4            I didn't recognize it as a problem and so I
5         didn't do anything medically to treat it as a
6         problem.
7    Q.   Did you do anything during that period other
8         than talk to Gorman and tap your pen camera?
9    A.   No.
10   Q.   Okay.  Now after the groaning stops, movement
11        and any sound at all ceased on David Smith;
12        correct?
13   A.   I'm not sure.  I don't know.
14   Q.   Well, that makes sense, doesn't it?  Didn't you
15        describe any movement --
16   A.   No, I didn't.
17   Q.   -- or sound that you remember after that --
18   A.   Not --
19   Q.   -- period?
20   A.   -- that I...  Not...  I mean if we're going to
21        go based on exact second...  I don't know.
22   Q.   Well, do you remember after the groaning --
23        after that sound --
24   A.   I --
25   Q.   -- stopped?

290

1    A.   I do from watching the tape.  Not at the time.
2    Q.   All right.  Has there -- has there any...
3            Well, you were talking at the time; right?
4    A.   Yes.
5    Q.   So were you being vigilant?
6    A.   Again, we're talking, as well.
7            I didn't have reason to believe that he was
8         in distress.
9    Q.   Well, doesn't your training say that you're
10        supposed to turn him over once he's adequately
11        controlled?
12   A.   If you're using a maximal restraint, that's
13        correct.
14   Q.   Everybody said -- you heard Fors say, --
15   A.   Well, --
16   Q.   -- you heard Sergeant Anderson --
17   A.   -- that's --
18   Q.   -- say...
19            That's your tortured interpretation of it.
20            Has any -- did you hear other officers say
21        different?  Did you watch it on the screen
22        there?
23   A.   I'm not sure that you -- they read that correct
24        -- you gave them the correct information from
25        that policy or what policy you were reading

21 (Pages 287 to 290)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

291

1     from.
2   Q.   Well, --
3   A.   If you had displayed that policy in front of
4        them and they were reading from it they would
5        not have said --
6   Q.   So you didn't...
7        That's what they're taught generally, too;
8        right?
9   A.   No.
10  Q.   Okay.  Well, --
11  A.   Not to my knowledge.
12  Q.   Okay.  Then after the groaning stops you talk
13       about whether you tased him five or six times or
14       four; right?
15  A.   Yes.
16  Q.   And there's some more unanswered questions and
17       statements that Gorman makes to him; correct?
18  A.   Yes.
19  Q.   And then you say, "You're going to talk to us,
20       man.  Dave, you're going to talk to us.  What's
21       wrong with you?"  No response.  That's at 4:34.
22       Right?
23  A.   Okay.  Yes.
24  Q.   Well, is that what's --
25  A.   That's what it says there.

292

1   Q.   Do you remember saying that?
2   A.   That's what it says here, yes.
3   Q.   And then another almost minute goes by with
4        nothing happening; right?  And you say, "Well, I
5        hope we're not going to wait for somebody to get
6        done with roll call."
7   A.   I thought that was before that, but I could be
8        mistaken.
9   Q.   Well, you said you didn't have any problem with
10       this transcript, so that's why I'm going from
11       this.  This is a --
12  A.   Well, I do have some problems with this
13       transcript.
14  Q.   Okay.
15  A.   I said that to you earlier.
16  Q.   All right.  Well, we can -- we can do this by
17       looking at the time, but you...
18       Did you do anything to medically monitor him
19       between 3:01 and 5:41?  You can answer that yes
20       or no.  I don't need your thought process.
21  A.   I don't think I can answer it yes or no.
22  Q.   Well, what did you do to -- to actively assess
23       his condition?
24  A.   I was there and I was looking at him.  His...
25       Again, I wasn't looking at him 100% of the

293

1        time, every second, between these -- these
2        time frames that you're saying, but I was under
3        the impression that he was breathing.
4   Q.   Did you do anything to check?
5   A.   I didn't do anything --
6   Q.   Between 3:01 --
7   A.   I didn't do anything --
8   Q.   -- and 5:41?
9   A.   I didn't do anything specific.
10  Q.   Okay.  Did you do anything to check his pulse
11       between that time?
12  A.   No, I didn't.
13  Q.   Did you do anything to see if he was conscious
14       during that time?
15  A.   No, I didn't.
16  Q.   You assumed, without actually assessing, that he
17       was breathing; correct?
18  A.   Based on his prior behavior, yes.
19  Q.   You assumed, without actually assessing whether
20       he was conscious?
21  A.   Again, based on his prior behavior, yes.
22  Q.   You assumed, without having checking, that he
23       had a pulse?
24  A.   Until I did check his pulse.
25  Q.   I understand.

294

1   A.   Yes.
2   Q.   But until that very first time at the 7:50 mark
3        you assumed, without checking, that he had a
4        pulse?
5   A.   Yes.
6   Q.   Okay.  Can you tell me anything that Gorman did
7        to assess -- actively assess his breathing at
8        any time?
9   A.   I...  The only thing I could refer to is that
10       when I asked if -- "Is he breathing" and
11       Officer Gorman looked at him and said, "Uh-huh"
12       or said "Yes," in the affirmative.  So that's
13       the only thing I can point to.
14  Q.   Well, actually didn't Gorman say -- and it's --
15       you can hear it on the Taser and Exhibit 34.  I
16       think I can get that out there...  Or 33.
17       When you asked the rhetorical question,
18       "Is he breathing?"  Do you remember that?
19  A.   Yes.
20  Q.   He says what?
21  A.   It doesn't say that in mine.
22  Q.   No.  This is the other exhibit.  This is the
23       Taser --
24  A.   All --
25  Q.   -- video.

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

295

1   A.   -- he says is -- all he says is "Uh-huh."
2   Q.   Well, what does he say? "Uh-huh, he's fine"?
3   A.   No, it doesn't say that here.
4   Q.   You're talking about the wrong exhibit.
5        MR. STORMS:  Give him the other exhibit.
6   BY MR. BENNETT:
7   Q.   I can give you...  This is 33.  This is the
8        Taser video and --
9   A.   Oh.
10  Q.   -- you've got the...
11  A.   Okay.
12  Q.   So --
13  A.   I don't recall him saying that.  I thought --
14       recall him saying, "He's fine."  I don't recall
15       him saying, "He's just pretending."
16       MR. BENNETT:  We can -- you can hear it
17       on...
18       MR. STORMS:  Yeah.
19  BY MR. BENNETT:
20  Q.   The -- well, assume he says that.
21       Did you remember -- you don't remember him
22       saying, "Uh-huh.  He's just pretending"?
23  A.   I remember him saying, "He's fine.  I don't
24       remember the, "He's just pretending."
25  Q.   You don't suppose Jason Case just made that up,

296

1        do you?
2   A.   Well, he got the -- what you referred to as
3        "Mope" wrong.
4   Q.   Well, he referred to it.  I just...  You know.
5   A.   Well, he got that wrong, though, didn't he?
6   Q.   Okay.  Did -- did he get -- did you listen to
7        the Taser video, though, too?
8   A.   I've only seen that one time and it was two
9        years ago.
10  Q.   Okay.  Did...  As far as you know, though,
11       did -- did Gorman do anything before you
12       checked --
13  A.   I don't know.
14  Q.   And just let me get the question...  I know -- I
15       know you know what I'm going to ask...
16  A.   Okay.
17  Q.   But before you checked David Smith's pulse did
18       Officer Gorman do anything, to your knowledge,
19       to assess his pulse?
20  A.   I don't know.
21  Q.   Did he do anything, to your knowledge, to assess
22       his breathing?
23  A.   He was very close to his head.  I don't know if
24       he was -- if he thought he was breathing or not.
25  Q.   Well, let me ask you this.  Did you see him do

297

1        anything to assess his breathing?
2   A.   I don't recall.  I don't recall him doing
3        anything specific.
4   Q.   Same thing with the pulse?
5   A.   To my recollection I'm the only one who checked
6        the pulse.
7   Q.   I think that's right.
8        How about his level of consciousness?  Did
9        you do anything to -- to have him assess his
10       level of consciousness?
11  A.   I don't know.  I -- I don't know if he was doing
12       the same thing that I was doing.
13  Q.   Well...  So is it your testimony that you were
14       being vigilant with regard to the medical
15       monitoring of David Smith?
16  A.   Not -- what do you mean by "vigilant"?
17  Q.   I mean what the common use of the word
18       "vigilant" means.  You were paying attention to
19       it.
20  A.   I was under the impression that he was okay --
21  Q.   Okay.
22  A.   -- until I realized he wasn't.
23  Q.   I know.  But you were involved -- you were
24       involved in all these extraneous things.
25       You were talking about the charge: right?

298

1   A.   We were talking about a charge, yes.
2   Q.   You were talking about the jaw, your pain, the
3        fight, the tasing: right?
4   A.   Yes.
5   Q.   Now when you were doing all that were you paying
6        vigilant attention to David Smith?
7   A.   I'm going to refer again to what I have said
8        prior.  I didn't get out --
9   Q.   Is that a yes or a no?  I don't --
10  A.   I didn't get out any medical equipment to -- I
11       thought that he was breathing.
12  Q.   Well, I mean --
13  A.   The second that I thought he wasn't I rendered
14       aid.  I would have done that whether it was --
15       if it had been five seconds after the groaning.
16  Q.   But you -- you didn't render aid until almost
17       five minutes after the groaning stopped, the
18       agonal breathing stopped: right?
19  A.   Right.  When I realized.
20  Q.   In fact, you didn't even really render aid for
21       about a minute and a half after you checked his
22       pulse.
23  A.   I don't know.
24  Q.   Well, isn't that what it said?  What does that
25       say?  When do you start chest compressions?

23 (Pages 295 to 298)

Timothy Callahan
10/16/2012

299

1   A.   It says 8:44 here.
2   Q.   So that's about a minute after you checked his
3        pulse: right?
4   A.   Well, you wouldn't -- you want to make sure that
5        you're checking the pulse correctly.  You don't
6        want to give chest compressions to somebody who
7        is -- does have a pulse.  You want to -- to make
8        sure.
9   Q.   Well, I don't recall that in my CPR, but...
10  A.   Do you -- do you think it would be beneficial to
11       you if I started giving you chest compressions
12       if your heart was beating?
13  Q.   Well, if you weren't sure...
14  A.   Well, you want to make sure that there --
15       whether there is or isn't.
16  Q.   At 7:50 you take the -- you take his pulse and
17       say at 8:00, "Gorman, Gorman.  Dude, I don't
18       think he's breathing."
19  A.   I was trying to confirm.
20  Q.   Okay.  And you remember Gorman when you -- in
21       response at 8:27, to you saying, "I ain't got no
22       pulse."  Him saying, "Hmmm."  Right?
23  A.   That's what the transcript says.
24  Q.   Do you remember hearing that on the tape, too?
25  A.   I don't know.

300

1   Q.   Okay.  You were concerned about your own health
2        during that period, right, talking about can't
3        bite down, your jaw hurts, you're in pain;
4        right?
5   A.   I wasn't concerned that -- I mean, yeah, my jaw
6        hurt.  Yes, I was concerned.
7   Q.   Uh-huh.  Would it be fair to say that prior to
8        taking David's pulse you did nothing actively in
9        response to his failure to respond to you?  Is
10       that true?
11  A.   Say it again.
12  Q.   Would it be fair to say prior to taking his
13       pulse at the 7:50 mark you didn't do anything in
14       response to him being unresponsive to you?
15  A.   I didn't actively do anything, no.
16  Q.   Okay.  You were still angry, whether it's, you
17       know, personal or not, at the 6:46 mark, when
18       you said, "I can't bite down, mother fucker.  I
19       can't" --
20            MS. FUNDINGSLAND:  Objection --
21  BY MR. BENNETT:
22  Q.    -- bite down" --
23            MS. FUNDINGSLAND:  I'm sorry.
24  BY MR. BENNETT:
25  Q.   Period.

301

1        "Mother fucker, you better not have broke my
2        jaw."
3        You were still angry then, as we discussed;
4        right?
5            MS. FUNDINGSLAND:  Objection, asked and
6        answered.
7            THE WITNESS:  Again, it was not -- I
8        was -- I was not angry personally at Mr. Smith.
9            MR. BENNETT:  Well, that's maybe for
10       others to judge, but the...
11           MS. FUNDINGSLAND:  Object.
12  BY MR. BENNETT:
13  Q.   You said it angrily, didn't you?
14  A.   I don't know.  I mean you're -- you're asking
15       for an impression of my tone of voice, I guess.
16       Is that what you're asking?
17  Q.   Yeah.
18  A.   As I said, I was irritated that I was
19       potentially injured.
20  Q.   And you leaned down and said it close to his
21       ear, didn't you?
22  A.   I believe I did lean forward.
23  Q.   All right.  And you didn't, at the time you did
24       that, assess his breathing.  You were very close
25       to him.  You could have done that: correct?

302

1   A.   I -- I don't recall if I did or... Did anything
2        like that.
3   Q.   Did you -- well, you know now he wasn't
4        breathing then, don't you?
5   A.   According to the medical examiner.
6   Q.   And you didn't do anything to assess his
7        consciousness when you got right down there
8        close to him?
9   A.   Not actively, no.
10  Q.   And you didn't do -- and by then you had not
11       checked his pulse?
12  A.   (No response.)
13  Q.   If you had time to be angry for six minutes, or
14       a little more than that, would you have time to
15       follow your professional training as described
16       by Sergeant Anderson?
17  A.   I was following training.
18  Q.   You understand --
19  A.   I requested a supervisor immediately and I
20       requested an ambulance immediately.
21  Q.   You understand that others disagree with that?
22       You've heard testimony about that today?
23  A.   I have heard testimony about that today.
24  Q.   If you had time to be angry for six minutes
25       would you have time to follow --

24 (Pages 299 to 302)

Timothy Callahan
10/16/2012

303

1   A.   I wasn't angry for six minutes.
2   Q.   Well, which is more important, let me ask you
3        this--your feelings, your personal feelings of
4        anger, or your professional duty?
5            MS. FUNDINGSLAND:  I'm going to object
6        to the form of the question.
7            THE WITNESS:  Say that question again.
8   BY MR. BENNETT:
9   Q.   Which is more important--your personal feelings
10       of anger or your professional duty?
11  A.   My professional duty.
12  Q.   Which is more important--your personal feelings
13       of anger or the duties imposed by the
14       4th Amendment in the United States Constitution?
15  A.   The second part.
16  Q.   The 4th Amendment?
17  A.   Yes.
18  Q.   Which is more important:  Your personal feelings
19       of anger or another person's life?
20  A.   Another person's life.
21  Q.   Okay.  And during -- once he's secure...
22           I -- I mean I -- I can conceive of tactical
23       situations where people are left in the prone
24       position, handcuffed; for instance, if you had a
25       high-risk warrant entry and you had a number of

304

1        people that had to be handcuffed and dealt with
2        but there was threats throughout the structure,
3        let's say you're doing a drug house.  I mean
4        I -- I get that.  That would be one situation
5        where you might leave somebody handcuffed in a
6        prone position to make sure, for purposes of
7        officers' safety, that the house was clear;
8        correct?
9   A.   Yes.
10  Q.   In this case there wasn't anybody sympathetic to
11       David Smith?  There was no crowd or riot?  You
12       know -- you know, there was no -- he had no ally
13       there, did he?
14  A.   Not to my knowledge.
15  Q.   There was nobody that interfered with you?
16  A.   No.
17  Q.   In fact, there were witnesses that Gorman
18       identified that would be supportive, that he
19       wanted to make sure got -- that he got in
20       contact with and got statements from them;
21       right?
22  A.   Yes.
23  Q.   Okay.  So you really were in a situation that
24       was relatively safe for officers after you have
25       him handcuffed and in the prone restraint;

305

1        correct?
2   A.   Other than from Mr. Smith, the environment was
3        safe.
4   Q.   Yeah.  Well, once you got him handcuffed he's --
5   A.   Well, --
6   Q.   -- unable --
7            He's unable to do anything with his hands,
8        so he wouldn't be able to strike you, as he had
9        struck you in the jaw; correct?
10  A.   He wouldn't be able to punch me with any real
11       force, no.
12  Q.   Well, he wouldn't be able to punch you with a
13       fist at all, really, would he?
14  A.   No.  But I've been grabbed by people's hands
15       before --
16  Q.   Okay.
17  A.   -- in certain areas.
18  Q.   Yeah.  Well, I'm sorry about that and I
19       appreciate your dealing with it...
20           But the fact of the matter is, is that the
21       handcuffing restricts the upper extremities and
22       is meant to; correct?
23  A.   Restricts his -- his arms, yes.
24  Q.   Yeah.  That's what I call the upper extremities.
25       Right?

306

1   A.   Okay.
2   Q.   And -- and -- and then there's a situation where
3        there's two officers on one person whose
4        upper extremities are restrained; correct?  So
5        your ability to control him with two officers is
6        even greater than one officer; correct?
7   A.   Yes.
8   Q.   All right.  So really the paramount thing you
9        have to deal with after you've tasered him,
10       fought with him, got him on the ground...
11           And you say in your transcript that he was
12       adequately controlled by handcuffing; correct?
13  A.   His -- his hands were adequately controlled.
14  Q.   Yeah, you testified to that.  But once that's
15       done your duty is to pay attention to him, your
16       professional duty; correct?
17  A.   In -- in the sense that we -- we need to stay
18       with him, yes.
19  Q.   Well, you -- and you need to monitor his health
20       vigilantly until you either turn him over to
21       medical personnel or take him to the jail;
22       correct?
23  A.   I don't know about the -- your use of the term
24       "vigilantly," but we need to make sure that he's
25       okay.

25 (Pages 303 to 306)

Timothy Callahan
10/16/2012

307

```
 1          (Sotto voce comments.)
 2       (Brian Anderson Embedded Video
            Page 156, Line 13 - Page 156, Line 19)
 3
            "Q. So as an officer you want to remain
 4    vigilant always?
            "A. Try to be, yes.
 5          "Q. Okay. And you try to be vigilant with
      respect to monitoring the medical condition of
 6    anyone you've used force on?
            "A. Correct."
 7
 8    BY MR. BENNETT:
 9    Q.  You'd agree with that, wouldn't you, with
10    Sergeant Anderson?
11    A.  I'd use some different terminology, I guess.
12    You're using the term "vigilant" as -- in a
13    different way, I think.
14    Q.  Than what?
15    A.  Than what he's... That's a difference of
16    opinion.
17    Q.  Well, he didn't appear to be -- he said
18    "Correct," with the use of the word "vigilant":
19    correct?
20    A.  (Pausing.)
21    Q.  Right?
22    A.  Well, you could use a lot of different words
23    that --
24    Q.  Well, we used -- the term "vigilant" was used --
25    A.  Well, --
```

309

```
 1       (Jason Case Embedded Video
            Page 62, Line 14 - Page 63, Line 15)
 2
            "Q. There... The officers exhibit no fear
 3    or danger from any other forces in the scene:
      correct?
 4          "A. Not that I'm aware of.
            "Q. I mean there's nothing about what you
 5    observed in the pen camera video, the YMCA video
      or the Taser video that would lead you to
 6    believe that they were concerned about other --
      other people or things other than -- than
 7    Mr. Smith: correct?
 8          "A. Based on what I reviewed I would say
      that is correct.
 9          "Q. And there -- there were people playing
      bas- -- don't the videos show a bunch of guys
10    are bouncing the basketball and shooting hoops?
      But there's no problem with anybody, is there?
11          "A. Yeah, I -- I guess I vaguely remember
      people playing basketball, but correct.
12          "Q. But during a time period when it was
      critical to Mr. Smith's continuation of life
13    they're talking about things other than his
      health: is that true, based on your charting?
14          "A. Based on the charting, that is correct.
            "Q. And during a time period where it was
15    critical to Mr. Smith's continuation of life
      they are not manifesting any vigilance or care
16    about his physical predicament?
            "A. There's no indication on -- you know,
17    on either of the videos that -- that they were."
18    BY MR. BENNETT:
19    Q.  And you'd agree with that?
20    A.  No. I checked his pulse and rendered aid when I
21    became aware. There -- if you're implying that
22    we did nothing, I disagree with that.
23    Q.  Well, did you do nothing until he was
24    effectively dead?
25          MS. FUNDINGSLAND: Object to the form of
```

308

```
 1    Q.  -- in sworn testimony.
 2    A.  -- you could use the term "monitor," as well.
 3    Q.  Yeah, but in terms of how, he agreed with the
 4    use of the word "vigilant."
 5    A.  Does the -- does the policy say "vigilant" or
 6    does it say "monitor"? I'm not sure.
 7    Q.  I'm saying there's your training officer for the
 8    city, who the city propped up as their legal
 9    representative. Do you disagree with him or
10    not?
11    A.  I don't disagree that that's what he said.
12    Q.  Do you disagree with the --
13    A.  I guess I --
14    Q.  -- the facts?
15    A.  I think I disagree with his terminology.
16    Q.  Okay.
17       (Brian Anderson Embedded Video
            Page 110, Line 14 - Page 110, Line 17)
18
            "Q. And in terms of medical monitoring, is
19    that a passive thing: meaning, you know, 'If I
      happen to notice it, I pay attention to it'?
20          Or were the officers --
21          MR. BENNETT: Well, we did that. Why
22    don't we stop it?
23
24
25
```

310

```
 1    the question.
 2          THE WITNESS: Again, I checked his pulse
 3    when I became concerned that there -- that he
 4    was experiencing a problem.
 5    BY MR. BENNETT:
 6    Q.  Would you agree that he was already effectively
 7    dead at that point?
 8          MS. FUNDINGSLAND: Same objection.
 9          THE WITNESS: No, I don't agree because
10    he wasn't -- he was alive at the hospital.
11    BY MR. BENNETT:
12    Q.  Was there any brain activity at the hospital?
13    A.  I don't know.
14    Q.  If there wasn't any brain activity at the
15    hospital, and I could prove that to you, would
16    you agree that he was effectively dead?
17          MS. FUNDINGSLAND: Same objection.
18          THE WITNESS: Mr. Bennett, I'm not a
19    doctor.
20          MR. BENNETT: I understand.
21          THE WITNESS: He left with a pulse, to
22    my understanding.
23          (Sotto voce comments.)
24    BY MR. BENNETT:
25    Q.  So you think he was resuscitated from the
```

26 (Pages 307 to 310)

Timothy Callahan
10/16/2012

311

1    cardiopulmonary arrest?
2    A.   That's my understanding.
3    Q.   But he -- to the best of your knowledge and
4         belief was he ever -- did he ever recover from
5         his anoxic encephalopathy: that is, the
6         deprivation of oxygen to the brain for a
7         prolonged period of time?
8              MS. FUNDINGSLAND:  Object, foundation.
9              MR. BENNETT:  And I'll --
10   BY MR. BENNETT:
11   Q.   If you don't know, you don't know.  I can prove
12        it.
13   A.   I don't know.
14   Q.   Okay.  All right.  I'm showing you page 39 of
15        your deposition.  I asked you:
16        "Q.  Well, was David Smith a subject who was
17        not adequately controlled by handcuffing?"
18        And you gave this answer:
19        "A.  No.  I would say that once we had him
20        handcuffed, we had him --
         "Q.  Adequately controlled?
21        "A.  ... I think so."
22        Is that right?
23   A.   I said that, yeah.
24   Q.   You also told Klund that once he was hand- --
25   A.   But there was more to it than just handcuffing,

312

1    as far as what we were doing.
2    Q.   All right.  You told -- once he was handcuffed
3         he was complying, stopped resisting and given
4         up: do you remember that?
5    A.   I was under the -- I -- I believed that he
6         was -- for a period of time he -- he was being
7         compliant, but I wasn't willing to trust that he
8         wouldn't act out.
9    Q.   Well, let's have you listen to these.  See if
10        you agree with this.
11        (Amelia Huffman Embedded Video
12         Page 80, Line 22 - Page 81, Line 18)
13        "Q.  Are you aware that Dr. Baker testified
          and determined that they continued to kneel on
14        David Smith's back long after he had ceased
          breathing?
15        "A.  Yes.
16        "Q.  Okay.  That's problematic, isn't it?
          "A.  Yes.
17        "Q.  You never want to kneel on someone's
          back who is no longer breathing?  There's no
18        police purpose there, is there?
          "A.  No.
19        "Q.  And similarly, when a subject gives up
          and is complying, there's no need to continue
20        kneeling on a subject's back at that point
          either, is there?
21        "A.  Correct.
          "Q.  It's the reason to lessen force?
22        "A.  Yes.
          "Q.  Are -- are you aware of the fact that
23        Callahan in his statement said that after the
          handcuffs had been applied Smith gave up and was
24        complying?
          "A.  Yes."
25

313

1    BY MR. BENNETT:
2    Q.   Do you agree with Captain Huffman's answers to
3         those questions?
4    A.   No.
5    Q.   Okay.
6              MR. BENNETT:  Let's talk about training
7         in that.
8         (Brian Anderson Embedded Video
9          Page 199, Line 9 - Page 199, Line 13)
10        "Q.  Okay.  Was it consistent with MPD
          training prior to September 9, 2010, to kneel on
11        a subject's back for approximately 4-1/2 minutes
          after the subject had been adequately
12        controlled?
          "A.  No."
13   BY MR. BENNETT:
14   Q.   Do you agree with that answer?
15   A.   No.
16        (Brian Anderson Embedded Video
          Page 201, Line 11 - Page 202, Line 2)
17
18        "MR. OSBORNE:  Well, he just gave you a
          hypothetical that was pretty clear, though.
19        If the person was cuffed and had given up
          and was complying.
20        Right, Jeff?
          "MR. STORMS:  Yep.
21        "MR. OSBORNE:  Okay.
          "BY MR. STORMS:
22        "Q.  Would it be consistent with policy to
          continue kneeling on that person's back for
23        4 minutes and 30 seconds?
          "A.  No.
24
25

314

1         "Q.  Okay.  Would it have been consistent
          with training prior to September of 2010 to
2         continue kneeling on a subject's back under
          those circumstances?
3         "A.  No."
4    BY MR. BENNETT:
5    Q.   Would that be consistent with the training you
6         received?
7    A.   I'm going to tell you again, I -- after I first
8         -- the first time that he was tasered and he
9         stood up, I thought he was complying and giving
10        up at that time, as well, and then he punched me
11        in the face.
12        So even though I said after he was
13        handcuffed, I was not willing to give him the
14        benefit of the doubt that he wasn't going to act
15        out again.
16        So while I believe that he was
17        giving up and complying, I wasn't willing to
18        remove myself from his legs.
19        (Travis Glampe Embedded Video
          Page 99, Line 5 - Page 101, Line 3)
20
21        "Q.  Do you believe as an IAU commander that
          Callahan's statement that David Smith calmed
22        down, was not resisting and was -- had given up
          at the time of his handcuffing, was complying,
23        was in fact borne out by the video evidence?
          "MS. FUNDINGSLAND:  Objection, asked and
24        answered.
          "THE WITNESS:  What page is that on?
25        "BY MR. BENNETT:
          "Q.  Page 56 of the statement.

27 (Pages 311 to 314)

Timothy Callahan
10/16/2012

---

**315**

1  That was borne out by the -- by the
evidence, both on the Taser camera and the
2  pen camera.
    "A. I believe his statement here--that he
3  was not as -- resisting as hard and that he was
giving up and complying, yes.
4  Q. All right. And you would agree with me
that -- that the need for force against an
5  individual once he was handcuffed and ceased
struggling with an officer is much less;
6  correct?
    "A. Correct.
7  Q. In fact, it's good reason to cease
force whatsoever?
8  "A. Could be.
    Q. And if they're in a prone restraint, to
9  then assess their physical condition and
breathing?
10  "A. Correct.
    Q. You're aware of the policy that says
11  that when any restraint is used...
    "MR. STORMS: 24.
12  "MR. BENNETT: Yeah.
    "BY MR. BENNETT:
13  "Q. 'When ANY restraint technique is used
on a subject, the subject shall not be left in a
14  prone position and shall be placed on their side
as soon as they are secured.'
15  "A. Correct.
    "Q. 'Once the subject is secured, an
16  officer shall watch for the following signs:
Significant change in behavior or level [of]
17  consciousness.'
    "A. Yes.
18  "Q. 'Shortness of breath or irregular
breathing.'
19  "A. Correct.
    "Q. 'Seizures or convulsions.'
20  "A. Correct.
    "Q. 'Complaints of serious pain or injury.'
21  "A. Correct.
    "Q. 'And/or any other serious medical
22  problem.'
    "A. Correct."
23
24  BY MR. BENNETT:
25  Q. Do you have any disagreement with

---

**316**

1  Lieutenant Glampe's analysis?
2  A. I believe he would have answered differently had
3  you told him where you were reading from. You
4  didn't identify that as the maximal restraint
5  policy.
6  Q. Well, he had it in front of him. I'll guarantee
7  you that.
8  A. He didn't appear to be looking at it when you
9  were asking him the question.
10  Q. Okay. Well, nobody else, like I say, makes the
11  distinction, do they? They were all shown
12  Exhibit 24.
13  Um... So you don't agree with --
14  A. It's interesting that you don't ever mention the
15  term "maximal restraint" to them in your
16  questioning. And that's specifically where
17  you're reading from.
18  Q. Okay. We'll see.
19  A. Or else they're not aware of the policy that you
20  say is in front of them.
21  (Brian Anderson Embedded Video
    Page 157, Line 12 - Page 157, Line 23)
22
    "Q. If MPD officers were maintaining
23  someone in a prone position, though, in terms of
    training prior to 2010, they would have been
24  trained that you want to overall pay attention
    to the medical condition of the subject?
25  "A. Correct.

---

**317**

1  "Q. Because you would want to do that after
any use of force anyway?
2  "A. Correct.
    "Q. And handcuffing someone and putting
3  them in a prone position is obviously a use of
force?
4  "A. Correct."
5  BY MR. BENNETT:
6  Q. So it doesn't make any difference to the
7  training officer whether it's in the mechanic --
8  whether it's in the maximal restraint policy or
9  not. It's in the regular use-of-force policy.
10  Do you understand that?
11  A. I understand.
12  Q. All right. So do you disagree with
13  Sergeant Anderson in that clip?
14  A. I -- I -- I -- I don't. I thought we were
15  monitoring his condition.
16  (Brian Anderson Embedded Video
    Page 191, Line 22 - Page 192, Line 5)
17
    "Q. You would basically expect any officer
18  working at the MPD in September of 2010, who had
been there for any period of time, would have
19  been trained that if they're holding someone in
a prone restraint position, as soon as it's
20  practical they should be paying attention to
whether or not that individual is suffering from
21  any medical conditions?
    "A. Correct."
22
23  BY MR. BENNETT:
24  Q. Do you agree with that then, too?
25  A. As soon as it is practical, yes.

---

**318**

1  Q. And that would have been right away because --
2  (Unidentified video clip playing.)
3  BY MR. BENNETT:
4  Q. That would have been right away because there
5  wasn't anything else going on in the gym; right?
6  A. No.
7  Q. Why?
8  A. Because he was un- -- he had shown himself to be
9  unpredictable.
10  Q. Well, a person can give up any time: right?
11  A. And they can un-give up, as well.
12  Q. Well, sure. But let's -- let's take this case
13  that we -- we used as an example with Harteau.
14  I've got an individual that's alleged to
15  have a gun. He's running. Okay?
16  He jumps and climbs a fence. Okay?
17  And he -- but he can't get over the fence
18  and three squads show up.
19  Now he turns around and puts his hands up.
20  Can you -- can you hit him three times in the
21  face and four times with an impact weapon?
22  A. This is a case that you're currently...
23  Q. Just -- just answer me that.
24  He's given up. The person puts -- he's
25  complying. He surrenders.

---

28 (Pages 315 to 318)

Timothy Callahan
10/16/2012

319

1  A.   I -- I don't know all of the facts of it and I
2       don't want to comment on it.
3  Q.   So you think there's possibility that he may be
4       able to hit him in the face three times?
5  A.   I don't know.
6  Q.   Okay. Well, how would a person surrender for
7       you? Other -- other than give you the
8       impression, which you told Detective Klund that
9       he was complying, he was giving up.
10 A.   At that time.
11 Q.   What more can a person do to have you lessen the
12      force on them?
13         MS. FUNDINGSLAND: I'm going to object
14      to the form of the question. It's vague.
15         MR. BENNETT: That's his own words.
16         THE WITNESS: Well, again, I'll say that
17      he did not give me any verbal cues, so I had no
18      -- he wasn't telling me that he was giving up.
19      The first time I thought he was giving up he
20      actually didn't give up. He punched me in the
21      face.
22         The second time I did think he was starting
23      to comply, but I wasn't willing to not -- to
24      give him the benefit of the doubt again so that
25      he could attempt to injure me again.

