# EXHIBIT 1

Amelia Huffman
7/31/2012

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
------------------------------------------------------
Case No. 11-CV-03071(SRN/JJK)

Larry E. Smith, as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

　　　　Plaintiff,

　　vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers,
and The City of Minneapolis,

　　　　Defendants.
------------------------------------------------------

VIDEOTAPED DEPOSITION TRANSCRIPT OF

AMELIA HUFFMAN

July 31, 2012

9:07 A.M.

at

Gaskins, Bennett, Birrell, Schupp, LLP
333 South 7th Street
Suite 2900
Minneapolis, MN 55402

Court Reporter: Janet D. Winberg, RPR
Videographer: Jayme Hogan, Envision

Amelia Huffman
7/31/2012

**2**

1    APPEARANCES:
2    On Behalf of the Plaintiff:
         KATHRYN BENNETT, Attorney at Law
3        kbennett@gaskinsbennett.com
         ROBERT BENNETT, Attorney at Law
4        rbennett@gaskinsbennett.com
         JEFFREY S. STORMS, Attorney at Law
5        jstorms@gaskinsbennett.com
         GASKINS, BENNETT, BIRRELL, SCHUPP, LLP
6        333 South 7th Street
         Suite 2900
7        Minneapolis, Minnesota 55402
8    On Behalf of the Defendants:
         C. LYNNE FUNDINGSLAND, Assistant City
9        Attorney
         c.lynne.fundingsland@ci.minneapolis.mn.us
10       CITY OF MINNEAPOLIS-OFFICE OF CITY ATTORNEY
         350 South Fifth Street
11       City Hall, Room 210
         Minneapolis, Minnesota 55415
12
13   VIDEOGRAPHER:
         Jayme Hogan
14       Envision
         jayme@envisionvideo-legal.com
15       612.998.6809
16
17
18
19
20
21
22   NOTE:
     The original transcript will be delivered to the
23   noticing party, Gaskins, Bennett, Birrell & Schupp.
24
     NOTE:
25   Exhibit 92 was marked.

**3**

PROCEEDINGS

3       VIDEOGRAPHER: This is the video
4    deposition of Amelia Huffman.
5       The date is July 31, 2012.
6       The time is 9:07 A.M.
7       Would each attorney please state his or her
8    name for the record?
9       MR. STORMS: Jeff Storms, Robert Bennett
10   and Kathryn Bennett, on behalf of the plaintiff.
11      MS. FUNDINGSLAND: Lynne Fundingsland,
12   on behalf of the defendants.
13      VIDEOGRAPHER: Thank you.
14      Would the court reporter please administer
15   the oath?
16              *  *  *
17   (Witness sworn.)
18             AMELIA HUFFMAN,
19   called as a witness, being first duly sworn,
20   was examined and testified as follows:
21              *  *  *
22             EXAMINATION
23   BY MR. STORMS:
24   Q.   Please state and spell your name for the record.
25   A.   Amelia Huffman. A-M-E-L-I-A  H-U-F-F, like

**4**

1       Frank, M-A-N.
2    Q.   And how old are you?
3    A.   I'm 40.
4    Q.   And you understand that you're testifying under
5        oath today?
6    A.   I do.
7    Q.   What documents did you review in preparation for
8        your deposition?
9    A.   The CAPRS Report from the police computer system
10       and the VisiNet Call Details.
11   Q.   And by the CAPRS Report, did you also read all
12       the supplements attached to the CAPRS Report?
13   A.   Yes, I did.
14   Q.   And you did not actually create a supplement
15       yourself in this case?
16   A.   Correct.
17   Q.   Okay. And why was it that you did not create a
18       supplement in this case?
19   A.   I wasn't an -- an investigator on the case, nor
20       did I go to the scene so I didn't have any
21       firsthand details to add to the CAPRS in the
22       form of a supplement.
23   Q.   Have you ever reviewed any of the videos related
24       to this case?
25   A.   I have at the time of the incident, but it's

**5**

1        been several years since I've seen them.
2    Q.   Do you recall which videos you reviewed related
3        to the incident?
4    A.   I have seen the video from the pen cam and I
5        have seen the video from the Y.
6        I do not recall if I've seen the Taser
7        video. I don't think so.
8    Q.   And were these videos that you observed shortly
9        after the incident itself?
10   A.   Yes.
11   Q.   And any time between now and the first time you
12       viewed those videos have you viewed them again?
13   A.   No, I have not.
14   Q.   Okay. What was your purpose for viewing the
15       videos initially?
16   A.   In my role as the commander of criminal
17       investigations I received briefings from the
18       investigators and during those briefings I
19       viewed the videos.
20   Q.   I want to briefly talk about your background.
21       My understanding is that you graduated from
22       Smith College?
23   A.   I did.
24   Q.   And what year did you join the MPD?
25   A.   1994.

2 (Pages 2 to 5)

Amelia Huffman
7/31/2012

6

1　Q.　And when did you receive a promotion to
2　　　sergeant?
3　A.　1999.
4　Q.　And when were you promoted after your sergeant
5　　　promotion?
6　A.　I was promoted to lieutenant... Ah, let's see.
7　　　In 2005 perhaps. I'd have to go look to be
8　　　sure.
9　　　　　And then I took over my position as captain
10　　　in criminal investigations in July of 2008.
11　Q.　In 2005, when you were a lieutenant were you --
12　　　which precinct were you assigned to?
13　A.　First I was assigned to the 5th Precinct in
14　　　Southwest Minneapolis. And then I was assigned
15　　　as the public information officer for the
16　　　department.
17　Q.　And what was your role as the public information
18　　　officer?
19　A.　To give public information to the media and
20　　　other sources who were inquiring.
21　Q.　You would conduct press briefings?
22　A.　Correct.
23　Q.　Okay. And you remained in... Was that the --
24　　　the second role you held as a lieutenant then?
25　A.　Yes. And then the third role I held as a

7

1　　　lieutenant for the last year was as the
2　　　commander of homicide.
3　Q.　And in 2007 you were promoted to commander of
4　　　homicide?
5　A.　Yes.
6　Q.　Okay. As commander of homicide what did your
7　　　duties entail?
8　A.　Overseeing the work of the homicide
9　　　investigators. Coordinating the work of the
10　　　unit. Managing the schedule. Assigning cases.
11　　　The general administration and management of the
12　　　unit.
13　Q.　Would the results of every homicide
14　　　investigation ultimately end up on your desk?
15　A.　Yes. I would have been receiving briefings from
16　　　the investigators and have reviewed documents
17　　　and reports for every homicide investigation.
18　Q.　And in that role was it your duty to conclude
19　　　whether or not a homicide investigation had been
20　　　adequately performed?
21　A.　Well, ultimately it's really the judgment of the
22　　　prosecutor's office to determine whether there's
23　　　additional evidence or investigation they would
24　　　like to see pursued before charging a case.
25　　　　　So, you know, it's not solely the role of

8

1　　　the homicide commander to determine whether an
2　　　investigation is complete. You know, because
3　　　the -- the user of that investigation really is
4　　　the prosecutor's office, we're deferring greatly
5　　　to their judgment.
6　Q.　They would expect that you would have the
7　　　experience...
8　　　　　It would be expected that you have the
9　　　experience and training necessary, though, to
10　　　provide input with respect to whether or not an
11　　　investigation is complete?
12　A.　Yes, that's correct.
13　Q.　Or other investigative tasks should be
14　　　performed?
15　A.　Yes.
16　Q.　And it's your job to reach those decisions from
17　　　the police perspective as opposed to the
18　　　prosecuting perspective?
19　A.　Yes. Although again, you know, we don't do that
20　　　in a vacuum. We collaborate extensively with
21　　　the prosecutor's office in reviewing cases. You
22　　　know, that's a critical partnership for us.
23　Q.　And there were times where I take it as the head
24　　　of homicide that you had investigations that
25　　　appeared incomplete and you'd asked your

9

1　　　investigators to go back and obtain additional
2　　　information?
3　A.　In collaboration with the prosecutor's office?
4　Q.　Independently or in collaboration.
5　A.　Yes, absolutely there are times when the
6　　　prosecutor's office asks for additional
7　　　information in every kind of case. Or asks to
8　　　-- the investigators to pursue something to see
9　　　whether a certain kind of information could be
10　　　obtained.
11　Q.　And were there times when you personally,
12　　　outside of the prosecution, would -- would see
13　　　information that you thought should be obtained
14　　　in connection with an investigation and
15　　　instructed your investigators to obtain that
16　　　information?
17　A.　Sure. Absolutely. I have conversations even
18　　　now in my current role with investigators
19　　　discussing cases and, you know, saying, "What
20　　　about this avenue? Have we tried this avenue?"
21　　　You know, "Could we bring this person in?"
22　　　　　You know, certainly the commander of
23　　　homicide and the commander of criminal
24　　　investigations have those kind of conversations
25　　　with investigators routinely.

3 (Pages 6 to 9)

Amelia Huffman
7/31/2012

10

1  Q.  And in order to -- to lead homicide in the
2      fashion that you did, you necessarily have to
3      have an understanding of -- of the laws that
4      apply to homicide?
5  A.  Yes.
6  Q.  The laws that apply to evidence collection?
7  A.  Yes.
8  Q.  You want to make sure that your officers are
9      acting within their constitutional parameters in
10     terms of collecting evidence?
11 A.  Correct.
12 Q.  And then you have situations, I take it then,
13     where there were officer-involved homicides that
14     you oversaw?
15 A.  Correct.
16 Q.  Because Minneapolis does handle all its own
17     officer-involved homicides?
18 A.  Yes, we do.
19 Q.  And in order to necessarily evaluate those
20     incidents, officer-involved homicides, you'd
21     have to have an understanding of what the proper
22     constructs are of officer conduct?
23 A.  Yes.
24 Q.  You have to have an understanding of how
25     officers can appropriately behave under the

11

1      4th Amendment?
2  A.  Yes.
3  Q.  And you have to have an understanding of what
4      MPD policy is and whether or not your officers
5      are operating within those policies?
6  A.  Yes, although policy questions are handled
7      separately from the criminal issue.
8          So for in every -- for every-officer
9      involved critical incident, you know, a shooting
10     or other use of force that results in some kind
11     of serious injury or death, there are two
12     parallel processes that go on.
13         And policy questions are handled in an
14     administrative review and that's done
15     separately.
16         So the homicide investigators provide
17     information that ultimately goes to that
18     investigation. The information doesn't come
19     back the other way. Those two processes aren't
20     intertwined.
21 Q.  If you see a policy violation, as the head of
22     homicide, you obviously have the ability to
23     point that out to Internal Affairs
24     investigators?
25 A.  Yes, certainly, if we see a policy violation.

