# EXHIBIT 24

Michael Berkow
2/25/2013

1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
-------------------------------------------------------

Case No. 11-cv-03071 (SRN/JJK)

Larry E. Smith, as trustee for
the Heirs and Next of Kin of
David Cornelius Smith,

        Plaintiff,

      vs.

Timothy Gorman and Timothy Callahan,
acting in their individual capacities
as Minneapolis police officers, and
The City of Minneapolis,

        Defendants.

-------------------------------------------------------

VIDEOTAPED DEPOSITION TRANSCRIPT OF

MICHAEL BERKOW

February 25, 2013

at



Gaskins Bennett Birrell Schupp, LLP
333 South Seventh Street
Suite 2900
Minneapolis, MN 55402

Reporter:  Jane T. Doby
Registered Merit Reporter
Doby Professional Reporting, Inc.
DobyReporting.com
952.943.1587

Michael Berkow
2/25/2013



**Page 2**

1  APPEARANCES:
2  On Behalf of the Plaintiff:
3     Robert Bennett, Attorney at Law
      rbennett@gaskinsbennett.com
4     Jeffrey S. Storms, Attorney at Law
      jstorms@gaskinsbennett.com
5     Kathryn Bennett, Attorney at Law
      kbennett@gaskinsbennett.com
      GASKINS BENNETT BIRRELL SCHUPP, LLP
7     333 South Seventh Street
      Suite 2900
      Minneapolis, MN 55402
8
      On Behalf of the Defendants:
9
      Burt T. Osborne, Assistant City Attorney
10    burt.osborne@ci.minneapolis.mn.us
      CITY OF MINNEAPOLIS-OFFICE OF CITY ATTORNEY
11    350 South Fifth Street
      City Hall, Room 210
12    Minneapolis, MN 55415
13    Videographer: Jayme Hogan, Envision Video
14
15    NOTE: Pursuant to Minnesota Rule of Civil Procedure
16    30.06, the original transcript will be
      delivered to Gaskins Bennett Birrell
      Schupp, LLP, the noticing party.
17
      NOTE: Exhibit Nos. 1 through 6 were marked
18    for identification.
19
20
21
22
23
24
25

**Page 3**

1          P R O C E E D I N G S
2     (The videotaped deposition of MICHAEL BERKOW
3  was commenced at 9:02 a.m. as follows:)
4     (Exhibits 1 through 3 were marked for
5  identification.)
6          MICHAEL BERKOW,
7  called as a witness, being first duly sworn, was
8  examined and testified as follows:
9                    ***
10    VIDEOGRAPHER:  This is the video deposition
11 of Michael Berkow.  The date is February 25th, 2013,
12 and the time is approximately 9:02 a.m.
13    Would each attorney please state his or her
14 name for the record.
15    MR. BENNETT:  Robert Bennett, appearing on
16 behalf of the plaintiff.
17    MR. STORMS:  Jeff Storms, also on behalf of
18 the plaintiff.
19    MS. BENNETT:  Kathryn Bennett for the
20 plaintiffs.
21    MR. OSBORNE:  Burt Osborne for the
22 defendants.
23    VIDEOGRAPHER:  Thank you.
24    Would the court reporter please administer
25 the oath.

**Page 4**

1          (Oath administered.)
2     THE WITNESS:  I do.
3          EXAMINATION
4  BY MR. BENNETT:
5     Q  Would you state your full name for the
6  record, spelling your last, please.
7     A  Michael Berkow.  B-E-R-K-O-W.
8     Q  And how old are you, sir?
9     A  I'm 57.
10    Q  I'm showing you what has been marked -- we've
11 marked three exhibits so far for the deposition.  The
12 first is your 22-page report dated March -- or excuse
13 me, December 12 -- excuse me, December 17th, 2012 for
14 this matter.  Correct?
15    A  Yes, sir.
16    Q  Exhibit 2 is Attachment A to that report, and
17 Exhibit B -- or 3 is Attachment B to the report.
18 Correct?
19    A  Yes, sir.
20    Q  All right.
21    And those -- you prepared the Exhibit 1 on
22 behalf of the City of Minneapolis at the behest of the
23 City Attorney's Office; is that right?
24    A  Yes, sir, I did.
25    Q  The...

**Page 5**

1     MR. BENNETT:  I'm going to have to staple
2  these.  Do we have a stapler?  Somewhere in there?
3     THE WITNESS:  There's a paperclip right
4  there.
5     MR. BENNETT:  I'm going to paperclip it.
6  We'll staple it later.
7  BY MR. BENNETT:
8     Q  Attachment A is you list your publications, a
9  list of cases which you testified as an expert by trial
10 or deposition in the past four yours and your fee
11 schedule; is that correct?
12    A  Yes, sir.
13    Q  Do you know how much you have been paid in
14 this case to date?
15    A  I believe it's approximately $16,000.
16    Q  Okay.  And that doesn't include the charges
17 to come out here and testify today?
18    A  No, sir.
19    Q  Okay.  So that would be in addition to the
20 16,000?
21    A  Yes, sir.
22    Q  I'd like to go through Attachment B, which is
23 Exhibit 3.  That's your CV; is that correct?
24 Curriculum vitae?
25    A  It's a version of it, yes, sir.

2 (Pages 2 to 5)

Michael Berkow
2/25/2013

**6**

1    Q   And by "a version," what do you mean?
2    A   Well --
3    Q   Do you have -- do you have other versions?
4    A   Sure.
5    Q   This is the one you prepared for purposes of
6    this report?
7    A   Yes, that's correct.
8    Q   Is it true and accurate?
9    A   Yes, sir.
10   Q   Okay.
11       Where did you grow up?
12   A   I lived in a lot of places.  I was born in
13   Texas.
14   Q   I see you ultimately went to -- you got your
15   B.A., bachelor of arts, from Kalamazoo College?
16   A   Yes.
17   Q   Is that in Kalamazoo, Michigan?
18   A   Yes.
19   Q   So you were not a Michigan native or --
20   A   Oh, no, sir.
21   Q   Okay.
22       Then you -- you got that in 1978.  What --
23   what year did you graduate from high school?
24   A   1973.
25   Q   And did you spend all of your baccalaureate

**7**

1    time at Kalamazoo College?
2    A   No, sir.
3    Q   Where did you -- where else did you go to
4    college?
5    A   University of Rochester.
6    Q   What years did you attend there?
7    A   It would have been 1978, part of 1978.
8    Portion.
9    Q   When did you start Kalamazoo College?
10   A   I started Kalamazoo in September of 1973.
11   Q   And how long did you attend Kalamazoo College
12   consecutively?
13   A   I attended until the fall of 1976.
14   Q   By then what were you in terms of credits?
15   Were you a junior at that time, or a sophomore?
16   A   Senior, sir.
17   Q   You had not yet graduated, though?
18   A   No, sir.
19   Q   So you left Kalamazoo College to go back to
20   Rochester?
21   A   Yes, sir.
22   Q   And you were appointed a peace officer in
23   November 1 of '76, correct?
24   A   Yes, sir.
25   Q   Did you have any training in -- to become a

**8**

1    police officer before then?
2    A   Before November 1st, 1976?
3    Q   Correct.
4    A   Yeah, no, sir.
5    Q   You were just -- were you in a cadet program
6    or -- I mean, did -- your...
7        How did you become a police officer with the
8    Rochester Police Department?
9    A   In New York state it's a civil service test.
10   So I took a civil service test, was placed on a list
11   and was ultimately notified that I was accepted for
12   employment.
13   Q   And where did you take your police skills
14   training?
15   A   It -- my basic police academy?
16   Q   Yes.
17   A   At the Monroe County Regional Criminal
18   Justice Training Center.
19   Q   In New York?
20   A   Yes, sir.
21   Q   And you did that prior to November of '76 or
22   after?
23   A   After.
24   Q   Okay.
25       But you're actually -- while you're at the

**9**

1    academy or the training academy, you are a police
2    officer; is that right?
3    A   Yes, sir.  Yes, sir.
4    Q   And you were a police officer for the
5    Rochester, New York Police Department from November of
6    '76 until March of '82?
7    A   Yes, sir.
8    Q   You can look at Exhibit 3, if you'd like.
9    A   Oh, I'm sorry.  I'm trying to -- I'm looking
10   over your shoulder.
11   Q   Yeah, you can --
12   A   Excuse me.
13   Q   Whatever you want.  That's fine, too.  But
14   that's why I gave it to you.
15   A   You're just on a different page.  I don't --
16   I think you might not have given me a complete
17   attachment.  Or did you?  Are you starting down here?
18   I'm sorry.  Okay.  Go ahead.
19   Q   I'm trying to follow it chronologically.
20   A   Yes, sir.
21   Q   Your education and your work history kind of
22   intertwine; is that --
23   A   Yeah, I would say that is correct, yes, sir.
24   Q   Okay.  So you were -- you were a police
25   officer.  And what was your rank from '76 until '82?

3 (Pages 6 to 9)



Michael Berkow
2/25/2013

### 10

1    A   Police officer.

2    Q   All right.

3    A   Would have had different assignments, but my

4  rank was police officer.

5    Q   Okay. You hadn't become a sergeant or --

6    A   No, sir.

7    Q   So then you decide some -- in the middle of

8  being this police officer stint at the -- at Rochester

9  Police Department you're going to finish your

10  baccalaureate degree; is that right?

11    A   Yes, sir.

12    Q   And you do that at the University of

13  Rochester but get a diploma from Kalamazoo College?

14    A   Correct.

15    Q   All right. And you do that in 1978

16  ultimately, correct?

17    A   Yes, sir.

18    Q   When in '78?

19    A   When did I get my diploma?

20    Q   Yeah.

21    A   I believe it was May or June.

22    Q   Okay.

23    A   I'm not a hundred percent certain.

24    Q   Were you full-time on campus at the

25  University of Rochester?

### 11

1    A   No, sir.

2    Q   So it was part-time? Was it at night or...

3    A   Actually, during the day.

4    Q   Okay. I suppose you could work the night

5  shift and go to school during the day if you're a

6  police officer, correct?

7    A   Yes, sir.

8    Q   All right.

9    Then you decide while you're a police officer

10  to attend the Syracuse University College of Law; is

11  that right?

12    A   Yes, sir.

13    Q   Do you do that on a full-time basis?

14    A   Yes, sir.

15    Q   And is that a day program or a night program?

16    A   To my knowledge, at that time they only had a

17  day program.

18    Q   Okay. How long did it take you to go through

19  law school?

20    A   Three years.

21    Q   And you took the New York bar?

22    A   Yes, sir.

23    Q   And passed?

24    A   Yes, sir.

25    Q   Then you graduated when? In like June of

### 12

1  ninety -- '81? From law school?

2    A   I believe it's May of '81, yes, sir.

3    Q   And you remain a police officer in Rochester

4  with a law degree until March of 1982; is that right?

5    A   Yes, sir.

6    Q   Then you're -- you say you were appointed as

7  a confidential law clerk. Now, I don't know what that

8  is. To the Honorable Michael A. Telesca. Is that

9  how -- did I say that right?

10    A   Telesca.

11    Q   Telesca. From March of '82 to March of '83.

12  So a one-year clerkship?

13    A   Yes, sir.

14    Q   What is a confidential law clerk? I don't

15  know.

16    A   That was the title that they called it at the

17  time that I went to work for him. I was a law clerk to

18  a federal judge.

19    Q   Okay. Okay. So how many law clerks did that

20  federal judge have?

21    A   Two.

22    Q   Okay. And Judge Telesca was an Article III

23  United States District Court judge, correct?

24    A   Yes, sir.

25    Q   And you did that for one year?

### 13

1    A   Approximately one year, yes, sir.

2    Q   Then what did you do?

3    A   I then accepted a position as a litigation

4  associate, as an associate at a law firm.

5    Q   And where was the law firm located?

6    A   Seattle, Washington.

7    Q   And how big a firm was that at the time?

8    A   I believe it was about, as -- best of my

9  recollection, it was about 75 lawyers at that time.

10  The name has changed and it's obviously a much larger

11  firm today.

12    Q   What's the name of it today?

13    A   Last time I checked, it was Davis Wright

14  Tremaine.

15    Q   Okay. And you were there on the order of

16  eight months or so; is that right?

17    A   Approximately, yes, sir.

18    Q   March of '83 to November of '83?

19    A   Approximately, yes, sir.

20    Q   Did you take and pass the Washington state

21  bar?

22    A   I did.

23    Q   And why did you decide to leave?

24    A   I decided I liked being a police officer

25  better than I liked being a lawyer.

Michael Berkow
2/25/2013

**14**

1        Q   The -- so you get reinstated to the Rochester
2   Police Department in November of '83 and serve as a
3   police officer there for ten years until September of
4   1993, correct?
5        A   Yes. Yes, sir, that is correct.
6        Q   Promoted to sergeant in '86 and lieutenant in
7   1990, correct?
8        A   Yes, sir, that is correct.
9        Q   In 1984 you went to the FBI National Law
10   Institute; is that right?
11       A   Yes, sir.
12       Q   How long was that program?
13       A   I -- I don't recall exactly how long it was.
14   It was -- whether it was a week or two weeks.  I don't
15   recall.
16       Q   It's not a long program, though, right?
17       A   No.  Well, I don't know what you mean by
18   "long."
19       Q   Like a semester of college --
20       A   No, sir.
21       Q   Or --
22       A   No, sir.
23       Q   -- law school?
24       A   No, sir.
25       Q   Okay.

**15**

1        A   No, sir.
2        Q   How about the FBI National Academy, 173rd
3   Session, that's -- how long is that program?
4        A   That's a -- I believe that is ten weeks.
5        Q   All right.
6            Southwest Command College, how long is that
7   program?
8        A   You know, I don't recall.  I want to say it
9   was either two or three weeks.  It's a
10   several-week-long program.
11       Q   And then ultimately you got a master's in
12   science -- Master of Science in Leadership and
13   Management in May of 2000.  Correct?  From Johns
14   Hopkins?
15       A   Yes, sir.
16       Q   Was that -- were you an on-campus student at
17   Johns Hopkins University?
18       A   Yes, sir.
19       Q   And where is that located?
20       A   Baltimore, Maryland.
21       Q   Was that at the same time that you were chief
22   of police at the South Pasadena Police Department?
23       A   Yes, sir.
24       Q   They're a ways away from each other, aren't
25   they?  Pasadena, California and -- what's it --

**16**

1   Baltimore, Maryland.  Right?
2        A   Yes, that would be correct.
3        Q   How did you pull that off?  How long is that
4   master's program?  Was it an executive program or a
5   regular, at least year or two-year master's program?
6        A   It's a two years master's program, but it's
7   in executive format.  So it's two full days every other
8   week.
9        Q   So you have to fly across country and go to
10   school?
11       A   Yes, sir.
12       Q   Okay.
13           You say that you were -- that you went to the
14   United States Department of Justice International Crime
15   Investigative Training Assistance Program.  When was
16   that?
17       A   That was in August/September timeframe of
18   1993.
19       Q   Was that a job or was that -- were you on
20   loan from a police department?  I'm trying to just
21   figure that out.
22       A   It started as a detail where I was detailed
23   from the police department to the Department of
24   Justice.
25       Q   Okay.

**17**

1        A   And then became a full-time position.  I
2   mean, it was full-time all the time, but it became a --
3   an actual U.S. Department of Justice employee.
4        Q   Okay.  And when was that, that you were an
5   actual Department of Justice employee?
6        A   Sometime during that same timeframe.  I
7   couldn't tell you exactly when.
8        Q   Then you leave to -- that to go become chief
9   of police in -- is it Coachella?
10       A   That would be Coachella, California, yes,
11   sir.
12       Q   And you're there from April of '95 to July of
13   '97?  Is that right?
14       A   Yes, sir.
15       Q   South Pasadena Police Department from July of
16   '97 to August of 2001; is that right?
17       A   That is correct, yes, sir.
18       Q   Chief of police of Irvine Police Department
19   at August 2001 to April 2003?
20       A   Yes, sir.
21       Q   And then deputy chief of police at LAPD from
22   April 2003 to November of 2006?
23       A   Yes, sir.
24       Q   Any of those -- did you leave all of those
25   positions voluntarily?

5 (Pages 14 to 17)

Michael Berkow
2/25/2013

18

1      A   Yes, sir.
2      Q   And as to L.A., you were not -- you were not
3   terminated, correct?
4      A   Absolutely not.
5      Q   Were -- was it suggested that you resign from
6   L.A.?
7      A   The opposite.
8      Q   They wanted to keep you?
9      A   Yes, sir.
10     Q   Okay.  But you decided to go to Savannah-
11  Chatham Metro Police Department in Savannah, Georgia;
12  is that right?
13     A   Yes, sir.
14     Q   You leave them in November of 2009 and go
15  to -- was it Kroll at the time or was it --
16     A   It was Altegrity at the time.
17     Q   Okay.  And then Kroll buys Altegrity,
18  ultimately?
19     A   No.  Altegrity bought Kroll.
20     Q   Okay.
21     A   Yes.  This is a little confusing at this --
22  this one.
23     Q   And you're there for two and a half years?
24     A   Started in November -- I guess I -- yes.
25     Q   And then you leave to go to Strategic Policy

19

1   Partners.  What's that?
2      A   It's just a consulting firm.  Does --
3      Q   Where?
4      A   -- police consulting.
5      Q   Okay.
6          And where did you consult for?
7      A   You mean who were the clients?
8      Q   Yeah.
9      A   It ranged from clients inside the United
10  States to international clients, various police
11  departments and governments.
12     Q   Was one of them the Boston Police Department?
13     A   Yes, sir.
14     Q   Okay.  Then you left to join the U.S. Coast
15  Guard Investigative Service in October of 2012?
16     A   Yes, sir.
17     Q   And you -- that's your present employer?
18     A   That is.
19     Q   And what are your duties and responsibilities
20  there?
21     A   I serve as the director of the Coast Guard
22  Investigative Service.
23     Q   Okay.  So what does that amount to?  Tell me
24  what you do on a day-to-day basis.
25     A   I am the leader of all of -- I'm responsible

20

1   for and in charge of all of the criminal investigators
2   in the United States Coast Guard worldwide.  So it's
3   similar to being a criminal investigative division
4   command, would be the analogy I would use for a police
5   department.
6      Q   How many investigators are worldwide in the
7   Coast Guard?
8      A   Just under 400.  Somewhere in the --
9   depending on if you count reserves and full-time.
10     Q   Okay.
11         Are you presently a member of the -- good
12  standing of any bar association of any state?
13     A   New York state bar.  But I'm in what they --
14  I believe it's called a retirement status.
15     Q   Does that mean you don't keep up your CLE and
16  that sort of thing?
17     A   That's correct.
18     Q   You just -- so you -- you wouldn't actually
19  be -- if you had to go get a certification of
20  membership in good standing, you couldn't get one until
21  you complied with your CLE requirements, as I
22  understand it, correct?
23     A   I have no idea.
24     Q   Okay.
25     A   I pay a fee, I have a certain -- I get

21

1   letters from them on a regular basis to confirm my
2   status.
3      Q   Can you practice law in the courts of the
4   state of New York?
5      A   I don't know.  I haven't looked into it.  I
6   don't -- I don't practice law in the state.
7      Q   You don't know if you can or you can't?
8      A   I have no idea.
9      Q   Okay.  How about are you a member in the good
10  standing of the bar association -- bar of any United
11  States District Court, any U.S. Court of Appeals or the
12  United States Supreme Court?
13     A   I have no idea.  I don't know if that expires
14  or have -- once having had that, if it expires.  I just
15  have no idea.
16     Q   Okay.  Have you ever been disciplined or
17  sanctioned by any bar association or any court of any
18  competent jurisdiction?
19     A   Never.
20     Q   Okay.
21         How long have you held yourself out as being
22  available to do expert witness testimony?
23     A   I'm not sure I understand the question, sir.
24     Q   Well, you know, Mr. Osborne found you,
25  looking for an expert.  Did you have other people who

6 (Pages 18 to 21)

Michael Berkow
2/25/2013

22

1  hired you as a -- as being an expert in police matters
2  for testimonial purposes?
3  **A    At different times, yes, sir.**
4      Q    How long have you been doing that kind of
5  work?
6  **A    I've done it off and on.  Very little of it,**
7  **frankly.  So occasionally I get asked to do it.  I**
8  **actually get asked to do it and very rarely do I take**
9  **on the engagements.**
10     Q    Okay.  As I understand it, you haven't
11  testified in any matter in the last four years; is that
12  right?
13  **A    Not as an expert witness, no, sir.**
14     Q    How long have you had this fee schedule
15  that's page 2 of Exhibit 2?
16  **A    Page 2, Exhibit 2.  I believe this would have**
17  **been put together when I left Kroll.  So that would**
18  **have been right at the beginning of March of 2012.**
19     Q    Did you testify -- or did you review matters
20  to be an expert witness when you worked for Kroll?
21  **A    Yes, sir.  This engagement started with**
22  **Kroll.**
23     Q    So this was put together after you left
24  Kroll, this fee --
25  **A    Yes, sir.**

23

1      Q    PolicyPartners.com, was that your email at --
2  at your -- the consulting firm?
3  **A    Yes, sir.**
4      Q    Strategic Policy Partners?
5  **A    Yes, sir.**
6      Q    So you began this engagement when you were
7  working for Kroll; is that right?
8  **A    Yes, sir.**
9      Q    And continued in the Strategic Policy
10  Partners, correct?
11  **A    Yes, sir.**
12     Q    All right.  Do you know, do you have any
13  understanding about, why you haven't been asked to
14  testify as an expert in trial or deposition in the last
15  four years?
16  **A    I'm sorry?**
17     Q    Do you know why you -- do you have a belief
18  as to why you have never testified in the last four
19  years?
20  **A    Just haven't taken cases, I don't believe,**
21  **that have gone to trial or been engaged in matters that**
22  **have -- where I've been asked to testify.**
23     Q    How many cases do you presently have?
24  **A    Right now I have this one and one other one.**
25     Q    What kind of case is the other one?