320

1  BY MR. BENNETT:
2  Q.   Why -- why didn't Gorman just handcuff him when
3       you had him under power on the Taser?
4  A.   We were trying to.
5  Q.   He -- he let go and let him stand up.
6  A.   That was before the first one.
7         I wouldn't have tased him if we could have
8       gotten him under control then. We couldn't get
9       him under control.
10        (Unidentified video clip playing.)
11        MR. BENNETT: Stop it. Stop.
12        (Video clip stopped.)
13        MR. BENNETT: All right.
14        (Erick Fors Embedded Video
15         Page 98, Line 7 - Page 98, Line 25)
16      "Q. And, you know, you would -- you
17   believe, if as Gorman admits, he was on --
18   applying pressure with one or both knees, or
19   alternatively applying pressure with the left or
20   right knee for a period of 4-1/2 minutes, you
21   would expect him to pay attention for those
22   4-1/2 minutes, don't you?
23      "A. Yes.
24      "Q. And the attention is to be directed to
25   the person you're using the force on?
        "A. Correct.
      "Q. And the reason you do that is that you
   don't want someone to die by mistake while
   you're holding onto them, do you?
      "A. I think you could -- you could
   encompass it into a wider range. You don't want
   the person to suffer any medical problems.
      "Q. That's right.
      "A. Nodding."

321

1         (Erick Fors Embedded Video
2          Page 99, Line 6 - Page 99, Line 11)
3  "BY MR. BENNETT:
4      "Q. You've had instruction from the
5   Minneapolis Police Department that prolonged
6   kneeling on a subject's back during a
7   use-of-force encounter can compromise breathing;
8   correct?
9      "A. Correct."
10 BY MR. BENNETT:
11 Q.   Have you been trained the same way that
12      Detective Fors has been trained?
13 A.   I would assume so.
14 Q.   Do you have the same -- would you answer the
15      questions the same way as Detective Fors to the
16      questions he was asked?
17 A.   It's easy to give a static answer on a static
18      question. That was a fluid situation. Things
19      could change at any moment when -- when we were
20      at the scene.
21 Q.   Well, not after his heart stopped: right?
22         MS. FUNDINGSLAND: Object to the form of
23      the question and foundation.
24 BY MR. BENNETT:
25 Q.   The fluid stopped moving through his heart.
   A.   I'm not aware of when his heart stopped.
   Q.   Well, it stopped before you checked his pulse,
        hadn't it?

322

1         MS. FUNDINGSLAND: Object, form of the
2      question.
3         THE WITNESS: I did not get a pulse.
4         (Brian Anderson Embedded Video
5          Page 193, Line 19 - Page 194, Line 5)
6      "Q. Okay. Prior to September 9, 2010 were
7   MPD officers trained that it's appropriate
8   to place a subject in prone position and
9   kneel on a subject's back for several
10  minutes without monitoring the subject's
11  level of consciousness?
12     "A. No.
13     "Q. Okay. Prior to September 9, 2010 were
14  MPD officers trained that it was appropriate to
15  place a subject in the prone position and kneel
16  on the subject's back for several minutes
17  without monitoring the subject's breathing?
18     "A. No."
19 BY MR. BENNETT:
20 Q.   You'd agree with those answers?
21 A.   It's not -- it's not a specific training thing.
22      I don't recall any training that says that it's
23      prohibited --
24 Q.   Well, you -- you --
25 A.   -- ever.
   Q.   You were trained to put people in the recovery
        or side position, weren't you?
   A.   If using a maximal restraint.
   Q.   That's the only situation?
   A.   That's the only one that I'm aware of in the
        manual.

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

323

1  Q.  All right.  How about this?  Well, okay.
2  A.  Recovery position.
3          (Brian Anderson Embedded Video
            Page 125, Line 22 - Page 126, Line 7)
4
5          "Q.  And what I'm saying is based upon the
        training that you've received and training
6        that's been provided by the MPD, is that the
        ideal medical position, in terms of facilitating
7        breathing, is to put someone in a side or seated
        position rather than a prone position?
          "A.  Correct.
8          "Q.  And that's training that has been
        provided to MPD officers I think since like the
9        mid '90s; right?
          "A.  Correct."
10
11  BY MR. BENNETT:
12  Q.  You retrieved...  You received that training
13      for -- in a number of circumstances, not just
14      the maximal restraint?
15  A.  The?
16  Q.  Training.
17  A.  No.
18  Q.  Not policy.
19          No?
20  A.  That is -- that is in reference to "What is the
21      approved recovery position?"  And that is
22      putting someone on their side or sitting them
23      up, but it's not in -- it's in response to using
24      a maximal restraint.  That is the recovery
25      position.  I don't dispute that.

324

1  Q.  All right.  All right.
2          (Brian Anderson Embedded Video
            Page 189, Line 5 - Page 189, Line 14)
3
4          "Q.  So if you had a suspect who was
        complying and was under control, the training
5        that you provided would have been at that point
        you want to get that person in a side position
6        or a seated position?
          "A.  Correct.
7          "Q.  Okay.  Would you expect that all MP --
        all MPD officers prior to 2010 would have
8        received training to that effect?
          "A.  Correct."
9  BY MR. BENNETT:
10  Q.  Would you agree that that's the training you
11      received, that Sergeant Anderson indicated?
12  A.  I had reason to believe that David Smith
13      would -- would continue to act out, so he was
14      not placed in a different position.
15  Q.  Well, what did he do after he stopped moaning?
16  A.  Just -- there was -- once we had him handcuffed,
17      yeah, he wasn't acting out, but I didn't trust
18      that he wouldn't in --
19  Q.  Well, --
20  A.  -- the future.
21  Q.  -- how would he ever give up under your
22      scenario?
23  A.  We were -- we were just holding -- getting --
24      holding control of his body.  We weren't --
25  Q.  You were suffocating him.

325

1  A.  We were not exerting force on him anymore.
2  Q.  Well, that's obviously not true, isn't it?
3  A.  Well, I mean that's your opinion of force.
4  Q.  Well, it's Dr. Baker's opinion of force.
5          MS. FUNDINGSLAND:  Objection,
6      foundation.
7  BY MR. BENNETT:
8  Q.  You understand he was mechanically asphyxiated.
9      Do you disagree with that?
10          MS. FUNDINGSLAND:  Objection,
11      foundation.
12          THE WITNESS:  I -- I personally
13      disagree.
14  BY MR. BENNETT:
15  Q.  How?  Based on --
16  A.  I --
17  Q.  -- what?
18  A.  I'm not a -- I'm not a doctor.  I don't --
19  Q.  What is your disagreement based on?
20  A.  We could give test-- I could give the rest of
21      my testimony with you leaning on my back, if
22      you'd like.
23          I don't believe that that's what...  But
24      it's opinion.
25  Q.  What -- what -- what -- what evidence do you

326

1      have to believe that -- that you didn't
2      mechanically asphyxiate him?
3  A.  I think it was a compound of many different
4      factors.
5  Q.  Okay.  You didn't go to medical school?
6  A.  No, I didn't.
7  Q.  You didn't take any -- any postgraduate
8      residency in pathology, did you?
9  A.  No.
10  Q.  You have never been president of the National
11      Association of Medical Examiners?
12  A.  No.
13  Q.  Why do think they tell you to put people on
14      their side?
15  A.  Because when -- what is referred to as what used
16      to be hogtying, or considered hobbling now, when
17      the feet are connected to the hands, that it
18      exerts a lot of pressure on the chest wall.
19  Q.  None of these people that we've shown you
20      testifying mentioned anything about hobbling or
21      maximal restraint, did they?
22  A.  I don't think you mentioned it to them.
23          (Sotto voce comments.)
24
25

30 (Pages 323 to 326)

Timothy Callahan
10/16/2012

327

```
 1        (Adam Grobove Embedded Video
          Page 22, Line 22 - Page 23, Line 23)
 2
          "Q.  Now, it appears that -- I mean, you
 3    understand that the department has trained that
      when any restraint technique is used on a
 4    subject, the subject shall not be left in a
      prone position and shall be placed on their side
 5    in a position of recovery as soon as they are
      secured.  Is that training that you've done and
 6    received?
          "MS. FUSSY:  Objection, foundation.
 7    "You can answer, if you know.
          "A.  Yes, we have discussed that and we
 8    taught that in training.
      "BY MR. BENNETT:
 9        "Q.  And that's been trained that --
          "A.  Talked about it.
10        "Q.  -- way for a long time, hasn't it?
          "A.  I don't know when they started that,
11    sir.  I can't give you an exact date clarifying
      it was long.
12        "Q.  But you expect everybody from patrol
      officers to the chief to know that, don't you?
13        "MS. FUSSY:  Objection, speculation
      and foundation.
14        "A.  That depends.  Sometimes -- I would say
      that it would have to depend on each person.
15    "BY MR. BENNETT:
          "Q.  Well, they're all trained that way,
16    right?
          "MS. FUSSY:  Objection, foundation.
17        "A.  Yes, they would be trained that way."
18    BY MR. BENNETT:
19    Q.   So do you disagree with Officer Grobove?
20    A.   If you can show me somewhere in our manual,
21    force field, where it says recovery position
22    other than the maximal restraint, then I will --
23    then I'll agree.
24    Q.   We're talking about training.
25    A.   Right.
```

328

```
 1    Q.   Training is not the manual, is it?
 2    A.   We get training --
 3    Q.   You get training separate from the --
 4    A.   No.  We get training based -- based on the
 5         manual.
 6    Q.   These are the trainers we're asking; right?  We
 7         asked the trainers.  That's what they say they
 8         train.
 9    A.   Right.  And I say --
10    Q.   And you disagree with that?
11    A.   And I think you didn't give them the full
12         question.
13    Q.   You think...  No.  And -- and then do you think
14         the city attorney didn't coach them?  Do you
15         think the city attorney didn't tell them there's
16         this maximal restraint policy?  Now --
17         MS. FUNDINGSLAND:  Object to the form of
18         the question.
19    BY MR. BENNETT:
20    Q.   I mean do you really think that?
21    A.   I don't know.
22         MR. BENNETT:  That's a lot of people to
23    hoodwink.
24         MS. FUNDINGSLAND:  Object.
25
```

329

```
 1        (Amelia Huffman Embedded Video
          Page 76, Line 4 - Page 76, Line 25)
 2
          "Q.  Now you talk about not being a doctor
 3    in terms of understanding the length of time,
      you know, there was kneeling on David Smith's
 4    back.
          "Minneapolis police officers, along with all
 5    other police officers, have been trained for a
      long period of time that you're not supposed to
 6    continue to kneel on the backs of subjects for a
      long period of time; isn't that right?
 7        "A.  Yes.  We train officers to turn them
      over into the recovery position as soon as
 8    practical.
          "Q.  And that was long before this case,
 9    wasn't it, that that training has been provided?
          "A.  Yes.  I don't know for how long and in
10    -- and in what context, but certainly it's been
      part of our maximal restraint policy for many
11    years.
          "Q.  And it's something that you would --
12    that you train to do not only in maximal
      restraint, but in any situation where you have a
13    handcuffed individual in the prone position;
      isn't that right?
14        "A.  Yes.  We encourage officers to turn
      them over as soon as practical onto their side."
15
16    BY MR. BENNETT:
17    Q.   It seems like Captain Huffman doesn't make the
18         distinction that you're trying to make.
19    A.   She answered that a little bit differently than
20         the others did before.  She said, "As soon as
21         practical."
22    Q.   Do you disagree with her?
23    A.   I don't disagree that you could put somebody
24         into a different position when -- if it's
25         practical.
```

330

```
 1    Q.   Well, when -- why wouldn't it be practical?
 2    A.   I did not know if David Smith was done.
 3    Q.   So what?  He complied.  He gave up.  Why do you
 4         kneel on someone after he gave up and not
 5         monitor him?
 6    A.   As --
 7         MS. FUNDINGSLAND:  Objection, compound
 8         question.
 9         THE WITNESS:  As I said before, I
10         thought he gave up once before, too, and he
11         didn't.  So it was not practical --
12    BY MR. BENNETT:
13    Q.   Well, then you used force on him again.
14         MS. FUNDINGSLAND:  Objection, allow him
15         to finish his answer, please.
16    BY MR. BENNETT:
17    Q.   I thought you had.  If you've got more answer,
18         give it.
19    A.   Well, you can ask another question.  I don't
20         remember where I was going with that.
21    Q.   Well, I'll -- I'll -- I'll reprise it for you.
22         You -- you know, you thought he gave up once
23         before --
24    A.   Correct.
25    Q.   -- and so in response to that you tased him four
```

31 (Pages 327 to 330)

Timothy Callahan
10/16/2012

331

1    more times, handcuffed him and put him in the
2    prone position.
3    A.    Well, in -- in response to him punching me I --
4    Q.    Okay.
5    A.    -- felt it was necessary to tase him again.
6    Q.    Absolutely.  I've got no problem with that.
7          But then, when you think he gives up
8    again...
9          Once you think he gives up, you've got to
10   stop: right?
11   A.    I did stop after the first time.
12   Q.    I know.  And have to stop -- if he gives up
13   again...
14         The idea was to use force to make him give
15   up: correct?
16   A.    Yep.  Yes.
17   Q.    All right.  And -- and it didn't work the first
18   time.  I get what you're saying.
19         But then when you conclude and tell the
20   detectives that he gave up once he was
21   handcuffed, then a different response is
22   engendered after that.  You can't use force
23   prophylactically, can you?
24   A.    I don't know what you mean by that.
25   Q.    Well, you -- you use force in response to the

332

1    activities of the person you're arresting.
2    A.    When somebody gives up we don't untie and
3    handcuff them, as well.
4    Q.    No.  You want to keep them adequately
5    controlled, don't you?
6    A.    And that's what I -- and in my opinion that is
7    what we're doing.
8    Q.    Okay.  That's -- that's what... Okay.
9          (Robert Allen Embedded Video
             Page 102, Line 25 - Page 105, Line 3)
10
11        "Q.  Deputy Chief, do you have any
     disagreement with Captain Amelia Huffman's
12   answers to any of those questions?
          "A.  To the last question... You know, we
13   wouldn't always turn a handcuffed prisoner onto
     their side.  We may have them in a sitting
     position, for example, in the back of a police
14   car.
          "Q.  But that -- that in itself is a
15   different kind of recovery position?
          "A.  Correct.
16        "Q.  You don't leave them in a prone
     restraint handcuffed position?
17        "A.  Well, we may, but not without moni- --
     I mean there are tactical situations, for
18   example, during a search warrant in which you'd
     place somebody in a prone position for a short
19   period of time and so forth.
          "Q.  But while you do that you have to be
20   especially mindful of breathing: --
          "A.  Correct.
21        "Q.  -- correct?
          "So there's a correlation between the -- a
22   decision to tactically leave someone in a prone
     restraint position and the need to monitor the
23   breathing?
          "A.  Correct.
24        "Q.  If you make a tactical decision to --
     that a person needs to be kept in a prone
25   restraint position while they're handcuffed, you

333

1    need to be darn sure that you're paying
     attention to their breathing?
2         "A.  That's correct.
          "Q.  And to do otherwise would be
3    unreasonable?
          "A.  Well, again, there are circumstantial
4    factors involved in any of those situations,
     which it's -- it's hard to say that...
5         "For example, if you were taking fire or
     something then I think it would be reasonable to
6    get out of the way --
          "Q.  Sure.
7         "A.  -- or drag the person and -- and so
     forth.
8         "Q.  I -- I get that.
          "A.  So circumstances vary.
9         "Q.  But to do so when there's no other
     subject to control and when the subject you are
10   -- that you are handcuffing has complied and has
     given up, there's certainly -- it would be
11   unreasonable to not pay attention to their
     breathing if you continued to keep them in the
12   prone restraint position?
          "A.  Um... Correct.
13        "Q.  You realize that Gorman and Callahan
     weren't taking fire?
14        "A.  Yes."
15   BY MR. BENNETT:
16   Q.    Do you have any disagreement with Deputy Chief
17   Allen's answers to those questions?
18   A.    Again, Mr. Smith was left in the position he was
19   because I was not confident that he would not
20   continue to resist.
21   Q.    Well, do you agree or not?  I'll tell you...
22         I mean do you agree with his analysis or
23   not?  That if you're going to keep him there
24   you've got to --
25   A.    I don't disagree.

334

1    Q.    Okay.
2    A.    And if -- and if -- if the situation had been
3    different we would have stood him up and walked
4    him out.
5    Q.    Why didn't you just roll him over when he
6    complied and was giving up?
7          MS. FUNDINGSLAND:  Object to the form of
8    the question.
9    BY MR. BENNETT:
10   Q.    I mean how many times do you have to give up?
11         MS. FUNDINGSLAND:  Objection, compound
12   question.
13         THE WITNESS:  Rolling him over allows
14   him much more leverage with his legs as far as
15   kicking.
16   BY MR. BENNETT:
17   Q.    Couldn't you just sit on his legs and roll him
18   over?
19   A.    That allows him more access with -- to move
20   around with his head, to possibly bite, spit,
21   what -- a number of different things.
22   Q.    He never spit at you?  He never bite -- he never
23   bit you, did he?
24   A.    He -- he didn't punch me prior to punching me
25   either, but then he did.

32 (Pages 331 to 334)

Timothy Callahan
10/16/2012

335

1  Q.  Well, you don't get to kill him for biting you
2      either, do you?
3  A.  I -- our intent was not to do anything --
4  Q.  Well, that's --
5  A.  -- any harm to him.
6  Q.  All right.  You are aware of and have been
7      trained regarding the risks relating to pressure
8      on a subject's chest wall; correct?
9  A.  Can you say it?
10 Q.  If you put pressure on a subject's chest wall,
11     you're aware of the dangers of that; correct?
12 A.  I'm aware of -- that's why we have a maximal
13     restraint policy.
14 Q.  Kneeling on a subject's back would put pressure
15     on a subject's chest wall; correct?
16 A.  I don't -- I don't know that it would be
17     necessarily incapacitating because --
18         (Sotto voce comments.)
19     (Richard Zimmerman Embedded Video
           Page 64, Line 4 - Page 64, Line 8)
20
           "Q.  Did it surprise you that the cause of
21     death was mechanical asphyxia?
           "A.  No.
22         "Q.  And why didn't that surprise you?
           "A.  Because they had kneeled on him to
23     handcuff him."
24 BY MR. BENNETT:
25 Q.  That's Lieutenant Zimmerman, the head of

336

1      Homicide?
2  A.  That is.
3  Q.  So this doesn't -- apparently this wasn't a new
4      concept to the lieutenant--if you kneel on them
5      to handcuff them you could kill them?
6  A.  Every person that I have handcuffed, that I
7      handcuffed on the ground, I've knelt on them,
8      most likely.
9  Q.  Okay.
10 A.  I can't say exactly every single person.
11         (Sotto voce comments.)
12 BY MR. BENNETT:
13 Q.  So are you saying you can kneel on a subject's
14     back until they mechanically asphyxiate just in
15     case --
16     MS. FUNDINGSLAND:  Object to the form of
17     the question.
18 BY MR. BENNETT:
19 Q.  -- he might get up?
20 A.  No, I'm not saying that.
21 Q.  Okay.  I just wanted to be clear.
22     MR. BENNETT:  Why don't we break for
23     lunch.
24     MS. FUNDINGSLAND:  How long do you
25     intend to go?

337

1      MR. BENNETT:  I've got quite a bit more.
2      MS. FUNDINGSLAND:  Well, don't forget
3  you've already got about 3-1/2 hours in from the
4  first one.
5      MR. BENNETT:  Well, I think it's more
6  like two forty-five.
7      MS. FUNDINGSLAND:  No, I counted it.
8  Gorman's was shorter.
9      MR. BENNETT:  Well, we're off the record
10 now.
11     VIDEOGRAPHER:  Off the video record at
12 12:05 P.M.
13     (Recess:  12:05 P.M. to 12:54 P.M.)
14     VIDEOGRAPHER:  This Disc 3.
15 We are on the record at 12:55 P.M.
16 BY MR. BENNETT:
17 Q.  Would it be correct to state that each patrol
18     officer has received sufficient emergency
19     medical training to be able to work among the
20     public in such a way as that they should have
21     the capacity to assess whether a person is
22     breathing?
23 A.  Again, it's -- it's a very -- as far as I know
24     it's just CPR training now, but --
25 Q.  But --

338

1  A.  -- yes, you can tell if somebody is breathing.
2  Q.  And the capacity to tell if someone is conscious
3      or alive?
4  A.  I -- I don't know that we're specifically
5      trained on vitals.
6  Q.  How about consciousness?
7  A.  Maybe -- maybe we have been.  I'm not -- I don't
8      know.
9  Q.  Okay.  All right.  Well, um...
10 A.  As far as training goes.
11     MR. BENNETT:  Off the record.
12     VIDEOGRAPHER:  Off the video record at
13 12:56 P.M.
14     (Off the record.)
15     MR. BENNETT:  Let's go back on the
16 record, please.
17     VIDEOGRAPHER:  We are back on the video
18 record at 12:56 P.M.
19 BY MR. BENNETT:
20 Q.  Why did you buy the pen camera?
21 A.  Just to have.  I thought it could be helpful in
22     some scenarios/situations.
23 Q.  Did you buy it for work purposes?
24 A.  Yes.  I never used it outside of work.
25 Q.  So you only used the pen camera that's the

33 (Pages 335 to 338)

Timothy Callahan
10/16/2012

339

1    subject of the -- the facts in this case in work
2    conditions?
3  A.  To my recollection I've only used it at work,
4    yes.
5  Q.  And that was as a patrol officer for the city of
6    Minneapolis?
7  A.  Correct.
8  Q.  Did you use it in any off-duty jobs?
9  A.  Not that I'm aware of.
10 Q.  Prior to September 9, 2010 did you ever request
11   permission or authority to use the pen camera on
12   duty as a Minneapolis police patrol officer?
13 A.  Not that I recall.
14 Q.  Who was your direct supervisor on that date?
15 A.  On that date?
16 Q.  On that day.
17 A.  I don't remember who it was.
18 Q.  Who was your lieutenant?
19 A.  (No audible response.)
20 Q.  And who would you have asked if you were going
21   to ask permission?
22 A.  It didn't occur to me to ask.
23 Q.  Okay.  Prior to September 9, 2010 did you ever
24   advise any supervisor that you were using the
25   pen camera on duty as a Minneapolis police

340

1    patrol officer?
2  A.  I -- I don't recall if it ever came up or if I
3    ever... I mean people knew that I had it.  I
4    don't know if I ever told a supervisor.  It may
5    have come up in passing, but I didn't
6    specifically say anything.
7  Q.  Who knew that you had it?
8  A.  I don't know.  I mean I --
9  Q.  You're --
10 A.  It wasn't --
11 Q.  -- the one that just said that.
12 A.  I -- I understand that.  But what I'm trying to
13   tell you is it wasn't a secret.  I don't know
14   who may have -- I may have mentioned it to while
15   having coffee or something.
16 Q.  But you didn't -- you neither sought nor
17   obtained permission from any Minneapolis Police
18   Command & Control person to use it; correct?
19 A.  No, I didn't.
20 Q.  Okay.
21 A.  To my knowledge I don't think I did.
22 Q.  Have you ever used a pen camera or other spy
23   camera device after -- after September 9, 2010?
24 A.  No.
25 Q.  Did you use the pen camera prior to

341

1    September 9th, while on duty as a Minneapolis
2    patrol officer, to capture images of you and
3    others in the performance of your police
4    activities for the Minneapolis Police
5    Department?
6  A.  Yes.
7  Q.  How many times?
8  A.  I don't know.
9  Q.  Well, more than 20?
10 A.  Probably, yes.
11 Q.  More than 30?
12 A.  Probably.
13 Q.  Less than 50?
14 A.  I don't know.  I...  It could be a hundred.
15 Q.  Okay.
16 A.  I don't know.
17 Q.  And if I understand your prior answer, the
18   answer to this question is no, but you made no
19   personal use of the pen camera while not on duty
20   as a Minneapolis police patrol officer?
21 A.  I don't believe so.
22 Q.  All right.  As of September 10, 2010 did the
23   video files of the other incidents that you had
24   captured on -- by the use of that digital video
25   recorder/pen camera remain on the pen camera?

342

1  A.  Anything prior to 2010?
2  Q.  No.
3  A.  Or...
4  Q.  Before the day after this incident did all of
5    the video files remain on the pen camera itself?
6  A.  No.
7  Q.  Had you deleted some before?
8  A.  Yes.
9  Q.  How many -- were there pen camera videos that
10   were un-deleted on the pen camera as of
11   September 9, 2010?
12 A.  There may have been one or two.  It has a very
13   limited memory capacity.  If you don't remove
14   them it's useless.
15 Q.  Did you ever put them anyplace?
16 A.  On my computer, I suppose, is where I put them.
17 Q.  All right.  Did you ever make zip files of any
18   of the other...
19 A.  No, not that I -- not that I recall.
20 Q.  Did you ever e-mail any of those other images to
21   anyone else?
22 A.  No.
23 Q.  You e-mailed -- you made a zip file of the video
24   of this incident?
25 A.  I...  When you say "zip file" do you mean a

34 (Pages 339 to 342)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

343

1         flash drive?
2    Q.   No.  A... I guess I should...
3         What I understood is you made a file -- an
4    e-mail attachment of it; correct?
5    A.   Not to my knowledge.  I may have tried it --
6    maybe I tried to do that, to send to my attorney
7    or something.  I don't know.
8    Q.   Did you make e-mail attachments of other videos?
9    A.   Not to my knowledge.
10        MR. BENNETT:  Mark this.  What are we
11   on?
12        (Discussion held off the record.)
13        (Exhibit 115 marked.)
14   BY MR. BENNETT:
15   Q.   Showing you Exhibit 115, that was prepared by an
16   expert retained by the city, showing that on
17   September 10, 2001 [sic] at 15:32:58 you created
18   a video file on your computer and compressed to
19   a zip file.  Do you see that?
20   A.   I see it.
21   Q.   And made it an Outlook Express e-mail
22   attachment?
23   A.   I see it.
24   Q.   Do you deny doing that?
25   A.   I don't deny doing it.  I don't know what I -- I

344

1    don't know what it's for.
2    Q.   Did you copy that video file to -- from the
3    pen camera to your home computer at 21:51:11?
4    A.   It looks like it, yeah.
5    Q.   Okay.
6    A.   That's the only way to view it, as -- as I
7    recall.
8    Q.   And you did that onto your personal computer?
9    A.   Yes.
10   Q.   The one upstairs?
11   A.   Yes.
12   Q.   Do you have another computer?
13   A.   I have an old laptop.  If I can find it.  I
14   don't know if I still have it or if I've gotten
15   rid of it, but I have --
16   Q.   Did you search for it?
17   A.   Ah... I haven't -- I looked around.  I didn't
18   look where -- the last place it could be.
19   Q.   I don't understand.
20   A.   There's one place that I could continue to look
21   that I might be able to find it.  I don't use
22   it.  I haven't used it in a long time, but --
23   Q.   Have you ever used it with the pen camera?
24   A.   No.
25   Q.   Did you ever have, prior to this pen camera, any

345

1         other spy camera?
2    A.   No.
3         (Exhibit 116 marked.)
4    BY MR. BENNETT:
5    Q.   This was -- this was given to me by the
6    city attorney's office.  Indicated that -- the
7    pen camera videos archived on your personal
8    computer.  Do you see that?
9    A.   Yes.
10   Q.   Have you looked at these?
11   A.   I don't know.  I'm sure that I've seen them at
12   some point.
13   Q.   Well, have you looked at --
14   A.   Not recently.
15   Q.   -- them since they were --
16   A.   No.
17   Q.   -- captured --
18   A.   I haven't looked at them recently.
19   Q.   One -- we're only going to have to speak one at
20   a time.
21   A.   Okay.
22   Q.   If you let me finish my question...  We've both
23   done it, but it just messes up the record.
24   Okay?
25   A.   Okay.

346

1    Q.   Do you remember...  Do you remember any of these
2    specific files?
3    A.   No.
4    Q.   Did -- did you -- the earliest one is June 26,
5    2010.  Did you use the pen camera before that?
6    A.   I don't know.
7    Q.   The last one is 9/4/2010.  Did you use the
8    pen camera between that and 2010 -- September --
9    A.   It was --
10   Q.   -- September 9, 2010?
11   A.   Say it again.
12   Q.   Well, the last one on Exhibit 116 is -- was last
13   written 9/4/2010, 11:35.  Do you see that?
14   A.   Are you asking me if that's the last time it was
15   used prior to this incident?
16   Q.   Yes.
17   A.   I don't know.  If that's what it says.  I have
18   no idea what dates I used it.  I don't dispute
19   it.
20   Q.   Okay.  I've looked at those videos.
21        Did you typically start your computer -- or
22   excuse me.
23        Did you typically start the digital video
24   recorder, your pen camera, at the time you were
25   still in your squad car about to take the call?

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

347

1   A.   Sometimes.
2   Q.   Well, I've never...  I've looked at all those
3        files.  Have you ever done it any other way
4        other than the -- the incident involved with
5        David Smith?
6   A.   I'm sure that I have.
7   Q.   So you've activated it mid call before?
8   A.   Yes, I'm sure I have.
9   Q.   Other than the David Smith one?
10  A.   I would say probably.  I mean I -- I can't give
11       you a definitive which one, where, when.
12           I'm saying that sometimes calls change--it
13       goes from being a nothing call to something that
14       maybe you might want to have a recording of and
15       then you would start it.
16  Q.   Did you ever...  Do you remember the naked-man
17       videos?
18  A.   Videos?
19  Q.   I think there's two.
20  A.   I -- I remember --
21  Q.   There's two files.
22  A.   I remember there's an incident concerning a
23       naked man.
24  Q.   Did you e-mail those to any other officers?
25  A.   No.

348

1   Q.   Okay.  Did you ever use the pen camera to
2        belittle or demean anyone?
3   A.   Not to my knowledge.
4   Q.   Well, do you think the -- the naked-man video
5        was belittling and demeaning in the way you took
6        the -- took the video?
7   A.   No.  No more so than him being in public naked
8        and for all the world to see.
9   Q.   Okay.  Well, the world wouldn't have seen it if
10       you...  You know, you're the one who recorded it
11       digitally; correct?
12  A.   It may have been on the squad camera.  I'm not
13       sure.
14  Q.   Well, don't you remember your -- sticking your
15       hand out the side of the squad and taking the
16       video with the pen?
17  A.   I don't know.  Maybe I did.
18  Q.   Did you...  Okay.
19           MR. BENNETT:  Why don't we play that.
20       Do you want to play it on the record or off
21       the record, Lynne?  I don't -- we can just as
22       easily watch it off the record.
23           MS. FUNDINGSLAND:  That's fine.
24           MR. BENNETT:  Off the record.
25           MS. FUNDINGSLAND:  As long as we get it

349

1        identified.
2            MR. BENNETT:  Yeah.
3            VIDEOGRAPHER:  Off the video record at
4        1:08 P.M.
5            (Discussion held off the record.)
6            VIDEOGRAPHER:  We are back on the video
7        record at 1:08 P.M.
8            (8/21/10 Pen Camera Video Playing.)
9            MR. BENNETT:  It's the video taken on
10       August 21, 2010 at 19:42 hours.
11       Is that right, Officer?
12           THE WITNESS:  That's what it says on the
13       screen, yes.
14           MR. BENNETT:  Off.
15           VIDEOGRAPHER:  Off the video record at
16       1:09 P.M.
17           MR. BENNETT:  I may I have enough to ask
18       you the questions I need you to ask.
19           (8/21/10 Pen Camera Video Stopped.)
20  BY MR. BENNETT:
21  Q.   Do you have that video in mind?  I mean do you
22       know basically what's on that or do you want to
23       watch it?
24  A.   No, I have it in mind.
25  Q.   Do you think you can answer questions about it?

350

1        I don't want to be unfair you.  You seem to
2        think we --
3   A.   I mean I'll do my best.  I -- if you ask me if I
4        said a specific word I might need to have
5        clarification, but I remember the video.
6   Q.   Okay.
7            MR. BENNETT:  All right.  Let's go back
8        on.
9            VIDEOGRAPHER:  We are back on the video
10       record.  It is approximately 1:10 P.M.
11  BY MR. BENNETT:
12  Q.   What we were looking at here is a video from the
13       pen camera; correct?
14  A.   Yes.
15  Q.   Not a squad video?
16  A.   No.
17  Q.   A squad video would be oriented towards the
18       front of the squad; correct?
19  A.   Yes.  The camera can be turned.
20  Q.   Okay.  But it wasn't?  This is your pen --
21  A.   I don't -- I don't think I did.
22  Q.   In this one you can actually see yourself in the
23       side-view mirror holding the pen camera out
24       taking the image; correct?
25  A.   Yes.