12

1  Q.  Is that something you've done in the past?
2  A.  I'm trying to think of a specific case where
3      Internal Affairs wasn't already working on it.
4      Their process starts at the same time that the
5      homicide investigation starts, so it's not as if
6      they're waiting for us to say there was a policy
7      violation to jump-start their investigation.
8          So they're routinely working on those things
9      right from the beginning, at the same time that
10     homicide is.
11 Q.  Well, and if you have an officer-involved
12     shooting, or something to that extent, when
13     you're looking at the propriety of the officer's
14     conduct from a homicide perspective, you might
15     look to policy for guidance on whether or not
16     that conduct was appropriate?
17 A.  Yes. I mean certainly we have policies that are
18     reflective of the law, but generally what we're
19     looking for in the criminal investigation, what
20     our investigators are focusing on from
21     homicide's perspective is pulling together all
22     the evidence for the county attorney's office to
23     review and to present to the grand jury if they
24     should so choose.
25         So policy questions, you know, "Was the

13

1      officer, you know, carrying all of their
2      equipment appropriately..."
3          You know, "Did the use of force, the
4      non-criminal questions of use of force meet
5      policy and training?" Those things are handled
6      during the administrative review.
7          In this case there was an administrative
8      review. I wasn't involved in that. The
9      homicide investigators were not involved in that
10     other than pulling together the information,
11     some of which would have been used in that
12     administrative review.
13         And I haven't seen the results of that, so I
14     can't speak to anything that would have been
15     part of that administrative review.
16 Q.  And by "administrative review" were you
17     referring to the force review that was
18     ultimately done through Internal Affairs?
19 A.  Correct.
20 Q.  Now one of the things that you would observe
21     naturally as part of leading homicide
22     investigations would be whether or not other
23     related crimes might have occurred?
24 A.  Yes.
25 Q.  For example, if you saw that someone was hiding

4 (Pages 10 to 13)

Amelia Huffman
7/31/2012

14

1     evidence related to that homicide, that's
2     something you would observe and probably point
3     out to a prosecutor?
4 A.  Yes. Although I doubt the prosecutors would
5     need me to point that out.
6 Q.  Because it would be so obvious?
7 A.  Yes.
8 Q.  Okay. And if you believed as the head of
9     homicide that someone was hiding evidence from
10     your investigators you might work with your
11     investigators to take steps to go ahead and
12     obtain that evidence?
13 A.  Yes.
14 Q.  You might obtain a search warrant, for example?
15 A.  Yes, we might.
16 Q.  If you're dealing with issues of -- related to
17     computers or other electronics, you might have a
18     forensic review conducted?
19 A.  Yes.
20 Q.  That's something you probably directed to be
21     done many times?
22 A.  Yes. That's generally something that you know
23     can be done and often is done in not just
24     homicide cases, but other kinds of cases
25     involving technology.

15

1 Q.  And if someone doesn't -- does hide evidence
2     from investigators it's clear that that's
3     obstruction of justice typically, isn't it?
4 A.  If someone were hiding, yes. Although I mean in
5     general in homicide cases I have not seen...
6     In fact, I don't think I've seen any cases
7     where we've had additional charges related to a
8     homicide that were specifically for hiding some
9     kind of piece of evidence.
10     You know, we do sometimes see people who are
11     charged as an accessory after the fact for, you
12     know, helping someone escape the scene, or to
13     flee the jurisdiction, something like that.
14     But I don't recall any cases where I've seen
15     our prosecutor's office charge someone for
16     knowing that the suspect dumped bloody clothes
17     in a garbage can and not telling investigators
18     when they were questioned, for example.
19 Q.  That certainly could be obstruction of justice?
20 A.  It certainly could be, but I have not actually
21     seen that charged.
22 Q.  And if I aided someone in doing that, in hiding
23     the evidence, that's a situation where I could
24     potentially be criminally liable for accessory
25     after the fact?

16

1 A.  Yes.
2 Q.  Okay. And those are the types of issues that
3     any -- in the course of conducting any good
4     homicide investigation you would necessarily
5     evaluate those issues, as well?
6 A.  Certainly. If those issues came up that would
7     be something the prosecutor's office would be
8     aware of and, you know, could choose to take
9     action on.
10 Q.  Well, and MPD -- the MPD Homicide Department
11     could pursue that investigation on their own, as
12     well?
13 A.  Yes. But in terms of actually making a decision
14     whether or not to pursue some kind of charging,
15     that decision is made by the prosecutor's
16     office.
17 Q.  As the MPD Homicide Unit...
18     Does the MPD Homicide Unit make
19     recommendations at all to the Hennepin
20     County Attorney's Office?
21 A.  Sure.
22 Q.  Okay. So if you conduct a homicide
23     investigation you -- at the end of that
24     investigation you might say, you know, "This
25     person we believe should be charged for some

17

1     degree of murder and also obstruction of
2     justice"?
3 A.  Yes. Although, like I said before, I haven't
4     seen cases that are charged out in the way that
5     you're suggesting, so I don't think that that's
6     something that we would be recommending because
7     it's not typically what's done here in
8     Hennepin County.
9     I mean certainly we have made
10     recommendations, you know, or have asked the
11     county attorney's office to review cases where
12     someone is ultimately charged as an accessory,
13     but it's not under the circumstances that you're
14     suggesting.
15 Q.  And so the circumstances I'm suggesting... It's
16     not that those couldn't be true, it's just
17     something you haven't actually encountered?
18 A.  Correct.
19 Q.  Okay. Now did you remain in -- ahead of
20     homicide from 2007 to 2008; is that right?
21 A.  Yes. In July of 2008 is when I took over my
22     current position.
23 Q.  Okay. And what position is that?
24 A.  It's the captain/commander of Criminal
25     Investigations Division.

5 (Pages 14 to 17)

Amelia Huffman
7/31/2012

18

1    Q.   And is that based out of one of the precincts?
2    A.   No.  It's based out of city hall.
3    Q.   And what are your duties as the commander of
4         investigations?
5    A.   So I supervise the lieutenants who supervise the
6         investigative units.
7              So looking at the overall coordination of
8         our investigative resources.
9              Making decisions about staffing.
10             Helping to plan training.
11             We work closely with the county attorney's
12        office to do yearly training for all
13        investigators.
14             Looking at overall resources, training
15        that's needed from outside, other resources that
16        are needed from outside.  Those kind of
17        administrative and management things.
18   Q.   And what units do you supervise?
19   A.   Let's see.  Homicide.  Assaults.  Robbery.  Sex
20        Crimes.  Domestic Assault.  Child Abuse.  And
21        the Safe Streets Task Force.
22             I also have the civilian portions of the
23        department in records transcription and property
24        and evidence.
25   Q.   And incidents defined by the...

19

1              Investigations defined by the MPD as
2         critical incident investigations, do those fall
3         within the work of homicide?
4    A.   They do.
5    Q.   And that was how you came to be involved with
6         the David Smith case?
7    A.   Correct.
8    Q.   It was in your role as supervising -- was it
9         Lieutenant Zimmerman at the time?
10   A.   Yes.
11   Q.   Okay.  How was it that you came to learn about
12        the David Smith incident?
13   A.   So whenever there is a critical incident there's
14        a notification system and so the lieutenant of
15        homicide, the commander of criminal
16        investigations are on the list of people who are
17        automatically notified in that kind of
18        circumstance.
19             So in this particular case I was notified as
20        a matter of course.
21   Q.   You got the text message?
22   A.   Yeah.
23   Q.   Okay.  Were you on duty at the time you received
24        the text message?
25   A.   I was.

20

1    Q.   And where were you at the time?
2    A.   In Room 108, which is in city hall.  It's the
3         main criminal investigations section.
4    Q.   Is that where you...  What was your purpose for
5         being in Room 108 at that time?
6    A.   My office is there.
7    Q.   Okay.  So does Room 108 -- Room 108 house
8         several offices?
9    A.   It does.  It houses the bulk of investigations,
10        not the entirety, but homicide, assault,
11        robbery, some of sex crimes, domestic assault
12        and child abuse are there.  And then there are
13        some additional office spaces that house other
14        investigators.
15   Q.   So Room 108, that's where Lieutenant Zimmerman
16        is also based?
17   A.   Yes.
18   Q.   Okay.  So it's not really just one room, it's
19        many rooms?
20   A.   Yeah, it's a -- it's a long L-shaped corridor
21        with lots of cubicles and offices.
22   Q.   After receiving the text message do you recall
23        what the next steps were that you took?
24   A.   Well, at that point the investigators, you know,
25        left to go out to the scene and collect

21

1         information.
2              So at that point all I was doing was waiting
3         for the investigators and the folks, the
4         precinct officers who were assigned it, to that
5         particular call, to do their tasks.
6              So I wasn't doing anything more than waiting
7         for that information to start coming back as a
8         part of the investigation.
9    Q.   It's Lieutenant Zimmerman that takes the role in
10        terms of delegating those tasks; is that right?
11   A.   Correct.  He's the direct commander of homicide,
12        so in terms of assigning resources there's an
13        investigative team who is on call during any
14        given period of time.  And so they would be the
15        ones who would be first up to -- to respond and
16        catch that case.  And then he would assign
17        additional resources, as needed.
18   Q.   And so you're not making any -- or giving any
19        direct orders at that point in time?
20   A.   Correct.
21   Q.   Are you giving any direct orders -- when you
22        find out about this did you give
23        Lieutenant Zimmerman any orders?
24   A.   No.
25   Q.   Okay.  So he's operating pretty autonomously at

6 (Pages 18 to 21)

Doby Professional Reporting, Inc.
952-943-1587

Amelia Huffman
7/31/2012

22

1     that point?
2  A.  Yes.
3  Q.  Okay.  When was it that you first became
4     involved then after receiving the text message?
5  A.  So once -- once the investigation had progressed
6     to the point that folks were coming downtown...
7        The involved officers had come downtown.
8     And we use another room in city hall, which is
9     really a collection of rooms, but Room 100 as
10    the headquarters for where we bring the involved
11    officers.  The folks from the police Federation
12    come, the chaplain, the attorneys and so on and
13    so forth.
14       At that point the Taser coordinator, who was
15    Adam Grobove, came down and asked for guidance
16    about downloading the Taser cam video.
17       And at that point I said, yes, you know, we
18    should download that.  Get the item entered into
19    evidence and then check it out, download it, as
20    his procedure normally is so that it can be
21    viewed as part of the investigation.
22       So that was at the first point where, you
23    know, I offered input about the course of the
24    investigation.
25  Q.  So you're in Room 108 at that point in time?