24

1      A    It's a police pursuit case.
2      Q    Okay.  Where?
3      A    Jacksonville, Florida.
4      Q    How many cases have you had in the last four
5  years?
6      A    I don't know the exact number.
7      Q    Well, is it more than ten?
8      A    Over the course of four years?
9      Q    Yeah.
10     A    Give me a date you want to start that time
11  clock with, sir.
12     Q    Well, let's take four years from today.  So
13  March of two thousand -- or February of 2009.
14     A    Well, in February of 2009 I would have been
15  the chief of police in Savannah, so I wouldn't have
16  been taking cases.
17     Q    You didn't take any cases while you were
18  chief of police there?
19     A    Not that I recall, no.
20     Q    And how many have you taken after you left
21  Savannah, then?
22     A    I don't recall the number.  I've looked at a
23  number of cases.  I've been asked to take a number of
24  cases.  There was a small number of cases that I have
25  taken.  And when I accepted the position with the Coast

25

1  Guard, the United States Coast Guard, I removed myself
2  from all the cases that I could ethically.
3      Q    Okay.
4          (Reporter's Note:  Sotto voce communication
5  between Mr. Bennett and Mr. Storms.)
6  BY MR. BENNETT:
7      Q    Have you ever previously provided expert
8  testimony?
9      A    In what context, sir?
10     Q    Well, as an expert witness hired under Rule
11  702 of the Federal Rules of Evidence or the state
12  corollary.
13     A    Have I been hired as an expert witness?
14     Q    Yeah.
15     A    Yes, sir.
16     Q    How many times?
17     A    I don't recall the exact number, sir.
18     Q    Have you ever been deposed before?
19     A    Yes, sir.
20     Q    As an expert witness?
21     A    Yes, sir.
22     Q    Otherwise, other than as an expert witness?
23  As a fact witness have you been deposed?
24     A    Yes, sir.
25     Q    How many times?

7 (Pages 22 to 25)

Michael Berkow
2/25/2013

26

1    A   Again, I wouldn't have an exact number.  A
2  number of times over the years.
3    Q   Was the only consulting that you've done in
4  terms of expert witness testimony done after you were
5  done being a chief of police?
6    A   No.  I believe that I did have a couple of
7  cases while I still was.
8    Q   Where?
9    A   I believe that I did some expert work for the
10  City of Chicago.
11    Q   Do you remember when that was?
12    A   Not exactly, no, sir.
13    Q   Do you remember what the case involved, who
14  the lawyers were?
15    A   I'd have to go back and look for notes.
16    Q   You don't know as you sit here today?
17    A   No, sir.
18    Q   When were you first contacted about this
19  case?
20    A   I believe it was January or early February of
21  2012.
22    Q   Who were you contacted by?
23    A   I was asked by my boss, Bill Bratton, to
24  contact the City Attorney's Office here in Minneapolis
25  about a particular case, about this case.

27

1    Q   And at that time you used the Kroll fee
2  schedule?
3    A   Yes, sir.  It might actually have been
4  earlier than that, because I know there was some
5  negotiation between Kroll and the City Attorney's
6  Office over the agreement.
7    Q   What was the assignment you were given by the
8  people that hired you for this case?
9    A   By the City Attorney's Office here?
10    Q   Uh-huh.
11    A   To review the facts surrounding this
12  particular case involving Mr. David Smith.
13    Q   Other than the items listed in your report,
14  did you review any additional documents or material
15  prior to today's deposition?
16    A   I'm sorry, which report are you referring to,
17  sir?
18    Q   Exhibit 1.
19    A   There's two reports.
20       So the most recent report?
21    Q   Well, is there anything – the – your first
22  report...
23       I guess we – we can mark that, too.
24       I don't have an extra copy of that.
25       (Reporter's Note:  Sotto voce communication

28

1  between Mr. Bennett and Mr. Storms.)
2       (Exhibit 4 was marked for identification.)
3  BY MR. BENNETT:
4    Q   Are all the materials listed that you
5  reviewed in Exhibit 4 listed in Exhibit 1?
6    A   You mean you want me to compare these two?
7    Q   Yeah.  What I mean, my guess is Exhibit 1
8  just is -- is documents that were added to the list of
9  things you reviewed, not subtracted.
10    A   Yes, sir.
11    Q   Okay.  So Exhibit 1 would be the exhaustive
12  list of things you've now reviewed?
13    A   Yes.  Yes, sir.
14    Q   And that lists all of the things that you
15  reviewed, as far as you know?
16    A   As far as I can recall right now, yes, sir.
17    Q   What did you review for your deposition
18  today?  Anything else?
19    A   Anything in addition to these?
20    Q   Yes.
21    A   No, sir.
22    Q   Did you re-review anything in preparation for
23  today's deposition?
24    A   I reread these two reports.  I reread
25  Mr. Ryan's reports.

29

1    Q   Okay.
2    A   I looked at two of the videos.
3    Q   Which ones?
4    A   The -- well, the disks that I have them,
5  they're labeled as the "pen cam" and the "TASER cam."
6       And I believe I also reviewed a couple of
7  depositions, sir.
8    Q   How much of the work was done at $400 an hour
9  and how much was done at 250?
10    A   I don't know exactly.  It would be a -- I
11  don't know if anything was billed at $400 an hour.  If
12  it was, it would have been a very small number.
13    Q   Okay.
14    A   I don't know exactly, though, sir.
15    Q   Did you read all of the depositions listed in
16  Exhibit 1 in their entirety?
17    A   When, sir?
18    Q   Before you wrote your report.
19    A   Yes, sir.
20    Q   You know what asphyxia is, don't you?
21    A   I'm sorry?
22    Q   Do you know what asphyxia is?
23    A   I'm not sure what you're asking me.
24    Q   The term "asphyxia," do you know what it
25  means?

8 (Pages 26 to 29)

Michael Berkow
2/25/2013

30

1    A  I'm not -- I'm not sure I know what you're
2  talking about.  No.
3    Q  So you -- are you aware of the related
4  concepts of positional, mechanical, and restraint
5  asphyxia?
6    A  I'm aware that there's a lot of terms that
7  have been used in this case.  I certainly have some
8  knowledge of some of those terms.
9    Q  Which terms do you have knowledge of?
10    A  I would be most familiar with positional
11  asphyxia.
12    Q  And when did you first become aware of that
13  as a concept?
14    A  Oh, it's been -- I would guess probably in
15  the very early 1980s.
16    Q  Positional asphyxia and mechanical asphyxia
17  and restraint asphyxia are kind of talking about the
18  same types of things, aren't they?
19    A  I don't know, sir.  I'm trying to be very
20  precise.  And so you asked me so what I specifically
21  know, and I'm aware of positional asphyxia, and...
22    Q  Okay.
23      Are you aware that asphyxia has long been
24  associated with the prone position in terms of police
25  work?

31

1    A  I'm aware that there have been issues about
2  in-custody deaths and there have been questions about
3  why people have ultimately died or been seriously
4  injured during in-custody -- taking people into
5  custody, securing them and moving them, yes, sir.
6    Q  Well, in fact, law enforcement entities
7  nationwide have been training officers about risks
8  associated with maintaining subjects in a prone
9  position for a long time, haven't they?
10    A  I don't know what you're referring to, sir.
11    Q  You -- so you're not aware of it generally,
12  that law enforcement entities nationwide will train its
13  officers about the risks associated with maintaining
14  the subjects in the prone position?
15    A  I think that it is difficult to make a
16  statement generally about, quote -- "generally" was the
17  word that you used about law enforcement in the United
18  States.  There's 19,000 law enforcement agencies, and
19  so I'm very leery and concerned about the use of the
20  word "generally."
21    Q  Well, let's ask:  Have you ever provided
22  training warning officers about potential risks
23  relating -- related to maintaining subjects in a prone
24  position for extended periods of time?
25    A  Provided training?

32

1    Q  Yes.
2    A  No, sir.
3    Q  Have you ever been in charge of reviewing or
4  implementing policies in that regard?
5    A  Specifically policies about...
6      Not that I recall, no, sir.
7    Q  Have you ever worked for a police department
8  that had policies reflecting the potential risks of
9  maintaining subjects in a prone position for extended
10  periods of time?
11    A  Can you repeat that, please?
12      MR. BENNETT:  Can you read it back, Jane?
13      (The following was read back by the court
14  reporter:
15      "Have you ever worked for a police department
16  that had policies reflecting the potential risks of
17  maintaining subjects in a prone position for extended
18  periods of time?")
19    A  I don't recall specific policies about that
20  right now, no, sir.  I'd have to review the policy
21  manuals for the different agencies.
22  BY MR. BENNETT:
23    Q  Do you know if the Minneapolis Police
24  Department officers have received training reflecting
25  the potential risks for -- related to maintaining

33

1  subjects in a prone position for extended periods of
2  time?
3    A  I certainly reviewed extensive period -- you
4  know, amount of their training material.  I don't
5  recall the precise answer to that question right now,
6  sir.
7    Q  Well, you'd be surprised, wouldn't you, if
8  any officer working from, say, 2000 to 2010 for a major
9  metropolitan police force had not learned at least on
10  one occasion about the potential dangers associated
11  with prone positioning and asphyxia?  Correct?
12    A  I can't answer that question in that context,
13  sir.  As I've explained, there's too many police
14  departments and there is no national standard.
15    Q  Are you aware that police officers have long
16  been trained that the ideal medical position to place
17  positions (sic) in to facilitate breathing is the
18  seated or side recovery position?
19    A  I'm aware of a great deal of discussion.  I'm
20  aware of a great deal of --
21    Q  How about training?
22    A  Am I -- question, sir?
23    Q  Are you aware that officers have been trained
24  that way?
25    A  I'm aware that there exists some training for

9 (Pages 30 to 33)

Michael Berkow
2/25/2013

34

1   that, yes, sir.
2       Q   Do you know if Minneapolis has done that?
3       A   I don't recall as I sit here, sir.
4       Q   Have you read the depositions of the officers
5   of the Minneapolis Police Department, other than
6   Callahan and Gorman, that are listed in Exhibit 1?
7       A   Yes, sir, I did at one point in time.
8       Q   And in fact, every one of those officers,
9   every one of them, testified they'd received that
10  training, correct?
11      A   I don't recall that as I sit here now, sir.
12      Q   Okay.
13          You and I can agree that an officer's use of
14  force must be objectively reasonable under the Fourth
15  Amendment, correct?
16      A   Yes, sir.
17      Q   And that the Minneapolis Police Department,
18  like most police departments nationwide, have
19  enacted -- has enacted policies that mirror the
20  use-of-force obligations under the Fourth Amendment,
21  correct?
22      A   I -- I will -- I'm sorry, I can't agree to a
23  statement about most police departments.
24      Q   Well, how about the Minneapolis Police
25  Department?

35

1       A   Yes, sir.
2       Q   Okay.
3           And the Minneapolis Police Department has
4   provided its officers with training to instruct the
5   officers on use of force and the need for such force to
6   be objectively reasonable, correct?
7       A   Yes, sir, I believe they have.
8       Q   The...
9           And it has been well and long established
10  that an officer's seizure of a subject starts when the
11  officer restricts the subject's volitional movements by
12  oral commands or physical action and ends when the
13  officer either releases the subject or turns the
14  subject over to jail or medical personnel; is that
15  right?
16      A   I'll certainly agree with the beginning part
17  of that statement. I guess the second part, it could
18  be court or there would be other -- it depends on how
19  you want to define "jail." Custody facilities, court
20  facilities.
21      Q   Some other custodial facility or medical
22  personnel?
23      A   Or -- or their probable cause to arrest has
24  evaporated. Or if it's a mental hygiene arrest and
25  they've seized someone pursuant to mental hygiene

36

1   authority and they've turned them over to medical
2   facilities. So I think there's a variety of ways it
3   can end.
4       Q   Okay. So release, turning the subject over
5   to some kind of custodial facility, medical or legal,
6   and -- or taking -- or releasing them to medical
7   personnel, correct?
8       A   Yeah, I think, I believe that...
9       Q   Okay.
10          And it's well and long established that an
11  officer's conduct throughout the entirety of the
12  seizure must be reasonable to comply with the Fourth
13  Amendment, correct?
14      A   Yes, sir.
15      Q   Okay.
16          And it is well established, prior to
17  September of 2010, that officers have a duty to monitor
18  the medical condition of any subject they have used
19  force on once it becomes reasonable to do so?
20      A   I don't know -- I can't agree with that
21  statement.
22      Q   You don't agree with it?
23      A   Well, I don't -- you've got a lot of very
24  broad language in there. "Well established" --
25      Q   Well, "well established" just means it's

37

1   well-known in the industry. You make all sorts of --
2   you make all sorts of representations in your report,
3   which we'll go into, that what is inside contemporary
4   police thinking, training and practice, and -- and what
5   is generally -- what is consistent with generally
6   accepted practices and procedures. And it is part of
7   those generally accepted practices and procedures that
8   establishes the duty to monitor the medical condition
9   of a subject that has forced -- that force has been
10  used on, correct?
11      A   I can't agree with that statement as you're
12  stating it, no, sir.
13      Q   Okay. Okay.
14          You don't agree that officers must monitor
15  things like consciousness of the people they've used
16  force on?
17      A   Sure. Absolutely.
18      Q   How about whether they're -- they're
19  respiring, breathing?
20      A   Breathing. Yes, sir.
21      Q   Whether they're bleeding?
22      A   Absolutely. Yes, sir.
23      Q   Whether they've suffered any dangerous or
24  life-threatening injuries?
25      A   Absolutely. Yes, sir.

10 (Pages 34 to 37)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

38

1    Q   Whether they've suffered any injury that
2  requires the intervention of professional medical
3  personnel?
4    A   I think you would have covered that in the
5  breathing or bleeding.
6    Q   Well, he could be -- he could be breathing
7  and not -- not bleeding and having a stroke, for
8  example, couldn't you?  Or an ascending aortic aneurysm
9  or a heart attack, right?
10    A   I'm not a medical personnel, sir, but if -- I
11  believe if you -- what you're describing, the symptoms
12  would be so obvious that there would be a clear need to
13  get medical attention, yes, sir.
14    Q   And medical monitoring requires an active
15  analysis on the -- on the part of the officer, does it
16  not?
17    A   I -- you use the phrase "medical monitoring,"
18  and I'm not quite sure what you mean by that.
19    Q   Well, monitoring -- monitoring a person's
20  respiration, consciousness, and whether or not they're
21  injured requires a certain level of vigilance on the
22  part of the officer.  Would you agree?
23    A   Monitoring someone.  Let's agree on the word
24  of "monitoring."
25    Q   Yeah.

39

1    A   "Medical monitoring" I have trouble with,
2  because "medical monitoring" could have a wide variety
3  of applications.
4    Q   Sure.  But for the police officer, what
5  applications are -- if you're using force on a subject,
6  what are you monitoring, if you're a police officer?
7    A   You're monitoring the subject just as you
8  described:  To make sure that they're breathing,
9  they're not bleeding, they don't have some more serious
10  injury that requires immediate medical attention.
11    Q   And that requires that the officer pay
12  attention to those things, does it not?
13    A   Yes, it does.
14    Q   It requires a certain level of vigilance,
15  does it not?
16    A   I'm not sure I would use the word
17  "vigilance," but a certain amount of attention.
18    Q   Well, you don't want the officers -- I mean,
19  there may be situations certainly where they have to
20  pay attention to extraneous things, like if there's
21  someone who might endanger them near the -- near the
22  event, correct?
23    A   Yes, sir.
24    Q   But if the -- absent that, they should be
25  paying attention to the subject upon whom force has

40

1  been used, correct?
2    A   In a -- in a general broad term, yes, sir.
3    Q   Okay.
4    "Vigilant" is a conclusion.
5    Q   Well, then let's not use vigilant.  You
6  should -- you have to be paying at least enough
7  attention to observe whether or not a subject is
8  conscious?
9    A   You should be paying attention to the people
10  you've arrested to make sure that -- people that are in
11  your custody to make sure that they are not as we just
12  discussed.
13    Q   Okay.
14    Now, Exhibit 1, your -- you wrote a 22 --
15  that's a 22-page report, and I think there were 73
16  footnotes.  Is that right?
17    A   Yes, sir, 22 pages.  And yes, sir, 73
18  footnotes.
19    Q   And, Mr. Berkow, it appears to me that in --
20  that within those -- that report, the 22 pages and the
21  73 footnotes, that there's no mention of or -- of
22  several issues critical to a Fourth -- to any Fourth
23  Amendment analysis of the conduct of Officers Gorman
24  and Callahan.  Do you know what those issues are?
25    A   I -- I don't understand your question, sir.

41

1    Q   Well, I think -- I think you missed several
2  critical issues, and I want to understand if you did it
3  by mistake or by -- on purpose.  Okay?  So do you know
4  what issues you missed --
5    MR. OSBORNE:  Objection.
6  BY MR. BENNETT:
7    Q   -- that don't appear in your report?
8    MR. OSBORNE:  Argumentative.
9    A   I have no idea what question you're asking
10  me, sir.  I don't understand your question.
11  BY MR. BENNETT:
12    Q   Well, you know, you -- I think you -- I think
13  Callahan -- you cite Callahan's statement in 13
14  footnotes.  Do you want to look at that?  And by "his
15  statement," I'm talking about Exhibit 37.  Do you
16  want to -- do you want to count them?  I have.
17    A   If you'd like me to, I will.
18    Q   Yeah.  You can start with footnotes 14, 15,
19  16, 17, 18, 19, 21 --
20    A   I'm sorry.  If you'll -- you'll have to give
21  me a pen, and want me to write those down, sir?
22    MR. OSBORNE:  What do you want -- what's this
23  exercise all about, Bob?
24    MR. BENNETT:  Well, hopefully it will become
25  clear.  If you --

11 (Pages 38 to 41)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

42

1    MR. OSBORNE: Good, because it isn't now.
2    MR. BENNETT: Look -- look -- it doesn't have
3 to be now. And I don't have to make it clear to you,
4 Burt.
5    MR. OSBORNE: No, I know, but --
6 BY MR. BENNETT:
7    Q   If you -- you start citing it on footnote
8 number 14. So if you'd find footnote number 14. Do
9 you see where you start there with "Callahan's"?
10   A   Yes, sir.
11   Q   Okay. And what you're citing to is
12 Exhibit 37; is that right?
13   A   I don't know what Exhibit 37 is, sir.
14   Q   That's Callahan's statement to Sergeant Klund
15 on the 15th of September 2010.
16   A   I believe it's a supplement of this other
17 sergeant, Erick Fors.
18   Q   Well, but it's a statement of Officer Tim
19 Callahan. Do you see that?
20   A   Yes, sir.
21   Q   Isn't that how you cite it?
22   A   Yes, sir.
23   Q   And did you cite it in footnote 13?
24   A   13? No, sir.
25   Q   Oh, excuse me. 14?

43

1    A   14, yes, sir.
2    Q   15?
3    A   15, yes, sir.
4    Q   16?
5    A   Yes, sir.
6    Q   17?
7    A   No, sir.
8    Q   Yeah, well, look at 17. "See also statements
9 of Officers Callahan and Gorman." That's what you're
10 referring to there, when you say "See also"?
11   A   Let me read the...
12       I could be referring to this or I could be
13 referring to their deposition testimony.
14   Q   You -- but if you're --
15   A   It's covered in both places, that -- those
16 comments.
17   Q   Okay. But a statement would be Exhibit 37,
18 correct?
19   A   Could be, yes, sir.
20   Q   All right. Same thing with 18?
21   A   Yes, sir.
22   Q   19?
23   A   Yes, sir.
24   Q   21? That's what you're referring to,
25 Exhibit 37? To Erick Fors?

44

1    A   Let me just -- I'll just look at the actual
2 Exhibit 37, if you don't mind.
3    Q   Sure.
4    A   May I grab this?
5    Q   Sure.
6    A   Yes, sir, the quote is here.
7    Q   Okay.
8       23? I guess we just did 23.
9       25?
10   A   We just -- we just did 19.
11       23 --
12   Q   19 and 21, excuse me.
13   A   21.
14   Q   "See statement of Officer Callahan."
15   A   Yes, sir.
16   Q   23, "See statement of Officer Callahan"?
17       And you're citing about the facts of the --
18 of what Mr. Smith was able to do and what he was -- and
19 what he was -- for example, 23 is a footnote to the
20 following sentence: "Officer Callahan subsequently
21 drew his TASER, activating his TASER video, and he
22 removed one of his hands from Mr. Smith to do so.
23 Mr. Smith was able to get his" -- "get to his feet and
24 momentarily break free from the officers, run away,"
25 footnote 23, and you're referring to his statement.

45

1 Correct?
2    A   I believe so. I'm looking to see if I can
3 find it in the statement, sir.
4    Q   Well, I -- I'm just looking at your report.
5 So you don't -- you can look -- I'll refer you
6 specifically to the statement, but you did make a
7 reference to the statement for that fact, correct?
8    A   On -- on 23?
9    Q   Yeah, on page 9, footnote 23.
10   A   Yes, sir.
11   Q   Then you go to page 10, footnote 25, you cite
12 Callahan statement for the fact that at that time
13 Mr. Smith was able to punch Officer Callahan in the
14 face, paren, jaw, close paren, and that Callahan was
15 unable to block the punch, as he had one hand on Smith
16 and the other hand was holding his TASER, and then you
17 cite his statement again, correct?
18   A   Yes, sir.
19   Q   26 is a footnote about what Mr. Smith did,
20 and the -- and the -- and the attempts to handcuff him;
21 is that right?
22   A   Yes, sir.
23   Q   27 is a further description by Callahan of
24 the struggle, correct, footnote 27?
25   A   I'm just looking for it, sir.