36 (Pages 347 to 350)

Timothy Callahan
10/16/2012

351

1  Q.   Okay.  Did you do that a lot?
2  A.   No.
3  Q.   Typically would you wear the pen camera in the
4       pen --
5  A.   Yes.
6  Q.   -- section of your left breast Minneapolis
7       City of the Lakes' duty blouse?
8  A.   Yes.
9  Q.   Okay.  And it stayed there during the rough and
10      tumble struggle with David Smith; correct?
11 A.   As far as I know it didn't come out, yes.
12 Q.   It didn't come out?  It captured the video that
13      was shown.  And as far as you know it stayed in
14      that position from the point it started until
15      the point it ended?
16 A.   Exactly where it was, I don't know.
17 Q.   Well, in -- it stayed put in --
18 A.   It was in the pocket --
19 Q.   Yeah.
20 A.   -- as far as I know.
21 Q.   And the clip kept it in -- into the pocket;
22      correct?
23 A.   No, the clip is not -- the clip is more for show
24      than...  It's not -- it's not very much tension
25      on it.  The pen can slide up and down no

352

1       problem.
2  Q.   Uh-huh.  Well, if the clips on it can't slide...
3       The clip is shown in Exhibit 50, isn't it,
4       on top of your -- and it keeps it secure?
5  A.   Well, it keeps it from going like this one does,
6       from going down in the pocket, if that's what
7       you're asking.  It doesn't keep it necessarily
8       in the pocket.
9  Q.   Correct.  But it kept it secured -- it stayed in
10      the pocket throughout your struggle?
11 A.   As far as I know, yes.
12 Q.   Yeah.
13 A.   I didn't have to pick it up off the ground, that
14      I recall.
15 Q.   All right.  And it operated throughout the
16      struggle, as at least is indicated by the video
17      itself; correct?
18 A.   Yes.
19 Q.   All right.  Now Exhibit 113 is the work rules
20      and benefits...  Ah...
21          (Sotto voce comments.)
22 BY MR. BENNETT:
23 Q.   And that governs personal equipment; correct?
24 A.   Personal equipment or department equipment?
25 Q.   It says "Personal Equipment."

353

1  A.   Where?
2  A.   On top.
3  A.   Oh, there.  Ah, yes, it says that.
4  Q.   And 3.201 says, "Authorized equipment and
5       weapons" and it's been in place since 2007;
6       correct?
7  A.   Yes.
8  Q.   And it says, "While working sworn MPD employees
9       shall..."
10          And that's you; right?
11 A.   Yes.
12 Q.   "...shall only carry and use equipment and
13      weapons that have been authorized by the MPD
14      Training Unit and only the weapons that the
15      employees have been trained to use by the MPD
16      Training Unit or its designee"; correct?
17 A.   Yes.
18 Q.   And "The MPD Training Unit shall be responsible
19      for conducting research and product testing of
20      any new equipment or weapons prior to
21      authorization for carry and use by sworn MPD
22      employees"; right?
23 A.   Where did you read that from?
24 Q.   The second paragraph.
25 A.   Okay.

354

1  Q.   Is that -- that's what it says?
2  A.   Yes, that's what it says.
3  Q.   Did you ever take the pen camera to the MPD
4       Training Unit?
5  A.   No.
6  Q.   Was the pen camera ever authorized by the MPD
7       Training Unit?
8  A.   I didn't take it to them so I don't know.
9  Q.   Well, have you ever been advised that it is?
10 A.   No.
11 Q.   I mean they -- they list all sorts of things
12      that are approved and which models you can use
13      of approved equipment; correct?
14 A.   Yes.
15 Q.   I mean they tell you what you have to have and
16      then they tell you what you can't have.
17 A.   Well, it doesn't say the name brand of stuff.
18 Q.   Well, it sure does.
19 A.   No, it doesn't.  It says, "Chemical agent."  It
20      doesn't say what kind we use.
21 Q.   Well, for your flashlight you can use a
22      Streamlight Model 3, Model 3X or TRL 1.
23 A.   Where are you?  I don't --
24 Q.   That's page 4.  I mean they -- they list
25      specific brand names for things like flashlights

37 (Pages 351 to 354)

Timothy Callahan
10/16/2012

355

1      and flashlight attachments; --
2  A.  Yes.
3  Q.  -- right?
4      Weapons?
5  A.  Where's the weapons part?
6  Q.  Well, you can carry either a Smith & Wesson
7      J Frame 5-shot revolver if -- for your secondary
8      handgun.  Or Colt D Frame 6-shot revolver or
9      Ruger 5-shot revolver; right?
10 A.  Uh-huh.
11 Q.  Is that -- is that a "Yes"?
12 A.  Yes.
13 Q.  And you can carry the kind --
14 A.  It doesn't say -- it doesn't say specifically
15     for everything, though.
16 Q.  Well, no.
17 A.  For that particular section it does.
18 Q.  But there -- there are a number of things that
19     it lists specifically; right?
20 A.  Yeah.
21 Q.  And it lists all sorts of equipment, none of
22     which include a spy camera or pen camera of any
23     type: correct?
24 A.  Correct.  I also don't see my sunglasses, or my
25     wallet, or my personal keys or what kind of

356

1      socks I can wear.
2  Q.  Okay.  Well, --
3  A.  It doesn't show a lot of stuff --
4  Q.  But you're not --
5  A.  -- that I carry every day.
6  Q.  Are your socks evidence?  Are your keys
7      evidence?
8  A.  I -- not in this scenario, no.
9  Q.  Okay.  If you're taking a picture of the
10     naked man is that evidence?
11 A.  It could have been.
12 Q.  If you're -- you -- you -- you used this
13     pen camera for the very purpose of capturing
14     video images of your police work and the people
15     you encounter therein; correct?
16 A.  Yeah.  And for situations just like this, where
17     I'm -- potentially I could get sued for
18     using force or using -- for doing anything.
19 Q.  Well, you're being sued for using force that
20     killed somebody in this case, but the...
21     MS. FUNDINGSLAND:  Excuse me, counsel.
22     MR. BENNETT:  Well, I...
23     His answer was no less responsive.
24 BY MR. BENNETT:
25 Q.  You -- but the idea is to create evidence with

357

1      the pen camera: correct?
2  A.  If necessary, yes.
3  Q.  Well, you -- you did in this naked-man video.
4  A.  That man wasn't charged with a crime.  It's not
5      evidence.
6  Q.  Well, you know, it's... Isn't it a crime --
7  A.  He was taken to APS, as I recall.
8  Q.  Okay.  It's at least potentially criminal to
9      walk downtown naked, I would think.
10 A.  If he knew what he was doing.  I don't think he
11     knew what he was doing.
12 Q.  I --
13 A.  That was my assessment at the time.
14 Q.  Sure.  But it is -- you are actually capturing
15     evidence of a crime?
16 A.  It -- it could have been.
17 Q.  Yeah.  And -- and you captured evidence of a
18     crime that is Assault 4, at least in your view
19     and Gorman's view, of David Smith.
20 A.  I -- as I said, I don't know that we were going
21     to charge him.  Officer Gorman suggested and I
22     didn't necessarily disagree with it.
23     But it was my opinion that if he was
24     charged, it would have been charged at a later
25     date because he would have -- would have gone to

358

1      the hospital first, --
2  Q.  Well, --
3  A.  -- to APS.
4  Q.  But you talked about what to charge him with?
5      That is a police --
6  A.  That would have been what we would have charged
7      him with, yes.
8  Q.  And that is a police function?
9  A.  Yes.
10 Q.  And what you captured was police evidence of
11     either a felony, or a gross misdemeanor, or a
12     critical incident?
13 A.  Something that evolved into a critical incident,
14     yes.
15 Q.  Well... But it was a critical incident?  I mean
16     it --
17 A.  Right.  But it didn't start out that way.  I
18     didn't -- I didn't start the camera because I
19     thought it was going to be a critical incident.
20 Q.  But if it -- but if it catches video of a
21     shooting or of -- of -- in this case a
22     mechanical asphyxiation, it obviously is
23     evidence, isn't it?
24     MS. FUNDINGSLAND:  Object to the form of
25     the question.

38 (Pages 355 to 358)

Timothy Callahan
10/16/2012

---

359

1    THE WITNESS:  It would -- it would be a
2    part of --
3         MR. BENNETT:  Sure.
4         THE WITNESS:  Probably.
5    BY MR. BENNETT:
6    Q.   Was it your practice to take videos from your
7         pen camera and download them on your own
8         computer?
9    A.   Yes.
10   Q.   You never take -- you never download any of the
11        images to the Minneapolis Police Department?
12   A.   Not that I recall.
13   Q.   Okay.  Have you ever arrested anyone that you
14        filmed with a pen camera?
15   A.   I'm -- I'm sure.
16   Q.   So you know you would have created evidence
17        there; right?
18   A.   Not -- no.  I don't know that.
19   Q.   Did you ever film an actual incident underlying
20        the crime itself then?
21   A.   I don't -- I don't -- I don't think so.  I
22        don't...  We rarely get there when the crime is
23        in -- in process -- in progress.  We generally
24        get there afterwards.
25   Q.   Okay.  Well, you -- you had evidence of this

---

360

1         supposed Assault 4 on the video; correct?
2    A.   I assumed that I did.
3    Q.   Okay.  Well, you said you "...got it all here";
4         right?
5    A.   Yeah, but I don't know that it was -- that it
6         captured it.
7    Q.   Well, you turned out to be correct.
8    A.   I turned out to be -- that was correct, yes.
9    Q.   Once you downloaded the videos onto your home
10        computer what did you do with them?
11   A.   I didn't -- what do you mean what -- I didn't do
12        anything with them.
13   Q.   You never e-mailed them to anyone in the
14        department?
15   A.   Not to my knowledge.
16   Q.   Ever e-mailed them to family or friends?
17   A.   I don't believe so.
18   Q.   You're not sure?
19   A.   I -- I don't know how to do it.  If it shows me
20        in this one attempting to do it, then I
21        attempted to do it and it didn't work.
22        And I would have sent it probably to Fred
23        Bruno.
24   Q.   Did you send the naked-man one to Fred Bruno,
25        too?

---

361

1    A.   I don't believe I've ever e-mailed any of them
2         to anyone.
3    Q.   All right.  Your supplement shows that you
4         turned the pen camera in on October 15, 2010; is
5         that right?
6    A.   I believe so.
7    Q.   Did you learn that day that you had to turn the
8         pen camera in?  Or did you learn it before that?
9    A.   I volunteered to turn it in.
10   Q.   Did someone tell you to turn it in?
11   A.   No.  Wait.  The actual pen camera or the footage
12        of the pen camera?
13   Q.   The pen camera.
14   A.   I volunteered -- the actual camera itself, the
15        hardware, --
16   Q.   Yeah.
17   A.   -- not the footage from it?
18   Q.   Yeah.
19   A.   Okay.  What date?
20   Q.   October 15, 2010.
21   A.   As I believe, I brought it up and asked would --
22        "Would you like this to go into evidence?"  And
23        whoever it was that I was talking to said,
24        "Yeah, why don't you put it into evidence."
25   Q.   Your attorney didn't tell you to do that?

---

362

1    A.   No, I didn't --
2         MS. FUNDINGSLAND:  Can you be more
3         specific?
4    BY MR. BENNETT:
5    Q.   Well, were you advised to turn it in by an
6         attorney?
7    A.   Are you referring to Fred Bruno or the city's
8         attorneys?
9    Q.   I'm not -- I'm just -- there's -- I'm just -- an
10        attorney.
11   A.   Not the pen camera, no.
12   Q.   Okay.
13   A.   Well, no, I -- I asked if it should go into
14        evidence and somebody, and I don't know who,
15        said, "Yeah, why don't you put it in evidence."
16        I had already turned in the footage.
17   Q.   Okay.
18        (Sotto voce comments.)
19        (Exhibit 117 marked.)
20   BY MR. BENNETT:
21   Q.   Exhibit 117, page 1, --
22        MS. FUNDINGSLAND:  They're both page 1,
23        Mr. Bennett.
24        MR. BENNETT:  Okay.  Exhibit 1 [sic]
25        ES 0- -- 01.

---

39 (Pages 359 to 362)

Timothy Callahan
10/16/2012

---

363

1        MS. FUNDINGSLAND:  That's both of them.
2        MR. BENNETT:  Yeah.
3   BY MR. BENNETT:
4   Q.   Smith -- "Smith Pen Camera:  Active Files and
5        Folders" list, lists one AVI file; correct?
6   A.   Is this the page that you're --
7   Q.   Yep.
8   A.   I see one AVI file.
9   Q.   The second page lists a number of AVI files;
10       correct?
11  A.   Yes.
12  Q.   And they're -- they exceed the number on
13       Exhibit 116; correct?
14  A.   I don't have 116.
15  Q.   One --
16  A.   No.
17       Say it again.
18  Q.   The AVI files are different from and different
19       in number -- in fact, there are only two AVI
20       files that appear on 116 that appear on 117.
21  A.   I don't know.  Okay.
22  Q.   Did you...  And then it shows a bunch of lex
23       files.  Accessed 10/5/2010.  Do you see that?
24  A.   I see that it says "lex."
25  Q.   Did you delete all of those files?  Does that

---

364

1        show a recordation of the deletion of those
2        files?
3   A.   I don't know what "lex" means.
4   Q.   Well, did you de- -- well, let me ask you this:
5        Did you delete AVI files that are reflected with
6        the lex and the AVI numbers on 10/5/2010?
7   A.   I don't know.
8   Q.   Do you remember deleting a number of files from
9        the pen camera on that -- on 10/5/2010?
10  A.   Ah...  I may have taken stuff off and deleted
11       it.  I don't know.  I don't know what this --
12       these -- this means.
13  Q.   Well --
14  A.   You're telling me if it...
15       Are you telling me that "lex" means
16       "deleted"?
17  Q.   I will -- I'm going to -- that's what I believe
18       we have.
19       (Sotto voce comments.)
20  BY MR. BENNETT:
21  Q.   You see there's a number of AVI files that are
22       last accessed on 10/5/2010.  Do you see that?
23  A.   I -- I see what you're referring to, but what
24       I'm saying is I don't know what this stuff
25       means.

---

365

1   Q.   Did you delete a number of files?
2   A.   I don't know.  I don't know if I did.
3   Q.   You don't know?
4   A.   I might have.
5   Q.   Do you have a recollection of deleting files in
6        early October before you gave the pen camera to
7        the Property Department?
8   A.   I don't know.  I -- if I -- maybe I did.  I'm
9        saying that I don't remember doing it.  Could I
10       have done it?  I could have.
11  Q.   Did anyone tell you to?
12  A.   No.
13  Q.   When you turned the pen camera into the
14       Property Room on 10/15 was it your intention to
15       have every other video file deleted from that at
16       that time?
17  A.   From the actual pen cam itself?
18  Q.   Yes.
19  A.   I think I had removed the other files that were
20       not pertinent to the reason I was property
21       inventorying it.  Is that what you're asking?
22  Q.   Yes.
23  A.   I think I did that.
24  Q.   Did you remove it by deleting it?
25  A.   I don't know.  That I don't know.

---

366

1   Q.   How did you remove it?
2   A.   You just take them off the -- when the screen
3        comes up you just remove it -- remove it from
4        the pen cam itself.
5   Q.   Why did you erase those images after you learned
6        you were going to property inventory it?
7   A.   I didn't --
8        MS. FUNDINGSLAND:  Object to form of the
9        question.  He has not stated that.
10  BY MR. BENNETT:
11  Q.   Why did you remove the images --
12  A.   I turned in what I thought --
13  Q.   -- before you turned it in to Inventory?
14  A.   I turned in the footage that was relevant to the
15       date of the reason I was turning it in, this
16       incident.
17       Obviously you have other footage.  They're
18       not deleted.  They're just taken off the
19       pen camera.
20  Q.   Well, I don't think that's actually true.  I
21       think they were -- those were obtained from your
22       hard drive.  If you look at --
23  A.   Which is where these would have went.  If you're
24       saying I removed them from the pen cam they
25       would have went --

---

40 (Pages 363 to 366)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

367

1  Q.  I -- I don't know.  Did you remove them --
2  A.  I've deleted lots of files because if it turns
3      on, or if it turns on inadvertently...  If it turns
4      on -- if I turn it on and it's a nothing
5      situation, I'll delete lots of stuff.
6  Q.  So you only turn it on and keep it if it's
7      something you want to keep?
8  A.  No.  There -- there might be files that I didn't
9      ever get around to cleaning -- or taking off of
10     my hard drive or... But they just need to be
11     removed from the pen cam otherwise the pen cam
12     storage fills up.
13  Q.  Have you removed files from your hard drive, as
14      well?
15  A.  I don't -- whatever is on my hard drive is what
16      was taken from the pen cam and put there.  I
17      don't believe I've deleted any of them.
18  Q.  Have you tried to?
19  A.  Not -- no.  Whatever is there I didn't try to
20      delete.  The ones that were deleted, that were a
21      couple of seconds long or something, they might
22      have been.  I don't recall.
23  Q.  Have you ever turned in a video of your police
24      work to the Minneapolis Police Department prior
25      to the David Smith incident?

368

1  A.  I don't believe so.
2  Q.  Okay.  Did you and Gorman text each other, text
3      message each other after the incident?
4  A.  I don't know.  I doubt it.  I'm not a big
5      texter.
6  Q.  Did you often text him?
7  A.  No.
8  Q.  How did you communicate with Gorman?
9  A.  At work.  There may have been an instance where
10     we talked on the phone, but for the most part
11     we -- whatever communicating we did, we did at
12     work.
13  Q.  Well, the records reflect that you and Gorman
14      spoke seven times between September 9, 2010 and
15      September 16, 2010, totaling 130 minutes.
16  A.  Okay.
17  Q.  Ah --
18  A.  You didn't ask me if... Well, go ahead.
19  Q.  Is that -- would that be generally correct to
20      the best of your knowledge?
21  A.  Is that from my cell phone bill?
22  Q.  Yep.
23  A.  It's probably correct then.
24  Q.  What did you speak about in those days between
25      the time you downloaded the incident onto your

369

1      home computer and the time he gave his
2      statement?
3  A.  I... I don't know.  I -- I know specifically we
4      talked about...  Because we have to go and see a
5      department-authorized... I guess a psychiatrist
6      after a critical incident.
7          I know we spoke about -- because I didn't --
8      I don't think I had all the names that he had of
9      people -- of options that we could do.  And I
10     think he gave me a number for one of them.
11         The rest of the stuff, I don't know.  It was
12     just general.
13  Q.  Well, other calls you made were to Susan K.
14      Powers Olson.  Is she the --
15  A.  That's the person I went and saw.
16  Q.  Okay.  Who is Bob Jacobson?
17  A.  My -- one of my sergeants, --
18  Q.  Okay.
19  A.  -- I believe.  That's...  Unless there's a
20      different Bob Jacobson, but I have a sergeant
21      named Bob Jacobson.
22  Q.  Okay.  What's his phone number?
23  A.  I don't know.
24  Q.  Can you look it up on your phone?
25  A.  I did not bring my phone today.

370

1  Q.  Well, if I read his number could you -- would
2      you know it?
3  A.  No.
4  Q.  Okay.
5  A.  I know very few numbers.  With cell phones...
6          But I can tell you that I made a lot of --
7      we were supposed to make these calls to get to
8      somebody to talk to.  And I made a lot of calls
9      that people were not around.  They didn't
10     respond.
11         It was -- this was a Thursday, wasn't it?
12         (Sotto voce comments.)
13         THE WITNESS:  I think it was a Thursday.
14         MS. FUNDINGSLAND:  I think so.
15         MR. BENNETT:  I believe that's right,
16     yeah.
17         THE WITNESS:  And either people were out
18     of town, or they didn't get back to me before
19     the weekend.  But there was a lot of numbers
20     that I called, that if I looked even at my
21     transcript -- or my cell phone bill, I
22     wouldn't -- I don't who they are.
23         If I called them I wouldn't find -- you know,
24     then I would find out it was some psy...  I'm
25     not using the right word.  Um...

41 (Pages 367 to 370)

Timothy Callahan
10/16/2012

371

1    BY MR. BENNETT:
2    Q.   Well, you --
3    A.   Therapist or something.  Whoever was --
4    Q.   -- you had several lengthy phone calls with
5         Gorman, though: right?
6    A.   I don't know how long they were.
7    Q.   Thirty-three.  Thirty-two.  Thirty-one.
8         Twenty-three.
9    A.   Okay.
10   Q.   What do you remember talking to Gorman about?
11   A.   Again, I don't remember specifically what it
12        was, but I would assume that...  Whether he
13        called me or I called him it was along the lines
14        of, "How are you doing?  Are you okay?"  It...
15   Q.   Did you talk about the video camera, the video?
16   A.   I don't know if we did specifically.
17   Q.   You had looked at it how many times by 8:15 --
18        by 8:11 in the morning the next day?
19   A.   Once I think.  Maybe twice.  I don't know.
20   Q.   How often do you typically use your personal
21        e-mail account?
22   A.   Almost never.
23   Q.   Have you ever e-mailed Gorman from your personal
24        e-mail account?
25   A.   Not that I recall.  I can almost say probably I

372

1         have not because I don't use it.  I use my work
2         one.
3    Q.   You -- you made this Outlook Express attachment,
4         e-mail attachment from -- of the pen camera.
5         You know what Outlook Express is, don't you?
6    A.   E-mail, I think.
7    Q.   All right.  Why did you make an e-mail
8         attachment?
9    A.   Again, I think it was probably to get to Fred
10        Bruno since he wasn't in town.  As I was advised
11        to let Bruno decide what to do with it since it
12        was a critical incident.
13   Q.   Do you recall being asked to get the computer
14        that you downloaded the video on?
15   A.   That day?
16   Q.   No.  At some time in the last couple years.
17   A.   Yes, I had a -- I've had a discussion with the
18        city attorney.
19   Q.   And you knew that you downloaded it on your
20        computer upstairs?
21   A.   Yes.
22   Q.   And watched it up there with your wife?
23   A.   Yes.
24             MR. BENNETT:  Would you mark that?
25             (Exhibit 118 marked.)

373

1    BY MR. BENNETT:
2    Q.   This is a transcript of a voicemail we got from
3         -- that Jeff Storms got from Burt Osborne.
4         You know who Burt Osborne is, don't you?
5    A.   Yes.
6    Q.   It said...  There on the bottom it says, "Also,
7         let Bob and Katie know that Callahan doesn't
8         have the computer anymore.  The thing was
9         somewhat old, I think, and he got rid of it over
10        a year ago, he told us yesterday."
11        Did you tell him you got rid of the computer
12        over a year ago?
13   A.   Well, apparently we had a miscommunication over
14        the --
15   Q.   Can you just answer?  Either you did or you
16        didn't?  Yes or no?
17   A.   No, I can't answer it yes or no because I don't
18        remember what I said.  I think I was asked to
19        voluntarily turn it over and I think I was not
20        wanting to do that.  I don't know if I said,
21        "I got rid of it over a year ago."
22        I called him the next day and said, "You can
23        have access to it."
24        I was under -- I didn't know if it was
25        voluntary or if it was under the subpoena from

374

1         the judge -- from a judge.
2    Q.   All I'm asking --
3    A.   We obviously mis-communicated.  I don't recall
4         exactly what I said to him.
5    Q.   Is there any reason to believe that Burt got
6         that wrong?
7    A.   I don't -- perhaps.  And maybe I got it wrong.
8         Maybe I said it wrong to him.
9    Q.   Well, what I want to know --
10   A.   That computer has been out of commission.
11   Q.   Yes or no?  Did you tell him that -- that you
12        got rid of it over a year ago?
13   A.   I don't recall if I said those words, those
14        exact words.
15   Q.   Would you deny it?
16   A.   Do I deny it?
17   Q.   Yeah.
18   A.   I'm suggesting to you that this was a
19        miscommunication.  And I don't remember what the
20        exact conversation was.
21        But --
22   Q.   Would --
23   A.   -- I provided the computer to you.
24   Q.   Would you deny that you told him this?
25   A.   I would deny that I used that particular

42 (Pages 371 to 374)

Timothy Callahan
10/16/2012

---

375

1      language. I don't know. But maybe I did. I
2      don't know.
3   Q.   So you really don't have any reason or
4      foundation to deny it if you don't know;
5      correct?
6   A.   Well, I -- I assume that you're trying to paint
7      me as a liar, but I turned over the computer.
8      You had access to it, so --
9   Q.   I just want to know if you told --
10  A.   I mis-communicated with Burt Osborne somehow to
11     give him the -- that impression. I didn't know
12     that --
13  Q.   Do you remember if -- Do you know Grobove very well?
14     originally, were you? You didn't want to?
15  A.   I wasn't -- I didn't know if it was a voluntary
16     thing or if it was something that was ordered by
17     a subpoena, by the judge.
18  Q.   You didn't want to give us the computer, did
19     you?
20  A.   I was -- I didn't really feel that you needed to
21     dig through my personal life in that manner. I
22     turned over the footage, --
23  Q.   Well, --
24  A.   -- which has been established that it's -- it's
25     all there, --

---

376

1   Q.   You're the one that --
2   A.   -- I think.
3   Q.   -- made the computer, your computer relevant;
4      you understand that?
5   A.   How did I do that?
6   Q.   By downloading the pen camera on it.
7   A.   Yeah, that particular footage, but not going
8      through -- digging through my personal
9      hard drive.
10  Q.   Well, you -- have you got the -- have you got
11     the -- the new -- what do they call it?
12     Administrative...
13        MS. FUNDINGSLAND: Announcement.
14        MR. BENNETT: Oh.
15  BY MR. BENNETT:
16  Q.   That if you...
17        Today what would happen with your pen camera
18     and your computer?
19  A.   I'm aware that there's a new policy.
20  Q.   And they take everything, wouldn't they?
21  A.   It looks like it, yeah.
22  Q.   And they process your call history, your text
23     messages, your contact lists, all images, all
24     video, all audio and deleted data files; right?
25  A.   That's the way I understand it.

---

377

1   Q.   And as you understand it, that's what we asked
2      for; right?
3   A.   I -- I don't -- you asked for my computer, --
4   Q.   Well, --
5   A.   -- in which to look through my entire personal
6      hard drive.
7   Q.   Well, we wanted to process it the same way that
8      this would be, this processing by the
9      department; correct?
10  A.   I don't know.
11  Q.   You don't know? Okay.
12  A.   I don't know what you're going to do with it.
13  Q.   All right. Do you know Grobove very well?
14  A.   I know who he is. I -- I'm friendly with him.
15     I wouldn't classify us as friends.
16  Q.   Okay. You know he did a supplement. You've
17     seen the supplement, haven't you?
18  A.   No. I don't know.
19  Q.   Okay.
20        (Sotto voce comments.)
21  BY MR. BENNETT:
22  Q.   Is there any reason that you believe that we
23     should not get to look at all the videos that
24     you've taken while performing police work?
25  A.   Ah, that -- that... I have no opinion on that.

---

378

1      I don't know what the --
2   Q.   Well, they weren't personal. They were police
3      -- they were taken for the purposes of police
4      duties with equipment you carried into the field
5      on that day.
6   A.   I have no opinion on it.
7   Q.   Well, would you object to it?
8        MS. FUNDINGSLAND: Object to the form of
9      the question.
10        (Sotto voce comments.)
11  BY MR. BENNETT:
12  Q.   Would you --
13        MS. FUNDINGSLAND: I'm going to instruct
14     him not to answer that question.
15        MR. BENNETT: Why?
16        MS. FUNDINGSLAND: Because we do the
17     objecting on behalf of our clients, not him.
18        MR. BENNETT: Well, --
19        MS. FUNDINGSLAND: Unless you want to
20     rephrase the question.
21  BY MR. BENNETT:
22  Q.   You took the -- the digital video recorder into
23     -- on duty with you for the purpose of capturing
24     on-duty experiences and events; correct?
25  A.   Yes.

43 (Pages 375 to 378)

Timothy Callahan
10/16/2012

---

### 379

1  Q.   Okay.  And you had no expectations that -- that
2      those recordations would be kept private, did
3      you?
4          MS. FUNDINGSLAND:  I'm sorry, but the
5      what would be kept private?
6          MR. BENNETT:  Any of those recordings
7      because they were on-duty events and
8      experiences.
9          THE WITNESS:  They would be private
10      unless I introduced them for evidence.
11  BY MR. BENNETT:
12  Q.   Well, why do you get to decide that?  If
13      you're...  Aren't we entitled to know, as
14      citizens, what you do as an officer, especially
15      if you take that piece of equipment into the
16      field?
17  A.   You could come on a ride-along and see what we
18      do as officers.  You can get squad video and all
19      other kinds of video.  That was -- that was a
20      personal recorder.
21  Q.   Is there anything on the pen camera videos that
22      is embarrassing or you wouldn't want us to see?
23  A.   Not that I'm aware of.
24  Q.   Okay.  Okay.  Grobove's supplement indicates
25      that when he came into Room 100 that you and

---

### 380

1      Gorman were there; is that correct?
2  A.   I believe so.
3  Q.   He also says that Lieutenant Glampe,
4      Captain Huffman and Lieutenant Delmonico and
5      Crime Lab personnel were there.  Is that
6      correct?
7  A.   I don't recall exactly who was in the room.
8  Q.   You recall Lieutenant Delmonico, don't you?
9  A.   Yes.
10  Q.   Okay.  So Grobove's testimony...
11          (Adam Grobove Embedded Video
            Page 44, Line 16 - Page 45, Line 11)
12
          "Q.  Okay.  And when I -- you come into
13      Room 100 -- is that right?  First of all you go
      to Room 108, then end up in Room 100, correct?
14          "A.  Yes.
          "Q.  And you describe the people that were
15      in that room.  You're comfortable with your
      recordation of the people?
16          "A.  Yes.
          "Q.  Do you remember seeing Lieutenant
17      Delmonico?
          "A.  Yes, sir, I did.
18          "Q.  He's not a person you can easily miss,
      either.  I mean --
19          "A.  Yeah, he's full of smiles.  He's a
      gentleman.
20          "Q.  He's a -- he's a good -- but he's --
      you notice him when he's in the room?
21          "A.  Yes.
          "Q.  And you've got there Lieutenant Glampe
22      from IA, and Captain Huffman from
      Investigations, and Lieutenant Delmonico from
23      the Police Federation were in the room with you
      when you arrived?
24          "A.  Yes."
25

---

### 381

1  BY MR. BENNETT:
2  Q.   Would you agree that that's a true statement?
3          MS. FUNDINGSLAND:  Well, I'm going to
4      object to the form of the question as -- on
5      foundation as to --
6          MR. BENNETT:  Let me -- let me ask --
7          MS. FUNDINGSLAND:  Okay.
8  BY MR. BENNETT:
9  Q.   Did you see Grobove come in?
10  A.   He's the -- I believe he's the one who came in
11      and took custody of the Taser.
12  Q.   Yeah.  He comes right to you and --
13  A.   But I was -- I don't...  I'll be honest, I don't
14      recall seeing Lieutenant -- or Captain Huffman
15      that night.
16  Q.   Okay.  But that's okay.  You...
17  A.   I don't deny that she was there if she says she
18      was there.  I don't recall seeing her.
19  Q.   Well, and he says she was there.
20  A.   Okay.  I don't -- I don't recall seeing her.
21  Q.   Okay.  But you recall Grobove coming and -- and
22      taking custody of your Taser?
23  A.   Yes.
24  Q.   Okay.  Delmonico is there and he has no other
25      police purpose there?  He's not a lieutenant in

---

### 382

1      charge of anything?  He's there as the
2      Federation rep?
3  A.   I believe so.
4  Q.   Okay.  For example, other people in the room
5      could be Feder...
6          Jindra is a Federation person, too, --
7  A.   Yes.
8  Q.   -- on the board?
9  A.   Yes, he is.
10  Q.   Other members -- other people are members of the
11      Federation.  You and Lieutenant Halvorson and --
12      you know, you're all members; right?
13  A.   Yes.
14  Q.   Now Huffman wouldn't be because I think as
15      captain you can't be; right?
16  A.   I don't know what the rules are.
17  Q.   Okay.  Well, when do you think you --
18  A.   Well, we have lieutenants on the board, so I'm
19      assuming lieutenants can.
20  Q.   Yeah.
21  A.   I don't know -- I'm not aware of who isn't [sic]
22      or isn't.
23  Q.   Okay.  You generally make the assumption they
24      are, I take it then?
25  A.   What?

---

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

383

1  Q.  Members of the Federation union itself?
2  A.  There's a lot of people who aren't actually
3      members.
4  Q.  Really?
5  A.  I don't know what the number is.
6  Q.  Sworn employees?
7  A.  Yes.
8  Q.  Okay.  Lieutenant Halvorson and Sergeant Jindra
9      are there for a specific defined police purpose;
10     correct?
11 A.  Ah...
12         MS. FUNDINGSLAND:  I'm going to object
13     on foundation.
14 BY MR. BENNETT:
15 Q.  Well, you -- you know they're there as escort
16     officers under the critical incident policy?
17 A.  Sergeant Halvorson was my escort officer, not
18     Lieutenant Halvorson.
19 Q.  Okay.
20 A.  Ah --
21 Q.  I'm just using...  He is a lieutenant today?
22 A.  Yes, he is.
23 Q.  He was a sergeant then?
24 A.  He was a sergeant then.
25 Q.  They were both sergeants?

384

1  A.  They were both sergeants.
2  Q.  And at the scene there -- you're supposed to be
3      assigned escort officers for the -- if there are
4      multiple officers involved for -- one for each
5      involved officer: correct?
6  A.  I believe so, yes.
7  Q.  And the escorts -- the escorts have to be at
8      least rank of sergeant.  They can be above, but
9      they have to be at least a sergeant?
10 A.  I think so.  I'm not sure.
11 Q.  Okay.  And they have a job.  They take you to
12     the designated -- they -- they sit with you at
13     the scene while you're needed: right?
14 A.  I don't know what their specific -- I don't --
15     I'm not a sergeant, so I don't know what their
16     specific duties are.
17 Q.  Well, according to the policies they -- they're
18     there to deal -- sit with you at the scene as
19     soon as they get there.
20 A.  Okay.
21 Q.  I mean they're basically there to babysit you,
22     aren't you [sic]?  Would that be a fair...
23 A.  Yeah, that's fine.
24 Q.  And they're supposed to keep the involved
25     officers separate.