23

1  A.  So the conversation, as I recall, started in
2     Room 108.
3        I believe according to the supplements in
4     the case we went to Room 100.
5        I don't -- I don't recall being in 100
6     versus being in 108.  I remember the
7     conversation, but which room it took place in
8     didn't really stick in my memory.
9  Q.  And the individuals listed in being in 108 at
10    the time that you had met with Adam Grobove were
11    Sergeant Erick Fors, Lieutenant Zimmerman and
12    yourself in 108.
13       Does that sound familiar in terms of people
14    who were there?
15 A.  Yes.
16 Q.  Okay.  Is there anyone else that you had
17    remembered being there at the time?
18 A.  No.
19 Q.  Okay.  So when Adam Grobove comes to you and
20    talks about the Taser download you think it's
21    important to get that information right away?
22 A.  Yes.
23 Q.  Okay.  And why is it important to get that
24    information right away?
25 A.  Well, obviously we want to have as -- as many

24

1     sources of information as possible in the
2     investigation.  And the video is available, it
3     just needs to be downloaded.  So there's no
4     reason to wait to download it and view it
5     because we have the Taser coordinator who is the
6     person who has the capability to use the
7     equipment to download that video properly,
8     present right there on the scene, so there's no
9     reason not to do it now.
10 Q.  And in the course of a homicide investigation
11    you're taught to collect as much evidence as
12    quickly as possible, isn't that right?
13 A.  Yes.  We like to get as much as we can.
14 Q.  You want to prevent any of the evidence from
15    being disturbed or perverted in any fashion?
16 A.  Yes.
17 Q.  Okay.  And the sooner you have evidence in your
18    possession, the -- the sooner you have the
19    ability to go and collect other evidence
20    potentially?
21 A.  Yes.
22 Q.  Before that evidence is disturbed?
23 A.  Yes.
24 Q.  Okay.  And my understanding is that from the
25    outset you're treating this as a critical

25

1     incident?
2  A.  Yes.  From the outset we treat it as a critical
3     incident.
4        It wasn't clear at the time what the
5     ultimate outcome would be.  And obviously David
6     Smith didn't die at the scene, the way we see in
7     some critical incident cases where, you know, we
8     know right there that we're dealing with a
9     death.  But it was clear that it was serious
10    incident, he was going to be admitted to the
11    hospital and that falls under our critical
12    incident policy.
13       So it's not only cases of death that get
14    treated as a critical incident.
15 Q.  And as a critical incident you had -- I know you
16    had mentioned that a Federation officer is there
17    and that was -- eventually captain -- or
18    Lieutenant Delmonico showed up on the scene?
19 A.  I don't know if he was at the scene.
20 Q.  Or I'm sorry.  At Room 100?
21 A.  Yes.  Yes.  The Federation always shows up in
22    Room 100 for the involved officers.
23 Q.  And what's the purpose of the Federation showing
24    up?
25 A.  It's part of our critical incident policy that

7 (Pages 22 to 25)

Amelia Huffman
7/31/2012

26

1    the -- the officers have a right to confer with
2    the Federation rep and an attorney.
3         And so the Federation comes so that the
4    officers can exercise their right to confer with
5    them.
6    Q.   And what's your understanding of why they have
7    that right?
8    A.   Well, because it's a criminal investigation at
9    that point.
10        All the information that homicide is
11   collecting is going to be presented to the
12   county attorney's office and possibly, or in the
13   case of a death definitely, reviewed by a
14   grand jury.  And so the officers have legal
15   rights that the Federation protects.
16   Q.   Now I read in your critical incident policy
17   that, you know, part of the critical incident
18   policy in addition to making sure that evidence
19   is adequately collected is to sort of be
20   sensitive to the officer's needs.  You don't
21   want to treat the officer like a suspect?
22   A.   That is correct.  That is part of our policy.
23   Q.   Okay.  Just because you're not treating the
24   officer like a suspect, that doesn't mean that
25   the MPD is going to treat that investigation

27

1    with any less rigor, does it?
2    A.   Correct.  And, you know, we have certainly
3    investigations that are ultimately ruled to be
4    justifiable homicide, after review by the
5    county attorney's office, that don't involve any
6    officers, involve completely civilians.
7         And so, you know, officer-involved cases are
8    not ultimately the only ones that are reviewed
9    and determined to be justifiable homicide.
10   Q.   One of the things that's noted, though, is you
11   want to make sure you maintain -- in the
12   critical incident policy, is you want to make
13   sure that you maintain public confidence.  There
14   is sort of an awareness, at least on the MPD's
15   part, that if there are not proper procedures in
16   place that the investigation of its own officers
17   might appear less than proper?
18   A.   Yes, that's true.
19   Q.   And so you want to be particularly keen to
20   making sure that the proper procedural steps are
21   taken with respect to investigating an
22   officer-involved homicide?
23   A.   Yes.
24   Q.   Mr. Smith, his family, the entire community,
25   they're entitled to a proper and

28

1    professionally-competent investigation into his
2    homicide?
3    A.   Yes, they are.
4    Q.   Okay.  And any concerns about the officers'
5    feelings wouldn't get in the way of that?
6    A.   No.
7    Q.   Okay.  Now in accordance with some of the
8    officer's rights that he is provided under your
9    policy, there -- there are only certain
10   individuals who he needs to talk to and he only
11   needs to talk to those individuals about certain
12   things.  Is that a fair characterization?
13   A.   Yes, that is a fair characterization.
14   Q.   One of the things that can be discussed with the
15   officer is issues related to the collection of
16   evidence?
17   A.   Yeah.  In general they take a public -- what's
18   called a Public Safety Statement from the
19   officers, so asking them questions that would
20   lead us to any additional suspects, any other
21   injured people, the recovery of weapons.  Those
22   things that are of immediate public safety
23   interest.
24   Q.   And that's what can be asked at the scene?
25   A.   Correct.  We don't ask additional questions

29

1    beyond the Public Safety Statement that's taken,
2    other than, you know, things like, "Can I get
3    you a drink of water?"  And, you know, "Do you
4    need to use the bathroom?"
5         But we don't ask investigative questions
6    beyond the Public Safety Statement.  That's
7    what's allowable under our policy.
8    Q.   You are allowed to require -- the MPD can
9    require the officers to turn over any equipment
10   on their person at that point?
11   A.   Well, the policy calls for collecting their
12   weapon.  So we do a gun exchange in the case of
13   a shooting.
14        In this case we collected the Taser, which
15   is department-issued property.
16        You know, in other cases certainly we've had
17   officers who were involved in a prolonged
18   struggle who have torn uniforms and we ask them
19   if we can collect that right at the scene.  And
20   we have hospital-type scrubs that we exchange
21   for their clothing.
22        So depending on the circumstances, we
23   collect or ask for different things.
24        MR. STORMS:  Can I have this marked,
25   please.

8 (Pages 26 to 29)

Doby Professional Reporting, Inc.
952-943-1587

Amelia Huffman
7/31/2012

30

1          (Exhibit 92 marked.)
2   BY MR. STORMS:
3   Q.   I'm going to show you what's been marked as
4        Exhibit 92. Take a moment to review it.
5          I'm going to direct you towards the back of
6        the policy where the critical incident is
7        discussed.
8          In particular I'm going to go to page 9 of
9        12.
10         Do you see the -- in the first full
11        paragraph on page 9...
12         Well, first of all, does this appear to be a
13        correct copy of your MPD policy related to
14        critical incidents?
15  A.   Yes.
16  Q.   Here it states, "If requested by Investigators,
17        Involved Officers shall make themselves
18        available for firearms inspection and shall
19        surrender his or her firearm and any other
20        requested equipment to them."
21  A.   Yes. And generally we do the weapons exchange.
22         We haven't had any cases that I can recall
23        that involved an impact weapon.
24         But, for example, we could ask to -- to take
25        a Taser. We often do ask to take pieces of a

31

1        uniform that have been damaged in a fight.
2        Most of the time it involves the gun
3        exchange, but certainly in other cases it has
4        involved other kinds of equipment, typically
5        uniform.
6   Q.   Well, in order to determine what type of
7        equipment has been involved, the basic question
8        of "What equipment did you use" would be
9        something that would be asked of the officers,
10        wouldn't it?
11  A.   Well, generally during the Public Safety
12        Statement, you know, there's that question
13        that's asked about, you know, the direction of
14        any kinds of fire, the weapons that were used,
15        the public safety pieces that get asked. So
16        it's not an exhaustive set of questions.
17         But yes, generally we have an idea of what
18        equipment was used in the actual use-of-force
19        piece.
20         And we can clearly see if there's damage
21        that's been done to someone's uniform or they
22        have something broken, pieces of equipment
23        hanging off of their belt. We can see those, so
24        we don't need to ask questions about it.
25  Q.   Well, if you can ask them to turn equipment

32

1        over, you can certainly ask them what equipment
2        they have on them?
3   A.   I'm not sure we've ever had that situation where
4        we've just asked, "What's every piece of
5        equipment that you're carrying?"
6          We've never asked that question that way.
7   Q.   Have you ever asked whether or not they're in
8        possession of evidence related to the incident,
9        physical evidence?
10  A.   Have we ever asked that question?
11  Q.   (Nodding.)
12  A.   To my knowledge we've never asked that question.
13  Q.   How about a question similar to that?
14  A.   We've asked questions like, you know, "Is any of
15        your equipment damaged?" "Do you have any
16        injuries?" We frequently ask those questions
17        because there's a struggle involved. "Do you
18        have any injuries for us to photograph?"
19          So -- so we ask questions based on the
20        information that we know about the use-of-force
21        incident.
22  Q.   Do you ask them simply, "What equipment did you
23        use in this incident"?
24  A.   No.
25  Q.   Why wouldn't you ask them that question?

33

1   A.   We know from the information about the use of
2        force -- we know what kind of
3        use-of-force-incident it was, but we've never
4        asked that question, "What equipment did you
5        use?"
6          We know if it was a shooting, we know if
7        there was a struggle... But we don't ask that
8        broad question. We've never asked that broad
9        question.
10         MR. BENNETT:(Sotto voce comment.)
11         MR. STORMS: Yeah.
12  BY MR. STORMS:
13  Q.   I'm asking you why -- why you wouldn't ask that
14        question?
15  A.   We wouldn't ask that question in that way
16        because once the Public Safety Statement has
17        been made we know -- we know the general
18        parameters of the use-of-force incident.
19  Q.   Well, how would you know if an officer used his
20        baton if he put the baton back in his utility
21        belt?
22  A.   Well, because when they give the Public Safety
23        Statement and they're asking about, you know,
24        issues for medical treatment, additional
25        suspects, you know, they're going to get an

9 (Pages 30 to 33)

Amelia Huffman
7/31/2012

34

1      overview of that use of force. But beyond that,
2      you know, we've never asked that broad question.
3      We don't ask that broad question.
4            MR. BENNETT: (Sotto voce comment.)
5      BY MR. STORMS:
6      Q.   Why?
7      A.   Because -- because what -- because we ask the
8      public safety statement and that's designed to
9      get at the -- issues that are -- that are
10     required to be handled immediately at the scene.
11     And those broad questions we're supposed to ask
12     later when the officer comes in for a statement.
13     Q.   Well, one of the things you want to accomplish
14     at the scene is to collect all available
15     evidence.
16     A.   Yes.
17     Q.   If the officer is in possession of evidence that
18     is not disclosed in the Public Safety Statement
19     how would you as a department be aware of the
20     existence of that evidence?
21     A.   If it's not disclosed during the Public Safety
22     Statement and there's no witness officer or
23     other witness who would be able to tell us about
24     it, we might not know until we took a statement
25     from an officer.

35

1      Q.   So you would -- so under MPD policy an officer,
2      if he doesn't disclose critical evidence during
3      a Public Safety Statement, he would be able to
4      walk away from that scene without ever having to
5      disclose to the MPD the existence of that
6      evidence?
7      A.   Yes. If there were no witness officers who were
8      giving us a statement at the time and there were
9      no other witnesses and there were information
10     that wasn't part of the Public Safety Statement,
11     we wouldn't know it until we took a voluntary
12     statement from the officer later.
13     Q.   If a civilian was involved in a potential
14     homicide and had evidence related to that
15     homicide on their person, would you not ask
16     about their possession of that evidence?
17     A.   If we're taking a statement from a civilian
18     witness and they're -- they're giving us a
19     statement, we would ask them about that.
20           When the officer comes in for a statement we
21     obviously ask questions of them, but we're not
22     taking that statement at the time because our
23     policy doesn't allow for that.
24           So when we're taking a statement from a
25     civilian witness if we're taking it at the time

36

1      of the incident we would certainly ask about
2      that. We would find out that information.
3            If a civilian witness refused to make a
4      statement at that time we wouldn't know about it
5      then either.
6      Q.   Why is it that you were able to photograph
7      Officer Callahan and Officer Gorman from every
8      angle under your policy?
9      A.   That's typical. We photograph in every case so
10     there's not a question about what kind of
11     uniform or markings that the officers had
12     designating them as police.
13           We sometimes have officers who are in plain
14     clothes, but wearing a badge around their neck
15     or they're wearing raid garments that say
16     "POLICE."
17           We want to make sure that it's clear, you
18     know, that officers were in full uniform, or
19     they were in some kind of modified uniform, or
20     if they were plain clothes wearing a badge on a
21     chain around their neck, that that's documented.
22     Q.   Have you seen the photographs that were taken in
23     this case?
24     A.   No, I have not.
25     Q.   You were in the room when the photographs were

37

1      being taken, weren't you?
2      A.   I don't believe I was still in the room when the
3      photographs were being taken.
4      Q.   So you think you left before they did the
5      inventorying of Officer Callahan and
6      Officer Gorman?
7      A.   I think so. I don't -- I don't remember the
8      photographs being taken.
9      Q.   So you're not aware of the fact that they
10     photographed, for example, the disposable camera
11     that Officer Callahan used to have a photograph
12     of his face taken?
13     A.   I saw that in the statements, yes.
14     Q.   Okay. So you did see that in the statements?
15     A.   Yes. That they used a -- a disposable camera to
16     take pictures because he had an injury to his
17     jaw.
18     Q.   So is -- is the only evidence Officer Callahan
19     required to turn over is the evidence that he
20     voluntarily decides to turn over?
21     A.   Our policy is written so that we take the Public
22     Safety Statement. We have the officers
23     photographed. We do a weapons exchange. But
24     they're not required to give a statement at the
25     time.