12 (Pages 42 to 45)

Michael Berkow
2/25/2013

46

1    Yes, sir.
2    Q    And that -- and that goes to about to the
3 physical conditioning?
4    A    Well, footnote -- hang on a second. Footnote
5 27 --
6    Q    Physical positioning, excuse me.
7    A    Footnote 27 is about Gorman, not about --
8    Q    But -- but what you're doing is that Officer
9 Callahan describes what Officer Gorman did in his
10 statement, correct? That's an Id cite?
11    A    It is. And then it says, "And --
12    Q    "See statement of" --
13    A    -- "see statement of Gorman."
14    Q    Okay. And that's Exhibit 39?
15    A    So that would be a different exhibit, yes,
16 sir.
17    Q    Yep. All right.
18    Then go to page 12. Footnote 36 you cite
19 the statement of Officer Callahan again?
20    A    What -- which footnote?
21    Q    36.
22    A    36? Just a second, I have to find it.
23    Yes, sir.
24    Q    And 41 on page 14. Again, you cite the
25 statement of Officer Callahan. Footnote 41.

47

1    A    Yes, sir. Yes, sir.
2    Q    Okay.
3    Now, I didn't read anywhere in your report --
4 and so that's four -- that's -- what did I say? That's
5 13 times you cited him. Did you ever mention or -- or
6 cite in your 22-page, 73-footnote document the
7 following language from the same exhibit, Exhibit 37,
8 talking about that, "And it was at this point we were
9 able to get his arms fully behind his back and
10 handcuffed together. It was also at this time that
11 Smith seemed to calm down a bit and was not resisting
12 as hard. I believed that Smith was giving up at this
13 time and complying"?
14    Does that appear in Exhibit 1 at all? Any
15 citation to that?
16    A    I don't recall. You didn't just point it out
17 to me, though, sir.
18    Q    Well, I -- I --
19    A    I can certainly read the whole thing again.
20    Q    Well, you read it -- you read your report to
21 get ready for your deposition today. You said that.
22    A    Yes, sir.
23    Q    Did you read that in that?
24    A    At this point in time I have seen that
25 statement cited so many times, whether it's been in

48

1 depositions from you or in other reports, that I don't
2 recall exactly where I've seen it as I sit here.
3 But --
4    Q    Well, it isn't in your report, is it?
5    A    I'd have to reread my report precisely,
6 but --
7    Q    All right. Do you want to take the time to
8 do that right now? It's fine with me.
9    A    It's up to you, sir.
10    Q    All right. We'll take a break. You read it.
11    VIDEOGRAPHER: Off the video record at
12 9:55 a.m.
13    (Recess taken.)
14    VIDEOGRAPHER: We're back on the video
15 record. It is 10:06 a.m.
16 BY MR. BENNETT:
17    Q    Mr. Berkow, you've had now an opportunity to
18 read through your own report again, correct?
19    A    Yes, sir.
20    Q    And there is no citation to any of the
21 language in Exhibit 37, page 5, that I read on the
22 record before we broke, correct?
23    A    There is no specific cite to that paragraph,
24 no, sir.
25    Q    Well, there's no specific cite in the

49

1 language regarding stopped -- stopping resisting,
2 compliance, and giving up. Does not appear in your
3 report, correct?
4    A    Those specific words do not.
5    Q    Those were the specific words of Officer Tim
6 Callahan the first time he was asked about this,
7 though, correct?
8    A    I don't know if it was the first time. It
9 was the first time he was formally interviewed.
10    Q    Okay. Well, it's the first interview of him
11 that you can look at?
12    A    Yes, sir.
13    Q    All right. The first one I can look at and
14 the first one the jury will be able to look at,
15 correct?
16    A    Best of my knowledge, yes, sir.
17    Q    He's represented by counsel?
18    A    Yes, sir.
19    Q    And would it be correct to say that a Fourth
20 Amendment analysis of use of force would necessarily
21 include the fact when the officer using the force
22 perceived that the subject of the -- à force was giving
23 up, complying, not resisting?
24    A    Yes, I think that would absolutely be a
25 factor.

13 (Pages 46 to 49)

Michael Berkow
2/25/2013

50

1 Q   They are critical factors, aren't they?
2 A   I think it is absolutely a factor.
3 Q   Well, let's just take an example outside of
4 this case, because I think it's so stark and so real.
5 I could show you the videotape of it, for example.
6      The police officers are engaged in a chase of
7 a person they believe may have a gun. They're chasing
8 him in squads and on foot. Okay? Do you have that in
9 mind?
10 A   Yeah, it's a foot chase or a car chase?
11 Q   Both. Well, the police are in cars and on
12 foot. And the perpetrator, the suspect, is on foot.
13 A   Okay, sir.
14 Q   He runs, he gets -- runs to kind of a
15 dead-end alley, tries to climb a large chain-link
16 fence, realizes he's not going to get across. Turns
17 around. Puts his hands up in the air --
18      MR. BENNETT: Like this, Jayme.
19      (Demonstrating.)
20 BY MR. BENNETT:
21 Q   So his hands are visible to all officers and
22 the squad video. Okay?
23 A   Yes, sir.
24 Q   Would you -- would you recognize that as a
25 sign of surrender and acquiescence to police authority?

51

1 A   Yes, sir, that certainly suggests that, yeah.
2 Q   So it would then be improper under any
3 reasonable Fourth Amendment analysis for the officers
4 to strike him in the head several times, kick him and
5 hit him with ASP while his hands are up in the air,
6 correct?
7 A   I don't know all the facts. Sounds like
8 you're relating a very specific case.
9 Q   I am.
10 A   But the fact pattern as you've described it,
11 with that limited, absolutely.
12 Q   Well, I'm just describing what was on the
13 video.
14      MR. OSBORNE: Well, he hasn't seen the video
15 you're talking about, Bob. I mean, you know, he's
16 trying to answer the best he can.
17 A   You're asking me a hypothetical with a
18 limited set of facts.
19 BY MR. BENNETT:
20 Q   I am. But the key to that is his hands in
21 the air, compliance, acquiescence, stopping flight, and
22 stopping any fighting. Correct? Putting your hands
23 up, giving up, is really important, isn't it?
24 A   Giving up is absolutely a factor.
25 Q   You cannot use force on somebody who is

52

1 giving up or at least your use of forces are
2 restricted, correct?
3 A   The use of all force is judged by a standard
4 of is it objectively reasonable.
5 Q   Yeah. And it is objectively unreasonable to
6 use force of any significance on a person that is
7 giving up, correct?
8 A   I think "giving up" covers a lot of ground,
9 so you'd have to give me specific facts to -- to answer
10 that.
11 Q   It was on the video, right? You saw the
12 video of David Smith?
13 A   I'm sorry, you were pointing at something and
14 then asking me a different question.
15 Q   Exhibit 37 is what I'm pointing at.
16 A   Yes, sir.
17 Q   Paragraph 5.
18 A   Yes, sir.
19 Q   Callahan's own words.
20 A   Yes, sir.
21 Q   Callahan perceives subjectively that David
22 Smith is giving up and complying; doesn't he state
23 that?
24 A   That is not what he states.
25 Q   All right. Let's just -- let's read exactly

53

1 what he states.
2      Beliefs are subjective, right?
3 A   Pardon me?
4 Q   Beliefs are subjective as opposed to
5 objective. Correct? What he -- what he states -- do
6 you agree that beliefs are subjective?
7 A   I'm not sure I understand what you're asking
8 me about, sir.
9 Q   Well --
10 A   You're jumping from --
11 Q   Well, do you know the difference between
12 objective and subjective?
13 A   Yes, sir.
14 Q   What's subjective?
15 A   Subjective is what I -- if I believe, for
16 example, that you're hostile or you're --
17 Q   All right.
18 A   Conclusionary statements.
19 Q   And the question is would an objective review
20 of the same facts come to that conclusion. That's a
21 different -- that's an objective review, correct?
22 A   I'm sorry, say that once more?
23 Q   If -- if other people looking at the same
24 facts would believe that to be true is -- is an
25 objective analysis?

14 (Pages 50 to 53)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

54

1      A   I believe it's the hypothetical reasonable
2  person, sir.
3      Q   Correct.  All right.
4      Well, Callahan, first time he talks about it
5  on recorded with his attorney, says, "And it was at
6  this point we were able to get his arms fully behind
7  his back and handcuffed together."
8      Do you know where that is in the video?
9      A   Where they get him handcuffed?
10     Q   Yeah.  Do you have that in mind in the video?
11     A   What do you mean by that, have in mind?
12     Q   Do you have a visual recollection of them
13  getting him handcuffed and his hands behind his back?
14     A   I have a recollection there's a point in time
15  in the videos where, yes, they do.
16     Q   And he says, "It was also at this time that
17  Smith seemed to calm down a bit and was not resisting
18  as hard.  I believed that Smith was giving up at this
19  time and complying."
20     I read that correctly, didn't I?
21     A   You read the statement, yes, sir.
22     Q   All right.  Those are Callahan's words, not
23  words anybody else picked.  Those are his words?
24     A   Yes, sir.
25     Q   All right.  So compliance and giving up are

55

1  important concepts in any Fourth Amendment analysis; we
2  agreed on that, right?
3      A   Yes, sir.
4      Q   Did you -- and I note also that you didn't
5  cite in -- in your 22-page, 73-footnote report the fact
6  that Officer Callahan also said that he believed that
7  David Smith was adequately controlled by handcuffing.
8  He did testify to that, didn't he?
9      A   I don't recall that specific sentence, sir.
10     Q   All right.
11     (Reporter's Note: Sotto voce communication
12  between Mr. Bennett and Mr. Storms.)
13  BY MR. BENNETT:
14     Q   You might want to take a look.
15     (Video clip shown of the following questions
16  and answers from the January 30, 2012 testimony of
17  Officer Timothy Callahan:
18     "Well, was David Smith a subject who was not
19  adequately controlled by handcuffing?
20     "No.  I would say that once we had him
21  handcuffed, we had him --
22     "Adequately controlled?
23     "I -- I -- I think so.")
24     (End of video clip.)
25

56

1  BY MR. BENNETT:
2      Q   And whether a person is adequately controlled
3  by handcuff is important to a Fourth Amendment
4  analysis, isn't it?
5      A   I'm not sure what he means -- that's -- first
6  of all, you're showing me one snippet of a very long
7  deposition.  I'm not sure --
8      Q   Did you -- did you read that snippet?
9      A   Did I read that snippet now?
10     Q   Yeah.
11     A   Just now?
12     Q   And --
13     A   Yes, sir, I did.
14     Q   And did you read it when you read his
15  deposition?
16     A   At some point in time, yes, sir, I did.
17     Q   So you read the whole context of the
18  deposition?
19     A   Yes, sir.
20     Q   You didn't cite that portion or note in your
21  report that he -- that Callahan believed he was
22  adequately controlled?
23     A   There's a number of things I didn't cite
24  specifically.
25     Q   I know.  And I want to talk about those --

57

1      A   But I --
2      Q   -- things in particular.
3      I agree.  I just want to figure out if it was
4  by mistake or on -- or by conscious choice.
5      The -- let me ask you this.  This is the
6  training officer, Sergeant Anderson.
7      (Video clip shown of the following questions
8  and answers from the October 2, 2012 testimony of
9  Sergeant Brian Anderson:
10     "Was it consistent with MPD training prior to
11  September 9, 2010 to kneel on a subject's back for
12  approximately four and a half minutes after the subject
13  had been adequately controlled?
14     "No.")
15     (End of video clip.)
16  BY MR. BENNETT:
17     Q   Did you read Sergeant Anderson's deposition,
18  the Rule 30(b)(6) deposition?
19     A   At some point, yes, sir, I have.
20     Q   He was the training expert officer?
21     A   Yes, sir.
22     Q   All right.  And was that statement by Officer
23  Anderson -- or Sergeant Anderson, excuse me, was that
24  consistent -- was his testimony consistent with
25  generally accepted practices and procedures of properly

15 (Pages 54 to 57)

Michael Berkow
2/25/2013

**58**

1   trained and prudent law enforcement officers?
2       A   I'm not sure I can answer your question the
3   way you're asking --
4       Q   Why?
5       A   -- sir.
6           Pardon me?
7       Q   What's wrong with my question?
8       A   Well, to start with, the way you phrased the
9   question to him, it was "kneeling on."
10      Q   Yeah.
11      A   You'd have to define for me what you mean by
12  "kneeling on."
13      Q   You saw Gorman kneeling on him, didn't you?
14      A   I did not.
15      Q   You didn't?
16      A   No, sir.
17      Q   Really?
18      A   No, sir.
19      Q   What did you see?
20      A   I saw Gorman with a knee on him.  That's why
21  I'm saying, let's define "kneeling."
22      Q   What -- what is kneeling?  You've got to have
23  both knees down?  Like some Catholics have one knee
24  down in church and some have two.  So what -- is
25  there -- I mean, is one not kneeling and one is?

**59**

1       A   I would -- to me, "kneeling" is -- has a
2   specific meaning that you are -- both knees are on
3   someone --
4       Q   Oh.
5       A   -- and -- and so I think there's been some
6   lack of clarity in --
7       Q   Oh, really.
8       A   -- some of the questioning.
9       Q   I see.
10          Did you ever see Gorman with both knees on
11  him?
12      A   From the video, it appears he switches knees.
13      Q   Did you ever see him with both knees on him?
14      A   There may have been a second while he's
15  switching knees, yes, sir.
16      Q   So then he'd be kneeling on him?
17      A   Yes, sir.
18      Q   Would you agree that he kept --
19      A   He'd have both knees on him for a period of
20  time.
21      Q   Well, you read Gorman's deposition, right?
22      A   Yes, sir.
23      Q   He says he was kneeling on him for four and a
24  half minutes with one or both knees, correct?
25      A   I -- I don't recall that.  I'd have to look

**60**

1   at his -- his testimony again.
2       Q   Okay.  All right.
3           Look at this.
4           So you don't -- you don't think that -- is it
5   your position that Sergeant Anderson's answer there was
6   not consistent with generally accepted -- and I'm using
7   the words from your own report -- generally accepted
8   practices and procedures of properly trained and
9   prudent law enforcement officers?
10      A   Officer Anderson is responding to a question
11  from you, sir.  It's not clear to me that -- what
12  you're talking about in terms of kneeling, and so --
13      Q   Is his answer consistent with generally
14  accepted practices or procedures of properly trained
15  and prudent law enforcement officers?
16      A   You'd have to explain to me exactly what
17  you're -- you expected him --
18      Q   If you want to say no, say no, if you want to
19  say yes, say yes, but give me an answer.
20      A   I'm giving an answer, sir.
21      Q   You heard his testimony.  Based solely on his
22  testimony, is it true or not true?
23      A   His testimony is responsive to the way you
24  phrased the question and his understanding.  I can't
25  tell you what was in his head.

**61**

1           MR. STORMS:  Well, his attorney didn't object
2   as vague, and I asked the question.  It seemed like he
3   understood the answer and his attorney obviously did.
4   BY MR. BENNETT:
5       Q   You didn't understand the question?
6       A   I'm not testifying for him, sir.
7       Q   All right.  Well, all I'm asking is you say a
8   number of things that are consistent with --
9           MR. OSBORNE:  And I don't always object when
10  questions are vague.  I mean, you know, otherwise I'd
11  be objecting a lot more.
12  BY MR. BENNETT:
13      Q   So you don't have an opinion one way or
14  another whether that -- whether Sergeant Anderson's
15  testimony in that specific instance is consistent with
16  generally accepted practices and procedures of properly
17  trained and prudent law enforcement officers?  Is that
18  correct?  You don't have an opinion?
19      A   My answer is that from the question that
20  you've asked him, I'm not clear what he's responding
21  to, because you and I have already established we don't
22  agree what "kneeling" means.
23      Q   Okay.
24      A   You used it in a different way than I would
25  use it.

16 (Pages 58 to 61)

Michael Berkow
2/25/2013

62

1    Q   All right.  Let's see.
2        (Video clip shown of the following questions
3    and answers from the October 2, 2012 testimony of
4    Sergeant Brian Anderson:
5        "Well, he just gave you a hypothetical that
6    was pretty clear, though.  If the person was cuffed and
7    had given up and was complying.  Right, Jeff?")
8    MR. BENNETT:  That's Mr. Osborne.
9        ("Would it be consistent with policy to
10   continue kneeling on that person's back for four
11   minutes and 30 seconds?
12       "No.
13       "Okay.  Would it have been consistent with
14   training prior to September of 2010 to continue
15   kneeling on a subject's back under those circumstances?
16       "No.")
17       (End of video clip.)
18   BY MR. BENNETT:
19       Q   Now, let's forget your -- whatever your
20   interpretation.  Let the jury decide what's kneeling,
21   if you have to -- if you have -- if it's a two-knee
22   requirement or a one-knee requirement.
23       The...
24       Is Sergeant Anderson's answer, the training
25   officer, is it consistent with generally accepted

63

1    practices and procedures of properly trained and
2    prudent law enforcement officers facing similar
3    circumstances?
4        A   If you're referring to full kneeling --
5        Q   I'm -- I'm -- there's no full kneeling.  The
6    question and answer as asked.
7        A   Then I cannot answer the question as asked.
8        Q   All right.  That's fine.  You don't have an
9    opinion, then.  All right.  That's fine.
10       (Video clip shown of the following questions
11   and answers from the January 30, 2012 testimony of
12   Officer Timothy Callahan:
13       "And you said, 'I know I activated it at
14   least one more time.'  And that would have been the
15   final time?  You had five cycles in your TASER,
16   correct?
17       "I believe I was told that there were five
18   cycles.
19       "I can show you the TASER record, and you
20   wouldn't deny --
21       "I don't disagree.
22       "Okay.  And you say, 'It was at this point
23   that we were able to get the arms fully behind his back
24   and handcuffed together,' correct?  That's what you
25   said?

64

1        "I know that the last time I activated the
2    TASER was the time prior to we -- us handcuffing him.
3        "All right.  So once the -- the last TASER
4    cycle immediately precedes the final handcuffing?
5        "Yes.
6        "Correct?  And one -- you said, 'It was also
7    at this time...'  And I assume you're meaning in this
8    answer at the time you got him handcuffed -- 'that
9    Smith seemed to calm down a bit.'  You said that,
10   right?
11       "I did say that.
12       "And he was not resisting as hard?
13       "Yes.
14       "And you believed that Smith was giving up at
15   this time and complying, correct?
16       "Yes.
17       "And when a person does that the excuse for
18   force abates?  Ends?  Correct?
19       "Yes.")
20       (End of video clip.)
21   BY MR. BENNETT:
22       Q   Do you agree with Officer Callahan?
23       A   Generally, yes.
24       Q   Okay.  And that is -- Officer Callahan's
25   answers are consistent with generally accepted

65

1    practices and procedures of properly trained and
2    prudent law enforcement officers facing similar
3    circumstances, correct?
4        A   Generally, yes, sir.
5        Q   Okay.
6        How do you define "kneeling"?  I want to
7    get -- you give me your definition of kneeling, because
8    I don't -- I don't -- want to be sure that I understand
9    exactly what you mean.
10       A   In the context of this case?
11       Q   No.  I mean what does the word "kneeling"
12   mean?
13       A   I think "kneeling" can have a variety of
14   meanings, depending on the context.
15       Q   Oh.  Okay.
16       Well, what about the context of -- well, you
17   tell me what you -- what you understand the word
18   "kneeling" to mean.
19       A   Again, I think "kneeling" can have a variety
20   of meanings, depending on the context.  So if I'm in a
21   firearm shooting course, there are different kneeling
22   positions, and you define them and you say, okay, a
23   single-knee kneeling position, a two-knee kneeling
24   position.  So there are different positions, but the
25   term "kneeling" is used for both sets of circumstances.

17 (Pages 62 to 65)

Michael Berkow
2/25/2013

**66**

1  **They have different practical -- practical, visible,**
2  **real meaning.**
3     Q   Really.
4     **A   Yes, sir.**
5     Q   Well, you know all the officers that were
6  questioned about kneeling in this case saw the videos,
7  don't you?
8     **A   I don't know that at all.**
9     Q   Did you see the video?
10    **A   Yes, sir.**
11    Q   Did you know what I meant by "kneeling"?
12    **A   Do I know what you meant by "kneeling"?**
13    Q   Correct.
14    **A   No, sir.  We've never talked until today.**
15    Q   Well, let's assume I meant the kneeling
16 that's depicted on the videos.
17    **A   Okay, sir.**
18    **A   That would be a kneeling like a single-knee**
19 kneeling like you talked about for shooting, right?
20    **A   Yes, sir.**
21    Q   And why do you do -- why do you use a
22 single-knee position in shooting?
23    **A   It's a stabilized position --**
24    Q   Correct.
25    **A   -- basically.**

**67**

1     Q   You use the knee to stabilize, correct?
2     **A   Well, it's stabilizing or you're behind**
3  cover.  There can be a variety of reasons.
4     Q   Okay.
5     And the reason for force abates when a person
6  gives up is a common, critical law enforcement
7  principle in terms of Fourth Amendment analysis,
8  correct?
9     **A   When they give up?**
10    Q   Yeah.
11    **A   Surrender?  Yes, sir.**
12    Q   Yeah.  Comply.
13    **A   Yes, sir.**
14    Q   And you know that Mr. Callahan -- you -- did
15 you know that's -- you looked at Officer Callahan
16 there, right?
17    **A   Looked at him on the video?  Yes, sir.**
18    Q   He understood, he didn't indicate any lack of
19 knowledge about my questions, did he?
20    **A   I would be speculating as to whether he --**
21    Q   Well, in the answer you just saw, did he have
22 any problem understanding my questions?
23    **A   I noticed some significant hesitation before**
24 **he answered, but he certainly answered them.  So I**
25 **would --**

**68**

1     Q   Well, a lot of times --
2     A   That would be my belief as to whether or not
3  he understood it.
4     Q   A lot of times when the answers are damning,
5  they hesitate a bit, don't they?
6     MR. OSBORNE:  Objection; argumentative.
7     A   Is that a question for me?
8  BY MR. BENNETT:
9     Q   Yeah.
10    A   I think there are a variety of reasons why
11 people could hesitate before answering the questions.
12    Q   Okay.
13    A   Make sure they understand the wording, make
14 sure they understand the context.
15    Q   Conceive of the answer in their head?
16    A   Sure.
17    Q   Okay.
18    But the answer he gave was unequivocal,
19 "Yes," wasn't it?
20    A   Yes, sir.
21    Q   And neither Officer nor Officer -- neither
22 Officer Callahan nor Officer Gorman describe any
23 resistant behavior after Gorman hits him in the head,
24 on the video?
25    A   I'm not sure that I see a hit to the head, so

**69**

1  you'll have to take me through where you're -- you're
2  timing that and what you mean by that, sir.
3     Q   You never -- you didn't see a hit on the
4  head?
5     A   Not an unequivocal hit, yes, no, sir, I did
6  not.
7     Q   Well, didn't Officer Gorman try that in his
8  deposition, that -- say it was unequivocal, and then he
9  just gave up after I showed him the video three times?
10 Do you remember that?
11    A   I'd be -- I'm not aware of what he said in
12 his -- I don't recall what he said in his video -- in
13 his --
14    Q   Well, his deposition --
15    A   -- deposition.  Excuse me.
16    Q   Well, if I described that accurately, you
17 don't -- you don't remember that?  He tried to say,
18 well, it was kind of a light cuff, it was this or that,
19 and then he said, "Well, I actually did hit him."  Do
20 you remember that?
21    A   I recall a discussion, an extended
22 discussion, about that, but I don't recall what his
23 specific answers were.
24    Q   You don't mention Gorman hitting him in the
25 head, do you, in your report?