385

1  A.  Okay.
2         MS. FUNDINGSLAND:  Is that a question?
3  BY MR. BENNETT:
4  Q.  Do you understand that to be true?
5  A.  I don't know.
6  Q.  Did they keep you separate?  Jindra and
7      Halvorson keep you and Gorman separate?
8  A.  We were separate at the scene.
9  Q.  And at Room 100?
10 A.  Well, it's a big room.  We were in the same room
11     together as I recall.
12 Q.  But they're not supposed to let you sit next to
13     each other and talk about the incident, are
14     they?
15 A.  I don't believe -- I don't know.  I don't know
16     what they're supposed to do.
17 Q.  Did they?
18 A.  I don't recall exactly where I was in that room
19     or who I was standing to [sic].  Everybody --
20     there was people in the room.
21 Q.  But it's -- like you say, it's a --
22 A.  We weren't -- we weren't alone together, me and
23     Gorman in the room, if that's what you're
24     asking.
25 Q.  Correct.

386

1  A.  Okay.  We weren't alone.
2  Q.  Were you next to each other in the room?  I mean
3      the room -- that room is much bigger than this
4      large conference room, isn't it?
5  A.  I believe so.
6  Q.  Yeah.  It's a pretty big room.
7  A.  Well, there's -- it's broken up in cubicles.
8  Q.  Uh-huh.  Were you in a cubicle with Halvorson?
9  A.  No.
10 Q.  Was Jindra in a cubicle with Gorman?
11 A.  I don't know.
12 Q.  Did you see Gorman?
13 A.  Yes.
14 Q.  How far away was he?
15 A.  I don't know.  We don't have -- we didn't have,
16     you know, cordoned-off fences.  If I walked past
17     him, or if we stood together, if we stood next
18     to each other, I don't...
19 Q.  Okay.  Did you talk to Delmonico?
20 A.  Yes.
21 Q.  Okay.
22 A.  I believe so.
23 Q.  And you did so as -- as the union rep?
24 A.  Yes.
25 Q.  Okay.  And Lieutenant Halvorson said that he sat

45 (Pages 383 to 386)

Timothy Callahan
10/16/2012

387

1       with you at the scene, was with you at the
2       transport to the -- to Room 100 and at 100 and
3       even went with you to HCMC; is that correct?
4  A.  I was...  He was my escort officer -- sergeant.
5       And we were together.
6  Q.  As far as you're concerned did he dutifully
7       complete his escort duty?
8  A.  I mean we were in...  Like I said, he didn't
9       hold my hand and sit next to me.  We were all in
10      the same room together.  I don't know if he was
11      right next to me the whole time or even at the
12      scene if he was never out of my sight.  I don't
13      know.
14  Q.  You never reported any discussion with
15      Sergeant Jindra in Room 100 to the Homicide
16      investigators; correct?
17  A.  Ah...  I don't know.
18  Q.  Well, do you remember having any conversation
19      with Jindra in the presence of Halvorson?
20  A.  I had a conversation with Jindra, but I don't
21      know if Halvorson was a part of it.
22  Q.  Well, Jindra was the escort for Gorman.
23  A.  Yes.
24  Q.  Halvorson was the escort for you.
25  A.  Yes.

388

1  Q.  And the idea is to keep you two separate.
2       Why...  Do you remember Jindra talking to
3      you?
4  A.  I -- I mean I talked to everybody down there.
5       And I talked to Jindra, too.
6  Q.  About what?
7  A.  I told him that I -- that I had a pen cam.
8  Q.  Did you tell Halvorson, your escort officer
9      that?
10  A.  No.
11         (Sotto voce comments.)
12  BY MR. BENNETT:
13  Q.  Did you tell Lieutenant Delmonico that?
14  A.  I don't know if I did.
15  Q.  Well, --
16  A.  I don't think so.
17  Q.  -- your rep, though, is Delmonico; right?
18  A.  I don't know that we had an assigned rep.
19  Q.  Well, you -- you know that Jindra had an
20      assigned role as an escort officer for the other
21      involved officer; right?
22  A.  Yeah.
23  Q.  Okay.  Was he doing his job?
24  A.  I'm not a sergeant.  I don't know what
25      specifically his job is.

389

1  Q.  Okay.  So you -- the only person you told, that
2      you remember telling at Room 100 or at the
3      scene, was Jindra, that you had the pen camera?
4  A.  That I can recall.
5  Q.  Why Jindra?
6  A.  He's a Federation rep.
7  Q.  Well, so is Delmonico.
8  A.  Yeah.
9  Q.  He did a supplement.  He never mentions talking
10      to you.
11  A.  I don't think I did about that.  But I -- I'm
12      sure that I talked to him.  He was -- I don't
13      think he was ever at the scene.  He came in at
14      Room 100, I believe.
15  Q.  Okay.  Well, how did Gorman get to Room 100?
16  A.  He rode with Jindra.
17  Q.  Well, wouldn't he have to -- he rode from the
18      scene with Jindra?
19  A.  I believe so.
20  Q.  Well, who are you saying didn't come to the
21      scene, Delmonico?
22  A.  I don't think Delmonico was at the Y.  I think
23      he just came into Room 100.
24  Q.  Which would be very typical of a Federation rep.
25  A.  I -- okay.

390

1  Q.  Well, is that true or not?
2  A.  I don't know.
3  Q.  The critical incident policy indicates you're
4      supposed to give statements within 48 hours of
5      the critical incident to ensure the continuity
6      of the investigation.
7       Was there some reason you couldn't give a
8      statement in the first 48 hours?
9  A.  I don't think so.
10  Q.  Bruno didn't say anything at your statement
11      either, did he?
12  A.  I don't -- I don't recall.  I don't think so.
13  Q.  Okay.  You had given Bruno prior to the
14      statement the zip drive, the USB?
15  A.  Yes.
16  Q.  Okay.  Do you know that he had -- did you see
17      him do anything with it?
18  A.  He left the room and went and talked to
19      Sergeant Klund, I think.
20  Q.  Okay.
21      They didn't talk about -- in front of me.
22  Q.  Okay.  They didn't?  Did not?
23  A.  No.
24  Q.  Okay.
25      MR. BENNETT:  Let's go off the record

46 (Pages 387 to 390)

Timothy Callahan
10/16/2012

391

1    for a second.
2         VIDEOGRAPHER:  Off the video record at
3    1:55 P.M.
4         (Recess taken.)
5         VIDEOGRAPHER:  This is Disc 4.
6    We are on the record at 2:09 P.M.
7    BY MR. BENNETT:
8    Q.   Showing you what's been marked as Exhibit 50-A.
9         That shows the position of the pen camera at the
10        scene outside the YMCA on the street where
11        Officer Kingdon took your picture; correct?
12   A.   Yes.
13   Q.   And would it be fair to say that that is the
14        same relative position the pen camera was in
15        from the time of the incident until then?
16   A.   No.
17   Q.   Well, okay.  Why not?
18   A.   Because it's riding up a lot higher than I would
19        carry it.  It would have been tucked down in,
20        all the way down to the top of that clip.  I can
21        only assume that it rode up during the struggle.
22   Q.   Okay.  But it's still on there?
23   A.   (Pausing.)
24   Q.   Right?
25   A.   Is that a question?

392

1    Q.   Yeah.  It's still on your --
2    A.   It's still in my pocket.
3    Q.   -- blouse, in the poc- -- in the same pocket
4         your pen there exists in; right?
5    A.   Yes.
6    Q.   Okay.  And the -- and the business end of that
7         piece of equipment is the part above the clip;
8         correct?
9    A.   Yes.
10   Q.   And that's the -- that's the camera and the
11        microphone; correct?
12   A.   I don't know where the microphone is, but the
13        lens is in -- in the front on the top.
14   Q.   Showing you Exhibit 97, is this the same or one
15        very similar to the one you bought?
16   A.   It's not the same for sure.
17   Q.   It isn't the same?  Where was your --
18   A.   Ah...
19   Q.   What was your manufacturer?
20   A.   I don't know.  I mean I just... I got it.  I saw
21        it on the Internet and I bought it.  I didn't
22        keep a record of...
23        I mean I think I gave Stillman, if that's
24        his name.
25        MS. FUNDINGSLAND:  Uh-huh.

393

1         THE WITNESS:  I think I gave him the box
2    that it came in.
3         MR. BENNETT:  Uh-huh.
4         THE WITNESS:  But I couldn't tell you
5    what it was -- what kind it was.
6    BY MR. BENNETT:
7    Q.   Did you ever buy the spy sunglasses?
8    A.   No.
9    Q.   Um...
10        MR. BENNETT:  I figured it was worth a
11   try.
12        THE WITNESS:  These are not spy
13   sunglasses that you're looking at.
14        MR. BENNETT:  Kind of double spyware.
15   BY MR. BENNETT:
16   Q.   You don't have a guy named "Cue" that you deal
17        with?
18   A.   We have -- there's a guy in the department named
19        "Cubes," but not "Cue."
20   Q.   Exhibit 72 and 73 are the photos taken by the
21        Crime Lab personnel, correct, in Room 100?
22   A.   Yes, I believe so.
23   Q.   All right.  Let's look with reference at -- just
24        show those for the record, will you?  So that
25        we...

394

1    A.   (Complying.)
2    Q.   The pen camera is no longer visible?
3    A.   Well, it's visible in my shirt, but it's not --
4         you can't see the color of it or the black part.
5    Q.   The lens is not sticking above your...
6    A.   No.
7    Q.   The clip is not above the top of your --
8    A.   No.
9    Q.   -- shirt blouse?
10        Correct?
11   A.   No.
12   Q.   It's been moved from the picture -- from the way
13        it was in Exhibit 50-A; correct?
14   A.   It's in a different position.  It wasn't... To
15        my -- to my recollection it wasn't moved
16        deliberately.
17   Q.   Well... The clip --
18   A.   Let me -- can I rephrase that?
19   Q.   Sure.
20   A.   It wasn't moved deliberately to conceal it, if
21        that's -- if that's what you're getting at.
22   Q.   Well, I'm going to ask you a few more
23        questions --
24   A.   Okay.
25   Q.   -- to get --

47 (Pages 391 to 394)

Timothy Callahan
10/16/2012

395

1    A.   All right.
2    Q.   -- at that, --
3    A.   Okay.
4    Q.   -- you know.
5    A.   I'm sorry for interrupting you.
6    Q.   No, that's fine. I... It's -- it's probably
7         better that you made that known.
8              You know, I -- I'm going to ask you some
9         questions and we're not going to talk about --
10        I'm going to talk about things...
11             I mean you knew where the pen camera was at
12        the scene; correct?
13   A.   In this particular picture?
14   Q.   Exhibit 50-A?
15   A.   I...
16   Q.   You knew it was still in place on your blouse?
17   A.   What I... As I said earlier, when you asked if
18        that's the normal...
19             (Sotto voce comments.)
20   BY MR. BENNETT:
21   Q.   Yeah.
22   A.   When you -- when you asked if that's the normal
23        position I said, "No, it's not."
24   Q.   It's --
25   A.   Normally --

396

1    Q.   -- a little high?
2    A.   -- it would be -- no -- yeah, it's high.
3    Q.   Yeah.
4    A.   And I -- and what I said is I assume that...
5         It's hard for me to explain without it.
6              Can I have that Sharpie?
7    Q.   Sure.
8    A.   This is a similar material, smooth, --
9    Q.   Yeah.
10   A.   -- very smooth plastic.
11             And I guess a similar clasp, but that metal
12        thing is not --
13             VIDEOGRAPHER: Excuse me. I'm going to
14        interrupt. Can you --
15             MR. BENNETT: She can't see the --
16             THE WITNESS: (Displaying Sharpie pen.)
17             VIDEOGRAPHER: That's fine. Thank you.
18        That will work.
19   BY MR. BENNETT:
20   Q.   But the clip is in a low -- lower situated, so
21        it... There's --
22   A.   It is.
23   Q.   There's a thing --
24   A.   There's --
25   Q.   Above the clip is more space so that the lens

397

1         can be --
2    A.   Yes, --
3    Q.   -- seated.
4    A.   -- there's more -- there's more space than what
5         -- what would be on that one --
6    Q.   Yeah.
7    A.   -- or this one.
8              But -- okay. What I'm trying to say is it's
9         very smooth material and it wouldn't be uncommon
10        for that pen to ride up out of the pocket.
11             If you bend over with this vest, with my
12        duty belt, you can see my... Well, not when I'm
13        sitting in this chair, but even my magazine
14        carriers can touch the bottom of that and push
15        it up. So it wouldn't be in... It's not
16        unusual at all for me to be tucking it back in.
17             Now had I tucked it back in and that clip
18        didn't catch it, it would have gone inside my
19        pocket. That's not unusual at all.
20   Q.   Well, the clip kept it in place... You can see
21        the clip is at least about a half an inch onto
22        your duty blouse right there, on Exhibit 50-A?
23   A.   Well, I had I'd say more like a quarter to
24        3/8ths.
25   Q.   Pretty hard to measure that, but okay.

398

1              But it stayed in there throughout this
2         entire fight and throughout the entire event.
3    A.   It did.
4    Q.   In fact, you didn't shut it off until you looked
5         at Mercil and hit the button; correct?
6    A.   I -- I shut it off, yes.
7              MR. BENNETT: Show -- let's show that
8         clip.
9              (Pen camera video playing.)
10   BY MR. BENNETT:
11   Q.   There's Gorman and Sergeant Johnny Mercil;
12        right?
13   A.   Yes.
14   Q.   And there's you shutting off the pen camera.
15   A.   Yeah.
16             (Pen camera video stopped.)
17   BY MR. BENNETT:
18   Q.   Did you turn away from Mercil to shut off the
19        pen camera for any reason?
20   A.   I don't think I did.
21             MR. BENNETT: Play it again.
22             (Pen camera video playing.)
23   BY MR. BENNETT:
24   Q.   You realize now that the camera is on; right?
25   A.   (No audible response.)

48 (Pages 395 to 398)

Timothy Callahan
10/16/2012

399

1    MR. BENNETT:  And shut it off.
2    (Pen camera video stopped.)
3    THE WITNESS:  As you can see, they're --
4    they're in my line of sight --
5    MR. BENNETT:  Okay.
6    THE WITNESS:  -- when I turn it off.
7    BY MR. BENNETT:
8    Q.   So you saw Mercil at the time you decided to
9    turn the pen camera off?
10   A.   I -- no, I spoke to -- I spoke to him earlier
11   when it was on.
12   Q.   Okay.
13   A.   It's -- I believe that's on the video.
14   Q.   Okay.  Why didn't you give it to Mercil?
15   A.   I don't know.  I guess I didn't think of it, to
16   give it -- I mean this -- this was still
17   happening.  Mr. Smith was still in the
18   gymnasium.  I wasn't thinking about --
19   Q.   All right.
20   A.   -- that.
21   Q.   Who moved the pen from the condition it was in
22   50-A to the condition it is in 72 and 87,
23   Exhibit 72 and 87?
24   A.   Me.
25   Q.   Okay.  And the...  You had...  Did you

400

1    consciously move it?
2    A.   Well, as I -- this is what I was trying to
3    explain to you.
4    Q.   Now I'm asking consciously.
5    A.   I consciously pushed it back in my pocket, yeah.
6    I'm trying to explain to you why -- how it may
7    have gone from this position to that position.
8    Q.   Okay.  Well, if you'd had pushed down on it...
9    Well, let's get -- take this out.
10   If -- if you pushed down on the pen, as it
11   is shown on Exhibit 50-A, the clip would have
12   just gone down further; correct?
13   A.   That's true.
14   Q.   On the outside of your blouse?
15   A.   That's correct.
16   Q.   The clip is not on the outside of your blouse --
17   A.   No, it's not.
18   Q.   -- in Exhibit eighty -- 72?
19   A.   No, it's not.
20   Q.   And it looks to me like some care was taken to
21   make sure that the camera -- the pen and its
22   lens is in -- totally in your -- in your duty
23   blouse.
24   MS. FUNDINGSLAND:  I'll object to the
25   form of the question.

401

1    BY MR. BENNETT:
2    Q.   Would you disagree?
3    A.   I disagree.
4    Q.   Okay.
5    A.   I disagree with your premise.
6    Q.   Okay.
7    A.   What I was trying to explain to you before is I
8    don't know at what point that got -- it got
9    pushed back in by me.
10   What I'm saying is it moves in there.  And
11   it may have even moved up even higher and I
12   pushed it down.  The clip may not have caught
13   the pocket.  It may have gone up farther than it
14   was right here.
15   Q.   And it was just a coincidence that you didn't
16   turn it in, as well?
17   MS. FUNDINGSLAND:  Object to the form of
18   the question.
19   BY MR. BENNETT:
20   Q.   Well, you had three cameras on you.
21   A.   I -- I was advised by Sergeant Jindra to discuss
22   it with Fred Bruno.
23   Q.   Well, you have a duty to turn in evidence before
24   the end of your shift; correct?
25   A.   Not always.

402

1    Q.   Not always?
2    A.   No.
3    Q.   When are you -- when -- when is -- what's the
4    exception?  What's the excuse?
5    A.   A lot of what we do is reporting.  And we go to
6    burglaries, we go to thefts, we go to situations
7    all the time where somebody has footage of the
8    incident, but they don't know how to put it on a
9    format that -- a portable format that we can
10   take from them.  So there's a lot of times we
11   leave evidence at -- digital evidence at the
12   scene and an investigator, once the victim --
13   victim, business, whatever, gets that format off
14   of their computer or off of their cameras and
15   gives it to investigators.  So that -- that's a
16   scenario where we wouldn't take evidence
17   immediately and inventory it.
18   Q.   Well, you don't take the thing home, though, do
19   you?  You wouldn't take the -- the video
20   evidence from the business home to your house
21   and download it onto your personal computer,
22   would you?
23   A.   I didn't think that that was going to be a
24   problem.  I was going to take it off and put it
25   onto a flash drive and present it.

49 (Pages 399 to 402)

Timothy Callahan
10/16/2012

403

1    Q.    Well, you have computer forensic people in the
2          department; correct?
3    A.    Yes.
4    Q.    You knew that before?
5    A.    Yes.
6    Q.    You've seen them work before?
7    A.    Yeah.
8    Q.    You know they could have downloaded everything
9          on your -- just as easy as you?
10   A.    They could have.
11   Q.    And do you know that they used write-blocking
12         software, things to maintain the integrity of
13         the evidence?
14   A.    No. I don't know that. I don't know what that
15         is.
16   Q.    Well, do you think they do things to maintain
17         the chain of custody and the integrity of the
18         evidence in the Minneapolis Police Department
19         Crime Lab?
20   A.    Probably. I would assume so.
21   Q.    Well, they prosecute people --
22   A.    I haven't worked in the Crime Lab. I don't know
23         their --
24   Q.    I understand but, you know, you're not...
25   A.    I'm telling you that I assume so.

404

1    Q.    Okay. You're not an inexperienced person. You
2          know they make convictions of child
3          pornographers and -- and all sorts of things
4          from computer forensic imaging; correct?
5    A.    Yes. But I'm telling you I don't know what the
6          process is.
7    Q.    I believe you. That's fine. I'm not arguing
8          with you about that, but you know they have --
9          they've got to have a way to make it so the
10         evidence is foundationally acceptable in court.
11   A.    Okay.
12   Q.    I mean do you agree with that as a premise?
13   A.    Yes.
14   Q.    All right. I mean you wouldn't -- you know
15         you're not supposed to take bullets that you
16         fire at a scene home, right, or casings? Either
17         the projectiles or the casings? You know what
18         -- that you couldn't do that; right?
19   A.    That I wouldn't -- I wouldn't disturb it off the
20         ground. That's something for other people to
21         collect. I might point it out, but I wouldn't
22         collect it.
23   Q.    You had two -- you had three cameras with you
24         that -- that evening.
25   A.    Three?

405

1    Q.    Afternoon. Yeah. You had a disposable?
2    A.    I didn't have that.
3    Q.    Wasn't it in your car?
4    A.    I don't know if that came from my car or if it
5          came from Officer Kingdon's car. I don't recall
6          where that was from.
7    Q.    He said he gave it -- his report says it came
8          from yours.
9    A.    Okay. Well, maybe it did.
10   Q.    Okay. You had the Taser --
11   A.    But it wasn't something that I -- it was in the
12         trunk. At that time we were using disposable
13         cameras.
14   Q.    Yeah.
15   A.    So I may have had one -- there may have been one
16         just in the trunk.
17   Q.    Okay.
18   A.    Okay.
19   Q.    But there were three cameras that -- and they
20         got two of them that they obviously took,
21         developed the film off of or captured the image;
22         correct?
23         The Taser -- you've seen the Taser video?
24   A.    Yeah.
25   Q.    You created that by using your Taser; right?

406

1    A.    Yes.
2    Q.    If you accept my premise that they got the
3          digital out of your squad, then they used the
4          portable disposable camera from your squad?
5    A.    Yes.
6    Q.    And -- and you didn't -- you didn't turn over
7          the pen camera that night to anyone at the scene
8          or anyone in Room 100?
9    A.    That's correct.
10   Q.    And your guiding light, you want us to believe
11         for that decision, was Jindra?
12         MS. FUNDINGSLAND: I'll object to the
13         form of the question.
14         THE WITNESS: I -- I wasn't -- advised
15         to let my attorney --
16   BY MR. BENNETT:
17   Q.    Did he do that in front of Halvorson?
18   A.    Oh, I have --
19   Q.    Or did you have some secret conversation?
20   A.    I don't know where Sergeant Halvorson was at the
21         time.
22   Q.    Well, Sergeant Halvorson said he would have had
23         no part in you not turning that in.
24   A.    Okay.
25         MS. FUNDINGSLAND: Is that a question?

50 (Pages 403 to 406)

Timothy Callahan
10/16/2012

407

1           MR. BENNETT: Well...
2    BY MR. BENNETT:
3    Q.   Did you and Jindra steal off alone and have some
4         availability to talk in Room 100? Did he leave
5         his escort duty to talk to you?
6           MS. FUNDINGSLAND: Objection, compound
7    question.
8           THE WITNESS: I don't know.
9    BY MR. BENNETT:
10   Q.   Can you tell me... All right.
11        Was Gorman in on that conversation?
12   A.   He may have been. Again, I don't know when --
13        where everybody was standing and when everybody
14        was standing where.
15   Q.   I want to ask you something about this part of
16        the video.
17           (Pen camera video playing.)
18   BY MR. BENNETT:
19   Q.   Do you remember that? You reaching out to grab
20        a hold of him, Gorman?
21   A.   I mean I remember -- I can see it.
22   Q.   What were you doing?
23   A.   I don't know.
24   Q.   At all?
25   A.   I'm not sure what that was for.

408

1    Q.   You don't have any present recollection of what
2         you were doing?
3    A.   I don't.
4    Q.   Okay.
5           (Brian Anderson Embedded Video
6           Page 143, Line 13 - Page 144, Line 4)

7           "Q. So -- so what you're testifying to is
8         you're aware of some training about positional
9         asphyxia at the MPD prior to 2010, but you don't
10        recall a specific course on positional asphyxia?
          "A. Correct.
          "Q. Okay.
          "A. It was always contextual within
          whatever the main base training was for
          defensive tactics. That was always kind of
11        thrown in there without being documented.
          "Q. Okay. And so you would have expected
12        that -- that all MPD officers prior to 2010
          would have had some instruction about restraints
13        or positional asphyxia?
          "A. As far as what I've taught, yes. As
14        what other instructors, I cannot say.
          "Q. Okay."
15
16   BY MR. BENNETT:
17   Q.   Do you remember getting taught about positional
18        asphyxia in the basic defensive tactics course?
19   A.   I don't.
20   Q.   Okay.
21           (Brian Anderson Embedded Video
          Page 218, Line 23 - Page 219, Line 6)
22
          "Q. Well, my understanding of your
23        testimony is that all known evidence should be
          inventoried prior to the end of an officer's
24        shift.
          "A. Correct.
25        "Q. So if Officer Callahan understood that

409

1    known evidence that you would expect to be
     inventoried prior to the close of his shift?
2    "A. Correct.
3    BY MR. BENNETT:
4    Q.   Do you disagree with that?
5    A.   Yes.
6    Q.   Okay.
7           (Brian Anderson Embedded Video
          Page 227, Line 3 - Page 227, Line 18)
8
9           "Q. And when officers are involved in a
          critical incident you have very specific
10        policies about the handling of evidence and the
          handling of the officer that tries to maintain
          the propriety of that -- of the evidence related
11        to that incident so that there's sort of a
          public confidence: right?
12        "A. Correct.
          "Q. Okay. So in this situation, you know,
13        you knew that Officer Callahan was involved in
          the critical incident.
14        "You wouldn't expect that he would take
          evidence related to that critical incident home
15        with him as a matter of training and policy,
          would you have?
16        "A. Identified evidence, no."
17   BY MR. BENNETT:
18   Q.   And you had already... You had bought the
19        camera, as we indicated, for the very purpose of
20        creating evidence: correct?
21   A.   Not -- I -- I'm not going to say necessarily for
22        creating evidence. If -- if that would have,
23        you know, come to pass, then so be it. It was
24        more for personal protection and -- and evidence
25        of that personal protection.

410

1    Q.   Well, you knew when -- if in fact you had this
2         conversation with Sergeant Jindra, which I'm not
3         entirely sure about, but if you did you knew
4         that the pen camera was evidence, didn't you?
5           MS. FUNDINGSLAND: Object to the form of
6    the question.
7           THE WITNESS: I didn't know at the time
8         whether this was going to turn out the way that
9         it did or if that -- you know, potentially I'd
10        be getting sued. But it was my personal
11        property and I consulted with Sergeant Jindra
12        and he advi -- and since we were going to be --
13        the Federation was going to be providing an
14        attorney to let the attorney decide.
15   BY MR. BENNETT:
16   Q.   Well, your gun is your personal property?
17   A.   Yes.
18   Q.   Your bullets are your personal property? If you
19        shoot somebody --
20   A.   My bullets are not my personal property.
21   Q.   I thought they -- they were. That's what
22        everybody else testified to. Did they --
23   A.   I did not purchase these bullets.
24   Q.   Oh.
25   A.   These purchased -- these bullets were purchased

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

**411**

1  by the department and given to me every time I
2  go to the range.
3  Q.  Okay.  All right.  That's fine.  The gun is
4  yours.
5  A.  I purchased it, yes.
6  Q.  And you'd have to give it up if you shot
7  somebody with it, at least for a period of time,
8  wouldn't you, --
9  A.  Ah...
10  Q.  -- as evidence?
11  A.  I haven't shot anybody, but that's my
12  understanding.
13  Q.  I understand, but --
14  A.  That's my understanding.
15  Q.  Okay.  But when you talked to Jindra you were
16  talking to him about what you ought to do with
17  evidence; correct?
18  A.  From a personal standpoint.
19  Q.  Well, you knew when you say, "I've got it all on
20  here," that that's evidence, don't you?  Are you
21  -- are you -- are you really maintaining you
22  didn't understand it was evidence?
23  A.  It was brand new territory that hadn't been
24  covered before.  I didn't know what to do with
25  it.

**412**

1  Q.  Videotapes of incidents have always been
2  evidence --
3  A.  Not from --
4  Q.  -- since you --
5  A.  Not as -- not from an officer's personal
6  standpoint.  Not from them personally doing it
7  without it being issued by the department.
8  Q.  So what?  What does that have --
9  A.  I mean --
10  Q.  What --
11  A.  -- do you want to present something to me that
12  indicates it's -- it's been altered?
13  Q.  Do you want to present...  We're not talking
14  about alteration yet.  Okay?
15  A.  So we're just talking about time?
16  Q.  We're talking about evidence.  Yeah.  Chain of
17  custody and integrity of evidence.
18     The...  Do you want to -- do you want to
19  fight with me any more about whether it's
20  evidence?
21     MS. FUNDINGSLAND:  Ask a question that
22  he can answer, Mr. Bennett.
23  BY MR. BENNETT:
24  Q.  Well, do you agree that the pen camera can
25  capture video and audio images that are

**413**

1  undoubtedly evidence?
2  A.  It's being used as evidence.
3  Q.  Okay.
4     (Brian Anderson Embedded Video
5        Page 224, Line 11 - Page 224, Line 15)
6     "Q.  I mean the fact that it's his personal
6  property, does that impact the officer's
   obligation to inventory evidence at the end of a
7  shift?
      "A.  No."
8
9  BY MR. BENNETT:
10  Q.  Do you disagree with that?
11  A.  That's Officer An-- or Sergeant Anderson's
12  opinion.
13  Q.  That's -- no.  That's the city of Minneapolis'
14  opinion as the legal designee under
15  Rule 30(b)(6).
16  A.  Okay.
17  Q.  Do you disagree with that?
18  A.  I didn't know that he was in charge -- I thought
19  he was in charge of training, but...
20  Q.  That's who they -- that's who they put up there
21  for -- to answer these questions.
22  A.  Okay.
23  Q.  They make the designation.  They get to pick.  I
24  don't.  That's who they put up.
25     Do you disagree with his answer?

**414**

1  A.  I do.
2  Q.  Okay.
3     (Jeffrey Jindra Embedded Video
      Page 63, Line 22 - Page 63, Line 25)
4
5     "Q.  You had every reason to believe that
   the pen camera would not be turned in by the end
   of his shift; correct?
6      "A.  Ah, yes."
7  BY MR. BENNETT:
8  Q.  Jindra knew it was evidence and it wouldn't be
9  turned in by the end of his shift; right?
10     MS. FUNDINGSLAND:  Objection,
11  speculation as to what Jindra knew.
12  BY MR. BENNETT:
13  Q.  You told him about what was on the pen camera,
14  didn't you?
15  A.  I told him that I had a pen camera.  That I
16  believed that it captured half of the incident.
17  Q.  Okay.  Okay.
18     (Sotto voce comments.)
19     MR. BENNETT:  Let's go off the record
20  for a bit.
21     VIDEOGRAPHER:  Off the video record at
22  2:32 P.M.
23     (Recess taken.)
24     VIDEOGRAPHER:  We are back on the video
25  record.  It is 2:43 P.M.