10 (Pages 34 to 37)

Doby Professional Reporting, Inc.
952-943-1587

Amelia Huffman
7/31/2012

38

1      The statement is a voluntary statement that
2  they give, so if we were to compel a statement
3  from them at the time of the incident it would
4  be a Garrity statement.
5      A Garrity statement cannot be used in the
6  criminal portion of the investigation, which is
7  what homicide is doing.
8  Q.   Can an MPD officer knowingly leave the scene of
9      an incident and knowingly leave Room 100 or
10     Room 108 with critical evidence related to the
11     incident without repercussion?
12 A.   If there were no other witness who would be able
13     to tell us about that piece of evidence the
14     officer could leave and then during the course
15     of the rest of the investigation, you know,
16     hopefully that evidence would come to light.
17     It is possible that someone could conceal a
18     piece of evidence that only they knew about it,
19     no one else knew about and never -- it would
20     never come to light?  Yes, of course.
21     If I'm the only one who knows about
22     something, no one else knows it exists, and I
23     choose to never disclose it, no one else would
24     ever know but me.  So yes, of course that could
25     happen.

39

1  Q.   So are you saying the officer has no obligation
2      either on the scene or in Room 100 to turn over
3      critical pieces of evidence related to a
4      critical incident?
5  A.   I would say the officer has a professional
6      obligation to turn over critical pieces of
7      evidence, --
8  Q.   And --
9  A.   -- yes.
10 Q.   -- what's that -- what's that professional
11     obligation consist of?
12 A.   Well, you're required under all sorts of
13     sections of our policy to be -- to be truthful
14     when you're questioned.
15     For example, in this case if in the force
16     review a Garrity statement had been taken from
17     the officers, you're compelled to be truthful
18     under a Garrity statement.
19     You know, you're compelled in other parts of
20     our policy to behave with professional ethics.
21     And so obviously that would include bringing
22     forth critical pieces of evidence.
23 Q.   But -- and -- but you're also compelled to turn
24     over all critical -- all evidence in your
25     possession related to a crime before the end of

40

1      your shift, aren't you?
2  A.   Yes.
3  Q.   Officer Callahan didn't do that, did he?
4  A.   No, he did not.
5  Q.   Okay.  Do you find that problematic?
6  A.   I wish that he had turned that over at -- at the
7      scene in Room 100, yes, that would be ideal.
8  Q.   So do you find that problematic?
9  A.   Yes, I wish he would have turned it over in
10     Room 100, that would have been ideal.
11 Q.   And it did violate MPD policy?
12 A.   We don't have a policy -- we don't have a policy
13     that's specifically written for personal
14     recording devices, cameras, cell phones.  We've
15     asked the city attorney's office for guidance
16     because those are our personally-owned devices.
17     We haven't yet received information to write
18     a policy.  We still don't have a policy for
19     personal recording devices and phones.
20 Q.   Well, you just told me that MPD policy is that
21     officers need to turn over all evidence before
22     to a crime before the end of their shift.
23 A.   Yes.
24 Q.   Now evidence is evidence regardless of whether
25     or not it was captured by Minneapolis-issued

41

1      equipment or personal equipment?
2  A.   Yes.  However, we're told from the city
3      attorney's office that because this is a
4      personally-owned device that the question is
5      more complicated.
6      Ideally I think had we known about the
7      existence of the pen camera we would have asked
8      the crime lab to down -- download that video
9      immediately.  That would have been the best way
10     to handle that piece of evidence.  But we didn't
11     know about it at the time.  If we had, that's
12     what we would have done.
13 Q.   So you're saying what you -- that you believe
14     that what Officer Callahan did was proper under
15     policy; is that what you're saying?
16 A.   No.  I'm saying that we should have a better
17     policy that would address specifically this
18     issue.  We don't.
19     We do have the policy that you have referred
20     to.
21     Ideally, the best thing for Officer Callahan
22     to have done would have been to have turned over
23     that video at the scene.  That is the
24     best-possible scenario.  That didn't happen in
25     this case.

11 (Pages 38 to 41)

Amelia Huffman
7/31/2012

**42**

1  Q.   Doesn't the law require individuals -- officers
2       and individuals to turn that evidence over to
3       homicide investigators?
4  A.   The law --
5  Q.   Well, wouldn't it be obstruction of justice if I
6       were to conceal evidence from homicide
7       investigators?
8          MS. FUNDINGSLAND:  I'm going to object
9       to the form of the question as to time.
10      Foundation.
11 BY MR. STORMS:
12 Q.   You can answer.
13 A.   Yes, if somebody were willfully hiding evidence
14      and, you know, intended to never turn that over
15      to the police.
16 Q.   You -- you don't believe that Officer Callahan
17      accidentally walked out of Room 100 and went
18      home with that pen camera, do you?
19 A.   I don't know the answer to why Officer Callahan
20      didn't turn over the pen camera.  I don't know.
21      I don't know whether he intended not to turn it
22      over because he wanted to view it first.  I
23      don't know whether he forgot in all of the, you
24      know, upheaval of being involved in a critical
25      incident.

**43**

1         I don't know the answer to that question
2      because I wasn't in Officer Callahan's mind.
3  Q.   I'm asking you what you believe.
4  A.   I don't know.  I don't -- I honestly don't know
5      why Officer Callahan didn't turn that over.
6  Q.   Okay.  Why didn't homicide ever ask Officer
7      Callahan why he did not turn that over?
8  A.   That -- that question is immaterial to the
9      information that's going to be presented to the
10     grand jury about the use of force.
11 Q.   Wouldn't it be material to the question of
12     whether or not there was obstruction of justice?
13 A.   No.  Because Officer Callahan turned that video
14     over at the first time that he had contact with
15     investigators, when he came in to give his
16     statement.
17 Q.   Well, he had contact with investigators on the
18     scene.
19 A.   But he wasn't being questioned at that point.
20 Q.   He didn't -- he also didn't fulfill his
21     professional obligation, as you put it, to
22     divulge relevant information related to a
23     critical incident, did he?
24 A.   No, he did not turn that over at the scene.  But
25     at the time that he was questioned he turned it

**44**

1      over.  His attorney turned it over at the time
2      he came in to fulfill his obligation to give a
3      statement.
4  Q.   And he didn't turn it over in Room 100?
5  A.   That's correct, he did not.
6  Q.   And he actually -- it was his attorney who
7      turned it over?
8  A.   Correct.
9  Q.   Now you understand that as an attorney --
10         MR. BENNETT:  He turned a version of --
11         MR. STORMS:  Yeah.
12         MR. BENNETT:  -- it.  He didn't turn it.
13         MR. STORMS:  I'll get there.
14 BY MR. STORMS:
15 Q.   You understand as attorneys that we have ethical
16     obligations not to conceal or destroy evidence;
17     correct?
18 A.   Yes.
19 Q.   So how do you know that it was Officer Callahan
20     who made the decision not to turn -- or to turn
21     that information over to the MPD?
22 A.   I don't know beyond the fact that if
23     Officer Callahan had intended for that video
24     never to come to light, he would never have
25     turned it over to anyone, including his

**45**

1      attorney.
2  Q.   Do you know...  What -- what steps has homicide
3      taken to verify the veracity of that video
4      evidence?
5  A.   So that particular video evidence was compared
6      with the other video evidence.
7         So there's video from the Y.  There's video
8      from the Taser cam.  And all of the video is
9      consistent.
10 Q.   The...  You have an understanding that the --
11     the pen camera video, as you viewed it, was not
12     taken by MPD investigators or homicide
13     investigators directly from the pen camera?  It
14     was something that was taken from or viewed
15     after receiving it on a flash drive from
16     Officer Callahan?
17 A.   That's correct.
18 Q.   What has the MPD done investigative-wise to
19     determine that the video started where
20     Officer Callahan has represented that it
21     started?
22 A.   You mean in terms of like asking a forens- --
23     forensics to examine the video?
24 Q.   Right.
25 A.   The county attorney's office didn't ask us to

Doby Professional Reporting, Inc.
952-943-1587

Amelia Huffman
7/31/2012

46

1    have any forensic examination of that particular
2    video done. We could have, but we did not.
3  Q.  You don't need the county attorney's office to
4    direct you to do that, do you?
5  A.  No. But if it's not -- if it's not something
6    that they need to have done for the presentation
7    of evidence to the grand jury, why would we have
8    the forensic computer examiners work on this
9    particular piece of evidence versus another
10   that's needed in another criminal investigation?
11 Q.  Well, how about to promote the public confidence
12   and show that David Smith and his family are
13   receiving a competent and professional homicide
14   investigation? Wouldn't it be a good reason
15   to investigate the veracity of that evidence?
16 A.  If there's no indication because there's nothing
17   in the case that suggests that that piece of
18   video differs from any of the other video or
19   witness evidence on the scene, then there's no
20   outstanding question.
21 Q.  Well, none of the video evidence captured the
22   time before the pen camera started, did it?
23 A.  But the witness statements capture the entire
24   incident from the time before the officers
25   arrive, from the statements of the young boy,

47

1    through the manager on duty bringing the
2    officers upstairs, through the uninvolved
3    non-employee witness at the Y who was watching
4    the entire incident, through the Y's
5    surveillance video, through the Taser cam video.
6      Absent this pen cam video entirely, this
7    incident is well documented.
8  Q.  Well, the pen camera video -- the video evidence
9    would be the best possible evidence of what
10   actually happened, wouldn't it?
11 A.  The video evidence is like all the evidence --
12   other evidence. It's one slice of what
13   happened.
14     The pen camera video, the surveillance
15   video, the Taser video, those are all small
16   slices. They don't capture, you know, a
17   360-degree panoramic view of this incident.
18   Neither do the witnesses.
19     Nothing captures a 360-degree panoramic view
20   of any incident in any case.
21 Q.  Well, do you know that the video evidence shows
22   inconsistencies in both witness statements and
23   officer statements?
24 A.  Inconsistencies? I know that the -- the video
25   and the witness statements and the officer