18 (Pages 66 to 69)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

70

1    A   I just said I don't see it, an unequivocal
2   hit to the head. I've certainly read a lot of
3   testimony about something. Again, I think words are
4   important. "Hit" has a very --
5    Q   Words are important. How about the word
6   "motherfucker"? Is that important?
7    A   Yes.
8    Q   Okay. Did you hear the word "motherfucker"
9   on the tape?
10   A   Yes, sir.
11   Q   And who was that used by and who was it used
12  to?
13   A   I believe it was used by Officer Callahan.
14   Q   And who was he calling a "motherfucker"?
15   A   He -- I believe he was directing it to
16  Mr. Smith.
17   Q   Okay. And do you find that to be a term of
18  endearment? Have you felt that over the years?
19      MR. OSBORNE: Objection; argumentative.
20      MR. BENNETT: Really?
21      MR. OSBORNE: Yeah.
22  BY MR. BENNETT:
23   Q   Is it a term of endearment, "motherfucker"?
24   A   Generally, no.
25   Q   Okay. In fact, it implies some animus, does

71

1   it not, some -- some anger?
2    A   It can, certainly.
3    Q   Okay.
4    A   Again, context is important. But certainly
5   can. Absolutely.
6    Q   Okay. Did you cite anywhere in the testimony
7   of, in your report from Officers Gorman and Callahan
8   that -- that -- where both of them agree that they did
9   nothing to actively monitor the level of consciousness
10  or respiration of David Smith until the first time that
11  Tim Callahan takes his pulse?
12   A   I'm sorry, repeat that question, sir. It has
13  a lot of pieces.
14      MR. BENNETT: Can you read it back?
15      (The following was read back by the court
16  reporter:
17      "Did you cite anywhere in the testimony, in
18  your report, from Officers Gorman and Callahan
19  that" --)
20      MR. BENNETT: I'll start over, because I...
21  BY MR. BENNETT:
22   Q   Did you cite anywhere in the text of your
23  report the testimony of Officer Callahan and Officer
24  Gorman that they did nothing to actively monitor David
25  Smith's consciousness or respiration until the time on

72

1   the tape where it is clear that Tim Callahan takes
2   David Smith's pulse?
3    A   I don't believe that is the accurate
4   statement of what occurred.
5    Q   Oh, really? So you didn't cite their
6   testimony that admits that?
7    A   I'm not sure what you're referring to, sir.
8    Q   Okay.
9       Does -- do the words "recovery position"
10  appear in your report?
11   A   I don't believe so, no, sir.
12   Q   Do you know what a recovery position is, or
13  is that a little like kneeling?
14      Well, that's argumentative. Forget it.
15      Do you know -- do you know what the word --
16  what the words "recovery position" mean in police
17  vernacular?
18   A   I've certainly heard it used in this case and
19  seen discussion of it in this case, yes.
20   Q   Have you heard it -- have you seen it in the
21  training videos done by the New York medical examiner?
22   A   I don't believe so, no, sir.
23   Q   Okay. Have you -- have you seen it in
24  connection with training materials relating to excited
25  delirium?

73

1    A   The specific phrase "recovery position"?
2    Q   Correct.
3    A   Not that I recall, no, sir.
4    Q   Have you seen it in the TASER training
5   materials and manual?
6    A   "Recovery position"?
7    Q   Correct.
8    A   Not that I recall.
9    Q   Okay.
10      Did you look at the -- did you cite the
11  testimony of now Police Chief Janee Harteau in any of
12  your 73 footnotes?
13   A   I don't believe so, no, sir.
14   Q   How about the testimony of Captain Amelia
15  Huffman?
16   A   I don't -- I don't recall exactly. I don't
17  think so, no, sir.
18   Q   How about the testimony of Sergeant Brad
19  Anderson, the Rule 30(b)(6) training representative of
20  the Minneapolis Police Department?
21   A   I might have cited him, didn't I? I don't
22  recall. I'd have to look. If you'd like, I'll look.
23   Q   Go ahead and look.
24      MR. OSBORNE: Bob, I think you called him
25  Brad Anderson. I think it's Jason.

19 (Pages 70 to 73)

Michael Berkow
2/25/2013

74

1      MR. BENNETT: No. Jason Case, isn't it?
2  It's Brad Anderson.
3      MS. BENNETT: Brian.
4      MR. BENNETT: Brian Anderson?
5      MR. OSBORNE: Brian. We're both wrong.
6      MR. BENNETT: Okay. That wouldn't surprise
7  me, that we were both wrong.
8      Can we -- well, I'm sorry.
9  BY MR. BENNETT:
10     Q   It's Brian Anderson.
11     **A   Yeah, I understand, sir.**
12     **No, sir, I did not.**
13 BY MR. BENNETT:
14     Q   What about Lieutenant Zimmerman?
15     **A   Not that I recall, no, sir.**
16     Q   How about now Deputy Chief Glampe, was then
17 the IA supervisor?
18     **A   Not that I recall, sir.**
19     Q   How about the depo testimony of Erick Fors?
20     **A   Not that I recall, sir, no.**
21     Q   How about the depo testimony of Sergeant
22 Jason Case?
23     That's the Jason.
24     **A   Not that I recall, sir.**
25     **Erick Fors, I cite some of the interviews,**

75

1  **but not --**
2      Q   Correct.
3      **A   -- his depo.**
4      Q   Not his dep, not his testimony.
5      **A   I don't believe so, no, sir.**
6      Q   How about Dr. Baker's death hierarchy or
7  testimony, either one?
8      **A   I don't believe so, no, sir.**
9      Q   Do you agree with Dr. Baker's death
10 hierarchy?
11     MR. OSBORNE: Objection; lack of foundation.
12     **A   I'm not a medical expert.**
13 BY MR. BENNETT:
14     Q   You have no reason to disagree with it?
15     **A   I have no -- I read it. I don't -- I don't**
16 **have a strong feeling about it.**
17     Q   Okay.
18     **A   I'm not a medical expert.**
19     Q   Okay.
20     It -- nevertheless, it -- how David Smith
21 died, according to the Hennepin County medical
22 examiner, chief medical examiner, is not in your report
23 either, is it?
24     **A   No, sir.**
25     THE WITNESS: May I trouble you for a bottle

76

1  of that water while we're...
2      MR. BENNETT: Sure. Let's go off the record.
3      VIDEOGRAPHER: Off the video record at
4  10:33 a.m.
5      (Off the record.)
6      VIDEOGRAPHER: We are back on the video
7  record at 10:33 a.m.
8  BY MR. BENNETT:
9      Q   Did you look at any of the depositions as
10 well?
11     **A   Look at the video of them?**
12     Q   Yeah.
13     **A   No, sir.**
14     Q   You just read them?
15     **A   Yes, sir.**
16     Q   Let me show you this one.
17     (Video clip shown of the following questions
18 and answers from the October 5, 2012 testimony of
19 Deputy Chief Janee Harteau:
20     "Well, I did. I asked on page 39, 'Well, was
21 David Smith a subject who was not adequately controlled
22 by handcuffing?'
23     "Answer: No. I would say that once we had
24 him handcuffed, we had him --
25     "Adequately controlled?

77

1      "I think so. So if --
2      "Okay.
3      "-- someone is adequately controlled do they
4  need to be knelt on in a prone restraint position?
5      "Probably not.")
6      (End of video clip.)
7  BY MR. BENNETT:
8      Q   Is that consistent with generally accepted --
9  that's Chief Janee Harteau, by the way -- with
10 generally accepted practices and procedures of properly
11 trained and prudent law enforcement officers facing
12 similar circumstances?
13     **A   Again, we're back to what's he doing, is he**
14 **merely controlling him with his knee or is he kneeling**
15 **on him.**
16     Q   Well, just so we're clear, you read
17 Dr. Baker's --
18     **A   Yes, sir, I did.**
19     Q   Dr. Baker said he committed a homicide by
20 kneeling on him, didn't he?
21     **A   I don't recall that specifically, no, sir.**
22     Q   He -- he was the agent of the mechanic -- his
23 knee was the agent of the mechanical asphyxia. He said
24 that, didn't he?
25     **A   I don't recall that, sir.**

20 (Pages 74 to 77)

Michael Berkow
2/25/2013

78

1    Q  Okay.
2       You don't recall him saying that the pressure
3  of the knee on his -- between his scapulas caused the
4  mechanical asphyxia?
5    A  I don't recall that specific language, no,
6  sir, I do not.
7    Q  What do you think was the cause of the
8  mechanical asphyxia?
9    A  I think there are a variety of factors in --
10  in play in the death of David Smith.
11    Q  Okay.
12    A  And I believe that's what the medical
13  examiner said.
14    Q  Well, no.  He said -- he -- he died of anoxic
15  encephalopathy caused by cardiopulmonary arrest,
16  resuscitated, caused by mechanical asphyxia.  Isn't
17  that right?  That's what Exhibit 5 says.  Or excuse me,
18  Exhibit 4.
19       The actual due to or as a cause of is, in
20  reverse hierarchical order, anoxic encephalopathy,
21  cardiopulmonary arrest, resuscitated, due to or as a
22  consequence of mechanical asphyxia.  Correct?
23    A  I don't see the statement about reverse
24  hierarchy of order.  I see a cause of death hierarchy
25  report, and then...

79

1    Q  Well, the testimony was it's a reverse
2  hierarchy.  Do you remember that?
3    A  Sir, I'm responding to your question.  And
4  you used the word "reverse hierarchy" and you're
5  pointing at a report.  It's not there.
6    Q  Okay.
7    A  It says, "Cause of Death Hierarchy Report."
8  So my -- I absolutely see what you're --
9    Q  Do you understand --
10    A  These specific words.
11    Q  You understand what a reverse hierarchy is?
12    A  Reverse, you'd flip these.
13    Q  No.  You know what anoxic encephalopathy is?
14    A  No, sir.
15    Q  Brain death.  That's caused by -- it says
16  "due to or as a consequence of (b):  Cardiopulmonary
17  arrest."  It's your heart and your lungs stop working.
18  Do you know what that -- do you understand that?
19    A  Yes, sir.
20    Q  "Due to or as a consequence of (c):
21  Mechanical asphyxia."  Do you see that?
22    A  Yes, sir.
23    Q  You don't know what Dr. Baker said was the
24  cause of the mechanical asphyxia?
25    A  I recall reading the report, but I -- I mean,

80

1  I don't recall specifically his words, no, sir.
2    Q  And these other things may or may not have
3  anything to do with the death itself, correct?
4    A  Well, it says "other significant conditions."
5    Q  Well, I know.  But let's say you were -- you
6  fell into the orca tank at Sea World and you were a
7  woman.  Now, the orca bit you in half, okay?  But if
8  you get stage four breast cancer, they'd list that in
9  "other significant conditions."  Do you understand
10  that?
11    A  I don't know that to be the practice.  But...
12    Q  All right.
13       (Reporter's Note:  Sotto voce communication
14  between Mr. Bennett and Mr. Storms.)
15       MR. BENNETT:  Let's go off the record for a
16  second.
17       VIDEOGRAPHER:  Off the video record at
18  10:38 a.m.
19       (Off the record.)
20       VIDEOGRAPHER:  We are back on the video
21  record at 10:41 a.m.
22  BY MR. BENNETT:
23    Q  The following questions and answers were
24  given by Dr. Baker.
25       He was asked, "How was the mechanical force

81

1  that caused the asphyxia of David Smith supplied?
2       "Answer:  From the videotapes I was able to
3  review, it appeared to be the weight of one of the
4  officers on Mr. Smith's back.
5       "Just one or both?
6       "I could only tell one from the videotape,
7  that I could see.
8       "And that would be the one who had his knee
9  and -- one or both knees at varying points in time --
10       "Yes.
11       "-- in the middle of his back between his
12  scapulas?
13       "Yes."
14       The...
15       Did you read Dr. Baker's deposition?
16    A  Yes, sir, I did.
17    Q  So you would have read that?
18    A  At some point in time, yes, sir.
19    Q  Did you also read the fact that, "If, once he
20  had been handcuffed, and the officers not remained on
21  top of the subject, and the subject had been turned on
22  his side or in an upright position of comfort, he would
23  not have died of mechanical asphyxia?
24       "Answer:  No, he would not have died of
25  mechanical asphyxia."

21 (Pages 78 to 81)

Michael Berkow
2/25/2013

82

1      Do you remember that question and that
2  answer?
3      **A  No, sir, I don't recall that.**
4      Q  Okay. Thank you.
5      MR. BENNETT: Give me volume two as well.
6      **A  Sorry, and your question to me now, sir?**
7  **Because it's -- there's quite a bit of back-and-forth**
8  **about that issue.**
9  BY MR. BENNETT:
10      Q  Well, no, there isn't.
11      I read the question correctly, didn't I?
12      **A  May I have -- may I have the statement, sir?**
13      Q  Yes.
14      **A  Because it starts, you ask the question, "Let**
15  **me ask..." If you want me to read the one sentence**
16  **that you're pointing to --**
17      Q  Yeah.
18      **A  -- then I can say yes, that's what the**
19  **transcript says.**
20      Q  Okay.
21      **A  But just prior to that you said, "Let me ask**
22  **you. If once David Smith had been handcuffed, had he**
23  **been turned on his side or in an upright position,**
24  **would he have died?**
25      **"Answer: He might have."**

83

1      MR. BENNETT: Okay.
2      I'll ask that it be stricken. It's not
3  responsive.
4      MR. OSBORNE: You don't actually strike
5  things from the record, do you? Okay.
6      MR. BENNETT: No, not -- she doesn't.
7  BY MR. BENNETT:
8      Q  And just to be clear, he says, "I don't want
9  to endorse that he would have died of some other
10  unknown cause. He has another lethal condition going
11  on that he could have died for -- from." Do you see
12  that?
13      **A  Yes, sir, I do.**
14      Q  And then he goes on to answer that, that he
15  could not tell us to a reasonable degree of medical
16  certainty whether or not he would have expired in 2010
17  from dextromethorphan or chlorpheniramine intoxication
18  at all, correct? Correct.
19      You read that, too, didn't you?
20      **A  At some point in time I read his entire**
21  **deposition, yes, sir.**
22      Q  In fact, he's never had anybody that he knows
23  of die of -- he's never encountered anybody in his
24  career who's died of dextromethorphan or
25  chlorpheniramine intoxication, nor anyone who's died

84

1  on -- from Coricidin overdose; isn't that correct?
2      **A  I recall a lot of discussion about those**
3  **various drugs. I don't recall the exact details.**
4      Q  And then discussing his high level of
5  dextromethorphan, he says -- I asked him, "You can't
6  tell me that it contributed at all to his death, can
7  you, to a reasonable degree of medical certainty?"
8  Answer: "No."
9      Do you see that?
10      **A  I see those specific lines that you're**
11  **pointing out to me in the deposition, yes, sir.**
12      Q  All right.
13      Now, you wanted to make sure I put everything
14  in with Dr. Baker, right? You wanted me to -- you
15  wanted to add things from that. You didn't put in the
16  compliance, resistance, or -- or giving up in your
17  report about David Smith, correct, Exhibit 1?
18      **A  No, that's not correct.**
19      Q  Where is -- where do the words that he
20  complied, was not resisting, was giving up, in your
21  report? Point them out to me.
22      **A  You didn't ask me if I used those specific**
23  **words. If I -- I don't know if I used those specific**
24  **words.**
25      Q  I do.

85

1      **A  But I certainly --**
2      Q  You didn't.
3      MR. OSBORNE: Let him -- let him finish.
4  BY MR. BENNETT:
5      Q  Do you want to look? Go ahead and look.
6      **A  I'm sorry, is there a question there, sir?**
7      Q  Did you use those specific words?
8      **A  Um...**
9      Q  Did you say --
10      **A  Give me the specific words.**
11      Q  Did you ever say that Officer Callahan
12  believed he was complying and giving up, David Smith?
13      **A  Those specific words?**
14      Q  Yeah.
15      **A  No, sir.**
16      Q  Okay.
17      So you understand that Dr. Baker felt that
18  the agent of the mechanical asphyxia was one knee or
19  both knees of -- of Officer Gorman, correct?
20      **A  I understand that we read a line or two from**
21  **his deposition that said that, yes, sir.**
22      Q  You read his whole deposition.
23      **A  And I don't recall his entire deposition as I**
24  **sit here, sir.**
25      Q  Isn't that what he said? Wasn't that his

22 (Pages 82 to 85)

Michael Berkow
2/25/2013



86

1  conclusion to a reasonable degree of medical certainty?
2     **A  I don't recall that, sir.**
3     Q  I'll read you the following question and
4  answer. This is to Dr. Baker, volume two of his
5  deposition.
6       "And if both officers testified that Officer
7  Gorman, that is the officer with the knee or knees
8  placed between the scapula of David Cornelius Smith,
9  kept that position with one or both knees for a period
10  of four and one half minutes, that would be consistent
11  with your view of the video evidence?
12       "Answer: Yes.
13       "And that is the particular evidence of the
14  mechanical asphyxia that you rely on to come to your
15  judgment to a reasonable degree of medical certainty?
16       "Answer: Yes."
17       Do you understand that to be his conclusion?
18     **A  I understand what you just read me, yes, sir.**
19     Q  Okay.
20       Now, you read the depositions of -- of Amelia
21  Huffman and Lieutenant Zimmerman as well, right?
22     **A  I believe so, yes, sir.**
23     Q  Let me ask you this. Let's just take you
24  through this. Let's talk about the duty to monitor a
25  subject's medical condition.

87

1       This is Sergeant Brian Anderson.
2       (Video clip shown of the following questions
3  and answers from the October 2, 2012 testimony of
4  Sergeant Brian Anderson:
5       "And aside from just the Tasing, I guess we
6  can back up to section 5-306. Now, here it states
7  that, 'Any sworn MPD employee that uses force shall
8  comply with the following requirements.' And the first
9  it lists is medical assistance, and states, 'As soon as
10  reasonably practical, determine if anyone was injured
11  and render medical aid consistent with training and
12  request emergency medical service if necessary,
13  correct?
14       "Correct.
15       "So this policy works similar to the TASER
16  policy we discussed, in that after you use some level
17  of force, the first thing you want to do as soon as
18  it's reasonably practical is monitor the medical
19  condition of the subject you used force on?
20       "Correct.
21       "Okay. And that's been standard training
22  since well before September 2010?
23       "Correct.
24       "The need to monitor the medical condition,
25  as set forth in this policy, reflects the officer's

88

1  obligations under the Fourth Amendment, correct?
2       "Correct.
3       "Okay.")
4       (End of video clip.)
5  BY MR. BENNETT:
6     Q  Is that statement by Sergeant Anderson
7  consistent with generally accepted practices and
8  procedures of properly trained and prudent law
9  enforcement officers?
10     **A  Which statement? There was like four**
11  **questions.**
12     Q  Was there anything that wasn't consistent in
13  those statements?
14     **A  I don't believe so, no.**
15     Q  Okay.
16       (Video clip shown of the following questions
17  and answers from the October 2, 2012 testimony of
18  Sergeant Brian Anderson:
19       "And it's a little... in some sense it's
20  superfluous or redundant, I guess, that you need to
21  monitor the medical condition of someone post-Tasing
22  because the policy was already requiring officers to
23  monitor the medical condition of a subject after any
24  force?
25       "Correct.