52 (Pages 411 to 414)

Timothy Callahan
10/16/2012

415

1    MR. BENNETT:  I think we've been
2  informed by Janet that I've got -- if we're
3  going to use the traditional seven-hour boundary
4  system I've got about 30 minutes.
5    Is that correct?
6    THE REPORTER:  Yes.
7    MR. BENNETT:  And having said that we
8  have this one sort of lingering dispute that I
9  am aware of regarding the pen camera videos and
10  the extent to which they have to be or should
11  be, based on evidence deduced today, turned
12  over.
13    So I'm going to reserve the remaining time
14  period and the right to ask for maybe a little
15  more at this time for the purpose of finishing
16  this, if we need to, after I have seen the
17  remainder of the video.
18    And, if possible, I'd like to avoid going
19  back to the Boylan or Keyes or whatever I'd go
20  back to, but that's at least the way I'm
21  thinking right now, Lynne.
22    MS. FUNDINGSLAND:  All right.  And I
23  understand counsel's position.
24    MR. BENNETT:  Should we have him read
25  and sign this continuation volume?  I think that

416

1  makes sense.
2    MS. FUNDINGSLAND:  I think we should
3  being that we may not be back.
4    MR. BENNETT:  Yeah, we may not be back,
5  but...
6    MS. FUNDINGSLAND:  But -- yeah.  Let's
7  do that.
8    MR. BENNETT:  Let's do that anyway.
9    And doing it again wouldn't be that big of a
10  deal.
11    MS. FUNDINGSLAND:  No.
12    MR. BENNETT:  All right.
13    VIDEOGRAPHER:  We are off the video
14  record at 2:45 P.M.
15    (Adjourned at 2:45 P.M.)
16      * * *
17
18
19
20
21
22
23
24
25

417

1  STATE OF MINNESOTA )
2          : ss  CERTIFICATE
   COUNTY OF WASHINGTON )
3      I, Janet D. Winberg, hereby certify
   that I reported the continuation of the
4  videotaped deposition of TIMOTHY CALLAHAN, on
   the 16th day of October, 2012, in Minneapolis,
5  Minnesota, and that the witness was, by me,
   first duly sworn to tell the truth:
6
   That the testimony was transcribed by me and is
7  a true record of the testimony of the witness;
8  That I am not a relative, or employee, or
   attorney, or counsel of any of the parties; or a
9  relative or employee of such attorney or
   counsel:
10
   That I am not financially interested in the
11  action and have no contract with the parties,
   attorneys or persons with an interest in the
12  action that affects or has a substantial
   tendency to affect my impartiality:
13
   That the right to read and sign the transcript
14  by the witness was reserved.
15  WITNESS MY HAND AND SEAL THIS 26th day of
   October, 2012.
16
17
18
19
20
21
22  JANET D. WINBERG
   Registered Professional Reporter
23  Notary Public
24  Washington County, Minnesota.
25

418

1  STATE OF MINNESOTA )
   : SS CERTIFICATE
2  COUNTY OF WASHINGTON )
3      I, TIMOTHY CALLAHAN, certify that I have
4  read and examined the typewritten transcript of
5  the deposition taken of me in the matter of
6  Larry E. Smith, et al., vs. Timothy Gorman,
7  et al., on October 16, 2012, consisting of the
8  preceding pages, and find the same to be true
9  and correct (Except as follows):
10      Reason
   Page  Line Correction      for Change
11  _____ ____ _____ _____
12  _____ ____ _____ _____
13  _____ ____ _____ _____
14  _____ ____ _____ _____
15  _____ ____ _____ _____
16  _____ ____ _____ _____
17  _____ ____ _____ _____
18  _____ ____ _____ _____
19  _____ ____ _____ _____
20  _____ ____ _____ _____
21  _____ ____ _____ _____
22  _____ ____ _____ _____
23  Dated this_____day of_____
24  _____
   TIMOTHY CALLAHAN
25  Reporter: JDW

53 (Pages 415 to 418)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

419

| | |
|---|---|
| 1 | EXAMINATION INDEX |
| 2 | By Mr. Bennett: 210 - 415 |
| | -------------------------------------------- |
| 3 | |
| | OBJECTION INDEX |
| 4 | |
| | Ms. Fundingsland: 233, 279, 284, 285, 300, 301 303, |
| 5 | 309, 310, 311, 319, 321, 322, 325, 328, 330, 334, 336, |
| | 358, 366, 378, 381, 383, 400, 401, 406, 407, 410, 414 |
| 6 | -------------------------------------------- |
| 7 | EXHIBIT INDEX |
| | Exhibit 115: |
| 8 | Timeline * Document 48-11 |
| | marked/identified/reviewed.......................343 |
| 9 | |
| | Exhibit 116: |
| 10 | Pen Camera Videos on Officer Callahan's Personal |
| | Computer |
| 11 | marked/identified/reviewed..............345, 346, 363 |
| 12 | Exhibit 117: |
| | ES:01 Smith Pen Camera: |
| 13 | Page 1:  Active Files and Folders |
| | Page 2:  Deleted Files and Folders |
| 14 | marked/identified/reviewed.......................362 |
| 15 | Exhibit 118: |
| | Transcript of 7/10/12 voicemail |
| 16 | "Burt" to "Jeff" |
| | marked/identified/reviewed.......................372 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

54 (Page 419)

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

Page 420

**A**

**ability** 259:6 284:19 306:5
**able** 236:10 266:14 305:8
305:10,12 319:4 337:19
344:21
**Absolutely** 331:6
**abstract** 270:22
**accept** 406:2
**acceptable** 404:10
**access** 334:19 373:23
375:8
**accessed** 363:23 364:22
**account** 371:21,24
**accurate** 222:12 255:9
**acquainted** 262:13,14
**act** 312:8 314:14 324:13
**acted** 227:22
**acting** 210:7 226:23
227:15,25 228:6 241:16
324:17
**action** 417:11,12
**actions** 269:17
**activated** 347:7
**active** 265:20 266:20,20
266:20 267:3,25 268:9
268:14,18 269:10
270:14,25 271:6,7
281:9,14 363:4 419:13
**actively** 265:6,17 275:14
277:19 292:22 294:7
300:8,15 302:9
**activities** 270:16 332:1
341:4
**activity** 310:12,14
**actual** 213:15 244:25
359:19 361:11,14
365:17
**Adam** 222:5,7 256:11
327:1 380:11
**added** 243:22
**additional** 226:16 229:21
**adequately** 290:10 306:12
306:13 311:16,20
313:11 332:4
**Adjourned** 416:15
**administer** 212:18
**Administrative** 376:12
**admits** 320:16
**Adult** 235:18
**advi** 410:12
**Advil** 245:17
**advise** 339:24
**advised** 354:9 362:5
372:10 401:21 406:14
**affairs** 259:7
**affect** 417:12
**affirmative** 294:12
**Afternoon** 405:1
**agent** 354:19
**ago** 296:9 373:10,12,21
374:12
**agonal** 258:19,22 276:15
277:11 286:18,23
287:22 298:18
**agree** 214:13,15 222:25
231:23 236:25 237:13
238:17 240:2 251:2,25
252:13 253:20 255:12
255:25 256:4,8,24
257:3,16 267:24 270:14
274:11 275:9,20 278:20
284:2,10,13 307:9
309:19 310:6,9,16
312:10 313:2,14 315:4
316:13 317:24 322:14
324:10 327:23 333:21
333:22 381:2 404:12

412:24
**agreed** 272:8 308:3
**Ah** 228:16 344:17 352:20
353:3 364:10 368:17
377:25 383:11,20
387:17 392:18 411:9
414:6
**ahead** 263:22,25 368:18
**aid** 233:8 239:15 259:13
260:7 298:14,16,20
309:20
**ain't** 299:21
**air** 277:8
**al** 418:6,7
**alive** 310:10 338:3
**allegations** 227:9
**alleged** 318:14
**Allen** 262:2 332:9
**Allen's** 333:17
**allow** 233:20 330:14
**allows** 334:13,19
**ally** 304:12
**alongside** 259:17
**alteration** 412:14
**altered** 412:12
**alternatively** 320:17
**Amelia** 257:5 312:11
329:1 332:11
**Amendment** 239:24 257:7
257:11 303:14,16
**analysis** 265:9,20 266:20
267:4 268:10,14,18
269:11 270:15 271:6,7
316:1 333:22
**Anderson** 213:11,13
215:6 216:1,18 218:13
221:1 236:1 237:4
239:10 240:3,5 250:15
251:13 265:2 266:6
267:3,13 290:16 302:16
307:2,10 308:17 313:8
313:16 316:21 317:13
317:16 322:4 323:3
324:2,11 408:5,21
409:7 413:4
**Anderson's** 215:5 251:25
413:11
**Andrew** 278:22
**And/or** 251:18 315:21
**anger** 303:4,10,13,19
**angrily** 301:13
**angry** 242:11,13,16,19,24
243:19,25 244:20,21
248:12,14,21 249:7
300:16 301:3,8 302:13
302:24 303:1
**Announcement** 376:13
**anoxic** 311:5
**answer** 242:20 243:17
254:12 256:6 263:8,10
266:10 268:4,13 274:18
280:3,4,10 282:21
285:5 288:12,15,18
292:19,21 311:18
313:14 318:23 321:11
321:14 327:7 330:15,17
341:17,18 349:25
356:23 373:15,17
378:14 412:22 413:21
413:25
**answered** 285:15 301:6
314:23 316:2 329:19
**answering** 251:6 275:7
285:6
**answers** 240:2 251:4
252:1 255:25 256:4
257:19 260:4 313:2

322:14 332:11 333:17
**anybody** 220:2 263:3
304:10 309:10 411:11
**anybody's** 252:22 253:4,5
**anymore** 231:12 282:13
325:1 373:8
**anyplace** 342:15
**anyway** 242:3 317:1
416:8
**apparently** 336:3 373:13
**appear** 219:5 238:21
271:13 307:17 316:8
363:20,20
**APPEARANCES** 211:1
**appearing** 212:9
**appears** 327:2
**applicable** 237:15 242:9
**applied** 312:22
**apply** 254:7
**applying** 320:16,17
**appreciate** 305:19
**appropriate** 269:20 322:6
322:9
**appropriately** 241:17
267:17
**approved** 323:21 354:12
354:13
**approximately** 212:6
313:10 350:10
**April** 228:12,13
**APS** 235:17 357:7 358:3
**archived** 345:7
**areas** 305:17
**arguing** 404:7
**arms** 305:23
**arrest** 257:7 311:1
**arrested** 257:12 359:13
**arrestee** 255:2
**arresting** 256:21 332:1
**arrived** 380:23
**articulated** 220:13
**aside** 239:11
**asked** 226:2 241:21,22
243:15,16 247:8,16
254:4 267:18 282:16,16
282:23 283:21 284:18
285:5,14 288:6,22,24
294:10,17 301:5 311:15
314:23 321:13 328:7
330:20 361:21 362:13
372:13 373:18 377:1,3
395:17,22
**asking** 228:2 237:22
238:25 239:3 263:5
271:4,5 274:3 284:17
285:18 289:2 301:14,16
302:24 294:7,7 296:19
322:7,10 325:21 329:4
332:13 335:14 336:14
338:15,17 349:6 350:7
350:9 370:18 397:16,17
400:5 401:9 414:24
415:15 210:12 416:3,4
**backs** 329:6
**bad** 260:21

269:11 270:14,25 271:6
357:13
**assigned** 384:3 388:18,20
**Assistance** 239:14
**Assistant** 211:10
**Association** 326:11
**assume** 256:25 295:20
321:10 371:12 375:6
391:21 396:4 403:20,25
**assumed** 225:15 293:16
293:19,22 294:3 360:2
**assuming** 270:11 382:19
**assumption** 382:23
**attachment** 343:4,22
372:3,4,8
**attachments** 343:8 355:1
**attempt** 319:25
**attempted** 360:21
**attempting** 360:20
**attended** 214:22 216:23
222:12
**attending** 214:24
**attention** 232:10 240:18
255:6,13,17 265:5,20
265:22,24 297:18 298:6
306:15 308:19 316:24
317:20 320:18,19 333:1
333:11
**attorney** 211:3,4,5,10,11
212:7 328:14,15 343:6
361:25 362:6,10 372:18
406:15 410:14,14 417:8
417:9
**attorneys** 362:8 417:11
**attorney's** 345:6
**attributes** 215:22
**at-risk** 215:22
**audible** 339:19 398:25
**audio** 276:8 376:24
412:25
**August** 349:10
**authority** 339:11
**authorization** 353:21
**authorized** 353:4,13
354:6
**availability** 407:4
**AVI** 363:5,8,9,18,19 364:5
364:6,21
**avoid** 415:18
**aware** 237:23 239:2,5
255:20 264:22 267:6
279:3 309:4,21 312:12
312:21 315:10 316:19
321:23 322:24 335:6,11
335:12 339:9 376:19
379:23 382:21 408:7
415:9
**awareness** 221:9,11
**A.M** 210:15 212:6 213:20
213:24 243:7,13 264:11
264:14

**B**

**babysit** 384:21
**back** 213:22,23 220:12,15
220:22 239:12 243:9,12
262:22 264:23 268:8
263:6 312:13,16,19
313:10,22 314:2 321:4
322:7,10 325:21 329:4
332:13 335:6 336:14
338:15,17 349:6 350:7
350:9,20 416:3,4
**backs** 329:6
**bad** 260:21

**bag** 225:10
**bags** 225:15
**Baker** 278:22 312:12
**Baker's** 325:4
**bar** 220:23
**bas** 309:9
**base** 408:10
**based** 227:8,17 235:12
276:25 277:1 282:1
289:21 293:18,21 309:7
309:13,13 323:4 325:15
325:19 328:4,4 415:11
**basic** 228:20 229:9
233:17 408:18
**basically** 225:13 226:21
256:20 267:12 281:7
317:17 349:22 384:21
**basis** 231:7
**basketball** 309:9,11
**beating** 312:9 299:12
**behalf** 211:2,9 212:10,11
212:16 378:17
**behavior** 235:6,12 251:16
253:22 256:14 282:1,2
282:5 293:18,21 315:16
**behaviors** 256:15
**beings** 240:22
**belief** 311:4
**believe** 219:17 223:15
225:16,21 226:3,4
227:18 231:2 233:19
235:11 240:15 252:4
257:25 259:12,18 260:3
269:24 274:14 275:12
275:22 287:8 290:7
301:22 309:6 314:16,20
315:2 316:2 320:16
324:12 325:23 326:1
341:21 360:17 361:1,6
361:21 364:17 367:17
368:1 369:19 370:15
374:5 377:22 380:2
381:10 382:3 384:6
385:15 386:5,22 389:14
389:19 393:22 399:13
404:7 406:10 414:4
**believed** 235:10 277:5,9
312:5 414:16
**belittle** 348:2
**belittling** 348:5
**belt** 397:12
**bend** 397:11
**beneficial** 299:10
**benefit** 314:14 319:24
**benefits** 352:20
**Bennett** 210:17 211:3,5,6
211:24 212:9,9,13,13
213:2,10,13,14,17,22
213:25 215:24 220:12
220:20,22 221:10,19
222:2,4,15 223:14
225:1,5 229:5 232:5,6
234:1,2 236:24 237:12
240:1,5,8,9 242:5,6
243:4,9,14 244:5,6
249:25 250:4,14 251:1
251:24 252:6,9,10,17
253:16 255:22 256:23
257:15 258:4,7 259:22
263:19,21 264:1,3,5,15
266:3 279:2 285:4,16
288:16,19,21 295:6,16
295:19 300:21,24 301:9
301:12 303:8 307:8
308:21 309:18 310:5,11
310:18,20,24 311:9,10
313:1,6,13 314:4,24
315:12,12,24 317:5,23

**Doby Professional Reporting, Inc.**
952-943-1587

Timothy Callahan
10/16/2012

Page 421

318:3 319:15 320:1,11
320:13 321:2,7,21
322:13 323:11 324:9
325:7,14 327:8,15,18
328:19,22 329:16
330:12,16 333:15 334:9
334:16 335:24 336:12
336:18,22 337:1,5,9,16
338:11,15,19 343:10,14
345:4 348:19,24 349:2
349:9,14,17,20 350:7
350:11 352:22 356:22
356:24 359:3,5 362:4
362:20,23,24 363:2,3
364:20 366:10 370:15
371:1 372:24 373:1
376:14,15 377:21
378:11,15,18,21 379:6
379:11 381:1,6,8
383:14 385:3 388:12
390:25 391:7 393:3,6
393:10,14,15 395:20
396:15,19 398:7,10,17
398:21,23 399:1,5,7
401:1,19 406:16 407:1
407:2,9,18 408:16
409:3,17 410:15 412:22
412:23 413:9 414:7,12
414:19 415:1,7,24
416:4,8,12 419:2
**best** 229:7 311:3 350:3
368:20
**better** 244:11 246:22
248:23 249:15 271:15
271:16 301:1 395:7
**big** 368:4 385:10 386:6
416:9
**bigger** 386:3
**bill** 368:21 370:21
**Birrell** 210:17 211:6,24
**bit** 226:18 264:24 274:1
329:19 334:23 337:1
414:20
**bite** 246:19,21 278:13
300:3,18,22 334:20,22
**biting** 335:1
**black** 394:4
**blinked** 271:20
**blinking** 271:25
**blocks** 219:1
**blouse** 351:7 392:3 394:9
395:16 397:22 400:14
400:16,23
**blow** 278:7,11
**board** 382:8,18
**Bob** 242:4 369:16,20,21
**body** 324:24
**book** 273:20 274:7
**borne** 314:22 315:1
**bottom** 234:17 236:18
373:6 397:14
**bought** 392:15,21 409:18
**bouncing** 309:9
**boundary** 415:3
**box** 393:1
**boy** 227:23
**Boylan** 415:19
**brace** 245:11
**Brad** 213:10
**brain** 310:12,14 311:6
**brand** 354:17,25 411:23
**break** 224:24 263:24
264:1,6 336:22
**breast** 351:6
**breath** 251:17 253:24
256:15 276:23 315:18
**breathe** 257:9

**breathing** 241:13 250:22
251:17 252:21,23
253:19,24 254:20,21,21
255:8,9,11,14 256:16
256:16 257:12 258:13
258:13,19,23 265:15,18
267:19 271:9 274:13,15
274:17,22 276:15,20
277:8,9,11,11 279:9
280:12,19 284:2,6,16
286:18,24 287:22
288:11 293:3,17 294:7
294:10,18 296:22,24
297:1 298:11,18 299:18
301:24 302:4 312:14,16
315:9,18 321:4 322:11
323:6 332:20,23 333:1
333:11 337:22 338:1
**Brian** 213:12,13 215:5,6
218:13 221:1 236:1
237:4 239:10 250:15
251:13 265:2 307:2
308:17 313:8,16 316:21
317:16 322:4 323:3
324:2 408:5,21 409:7
413:4
**briefly** 250:21
**bring** 369:25
**broad** 253:23
**broke** 244:11 246:22
248:24 249:3,15 271:15
271:17 301:1
**broken** 244:22 245:7,8
249:3,11 386:7
**brought** 226:13 361:21
**Bruno** 360:23,24 362:7
372:10,11 390:10,13
401:22
**bullet** 233:11
**bullets** 404:15 410:18,20
410:23,25
**bunch** 309:9 363:22
**burglaries** 402:6
**Burt** 373:3,4 374:5 375:10
419:16
**business** 255:18 392:6
402:13,20
**button** 398:5
**buy** 338:20,23 393:7

---
**C**
---

**C** 211:10 212:1
**call** 225:23,24 226:3
234:21 247:19,20,21,22
251:8 292:6 305:24
346:25 347:7,13 376:11
376:22
**Callahan** 210:7,13 212:4
212:22 222:9 236:11,22
254:4 312:22 333:13
373:7 408:25 409:13
417:4 418:3,24
**Callahan's** 314:21 419:10
**called** 212:23 235:20
370:20,23 371:13,13
373:22
**calling** 288:1
**calls** 276:16 347:12
369:13 370:7,8 371:4
**calmed** 220:3 314:21
**cam** 365:17 366:4,24
367:11,11,16 388:7
**camera** 246:6 247:11
249:18 287:14 289:8
309:5 315:1,2 338:20
338:25 339:11,25
340:22,23,25 341:19,25

341:25 342:5,9,10
344:3,23,25 345:1,7
346:5,8,24 348:1,12
349:8,19 350:13,19,23
351:3 354:3,6 355:22
355:22 356:13 357:1
358:18 359:7,14 361:4
361:8,11,12,13,14
362:11 363:4 364:9
365:6,13 366:19 371:15
372:4 376:6,17 379:21
389:3 391:9,14 392:10
394:2 395:11 398:9,14
398:16,19,22,24 399:7
399:9 400:21 406:4,7
407:17 409:19 410:4
412:24 414:5,13,15
415:9 419:10,12
**cameras** 401:20 402:14
404:23 405:13,19
**capacities** 210:7
**capacity** 337:21 338:2
342:13
**Caps** 228:20
**captain** 257:17 260:12
313:2 329:17 332:11
380:4,22 381:14 382:25
**capture** 341:2 412:25
**captured** 341:24 345:17
351:12 357:17 358:10
360:6 405:21 414:16
**capturing** 356:13 357:14
378:23
**car** 230:14 332:14 346:25
405:3,4,5
**cardiopulmonary** 311:1
**care** 239:4 309:15 400:20
**carried** 378:4
**carriers** 397:14
**carry** 353:12,21 355:6,13
356:5 391:19
**case** 210:2 235:2 236:7
257:13 259:11,12 270:5
295:25 304:10 309:1
318:12,22 329:8 336:15
339:1 356:20 358:21
**casings** 404:16,17
**catch** 397:18
**catches** 358:20
**caught** 401:12
**cause** 335:20
**cease** 315:7
**ceased** 289:11 312:13
315:5
**CED** 229:9 232:12,25
233:9 236:19 237:15
238:15
**cell** 368:21 370:5,21
**certain** 215:4,16,22
251:20 267:14 305:17
**certainly** 241:9 329:10
333:10
**CERTIFICATE** 417:1
418:1
**certified** 228:17 237:9
**certify** 417:3 418:3
**chain** 403:17 412:16
**chair** 397:13
**change** 251:16 253:21
256:14 315:16 321:16
347:12 418:10
**changes** 282:7,8
**characteristics** 231:3
**charge** 272:13 273:2
274:10 275:9 278:1
297:25 298:1 357:21
358:4 382:1 413:18,19
**charged** 357:4,24,24

358:6
**charting** 309:13,13
**check** 235:5 241:18
249:13 253:10 258:11
277:16 279:19 280:12
281:3,4,9 284:1,5
285:21 293:4,10,24
**checked** 258:11 285:1,10
285:11 296:12,17 297:5
298:21 299:2 302:11
309:20 310:2 321:24
**checking** 293:22 294:3
299:5
**Chemical** 354:19
**chest** 298:25 299:6,11
326:18 335:8,10,15
**chief** 260:25 327:12
332:10 333:16
**chiefs** 262:1
**child** 404:2
**Chris** 211:14
**circulated** 236:5
**circumstances** 314:2
323:13 333:8
**circumstantial** 333:3
**CIT** 214:4 215:17 216:7,14
216:15,17 217:15 218:9
218:17,22 221:12,13
222:10,17,21 223:17,19
223:19
**citizens** 379:14
**city** 210:8 211:10,11,11
211:12 216:2,17 251:3
251:7 264:20 300:8,8
328:14,15 339:5 343:16
345:6 351:7 372:18
413:13
**city's** 264:25 362:7
**clarification** 350:5
**clarifying** 327:11
**clasp** 396:11
**class** 222:23 228:25
229:17
**classify** 377:15
**cleaning** 367:9
**clear** 243:3 250:3 304:7
313:18 336:21
**clients** 378:17
**climbs** 318:16
**clip** 317:13 318:2 320:10
320:12 351:21,23,23
352:3 391:20 392:7
394:7,17 396:20,25
397:17,20,21 398:8
400:11,16 401:12
**clips** 352:2
**close** 296:23 301:20,24
302:8 409:1
**coach** 328:14
**code** 220:23
**coffee** 340:15
**coincidence** 401:15
**colleague** 252:2
**collect** 404:21,22
**color** 394:4
**Colt** 355:8
**combined** 269:9
**come** 235:5 340:5 351:11
351:12 379:17 380:12
381:9 389:20 409:23
**comes** 366:3 381:12
**comfortable** 380:15
**coming** 247:25 276:23
381:21
**Command** 263:12 340:18
**commander** 314:20
**comment** 272:19 319:2
**comments** 220:21 222:3

229:1 239:9 245:24
249:24 250:13 251:12
252:16 253:15 307:1
310:23 326:23 335:18
336:11 352:21 362:18
364:19 370:12 377:20
378:10 388:11 395:19
414:18
**commission** 374:10
**common** 297:17
**communicate** 368:8
**communicating** 368:11
**complaining** 267:21
**Complaints** 251:18
256:18 315:20
**complete** 387:7
**compliant** 312:7
**complied** 330:3 333:10
334:6
**comply** 239:13 319:23
**complying** 258:6 312:3
312:18,23 313:19 314:9
314:17,22 315:3 318:25
319:9 324:4 394:1
**compound** 284:25 326:3
330:7 334:11 407:6
**compressed** 343:18
**compressions** 298:25
299:6,11
**comprised** 229:7
**compromise** 254:21
255:8,11 321:4
**computer** 342:16 343:18
344:3,8,12 345:8
346:21 359:8 360:10
369:1 372:13,20 373:8
373:11 374:10,23 375:7
375:13,18 376:3,3,18
377:3 402:14,21 403:1
404:4 419:10
**conceal** 394:20
**conceive** 303:22
**concept** 219:16,23 336:4
**concern** 259:14,16
**concerned** 244:22 265:14
280:19 285:2,10 300:1
300:5,6 309:6 310:3
387:6
**concerning** 347:22
**conclude** 331:19
**condition** 232:24 234:15
236:19 237:6,10 238:6
239:19,23 240:11,14,19
240:24 250:17,19,20
251:21 252:20 257:25
265:7,20,25 268:1
278:11 280:12 292:23
307:5 315:9 316:24
317:15 399:21,22
**conditions** 317:21 339:2
**conduct** 263:1
**conducted** 232:11 234:8
236:8
**conducting** 353:19
**conductive** 268:20,22
269:2,2,7
**conference** 386:4
**confidence** 409:11
**confident** 333:19
**confirm** 299:19
**connected** 367:1
**conscious** 250:23 272:3
279:24 293:13,20 338:2
**consciously** 400:1,4,5
**consciousness** 251:16
252:24 253:19,22
254:19 255:14 256:14
275:11 279:20 280:9

Timothy Callahan
10/16/2012

Page  422

282:8 297:8,10 302:7
315:17 322:8 338:6
**considered** 268:22
326:16
**consistent** 225:19 239:15
313:9,22 314:1,5
**consisting** 418:7
**Constitution** 303:14
**consulted** 410:11
**contact** 260:11,13 304:20
376:23
**contained** 225:11
**contend** 257:24
**context** 329:10
**contextual** 408:9
**continuation** 210:11
212:3 309:12,14 415:25
417:3
**continue** 257:11,11
312:18 313:22 314:2
324:13 329:6 333:20
344:20
**continued** 312:13 333:11
**Continues** 257:9
**continuing** 253:11 255:13
268:6
**continuity** 390:5
**continuous** 273:22
**contract** 417:11
**control** 263:12 306:5
320:8,9 324:4,24 333:9
340:18
**controlled** 290:11 306:12
306:13 311:16,20
313:11 332:5
**conversation** 374:20
387:18,20 406:19
407:11 410:2
**convictions** 404:2
**convulsions** 251:17
256:17 315:19
**cordial** 262:14
**cordoned-off** 386:16
**Cornelius** 210:4
**correct** 216:20 217:1
221:8,14 222:17 224:10
225:11,20 227:9,11,12
227:16,20 230:11 232:1
232:16 233:4,13,20
234:16 236:3,4,6,8,9,22
237:7,11 238:1,4
239:16,17,20,22,24,24
241:2,6,10,13,18
242:12 244:1 245:21,25
248:15 249:14 250:19
250:22,23,25 251:22
252:14 253:22 254:19
254:19,22,24,24 255:3
255:3,5,9,15,19 258:9
261:1,4,17,22 265:16
265:19 266:16 267:21
268:1,10,16,21 269:3
269:12,23 271:2 272:10
272:15 273:9,14,24,25
274:3,7 276:11,17,21
282:6,22 283:2,4,23
284:8 285:13 287:17
289:12 290:13,23,24
291:17 293:17 301:25
304:8 305:1,9,22 306:4
306:6,12,16,22 307:6
307:18,19 309:3,7,8,11
309:13 312:20 315:6,6
315:10,15,19,20,21,22
316:25 317:2,4,21
320:20 321:5,5 323:7,9
324:6,8 330:24 331:15

332:15,20,21,23 333:2
333:12 335:8,11,15
337:17 339:7 340:18
343:4 348:11 350:13,18
352:17,23 353:6,16
354:13 355:23,24
356:15 357:1 360:1,7,8
363:5,10,13 368:19,23
375:5 377:9 378:24
380:1,6,13 383:10
384:5 385:25 387:3,16
391:11 392:8,11 393:21
394:10,13 395:12 398:5
400:12,15 401:24 403:2
404:4 405:22 406:9
408:8,24 409:2,12,20
411:17 414:5 415:5
418:9
**Correction** 418:10
**correctly** 220:14 299:5
**correlation** 332:21
**Coughing** 218:4
**counsel** 240:6 356:21
417:8,9
**counsel's** 415:23
**County** 417:2,23 418:2
**couple** 367:21 372:16
**course** 214:11,16 216:7,7
216:14 232:16 240:17
255:23 408:8,18
**court** 210:1,24 212:18
220:15 404:10
**cover** 213:3
**covered** 227:7 411:24
**CPR** 233:25 299:9 337:24
**crash** 230:16
**create** 356:25
**created** 343:17 359:16
405:25
**creating** 409:20,22
**credit** 286:24
**crime** 357:4,6,15,18
359:20,22 380:5 393:21
403:19,22
**criminal** 227:8,19 357:8
**Crisis** 219:19
**critical** 309:12,14 358:12
358:13,15,19 369:6
372:12 383:16 390:3,5
409:9,13,14
**criticism** 263:14
**crowd** 304:11
**Cubes** 393:19
**cubicle** 386:8,10
**cubicles** 386:7
**Cue** 393:16,19
**cues** 319:17
**cuffed** 313:19
**currently** 318:22
**custody** 254:11 257:8
282:5,6 381:11,22
403:17 412:17
**c.lynne.fundingsland@...**
211:11

**D**

**D** 210:24 212:1 355:8
417:3,21
**danger** 220:4 309:3
**dangers** 335:11
**darn** 333:1
**data** 376:24
**date** 212:5 214:6 224:4
236:3 327:11 339:14,15
357:25 361:19 366:15

**Dated** 418:23
**dates** 346:18
**Dave** 287:19,20,20,20
291:20
**David** 210:4 219:4 224:22
234:24 242:12 264:21
270:23 274:10 283:21
284:1,6,14 289:11
296:17 297:15 298:6
304:11 311:16 312:13
314:21 324:12 329:3
330:2 347:5,9 351:10
357:19 367:25
**David's** 300:8
**day** 261:19,21 262:9
339:16 342:4 356:5
361:7 371:18 372:15
373:22 378:5 417:4,15
418:23
**days** 261:19 368:24
**de** 364:4
**dead** 309:24 310:7,16
**deal** 224:13,16,20 306:9
384:18 393:16 416:10
**dealing** 220:10,18 225:19
265:9 305:19
**dealt** 304:1
**death** 258:23 264:21
335:21
**deceased** 253:8
**decide** 372:11 379:12
410:14
**decided** 235:2 399:8
**decision** 332:22,24
406:11
**deduced** 415:11
**defendants** 210:9 211:9
212:16
**defensive** 408:10,18
**define** 261:5
**defined** 383:9
**definitive** 227:1 347:11
**degree** 273:14 274:11
**delete** 363:25 364:5 365:1
367:5,20
**deleted** 342:7 364:10,16
365:15 366:18 367:2,17
367:20 376:24 419:13
**deleting** 364:8 365:5,24
**deletion** 364:1
**deliberately** 394:16,20
**delineated** 254:6
**delirium** 255:4,7
**delivered** 211:23
**Delmonico** 380:4,8,17,22
381:24 386:19 388:13
388:17 389:2,4,25
**demean** 348:2
**demeaning** 348:5
**deny** 223:23 224:2 244:14
343:24,25 374:15,16,24
374:25 375:4 381:17
**denying** 254:10
**department** 215:10,11
223:1 233:18 236:17
262:23 263:13 321:3
327:3 341:5 352:24
359:11 360:14 365:7
367:24 377:9 393:18
403:2,18 411:1 412:7
**departmental** 237:1
**Department's** 232:8
**department-authorized**
369:5
**depend** 327:14
**dependent** 270:15
**depends** 327:14
**depo** 244:4

**deposition** 210:12 212:4
242:22 247:11 279:4,5
311:15 417:4 418:5
**deprivation** 311:6
**deputy** 260:25 262:1
332:10 333:16
**describe** 289:15 380:14
**described** 302:15
**designated** 384:12
**designation** 413:23
**designee** 216:2,2 251:2,3
251:7 264:25 353:16
413:14
**desk** 249:10
**detailed** 276:5
**Detective** 319:8 321:9,12
**detectives** 331:20
**determine** 233:11 239:15
255:14 271:9,25 276:9
276:14 279:23 280:8
**determined** 235:14 241:1
312:13
**developed** 405:21
**device** 234:9 268:20,22
269:3 340:23
**devices** 232:11 236:8
269:7
**de-escalate** 221:6 223:24
**de-escalation** 219:11
219:16
**die** 266:22 320:21
**difference** 307:15 317:6
**different** 215:23 220:2
227:5 229:20 265:11
283:21 290:21 307:11
307:13,22 324:14 326:3
329:24 331:21 332:15
334:3,21 363:18,18
369:20 394:14
**differentiate** 280:17
**differently** 316:2 329:19
**dig** 375:21
**digging** 225:10 376:8
**digital** 341:24 346:23
378:22 402:11 406:3
**digitally** 348:11
**direct** 339:14
**directed** 320:19
**disagree** 254:7 257:23
260:4 267:2 302:21
308:9,11,12,15 309:22
317:12 325:9,13 327:19
328:10 329:22,23
333:25 357:22 401:2,3
401:5 409:4 413:10,17
413:25
**disagreed** 270:3
**disagreeing** 267:5
**disagreement** 257:18
315:25 325:19 332:11
333:16
**Disc** 264:13 337:14 391:5
**discuss** 274:10 275:8
401:21
**discussed** 216:23 236:4
239:18 301:3 327:7
**discussing** 273:2
**discussion** 266:6 343:12
349:5 372:17 387:14
**dispatched** 226:1
**displayed** 291:3
**Displaying** 396:16
**disposable** 405:1,12
406:4
**dispute** 246:3 248:25
250:1,5,10 323:25
346:18 415:8
**distinction** 316:11 329:18

**distress** 240:16 258:1,2,8
269:25 270:1 285:3
290:8
**distressed** 288:10
**DISTRICT** 210:1,1
**disturb** 404:19
**disturbed** 226:7
**doctor** 288:5 310:19
325:18 329:2
**document** 221:4 249:16
419:8
**documented** 408:11
**doing** 265:12 268:6 272:5
272:5 274:23 275:12,13
275:14 278:16 279:21
284:9 297:2,11,12
298:5 304:3 312:1
332:7 343:24,25 356:18
357:10,11 365:9 371:14
388:23 407:22 408:2
412:6 416:9
**double** 393:14
**doubt** 314:14 319:24
368:4
**download** 359:7,10
402:21
**downloaded** 276:2 360:9
368:25 372:14,19 403:8
**downloading** 376:6
**downtown** 224:14 357:9
**Dr** 312:12 325:4
**drag** 333:7
**draw** 232:9
**drive** 343:1 366:22 367:10
367:13,15 376:9 377:6
390:14 402:25
**drug** 304:3
**drugs** 287:3
**Dude** 299:17
**duly** 212:23 417:5
**duties** 303:13 378:4
384:16
**dutifully** 387:6
**duty** 237:5,9 259:8,13,15
303:4,10,11 306:15,16
339:12,25 341:1,19
351:7 378:23 387:7
397:12,22 400:22
401:23 407:5