48

1    statements overall are describing the same
2    incident from different perspectives.
3  Q.  And so do you have an understanding of whether
4    or not the video revealed inconsistencies in the
5    officer and witness statements?
6  A.  No.
7  Q.  Okay. Did you compare the witness statements to
8    the video?
9  A.  I did not -- I did not sit down and review every
10   witness statement while I was watching the
11   video. So, you know, if you're looking for a
12   detailed timeline of, you know, "Witness X said
13   this at the point where we think this video is
14   showing this," no, I can't answer that question
15   because I wasn't the primary investigator on
16   this case.
17     However, all of that evidence
18   comprehensively provides a consistent account of
19   the incident and all of it was viewed by the
20   grand jury.
21 Q.  Well, the grand jury only saw whatever the
22   Hennepin County Attorney's Office decided to
23   show it; right?
24 A.  Correct.
25 Q.  Okay. We didn't get to present our evidence at

49

1    the grand jury?
2  A.  Correct.
3  Q.  Okay. So as you sit here today what proof do
4    you have that the entire pen camera video was
5    viewed by yourself and other investigators?
6      MS. FUNDINGSLAND: I'm sorry, can you
7    repeat that?
8      MR. STORMS: Yeah, let me rephrase the
9    question.
10 BY MR. STORMS:
11 Q.  As you sit here today what certainty do you have
12   that Officer Callahan when he turned over that
13   flash drive turned over the entirety of the
14   video that he had recorded that day?
15 A.  I'm not a forensic examiner so I don't have the
16   expertise to answer that question.
17 Q.  And you didn't ask forensic examiners to answer
18   that question, did you?
19 A.  No, we did not.
20 Q.  Nobody did?
21 A.  No.
22 Q.  Because they just took the officer's
23   representation on faith?
24 A.  There was -- there was no indication that this
25   video differed in any material way from any of

Doby Professional Reporting, Inc.
952-943-1587

Amelia Huffman
7/31/2012

50

1   the other evidence in the case.
2       That particular video wasn't an open
3   question.
4       The incident was well documented.
5   Q.   How come homicide never even asked
6   Officer Callahan to turn the camera itself over?
7   A.   You know generally when we have video evidence,
8   digital video evidence, we don't collect the
9   entire system.
10      So we have the evidence from the Y camera.
11  We did not collect their system.
12      We collect evidence routinely from various
13  digital recording systems--convenience stores
14  where we have shootings.  Banks.  We don't
15  collect the entire system.
16      So I don't think that it occurred to the
17  investigators at that point to collect the
18  entire recording system because generally we
19  just collect the digital recording itself.
20  Q.   It's a lot easier to collect a pen than it is to
21  collect an entire security system from, for
22  example, the YMCA, isn't it?
23  A.   Sure.  But, you know, we certainly could collect
24  every digital recording system.  As you know,
25  some of them are quite small.

51

1       We sometimes have evidence that we collect
2   from, you know, the home of a private person,
3   for example, who has one camera that records
4   surveillance video on their garage because their
5   neighborhood has a problem with thefts from
6   their garage.
7       But in that case, you know, we would simply
8   take the downloaded evidence, as we did from the
9   Y, as we did in this case from the pen cam, as
10  we do from convenience stores.
11      You know, we ask the owners of the system to
12  download that evidence, the video evidence for
13  us and then we take it.
14      If the owner doesn't know how to download
15  the images from their own system our crime lab
16  will go out and attempt to do that for them, but
17  we don't routinely do that.
18  Q.   Well, you're not talking about someone who is a
19  homicide suspect there, are you?  If I was a
20  homicide suspect and I just turned over a
21  flash drive of what I said was the entire
22  version of a murder, you wouldn't get a warrant
23  or in some other way try to collect that
24  recording device from me as a homicide suspect?
25      MS. FUNDINGSLAND: I'll object to the

52

1   form of the question.
2   BY MR. STORMS:
3   Q.   Is that what you're telling me?  Really?
4   A.   So -- so what you're suggesting is that the
5   circumstances of this case are equivalent to me
6   being a -- a gangster involved in a drive-by
7   shooting?
8   Q.   Well, why does it have to be a gangster?
9   Isn't -- isn't Officer Callahan a homicide
10  suspect in this case?
11  A.   Homicide --
12  Q.   Yes -- yes or no?  Is he a homicide suspect in
13  this case?
14  A.   Yes.
15  Q.   And was Officer Gorman a homicide suspect in
16  this case?
17  A.   Yes.
18  Q.   And you had an understanding that
19  Officer Callahan, as a homicide suspect, had a
20  recording device that recorded portions of a
21  homicide?
22  A.   Yes.
23  Q.   And despite the fact that he knowingly did not
24  immediately turn that device over to
25  investigators, you gave him a pass and never

53

1   forensically examined that pen; isn't that
2   right?
3   A.   We never forensically examined that pen.  But to
4   equate this case with every other homicide case
5   we investigate is -- is false.
6   Q.   Why?  Is Officer Callahan entitled to some sort
7   of different rules or does he have different
8   rights than any other defendant in a homicide?
9   Is that what you're saying?
10      MS. FUNDINGSLAND:  Objection, compound
11  and argumentative.
12      THE WITNESS:  No, but as I mentioned --
13  BY MR. STORMS:
14  Q.   It sounds like that's what you're saying.
15      MS. FUNDINGSLAND:  Excuse me.
16      She's trying to answer the question.
17      THE WITNESS:  As I mentioned before, we
18  have a number of cases every year that do not
19  involve off- -- involve officers, involving, you
20  know, entirely groups of civilians where the
21  cases are determined to be justifiable homicide.
22      And, you know, certainly we treat individual
23  cases based on the circumstances of those cases.
24  BY MR. STORMS:
25  Q.   Well, in this case the result of the method of

14 (Pages 50 to 53)

Amelia Huffman
7/31/2012

54

1    dealing with the pen camera video was for you
2    and the rest of the MPD to allow an active
3    participant in the homicide to decide what would
4    be evidence in the investigation; is that right?
5         MS. FUNDINGSLAND: Objection,
6    argumentative.
7    BY MR. STORMS:
8    Q.   Who decided what video was going to be turned
9         into the MPD in this case?
10   A.   Officer Callahan, --
11   Q.   Okay. Now what --
12   A.   -- in terms of that particular piece of video.
13   Q.   And what did the MPD ever do to ensure that they
14        received the entire video?
15   A.   There was no reason to believe we did not
16        receive the entire video. It was not the only
17        piece of evidence in this case.
18         MR. BENNETT: (Sotto voce comment.)
19   BY MR. STORMS:
20   Q.   Is the answer nothing?
21   A.   The case is well documented.
22   Q.   Is the answer nothing?
23   A.   We didn't do a forensic investigation, no.
24   Q.   Okay. And you're telling me that if a homicide
25        suspect turned over video evidence of a homicide

55

1    that he had allegedly committed or potentially
2    committed, that you would not make efforts to
3    secure the recording device? Is that what
4    you're telling me?
5         MS. FUNDINGSLAND: Objection,
6    argumentative.
7         THE WITNESS: It depends on the
8    circumstances. But not -- not in every case
9    would we go out and seize a system if we had the
10   video recording from it.
11        And, in fact, in almost no cases do we seize
12   an entire recording system.
13   BY MR. STORMS:
14   Q.   You're -- you're just --
15   A.   We've never had a case -- we've never had a case
16        under the circumstance you described.
17        This is the only case I'm aware of that
18        we've ever had where someone involved in a
19        critical incident or another homicide, for that
20        matter, has ever had a personal recording device
21        that captured the incident.
22        Under ideal circumstances we would have
23        known about that right at the time of the
24        incident.
25        I can't tell you why Officer Callahan didn't

56

1    turn that pen cam over at the scene or even
2    mention it to us in Room 100. If he had we
3    would have asked the crime lab to download the
4    video from that pen cam.
5         That's what we would do in a normal
6    circumstance with anyone. We would -- we would
7    get the video. Ideally we would have the crime
8    lab download it.
9         We didn't have that opportunity because
10   Officer Callahan didn't tell us he had a pen
11   cam.
12   Q.   And why is it that no one's ever asked him why
13        he didn't turn the pen camera over?
14   A.   Well, in the administrative review if -- if the
15        department wanted to pursue that as a policy
16        question, that would have been the appropriate
17        time to ask that question.
18        I haven't seen the administrative review
19        that was done on this case, so I can't answer
20        any questions about what questions were asked
21        and what questions were not asked. But I
22        believe that that is a policy question that
23        would better have been addressed there.
24   Q.   As the -- as your current role as captain in
25        charge of criminal investigations do you not

57

1    have the authority to go and ask that question
2    right now if you want to?
3    A.   To -- to call officer -- to ask Officer Callahan
4         to come in and make a voluntary statement and
5         answer that question?
6    Q.   Yes.
7    A.   We could ask him to do that, but I wouldn't.
8    Q.   Why?
9    A.   Because I don't believe it was material to the
10        use-of-force incident.
11   Q.   You don't believe that it was material as to
12        whether or not he had professionally handled
13        evidence properly or legally handled evidence
14        properly? It's not material to that?
15   A.   What you're suggesting is that there should have
16        been criminal charges brought.
17        I don't believe that there's probable cause
18        to show that he intended to withhold that.
19        It was turned over at the first meeting
20        between Officer Callahan, his attorney and the
21        investigators for the purpose of questioning
22        Officer Callahan.
23        I don't believe that it would be possible to
24        show that he intended to withhold that piece of
25        evidence because it was turned over at the first

15 (Pages 54 to 57)

Amelia Huffman
7/31/2012

58

1    time that he met with investigators for
2    questioning.
3    Q.   Well, it was obvious he intended not to turn it
4    over at the conclusion of the incident; right?
5    A.   He did not turn it over at the time of the
6    incident.
7    Q.   And you know he took the...
8        Are you aware of the fact that he took the
9    video home and watched it with his wife before
10   anyone in the MPD had seen it?
11   A.   I had heard that.
12   Q.   That's not proper, is it?
13   A.   If he had -- if he had not watched it then --
14   Q.   Is that proper?
15   A.   To watch the video before you give a statement?
16   Q.   No. So is it proper for him to go home and
17   download evidence of a critical incident and a
18   homicide and watch it with his wife before
19   divulging it to MPD?
20       MS. FUNDINGSLAND: Objection, compound
21   and argumentative.
22       THE WITNESS: I -- I have already
23   answered the question by saying that the ideal
24   thing would have been to have collected that
25   video from him right at the time.