89

1       "Okay. And in terms of monitoring the
2  medical condition of a subject, and I think we touched
3  on it briefly, things that officers were trained prior
4  to 2010 to observe would be is the subject breathing?
5       "Correct.
6       "Are they conscious?
7       "Correct.
8       "Do they have any other life-threatening
9  injuries?
10       "Correct."
11       (End of video clip.)
12  BY MR. BENNETT:
13     Q  All of that is consistent with generally
14  accepted practices and procedures of properly trained
15  and prudent law enforcement officers, correct?
16     **A  Yes. In general I would agree with all of**
17  **that, sir.**
18     Q  Okay.
19       (Video clip shown of the following questions
20  and answers from the October 2, 2012 testimony of
21  Sergeant Brian Anderson:
22       "It goes on to say, 'Once a subject is
23  secured, an officer shall watch for any of the
24  following signs: Significant change in behavior or
25  level of consciousness, shortness of breath or

23 (Pages 86 to 89)

Michael Berkow
2/25/2013

**90**

1  irregular breathing, seizures or convulsions,
2  complaints of serious pain or injury, and/or any other
3  serious medical problem.' Do you see that?
4      "Yes.
5      "Now, this -- at a certain level, this
6  mirrors the use-of-force policy itself which says you
7  need to monitor the medical condition of the subject?
8      "Correct.")
9      (End of video clip.)
10 BY MR. BENNETT:
11     Q   And is that all consistent with generally
12 accepted practices and procedures of properly trained
13 and prudent law enforcement officers?
14     A   **Well, he's reading from a document, and I**
15 **don't know what the document is.**
16     Q   Well, does it or does it not?
17     A   **I can't answer the question, because he's**
18 **reading from a specific document and the questions were**
19 **about that document and I don't know what that document**
20 **is.**
21     Q   All right.
22     A   **He's being asked questions about a specific**
23 **document that --**
24     Q   Well, did they -- did the principles appear
25 to be consistent with generally accepted practices and

**91**

1  procedures of a properly trained and prudent law
2  enforcement --
3      A   **The principles that we discussed earlier**
4  **about medically monitoring someone --**
5      Q   Yes.
6      A   **-- to make sure that they were --**
7      Do you want me to answer or not, sir?
8      Q   Yeah, go ahead.
9      A   **Whether or not they're breeding -- breathing**
10 **or bleeding, absolutely, yes, sir.**
11     Q   I'm going to show you, this is Detective
12 Fors.
13     (Video clip shown of the following questions
14 and answers from the May 10, 2012 testimony of
15 Detective Erick Fors:
16     "Somebody you take -- you lay hands on and
17 you use force on them, you have to monitor their
18 consciousness, correct?
19     "Correct.
20     "You have to monitor their -- their
21 breathing; in other words, they can't -- you don't want
22 them to stop breathing or have a compromise in their
23 breathing, do you?
24     "Correct.
25     "You're responsible for the people you seize

**92**

1  and lay hands on from the time you do so until the time
2  you turn them over to either the jail or the medical
3  personnel, correct?
4      "Correct.
5      "You have been taught in your training that
6  if a person -- that -- well, there are a number of
7  situations you've been taught or trained to turn an
8  arrestee on their side or to set them up -- sit them
9  up, correct?
10     "Correct.
11     "One of them, oddly enough, is the excited
12 delirium situation.  You actually have training on
13 that, right?
14     "Correct.
15     "And you're trained that if there's any --
16 you're supposed to pay attention if there's any of
17 those myriad of things that you list for potential
18 excited delirium; that you're to watch the breathing
19 and if there's any compromise at all, you turn them on
20 their side or sit them up so that you get them
21 breathing, correct?
22     "That sounds accurate.
23     "That's also true with regard to really any
24 time that you have a person restrained in a prone
25 restraint and you notice any compromise of breathing.

**93**

1  That's what you're supposed to do?  That's the
2  response?
3      "I -- I would agree with you.
4      "The other thing is you're supposed to pay
5  attention to the person you're continuing to use force
6  on to determine if they're losing consciousness or
7  having trouble breathing?
8      "Correct.
9      "So you can't really -- you know, you don't
10 want to talk about the weather.  You don't want to, you
11 know, try to figure your golf score in reverse order
12 from the holes you played.  You don't want to -- you
13 want to pay attention to the -- to the very serious
14 business of -- of using force on people, which is
15 something that we license police officers to do,
16 correct?
17     "Yes, you should be aware.")
18     (End of video clip.)
19 BY MR. BENNETT:
20     Q   Anything about Detective Fors' testimony that
21 you disagree with?
22     A   **Well, you played me a fairly long snippet**
23 **there.  There's a number of places where if you had**
24 **stopped it, I would say absolutely there are some**
25 **things that -- the excited delirium and the discussion**

24 (Pages 90 to 93)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

94

1  about moving someone is a little more problematic. But
2  absolutely in terms of the broad, general concepts of
3  monitoring someone, making sure that they are
4  breathing, being responsible for the people that you
5  have in custody, yes.
6      Q   You read Adam Grobove -- he's actually a
7  trainer who trained Callahan and Gorman.  Do you
8  remember reading that?
9      A   Vaguely, yes, sir.
10      MR. BENNETT:  This is Grobove:
11      (Video clip shown of the following questions
12  and answers from the August 13, 2012 testimony of
13  Officer Adam Grobove:
14      "And they'd be trained that once you have a
15  subject secured, an officer shall watch for any of the
16  following signs, including significant change in
17  behavior or level of consciousness?
18      "Yes, those are behaviors.
19      "Shortness of breath, irregular breathing or
20  not breathing?
21      "Yes.
22      "Seizures, convulsions?
23      "Yes.
24      "Complaints of any other serious pain or
25  injury and any other serious medical problem, right?

95

1      "Yes.
2      "I mean, you're basically --
3      "It's medical monitoring.
4      -- supposed to medically monitor the person
5  you're arresting?
6      "Yes.")
7      (End of video clip.)
8  BY MR. BENNETT:
9      Q   And the trainer who trained Gorman and
10  Callahan used the term "medically monitoring," didn't
11  he?
12      A   He did.
13      Q   And this is Captain Huffman.  This gets --
14      (Video clip shown of the following questions
15  and answers from the July 31, 2012 testimony of Captain
16  Amelia Huffman:
17      "And similarly, officers have an obligation
18  under the Fourth Amendment when they -- when they
19  arrest someone or otherwise maintain someone in
20  custody, they have an obligation to ensure that that
21  person remains in good health?
22      "Yes.
23      "Continues to breathe?
24      "Yes.
25      "And so officers have an obligation under the

96

1  Fourth Amendment to, for example, continue -- to
2  continue monitoring the breathing of a suspect that
3  they've arrested?
4      "Yes.
5      "That didn't happen in this case?
6      "No.  There was a significant gap of time in
7  which that did not happen.")
8      (End of video clip.)
9  BY MR. BENNETT:
10      Q   Do you disagree with anything that Captain
11  Huffman said?
12      A   About the -- except for the last sentence, I
13  agree with everything she said.  I don't agree with her
14  last sentence.
15      Q   And why not?
16      A   Because I believe that they were talking to
17  him, engaged with him while they were with him.  They
18  may not have been perfectly attentive to him, but they
19  were attenant (sic) to him to some degree.
20      Q   Well, they never got any response from him.
21      A   They never got a response from him the entire
22  time they interacted with him, yes, sir, that's
23  correct.
24      Q   After the agonal breathing, could you hear
25  any sounds from him?

97

1      A   I'm not familiar with the term "agonal
2  breathing," except when you've used it in this case,
3  sir.
4      Q   Well, after the second moaning or groaning,
5  whatever, the -- what -- what Dr. Baker called agonal
6  breathing or sonorous breathing.  Do you know what I'm
7  talking about, on the tape?
8      A   I understand when you say "groaning," yes.
9      Q   Did you hear any sounds from him after that
10  time?
11      A   I don't believe so, no, sir.
12      Q   And that was at the -- at the 2:45 minute
13  mark after the start of the first TASER cycle.
14      A   Well, which clock are you using?  Because
15  there's multiple clocks --
16      Q   Well, I'm using Dr. Baker's PowerPoint.  He
17  starts at the end -- at the first TASER cycle.  He's
18  handcuffed at -- at, according to Dr. Baker -- the last
19  TASER cycle ends at 50 seconds.  By 54 seconds he's
20  handcuffed.  Baker says his last voluntary sound is at
21  a minute 46.  Do you see that?
22      A   I -- I -- you've got it upside down there.
23      Q   I'm sorry.
24      A   That's all right.
25      Q   Don't mind me.  I'm not trying to --

25 (Pages 94 to 97)

Michael Berkow
2/25/2013

98

1    A   I didn't think you were, sir.
2    Q   -- intimidate you or do anything to -- not
3  that I could, but the...
4       And he says the sonorous breathing or what he
5  says agonal breathing, or the death rattle, for
6  laypeople, starts at 2:14 and ends at 2:45. Do you see
7  that?
8    A   If you're talking about the groaning, yes,
9  sir.
10   Q   I'm -- he has the knee still on the back at
11  4:48, for another two minutes after the sonorous
12  breathing ends, correct?
13   A   Yes, sir.
14   Q   And he doesn't have the CPR started for
15  almost four minutes after that, correct?
16   A   Yes, sir. Yes, sir.
17   Q   Do you have any disagreement with those
18  times?
19   A   No, sir.
20   Q   Okay.
21      Did they ever get a response from David Smith
22  in all their discussion with him?
23   A   A verbal response? No, sir.
24   Q   Well, did they get any response?
25   A   Well, there's different sounds that he makes

99

1  and there's different movements that he makes at
2  different times.
3    Q   Is there any movement after sonorous
4  breathing ends?
5    A   I really don't recall when the movements stop
6  and start. It's a little difficult to determine.
7    Q   The last -- you understand what Exhibit 30
8  is? Do you know what that is?
9    A   I believe this is a little matrix that was
10  put together, yes, sir.
11   Q   It says, "Timeline of Events. Pen Camera
12  Video"?
13   A   Yes, sir.
14   Q   It has the MPD case control number on it?
15   A   Where is that?
16      Oh, yes. Yes, sir.
17   Q   I mean, just to reference it to this case.
18   A   Yeah. No, I understand. I just didn't -- I
19  didn't see it.
20   Q   Do you know who did this?
21   A   I think it was done by an Internal Affairs --
22  is it -- might be Sergeant Case.
23   Q   Correct.
24   A   Is that right?
25   Q   And he didn't get all the words right, but he

100

1  took a shot at it. And -- like, for example, I think
2  one that -- for instance, Gorman testified in the
3  second deposition after hearing this, he said, "Never
4  get the drugs out on time." The word "drugs" is not
5  correct. It was "never get the gloves out on time."
6    A   Yes, sir.
7    Q   Do you remember reading that?
8    A   Yes, sir.
9    Q   Okay.
10   A   I remember some conversation somewhere about
11  that, yes, sir.
12   Q   But it was -- it was, you know, they
13  oftentimes put gloves on if they're going to -- they
14  know they're going to deal with people, and you see
15  them -- did you watch all the pen camera videos?
16   A   I've watched pen camera videos. Whether
17  they're all of them, I don't know, sir.
18   Q   Did you watch -- did you get a video -- did
19  you get a disk with a number of pen camera videos on
20  it?
21   A   That I don't recall.
22      MR. OSBORNE: I don't think I sent those to
23  Michael.
24  BY MR. BENNETT:
25   Q   Okay. So you haven't seen the other

101

1  instances in which the pen camera was used?
2    A   I've read deposition testimony about it.
3    Q   Okay.
4    A   But I've not -- I don't believe I've seen
5  those videos, no, sir.
6    Q   Okay. Well, you -- you can imagine that they
7  go to a call; if they know they've got to deal with
8  someone hands-on, a lot of times they'll put on gloves.
9  That's not uncommon, correct?
10   A   Talking about latex gloves or like black
11  leather or Kevlar?
12   Q   Actually, Gorman seems to put on latex and --
13  and Callahan seems to put on leather gloves, if I
14  remember right.
15      MR. OSBORNE: Yeah, but I think that's --
16   A   There are certainly issues about putting on
17  gloves and what departments allow, and...
18      A number of departments are -- don't approve
19  of the black leather gloves.
20  BY MR. BENNETT:
21   Q   Okay. The...
22      But there's a lot of discussion in this
23  period, including the period when the groaning starts
24  and the groaning stops, right? You know, "Never get
25  the gloves out on time. I can't believe he punched me

26 (Pages 98 to 101)

Michael Berkow
2/25/2013

102

1  in the face. I got that all on here," and he taps the
2  video. Do you remember seeing that?
3  　　A　Yes, sir, I do.
4  　　Q　"Can we charge him with assault 4?" And then
5  they say, "Dave, what are you doing? What are you on?
6  Dave? Dave? Dave? Come on, man. Or what are you on,
7  man? Dave?"
8  　　　　And there's -- you know, so there's
9  discussion. They never get any response to any
10  questions, right?
11  　　A　No, sir, they do not.
12  　　Q　So if you don't get a response, shouldn't you
13  be worried? If you ask questions, you get nothing?
14  　　A　Well, they -- they never got an answer from
15  him the whole time they asked him questions.
16  　　Q　Well, it doesn't mean you can -- if you don't
17  get an answer, it doesn't mean you can stop medically
18  monitoring, does it?
19  　　A　You -- they're still engaged with him,
20  they're still with him, they're still looking at him.
21  　　Q　Well, they didn't notice him die, did they?
22  And that's really what happened.
23  　　A　They did not notice that there came a point
24  in time when he stopped breathing, immediately. They
25  did notice it and then they immediately started CPR.

103

1  But there was a period --
2  　　Q　Well, they didn't even do that. That isn't
3  fair, is it? They took his pulse. How much time
4  elapsed between the -- he says Gorman -- Gorman goes...
5  　　　"Gorman. Gorman. I don't think he's
6  breathing." That's at eight -- at the 8-minute mark,
7  according to Exhibit 30.
8  　　A　Yes, sir.
9  　　Q　And they don't start CPR --
10  　　A　Well, they're doing other things here, aren't
11  they? I -- he's checking his pulse at that point in
12  time.
13  　　Q　But he waits 44 seconds. I mean --
14  　　A　He waits 44 seconds for what? He's checking
15  his pulse in that time.
16  　　Q　He already had no pulse.
17  　　A　Well --
18  　　Q　Here's where the no pulse is.
19  　　　　He -- you -- where he checks his pulse, you
20  can see that. You can't -- he didn't check the pulse
21  once he turns him over.
22  　　A　I believe it says right here, "I ain't got no
23  pulse."
24  　　Q　Okay. And that's at 8:27 he's having this
25  discussion. And that's where Gorman goes, "Hmmm."

104

1  Right?
2  　　A　Yes, sir.
3  　　Q　And they don't start chest compressions
4  until -- from -- for 45 seconds after he says, "Gorman.
5  Gorman. Dude. I don't think he's breathing."
6  　　A　Yes, sir, that's correct.
7  　　Q　Okay.
8  　　　　When you're not breathing, 45 seconds is not
9  immediately, is it?
10  　　A　I don't know how to answer that. I mean, if
11  you're not breathing, you want someone to assist you
12  immediately.
13  　　Q　Yeah. Because you got how many minutes
14  before you go brain dead, before you have brain damage?
15  About four?
16  　　A　I knew that once upon a time. I'm not sure
17  I've studied that in a long time.
18  　　Q　I'm going to talk to you about -- this is the
19  head of detectives.
20  　　　　(Video clip shown of the following questions
21  and answers from the July 31, 2012 testimony of
22  Lieutenant Richard Zimmerman:
23  　　　　"As a homicide investigator and then, you
24  know, obviously now as a lieutenant, do you have the
25  ability to point out any policy violations that you

105

1  observe to someone in Internal Affairs?
2  　　　　"Yes. I have a duty to report policy
3  violations. Yeah.
4  　　　　"Okay. And is that something you've done
5  before?
6  　　　　"Yes.
7  　　　　"Okay. Did you observe any policy violations
8  in this case?
9  　　　　"Um... I may have, yes.
10  　　　　"And what policy violations do you believe
11  you may have observed in this case?
12  　　　　"The duty to render -- you know, to render
13  aid right away.
14  　　　　"Did you express concern about that to
15  anyone?
16  　　　　"No.
17  　　　　"And if you have a duty to do so, why is it
18  that you didn't express concern about that to anyone?
19  　　　　"Because IA was down there, too, and
20  investigated alongside of Homicide.
21  　　　　"And so are you saying that you believe that
22  any policy violation is something that should have been
23  observed by them?
24  　　　　"Yes.
25  　　　　"Okay. And it was a policy violation that

27 (Pages 102 to 105)

Michael Berkow
2/25/2013

106

1   was obvious to you?
2       "Yeah.")
3       (End of video clip.)
4   BY MR. BENNETT:
5       Q   Do you disagree with Lieutenant Zimmerman?
6       A   Yes, sir.
7       Q   Okay.
8       Lieutenant Zimmerman took some time before he
9   answered those questions, too, didn't he?
10      A   Yes, sir, he did, at least the one.  One
11  question he did.
12      Q   There are specific training about -- that MPD
13  gives to monitor the handcuffed subjects in the prone
14  position; isn't that true?
15      A   I don't recall.  It might have been in the
16  training material.
17      Q   Well, here's the training officer.
18      (Video clip shown of the following questions
19  and answers from the October 2, 2012 testimony of
20  Sergeant Brian Anderson:
21      "If MPD officers were maintaining someone in
22  a prone position, though, in terms of training prior to
23  2010, they would have been trained that you want to
24  overall pay attention to the medical condition of the
25  subject?

107

1       "Correct.
2       "Because you would want to do that after any
3   use of force anyway?
4       "Correct.
5       "And handcuffing someone and putting them in
6   a prone position is obviously a use of force?
7       "Correct.
8       "Okay.")
9       (End of video clip.)
10  BY MR. BENNETT:
11      Q   Do you agree with those statements?
12      A   Yes, sir.
13      (Video clip shown of the following questions
14  and answers from the October 2, 2012 testimony of
15  Sergeant Brian Anderson:
16      "You would basically expect any officer
17  working at the MPD in September of 2010, who had been
18  there for any period of time, would have been trained
19  that if they're holding someone in a prone restraint
20  position, as soon as it's practical, they should be
21  paying attention to whether or not that individual is
22  suffering from any medical conditions?
23      "Correct.")
24      (End of video clip.)
25

108

1   BY MR. BENNETT:
2       Q   Do you agree with those -- with that?
3       A   Yes, sir.
4       Q   And then here's --
5       (Video clip shown of the following questions
6   and answers from the May 10, 2012 testimony of
7   Detective Erick Fors:
8       "You believe, if, as Gorman admits, he was
9   on -- applying pressure with one or both knees or
10  alternatively applying pressure with the left or right
11  knee for a period of four and a half minutes, you would
12  expect him to pay attention for those four and a half
13  minutes, don't you?
14      "Yes.
15      "And the attention is to be directed on the
16  person you're using the force on?
17      "Correct.
18      "And the reason you do that is that you don't
19  want someone to die by mistake while you're holding
20  onto them, do you?
21      "I think you could encompass it into a wider
22  range:  If you don't want the person to suffer any
23  medical problems.
24      "That's right."
25      MR. BENNETT:  And --

109

1       (Video clip continues:
2       "...Minneapolis Police Department, that
3   prolonged kneeling on a subject's back during a
4   use-of-force encounter can compromise breathing,
5   correct?
6       "Correct.")
7       (End of video clip.)
8   BY MR. BENNETT:
9       Q   Do you agree with Detective Fors?
10      A   I don't know who he is.  And I think we've
11  already looked at this, sir.
12      Q   Not that one.
13      A   Okay.  You show me little clips of videos,
14  sir.  It's difficult -- and you show them in a random,
15  rapid order without telling me who is speaking first.
16  So it's a little difficult me to keep them all
17  straight.
18      Q   That was Detective Fors, who -- the guy who
19  took --
20      A   The statements.
21      Q   -- the statements.
22      A   Okay.  Great.
23      I can agree with what he said up until the
24  last question and answer.
25      Q   Okay.

28 (Pages 106 to 109)

Michael Berkow
2/25/2013

110

1       And what do you disagree with about the last
2   question and answer?
3       A   Oh, well, now you -- I'd have to -- you'd
4   have to show me that last question and answer again.
5       Q   Okay.
6       MR. BENNETT:  Can I move this forward to
7   the -- no?
8       (Video clip shown of the following questions
9   and answers from the May 10, 2012 testimony of
10  Detective Erick Fors:
11      "You believe, if, as Gorman admits, he was
12  on -- applying pressure with one or both knees or
13  alternatively applying pressure with the left or right
14  knee for a period of four and a half minutes, you would
15  expect him to pay attention for those four and a half
16  minutes, don't you?
17      "Yes.
18      "And the attention is to be directed on the
19  person you're using the force on?
20      "Correct.
21      "And the reason you do that is that you don't
22  want someone to die by mistake while you're holding
23  onto them, do you?
24      "I think you could encompass it into a wider
25  range:  If you don't want the person to suffer any

111

1   medical problems.
2       "That's right."
3       (End of video clip.)
4   BY MR. BENNETT:
5       Q   And there's the last question.
6       A   Right.
7       (Video clip shown of the following questions
8   and answers from the May 10, 2012 testimony of
9   Detective Erick Fors:
10      "... the Minneapolis Police Department, that
11  prolonged kneeling on a subject's back during a
12  use-of-force encounter can compromise breathing,
13  correct?
14      "Correct.")
15      (End of video clip.)
16  BY MR. BENNETT:
17      Q   Do you disagree with the fact that he's had
18  that training?
19      A   I have no idea.  I don't recall if he did or
20  he didn't.
21      Q   So that isn't -- is that training that he
22  just talked about in the last answer, is that
23  consistent with generally accepted practices and
24  procedures of properly trained and prudent law
25  enforcement agencies?