**E**

**E** 210:3 212:1,1 418:6
**ear** 301:21
**earlier** 234:18 236:4
292:15 395:17 399:10
**earliest** 346:4
**early** 365:6
**easily** 348:22 380:18
**easy** 321:14 403:9
**EDP** 226:6,25 227:3
**effect** 229:16 324:7
**effectively** 309:24 310:6
310:16
**effects** 215:9
**eight** 229:6,10
**eighty** 400:18
**EIS** 214:4
**either** 222:8 236:22 246:5
254:23 260:16,23 286:1
306:20 309:16 312:19
334:25 335:2 355:6
358:11 370:17 373:15
380:18 390:11 404:16
**ejected** 227:24
**electricity** 232:25 233:9
236:19
**elevated** 230:2

Doby Professional Reporting, Inc.
952-943-1587

elevator 226:9 235:3,4
273:16
embarrassing 379:22
embedded 215:6 216:8
221:1 222:7 236:1
237:4 239:10 250:15
251:13 254:16 256:11
257:5 259:4 265:2
307:2 308:17 309:1
312:11 313:8,16 314:19
316:21 317:16 320:14
321:1 322:4 323:3
324:2 327:1 329:1
332:9 335:19 380:11
408:5,21 409:7 413:4
414:3
emergency 235:16
239:16 337:18
emotionally 226:7
employee 226:11 239:13
417:8,9
employees 232:20 236:18
236:21 237:18 353:8,15
353:22 383:6
EMS 233:12,15,17,18,24
234:3 235:5
encephalopathy 311:5
enclosed 235:4
encompass 320:23
encounter 268:3,7 321:4
356:15
encourage 319:14
ended 351:15
ends 286:22
energy 232:11 234:8
236:8 268:20 269:2,3,7
enforcement 233:1
236:20
engender 234:14
engendered 331:22
ensure 257:8 390:5
entire 268:3 269:15,18
377:5 398:2,2
entirely 410:3
entitled 379:13
entry 303:25
environment 305:2
Envision 210:25
EP 227:2
equipment 298:10 352:23
352:24,24,25 353:4,12
353:20 354:13 355:21
378:4 379:15 392:7
erase 366:5
Erick 254:16 320:14
321:1
ES 362:25
escort 383:15,17 384:3
387:4,7,22,24 388:8,20
407:5
escorts 384:7,7
especially 224:14 271:10
332:20 379:14
Essentially 254:3
established 240:10
262:20 375:24
ES:01 419:12
et 418:6,7
evening 404:24
event 260:2 264:17,17,21
398:2
events 249:18 378:24
379:7
Eventually 281:13
everybody 236:16 237:17
283:11,13,15 290:14
327:12 385:19 388:4
407:13,13 410:22

evidence 227:1 270:5,8
314:22 315:1 325:25
356:6,7,10,25 357:5,15
357:17 358:10,23
358:16,25 361:22,24
362:14,15 379:10
401:23 402:11,11,16,20
403:13,18 404:10
408:23 409:1,9,10,14
409:16,20,22,24 410:4
411:10,17,20,22 412:2
412:16,17,20 413:1,2,6
414:8 415:11
evolved 358:13
exact 289:21 327:11
374:14,20
exactly 217:12 222:11
226:20 336:10 351:16
374:4 380:7 385:18
EXAMINATION 213:1
419:1
examined 212:24 418:4
examiner 288:1 302:5
Examiners 326:11
example 257:11 318:13
332:13,18 333:5 382:4
exceed 363:12
exception 402:4
excited 255:4,7
excuse 212:16 218:4
254:5 346:22 356:21
396:13 402:4
exerting 325:1
exerts 326:18
exhibit 218:3 222:19
232:3,7 246:6 249:21
250:8,10 272:6,9
275:21 276:12 278:25
282:18 294:15,22 295:4
295:5 309:2 316:12
343:13,15 345:3 346:12
352:3,19 362:19,21,24
363:13 372:25 391:8
392:14 393:20 394:13
395:14 397:22 399:23
400:11,18 419:7,7,9,12
419:15
Exhibits 211:25
exists 392:4
expect 317:17 320:18
324:6 327:12 409:1,14
expectations 379:1
expected 215:13 236:5
237:8 238:22 408:11
experience 231:21
260:25 261:4 262:4,5,6
262:8
experiences 378:24
379:8
experiencing 310:4
expert 343:16
expiration 279:10
explain 289:3 396:5 400:3
400:6 401:7
explained 262:24
exposed 232:24 233:9
236:19
exposure 233:7
express 259:14,16 343:21
372:3,5
extent 415:10
extraneous 265:24
297:24
extrapolate 241:15
extremities 305:21,24
306:4
eyes 271:17,25 272:2
e-mail 342:20 343:4,8,21

347:24 371:21,24 372:4
372:6,7
e-mailed 342:23 360:13
360:16 361:1 371:23

F

face 241:20 243:20 248:8
248:13 271:10 272:14
272:19 287:9 314:11
318:21 319:4,21
facilitating 323:6
fact 235:11 241:15 267:19
277:1,18 278:22 298:20
304:17 305:20 312:21
314:22 315:7 363:19
398:4 410:1 413:5
factors 326:4 333:4
facts 276:25 281:22,24,24
308:14 319:1 339:1
failure 300:9
failures 262:25
fair 228:7 300:7,12 384:22
391:13
fall 214:2 219:7 221:19
false 270:18
familiar 260:23 271:7
family 360:16
far 262:3 265:8 282:11
296:10 312:1 334:14
337:23 338:10 351:11
351:13,20 352:11
386:14 387:6 408:13
farther 401:13
fear 309:2
Feder 382:5
Federation 380:23 382:2
382:6,11 383:1 389:6
389:24 410:13
feel 231:20 270:19 279:10
375:20
feelings 303:3,9,12,18
feet 326:17
fell 241:20
felony 272:25 273:2
358:11
felt 331:5
fence 318:16,17
fences 386:16
field 327:21 378:4 379:16
Fifth 211:12
fight 235:2,4 241:4 278:3
278:4 279:6 298:3
398:2 412:19
figure 255:16
figured 393:10
file 342:23,25 343:3,18,19
344:2 363:5,8 365:15
files 341:23 342:5,17
346:2 347:3,21 363:4,9
363:18,20,23 364:2
364:5,8,21 365:1,5,19
367:2,8,13 376:24
419:13,13
fills 367:12
film 359:19 405:21
filmed 359:14
financially 417:10
find 344:13,21 370:23,24
418:8
fine 240:24 264:3 285:9
295:2,14,23 348:23
384:23 395:6 396:17
404:7 411:3
finish 223:10 288:15,17
330:15 345:22
finishing 258:9 415:15
fire 333:5,13 404:16

first 212:23 213:5 225:8
225:10 228:11 233:10
236:2 239:14,18 249:13
263:5,7,9 282:23,25
285:11 287:5 294:2
314:7,8 319:19 320:6
331:11,17 337:4 358:1
380:13 390:8 417:5
fist 305:13
five 283:3 291:13 298:15
298:17
flammable 230:5
flash 343:1 402:25
flashlight 354:21 355:1
flashlights 354:25
floor 226:8 235:10
fluid 321:15,22
focus 272:7
Folders 363:5 419:13,13
follow 237:17 238:22
239:4,7 302:15,25
followed 238:3
following 220:15 233:10
234:10 239:13 243:17
251:15 256:13 302:17
315:16
follows 212:24 418:9
footage 361:11,17 362:16
366:14,17 375:22 376:7
402:7
force 235:21 239:13,18
239:20 240:12 250:19
254:18 255:14,18 262:2
268:15,23,25 269:6
270:16,16,18,24 271:1
273:5 283:1,5 284:20
305:11 307:6 312:20
315:4,7 317:1,3 319:12
320:20 325:1,3,4
327:21 330:13 331:14
331:22,25 356:18,19
forces 309:3
forensic 401:3 404:4
forget 337:2
form 215:19 233:22
284:24 303:6 309:25
319:14 321:19 322:1
328:17 334:7 336:16
358:24 366:8 378:8
381:4 400:25 401:17
406:13 410:5
format 402:9,9,13
Fors 254:16 255:24
290:14 320:14 321:1,9
321:12
forth 239:23 266:5 332:19
333:7
forty-five 337:6
forward 241:20 301:22
fought 306:10
foundation 279:1 311:8
321:20 325:6,11 327:6
327:13,16 375:4 381:5
383:13
foundationally 404:10
four 291:14 318:21
330:25
Frame 355:7,8
frames 293:2
Fred 360:22,24 362:7
372:9 401:22
friendly 377:14
friends 360:16 377:15
front 217:23 291:3 316:6
316:20 350:18 390:21
392:13 406:17
fuck 246:13,17
fucker 243:16 244:10

245:24 246:11,20,22
248:9,22,23 249:14
271:16,16 300:18 301:1
fucking 246:22 248:24
250:7
full 328:11 380:19
function 358:8
functioning 229:9 267:20
Fundingsland 211:10
212:15,15 221:17 223:9
223:12 224:24 225:3
229:2 233:21 240:4
242:4 244:3 250:2
252:7 263:18,22 264:2
264:4,8 284:24 285:14
288:14,17 300:20,23
301:5,11 303:5 309:25
310:8,17 311:8 314:23
319:13 321:19 322:1
328:17,24 334:7,11
336:16,24 337:2,7
348:23,25 356:21
358:24 362:2,22 363:1
366:8 370:14 376:13
378:8,13,16,19 379:4
381:3,7 383:12 385:2
392:25 400:24 401:17
406:12,25 407:6 410:5
412:21 414:10 415:22
416:2,6,11 419:4
further 400:12
FUSSY 327:6,13,16
future 324:20

G

G 212:1
gap 257:13
Gaskins 210:17 211:6,24
general 219:23 229:25
265:8,12,19 369:12
generally 254:7 291:7
359:23 368:19 382:23
gentleman 380:19
Gerlicher 262:3
getting 243:19 269:21
324:23 394:21 408:17
410:10
give 226:16,24 240:23
266:10 295:5,7 299:6
314:13 318:10 319:7,17
319:20,24 321:14
324:21 325:20,20
327:11 328:11 330:18
331:14 334:10 347:10
375:11,13,18 390:4,7
399:14,16 411:6
given 264:16,20 266:23
266:24 282:21 312:3
313:19 314:21 318:24
333:10 345:5 390:13
411:1
gives 312:18 331:7,9,12
332:2 402:15
giving 299:11 314:9,17
315:3 319:9,18,19
334:6
Glampe 314:19 380:3,21
Glampe's 316:1
go 213:18,22 217:11
221:16 227:8 231:3
233:6 235:11 243:4,9
246:10,13 248:5 263:22
263:25 264:23 265:11
265:12 268:8 272:15
289:21 320:5 326:5
336:25 338:15 350:7

Timothy Callahan
10/16/2012

Page 424

361:22 362:13 368:18
369:4 380:13 390:25
402:5,6,6 411:2 414:19
415:19
**goes** 251:14 272:20
282:11 292:3 338:10
347:13
**going** 213:3 225:15
227:13 233:21 235:15
247:19 249:1,4,5
262:22 263:24 269:19
269:21 271:9 272:12
274:3 282:1 289:20
291:19,20 292:5,10
296:15 298:7 303:5
314:7,14 318:5 319:13
330:20 333:23 339:20
345:19 352:5,6 357:20
358:19 364:17 366:6
375:13 376:7 377:12
378:13 381:3 383:12
394:22 395:8,9,10
396:13 402:23,24
409:21 410:8,12,13
415:3,13,18
**golf** 255:16
**good** 211:14 257:8
262:17 263:7 287:17
315:7 380:20
**goods** 225:11
**Gorman** 210:7 221:16
222:9 223:19 236:14,22
237:20 238:3,19 248:7
254:5 272:13,16,20
273:7,18 274:2 282:17
283:21 284:21 286:17
287:2,12 289:8 291:17
294:6,11,14 296:11,18
299:17,17,20 304:17
320:2,16 333:13 357:21
368:2,8,13 371:5,10,23
380:1 385:7,23 386:10
386:12 387:22 388:15
398:11 407:11,20 418:6
**Gorman's** 222:20 228:14
228:15 238:20 337:8
357:19
**gotten** 215:19 264:20
320:8 344:14
**governs** 352:23
**grab** 407:19
**grabbed** 305:14
**greater** 268:10 271:1
306:6
**groan** 227:21
**groaning** 274:4,5 276:15
276:16 277:12,20
278:17 281:23 286:22
289:10,22 291:12
298:15,17
**Grobove** 222:5,7 223:16
223:17 256:11 257:3
327:1,19 377:13 380:11
381:9,21
**Grobove's** 223:4 379:24
380:10
**gross** 358:11
**ground** 241:4 306:10
336:7 352:13 404:20
**group** 215:22 216:1
**guarantee** 316:6
**guess** 239:11 243:2
250:17 301:15 307:11
308:13 309:10 343:2
369:5 396:11 399:15
**guiding** 406:10
**gun** 318:15 410:16 411:3
**guy** 242:2 393:16,18

**guys** 277:24 309:9
**gym** 318:5
**gymnasium** 399:18

### H

**half** 298:21 397:21 414:16
**Hall** 211:12
**Halvorson** 382:11 383:8
383:17,18 385:7 386:8
386:25 387:19,21,24
388:8 406:17,20,22
**hand** 273:8 279:8 311:24
348:15 387:9 417:15
**handcuff** 320:2 332:3
335:23 336:5
**handcuffed** 241:6 272:10
273:12 303:24 304:1,5
304:25 305:4 311:19
312:2 314:13 315:5
324:16 329:13 331:1,21
332:12,16,25 336:6,7
**handcuffing** 258:9 305:21
306:12 311:16,25
314:22 317:2 333:10
**handcuffs** 312:22
**handgun** 355:8
**handling** 409:9,10
**hands** 254:18,23 305:7,14
306:13 318:19 326:17
**happen** 257:13,14 265:5
308:19 376:17
**happened** 243:1 249:3
**happening** 265:9 292:4
399:17
**happens** 244:18
**hard** 315:3 333:4 366:22
367:10,13,15 376:9
377:6 396:5 397:25
**hardware** 361:15
**harm** 335:5
**Harteau** 261:1 262:2
318:13
**HCMC** 387:3
**head** 231:11 259:25 273:8
274:2 296:23 334:20
335:25
**heal** 249:11
**health** 240:14 257:8
278:10 279:7 300:1
306:19 309:13
**hear** 265:13 267:18 276:7
277:21 290:20 294:15
295:16
**heard** 263:5,9,14 276:2,8
276:8 290:14,16 302:22
302:23
**hearing** 275:24 287:6
288:7 299:24
**heart** 253:12 267:20
279:17 299:12 321:18
321:22,23
**Heirs** 210:4
**held** 260:19 343:12 349:5
**hell** 278:4
**help** 220:5 224:9 264:17
**helpful** 338:21
**high** 396:1,2
**higher** 391:18 401:11
**high-risk** 303:25
**history** 376:22
**hit** 318:20 319:4 398:5
**hits** 274:2
**Hmmm** 299:22
**hobbling** 326:16,20
**Hogan** 210:25
**hogtying** 326:16
**hold** 273:8 387:9 407:20

**holding** 317:19 320:22
324:23,24 350:23
**holes** 255:17
**home** 344:3 360:9 369:1
402:18,20 404:16
409:14
**homicide** 259:5,17,25
336:1 387:15
**honest** 381:13
**hoodwink** 328:23
**hoops** 309:9
**hope** 292:5
**hopefully** 213:3 235:6
**hospital** 235:8,12,13,14
245:2 310:10,12,15
358:1
**hours** 216:11 229:6,10
337:3 349:10 390:4,8
**house** 304:3,7 402:20
**Huffman** 257:5,17 260:12
262:22 263:4,15 270:6
312:11 329:1,17 380:4
380:22 381:14 382:11
**Huffman's** 313:2 332:11
**human** 240:22
**hundred** 226:20 341:14
**hung** 271:3
**hurt** 300:6
**hurts** 246:7 247:17 248:6
300:3
**hypothetical** 313:18

### I

**IA** 246:6,15 249:18 259:17
276:16 283:19 380:22
**IAU** 314:20
**ice** 245:20
**idea** 224:8 331:14 346:18
356:25 388:1
**ideal** 323:6
**identified** 304:18 349:1
409:16
**identify** 215:8,14 316:4
**identifying** 224:3
**ill** 219:12 225:4
**illness** 219:5,14,19,22
220:9,17 221:7 223:25
224:3,15 225:7,20
**image** 350:24 405:21
**images** 341:2 342:20
356:14 359:11 366:5,11
376:23 412:25
**imaging** 404:4
**immediately** 302:19,20
402:17
**impact** 318:21 413:6
**impartiality** 417:12
**implying** 309:21
**important** 215:20,21
303:2,9,12,18
**imposed** 303:13
**impression** 293:3 297:20
301:15 319:8 375:11
**inadvertently** 367:3
**incapacitating** 335:17
**inch** 397:21
**incident** 219:3 342:4,24
346:15 347:4,22 358:12
358:13,15,19 359:19
366:16 367:25 368:3,25
369:6 372:12 383:16
385:13 390:3,5 391:15
402:8 409:9,11,13,14
414:16
**incidents** 341:23 412:1
**include** 233:10 237:20
355:22

**includes** 228:25
**including** 252:21 256:13
**increase** 268:15,19
**increases** 269:6
**INDEX** 419:1,3,7
**indicate** 214:1 216:25
226:5 283:20
**indicated** 216:3 217:9
227:25 234:18 275:21
275:22 285:12 324:11
345:6 352:16 409:19
**indicates** 265:1 379:24
390:3 412:12
**indicating** 286:5
**indication** 226:24 309:16
**indicator** 272:2
**indicia** 240:22
**individual** 210:7 220:9,18
226:22 259:23 270:17
315:5 317:20 318:14
329:13
**individuals** 215:10,14,16
215:16 221:7 223:25
inebriated 224:20 225:3
**inexperienced** 404:1
**infer** 214:21
**information** 219:15 224:9
225:18 226:5,17,19
227:17,21 228:4 269:21
290:24
**informed** 415:2
**initial** 273:25
**initially** 225:8
**injure** 319:25
**injured** 233:12 239:15
240:16 301:19
**injuries** 250:24 279:7
**injury** 251:18 256:18
315:20
**inquire** 265:17
**inquired** 265:25
**inquiry** 266:20
**inside** 397:18
**instance** 303:24 368:9
**instruct** 378:13
**instruction** 321:3 408:12
**instructors** 408:14
**integrity** 403:12,17
412:17
**intend** 336:25
**intent** 335:3
**intention** 365:14
**interaction** 240:23
**interest** 417:11
**interested** 417:10
**interesting** 316:14
**interfered** 304:15
**interlude** 267:8
**internal** 259:7
**Internet** 392:21
**interpret** 218:11
**interpretation** 290:19
**interrupt** 263:23 264:9
396:14
**interrupting** 395:5
**Intervention** 219:19
**intimidated** 226:23
**introduced** 379:10
**inventoried** 408:23 409:1
**inventory** 366:6,13
402:17 413:6
**inventorying** 365:21
**investigated** 259:17
**investigation** 390:6
**Investigations** 380:22
**investigator** 259:5 402:12
**investigators** 387:16
402:15

**involved** 297:23,24 333:4
347:4 384:4,5,24
388:21 409:8,13
**involving** 221:7 223:25
**in-service** 214:3 216:8,20
216:21 217:6,8,11,14
218:5,23 219:7 221:19
221:23 223:20
**irregular** 251:17 253:24
256:15 315:18
**irritated** 301:18
**issuance** 236:5
**issue** 236:3 256:6
**issued** 229:15 236:3
412:7

### J

**J** 355:7
**Jacobson** 369:16,20,21
**jail** 254:24 306:21
**Janet** 210:24 415:2 417:3
417:21
**Jason** 295:25 309:1
**jaw** 244:11 245:6,11
246:7,23 247:16 248:6
248:21,24 249:3,7,11
249:15 271:15,17 298:2
300:3,5 301:2 305:9
**Jayme** 210:25
**JDW** 418:25
**Jeff** 212:11 313:20 373:3
419:16
**Jeffrey** 211:4 414:3
**jerks** 227:2
**Jindra** 382:6 383:8 385:6
386:10 387:15,19,22,22
388:2,5,19 389:3,5,16
389:18 401:21 406:11
407:3 410:2,11 411:15
414:3,8,11
**job** 384:11 388:23,25
**jobs** 339:8
**Johnny** 398:11
**jstorms@gaskinsbenn...**
211:4
**judge** 270:2 301:10 374:1
374:1 375:17
**July** 288:23
**jumps** 318:16
**June** 346:4
**juvenile** 226:23

### K

**K** 369:13
**Kathryn** 211:5 212:13
**Katie** 373:7
**kbennett@gaskinsbenn...**
211:5
**keep** 249:8 283:8 332:4
333:11,23 352:7 367:6
367:7 384:24 385:6,7
388:1 392:22
**keeps** 352:4,5
**kept** 332:24 351:21 352:9
379:2,5 397:20
**Keyes** 415:19
**keys** 355:25 356:6
**kicking** 334:15
**kill** 335:1 336:5
**killed** 356:20
**Kin** 210:4
**kind** 213:3 254:9 268:25
274:1 332:15 354:20
355:13,25 393:5,14
406:22
**kinds** 379:19
**Kingdon** 391:11

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

Page 425

**Kingdon's** 405:5
**Klund** 311:24 319:8
   390:19
**knee** 320:17
**kneel** 312:13,16 313:10
   322:7,10 329:6 330:4
   336:4,13
**kneeled** 335:22
**kneeling** 312:19 313:22
   314:2 321:4 329:3
   335:14
**knees** 320:16
**knelt** 283:6 284:21 336:7
**knew** 258:13 340:3,7
   357:10,11 372:19
   395:11,16 403:4 409:13
   410:1,3 411:19 414:8
   414:11
**know** 217:17,19 218:6,25
   218:25 219:13,18,20
   220:1,4,5 221:22 222:5
   225:16 227:6 228:17,19
   229:11,23 230:19,23
   231:6 236:14,16 237:14
   237:23 238:10,18
   241:12 246:1,4,24,25
   249:1 254:12 255:15,16
   255:23 256:2,2,25
   257:16 258:10,17,25
   259:6,13 260:10,17,20
   260:24 262:16 264:5
   265:4 266:8,14,15,23
   267:14,16,19,19 269:13
   270:2,9 275:19 276:4
   278:13 283:10 285:8,9
   286:12,20 287:6 289:13
   289:21 296:4,10,13,14
   296:15,15,20,23 297:11
   297:11,23 298:23
   299:25 300:17 301:14
   302:3 304:12,12 306:23
   308:19 309:16 310:13
   311:11,11,13 319:1,5
   320:15 327:7,10,12
   328:21 329:3,9 330:2
   330:22 331:12,24
   332:12 335:16 337:23
   338:4,8 340:4,8,13
   341:8,14,16 343:7,25
   344:1,14 345:11 346:6
   346:17 348:10,17
   349:22 351:11,13,16,20
   352:11 354:8 357:6,20
   359:16,18 360:5,19
   362:14 363:21 364:3,7
   364:11,11,24 365:2,2,3
   365:8,25,25 367:1
   368:4 369:3,3,7,11,23
   370:2,5,23 371:6,16,19
   372:5 373:4,7,20,24
   374:9 375:1,2,4,9,11,15
   377:10,11,12,13,14,16
   377:18 378:1 379:13
   382:12,16,21 383:5,15
   384:14,15 385:5,15,15
   386:11,15,16,18 387:10
   387:13,17,21 388:14,18
   388:19,24 390:2,16
   392:12,20 395:4,8
   399:15 401:8 402:8
   403:8,11,14,14,22,24
   404:2,5,8,14,17 405:4
   406:20 407:8,12,23
   409:12,23 410:7,9
   411:24 413:18
**knowing** 215:22
**knowledge** 221:22 233:23
   283:18 291:11 296:18

   296:21 304:14 311:3
   340:21 343:5,9 348:3
   360:15 368:20
**known** 395:7 408:23
   409:1
**knows** 238:19

**L**

**Lab** 380:5 393:21 403:19
   403:22
**Lakes** 351:7
**language** 375:1
**laptop** 344:13
**large** 386:4
**Larry** 210:3 418:6
**laser** 231:7
**law** 211:3,4,5 233:1
   236:20
**lay** 254:18,23
**lead** 269:10 309:5
**lean** 301:22
**leaned** 244:9 301:20
**leaning** 325:21
**learn** 264:17 361:7,8
**learned** 366:5
**leave** 235:1 304:5 332:16
   332:22 402:11 407:4
**left** 303:23 310:21 315:13
   320:17 327:4 333:18
   351:6 390:18
**legal** 214:3 216:1 308:8
   416:6,8
**legs** 314:18 334:14,17
**length** 329:3
**lengthy** 371:4
**lens** 392:13 394:5 396:25
   400:22
**lessen** 312:20 319:11
**let's** 213:18 215:11 243:4
   243:9 250:14 254:14
   268:8,13 270:22 272:4
   272:4,5 304:3 312:9
   313:6 318:12,12 338:15
   350:7 390:25 393:23
   398:7 400:9 414:19
   416:6,8
**level** 239:18 242:25
   251:16,20 252:24
   253:22 256:14 268:23
   269:10 270:15 275:11
   279:19 280:8 297:8,10
   315:16 322:8
**leveled** 263:13
**leverage** 334:14
**lex** 363:22,24 364:3,6,15
**liar** 375:7
**license** 255:19
**lieutenant** 259:6,24 260:8
   260:22 316:1 335:25
   336:4 339:18 380:3,4,8
   380:16,21,22 381:14,25
   382:11 383:8,18,21
   386:25 388:13
**lieutenants** 382:18,19
**life** 303:19,20 309:12,14
   375:21
**life-threatening** 250:24
**light** 406:10
**limited** 342:13
**line** 215:6,6 221:2 222:7,7
   236:1,1 237:4,4 239:10
   239:10 243:18 250:15
   250:15 251:13,13
   254:16,16 256:11,11
   257:5,5 259:4,4 265:2,2
   307:2,2 308:17,17
   309:1,1 312:11,11

   313:8,8,16,16 314:19
   314:19 316:21,21
   317:16,16 320:14,14
   321:1,1 322:4,4 323:3,3
   324:2,2 327:1,1 329:1,1
   332:9,9 335:19,19
   380:11,11 399:4 408:5
   408:5,21,21 409:7,7
   413:4,4 413:3,3 418:10
**lines** 371:13
**lingering** 415:8
**list** 255:7 354:11,24 363:5
**listen** 296:6 312:9
**lists** 239:14 355:19,21
   363:5,9 376:23
**little** 226:18 250:16
   260:10,13 274:1 302:14
   329:19 396:1 415:14
**LLP** 210:17 211:6
**long** 249:10 258:16 261:8
   271:21 312:13 327:10
   327:11 329:5,6,8,9
   336:24 344:22 348:25
   367:21 371:6
**longer** 241:21,22 312:16
   394:2
**look** 215:3,15 217:19,24
   217:25 218:3 220:22
   222:11,19 232:19 234:8
   235:22 246:2 250:14
   253:21 254:14 271:21
   271:24 272:4,5,6,9
   282:18,19 344:18,20
   366:22 369:24 377:5,23
   393:23
**looked** 245:3 247:10,11
   270:8,9,11 294:11
   344:17 345:10,13,18
   346:20 347:2 370:20
   371:17 398:4
**looking** 228:13 240:25
   271:11,12 292:17,24,25
   316:8 350:12 393:13
**looks** 228:23 287:16
   344:4 376:21 400:20
**losing** 255:14
**lot** 215:17 226:18 261:24
   285:24 307:22 326:18
   328:22 351:1 356:3
   370:6,8,19 383:2
   391:18 402:5,10
**lots** 367:2,5
**low** 268:23 396:20
**lower** 396:20
**lunch** 336:23
**Lynne** 211:10 212:15
   348:21 415:21

**M**

**Mace** 268:23
**machinery** 230:13
**mad** 243:1
**magazine** 397:13
**main** 408:10
**maintain** 257:7 403:12,16
   409:10
**maintaining** 316:22
**major** 230:6
**making** 241:12 246:5
   265:6,10 267:13 272:18
   272:18 274:24 275:3,15
   275:17 277:3,3,18
   287:22 288:3
**man** 287:19 291:20
   347:23 356:10 357:4
**maneuver** 283:17

**manifesting** 309:15
**manner** 262:15 375:21
**manual** 251:5 252:3 267:1
   283:9 322:25 327:20
**manufacturer** 392:19
**manufacturer's** 229:13
**mark** 280:23 285:12 294:2
   300:13,17 343:10
   372:24
**marked** 211:25 343:13
   343:5 362:19 372:25
   391:8
**marked/identified/revie...**
   419:8,11,14,16
**material** 396:8 397:9
**matter** 261:8 305:20
   409:15 418:5
**maximal** 252:5,6,13
   290:12 316:4,15 317:8
   322:22 323:14,24
   326:21 327:22 328:16
   329:10,12 335:12
**mean** 217:13 224:12
   229:24 230:18 237:22
   242:10 248:21 256:3,20
   261:12 262:11 264:5,8
   265:12,21 270:2 271:9
   272:23 279:22 289:20
   297:16,17 298:12 300:5
   301:14 303:22 304:3
   309:4 325:3 327:2
   328:20 331:24 332:17
   333:22 334:10 340:3,8
   342:25 347:10 349:21
   350:3 354:11,15,24
   358:15 360:11 380:18
   384:21 386:2 387:8
   388:4 392:20,23 395:11
   399:16 404:12,14
   407:21 412:9 413:5
**meaning** 265:4 308:19
**means** 283:16 287:7
   297:18 364:3,12,15,25
**meant** 262:9,9 305:22
**measure** 397:25
**mechanic** 317:7
**mechanical** 335:21
   358:22
**mechanically** 325:8 326:2
   336:14
**medical** 232:23 233:1,8
   234:15,21 235:9 236:19
   236:20 237:6,10 238:6
   239:14,15,16,19,22
   240:11 244:25 245:10
   250:17,18,20 251:18,21
   252:19 254:6,24 266:18
   256:20 264:24 265:4,7
   265:20,25 270:4 277:20
   280:12 288:1 297:14
   298:10 302:5 306:21
   307:5 308:18 315:21
   316:24 317:21 320:23
   323:6 326:5,11 337:19
   336:21 337:10,12,14,15
   281:17 282:4 289:5
   292:18
**medication** 245:14
**members** 382:10,10,12
   383:1,3
**memory** 342:13
**mental** 215:9,14,19,22
   220:9,17 221:7 223:25
   224:3,15 225:7,20
**mentally** 219:12 225:4
**mention** 316:14
**mentioned** 326:20,22

   340:14
**mentions** 389:9
**Mercil** 398:5,11,18 399:8
   399:14
**message** 368:3
**messages** 376:23
**messes** 345:23
**metal** 396:11
**microphone** 392:11,12
**Microsoft** 230:21
**mid** 323:9 347:7
**mind** 240:10 349:21,24
**mindful** 332:20
**mine** 251:17 294:21
**Minneapolis** 210:8,8,19
   211:7,13 218:18 224:14
   231:25 232:7 263:13
   321:3 329:4 339:6,12
   339:25 340:17 341:1,4
   341:20 351:6 359:11
   367:24 403:18 413:13
   417:4
**MINNEAPOLIS-OFFICE**
   211:11
**Minnesota** 210:1 211:7
   211:13 417:1,5,23
   418:1
**minute** 249:12 292:3
   298:21 299:2
**minutes** 248:16 283:7,20
   284:19 285:17 298:17
   302:13,24 303:1 313:10
   313:23 320:17,18 322:7
   322:10 368:15 415:4
**mirror** 276:22 350:23
**mirrors** 251:21
**miscommunication**
   373:13 374:19
**misdemeanor** 358:11
**mistake** 266:22 320:21
**mistaken** 223:18 292:8
**mis-communicated** 374:3
   375:10
**MN** 210:19
**moaning** 273:24,25
   276:11,20 277:4 278:24
   324:15
**Model** 354:22,22
**models** 354:12
**moment** 243:11 321:16
**moni** 332:17
**monitor** 232:23 236:19
   237:5,5,9 238:5 239:19
   239:22 250:17,18
   251:21 252:19,22 253:3
   253:18,21 254:18,20
   256:21 268:24 277:20
   279:19 280:21 282:4
   292:18 306:19 308:2,6
**monitored** 253:4
**monitoring** 234:15 240:11
   240:13,18,19 250:20
   254:6 256:20 257:11,24
   264:24 265:4 270:4
   277:23 281:17 297:15
   307:5 308:18 317:15
   322:7,11
**mope** 250:7 296:3
**morning** 241:1 371:18
**mother** 243:16 244:10
   245:24 246:10,20,21
   248:9,22,23 249:14
   271:15,16 300:18 301:1
**move** 258:18,23 334:19
   400:1
**moved** 241:22 394:12,15
   394:20 399:21 401:11