59

1        If he had wanted to watch the video before
2    making his statement, we would have permitted
3    that.
4        It's part of our policy that when we have
5    video that's captured, like squad video, for
6    example, we allow officers to review that before
7    they make their statement.
8        So I do not think that there was a problem
9    with him reviewing the video before he made the
10   statement. I wish it had occurred under
11   different circumstances.
12   BY MR. STORMS:
13   Q.   So when you say under ideal circumstances, do
14   you mean that had he had done what he was
15   supposed to do, it would have been him following
16   the law and his duty, as opposed to what he
17   actually did?
18       MS. FUNDINGSLAND: Objection,
19   argumentative and asked and answered.
20       THE WITNESS: I would not answer the
21   question that way. Those are your words, not
22   mine.
23   BY MR. STORMS:
24   Q.   Well, how would you answer the question?
25   A.   The way I did. I would say under ideal

60

1    circumstances we would have known about that
2    pen cam at the time of the incident.
3    Q.   Because he would have told you?
4    A.   Yes.
5    Q.   Okay.
6    A.   But he didn't. I can't answer the question
7    about why, but he turned it over when he met
8    with investigators, he and his attorney, at the
9    time that he was questioned.
10   Q.   Do you know that he took that pen camera video
11   and downloaded it onto his own personal
12   computer?
13   A.   I don't know.
14   Q.   Do you know that that personal computer has
15   editing equipment on it?
16   A.   I don't know what he has on his personal
17   computer.
18   Q.   Why didn't you find that out?
19   A.   Because this was -- this video was only one
20   piece. It was consistent with the other
21   evidence in this case.
22       There were no open questions about this
23   video.
24   Q.   Well, how do you know that before he turned on
25   the camera he wasn't calling David Smith racial

61

1    words? Or racial -- how do you know that?
2    A.   I don't know that. But I also know that there
3    was no suggestion of that from any of the
4    witness statements.
5        And, in fact, the witness statements several
6    times mentioned how professional the officers
7    were. They mentioned that they were trying to
8    be friendly with him. That they said something
9    like, "Hey, come on over here, we want to talk
10   to you."
11       The witnesses did not provide any evidence
12   that they were using any racial slurs or any
13   other kinds of inappropriate language.
14   Q.   Do you know how close the witness was standing
15   to them at the time?
16   A.   I believe that in his statement the witness who
17   was not an employee of the Y said that he was
18   about 20 feet away.
19   Q.   And did you know that that witness had
20   previously worked for a police department?
21   A.   Yes, I saw that in his statement.
22   Q.   And so that wouldn't give you some reason to be
23   concerned about whether or not that witness
24   could potentially be biased in terms of the
25   statement he gave?

16 (Pages 58 to 61)

Doby Professional Reporting, Inc.
952-943-1587

Amelia Huffman
7/31/2012

62

1      MS. FUNDINGSLAND: Objection,
2  argumentative.
3      MR. BENNETT: He said he was biased.
4      THE WITNESS: He said that he -- that he
5  had worked for a police --
6      MR. STORMS: Answer --
7      THE WITNESS: -- agency in the past.
8      MR. STORMS: -- my question.
9  BY MR. STORMS:
10  Q.   I'm asking you whether or not that would give
11  you cause to believe that he could have been a
12  biased witness?
13      MS. FUNDINGSLAND: Same objection.
14      THE WITNESS: No. Because I read all of
15  the witness statements. I didn't read his
16  statement in a vacuum, any more than I looked at
17  the pen camera video in a vacuum, any more than
18  the investigators or the county attorney's
19  office looked at any of these items in a vacuum.
20      I looked at them as part of the entire case.
21  Q.   Well...
22      MR. BENNETT: (Sotto voce comment.)
23  BY MR. STORMS:
24  Q.   Any videotaped evidence that could have been on
25  the pen camera related to this incident that

63

1  wasn't disclosed, that could have been important
2  evidence, couldn't it have been?
3  A.   Important evidence?
4  Q.   For -- related to this case, yeah.
5  A.   If -- if there were other video?
6  Q.   Yes.
7  A.   Um, sure.
8  Q.   And if there were other video where they were
9  calling him racial slurs, that would be a big
10  problem, wouldn't it?
11  A.   It would be a big problem, but --
12  Q.   Now if you --
13  A.   -- there's no reason to think that that exists.
14  Q.   Well, you -- if you would have done the forensic
15  review or had the department do the forensic
16  review you could say with certainty today that
17  that didn't happen, couldn't you?
18  A.   If we had -- if we had asked for a forensic
19  evaluation of the video, hopefully they would be
20  able to tell us if the video appeared to have
21  been started in the middle.
22      I'm not a forensic examiner so I don't know
23  for sure whether they would be able to
24  definitively tell us, "This was the actual
25  starting point." So I don't -- I guess I don't

64

1  know from a video forensic examiner perspective
2  what exactly they would be able to tell us.
3  Q.   And you didn't do it in this case because
4  Officer Callahan is a police officer and not to
5  use the word you had put before, but a
6  gang-banger.
7      If this had been a gang-banger maybe you
8  would have taken that step?
9  A.   If the county attorney's office had requested
10  that, we would have taken that step.
11  Q.   I'm not asking about the county attorney. I'm
12  asking about what MPD decides to do.
13      So if this had been some gang-banger who had
14  this video device and turned it over would you
15  have made that forensic effort?
16  A.   If there had been open questions about it, yes,
17  we would have.
18  Q.   And the fact that he initially concealed this
19  pen camera from investigators, that doesn't
20  create open questions to you in terms of the
21  veracity of the evidence?
22  A.   No. Because he turned it over at the first
23  meeting between his attorney, him and the
24  investigators at the time that they were going
25  to be questioned.

65

1      MR. BENNETT: (Sotto voce comment.)
2  BY MR. STORMS:
3  Q.   Do you tend to -- is it good homicide protocol
4  to wait six days to get critical video evidence?
5  Is that how you prefer to conduct your
6  investigations?
7      MS. FUNDINGSLAND: Objection,
8  argumentative.
9      THE WITNESS: No, we would have
10  preferred to have it at the time.
11  BY MR. STORMS:
12  Q.   And he should know that as a police officer,
13  shouldn't he?
14  A.   Yes, he would know that as a police officer.
15  Q.   I mean there's no reason for him to think, "The
16  right thing for me to do here as a
17  police officer is to take this video home with
18  me," is there?
19  A.   I don't know what he was thinking.
20  Q.   Does MPD train that that's okay?
21  A.   But... No, of course not.
22      He would have known that we would have
23  wanted to collect as much evidence as possible.
24      I don't know what he was thinking at that
25  point.

Amelia Huffman
7/31/2012

66

1   Q.  And you -- in terms of evidence related to
2      whether or not this was intentional, I'm showing
3      you Exhibit 50-A. Have you seen that before?
4   A.  No.
5   Q.  It's a picture that was taken from the
6      disposable camera that we've taken the liberty
7      to blow up.
8      And what do you see in his right breast
9      pocket?
10      MR. BENNETT: Left.
11 BY MR. STORMS:
12   Q.  Or left breast pocket?
13   A.  The pen cam.
14   Q.  Okay.
15      MR. BENNETT: 72.
16      MR. STORMS: Yeah.
17 BY MR. STORMS:
18   Q.  I'm showing you what's been marked as
19      Exhibit 72. Have you seen this before?
20      MS. FUNDINGSLAND: She's already stated
21   she never saw any photos, counsel.
22      THE WITNESS: No, I never saw the
23   pictures.
24      MR. BENNETT: She's seeing it now.
25 BY MR. STORMS:

67

1   Q.  Now when you --
2      MS. FUNDINGSLAND: Excuse me?
3      MR. BENNETT: She's seeing it now.
4   That's --
5      MS. FUNDINGSLAND: Well, she'd already
6   said she had never seen the pictures. All
7   right?
8 BY MR. STORMS:
9   Q.  When you look in the left breast pocket do you
10      see the pen camera visibly?
11   A.  No. I see the bulge, but I don't see it
12      protruding from the pocket.
13   Q.  It looks like the pen camera has been shoved
14      into the pocket, doesn't it?
15   A.  Yes, it does.
16   Q.  Okay. Now that would evidence to you some
17      intent to not disclose the pen camera, wouldn't
18      it?
19   A.  Or maybe he just put it back in his pocket and
20      instead of the clip going on the outside it went
21      all the way in.
22   Q.  And -- and so you would think that in the course
23      of everyone taking pictures of everything else
24      on his person, it just wouldn't occur to him
25      that maybe the most critical piece of evidence

68

1      is sitting in his pocket? Is that what you're
2      hoping for? Or --
3   A.  I don't -- I don't know what he was thinking,
4      but I don't know that I would characterize this
5      pen cam as the most critical piece of evidence
6      in the case.
7   Q.  Are you aware of the fact that Dr. Baker said
8      that that was the evidence that allowed him to
9      conclude that this was a homicide?
10   A.  I didn't know that Dr. Baker said that. But I
11      would say what I have said before--this pen cam
12      video was one pieces of evidence in this case,
13      along with video from the Y, the Taser cam, the
14      witness statements, the officer statements, all
15      the other things that were gathered.
16      This piece of video -- I wish we would have
17      had it at the time. That would have been the
18      ideal, to have it turned over immediately. But
19      it wasn't the only piece of evidence in this
20      case.
21   Q.  Well, it was the clearest video evidence, wasn't
22      it?
23   A.  Yes.
24   Q.  It --
25   A.  It's good quality.

69

1   Q.  -- captured -- it captured almost the entire
2      event?
3   A.  Yes.
4   Q.  We don't know how much of the event because no
5      one's ever found out?
6   A.  But like you just said, nearly the entire thing.
7   Q.  Nearly the entire thing.
8      And how -- so how was that not the most
9      critical piece of evidence that -- that the MPD
10      came in possession of?
11   A.  It was -- it was an important piece of evidence,
12      but I wouldn't have wanted to do this
13      investigation without all of the pieces of
14      evidence.
15      I mean certainly in all of our
16      investigations, you know, this one was great.
17      We had --
18   Q.  You haven't answered my question.
19      So why was it not the most important piece
20      of evidence? What was more important than the
21      pen camera? How about that. What piece of
22      evidence was more important than the pen camera?
23   A.  Well, I would say that there were things that
24      were equally as important as the pen camera.
25      The statement from the 13-year-old boy

18 (Pages 66 to 69)

Amelia Huffman
7/31/2012

70

1  who -- you know, his encounter with David
2  Smith --
3      MR. BENNETT:  What does that have to do
4  with --
5      THE WITNESS:  -- was an extremely
6  important piece of information because it
7  explained to us, you know, how this incident
8  started, what circumstances were like at the Y
9  before the officers even arrived, along with the
10  statement from the manager on duty.
11      The uninvolved, non-employee witness...
12      I mean we had more statements and more video
13  on this case than we do in nearly any other
14  critical incident investigation I've seen.  All
15  of those pieces are critical.
16      But the -- the pen camera video was a great
17  piece of evidence.  But to suggest that it was
18  the only thing we had in this case and that
19  somehow if we hadn't had that piece of video we
20  would have nothing, would be false.
21  BY MR. STORMS:
22  Q.   Well, without that video how would we know that
23  Gorman kneeled on Smith's back for 4-1/2
24  minutes?
25  A.   Well, we would have known from their statements.