112

1       A   What training?
2       Q   That he just said he received.
3       A   I'm not aware of what training he received,
4   sir.  I don't recall what training he received.
5       Q   The training that kneeling on the subject's
6   back in the prone position for four and a half minutes
7   is improper.
8       A   You're saying that he received specific
9   training that --
10      Q   He said.  I didn't say.  I'm just saying --
11  you say -- are you saying he didn't get the training he
12  just said?
13      A   No, I'm not -- I have no opinion whether or
14  not he got the training.
15      Q   Is the training that he described consistent
16  with generally accepted practices and procedures of a
17  properly trained and prudent law enforcement agency?
18      A   I have no idea.  I'd have to see the
19  training.
20      Q   Okay.
21      And here's the training officer.
22      (Video clip shown of the following questions
23  and answers from the October 2, 2012 testimony of
24  Sergeant Brian Anderson:
25      "Prior to September 9, 2010, were MPD

113

1   officers trained that it's appropriate to place a
2   subject in prone position and kneel on the subject's
3   back for several minutes without monitoring the
4   subject's level of consciousness?
5       "No.
6       "Prior to September 9, 2010, were MPD
7   officers trained that it is appropriate to place a
8   subject in prone position and kneel on the
9   subject's back for several minutes without monitoring
10  the subject's breathing?
11      "No.")
12      (End of video clip.)
13  BY MR. BENNETT:
14      Q   Do you agree with -- with training Officer
15  Brian Anderson?
16      A   Well, again, he's referencing training, and
17  I'm not sure what you're referring to.  And if you'll
18  recall from the video before that, you were very
19  careful, Mr. Bennett, to talk about alternately placing
20  pressure of one knee and then the other, versus here
21  where it's just referred to as "kneeling."  So I have
22  difficulty just giving you a yes or no answer as to do
23  I agree with the sergeant.
24      Q   So you don't -- you're not able to answer the
25  question?

29 (Pages 110 to 113)

Michael Berkow
2/25/2013

114

1    A   No, sir.  There's a significant difference in
2  the way the questions were phrased.
3    Q   Okay.  This is Sergeant Anderson again.
4        (Video clip shown of the following questions
5  and answers from the October 2, 2012 testimony of
6  Sergeant Brian Anderson:
7        "So if you had a suspect who was complying
8  and was under control, the training that you provided
9  would have been at that point you want to get that
10 person in a side position or a seated position?
11       "Correct.
12       "Okay.  Would you expect that all MP -- all
13 MPD officers prior to 2010 would have received training
14 to that effect?
15       "Correct.
16       "Okay.")
17       (End of video clip.)
18 BY MR. BENNETT:
19   Q   Is that training consistent with generally
20 accepted practices and procedures of a properly trained
21 and prudent law enforcement agency?
22   A   I don't know what training he's referencing,
23 sir.  I'm not --
24   Q   The training he just described.
25   A   He didn't describe training, sir.

116

1  person in a side position or a seated position?
2        "Correct.
3        "Okay.  Would you expect that all MP -- all
4  MPD officers prior to 2010 would have received training
5  to that effect?
6        "Correct.
7        "Okay.")
8        (End of video clip.)
9  BY MR. BENNETT:
10   Q   What's wrong with -- what is unanswerable
11 about that question?
12   A   Ask me the question, sir.  You're asking --
13 if you're asking me about the training, I'd have to see
14 the plan of training.  If you're asking me about --
15   Q   I asked him about the training.  He didn't
16 say I needed to show him the plan of training.
17   A   I'm not testifying for him, sir.
18   Q   Well, he was the -- he was the training
19 expert for the city that they put up as a Rule
20 30(b)(6).  You know what that is, don't you?
21   A   Yes, I do.
22   Q   You're a lawyer.
23   A   Yes, sir.
24   Q   Okay.  That means they designate someone
25 who's most knowledgeable about training, doesn't it?

115

1    Q   He did --
2    A   The question was -- the question was: Did
3  you provide training.  And I -- I don't have the
4  training program, so I'd have to see what the specific
5  training was, sir.
6    Q   Well, he -- he's verbally describing the
7  training.  Is that the problem, you don't like his
8  verbal description of it?  Do you disagree with his
9  verbal description of it?
10   A   I don't know, sir.  I'd have to see what the
11 specific training -- you're asking him about training
12 that was delivered to Minneapolis PD.  You're
13 referencing a course of training.
14   Q   Well, he is.
15   A   No, sir.  The question is -- the questioner
16 is asking him about a course of training.
17   Q   Well, what do you disagree with the answer?
18 Is there anything you -- just watch it again, see if
19 you -- you tell me what's wrong with his answer.
20       (Video clip shown of the following questions
21 and answers from the October 2, 2012 testimony of
22 Sergeant Brian Anderson:
23       "So if you had a suspect who was complying
24 and was under control, the training that you provided
25 would have been at that point you want to get that

117

1    A   They designate a specific individual to speak
2  on training, yes, sir.
3    Q   Well, assuming I wrote the Rule 30(b)(6)
4  Notice correctly, it would be the person who's able to
5  give the answers with the most underlying knowledge,
6  correct?
7    A   And presume they pick the right person,
8  absolutely.
9    Q   Is there anything about his answer you didn't
10 understand?
11   A   That I didn't understand?
12   Q   Yes.
13   A   No.
14   Q   Anything you disagreed with?
15   A   He's -- his answer relates to a specific
16 course of training that he's familiar with that I'm
17 not.
18   Q   Okay.  But he's asking about what officers
19 should have understood from the training.  Did you get
20 that from the answer?
21   A   Yes, sir.
22   Q   All right.  Do you have any disagreement
23 with -- I mean, is that -- is that what you want
24 officers to get from that kind of training?
25   A   I -- I don't know what the training was, sir.

30 (Pages 114 to 117)

Michael Berkow
2/25/2013

118

1      Q   Okay.  All right.
2          (Video clip shown of the following questions
3   and answers from the July 31, 2012 testimony of Captain
4   Amelia Huffman:
5          "Now, you talk about not being a doctor in
6   terms of understanding the length of time that you,
7   know, there was kneeling on David Smith's back.
8   Minneapolis police officers, along with all other
9   police officers, have been trained for a long period of
10  time that you're not supposed to continue to kneel on
11  the backs of subjects for a long period of time; isn't
12  that right?
13         "Yes.  We train officers to turn them over
14  into the recovery position as soon as practical.
15         "And that was long before this case, wasn't
16  it, that that training has been provided?
17         "Yes.  I don't know for how long and in --
18  and in what context, but certainly it's been part of
19  our maximal restraint policy for many years.
20         "And it's something that you would -- that
21  you train to do not only in maximal restraint, but in
22  any situation where you have a handcuffed individual in
23  the prone position; isn't that right?
24         "Yes.  We encourage officers to turn them
25  over as soon as practical onto their side.")

119

1          (End of video clip.)
2   BY MR. BENNETT:
3      Q   Do you understand what that training that
4   she's describing is?
5      A   No, sir.
6      Q   Okay.
7          So you're unable to comment on it one way or
8   another?
9      A   No, sir, I wouldn't comment on that.
10     Q   Okay.  Good.
11         This is Travis Glampe, the head of IA.
12         (Video clip shown of the following questions
13  and answers from the July 24, 2012 testimony of
14  Lieutenant Travis Glampe:
15         "-- restrained in a prone position in the way
16  that Callahan and Gorman did" --
17         THE WITNESS:  Can you restart it?  I'm sorry,
18  you were talking to me when it started.
19         MR. BENNETT:  Sure.
20         Can I just hit it again, Katie?
21         Travis Glampe, IA lieutenant:
22         ("You agree that keeping David Smith
23  restrained in a prone position in the way that Callahan
24  and Gorman did was a use of force?
25         "Yes.

120

1          "Your training as a Minneapolis police
2   officer tells you that you should turn a
3   prone-restrained subject on their side to assist with
4   breathing?
5          "At a certain point, yes.
6          "Well, whenever you can, the first point you
7   can?
8          "Yes.
9          "MPD policy also tells you the same thing?
10         "Correct.
11         "You believe that there may have been a
12  different outcome in this case if David Smith was put
13  on his side?
14         "There could have been, yes.")
15         (End of video clip.)
16  BY MR. BENNETT:
17     Q   Do you have any disagreement with Lieutenant,
18  now Deputy Chief, Glampe?
19     A   Again, I believe it appears to me that the
20  questions are very broad and his answers are very
21  broad, so I would not agree with them as given.
22     Q   Okay.
23         Here is Detective Zimmerman.
24         (Video clip shown of the following questions
25  and answers from the July 31, 2012 testimony of

121

1   Lieutenant Richard Zimmerman:
2          "Did it surprise you that the cause of death
3   was mechanical asphyxia?
4          "No.
5          "And why didn't that surprise you?
6          "Because they had kneeled on him to handcuff
7   him.")
8          (End of video clip.)
9   BY MR. BENNETT:
10     Q   Now, I didn't use the word "kneel," and
11  neither did Mr. Storms.  That was the head of -- or the
12  lieutenant in Homicide's words.  Correct?
13     A   Yes, sir.
14     Q   Okay.
15         And he certainly understood that kneeling on
16  the subject's back could cause them to die from
17  mechanical asphyxia, couldn't he?  Is that generally
18  understood in police -- in police practice?
19     A   Well, we've seen "kneeling" described four
20  different ways, at least, since we've been going
21  through these videos.  So I don't think I can give you
22  a clear answer to that question.
23     Q   I'm sure you can't.
24     A   I'm sorry, was that a question, sir?
25     Q   No, that was a comment.

31 (Pages 118 to 121)

Michael Berkow
2/25/2013

122

1      The -- I want to go through your report, ask
2  you some questions here about that.
3      Basically what was described in the details
4  of the incident was a person who was mentally ill,
5  correct? That they were --
6      A  I don't know what you're referring to, sir.
7      Q  Well, I'm referring to page 7 and 8 of your
8  --
9      "He might have been drunk, but she was unsure
10 if he was drunk, but he was nonresponsive to her
11 questions, confused." Correct?
12     A  You're asking what -- I'm repeating what the
13 various witnesses said?
14     Q  Well, you repeat parts of what various
15 witnesses said, to be fair. Correct?
16     A  I try and lay out the facts using the various
17 witnesses that are fact witnesses.
18     Q  Yeah. Okay.
19     And in fact, you cite the 911 call. It said,
20 "We have a gentleman in the building. He doesn't know
21 who he is, he doesn't know his name, he doesn't know my
22 name, and he doesn't know where he is."
23     A  Yes, sir.
24     Q  Page 8.
25     A  Yes, sir.

123

1      Q  Does that sound like someone who might be
2  having a mental illness problem?
3      A  I think it could be. It could be that, could
4  be a lot of things. Yes, sir.
5      Q  Sure.
6      You don't mention the four and a half minutes
7  that -- that Gorman remained on -- putting pressure
8  with one or both knees on David Smith's back, correct,
9  in your report?
10     A  Um, I believe that I describe the
11 circumstances of them using force, taking him into
12 custody. I just... I'm not sure what your specific --
13 you're asking me to -- a negative, I believe.
14     Q  Well, do the -- does the words "four and a
15 half minutes" appear there, in your report?
16     A  I don't believe so, no, sir.
17     Q  Okay.
18     And you don't make any mention of the term
19 "motherfucker." You discuss a lot of things they talk
20 about, but you don't talk about that, right?
21     A  No, sir.
22     Q  You don't mention the threat about what he
23 would do to him if his jaw was broken, do you?
24     A  I don't recall a threat. I recall him
25 saying, "Motherfucker, I -- you better not have broken

124

1  my jaw."
2      Q  Well, there's a --
3      A  Or something like that.
4      Q  -- "or else" sort of component to that, isn't
5  there? You better not have broken my jaw or what?
6      A  I didn't hear a threat or -- an "or else,"
7  sir.
8      Q  Okay.
9      A  Not that I recall.
10     Q  "I can't bite down. Motherfucker, you better
11 not have broke my fucking jaw." That's what he said,
12 right?
13     A  Period. Yes, sir.
14     Q  So that is just a declarative sentence, in
15 your view? That's --
16     MR. OSBORNE: Weren't they talking right
17 around there about fourth degree assault or something
18 like that?
19     MR. BENNETT: No, not -- actually, not then.
20 This is later on, actually. This is at the 6:46 mark.
21     A  They actually use "motherfucker" several
22 times, as I recall.
23 BY MR. BENNETT:
24     Q  I do, too.
25     But, "You better not have broke my fucking

125

1  jaw," causes me to ask, or what? Or else what?
2      MR. OSBORNE: Well, that's not on there,
3  though, Bob.
4      MR. BENNETT: No.
5      MR. OSBORNE: It's not on the videotape
6  either.
7      MR. BENNETT: No, it isn't.
8      THE WITNESS: I guess that's a comment again,
9  sir.
10 BY MR. BENNETT:
11     Q  Or you'll kill me? What? I mean -- I
12 don't --
13     A  Is there a question?
14     Q  You know, what is the implied --
15     MR. OSBORNE: Could be you could be charged
16 with a crime.
17     MR. BENNETT: Okay.
18 BY MR. BENNETT:
19     Q  The...
20     Was there -- do you -- do you describe any
21 overt activity to monitor consciousness or respiration
22 before he checks the pulse at 7:50, at the 7:50 mark on
23 Exhibit 30?
24     A  I'm sorry, by officers -- any affirmative
25 action by the officers on the scene?

32 (Pages 122 to 125)

Michael Berkow
2/25/2013

126

1    Q   Yeah.
2    A   Is that what you're talking about, sir?
3    Q   Yeah.
4    A   On page 10 I believe I said both are talking
5    to him on a fairly regular basis. They're both asking
6    him if he's okay. They're both asking if he understood
7    him.
8    Q   And they -- but they got -- you know, if you
9    talk to someone who is unconscious, what kind of
10   response are you going to get?
11   A   Nothing.
12   Q   How about the person who's dead?
13   A   Nothing.
14   Q   Okay. So not getting responses doesn't tell
15   very -- you very much, does it?
16   A   That verbal interaction, yes, no, it doesn't
17   tell you very much.
18   Q   So you have to do something beyond not
19   getting responses to actually check the level of
20   consciousness or respiration, correct?
21   A   Well, there could be other factors, sir.
22   Q   Well, you hear on the tape Gorman and
23   Callahan breathing hard from the struggle, correct?
24   A   I hear a lot of people breathing hard. I'm
25   not sure I can distinguish who's breathing hard.

127

1    There's -- seems to me everybody is breathing hard at
2    some point.
3    Q   Okay.
4        Now, you go on on page 11 to state that the
5    MPD conducted a bifurcated investigation.
6    A   Yes, sir.
7    Q   In fact, is that true? There was not a
8    separate investigation onto -- on IA, was there?
9    A   Ah, I don't know. What I've seen is the --
10   they did a voluntary statement that was in the criminal
11   investigation that then went over into the IA
12   investigation.
13   Q   Well, no. But the IA investigator did not
14   take a statement under -- with a Garrity warning,
15   correct?
16   A   No, he did not. Not that I've seen, no, sir.
17   Q   And he didn't take statement -- Sergeant Case
18   didn't take any independent witness statements at all,
19   did he?
20   A   When that -- that doesn't answer the question
21   of whether or not it's bifurcated or not. But the
22   Garrity statement certainly is a relevant factor.
23   Q   He didn't -- he didn't conduct any
24   investigation beyond letting -- other than -- as far as
25   I can tell, other than doing this timeline from the pen

128

1    camera and the TASER camera video.
2    A   I -- I don't know exactly what he did, sir.
3    Q   Well, you read his deposition, didn't you?
4    A   Who? I'm sorry?
5    Q   Case. He's the investigator for Internal
6    Affairs?
7    A   I'm sure I did. I don't recall the specific
8    details of it.
9    Q   And apparently Case didn't even figure out
10   the violation that Homicide Lieutenant Zimmerman found,
11   correct?
12   A   I have no idea.
13   Q   Well, he didn't -- you saw what Zimmerman
14   testified to, correct?
15   A   I just saw this -- this testimony, yes, sir.
16   Q   And you read it before, right?
17   A   May have. I'm sure I've read it, but I don't
18   recall it.
19   Q   Okay.
20   A   There was an awful lot of material in this
21   case.
22   Q   Did you review potential criminal statutes to
23   see what might have been brought up to the grand jury?
24   A   No, sir.
25   Q   Now, you're not conflating the grand jury

129

1    process with the Internal Affairs process, are you?
2    They're entirely different.
3    A   I don't understand your question.
4    Q   Well, a grand jury doesn't consider Internal
5    Affairs disciplinary actions, does it?
6    A   No.
7    Q   They're never even told about various
8    policies of the Minneapolis Police Department, are
9    they?
10   A   I don't know. They may or may not have been.
11   Q   All right. It's not really within their
12   purview about whether a policy was violated. It's
13   whether a law was violated, a criminal law of the state
14   of Minnesota --
15   A   Correct.
16   Q   -- correct?
17       So they're not -- they're -- they're
18   different analyses, Internal Affairs and a grand jury?
19   A   Absolutely. Absolutely.
20   Q   And a no bill on a grand jury does not excuse
21   the Internal Affairs and the people that supervise it
22   and exercise disciplinary activity from the
23   investigation from doing their job, does it?
24   A   No.
25   Q   Okay.

33 (Pages 126 to 129)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

130

1        And you haven't read any grand jury minutes
2   or transcript, have you?
3        A   No, sir.
4        Q   So you don't know what was done there and
5   what wasn't done there?
6        A   No idea.
7        Q   And you -- did -- when you were back there
8   in -- you didn't do criminal work, it sounds like,
9   in -- at your job in Washington; is that true?
10       A   I'm sorry?
11       Q   Did you do criminal defense stuff or
12  prosecution in Washington?
13       A   Oh, the state of Washington.  Actually, yes,
14  I did, sir.
15       Q   Okay.  Well, then you know a little bit about
16  it.
17           You would have known that as a police
18  officer, maybe as a law clerk and -- to a federal
19  judge, but, you know, there's a -- there's an old
20  saying, at least that I've heard many times, that, you
21  know, if the U.S. attorney wants to indict someone,
22  they could indict a ham sandwich.  You heard that
23  before, too?
24       A   Yes, I have.
25       Q   Okay.  And if they don't, they don't -- they

131

1   can get no bills pretty easily too, can't they?
2        A   I've not heard that corresponding corollary.
3        Q   All right.
4           The -- you didn't mention it, but it's a fact
5   that the -- that the recommendation from the
6   use-of-force review committee was that the MPD receive
7   additional training for all officers on excited
8   delirium syndrome, correct?
9        A   Yes, sir.
10       Q   And you understand that the medical
11  examiner's with -- of this -- the common jurisdiction
12  found that there was no excited delirium involved,
13  correct?
14       A   I don't recall any mention by the medical
15  examiner of excited delirium.
16       Q   Well, I think they actually ruled it out, to
17  be perfectly -- there wasn't any -- there wasn't
18  excited delirium in this case, is what Baker said.
19  I --
20       A   I don't -- I don't recall, but...
21       MR. BENNETT:  Okay.
22       I want to -- let me -- let me ask you a
23  question --
24       MR. OSBORNE:  Sure.
25       MR. BENNETT:  -- first.  And the answer

132

1   doesn't --
2        Why don't we go off the record.
3        VIDEOGRAPHER:  Off the video record at
4   11:32 a.m.
5        (Discussion held off the record.)
6        VIDEOGRAPHER:  We are back on the video
7   record at 11:52 a.m.
8   BY MR. BENNETT:
9        Q   I understand that you made a site visit to
10  the YMCA gym on March 12, 2012, correct?
11       A   Yes, sir.
12       Q   And you went with Officer Callahan and
13  Gorman, accompanied by city attorneys Burt Osborne and
14  Tracey Fussy; is that right?
15       A   Yes, sir.
16       Q   And you didn't allow the officer to review
17  any reports, diagram, photos or videos?
18       A   Not with me, did not, no, sir.
19       Q   So basically they -- you went there without
20  any firm reference to the record as it existed?
21       A   Well, they were the best evidence.  They were
22  the ones who did it, so --
23       Q   Well, they -- that was a year and a half ago.
24  The best evidence is the film that occurred
25  contemporaneously with it occurring.  They were the --

133

1   that's the best evidence, isn't it?
2        A   No, that's a partial record.  It's not
3   complete.  It's certainly very relevant.  It's
4   certainly very valuable.  But it's not a total and
5   complete depiction of everything.
6        Q   And you -- you had them walk through their
7   incident to the best of their recollection without any
8   reference to record evidence, correct?
9        A   Yes, sir.
10       Q   And so you didn't have either the Y video to
11  take you through where they had started and where they
12  ended up, right?
13       A   No, sir, did not --
14       Q   Didn't have the TASER video and you didn't
15  have the pen camera video?
16       A   No, sir.
17       Q   All right.
18           And then you had them independently position
19  you on the floor, and they each took their respective
20  positions on you in the same manner that they had been
21  positioned on Mr. Smith.  How could you tell that
22  without reference to the record?
23       A   They positioned me to the best of their
24  recollection.
25       Q   Well, so it's not necessarily the same

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

134

1  manner. The best of their recollection is of
2  March 12th, 2012, is what they gave you, right?
3  **A   Yes, sir.**
4  Q   And did they have you pointed the same way as
5  Smith?
6  **A   Yes, sir.**
7  Q   All right. Now, I take it there -- there was
8  no application of the Scientific Method in this at all,
9  was there? Do you know what the Scientific Method is?
10  **A   Well, why don't you explain to me what you**
11  **mean by it.**
12  Q   Why don't you tell me what the Scientific
13  Method is as you understand it.
14  **A   I don't know what you're talking about, sir.**
15  **"Science" could mean a whole range of things.**
16  Q   Well, there's such a thing called the
17  Scientific Method that experts use to -- in order to
18  make conclusions from events as if they were
19  scientists. And you -- you were not trying to follow a
20  Scientific Method?
21  **A   I was not trying to find a randomized control**
22  **study or an experiment in that nature, no, sir.**
23  Q   And you understand -- have you read Chan's
24  studies?
25  **A   At some point in time I actually have, yes,**

135

1  sir.
2  Q   Sure. So you know that he writes in his own
3  reports the significant limitations of his study?
4  **A   Yes, sir.**
5  Q   But he is actually trying to use the
6  scientific method, isn't he?
7  **A   Appears to be, yes, sir.**
8  Q   And he has to take that and run it through an
9  institutional review board that approves
10  experimentation -- scientific experimentation on human
11  subjects?
12  **A   I recall a lot of that discussion in his**
13  **deposition, yes, sir.**
14  Q   And you did not?
15  **A   No, sir.**
16  Q   And basically yours is a year-and-a-half-
17  later anecdotal view of what happened from the officers
18  who were involved in a critical incident?
19  **A   Yes, sir.**
20  Q   Okay.
21  MR. OSBORNE: It would be offered for nothing
22  more than that. I mean --
23  MR. BENNETT: Well, yeah. Yeah, I'm going to
24  object to it, as you know.
25

136

1  BY MR. BENNETT:
2  Q   Obviously -- you're not psychotic, are you?
3  **A   I'm sorry?**
4  Q   You're not psychotic?
5  **A   I don't think so, no, sir.**
6  Q   They didn't Tase you five times?
7  **A   No, sir.**
8  Q   You didn't ingest 30-plus Coricidin?
9  **A   No, sir.**
10  Q   They did not engage you in a ground fight
11  that lasted at least a minute, correct?
12  **A   No, sir.**
13  **A   The...**
14  And you knew basically that whenever you
15  wanted them to get off your back, they'd get off your
16  back?
17  **A   I assumed so, yes, sir.**
18  Q   Okay. So -- they didn't handcuff you?
19  **A   No, sir.**
20  Q   So you really weren't put in the prone
21  restraint position at all, were you? You weren't
22  restrained with your hands handcuffed behind your back?
23  **A   No, sir, I was not.**
24  Q   Okay.
25  So you'd agree with me that what you did in

137

1  no way replicates what actually transpired in that gym
2  on September 10, 2012, correct?
3  **A   I won't agree with you that it in no way**
4  **replicates.**
5  Q   Well, what ways does it replicate it?
6  **A   Well, what I asked was the officers to**
7  **position themselves as they had been relevant (sic) to**
8  **Mr. Smith.**
9  Q   Did you double-check whether they were doing
10  that by your viewing the videos?
11  **A   I certainly have viewed the videos and it's**
12  **consistent with what they described and showed me.**
13  Q   On March 12th when it was occurring, did you
14  verify that they were in fact in the positions that
15  they were as depicted in the TASER and pen camera
16  videos?
17  **A   No.**
18  Q   Okay.
19  You didn't do anything to replicate the
20  ground fight?
21  **A   No, sir.**
22  Q   Nothing to replicate the Tasings?
23  **A   No, sir.**
24  Q   Nothing to replicate the condition of the
25  person being held down?