Timothy Callahan
10/16/2012

Page 426

movement 289:10,15
moves 401:10
moving 241:16 258:14
265:17 267:17 271:10
282:12 321:22
MP 324:6
MPD 215:7,12,20 236:6
236:11 237:18 239:12
265:5 313:9 316:22
317:18 322:6,9 323:5,8
324:7 353:8,13,15,18
353:21 354:3,6 408:7
408:12
multiple 268:20 384:4
myriad 255:7

**N**

N 212:1
naked 347:23 348:7
356:10 357:9
naked-man 347:16 348:4
357:3 360:24
name 212:8 226:15
238:20 354:17 392:24
named 369:21 393:16,18
names 354:25 369:8
National 326:10
necessarily 220:1 265:14
267:5 269:13 335:17
352:7 357:22 409:21
necessary 224:9 239:16
331:5 357:2
need 215:22 231:20
239:22 241:18 250:17
251:21 253:18 263:20
267:3,24 268:9,14,18
269:5 270:25 273:4
292:20 306:17,19,24
312:18 315:4 332:22
333:1 349:18 350:4
367:10 415:16
needed 235:11 253:9
274:15 375:20 384:13
needs 220:3 332:24
neither 340:16
never 253:4,5,9 286:15
287:3 312:16 326:10
334:22,22,22 338:24
347:2 359:10,10 360:13
371:22 387:12,14 389:9
new 336:3 353:20 376:11
376:19 411:23
night 276:2 381:15 406:7
Nodding 320:24
noise 241:12 288:3
noises 275:1,3,16,18,20
277:18
nonresponsive 279:23
280:9,11,14 282:14,24
non-certified 237:8,8
non-criminal 227:15,21
228:5
non-Taser 237:8
non-verbal 269:20 283:23
non-verbally 269:22
normal 240:22 395:18,22
Normally 395:25
Notary 417:22
NOTE 211:23,25
noted 219:8
notice 255:11 265:5
308:19 380:20
noticing 211:24
number 227:5 247:14
255:2 264:13 268:2
278:5 303:25 323:13
334:21 355:18 363:9,12

363:19 364:8,21 365:1
369:10,22 370:1 383:5
numbers 364:6 370:5,19

**O**

O 212:1
oath 212:19 244:13 251:6
object 233:21 279:1
284:24 301:11 303:5
309:25 311:8 319:13
321:19 322:1 328:17,24
334:7 336:16 358:24
366:8 378:7,8 381:4
383:12 400:24 401:17
406:12 410:5
objecting 378:17
objection 285:14 300:20
301:5 310:8,17 314:23
325:5,10 327:6,13,16
330:7,14 334:11 407:6
414:10 419:3
obligation 237:25 257:7,8
257:10 413:6
obligations 239:23
observable 281:24
observations 265:6
266:15
observe 250:21 259:7,10
observed 259:12,19
262:25 309:5
obtained 340:17 366:21
obvious 259:20 267:15
obviously 215:17 240:21
259:6 317:3 325:2
358:22 366:17 374:3
405:20
occur 339:22
occurred 226:16
October 210:14 212:5
214:7 361:4,20 365:6
417:4,15 418:7
oddly 255:4
office 345:6
officer 212:4 213:9
215:12 216:1,4,18
218:19 222:8,9 223:17
223:19,19,19 224:12,13
228:14 236:11,14,22,22
238:13,19,20 240:3
251:15 254:3,3,15,15
256:13,25 257:3 260:9
265:17 269:11 272:16
272:22 294:11 296:18
306:6 307:3 308:7
315:5,16 317:7,17
327:19 337:18 339:5,12
340:1 341:2,20 349:11
357:21 379:14 383:17
384:5 387:4 388:8,20
388:21 391:11 405:5
408:25 409:10,13
413:11 419:10
officers 210:8 213:15
215:8,10,11,17,18,18
215:20,21 216:19
218:18 221:5,12 232:21
236:10 237:9,14 239:23
250:18,21 255:19 257:6
257:10 265:5,6,23
283:14 290:20 304:7,24
306:3,5 308:20 309:2
316:22 322:6,9 323:8
324:7 327:12 329:4,5,7
329:14 347:24 379:18
383:16 384:3,4,25
408:12 409:8
officer's 408:23 412:5

413:6
official 216:2 217:1 251:3
251:7 264:25 266:10
off-duty 339:8
Oh 220:23 229:4 243:16
246:10,13,17 248:9,18
248:22 249:14 276:4
295:9 353:3 376:14
406:18 410:24
okay 214:11,24 219:10
220:20 221:16 222:2,23
224:8 225:18,22 226:8
226:24 228:9 230:17,25
231:6,20 232:3 234:1
236:4,9 237:3,8 238:16
239:8,21 240:20 241:1
241:17 242:1 243:2,21
243:25 245:17 246:10
246:14,17,19,24 247:5
247:6 248:10,20 249:12
249:20,23 250:12,20
251:11 252:15 253:14
255:20 256:8,10 258:22
259:3,9,10,20 260:8
262:22 263:17 264:2,4
264:23 265:18,19
266:15,19 267:16
270:10 272:1 273:7,22
274:6 275:4,13,24
276:9 277:10 279:6
280:25 281:2,20,21
283:19,25 284:10
286:25 287:1 288:25
289:10 291:10,12,23
292:14 293:10 294:6
295:11 296:6,10,16
297:20,21 299:20 300:1
300:16 303:21 304:23
305:16 306:1,25 307:5
308:16 311:14 312:15
313:5,9,21 314:1
316:10,18 318:15,16
319:6 322:5,9 323:1
324:6 326:5 331:4
332:8,8 334:1 336:9,21
338:9 339:23 340:20
341:15 344:5 345:21,24
345:25 346:20 348:1,9
351:9 353:25 356:2,9
357:8 359:13,25 360:3
361:19 362:12,17,24
363:21 368:2,16 369:16
369:18,22 370:4 371:9
371:14 377:11,16,19
379:1,24,24 380:10,12
381:7,16,16,20,21,24
382:4,17,23 383:8,19
384:11,20 385:1 386:1
386:19,21,25 388:23
389:1,15,25 390:13,16
390:20,22,24 391:17,22
392:6 394:24 395:3
397:8,25 399:5,12,14
399:25 400:8 401:4,6
404:1,11 405:9,10,17
405:18 406:24 408:4,9
408:11,14,20 409:6,12
411:3,15 412:14 413:3
413:16,22 414:2,17,17
old 344:13 373:9
Olson 369:14
once 217:18 219:3 231:17
234:22 251:14 254:11
256:12 265:23 290:10
303:21 305:4 306:14
311:19,24 312:2 315:5

315:15 324:16 330:10
330:22 331:9,20 360:9
371:19 402:12
ones 222:11 229:24 260:6
367:20
one's 263:17
on-duty 378:24 379:7
open 271:17,19 272:2
operate 224:9 233:20
operated 352:15
operating 230:1,13 231:3
operation 232:8,16 234:5
234:9
OPERATOR 228:20
opinion 260:14 307:16
325:3,4,24 332:6
357:23 377:25 378:6
413:12,14
opportunity 236:7,17
274:9,12 275:8,10
283:25 284:7,11,13,22
options 369:9
order 255:17 265:8
ordered 375:16
oriented 350:17
original 211:23
originally 375:14
Osborne 279:1 313:18,21
373:3,4 375:10
ought 411:16
Outlook 343:21 372:3,5
outside 338:24 391:10
400:14,16
overall 316:24
over-the-counter 245:16
oxygen 311:6

**P**

P 212:1
page 215:6,6 221:2,2
222:7,7 232:10,20
236:1,1 237:4,4 239:10
239:10 243:18 244:2
247:8 250:15,15 251:13
251:13 254:16,16
256:11,11 257:5,5
259:4,4 265:2,2 307:2,2
308:17,17 309:1,1
311:14 312:11,11 313:8
313:8,16,16 314:19,19
314:24,25 316:21,21
317:16,16 320:14,14
321:1,1 322:4,4 323:3,3
324:2,2 327:1,1 329:1,1
332:9,9 335:19,19
354:24 362:21,22 363:6
363:9 380:11,11 408:5
408:5,21,21 409:7,7
413:4,4 414:3,3 418:10
419:13,13
pain 243:22 251:18
256:18 298:2 300:3
315:20
paint 375:6
paragraph 232:19 233:6
234:18 353:24
paramount 306:8
Pardon 232:5
part 216:21 220:9,17
233:3 234:3 235:13
240:17 261:20 276:15
303:15 329:10 355:5
359:2 368:10 387:21
392:7 394:4 406:23
407:15
particular 215:19 217:6

219:14 220:7,17 256:5
257:20 355:17 374:25
376:7 395:13
particularly 232:9
parties 417:8,11
party 211:24
pass 214:21 409:23
passed 214:19 223:2
passing 340:5
passive 265:4 308:19
pathology 326:8
patrol 218:18 224:12
327:12 337:17 339:5,12
340:1 341:2,20
Pausing 279:11 307:20
391:23
pay 255:6,13,17 265:5
306:15 308:19 316:24
320:18 333:11
paying 240:18 265:20,21
297:18 298:5 317:20
333:1
pen 246:6 247:11 249:18
287:14 289:8 309:5
315:2 338:20,25 339:11
339:25 340:22,25
341:19,25 342:5,9,10
344:3,23,25 345:7
346:5,8,24 348:1,16
349:8,19 350:13,20,23
351:3,4,25 354:3,6
355:22 356:13 357:1
359:7,14 361:4,8,11,12
361:13 362:11 363:4
364:9 365:6,13,17
366:4,19,24 367:11,11
367:16 372:4 376:6,17
379:21 388:7 389:3
391:9,14 392:4 394:2
395:11 396:16 397:10
398:9,14,16,19,22
399:2,9,21 400:10,21
406:7 407:17 410:4
412:24 414:5,13,15
415:9 419:10,12
pending 229:3
people 224:3,14,16,20,23
227:2 230:5 235:8
253:7,7 254:11,22
255:18 262:24 270:3
303:23 304:1 309:6,8
309:11 322:20 326:13
326:19 328:22 340:3
356:14 369:9 370:9,17
380:14,15 382:4,10
383:2 385:20 403:1,21
404:20
people's 305:14
percent 226:20
performance 341:3
performing 377:24
period 246:21 258:22
262:20 274:21 276:11
278:24 280:2 283:20
285:24 289:7,19 300:2
300:25 309:11,14 311:7
312:6 317:18 320:17
329:5,6 332:19 411:7
415:14
permission 339:11,21
340:17
person 225:6,19,24 226:3
226:7 228:5 232:24
233:8 234:16 236:19
240:12 255:1,10,13
256:21 257:8 265:9,10
265:11,15,18 267:16
279:22 306:3 313:19

Doby Professional Reporting, Inc.
952-943-1587

Timothy Callahan
10/16/2012

Page 427

318:10,24 319:6,11
320:20,23 324:5 327:14
332:1,24 333:7 336:6
336:10 337:21 340:18
369:15 380:18 382:6
389:1 404:1
**personal** 242:17,25 244:7
244:12,15 260:14 262:4
262:5,8 300:17 303:3,9
303:12,18 341:19 344:8
345:7 352:23,24,25
355:25 371:20,23
375:21 376:8 377:5
378:2 379:20 402:21
409:24,25 410:10,16,18
410:20 411:18 412:5
413:5 419:10
**personally** 238:1 242:17
262:13 301:8 325:12
412:6
**personnel** 233:1 234:21
235:9 236:20 254:24
306:21 380:5 393:21
**persons** 417:11
**person's** 252:19 303:19
303:20 313:22
**pertinent** 365:20
**phase** 276:21 277:5,20
**phone** 368:10,21 369:22
369:24,25 370:21 371:4
**phones** 370:5
**photos** 393:20
**physical** 240:14,24
266:14 269:17 309:15
315:9
**pick** 276:5 352:13 413:23
**picture** 356:9 391:11
394:12 395:13
**piece** 379:15 392:7
**place** 235:4 237:7 322:6
322:10 332:18 344:18
344:20 353:5 395:16
397:20
**placed** 315:14 324:14
327:4
**plaintiff** 210:5 211:2
212:10,12,14
**plan** 234:24
**plastic** 396:10
**play** 247:4 348:19,20
398:21
**played** 255:17
**playing** 309:11 318:2
320:10 349:8 398:9,22
407:17
**please** 212:7,18 220:11
223:13 243:11 288:15
330:15 338:16
**poc** 392:3
**pocket** 351:18,21 352:6,8
352:10 392:2,3 397:10
397:19 400:5 401:13
**point** 233:11 242:7 259:6
265:7,14 267:13 273:7
275:6 294:13 310:7
312:19 324:4 345:12
351:14,15 401:8 404:21
**pol** 238:24
**police** 210:8 218:18
231:25 232:8 255:19
260:9 263:13 272:22
312:17 321:3 329:4,5
332:13 339:12,25
340:17 341:3,4,20
356:14 358:5,8,10
359:11 367:23,24
377:24 378:2,3 380:23
381:25 383:9 403:18

**policies** 238:8,11 239:7
384:17 409:9
**policy** 231:25 232:9,10,15
234:10 236:2,5,11,12
236:13,15,16,16,18
237:1,18,21 238:3,5,7,9
238:9 239:4,6,17,18,23
250:18 251:21 252:6,12
259:6,8,10,12,18,20
262:25 265:21 269:2
281:4 282:7 290:25,25
291:3 308:5 313:22
315:10 316:5,19 317:8
317:9 323:18 328:16
329:10 335:13 376:19
383:16 390:3 409:15
**pornographers** 404:3
**portable** 402:9 406:4
**portion** 250:6
**portions** 213:8
**position** 241:5 283:6,8,12
303:24 304:6 315:14
316:23 317:3,19 322:6
322:10,21 323:2,6,7,7
323:21,25 324:5,5,14
327:4,5,21 329:7,13,24
332:22,25 333:12,18
351:14 391:3,14 394:14
395:23 400:7,7 415:23
**positional** 408:7,8,13,17
**positions** 260:18 262:25
**possibility** 319:3
**possible** 415:18
**possibly** 334:20
**Post** 233:7
**postgraduate** 326:7
**post-tasing** 237:7 250:18
252:18 253:20
**potential** 255:7
**potentially** 301:19 356:17
357:8 410:9
**power** 320:3
**PowerPoint** 230:21
**Powers** 369:14
**practical** 215:9,11,19
317:20,25 329:8,14,21
329:25 330:1,11
**practice** 359:6
**preceding** 219:3 418:8
**precinct** 221:24 261:13
261:15
**predicament** 309:15
**pregnant** 230:4,4
**premise** 222:7,20 401:5
404:12 406:2
**premises** 228:7
**prepared** 343:15
**prerogative** 228:1
**presence** 387:19
**present** 211:14 402:25
408:1 412:11,13
**president** 326:10
**pressure** 326:16,17
326:18 335:7,10,14
**pretending** 295:15,22,24
**pretty** 313:18 386:6
397:25
**prevent** 264:21
**principles** 266:5
**prior** 215:7 233:6 236:11
247:10 250:21 265:6
266:6 282:1,2,15
293:18,21 298:8 300:7
300:12 313:10 314:1
316:23 322:5,9 324:7
334:24 339:10,23
340:25 341:17 342:1

344:25 346:15 353:20
367:24 390:13 408:7,12
408:23 409:1
**prisoner** 332:12
**private** 379:2,5,9
**probably** 235:17 241:17
242:1,3 244:21 267:15
279:15,18 341:10,12
347:10 359:4 360:22
368:23 371:25 372:9
395:6 403:20
**problem** 251:18 256:18
289:4,6 292:9 309:10
310:4 315:22 331:6
352:1 402:24
**problematic** 312:15
**problems** 224:15 225:7
292:12 320:23
**process** 292:20 359:23
376:22 377:7 404:6
**processing** 377:8
**product** 353:19
**professional** 242:25
262:6,8,15,17 302:15
303:4,10,11 306:16
417:22
**professionally** 262:14
**progress** 359:23
**prohibited** 322:17
**projectiles** 404:17
**prolonged** 311:7 321:3
**prone** 240:13 241:5
255:11 269:8 283:5,8
283:11,15 303:23 304:6
304:25 315:8,14 316:23
317:3,19 322:6,10
323:7 327:4 329:13
331:2 332:16,18,22,24
333:12
**property** 365:7,14,20
366:6 410:11,16,18,20
413:6
**prophylactically** 331:23
**propped** 308:8
**propriety** 409:10
**prosecute** 403:21
**protection** 409:24,25
**prove** 310:15 311:11
**provide** 215:8,9,10 224:8
provided 218:17 323:5,8
324:4 329:9 374:23
**provides** 216:18,19
233:18
**providing** 410:13
**psy** 370:24
**psyche** 235:16
**Psychiatric** 235:18
**psychiatrist** 369:5
**public** 337:20 348:7
409:11 417:22
**pulse** 241:17 249:13
253:1,3,4,5,10 258:12
276:10,10,15 277:14
279:16 280:13,22
281:12,13 284:4,14,15
286:9 293:10,23,24
294:4 296:17,19 297:4
297:6 298:22 299:3,5,7
299:16,22 300:8,13
302:11 309:20 310:2,21
**punch** 305:10,12 334:24
**punched** 242:16 243:19
244:1 248:12 272:14,19
287:8 314:10 319:20
**punching** 331:3 334:24
340:25 341:17 342:1
**purchase** 410:23

**purchased** 410:25,25
411:5
**purpose** 312:17 356:13
378:23 381:25 383:9
409:19 415:15
**purposes** 213:7 304:6
338:23 378:3
**push** 242:4 397:14
**pushed** 400:5,8,10 401:9
401:12
**put** 221:9 229:13,18
240:13 241:5 245:20
276:22 280:22 283:5
322:20 323:6 328:13
329:23 331:1 335:10,14
342:15,16 351:17
361:24 362:15 367:16
402:8,24 413:20,24
**puts** 318:19,24
**putting** 254:9 317:2
323:22
**P.M** 337:12,13,13,15
338:13,18 349:4,7,16
350:10 391:3,6 414:22
414:25 416:14,15

**Q**

**quality** 278:3
**quarter** 397:23
**question** 220:13 223:12
229:2 233:22 252:2
263:7,11 268:4 274:18
280:3,10 282:22 284:3
284:25 285:5,6,22
288:6 289:2 294:17
296:14 303:6,7 310:1
316:9 319:14 321:15,20
322:2 328:12,18 330:8
330:19 332:12 334:8,12
336:17 341:18 345:22
358:25 366:9 378:9,14
378:20 381:4 385:2
391:25 400:25 401:18
406:13,25 407:7 410:6
412:21
**questioning** 220:8,17
**questions** 213:7 240:3
241:21,22 251:4,6
254:12 256:1,5 267:18
275:7 282:16,20,23
283:22 284:19 285:19
291:16 313:3 321:12,13
332:11 333:17 349:18
349:25 394:23 395:9
413:21
**quiet** 281:8
**quite** 261:3 337:1
**quote** 243:15 250:6

**R**

**R** 212:1
**range** 320:23 411:2
**rank** 384:8
**ranks** 260:18
**rarely** 359:22
**ratchet** 269:10
**rattle** 258:23
**rbennett@gaskinsbenn...**
211:3
**reaching** 407:19
**read** 220:12,15 236:17
238:8 242:20,22 279:3
279:5 287:5 290:23
353:23 370:1 415:24
417:13 418:4
**reading** 251:5 252:3,3,11
253:25 254:1 290:25

291:4 316:3,17
**real** 305:10
**realize** 245:23 269:25
273:19 333:13 398:24
**realized** 258:1 297:22
298:19
**really** 248:18 255:10,15
266:9 298:20 304:23
305:13 306:8 328:20
375:3,20 383:4 411:21
**reason** 223:7,15 227:18
240:15 242:11 244:21
257:25 269:24 274:14
281:3 285:21 286:10
290:7 312:20 315:7
320:21 324:12 365:20
366:15 374:5 375:3
377:22 390:7 398:19
414:4 418:10
**reasonable** 260:9 333:5
**reasonably** 239:14,19
**recall** 214:8 217:5 219:14
223:22 226:21 234:6,20
246:14 266:17 287:6
295:13,14,14 297:2,2
299:9 302:1 322:16
339:13 340:2 342:19
344:7 352:14 357:7
359:12 367:22 371:25
372:13 374:3,13 380:7
380:8 381:14,18,20,21
385:11,18 389:4 390:12
405:5 408:8
**receive** 215:20
**received** 213:6 214:1
215:13,15 217:15
219:10 221:5 222:16,21
223:23 224:2 225:18
227:22 228:9,11 236:25
278:7,8 314:6 323:5,12
324:7,11 327:6 337:18
**receiving** 214:5 283:22
**Recess** 264:12 337:13
391:4 414:23
**recite** 219:21
**recognition** 220:8,17
**recognize** 215:21 224:22
225:2,6 259:23 287:25
288:10 289:4
**recognizes** 288:19
**recollect** 229:8
**recollection** 223:5 297:5
339:3 365:5 394:15
408:1
**record** 212:8 213:18,19
213:21,24 217:2,19
222:16 243:2,4,6,8,10
243:12 264:10,14
266:12 267:11 337:9,11
337:15 338:11,12,14,16
338:18 343:12 345:23
348:20,21,22,24 349:3
349:5,7,15 350:10
390:25 391:2,6 392:22
393:24 414:19,21,25
416:14 417:7
**recordation** 364:1 380:15
**recordations** 379:2
**recorded** 214:19 287:2
348:10
**recorder** 346:24 378:22
379:20
**recorder/pen** 341:25
**recording** 347:14
**recordings** 379:6
**records** 214:1 215:15
216:25 218:20 222:12
222:20 233:15 236:7,8

---

Doby Professional Reporting, Inc.
952-943-1587

236:10 368:13
**recover** 311:4
**recovered** 265:24
**recovery** 322:20 323:2,21
323:24 327:5,21 329:7
332:15
**red** 248:8
**redundant** 250:17
**refer** 226:6 294:9 298:7
**reference** 247:23 323:20
393:23
**referred** 278:24 296:2,4
326:15
**referring** 219:18 228:18
273:16 362:7 364:23
**reflect** 221:4 233:15
286:22 368:13
**reflected** 364:5
**reflects** 222:16 239:23
**refresh** 223:4
**regard** 231:24 237:20
251:3,4 252:1 255:10
278:11 297:14
**regarding** 215:3 229:12
251:7 335:7 415:9
**regards** 257:20
Registered 417:22
**regular** 214:2 215:17,18
216:3,8,19 218:18
219:6 221:12 223:20
224:12,18 230:1 317:9
**relate** 236:8
**related** 265:7 409:10,14
**relates** 219:18
**relating** 335:7
**relationship** 262:18
**relative** 391:14 417:8,9
**relatively** 304:24
**released** 232:25 236:20
**relevant** 366:14 376:3
**remain** 307:3 341:25
342:5
**remainder** 415:17
**remained** 248:14
**remaining** 415:13
**remains** 257:8
**remember** 214:5,24 215:1
217:12 219:16 222:13
224:6,7 226:1,15
228:24 229:6 230:6,18
246:17,19 247:1,5,7
259:1 266:19 267:9
273:25 275:24 287:4,9
287:11 289:17,22 292:1
294:18 295:21,21,23,24
299:20,24 309:10 312:4
330:20 339:17 346:1,1
347:16,20,22 348:14
350:5 364:8 365:9
371:10,11 373:18
374:19 380:16 387:18
388:2 389:2 407:19,21
408:17
**removal** 234:24
**remove** 235:6,9 314:18
342:13 365:24 366:1,3
366:3,11 367:1
**removed** 228:6 230:4
365:19 366:24 367:11
367:13
**render** 239:15 259:13,13
298:16,20
**rendered** 298:13 309:20
**rendering** 260:7
**rep** 382:2 386:23 388:17
388:18 389:6,24
**repeat** 231:20
**rephrase** 378:20 394:18

**report** 259:8 405:7
**reported** 387:14 417:3
**reporter** 210:24 212:18
220:15 415:6 417:22
418:25
**reporting** 402:5
**representative** 308:9
**reprise** 330:21
**request** 239:16 339:10
**requested** 302:19,20
**require** 231:12 238:4
**required** 234:14,21
238:10 239:3,7 245:14
270:15
**requirement** 269:1
**requirements** 239:13
**requires** 233:12 240:13
**requiring** 250:18
**research** 353:19
**reserve** 415:13
**reserved** 417:14
**residency** 326:8
**resist** 333:20
**resisting** 286:14 312:3
314:21 315:3
**respect** 236:10,12,14
307:5
**respond** 241:23 300:9
370:10
**responding** 265:12
266:13 267:17
**responds** 248:7 287:12
**response** 215:23 234:14
255:12 272:17 283:23
288:2,7,24 291:21
299:21 300:9,14 302:12
323:23 330:25 331:3,21
331:25 339:19 398:25
**responsible** 254:10,22
353:18
**responsive** 241:8,9 275:5
279:25 356:23
**responsiveness** 270:17
**rest** 325:20 369:11
**restrained** 255:10 282:12
306:4
**restraint** 240:13 241:5
252:5,6,12,13 254:2
255:11 269:8 283:6,8
283:11,16 290:12
304:25 315:8,11,13
316:4,15 317:8,19
322:22 323:14,24
326:21 327:3,22 328:16
329:10,12 332:16,22,25
333:12 335:13
**restraints** 408:12
**restricts** 305:21,23
**resuscitated** 310:25
**retained** 343:16
**retrieved** 323:12
**reverse** 255:17
**review** 236:7,9 262:2
**reviewed** 309:7
**revolver** 355:7,8,9
**rhetorical** 294:17
**Richard** 259:4 335:19
**rid** 344:15 373:9,11,21
374:12
**ride** 397:10
**ride-along** 379:17
**riding** 391:18
**right** 214:9 216:6 218:14
218:24 225:24,25
227:13 230:16,18 231:1
231:4,8,23 232:21
234:12 235:20 238:8
240:8,19 242:9 246:11

248:3,8 249:22 255:5
256:19 257:1 259:13
260:4,6 262:8,16 263:7
263:10 268:4,8,13
270:12 272:20,23,25
273:5,8,11 275:2,4,25
277:4,25 278:1,5,11,14
283:1 284:15 286:17,18
288:13 290:2,3 291:8
291:14,22 292:4,16
297:7,25 298:3,18,19
299:3,22 300:2,4 301:4
301:23 302:7 304:21
305:25 306:8 307:21
311:14,22 312:2 313:20
315:4 317:12 318:1,4,5
318:10 320:13,17,24
321:18 323:1,9 324:1,1
327:16,25 328:6,9
329:6,13 331:10,17
335:6 338:9 341:22
342:17 349:11 350:7
352:15,19 353:10,22
355:3,9,19 358:17
359:17 360:4 361:3,5
370:15,25 371:5 372:7
376:24 377:2,13 380:13
381:12 382:12,15
384:13 387:11 388:17
388:21 391:24 392:4
393:23 395:1 397:22
398:12,24 399:19
401:14 404:14,16,18
405:25 407:10 409:11
411:3 414:9 415:14,21
415:22 416:12 417:13
**riot** 304:11
**risen** 260:17,18
**risks** 335:7
**Robert** 211:3 212:9 332:9
**rode** 389:16,17 391:21
**role** 388:20
**roll** 247:21,22 292:6 334:5
334:17
**Rolling** 334:13
**room** 211:12 235:16
365:14 379:25 380:7,13
380:13,13,15,20,23
382:4 385:9,10,10,18
385:20,23 386:2,3,3,4,6
387:2,10,15 389:2,14
389:15,23 390:18
393:21 406:8 407:4
**rough** 351:9
**route** 265:11
**routinely** 232:23 234:15
236:18 238:5
**RPR** 210:24
**Ruger** 355:9
**Rule** 251:8 413:15
**rules** 352:19 382:16
**running** 318:15

——————————
**S**
——————————

**S** 211:4 212:1
**safe** 304:24 305:3
**safety** 231:6 304:7
**sat** 386:25
**saw** 225:8,10 369:15
392:20 399:8
**saying** 217:5 244:15
246:17,19 247:1,5
259:18 265:13 267:6
272:17 274:19 284:5
287:3,9,11 292:1 293:2
295:13,14,15,22,23
299:21,22 308:7 323:4

331:18 336:13,20
347:12 364:24 365:9
366:24 389:20 401:10
**says** 218:8,9,21 223:1,3
228:20 232:11,20 233:7
234:17 238:7 249:17
250:6 251:21 252:8
254:1 267:1,3 272:15
273:20 274:4,5 275:23
278:19,23 282:7 283:11
287:17,19,23 291:25
292:2 294:20 295:1,1
295:20 299:1,23 315:10
322:16 327:21 346:17
349:12 352:25 353:3,4
353:8 354:1,2,19
363:24 373:6 380:3
381:17,19 405:7
**scenario** 322:24 356:8
402:16
**scenarios/situations**
338:22
**scene** 265:23 309:3
321:17 384:2,13,18
385:8 387:1,12 389:3
389:13,18,21 391:10
395:12 402:12 404:16
406:7
**school** 234:7 326:5
**Schupp** 210:17 211:6,24
**score** 255:16
**scream** 258:18
**screaming** 258:14
**screen** 290:21 349:13
366:2
**SEAL** 417:15
**search** 332:18 344:16
**seated** 323:6 324:5 397:3
**second** 213:18 243:5
289:21 293:1 298:13
303:15 319:22 353:24
363:9 391:1
**secondary** 355:7
**seconds** 248:7,11,19
249:12 258:8 286:23
298:15 313:23 367:21
**secret** 340:13 406:19
**section** 213:4 232:8
239:12 351:6 355:17
**secure** 303:21 352:4
**secured** 234:25 251:15
256:13 265:23,23
315:14,15 327:5 352:9
**see** 214:18 217:20 218:8
222:20 223:1 232:13
234:13 236:20 240:20
246:8 251:19 253:10,12
259:2 261:19,23 262:9
274:23 276:23 279:9,9
281:20 282:20 293:13
296:25 312:9 316:18
343:19,20,23 345:8
346:13 348:8 350:22
355:24 363:8,23,24
364:21,22,23 369:4
379:17,22 381:9 386:12
390:16 394:4 396:15
397:12,20 399:3 407:21
**seeing** 277:22 380:16
381:14,18,20
**seen** 257:1 270:3,5 296:8
345:11 348:9 377:17
403:6 405:23 415:16
**seize** 254:23
**Seizures** 251:17 256:17
315:19
**send** 343:6 360:24
**sense** 213:4 250:16

252:22 253:23 265:9,11
265:20 266:10 281:19
284:4 289:14 306:17
416:1
**sent** 236:16 360:22
**separate** 328:3 384:25
385:6,7,8 388:1
**September** 215:7,13
236:11 237:6 239:21
313:10 314:1 317:18
322:5,9 339:10,23
340:23 341:1,22 342:11
343:17 346:8,10 368:14
368:15
**sergeant** 213:10 240:4,5
251:25 255:24 266:6
267:3,13 290:16 302:16
307:10 317:13 324:11
369:20 383:8,17,23,24
384:8,9,15 387:4,15
388:24 390:19 398:11
401:21 406:20,22 410:2
410:11 413:11
**sergeants** 369:17 383:25
384:1
**serious** 251:18,18 255:18
256:18,18 315:20,21
**service** 239:16
**Services** 235:18
**set** 239:23 253:3 266:5
**seven** 368:14
**seven-hour** 415:3
**Shaking** 231:11
**Sharpie** 396:6,16
**shift** 261:12 401:24
408:24 409:1 413:7
414:5,9
**shirt** 394:3,9
**shoot** 230:1 410:19
**shooting** 309:9 358:21
**short** 332:18
**shorter** 337:8
**Shortness** 251:17 253:24
256:15 315:18
**shot** 411:6,11
**show** 231:1,6,7 244:3
309:9 318:18 327:20
351:23 356:3 364:1
393:24 398:7,7
**showed** 270:13
**showing** 232:7 249:16
311:14 343:15,16 391:8
392:14
**shown** 316:11 318:8
326:19 351:13 352:3
400:11
**shows** 223:2 360:19
361:3 363:22 391:9
**shut** 398:4,6,18 399:1
**shutting** 398:14
**sic** 227:2 233:2,12 243:22
247:20 251:19 252:12
343:17 362:24 382:21
384:22 385:19
**side** 246:8 247:17 248:6,8
255:2,8 286:9,10,15
315:14 322:21 323:6,22
324:5 326:14 327:4
329:14 332:13 348:15
**side-view** 350:23
**sight** 387:12 399:4
**sign** 415:25 417:13
**significant** 251:16 256:14
257:13 261:3 315:16
**signs** 251:15 256:13
269:22 315:16
**similar** 239:17 392:15
396:8,11