71

1      Yet we wouldn't have known -- we wouldn't have
2  known the length of time.  However, we would
3  have known because Officer Gorman says he was
4  using the technique of putting his knee on David
5  Smith's shoulder at the conclusion.
6      Both of the officers described themselves as
7  being in the positions that they were in.
8  Q.   Well, Gorman says he put his left knee on
9  Smith's back; right?
10     MR. BENNETT:  On his right shoulder.
11     THE WITNESS:  He says he put it --
12     MR. STORMS:  On his right shoulder.
13     THE WITNESS:  He put his knee on his
14  shoulder.
15  BY MR. STORMS:
16  Q.   And in the video it clearly shows at times
17  Gorman has his right knee on David Smith's back,
18  doesn't it?
19  A.   Well, it's been a while since I've seen the
20  video and whether it's his right knee or his
21  left knee...  He puts himself in that position,
22  using that technique of -- of kneeling on his
23  shoulder or upper back.
24     MR. BENNETT:  (Sotto voce comment.)
25  BY MR. STORMS:

72

1  Q.   Well, and are you aware of the fact that the
2  medical examiner stated that his knee was
3  between his scapulae?  Are you aware of that?
4  A.   No, I -- I'm not aware of that.
5      MR. BENNETT:  (Sotto voce comment.)
6  BY MR. STORMS:
7  Q.   And the reason that -- the reason that Gorman --
8  that we don't know how long he kneeled on his
9  back is that your investigators never asked that
10  question, did they?
11  A.   They asked the questions about where they were,
12  what techniques they were using, but they didn't
13  ask how long they were there.  And I wouldn't
14  have expected the officers to be able to
15  precisely answer the question of how long they
16  were there.
17  Q.   Well, and without the pen camera we would never
18  know, would we?
19  A.   No, we wouldn't have nearly as precise --
20  Q.   And --
21  A.   -- an estimate.
22  Q.   And Gorman could have said it was 30 seconds and
23  we would have no way to prove otherwise, would
24  we, without the pen camera?
25  A.   No.  We know the overall time of the incident,

73

1  so we could certainly make some estimates, but
2  we wouldn't be nearly as precise without the
3  pen camera video.
4  Q.   So...  And the question of how long they
5  continued to kneel or sit on David Smith's back,
6  that's very relevant to the inquiry of
7  mechanical asphyxia, isn't it?
8      MS. FUNDINGSLAND:  Object to the form of
9  the question.
10     THE WITNESS:  Dr. Baker would be the
11  best person to answer questions about that.  But
12  obviously, yes, the position that they had him
13  in was relevant to the mechanical asphyxia,
14  which was, you know, one of the contributing
15  factors that Dr. Baker --
16     MR. BENNETT:  It was the cause of death.
17     THE WITNESS:  -- concluded was involved.
18     MR. BENNETT:  Cause of death, not a
19  contributing factor.
20     MS. FUNDINGSLAND:  Excuse me.
21  Who's --
22     MR. BENNETT:  Well, I mean --
23     MS. FUNDINGSLAND:  -- testifying --
24     MR. BENNETT:  -- it's just bullshit.
25     MS. FUNDINGSLAND:  -- here?

19 (Pages 70 to 73)

Amelia Huffman
7/31/2012

74

1      MR. BENNETT: It's -- it's --
2      MS. FUNDINGSLAND: Well, why --
3      MR. BENNETT: -- ridiculous.
4      MS. FUNDINGSLAND: -- don't you swear
5   yourself in, Mr. Bennett, then? Okay?
6      MR. BENNETT: These answers are --
7      MS. FUNDINGSLAND: Well, --
8      MR. BENNETT: -- ridiculous.
9      MS. FUNDINGSLAND: -- I don't --
10     MR. BENNETT: I'm tired of them.
11     MS. FUNDINGSLAND: -- care if you don't
12  like the answers that you're getting.
13     MR. BENNETT: Okay.
14     MS. FUNDINGSLAND: Okay?
15     MR. BENNETT: Let's -- let's go on.
16     MS. FUNDINGSLAND: Please.
17     MR. BENNETT: But that's --
18     MS. FUNDINGSLAND: Mr. --
19     MR. BENNETT: -- that's just not true.
20     MS. FUNDINGSLAND: Mr. Bennett, just let
21  the person answer the question. Otherwise you
22  don't need to depose her at all. Okay? You can
23  just get up there and testify.
24     MR. BENNETT: Well, --
25     MS. FUNDINGSLAND: So --

75

1      MR. BENNETT: -- I'd --
2      MS. FUNDINGSLAND: -- either let her --
3      MR. BENNETT: -- testify to the truth.
4      MS. FUNDINGSLAND: Either let her answer
5   or don't.
6      MR. BENNETT: Okay. She's sworn to tell
7   the truth.
8      MR. STORMS: Well, --
9      MS. FUNDINGSLAND: Don't start with me.
10     MR. BENNETT: Start with her.
11     MS. FUNDINGSLAND: And don't do it.
12  You keep that up and this deposition will be
13  over.
14     MR. BENNETT: Yeah. It's over now.
15     MS. FUNDINGSLAND: Just because you
16  don't like what she's saying --
17     MR. BENNETT: Oh, --
18     MS. FUNDINGSLAND: -- doesn't mean she --
19     MR. BENNETT: -- I do like what she's
20  saying. Don't get me wrong. Because it's as --
21     MS. FUNDINGSLAND: Well, --
22     MR. BENNETT: -- silly as anything I've
23  ever heard.
24     MS. FUNDINGSLAND: -- just let her
25  answer the questions.

76

1      You'll give your final argument some day.
2      MR. BENNETT: You betcha, I will.
3   BY MR. STORMS:
4   Q.  Now you talk about not being a doctor in terms
5      of understanding the length of time, you know,
6      there was kneeling on David Smith's back.
7         Minneapolis police officers, along with all
8      other police officers, have been trained for a
9      long period of time that you're not supposed to
10     continue to kneel on the backs of subjects for a
11     long period of time; isn't that right?
12  A.  Yes. We train officers to turn them over into
13     the recovery position as soon as practical.
14  Q.  And that was long before this case, wasn't it,
15     that that training has been provided?
16  A.  Yes. I don't know for how long and in -- and in
17     what context, but certainly it's been part of
18     our maximal restraint policy for many years.
19  Q.  And it's something that you would -- that you
20     train to do not only in maximal restraint, but
21     in any situation where you have a handcuffed
22     individual in the prone position; isn't that
23     right?
24  A.  Yes. We encourage officers to turn them over as
25     soon as practical onto their side.

77

1   Q.  Do you know if whether or not that was part of
2      the grand jury presentation in terms of what
3      officers have been trained on?
4   A.  I don't know what the county attorney's office
5      presented at the grand jury.
6         The training records certainly were part of
7      the case file, but I don't know whether that was
8      presented.
9   Q.  Do you know why your homicide investigators
10     never asked Smith and -- or Gorman and Callahan
11     why they did not put Smith on his side?
12  A.  No, I don't know why they didn't ask.
13  Q.  As you sit here today do you know why Callahan
14     and Gorman did not put Smith on his side?
15  A.  I know what they said in their statements.
16     That, you know, they were -- they were
17     recovering from the struggle.
18        That they were breathing heavily.
19        That they were feeling -- one of them was
20     feeling light-headed.
21        And at one point Officer Gorman went to look
22     for the manager on duty from the Y. He wanted
23     to ascertain that they were going to be able to
24     get the medical people up in the elevator.
25        So, you know, I know how they explained what

20 (Pages 74 to 77)

Amelia Huffman
7/31/2012

78

1        they were doing at that time.
2    Q.   Did anyone ever...
3        (Sotto voce conversation.)
4    BY MR. STORMS:
5    Q.   Have you watched the --
6        MR. BENNETT: Just ask it that way.
7        MR. STORMS: Yeah.
8    BY MR. STORMS:
9    Q.   Are those statements belied by the pen camera
10       video?
11       MR. BENNETT: Yes or no.
12   BY MR. STORMS:
13   Q.   Yes or no?
14       MS. FUNDINGSLAND: What statements?
15       I'm sorry.
16       MR. BENNETT: That she just made.
17   BY MR. STORMS:
18   Q.   The statements in terms of what the officers...
19       In terms of what the officers said in their
20       statements about what they were doing, in terms
21       about recovering and things of that nature, is
22       that supported by the pen camera video?
23   A.   Yes, as far as I know.
24   Q.   At times when Gorman was kneeling on Smith's
25       back and Callahan was sitting on Smith's

79

1        buttocks and upper thighs were they not talking
2        about other things such as what they could
3        charge him with and what a tough fight that was?
4    A.   Yes, they were having some conversations.
5    Q.   That shows an ability to breathe certainly,
6        doesn't it?
7    A.   Right. But I -- but I believe, as I recall from
8        viewing it, that you can also hear that they
9        were breathing heavily, panting and, you know,
10       clearly recovering from the struggle.
11   Q.   So is it appropriate to mechanically asphyxiate
12       a subject while the officers catch their breath?
13   A.   No.
14   Q.   Is that appropriate?
15       MS. FUNDINGSLAND: Object to the form of
16       the question. And argumentative.
17       THE WITNESS: No.
18       MR. STORMS: Okay.
19   BY MR. STORMS:
20   Q.   Officers are -- your officers have been well
21       trained that they should put them into a
22       recovery position; correct?
23       MS. FUNDINGSLAND: Objection, asked and
24       answered.
25   BY MR. STORMS:

80

1    Q.   How come homicide never asked these officers why
2        Smith was not put into a recovery position?
3        MS. FUNDINGSLAND: Objection, asked and
4        answered.
5        THE WITNESS: The officers explained
6        what they were doing and why they were doing it.
7    BY MR. STORMS:
8    Q.   Were they asked that question?
9    A.   No, they were not.
10   Q.   Do you know why they weren't asked that
11       question?
12       MS. FUNDINGSLAND: Objection, asked and
13       answered.
14       THE WITNESS: No, I don't know why the
15       homicide investigators chose to ask one question
16       versus another, but they were asked to describe
17       their course of action, what they were doing and
18       why they were doing it and that's what they gave
19       in their statements.
20       MR. STORMS: Okay.
21   BY MR. STORMS:
22   Q.   Are you aware that Dr. Baker testified and
23       determined that they continued to kneel on David
24       Smith's back long after he had ceased breathing?
25   A.   Yes.

81

1    Q.   Okay. That's problematic, isn't it?
2    A.   Yes.
3    Q.   You never want to kneel on someone's back who is
4        no longer breathing? There's no police purpose
5        there, is there?
6    A.   No.
7    Q.   And similarly, when a subject gives up and is
8        complying, there's no need to continue kneeling
9        on a subject's back at that point either, is
10       there?
11   A.   Correct.
12   Q.   It's the reason to lessen force?
13   A.   Yes.
14   Q.   Are -- are you aware of the fact that Callahan
15       in his statement said that after the handcuffs
16       had been applied Smith gave up and was
17       complying?
18   A.   Yes.
19   Q.   Why did homicide not ask -- are you aware of why
20       homicide didn't ask why Smith -- or why Gorman
21       and Callahan continued to kneel on Smith's back
22       for 4-1/2 minutes after he had complied?
23   A.   Like I said before, why they asked
24       particular questions I can't answer that. But
25       they asked for their course of what they did and

Amelia Huffman
7/31/2012

82

1    their thoughts about why they did it.
2    Q.   If they were conducting a
3    professionally-competent investigation should
4    they have asked that question?
5        MS. FUNDINGSLAND: I'm going to object
6    to the form of the question.
7        THE WITNESS: I think that that's one
8    question that could have been asked.
9        I think they asked for the officers to
10   describe what they did, their course of conduct
11   during this incident.
12       MR. BENNETT: (Sotto voce comment.)
13   BY MR. STORMS:
14   Q.   Is the answer yes or no?
15   A.   Would you ask the question again? And I'll give
16   you the yes or no answer.
17       MR. STORMS: Can you please read back my
18   question?
19       (The following was read back by the
     court reporter.
20
     "Q.   If they were conducting a professionally-
21   competent investigation should they have asked
     that question?"
22
23       THE WITNESS: Yes, that's one question
24   that could have been asked.
25   BY MR. STORMS:

83

1    Q.   And if they were conducting a
2    professionally-competent investigation they
3    should have asked why no one attended to Smith's
4    breathing for a period of 6-1/2 minutes?
5    A.   (Pausing.)
6    Q.   Yes?
7    A.   The officers provided first aid. It's clear
8    from watching the video the officers provided
9    first aid. When they realized that David Smith
10   was in distress they provided first aid.
11   Q.   Are you aware of the fact that they did not
12   check either his breathing or pulse for a period
13   of 6-1/2 minutes after handcuffs were applied?
14   A.   I hadn't measured the length of time, but yes, I
15   knew that there was a time period where they --
16   they didn't check his breathing or pulse, they
17   didn't realize he was in distress and so they
18   didn't start first aid yet.
19   Q.   Under the training that's been provided by the
20   Minneapolis Police Department is that an
21   acceptable period of time to maintain someone in
22   a prone position without checking either their
23   breathing or consciousness?
24   A.   No. We train officers to turn them over into
25   the recovery position as soon as practical.