35 (Pages 134 to 137)

Michael Berkow
2/25/2013

138

1    A  I don't understand what you mean.
2    Q  Well, I mean, for example, Chan makes, at
3  least in some of his studies, makes the people engage
4  in some exercise.
5    A  Yes, sir.
6    Q  You didn't engage in any exercise --
7    A  No, sir.
8    Q  -- before that?
9    A  No, sir.
10    Q  And basically you were trying to get an idea
11  of what the officers might have done on that day in
12  terms of positioning on the bodies, correct?
13    A  The officers' recollection of what they did
14  relative to positioning on the bodies, yes, sir.
15    Q  All right.  Did you check and see if it was
16  consistent with what they told the grand jury?
17    A  No.
18    Q  Did you check and see if it was consistent
19  with what they said in their deposition on March 12th?
20    A  On the day that I did this?
21    Q  Yes.
22    A  No, sir.
23    Q  Okay.
24        And when you did it, you did it one officer
25  at a time; correct?

139

1    A  Yes, sir.
2    Q  Who did you do first?
3    A  Callahan.
4    Q  All right.  And you did it so that Gorman
5  couldn't see what Callahan did and Callahan couldn't
6  see what Gorman did?
7    A  That's correct.
8    Q  All right.  Did Gorman get in the position
9  that he was in, or did he get into the position he
10  remembered Callahan was in as well?
11    A  I'm sorry.  Excuse me?
12    Q  Well, did -- so Gorman put a knee or both
13  knees or switched knees on your back?  Did he -- which
14  knee did he use?
15    A  Yes, sir.  He -- that's what he did.  He
16  did -- took the position that he recalled him taking
17  with Mr. Smith.
18    Q  Did he hop on your -- on your back with both
19  knees?
20    A  Did he hop?
21    Q  Yeah.
22    A  No, sir, he did not.
23    Q  Did he hit you in the head?
24    A  No, sir.
25    Q  Okay.

140

1        As far as you know, though, you didn't do
2  anything to double-check their work -- their
3  recollection that day as being reliable and consistent
4  with the videotapes?
5    A  On that day, no, sir.
6    Q  All right.  And you didn't videotape what
7  they did, did you?
8    A  No, sir.
9    Q  So we can't look at what they did?
10    A  No, sir.
11    Q  And we rely on your -- who was in the room
12  with you when they did it?
13    A  The two city attorneys.
14    Q  So basically we got two people who can't
15  really act as witnesses, if I understand the -- unless
16  they want to hire new lawyers.
17    A  Well, I --
18    Q  So, I mean -- and you were facedown on the
19  ground?
20    A  Correct.
21    Q  Okay.
22        Now, I've heard of and actually been involved
23  in some reenactments.
24    A  Yes, sir.
25    Q  Okay.  And the reenactments that I've been

141

1  involved in and been involved in looking at, A, we
2  filmed them all.  Have you filmed reenactments?  Have
3  you ever done any as a chief?
4    A  Yes, sir.
5    Q  You've filmed them, haven't you?
6    A  Filmed the whole reenactment?
7    Q  Yeah.
8    A  Um, I think in one case we may have filmed
9  the whole reenactment, but there are others where --
10    Q  You didn't?
11    A  No.  No, sir.
12    Q  Well, if you're going to do a, quote,
13  reenactment, end quote, you want to be sure that you're
14  doing everything as close to the actual event as
15  possible, correct?
16    A  Yes, sir.
17    Q  All right.  This was not even a reenactment,
18  was it?
19    A  No, I would not call it that.
20    Q  All right.
21        And the officers weren't mad at you?
22    A  I'm sorry?
23    Q  The officers weren't angry at you?
24    A  I really don't know.
25    Q  They didn't say anything -- they didn't call

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

142

1  you a "motherfucker," I imagine, did they?
2      A   No, they did not call me a "motherfucker."
3      Q   They didn't discuss criminal charges for you
4  either, I would guess, did they?
5      A   I don't believe I committed anything they
6  could charge me for, sir.
7      Q   I'm quite sure you didn't, but the...
8          Did you -- did you take notes of any of this?
9      A   No, sir.
10     Q   Did you record any of it with any
11 audio-recording device?
12     A   No, sir.
13     Q   So other than everybody's kind of gross
14 recollection, we don't know what you did, right?
15     A   Other than a recollection of my report, yes,
16 sir.
17     Q   Okay.  Now, you say -- well...
18         Officers are supposed to be trained how to
19 deal with the mentally ill, aren't they?
20     A   Officers are supposed to be trained, just
21 generally?
22     Q   Yeah.
23     A   I would say that in general, yes, they should
24 have some level of training.
25     Q   Okay.

143

1          Now, you see on page 13 in your report that
2  the material reviewed indicates that Mr. Smith was,
3  quote, "combative throughout his interactions with the
4  officers, including during the restraint process."
5          Do you see that?
6          Right here (indicating).
7      A   Yes, sir.
8      Q   All right.
9      A   Yes, sir.
10     Q   I read your language correctly?
11     A   Yes, sir.
12     Q   And that would be inconsistent with the
13 statement given at the first opportunity by Officer
14 Callahan where he basically said that once he was --
15 "arms were fully behind his back and handcuffed
16 together, it was at this time that Smith seemed to calm
17 down a bit and was not resisting as hard.  I believed
18 that Smith was giving up at this time and complying."
19         That is not the same as being combative
20 throughout his interactions with the officers,
21 including during the restraint process, is it?
22     A   You've read me two very long things and asked
23 me a question.  Can you please ask it --
24     Q   All right.
25     A   -- again?

144

1      Q   All right.  You wrote one thing.
2      A   Yes, sir.
3      Q   Do you see what you wrote?
4      A   Yes, sir, I do.
5      Q   Is what you wrote inconsistent with
6  Callahan's statement to Fors and Klund on September
7  15th?
8      A   No, sir.
9      Q   Okay.
10         Now, you -- you speculate that had Mr. Smith
11 complied with the officers' request, they would have
12 simply walked with him as he exited the building.  You
13 don't know that for a fact, do you?
14     A   Both the officers said that.
15     Q   Okay.  Well, they didn't stop putting force
16 on him once -- when he complied and gave up; correct?
17     A   By "putting force on him," what do you mean,
18 sir?
19     Q   I mean kneeling on him and sitting on him
20 such that he was mechanically asphyxiated.
21     A   I -- I can't agree with that.  I can agree
22 that they did not -- they -- they were engaged with him
23 the entire time.
24     Q   Well, they were placing weight on him,
25 weren't they, while he was in the prone restraint

145

1  position?
2      A   They were placing weight on him, yes, sir.
3      Q   Okay.  How much weight you don't know?
4      A   Exactly?  No, sir.
5      Q   And did you -- did you have Gorman -- how
6  much weight did Gorman place on you?  Half of his
7  weight?  A third of his weight?
8      A   What he was asked to do is put weight that,
9  to the best of his recollection, is the same as he put
10 on Mr. Smith.
11     Q   Did you ask him about that?
12     A   Pardon me?
13     Q   Did you ask him how much weight he did?
14     A   No.
15     Q   I mean, you realize that he could -- you can
16 modulate how much weight you put on one knee versus
17 another, correct?
18     A   Certainly.
19     Q   All right.  I mean, I was over at the
20 national duels, and you can have all of your -- you can
21 have both of your legs touching and being -- applying
22 different points of weight at different -- at different
23 parts on somebody else's body, though, correct?
24     A   I have no idea what you're referring to, sir.
25     Q   All right.  Well, forget it.  Get it from

37 (Pages 142 to 145)

Michael Berkow
2/25/2013

146

1  somebody else.
2       You'd agree with me that your perceptions
3  about what happened during this visit with Gorman and
4  Tracey Fussy and Burt Osborne and Callahan at the Y on
5  March 12th that didn't even amount to a reenactment
6  wouldn't be relevant to what David Smith felt on
7  September 10, 2010, correct?
8       A  No.
9       Q  September 9th --
10      A  I would not agree with you.
11      Q  You wouldn't?  How would it be relevant?
12      A  What I was trying to do was understand the
13  officers' positioning on Mr. Smith's body.
14      Q  Okay.  But you didn't verify that with any of
15  the available video evidence, correct?
16      A  On that day, no.
17      Q  On any day.  I mean, since you didn't -- you
18  couldn't verify it today if you wanted to, could you?
19      A  Sure.  I can certainly testify as to how they
20  positioned themselves on me and that I've looked at the
21  videos and whether they're consistent or inconsistent.
22      Q  That's if you remember right.  But you could
23  have filmed it; we'd have known, right?
24      A  Is your question could it have been filmed?
25      Q  Could it have been filmed?  Could you have

147

1  documented it with still photos?
2       A  Yes.
3       Q  Could you have recorded it audio -- with
4  audio equipment?
5       A  Yes, sir, I could have.
6       Q  You did none of those?
7       A  I did not.
8       Q  And you said it isn't even good enough to be
9  a reenactment, correct?
10      A  Well, it's a -- I said that in the context of
11  which you were asking me about full-blown reenactments
12  with filming.  And so we were having a discussion about
13  filming the entire reenactment.
14      Q  You said some reenactments you filmed and
15  some you didn't, right?
16      A  That's correct.
17      Q  But they were reenactments nonetheless.  You
18  tried to replicate the event, correct?
19      A  The full-blown event.  In this case I was not
20  trying to do that, no, sir.
21      Q  Correct.
22         So how you felt about not -- about some
23  individualized part of an event, how would that be
24  relevant to --
25      A  I was focused on that individualized part of

148

1  how they were positioned on Mr. Smith while he was
2  prone on the gym floor.
3       Q  Okay.  Where did he put his knee?
4       A  Variety of positions on my back.
5       Q  Did he say which one was the one he used?
6       A  Well, he moved, because he switched from one
7  knee to the other, just as he did in the actual
8  incident.
9       Q  How do you know he moved correctly?
10      A  I'm sorry?
11      Q  How do you know that he described or placed
12  his knee correctly?
13      A  I know that he did it to the best of his
14  ability.
15      Q  How do you know he did it correctly?
16      A  Correctly as compared to what, sir?
17      Q  Empirically correctly; that is, the same.
18      A  There isn't 100 percent record of where his
19  knee is.
20      Q  Okay.
21         Tell me, how is it that you reconcile the
22  fact that you say Mr. Smith was combative throughout
23  his interactions with the officers, including during
24  the restraint process, with Callahan's five-day-old
25  recollection of it with Fors?  How do you reconcile

149

1  that?
2       A  Well, he says, "He seemed to calm down a
3  bit" --
4       Q  Yes.
5       A  -- "and was not resisting as hard."
6       Q  Yes.
7       A  So if he's not resisting as hard --
8       Q  Read the rest -- and then the next sentence.
9       A  "I believed that he was giving up at this
10  time and complying."
11      Q  "Giving up and complying."
12      A  Right.  So the two sentences are
13  inconsistent.
14      Q  Okay.  Or that -- or he became more compliant
15  as he went on, right?  That's -- I believed he was
16  giving up and complying is not being combative, is it?
17      A  That sentence?  No, sir.
18      Q  Okay.
19         And as we established, Callahan was there and
20  you weren't?
21      A  Yes, sir.
22      Q  And you didn't think that was important
23  enough to include in your report, that I was giving
24  up -- I believed that he was giving up and complying?
25      A  I believe I covered that on page 10 of my

38 (Pages 146 to 149)

Michael Berkow
2/25/2013

150

1  report.
2  Q  What language do you look at for that?
3  A  When they talk about fully positioning him.
4  So --
5  Q  Find -- all right. Where is this? Where
6  does it say --
7  A  It's -- go ahead. I'm sorry.
8  Q  Just tell me where you're looking at.
9  A  I'm just looking at the bottom of the first
10 paragraph. And then it continues throughout that page.
11 It's describing the incident.
12 Q  I know. But nowhere does it say Callahan
13 believed he was giving up and complying. It doesn't
14 say that.
15 A  You're asking me if I quoted from Callahan?
16 The answer is no, sir.
17 Q  Well, you don't even get the concept in here.
18 Find me language that you think gets that concept in
19 your report.
20 A  I think what he gets to is they got him
21 handcuffed and they've secured him, he's positioned on
22 him to prevent him from getting up or rolling. They
23 remained in position.
24 Q  Well, that they accomplished, right? He
25 didn't get up or roll.

151

1  A  No. That's right.
2  Q  Ever. Right?
3  A  Is that a comment or a question, sir?
4  Q  He never got up again, did he?
5  A  Well, they rolled him over, certainly.
6  Q  Yeah, okay.
7     Where do you say that -- at the point in time
8  that he was handcuffed, you say, "Mr. Smith was
9  facedown on the gym floor while Callahan was positioned
10 on top of his legs, both knees on the ground on either
11 side of his legs (Smith's legs), basically pinning them
12 and preventing Mr. Smith from getting up, kicking, or
13 rolling over."
14 A  Yes, sir.
15 Q  Then you say -- but you don't say that at
16 this point in time Mr. Smith, by Callahan's own
17 admission, was giving up and complying, do you?
18 A  I don't know if he was giving up and
19 complying.
20 Q  Well, you do if you listen -- if you read
21 Mr. Callahan's -- or Officer Callahan's statement,
22 right?
23 A  It's in conflict with the sentence before
24 that.
25 Q  Okay. Well, did you ask him about that when

152

1  you went to the YMCA gym on March 12th, 2012?
2  A  Not that I recall, sir, no.
3  Q  Okay. Never talked to Callahan at all about
4  that?
5  A  I don't believe so, no, sir.
6  Q  Okay.
7     Because if he's giving up, you don't have to
8  pin him to the ground, do you?
9  A  If someone had completely surrendered and had
10 given up, no, you don't.
11 Q  How do you completely surrender if you're
12 handcuffed in the prone position? What would you do to
13 completely surrender?
14 A  You'd stop struggling. This suggests that he
15 was still resisting. He's not resisting as hard.
16 Q  That was one sentence. And read the next one
17 again.
18 A  The two are -- I said the two sentences are
19 in conflict.
20 Q  Or they're chronologically correct, that he
21 went from not resisting as hard to giving up and
22 complying.
23 A  That would be one interpretation.
24 Q  Certainly one that -- that Officer Callahan
25 came to.

153

1  A  I don't know that.
2  Q  Okay.
3     Your opinion number three is an interesting
4  opinion to me. Page 16, you say, "During the officers'
5  efforts to gain control of Mr. Smith during his violent
6  resistance, the placing of Mr. Smith in a prone
7  position to facilitate handcuffing and control was
8  appropriate."
9     You say that, correct?
10 A  Yes, sir.
11 Q  After he was placed in the prone position for
12 the next four and a half minutes, do you find that
13 their activities were appropriate?
14 A  Their -- can you be a little more detailed
15 about your question, sir?
16 Q  You're talking about the efforts to gain
17 control and the placing, in opinion number three.
18 A  Yes, sir.
19 Q  And I'm talking about for the four and a half
20 minutes after he was done being placed --
21 A  Uh-huh.
22 Q  -- while they continued to put pressure on
23 him, such that the Hennepin County medical examiner
24 believes they committed a homicide by mechanically
25 asphyxiating him. Is it your view and opinion to a

39 (Pages 150 to 153)

Michael Berkow
2/25/2013

154

1  reasonable degree of professional certainty that
2  their -- their conduct was appropriate?
3      A   I think you're going to have to break that
4  down. You've thrown a whole bunch of things into that
5  question, sir.
6      Q   What don't you understand about it?
7      A   Well, you're adding things about the medical
8  examiner. So --
9      Q   Well, you know what the medical examiner
10  said. You don't disagree with him because you're not a
11  medical guy. You accept what the medical examiner
12  says, right?
13      A   So --
14      MR. OSBORNE: The medical examiner, though,
15  Bob, didn't say he committed a homicide.
16      MR. BENNETT: Yeah, he did.
17      MR. OSBORNE: He said the manner of --
18  it's -- it's the -- the cause of death or the manner of
19  death.
20      MR. BENNETT: Is a homicide. That's death
21  caused by another.
22      MR. OSBORNE: No. I think we just agree that
23  the medical examiner's report says what it says.
24  BY MR. BENNETT:
25      Q   All right. The medical examiner found that

155

1  the manner of death was a homicide, correct?
2      A   Yes, sir.
3      Q   And that the -- the -- it was -- in fact, he
4  says in the part you read, it was -- it was the
5  pressure from Gorman's knees or knees -- knee or knees
6  that caused the mechanical asphyxia. You read that,
7  right? Do you accept that?
8      A   We read a portion of his deposition, yes,
9  sir.
10      Q   Well, you didn't want to read both, both
11  days.
12      But what I'm getting at is after the
13  restraint, do you find -- after they're done getting
14  him in the prone restraint position with Gorman
15  positioned how he was positioned and Callahan
16  positioned as he was positioned, for the next four and
17  a half minutes after that, are you saying that their
18  activities were appropriate? Yes or no?
19      A   Their activities were reasonable, yes.
20      Q   Okay. Thanks.
21      How long did Gorman keep his knee or knees on
22  you?
23      A   It was several minutes, at least. I didn't
24  time it.
25      Q   How do you know? The answer is you don't

156

1  know, right?
2      A   No. The answer is I'm -- I'm testifying it
3  was several minutes, but I didn't put a watch on it.
4      Q   Well, did you make any effort to time it?
5      A   I was on the ground for a period of time
6  while he was kneeling on me.
7      Q   How long was Callahan on you?
8      A   Again, for some period of time.
9      Q   Do you know how long?
10      A   I did not time it.
11      Q   Now, if Officer Gorman knelt on your back and
12  Callahan wasn't there -- and you weren't handcuffed,
13  right?
14      A   No, sir, I was not handcuffed.
15      Q   You could have gotten up, right?
16      A   You mean I could have forced my way up --
17      Q   Yeah.
18      A   -- when he was on my back?
19      Q   Yeah.
20      A   I certainly could have struggled with him,
21  yes.
22      Q   Do you believe you could have gotten up?
23      A   I have no idea.
24      Q   Well, you could have easily gotten out of the
25  way of one knee, correct? You can't hold someone to

157

1  the ground with one knee, can you?
2      A   Well, I'm not a wrestler. Your colleague
3  would be a wrestler. But certainly I -- he had me
4  securely -- in a secure position. Could I have gotten
5  up? I believe I could have --
6      Q   Sure.
7      A   -- yes, sir.
8      I should say, could I have fought my way up?
9  Certainly, if that was the question.
10      Q   Uh-huh.
11      Now, you mention that Officer Callahan can be
12  heard to ask, "Is he breathing?" On page 19 of your
13  report. Last sentence.
14      A   Where is it? I'm sorry?
15      Q   Bottom.
16      A   On 19? I think we're looking at different
17  documents, sir.
18      Q   17. Excuse me. Pardon me.
19      A   Yes, sir.
20      Q   And Callahan testified that that was not a
21  serious question, correct?
22      A   I don't recall that, sir.
23      Q   Okay.
24      Gorman answers, you say, in the affirmative?
25      A   Yes, sir.