Timothy Callahan
10/16/2012

Page 429

similarly 257:6 312:18
simple 288:6
single 283:22 336:10
sir 327:11 380:17
sit 255:3,8 334:17 384:12
  384:18 385:12 387:9
sitting 241:16 323:22
  332:13 397:13
situated 396:20
situation 227:14,21
  242:10 253:8 255:4
  257:20 265:9 280:6
  304:4,23 306:2 321:15
  322:23 329:12 334:2
  367:5 409:12
situations 219:11 221:6
  223:24 255:2 267:14,15
  303:23 332:17 333:4
  356:16 402:6
six 245:23 282:16 283:21
  291:13 302:13,24 303:1
six-hour 214:14,15
  222:23
slide 351:25 352:2
smiles 380:19
Smith 210:3,4 219:4
  224:22 234:25 242:12
  264:21 270:23 283:21
  289:11 297:15 298:6
  301:8 304:11 305:2
  309:7 311:16 312:22
  314:21 324:12 330:2
  333:18 347:5,9 351:10
  355:6 357:19 363:4,4
  367:25 399:17 418:6
  419:12
Smith's 273:8 284:2,6,14
  296:17 309:12,14
  312:13 329:3
smooth 396:8,10 397:9
socks 356:1,6
software 403:12
somebody 226:10 227:4
  230:2,13 234:22 247:19
  248:2 254:18 262:9
  267:23 270:25 281:5
  292:5 299:6 304:5
  329:23 332:2,18 338:1
  356:20 362:14 370:8
  402:7 410:19 411:7
somebody's 253:10
someone's 312:16
somewhat 373:9
soon 239:14,19 315:14
  317:19,25 327:5 329:7
  329:14,20 384:19
sooner 285:8
sorry 213:13 263:21,22
  300:23 305:18 379:4
  395:5
sort 221:5 253:8 266:19
  409:11 415:8
sorts 354:11 355:21
  404:3
Sotto 220:21 222:3 229:1
  239:9 249:24 250:13
  251:12 252:16 253:15
  307:1 310:23 326:23
  335:18 336:11 352:21
  362:18 364:19 370:12
  377:20 378:10 388:11
  395:19 414:18
sought 340:16
sound 278:17,23 287:22
  287:24 288:2,9 289:11
  289:17,23
sounds 255:9 277:2,3
South 210:18 211:6,12

space 396:25 397:4
speak 345:19 368:24
specific 215:10 221:14
  231:25 233:3 236:13,15
  236:25 237:24 265:7,13
  266:17,17 269:1 280:6
  280:6,10 293:9 297:3
  322:15 346:2 350:4
  354:25 362:3 383:9
  384:14,16 408:8 409:9
specifically 214:8 218:8
  218:22 219:1,8,13
  223:17 232:15 234:20
  236:16 237:7,22 247:8
  248:11 264:16 266:25
  277:16 316:16 338:4
  340:6 355:14,19 369:3
  371:11,16 388:25
specifics 219:21
speculation 327:13
  414:11
spit 334:20,22
spoke 368:14 369:7
  399:10,10
spy 340:22 345:1 355:22
  393:7,12
spyware 393:14
squad 273:3 346:25
  348:12,15 350:15,17,18
  379:18 406:3,4
squads 318:18
ss 417:1 418:1
stage 277:12
stand 320:5
standard 239:21
standing 273:17 385:19
  407:13,14
standpoint 411:18 412:6
start 215:11 246:7 298:25
  346:21,23 347:15
  358:17,18
started 258:3 299:11
  327:10 351:14
starting 319:22
starts 274:4 286:22
state 212:7 337:17 417:1
  418:1
stated 286:11 366:9
statement 225:14 312:22
  314:21,25 315:2 369:2
  381:2 390:8,10,14
statements 291:17
  304:20 390:4
states 210:1 236:18 238:5
  239:12,14 303:14
static 321:14,14
status 282:8,9
stay 306:17
stayed 351:9,13,17 352:9
  398:1
steal 407:3
step 281:14
steps 220:7,17 265:8
  266:18 281:9
stick 279:8
sticking 348:14 394:5
Stillman 392:23
stood 314:9 334:3 386:17
  386:17
stop 254:21 258:4,5
  308:22 320:11,11
  331:10,11,12
stopped 279:17 281:23
  289:25 298:17,18 312:3
  320:12 321:18,22,23,24
  324:15 349:19 398:16
  399:2
stopping 286:6,8

stops 273:24 274:5
  278:17 289:10 291:12
storage 367:12
Storms 211:4 212:11,11
  213:12 232:4 252:5
  258:6 295:5,18 313:20
  313:21 315:11 373:3
strangely 226:23 227:16
  227:22,25 228:6
Streamlight 354:22
street 210:18 211:6,12
  215:18,18 216:3,19
  221:12 224:10,12
  233:20 391:10
stretcher 235:1,7
strike 305:8
struck 272:23 305:9
structure 304:2
struggle 351:10 352:10
  352:16 391:21
struggling 315:5
stuff 229:21 246:5,16
  354:17 356:3 364:10,24
  367:5 369:11
subject 215:8 226:17
  233:11 237:6,10 239:19
  250:9,20,22 251:15,22
  254:2 256:13 265:7,20
  265:23 266:1 311:16
  312:18 313:11 315:13
  315:13,15 316:24 322:6
  322:10 327:4,4 333:9,9
  339:1
subjects 329:6
subject's 312:19 313:10
  314:2 321:4 322:7,7,10
  322:11 335:8,10,14,15
  336:13
subpoena 373:25 375:17
substances 230:5
substantial 417:12
sued 356:17,19 410:10
suffer 320:23
suffering 215:8,14 317:20
sufficient 233:19 337:18
suffocating 324:25
suggested 357:21
suggesting 374:18
suggestive 227:3
Suite 210:18 211:7
sunglasses 355:24 393:7
  393:13
superfluous 250:17
supervised 261:12
  262:10
supervisor 235:20 247:24
  261:6,17 273:4 302:19
  339:14,24 340:4
supplement 361:3 377:16
  377:17 379:24 389:9
supportive 304:18
suppose 295:25 342:16
supposed 230:10 237:21
  238:7 253:20 255:6,11
  255:13 256:21 265:8,21
  271:24 290:10 329:5
  360:1 370:7 384:2,24
  385:12,16 390:4 404:15
sure 218:1 220:19 221:24
  222:1,12 223:18 226:20
  227:3 228:2 229:16
  237:16 260:1 262:1
  266:21 273:21 289:13
  290:23 299:4,8,13,14
  304:6,19 306:24 308:6
  318:12 333:1,6 345:11
  347:6,8 348:13 354:18
  357:14 359:3,15 360:18

384:10 389:12 392:16
  394:19 396:7 400:21
  407:25 410:3
surface 230:2
surprise 335:20,22
surrender 319:6
surrenders 318:25
Susan 369:13
suspect 257:12 324:3
sworn 212:21,23 232:20
  236:18,21 237:18
  238:13 239:12 308:1
  353:8,21 383:6 417:5
sympathetic 304:10
system 415:4
systems 214:4

T

table 241:21
tactical 303:22 332:17,24
tactically 332:22
tactics 408:10,18
take 217:24 226:10
  229:10 245:14 254:11
  254:18 256:6 263:24
  264:1,6 265:8 268:13
  270:22 273:16 282:4,6
  284:13,15,17,23 299:16
  299:16 306:21 318:12
  326:7 346:25 354:3,8
  359:6,10 366:2 376:20
  379:15 382:24 384:11
  400:9 402:10,16,18,19
  402:24 404:15 409:14
taken 253:5 264:12 286:4
  349:9 357:7 364:10
  366:18 367:16 377:24
  378:3 391:4 393:20
  400:20 414:23 418:5
takes 249:11
talk 213:5 247:16 255:16
  264:23 270:22 272:12
  273:11,13,23 274:6
  278:3,7 279:6 289:8
  291:12,19,20 313:6
  329:2 370:8 371:15
  385:13 386:19 390:21
  395:9,10 407:4,5
talked 216:18 266:11
  267:8 271:6 286:17,17
  327:9 358:4 368:10
  369:4 388:4,5 389:12
  390:18 411:15
talking 215:20 218:12,13
  218:14 221:17 240:25
  246:7 248:2 265:10,14
  265:15 266:13 267:16
  271:8 273:20 275:2
  277:24,25 281:16,19
  285:17 290:3,6 295:4
  297:25 298:1,2 300:2
  309:12 327:24 361:23
  371:10 388:2 389:9
  411:16 412:13,15,16
tap 289:8
tape 259:2 290:1 299:24
tapped 287:14
tase 281:5 331:5
tased 231:8,10,16 234:16
  234:22,25 237:10 241:4
  278:5 291:13 320:7
  330:25
Taser 228:9,11,17,20
  229:7,13 230:10,20
  232:16 233:4,4 234:3,9
  234:13,14 235:22
  237:21 239:18 240:12

250:9 269:3 283:3
  284:20 294:15,23 295:8
  296:7 309:5 315:1
  320:3 381:11,22 405:10
  405:23,23,25
tasered 306:9 314:8
Tasers 229:18,19 232:1
tasing 239:11 298:3
taught 215:1 217:8 220:7
  220:16 223:5,20 224:4
  224:6 228:24 255:1,2
  265:21 291:7 327:8
  408:13,17
technique 254:2 315:13
  327:3
tell 219:20,25 234:19
  236:10 261:10 265:17
  281:4 294:6 314:7
  326:13 328:15 331:19
  338:1,2 340:13 354:15
  354:16 361:10,25
  365:11 370:6 373:11
  374:11 388:8,13 393:4
  407:10 417:5
telling 244:9,13 253:6
  267:7 319:18 364:14,15
  389:2 404:5
tendency 417:12
tension 351:24
term 219:22 306:23
  307:12,24 308:2 316:15
terminology 307:11
  308:15
terms 234:9 250:20 265:4
  308:3,18 316:23 323:6
  329:3
territory 411:23
test 325:20
testified 212:24 223:16
  306:14 312:12 410:22
testify 215:15
testifying 326:20 408:6
testimony 215:3,5 223:4
  242:14 262:23 297:13
  302:22,23 308:1 325:21
  380:10 408:23 417:6,7
testing 353:19
text 368:2,2,6 376:22
texter 368:5
Thank 212:17 240:6 264:4
  396:17
thefts 402:6
Therapist 371:3
they'd 256:12
thing 218:14 220:23
  228:13 239:18 244:8,12
  244:15 248:22 255:13
  265:4 277:25 280:7
  294:9,13 297:4,12
  306:8 308:19 322:15
  373:8 375:16 396:12,23
  402:18
things 217:1 227:5 230:8
  250:21 255:7 265:24
  266:21 269:6,8 277:17
  281:17 285:24 297:24
  309:6,12 321:15 334:21
  354:11,25 355:18
  395:10 403:12,16 404:3
think 219:25 220:3,13
  221:25 225:8 228:14
  229:15 230:2,3,23 234:11
  235:15 240:10 241:23
  245:5 246:4 250:8,20
  252:8 253:7,17,17
  258:21 260:1,8 261:14
  263:10 264:19 265:13
  271:3 273:15 281:16

Timothy Callahan
10/16/2012

Page 430

287:24 288:23 292:21
294:16 297:7 299:10,18
307:13 308:15 310:25
311:20 319:3,22 320:22
323:8 326:3,13,22
328:11,13,13,15,20
331:7,9 333:5 337:5
340:21 347:19 348:4
349:25 350:2,21 357:9
357:10 359:21 365:19
365:23 366:20,21 369:8
369:10 370:13,14
371:19 372:6,9 373:9
373:18,19 376:2 382:14
382:17 384:10 388:16
389:11,13,22,22 390:9
390:12,19 392:23 393:1
398:20 399:15 402:23
403:16 415:1,25 416:2
thinking 399:18 415:21
thirty 248:5
Thirty-one 371:7
Thirty-three 371:7
Thirty-two 371:7
thought 246:25 253:9
267:7,12 274:15,17,20
276:24 277:17 279:21
280:11,14 281:1,7,20
284:9,16 285:9 288:3
292:7,20 295:13 296:24
298:11,13 314:9 317:14
319:19 330:10,17,22
338:21 358:19 366:12
410:21 413:18
threats 304:2
three 262:1 318:18,20
319:4 401:20 404:23,25
405:19
thrown 408:11
Thursday 370:11,13
time 212:5 216:22,23
217:11,12 221:25
224:13,13 229:25
248:12,22 253:6 254:23
254:23 255:10 257:14
260:2 261:14 264:3,7
265:14 269:15,18 274:9
274:12,19,20,21 275:8
275:10 277:15 279:7,8
279:14,16,19 280:15,20
283:25 285:11,21,25
286:4 287:2,3 290:1,3
292:17 293:1,2,11,14
294:2,8 296:8 301:23
302:13,14,24,25 309:11
309:14 311:7 312:6
314:8,10,22 317:18
318:10 319:10,19,22
327:10 329:3,5,6
331:11,18 332:19
344:22 345:20 346:14
346:24 357:13 365:16
368:25 369:1 372:16
387:11 391:15 399:8
402:7 405:12 406:21
410:7 411:1,7 412:15
415:13,15
timeline 249:18 275:21
419:8
times 217:15,20 219:6
247:14 261:16,18,24
268:20 278:5 282:19
283:3 291:13 318:20,21
319:4 331:1 334:10
341:7 368:14 371:17
402:10
Timothy 210:7,7,13 212:4
212:22 222:19 417:4

418:3,6,24
today 263:15 302:22,23
369:25 376:17 383:21
415:11
told 281:1 311:24 312:2
316:3 319:8 340:4
373:10 374:24 375:9
388:7 389:1 414:13,15
tolling 403:25
tone 301:15
top 352:4 353:2 391:20
392:13 394:7
topic 218:7
tortured 290:19
totaling 368:15
totally 400:22
touch 397:14
touched 250:21
town 370:18 372:10
traditional 415:3
train 222:8 229:12 231:24
266:4 328:8 329:7,12
trained 225:12 236:10,14
250:21 253:18 255:2,6
256:12 265:1,6 266:4
283:17 316:24 317:19
321:8,9 322:6,9,20
327:3,9,15,17 329:5
335:7 338:5 353:15
trainers 328:6,7
training 213:6,15 214:1,2
214:3 215:4,8,13,17,19
215:20 216:3,9,15,17
216:20 217:2,16 218:5
218:17,20,23 219:1,7
219:10,19 221:6,9,11
221:13,13,16,23 222:10
222:12,13,17,20,22
223:21,24 224:2,8
228:9,11 229:7 233:3
233:15,17,19,24 234:3
235:23 236:7,8,10,15
237:1 239:15,21 251:2
251:8 254:15 255:1,5
264:16,19 265:7 266:17
266:24,24 271:5 290:9
302:15,17 308:7 313:6
313:10 314:1,5 316:23
317:7 322:15,16 323:5
323:5,8,12,16 324:4,7
324:10 327:5,8,24
328:1,2,3,4 329:9
337:19,24 338:10
353:14,16,18 354:4,7
408:7,10 409:15 413:19
trains 232:18
transcribed 417:6
transcript 210:12 211:23
213:8,9 250:5 272:7,8
283:19 286:21,25
292:10,13 299:23
306:11 370:21 373:2
417:13 418:4 419:15
transport 387:2
Travis 314:19
treat 289:5
treatment 233:7 245:1,10
tried 343:5,6 367:18
tries 409:10
TRL 354:22
trouble 255:14
true 216:4 217:1 243:23
243:24 255:10 263:11
263:16 270:18,20
300:10 309:13 325:2
366:20 381:2 385:4
390:1 400:13 417:7
418:8

trunk 405:12,16
trust 312:7 324:17
trustee 210:3
truth 417:5
try 215:21 235:3 255:16
307:4,5 367:19 393:11
trying 273:16 280:4
299:19 320:4 329:18
340:12 375:6 397:8
400:2,6 401:7
tucked 391:19 397:17
tucking 397:16
tumble 351:10
turn 254:23 255:2,8
286:10 290:10 306:20
329:7,14 332:12 361:7
361:9,10 362:5 367:4,6
373:19 398:18 399:6,9
401:16,23 406:6 410:8
turned 286:15 350:19
360:7,8 361:4 362:16
365:13 366:12,13,14
367:23 375:7,22 414:5
414:9 415:11
turning 286:8 366:15
406:23
turns 318:19 367:2,3,3
Twenty-three 371:8
twice 371:19
two 262:6 269:16 280:17
296:8 306:3,5 337:6
342:12 347:19,21
363:19 388:1 404:23
405:20
type 215:19 263:14
270:16 355:23
typewritten 418:4
typical 389:24
typically 261:23 346:21
346:23 351:3 371:20

U

Uh-huh 234:19 240:17
246:9 249:9 294:11
295:1,2,22 300:7 352:2
355:10 386:8 392:25
393:3
um 259:11 316:13 333:12
338:9 370:25 393:9
un 318:8
unable 305:6,7
unanswered 284:18
291:16
uncommon 397:9
unconscious 271:13
underlying 359:19
understand 217:10
219:22 238:11 242:5,23
244:19 245:3 250:7
261:3 278:22 293:25
302:18,21 310:20
317:10,11 325:8 327:3
340:12 341:17 344:19
376:4,25 377:1 385:4
403:24 411:13,22
415:23
understanding 215:25
228:4 236:3 237:9
310:22 311:2 329:3
408:22 411:12,14
understands 283:15
understood 237:25 343:3
408:25
undoubtedly 413:1
unfair 350:1
unfolding 282:5
Unidentified 258:3 318:2

320:10
union 383:1 386:23
Unit 353:14,16,18 354:4,7
United 210:1 303:14
unpredictable 318:9
unreasonable 333:3,11
unresponsive 265:17
267:24 268:2,9 269:15
269:18 300:14
unresponsiveness 269:9
untie 332:2
unusual 275:6 397:16,19
unwanted 226:4
un-deleted 342:10
un-give 318:11
un-want 225:24
Updates 214:3
upper 305:21,24 306:4
upstairs 344:10 372:20
usage 233:4 269:7
USB 390:14
use 220:2 230:10 232:11
234:8,13 238:15 239:18
252:13 254:18 255:14
268:15,19 269:8 270:17
270:24 271:1 281:5
297:17 306:23 307:11
307:18,22 308:2,4
317:1,3 331:14,22,25
339:8,11 340:18,25
341:19,24 344:21 346:5
346:7 348:1 353:12,15
353:21 354:12,20,21
371:20 372:1,1 415:3
useless 342:14
uses 239:13
use-of-force 232:9
237:17 251:21 317:9
321:4
utter 263:15

V

vague 319:14
vaguely 309:10
vary 333:8
verbal 283:22 319:17
verbally 269:17,21 275:5
282:11,14
verify 217:4
versions 230:23
vest 397:11
victim 402:12,13
video 210:25 213:8,19,23
215:6 221:1 222:7
236:1 237:4 239:10
243:6,12 246:6 249:19
250:9,15 251:13 254:16
256:11 257:5 258:3
259:4 264:10 265:2
275:25 276:8 283:19
286:21 294:25 295:8
296:7 307:2 308:17
309:1,5,5,5 312:11
313:8,16 314:19,22
316:21 317:16 318:2
320:10,12,14 321:1
322:4 323:3 324:2
327:1 329:1 332:9
335:19 337:11 338:12
338:17 341:23,24 342:5
342:23 343:18 344:7
346:23 348:4,6,16
349:3,6,8,9,15,19,21
350:5,9,12,15,17
351:12 352:16 356:14
357:3 358:20 360:1
365:15 367:23 371:15

371:15 372:14 376:24
378:22 379:18,19
380:11 391:2 398:9,16
398:22 399:2,13 402:19
405:23 407:16,17 408:5
408:21 409:7 412:25
413:4 414:3,21,24
415:17 416:13
Videographer 210:25
212:3,17 213:19,23
243:6,11 264:10,13
337:1,14 338:12,17
349:3,6,15 350:9 391:2
391:5 396:13,17 414:21
414:24 416:13
videos 309:9,16 342:9
343:8 345:7 346:20
347:17,18 359:6 360:9
377:23 379:21 415:9
419:10
videotaped 210:12 417:4
Videotapes 412:1
view 344:6 357:18,19
vigilance 309:15
vigilant 292:5 297:14,16
297:18 298:6 307:4,5
307:12,18,24 308:4,5
vigilantly 306:20,24
violation 259:18,20
violations 259:7,8,11,12
visible 394:2,3
vitals 338:5
voce 220:21 222:3 229:1
239:9 249:24 250:3
251:12 252:16 253:15
307:1 310:23 326:23
335:18 336:11 352:21
362:18 364:19 370:12
377:20 378:10 388:11
395:19 414:18
voice 301:15
voicemail 373:2 419:15
volume 415:25
voluntarily 373:19
voluntary 278:23 373:25
375:15
volunteer 231:13
volunteered 361:9,14
volunteers 221:14
vs 210:6 418:6

W

wait 247:19 292:5 361:11
waiting 248:2
walk 357:9
walked 334:3 386:16
wall 326:18 335:8,10,15
wallet 355:25
want 213:5 215:12 217:25
235:3 239:18 242:2,20
246:4 249:7,10 254:21
255:16,16,17,17 263:23
264:6 282:19 285:8
299:4,6,7,14 307:3
312:16 316:24 317:1
319:2 320:21,23 324:5
332:4 347:14 348:20
349:22 350:1 367:7
374:9 375:9,14,18
378:19 379:22 406:10
407:15 412:11,13,18,18
wanted 227:24 228:6
235:1,5,8 249:6 284:1
304:19 336:21 377:7
wanting 373:20
ward 235:16
warnings 229:13,14,15

Timothy Callahan
10/16/2012

Page 431

229:16,18
**warrant** 303:25 332:18
**Washington** 417:2,23
418:2
**wasn't** 223:15 228:17
242:13,17,17 244:7,23
249:5,12 261:25 266:9
271:21 280:19,19
282:12,13 292:25
297:22 298:13 300:5
302:3 303:1 304:10
310:10,14 312:7 314:14
314:17 318:5 319:18,23
324:17 329:9 336:3
340:10,13 350:20 357:4
370:11 372:10 375:15
394:14,15,20 399:18
405:3,11 406:14
**watch** 251:15 255:7
256:13 290:21 315:16
348:22 349:23
**watched** 276:3 372:22
**watching** 276:4 290:1
**way** 219:5 228:23 254:9
268:24 280:15 287:16
307:13 321:8,12 327:10
327:15,17 333:6 337:20
344:6 347:3 348:5
358:17 376:25 377:7
391:20 394:12 404:9
410:8 415:20
**ways** 268:2
**weapon** 231:4 318:21
**weapons** 353:5,13,14,20
355:4,5
**wear** 351:3 356:1
**weather** 255:16
**week** 222:21
**weekend** 370:19
**went** 214:21 217:7 229:17
245:2 266:11 267:11
271:14 366:23,25
369:15 387:3 390:18
**weren't** 271:18 299:13
322:21 324:24 333:13
375:13 378:2 385:22,22
386:1
**Wesson** 355:6
**we'll** 240:21 264:7 273:20
316:18
**we're** 213:3 218:14 220:5
241:1,13,15 271:3
281:19 283:17 289:20
290:6 292:5 327:24
328:6 337:9 338:4
345:19 395:9 412:13,15
412:16 415:2
**we've** 221:22 227:6
233:24 240:10 254:4
257:1 326:19 345:22
415:1
**whatsoever** 227:9 315:7
**wholly** 265:16 267:23
**wide** 271:17
**wider** 320:23
**wife** 276:3 372:22
**wiggling** 274:1
**willing** 312:7 314:13,17
319:23
**Winberg** 210:24 417:3,21
**wired** 245:11
**witness** 212:21,23 220:19
220:23 221:21 223:11
229:4 233:23 240:7
251:9 285:1 301:7
303:7 310:2,9,18,21
314:24 319:16 322:3
325:12 330:9 334:13

349:12 359:1,4 370:13
370:17 379:9 393:1,4
393:12 396:16 399:3,6
406:14 407:8 410:7
417:5,7,14,15
**witnesses** 304:17
**women** 230:4,4
**word** 297:17 307:18 308:4
350:4 370:25
**words** 242:11 244:14
254:20 266:12 269:16
307:22 319:15 374:13
374:14
**work** 249:8 262:10 331:17
337:19 338:23,24 339:1
339:3 352:19 356:14
360:21 367:24 368:9,12
372:1 377:24 396:18
403:6
**worked** 261:12,19,21
403:22
**working** 261:25 262:17
317:18 353:8
**works** 239:17
**world** 348:8,9
**worldly** 225:11
**worth** 393:10
**wouldn't** 224:2 231:23
241:24 242:3 253:3
262:12 266:12 284:15
299:4 305:8,10,12
307:9 312:8 320:7
324:18 330:1 332:12
348:9 370:22 376:20
377:15 379:22 382:14
389:17 397:9,15 402:16
402:19 404:14,19,19,21
409:14 411:8 414:8
416:9
**write-blocking** 403:11
**written** 346:13
**wrong** 228:13 241:24
246:16 291:21 295:4
296:3,5 374:6,7,8

**X**

**X-rayed** 245:3

**Y**

**Y** 227:24,24 228:6 389:22
**yeah** 214:13 228:15,19
230:22 235:22 244:5,19
247:15 248:25 252:9
259:8,21,25 261:21
270:8 282:25 287:12
295:18 300:5 301:17
305:4,18,24 306:14
308:3 309:10 311:23
315:12 324:17 344:4
349:2 351:19 352:12
355:20 356:16 357:17
360:5 361:16,18,24
362:15 363:2 370:16
374:17 376:7,21 380:19
381:12 382:20 384:23
386:6 388:22 389:8
392:1 395:21 396:2,3,9
397:6 398:15 400:5
403:7 405:1,14,24
412:16 416:4,6
**year** 219:3 373:10,12,21
374:12
**years** 217:13 231:19
233:24 261:8,9,11
262:20 296:9 329:11
372:16
**yell** 258:18

**yelling** 258:14 276:20
277:4
**Yep** 278:6 287:18 313:20
316:3,10 363:7 368:22
**yesterday** 373:10
**YMCA** 210:11 309:5
391:10
**young** 227:23

**Z**

**Zimmerman** 259:4,24
260:8,22 263:4,14
270:6 335:19,25
**Zimmerman's** 262:22
**zip** 342:17,23,25 343:19
390:14

**0**

**0** 362:25
**01** 362:25

**1**

**1** 236:1 354:22 362:21,22
362:24 419:13
**1st** 261:13
**1:08** 349:4,7
**1:09** 349:16
**1:10** 350:10
**1:15** 272:9
**1:46** 282:17 285:18
**1:55** 391:3
**10** 249:12 261:14 273:3
341:22 343:17
**10.0** 230:23
**10/15** 365:14
**10/5/2010** 363:23 364:6,9
364:22
**10:11** 243:7
**10:12** 243:13
**10:35** 264:11
**10:49** 264:14
**100** 379:25 380:13,13
385:9 387:2,2,15 389:2
389:14,15,23 393:21
406:8 407:4
**100%** 292:25
**101** 314:19
**102** 332:9
**104** 236:1
**105** 236:1 332:9
**106** 239:10
**107** 239:10
**108** 380:13
**11** 259:4 313:16 321:1
380:11 413:4
**11-CV-03071(SRN/JJK)**
210:2
**11:35** 346:13
**110** 265:2 308:17,17
**112** 237:4 265:2
**113** 237:4 250:15 352:19
**114** 250:15
**115** 211:25 343:13,15
419:7
**116** 345:3 346:12 363:13
363:14,20 419:9
**117** 362:19,21 363:20
419:12
**118** 211:25 372:25 419:15
**12** 221:2 316:21
**12:05** 337:12,13
**12:54** 337:13
**12:55** 337:15
**12:56** 338:13,18
**125** 323:3
**126** 323:3

**13** 250:15 307:2 313:8
408:5
**130** 368:15
**131** 243:18 247:8
**136** 244:2
**14** 236:1 265:2 308:17
309:1 324:2
**140** 247:8
**143** 408:5
**144** 408:5
**15** 215:6 230:24 309:1
361:4,20 413:4
**15:32:58** 343:17
**156** 307:2,2
**157** 316:21,21
**16** 210:14 212:5 230:24
368:15 380:11 418:7
**16th** 417:4
**17** 256:11 308:17
**174** 221:2,2
**18** 222:7 251:13 312:11
409:7
**189** 324:2,2
**19** 214:7 222:7 237:4
307:2 322:4
**19:42** 349:10
**190** 251:13,13
**191** 317:16
**192** 317:16
**193** 322:4
**194** 322:4
**199** 313:8,8

**2**

**2** 264:13 313:16 419:13
**2:09** 391:6
**2:32** 273:12 274:6 414:22
**2:37** 286:22
**2:43** 414:25
**2:45** 416:14,15
**2:50** 287:8
**20** 215:6 217:13 239:10
239:10 341:9
**2000** 261:14,14
**2001** 343:17
**2007** 353:5
**2009** 214:2,7 219:15
221:18,20,25 222:17
228:12,20 229:22
**201** 313:16
**2010** 215:7,13 236:11
237:6 239:21 250:21
265:6 313:10 314:1
316:23 317:18 322:5,9
324:7 339:10,23 340:23
341:22 342:1,11 346:5
346:8,10 349:10 361:4
361:20 368:14,15 408:7
408:12
**2012** 210:14 212:5 417:4
417:15 418:7
**202** 313:16
**21** 222:7 349:10
**21:51:11** 344:3
**210** 211:12 419:2
**218** 408:21
**219** 408:21
**22** 257:5 312:11 317:16
323:3 327:1,1 414:3
**224** 413:4,4
**227** 409:7,7
**23** 218:3 256:11 286:23
316:21 327:1,1 408:21
**233** 419:4
**24** 256:11 315:11 316:12
**25** 256:11 320:14 329:1
332:9 414:3

**26** 346:4
**26th** 417:15
**279** 419:4
**284** 419:4
**285** 419:4
**2900** 210:18 211:7

**3**

**3** 251:13 256:14 314:19
332:9 337:14 354:22
409:7
**3X** 354:22
**3-1/2** 337:3
**3.201** 353:4
**3/8ths** 397:24
**3:01** 282:17 286:23
292:19 293:6
**3:47** 282:17
**30** 246:6 249:21 250:10
272:6,9 275:21 276:12
278:25 282:18 313:23
341:11 415:4
**30(b)(6)** 251:8 413:15
**300** 419:4
**301** 419:4
**303** 419:4
**309** 419:5
**310** 419:5
**311** 419:5
**319** 419:5
**321** 419:5
**322** 419:5
**325** 419:5
**328** 419:5
**33** 294:16 295:7
**330** 419:5
**333** 210:18 211:6
**334** 419:5
**336** 419:5
**34** 294:15
**343** 419:8
**345** 419:11
**346** 419:11
**35** 248:19
**350** 211:12
**358** 419:5
**362** 419:14
**363** 419:11
**366** 419:5
**372** 419:16
**378** 419:5
**381** 419:5
**383** 419:5
**39** 311:14

**4**

**4** 272:15,21 273:11,21
313:23 329:1 335:19
354:24 357:18 360:1
391:5 408:5
**4th** 239:24 257:7,11
273:14 274:11 288:23
303:14,16
**4-1/2** 283:7 313:10 320:17
320:18
**4:34** 282:17 291:21
**40** 216:11
**40-hour** 216:6,12 221:13
**400** 419:5
**401** 419:5
**406** 419:5
**407** 419:5
**410** 419:5
**414** 419:5
**415** 419:2
**43** 222:19
**44** 380:11

Timothy Callahan
10/16/2012

**45** 248:16,17 380:11
**48** 390:4,8
**48-11** 419:8

---
**5**
---

**5** 237:4 250:15 265:2
  284:18 314:19 317:16
  322:4 324:2
**5-shot** 355:7,9
**5-1/2** 283:20 284:7 285:17
**5-306** 239:12
**5.314** 232:11
**5:41** 292:19 293:8
**5:55** 282:18
**50** 341:13 352:3
**50-A** 391:8 394:13 395:14
  397:22 399:22 400:11
**55402** 210:19 211:7
**55415** 211:13
**56** 314:25

---
**6**
---

**6** 222:7 254:16 321:1
  408:21
**6th** 226:8 235:10
**6-shot** 355:8
**6:05** 245:24 246:7 248:5
  248:15
**6:11** 246:10
**6:22** 246:13
**6:41** 245:24
**6:45** 248:15
**6:46** 246:23 300:17
**62** 309:1
**63** 309:1 414:3,3
**64** 335:19,19
**69** 259:4

---
**7**
---

**7** 221:2 243:18 257:5
  320:14 323:3
**7th** 210:18 211:6
**7/10/12** 419:15
**7:09** 282:18 285:18
**7:50** 280:22 285:12 294:2
  299:16 300:13
**70** 259:4
**72** 393:20 399:22,23
  400:18
**73** 393:20
**76** 329:1,1

---
**8**
---

**8** 335:19
**8/17/07** 232:12 236:3
**8/21/10** 349:8,19
**8:00** 299:17
**8:11** 371:18
**8:15** 371:17
**8:27** 299:21
**8:44** 299:1
**80** 215:6 312:11
**81** 215:6 312:11
**87** 399:22,23
**88** 257:5,5

---
**9**
---

**9** 215:7,13 232:10 237:6
  259:4 313:8,10 322:5,9
  339:10,23 340:23
  342:11 346:10 368:14
**9th** 341:1
**9/14/2009** 222:17
**9/21/2009** 222:21
**9/4/2010** 346:7,13

**9:34** 210:15 212:6
**9:35** 213:20,24
**90** 232:4,5,7
**90s** 323:9
**91** 232:3
**9111.01** 254:7
**96** 254:16
**97** 392:14
**98** 254:16 320:14,14
**99** 314:19 321:1,1