84

1    Q.   And to monitor their breathing and
2    consciousness?
3    A.   Yes.
4    Q.   So would a professionally-competent
5    investigation have included asking Callahan and
6    Gorman why they did nothing to check his
7    breathing or health status for a period of
8    6-1/2 minutes?
9    A.   You know, the -- the suggestions that the
10   training and policy were violated would have
11   been a good question for the force review, you
12   know, particularly focusing on those issues of
13   training and policy.
14       The homicide investigation, you know, was
15   looking at the use of force itself and they were
16   very focused on the incidents that led up to the
17   use of force and the use of force itself and --
18   and not on the issues that occurred after the
19   use of force was completely finished.
20   Q.   Well, if an officer fails to follow policy and
21   fails to comply with the guidelines of the
22   4th Amendment wouldn't that be relevant to the
23   question of whether or not a negligent homicide
24   had occurred, for example, or involuntary
25   manslaughter?

85

1    A.   Well, in this case I think that, you know,
2    there's clearly an effort made--they intended to
3    provide first aid. You know, there's no --
4    there's no evidence in the case that, you know,
5    they willfully deprived him of, you know,
6    medical attention once they realized he was in
7    distress.
8    Q.   Well, if I -- I can't commit involuntary
9    manslaughter? I can't accidentally or
10   negligently kill someone and then provide them
11   with CPR, but still be criminally liable for
12   negligent homicide? Is that what you're telling
13   me?
14   A.   I suppose.
15       I haven't seen a case like that charged out.
16   Q.   Do you need intent for negligent homicide?
17   A.   No.
18   Q.   Okay. So the question of intent is really kind
19   of irrelevant as to whether or not a negligent
20   homicide occurred in this case; right?
21   A.   Yes.
22   Q.   Okay. I mean kneeling on Smith's back by Gorman
23   and sitting on his buttocks by Callahan, that
24   was a use of force, wasn't it?
25   A.   It was -- it was not a use of force in terms of

22 (Pages 82 to 85)

Amelia Huffman
7/31/2012

86

1      the use of force like a takedown technique.
2      They were restraining him, yes.
3   Q.   Well, all right.
4      (Sotto voce conversation.)
5   BY MR. STORMS:
6   Q.   Are you aware of the fact that restraining
7      someone is -- falls within the definition of
8      force under MPD policy?
9   A.   Yes.  But I'm clarifying that -- that the use
10     of -- the use of force in this case involved a
11     number of different aspects.
12        They were restraining him at that point, but
13     there wasn't a use of force at that point.  Like
14     the Taser use of force had already occurred.
15     There was no additional, you know, arm bar
16     techniques.  There were no pressure point
17     techniques that were being applied.
18  Q.   Well, they struck him in the head while he was
19     in prone position, didn't they?
20  A.   Yes.
21  Q.   Are you supposed to hit handcuffed individuals
22     in the head?
23  A.   They were cuffing him in the head with an open
24     hand to discourage him from continuing to
25     resist.

87

1   Q.   And that's appropriate?
2   A.   They were exonerated in the use-of-force review.
3   Q.   You don't know what information was presented at
4      the use-of-force review?  You weren't there;
5      right?
6   A.   No, I haven't seen the use-of-force review.
7   Q.   So back to my point.
8        Kneeling on his back and sitting on his
9      buttocks, those are uses of force, aren't they?
10  A.   Yes.
11  Q.   And they're governed by the 4th Amendment;
12     right?
13  A.   Yes.
14  Q.   Okay.  Now continuing to kneel on someone's back
15     until they mechanically asphyxiate, that's not
16     proper police training, is it?
17  A.   No.
18        MS. FUNDINGSLAND:  Object to the form of
19     the question.
20  BY MR. STORMS:
21  Q.   And that wouldn't fall within proper conduct
22     under the 4th Amendment either, would it?
23  A.   No.  We certainly don't train people...
24  Q.   And the 4th Amendment certainly doesn't allow
25     for police officers to kneel on someone's back

88

1      until they die of mechanical asphyxia?
2        MS. FUNDINGSLAND:  Object to the form of
3      the question.
4        THE WITNESS:  Yes.
5        MR. STORMS:  Okay.
6   BY MR. STORMS:
7   Q.   And similarly officers have an obligation under
8      the 4th Amendment when they -- when they arrest
9      someone or otherwise maintain someone in
10     custody, they have an obligation to ensure that
11     that person remains in good health?
12  A.   Yes.
13  Q.   Continues to breathe?
14  A.   Yes.
15  Q.   And so officers have an obligation under the
16     4th Amendment to, for example, continue to -- to
17     continue monitoring the breathing of a suspect
18     that they've arrested?
19  A.   Yes.
20  Q.   That didn't happen in this case?
21  A.   No.  There was a significant gap of time in
22     which that did not happen.
23  Q.   Okay.  So wouldn't having answers to those
24     questions inform any kind of legitimate inquiry
25     as to whether or not a negligent homicide

89

1      occurred in this case?
2   A.   Well, --
3        MS. FUNDINGSLAND:  Objection, asked and
4      answered.
5        THE WITNESS:  The -- the witness
6      statements, the videos, all of them that are
7      available, clearly show the time period.  They
8      show the events that occurred.
9   BY MR. STORMS:
10  Q.   And they show that they kneeled on his back for
11     4-1/2 minutes?
12  A.   Yes.
13  Q.   Not good; right?
14  A.   No.  Not good.
15  Q.   Right.
16  A.   There was no question -- there was no question
17     that that had happened.
18  Q.   Okay.  And so why would that be okay then?  Why
19     would that not be a policy violation?  You --
20     you seem to have informed me that that's against
21     training, it's against policy, it's against what
22     officers know.
23        So aside from a policy violation why
24     wouldn't that be a negligent homicide?
25  A.   Well, that's certainly something that the

23 (Pages 86 to 89)

Amelia Huffman
7/31/2012



**90**

1    grand jury could have considered.  Obviously I
2    wasn't present at the grand jury.  But the
3    grand jury reviewed this case and determined
4    that no charges were appropriate.  And the only
5    one who can answer the question about why is the
6    grand jury.
7    Q.   Do you consider this to be a negligent homicide?
8    A.   Um... Um...I do not consider this to be a
9    negligent homicide because it's been reviewed by
10   the authority to determine that --
11   Q.   I don't care --
12   A.   -- and determined not to be a negligent
13   homicide.
14   Q.   I don't care about the review.  I want to know
15   based upon all your training and all your
16   education, your work as a police officer,
17   whether or not you consider this to be a
18   negligent homicide.
19        MR. BENNETT:  (Sotto voce comment.)
20        THE WITNESS:  I think that, as you have
21   pointed out, there were clearly issues in this
22   case where the way we train officers to monitor
23   someone's medical condition and breathing, those
24   training standards were not upheld.
25        I do not believe it rises to the level of

**91**

1    negligent homicide.
2         It's not that they made no effort.  They
3    clearly did not make no effort to be cognizant
4    of David Smith's medical condition.  There was a
5    significant gap.  There was a gap that was too
6    long, but I do not believe that they -- that
7    they were completely negligent of Mr. Smith's
8    welfare.
9    BY MR. STORMS:
10   Q.   You believe it was a belated effort?
11   A.   Yes, I do.
12   Q.   And you believe that their conduct and the
13   efforts they made were contrary to the police
14   standards, practices and policies as you
15   understand them?
16   A.   Yes, I do.
17        MR. STORMS:  Can we go off the record?
18        VIDEOGRAPHER:  Off the video record at
19   10:28 A.M.
20        (Recess taken.)
21        VIDEOGRAPHER:  This is Disc 2.
22   We are on the record at 10:36 A.M.
23   BY MR. STORMS:
24   Q.   The training standards and policies and
25   practices regarding -- or requiring officers to

**92**

1    monitor the health and welfare of subjects,
2    that's meant to fulfill the officer's
3    requirements under the 4th Amendment, isn't it?
4    A.   Yes.
5    Q.   And the same is true for the standards and
6    policies and practices with respect to removing
7    subjects from a prone position into a recovery
8    position?
9    A.   Yes.
10        MR. STORMS:  I have no further
11   questions.
12        MS. FUNDINGSLAND:  We'll read and sign.
13        VIDEOGRAPHER:  This concludes the video
14   deposition.
15        It is 10:37 A.M.
16        (Concluded at 10:37 A.M.)
17             * * *
18
19
20
21
22
23
24
25

**93**

1    STATE OF MINNESOTA  )
          : ss  CERTIFICATE
2    COUNTY OF WASHINGTON )
          I, Janet D. Winberg, hereby certify
3    that I reported the videotaped deposition of
     AMELIA HUFFMAN, on the 31st day of July, 2012,
4    in Minneapolis, Minnesota, and that the witness
     was, by me, first duly sworn to tell the truth;
5    That the testimony was transcribed by me and is
6    a true record of the testimony of the witness;
7
     That I am not a relative, or employee, or
8    attorney, or counsel of any of the parties; or a
     relative or employee of such attorney or
9    counsel;
     That I am not financially interested in the
10   action and have no contract with the parties,
     attorneys or persons with an interest in the
11   action that affects or has a substantial
     tendency to affect my impartiality;
12   That the right to read and sign the transcript
13   by the witness was reserved.
14
     WITNESS MY HAND AND SEAL THIS 3rd day of August,
15   2012.
16
17
18
19
20
21   JANET D. WINBERG
     Registered Professional Reporter
22   Notary Public
23   Washington County, Minnesota.
24
25

24 (Pages 90 to 93)

Amelia Huffman
7/31/2012

**94**

```
1    STATE OF MINNESOTA  }
                         : SS CERTIFICATE
2    COUNTY OF WASHINGTON}
3        I, AMELIA HUFFMAN, certify that I have read
4    and examined the typewritten transcript of the
5    deposition taken of me in the matter of Larry E.
6    Smith, et al., vs. Timothy Gorman, et al., on
7    July 31, 2012, consisting of the preceding
8    pages, and find the same to be true and correct
9    (Except as follows):
10                      Reason
     Page  Line Correction        for Change
11
12   _____   _____
13   _____   _____
14   _____   _____
15   _____   _____
16   _____   _____
17   _____   _____
18   _____   _____
19   _____   _____
20   _____   _____
21   _____   _____
22
23   Dated this_____day of_____
24
                     AMELIA HUFFMAN
25   Reporter: JDW
```

**95**

```
1            EXAMINATION INDEX
2    By Mr. Storms: 3 - 92
     ------------------------------------------------
3
              OBJECTION INDEX
4
     Ms. Fundingsland: 42, 51, 53, 54, 55, 58, 59, 62, 65,
5    73, 79, 80, 82, 87, 88, 89
6    ------------------------------------------------
7            EXHIBIT INDEX
     Exhibit 92:
8    7-800 Tactical Response
     marked/identified/reviewed.........................30
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

25 (Pages 94 to 95)

Doby Professional Reporting, Inc.
952-943-1587