40 (Pages 154 to 157)

Michael Berkow
2/25/2013

158

1    Q   Do you know if Gorman -- and Gorman testified
2  he didn't do anything to check. You're aware of that?
3    A   I don't recall from his deposition
4  specifically what he said about this.
5    Q   In fact, we know as a matter of fact that
6  that's impossible, don't we?
7    A   No, sir.
8    Q   You don't think it was impossible that two
9  and a half minutes after he's done agonally breathing,
10 he could have been breathing?
11   A   I've already answered your question, sir.
12 I'm not familiar with agonal breathing. I don't know
13 when he -- he died, so I'm -- I can't tell you what, I
14 can't -- I certainly can't answer the question "it's
15 impossible."
16   Q   When you're agonally breathing, you
17 understand that all the medical people say you're very
18 close to death?
19   A   I don't understand that, no, sir.
20   Q   You don't? You didn't read those
21 depositions?
22   A   If I -- I don't recall seeing it in that
23 language, sir.
24   Q   Okay. All right.
25   A   I've seen it called a variety of different

159

1  kinds of breathing.
2    Q   Okay.
3    Again, you say, "The actions of" -- on page
4  18: "The actions of Gorman and Callahan were
5  reasonable in their efforts to gain control of Smith."
6    But you don't -- you don't ever specifically
7  say in this report that they were reasonable in their
8  efforts once they had gained control of Mr. Smith, do
9  you?
10   A   I don't believe I parse the incident in that
11 fashion, no, sir.
12   Q   Well, there's this pesky little four and a
13 half minutes after they gain control in which they
14 continue to put pressure on him, downward pressure,
15 mechanical pressure. You understand that, right?
16 Where they're both doing it?
17   A   I don't know what you mean by "mechanical
18 pressure." I'm aware of the fact that they're both --
19   Q   A downward force is mechanical force. You
20 understand that, don't you?
21   A   I'm not familiar with that terminology, no,
22 sir.
23   Q   Okay. So I'm pushing down on this piece of
24 paper with a pen. You don't understand that I'm
25 applying a mechanical force?

160

1    A   I understand that you're applying pressure.
2    Q   You understand --
3    A   I've not heard it -- I've not heard it
4  described as "mechanical force," sir.
5    Q   Well, I'm using a device.
6    A   Okay.
7    Q   I could use my fist, or I can use the pen.
8    A   Okay.
9    Q   Those would both be mechanical applications
10 of force, would they not?
11   A   I don't know. If you'd like me to use the
12 definition, that's fine.
13   Q   Well, I'd like you to use one that is common
14 sense and like you were taught in physics class in high
15 school. That's what I was taught, but maybe you didn't
16 take physics.
17   Can you point to me where in this document
18 you contained -- where in this document -- start over.
19   Can you tell me where in this document it is
20 contained any facts to support an opinion from you that
21 the officers properly monitored Smith's condition?
22   A   I think there's a number of discussion points
23 in here where they are asking him; Callahan is checking
24 on him; they continue to ask him questions throughout
25 this encounter.

161

1    Q   But we've established that asking dead or
2  unconscious people questions isn't going to do you very
3  much good, is it?
4    A   If you're asking dead or unconscious people,
5  no.
6    Q   Okay. Any other monitoring conduct other
7  than asking dead or unconscious people questions?
8    A   You're merging a couple of things, sir.
9    Q   Well, I mean --
10   A   So let's separate the question, please.
11   Q   Other than asking him questions, did they do
12 anything before they at 7:53 took his pulse?
13   A   Is that the first taking of the pulse or the
14 second, sir?
15   Q   The first, according to Callahan's testimony
16 and Case's (indicating document).
17   A   Yeah, I believe if you look at this, there's
18 a whole bunch of things where they're talking to him
19 prior to that, asking a bunch of questions, and there's
20 a period of time when both of them at different times
21 lean over closer towards his -- his face and head.
22   Q   You could see his eyes were open, his eyes --
23 they were unblinking on the videotape, couldn't you?
24   A   At a certain point in time, yes, sir.
25   Q   Okay.

41 (Pages 158 to 161)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

162

1    A   Yes, sir. I could see that they were open.
2  I don't know that I could see they were unblinking, but
3  I could see they were open.
4    Q   They were -- his eyelids were fixed, weren't
5  they?
6    A   I didn't see that, no, sir. I saw that his
7  eyes were open.
8    Q   Okay.
9    A   It's a side view that I -- I recall right
10  now.
11    Q   You read Dolan's deposition?
12    A   Chief Dolan? Yes, sir, I've read his
13  deposition.
14    Q   And he admits to applying a subjective
15  standard to determine discipline for Fourth Amendment
16  violations, correct?
17    A   I didn't understand it that way, no, sir.
18    Q   Well, he said he didn't believe the officers
19  meant to do anything wrong. That's a subjective
20  analysis, isn't it?
21    A   That would be, yes, sir.
22    Q   Okay. And that's why he didn't discipline
23  them?
24    A   No, I didn't see that, sir.
25    Q   Okay.

163

1          You say -- this -- you say that "Mr. Ryan
2  opines that Chief Dolan has introduced the subjective
3  use-of-force analysis into the Minneapolis Police
4  Department."
5          Do you quarrel with that?
6    A   Can you tell me where you are reading, sir?
7    Q   Page 21.
8    A   Yes, sir.
9    Q   And that's true, isn't it?
10    A   No, I didn't agree with it.
11    Q   Well, that's what he testified, that he would
12  have -- he didn't discipline them because he think --
13  thought that he didn't -- they didn't mean to do it.
14    A   I don't recall that as his testimony, sir.
15    Q   Then the next sentence says, "It's critical
16  to remember that the MPD submitted this case to the
17  grand jury for review."
18          Why is that critical to remember? It doesn't
19  have anything to do with discipline.
20    A   It's -- it's certainly indicative of a
21  thorough follow-through to this. There's an awful lot
22  of cases that are not submitted criminally and not
23  submitted to grand jury, in my experience.
24    Q   In fact, it's just wrong factually, isn't it?
25    A   I -- I -- I don't understand the question,

164

1  sir.
2    Q   Well, first of all, the police doesn't decide
3  to call grand juries. Right? Police departments don't
4  do that; that's not their -- within their purview.
5    A   If you're asking if a police department
6  impanels a grand jury --
7    Q   Yeah.
8    A   Not in my experience, no, sir.
9    Q   No. No.
10    A   Might be true somewhere in this country; I
11  don't know.
12    Q   But it isn't true here, as far as you know.
13  The police -- the Hennepin County Attorney's Office
14  decides whether to impanel a grand jury or not,
15  correct?
16    A   Impanel? I have no idea.
17    Q   To call a grand jury, to bring a -- any --
18  they decide what to bring in front of the grand jury?
19    A   I -- I don't know the practice here.
20    Q   Well, the practice is not for the MPD to
21  submit a case to the grand jury.
22          In fact, that didn't happen, did it?
23    A   I'm sorry?
24    Q   MPD doesn't --
25    A   The case was considered by the grand jury.

165

1    Q   You say -- I'm just -- you're the guy -- you
2  know, you're the language parser here. You say that
3  the -- "It is critical to remember that the MPD
4  submitted a case to the grand jury for review." That
5  is in fact false, is it -- isn't it?
6    A   Not to my knowledge, no, sir.
7    Q   Oh. Who -- tell me what document you rely on
8  to support that fact.
9    A   I don't recall specifically, but I've been
10  informed that this case was presented -- was presented
11  to the grand jury. So that's a -- that's a --
12    Q   I don't disagree with you. But by the
13  Hennepin County Attorney's Office, not by the MPD. The
14  MPD has nothing to do with --
15    A   Well, the MPD conducted that investigation,
16  prepared that investigation, and then handed that for
17  presentation to the grand jury.
18    Q   Well, they handed it to the county attorney
19  for a decision. Right?
20    A   They -- it went to the grand jury. It wasn't
21  the county attorney that unilateral --
22    Q   Well, I didn't write that the MPD submitted a
23  case to the grand jury. You did that, right?
24    A   That's right.
25    Q   You don't know if it's right or not, as you

42 (Pages 162 to 165)

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

166

1 sit here today?
2     **A  That is my understanding, that this case was**
3 **submitted to the grand jury by the police department.**
4     Q  By the police department?
5     **A  Correct.**
6     Q  Okay. All right. Thanks.
7     And when you say, "That is far from the chief
8 applying any view of his own to the process; he is
9 turning over the determination to an outside entity,"
10 he doesn't turn over his disciplinary proceedings to an
11 outside entity, does he?
12     **A  To the grand jury?**
13     Q  Yeah.
14     **A  No, sir.**
15     Q  So what are you trying to say there?
16     **A  What I'm saying is that he -- there is an**
17 **outside, independent review of the facts of this case.**
18     Q  No, you said he is turning over the
19 determination to an outside entity. What does that
20 mean?
21     **A  It means --**
22     Q  You're talking -- is "he" Dolan?
23     **A  To the best of my knowledge, yes.**
24     Q  How is he turning over the determination to
25 an outside entity?

167

1     **A  Submitting the case to the grand jury.**
2     Q  All right. So now it's not just the MPD,
3 it's Dolan submitted the case to grand jury; is that
4 right?
5     **A  Well, Dolan is the leader of the MPD.**
6     Q  Okay. Okay. All right.
7     How many times have you been named defendant
8 in a lawsuit before?
9     **A  I don't know exactly.**
10     Q  A lot?
11     **A  No. I wouldn't say that. Depends on how you**
12 **define "a lot."**
13     Q  In May of 2006 were you named as a defendant
14 in a case brought by Ms. Ya-May Christle?
15     **A  Yes.**
16     Q  She was an officer that was promoted several
17 times and eventually began working in Internal Affairs
18 for the LAPD in 2003?
19     **A  I don't know when she worked for the LAPD,**
20 **what year she started.**
21     Q  Okay. Forget the year. Was she promoted --
22 was -- she's an officer who you know to be promoted
23 several times and worked in Internal Affairs?
24     **A  I know her to have been promoted once. She**
25 **was a sergeant. I don't know about "several times."**

168

1     Q  She was -- eventually became the investigator
2 for the workplace investigation unit in 2005?
3     **A  One of a number. Wasn't -- she was not a**
4 **sole.**
5     Q  What is the WIU, workplace investigation
6 unit?
7     **A  It was a small unit created to look into**
8 **hostile workplace environment issues, retaliation**
9 **issues, other kinds of particular workplace complaints.**
10     Q  Did she -- well, let me ask you this: Were
11 you engaging in intimate relationships with any women
12 working at the LAPD during your time as deputy chief?
13     MR. OSBORNE: Objection; relevance.
14     MR. BENNETT: Depends on his answer.
15     **A  I'm actually not going to go through that**
16 **lawsuit again. I was dismissed from that lawsuit by --**
17 **at summary judgment. So if you'd like to go through**
18 **the details, I think you're probably going to have to**
19 **go a little further. But I was dismissed.**
20 BY MR. BENNETT:
21     Q  Just depends on -- you can -- that's fine.
22 I'm asking you just -- you can give me a yes or no
23 answer. Were you engaging in intimate relationships
24 with any women working at the LAPD during your time as
25 deputy chief? Yes or no?

169

1     **A  I guess I don't -- I would like to talk to my**
2 **lawyer about that for just a second, if you don't mind.**
3     MR. BENNETT: All right. We can break and
4 talk to your lawyer.
5     VIDEOGRAPHER: Off the video record at
6 12:34 p.m.
7     (Recess taken.)
8     VIDEOGRAPHER: We are back on the video
9 record. The time is 12:41 p.m.
10     MR. OSBORNE: Bob, I -- you know, I guess
11 I'll just take a standing objection to the relevance of
12 any of this, and --
13     MR. BENNETT: Well, it'll depend on how he
14 answers, if it becomes relevant. If he answers
15 truthfully, I guess it won't be irrelevant, it -- it
16 will be fine. You know, we can decide what, you know,
17 is relevant depending on the answers. That's -- that's
18 the trouble with this line of questioning.
19     MR. OSBORNE: All right.
20     Was there a question pending when we took a
21 break?
22 BY MR. BENNETT:
23     Q  I think it was, were you engaging in intimate
24 relationships with any women working at the LAPD during
25 your time as deputy chief?

43 (Pages 166 to 169)

Michael Berkow
2/25/2013

**170**

1    A  Yes.
2    Q  Did you violate any LAPD policies by engaging
3 in said relationships?
4    **A  I don't -- I don't exactly know, no, sir.**
5    Q  Did you violate any LAPD policies by not
6 reporting the relationships to your superior officer?
7    **A  That's the only question, whether or not**
8 **there would have been a violation there.**
9    Q  Were you disciplined for that?
10    **A  No, sir.**
11    Q  Did it have anything to do with your
12 departure from LAPD?
13    **A  Absolutely none.**
14    Q  What is the Bradbury Building?
15    **A  It's an office building in downtown Los**
16 **Angeles.**
17    Q  Is that where the LAPD's Professional
18 Standards Bureau worked?
19    **A  It's one of the buildings.**
20    Q  Is that the bureau -- was the bureau part of
21 your duty assignment as deputy chief?
22    **A  Yes, sir.**
23    Q  Did you maintain an office in that building
24 to sleep in?
25    **A  Not an office to sleep in, no, sir.  Just**

**171**

1 **a -- there was a sleep room.**
2    Q  The...
3    Do you know who Andrea Balter is?
4    **A  Yes, sir.**
5    Q  Did she sue you and the LAPD and the City of
6 Los Angeles?
7    **A  No.**
8    MR. BENNETT:  Oh, is that Christle?
9 BY MR. BENNETT:
10    Q  Who -- who -- when you say what lawsuit you
11 were dismissed in, was that Christle's lawsuit?
12    **A  Yes.**
13    Q  And that's the one you were -- you were
14 dismissed individually, but they paid over a million
15 dollars or got a jury verdict in excess of a million
16 dollars on the retaliation claim?
17    **A  There were a number of defendants.  I was**
18 **dismissed.  I don't -- I don't know what the exact**
19 **result was.**
20    Q  Was the gist of her lawsuit against you and
21 the City of Los Angeles that she was retaliated against
22 for reporting your misconduct related to -- relating to
23 a sexual relationship and the handling of computer
24 evidence in a criminal matter?
25    **A  No.  Not to my knowledge, no, sir.**

**172**

1    **There were multiple allegations in the**
2 **lawsuit, to the best of my recollection.**
3    Q  Have you ever discussed with other
4 individuals who hired you to do expert consulting
5 about -- other than Mr. Osborne -- about not putting
6 you on the stand as a result of that lawsuit or that
7 conduct?
8    **A  No, sir.**
9    **(Reporter's Note:  Sotto vocce communication**
10 **between Mr. Bennett and Mr. Storms.)**
11    MR. STORMS:  Can we go off the record for a
12 second?
13    MR. BENNETT:  Yeah, let's go off the record.
14    VIDEOGRAPHER:  Off the video record at
15 12:44 p.m.
16    (Off the record.)
17    VIDEOGRAPHER:  We are back on the video
18 record.  It is 12:51 p.m.
19 BY MR. BENNETT:
20    Q  Mr. Berkow, we just had the opportunity to
21 view a training video that was done at least in part by
22 the New York City medical examiner and the New York
23 City Police Department and has now been utilized for
24 training in the Minneapolis Police Department.  Did you
25 get a chance to look at the video?

**173**

1    **A  Yes, sir.**
2    Q  And have you received training from either
3 medical or law enforcement professionals similar to
4 that, expressed in that video?
5    **A  I don't recall receiving training.  Certainly**
6 **read articles that...**
7    Q  Were consistent with it?
8    **A  That discuss some of these same issues, yes,**
9 **sir.**
10    Q  Do you have any disagreement with the
11 training video provided by the New York City and the
12 Minneapolis Police Department?
13    **A  In a broad sense, no, sir.**
14    Q  Okay.  Are you aware of training of that type
15 being provided to the LAPD officers?
16    **A  Not that I recall, no, sir.  Not of that**
17 **specifically.**
18    Q  Okay.  Now, you saw them talking about
19 kneeling on the officer -- on the subject, correct?
20    **A  I heard a variety of things about being on**
21 **someone's back.**
22    Q  Including kneeling?
23    **A  Could have been.  I -- I didn't memorize the**
24 **video.**
25    Q  Did you see the video images of the person

Doby Professional Reporting, Inc.
952-943-1587

Michael Berkow
2/25/2013

174

1    kneeling with one knee on the back?
2        A   I saw a number of people on the back of an
3    individual, yes, sir. A swarm.
4        Q   One of them kneeling with one knee, right,
5    that you could see over the top of his neck? From
6    the -- approaching him from the neck/shoulder area down
7    to the mid-scapula?
8        A   I don't -- I may have. I don't -- I saw a
9    number of people on the backs of these individuals.
10       Q   Okay. And you also heard the -- the -- the
11   warning not to restrict the movement of the legs of the
12   individuals, correct?
13       A   Not to restrict the movement --
14       Q   Not to hold the legs down, not to tie them
15   up, not to hobble them. There were several examples
16   they gave about not restraining the legs as well.
17       A   Actually, I thought I heard something that
18   says tie -- tie the legs, but don't hobble them, I
19   thought I heard.
20       Q   No, I don't think that was there, but...
21       A   Well --
22       Q   I guess the -- it'll --
23       A   I've seen it once.
24       MR. STORMS: Should we make that video an
25   exhibit?

176

1        MR. BENNETT: Whoever speaks.
2        (The videotaped deposition of MICHAEL BERKOW
3    was concluded at 12:57 p.m.)
4        (Reporter's Note: Exhibit 6 was marked for
5    identification once transcription was completed.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

175

1        MR. BENNETT: Hmmm?
2        MR. STORMS: Should we make that video an
3    exhibit?
4        MR. BENNETT: Yeah, we probably ought to
5    make -- have we marked this -- that training video
6    anywhere?
7        MR. OSBORNE: No.
8        MR. BENNETT: Let's mark it. So that can be
9    Berkow 5.
10       (Exhibit 5 was marked for identification.)
11   I have no further questions.
12       MR. OSBORNE: We'll read and sign.
13       VIDEOGRAPHER: This concludes the video
14   deposition. The time is 12:54 p.m.
15       (Discussion held off the record.)
16       MR. BENNETT: The only part I want on the
17   record is the stipulation that Mr. Osborne and I have
18   agreed that you are going to do a transcript of the
19   Exhibit 5; we'll mark the transcript Exhibit 6. And
20   you can -- you don't need to take the -- the transcript
21   needs to be only of the good doctor and his explanation
22   of it. It's really the training part.
23       MR. OSBORNE: There was another -- there was
24   another gentleman's voice on there, too. Just
25   whoever --

177

1    STATE OF MINNESOTA.
                        CERTIFICATE
2    COUNTY OF HENNEPIN:
         I, Jane T. Doby, Registered Merit Reporter, a
3    Notary Public in and for the County of Hennepin,
     State of Minnesota, certify that the foregoing is
4    a true record of the testimony given by MICHAEL BERKOW,
     who was first duly sworn by me, having been taken on
5    February 25, 2013, at Gaskins Bennett Birrell Schupp,
     333 South Seventh Street, Suite 2900, Minneapolis,
6    Minnesota, in my presence and reduced to writing in
     accordance with my stenographic and computerized notes
7    made at said time and place;
8
         I further certify that I am not a
9    relative or employee or attorney or counsel of any
     of the parties or a relative or employee of such
10   attorney or counsel;
         That I am not financially interested in
11   the action and have no contract with the parties,
     attorneys or persons with an interest in the
12   action that affects or has a substantial tendency
     to affect my impartiality;
13       That the cost of the original has been
     charged to the party who noticed the deposition,
14   and that all parties who ordered copies have been
     charged at the same rate for such copies;
15
         That the witness DID request an opportunity to
16   review the transcript.
17       WITNESS MY HAND AND SEAL this 2nd day of
18   March, 2013.
19
20
21
22
23   Jane T. Doby
     Registered Merit Reporter
24   Notary Public
     Hennepin County, Minnesota
25

45 (Pages 174 to 177)

Michael Berkow
2/25/2013

178

```
 1    STATE OF MINNESOTA )
                         : SS CERTIFICATE
 2    COUNTY OF HENNEPIN )
 3         I, MICHAEL BERKOW, certify that I have read
 4    and examined the typewritten transcript of the
 5    deposition, taken of me in the matter of
 6    Larry E. Smith, as trustee for the Heirs and Next of
 7    Kin of David Cornelius Smith vs. TIMOTHY GORMAN, ET
 8    AL., on February 25, 2013, consisting of the preceding
 9    pages, and find the same to be true and correct.
10         (Except as follows):
11                              Reason
      Page Line  Correction        for Change
12
13    _____  _____  _____  _____
14    _____  _____  _____  _____
15    _____  _____  _____  _____
16    _____  _____  _____  _____
17    _____  _____  _____  _____
18    _____  _____  _____  _____
19    _____  _____  _____  _____
20    _____  _____  _____  _____
21    _____  _____  _____  _____
22    Dated this _____ day of _____
23
            MICHAEL BERKOW
24
25
```

179

```
 1           EXAMINATION INDEX
 2    By Mr. Bennett: 4-175
 3    _____
 4            OBJECTION INDEX
 5    By Mr. Osborne: 41, 51, 68, 70, 75, 154, 168, 169
 6    By Mr. Bennett: 82 (request to strike)
 7    _____
 8           BERKOW EXHIBIT INDEX
 9    Exhibit 1: Berkow report (12/17/2012)
      marked/identified/reviewed      3,4,27,34,40,47,84
10
      Exhibit 2: Attachment A, Rule 26(B) Disclosures
11    marked/identified/reviewed      3,4,22
12    Exhibit 3: Attachment B, educational background,
            training, operational experience and
13          qualifications
      marked/identified/reviewed      3,4,5,9
14
      Exhibit 4: Berkow report (3/15/2012)
15    marked/identified/reviewed      28
16    Exhibit 5: Compact disk labeled "MPD Prone Restraint
            Training Video"
17    marked/identified/reviewed      175
18    Exhibit 6: Transcript of "MPD Prone Restraint
            Training Video"
19    marked/identified/reviewed      175
20          INDEX OF PREVIOUSLY MARKED EXHIBITS
21    Exhibit 4: Cause of Death Hierarchy Report
      reviewed                        78
22
      Exhibit 30:
23    reviewed                        99,125
24    Exhibit 37: 9.15.2010 Statement of Officer Callahan
      reviewed                        41,47,52
25
```

46 (Pages 178 to 179)



Doby Professional Reporting, Inc.
952-943-1587